No. 22-1440

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

LONNIE BILLARD,

*Plaintiff-Appellee,*

v.

CHARLOTTE CATHOLIC HIGH SCHOOL,
MECKLENBURG AREA CATHOLIC SCHOOLS, AND
ROMAN CATHOLIC DIOCESE OF CHARLOTTE,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Western District of North Carolina, Charlotte Division
Case No. 3:17-cv-0011 – Judge Max O. Cogburn Jr.

## APPELLANTS' OPENING BRIEF

Joshua Daniel Davey, Esq.
Troutman Pepper Hamilton
  Sanders LLP
301 South College Street
34th Floor
Charlotte, NC 28202
(704) 916-1503
joshua.davey@troutman.com

Luke W. Goodrich
Nicholas R. Reaves
Laura E. Wolk
The Becket Fund for
  Religious Liberty
1919 Pennsylvania Ave. N.W.,
  Ste. 400
Washington, DC 20006
(202) 955-0095
lgoodrich@becketlaw.org

*Counsel for Defendants-Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

### DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No.  22-1440       Caption:  Billard v. Charlotte Catholic High School, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Charlotte Catholic High School
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?                              ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:


3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                          ☐YES ☑NO
    If yes, identify all such owners:


i

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____          Date: 5/9/2022 _____

Counsel for: __Appellants_____

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __22-1440__    Caption: __Billard v. Charlotte Catholic High School, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

Mecklenburg Area Catholic Schools
(name of party/amicus)

who is    __appellant__    , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____    Date: __5/9/2022_____

Counsel for: __Appellants_____

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. ___22-1440___      Caption: _Billard v. Charlotte Catholic High School, et al._____

Pursuant to FRAP 26.1 and Local Rule 26.1,

Roman Catholic Diocese of Charlotte_____
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?                    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

Signature:    _____        Date:    __5/9/2022_____

Counsel for:    __Appellants_____

Print to PDF for Filing

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ........................................................................ix

JURISDICTIONAL STATEMENT ........................................................... 1

STATEMENT OF ISSUES........................................................................ 1

INTRODUCTION ....................................................................................... 2

STATEMENT OF THE CASE .................................................................. 7

    A.   The Diocese of Charlotte and Its Catholic Schools................ 7

    B.   The Role of Diocesan Teachers ................................................ 8

    C.   Efforts to Uphold Catholic Teaching .................................... 11

    D.   Billard's Role at Charlotte Catholic...................................... 14

    E.   The End of Billard's Employment ........................................ 16

    F.   The Decision Below ................................................................. 18

SUMMARY OF THE ARGUMENT ......................................................... 20

STANDARD OF REVIEW........................................................................ 21

ARGUMENT ............................................................................................. 21

    I.   Billard's claim is barred by Title VII's religious
        exemption. ................................................................................. 21

        A.   Title VII allows religious organizations to hire
            individuals of a particular religious belief,
            observance, or practice........................................................ 22

        B.   The district court's contrary holding is mistaken. .............. 32

II.  Billard's claim is barred by the First Amendment. ...................37

    A.   Billard's claim is barred by church autonomy......................38

    B.   Billard's claim is barred by freedom of association..............46

    C.   Constitutional avoidance requires reversal.........................52

III. Billard's claim is barred by RFRA...............................................53

CONCLUSION ......................................................................................59

CERTIFICATE OF COMPLIANCE.......................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ayes v. U.S. Dep't of Veterans Affairs,*
    473 F.3d 104 (4th Cir. 2006)..............................................................22

*Bear Creek Bible Church & Braidwood Mgmt., Inc. v. EEOC,*
    571 F. Supp. 3d 571 (N.D. Tex. 2021)....................................26, 30, 52

*Bell v. Presbyterian Church (U.S.A.),*
    126 F.3d 328 (4th Cir. 1997)........................................................38, 41

*Bostock v. Clayton County,*
    140 S.Ct. 1731 (2020)............................................................... *passim*

*Bouldin v. Alexander,*
    82 U.S. (15 Wall.) 131 (1872)......................................................39

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000).................................................................. *passim*

*Boy Scouts v. Wyman,*
    335 F.3d 80 (2d Cir. 2003) ................................................................52

*Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.,*
    796 N.E.2d 286 (Ind. 2003) ...............................................................41

*Bryce v. Episcopal Church in the Diocese of Colo.,*
    289 F.3d 648 (10th Cir. 2002)..........................................5, 40, 41, 45

*Butler v. St. Stanislaus Kostka Catholic Acad.,*
    No. 19-cv-3574, 2022 WL 2305567
    (E.D.N.Y. June 27, 2022) ..................................................................41

*Carson v. Makin,*
    142 S.Ct. 1987 (2022)........................................................................42

*Chi. Area Council of Boy Scouts v. City of Chi.*
  *Comm'n on Hum. Rels.*,
  748 N.E.2d 759 (Ill. App. Ct. 2001) ...................................................... 52

*Christian Legal Society v. Walker*,
  453 F.3d 853 (7th Cir. 2006) ................................................ 47, 48, 49

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ............................................................................ 50

*Corp. of Presiding Bishop v. Amos*,
  483 U.S. 327 (1987) ................................................................ 6, 37, 40

*Curay-Cramer v. Ursuline Academy of Wilmington,*
  *Delaware, Inc.,*
  450 F.3d 130 (3d Cir. 2006) .................................................... 29, 30, 53

*EEOC v. Catholic Univ.*,
  83 F.3d 455 (D.C. Cir. 1996) .................................................. 44, 55, 56

*EEOC v. Fremont Christian Sch.*,
  781 F.2d 1362 (9th Cir. 1986) ........................................................ 34-35

*EEOC v. Miss. Coll.*,
  626 F.2d 477 (5th Cir. 1980) ...................................................... 30, 34

*EEOC v. Roman Catholic Diocese of Raleigh*,
  213 F.3d 795 (4th Cir. 2000) .............................................................. 38

*Fulton v. City of Philadelphia*,
  141 S.Ct. 1868 (2021) .................................................................... 4, 51

*Garrick v. Moody Bible Inst.*,
  412 F. Supp. 3d 859 (N.D. Ill. 2019) ............................................ 40, 41

*Gen. Conf. of Seventh-Day Adventists v. McGill*,
  617 F.3d 402 (6th Cir. 2010) ....................................................... 56, 57

*Hall v. Baptist Mem'l Health Care Corp.*,
  215 F.3d 618 (6th Cir. 2000) .............................................................. 24

*Hankins v. Lyght,*
441 F.3d 96 (2d Cir. 2006) ............................................54-58

*Hishon v. King & Spalding,*
467 U.S. 69 (1984) ...........................................................51, 52

*Holt v. Hobbs,*
574 U.S. 352 (2015) .........................................................54, 55

*Hosanna-Tabor Evangelical Lutheran Church
& Sch. v. EEOC,*
565 U.S. 171 (2012) ............................................... 39, 45, 48

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.,*
515 U.S. 557 (1995) ................................................... 47, 49

*Kedroff v. St. Nicholas Cathedral,*
344 U.S. 94 (1952) ...........................................................6, 38

*Kennedy v. St. Joseph's Ministries, Inc.,*
657 F.3d 189 (4th Cir. 2011) .................................... *passim*

*Kidwell v. Transp. Commc'ns Int'l Union,*
946 F.2d 283 (4th Cir. 1991) .............................................. 46

*Libertarian Party of Va. v. Judd,*
718 F.3d 308 (4th Cir. 2013) .............................................. 21

*Listecki v. Off. Comm. of Unsecured Creditors,*
780 F.3d 731 (7th Cir. 2015) .............................................. 56

*Little v. Wuerl,*
929 F.2d 944 (3d Cir. 1991) ........................................ 30, 53

*Maguire v. Marquette Univ.,*
627 F. Supp. 1499 (E.D. Wis. 1986) .................................. 30

*Masterpiece Cakeshop, Ltd. v. Colorado Civil
Rights Commission,*
138 S.Ct. 1719 (2018) ........................................................ 19

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)...................................................................54, 59

*NLRB v. Catholic Bishop of Chi.*,
440 U.S. 490 (1979).............................................................42, 43, 53

*Obergefell v. Hodges*,
576 U.S. 644 (2015)..............................................................7, 37, 50

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
140 S.Ct. 2049 (2020)................................................................ *passim*

*Our Lady's Inn v. City of St. Louis*,
349 F. Supp. 3d 805 (E.D. Mo. 2018)................................................52

*Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*,
819 F.2d 875 (9th Cir. 1987)......................................................39, 56

*Priests for Life v. HHS*,
7 F. Supp. 3d 88 (D.D.C. 2013)........................................................52

*R.G. & G.R. Funeral Homes v. EEOC*,
139 S.Ct. 1599 (2019)......................................................................59

*Rayburn v. General Conference of Seventh-Day Adventists*,
772 F.2d 1164 (4th Cir. 1985)...................................................... *passim*

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984)....................................................................46, 49

*Serbian E. Orthodox Diocese v. Milivojevich*,
426 U.S. 696 (1976).........................................................................38

*Sikorsky Aircraft Corp. v. United States*,
102 Fed. Cl. 38 (Fed. Cl. 2011)........................................................57

*Starkey v. Roman Catholic Archdiocese of Indianapolis*,
41 F.4th 931 (7th Cir. 2022) ...................................................26, 31, 35

*Starkey v. Roman Catholic Archdiocese of Indianapolis*,
496 F. Supp. 3d 1195 (S.D. Ind. 2020)..............................................35

*Tanzin v. Tanvir*,
    141 S.Ct. 486 (2020)..........................................................................55

*Wachovia Bank v. Schmidt*,
    388 F.3d 414 (4th Cir. 2004)............................................................28

*Yeshiva Univ. v. YU Pride All.*,
    No. 22A184, 2022 WL 4232541 (Sept. 14, 2022)...............................56

*In re Young*,
    82 F.3d 1407 (8th Cir. 1996)............................................................55

## Statutes

42 U.S.C. § 2000 .............................................................................. *passim*

42 U.S.C. § 12113 ............................................................................ *passim*

Pub. L. No. 88-352, § 702 ........................................................................23

## Religious Authorities

1983 Code of Canon Law............................................................7-8, 9, 44

Catechism of the Catholic Church .....................................................13, 14

Congregation for Catholic Education,
    *Instruction: The Identity of the Catholic School for a*
    *Culture of Dialogue* (Jan. 25, 2022).....................................................13

Congregation for Catholic Education,
    *The Catholic School* (1977) .................................................................2

Pope Paul VI, *Gravissimum Educationis* (1965) ......................................9

## Other Authorities

Richard Carlson, *The Small Firm Exemption and the Single*
    *Employer Doctrine in Employment Discrimination*,
    80 St. John's L. Rev. 1197 (2006) ......................................................51

Shruti Chaganti, *Why the Religious Freedom Restoration Act Provides a Defense in Suits by Private Plaintiffs*, 99 Va. L. Rev. 343 (2013) .................................................................. 58

Carl H. Esbeck, *Federal Contractors, Title VII, and LGBT Employment Discrimination: Can Religious Organizations Continue to Staff on a Religious Basis?*, 4 Oxford J.L. & Relig. 368 (2015) ...................................................... 24

Stephanie N. Phillips, *A Text-Based Interpretation of Title VII's Religious-Employer Exemption*, 20 Tex. Rev. L. & Pol. 295 (2016) ...................................................... 24

*Scandal*, Merriam-Webster.com Dictionary ........................................... 13

U.S. EEOC, Section 12: Religious Discrimination (Jan. 15, 2021) .................................................................................. 32

## JURISDICTIONAL STATEMENT

The district court entered final judgment on March 18, 2022. JA1430. The notice of appeal was timely filed on April 18, 2022. JA1432. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether Plaintiff's claim is barred by Title VII's religious exemption.

2. Whether Plaintiff's claim is barred by the First Amendment doctrines of religious autonomy or expressive association.

3. Whether Plaintiff's claim is barred by the Religious Freedom Restoration Act.

## INTRODUCTION

The question in this case is simple but significant: May religious schools require their teachers to support their core religious practices? The answer—supplied by federal statute, the Constitution, and binding precedent—is yes.

The Roman Catholic Diocese of Charlotte, as part of its religious mission, operates nineteen Catholic schools. Like Catholic schools around the country, these schools ask all teachers to uphold core Catholic teachings in word and deed. This requirement is rooted in Catholic theology, which calls on teachers to "reveal the Christian message not only by word but also by every gesture of their behaviour." Sacred Congregation for Catholic Education, *The Catholic School*, at ¶ 43 (1977). And this requirement is regularly communicated to teachers in employment contracts, faculty handbooks, a code of ethics, and recurring training sessions.

Plaintiff Lonnie Billard served as a drama teacher at a diocesan high school. In 2014, he publicly announced he was entering a same-sex union, which he knew contradicted Catholic teaching. He said he knew the Diocese "would not be delighted." And the Diocese, in fact, concluded his public rejection of Catholic teaching disqualified him from serving as a Catholic teacher and declined to continue his employment. Billard then sued under Title VII, claiming the Diocese's decision constituted sex discrimination.

2

Billard's claim, however, is barred by multiple statutory and constitutional protections for religious freedom.

***First***, it is barred by Title VII's religious exemption, which this Court has said protects the right of religious organizations "to employ only persons whose *beliefs and conduct* are consistent with the employer's religious precepts." *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 194 (4th Cir. 2011) (emphasis added). Specifically, Title VII provides that its prohibitions "shall not apply" to a religious organization "with respect to the employment of individuals of a particular religion," 42 U.S.C. § 2000e-1(a), and it defines "religion" to include not just religious "belief" but "all aspects of religious observance and practice," *id.* § 2000e(j). Thus, when a religious organization makes an employment decision based on an employee's religious "belief," "observance," or "practice"—as here— Title VII does not apply.

***Second***, beyond Title VII, Billard's claim is barred by multiple First Amendment protections. It is barred by the doctrine of church autonomy, which protects the freedom of churches to set religious qualifications for membership and employment, particularly in the context of church-run schools. It is barred by the doctrine of expressive association, which protects the freedom of expressive groups like religious schools to disassociate from teachers who would undermine their religious message. And it is barred by the doctrine of constitutional avoidance, which requires

courts to construe Title VII to avoid creating serious First Amendment issues.

***Third***, Billard's claim is barred by the Religious Freedom Restoration Act (RFRA), which "applies to all Federal law" and requires strict scrutiny of any federal law that "substantially burden[s]" religious exercise. 42 U.S.C. § 2000bb-1-3. Here, it is undisputed that imposing liability under Title VII substantially burdens the Diocese's religious exercise. And the application of Title VII here cannot satisfy strict scrutiny—particularly when Title VII categorically exempts small businesses constituting approximately 80% of all employers nationwide, and when the Supreme Court has repeatedly (and unanimously) held that the government's interest in eliminating sexual-orientation discrimination does not justify penalizing religious groups for adhering to their religious views on marriage. *E.g.*, *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021).

The district court's contrary ruling was mistaken on each issue.

***First***, the district court held that Title VII's religious exemption applies only when plaintiffs bring claims of "religious discrimination," not claims of "sex discrimination." JA1391. But this ignores the exemption's text, which applies to the entire "subchapter" of Title VII—not just the ban on religious discrimination. 42 U.S.C. § 2000e-1(a). It is also foreclosed by this Court's ruling in *Kennedy*, which expressly rejected the argument that the exemption is limited to one particular category of

"claims," and instead held that the exemption can apply to "all" claims that "arise from" Title VII. 657 F.3d at 193-94. And it is contrary to multiple circuits' precedents, which have applied the exemption to bar sex-discrimination claims like Billard's.

**Second**, the court rejected the Diocese's church autonomy defense on the ground that if churches could apply religious standards to non-ministers, "then there would be no need to have a ministerial exception." JA1396. But this fundamentally misunderstands both the ministerial exception and church autonomy. As the Supreme Court has explained, the "ministerial exception" is just one "component" of the broader "church autonomy" doctrine. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2060-61 (2020). And as other courts have held, the "broader church autonomy doctrine" includes the freedom to make "personnel decision[s] based on religious doctrine"—even for non-ministers. *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 658-60 & n.2 (10th Cir. 2002).

The district court also rejected the Diocese's expressive association defense on the ground that "[f]reedom of association does not apply in the employment context." JA1420. But this is incorrect. There is no "employment" exception to the right of expressive association. And multiple courts have held that freedom of association *does* apply to employment disputes.

5

**Finally**, the district court rejected the Diocese's RFRA defense on the ground that "RFRA only applies when the government is a party." JA1412. But this conflicts with RFRA's text, which says it applies to "all Federal law, and the implementation of that law, whether statutory or otherwise"—with no limit on who is a party. 42 U.S.C. § 2000bb-3(a). It also contradicts multiple circuits that have applied RFRA to suits between private parties like this one. And it stands in tension with the Supreme Court's recent statement in *Bostock v. Clayton County* calling RFRA a "super statute" that "might supersede Title VII's commands" in cases like this one. 140 S.Ct. 1731, 1754 (2020).

*              *              *

The decision below is not only wrong but also poses a serious threat to separation of church and state. Since our nation's founding, the Constitution has protected the freedom of religious organizations "to decide for themselves, free from state interference, matters of church government." *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952). This includes the freedom to decide "that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring). And this freedom extends to modern debates over sexual morality. As the Supreme Court said, "religious organizations" like the Diocese must be given "proper protection as

6

they seek to teach" and "to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned." *Obergefell v. Hodges*, 576 U.S. 644, 679-80 (2015).

Here, the Diocese seeks to ensure its schools faithfully teach the view of marriage the Catholic Church has taught for millennia. If separation of church and state means anything, it means the government cannot force the Church to employ teachers who publicly reject its message.

## STATEMENT OF THE CASE

### A. The Diocese of Charlotte and Its Catholic Schools

The Diocese of Charlotte is the embodiment of the Roman Catholic Church in 46 counties in western North Carolina. JA769. It consists of 73 parishes and 19 missions led by the Bishop of Charlotte, currently Bishop Peter Jugis. JA769. Its mission is to spread the Gospel of Jesus Christ. JA769, JA938.

Catholic schools are "absolutely essential" to accomplishing this mission. JA769. "The Catholic school forms part of the saving mission of the Church," because "the simultaneous development of man's psychological and moral consciousness is demanded by Christ almost as a pre-condition" for receiving the "divine gifts of truth and grace." JA769-70.

Accordingly, canon law requires Catholic bishops to "take care that [Catholic schools] are established." 1983 Code c.802, § 1. It urges lay Catholics "to foster Catholic schools … according to their means." 1983

7

Code c.800, § 2. And it encourages parents "to entrust their children to those schools which provide a Catholic education." 1983 Code c.798.

Consistent with this canonical mandate, the Diocese currently operates nineteen Catholic schools. JA768. Nine schools near Charlotte are organized into a school system called Mecklenburg Area Catholic Schools. JA768. All diocesan schools are charged with providing not just for students' educational needs, but for their spiritual needs, JA563, JA612, seeking "to graduate students who are faith-filled and possess a strong moral compass informed by Catholic teaching," JA770.

Religion permeates the daily life of these schools. For example, at Charlotte Catholic, where Plaintiff Billard taught, religion is infused throughout the curriculum; every day and every class begins with prayer; every classroom has a crucifix; and all students and teachers attend regular school-wide Masses. JA179, JA563, JA612-13, JA770-72, JA1048. These and many other religious observances reinforce the school's motto, "the soul of education is the education of the soul." JA771.

## B. The Role of Diocesan Teachers

Teachers play a crucial role in the Diocese's schools. JA771, JA580-82. As the Vatican has explained: "The extent to which the Christian message is transmitted through education depends to a very great extent on the teachers"—particularly on the "integration of faith and life in the person of the teacher." JA771. Thus, teachers must "reveal the Christian

message not only by word but also by every gesture of their behavior." JA771; *see also* Pope Paul VI, *Gravissimum Educationis* § 8 (1965), https://perma.cc/7EUG-646F ("[T]he Catholic school depends upon [teachers] almost entirely for the accomplishment of its goals and programs"; thus, teachers must "bear witness to Christ" "by their life as much as by their instruction."). This dynamic is embodied in the Church's canon law, which mandates that "teachers are to be outstanding in correct doctrine and integrity of life." 1983 Code c.803, § 2.

In keeping with canon law, and with the employment practices of Catholic dioceses across the country, the Diocese asks all teachers "regardless of their membership in the Catholic Church" to "serve as role models for students" in support of the Diocese's "Catholic educational mission." JA771. This means "teachers may not publicly engage in conduct … opposed to the fundamental moral tenets of the Roman Catholic faith, including those concerning marriage." JA771-72.

The Diocese communicates this expectation in many ways. JA772-73. It publishes a Code of Ethics for all diocesan employees, including full-time and substitute schoolteachers, which it posts on its website and provides to each teacher. JA613, JA624. The Code stresses that "[t]he public and private conduct of … lay employees … can be a source of inspiration and motivation, but it can also scandalize and undermine the faith of the

people that are served." JA624. It thus provides that teachers must "conduct themselves at all times in a manner that is consistent with the teachings and the precepts of the Roman Catholic Church." JA613, JA625.

The Diocese also maintains a Personnel Policies Handbook, which applies to all employees, including full-time and substitute schoolteachers. JA613, JA640, JA214-15. The Handbook states that employees "share in the mission … to spread the Gospel" and therefore must "respect, appreciate, and uphold the teachings, principles, legislation, policies and traditions of the Roman Catholic Church in both word and example." JA461, JA613-14, JA646. This Handbook is also available on the Diocese's website and provided to each teacher. JA614.

Diocesan schools also issue their own Faculty Handbooks that outline expectations for teachers. JA614, JA737. The Handbook for Charlotte Catholic, where Billard taught, incorporates the already-described Personnel Policies Handbook, JA759, and states that teachers must "model and integrate the teachings of Jesus in all areas of conduct," JA738.

Full-time teachers also sign an annual Teacher Employment Contract, which provides that each "[t]eacher, regardless of membership in the Catholic Church, must be consistent at all times, in example and expression, with the tenets and morals of the Catholic Faith." JA614, JA766.

Beyond the Code of Ethics, Personnel Policies Handbook, Faculty Handbooks, and Contracts, the Diocese also communicates its requirements to teachers via annual training sessions that all full-time teachers are expected to attend. JA615, JA772-73, JA807-08. Drawing on the Vatican documents discussed above, these sessions describe "the essential role that all teachers play in the religious mission of [diocesan] schools" and are intended to help teachers "build a culture of holiness and salvation within Diocesan schools." JA772-73. These training sessions quote the Personnel Policies Handbook, stating that all teachers "share in the mission … to spread the Gospel" and therefore must "uphold the teachings … of the Roman Catholic Church in both word and example." JA773, JA904, JA215.

## C. Efforts to Uphold Catholic Teaching

When the Diocese or a school becomes aware that an employee has departed from these expectations, it seeks to work with the employee to address the issue amicably and find a constructive solution. JA615.

Often this is done informally via conversation with the employee. For example, when a teacher at Charlotte Catholic said something erroneous about Church teaching in class, the chaplain saw her in the hallway, clarified the teaching, and gave her an opportunity to correct it in class. JA1094-95. Or when a parent told the chaplain that an assistant coach posted something inappropriate on Facebook, the chaplain "brought it to

the head coach's attention" and the assistant "was spoken to privately" and "asked to set a better example" and "take that post down," "which he did." JA1099-1100, JA1094-95. Other times, issues are addressed on the employee's own initiative, such as by speaking privately with a priest during confession. JA968-69.

Sometimes, a school administrator or diocesan official becomes involved. JA615, JA1100-03. For example, a school official might ask an employee to "stop certain behavior" or, in the case of remarriage after divorce, to "work within the Church's processes to correct the situation, such as by seeking an annulment." JA615. In all instances of correction, the hope is to find "a path to resolving the situation" that complies with Church teaching and allows employment to continue. JA615.

If the conduct is "not something that can be undone," or "if the employee refuses to stop engaging in the conduct or advocacy opposed to church teaching," then it may be necessary to end the employment relationship. JA615. As the Vatican recently instructed Catholic schools: "Teachers … have the obligation to recognise and respect the Catholic character of the school from the moment of their employment"; if a teacher "does not comply with the requirements of the Catholic school …, the school is responsible for taking the necessary steps," up to

and including "[d]ismissal." Congregation for Catholic Education, *Instruction: The Identity of the Catholic School for a Culture of Dialogue*, at ¶¶ 46-47 (Jan. 25, 2022), https://perma.cc/CU77-536R.

The Diocese has on several occasions had to release employees who engaged in conduct or advocacy contrary to Church teaching. For example, it had to release a physical education teacher "after it came to the attention of school administrators that he was engaged in an extramarital affair." JA617. And it had to release a teacher after she "made it clear that she intended to marry a Catholic man who had been divorced and did not have an annulment," which "would be a public act contrary to Church teaching." JA617.

The need for the Diocese to address violations of Church teaching stems in part from the Catholic doctrine of scandal. JA1273, JA1292, JA439, JA615. This is not "scandal" in the colloquial sense—*i.e.*, immoral conduct that harms someone's reputation. Cf. *Scandal*, Merriam-Webster.com Dictionary, https://perma.cc/42DE-N5A7. Rather, the Catholic Church defines scandal as "an attitude or behavior which leads another to do evil." Catechism of the Catholic Church § 2284. One form of scandal is when a person publicly engages in immoral activity and "there [is] no response from some person in authority"—which causes another person to "be led astray into thinking … that that activity was acceptable."

13

JA1307. The Church teaches that "[s]candal takes on a particular gravity" when it is given "by those who by nature or office are obliged to teach and educate others." Catechism § 2285. Thus, the doctrine of scandal has particular relevance to Catholic schools, where educators are charged with serving as role models for their students. *Supra* pp.8-11; JA55-56 ("We're trying to model behaviors we want all kids to have.").

### D.  Billard's Role at Charlotte Catholic

Plaintiff Lonnie Billard began working at Charlotte Catholic as a substitute teacher in early 2001. JA34. From fall 2001 to 2012, he was a full-time teacher, serving one year in the English department and the rest as a drama teacher. JA35. After retiring, Billard continued as a substitute teacher until 2014. JA36.

When he began teaching at Charlotte Catholic, Billard was married to his wife of over 20 years and had a son from this marriage. JA113-14, JA158-59. Throughout his full-time tenure, he signed annual employment contracts agreeing that his actions, "regardless of membership in the Catholic Church, must be consistent at all times in example and expression with the tenets and morals of the Catholic Faith." JA195, JA766. He received the Diocese's and school's handbooks outlining these expectations, as described above. JA200, JA205, JA214-15. And he attended trainings describing the role and expectation of teachers in the religious mission of the school. JA185-90, JA772-73.

14

As a full-time teacher, he was required to begin every class with prayer, which he did—either leading prayer himself or inviting students to pray for "family members or teen issues that they were concerned about … [and] wanted the support of the prayer group for." JA36, JA179-80. Sometimes he also gave students an "[i]nspirational talk" "about issues that they were facing" and "how to find strength in those situations" and "do the right thing." JA179-80. He followed this same approach to classroom prayer as a substitute. JA181.

While working at the school, he considered himself "a practicing Catholic." JA124. He attended faculty prayer services about twice a month. JA125. He was responsible for accompanying students to Mass, where he received Holy Communion with them—which under Church teaching only practicing Catholics may do. JA183-84. He was evaluated on whether he "[t]eaches secular subjects in a way agreeable with Catholic … though[t]," "[c]ontributes by example to an atmosphere of faith commitment," and "[s]upports & implements objectives of the school." JA1048-49, JA560. He generally received positive reviews, and when he retired in 2012, he received the award for teacher of the year. JA35-36.

In 2002, Billard divorced his wife and moved in with his romantic partner, Richard Donham. JA37, JA159, JA175-76. Throughout their relationship, Billard listed Donham as his "friend" or "housemate" on emergency contact forms. JA160, JA165, JA166, JA168-72, JA174. For the

15

first several years, he also listed Donham as living at a separate address, even though they lived together. JA160-61, JA165.

The parties dispute whether anyone in the school's administration knew Billard and Donham had a sexual relationship. JA326. (Both sides, however, agree this dispute is immaterial.) Billard testified that Donham attended various school events where they acted "like any other couple," though without physical displays of romantic affection. JA336-38, JA37. Billard also testified that then-principal Jerry Healy and Assistant Principal Steve Carpenter would have "assume[d]" he and Donham were in a relationship based on how they "behave[d] in public as a couple." JA334. However, Billard admitted he never told anyone in the administration he was in a sexual relationship with Donham. JA1376, JA332-33. And both Principal Telford (who replaced Healy) and Carpenter testified that they were not aware Billard was in a sexual relationship until he posted about it on Facebook, as described below. JA953, JA1003, JA1007.

### E.  The End of Billard's Employment

On October 25, 2014, two weeks after same-sex marriage was legalized in North Carolina, Billard published a Facebook post announcing his intent to marry Donham. The post said, "Yes, I'm finally going to make an honest (at least legal) man out of Rich. We will be married on May 2, 2015." JA554. The post thanked "all the courageous people" who "refused to back down and accept anything but 'equal.'" *Id.* And it concluded: "ps.

16

If you don't agree with this … keep it to yourself. You never asked my opinion about your personal life and I am not asking yours." *Id.* Billard was Facebook friends with "around 30" current employees of Charlotte Catholic, as well as many parents of current and former students. JA264, JA356.

After publishing his Facebook post on a Saturday, Billard "made a point" to meet with Assistant Principal Carpenter "as soon as I could get to him" the following Monday, so that Carpenter, who was not on Facebook, "would hear it directly from me rather than from a bunch of other people." JA265, JA268. He told Carpenter he did "not want to get in trouble," and he "knew that if the Diocese learned of the engagement, that there could be some negative ramifications." JA324 (Diocese "wouldn't be pleased"); JA266 (Diocese "would not be delighted"). Carpenter agreed "that's probably true" and noted that another diocesan employee had been dismissed for entering a same-sex union. JA366, JA324-25.

When the school's chaplain, Fr. Matthew Kauth, learned of Billard's announcement, he informed Principal Telford. JA1101-02. Telford agreed that the "posting goes against the tenets of the church, and you can't oppose the tenets of the church"; so he no longer had "discretion to have [Billard] continue as a substitute." JA954. That day, Telford confirmed his decision with the Superintendent of Catholic Schools and informed Assistant Principal Carpenter (who oversaw substitutes) that Billard

17

could no longer be called as a substitute. JA954, JA616, JA53-54. To make the transition as gentle as possible, Telford ensured Billard could finish his current assignment, which lasted a few more days until Christmas break. JA953-54, JA959, JA1101-02.

During Christmas break, Billard told his friend and fellow teacher, Joan Stretch, that he had not yet heard from Carpenter about substituting for her after the Christmas holiday. JA270. Stretch said she heard he wouldn't be called back as a substitute. JA271. Billard then spoke with Carpenter by phone, who confirmed that he would not be invited back as a substitute. JA272.

## F. The Decision Below

On May 21, 2015, Billard filed a discrimination charge with the EEOC. JA14. After receiving a right to sue letter, Billard filed this lawsuit on January 11, 2017. He alleged a single count of discrimination under Title VII, claiming the Diocese's failure to keep calling him as a substitute amounted to discrimination "on the basis of sex." JA18.

After discovery, the parties cross-moved for summary judgment. JA6. The Diocese argued that Billard's claim was barred by Title VII's religious exemption, which provides that Title VII "shall not apply" to a religious organization "with respect to the employment of individuals of a particular religion," and defines "religion" to include "all aspects of religious observance and practice." 42 U.S.C. §§ 2000e-1(a), 2000e(j);

18

JA1386, JA1332. The Diocese also argued that Billard's claim was barred by the First Amendment protections for church autonomy and expressive association, because imposing Title VII liability would penalize an internal church decision about the religious qualifications of a teacher, and because forcing the Diocese to employ a teacher who publicly rejects Catholic teaching would undermine its ability to communicate that teaching to its students. JA1348-51. Finally, the Diocese argued that Billard's claim was barred by RFRA, because imposing Title VII liability would substantially burden the Diocese's religious exercise and could not satisfy strict scrutiny. JA1342-44.

After a stay of litigation to await rulings in *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S.Ct. 1719 (2018), and *Bostock*, 140 S.Ct. 1731, the court granted Billard's motion for partial summary judgment, rejecting the Diocese's defenses. The court rejected the Title VII exemption defense, concluding that the exemption applies only to "suits for religious discrimination," not suits for "sex discrimination." JA1387-88. It rejected the church autonomy defense, stating that "the church autonomy doctrine is limited only to employees who perform spiritual functions that qualify for the ministerial exception." JA1396. It rejected the expressive association defense, holding that "[f]reedom of association does not apply" in "commercial contexts" (which is how it characterized a non-profit religious school). JA1419-20. And it rejected the

RFRA defense, concluding that "RFRA only applies when the government is a party." JA1412.

After the parties stipulated to damages, the court entered final judgment for Billard. JA1426, JA1430.

## SUMMARY OF THE ARGUMENT

Billard's claim is barred by multiple statutory and constitutional protections for religious freedom, each independently requiring reversal.

**I.** First, Billard's claim is barred by Title VII's religious exemption, which states that Title VII "shall not apply" to a religious organization "with respect to the employment of individuals of a particular religion," 42 U.S.C. § 2000e-1(a), and defines "religion" to include "all aspects of religious observance and practice," *Id*. § 2000e(j). Here, it is undisputed that the Diocese declined to continue Billard's employment because he publicly rejected the Church's "religious observance and practice" regarding marriage. Thus, the exemption protects the Diocese.

**II.** Second, Billard's claim is barred by several First Amendment doctrines: the doctrine of church autonomy, which protects a church's freedom to make internal decisions about religious qualifications for membership and employment; the freedom of expressive association, which protects a religious school's ability to disassociate from a teacher who publicly rejects its message; and the doctrine of constitutional avoidance,

20

which requires the Court to construe Title VII to avoid these constitutional problems.

**III.** Lastly, Billard's claim is barred by RFRA, which prohibits any application of federal law that would substantially burden religious exercise, unless the application satisfies strict scrutiny. Here, it is undisputed that applying Title VII to penalize the Diocese would substantially burden its religious exercise. And applying Title VII in this way cannot satisfy strict scrutiny.

## STANDARD OF REVIEW

This Court reviews grants of summary judgment de novo, "view[ing] the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013).

## ARGUMENT

## I. Billard's claim is barred by Title VII's religious exemption.

Title VII's religious exemption expressly permits religious organizations to make employment decisions based on an individual's religious "belief," "observance," or "practice." Here, it is undisputed that the Diocese stopped calling Billard as a substitute because he publicly rejected the Church's belief and practice on marriage. Thus, his claim is barred by Title VII. The district court's contrary holding—that the religious ex-

emption applies only when the plaintiff brings a claim of "religious discrimination," not "sex discrimination"—cannot be reconciled with Title VII's text, structure, or controlling precedent. JA1391.

### A. Title VII allows religious organizations to hire individuals of a particular religious belief, observance, or practice.

Title VII contains two exemptions relevant here. The first, applicable to all religious corporations, provides:

> This subchapter shall not apply to … a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion.

42 U.S.C. § 2000e-1(a). The second exemption, which is specific to religious "educational institutions," similarly provides that, "[n]otwithstanding any other provision of this subchapter, … it shall not be an unlawful employment practice" for such institutions "to hire and employ employees of a particular religion." *Id.* § 2000e-2(e). Defendants are both "religious corporation[s]" and an "educational institution," so both exemptions apply. But given that both exemptions employ the functionally identical language of "individuals of a particular religion," and for simplicity's sake, this brief focuses on the first. That exemption's text, structure, and precedent all demonstrate that Billard's claim is barred.

***Text.*** When interpreting a statute, this Court starts with "the plain meaning." *Ayes v. U.S. Dep't of Veterans Affairs*, 473 F.3d 104, 108 (4th Cir. 2006). If "the words of a statute are unambiguous," then "judicial

inquiry is complete." *Id.*; *cf. Bostock*, 140 S.Ct. at 1738-39. Here the plain meaning unambiguously bars Billard's claim.

First, the exemption broadly states that "[t]his subchapter shall not apply" to the exempted conduct. 42 U.S.C. § 2000e-1(a); *cf. id.* § 2000e-2 ("Notwithstanding any other provision of this subchapter …."). The "subchapter" referenced is "the entire 'subchapter' of Title VII." *Kennedy*, 657 F.3d at 194; *see also* Civil Rights Act of 1964, Pub. L. No. 88-352, § 702, 78 Stat. 241, 255 ("This title shall not apply …."). As this Court has explained, this means the religious exemption is not limited to one particular category of "claims"—like claims for "discriminatory discharge." *Kennedy*, 657 F.3d at 193. Rather, it applies to "all" claims that "arise from" Title VII—including claims for "harassment" or "retaliation." *Id.* at 194. Here, that means the exemption is not limited to one category of "claims" for "religious discrimination," but applies to other claims of discrimination too—as long as the religious organization is engaged in the exempted conduct.

What is the exempted conduct? The text makes that clear: It is the "employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a). And what does it mean to employ "individuals of a particular *religion*"? The text makes that clear, too, defining religion to include "*all aspects* of religious *observance and practice*, as well as belief." *Id.* § 2000e(j)

(emphases added). In other words, the exemption applies when a religious employer makes an employment decision based on an individual's particular religious "belief," "observance," or "practice"—regardless of how the individual styles his claim. Thus, as this Court said in *Kennedy*, the exemption "include[s] the decision to terminate an employee whose *conduct or religious beliefs* are inconsistent with those of its employer." 657 F.3d at 192 (emphasis added) (quoting *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 624 (6th Cir. 2000)). That is just what the Diocese has done here.

This does not, as the district court suggested, mean religious employers "completely bypass Title VII liability" for all claims of discrimination. JA1393. Rather, it means religious employers are exempt *only if* they made an employment decision based on an individual's particular religious belief, observance, or practice; otherwise, they remain subject to all types of Title VII claims. *See* Stephanie N. Phillips, *A Text-Based Interpretation of Title VII's Religious-Employer Exemption*, 20 Tex. Rev. L. & Pol. 295 (2016) (offering the same textual analysis); Carl H. Esbeck, *Federal Contractors, Title VII, and LGBT Employment Discrimination: Can Religious Organizations Continue to Staff on a Religious Basis?*, 4 Oxford J.L. & Relig. 368, 376 (2015), https://perma.cc/D94R-R5MF (same).

***Structure.*** This straightforward reading of the text also follows from the exemption's structure. The structure is simple: "[law X] shall not apply to [religious employers] with respect to [conduct Y]." 42 U.S.C. § 2000e-1(a). The *law* that shall not apply is "[t]his subchapter"—*i.e.*, *all* of Title VII, not just the ban on religious discrimination. *Id.* And the *conduct* exempted is the "employment of individuals of a particular" "belief," "observance," or "practice." *Id.*; 42 U.S.C. § 2000e(j). So when a religious employer engages in the relevant conduct—making employment decisions based on an individual's religious "belief," "observance," or "practice"—Title VII doesn't apply.

If Congress had wanted to limit the religious exemption to only *religious discrimination claims*—as the district court held—it easily could have done so. It could have said, "This subchapter's *prohibition on religious discrimination* shall not apply…." Or it could have said, "This subchapter shall not apply to *claims of religious discrimination* against…." But it didn't, and that decision is controlling here. *See Kennedy*, 657 F.3d at 194 ("if Congress had wished to limit the religious organization exemption to [certain] decisions, it could clearly have done so," but "it painted with a broader brush").[1]

---

[1]    The religious-school exemption in Section 2000e-2 follows the same structure. It exempts specific conduct "[n]otwithstanding *any other pro-*

This structural point is further underscored by the *other half* of Section 2000e-1(a): the "alien" exemption. Section 2000e-1(a), in fact, includes *two* exemptions introduced with the same language: "This subchapter shall not apply to *an employer with respect to the employment of aliens outside any State*, or to a religious [employer] with respect to the employment of individuals of a particular religion …." (emphasis added). If the religious exemption were limited to only certain types of claims (*i.e.*, religious discrimination), one would expect the alien exemption to have a similar limitation (to only claims of race or national-origin discrimination). But courts have imposed no such limitation on the alien exemption. Rather, "[t]hat language has been understood to mean what it says: none of Title VII's substantive rules applies to aliens covered by § 702(a)." *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 947 (7th Cir. 2022) (Easterbrook, J., concurring) (citing cases). Thus, the two exemptions "must be read equally broadly." *Bear Creek Bible Church & Braidwood Mgmt., Inc. v. EEOC*, 571 F. Supp. 3d 571, 591 (N.D. Tex. 2021).

---

*vision* of this subchapter"—including the provisions barring sex discrimination; it says the relevant conduct "shall not be an unlawful employment practice" on *any* ground; and it defines the relevant conduct as "to hire and employ employees of a particular religion." 42 U.S.C. § 2000e-2 (emphasis added).

26

Finally, this understanding of the religious exemption is confirmed by the use of identical language in a parallel exemption in another statute: the Americans with Disabilities Act (ADA). The ADA's religious exemption provides: "*This subchapter* shall not prohibit a religious corporation, association, educational institution, or society from giving preference in employment to *individuals of a particular religion.*" 42 U.S.C. § 12113(d)(1) (emphasis added). If the district court were right—that an exemption for employing "individuals of a particular religion" protects only against claims of *religious* discrimination—then the ADA's religious exemption would be entirely superfluous, because the ADA doesn't prohibit religious discrimination; it prohibits only *disability* discrimination. *Id.* § 12112(a).

Therefore, the only way to give the ADA's religious exemption any meaning is to construe it to allow religious employers to make employment decisions based on an employee's religion—even when the employee brings a claim of disability discrimination. And if there were any doubt about whether "religion" includes both belief and conduct, the ADA further clarifies that religious organizations "may require that all applicants and employees *conform to the religious tenets* of such organization," *id.* § 12113(d)(2) (emphasis added)—just as Title VII clarifies that "religion" includes "all aspects of religious observance and practice," *id.* § 2000e(j). If this is what an exemption for employing "individuals of a particular

27

religion" means under the ADA, the same is true under the identical language of Title VII. *See Wachovia Bank v. Schmidt*, 388 F.3d 414, 422 (4th Cir. 2004) ("Statutes that are *in pari materia* or relating to the same subject matter are to be interpreted in light of, and consistently with, one another," "especially … when the two statutes adopt a single consistent vocabulary in reference to the same subject matter."), *rev'd on other grounds*, 546 U.S. 303 (2006).

**Precedent.** Not surprisingly, this is exactly how courts have interpreted Title VII's religious exemption—starting with this Court in *Kennedy*. There, the plaintiff sued her Catholic employer under Title VII for refusing to accommodate her religious clothing, asserting three claims of religious discrimination—discriminatory discharge, harassment, and retaliation. 657 F.3d at 190-91. The district court held that the claim for discriminatory discharge was barred by Title VII's religious exemption, but the claims for harassment and retaliation could proceed. *Id.* at 191.

This Court, however, held that *all* the claims were barred under the exemption's "plain language." *Id.* at 191 n.6. As this Court explained, the exemption by its terms applies to "the entire 'subchapter' of Title VII"—which "includes both § 2000e-2(a)(1), which covers harassment and discriminatory discharge claims, and § 2000e-3(a), which covers retaliation claims." *Id.* at 193-94. So the exemption barred "all" of plaintiff's claims. *Id*. The Court also emphasized that "[t]his conclusion conforms with the

28

purpose behind the exemption," which is "to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices." *Id.* at 194. Thus, "permission to employ persons 'of a particular religion' includes permission to employ only persons whose *beliefs and conduct* are consistent with the employer's religious precepts." *Id.* (emphasis added).

That is precisely the Diocese's position here. If the exemption applies to the entire "subchapter" of Title VII with no silent carve-out for retaliation and harassment claims, it likewise applies to all of Title VII with no silent carve-out for sex-discrimination claims. And if the exemption "includes permission to employ only persons whose *beliefs and conduct* are consistent with the employer's religious precepts," it likewise includes permission for the Diocese to employ only persons whose beliefs and conduct are consistent with its religious beliefs on marriage—which is just what it has done here. *Kennedy*, 657 F.3d at 194 (emphasis added).

Other courts have interpreted the religious exemption the same way—including to bar sex-discrimination claims like Billard's. The Third Circuit's decision in *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.* is illustrative. There, a Catholic school dismissed a teacher for engaging in pro-choice advocacy in violation of Catholic teaching. 450 F.3d 130, 132 (3d Cir. 2006). The teacher sued under Title VII for sex

discrimination, alleging the school treated her worse than similarly situated male teachers. *Id.* But the Third Circuit rejected her sex-discrimination claim under the religious exemption, explaining that "Congress intended the explicit exemptions of Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices." *Id.* at 141 (quoting *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991)). Because the school had "offer[ed] a religious justification" for its decision—the teacher's rejection of Catholic teaching on abortion—her claim was barred, even though she complained of sex (rather than religious) discrimination. *Id.* at 141-42.

Other courts have reached similar results. *See, e.g.*:

- *EEOC v. Miss. Coll.*, 626 F.2d 477, 485-86 (5th Cir. 1980) (religious exemption bars sex-discrimination investigation where college "applied its policy of preferring Baptists over non-Baptists");

- *Bear Creek*, 571 F. Supp. 3d at 591 ("The plain text of [the religious] exemption" bars sex-discrimination claims "when [a religious employer] refuses to employ an individual because of sexual orientation or gender expression, based on religious observance, practice, or belief");

- *Maguire v. Marquette Univ.*, 627 F. Supp. 1499, 1502-04 (E.D. Wis. 1986) (religious exemption barred sex-discrimination claim where Catholic university declined to hire professor based on her "views on abortion"), *aff'd in part, vacated in part on other grounds*, 814 F.2d 1213 (7th Cir. 1987).

Most recently, the Seventh Circuit considered the same issue in *Starkey*. There, the plaintiff was a guidance counselor at a Catholic high school who was dismissed for entering a same-sex union; like Billard, she sued for sex discrimination. Although the Court held her claims were barred by the First Amendment's ministerial exception, Judge Easterbrook explained that her claims were *also* barred by "[a] straightforward reading" of Title VII's religious exemption. 41 F.4th at 946-47 (concurring). The exemption, by its plain text, applies to "all of Title VII" and defines religion to include "all aspects of religious observance and practice, as well as belief." *Id.* Accordingly, it "permits a religious employer to require the staff to abide by religious rules." *Id.*

The Supreme Court's recent statements in *Bostock* likewise support this interpretation. In holding that Title VII's ban on sex discrimination includes claims of sexual-orientation and gender-identity discrimination, the Court stated that it remains "deeply concerned with preserving the promise of the free exercise of religion." 140 S.Ct. at 1754. To that end, the Court highlighted several "doctrines protecting religious liberty" that may be available in "future cases" asserting sex discrimination—including Title VII's "express statutory exception for religious organizations." *Id.* (citing 42 U.S.C. § 2000e-1(a)). It would make no sense to highlight Title VII's religious exemption in a sex-discrimination case unless the exemption could bar sex-discrimination claims.

31

Finally, based on these cases, the EEOC has promulgated guidance agreeing that the religious exemption applies in precisely this way. *See* U.S. EEOC, Section 12: Religious Discrimination (Jan. 15, 2021), https://perma.cc/FE9Z-W36B. In that guidance, the EEOC notes that "the exemption allows religious organizations to prefer to employ individuals who share their religion, defined not by the self-identified religious affiliation of the employee, but broadly by the employer's religious observances, practices, and beliefs." *Id.* And it uses the facts of *Curay-Cramer* as an illustrative example, stating that Title VII's religious organization exemption "bars adjudication of the sex discrimination claim" in such a case because it "preserves the religious school's ability to maintain a community composed of individuals faithful to its doctrinal practices." *Id.* Thus, the EEOC's guidance confirms this straightforward reading of the exemption's text.

## B. The district court's contrary holding is mistaken.

The district court rejected this reading of the text. It held instead that the exemption applies only to "suits for religious discrimination," while "allow[ing] a plaintiff to bring claims of other forms of Title VII discrimination." JA1387, JA1391. And since Billard brought a claim of sex discrimination, "Defendants do not qualify for [the exemption's] protection." JA1392.

Remarkably, the district court did not attempt to ground its ruling in the exemption's text or structure. The court did not mention the exemption's key introductory phrase—"This subchapter shall not apply"—which this Court analyzed in *Kennedy*. *Cf.* JA1386-93. The court did not discuss the statute's broad definition of religion. *Cf. id.* And the court did not acknowledge the existence of the parallel alien exemption in the same sentence of the statute, the parallel exemption in the ADA, or the many cases interpreting the exemption according to its text. *Cf. id.*

The district court initially sought support for its ruling in this Court's decisions in *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985), and *Kennedy*. JA1388. But neither case supports the district court. In fact, both held that Title VII claims were *barred* by the religious exemption or the First Amendment. And both support the Diocese.

In *Rayburn*, a white female Seventh-day Adventist sued under Title VII for race and sex discrimination after she was denied a position as a pastor. 772 F.2d at 1165. The church did not argue that it rejected Rayburn based on her religious beliefs or practices; and this Court expressly declined to consider "whether the reason for Rayburn's rejection had some explicit grounding in theological belief." *Id.* at 1169. Instead, the Court held her claims were barred by the First Amendment's ministerial exception regardless of "the reasons for [her] rejection." *Id.*

In passing, the Court said Title VII's religious exemption does not "exclude[] religious employers from coverage altogether"—a position with which the Diocese agrees. *Id*. at 1167 (quoting legislative history). And although the Court did not address the narrower question presented here—whether the exemption protects employment decisions based on an individual's religious belief, observance, or practice—it did say the exemption "makes clear that religious institutions may base relevant hiring decisions upon religious preferences." *Id*. at 1166. And it favorably cited *EEOC v. Mississippi College*, which held the religious exemption barred claims of sex discrimination where the employment decision was based on a religious preference. *Id*. (citing *Miss. Coll.,* 626 F.2d at 484). So, if anything, *Rayburn* supports the Diocese.

The same is true of *Kennedy*, which expressly rested its holding on the religious exemption. As noted above, this Court rejected the plaintiff's argument that the religious exemption was limited to one particular category of claims, instead holding that the exemption grants "permission to employ only persons whose *beliefs and conduct* are consistent with the employer's religious precepts"—which is exactly what the Diocese argues here. 657 F.3d at 194 (emphasis added).

Unable to ground its decision in this Circuit's precedent, the district court looked for out-of-circuit cases. First, it cited the Ninth Circuit's opinion in *EEOC v. Fremont Christian School*, 781 F.2d 1362 (9th Cir.

1986), which declined to apply the religious exemption to a claim of sex discrimination. But the Ninth Circuit, like the district court here, failed to address the basic elements of the exemption's text—including the "subchapter" clause, the definition of religion, or the alien exemption. *Id.* at 1366. And in any event, the facts of *Fremont* didn't fit within the religious exemption anyways, because the challenged employment practice there—denying health insurance to unmarried female employees—wasn't based on the *employee's* particular religious belief, observance, or practice.

Alternatively, the court below relied on the district court's opinion in *Starkey*, which offered a self-consciously "narrow" interpretation of the religious exemption. *Starkey v. Roman Catholic Archdiocese of Indianapolis*, 496 F. Supp. 3d 1195, 1202 (S.D. Ind. 2020); JA1389, JA1391-93. But the Seventh Circuit declined to adopt that interpretation. Indeed, Judge Easterbrook expressly rejected it in favor of the "straightforward reading" of the exemption that "permits a religious employer to require the staff to abide by religious rules." *Starkey*, 41 F.4th at 946 (concurring).

Lacking textual or precedential support, the district court offered a policy argument—worrying that applying the exemption's text "could lead to legal outcomes that completely erase Title VII's protections for protected groups working for religious institutions." JA1392. But that misunderstands both the text and the Diocese's position. *See supra* p.24.

35

The Diocese has never argued that religious employers enjoy a blanket exemption from all Title VII claims; rather, the text provides that religious employers are exempt *only when* their employment decision is based on an individual's particular religious belief, observance, or practice (regardless of what type of discrimination is alleged). But they remain subject to all types of Title VII claims when their employment decision is not.

In any event, *Bostock* expressly rejected the district court's policy-oriented approach to interpreting Title VII. Although the employers there worried that allowing claims of sexual-orientation and gender-identity discrimination would violate Congress's expectations in passing Title VII and have far-reaching consequences, 140 S.Ct. at 1749-54, the Court rejected such "policy appeals" as "the last line of defense for all failing statutory interpretation arguments." *Id.* at 1753. "When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest"—"the written word" prevails. *Id.* at 1737. So too here. Congress has plainly spoken—protecting the freedom of religious employers to make decisions based on an employee's religious belief or practice. *See Kennedy*, 657 F.3d at 194.

Moreover, to the extent policy concerns are relevant, they favor the Diocese. For decades, religious organizations have relied on the widely understood promise that they are free to choose employees who share

their religious beliefs and practices. This is, as the Supreme Court has long held, central to "the ability of religious organizations to define and carry out their religious missions." *Amos*, 483 U.S. at 339. Thousands of religious organizations across the country have employment practices just like the Diocese, asking employees to support their religious beliefs, including their belief in traditional marriage—which was almost universally held until very recently. Rejecting Title VII's plain language would unleash a wave of lawsuits against these organizations, generating widespread constitutional conflicts. It is also directly contrary to what the Supreme Court said in *Obergefell v. Hodges*—that religious organizations like the Diocese, which believe "same-sex marriage should not be condoned," must receive "proper protection as they seek to teach" and "to advocate with utmost, sincere conviction" this belief that is "so central to their lives and faiths." 576 U.S. 644, 679-80 (2015).

Unleashing widespread conflict is not required by Title VII. Just the opposite. Title VII expressly protects the Diocese's ability to employ individuals who share its religious beliefs, observances, and practices—which is just what the Diocese has done here.

## II. Billard's claim is barred by the First Amendment.

Even aside from Title VII, Billard's claim is barred by overlapping protections of the First Amendment. First, the church autonomy doctrine

37

protects a church's freedom to make decisions about internal church governance, such as establishing religious qualifications for teachers in religious schools. Second, the freedom of expressive association protects a church's ability to disaffiliate with those who publicly advocate against its message, especially in the context of religious education. And third, the doctrine of constitutional avoidance requires the Court to interpret Title VII to avoid these serious constitutional issues.

### A. Billard's claim is barred by church autonomy.

The church autonomy doctrine protects the freedom of churches "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff*, 344 U.S. at 116; *Our Lady*, 140 S.Ct. at 2061 (cleaned up). As this Court has explained, "courts must defer to the decisions of religious organizations 'on matters of discipline, faith, internal organization, or ecclesiastical rule, custom or law.'" *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 330-31 (4th Cir. 1997); *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 800-01 (4th Cir. 2000) (recognizing "the independence of the spiritual lives of religious bodies in accordance with the dictates of the First Amendment"). This deference protects both church and state: It protects churches' ability to conduct their internal affairs, while protecting the state from becoming "entangled in essentially religious controversies." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709 (1976).

One "component" of church autonomy is the ministerial exception, which bars employment claims brought by employees who perform important religious duties. *Our Lady*, 140 S.Ct. at 2060. Because such employees play an important "role in conveying the Church's message and carrying out its mission," the ministerial exception bars their claims even when a religious organization offers no "religious reason" for its hiring decision. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 192, 194 (2012).

But as *Our Lady* explained, "the general principle of church autonomy" is not limited to the ministerial exception. 140 S.Ct. at 2061. It also applies to "matters of internal government," *id.*, such as religious decisions about who is qualified for church membership or employment. For example, the Supreme Court has long held that courts cannot entertain lawsuits challenging church discipline or excommunication: Civil courts "have no power to revise or question ordinary acts of church discipline, or of excision from membership." *Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 139 (1872); *see also, e.g.*, *Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 883 (9th Cir. 1987) ("The members of the Church … have concluded that they no longer want to associate with her. … [T]hey are free to make that choice.").

And what is true of members is even more true of employees, who represent the church publicly and carry out its work. Determining that "only

those committed to [the church's] mission should conduct" its activities is a "means by which a religious community defines itself." *Amos*, 483 U.S. at 342 (Brennan, J., concurring). Thus, "[w]hen a church makes a personnel decision based on religious doctrine," even if the employee is not a minister, the "broader church autonomy doctrine" applies. *Bryce*, 289 F.3d at 656-58 & n.2, 660.

*Bryce* is illustrative. There, a church employee sued under Title VII, alleging that church officials' statements opposing homosexuality and her same-sex union constituted sex discrimination. *Id.* at 651-53. The Tenth Circuit declined to decide whether the plaintiff was a "minister" for ministerial-exception purposes. *Id.* at 658 n.2. Instead, it held that the "broader church autonomy doctrine" "extends beyond the specific ministerial exception" to include "personnel decision[s]" "'rooted in religious belief.'" *Id.* at 656-58 & n.2. Because the plaintiff challenged "a personnel decision based on religious doctrine," her suit was barred. *Id.* at 660.

Other courts have likewise applied church autonomy to bar employment claims even when the plaintiff was not a minister. *See, e.g., Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859, 871-73 (N.D. Ill. 2019) (citing *Bryce*, applying "overarching principle of religious autonomy" to dismiss challenge to doctrinally-rooted employment decision, regardless of

40

whether plaintiff was a minister); *Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.*, 796 N.E.2d 286, 293-94, 296 (Ind. 2003) (applying "church autonomy" as described by "[t]he *Bryce* court" to bar tortious-interference claim against archdiocese, though plaintiff lacked "ministerial-type duties"); *Butler v. St. Stanislaus Kostka Catholic Acad.*, No. 19-cv-3574, 2022 WL 2305567, at *11 (E.D.N.Y. June 27, 2022) (applying the "broader" "church autonomy principle" to bar Title VII sexual-orientation discrimination claim, "[e]ven if [plaintiff] did not qualify as a ministerial employee").

The same analysis applies here. Billard doesn't dispute the Diocese's decision was "based on religious doctrine," *Bryce*, 289 F.3d at 660—namely, Billard's violation of Church teaching by entering into a same-sex union. JA1355 ("it's uncontested that they had a religious motivation"). And a decision about whether a teacher satisfies canon-law requirements to teach in a Catholic school is a quintessential "matter[] of church government." *Bell*, 126 F.3d at 331. Thus, as in *Bryce*, *Garrick*, *Brazauskas*, and *Butler*, allowing Billard's claims to proceed "would impermissibly inject the auspices of government into religious doctrine and governance." *Garrick*, 412 F. Supp. 3d at 871-72.

This analysis applies with particular force in the context of a religious school. The Supreme Court has repeatedly emphasized that "[e]ducating young people in their faith, inculcating its teachings, and training them

to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Carson v. Makin*, 142 S.Ct. 1987, 2001 (2022). Thus, "[t]he church-teacher relationship in a church-operated school differs from the employment relationship in a public or other non-religious school." *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 504 (1979). This is true not only of teachers who "provide special religious instruction," but also of "lay teachers" who "provide a traditional secular education." *Id.* at 492-93.

*Catholic Bishop* is instructive. There, the National Labor Relations Board (NLRB) ordered two Chicago-area Catholic schools to bargain collectively with their "lay teachers." *Id.* at 494-95. The Supreme Court, however, rejected the NLRB's action because it "would give rise to serious constitutional questions." *Id.* at 501. The Court emphasized that it has repeatedly "recognized the critical and unique role of the teacher in fulfilling the mission of a church-operated school." *Id.* at 501. And resolving a labor dispute between the teachers and schools, particularly when the schools asserted their practices "were mandated by their religious creeds," would "necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission." *Id.* at 502. Thus, the "very process of inquiry" into this dispute, much less "the conclusions that may be reached by the Board," "may impinge on rights guaranteed by the Religion Clauses." *Id.*

This lawsuit threatens far greater impingement on church autonomy than *Catholic Bishop* did. First, the "process of inquiry" is more entangling here. *Id.* To probe the religious reason for the Diocese's action, Billard's counsel cross-examined Bishop Jugis extensively on his understanding of Catholic theology, asking questions like: "if someone … doesn't believe in the Holy Trinity … are they living in sin?"; "what does apostolic mean?"; "do these three paragraphs [of the catechism] represent the fundamental moral tenets of the Catholic Church…?"; "what's the definition of scandal as used in the context of the Catholic faith?"; "am I right that one of the teachings in the catechism is that there's no salvation outside the church?" JA1277-1307.

He then asked the bishop to apply these theological concepts to various hypotheticals involving "Jewish," "Muslim," "Hindu," or "Buddhist" employees, a "Catholic businessman," "in vitro fertilization," "contraception," "abortion," and "marriage involving disparity of cult," or "post[s] on Facebook," "secret" confessions, or "a private investigator" who "digs up information" on employees. JA1274-1314. This is far more entangling than the inquiry held problematic in *Catholic Bishop*. *Cf.* 440 U.S. at 502 n.10, 507-08 ("how many liturgies are required at Catholic parochial high schools; do you know?"). And it is just what this Court warned against in *Rayburn*—that "Church officials" would be subject to "cross-examination" and "the full panoply of legal process designed to probe the mind of the

church." 772 F.2d at 1171; *see also EEOC v. Catholic Univ.*, 83 F.3d 455, 467 (D.C. Cir. 1996) (Title VII claim resulted in "impermissible entanglement").

Second, the result reached by the district court here is far more intrusive than the NLRB's action in *Catholic Bishop*. There, the diocese had to bargain collectively over the terms of employment with qualified teachers it willingly employed. Here, the Diocese must *employ teachers against its will* after it has deemed those teachers *religiously disqualified*—or else suffer massive penalties under Title VII. Thus, under *Catholic Bishop*, this is an *a fortiori* case.

Indeed, the issue here is not just who decides which teachers are religiously qualified to teach at Catholic schools (although that should suffice); it is also a question of canon law. Under canon law, the bishop must ensure schoolteachers are "outstanding in correct doctrine and integrity of life." 1983 Code c.803, § 2. Here, following canon law, the Diocese determined that Billard's conduct disqualified him from teaching. *Supra* pp.8-11, 17-18. But the district court's decision makes it illegal for the Diocese to act on this understanding of canon law. And if the Catholic Church cannot apply its own understanding of canon law to Catholic teachers in Catholic schools, then the promise of "independence in matters of faith and doctrine and in closely linked matters of internal government" means nothing. *Our Lady*, 140 S.Ct. at 2061.

The district court's contrary ruling cannot be squared with these cases. Although the court admitted that "[t]he ministerial exception is [only] a branch of church autonomy doctrine," it held that if church autonomy applies to non-ministers, "then there would be no need to have a ministerial exception." JA1395-96. But this conclusion fundamentally misunderstands the relationship between the ministerial exception and the broader church autonomy doctrine. The ministerial exception applies to a *narrow* set of employees (ministers), but a *broad* range of employment decisions (including decisions not "made for a religious reason"). *Hosanna-Tabor*, 565 U.S. at 194-95. The "broader church autonomy doctrine" applies to a *broader* group of employees (including non-ministers), but only a *narrow* set of employment decisions (only those "based on religious doctrine"). *Bryce*, 289 F.3d at 656-58 & n.2, 660. The two protections thus have different scopes and cover different groups of employees; but both are necessary to provide the robust protections afforded by the First Amendment.

Without full protection of church autonomy, "[t]here is the danger," as this Court warned, "that churches, wary of EEOC or judicial review of their decisions, might make them with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of their own personal and doctrinal assessments of who would best serve the pastoral

45

needs of their members." *Rayburn*, 772 F.2d at 1171. Here, it is undisputed that the Diocese's decision was based on its understanding of religious doctrine. Penalizing it for that decision—particularly in a Catholic school, where the Diocese is deciding which teachers are religiously qualified under canon law—would violate church autonomy.

### B. Billard's claim is barred by freedom of association.

Billard's claim is also barred by freedom of association. Freedom of association protects both the right "to associate with others" for expressive purposes and the right "not to associate." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). As this Court has explained: "There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire." *Kidwell v. Transp. Commc'ns Int'l Union*, 946 F.2d 283, 301 (4th Cir. 1991).

The leading case is *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000). There, a former scoutmaster sued the Boy Scouts, claiming his dismissal for being a "gay rights activist" constituted sexual-orientation discrimination. *Id.* at 643-45. But the Supreme Court held the First Amendment foreclosed this claim, explaining that freedom to associate "presupposes a freedom not to associate," and that requiring the Boy Scouts to retain the plaintiff would impermissibly "force the [Boy Scouts] to send a mes-

sage, both to the youth members and the world, that [it] accepts homo-sexual conduct as a legitimate form of behavior." *Id.* at 648, 653; *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 574-75 (1995) (forcing parade organizers to include an LGBT group would violate freedom of association).

Similarly, in *Christian Legal Society v. Walker*, a state university con-cluded that a religious student group engaged in sexual-orientation dis-crimination, and therefore couldn't be officially recognized, because the group excluded members "who engage in or affirm homosexual conduct." 453 F.3d 853, 857 (7th Cir. 2006). The Seventh Circuit, however, applied *Dale* to protect the student group. As the Court explained, forcing the group to include those members would undermine its "ability to express its disapproval of homosexual activity," and the university's "interest in preventing discrimination" didn't outweigh the group's "interest in exer-cising its First Amendment freedoms." *Id.* at 862-64.

Under *Dale*, an expressive-association defense requires a court to ad-dress two questions: whether the organization "engage[s] in some form of expression"; and whether the forced association would "significantly af-fect [its] ability to advocate" for its viewpoints. 530 U.S. at 648, 650. If so, "the First Amendment prohibits" the forced association, absent satisfac-tion of strict scrutiny. *Id.* at 648, 659.

Here, the Diocese easily qualifies under both prongs of *Dale*. It is undisputed that the Diocese is "engaged in expressive activities," as it "seeks to instill Catholic teachings, including on marriage, in its students." JA1423. Indeed, "[r]eligious groups" like the Diocese "are the archetype of" expressive associations. *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., joined by Kagan, J., concurring). And forcing the Diocese to retain teachers who reject its views on marriage would obviously "significantly affect" its ability to instill those views in its students. As the Seventh Circuit explained: "It would be difficult for [a religious group] to sincerely and effectively convey a message of disapproval of certain types of conduct if, at the same time, it must accept members who engage in that conduct." *Walker*, 453 F.3d at 863.

Although the district court acknowledged its ruling would cause "some impairment of [the Diocese's] expressive activities," the court said this impairment was not "significant[]" enough, because Billard was a "lay employee" who taught "secular classes" and had "no mandate to inculcate students with Catholic teachings." JA1423. But this contradicts *Dale*, which held that courts must "give deference to an association's view of what would impair its expression." 530 U.S. at 653. And even without deference, the record here is undisputed: Billard conceded that if Catholic schools had to employ teachers who publicly contradicted the faith, stu-

48

dents "might be confused as to what the Catholic school actually believes." JA249-53. And the Bishop and Superintendent testified without contradiction that such a requirement would "irreparably damage[]" its religious mission. JA1318, JA617-18 ("very serious detrimental effect").

Because the Diocese satisfies both prongs of *Dale*, Billard's claim is barred unless applying Title VII here would satisfy strict scrutiny—advancing "compelling state interests … that cannot be achieved" through "less restrictive" means. 530 U.S. at 648 (quoting *Roberts*, 468 U.S. at 623). That standard cannot be met here.

The district court said "the [antidiscrimination] goals of Title VII are sufficiently compelling and narrowly tailored" to justify the infringement on the Diocese's freedom of association. JA1418. But this conclusion is flawed in multiple respects.

First, it contradicts *Dale* and *Hurley*, which held that however "compelling" the government's "interest in eliminating discrimination" based on "sexual orientation," that interest "d[id] not justify such a severe intrusion on … freedom of expressive association." *Dale*, 530 U.S. at 650, 657, 659; *Hurley*, 515 U.S. at 578-79; *Walker*, 453 F.3d at 863-64. Indeed, this case is even easier than *Dale*, since there, the Scouts' "central tenets" arguably did not "say[] the slightest thing about homosexuality," 530 U.S. at 665-68 (Stevens, J., dissenting), whereas here, the Catholic

49

Church has a clear teaching on marriage it has inculcated through Catholic schools for centuries.

Second, the district court's analysis ignores *Bostock* and *Obergefell*, which said the government should be "deeply concerned with preserving the promise of the free exercise of religion," *Bostock*, 140 S.Ct. at 1754, and must provide "proper protection" to religious groups "as they seek to teach" that "same-sex marriage should not be condoned," *Obergefell*, 576 U.S. at 679—not that the government has a compelling interest in forcing those groups to employ teachers who reject their message.

Third, it cannot be squared with the extensive exemptions already present in Title VII. As the Supreme Court has explained, a law cannot "be regarded as protecting an interest of the highest order" where "it leaves appreciable damage to [the] supposedly vital interest unprohibited." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (cleaned up). Here, Title VII has broad exemptions that exclude millions of employers from *all* coverage. Most notably, it exempts every employer in the country with fewer than fifteen employees. 42 U.S.C. § 2000e(b). This exemption alone covers approximately 80% of all employers nationwide, who employ over 16% of the private-sector work force.[2]

---

[2]   *See* Small Business & Entrepreneurship Council, *Facts & Data on*

Many of these are secular, for-profit businesses that have no constitutionally protected reason to dismiss an employee. Yet they are categorically exempt from Title VII's ban on *every* form of discrimination. The district court did not even attempt to explain how the government's interests allow it to overlook millions of secular businesses, which can fire any employee for any reason with impunity, but somehow cannot tolerate a Catholic school that simply asks its teachers to refrain from opposing core Catholic teachings. *See Fulton*, 141 S.Ct. at 1882 (government's interest in "equal treatment" for "gay couples" failed strict scrutiny when it had a "system of exceptions" for others, but denied an exception for a Catholic foster-care agency).

Pivoting from strict scrutiny, the district court alternatively held that "[f]reedom of association does not apply in the employment context," citing *Hishon v. King & Spalding*, 467 U.S. 69 (1984). JA1420. But this is incorrect. *Hishon* didn't hold that employment claims are *per se* exempt from expressive-association defenses; it simply held that the defendant there (a large, for-profit law firm) hadn't shown the relevant association

---

*Small Business and Entrepreneurship: A Rundown on Key Facts, Numbers and Trends,* SBE Council (Aug. 4, 2022), https://perma.cc/RG8H-XBD4; Richard Carlson, *The Small Firm Exemption and the Single Employer Doctrine in Employment Discrimination*, 80 St. John's L. Rev. 1197, 1198 & n.14 (2006).

(considering a woman for partnership) would in fact "inhibit[]" expression of its "ideas and beliefs." *Id.* at 78. There is no "employment" exception from the First Amendment; indeed, the law in *Dale* itself encompassed efforts to "obtain employment." 530 U.S. at 661-62; *id.* at 698 (Stevens, J., dissenting). Unsurprisingly, then, numerous courts have held that freedom of association *does* apply to employment claims.[3]

*Our Lady's Inn* is illustrative. There, a city ordinance prohibited employment discrimination based on "reproductive health decisions"—meaning Catholic schools would be required to employ individuals "who advocate for or perform abortions." 349 F. Supp. 3d at 809, 820. The court, however, held that freedom of association barred such claims, because forcing the schools to hire "teachers or other staff who do not adhere to [their] values" would "significantly affect [their] ability to advocate their viewpoints … to their students." *Id.* at 813, 820-22. So too here.

**C. Constitutional avoidance requires reversal.**

At a minimum, constitutional avoidance requires this Court to interpret Title VII to avoid the serious constitutional issues presented by

---

[3] *See, e.g.*, *Boy Scouts v. Wyman*, 335 F.3d 80, 89, 91 (2d Cir. 2003) (Scouts may "under any reading of *Dale*" exclude "gay activists" from "employment positions" involving "leadership"); *Bear Creek*, 571 F. Supp. 3d 571, 616-13 (N.D. Tex. 2021); *Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805, 822 (E.D. Mo. 2018); *Priests for Life v. HHS*, 7 F. Supp. 3d 88, 109 (D.D.C. 2013); *Chi. Area Council of Boy Scouts v. City of Chi. Comm'n on Hum. Rels.*, 748 N.E.2d 759, 769 (Ill. App. Ct. 2001).

52

Billard's claim. Interpreting Title VII to require the Diocese to retain Billard "would definitely give rise to serious constitutional questions." *Rayburn*, 772 F.2d at 1166 (cleaned up); *Curay-Cramer*, 450 F.3d at 137-42 (same); *Little*, 929 F.2d at 947 (same). Accordingly, the statute must be interpreted to avoid that result unless there is "clear expression of an affirmative intention of Congress" to require it. *Catholic Bishop*, 440 U.S. at 504. There is no such expression here. To the contrary, "Congress intended the explicit exemptions to Title VII to enable religious organizations … to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." *Kennedy*, 657 F.3d at 194. Thus, constitutional avoidance, as well as Title VII's plain text, requires reversal. *Curay-Cramer*, 450 F.3d at 137-42; *Little*, 929 F.2d at 951.

### III.  Billard's claim is barred by RFRA.

Finally, Billard's claim is barred by RFRA, which provides that the federal government may not "substantially burden" a person's religious exercise unless imposing that burden is the "least-restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. § 2000bb-1(b). Here, it is undisputed that imposing Title VII liability would substantially burden the Diocese's exercise of religion. And for the reasons just discussed, that application of Title VII cannot satisfy strict scrutiny. Thus, Billard's claim is barred.

The district court rejected this RFRA defense on the ground that "RFRA only applies when the government is a party." JA1412. But this ruling is contrary to RFRA's text and purpose. And it chooses the wrong side of a circuit split.

RFRA's text "easily covers" suits brought by private parties. *Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006). As the Second Circuit explained, RFRA provides that it "applies to all Federal law, and the implementation of that law." *Id.* at 103 (quoting 42 U.S.C. § 2000bb-3(a)). And it says a defendant may "assert" RFRA "as a … defense in a judicial proceeding." *Id.* (ellipsis in original) (quoting 42 U.S.C. § 2000bb-1(c)). That's this case: The Diocese seeks to "assert" RFRA "as a defense in a judicial proceeding" implementing Title VII, which is "Federal law."

This also comports with RFRA's purpose. "Congress enacted RFRA in order to provide greater protection for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). The First Amendment routinely bars private lawsuits brought under Title VII (and other statutes) even when the government isn't a party. *E.g.*, *Rayburn*, 772 F.2d 1164; *Our Lady*, 140 S.Ct. 2049. So does RFRA. This is because the imposition of liability in "a civil lawsuit between private parties" is an exercise of "state power" even when the government is not a party. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964). To conclude otherwise under RFRA would transform a statute meant to provide

54

"greater protection for religious exercise than is available under the First Amendment," into one that provides far less. *Holt*, 574 U.S. at 357.

Accordingly, multiple circuits have applied RFRA to claims brought by private parties—including in employment-discrimination suits. *Hankins*, 441 F.3d at 101 (employment discrimination); *Catholic Univ.*, 83 F.3d at 468-69 (D.C. Cir. 1996) (Title VII); *In re Young*, 82 F.3d 1407, 1416-17 (8th Cir. 1996), *vacated*, 521 U.S. 1114 (1997), *reinstated*, 141 F.3d 854 (8th Cir. 1998) (bankruptcy).

The district court found all this unpersuasive. It first said "cases in which the First Amendment has been permitted as a defense in suits between private parties are irrelevant," because "RFRA does not operate under the First Amendment." JA1403-04. But this is a *non sequitur*. As the Supreme Court has explained: "RFRA made clear that it was reinstating … substantive protections of the First Amendment." *Tanzin v. Tanvir*, 141 S.Ct. 486, 492 (2020). Indeed, the only sense in which RFRA provides *different* protection from the First Amendment is that it provides *greater* protection than the First Amendment. *Holt*, 574 U.S. at 357. And that cuts against the district court.

Next, the court said three circuits have "held that RFRA does not apply to suits between private parties." JA1407 (citing cases). But two of those circuits addressed trademark or bankruptcy claims where the gov-

55

ernment *could not bring an enforcement action*—unlike employment-discrimination claims. *See Gen. Conf. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 411 (6th Cir. 2010) ("There is no EEOC-like agency that can bring trademark-enforcement actions."); *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 737 (7th Cir. 2015) (bankruptcy). By contrast, two of the three circuits to address employment-discrimination claims have said RFRA applies—and those are the better-reasoned decisions. *Hankins*, 441 F.3d at 101; *Catholic Univ.*, 83 F.3d at 468-69 ("Sister McDonough's claims are barred … by RFRA.").

Turning to RFRA's text, the court relied primarily on two phrases. JA1409-10. First, the court noted that RFRA provides the "*government*" must "*demonstrate*" that the burden on religious exercise satisfies strict scrutiny—"and a private citizen cannot carry [that] burden in the government's place." JA1410. But private citizens carry an analogous burden in First Amendment cases all the time. *E.g.*, *Dale*, 530 U.S. at 658-59 (private scoutmaster defending application of New Jersey law); *Yeshiva Univ. v. YU Pride All.*, No. 22A184, 2022 WL 4232541, at *2 (Sept. 14, 2022) (Alito, J., dissenting) (private club defending application of municipal law); *Paul*, 819 F.2d at 882-83 (church member defending application of Washington law).

And RFRA expressly defines "government" to include any "branch" or "agency" of government, any "official," or any "other person acting under color of law." 42 U.S.C. § 2000bb-2(1). When a private citizen brings a

Title VII claim, he does so only after the EEOC, by declining to bring its own enforcement action and issuing a right-to-sue letter, has authorized him to do so. And in a statutory scheme where the government cedes its enforcement authority to a private party, it makes perfect sense for the private party to shoulder the litigation burden that otherwise belongs to the government. *See McGill*, 617 F.3d at 411; *Hankins*, 441 F.3d at 101.

Alternatively, the court cited Section 2000bb-1(c), which provides that a person suffering a RFRA violation "may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a *government*." JA1411-12 (emphasis added). According to the district court, because a person cannot "obtain appropriate relief against a government" unless the government is a party, RFRA can't apply to private-party lawsuits. *Id.*

But this misreads the provision. Even if the government *is* a party, a person cannot obtain "relief" against the government when he asserts a "defense." A defense merely defeats liability; it does not entitle a defendant to "relief," like damages or an injunction. *See Sikorsky Aircraft Corp. v. United States*, 102 Fed. Cl. 38, 48 n.14 (Fed. Cl. 2011) ("Affirmative defenses are not claims for additional relief."). So it makes no sense to read "obtain appropriate relief against a government" as narrowing the category of parties against which RFRA may be asserted "as a claim or defense."

57

Instead, "obtain appropriate relief against a government" serves a different function entirely: It abrogates the government's sovereign immunity. Indeed, as the drafting history shows, this is precisely why Congress added this language. Shruti Chaganti, Note, *Why the Religious Freedom Restoration Act Provides a Defense in Suits by Private Plaintiffs*, 99 Va. L. Rev. 343, 349 (2013). Thus, the provision, read as a whole, performs two functions: It provides that RFRA can be asserted as a claim or defense in a judicial proceeding, *and* it waives sovereign immunity for claims against the government.

The district court's contrary interpretation would also produce an anomalous result: Employment-discrimination claims brought by the EEOC would be subject to RFRA, while the same claims brought by a private party would not be. So courts would have to "render a different decision on the merits" "depending on whether [the claim is brought] by the EEOC or an aggrieved private party." *Hankins*, 441 F.3d at 103. And the EEOC could evade RFRA simply by delegating its enforcement power to private parties whenever a religious defendant might be involved.

The district court didn't disagree (JA1415); it simply said this is "not monstrous or absurd," because "[t]he Bill of Rights was not designed to protect a citizen from his neighbor, but rather to protect the citizen from the government." JA1415-16. But the Supreme Court has repeatedly held

just the opposite: The Bill of Rights *does* protect a citizen from his neighbor when—as here—the neighbor invokes government power to punish protected First Amendment conduct. *Our Lady*, 140 S.Ct. at 2055; *N.Y. Times*, 376 U.S. at 264.

Finally, the district court's position ignores *Bostock*'s discussion of RFRA. *Bostock* itself consolidated three Title VII cases. Two were brought by private parties; and in the only case where the federal government was a party, it sided with the religious defendant and argued Title VII didn't cover gender-identity discrimination. Brief of Respondent EEOC, *R.G. & G.R. Funeral Homes v. EEOC*, (2019) (No. 18-107), 2019 WL 3942898. Yet the Supreme Court went out of its way to emphasize that "RFRA operates as a kind of super statute, displacing the normal operation of other federal laws," and that "it might supersede Title VII's commands in appropriate cases." *Bostock*, 140 S.Ct. at 1754. There is no reason to emphasize this point unless RFRA can apply to suits between private parties—as confirmed by RFRA's text, purpose, and precedent.

## CONCLUSION

The district court's decision should be reversed.

Respectfully submitted,

/s/ Luke W. Goodrich

| | |
|---|---|
| Joshua Daniel Davey, Esq. | Luke W. Goodrich |
| Troutman Pepper Hamilton Sanders LLP | Nicholas R. Reaves |
| | Laura E. Wolk |
| 301 South College Street 34th Floor | The Becket Fund for Religious Liberty |
| Charlotte, NC 28202 | 1919 Pennsylvania Ave. N.W., Ste. 400 |
| (704) 916-1503 | Washington, DC 20006 |
| joshua.davey@troutman.com | (202) 955-0095 |
| | lgoodrich@becketlaw.org |

*Counsel for Defendants-Appellants*

**CERTIFICATE OF COMPLIANCE WITH
TYPE-VOLUME LIMITATION**

This document complies with type-volume limits because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 12,980 words.

This document complies with the typeface requirements because this document has been prepared in a proportional spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Date: September 22, 2022

/s/ Luke W. Goodrich
Luke W. Goodrich
*Counsel for Appellants*