**No. 22-1440**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LONNIE BILLARD,

*Plaintiff-Appellee,*

v.

CHARLOTTE CATHOLIC HIGH SCHOOL, MECKLENBURG AREA
CATHOLIC SCHOOLS, AND ROMAN CATHOLIC DIOCESE OF CHAR-
LOTTE,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Western District of North Carolina, Charlotte Division
Case No. 3:17-cv-0011 – Judge Max O. Cogburn Jr.

### JOINT APPENDIX

Joshua A. Block
AMERICAN CIVIL
  LIBERTIES UNION
125 Broad Street
  18th Floor
New York, NY 10004
(212) 549-2593
jblock@aclu.org

*Counsel for Plaintiff-
Appellee*

Luke W. Goodrich
Nicholas R. Reaves
Laura E. Wolk
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. N.W.,
  Ste. 400
Washington, DC 20006
(202) 955-0095
lgoodrich@becketlaw.org

*Counsel for Defendants-
Appellants*

**Counsel continued on inside cover**

Kristi L. Graunke
ACLU OF NORTH
 CAROLINA
P.O. Box 28004
Raleigh, NC 27611-8004
(919) 354-5066
kgraunke@acluofnc.org

S. Luke Largess
TIN FULTON WALKER &
 OWEN
301 East Park Avenue
Charlotte, NC 28203
(704) 338-1220
luke.largess@tinfulton.com

Daniel Mach
AMERICAN CIVIL
 LIBERTIES UNION
915 15th Street, NW
Washington, DC 20005-0000
(202) 548-6604
dmach@aclu.org

*Counsel for Plaintiff-
Appellee*

Joshua Daniel Davey, Esq.
TROUTMAN PEPPER HAMILTON
 SANDERS LLP
301 South College Street
 34th Floor
Charlotte, NC 28202
(704) 916-1503
joshua.davey@troutman.com

*Counsel for Defendants-
Appellants*

# JOINT APPENDIX
## Billard V. Charlotte Catholic High School
### No. 22-1440

**Volume I**

District Court Docket Report ..................................................... JA0001

Complaint (ECF 1) ................................................................... JA0012

Defendants' Answer (ECF 8) ................................................... JA0021

Stipulation re: Ministerial Exception (ECF 28-1) ..................... JA0031

Declaration of Lonnie Billard (ECF 28-2) ................................ JA0033

Deposition of Kurt Telford (ECF 28-5) ..................................... JA0042

Deposition of Lonnie Billard (ECF 31-1 & 31-2) ...................... JA0072

Deposition of Lonnie Billard, Ex. 3 .......................................... JA0560

**Volume II**

Declaration of Janice Ritter (ECF 31-3 & 31-4) ....................... JA0611

Declaration of Roger Arnsparger (ECF 31-5 to 31-14) ............ JA0767

Declaration of Bishop Peter Jugis (ECF 31-15) ....................... JA0935

Declaration of Kurt Telford (ECF 31-16) ................................. JA0946

Deposition of Steve Carpenter (ECF 31-17) ............................. JA0981

Deposition of Matthew Kauth (ECF 31-18) .............................. JA1086

Deposition of Richard Donham (ECF 31-19) ............................ JA1133

Deposition of Bishop Peter Jugis (ECF 31-20) ......................... JA1255

**Volume III**

Defs.' Responses to Requests for Admission (ECF 32-2) .......... JA1320

Summary Judgment Hearing Transcript ................................. JA1325

District Court Order (ECF 69) ................................................ JA1372

Joint Motion for Entry of Stipulated Judgment (ECF 71)........ JA1426

Judgment (ECF 72)................................................................ JA1430

Notice of Appeal (ECF 73) .................................................... JA1432

8/31/22, 4:06 PM                    CM/ECF - LIVE DATABASE - NCWD

**Query**    **Reports ▾**    **Utilities ▾**    **Help**    **Log Out**

APPEAL,IAC

# U.S. District Court
## Western District of North Carolina (Charlotte)
## CIVIL DOCKET FOR CASE #: 3:17-cv-00011-MOC-DCK

Billard v. Charlotte Catholic High School et al                 Date Filed: 01/11/2017
Assigned to: District Judge Max O. Cogburn, Jr               Jury Demand: Plaintiff
Referred to: Magistrate Judge David Keesler                   Nature of Suit: 442 Civil Rights: Jobs
Case in other court:  4th Circuit, 22-01440                    Jurisdiction: Federal Question
Cause: 42:2000 Job Discrimination (Sex)

**Plaintiff**

**Lonnie Billard**                              represented by  **Brian Matthew Hauss**
                                                                American Civil Liberties Union Foundation
                                                                125 Broad Street, 18th Floor
                                                                New York, NY 10004
                                                                212-549-2604
                                                                Fax: 212-549-2652
                                                                Email: bhauss@aclu.org
                                                                *LEAD ATTORNEY*
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Christopher A. Brook**
                                                                ACLU of NC Legal Foundation
                                                                PO Box 28004
                                                                Raleigh, NC 27611
                                                                919-834-3466
                                                                Fax: 919-834-3466
                                                                Email: cbrook@pathlaw.com
                                                                *TERMINATED: 04/17/2019*
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Elizabeth Olmsted Gill**
                                                                American Civil Liberties Union Foundation
                                                                39 Drumm St
                                                                San Francisco, CA 94111
                                                                415-621-2493
                                                                Fax: 415-255-8437
                                                                Email: egill@aclunc.org
                                                                *LEAD ATTORNEY*
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Joshua Block**
                                                                American Civil Liberties Union
                                                                125 Broad Street, 18th Floor

JA0001

New York, NY 10004-2400
212-549-2627
Fax: 212-549-2650
Email: JBlock@aclu.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Irena Como**
ACLU of North Carolina
PO Box 28004
Raleigh, NC 27511
919-480-8085
Fax: 919-480-8085
Email: icomo@acluofnc.org
*TERMINATED: 07/14/2022*
*ATTORNEY TO BE NOTICED*

**Kristi L. Graunke**
ACLU of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, NC 27611-8004
919-354-5066
Email: kgraunke@acluofnc.org
*ATTORNEY TO BE NOTICED*

**S. Luke Largess**
Tin, Fulton, Walker & Owen
301 East Park Ave.
Charlotte, NC 28203
704-338-1220
Fax: 704-338-1312
Email: llargess@tinfulton.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Charlotte Catholic High School**         represented by   **John G. McDonald**
McGuireWoods, LLP
100 N. Tryon Street Suite 2900
Charlotte, NC 28231
704-343-2276
Fax: 704-444-8753
Email: jmcdonald@mcguirewoods.com
*TERMINATED: 09/03/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Daniel Davey**
Troutman Sanders
301 S. College Street
34th Floor

Charlotte, NC 28202
704-916-1503
Fax: 704-998-4051
Email: Joshua.Davey@troutman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Meredith Anne Pinson**
McGuire Woods LLP
201 N. Tryon Street
Ste. 3000
Charlotte, NC 28202
704-343-2252
Email: mpinson@mcguirewoods.com
*TERMINATED: 09/03/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Moses M. Tincher**
Troutman Pepper Hamilton Sanders LLP
600 Peachtree, N.E., Suite 3000
Atlanta, GA 30308
404-885-2593
Fax: 404-885-3900
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mecklenburg Area Catholic Schools**          represented by   **John G. McDonald**
(See above for address)
*TERMINATED: 09/03/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Daniel Davey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Meredith Anne Pinson**
(See above for address)
*TERMINATED: 09/03/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Moses M. Tincher**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Roman Catholic Diocese of Charlotte**          represented by   **John G. McDonald**

(See above for address)
*TERMINATED: 09/03/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Daniel Davey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Meredith Anne Pinson**
(See above for address)
*TERMINATED: 09/03/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Moses M. Tincher**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/11/2017 | 1 | COMPLAINT against All Defendants with Jury Demand ( Filing fee $ 400 receipt number 0419-3207282), filed by Lonnie Billlard.(Largess, S.) (Entered: 01/11/2017) |
| 01/11/2017 | | Case assigned to Chief Judge Frank D. Whitney and Magistrate Judge David Keesler. Notice: You must click this link to retrieve the **Case Assignment Packet**. *This is your only notice - you will not receive a separate document.*(jaw) (Entered: 01/11/2017) |
| 01/11/2017 | 2 | Exhibit by Lonnie Billard. Exhibit to 1 Complaint (Attachments: # 1 Exhibit Notice of Right to Sue, # 2 Exhibit Notice of Right to Sue, # 3 Exhibit Notice of Right to Sue) (Largess, S.) (Entered: 01/11/2017) |
| 01/11/2017 | 3 | NOTICE of Appearance by Christopher A. Brook, 43466 on behalf of All Plaintiffs (Brook, Christopher) (Entered: 01/11/2017) |
| 01/11/2017 | | Clerk's Entry and Service of **Initial Scheduling Order** and **Certificate of Initial Attorney FRCP 26(f) Conference Form** pursuant to the Standing Order Governing Civil Case Management before the Honorable Frank D. Whitney (3:07-mc-47 (Doc. No. 2)). The parties are directed to click on the link above to retrieve the Order. (jaw) (Entered: 01/12/2017) |
| 01/13/2017 | 4 | Summons Issued Electronically as to Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte. **NOTICE: Counsel shall print the summons and serve with other case opening documents in accordance with Fed.R.Civ.P.4** . (jaw) (Entered: 01/13/2017) |
| 01/23/2017 | 5 | AFFIDAVIT of Service filed by Lonnie Billard. Mecklenburg Area Catholic Schools served on 1/17/2017, answer due 2/7/2017. (Largess, S.) (Entered: 01/23/2017) |
| 01/23/2017 | 6 | AFFIDAVIT of Service filed by Lonnie Billard. Charlotte Catholic High School served on 1/17/2017, answer due 2/7/2017. (Largess, S.) (Entered: 01/23/2017) |
| 01/23/2017 | 7 | AFFIDAVIT of Service filed by Lonnie Billard. Roman Catholic Diocese of Charlotte |

| | | served on 1/17/2017, answer due 2/7/2017. (Largess, S.) (Entered: 01/23/2017) |
|---|---|---|
| 02/07/2017 | 8 | ANSWER to 1 Complaint by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte.(Pinson, Meredith) (Entered: 02/07/2017) |
| 02/07/2017 | 9 | Corporate Disclosure Statement by Roman Catholic Diocese of Charlotte (Pinson, Meredith) (Entered: 02/07/2017) |
| 02/07/2017 | 10 | Corporate Disclosure Statement by Mecklenburg Area Catholic Schools (Pinson, Meredith) (Entered: 02/07/2017) |
| 02/07/2017 | 11 | Corporate Disclosure Statement by Charlotte Catholic High School (Pinson, Meredith) (Entered: 02/07/2017) |
| 02/08/2017 | 12 | NOTICE of Appearance by Joshua Daniel Davey on behalf of Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte (Davey, Joshua) (Entered: 02/08/2017) |
| 02/08/2017 | 13 | NOTICE of Appearance by John G. McDonald on behalf of Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte (McDonald, John) (Entered: 02/08/2017) |
| 02/10/2017 | | NOTICE pursuant to Local Rule 16.1 you are **required** to conduct an Initial Attorney's Conference within 14 days. At the conference, the parties are **required** to discuss the issue of consent to jurisdiction of a magistrate judge in accordance with Local Rules 16.1(A) and 73.1(C). The **Certificate of Initial Attorneys Conference**, and if applicable, the **Joint Stipulation of Consent to Exercise jurisdiction by a US Magistrate Judge**, should be filed within 5 days of the conference. If appropriate, a party may file a Motion to Stay the Initial Attorney's Conference. CIAC Report due by 3/1/2017. (clc) (Entered: 02/10/2017) |
| 02/18/2017 | 14 | MOTION for Leave to Appear Pro Hac Vice as to Brian Hauss Filing fee $ 281, receipt number 0419-3243432. by Lonnie Billard. (Attachments: # 1 Exhibit Statements in support, # 2 Exhibit Certificate of Good Standing)(Largess, S.). Motions referred to David Keesler. (Attachment 1 replaced on 2/22/2017) (eef). (Entered: 02/18/2017) |
| 02/18/2017 | 15 | MOTION for Leave to Appear Pro Hac Vice as to Elizabeth O. Gill Filing fee $ 281, receipt number 0419-3243433. by Lonnie Billard. (Attachments: # 1 Exhibit Statements in support, # 2 Exhibit Certificate of Good Standing)(Largess, S.). Motions referred to David Keesler. (Entered: 02/18/2017) |
| 02/21/2017 | 16 | **ORDER granting 15 Motion for Leave to Appear Pro Hac Vice. Ms. Elizabeth Gail is hereby admitted pro hac vice to represent Plaintiff Lonnie Billard. Signed by Magistrate Judge David Keesler on 2/21/17. (mga)** (Entered: 02/21/2017) |
| 02/21/2017 | | Notice to Elizabeth O. Gill: Pursuant to Local Rule 83.1 you are required to **Register** for ECF at www.ncwd.uscourts.gov. Deadline by 2/28/2017. (mga) (Entered: 02/21/2017) |
| 02/22/2017 | 17 | **ORDER granting 14 Motion for Leave to Appear Pro Hac Vice added Brian Hauss for Lonnie Billard. Signed by Magistrate Judge David Keesler on 2/21/2017. (eef)** (Entered: 02/22/2017) |
| 02/22/2017 | | Notice to Brian Hauss: Pursuant to Local Rule 83.1 you are required to **Register** for ECF at www.ncwd.uscourts.gov. Deadline by 3/1/2017. (eef) (Entered: 02/22/2017) |
| 03/01/2017 | 18 | CERTIFICATION of initial attorney conference and discovery plan (Pinson, Meredith) (Entered: 03/01/2017) |
| 03/03/2017 | 19 | **Pretrial Order and Case Management Plan : Estimated Trial Time: 3-5- days. Discovery due by 8/24/2017. Motions due by 9/21/2017. Mediation deadline set for 9/7/2017. Bench Trial set for 1/2/2018 09:00 AM in Courtroom 1-1, 401 W Trade St,** |

| | | |
|---|---|---|
| | | **Charlotte, NC 28202 before Chief Judge Frank D. Whitney.. Signed by Chief Judge Frank D. Whitney on 3/3/17. (clc)** (Entered: 03/03/2017) |
| 07/10/2017 | 20 | MOTION for Leave to Appear Pro Hac Vice as to Joshua Block Filing fee $ 281, receipt number 0419-3387325. by Lonnie Billard. (Attachments: # 1 Exhibit List of Bar Memberships, # 2 Exhibit Certificate of Good Standing)(Brook, Christopher)  Motions referred to David Keesler. (Entered: 07/10/2017) |
| 07/10/2017 | 21 | **ORDER granting 20 Motion for Leave to Appear Pro Hac Vice added Joshua Block for Lonnie Billard. Signed by Magistrate Judge David Keesler on 7/10/2017. (chh)** (Entered: 07/10/2017) |
| 07/10/2017 | | Notice to Joshua Block: Pursuant to Local Rule 83.1 you are required to **Register** for ECF at www.ncwd.uscourts.gov. Deadline by 7/17/2017. (chh) (Entered: 07/10/2017) |
| 08/25/2017 | 22 | Joint MOTION to Waive Alternative Dispute Resolution or For Judicial Settlement Conference re 19 Scheduling Order, by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte. Responses due by 9/8/2017 plus an additional 3 days if served by mail (Pinson, Meredith). Motions referred to David Keesler. (Entered: 08/25/2017) |
| 08/29/2017 | 23 | **ORDER denying 22 Motion To Waive Alternative Dispute Resolution Or For Judicial Settlement Conference. Signed by Magistrate Judge David Keesler on 8/28/17. (mga)** (Entered: 08/29/2017) |
| 09/07/2017 | 24 | Joint MOTION to Amend/Correct 19 Scheduling Order, *as to Alternative Dispute Resolution Deadline Only* by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte. Responses due by 9/21/2017 plus an additional 3 days if served by mail (Attachments: # 1 Exhibit A: Proposed Order)(Pinson, Meredith). Motions referred to David Keesler. (Entered: 09/07/2017) |
| 09/08/2017 | 25 | **ORDER granting 24 Motion To Amend/Correct Case Management Order As To Alternative Dispute Resolution Deadline Only. The parties shall file a report on the results of mediation on or before October 18, 2017. Signed by Magistrate Judge David Keesler on 9/8/17. (mga)** (Entered: 09/08/2017) |
| 09/08/2017 | | Set/Reset Pretrial Order Deadlines: Mediation deadline set for 10/18/2017. (mga) (Entered: 09/08/2017) |
| 09/21/2017 | 26 | MOTION for Partial Summary Judgment by Lonnie Billard. Responses due by 10/5/2017 plus an additional 3 days if served by mail (Largess, S.) (Entered: 09/21/2017) |
| 09/21/2017 | 27 | MEMORANDUM in Support re 26 MOTION for Partial Summary Judgment by Lonnie Billard. (Largess, S.) (Entered: 09/21/2017) |
| 09/21/2017 | 28 | Appendix by Lonnie Billard. Appendix re: 27 Memorandum in Support of Motion *for Partial Summary Judgment* (Attachments: # 1 Exhibit Stipulation, # 2 Exhibit Declaration of Plaintiff, # 3 Exhibit Deposition of Steve Carpenter, # 4 Exhibit Deposition of Bishop Jugis, # 5 Exhibit Deposition of Kurt Telford, # 6 Exhibit Defendants Responses to First Interrogatories, # 7 Exhibit Declaration of Colin Wilson, # 8 Exhibit Declaration of Grant Hedrick)(Largess, S.) (Attachment 6 replaced on 9/21/2017) (jaw). (Entered: 09/21/2017) |
| 09/21/2017 | 29 | MOTION for Summary Judgment by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte. Responses due by 10/5/2017 plus an additional 3 days if served by mail (Pinson, Meredith) (Entered: 09/21/2017) |
| 09/21/2017 | 30 | MEMORANDUM in Support re 29 MOTION for Summary Judgment by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte. (Pinson, Meredith) (Entered: 09/21/2017) |

| | | |
|---|---|---|
| 09/21/2017 | 31 | Appendix by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte. Appendix re: 29 Motion for Summary Judgment, 30 Memorandum in Support of Motion (Attachments: # 1 Exhibit 1: Deposition Transcripts of Plaintiff Lonnie Billard (Part 1), # 2 Exhibit 1: Deposition Transcripts of Plaintiff Lonnie Billard (Part 2), # 3 Exhibit 2: Declaration of Dr. Janice T. Ritter (Part 1), # 4 Exhibit 2: Declaration of Dr. Janice T. Ritter (Part 2), # 5 Exhibit 3: Declaration of Rev. Roger K. Arnsparger (Part 1), # 6 Exhibit 3: Declaration of Rev. Roger K. Arnsparger (Part 2), # 7 Exhibit 3: Declaration of Rev. Roger K. Arnsparger (Part 3), # 8 Exhibit 3: Declaration of Rev. Roger K. Arnsparger (Part 4), # 9 Exhibit 3: Declaration of Rev. Roger K. Arnsparger (Part 5), # 10 Exhibit 3: Declaration of Rev. Roger K. Arnsparger (Part 6), # 11 Exhibit 3: Declaration of Rev. Roger K. Arnsparger (Part 7), # 12 Exhibit 3: Declaration of Rev. Roger K. Arnsparger (Part 8), # 13 Exhibit 3: Declaration of Rev. Roger K. Arnsparger (Part 9), # 14 Exhibit 3: Declaration of Rev. Roger K. Arnsparger (Part 10), # 15 Exhibit 4: Declaration of Bishop Peter J. Jugis, # 16 Exhibit 5: Deposition of W. Kurt Telford), # 17 Exhibit 6: Deposition of Steve Carpenter, # 18 Exhibit 7: Deposition of F. Matthew Kauth, # 19 Exhibit 8: Deposition of Richard Donham, # 20 Exhibit 9: Deposition of Bishop Peter J. Jugis 30(b)(6))(Pinson, Meredith) (Entered: 09/21/2017) |
| 10/05/2017 | 32 | RESPONSE in Opposition re 29 MOTION for Summary Judgment by Lonnie Billard. Replies due by 10/12/2017 plus an additional 3 days if served by mail (Attachments: # 1 Exhibit Telford Deposition Excerpts, # 2 Exhibit Defendants' Response to Request for Admission)(Largess, S.) (Entered: 10/05/2017) |
| 10/05/2017 | 33 | MEMORANDUM in Opposition re 26 MOTION for Partial Summary Judgment by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte. Replies due by 10/12/2017 plus an additional 3 days if served by mail (Pinson, Meredith) (Entered: 10/05/2017) |
| 10/12/2017 | 34 | REPLY to Response to Motion re 26 MOTION for Partial Summary Judgment by Lonnie Billard. (Block, Joshua) (Entered: 10/12/2017) |
| 10/12/2017 | 35 | REPLY to Response to Motion re 29 MOTION for Summary Judgment by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte. (Attachments: # 1 Appendix, # 2 Exhibit A: October 6, 2017 Memorandum) (Pinson, Meredith) (Entered: 10/12/2017) |
| 10/18/2017 | 36 | REPORT of Mediation by Sarah J. Kromer, Mediator. Outcome of Mediation: Parties reached an Impasse. (ams) (Entered: 10/19/2017) |
| 10/25/2017 | 37 | Unopposed MOTION to Continue Docket Call/Trial by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte. Responses due by 11/8/2017 plus an additional 3 days if served by mail (Attachments: # 1 Proposed Order)(Pinson, Meredith) (Entered: 10/25/2017) |
| 10/26/2017 | 38 | **ORDER granting 37 Motion to Continue Docket Call/Trial Bench Trial set for 3/5/2018 09:01 AM in Courtroom 1-1, 401 W Trade St, Charlotte, NC 28202 before Chief Judge Frank D. Whitney.. Signed by Chief Judge Frank D. Whitney on 10/25/17. (clc)** (Entered: 10/26/2017) |
| 11/14/2017 | 39 | **ORDER STAYING CASE.The Court hereby STAYS this matter pending a resolution of Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission in the Supreme Court of the United States. Signed by Chief Judge Frank D. Whitney on 11/14/17. (clc)** (Entered: 11/14/2017) |
| 02/27/2018 | 40 | NOTICE of Supplemental Authority by Lonnie Billard re 26 MOTION for Partial Summary Judgment , 29 MOTION for Summary Judgment (Attachments: # 1 Exhibit) (Block, Joshua) (Entered: 02/27/2018) |

| 03/12/2018 | 41 | NOTICE of *Supplemental Authority* by Lonnie Billard re 26 MOTION for Partial Summary Judgment , 29 MOTION for Summary Judgment (Attachments: # 1 Exhibit) (Block, Joshua) (Entered: 03/12/2018) |
| --- | --- | --- |
| 06/08/2018 | 42 | NOTICE of *Supplemental Authority* by Lonnie Billard re 26 MOTION for Partial Summary Judgment , 39 Order Staying Case, 29 MOTION for Summary Judgment (Block, Joshua) (Entered: 06/08/2018) |
| 06/15/2018 | 43 | Joint MOTION to Lift Stay re 39 Order Staying Case, *and Permit Supplemental Briefing* by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte. Responses due by 6/29/2018 plus an additional 3 days if served by mail (Attachments: # 1 Exhibit A: Proposed Order)(Pinson, Meredith). Modified to remove referral on 6/15/2018 (mga). (Entered: 06/15/2018) |
| 06/18/2018 | 44 | **ORDER granting 43 Motion to Lift Stay. The parties are permitted until July 16, 2018, to file supplemental briefing in support of their motions for summary judgment, not to exceed 1,500 words, and until July 30, 2018 to file replies.. Signed by Chief Judge Frank D. Whitney on 6/18/18. (clc)** (Entered: 06/18/2018) |
| 07/13/2018 | 45 | Supplemental Memorandum by Lonnie Billard as to 26 MOTION for Partial Summary Judgment , 29 MOTION for Summary Judgment by Lonnie Billard. (Block, Joshua) (Entered: 07/13/2018) |
| 07/16/2018 | 46 | Supplemental Memorandum by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte as to 29 MOTION for Summary Judgment by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte. (Pinson, Meredith) (Entered: 07/16/2018) |
| 07/27/2018 | 47 | NOTICE of *Intent Not To File Reply* by Lonnie Billard re 44 Order on Motion to Lift Stay, 46 Supplemental Memorandum, 45 Supplemental Memorandum (Block, Joshua) (Entered: 07/27/2018) |
| 07/30/2018 | 48 | REPLY to Response to Motion re 26 MOTION for Partial Summary Judgment , 29 MOTION for Summary Judgment by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte. (Pinson, Meredith) (Entered: 07/30/2018) |
| 11/09/2018 | 49 | **ORDER/NOTICE Setting Hearing on Motion 26 MOTION for Partial Summary Judgment , 29 MOTION for Summary Judgment : Motion Hearing set for 12/3/2018 02:00 PM in Courtroom 1-1, 401 W Trade St, Charlotte, NC 28202 before Chief Judge Frank D. Whitney.. Signed by Chief Judge Frank D. Whitney on 11/8/18. (clc)** (Entered: 11/09/2018) |
| 11/12/2018 | 50 | Supplemental Memorandum by Lonnie Billard as to 26 MOTION for Partial Summary Judgment , 29 MOTION for Summary Judgment by Lonnie Billard. (Attachments: # 1 Unpublished Opinion)(Largess, S.) (Entered: 11/12/2018) |
| 11/15/2018 | 51 | Joint MOTION to Continue Dispositive Motions Hearing by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte. Responses due by 11/29/2018 plus an additional 3 days if served by mail (Attachments: # 1 Exhibit A: Proposed Order)(Pinson, Meredith) (Entered: 11/15/2018) |
| 11/19/2018 | 52 | **ORDER granting 51 Motion to Continue S/J motion hearing. It is herebyORDERED that the hearing on the Parties cross-motions for summary judgment be continued to February 26, 2019.. Signed by Chief Judge Frank D. Whitney on 11/19/18. (clc)** (Entered: 11/19/2018) |
| 11/29/2018 | 53 | Supplemental Memorandum by Lonnie Billard as to 26 MOTION for Partial Summary Judgment , 29 MOTION for Summary Judgment by Lonnie Billard. (Attachments: # 1 |

| | | Opinion)(Largess, S.) (Entered: 11/29/2018) |
|---|---|---|
| 01/16/2019 | 54 | **ORDER Setting Hearing on Motion 26 MOTION for Partial Summary Judgment , 29 MOTION for Summary Judgment : Motion Hearing set for 2/26/2019 03:00 PM in Courtroom 1-1, 401 W Trade St, Charlotte, NC 28202 before Chief Judge Frank D. Whitney.. Signed by Chief Judge Frank D. Whitney on 1/16/19. (clc)** (Entered: 01/16/2019) |
| 02/11/2019 | 55 | NOTICE *of Supplemental Authority* by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte re 29 MOTION for Summary Judgment (Attachments: # 1 Exhibit A: Wittmer v. Phillips 66 Co.)(Pinson, Meredith) (Entered: 02/11/2019) |
| 02/13/2019 | 56 | NOTICE *of Supplemental Authority Response* by Lonnie Billard re 55 Notice (Other), (Block, Joshua) (Entered: 02/13/2019) |
| 02/25/2019 | | NOTICE of Cancellation of Motion Hearing scheduled for 2/26/19 (clc) (Entered: 02/25/2019) |
| 03/13/2019 | | Case reassigned to District Judge Richard Voorhees. Chief Judge Frank D. Whitney no longer assigned to the case. Any pending hearings are cancelled. *This is your only notice - you will not receive a separate document.* (tmg) (Entered: 03/13/2019) |
| 04/17/2019 | 57 | Notice of Substitution of Counsel by Irena Como on behalf of Lonnie Billard, Attorney Christopher A. Brook terminated. (Como, Irena) (Entered: 04/17/2019) |
| 04/26/2019 | 58 | Joint MOTION to Stay *Case* by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte. Responses due by 5/10/2019 (Attachments: # 1 Proposed Order)(Pinson, Meredith). Motions referred to David Keesler. (Entered: 04/26/2019) |
| 04/29/2019 | 59 | **ORDER granting 58 Joint Motion to Stay Case. This case is STAYED pending a decision by the Supreme Court of the United States. Signed by Magistrate Judge David Keesler on 4/29/19. (mga)** (Entered: 04/29/2019) |
| 06/23/2020 | | Case reassigned to District Judge Max O Cogburn, Jr District Judge Richard Voorhees no longer assigned to the case. *This is your only notice - you will not receive a separate document.* (tmg) (Entered: 06/23/2020) |
| 07/15/2020 | 60 | Joint MOTION to Lift Stay re 59 Order on Motion to Stay by Lonnie Billard. Responses due by 7/29/2020 (Largess, S.). Motions referred to David Keesler. (Entered: 07/15/2020) |
| 07/16/2020 | 61 | **ORDER granting 60 Consent Motion to Lift Stay. The parties are directed to submit supplemental briefs on or before 8/7/2020 and submit reply briefs on or before 8/14/2020. Signed by Magistrate Judge David Keesler on 7/16/2020. (mek)** (Entered: 07/16/2020) |
| 08/07/2020 | 62 | Supplemental Memorandum by Lonnie Billard as to 26 MOTION for Partial Summary Judgment , 29 MOTION for Summary Judgment by Lonnie Billard. (Block, Joshua) (Entered: 08/07/2020) |
| 08/07/2020 | 63 | Supplemental Memorandum by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte as to 29 MOTION for Summary Judgment by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte. (Davey, Joshua) (Entered: 08/07/2020) |
| 08/14/2020 | 64 | Supplemental Memorandum by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte as to 26 MOTION for Partial Summary Judgment , 29 MOTION for Summary Judgment by Charlotte Catholic High |

|  |  |  |
|---|---|---|
|  |  | School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte. (Davey, Joshua) (Entered: 08/14/2020) |
| 08/14/2020 | 65 | Supplemental Memorandum by Lonnie Billard as to 26 MOTION for Partial Summary Judgment , 29 MOTION for Summary Judgment by Lonnie Billard. (Block, Joshua) (Entered: 08/14/2020) |
| 08/25/2020 |  | NOTICE of Hearing on Motion re: 26 MOTION for Partial Summary Judgment , 29 MOTION for Summary Judgment : Motion Hearing set for 9/16/2020 09:30 AM in Courtroom, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. *This is your only notice - you will not receive a separate document.*(ams) (Entered: 08/25/2020) |
| 09/14/2020 | 66 | MOTION for Leave to Appear Pro Hac Vice as to Moses M. Tincher Filing fee $ 281, receipt number 0419-4666816. by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte. (Davey, Joshua). Motions referred to David Keesler. (Entered: 09/14/2020) |
| 09/14/2020 | 67 | **ORDER granting 66 Motion for Leave to Appear Pro Hac Vice. Moses M. Tincher is hereby admitted pro hac vice to represent Defendants Charlotte Catholic High School, Mecklenburg Area Catholic Schools, and Roman Catholic Diocese of Charlotte. Signed by Magistrate Judge David Keesler on 9/14/20. (mga)** (Entered: 09/14/2020) |
| 09/16/2020 |  | Minute Entry: MOTION HEARING held before District Judge Max O. Cogburn, Jr. Re 26 MOTION for Partial Summary Judgment , 29 MOTION for Summary Judgment . Motion taken under advisement, order to issue. Plaintiffs attorney: Joshua Block, S. Luke Largess, Irena Como. Defendants attorney: Joshua Davis, Moses Tincher. Court reporter: Cheryl Nuccio. (ams) (Entered: 09/16/2020) |
| 10/23/2020 | 68 | NOTICE *of Supplemental Authority* by Lonnie Billard re 26 MOTION for Partial Summary Judgment , 29 MOTION for Summary Judgment (Attachments: # 1 Exhibit) (Block, Joshua) (Entered: 10/23/2020) |
| 09/03/2021 | 69 | **ORDER denying 29 Motion for Summary Judgment ; granting 26 Motion for Partial Summary Judgment. Signed by District Judge Max O. Cogburn, Jr on 9/3/21. (clc)** (Entered: 09/03/2021) |
| 09/03/2021 | 70 | Notice of Substitution of Counsel by Joshua Daniel Davey on behalf of Roman Catholic Diocese of Charlotte, Mecklenburg Area Catholic Schools, Charlotte Catholic High School, Attorney John G. McDonald and Meredith Anne Pinson terminated. (Davey, Joshua) (Entered: 09/03/2021) |
| 09/28/2021 |  | Set/Reset Hearings: Docket Call/Bench Trial set for 4/18/2022 09:30 AM in Courtroom #5A, 401 W Trade St, Charlotte, NC 28202 before District Judge Max O. Cogburn Jr. (ams) (Entered: 09/28/2021) |
| 02/25/2022 | 71 | Consent MOTION for Entry of Judgment *reserving Defendants' right to appeal and deferring Plaintiff's fee petition until after appeal* by Lonnie Billard. Responses due by 3/11/2022 (Largess, S.) (Entered: 02/25/2022) |
| 03/18/2022 | 72 | **ORDER and JUDGMENT granting 71 Motion for Entry of Judgment. The Court hereby enters judgment as stated herein. Signed by District Judge Max O. Cogburn, Jr on 3/18/2022. (ams)** Modified text on 3/23/2022 (ams). (Entered: 03/18/2022) |
| 04/18/2022 | 73 | NOTICE OF APPEAL as to 69 Order on Motion for Summary Judgment, Order on Motion for Partial Summary Judgment, 72 Order on Motion for Entry of Judgment by Charlotte Catholic High School, Mecklenburg Area Catholic Schools, Roman Catholic Diocese of Charlotte. Filing fee $ 505, receipt number ANCWDC-5534019. *Use this link* |

| | | |
|---|---|---|
| | | *www.ca4.uscourts.gov to retrieve 4th Circuit case opening documents, i.e. Appearance of Counsel, Docketing Statement, Disclosure Statement, and Transcript Order Form.* Note: Your Transcript Order Form must be served on the District Court as well as the Circuit Court. (Davey, Joshua) (Entered: 04/18/2022) |
| 04/22/2022 | 74 | Transmission of Notice of Appeal to US Court of Appeals re 73 Notice of Appeal(ams) (Entered: 04/22/2022) |
| 04/25/2022 | 75 | USCA Case Number [22-1440] for 73 Notice of Appeal, USCA Case Manager: Kirsten Hancock. (ejb) (Entered: 04/27/2022) |
| 05/09/2022 | 76 | USCA TRANSCRIPT ORDER ACKNOWLEDGMENT re 73 Notice of Appeal, [22-1440]. Court Reporter: Cheryl Nuccio. Current Deadline: 07/15/2022. Proceedings: 9/16/2020 hearing. Ordering Parties: Charlotte Catholic High School; Mecklenburg Area Catholic Schools; Roman Catholic Diocese of Charlotte. (ejb) (Entered: 05/10/2022) |
| 07/12/2022 | 77 | ORDER of USCA granting Appellee's Attorney Irena Como's motion to withdraw from further representation on appeal as to 73 Notice of Appeal. [22-1440] (ejb) (Entered: 07/13/2022) |
| 07/13/2022 | 78 | TRANSCRIPT of Motion for Summary Judgment held on 9/16/20 before Judge Cogburn **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov *(Does this satisfy all appellate orders for this reporter? - Yes.)*** Release of Transcript Restriction set for 10/11/2022. (Reporter: Cheryl Nuccio, 704-350-7494) (Entered: 07/13/2022) |
| 07/14/2022 | 79 | Notice of Substitution of Counsel by Kristi L. Graunke on behalf of Lonnie Billard, Attorney Irena Como terminated. (Graunke, Kristi) (Entered: 07/14/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/31/2022 16:06:34 | | |
| **PACER Login:** | becket93 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:17-cv-00011-MOC-DCK |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

JA0011

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| LONNIE BILLARD, | Civil Action No. 3:17-cv-0011 |
| *Plaintiff*, | |
| v. | |
| CHARLOTTE CATHOLIC HIGH SCHOOL, MECKLENBURG AREA CATHOLIC SCHOOLS, and ROMAN CATHOLIC DIOCESE OF CHARLOTTE | **COMPLAINT** |
| *Defendants*. | |

## NATURE OF THE ACTION

This is an employment discrimination lawsuit between Plaintiff Lonnie Billard ("Plaintiff") and Defendants Charlotte Catholic High School ("CCHS"), Mecklenburg Area Catholic Schools ("MACS"), and Roman Catholic Diocese of Charlotte ("Diocese") (collectively, "Defendants"). Plaintiff worked for more than 13 years as a teacher at CCHS, first as a full-time English and Theater teacher, and later as a regular substitute teacher. In the Spring of 2012 Plaintiff was named Teacher of the Year. In October 2014, Plaintiff married his same-sex partner of more than a dozen years. He announced the marriage on Facebook on October 25, 2014.

Plaintiff learned that he had been fired from his regular substitute teaching job at Christmas dinner, on December 25, 2014. According to the CCHS Assistant Principal, the Diocese ordered CCHS to terminate Plaintiff's employment because of his marriage announcement. A spokesperson for the Diocese publicly confirmed that this was the reason for Plaintiff's firing, stating that continuing to employ Plaintiff would be "legitimating that relationship." Accordingly, Defendants discriminated against Plaintiff because of his sex, in

violation of Title VII of the Civil Rights Act of 1964. Plaintiff seeks declaratory and injunctive relief, damages, and other equitable and legal remedies pursuant to the statute.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to Article III, § 2 of the United States Constitution; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended ("Title VII"); and 28 U.S.C. §§ 1331 and 1343.

2.      Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

3.      Venue is proper in this Court under 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3) because the parties reside in this District, and the unlawful practices complained of occurred within this District.

## PARTIES

4.      Plaintiff lives in Charlotte, North Carolina. At all times relevant to this Complaint, he was an employee, as that term is defined in 42 U.S.C. § 2000e(f), of Defendants.

5.      Defendant Charlotte Catholic High School ("CCHS") is a co-educational parochial school of approximately 1,400 students in grades 9 through 12. Its principal place of business is in Charlotte, North Carolina. CCHS is an employer within the meaning of 42 U.S.C. § 2000e(b).

6.      Defendant Mecklenburg Area Catholic Schools ("MACS") is a centralized, regional system parochial schools in the Charlotte area, including CCHS and eight other schools that serve pre-kindergarten through twelfth grade. It has direct supervisory control over the administration at CCHS. Its principal place of business is in Charlotte, North Carolina. MACS is an employer within the meaning of 42 U.S.C. § 2000e(b).

7.      Defendant Roman Catholic Diocese of Charlotte (the "Diocese,") is an unincorporated religious association with its principal place of business in Charlotte, North Carolina. The Diocese is an employer within the meaning of 42 U.S.C. § 2000e(b).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8.      On May 21, 2015, Plaintiff filed timely charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Defendants violated Title VII's prohibition on sex discrimination when they terminated him.  The EEOC issued Notices of Right to Sue on November 30, 2016.  (Exhibits A, B and C) This action was filed within 90 days of the Notices' receipt, as required by Title VII.

9.      All administrative prerequisites to the filing of this suit have been met.

## FACTS

10.      Plaintiff graduated from Central Missouri State University (now Central Missouri University) with a Bachelor of Science in Speech Pathology and Education. Earlier in his career, Plaintiff had spent roughly ten years as a full-time teacher at various grade levels at other schools.  Prior to beginning his employment with Defendants, Plaintiff worked for more than a decade as a corporate executive with Barnett Bank and Bank of America.

11.      In the Fall of 2000, Plaintiff spent three months working at CCHS as a substitute English teacher.

12.      Plaintiff initially sought temporary work as a substitute teacher because he was worried that he would not be able to connect with high school students at his age.

13.      Plaintiff, however, fell in love with teaching at CCHS. He realized he wanted to work there full-time.

14.     In the Spring of 2001, Plaintiff applied for a full-time teaching position at CCHS. He was hired shortly thereafter.

15.     In the Fall of 2001, Plaintiff started working as a full-time English and Public Speaking teacher at CCHS.

16.     In the Fall of 2002, Plaintiff switched roles after CCHS appointed him to be its Theater teacher in the Fine Arts Department.  In that role, he taught several drama courses and directed school plays. Plaintiff continued in this position until his retirement from full-time teaching in the Fall of 2012.

17.     In the Spring of 2012, Plaintiff won the CCHS Teacher of the Year award, which came with a $10,000 cash prize. Teachers are nominated for the award by their students. Then-principal Jerry Healy told Plaintiff that he was the only teacher who had been nominated for the award every year since its inception in 2005.

18.     In the Fall of 2012, at the age of 66, Plaintiff retired from teaching full-time. After his retirement from full-time teaching, Plaintiff continued working at CCHS as regular substitute teacher.

19.     Like other substitute teachers, and pursuant to Defendants' policy, Plaintiff did not sign a contract for employment with CCHS. Instead, Plaintiff was included on a list of substitute teachers who were regularly called in for assignments when full-time teachers became unavailable. On information and belief, the Diocese's human resources office classifies substitute teachers as temporary employees.

20.     Each CCHS school year consists of approximately 177 student days, or roughly 35 weeks. During the 2012-13 school year, Plaintiff worked for approximately 15 weeks. During the 2013-14 school year, he worked for approximately 13 weeks. During the Fall

semester of the 2014-15 school year, prior to his termination, Plaintiff worked for approximately 8 weeks.

21.     At all times during his employment by Defendants, Plaintiff performed well. During his tenure as a full-time teacher, he regularly received positive performance evaluations. As a substitute teacher, he did not receive performance evaluations.

22.     Plaintiff came out as gay to his family and close friends in 1995. In 2001, Plaintiff began a romantic relationship with his now-husband, Richard Donham ("Donham"), and in 2002 they began living together as a couple. Donham regularly accompanied Plaintiff to CCHS functions, and their relationship was common knowledge among the school's students, parents, alumni, staff, and administration. Plaintiff also listed Donham as his emergency contact on his employment forms. Plaintiff and Donham began discussing marriage after the Supreme Court's decision in *United States v. Windsor*, 133 S. Ct. 2675 (2013). In October 2014, after  marriage for same-sex couples was legalized in North Carolina, they decided to get married the following Spring.

23.     On October 25, 2014, Plaintiff wrote a Facebook post announcing his upcoming wedding. The post read: "Everyone sing along…. 'Goin' to the chapel and we're gonna' get ma-a-aried. Goin' to the chapel and we're gonna' get maa-aa-ried'. Yes, I'm finally going to make an honest (at least legal) man out of Rich. We will be married on May 2, 2015… details to follow. I cannot believe that I am saying this or that it is even possible. I thank all the courageous people who had more guts than I who refused to back down and accept anything but 'equal'. Ps. If you don't agree with this… keep it to yourself. You never asked my opinion about your personal life and I am not asking yours."

24.    A number of Plaintiff's Facebook friends responded to his post to congratulate him on his upcoming marriage. Plaintiff received no negative feedback about the posting, on Facebook or elsewhere.

25.    Two months later, on Christmas Day 2014, Plaintiff learned that his employment as a substitute teacher at CCHS had been terminated. He and Donham were at a Christmas dinner with CCHS alumni and employees. Plaintiff mentioned to a colleague that he had not yet heard from CCHS about a substitute teaching assignment for January that he routinely performed after the Christmas break. Plaintiff's colleague told him that CCHS Assistant Principal Steve Carpenter ("Carpenter") had informed her that Plaintiff could no longer serve as a substitute at CCHS.

26.    On December 30, 2014, Plaintiff texted Carpenter to ask about his status. A few minutes later, Carpenter telephoned Plaintiff. Carpenter said that the Diocese had instructed him that the school could no longer employ Plaintiff because he announced on Facebook his intention to marry a same-sex partner.

27.    On January 9, 2015, the Diocese's Director of Communications, David Hains ("Hains"), stated publicly that Plaintiff was terminated for "going on Facebook, entering into a same-sex relationship, and saying it in a very public way that he does not agree with the teachings of the Catholic Church." Continuing to employ Plaintiff, Hains stated, "would be legitimating that relationship. The church would be saying it's OK, and it's not."

28.    In late January 2015, Plaintiff wrote Janice Ritter, the Diocese's Superintendent of Catholic Schools, asking for official confirmation that his employment had been terminated. To date, he has received no response. He has not been offered another teaching assignment at CCHS.

6

## CAUSE OF ACTION

29.    Plaintiff realleges and incorporates by reference, as if fully set forth herein, the allegations of paragraphs 1 through 28.

30.    Plaintiff was highly qualified for the position of substitute teacher, as reflected in part by his 2012 Teacher of the Year Award.

31.    Defendants terminated Plaintiff because he announced his marriage to a same-sex partner.

32.    Defendants terminated Plaintiff because he is a man who intended to, and did, marry another man.

33.    Defendants terminated Plaintiff because he associated with another man.

34.    Defendants terminated Plaintiff because he does not conform to sex-based stereotypes associated with men in our society.

35.    Defendants discriminated against Plaintiff on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964.

36.    Defendants' unlawful employment actions were intentional.

37.    Defendants' unlawful employment actions were taken either with malice or with reckless indifference to Plaintiff's rights under the law.

38.    As a result of Defendants' unlawful employment actions, Plaintiff has been denied compensation and benefits which he would have otherwise received and has suffered emotional distress and other compensable damages.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the following relief:

A.    Declaratory relief, including but not limited to a declaration that Defendants violated Title VII;

B.    Appropriate injunctive relief, including but not limited to reinstatement and an order restraining Defendants from engaging in further discriminatory conduct of the types of which Plaintiff complains herein;

C.    Back pay and benefits in amounts to be determined at trial;

D.    In the event reinstatement is not granted, front pay;

E.    Compensatory and consequential damages, including for emotional distress;

F.    Punitive damages;

G.    Pre-judgment and post-judgment interest at the highest lawful rate;

H.    Costs incurred, including reasonable attorneys' fees to the extent allowable by law;

I.    Such other relief as the Court deems just and proper.

8

Dated: January 11, 2017

Respectfully submitted,

/s/ **S. Luke Largess**

S. Luke Largess (NC Bar # 17486)
Tin Fulton Walker & Owen PLLC
301 East Park Avenue
Charlotte, NC 28202
Telephone:  (704) 338-1220
Facsimile: (704) 338-1312
Email: llargess@tinfulton.com

Christopher Brook (NC Bar #33838)
American Civil Liberties Union
 of North Carolina Legal Foundation
PO Box 28004
Raleigh, NC 27611
Telephone:  (919) 834-3466
Facsimile:  (866) 511-1344
cbrook@acluofnc.org

Brian Hauss*
Elizabeth O. Gill*
American Civil Liberties Union
 Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2604
Facsimile: (212) 549-2652
bhauss@aclu.org
egill@aclunc.org

*Pro Hac Vice Applications Forthcoming

Counsel for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

### Civil Action No. 3:17-cv-0011

| | |
|---|---|
| **LONNIE BILLARD,** | |
| **Plaintiff,** | |
| **v.** | |
| **CHARLOTTE CATHOLIC HIGH SCHOOL, MECKLENBURG AREA CATHOLIC SCHOOLS, and ROMAN CATHOLIC DIOCESE OF CHARLOTTE,** | |
| **Defendants.** | |

### ANSWER

Defendants Charlotte Catholic High School ("CCHS"), Mecklenburg Area Catholic Schools ("MACS"), and Roman Catholic Diocese of Charlotte (collectively "Defendants"), by counsel, answering the Complaint filed by Plaintiff in the above-captioned action:

### Nature of Action

Defendants admit that Plaintiff was assigned to CCHS beginning in May 2001 as a full-time instructional teacher until his voluntary retirement in June 2012; Defendants admit that Plaintiff served as a substitute teacher assigned to CCHS following his voluntary retirement until December 2014; upon information and belief, Defendants admit that Plaintiff married his same-sex partner and publicly announced his intention to do so; Defendants admit that Plaintiff asserts claims pursuant to Title VII of the Civil Rights Act of 1964 and seeks declaratory and injunctive relief, damages and other equitable and legal remedies, but deny that Plaintiff can state any claim

1

or is entitled to any such relief; and Defendants deny the remaining allegations contained in what is referred to as "Nature of the Action" in Plaintiff's Complaint.

## Jurisdiction and Venue

1.      Upon information and belief, admit that this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331; admit that Plaintiff alleges a violation of Title VII of the Civil Rights Act of 1964, but deny that Plaintiff can state a viable claim or is entitled to any relief; and deny the remaining allegations in paragraph 1 of Plaintiff's Complaint;

2.      Admit that Plaintiff seeks declaratory relief as is authorized by 28 U.S.C. § 2201 and § 2202; but deny that Plaintiff is entitled to any such declaratory relief;

3.      Upon information and belief, admit that venue is proper in this Court pursuant to 28 U.S.C. § 1391; but deny that Plaintiff can state a viable claim or is entitled to any relief; and deny the remaining allegations in paragraph 3 of Plaintiff's Complaint;

4.      Upon information and belief, admit that at all times relevant Plaintiff has resided in Charlotte, North Carolina; but deny the remaining allegations in paragraph 4 of Plaintiff's Complaint;

5.      Admit that CCHS is a co-educational parochial school for students in grades 9 through 12; admit that CCHS operates in Charlotte, North Carolina; but deny the remaining allegations in paragraph 5 of Plaintiff's Complaint;

6.      Admit that MACS is a regional system of parochial schools in the Charlotte area, including CCHS and eight other schools; admit that MACS maintains its principal place of business in Charlotte, North Carolina; but deny the remaining allegations in paragraph 6 of Plaintiff's Complaint;

7.      Admit that the Roman Catholic Diocese of Charlotte is an unincorporated religious association which maintains its principal place of business in Charlotte, North Carolina; but deny the remaining allegations in paragraph 7 of Plaintiff's Complaint;

## Exhaustion of Administrative Remedies

8.      Admit that Plaintiff filed three Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") dated May 15, 2015, naming MACS, CCHS and the Roman Catholic Diocese of Charlotte as Respondents; admit the EEOC issued documents titled "Notice of Right to Sue (Issued on Request)" dated November 30, 2016, copies of which Plaintiff attaches to his Complaint as Exhibits A-C; but deny the remaining allegations in paragraph 8 of Plaintiff's Complaint;

9.      Deny the allegations in paragraph 9 of Plaintiff's Complaint, as they constitute legal conclusions to which no response is required; but, to the extent a response is required, deny the allegations in paragraph 9 of Plaintiff's Complaint;

10.     Upon information and belief, admit that Plaintiff graduated from Central Missouri State University with a Bachelor of Science in Education; upon information and belief, admit that Plaintiff spent roughly ten years in various instructional roles within various school systems prior to accepting employment with MACS; upon information and belief, admit that Plaintiff worked as a Human Resources Manager with Barnett Bank and in a managerial role with Bank of America prior to seeking employment with MACS; but deny the remaining allegations in paragraph 10 of Plaintiff's Complaint;

11.     Admit the allegations in paragraph 11 of Plaintiff's Complaint;

12.     Deny they have knowledge or information sufficient to form a reasonable belief regarding the truth of the allegations in paragraph 12 of Plaintiff's Complaint and, accordingly, deny those allegations;

13.     Deny they have knowledge or information sufficient to form a reasonable belief regarding the truth of the allegations in paragraph 13 of Plaintiff's Complaint and, accordingly, deny those allegations;

14.     Admit that Plaintiff applied for a full-time teaching position at CCHS on January 30, 2001; admit that Plaintiff was hired as a full-time teacher on May 11, 2001 for the 2001-2002 academic school year; but deny the remaining allegations in paragraph 14 of Plaintiff's Complaint;

15.     Admit the allegations in paragraph 15 of Plaintiff's Complaint;

16.     Admit that Plaintiff began teaching drama courses in the fall of 2002 until his voluntary retirement on June 8, 2012; but deny the remaining allegations in paragraph 16 of Plaintiff's Complaint;

17.     Deny they have knowledge or information sufficient to form a reasonable belief regarding the truth of the allegations in paragraph 17 and, accordingly, deny those allegations;

18.     Admit that Plaintiff retired from full-time teaching effective June 8, 2012; admit that following Plaintiff's retirement he served as a substitute teacher at CCHS; but deny the remaining allegations in paragraph 18 of Plaintiff's Complaint;

19.     Admit that Plaintiff did not sign a formal contract of employment when serving as a substitute teacher at CCHS; admit that Plaintiff was included on a list of substitute teachers

who were available to be called in for assignment when full-time teachers were unavailable; but deny the remaining allegations in paragraph 19 of Plaintiff's Complaint;

20. Admit that during the 2012-2013 academic calendar Plaintiff served as a substitute teacher assigned to CCHS for approximately ninety-four (94) days; admit that during the 2013-2014 academic calendar Plaintiff served as a substitute teacher assigned to CCHS for approximately seventy-six (76) days; admit that during the 2014-2015 academic calendar Plaintiff served as a substitute teacher assigned to CCHS for approximately sixty-nine (69) days; but deny the remaining allegations in paragraph 20 of Plaintiff's Complaint;

21. Admit that Plaintiff received positive performance evaluations as a full-time teacher and did not receive performance evaluations as a substitute teacher; but deny the remaining allegations in paragraph 21 of Plaintiff's Complaint;

22. Admit that Plaintiff listed his then-wife as his emergency contact person at the time his employment commenced, and that he listed Donham as one of multiple emergency contact persons on employment forms beginning in 2003, and repeatedly described Donham as a "Friend"; but deny they have knowledge or information sufficient to form a reasonable belief regarding the truth of the remaining allegations in paragraph 22 of Plaintiff's Complaint and, accordingly, deny those allegations;

23. Admit upon information and belief that Plaintiff published a post on the social media website Facebook in 2014 announcing his intention to marry his same-sex partner; but deny they have knowledge or information sufficient to form a reasonable belief regarding the accuracy of the alleged quotation or date of the post in paragraph 23 of Plaintiff's Complaint and, accordingly, deny those allegations;

24.     Deny they have knowledge or information sufficient to form a reasonable belief regarding the truth of the allegations in paragraph 24 of Plaintiff's Complaint and, accordingly, deny those allegations;

25.     Admit that CCHS Assistant Principal Steve Carpenter advised CCHS teacher Joan Stretch that Plaintiff would not be returning as a substitute for her English classes following the 2014 Christmas break; but deny they have knowledge or information sufficient to form a reasonable belief regarding the truth of the remaining allegations in paragraph 25 of Plaintiff's Complaint and, accordingly, deny those allegations;

26.     Admit that CCHS Assistant Principal Steve Carpenter advised Plaintiff via telephone that he would not be permitted to return as a substitute teacher at CCHS following the 2014 Christmas break because he had publicly announced his intention to marry a person of the same sex, in violation of Defendants' policies and the teachings of the Catholic Church; but deny the remaining allegations in paragraph 26 of Plaintiff's Complaint;

27.     Deny the allegations in paragraph 27 of Plaintiff's Complaint;

28.     Admit that Plaintiff has not been selected to serve as a substitute teacher at CCHS since December 2014; but deny the remaining allegations in paragraph 28 of Plaintiff's Complaint;

## Cause of Action

29.     Defendants incorporate herein by reference their responses to paragraphs 1 through 28 of Plaintiff's Complaint;

30.     Deny the allegations in paragraph 30 of Plaintiff's Complaint;

31.     Admit the allegations in paragraph 31 of Plaintiff's Complaint;

6

JA0026

32.     Admit the allegations in paragraph 32 of Plaintiff's Complaint;

33.     Deny the allegations in paragraph 33 of Plaintiff's Complaint;

34.     Deny the allegations in paragraph 34 of Plaintiff's Complaint;

35.     Deny the allegations in paragraph 35 of Plaintiff's Complaint;

36.     Deny the allegations in paragraph 36 of Plaintiff's Complaint;

37.     Deny the allegations in paragraph 37 of Plaintiff's Complaint;

38.     Deny the allegations in paragraph 38 of Plaintiff's Complaint;

39.     Deny it is required to respond to Plaintiff's prayer for relief; but, to the extent a response is required, deny that Plaintiff is entitled to any of the damages or relief he demands.

## **Affirmative & Additional Defenses**

Defendants, by counsel, state as follows for their affirmative and additional defenses, and averments:

1.     Defendants deny each and every allegation in Plaintiff's Complaint except as specifically admitted herein.

2.     Defendants deny they are required to respond to the allegations in Plaintiff's Complaint to the extent those allegations constitute legal conclusions.

3.     Plaintiff's Complaint fails to state claims upon which relief can be granted pursuant to the Federal Rules of Civil Procedure 12(b)(6).

4.     Any and all claims against Defendants must be dismissed, as they are not employers pursuant to Title VII of the Civil Rights Act of 1964.

5.     Plaintiff's Complaint is barred, in whole or in part, by all applicable statutes of limitations.

6.      Any claims for which Plaintiff failed to exhaust his administrative remedies, *e.g.*, by including the claim in a timely Charge of Discrimination filed with the EEOC, are barred.

7.      Plaintiff's claims are barred in whole or in part by the church autonomy doctrine and/or the First Amendment of the United States Constitution, including but not limited to the religion clauses, free speech clause, and/or the freedom of association clause.

8.      Plaintiff's claims are barred in whole or in part by the Religious Freedom Restoration Act.

9.      Plaintiff's claims are barred in whole or in part by the ministerial exception recognized in *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. ---, 132 S.Ct. 694 (2012).

10.     Defendants acted reasonably and in good faith at all times relevant to Plaintiff's claims and has not violated Title VII of the Civil Rights Act of 1964.

11.     All actions taken by Defendants with regard to Plaintiff were based on legitimate, non-discriminatory reasons, and all of Defendants' actions with respect to Plaintiff were for good cause.

12.     Defendants reserve the right to rely on the defense that Plaintiff has failed to mitigate his damages.

13.     To the extent Plaintiff seeks compensatory or punitive damages, such damages are not recoverable because Plaintiff cannot establish that Defendants acted with the requisite malice and/or bad faith. Plaintiff's claims for punitive damages also violate both the United States and North Carolina Constitutions.

14.    Defendants respectfully reserve the right to supplement their Answer and Affirmative & Additional Defenses to assert other lawful defenses applicable to this action.

Based on the foregoing, Defendants, by counsel, request the Court to enter an Order dismissing Plaintiff's Complaint, with prejudice; awarding them the costs expended herein; and granting such further relief as the Court deems just and proper.

This the 7th day of February 2017.

Respectfully submitted,

/s/ Meredith A. Pinson
John G. McDonald (N.C. Bar No. 23848)
jmcdonald@mcguirewoods.com
Joshua D. Davey (N.C. Bar No. 35246)
jdavey@mcguirewoods.com
Meredith A. Pinson (N.C. Bar No. 39990)
mpinson@mcguirewoods.com
McGuireWoods LLP
201 North Tryon Street, Ste. 3000
Charlotte, North Carolina  28202
704.343.2276
704.444.8753 (Facsimile)

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the court using

the CM/ECF system, which will send electronic notice to counsel for Plaintiff at the addresses as

follows:

> S. Luke Largess
> Tin Fulton Walker & Owen PLLC
> 301 East Park Avenue
> Charlotte, North Carolina 28202
> Telephone: 704-338-1220
> Facsimile:  704-338-1312
> Email:  llargess@tinfulton.com
>
> Christopher Brooke
> American Civil Liberties Union of North Carolina Legal Foundation
> P.O. Box 28004
> Raleigh, North Carolina 27611
> Telephone:  919-834-3466
> Facsimile:  866-511-1344
> Email:  cbrook@acluofnc.org

This the 7th day of February 2017.

.

> /s/ Meredith A. Pinson
> Meredith A. Pinson (N.C. Bar No. 39990)

10

## STIPULATION

Whereas the undersigned are parties to a lawsuit captioned *Lonnie Billard v. Charlotte Catholic High School, Mecklenburg Area Catholic Schools, and Roman Catholic Diocese of Charlotte*, Civil Action No.: 317-cv-0011, pending in the United States District Court for the Western District of North Carolina, Charlotte Division ("Lawsuit"); and

Whereas the parties in the Lawsuit seek to narrow the scope of questions at issue in the forthcoming deposition of Defendants Charlotte Catholic High School ("CCHS"), Mecklenburg Area Catholic Schools ("MACS"), and Roman Catholic Diocese of Charlotte ("Diocese") (collectively "Defendants") pursuant to Federal Rule of Civil Procedure 30(b)(6).

Therefore, the parties hereby stipulate and agree as follows:

1.     Defendants will not assert that Plaintiff Lonnie Billard ("Plaintiff") was a minister for purposes of the "ministerial exception" to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* at the time he was removed as a substitute teacher at CCHS and, therefore, will not invoke the "ministerial exception" to Title VII as a defense in this Lawsuit. Defendants reserve the right to assert all other defenses that may be available to Plaintiff's claims, including, without limitation, defenses under the First Amendment and/or the Religious Freedom Restoration Act. Plaintiff reserves the right to dispute all the alleged defenses raised by Defendants, including, without limitation, defenses under the First Amendment and/or the Religious Freedom Restoration Act. Based on Defendants' stipulation, Plaintiff stipulates not to explore Topics 2, 5, 6, and part of 8, set forth in Plaintiff's Fed. R. Civ. P. 30(b)(6) Notice of Deposition.

2.     Plaintiff was an employee of MACS and the Diocese at the time of his removal as a substitute teacher. Based on Defendants' stipulation, Plaintiff stipulates not to explore Topic 1 in Plaintiff's 30(b)(6) Notice of Deposition.

1

Stipulated and agreed to on this 11th day of August 2017.

S. Luke Largess
Tin Fulton Walker & Owen PLLC
301 East Park Avenue
Charlotte, North Carolina 28202
Telephone: 704-338-1220
Facsimile:  704-338-1312
Email:  llargess@tinfulton.com

Joshua Block
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004-2400
Telephone:  212-549-2627
Facsimile:  212-549-2650
Email:  jblock@aclu.org

Christopher Brooke
American Civil Liberties Union of North
Carolina Legal Foundation
P.O. Box 28004
Raleigh, North Carolina 27611
Telephone:  919-834-3466
Facsimile:  866-511-1344
Email:  cbrook@acluofnc.org

Brian Hauss
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY  10004
Telephone:  212-549-2604
Facsimile:  212-549-2652
Email:  bhauss@aclu.org

Elizabeth O. Gill
American Civil Liberties Union Foundation
39 Drumm Street
San Francisco, CA  94111
Telephone:  415-621-2493
Facsimile:  415-255-8437
Email:  egill@aclunc.org

*Attorneys for Plaintiff*

John G. McDonald (N.C. Bar No. 23848)
jmcdonald@mcguirewoods.com
Joshua D. Davey (N.C. Bar No. 35246)
jdavey@mcguirewoods.com
Meredith A. Pinson (N.C. Bar No. 39990)
mpinson@mcguirewoods.com
McGuireWoods LLP
201 North Tryon Street, Ste. 3000
Charlotte, North Carolina  28202
704.343.2276
704.444.8753 (Facsimile)

*Attorneys for Defendants*

2

Plaintiff's Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

LONNIE BILLARD,

      *Plaintiff*,

    v.

CHARLOTTE CATHOLIC HIGH SCHOOL,
MECKLENBURG AREA CATHOLIC
SCHOOLS, and ROMAN CATHOLIC
DIOCESE OF CHARLOTTE

      *Defendants*.

Civil Action No. 3:17-cv-0011

### DECLARATION OF LONNIE BILLARD

Pursuant to 28 U.S.C.§ 1746, I hereby declare as follows:

**My Background**

1.     I currently reside in Charlotte, North Carolina and have resided there for approximately twenty years.

2.     I am 70 years old.

3.     I graduated high school in 1964. After graduating high school I attended what was then called Central Missouri State College, now Missouri State University, where I received a Bachelor of Science in Education.

4.     I was issued a lifetime teaching accreditation for grades K-12 by the State of Missouri. I continue to hold this accreditation.

5.     After graduating college, I spent roughly ten years as a full-time teacher at various grade levels at other schools. During that time I taught English, American history, and speech therapy.

Plaintiff's Exhibit 2

6.      Before I began teaching at Charlotte Catholic High School ("CCHS"), I worked for nearly two decades as a Human Resource professional in four different businesses. Toward the end of my Human Resources career, I spent about a decade as a corporate executive with Barnett Bank and Bank of America.

7.      After retiring from my career in human resources, I decided to return to teaching because that was my original passion.

### My Work at CCHS

8.      I first applied to work as a substitute teacher at CCHS in January of 2001.

9.      After I submitted my letter of application, I was invited to interview for the position of substitute teacher at CCHS with Steve Carpenter, the Vice Principal of CCHS ("Carpenter"), and Gladys Howell ("Howell"), who was then-chair of the CCHS English department.. During the interview with Carpenter and Howell I was asked about my knowledge of grammar, vocabulary, and literature. Neither Catholicism nor the Catholic identity of CCHS was discussed during the interview.

10.      Shortly after the interview, I was hired by defendants to be a substitute teacher at CCHS. I began working in the spring Semester of 2001.

11.      I fell in love again with teaching. I felt that I was able to connect to the students and be relevant to them and their lives. I decided I wanted to become a full-time teacher, ideally at CCHS.

12.      After I began work as a substitute teacher at CCHS, I applied to become a full-time English teacher at CCHS.

13.      After I applied to be a full-time English teacher, I interviewed separately with each of the following individuals: Howell; Jeremy Kuhn ("Kuhn"), the incoming Chair of the CCHS English Department; Father Jim Cassidy ("Fr. Cassidy"), then-Principal of CCHS; and Carpenter.

Plaintiff's Exhibit 2

14. During my interview with Howell, we discussed the administration and structure of the English Department.

15. During my interview with Kuhn, we discussed the literature covered in the curriculum and my teaching methods for writing and grammar.

16. During my interview with Fr. Cassidy, we discussed teaching philosophy, classroom management, discipline, and teaching methodology.

17. During my interview with Carpenter we discussed my impressions, how I felt about the possibility of working at CCHS, and any questions I had.

18. I was hired as a full-time English teacher at CCHS. I began my position as a full-time English teacher during the fall 2001 semester.

19. I worked full-time as a teacher at CCHS from the fall 2001 semester until I retired from full-time teaching in the spring of 2012.

20. I taught English full-time at CCHS for the 2001-2002 school year. I then transitioned to teaching drama full-time during the 2002-2003 school year. I continued to work as a full-time drama teacher until my retirement from full-time teaching in the spring of 2012.

21. As a full-time drama teacher, I taught classes in film, acting, technical theater, and other drama-related subjects. I was also responsible for putting on the school plays and musicals each semester.

22. In the spring of 2011, I received the Inspirational Educator Award from North Carolina State University.

23. In the spring of 2012, I was selected as Teacher of the Year for CCHS which came with a $10,000 cash prize. Teachers are nominated for the award by their students. Jerry Healy, who was then-principal of CCHS, told me that I was the only teacher who had been nominated for the award every year since its inception in 2005.

Plaintiff's Exhibit 2

24.     I retired from full-time teaching in the spring of 2012. Before I retired, I received assurances from the school administration that I could continue to work at CCHS as a substitute teacher.

25.     After I retired from teaching full-time, I continued to work as a substitute teacher at CCHS. Each CCHS school year consists of approximately 177 student days, or roughly 35 weeks. During the 2012-2013 academic year, I worked as a substitute teacher at CCHS for approximately 94 school days. During the 2013-2014 academic year, I worked as a substitute teacher at CCHS for approximately 76 school days. During the Fall 2014 semester, I worked as a substitute teacher at CCHS for approximately 69 school days.

26.     Like other substitute teachers, and pursuant to CCHS policy, I did not sign a contract for employment with CCHS. Instead, I was included on a list of substitute teachers who were regularly called in for assignments when full-time teachers became unavailable.

27.     As a substitute teacher, I could accept or reject any particular teaching assignment. I primarily served as a substitute teacher for English courses because I have expertise on that subject.

28.     At all times during my employment by Defendants, I performed well. During my tenure as a full-time teacher, I always received positive performance evaluations. As a substitute teacher, I did not receive performance evaluations.

29.     During my time teaching at CCHS, all teachers were expected to begin each class with prayer led either by the teacher or the students. The campus minister, Mary Jane Dawson, informed me that there was no required content for the prayer Teachers generally chose for themselves how to conduct it. On many occasions, I used the time to speak to my students about issues they or their communities were facing. On other occasions, I invited the students to lead a prayer or read a prayer aloud to the class.

30.     During my time teaching at CCHS, there was an all-school mass approximately once per month.

Plaintiff's Exhibit 2

31.     Like other teachers at CCHS, I physically escorted and supervised the students during Mass. I performed no religious duties or function during the Mass.

32.     I did not direct or lead any of the religious aspects of the monthly all-school Masses.

## My Relationship with Rich

33.     I came out as gay to my family and close friends in 1995.

34.     I met my husband Richard Donham ("Rich" or "my husband") in the year 2000. We began a romantic relationship roughly a year after we first met. Rich and I became a couple and began living together in 2002.

35.     My romantic relationship with Rich was common knowledge among the school's parents, alumni, staff, and administration.

36.     Throughout the many years I taught at CCHS, I was open with Carpenter, Healy, and many others about my relationship with Rich.

37.     Rich customarily accompanied me to a variety of CCHS functions, including faculty parties, school plays, and other CCHS events. Carpenter and Healy often attended these events. At these events, Rich and I acted like any other couple. I did not usually bring anyone other than Rich to CCHS events.

38.     Healy first met Rich at an end-of-school party that Healy hosted for CCHS faculty, staff, and administrators at the end of his first year as principal. After the party Healy told me to make sure to bring my "friend" to the back-to-school party for the next school year. Healy said the word "friend" in an awkward manner. When I asked Healy if by "friend" he was referring to my partner, Rich, Healy remarked that he did not know if I was okay with him using that word.

39.     During the time I worked at CCHS, I told Healy, Carpenter, and many others that Rich and I had bought a house together.

Plaintiff's Exhibit 2

40.    At some point during the time I worked at CCHS, Rich lost his job. In a conversation with Carpenter, I recommended Rich for a substitute teacher position at CCHS. Carpenter interviewed Rich and hired him as a substitute teacher for CCHS. Rich also worked as a substitute teacher at Holy Trinity Middle School, where Carpenter's wife, Susan Carpenter, shared responsibility for procuring substitute teachers with the Vice Principal. Carpenter would often ask me whether Rich was available for a substitute teaching assignment at CCHS. Sometimes I answered the telephone when Carpenter or the middle school called our house to hire Rich as a substitute teacher.

41.    During the time I worked at CCHS, Healy, Carpenter, and others often asked me whether Rich and I had plans for vacations or holidays.

42.    If Rich and I were both working at CCHS on the same day, we customarily sat next to each other in the CCHS breakroom, which was located in an area right outside Healy and Carpenter's offices and frequented by CCHS staff, administrators, and faculty.

### My Marriage Announcement

43.    Rich and I began discussing marriage after the Supreme Court's decision in *United States v. Windsor*. We made the decision to get married in October 2014, after marriage for same-sex couples was legalized in North Carolina.

44.    I announced our marriage plans in a Facebook post I made on October 25, 2014 ("October 25 Facebook post"). A true and correct copy of the Facebook post is attached as Exhibit A. A number of my Facebook friends responded to my post to congratulate me on my upcoming marriage.

45.    I anticipated that my marriage might upset some officials at the Roman Catholic Diocese of Charlotte ("Diocese"). But I did not expect to be fired. I had been open about my relationship with Rich during my entire time at CCHS. I had previously heard about the music director from St. Gabriel Catholic Church being dismissed for marrying his partner. I did not

Plaintiff's Exhibit 2

believe that his situation was similar to mine because he was involved in religious activities—his primary function was to provide music for religious services—while I was a secular employee.

46. Within a few days after I made the October 25 Facebook post, I went to Carpenter's office and informed him about my marriage plans and the October 25 Facebook post. Carpenter congratulated me on my impending marriage.

47. During our meeting, Carpenter agreed that my marriage would likely displease the Diocese. Carpenter reminded me that a church music director for St. Gabriel's within the diocese had previously been dismissed after marrying his same-sex partner.

48. During our meeting, Carpenter told me that the diocese would not hear about the October 25 Facebook post or my intention to marry from him, which I took to mean that he wasn't going to inform the diocese about either the October 25 Facebook post or my intent to marry.

49. Within a week of my October 25 Facebook post Jessica Miller, another teacher at CCHS posted on Facebook that she was getting married. She remained a teacher for some time after her announcement and wedding. She now teaches in Atlanta, GA.

50. I did not hear anything further about my employment situation until I learned about my firing on Christmas Day.

**My Firing**

51. On December 25, 2014, Rich and I visited the home of Joan Stretch ("Stretch"), another teacher at CCHS, for Christmas dinner with some CCHS alumni and employees.

52. I mentioned to Stretch during that evening that I had not yet heard from CCHS about a substitute teaching assignment for January that I routinely performed after the Christmas break. Stretch told me that, when she spoke with Carpenter shortly before winter break to confirm that I would be handling the substitute teaching assignment, Carpenter informed her that I could no longer serve as a substitute teacher at CCHS.

53.     Stretch asked me not to tell Carpenter that she had informed me about their conversation. I agreed to wait a few days before contacting Carpenter.

54.     A few days later, I texted Carpenter to ask about my employment status. Shortly after I sent the text, Carpenter called and informed me that I would no longer be allowed to work as a substitute teacher at CCHS.

55.     During the call, I asked Carpenter why I had been dismissed. Carpenter told me that the Diocese decided to dismiss me because of my Facebook post announcing my marriage plans. He emphasized that it was the Diocese's decision, not his.

56.     When I was told that I could no longer teach at CCHS I was deeply hurt and saddened. I love teaching. I love having the opportunity to interact with students and parents and the possibility of having a positive influence on their lives. During my tenure parents frequently commended me on the difference I made with their children, letters were written to the administration about this. The administration frequently told me that I was a "blessing" and an "asset" to CCHS. To have that taken away was devastating. How could I have been successful and now was no longer worthy to do the one thing I truly loved? It was perplexing and I could make no sense of it. As with many people, a great deal of my personal identity and self-worth was wrapped in "I am a teacher at CCHS". Removing that "title" removed a big piece of me for quite some time.

57.     After I was able to process through the hurt and devastation I gradually became angry that I was dismissed. I was not a bad person, I performed my duties admirably, I had been rewarded with accolades and yet I was no longer fit to be a CCHS teacher. Why? Because I had the audacity to love someone and commit my life to them. I do not understand how love can be a disqualifier for employment.

58.     I felt that my firing was wrong and believed that the right thing to do was to stand up for myself. I believed that by standing up for myself I might inspire other people facing

discrimination to stand up for themselves too. I posted on Facebook about my feelings and decided to share my story with the media.

59.     In late January 2015, I wrote to Janice Ritter, the Diocese's Superintendent of Catholic Schools, asking for official confirmation that my employment had been terminated. To date, I have received no response. I have not been offered another teaching assignment at CCHS.

60.     On May 21, 2015, I filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which alleged that Defendants violated Title VII's prohibition on sex discrimination when they terminated me. The EEOC issued Notices of Right to Sue on November 30, 2016. Attached to this Declaration as Exhibits B, C, and D are true and correct copies of the Notices of Right to Sue.

61.     I have always told my students that you must live your life with integrity and stand for what is right. To simply accept my mistreatment would have made my words hollow and sent a message contrary to what I believe and what I hope I inspired my students to believe.

62.     I am proud of the time I spent at CCHS and cherish the many friends I continue to have among members of the administration, teachers, parents and former students.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: _9-21-17_

_Lonnie Billard_ (signature)

Lonnie Billard

USCA4 Appeal: 22-1440      Doc: 27      Filed: 09/29/2022      Pg: 46 of 1438

           IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                  CHARLOTTE DIVISION
           Civil Action No. 3:17-cv-0011


LONNIE BILLARD,                      )
                                     )
          Plaintiff,                 )
                                     )
vs.                                  )
                                     )
CHARLOTTE CATHOLIC HIGH SCHOOL,      )
MECKLENBURG AREA CATHOLIC            )
SCHOOLS, and ROMAN CATHOLIC          )
DIOCESE OF CHARLOTTE,                )
                                     )
          Defendants.                )
_____ )



                        Tuesday, August 15, 2017
                        Charlotte, North Carolina



     Deposition of W. KURT TELFORD, a witness herein,
called for examination by counsel for Plaintiff in the
above-entitled matter, pursuant to notice, before
Dayna H. Lowe, Court Reporter and Notary Public in and
for the State of North Carolina, at McGuireWoods, LLP,
201 North Tryon Street, Suite 3000, Charlotte, North
Carolina, commencing at the hour of 9:00 a.m.

Case 3:17-cv-00011-MOC-DCK   Document 28-5   Filed 09/23/17   Page 1 of 34

Plaintiff's Exhibit 5

Page 2

```
 1   APPEARANCES:

 2

 3        On behalf of the Plaintiff:

 4            JOSHUA A. BLOCK, ESQUIRE
              American Civil Liberties Union Foundation
 5            125 Broad Street, 18th Floor
              New York, New York 10004

 6

 7        On behalf of the Defendants:

 8            JOHN G. McDONALD, ESQUIRE
              JOSHUA D. DAVEY, ESQUIRE
 9            McGuireWoods, LLP
              201 North Tryon Street, Suite 3000
10            Charlotte, North Carolina 28202

11

12

13

14                          *   *   *

15

16

17

18

19

20

21

22

23

24

25
```

Plaintiff's Exhibit 5

1                    C O N T E N T S

2

3   Examination by Mr. Block:                              4

4

5

6

7            (No exhibits were identified.)

8

9

10

11

12

13                      *   *   *

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     P R O C E E D I N G S

 2    Whereupon,

 3                       W. KURT TELFORD

 4    was called as a witness and, having first been duly

 5    sworn, was examined and testified as follows:

 6                          EXAMINATION

 7            BY MR. BLOCK:

 8        Q.    Good morning, Mr. Telford.

 9        A.    Good morning.

10        Q.    My name is Josh Block.  I'm representing

11    Mr. Billard, and I'll be taking the deposition.  I just

12    want to go over a few ground rules to make sure that the

13    court transcript is clear.

14            The first is that since the court reporter is

15    writing down everything we say, it's important to give

16    answers verbally, like a yes or a no instead of a nod or

17    a uh-huh, just so she has a good transcript.

18            The second is it's very easy to talk over each

19    other, but it's important to make sure to wait until I

20    finish the whole question before answering just so she

21    can write down what I say and what you say.

22        A.    Okay.

23        Q.    And then the third is I want to make sure that

24    if anything I say is unclear that you ask me to clarify.

25    It's my job to ask you questions that you understand and
```

Plaintiff's Exhibit 5

Page 5

1  can answer, so if there's any ambiguity or if you don't

2  understand anything, please let me know and I'll

3  rephrase it.  Is that okay?

4       A.   Yes, sir.

5       Q.   Okay.  Have you ever had a deposition before?

6       A.   I don't know if it was a deposition, but

7  20 years ago it was an unemployment benefits hearing, so

8  it might have been with labor relations.

9       Q.   All right.

10      A.   I'm not really sure, it was so long ago.

11      Q.   Well, if you have a one-every-20-years ratio,

12  that's good.  So I just have a few questions.  Can you

13  say what your name is?

14      A.   Yes.  It's Walter Kurt Telford.

15      Q.   And what is your position at CCHS?

16      A.   Principal at Charlotte Catholic.

17      Q.   And how long have you had that position?

18      A.   Since July of 2014.

19      Q.   And what was your position before then?

20      A.   I was the principal at Our Lady of Grace in

21  Greensboro.

22      Q.   And was there a time at Charlotte Catholic

23  where you were serving in an interim or acting capacity?

24      A.   I was.  I was the interim from July until

25  December of 2014.

Plaintiff's Exhibit 5

Page 6

1    Q.   When is the first time you met Lonnie Billard?

2    A.   I don't recall the exact date.  I met him in

3    the fall but passing through.  He was a substitute

4    teacher.

5    Q.   Did you know him before you arrived at

6    Charlotte Catholic?

7    A.   No, I did not.

8    Q.   And so by the time you met him, he had already

9    retired as a full-time teacher, is that right?

10   A.   Yes, sir.

11   Q.   Do you recall any conversations you had with

12   him while passing in the hall?

13   A.   I don't recall any conversations.

14   Q.   Do you recall any conversations you've had

15   with other people pre-dating September 2014 in which

16   Mr. Billard came up?

17   A.   No.

18   Q.   Were you aware before September 2014 that

19   Mr. Billard is gay?

20   A.   No, I was not aware.

21   Q.   Before September 2014, had you ever met

22   Mr. Donham?

23   A.   No, I had not.  Had not.

24   Q.   When is the first time that you learned that

25   Mr. Billard is gay?

Plaintiff's Exhibit 5

Page 7

1    A.    December, the week that we were getting out

2    for Christmas break.  First time.

3    Q.    And how did you learn?

4    A.    Father Kauth came to me, and he's the

5    chaplain, and told me Mr. Billard had posted that he

6    was -- on Facebook that he was getting married to his

7    partner.

8    Q.    And you said this is the week before Christmas

9    break?

10    A.    The week we were going to get out for

11    Christmas break.  Mr. Billard was subbing for somebody,

12    I'm not sure who, but for that week.

13    Q.    He was subbing for someone that week that you

14    found out?  He was subbing?

15    A.    Yes.

16    Q.    Now, before Father Kauth told you, had

17    Mr. Carpenter spoken to you about Mr. Billard at all?

18    A.    Not that I'm aware of.

19    Q.    Had you heard any -- before Father Kauth spoke

20    to you, had you overheard anyone talking about

21    Mr. Billard being engaged?

22    A.    No.

23    Q.    So when Father Kauth spoke to you, what

24    exactly did he say?

25    A.    He said that Mr. Billard had posted on

Plaintiff's Exhibit 5

Page 8

1 | Facebook that he was going to marry his partner, and I

2 | think he was telling me because as principal I have to

3 | make decisions as far as employment, things of that

4 | nature, and make recommendations.

5 |      Q.   Did Father Kauth indicate what decision you

6 | should make based on that information?

7 |      A.   I wouldn't say he indicated or asked, but

8 | Lonnie posting goes against the tenets of the church,

9 | and you can't oppose the tenets of the church, so I

10 | thought we wouldn't be calling Lonnie anymore.

11 |      Q.   Did you feel that you had discretion to have

12 | Lonnie continue as a substitute if that's what you

13 | wanted to do?

14 |      A.   I don't think I had discretion in that.  I did

15 | call my boss, the superintendent, and I think she talked

16 | to HR just to make sure that I was making the right

17 | decision not calling him.

18 |      Q.   So what did you -- when did you call the

19 | superintendent?

20 |      A.   That day.

21 |      Q.   And the superintendent is Janice Ritter?

22 |      A.   Yes.

23 |      Q.   And what did you tell her?

24 |      A.   I said Lonnie has -- Lonnie Billard -- well, I

25 | think she knew who he was -- has posted that he's

Plaintiff's Exhibit 5

Page 9

1    marrying his partner, and I'm not going to call Lonnie

2    anymore.  She said -- as I recall it was -- she called

3    personnel, and I didn't hear any more because, again, I

4    don't think she saw it as I was making the wrong

5    decision.

6        Q.    And your understanding is she called personnel

7    because why?  Why do you have that understanding?

8        A.    Well, any time you're going to not use someone

9    as a sub, they could call HR, and it's almost a

10   heads-up.

11       Q.    So your understanding is she was notifying

12   them of a decision that had already been made not to

13   continue calling Mr. Billard, is that correct?

14            MR. DAVEY:  Objection.

15       A.    I'd be speculating, but possibly.

16            BY MR. BLOCK:

17       Q.    And just to be clear, did she tell you she was

18   about to call HR?

19       A.    No.  No.

20       Q.    When you informed the superintendent, did she

21   express any surprise that Mr. Billard was gay or was

22   getting engaged?

23       A.    I can't recall.

24       Q.    You said that she knew who Lonnie was.  How do

25   you know that?

Plaintiff's Exhibit 5

Page 10

1    A.   Her kids went to Charlotte Catholic.  He was I

2  believe a drama teacher, and Janice as -- Dr. Ritter, as

3  superintendent and as assistant superintendent, I

4  believe went to a lot of the plays.  She has since I've

5  been at Catholic.

6    Q.   At any time in talking with Dr. Ritter has

7  she -- has she -- let me start at the beginning.

8         At any time subsequent to this conversation

9  have you spoke with Dr. Ritter about Lonnie?

10   A.   I've talked to her about, for example, doing a

11  deposition, and that's how I know she spoke to HR.  I

12  found that out a few years later.

13   Q.   A few years later?

14   A.   Yeah.

15   Q.   So I'm not -- I don't want you to tell me any

16  information that involves attorney-client privilege at

17  all, but to the best of your recollection how many times

18  do you think you've spoken with Dr. Ritter about

19  Mr. Billard since December 2014?

20   A.   How many times has it been in the newspaper or

21  on TV?  That's usually the conversation, because it's

22  not something we want to be in the newspaper for.  It's

23  just not positive publicity for the school, so if it's

24  been in the newspaper or on TV generally.

25         And I talk to her three, four times a week,

Plaintiff's Exhibit 5

Page 11

1    sometimes three times a day, so some of the phone calls

2    were a check-in, how is it at Charlotte Catholic, or I

3    would say well, you saw today's paper or you saw

4    something on the news, so any time it was in the

5    newspaper is probably when I talked to her.

6        Q.    Why isn't it positive publicity?

7        A.    Well, I think the way it was presented, that

8    he was fired, and I didn't think we fired him.

9        Q.    How would you characterize it?

10       A.    He was a substitute teacher.  We chose not to

11   use him.

12       Q.    So besides that distinction between choosing

13   not to use him as a substitute and firing him, is there

14   any other aspect of the news stories that you perceive

15   to not be positive publicity?

16       A.    Well, again, probably not, other than the

17   firing.

18       Q.    So do you -- do you think that the fact that

19   Charlotte Catholic will not use substitute teachers who

20   are marrying someone of the same sex is a fact that is

21   going to generate positive publicity or negative

22   publicity or any other type of -- I don't want to -- let

23   me rephrase that question.

24            What type of publicity do you think would be

25   generated by the fact that Charlotte Catholic will not

Plaintiff's Exhibit 5

Page 12

1    use substitute teachers who have married someone of the

2    same sex?

3         A.   I'm not sure.

4         Q.   So in any of these subsequent conversations

5    with the superintendent, did she discuss her knowledge

6    of Mr. Billard's sexual orientation?

7         A.   No, she did not.

8         Q.   Did she ever indicate meeting Mr. Donham?

9         A.   She did not.

10        Q.   Have you talked with Jerry Healy about

11   Mr. Billard?

12        A.   I have not.

13        Q.   So backing up to when Father Kauth presented

14   you with this information, after Father Kauth told you

15   this, can you walk me through what you did next?

16        A.   I talked to Steve Carpenter, who is the

17   assistant principal who's in charge of substitutes, and

18   said Lonnie has posted -- Mr. Billard has posted.  I

19   said we can't use him anymore.  And then somewhere

20   during the day I called Dr. Ritter because I remember,

21   as I recall, Father Kauth spoke to me fairly early in

22   the day.

23        Q.   And what did Mr. Carpenter say in response?

24        A.   I can't recall.  I don't think it was

25   surprise.  I said let's let him finish out the week, and

Plaintiff's Exhibit 5

Page 13

1  that's why I don't know the exact date but it was

2  midweek, and I said we won't call him anymore.

3       Q.   Did Mr. Carpenter indicate whether he already

4  knew that Mr. Billard was getting married?

5       A.   While we talked that day?

6       Q.   Yeah.

7       A.   No.

8       Q.   While you talked that day, did he indicate

9  that he already knew that Mr. Billard was gay?

10      A.   I can't recall.  Subsequently, yes, he said he

11 knew he was gay.

12      Q.   When was that?

13      A.   Sometime after.  Just -- again, we didn't have

14 a lot of conversations.  I said Lonnie Billard has

15 posted, we can't use him.

16      Q.   And so what did Mr. Carpenter say to you when

17 he indicated that he knew that Lonnie was gay?

18      A.   I can't -- I really can't remember in the

19 conversation, but I think he was aware.

20      Q.   Did he say whether he was aware before the

21 engagement announcement or -- did he say whether he was

22 aware before the engagement announcement?

23      A.   He did not.

24      Q.   He didn't say one way or the other?

25      A.   No.

Plaintiff's Exhibit 5

Page 14

1    Q.    Did you ask him why he didn't inform you

2    earlier that Mr. Billard is gay?

3    A.    No, I didn't ask him.

4    Q.    Why not?

5    A.    I don't think it makes a difference whether

6    you're gay or straight or your sexual orientation.

7    Q.    Why is that?

8    A.    Why doesn't it make a difference?

9    Q.    Yeah.

10    A.    Well, again, the teachings of the church are

11    not -- we love all, so I don't think it matters whether

12    you're gay or straight.

13    Q.    But if a teacher is -- if a teacher at

14    Charlotte Catholic or a substitute teacher at Charlotte

15    Catholic is gay, is it your understanding that they must

16    be celibate in order to continue being a teacher or

17    substitute teacher?

18    A.    All teachers should be celibate, doesn't

19    matter whether you're straight or gay, if you're not

20    married.

21    Q.    So that answer is yes, then, right?  That if

22    you're gay and a teacher at Charlotte Catholic, in order

23    to continue working, you should be celibate?

24    A.    I don't think it's a simple yes-no.  I think

25    it's any teacher, gay or straight.  We're trying to

Plaintiff's Exhibit 5

Page 15

1   model behaviors we want all kids to have.

2       Q.   But you also think that -- it is also your

3   understanding that there is no context in which a

4   teacher at Charlotte Catholic who is gay could have

5   sexual activity with another person of the same sex.  Is

6   that right?

7           MR. DAVEY:  Objection.

8       A.   Can you restate the question?

9           MR. DAVEY:  It was just because I think it got

10  confusing.

11          MR. BLOCK:  Yeah, yeah.

12          BY MR. BLOCK:

13      Q.   So it's your -- your understanding is that

14  there's no -- that it is impossible for -- let me start

15  over.

16          Your understanding is that a teacher at

17  Charlotte Catholic cannot marry someone of the same sex

18  and continue working at Charlotte Catholic.  Is that

19  right?

20      A.   Yes.  That's correct.

21      Q.   And it's also your understanding that the only

22  context in which a teacher at Charlotte Catholic should

23  be having -- may have sexual activity is in the context

24  of marriage.  Is that right?

25      A.   Marriage between a man and a woman, yes.

Plaintiff's Exhibit 5

Page 16

1    Q.   So, therefore, it's your understanding that

2    there is no context in which a teacher at Charlotte

3    Catholic may have sexual activity with a person of the

4    same sex.

5        MR. DAVEY:  Objection.  You can answer.

6    A.   They should not.

7        BY MR. BLOCK:

8    Q.   So when Mr. Carpenter indicated to you that he

9    knew that Mr. Billard was gay, did he indicate whether

10   he had met Mr. Donham at all?

11   A.   He did not.

12   Q.   Did he indicate whether he knew that

13   Mr. Billard was sexually active?

14   A.   He did not.

15   Q.   Have you ever met someone who identified to

16   you as being gay but not being sexually active?

17   A.   They have not identified themselves that way

18   to me, but I don't ask the question.

19   Q.   Whose job is it at Charlotte Catholic to

20   enforce the prohibition on teachers publicly engaging in

21   conduct or advocating for conduct contrary to the moral

22   tenets of the Catholic faith?

23       MR. DAVEY:  Objection.

24   A.   I would be one of the persons.

25       BY MR. BLOCK:

Plaintiff's Exhibit 5

Page 17

```
 1        Q.    Who else?

 2        A.    Are you talking in a formal way or --

 3        Q.    Well, let's start with formal and then I'll

 4    ask informal.

 5        A.    Okay.  Well, formal it would be the principal.

 6    It probably would come to me.  And, again, I probably

 7    would talk to HR, and that would be the formal.  And I'd

 8    go through the superintendent to HR.

 9        Q.    And informally who's responsible?

10        A.    Well, I think we all are, so I think what

11    sometimes happens, somebody could send me information

12    and say, again, if somebody's doing something that's --

13    I don't want to say immoral, but maybe objectionable,

14    that could be anybody, because we're all role models.

15        Q.    Has there been any other time in which someone

16    has sent you that sort of information?

17        A.    I was sent something this past year.  A

18    teacher used profane language in a Facebook post.  It

19    was uncalled for.

20        Q.    Has there been any other time?

21              MR. DAVEY:  Just for clarification, are you

22    referring to just at Charlotte Catholic or when he was

23    at Our Lady of Grace as well?  I just want to make sure

24    I understood the time frame.

25              MR. BLOCK:  Any time frame actually.
```

Plaintiff's Exhibit 5

Page 18

```
 1        A.    Sure.  At Our Lady of Grace it happened also.
 2              BY MR. BLOCK:
 3        Q.    And how many times at Our Lady of Grace?
 4        A.    Once.
 5        Q.    And what was that about?
 6        A.    It was a staff member who was reported to be
 7   spending nights with his fiancee, and that was one
 8   where -- again, a parish school is a little different.
 9   Their superintendent is not directly over the school,
10   the priest is, so I went to the pastor and the pastor
11   dealt with it.
12        Q.    How did he deal with it?
13        A.    He told the gentleman that -- I think he
14   did -- he said he had been there.  The priest said you
15   could lose your job if I hear about it again, you will
16   no longer work for us, and that was how it was dealt
17   with.
18        Q.    In this incident we were just talking about --
19        A.    Yep.
20        Q.    -- how did a third party learn that the
21   teacher was spending nights at his fiancee's?
22        A.    I think he talked about it.
23        Q.    So do you think that when Mr. Carpenter first
24   learned that Mr. Billard was gay and not celibate that
25   he should have reported it to you?
```

Plaintiff's Exhibit 5

Page 19

1          MR. DAVEY:  Objection.  Just what's the time?

2    Because I think there was confusion on the prior

3    testimony.  When Mr. Carpenter told him this was after

4    the fact, so I just want to make sure I understand the

5    time.

6          BY MR. BLOCK:

7     Q.    Yeah.  So, I mean, having learned that

8    Mr. Carpenter had previously known, do you think that he

9    should have told you right away?

10         MR. DAVEY:  Again, objection, because my

11   understanding of the testimony is that Mr. Carpenter

12   never told Mr. Telford whether or not or knew whether or

13   not Mr. Billard was celibate or not.  I think your

14   question premised -- the first question said when he

15   told you that he wasn't celibate, so I think it's in

16   reference to --

17         MR. BLOCK:  It's well taken.

18         BY MR. BLOCK:

19    Q.    Did Mr. Carpenter, when he said that he

20   previously had heard that Lonnie was gay, did he

21   indicate whether he had previously heard that Lonnie was

22   getting engaged?

23    A.    He did not.

24    Q.    So if Mr. Carpenter had previously been aware

25   that Lonnie was engaged, should he have told you about

Plaintiff's Exhibit 5

Page 20

1  it?

2        A.   I'm not sure because of the context, because

3  he's known Lonnie for a long time.  So did he say it in

4  confidence?  I'm not sure.  That's hard for me to answer

5  that.

6        Q.   So if Lonnie had said it in confidence, in

7  this hypothetical situation, it would have been okay for

8  Mr. Carpenter not to tell you about it?

9             MR. DAVEY:  Objection.  You can answer.

10       A.   You know, again, it could be, look, you need

11  to go and talk to the priest.  It depends how he was

12  going to direct him.  I think -- again, I wasn't there

13  so I can't -- I'm speculating already.

14             BY MR. BLOCK:

15       Q.   Have you spoken with anyone else at Charlotte

16  Catholic who has indicated that they previously knew

17  that Lonnie was in a relationship with Mr. Donham?

18       A.   I have not.

19       Q.   At any time?

20       A.   Correct.

21       Q.   If another teacher at Charlotte Catholic had

22  known that Mr. Billard and Mr. Donham were in a romantic

23  relationship, what obligations would that teacher have

24  had to report it?

25       A.   That's a difficult question.  I don't know if

Plaintiff's Exhibit 5

Page 21

1    they're obligated to report it.

2         Q.    Why not?

3         A.    I think it's a matter of conscience, what you

4    feel you should report or not report.

5         Q.    You referenced Mr. Billard having made a

6    posting on Facebook.  If Mr. Billard had married

7    Mr. Donham but not posted about it on Facebook, would he

8    have been permitted to continue working as a substitute

9    teacher?

10             MR. DAVEY:  Objection.

11        A.    When I found out, no.

12             BY MR. BLOCK:

13        Q.    Are teachers at Charlotte Catholic allowed to

14   take contraception?

15        A.    Are you asking whether I -- I don't discuss

16   that so -- again, whether they're following the tenets,

17   I don't have that discussion with teachers.

18        Q.    But if you learned that a teacher was taking

19   contraception, what would the response be?

20        A.    I don't know that I'd ever learn that.  I've

21   been in this -- I've been a principal at different

22   levels for over 20 years.  That has never come across my

23   desk.

24        Q.    Do you think that -- if a teacher is engaging

25   in conduct that's contrary to the tenets of the church

Plaintiff's Exhibit 5

Page 22

1    but no one at CCHS finds out about it, are they

2    complying with the policy?

3         A.   Is it a teacher who's engaging in conduct

4    they're not supposed to?

5         Q.   Yeah.  So let me -- a teacher -- in the

6    contracts that teachers sign, is there a provision that

7    says teachers shall not publicly engage in or advocate

8    for conduct contrary to the tenets of the church?

9         A.   Teachings of the church, yes, there is.

10        Q.   If a teacher does engage in that contact but

11   does so in a manner that no one in the CCHS community

12   learns about it, do you think they're in breach of that

13   part of their contract?

14        A.   Yes.

15        Q.   So teachers shouldn't be engaging in that

16   conduct regardless of whether you end up finding out

17   about it, is that right?

18        A.   Correct.

19        Q.   So why don't you affirmatively ask teachers

20   whether they're engaging in that conduct?

21        A.   I don't think -- again, I'm not trying to be

22   the morality police, so it's just -- I don't think

23   that's -- I don't think it's my place to ask those

24   questions.  That's for -- if a priest were to ask -- and

25   I don't think a priest would ask that question.  I think

Plaintiff's Exhibit 5

Page 23

1    that would be you go to confession, you talk to a priest

2    if you have those questions about that.

3              Again, we're all sinners and sometimes it's,

4    you know, the Catholic Church, confession, things of

5    that nature.

6        Q.    When Father Kauth brought to your attention

7    the Facebook post, did he say how he had learned about

8    it?

9        A.    He said some people had sent information to

10    him.  He didn't say who.  I didn't ask.

11        Q.    So we've been talking about people engaging in

12    conduct.  Have you ever encountered a situation where

13    someone was advocating for conduct that ran afoul of the

14    school's policy?

15        A.    Can you give me an example?

16        Q.    Well, I'll give you a couple examples, with

17    the understanding that this is hypothetical.  Someone

18    announces that they support the legality of marriage for

19    same-sex couples.

20        A.    Were they advocating it?  By how?  Are they

21    going to a protest rally or --

22        Q.    How about they -- how about they attend a

23    relative's wedding and talk positively about it.

24        A.    I would probably ask them to talk to a priest.

25              MR. DAVEY:  And you noted it was hypothetical.

Plaintiff's Exhibit 5

Page 24

1   I'm just going to, just for clarity, object to the

2   hypothetical, but you may ask the question and use it

3   however is appropriate.

4           BY MR. BLOCK:

5       Q.   And has there ever been an actual situation in

6   any context, so not limited to the context of gay

7   people, in which someone was advocating for something

8   that you thought ran afoul of the school's policy?

9       A.   No.  But I think sometimes in my role people

10  aren't going to come to me and tell me.

11      Q.   Do you recall an assembly in the spring of

12  2014 in which I think her name was Sister Dominic spoke?

13      A.   Jane Dominic.  I wasn't there so --

14      Q.   Were you principal at Charlotte Catholic at

15  the time the assembly occurred?

16      A.   No.

17      Q.   Do you know how long after the assembly

18  occurred that you arrived at Charlotte Catholic?

19      A.   Four months, five months.

20      Q.   Have you spoken with anyone at Charlotte

21  Catholic about the assembly?

22      A.   Not about what exactly happened but just said

23  it was not good for anybody, and that's from I think

24  staff, parents, kids.

25      Q.   And why wasn't it good for anyone?

Plaintiff's Exhibit 5

Page 25

1     A.   I think some hot topics were pressed in the

2   meeting, and I think it didn't matter what side of the

3   spectrum you were on, it was just I think a difficult

4   assembly.

5     Q.   Do you think that it's okay for -- let me take

6   that back.  Sorry.

7          Do you think it's okay for employees at

8   Charlotte Catholic to say publicly that they disagree

9   with the decision to not allow Lonnie to continue as a

10   substitute?

11     A.   How do you mean public?  What do you mean

12   public?

13     Q.   Well, how about a teacher saying so to, you

14   know, another teacher in the break room?

15     A.   Conversations happen.  People are going to

16   have those.  I consider that private.  Now, public if

17   you meant in the newspaper, that's different.

18          MR. BLOCK:  If we can take a two-minute break,

19   I might actually be done with questions.

20          MR. DAVEY:  Certainly.

21          (Recess from 9:40 a.m. to 9:41 a.m.)

22          BY MR. BLOCK:

23     Q.   Just a few more.  I want to ask about the

24   policy at Charlotte Catholic to begin classes with a

25   prayer.  Was that policy in place before you came to

Plaintiff's Exhibit 5

Page 26

1   Charlotte Catholic?

2        A.   Yes.

3        Q.   And is it your understanding that a teacher

4   can choose to have a student lead the prayer instead of

5   leading it themselves?

6        A.   They can.  Yes.

7        Q.   And I want to ask about a teacher's

8   obligations to escort students to Mass when it's during

9   their class time.  Was that policy already in place when

10  you arrived?

11       A.   Yes.

12       Q.   Does a teacher in that position have any job

13  duties with respect to participating in the Mass?

14       A.   Well, we would ask to stand and sit and help

15  as kids go to communion.  They can go to communion.

16  They can't receive if they're not Catholic, but ask for

17  a blessing.  So we would ask that they participate in

18  some.

19            Again, teachers are coming back, and I have a

20  group of teachers who -- teachers are going to be

21  assigned areas during Mass because -- so you not only

22  participate but make sure the kids go in an orderly

23  fashion.  They're very good at Mass, but people

24  generally don't want to go up at the top of the

25  bleachers, so that's an administrative that I had some

Page 27

1   teachers say we'll put together a committee, because it
2   used to be voluntary.
3        Q.   And just to be clear, the people going up and
4   receiving blessings, are they students or teachers that
5   you're referring to?
6        A.   Anybody who's in attendance.
7        Q.   Can a teacher choose not to go up and receive
8   a blessing?
9        A.   Yes.  And so can students.
10       Q.   So it's optional?
11       A.   Yes.
12       Q.   Besides standing up and sitting down, are
13  teachers required to speak or participate in prayers as
14  part of a Mass?
15       A.   They're not.
16       Q.   Do you in your role as principal supervise --
17  sorry.  I want to start that question over.
18            Do you in your role as principal sit in and
19  evaluate teachers' classes at all?
20       A.   Yes.  Yes, I do.
21       Q.   And do you do that for teachers who are
22  teaching secular subjects?
23       A.   Yes.
24       Q.   In those classes, is there a requirement for
25  teachers to discuss Catholic doctrine at all?

Plaintiff's Exhibit 5

Page 28

1      A.   No.   There's no requirement.

2      Q.   If teachers wish to discuss Catholic doctrine

3  as part of their secular class, are they permitted to?

4      A.   I would prefer that they not.  And, again, it

5  depends -- let me rephrase.  It depends what they're

6  discussing.  If it's a feast day, a holy day, and you're

7  going to give information, but as far as opinions, no.

8  My preference would be no.

9      Q.   Your preference would be for the teachers

10  teaching religion classes --

11      A.   Religion.

12      Q.   -- to do that?

13      A.   And I've had kids come to me and ask me

14  religious questions and I'll say you need to speak to

15  Father or Sister, Sister Agnes, our department chairman.

16      Q.   Are you aware of whether there are any

17  students at Charlotte Catholic who are gay?

18      A.   I am.

19      Q.   And are you aware of whether there are

20  students who are gay and sexually active?

21      A.   I'm unaware.

22      Q.   Are students who are gay and sexually active

23  allowed to attend Charlotte Catholic?

24      A.   Yes.  And can I clarify?  The reason I know

25  they're gay is their parents have told me.

1     Q.    And why have the parents told you?

2     A.    Just letting me know.  I'm not -- quite

3  frankly, it happened this summer.  I would have said no

4  until three or four weeks ago.  Parents just told me.

5     Q.    And did the parents ask you to -- in this

6  situation ask you to do anything based on that

7  knowledge?

8     A.    No.

9           (Mr. Davey entered the proceedings.)

10          BY MR. BLOCK:

11    Q.    Were they concerned at all that the student

12  wouldn't be treated in a sensitive manner?

13    A.    Well, I'm not really sure, and when the one

14  parent talked he said I'm not really sure why I'm

15  telling you this.  He didn't come in specifically for

16  that.  I happened to see him.  He has multiple kids who

17  have gone through Catholic, and he said this one's gay,

18  which doesn't really matter.

19    Q.    Have you spoken with Mr. Billard at all?

20    A.    I have not.

21    Q.    And have you spoken with anyone at the Diocese

22  about Mr. Billard?

23    A.    No.

24          MR. BLOCK:  Okay.  I think that's all the

25  questions I have.

Plaintiff's Exhibit 5

Page 30

1          MR. McDONALD:  Can I just take one second?

2          MR. BLOCK:  Sure.

3          (Recess from 9:47 a.m. to 9:49 a.m.)

4          MR. McDONALD:  I have no questions.

5          (Whereupon, at 9:49 a.m. the deposition was

6   concluded.  Signature was reserved.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

Civil Action No. 3:17-cv-0011

**LONNIE BILLARD,**

      **Plaintiff,**

**v.**

**CHARLOTTE CATHOLIC HIGH
SCHOOL, MECKLENBURG AREA
CATHOLIC SCHOOLS, and ROMAN
CATHOLIC DIOCESE OF CHARLOTTE,**

      **Defendants.**

<u>**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

Exhibit 1
Deposition of Plaintiff Lonnie Billard (Volumes I & II)

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

LONNIE BILLARD,                          )
                                         )
            Plaintiffs,                  ) Civil Action No.
      vs.                                ) 3:17-cv-0011
                                         )
CHARLOTTE CATHOLIC HIGH SCHOOL,          ) Volume
MECKLENBURG AREA CATHOLIC                ) Pages 1-239
SCHOOLS, and ROMAN CATHOLIC              )
DIOCESE OF CHARLOTTE,                    )
                                         )
            Defendants.                  )
_____ )


DEPOSITION

OF

LONNIE BILLARD


Taken at:

McGuireWoods, LLP

Fifth Third Center

201 North Tryon Street

Charlotte, North Carolina


On Wednesday, August 16, 2017

REPORTER:  AMY A. BRAUSER, RPR, RMR, CRR

Notary Public

Lonnie Billard Vol. I (8/16/17)

Page 2

                    A P P E A R I N G
For the Plaintiff:    Christopher Brook, Esq.
                      American Civil Liberties Union
                        of North Carolina
                      P.O. Box 28004
                      Raleigh, North Carolina 27611
                      (919) 834-3466
                      cbrook@acluofnc.org
                         (and)
                      Brian Hauss, Esq.
                      American Civil Liberties
                        Union Foundation
                      125 Broad Street, 18th Floor
                      New York, New York 10004
                      (212) 549-2604
                      bhauss@aclu.org
For the Defendants:   Joshua D. Davey, Esq.
                      John G. McDonald, Esq.
                      Meredith A. Pinson, Esq.
                      McGuireWoods, LLP
                      201 North Tryon Street, Suite 3000
                      Charlotte, North Carolina 28202
                      (704) 343-2000
                      jdavey@mcguirewoods.com
                      jmcdonald@mcguirewoods.com
                      mpinson@mcguirewoods.com


                    I N D E X
                                          Page
EXAMINATION BY MR. DAVEY. . . . . . . . . .    5


            E X H I B I T S   M A R K E D
Number 1    Diocese of Charlotte Teacher        51
            Application Bates CCHS 000367 to 68


Number 2    Diocese of Charlotte Emergency      86
            data for Personnel Bates CCHS 000360

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 3 of 406
JA0074

Lonnie Billard Vol. I (8/16/17)

E X H I B I T S   M A R K E D   (con't)

| | | |
|---|---|---|
| Number 3 | Catholic Schools Teachers Meetings CCHS 000971 to 1026 | 117 |
| Number 4 | Color Slides Bates CCHS 000816 to 920 | 119 |
| Number 5 | Catholic School Teachers Meeting – August 2010 slides Bates CCHS 000921 to 970 | 119 |
| Number 6 | Diocese of Charlotte-MACS Teacher Employment Contract Bates CCHS 000565 | 121 |
| Number 7 | Faculty Handbook 2011-2012 Bates CCHS 000041 to 071 | 127 |
| Number 8 | Acknowledge of Receipt of Handbook Bates CCHS 000564 | 132 |
| Number 9 | Code of Ethics Policy Bates CCHS 000079 to 095 | 133 |
| Number 10 | Diocese of Charlotte Personnel Policies Handbook Bates Billard RFP 00052 to 148 | 140 |
| Number 11 | Acknowledgment of Receipt Bates CCHS 000578 | 141 |
| Number 12 | CCHS Formal Observation Instrument Bates CCHS 000385 to 389 | 147 |
| Number 13 | Teacher Evaluation Report Bates CCHS 000411 to 412 | 149 |
| Number 14 | Annual License Renewal Plan Review Bates CCHS 000435 | 152 |
| Number 15 | Individual Growth Plan Bates CCHS 000461 to 462 | 160 |
| Number 16 | Facebook post Bates Billard RFP 00045 to 051 | 185 |
| Number 17 | Facebook post Bates Billard RFP 000441 | 203 |

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 4 of 406
JA0075

Lonnie Billard Vol. I (8/16/17)

Page 4

          E X H I B I T S   M A R K E D   (con't)

Number 18    Facebook post Bates Billard          224
             RFP 000537


Number 19    Charlotte Observer article           228

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 5 of 406
JA0076

Lonnie Billard Vol. I (8/16/17)

1    Pursuant to Notice in the aforementioned matter

2  and in accordance with the North Carolina Rules of Civil

3  Procedures, this deposition of LONNIE BILLARD, was taken

4  by the Defendants, beginning at 10:58 a.m. on Wednesday,

5  August 16th, 2017, before Amy A. Brauser, RPR, RMR, CRR,

6  Notary Public.

7    LONNIE BILLARD, called as a witness, being first

8  duly sworn, was examined and testified as follows:

9

10    EXAMINATION BY MR. DAVEY

11  Q.  Mr. Billard, good morning.

12  A.  Good morning.

13  Q.  We met previously.  My name is Josh Davey, I'm one

14      of the attorneys for the Defendants in this

15      lawsuit.

16  A.  Right.

17  Q.  We are here today for your deposition.  Before we

18      get started, would you state your full name for the

19      record?

20  A.  Sure.  My name is Lonnie Howard Billard, that's B

21      as in boy, I-L-L-A-R-D.

22  Q.  Thank you.

23      And have you ever used any other names,

24      Mr. Billard?

25  A.  No.

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 6 of 406
JA0077

Lonnie Billard Vol. I (8/16/17)

Page 6

```
 1   Q.   Okay.  Have you ever testified before?
 2   A.   No.
 3   Q.   Okay.  So -- and I know you sat in on a couple of
 4        the depositions --
 5   A.   Right.
 6   Q.   -- in this case so you may have a general idea of
 7        how it works, but before we get started I'm going
 8        to just go over a couple of ground rules for the
 9        deposition.
10            The first thing is that everything we're saying
11        is being written down by the court reporter here.
12        What that means is it is important for you to
13        answer out loud rather than nodding your head or
14        shaking your head so she can take down your answer;
15        is that fair?
16   A.   Right.
17   Q.   It is also important that you and I try not to talk
18        over each other so that you let me finish my
19        question before you start answering and I'll try to
20        let you finish your answer before I ask another
21        question; is that fair?
22   A.   All right.  Thank you.
23   Q.   It's hard for her to write down if we're talking
24        over each other.
25   A.   Sure.
```

Lowrance Reporting Service, Inc.
704-543-7995   www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 7 of 406
JA0078

Lonnie Billard Vol. I (8/16/17)

1  Q.  We are going to go for a while today, but this is
2      not an endurance contest so if you need to take a
3      break at some point, let me know, I'm happy to do
4      that.  I would just ask you answer any question
5      that's pending, you know, before we go off the
6      record; is that fair?
7  A.  Okay.
8  Q.  If you don't understand a question, would you let
9      me know?  I'm going to try to ask clear questions
10     today, but once in a while I'll ask a question that
11     may not be so clear.  So if you don't understand
12     something or you want me to rephrase, just let me
13     know, okay?
14 A.  Sure.
15 Q.  Okay.  And I understand that you may be a bit hard
16     of hearing so if you don't hear something I say,
17     just let me know and I'll try to speak up and look
18     straight at you so that you --
19 A.  Okay.
20 Q.  -- don't have any problems, but do let me know if
21     you need me to repeat something.  Okay?
22         Have you ever been -- other than this case,
23     have you ever been a party to a lawsuit?
24 A.  No.
25 Q.  Okay.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 8 of 406
JA0079

Lonnie Billard Vol. I (8/16/17)

1    A.    Well, a divorce.

2    Q.    Okay.  Other than your divorce --

3    A.    No.

4    Q.    -- is that the only case?  Okay.

5          And you've just been divorced one time; is that

6          right?

7    A.    One time, that's correct.

8    Q.    Have you ever -- before this case, have you ever

9          filed any discrimination charges with the EEOC?

10   A.    No.

11   Q.    How about any discrimination charges with any state

12         agencies?

13   A.    No.

14   Q.    Okay.

15         Mr. Billard, are you under the influence of any

16         medications that might impact your ability to

17         testify in this case today?

18   A.    No.

19   Q.    Is there any -- any reason that you won't be able

20         to give truthful and complete answers in your

21         deposition today?

22   A.    No.

23   Q.    Okay.  Can you tell me what you did to prepare for

24         your deposition today?

25   A.    Worried.  Basically what I did is that I just -- I

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 9 of 406
JA0080

Lonnie Billard Vol. I (8/16/17)

```
 1         went back over this whole process in my mind and
 2         what -- so that I had a clear, as clear as
 3         possible, remembrances of the events of the process
 4         of what happened so that they kind of be fresh in
 5         my head.
 6    Q.   Okay.  Anything else you did to prepare?
 7    A.   No.
 8    Q.   Did you meet with your attorneys to prepare for the
 9         deposition today?  And don't tell me anything you
10         talked about if you did meet with them.
11    A.   Yes.
12    Q.   Okay.
13    A.   Yes, I did.
14    Q.   And how many times did you meet with your lawyers?
15    A.   Just the once.
16    Q.   Okay.  When did that meeting take place?
17    A.   Last Thursday, I believe.  Thursday afternoon.
18    Q.   Okay.  How long did that meeting last?
19    A.   I would say approximately two and a half to three
20         hours.
21    Q.   Did you review any documents to prepare for your
22         deposition today?
23    A.   No, I did not.
24    Q.   Mr. Billard, what's your date of birth?
25    A.   ███████ ██ ██.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 10 of 406
JA0081

Lonnie Billard Vol. I (8/16/17)

1  Q.  And are you from North Carolina?

2  A.  Not originally.

3  Q.  Okay.  Where are you from originally?

4  A.  Kansas City, Missouri.

5  Q.  Kansas City.  Okay.  Is that where you were born?

6  A.  Yes.

7  Q.  And how long did you live in Kansas City?

8  A.  Oh, gosh, 40-plus years.

9  Q.  Okay.  And where did you go after you left Kansas

10     City?

11  A.  From there I moved to Jacksonville, Florida --

12  Q.  Okay.

13  A.  -- for about ten years.

14  Q.  Okay.

15  A.  Then I moved here.

16  Q.  Okay.  And have you lived in Charlotte continuously

17     since you moved here from Jacksonville?

18  A.  I have.

19  Q.  Okay.  What's your current address, Mr. Billard?

20  A.  It's 5101 Harri Ann Drive, Charlotte, North

21     Carolina 28227.

22  Q.  How long have you lived at that address?

23  A.  About 10, 11 years, something like that.

24  Q.  Okay.  And when did you begin teaching at Charlotte

25     Catholic High School?

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 11 of 406
JA0082

Lonnie Billard Vol. I (8/16/17)

Page 11

```
 1   A.   2001, I believe.
 2   Q.   Okay.  During the -- since 2001 when you started
 3        teaching at Charlotte Catholic, have you lived
 4        anywhere else other than the Harri Ann address you
 5        just gave me a moment ago?
 6   A.   Yeah, when I first started teaching at Charlotte
 7        Catholic I lived on Selwyn Farms Avenue.
 8   Q.   Okay.
 9   A.   I think the number was 3200.  I owned a condo
10        there.  I think it was 3200 Selwyn Farms.
11   Q.   And do you remember approximately what years you
12        lived at the Selwyn Farms address?
13   A.   No, I don't.
14   Q.   Okay.  Other than the Selwyn Farms address and the
15        Harri Ann address that you gave me, have you lived
16        anywhere else in Charlotte during or since you
17        started teaching at Charlotte Catholic?
18   A.   Since teaching there?
19   Q.   Yes.
20   A.   No.
21   Q.   Okay.  And did you have other addresses in
22        Charlotte before you began teaching at Charlotte
23        Catholic?
24   A.   One.
25   Q.   Okay.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 12 of 406
JA0083

Lonnie Billard Vol. I (8/16/17)

```
 1   A.   Yes.
 2   Q.   What was that address?
 3   A.   I believe the actual address was 701 Smith, I
 4        think.  It's at the corner of Graham and Seventh
 5        Street.
 6   Q.   Okay.  Let me -- I just want to make sure I got the
 7        timeline at a high level of your time at Charlotte
 8        Catholic and I'll come back and ask you some more
 9        questions about that.  So I think you told me you
10        began teaching there in 2001 or thereabouts?
11   A.   2000/2001, yes.
12   Q.   Okay.  And is it -- was that the 2000/2001 school
13        year, is that what you're referring to?
14   A.   Yes.
15   Q.   Okay.  Gotcha.
16   A.   Yes.
17   Q.   So you started there in the fall of 2000?
18   A.   My first assignment was January, actually.  I
19        believe it was January.  I was called to be a
20        long-term substitute for a teacher that had
21        been -- that was out on medical leave.
22   Q.   Okay.  And at some point you became a full-time
23        teacher at Charlotte Catholic, right?
24   A.   Yes.
25   Q.   When did that happen?
```

Lowrance Reporting Service, Inc.
704-543-7995   www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 13 of 406
JA0084

Lonnie Billard Vol. I (8/16/17)

```
 1   A.   I think that's the 2001, I think.
 2   Q.   So for the 2001/2002 school year, your memory is
 3        that you were a full-time teacher that year?
 4   A.   I believe so, yes.
 5   Q.   Okay.  And then at some point you retired from
 6        full-time teaching, right?
 7   A.   Yes.
 8   Q.   And when did that happen?
 9   A.   2000 -- May -- June 2014, I think.
10   Q.   And by the way, I didn't mention this earlier, but
11        I'll ask you a lot of questions today and so if you
12        happen to think later on in the day about an answer
13        that you gave earlier and you need to correct
14        something or add some additional information, just
15        let me know and we can do that.  Okay?
16   A.   Yeah.
17   Q.   And then after you retired from full-time teaching
18        at Charlotte Catholic, you became a substitute
19        teacher again at Charlotte Catholic, right?
20   A.   That's correct.
21   Q.   If I've understood the chronology right, you lived
22        at the Harri Ann address the entire time that you
23        were a substitute teacher at Charlotte Catholic
24        after having retired from full-time teaching?
25   A.   That's correct.
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 14 of 406
JA0085

Lonnie Billard Vol. I (8/16/17)

Page 14

```
 1   Q.   Okay.
 2             Mr. Billard, have you ever been arrested?
 3   A.   Yes, I have.
 4   Q.   Can you tell me about that?
 5   A.   Sure.  I was arrested in -- in Florida, in Daytona
 6        Beach.  The circumstances of that was that I had
 7        gone to -- gone golfing with a bunch of guys.  One
 8        of the guys was getting married.  We -- several
 9        beers into the -- into the golf game, someone
10        thought it would be a great idea to go to a porn
11        theater and so we did.  The theater was raided and
12        everybody in the theater was arrested and taken
13        into the -- into the -- I think it was the Daytona
14        Beach City Police, but I'm not sure about that.
15   Q.   Did you spend any time in jail after that arrest?
16   A.   Well, just until I was bailed, I mean that same
17        day -- evening.
18   Q.   Okay.
19   A.   Yeah.
20   Q.   So a few hours?
21   A.   Yeah.
22   Q.   Okay.  When did this happen?
23   A.   Oh, I'm guessing -- let's see, what am I 70?
24        Twenty-five years ago, something like that.
25   Q.   Okay.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 15 of 406
JA0086

Lonnie Billard Vol. I (8/16/17)

Page 15

```
 1   A.   I don't -- I don't recall the date.
 2   Q.   So 25 years ago would have been, maybe, late 1980s.
 3        Does that sound right?
 4   A.   Yeah, that sounds right.
 5   Q.   Okay.
 6   A.   It would have been in late '80s, somewhere right
 7        around there, yes.
 8   Q.   Okay.  Is that the only time you've been arrested?
 9   A.   Yes.
10   Q.   Okay.  Did you -- were you charged with any
11        offenses following that arrest?
12   A.   From that arrest?
13   Q.   Yes, sir.
14   A.   It was -- let's see.  I don't remember the charge
15        that we all had.  The -- it was something about the
16        participation in lewd and lascivious or something
17        like that.
18   Q.   Okay.
19   A.   Okay?
20   Q.   Were you convicted of any offenses --
21   A.   No.
22   Q.   -- related to that?
23   A.   No.
24   Q.   Did you have to go to court?
25   A.   No.  I did hire an attorney.
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 16 of 406
JA0087

Lonnie Billard Vol. I (8/16/17)

Page 16

```
 1   Q.   Okay.
 2   A.   Okay?  And the attorney told me that I did not have
 3        to go to court, and she handled the whole thing and
 4        I paid her the money for representing me.
 5   Q.   Okay.  Did you have to pay any fines to the
 6        government as a result of that?
 7   A.   No.
 8   Q.   Okay.  Do you know what the outcome of the charges
 9        was, whether they were dismissed or whether there
10        was some other outcome?
11   A.   I -- I do remember this because I don't -- I still
12        to this day -- it was adjudication withheld.
13   Q.   Okay.  Other than this incident you told me about
14        in Daytona, have you ever been charged with any
15        crimes?
16   A.   No.
17   Q.   And you've never been convicted of any crimes
18        either?
19   A.   No.
20   Q.   Okay.
21            Obviously in this lawsuit, this lawsuit is a
22        lawsuit under Title VII, which is a
23        anti-discrimination law, and in this case, as I
24        understand it, you're alleging that you were
25        discriminated against by the Defendants.  Other
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 17 of 406
JA0088

Lonnie Billard Vol. I (8/16/17)

Page 17

1       than in this lawsuit, have you ever claimed that

2       you were the victim of discrimination?

3  A.  No.

4  Q.  Okay.

5       I'd like to ask you a little bit about your

6       educational background.

7  A.  Sure.

8  Q.  Can you tell me about your education after high

9       school, your college and any other degrees you

10       hold?

11  A.  Sure.  When I graduated from high school, I

12       attended what was then called Central Missouri

13       State College.  While I was there, it changed its

14       name, I believe, to Central Missouri State

15       University, CMSU.  I received a bachelor of science

16       in education in 1969, I think.  That's the only

17       degree I hold.

18  Q.  Okay.

19  A.  Okay?  I did take some courses at Rockhurst

20       University in Kansas City, Missouri as continuing

21       education but not for any degree -- pursuing any

22       degree.

23  Q.  Okay.  Do you have a recollection of how many

24       courses you took at Rockhurst?

25  A.  Oh, probably five or six is all.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 18 of 406
JA0089

Lonnie Billard Vol. I (8/16/17)

Page 18

1    Q.   Okay.  Did you receive college credit for those
2         courses?
3    A.   Yeah, they -- they were credit, yes.
4    Q.   Okay.  Do you have any other formal education after
5         high school other than what you just told me about?
6    A.   Say again, please.
7    Q.   Do you have any other formal education after high
8         school other than what you just told me about?
9    A.   No, I do not.
10   Q.   Okay.  What about other kinds of training or
11        certifications that you may have received since
12        high school.  Do you have anything of that nature?
13   A.   Yes.  When -- and I won't remember the date, but
14        when the Americans with Disabilities Act was passed
15        and enacted, I went through a formalized course on
16        how to implement that Act in the business
17        environment.
18            I also went through a series of -- they called
19        them courses, I would call them workshops, but
20        for -- on how to implement a software program
21        entitled PeopleSoft.  It was a human resources
22        software that Barnett Banks was putting into place
23        at that point.  And I was to be one of the people
24        to implement that.
25   Q.   Any other training or certifications that you can

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 19 of 406
JA0090

Lonnie Billard Vol. I (8/16/17)

1      recall?

2   A.  No, sir.

3   Q.  Tell me a little bit more about the Americans with

4       Disabilities Act training that you attended.  Where

5       did that take place?

6   A.  That took place in -- in Tallahassee, Florida.  It

7       was -- it was a third-party company that the bank

8       sent me to because I would be in charge of putting

9       together the -- the training for bank employees on

10      the implementation of the Americans with

11      Disabilities Act, and that was on employees, from

12      the employees' point of view.  It had nothing to do

13      with the -- the physical plant point of view, you

14      know, like ramps --

15  Q.  Okay.

16  A.  -- or braille or, yeah, anything like that.

17  Q.  Okay.  And you said that the bank sent you.

18      Were -- is this a bank you were working for?

19  A.  Yes.

20  Q.  Okay.  What was the name of that bank?

21  A.  Barnett Banks.

22  Q.  Barnett Banks.

23          Do you remember when this training took place?

24  A.  It would have been -- well, it was after the law

25      was passed but before it was enacted, and I don't

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 20 of 406
JA0091

Lonnie Billard Vol. I (8/16/17)

```
 1          remember those dates.
 2     Q.   Okay.  You mentioned there was a third-party
 3          company who conducted the training, did I hear that
 4          right?
 5     A.   Yes, that's correct.
 6     Q.   Okay.  Do you remember the name of that company?
 7     A.   I'm sorry, I do not.
 8     Q.   How long did the training last?
 9     A.   It was a two-day course, I believe.
10     Q.   Okay.  Were you provided any written materials in
11          connection with that training?
12     A.   Yeah, we had a notebook, if that's what you mean,
13          yes.
14     Q.   Okay.  Did you keep that notebook?
15     A.   No.
16     Q.   You don't have it today?
17     A.   Oh, no.
18     Q.   You mentioned that you were going to be in charge
19          with the bank of training employees regarding
20          implementation of ADA?
21     A.   Yes.
22     Q.   And did you ultimately have that responsibility
23          with your employer?
24     A.   I did.
25     Q.   Tell me what that entailed.
```

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 21 of 406
JA0092

Lonnie Billard Vol. I (8/16/17)

1    A.    Basically what that -- what that entailed was, it

2          was -- first of all, it started out with

3          sensitivity training for managers, particularly

4          hiring managers, and training managers on how to

5          recognize opportunities to make accommodations for

6          people that they might ordinarily dismiss out of

7          hand to make sure that managers knew that the kinds

8          of -- the kinds of assistance that would be

9          available like -- I can think, for example, Helen

10         was blind and yet she could be a teller, but she

11         needed a particular hearing thing where she could

12         hear what she was supposed to be doing while she

13         was dealing with the customer.  Those -- those

14         kinds of accommodations, mechanical accommodations

15         or -- or whatever that would be available to

16         managers.

17             I also made sure managers had the kinds of

18         resource -- I would say resource catalog is best

19         way I can think of it, you know.  If you need

20         hearing assistance, here's where you can -- or if

21         you need sight assistance or if you need that kinds

22         of things, you know, so they could get those things

23         directly rather than, you know, delaying the

24         process to come to me to go find somebody and that

25         kind of thing.

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 22 of 406
JA0093

Lonnie Billard Vol. I (8/16/17)

```
 1              I also trained employees on -- first of all, it
 2         was sensitivity training, how to deal with -- with
 3         people that are now a part of the workplace that
 4         they were not used to dealing with and what they
 5         can do or could do, should -- and what they should
 6         do.  And then also how to deal with customers who
 7         came in to one of the retail facilities and how
 8         they would -- and what they could do to make that
 9         visit more compliant with ADA, with the American
10         Disabilities Act, and, you know, how they could be
11         more sensitive to the special needs that that
12         person may bring with them into the retail
13         facility.
14    Q.   Okay.  Thank you for that explanation.
15              Any other job responsibilities you had in terms
16         of implementing the ADA that you didn't just tell
17         me about?
18    A.   Well, I did -- you know, I had kind of a -- it was
19         more an informal audit process where I went back
20         after the implementation had gone into effect, with
21         the law had come into effect, where I would visit
22         regional centers and -- and banking centers, you
23         know, to make sure, you know -- to kind of do an
24         audit on what they -- were they in compliance, what
25         kind of retraining would be -- might be necessary,
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 23 of 406
JA0094

Lonnie Billard Vol. I (8/16/17)

Page 23

```
 1        you know.  That kind of thing.
 2   Q.   Okay.  Did you ever have any responsibility for
 3        overseeing implementation of any other
 4        anti-discrimination laws other than the ADA?
 5   A.   No.
 6   Q.   Going back to your -- your education and -- and
 7        training that you've received, do you -- have you
 8        had any certifications from any kind of teaching
 9        certificates or any other kind of accrediting
10        agencies that you've received?
11   A.   Other than my teaching certificate, no.
12   Q.   Okay.  And you hold a teaching certificate from the
13        State of North Carolina?
14   A.   No, I do not.
15   Q.   Okay.  Did you at some point?
16   A.   No, I did not.
17   Q.   Okay.  Do you have any kind of -- other than the
18        college degree you told me about, do you have any
19        other certification relating to teaching?
20   A.   I do.  I have -- it was issued by the State of
21        Missouri.
22   Q.   Okay.
23   A.   It is a lifetime accreditation, K through 12.
24   Q.   Okay.  And is that still active today?
25   A.   Yes.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 24 of 406
JA0095

Lonnie Billard Vol. I (8/16/17)

1    Q.    And is that something that is recognized in North
2          Carolina?
3    A.    It -- yes, but there is a caveat to that, if I may.
4    Q.    Sure.
5    A.    I -- I don't know what the law says in North
6          Carolina for public schools, okay?
7    Q.    Okay.
8    A.    So I don't know how that -- how that would be
9          viewed in North Carolina for public schools, okay?
10         I know that -- no, I don't know.  I don't know how
11         that would be viewed.  Yeah.  When I was applying
12         for -- or actually trying to substitute at private
13         schools, and that's only where I tried to
14         substitute, I was told that -- that as long as I
15         had the certificate, that was fine.
16   Q.    Okay.  That's a good, I think, segue into the next
17         thing I wanted to ask you about, which is the jobs
18         you've held throughout your career.
19   A.    Sure.
20   Q.    Did you work full-time prior to going to college?
21   A.    Full-time?
22   Q.    Yes, sir.
23   A.    No.
24   Q.    Okay.  So why don't you walk me through, if you
25         would, the -- the full-time employment you had

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 25 of 406
JA0096

Lonnie Billard Vol. I (8/16/17)

| | | |
|---|---|---|
| 1 | | after your -- you received your college degree. |
| 2 | A. | Sure.  When I graduated from college, my first job |
| 3 | | was as a teacher and that was in Harrisonville, |
| 4 | | Missouri and the school district was titled Cass, |
| 5 | | C-A-S-S, Cass R9. |
| 6 | Q. | What -- sorry, were you finished? |
| 7 | A. | For that particular part, yeah. |
| 8 | Q. | Okay.  And how long did you hold that position as a |
| 9 | | teacher in Harrisonville? |
| 10 | A. | I believe it was six years. |
| 11 | Q. | Okay. |
| 12 | A. | Five years, may have been six, I don't recall. |
| 13 | Q. | What age level did you teach? |
| 14 | A. | I taught two different things.  I taught -- I did |
| 15 | | speech therapy for elementary students. |
| 16 | Q. | Okay. |
| 17 | A. | And then the other part of my job was teach English |
| 18 | | for high school. |
| 19 | Q. | Okay.  Did you -- did you do both of those at the |
| 20 | | same time or was there -- |
| 21 | A. | Yes. |
| 22 | Q. | Okay.  And were -- did those two jobs happen in |
| 23 | | different school buildings? |
| 24 | A. | Initially, no, but eventually, yes. |
| 25 | Q. | Okay.  Did you teach any other subjects in |

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 26 of 406
JA0097

Lonnie Billard Vol. I (8/16/17)

Page 26

1    Harrisonville, Missouri during that first period of
2    employment you told me about?
3  A.    Yes.
4  Q.    What are those?
5  A.    I also had one year where I taught a -- an American
6       history class.
7  Q.    Okay.  What grade level was that for?
8  A.    Also high school.
9  Q.    Okay.  After you left that position, what did you
10       do next?
11  A.    I took a year off and traveled and then came back
12       to Missouri and taught at Hickman Mills
13       Consolidated School District, I think is the name
14       of it.
15  Q.    Is that Hickman, H-I-C-K?
16  A.    H-I-C-K-M-A-N.
17  Q.    Okay.
18  A.    Hickman Mills.
19  Q.    How long were you employed in the Hickman Mills
20       School District?
21  A.    Six years, I think.
22  Q.    What subjects did you teach during that six-year
23       period?
24  A.    That was entirely speech therapy.
25  Q.    Okay.  For what age groups?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 27 of 406
JA0098

Lonnie Billard Vol. I (8/16/17)

```
 1   A.   Mostly elementary, but I did have some older
 2        students.
 3   Q.   And what was your next position of employment after
 4        you left the Hickman Mills School District?
 5   A.   I worked for a company by the name of
 6        Anaconda-Ericsson.
 7   Q.   What was your job with Anaconda-Ericsson?
 8   A.   I was a line supervisor.
 9   Q.   What does that mean?
10   A.   Anaconda, at that point -- Anaconda-Ericsson was
11        in -- in manufactured telephone cable.
12   Q.   Okay.
13   A.   Okay?  And they -- they put in a new -- a new
14        computerized process for the extrusion of plastic
15        onto copper wire, and they, for some reason,
16        thought that in order to run one of those machines
17        or to supervise people running those machines, you
18        needed a college degree.  And so I did that --
19   Q.   Okay.
20   A.   -- for about a year and a half, and then I -- they
21        asked me -- or I applied for and got the job of
22        quality assurance supervisor.
23   Q.   How long did you have the position of quality
24        assurance supervisor?
25   A.   About the same amount of time, about a year and a
```

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 28 of 406
JA0099

Lonnie Billard Vol. I (8/16/17)

```
 1        half.
 2   Q.   Okay.  How long were you employed with
 3        Anaconda-Ericsson total?
 4   A.   About three years.
 5   Q.   Three years.  Okay.
 6             So obviously that wasn't a teaching job?
 7   A.   No, it was -- not formally.
 8   Q.   Was it informally a teaching job?
 9   A.   I had to teach the people that worked for me, first
10        of all, in the first, how to do what they were
11        supposed to do.  Also in quality assurance as well.
12   Q.   Okay.
13   A.   But not specifically.
14   Q.   Is there a reason that, in particular, you decided
15        to leave teaching in a school setting for the job
16        at Anaconda-Ericsson?
17   A.   Yes.
18   Q.   What was that?
19   A.   Money.
20   Q.   The Anaconda-Ericsson job paid better?
21   A.   A lot better.
22   Q.   Any other reasons?
23   A.   No.  I was married.  We wanted a house, we wanted a
24        family, and we couldn't do that on a teacher's
25        salary.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 29 of 406
JA0100

Lonnie Billard Vol. I (8/16/17)

Page 29

```
 1   Q.   Fair enough.
 2             Where were you living when you worked for
 3        Anaconda-Ericsson?
 4   A.   Harrisonville, Missouri.
 5   Q.   Okay.  After you left the Anaconda-Ericsson job,
 6        what was your next position of employment?
 7   A.   I worked for a company by the name of Payless
 8        Cashways.
 9   Q.   What kind of company was that?
10   A.   It was kind of like a precursor to what is now a
11        Home Depot.
12   Q.   Okay.
13   A.   It was a do-it-yourself store, but those had
14        freestanding lumberyards.  They didn't have lumber
15        in the store like they do at -- like at a Home
16        Depot.
17   Q.   And what was your position with Payless Cashways?
18   A.   I started out there as a recruiter in human
19        resources.
20   Q.   And did you have some other positions while you
21        worked there?
22   A.   Uh-huh.
23   Q.   What were those?
24   A.   This was all within the employment section of -- of
25        this, but I had a training position there, a
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 30 of 406
JA0101

Lonnie Billard Vol. I (8/16/17)

| | | |
|---|---|---|
| 1 | | college recruiting, and then employee relations. |
| 2 | Q. | How long did you work for Payless Cashways? |
| 3 | A. | I don't recall.  I don't recall.  It was several |
| 4 | | years.  I worked there until the company was sold, |
| 5 | | but I don't recall -- I'm trying to remember. |
| 6 | | Maybe seven years. |
| 7 | Q. | Okay. |
| 8 | A. | I don't know for sure. |
| 9 | Q. | And were you still living in Harrisonville at that |
| 10 | | point? |
| 11 | A. | Initially yes, but actually, then, while I was |
| 12 | | working there we moved into -- into Kansas City. |
| 13 | Q. | Okay.  Is Harrisonville a suburb of Kansas City? |
| 14 | A. | Yeah, about 40 miles outside. |
| 15 | Q. | Okay.  You mentioned the company being sold.  Do |
| 16 | | you know who bought it? |
| 17 | A. | Who what? |
| 18 | Q. | Who bought Payless Cashways? |
| 19 | A. | I don't. |
| 20 | Q. | Okay.  But your employment with the company ended |
| 21 | | when the sale happened? |
| 22 | A. | Yes. |
| 23 | Q. | And was that -- were you laid off in connection |
| 24 | | with the sale or how did that happen? |
| 25 | A. | Yeah, what happened was -- actually, David Stanley |

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 31 of 406
JA0102

Lonnie Billard Vol. I (8/16/17)

```
 1          was the CEO and when the -- when the company was
 2          sold, David asked me if I would manage the
 3          outplacement of -- and this was for corporate
 4          employees, the outplacement of corporate employees,
 5          and I did, and then I managed my own outplacement.
 6     Q.   Okay.  Just, again, I want to get a rough sense of,
 7          you know, the approximate years you held these
 8          different positions.  Not designed to be a memory
 9          test, I just want to have an approximate timeline.
10          I know you finished your degree in 1969?
11     A.   Yes.
12     Q.   Okay.  And did you go straight to teaching in
13          Harrisonville after that?
14     A.   Yes.
15     Q.   Okay.  And so if you worked in that first job you
16          told me about in the Cass School District for about
17          six years?
18     A.   Yes.
19     Q.   So that would have been until approximately 1975?
20     A.   Yes.
21     Q.   Okay.  And you traveled during the '75/'76 school
22          year maybe?
23     A.   About that, yes.  It wouldn't have been a full
24          year, but it was close.
25     Q.   Okay.  And then was it the 1976/'77 school year
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 32 of 406
JA0103

Lonnie Billard Vol. I (8/16/17)

| | | |
|---|---|---|
| 1 | | that you started back teaching? |
| 2 | A. | Yes. |
| 3 | Q. | Okay.  And that would have -- you held that job for |
| 4 | | about six years, it would have taken you to about |
| 5 | | 1982? |
| 6 | A. | That sounds reasonable. |
| 7 | Q. | Okay.  And so that would have put you working for |
| 8 | | Anaconda-Ericsson from roughly 1982 to 1985? |
| 9 | A. | Okay, yeah. |
| 10 | Q. | Does that sound right? |
| 11 | A. | Yeah. |
| 12 | Q. | Okay.  And then Payless Cashways from maybe 1985 |
| 13 | | until 1992? |
| 14 | A. | No, that's -- that's too long. |
| 15 | Q. | Okay. |
| 16 | A. | I think it was more like 1990 or '91, I think. |
| 17 | Q. | Okay.  So in 1990 or '91, whenever your next |
| 18 | | position was, what was that next position of |
| 19 | | employment? |
| 20 | A. | With whom? |
| 21 | Q. | Well, where did you go to work after you left |
| 22 | | Payless Cashways? |
| 23 | A. | To Barnett Banks. |
| 24 | Q. | Okay.  And that happened in 1990 or '91? |
| 25 | A. | Yeah. |

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 33 of 406
JA0104

Lonnie Billard Vol. I (8/16/17)

Page 33

```
 1    Q.    Okay.  How long did you work for Barnett Banks?
 2    A.    Six years, seven years, until they were bought
 3          by -- well, it was then NationsBank which is now
 4          Bank of America.
 5    Q.    Gotcha.
 6              What was your position with Barnett Banks?
 7    A.    Originally I was hired to establish a centralized
 8          employment office for all of the -- of the -- what
 9          they called their affiliates.  I don't -- I don't
10          know that I understand the exact law, but there was
11          a trust company, there was an operations company,
12          there was a brokerage company, there -- you know,
13          they had like seven or eight affiliates.  And each
14          affiliate had its own human resource system and
15          it's own CEO, et cetera.  Barnett built a campus
16          where all of those people, all of those affiliates,
17          were housed.
18    Q.    Okay.
19    A.    And in that campus, it made sense to -- to garner
20          some -- some benefits from having them all in one
21          spot and create an employment office that could
22          feed into all of those -- all of those affiliates,
23          you know, candidates to be hired.
24    Q.    And did you hold that role for the entire period
25          you worked at Barnett Banks?
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 34 of 406
JA0105

Lonnie Billard Vol. I (8/16/17)

Page 34

1  A.    No.

2  Q.    Okay.

3  A.    Barnett, like a lot of -- a lot of banks in

4        particular at that time, went through lots of

5        restructuring and during that time I stayed in the

6        recruiting management, that piece of it, for -- for

7        quite a while and did that -- actually was doing

8        that when I did the Americans with Disabilities.

9        That was at the end of that piece.  And then after

10       that is when I moved into the -- the -- what

11       Barnett called was the in-house consulting group

12       and that was that PeopleSoft thing I told you

13       about.  They were putting in that -- that

14       particular piece of software.

15 Q.    Uh-huh.

16 A.    And it was at the end of that implementation that

17       the -- the bank was sold to NationsBank.

18 Q.    Okay.  And did your employment end when the sale to

19       NationsBank took place?

20 A.    No.  I was still employed there during the

21       transition, if you will, from -- from -- from

22       Barnett to Nations.  Nations had people in -- in

23       there, you know, managing that whole transition

24       process and I was approached by the people at

25       NationsBank and offered a job here in Charlotte.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 35 of 406
JA0106

Lonnie Billard Vol. I (8/16/17)

1  Q.   Okay.  Did you take that job?

2  A.   Pardon me?

3  Q.   Did you take that job?

4  A.   I did.

5  Q.   When you were working for Barnett Banks, were you

6       living in Jacksonville at that point?

7  A.   Yes.

8  Q.   So did you move to Jacksonville after your

9       employment with Payless Cashways ended?

10  A.   Yes.

11  Q.   Okay.  I know you told me you're divorced.  Were

12       you still married at the point when you moved to

13       Jacksonville?

14  A.   Yes.

15  Q.   Okay.  So you were just telling me you accepted a

16       job offer in Charlotte.  Do you remember what year

17       that was or approximately what year?

18  A.   Let's see.  I was 50 years old.  I'm 70 now

19       so . . . I'm sorry, I'm not good with numbers,

20       guys, I'm not good at numbers.

21  Q.   That's okay.  So this is 2017, so I think that

22       would take us back to 1997?

23  A.   That sounds --

24  Q.   Does that sound about right?

25  A.   Sounds pretty good.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 36 of 406
JA0107

Lonnie Billard Vol. I (8/16/17)

1   Q.   Okay.  And so you came to work in Charlotte for

2         NationsBank.  What was your position at that point

3         in time?

4   A.   Yeah.  I was -- my title was senior vice president

5         of personnel.  They did not use the term human

6         resources, which was kind of a -- a humacall thing.

7   Q.   Okay.

8   A.   And originally here, I -- I was brought here to put

9         together a call center that -- that served the

10        employees of NationsBank, and the primary purpose

11        of it, although not the exclusive purpose, was to

12        enroll employees into benefits -- into benefit

13        program, to make -- to help employees through the

14        process of, oh, gosh, 401Ks or, you know, what

15        are -- what do I have available for family leave or

16        anything that was human resources related, that was

17        where employees would call that -- that call

18        center.

19   Q.   Okay.

20   A.   And I put that together and then managed that.

21   Q.   Did you have any responsibility for coming up with,

22        I guess, policies or procedures that the call

23        center employees would use to provide answers to

24        employees who had questions?

25   A.   I'm not sure I understand.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 37 of 406
JA0108

Lonnie Billard Vol. I (8/16/17)

1   Q.   So as you were describing it, it sort of sounds

2       like what you're -- this call center was designed

3       to be internal human resources and employee

4       benefits call center for the bank; is that fair?

5   A.   That's correct.

6   Q.   Okay.  So people might call with questions about

7       leave or -- or whatnot and the call center employee

8       would then have to provide some kind of answer to

9       the employee about how much leave you have left or

10      here's how you enroll in our retirement plan or

11      whatever the question might be?

12   A.   That's correct.

13   Q.   Do you have that right?

14   A.   Yeah.  Okay.

15   Q.   So in terms of providing answers to employees who

16      might call in, do you know if the call center

17      employees, you know, had any written materials that

18      they would have to refer to to get -- make sure

19      they got the answer right for the employees who

20      would call?

21   A.   Yes.  Actually they were -- it was all

22      computerized.

23   Q.   Okay.

24   A.   It was like an employee handbook.

25   Q.   Yeah.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 38 of 406
JA0109

Lonnie Billard Vol. I (8/16/17)

1   A.   That -- but it was on a screen.

2   Q.   Okay.

3   A.   And when an employee called in, initially they

4        would identify themselves, and we could pull up

5        their record and then we could pull up on the other

6        half of the screen, we could pull up the employee

7        handbook so we would know what they were eligible

8        for.  Were they full-time, were they part-time, and

9        that kind of thing.

10  Q.   Okay.  And did you have any responsibility for

11       helping develop the employee handbook?

12  A.   No, I did not.

13  Q.   All right.  Somebody else came up with the

14       contents?

15  A.   That's correct.

16  Q.   Okay.  Have you ever had responsibility in any of

17       the positions you told me about for developing an

18       employee handbook?

19  A.   Handbook?  No.

20  Q.   How about developing something similar to an

21       employee handbook even if it didn't have that name?

22  A.   No.  The only thing I can think of is that when --

23       when NationsBank started the process of buying Bank

24       of -- Bank America based in California, in

25       San Francisco, pardon me, I was on the transition

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 39 of 406
JA0110

Lonnie Billard Vol. I (8/16/17)

Page 39

```
 1          team and traveled back and forth, and one of the
 2          things, then, that I was asked to do was to pull
 3          together employees from -- from NationsBank,
 4          because they had not changed their name at that
 5          point, and begin to pull together a -- the new
 6          policy for -- for partner benefits, benefits for
 7          same-sex or non-married partners.
 8   Q.     Okay.  And what responsibilities did you have in
 9          terms of developing those policies?
10   A.     Basically, it was -- it was pulling together people
11          from various parts of the bank and getting their
12          thoughts, their attitudes, their feelings, first of
13          all, to determine whether or not there was, you
14          know -- we wanted -- wanted to know what would be
15          the level of acceptance for that in Charlotte.  We
16          knew that we would have to -- have to somehow put
17          that -- pull that together because we were
18          inheriting a lot of employees from Bank America
19          that already had those benefits.
20   Q.     Okay.
21   A.     Okay?  So it was more in line of knowing what Bank
22          America had, finding out where we thought we were,
23          and then trying to marry the two.  And -- and the
24          attitude for that was, we wanted it to come from
25          within the managerial core, the employee core, and
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 40 of 406
JA0111

Lonnie Billard Vol. I (8/16/17)

Page 40

1             not be dictated by senior management.

2    Q.    Okay.  Did you have any understanding, and I know

3          you're not an attorney, but did you have any

4          understanding at that time of whether any of the

5          benefits that were offered to same-sex partners or

6          other unmarried partners were legally required to

7          be provided?

8    A.    I don't know.

9    Q.    Okay.

10            Other than that role you just told me about in

11         terms of working on these benefits, have you had

12         any other responsibility in any of your other

13         positions for coming up with policies, guidance

14         documents relating to -- in -- in the employment

15         relationship between employees and any of your

16         employers?

17   A.    No, I don't believe so.

18   Q.    Okay.  In any of your positions that you've told me

19         about, did you have any responsibility for dealing

20         with issues relating to sex discrimination?

21   A.    No.

22   Q.    How about discrimination on the basis of sexual

23         orientation?

24   A.    No.

25   Q.    Going back to your job history, I think we decided

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 41 of 406
JA0112

Lonnie Billard Vol. I (8/16/17)

```
 1        you moved to Charlotte in about 1997.  How long did
 2        you continue to work for NationsBank after that?
 3   A.   About three -- about three years.
 4   Q.   Okay.  And did you go back to teaching after that?
 5   A.   I did.
 6   Q.   Okay.  Did you have any other full-time employment
 7        after NationsBank before you went back to teaching?
 8   A.   No.
 9   Q.   What -- what made you decide to go back to
10        teaching?
11   A.   Very simple.  I was in the corporate life to make
12        money.  I had a son that was in college.  By the
13        time -- he was -- he was in the latter part --
14        well, no, he just was finishing college while I was
15        still employed with -- with then Bank of America.
16        He graduated from college, I no longer needed that
17        income, and I'm a teacher.  That's all I ever
18        wanted to do.  That's all I've ever been, I think,
19        good at.
20   Q.   Gotcha.
21           You mentioned your son.  Your son's name is
22        Ian.  Do I have that right?
23   A.   Ian, yes.
24   Q.   Do you have any other children other than Ian?
25   A.   I do not.
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 42 of 406
JA0113

Lonnie Billard Vol. I (8/16/17)

```
 1    Q.   And you told me about your divorce earlier.  When
 2         did that occur?
 3    A.   I was 51.
 4    Q.   Okay.  You moved to Charlotte when you were 50 you
 5         told me, right?
 6    A.   Uh-huh, I believe, yeah.
 7    Q.   Okay.
 8    A.   My move to Charlotte and my divorce were kind of
 9         together.
10    Q.   Gotcha.
11              What's your ex-wife's name?
12    A.   Pardon me.  Her legal name is Valerie.
13    Q.   Okay.
14    A.   But -- but she goes by Jeanne.
15    Q.   Jeanne.  Okay.  I think I've seen her name.  And
16         did she go by Jeanne Billard when you are married?
17    A.   When we were married.
18    Q.   Yeah.  And did she change her last name after you
19         divorced?
20    A.   When she remarried.
21    Q.   Okay.  What's her last name today?
22    A.   Haldiman.
23    Q.   Haldiman.  H-A-L-D-I-M-A-N?
24    A.   Uh-huh.
25    Q.   Okay.  Obviously, you were married to Jeanne for a
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 43 of 406
JA0114

Lonnie Billard Vol. I (8/16/17)

Page 43

```
 1          period of time.  How long were you and Jeanne
 2          married?
 3    A.    Twenty-four years, I think.  Twenty-four, 25,
 4          something like that.
 5    Q.    Do you remember how old you were when you got
 6          married?
 7    A.    Thirty-one or two, something like that.
 8    Q.    Okay.
 9    A.    Thirty -- about that.
10    Q.    And then you're married today?
11    A.    I am.
12    Q.    Have you been married any other times other than to
13          Jeanne and to Mr. Donham?
14    A.    No, I have not been.
15    Q.    Okay.  So you've only had just one divorce then?
16    A.    That's correct.
17    Q.    Okay.
18              So I think we got through all of your
19          employment history up to the point where you
20          started at Charlotte Catholic; is that correct?
21    A.    Yes, I think so.
22    Q.    Okay.  Are there any other positions of employment
23          you had before you began working at Charlotte
24          Catholic that you didn't tell me about?
25    A.    Yes, but they were -- yeah, they were short-term,
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 44 of 406
JA0115

Lonnie Billard Vol. I (8/16/17)

```
 1              like a couple weeks here, a couple -- when -- that
 2              I would help people out.  There was a restaurant
 3              in -- in Harrisonville.  The people that owned it,
 4              the husband just dropped dead unexpectedly.  I went
 5              in and managed it for, I don't know, three weeks,
 6              four weeks, so the widow could kind of get through
 7              the grieving process and, yeah, that kind of thing,
 8              but nothing of a formal nature.
 9    Q.       Okay.  No other -- no other full-time employment
10              from the time you finished college up until the
11              point you started teaching at Charlotte Catholic
12              that you didn't tell me about?
13    A.       No, you've got it all.
14    Q.       Okay.  Great.
15                   I think you told me earlier that when you
16              started looking for teaching positions you were
17              only focused on private schools.  Did I hear that
18              right?
19    A.       That's correct.
20    Q.       Okay.  What was the reason for that?
21    A.       The reason for that was -- is the reputation of the
22              Mecklenburg School District, Mecklenburg County
23              schools, Charlotte-Mecklenburg.
24    Q.       And what do you mean by "the reputation"?
25    A.       It wasn't very good.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 45 of 406
JA0116

Lonnie Billard Vol. I (8/16/17)

1    Q.   Okay.

2    A.   Wasn't well managed.  Lots of discipline problems.

3    Q.   Okay.

4    A.   And as a new sub, you get put in the very worst

5         assignments.

6    Q.   Yeah.

7              Were you applying specifically at that point

8         for only substitute teaching positions or were you

9         also applying for full-time positions?

10   A.   No, at that point I was only applying for

11        substitute.

12   Q.   Okay.  What's the reasoning for that as opposed to

13        applying for a full-time position?

14   A.   Sure.  I had been out of the classroom a number of

15        years, obviously.

16   Q.   Right.

17   A.   And before I committed to being a teacher again, I

18        needed to know two things.  One, could I relate to

19        the kids, and two, could I be relevant.

20   Q.   Uh-huh.

21   A.   I can't imagine -- well, there are -- there are

22        very few things in this world that -- that are more

23        horrifying to me than an irrelevant teacher, a

24        teacher who has no clue what the heck's going on.

25   Q.   Yeah.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 46 of 406
JA0117

Lonnie Billard Vol. I (8/16/17)

Page 46

```
1   A.    And I was not going to be one of those.  I want to
2         be -- I wanted to go back and be a teacher, but I
3         had to be sure I could meet those two criteria,
4         that kids that were now a lot younger -- they
5         weren't really younger but I had just gotten older,
6         the kids -- that I could relate to them and that I
7         could be relevant to them.
8   Q.    Gotcha.
9             And do you remember -- obviously, you applied
10        at Charlotte Catholic because you were hired there,
11        but do you remember if you applied anywhere else?
12  A.    For substituting?
13  Q.    Yes.
14  A.    Yes, yes.  I also substituted at Country Day --
15  Q.    Okay.
16  A.    -- and Charlotte Latin.
17  Q.    Okay.  Anywhere else that you applied and didn't
18        get hired as a substitute that you recall?
19  A.    I -- yeah, what I did, if I could clarify that,
20        Josh, is I just -- yeah, I -- I didn't know the
21        schools here and so I looked up private schools,
22        basically, in the yellow pages, and saw -- and I
23        don't remember how many -- I sent letters out
24        saying this is me, these are my qualifications, I'm
25        available to be a substitute.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 47 of 406
JA0118

Lonnie Billard Vol. I (8/16/17)

1    Q.    Okay.

2    A.    And those are the three that -- that called me to

3          be -- to -- to actually come and be a substitute.

4          I don't honestly recall whether or not I sent any

5          more than that.

6    Q.    Okay.  And now when it came to the transition to

7          full-time teaching, that happened the next school

8          year?

9    A.    Yes.

10   Q.    Did you have any offers for full-time teaching

11         positions other than Charlotte Catholic?

12   A.    I did.

13   Q.    And where was that?

14   A.    That was at Charlotte Country Day Middle.

15   Q.    And why did you decide to go work at Charlotte

16         Catholic instead of Charlotte Country Day Middle?

17   A.    Two things, primarily.  One was that the -- I

18         felt a -- I felt more comfortable with the faculty

19         at Charlotte Catholic and I felt like -- I felt

20         like the students were more approachable, that the

21         students were less guarded, less Eddie Haskell.

22   Q.    And I just didn't catch the very last thing you

23         said, less guarded, less what?

24   A.    Eddie Haskell.

25   Q.    You might have to explain that one to me.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK    Document 31-1    Filed 09/21/17    Page 48 of 406
JA0119

Lonnie Billard Vol. I (8/16/17)

```
1              MR. BROOK:  Come on, Josh.
2              THE WITNESS:  You ever see Leave It To
3         Beaver?
4              MR. BROOK:  Instead of making John
5         feel old here.
6              MR. DAVEY:  I know.
7              MR. BROOK:  There's just not that much
8         difference in age.
9              THE WITNESS:  There used to be a 1950s
10        television show entitled Leave It To Beaver.
11   BY MR. DAVEY:
12   Q.   Got it.
13   A.   And there was one kid that would come to the
14        Cleavers' house, and he was -- he was, Hello,
15        Mrs. Cleaver; you look lovely, Mrs. Cleaver; I sure
16        like you, Mrs. Cleaver, Mr. Cleaver.  He was a suck
17        up.
18   Q.   All right.  And that -- so if I understand you,
19        that was your, sort of, impression you had at
20        Charlotte Country Day Middle --
21   A.   Yeah.
22   Q.   -- of the student body?
23   A.   Sorry.
24   Q.   Got it.  That's very vivid.  I like that.
25             You also said -- I think you said you were more
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 49 of 406
JA0120

Lonnie Billard Vol. I (8/16/17)

Page 49

1       comfortable with the faculty at Charlotte Catholic?

2   A.   Yeah.

3   Q.   Tell me what you mean by that.

4   A.   I remember I -- probably a good example of that is

5        that I was teaching, it was freshmen, it was

6        freshmen English at Country Day, and I was teaching

7        Romeo and Juliet.  And I remember going to lunch

8        and I sat down at a -- because they had a specified

9        area for teachers --

10  Q.   Okay.

11  A.   -- and I sat down, and I was -- I introduced

12       myself, people introduced themselves, and it was --

13       the entire conversation was about who do you know.

14       Do you know this family, do you know that family,

15       do you -- you know, and then it was about, you

16       know, those people's position in the community or

17       what country club they belonged to or what position

18       they held at what -- at what company.  It

19       was all -- it seemed to me to be very superficial.

20       And I thought, well, that's the first day.  For the

21       next week, over a week, that was the conversation

22       every single day, and I thought I -- this -- I'm

23       not comfortable doing that.  That's -- I'm not here

24       because somebody's kid, you know, some -- some kid

25       has a dad that's a president of something.  That's

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 50 of 406
JA0121

Lonnie Billard Vol. I (8/16/17)

```
 1        absolutely no interest to me whatsoever.
 2   Q.   Okay.  A moment -- I think you said those two
 3        reasons that you just described, the faculty you're
 4        more comfortable with and then the student body was
 5        more approachable.
 6   A.   Uh-huh.
 7   Q.   I think you said those were the primary reasons.
 8        Are there any other reasons you chose Charlotte
 9        Catholic --
10   A.   Oh, yeah.
11   Q.   -- as opposed to Country Day?
12   A.   "Primary" was probably a bad choice of words.  You
13        know, that -- that really came down to it.
14   Q.   Okay.  Now, you knew -- at that point you obviously
15        were aware that Charlotte Catholic was a Catholic
16        high school?
17   A.   That's correct.
18   Q.   Okay.  Did that have any impact on your decision to
19        go teach there as opposed to Country Day?
20   A.   Not particularly.
21   Q.   You doing okay?  You want a break or . . .
22   A.   Can I get some water?
23   Q.   Yeah.  Why don't we go off the record for just a
24        minute, we'll take a quick break and come back in
25        just --
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 51 of 406
JA0122

Lonnie Billard Vol. I (8/16/17)

 1   A.   Okay.

 2   Q.   -- three or four minutes.

 3        (RECESS TAKEN FROM 12:01 P.M. TO 12:06 P.M.)

 4       (EXHIBIT NUMBER 1 WAS MARKED FOR IDENTIFICATION)

 5   BY MR. DAVEY:

 6   Q.   Mr. Billard, let me hand you what I marked as

 7        Exhibit Number 1.  Take as much time as you need to

 8        to look that over, but my question is whether you

 9        recognize Exhibit Number 1?

10   A.   Oh, yes.

11   Q.   And what is Exhibit 1?

12   A.   It looks like it was my application to -- to be a

13        teacher at Charlotte Catholic.

14   Q.   Okay.  And it's dated January 30, 2001.  Do you see

15        that there?

16   A.   Yes.

17   Q.   Is that consistent with your recollection of when

18        you applied --

19   A.   Yes.

20   Q.   -- to teach there?

21   A.   I guess, yeah.

22   Q.   If you look down here in the first top half of the

23        page, there's a -- there's a line for religion.  Do

24        you see that?

25   A.   Uh-huh.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 52 of 406
JA0123

Lonnie Billard Vol. I (8/16/17)

1    Q.    And it says Episcopal?

2    A.    Uh-huh.

3    Q.    Are you an Episcopalian?

4    A.    I have been -- yes, I've been confirmed an

5          Episcopalian.

6    Q.    Okay.  Are you a practicing Episcopalian today?

7    A.    Yes.

8    Q.    And have you been an Episcopalian continuously

9          since 2001 up to the present?

10   A.    Since 2001, no.

11   Q.    Okay.  Tell me about that.  Have you had any other

12         religious affiliation then?

13   A.    Basically, I -- I was a practicing Catholic, so --

14         so to speak.

15   Q.    Okay.

16   A.    Okay?  In that my religious experience during that

17         period of time would be what -- you know, whatever

18         I chose to participate in as far as what was

19         offered at the school.

20   Q.    Okay.  So when you were working at Charlotte

21         Catholic, did you have a parish that you attended

22         on the weekends?

23   A.    No.

24   Q.    Okay.  Neither Catholic or Episcopal?

25   A.    That's correct.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 53 of 406
JA0124

Lonnie Billard Vol. I (8/16/17)

```
 1    Q.    Okay.  But your -- you would -- sounds like you
 2          would attend school masses, for example?
 3    A.    Generally, but not always.
 4    Q.    Sure.  Okay.
 5              And then you mentioned other "religious
 6          experience" through the school.  What -- what do
 7          you mean by that?
 8    A.    Well, if -- they had a thing, I believe it was --
 9          one morning during the week, I don't recall which
10          morning --
11    Q.    Uh-huh.
12    A.    -- but it was called faculty prayer.
13    Q.    Okay.
14    A.    And it was just a prayer service where the faculty,
15          if they wanted to go, they could go, and there was
16          a little prayer service that teachers would read.
17          Lasted about 15 minutes or so, something like that.
18    Q.    Okay.  And did you attend that prayer service?
19    A.    I attended it occasionally.
20    Q.    Okay.  And do you have -- can you -- can you
21          ballpark how often you would go?
22    A.    Probably a -- wow.  A couple times a month, maybe.
23    Q.    Okay.
24    A.    If -- for me, it was when I needed to go
25          versus a -- versus a -- a duty to go.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 54 of 406
JA0125

Lonnie Billard Vol. I (8/16/17)

```
 1   Q.   Okay.  No one told you you had to go?
 2   A.   That's correct.
 3   Q.   Yeah.
 4            Were you ever formally a member of the Catholic
 5        church?
 6   A.   No.
 7   Q.   Okay.  Did you ever receive any sacraments in a
 8        Catholic church?
 9   A.   Yes.
10   Q.   Can you tell me about that?
11   A.   Sure.  There was a period in my early childhood
12        where we -- we were Catholic, so to speak, as I
13        look back.  I mean, I thought we were Catholic, but
14        who knows.  When -- when I was in college, my
15        roommates were Catholic so if I would go to church,
16        I would go with them to the Catholic church.  When
17        I left college, I briefly attended a Catholic
18        church and -- but it was on -- most likely on high
19        holy days.
20   Q.   Okay.
21   A.   More like Christmas, Easter, Ascension, et cetera.
22        When I -- when I met my soon-to-be wife, Jeanne --
23   Q.   Uh-huh.
24   A.   -- Jeanne had been married before.
25   Q.   Okay.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 55 of 406
JA0126

Lonnie Billard Vol. I (8/16/17)

Page 55

1   A.   Okay?  And she was -- she was Protestant, but also

2        not a practicing Protestant.

3   Q.   Okay.

4   A.   And I'm trying to remember how this all came about,

5        but I remember I said, Well, you know, I had gone

6        to the Catholic church a few times.  So she and I

7        went to the Catholic church.  We talked to the

8        priest there who said, Well, you'll have to get an

9        annulment.  We said, What's that, how does that

10       happen?  He said, Well, give us $5,000 and you can

11       have an annulment.  And I thought that was -- I

12       thought that was junk.

13  Q.   Uh-huh.

14  A.   Buying forgiveness.  I didn't buy that.  So when

15       Jeanne and I did get married or -- we got married

16       in the Episcopal church.  By that time, I had been

17       confirmed in the church.

18  Q.   The Episcopal church?

19  A.   Yes.

20       When I interviewed at -- at Charlotte Catholic,

21       the principal was a priest, and that was Father

22       Jim, and I -- I, you know, remember talking about

23       being -- I don't remember exactly what -- how it

24       came up, but the -- how -- how things were very

25       similar between the two, but I remember having that

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 56 of 406
JA0127

Lonnie Billard Vol. I (8/16/17)

Page 56

1              kind of conversation with Father Jim.

2    Q.    Okay.  Were you baptized in the Catholic church?

3    A.    I don't know.

4    Q.    And you -- sounds like you've not been confirmed in

5          the Catholic church?

6    A.    I have not.

7    Q.    Okay.  And you weren't married in the Catholic

8          church?

9    A.    I was not.

10   Q.    Have you ever been to confession in a Catholic

11         church?

12   A.    Have I been to --

13   Q.    Been to a confession in a Catholic church?

14   A.    One time.

15   Q.    Have you received communion in a Catholic church?

16   A.    I have.

17   Q.    Have you ever received last rights from a Catholic

18         priest?

19   A.    Last rights?

20   Q.    Yes, sir.

21   A.    No.

22   Q.    Okay.  So has there been a -- I appreciate your

23         description of your, sort of, religious journey.

24         Has there been a time in your adult life when you,

25         you know, regularly attended a church on the

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 57 of 406
JA0128

Lonnie Billard Vol. I (8/16/17)

```
 1       weekends?
 2   A.  Yes.
 3   Q.  Okay.  Tell me about that.
 4   A.  That was just prior to and during my marriage to
 5       Jeanne, and that was at Episcopal church, through
 6       our initial move to Florida and then we kind of --
 7       we got away from it.
 8   Q.  Okay.  Other than that period, have you ever had a
 9       period in your adult life when you regularly
10       attended a church on the weekends?
11   A.  No.
12   Q.  Did Jeanne ever get an annulment in the Catholic
13       church?
14   A.  She did not.
15   Q.  Okay.  Your son, Ian, did you have him baptized in
16       the Catholic church?
17   A.  I did not.
18   Q.  Okay.  Let me ask you about, if you would go back
19       to Exhibit 1, on the second page here.  There's a
20       line near the top of the page that says, Courses in
21       Religious Education Since 1985.  Do you see that
22       there?
23   A.  Courses in Religious Education.  Got it.
24   Q.  And there's a -- if I'm reading it right, it says:
25       (Reading)
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 58 of 406
JA0129

Lonnie Billard Vol. I (8/16/17)

```
 1                 Liturgy and lay ministry, dash,
 2            Father Brian Packer.
 3    A.    Father Packer.
 4    Q.    (Reading)
 5                 Dash, private study to become lay
 6            reader, chalice bearer, and homily,
 7            dash, tested and licensed by . . .
 8    A.    The Right Reverend Arthur Vogel.
 9    Q.    Thank you.
10            Can you explain what that means?
11    A.    Sure.  Sure.  Father Packer was the priest at
12          the -- at Saint Peter's Episcopal Church in
13          Harrisonville.  I went through a formalized study
14          process with him to be -- to be licensed to become
15          a lay reader and a chalice bearer and to deliver my
16          own homilies that I would write myself.
17    Q.    Okay.
18    A.    That was a several, several-month process and it
19          happened in stages.  And once you go through that,
20          you get tested on your knowledge of the
21          Episcopalian sacraments on policies -- teaching of
22          the church, et cetera, and then if you pass that,
23          the bishop of that diocese, who was Arthur Vogel,
24          Bishop Vogel, then -- then licensed you to be able
25          to serve in those capacities.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 59 of 406
JA0130

Lonnie Billard Vol. I (8/16/17)

1    Q.    Okay.  So Father Packer and Bishop Vogel are -- are

2          Episcopal clerics?

3    A.    That's correct.

4    Q.    Okay.

5             So I want to the go back to the -- after you

6          got hired at Charlotte Catholic, you spent part of

7          this year 2001 as a substitute?

8    A.    Uh-huh.

9    Q.    Do you remember what classes you substituted for?

10   A.    Well, originally, my first assignment was for --

11         for English.  I believe -- I believe most of the

12         classes were seniors because I remember teaching

13         Frankenstein to them and that's taught at the

14         senior level.

15   Q.    Senior level.

16   A.    Yeah.

17            And that was while ███████  ███████, who was the

18         actual teacher, ███████ ███████ had -- had surgery and

19         was out.  And then when he came back, I had

20         assignments for Catholic.  I also had assignments

21         at the other -- at the other two schools.

22   Q.    Okay.  And tell me how it worked at that time in

23         terms of how you would know if you were needed to

24         sub at Charlotte Catholic?

25   A.    You get a call from Mr. Carpenter.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 60 of 406
JA0131

Lonnie Billard Vol. I (8/16/17)

```
 1    Q.   Okay.  Was he the vice principal during this 2001
 2         school year when you began --
 3    A.   Yes.
 4    Q.   -- as a sub?  Okay.
 5    A.   Yeah.
 6    Q.   And so he would call you?
 7    A.   He would.
 8    Q.   And how would that go?  Would he just say, Can you
 9         come in on a particular day?  Or what was the
10         process?
11    A.   Well, from the very beginning, I sent a letter
12         to -- to the high school saying, you know, here I
13         am, I'm wonderful, I want to be a sub.  I got
14         a -- within a couple days after I sent the letter,
15         I got a call from Steve Carpenter asking me to come
16         in.  So I went in and I talked with him, and he
17         then had a lady by the name of Gladys -- Gladys,
18         shoot, she was the chair of the English department.
19         Okay?
20    Q.   Okay.
21    A.   And she was only there during that time when I was
22         substituting so I don't recall her name, I'm sorry,
23         maybe it'll come to me.  Gladys talked to me.
24    Q.   Okay.
25    A.   Okay?  And her -- her point was to be sure I
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 61 of 406
JA0132

Lonnie Billard Vol. I (8/16/17)

```
 1            understood grammar, I understood vocabulary, I
 2            understood literature.  That I could teach English.
 3    Q.      Uh-huh.
 4    A.      And within a day or so, I -- Steve offered me the
 5            position to cover for ████  ██████ while he was
 6            on -- on medical leave.  Does that answer your
 7            question?
 8    Q.      Yeah, that's helpful.
 9                So sounds like you had a meeting with Steve and
10            Gladys prior to being approved to serve as a
11            substitute; is that fair?
12    A.      That's correct.
13    Q.      Okay.  How long did that meeting last?
14    A.      How long did that what?
15    Q.      Do you recall how long you met with Steve and
16            Gladys?
17    A.      It all happened in an afternoon.  I would say no
18            more than two hours.
19    Q.      Okay.  Was that more in the nature of a job
20            interview or was it in the nature of an orientation
21            about this is the new job you're about to begin?
22    A.      I -- Gladys was more of a interview, basing --
23            trying to figure out if I had the knowledge --
24    Q.      Uh-huh.
25    A.      -- necessary to teach the class, is what I got out
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 62 of 406
JA0133

Lonnie Billard Vol. I (8/16/17)

Page 62

```
 1            of it.  Steve's was more of a, this is how we do
 2            things, you know, this is what -- you know, you'll
 3            need to -- you'll need to go through a background
 4            check, you'll need to -- something about the
 5            business office for direct deposit of checks, that
 6            kind of stuff.
 7     Q.     Okay.
 8     A.     You know, what -- what time to be there, where to
 9            park, that kind of thing.
10     Q.     During that meeting you had with Steve and Gladys,
11            did you discuss at all the Catholic identity of
12            Charlotte Catholic High School?
13     A.     Not at all.
14     Q.     Did Catholicism come up in any way during that
15            discussion?
16     A.     Not that I recall.
17     Q.     Have you ever subbed for any religion classes at
18            Charlotte Catholic?
19     A.     Any what kind of classes?
20     Q.     Religion classes?
21     A.     I have.
22     Q.     How many times has that occurred?
23     A.     I can recall three times.
24     Q.     Were those all after you were retired from
25            full-time teaching or were some of those before you
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 63 of 406
JA0134

Lonnie Billard Vol. I (8/16/17)

Page 63

```
 1        became a full-time teacher?
 2   A.   They were after.
 3   Q.   Okay.  When you -- when you first began or first
 4        applied at Charlotte Catholic, did you have any
 5        understanding what MACS was?
 6   A.   Of what?
 7   Q.   MACS.
 8   A.   MACS?
 9   Q.   Yes.
10   A.   Mecklenburg Area Catholic Schools.
11   Q.   Right.
12   A.   Is that what you're saying?
13   Q.   Yes, sir.
14   A.   No, I did -- I did not.
15   Q.   Okay.  Did you later come to understand what MACS
16        is?
17   A.   After I was employed, yes.
18   Q.   Okay.  And what's your understanding of what MACS
19        is?
20   A.   That's the school district.  The schools are
21        organized under Mecklenburg Area Catholic Schools,
22        and there's a superintendent of schools, assistant
23        superintendent, typical school organization.
24   Q.   Tell me about the process of becoming a full-time
25        teacher after you had initially spent some time as
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 64 of 406
JA0135

Lonnie Billard Vol. I (8/16/17)

1          a substitute.  How did that happen?

2    A.    Okay.  As I mentioned to you earlier, I wanted to

3          be sure I could relate to the kids and that I was

4          not irrelevant, that, you know, I wasn't just out

5          there.  When I felt like I could be a valuable

6          teacher, I decided to apply both at Catholic and

7          at -- and at Country Day.  I -- I told

8          Mr. Carpenter of my intention to apply for a

9          full-time job, if one was available.

10              At some point after telling him that, I was

11         told that there would be a full-time English

12         position open the following year.  I talked once

13         again -- and so he -- he set up a time for me to

14         talk with Gladys again and then, because she was

15         leaving, he had me meet with the guy that would be

16         the new English chair, and his name is Jeremy Kuhn.

17         I -- so I interviewed with Jeremy.  Within a few

18         days after that, they had set up a meeting for me

19         to meet with Father Cassidy.

20   Q.    Who is Father Cassidy?

21   A.    He was the principal, Father Jim Cassidy.

22              I interviewed with Father Cassidy, and I think

23         that's it.  I think it was subsequently after that

24         I -- Steve offered me a job.  Basically, it was, We

25         have this job, this is what you'll be doing, this

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 65 of 406
JA0136

Lonnie Billard Vol. I (8/16/17)

1    is what you will be paid, these are what the

2    benefits are, that kind of thing.

3  Q.  Okay.  And you were hired for -- for a position as

4    a English teacher?

5  A.  As an English teacher.

6  Q.  Okay.  What do you recall about your meeting with

7    Mr. Kuhn prior to being hired?

8  A.  With Mr. Kuhn?

9  Q.  Yes.

10 A.  He was asking me -- well, I didn't know it at the

11    time, but the opening was going to be for sophomore

12    English.

13 Q.  Okay.

14 A.  And he was asking me questions primarily about the

15    literature that would be taught at the sophomore

16    level, had -- what had I read, what was my

17    interpretation, that kind of thing.  Okay?  And

18    then he also asked me some questions about how I

19    taught writing and writing skills.

20 Q.  Uh-huh.

21 A.  He -- I remember him also asking about how I taught

22    grammar and did I diagram sentences, and I said,

23    oh, no way, I don't diagram sentences.  I think I

24    was a little more blunt than that, and how I taught

25    grammar and that was it.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 66 of 406
JA0137

Lonnie Billard Vol. I (8/16/17)

1    Q.    So you don't recall anything else about your
2          discussion with Mr. Kuhn during that meeting?
3    A.    It was about content.
4    Q.    Okay.  About how -- approximately how long did that
5          meeting last, do you recall?
6    A.    Thirty, 45 minutes, I would think.
7    Q.    How about your meeting with Gladys, do you remember
8          anything about that meeting?  This one right before
9          you were hired as a full-time teacher.
10   A.    I don't remember much of anything.  It's was mostly
11         this -- about the structure of the English
12         department, how classes are set up, but that's all
13         I recall about that.
14   Q.    Okay.  And then how about the meeting with Father
15         Cassidy, what do you remember about that?
16   A.    He asked me a lot more questions about teaching
17         philosophy.
18   Q.    Okay.
19   A.    About classroom management.
20   Q.    Uh-huh.
21   A.    About discipline.  He asked questions about
22         garnering other resources to -- to enhance the --
23         you know, what -- how you taught your classes and
24         that kind of thing.
25   Q.    Anything else you recall discussing with him?

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 67 of 406
JA0138

Lonnie Billard Vol. I (8/16/17)

```
 1   A.   Other than I -- I do remember, and I think it
 2        was -- I think it was during that that we had
 3        the -- a brief exchange about the comparison of
 4        Catholic, Episcopal, but that may not have happened
 5        in that meeting.
 6   Q.   Okay.  Anything else you recall talking about with
 7        Father Cassidy?
 8   A.   No.
 9   Q.   You mentioned he asked you questions about teaching
10        philosophy.  Do you remember what that discussion
11        was about?
12   A.   Yeah, generally, I do.  Father Cassidy believed
13        in -- what he did not want in the classroom was a
14        lecturer.
15   Q.   Okay.
16   A.   And -- pardon me.  And so that -- he wanted to be
17        sure that I had the temperament and the ability to
18        make the classroom inclusive --
19   Q.   Uh-huh.
20   A.   -- to make sure the students participated, you
21        know.  How you go about getting kids to participate
22        even when they don't want to participate and how do
23        you get kids to participate particularly when they
24        didn't do the homework and aren't prepared to
25        participate and that kind of thing.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 68 of 406
JA0139

Lonnie Billard Vol. I (8/16/17)

1   Q.   Okay.  Anything else you recall about the

2        discussion on teaching philosophy?

3   A.   He asked about -- I remember him asking about

4        discipline.  Okay?  And I -- I assume my -- my

5        answer must -- must have been okay because, you

6        know, I believe that you -- you discipline students

7        as much as possible in private and not in -- in the

8        classroom because all you create by doing it in the

9        classroom is a teenager who becomes defiant.

10  Q.   Uh-huh.

11  A.   They can't look bad to their buddies.  So, you

12       know, how do you discipline, and I remember talking

13       about you diffuse the situation and discipline

14       later, you know, if -- if at all possible.

15       Obviously, there are times you can't do that --

16  Q.   Right.

17  A.   -- but . . .

18  Q.   Okay.  And I know -- I know you said you couldn't

19       recall whether it was during this meeting or

20       another time that you had a conversation with

21       Father Cassidy about the differences between the

22       Catholic and the Episcopal church.  But whenever --

23       what I'm interested in is knowing what you talked

24       about, you know, whenever that conversation

25       occurred.  Does that make sense?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 69 of 406
JA0140

Lonnie Billard Vol. I (8/16/17)

Page 69

```
 1   A.   I think so.
 2   Q.   Okay.  So can you tell me as best as you can recall
 3        what you remember talking with Father Cassidy
 4        about --
 5   A.   Yes.
 6   Q.   -- relative to the differences between Catholic
 7        church and Episcopal church?
 8   A.   Yes, I can, because as you are talking, it came
 9        back to me.
10   Q.   Okay.
11   A.   I do recall this.
12   Q.   Okay.
13   A.   It was not during my interview.
14   Q.   Okay.  You recall when it took place?
15   A.   We were preparing for an all-school mass.  It was
16        not my first mass at Catholic, but it was during my
17        first year at Catholic.
18   Q.   Okay.
19   A.   Okay?  I went to Father Cassidy and asked him if I
20        would be allowed to receive communion, and it was
21        during that conversation where we talked about me
22        asking that question, about the -- the similarities
23        between the two services.
24   Q.   Uh-huh.
25   A.   And -- and -- as well as the similarity between the
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 70 of 406
JA0141

Lonnie Billard Vol. I (8/16/17)

1          sacraments.

2     Q.   Okay.

3     A.   And, you know, but that I also understood that

4          Catholics believe in transubstantiation --

5     Q.   Uh-huh.

6     A.   -- and Episcopalians do not, and he told me, he

7          said -- I said -- we were -- I was asking for

8          permission to take communion.  He gave me

9          permission to take communion and to be quiet about

10         it.

11    Q.   Okay.  What's your understanding of what

12         "transubstantiation" means?

13    A.   My understanding is that through the prayers of

14         consecration that the priest says that Catholics

15         believe that the bread and wine become the physical

16         body of -- of Jesus Christ.

17    Q.   Anything else, in terms of your understanding?

18    A.   That's my understanding.

19    Q.   Okay.  Great.

20              Do you recall anything else other than what you

21         told me about about your conversation with Father

22         Cassidy?

23    A.   I don't understand the question, Josh.  Please --

24    Q.   Sure.

25    A.   -- let me scoot back up.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 71 of 406
JA0142

Lonnie Billard Vol. I (8/16/17)

Page 71

```
 1   Q.   Sorry.
 2           Other than what you just told me about your
 3        conversation with Father Cassidy, do you remember
 4        anything else that you discussed with him about the
 5        differences between the Episcopal church and the
 6        Catholic church?
 7   A.   No.  Yeah, it came up because I wanted to take
 8        communion and it -- I mean, it was a five-minute
 9        conversation, maybe.
10   Q.   Okay.  So going back now to the, sort of, interview
11        process we were talking about before you were hired
12        as a full-time teacher.  You told me about meeting
13        with Mr. Kuhn, meeting with Gladys, meeting with
14        Father Cassidy.  Did you meet with anyone else
15        prior to being hired as a full-time teacher?
16   A.   Other than Steve Carpenter.
17   Q.   And what did you -- tell me about your meeting with
18        Steve, what did that cover?
19   A.   Steve -- Steve was the go-between, basically, of
20        the people that I would be talking to.  After I had
21        talked with everyone, and Father Cassidy was the
22        last one, I went -- I was -- Steve took me back
23        into his office, asked me how it went, what were my
24        impressions, how did I feel about the possibility
25        of working there, what kinds of questions did I
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 72 of 406
JA0143

Lonnie Billard Vol. I (8/16/17)

Page 72

```
 1          have, that kind of thing.
 2   Q.     Okay.  Did you have any type of, you know,
 3          orientation as a full-time teacher at Charlotte
 4          Catholic?
 5   A.     Uh-huh.  Uh-huh.
 6   Q.     Tell me about that.
 7   A.     You know, the only thing I really remember about it
 8          is that it was held at Holy Trinity.  All new
 9          teachers were there.  I frankly don't remember
10          anything else about that.  I must have been really
11          bored.
12   Q.     Do you remember whether that training took place
13          prior to your beginning work as a full-time teacher
14          or whether it was after?
15   A.     Did I do that before I started in the classroom, is
16          that what you're asking me?
17   Q.     Yes.
18   A.     Yes.
19   Q.     Okay.  So did that training happen before the
20          school year began?
21   A.     Yeah, it's during the teacher orientation period.
22          At the beginning of the year, the school district
23          schedules, I don't know, four, five, whatever
24          number of days, it has varied in the past.  New
25          teachers started one day before returning teachers,
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 73 of 406
JA0144

Lonnie Billard Vol. I (8/16/17)

Page 73

1         and it was that one day that we went over to Holy

2         Trinity.

3    Q.   Was the new teacher orientation at Holy Trinity an

4         all-day event?

5    A.   I don't think so.  I don't think so.

6    Q.   Do you remember how long it took?

7    A.   I don't.

8    Q.   Okay.  Did you get any materials during that new

9         teacher orientation?

10   A.   I don't recall that I did.

11   Q.   You don't recall receiving copies of the faculty

12        handbook or other diocesan policies or anything of

13        that nature?

14   A.   I don't.

15   Q.   Am I correct that you taught English for a period

16        of time and then you became a drama teacher?

17   A.   That's correct.

18   Q.   Okay.  How long did you teach English?

19   A.   Full-time for one year.

20   Q.   Okay.  And then did you become a full-time drama

21        teacher after that first year?

22   A.   Yes.

23   Q.   And so you were full-time drama teacher

24        continuously from your second year of full-time

25        teaching through your retirement?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 74 of 406
JA0145

Lonnie Billard Vol. I (8/16/17)

```
 1   A.   That's correct.
 2   Q.   Did you -- during that period, did you teach any
 3        other classes other than drama?
 4   A.   Other than drama-related classes, no.
 5   Q.   Okay.  And what would be an example of
 6        "drama-related classes"?
 7   A.   Well, I taught a film class.
 8   Q.   Okay.
 9   A.   I taught an acting class, I taught a technical
10        theater class, that kind of thing.
11   Q.   Did you have a sense of how many teachers at
12        Charlotte Catholic were not Catholic?
13   A.   A sense of how many?
14   Q.   Yeah.
15   A.   Not really.  I mean, I -- I know -- yeah, no, I
16        don't really know.
17   Q.   Mr. Billard, this lawsuit obviously relates to your
18        marriage to Mr. Donham, so I want to ask you some
19        questions about your, you know, sexual orientation
20        as it relates to this case.
21            Do you consider yourself to be gay, is that a
22        term that's fair?
23   A.   That's a fair term.
24   Q.   Okay.  And I think people sometimes have different
25        meanings they use when they use that term, so would
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 75 of 406
JA0146

Lonnie Billard Vol. I (8/16/17)

Page 75

```
 1        you mind telling me what you understand the term
 2        "gay" to me?
 3   A.   The term gay means?
 4   Q.   Yes.
 5   A.   To me, gay is a homosexual man who is -- who is
 6        exclusively attracted to other men for partnership,
 7        for dating, for whatever.
 8   Q.   Okay.  And have you -- so I know you were married
 9        to a woman --
10   A.   That's correct.
11   Q.   -- at one point, and I'm just trying to -- I think
12        different people have different, sort of,
13        experiences in their life when they, you know,
14        realize, in some cases, they're gay or some people
15        have always known, you know, that was the case.
16        And so I'm kind of wondering in your situation, you
17        know, was it something you've always known or is it
18        something that you sort of came to a realization
19        later that -- that you were gay?
20   A.   I -- "always known," I can't say that is correct.
21   Q.   Okay.
22   A.   Okay?  I had in college a couple of encounters that
23        I blew off as -- as experimentation.
24   Q.   Okay.
25   A.   Okay?  They did not -- they were not romantic in
```

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 76 of 406
JA0147

Lonnie Billard Vol. I (8/16/17)

Page 76

```
 1          nature.  I was -- I would guess I would say that I
 2          was in my mid/late twenties when I quit dating
 3          virtually and I was dating exclusively women.
 4     Q.   Uh-huh.
 5     A.   And began to contemplate more directly, more
 6          honestly, to myself that I might be, yep, I am gay.
 7     Q.   Okay.
 8     A.   And I -- I fought that with every inch of my being.
 9     Q.   Okay.  Now, the couple of encounters you mentioned
10          in college, those were same sex --
11     A.   I -- I can't hear you.
12     Q.   You mentioned a couple of encounters in college,
13          these were -- these were same-sex encounters?
14     A.   Yes.
15     Q.   With other men?
16     A.   Yes.
17     Q.   Okay.  So you got married, I understand, to Jeanne
18          after this period you just described when you began
19          to --
20     A.   That's correct.
21     Q.   -- think about it more seriously?
22          So did you -- at the time you got married, did
23          you think that you were gay or what was your
24          thinking -- thought process around it at that time?
25     A.   Yeah.  I had met Jeanne and I thought -- I thought
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 77 of 406
JA0148

Lonnie Billard Vol. I (8/16/17)

```
 1          she was a -- a very pretty woman, very, very
 2          stimulating intellectually.  As far as -- for
 3          women, she was the look of a woman that I found
 4          attractive.
 5   Q.     Uh-huh.
 6   A.     And I was torn.  I really, really enjoyed being
 7          with her, but I also was fighting this, I think
 8          he's good looking too.
 9   Q.     Okay.
10   A.     Okay?  I sought out a priest that I had known in
11          college, Father Larry Galliott.
12   Q.     Okay.
13   A.     Told him of my dilemma and he assured me that if I
14          would get married all that gay stuff would go away.
15   Q.     Okay.
16   A.     And that if I -- if I loved her and I wanted to
17          marry her, I should not worry about that at all.
18   Q.     Okay.
19   A.     That's what I did.
20   Q.     Okay.  Father Galliott, was he a Catholic priest or
21          an Episcopal priest?
22   A.     He was a Catholic priest.
23   Q.     Where was he -- where did you meet with him?
24   A.     He was at the parish in Warrensburg, Missouri, I'm
25          thinking it might have been Saint Paul's, but I
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 78 of 406
JA0149

Lonnie Billard Vol. I (8/16/17)

Page 78

```
 1          don't recall the actual name of the church, but it
 2          was in Warrensburg, Missouri.
 3     Q.   Okay.  And just from what I know about, you know,
 4          your life history, it sounds like what Father
 5          Galliott told you didn't turn out to really work in
 6          your case; is that correct?
 7     A.   Master of understatement.  No, it did not, Josh.
 8          I -- I thought it was working and really had
 9          several years where, you know, I was able to
10          mentally put that in a little box someplace back
11          there (indicating), and I don't know if it was age,
12          maturity, more -- being more comfortable with
13          myself, I began to feel as though Galliott fed me a
14          bunch of junk.
15     Q.   Okay.
16     A.   I prayed about it, I prayed daily.  I did
17          everything I knew how to do to be straight.
18     Q.   Okay.
19     A.   And about a year -- let me just, if I might, is
20          this important because it's hurtful?
21     Q.   And I understand it's a sensitive area for you and
22          I -- and I don't mean to make you walk through, you
23          know, experiences or events that are painful.
24          Maybe I can shortcut it by saying, what I'm --
25          probably what I'm trying to get at is whether there
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 79 of 406
JA0150

Lonnie Billard Vol. I (8/16/17)

```
 1          was a point in your life where you sort of came out
 2          of the closet, if you want to use that term, or
 3          reached a conclusion in your own head that, I'm
 4          done trying to be straight and I -- I consider
 5          myself gay exclusively from here on forward?  Does
 6          that -- does that make sense?
 7     A.   Yes, that would have been about the time I was 48
 8          or 49, I knew that it wasn't going away.
 9     Q.   Okay.
10     A.   And I was -- I was in a real quandary about what to
11          do because I loved Jeanne.
12     Q.   Uh-huh.
13     A.   I had no intentions of hurting her.  I was not
14          cheating on her with other men.
15     Q.   Okay.
16     A.   Okay?  I did not want that to happen, but I also
17          was telling -- know -- knew in my head and
18          eventually in my heart that at some point it would
19          have to change.
20     Q.   Okay.  Now, I -- I think some people have an
21          experience where they feel like they're in the
22          closet, by which they mean they're kind of
23          concealing it from the world and then at some point
24          they might be okay with making it public.  Did that
25          happen in your life?
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 80 of 406
JA0151

Lonnie Billard Vol. I (8/16/17)

```
 1   A.    Just bear with me, guys.  I mentioned that I didn't
 2         cheat on Jeanne.
 3   Q.    Uh-huh.
 4   A.    I got my fix, if you will, of gay by looking at gay
 5         men's magazines.
 6   Q.    Okay.
 7   A.    And I put one in my briefcase and Jeanne found it.
 8   Q.    Okay.
 9   A.    As I look back, I probably wanted her to find it,
10         but that was not a conscious decision.  She did not
11         tell me she had found it, and we had gone to -- we
12         had been invited to and had gone to a wedding of
13         some friends of ours that I worked with at Barnett
14         and we were standing there, it was an outdoor
15         wedding, but their wedding used -- I mean, it was
16         virtually, virtually a carbon copy of ours.
17   Q.    Interesting.  Okay.
18   A.    And we got back in the car and both of us were very
19         quiet and we're driving home and Jeanne said -- I
20         said -- and Jeanne's not a cryer.
21   Q.    Uh-huh.
22   A.    I'm the cryer in the family, not Jeanne.  And I
23         thought I heard her crying and I said, Are you
24         okay?  And she said, No, and neither are we.
25   Q.    Uh-huh.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 81 of 406
JA0152

Lonnie Billard Vol. I (8/16/17)

Page 81

```
 1   A.   That's when I came out.
 2   Q.   Okay.
 3                    MR. BROOK:  Do you want to take a
 4         break?
 5                    THE WITNESS:  Please.
 6                    MR. BROOK:  Sure.  Can we take a
 7         break?
 8                    MR. DAVEY:  Yeah, that's fine.
 9                    MR. BROOK:  Thank you.
10                    MR. DAVEY:  I was going to stop for
11         lunch at some point.
12                    MR. BROOK:  Do you want to stop for
13         lunch now or do you want to --
14                    MR. DAVEY:  Off the record.
15       (RECESS TAKEN FROM 1:54 P.M. TO 1:59 P.M.)
16   BY MR. DAVEY:
17   Q.   Mr. Billard, we're back after a lunch break.
18        Have you -- are you familiar with the term
19        "stereotype"?
20   A.   Stereotype, sure.
21   Q.   You've heard that before?
22        I looked it up and one of the definitions I
23        found was:  (Reading)
24             A widely held belief about a
25           group of people that is often unfair or
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 82 of 406
JA0153

Lonnie Billard Vol. I (8/16/17)

Page 82

 1            untrue.

 2              Would you agree with that definition?

 3     A.   Widely held that is often unfair, and what was the

 4          last word?

 5     Q.   Or untrue.

 6     A.   Or untrue.  Yeah, I think I probably would.

 7     Q.   Do you think it's wrong to judge someone based on

 8          stereotypes?

 9     A.   Yeah, yeah.

10     Q.   Are you familiar with the idea that there might be

11          stereotypes that might be applied to straight men?

12          For example, a stereotype for a straight man might

13          be, you know, a macho-type guy, strong or

14          masculine.

15     A.   Okay.

16     Q.   Are you familiar with that idea?

17     A.   Yeah, yeah.

18     Q.   Okay.  Or that a man might like sports, that might

19          be a stereotype for straight men?

20     A.   I suppose.

21     Q.   How about being in control, would that be a

22          stereotype for straight men?

23     A.   Never thought of that.

24     Q.   Okay.  What about not sensitive or emotional?

25     A.   I don't know -- yeah, probably, probably.  As I

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 83 of 406
JA0154

Lonnie Billard Vol. I (8/16/17)

```
 1          think about it, I think that, yeah, portrayed that
 2          way, yeah.
 3    Q.    Now, do you think it would be fair to conclude if a
 4          man was interested in sports, strong, and masculine
 5          and not emotional that that person is necessarily
 6          straight?
 7    A.    No.
 8    Q.    Okay.  Those things on their own don't tell you
 9          what his sexual orientation is; is that fair?
10    A.    I don't think so, no.
11    Q.    Are you familiar with stereotypes that might be
12          applied to gay men?
13    A.    Oh, sure.
14    Q.    Okay.  What are some of those that you can think
15          of?
16    A.    Effeminate.
17    Q.    Yep.
18    A.    Broadway shows, decorating, hair stylist,
19          designers, that -- that kind of thing.
20    Q.    Okay.  Somebody -- a stereotype might be that a gay
21          man would have a good sense of fashion, for
22          example?
23    A.    Yeah, probably.
24    Q.    Would it be fair to conclude if a man, you know,
25          was effeminate and was interested in Broadway shows
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 84 of 406
JA0155

Lonnie Billard Vol. I (8/16/17)

Page 84

1           and had good fashion sense that he was necessarily
2           gay?
3    A.     No.
4    Q.     Those things on their own don't tell you that?
5    A.     No.
6    Q.     Have you known men who fit some of the gay
7           stereotypes who ended up being straight?
8    A.     Yes.
9    Q.     And have you known men who fit the so-called
10          straight stereotypes who were gay?
11   A.     Yes.
12   Q.     Now, it's -- it's possible -- would you agree that
13          it's possible for two men to live together and
14          share expenses, is that something you've heard
15          before?
16   A.     Say again, please, Josh.
17   Q.     Two -- two men might live together in the same
18          house for the purpose of sharing living expenses,
19          is that possible?
20   A.     Possible, yeah.
21   Q.     Okay.  And you might -- if -- if people were doing
22          that, you might call them roommates or housemates;
23          is that fair?
24   A.     Probably.
25   Q.     Okay.  And it's possible for two men to live in the

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 85 of 406
JA0156

Lonnie Billard Vol. I (8/16/17)

Page 85

1           same house and not have sex with each other, right?

2    A.    Yes.

3    Q.    And that's true even if both of them are gay; is

4           that right?

5    A.    Yes.

6    Q.    Are you aware of any teachers at Charlotte Catholic

7           who ever lived with someone who wasn't their

8           spouse?

9    A.    That wasn't their spouse?

10   Q.    Yes, sir.

11   A.    Yes.

12   Q.    Okay.  Tell me about that.  Who do you know about

13          who did that?

14   A.    Well, there is -- I don't know if she's still

15          there -- a woman that lived with a man without

16          benefit of marriage.

17   Q.    Okay.

18   A.    I know there were teachers that lived with either

19          boyfriends or girlfriends without being married.

20   Q.    Okay.  Do you know of anyone at Charlotte Catholic

21          who lived with someone who was a roommate of theirs

22          for purposes --

23   A.    Who was what?

24   Q.    Who was a roommate for purposes of sharing living

25          expenses?

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 86 of 406
JA0157

Lonnie Billard Vol. I (8/16/17)

Page 86

1   A.   I can't recall anybody right now.

2   Q.   Okay.  Have you heard the term "gaydar"?

3   A.   Yes.

4   Q.   What does that mean?

5   A.   It's supposedly a -- a way in which people that are

6        gay can, without any verbal communication or

7        without any blatant clues, pick up on the fact that

8        the -- that somebody else is gay.

9   Q.   Do you think that it exists?

10  A.   I don't -- I don't know that it does.

11  Q.   Okay.

12      (EXHIBIT NUMBER 2 WAS MARKED FOR IDENTIFICATION)

13  BY MR. DAVEY:

14  Q.   Mr. Billard, I'm going to hand you what I've marked

15       as Exhibit Number 2.  Feel free to look it over.

16       I'll represent that this is a collection of

17       emergency data forms that we obtained from your

18       files at Charlotte Catholic.

19  A.   Okay.

20  Q.   And we have forms for --

21  A.   Oh, okay.

22  Q.   -- spanning several years here as part of the

23       exhibit.

24  A.   Okay.

25  Q.   So the first page of Exhibit 2 is a form dated

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 87 of 406
JA0158

Lonnie Billard Vol. I (8/16/17)

```
 1          August 24th, 2001.  Do you see that?
 2     A.   Yes, I see that.
 3     Q.   Okay.  And you see that Jeanne is listed here as
 4          your wife?
 5     A.   Yes.
 6     Q.   Okay.  And were you still married as of August 24,
 7          2001?
 8     A.   Yes.
 9     Q.   Okay.  Do you know when your divorce with Jeanne
10          was finalized?
11     A.   I don't know the date.
12     Q.   Do you remember the year?
13     A.   2002 or '3, somewhere around in there.
14     Q.   Okay.  If you look at the second page of Exhibit 2,
15          do you see here there's an emergency data form
16          dated August 14th, 2003?
17     A.   Uh-huh.
18     Q.   And if you look at the bottom of the page, you've
19          listed Jeanne here as your ex-wife; is that
20          correct?
21     A.   Uh-huh.
22     Q.   And just -- just for the record, you have to answer
23          out loud.
24     A.   Oh, I'm sorry.  Yes.
25     Q.   With a yes or no.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 88 of 406
JA0159

Lonnie Billard Vol. I (8/16/17)

1   A.   Yes, you're right.

2   Q.   And this is your handwriting on Exhibit Number 2,

3        right?

4   A.   It is.

5   Q.   And do you recognize these as forms that you

6        completed during the course of your employment with

7        Charlotte Catholic?

8   A.   Yes.

9   Q.   Okay.  So on the second page of Exhibit 2, it's a

10       form that's dated August 14th, 2003, Mr. Donham is

11       listed here as a friend; is that correct?

12  A.   That's correct.

13  Q.   Okay.  When did you meet Mr. Donham?

14  A.   When I met him.  2000, I believe.  Jeanne and I

15       were separated.  About 2000.

16  Q.   Okay.

17  A.   Maybe 1999, 2000, somewhere around in there.

18  Q.   Now, on page 2 here of Exhibit 2, there's an

19       address listed for you near the top of the page,

20       3300-1 Selwyn Farms Lane.  Do you see that?

21  A.   Yeah, yeah.  Oh, yeah.

22  Q.   And then there's a -- Mr. Donham's address is

23       listed as 3300-4 Selwyn Farms Lane?

24  A.   Yep.

25  Q.   And I think you told me earlier that there's a

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 89 of 406
JA0160

Lonnie Billard Vol. I (8/16/17)

Page 89

```
 1        condo complex at Selwyn Farms Lane?
 2   A.   Yes.
 3   Q.   Okay.  So did -- were you both living in the same
 4        complex?
 5   A.   No, that's a mistake.
 6   Q.   Okay.  Tell me what you mean by "mistake"?
 7   A.   The 4 is wrong.  He was -- we were living together
 8        at that point.
 9   Q.   Okay.  So you actually were living with
10        Mr. Donham --
11   A.   Yes.
12   Q.   -- as of August 14th, 2003?
13   A.   Uh-huh.
14   Q.   Okay.  So is one of these addresses right and the
15        other one wrong?
16   A.   I -- one of them is, but for some -- I don't know
17        which one, I don't recall.
18   Q.   Do you know if there is an address 3300-4 Selwyn
19        Farms Lane?  Is that an actual address?
20   A.   I don't know.
21   Q.   Okay.  How about 3300-1 Selwyn Farms Lane, do you
22        know if that's an actual address?
23   A.   I think that must have been my address, I thought
24        it was 2, but it might have been 1.
25   Q.   Okay.  Did Mr. Donham ever live at the Selwyn Farms
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 90 of 406
JA0161

Lonnie Billard Vol. I (8/16/17)

Page 90

1        Lane condo complex in a condo other than the condo
2        you lived in?
3   A.   No.
4   Q.   Okay.  Are there multiple condominiums at that
5        location?
6   A.   Yes.
7   Q.   Do you know how many there are?
8   A.   There're probably 10, 12 buildings of -- of about
9        ten condos per building.
10  Q.   And so would the way the addresses worked there,
11       the 3300, for example, would be the address of a
12       specific building and then the dash one would refer
13       to the specific unit within the building?
14  A.   That's -- yeah, that's how I recall it.
15  Q.   Okay.  Now, you also on page 2 here of Exhibit 2,
16       have listed a home phone for yourself of ███████
         ███████████    Do you see that there?
18  A.   That's correct.
19  Q.   Okay.  Was that a landline or a cell phone?
20  A.   That's a cell phone.
21  Q.   Do you still have that number today?
22  A.   I still do.
23  Q.   Okay.  Did you have a landline when you lived at
24       Selwyn Farms Lane?
25  A.   Originally, yes.  I don't -- but for not very long.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 91 of 406
JA0162

Lonnie Billard Vol. I (8/16/17)

```
 1    Q.    Okay.  Do you remember what that number was?
 2    A.    I don't.
 3    Q.    Okay.
 4              Mr. Donham's number on page 2 of Exhibit 2 is
 5          listed ██████  ██████; is that correct?
 6    A.    That's correct.
 7    Q.    Do you know if that's a cell phone or a landline?
 8    A.    That's a cell phone.
 9    Q.    Okay.  Is that his cell phone number?
10    A.    That is.
11    Q.    Does he still have that number today?
12    A.    He does.
13    Q.    Okay.  Okay.
14              I meant to ask you this and I apologize if I
15          did, but you -- you've listed Jeanne here as your
16          ex-wife at the bottom of the page on page 2 of
17          Exhibit 2, right?
18    A.    Yes.
19    Q.    So does that refresh your memory that your divorce
20          would have been finalized by -- at least by
21          August 14th, 2003?
22    A.    I don't know that that's correct.  I referred to
23          Jeanne as my ex-wife after we had separated.
24    Q.    Okay.
25    A.    Okay?  But as far as a legal status, I don't -- I
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 92 of 406
JA0163

Lonnie Billard Vol. I (8/16/17)

Page 92

```
 1          don't recall that that would have been the case.
 2     Q.   Okay.
 3               Now, let me ask you to turn to page 3 of
 4          Exhibit 2.
 5     A.   Uh-huh.
 6     Q.   So this is another Emergency Data for Personnel
 7          form dated August 9th, 2004; is that correct?
 8     A.   That is.
 9     Q.   And this is another form that you would have
10          completed on or about that date?
11     A.   It is.
12     Q.   Okay.  And your cell number is listed on this form
13          as (704) 491-2538.  Did I read that correctly?
14     A.   I'm sorry, say again.
15     Q.   If you look at the top right-hand part of the page,
16          there's a line that says, Cell?
17     A.   Yes.
18     Q.   And do you see that it states that the cell
19          number is (704) 491-2538?
20     A.   I see that.
21     Q.   Okay.  Was that correct?
22     A.   No.
23     Q.   Do you recognize that number?
24     A.   No.  Unless that would have been the landline
25          number that I originally had, I -- and it could
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 93 of 406
JA0164

Lonnie Billard Vol. I (8/16/17)

Page 93

```
 1       have been, I don't recall.
 2   Q.  Okay.  And then your home phone number is listed on
 3       page 3 of Exhibit 2 as ████████ ████████████ right?
 4   A.  That's correct.
 5   Q.  And that's actually your cell phone?
 6   A.  That is.
 7   Q.  Okay.  And you've listed your address here as
 8       3300-1 Selwyn Farms Lane?
 9   A.  That's correct.
10   Q.  And if you look down at the bottom of the page,
11       Mr. Donham is listed here as a friend; is that
12       correct?
13   A.  That's correct.
14   Q.  Okay.  And his address is listed as 3300-2 --
15   A.  Two.
16   Q.  -- Selwyn Farms Lane?
17   A.  That's correct.
18   Q.  All right.  And in August 9 of 2004, was
19       Mr. Donham -- were you and Mr. Donham living
20       together?
21   A.  August 9, 2004, yes.
22   Q.  Okay.  So did you actually have the same address at
23       that point in time?
24   A.  We did.
25   Q.  Okay.  Do you know which address that was?
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 94 of 406
JA0165

Lonnie Billard Vol. I (8/16/17)

Page 94

```
 1   A.   The 3000-1 -- or 3300-1.
 2   Q.   Dash one, okay.
 3            Is there a reason you wrote 3300-2 for
 4        Mr. Donham's address?
 5   A.   I don't know.
 6   Q.   Okay.  And then Mr. Donham's home phone, again, is
 7        listed as ██████  ███████; is that right?
 8   A.   Yes.
 9   Q.   And you told me a moment ago that's his cell?
10   A.   That's his cell.
11   Q.   Okay.
12            Look with me if you would at page -- at the
13        bottom of page 4 of Exhibit 2.
14   A.   Page 4, yeah.
15   Q.   Yes, sir.
16            And again -- again, there's a cell number for
17        you listed here that ends in 2538, and you don't
18        recognize that number?
19   A.   No.
20   Q.   Okay.  And Mr. Donham is listed here as a person to
21        be notified in case of emergency; is that right?
22   A.   That's correct.
23   Q.   And in the line that says relationship, it says
24        friend.
25   A.   That's correct.
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 95 of 406
JA0166

Lonnie Billard Vol. I (8/16/17)

```
 1   Q.   Correct?  Okay.
 2             Then on this form the address listed for both
 3        yourself and for Mr. Donham is 3300-1 Selwyn Farms
 4        Lane; is that right?
 5   A.   Yes, that's correct.
 6   Q.   Okay.  Is that the address that you both lived at
 7        as of August 18, 2005?
 8   A.   It is.
 9   Q.   Look with me if you would at the next page of
10        Exhibit 2, it's stamped at the bottom as CCHS
11        000355.
12   A.   Okay.
13   Q.   Are you with me there?
14   A.   I see it.
15   Q.   This is another Emergency Data for Personnel form
16        dated August 17, 2006?
17   A.   Uh-huh.
18   Q.   And just reminder, yes or no out loud so she can
19        write it down.
20   A.   Yes, yes, yes.
21   Q.   It's easy to do.
22             And do you recognize this page as a form that
23        you completed in the course of your employment at
24        Charlotte Catholic?
25   A.   Yes.
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 96 of 406
JA0167

Lonnie Billard Vol. I (8/16/17)

Page 96

1   Q.   Okay.  Now, on this page you have listed your

2        address as 5101 Harri Ann Drive, correct?

3   A.   That's correct.

4   Q.   And that's your current address, right?

5   A.   That's my current address.

6   Q.   Okay.  And then if you look down the page,

7        Mr. Donham is listed here as person to be notified

8        in case of emergency.

9   A.   That's correct.

10  Q.   And the relationship is a friend; is that correct?

11  A.   Yes.

12  Q.   Okay.  And his address is listed 3300 Selwyn Farms

13       Lane, Charlotte, North Carolina 28209, right?

14  A.   That's correct.

15  Q.   So when you moved to the Harri Ann Drive address,

16       did you and Mr. Donham move together?

17  A.   Not initially.

18  Q.   Okay.  Did he stay behind at the Selwyn Farms Lane?

19  A.   Yes.

20  Q.   Was there a particular reason for that?

21  A.   To sell it.

22  Q.   Okay.  The idea was, you were moving to the new

23       house and he was going to stay home -- at the old

24       house and sell it?

25  A.   Yes.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 97 of 406
JA0168

Lonnie Billard Vol. I (8/16/17)

Page 97

```
 1   Q.   All right.  And to the best of your recollection,
 2        as of August 17, 2006, were you living at the 5101
 3        Harri Ann Drive address?
 4   A.   I think so.
 5   Q.   Okay.  And to the best of your recollection, as of
 6        August 17, 2006, was Mr. Donham living at the 3300
 7        Selwyn Farms Lane address?
 8   A.   Yes.
 9   Q.   Okay.  Turn with me to the next page, if you would.
10   A.   Uh-huh.
11   Q.   It's the one stamped CCHS 000354.
12   A.   Okay.
13   Q.   And same kind of question here.  Again, Mr. --
14        Mr. Donham is listed as a person to be notified in
15        case of an emergency; is that right?
16   A.   Yes.
17   Q.   Okay.  And you indicated that the relationship was
18        that of a friend; is that correct?
19   A.   Say again, please.
20   Q.   In the relationship line, it says friend?
21   A.   It does.
22   Q.   Okay.  And this page indicates that both you and
23        Mr. Donham were living at 5101 Harri Ann Drive in
24        Charlotte; is that correct?
25   A.   That's correct.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 98 of 406
JA0169

Lonnie Billard Vol. I (8/16/17)

Page 98

```
 1    Q.    Okay.  And do you recognize this page as Emergency
 2          Data for Personnel form that you completed on or
 3          about August 15 of 2007?
 4    A.    I do.
 5    Q.    And to the best of your recollection, were both you
 6          and Mr. Donham living together at the 5101 Harri
 7          Ann Drive address as of that date?
 8    A.    Yes.
 9    Q.    Okay.
10          Next page, if you would, Mr. Billard, is the
11          one labeled CCHS 353 at the bottom.
12    A.    I see it.
13    Q.    And looks like you handwrote in a date, August 13,
14          2008, near the top of this?
15    A.    Yes.
16    Q.    And do you recognize this page as an Emergency Data
17          for Personnel form that you completed on or about
18          August 13, 2008?
19    A.    I do.
20    Q.    Okay.  And again, Mr. Donham here is listed as a
21          person to be notified in case of an emergency; is
22          that correct?
23    A.    That's correct.
24    Q.    And relationship line says friend; is that right?
25    A.    That's correct.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 99 of 406
JA0170

Lonnie Billard Vol. I (8/16/17)

Page 99

1    Q.    And the address for both of you is listed as 5101

2          Harri Ann -- I guess yours says Harri Ann Drive and

3          his says Harri Ann, but . . .

4    A.    Oh, yeah.

5    Q.    Was he living at 5101 Harri Ann Drive --

6    A.    Yeah.

7    Q.    -- at this time?

8    A.    Yes.

9    Q.    And you were as well?

10   A.    I was.

11   Q.    Look with me if you would at the next page, CCHS

12         352 at the bottom.  Do you see that there?

13   A.    Yes.

14   Q.    Do you recognize this as an Emergency Data for

15         Personnel form you completed on or about

16         August 19th of 2009?

17   A.    I do.

18   Q.    And here, Mr. Donham is listed as a person to be

19         notified in case of an emergency; is that correct?

20   A.    Yes.

21   Q.    And in the relationship line, it says

22         housemate/friend.

23   A.    Yes.

24   Q.    Is that correct?

25               Previously on these forms you had described him

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 100 of 406
JA0171

Lonnie Billard Vol. I (8/16/17)

 1       as a friend.  Is there a reason that you described

 2       him as a housemate/friend on this particular form?

 3   A.  No.

 4   Q.  And according to this page, the address for both of

 5       you was 5101 Harri Ann Drive in Charlotte; is that

 6       correct?

 7   A.  That's correct.

 8   Q.  All right.  And were you both living at that

 9       address in August of 2009?

10   A.  We were.

11   Q.  Look with me if you would at the next page labeled

12       CCHS 351 at the bottom.  Do you see that?

13   A.  Uh-huh, yes.

14   Q.  Okay.  Again, Mr. Donham is listed as an emergency

15       contact; is that correct?

16   A.  That's correct.

17   Q.  And the relationship line says friend; is that

18       correct?

19   A.  That's correct.

20   Q.  Now, here his address is listed as 5100 Harri Ann.

21       Do you see that?

22   A.  I do.

23   Q.  Do you know if that is a real address?

24   A.  I don't think there is one.

25   Q.  Okay.  Do you have any understanding of why

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 101 of 406
JA0172

Lonnie Billard Vol. I (8/16/17)

1          Mr. Donham's address was listed 5100 Harri Ann on

2          this form?

3    A.    No.

4    Q.    Do you think that's a mistake?

5    A.    I think it's a mistake.

6    Q.    Okay.  Were you both living at 5101 Harri Ann Drive

7          in August of 2010?

8    A.    We were.

9    Q.    Last one, last page of Exhibit 2, CCHS 350.  Do you

10         see that there, Mr. Billard?

11   A.    I see that.

12   Q.    Do you recognize this page as an Emergency Data for

13         Personnel form that you completed --

14   A.    I do.

15   Q.    -- on or about August 17, 2001?

16   A.    I do.

17   Q.    And I know you know what I'm going to ask, but just

18         so we get a good record.

19   A.    I'm sorry.

20   Q.    And do you see --

21              MR. BROOK:  And I just want to

22         clarify, you said 2001 just now.

23              MR. DAVEY:  Okay.  Thank you.

24   BY MR. BROOK:

25   Q.    Just so we get a clean record.

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 102 of 406
JA0173

Lonnie Billard Vol. I (8/16/17)

```
 1          Mr. Donham -- let me start again.
 2          Mr. Billard, do you recognize the last page
 3     here of Exhibit 2 as a Emergency Data for Personnel
 4     form that you completed on or about August 17th,
 5     2011?
 6  A.  I do.
 7  Q.  Thank you.
 8          And again, Mr. Donham is listed as an emergency
 9     contact; is that correct?
10  A.  He is.
11  Q.  And he's listed as a friend of yours; is that
12     correct?
13  A.  He is.
14  Q.  And the address for both of you is listed as 5101
15     Harri Ann Drive, Charlotte; is that right?
16  A.  That's correct.
17  Q.  And were you both living at that address in August
18     of 2011?
19  A.  Yes.
20  Q.  Thank you.
21          When did you and Mr. Donham first begin living
22     together?
23  A.  It's been 15 years, I think, close to 15.
24  Q.  Okay.  So this is 2017 so maybe 2002 or
25     thereabouts?
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 103 of 406
JA0174

Lonnie Billard Vol. I (8/16/17)

Page 103

1    A.    Somewhere around there.

2    Q.    When -- forgive me if I use the wrong terminology,

3          but I'm interested, when did you consider you and

4          Mr. Donham to be a couple, if you will, like

5          together in a romantic sense?

6    A.    When did I consider us to be a couple or we

7          considered each other?

8    Q.    Yeah, exactly.

9    A.    Yeah.  When he moved in.

10   Q.    Okay.  Prior to that moving in, how would you

11         describe your relationship with him?

12   A.    We dated.

13   Q.    Okay.  And I think you told me you met him in

14         approximately 2000?

15   A.    Somewhere around there.

16   Q.    When did you begin dating?

17   A.    It's hard to say.  It started out where you know,

18         people would go have coffee.

19   Q.    Uh-huh.

20   A.    You know, and then it was fewer people and then it

21         was just us type thing.  So I mean, it's not -- I

22         don't -- I don't -- I couldn't tell you an exact,

23         well, in March, we did this.  I mean, we -- we

24         would always sit together, we would always be part

25         of the group, and the group got smaller and it

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 104 of 406
JA0175

Lonnie Billard Vol. I (8/16/17)

 1          was -- so . . .

 2     Q.   Okay.  Sounds like it was a relationship that sort

 3          of grew over time; is that fair?

 4     A.   It did.

 5     Q.   Okay.  But at least -- at least by the time --

 6          well, let me ask this way.

 7               So at some point, though, before you moved in

 8          together, you did consider yourselves to be dating;

 9          is that fair?

10     A.   Before we moved in together, I considered us what?

11     Q.   To be dating; is that fair?

12     A.   Yes.

13     Q.   Okay.  It's just hard to put an exact date on when

14          that began?

15     A.   Yeah, I can't.

16     Q.   Mr. Billard, do you know the slogan of Charlotte

17          Catholic High School?

18     A.   The slogan?

19     Q.   Yeah.

20     A.   Slogan.

21     Q.   Or maybe motto would be a better term?

22     A.   Are -- are you referring to the education -- the

23          soul of education is the education of the soul or

24          something like that?

25     Q.   I think that's it.  Is that your understanding?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 105 of 406
JA0176

Lonnie Billard Vol. I (8/16/17)

1   A.   Yeah, it's on -- it's on the outside of the

2        building.

3   Q.   Okay.  Can you tell me where on the outside of the

4        building that's written?

5   A.   Yeah, right above the -- there's an entrance.

6   Q.   Uh-huh.

7   A.   There's a covered area before you go in the main

8        doors of the building, and it appeared up there one

9        year, I don't remember when.  It wasn't always

10       there.

11  Q.   Okay.

12  A.   Maybe the last couple years I taught.

13  Q.   Okay.  Do you know where -- you know, where that

14       phrase comes from?

15  A.   It comes from a Pope --

16  Q.   Okay.

17  A.   -- but I don't know which one.

18  Q.   Gotcha.

19            And how do you know that "it comes from a

20       Pope"?

21  A.   Because I think the sign says that.

22  Q.   Okay.  It attributes the quote to somebody?

23  A.   Something like that.

24  Q.   Yeah.

25  A.   I think it says, maybe, like I -- Pope John, I

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 106 of 406
JA0177

Lonnie Billard Vol. I (8/16/17)

Page 106

1     don't know, next to it.

2  Q.  Whatever his name was?

3  A.  Yeah, yeah, one of those guys.

4  Q.  Okay.

5       When you were a full-time teacher at Charlotte

6     Catholic --

7  A.  Uh-huh.

8  Q.  -- did classes begin with a prayer?

9  A.  They did.

10 Q.  Okay.  Was that something that was done the whole

11    time you were a full-time teacher?

12 A.  Yes.

13 Q.  Okay.  Did you have an understanding that that was

14    a requirement or was that just something that was

15    done out of custom or . . .

16 A.  No, I -- I don't know that I -- Josh, I don't know

17    that I would use the word "requirement."

18 Q.  Okay.

19 A.  I would say it was an expectation.

20 Q.  Gotcha.  Okay.

21      And did you always -- well, did you -- let me

22    ask you this way.  Did you personally lead your

23    classes in prayer at any point?

24 A.  Sometimes.

25 Q.  Okay.  And did you facilitate the prayer in other

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 107 of 406
JA0178

Lonnie Billard Vol. I (8/16/17)

1      ways at other times?

2   A.   Sometimes, yes.

3   Q.   Okay.  Can you tell me what you would do if you

4        didn't lead it yourself?

5   A.   Sure.  I would -- I would offer it to other

6        students.  Sometimes students would have particular

7        things they wanted to pray for --

8   Q.   Okay.

9   A.   -- like family members or teen issues that they

10       were concerned about or whatever, and they wanted

11       the support of the prayer group for that.

12       Sometimes I would -- I would read the prayer.

13       Sometimes -- but I would also always offer it to

14       other students to read instead of me.  If there

15       were no takers, then I would -- I would do -- you

16       know, I -- I would read it.

17           There were times when I -- we didn't do a

18       prayer at all, and I would do a -- I hate to use

19       the word "lecture," but I would speak to the kids

20       about issues that they were facing or their

21       community was facing and -- and how to find

22       strength in those situations and how to -- you

23       know, and how to do the right thing in that type of

24       situation.

25   Q.   So if I've understood you right, it might be a

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 108 of 406
JA0179

Lonnie Billard Vol. I (8/16/17)

1          devotional talk rather than a prayer; is that fair?

2     A.   To me, if I -- if I might, devotional talk implies

3          in my head, in my realm of definition, implies a

4          religious context --

5     Q.   Okay.

6     A.   -- and that would not necessarily be the case.

7     Q.   Okay.  Inspirational talk maybe?

8     A.   Inspirational might be better.

9     Q.   Okay.  Now, when it came to deciding how the

10         expectation of a prayer was going to be satisfied

11         on any given day, did you sort of make that call

12         kind of on the fly or did you have a calendar with

13         a sign-up sheet?  Or what was your approach to

14         deciding from day-to-day how that expectation was

15         going to be met?

16    A.   It was haphazard.  Okay?  If I knew I wanted to do

17         something and I needed to say something to them for

18         whatever reason, then I -- I -- that would take

19         precedent.  I -- I -- otherwise, I would typically

20         say, Is there anyone here who wants to lead the

21         prayer?  Very often kids would raise their hand and

22         come up and -- or not come up, they would just read

23         it or -- or do it.  So I didn't have a method to

24         the madness, if you will.

25    Q.   Okay.  Yeah, that's what I was trying to get at.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 109 of 406
JA0180

Lonnie Billard Vol. I (8/16/17)

Page 109

1   A.   Okay.

2   Q.   Now, did you -- was that the same approach you had

3        throughout your entire tenure as a full-time

4        teacher at Charlotte Catholic?

5   A.   Yes.

6   Q.   Okay.  And did you also use that same approach as a

7        substitute teacher after you had retired from

8        full-time teaching?

9   A.   Generally, yes.

10  Q.   Okay.  And when you say "generally," are you

11       thinking of some exceptions or . . .

12  A.   If -- if it were a teacher that I was not familiar

13       with outside of the English department in

14       particular, because that's where I spent most of

15       my -- not all, but most of my subbing time was in

16       English, the teachers would leave a lesson plan,

17       instructions.  Some teachers would say read the

18       prayer.  Some teachers would say allow students to

19       read the prayer or offer the prayer.  Whatever that

20       instruction was is what I did.

21  Q.   Okay.  So if the teacher that you were subbing for

22       had specified a particular approach to the prayer,

23       you would follow that?

24  A.   I would follow that.

25  Q.   Okay.  Gotcha.

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 110 of 406
JA0181

Lonnie Billard Vol. I (8/16/17)

Page 110

```
 1            I know you told me earlier you attended masses
 2       periodically as full-time teacher at Charlotte
 3       Catholic, and do you have any recollection of how
 4       frequently you would do that?
 5   A.  Well, I think -- it seems, as I recall, we would
 6       have an all-school mass about once a month.
 7   Q.  Okay.
 8   A.  For one reason or another.
 9   Q.  Gotcha.
10   A.  Okay?  And I would -- I would say I generally went
11       to mass, but I -- but I could not tell you I went
12       to all the masses.
13   Q.  Sure.  That would be quite a few over --
14   A.  Yeah.
15   Q.  -- yeah, 12 years or thereabouts of --
16   A.  Right.
17   Q.  -- full-time teaching.
18            Would you -- would you say that there was an
19       expectation for teachers to attend mass similar to
20       the way there was an expectation for classes to
21       begin with prayer?
22   A.  There was an expectation that -- that we take our
23       students to mass and there was an expectation that
24       we had a supervisory capacity in the mass itself.
25       That supervisory capacity changed from year to
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 111 of 406
JA0182

Lonnie Billard Vol. I (8/16/17)

1         year.  I mean, it wasn't always the same thing.
2    Q.   Uh-huh.  Okay.
3    A.   But there was a supervisory role associated with
4         it.
5    Q.   Okay.  Now, I think you told me earlier that during
6         the period when you were teaching full-time at
7         Charlotte Catholic you considered yourself to be a
8         practicing Catholic insofar as you would attend
9         mass and participate in religious functions through
10        the school?
11   A.   Yeah.
12   Q.   Okay.
13   A.   Yes.
14   Q.   And you also, it sounded like, I think I heard you
15        say that when you go to these masses you would
16        receive communion?
17   A.   I would.
18   Q.   And was that something you did regularly or just a
19        few times or do you remember?
20   A.   No, if I went to mass, I -- I would -- I would
21        receive communion.
22   Q.   Okay.  Now, are you -- are you aware that the
23        Catholic church's teaching is that communion is
24        limited to practicing Catholics?
25   A.   That the teacher -- say that one more time, please.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 112 of 406
JA0183

Lonnie Billard Vol. I (8/16/17)

1   Q.   Are you aware that the Catholic church teaches that

2        communion in the Catholic church should be reserved

3        to practicing Catholics?  In other words, people

4        who aren't Catholic shouldn't receive communion.

5   A.   I know that that is the official line, yes.

6   Q.   Okay.  So would -- would you agree that if someone

7        was at a mass and observed you receiving communion

8        that they might assume you were Catholic?

9   A.   Yeah, I guess that would be a reasonable

10       assumption.

11  Q.   Okay.

12            We talked about prayers, we talked about going

13       to mass.  Were there any other religious

14       activities that you were involved with in

15       connection with your teaching at Charlotte Catholic

16       High School?

17  A.   Religious activity?

18  Q.   Yes, sir.

19  A.   Prayer, mass.  No, I -- I -- no.

20  Q.   Do you know who Father Roger Arnsparger is?

21  A.   Pardon me?

22  Q.   Do you know who Father Roger Arnsparger is?

23  A.   I know who he is.

24  Q.   What's your understanding of who he is?

25  A.   He is -- I don't know what his title -- it might

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 113 of 406
JA0184

Lonnie Billard Vol. I (8/16/17)

```
 1            be, what would that be.  I don't know his title,
 2            but he's -- he has a responsibility at some level
 3            for education in the diocese.
 4    Q.    Okay.
 5    A.    That's best I can tell you.
 6    Q.    Okay.  Fair enough.
 7              Have you ever met Father Arnsparger?
 8    A.    I've never been introduced to him, no.  I've -- I
 9            have -- I've seen Father Arnsparger.
10    Q.    And where have you seen him?
11    A.    He -- he had come to Charlotte Catholic on a couple
12            of occasions that I recall to speak to -- to
13            teachers.
14    Q.    Okay.  You said "a couple of occasions."  Do you
15            remember how many times he did that?
16    A.    Two, three comes to mind.  It wasn't -- I don't
17            recall there being a bunch of them so . . .
18    Q.    Okay.  And those events occurred at Charlotte
19            Catholic High School?
20    A.    Say again, please.
21    Q.    He actually came to the school to speak to the
22            teachers?
23    A.    Yeah.  What I recall, Josh, is that either at the
24            beginning of the year or during a break in the
25            year, a teacher break, there would be a -- like a
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 114 of 406
JA0185

Lonnie Billard Vol. I (8/16/17)

```
 1         diocesan and teacher meeting --
 2    Q.   Okay.
 3    A.   -- where teachers would come from -- from -- all
 4         the way from up north at Bishop McGuinness, you
 5         know, in this area, whatever, and he would speak to
 6         that group of people because it would be a big
 7         group.
 8    Q.   Yep.  Do you remember how long these events were
 9         that he would come and talk at?
10    A.   How long he talked?
11    Q.   Well, I'll start with that, yeah.  How long did he
12         talk, do you remember?
13    A.   He probably spoke for an hour --
14    Q.   Okay.
15    A.   -- ish.
16    Q.   Do you remember what the content was of his talk?
17    A.   No.  I could tell you what I got.  I got
18         from -- from what I listened to of him was
19         admonition.
20    Q.   Okay.  Can you explain what you mean by
21         "admonition"?
22    A.   That basically all of us sitting in the room were
23         really unworthy and we needed to tow the line as
24         Father Arnsparger drew the line and that basically
25         sent me out of the room.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 115 of 406
JA0186

Lonnie Billard Vol. I (8/16/17)

1    Q.   Did you actually leave any of --

2    A.   Oh, absolutely, yes.

3    Q.   And just so we get a good record, just let me

4         finish my question.

5    A.   I'm --

6    Q.   It's okay.  And I hear -- I know you know where I'm

7         going.

8             But so are you saying you actually got up and

9         left the room during Father Arnsparger's talk?

10   A.   I have done that.

11   Q.   Okay.  Do you remember how many times that

12        occurred?

13   A.   I can recall two.

14   Q.   Okay.  Do you remember having sat through the

15        entirety of any of his talks?

16   A.   No.

17   Q.   Okay.  Did the talks cover the Catholic nature of

18        Charlotte Catholic High School?

19   A.   The Catholic nature of Charlotte Catholic High

20        School.  Well, for one, they weren't about

21        Charlotte Catholic High School.  So with that said,

22        I believe that what he was saying or trying to

23        communicate was his view of what a Catholic should

24        be.

25   Q.   Okay.  And I gather from the fact that you left

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 116 of 406
JA0187

Lonnie Billard Vol. I (8/16/17)

```
 1              that you disagreed with what he said?
 2      A.   Yes, but I'd have to say, if I may, as much the way
 3              he said it.
 4      Q.   Okay.  So your disagreement was to some degree
 5              about the content of what he said but also about
 6              the way it was said?
 7      A.   That's correct.
 8      Q.   I'd like to talk about both of those things.  Can
 9              you tell me what you mean by disagreeing with the
10              way it was said?
11      A.   The way it was said.  Sure.  It came across to me
12              as condescending, as preachy.
13      Q.   Okay.
14      A.   As -- as someone who saw themselves in a position
15              well above that of a teacher.  It -- it -- to me,
16              you know, that was not something I liked so . . .
17      Q.   Anything else about the way it was said that you
18              disagreed with?
19      A.   The way it was said.  I felt like that there --
20              and -- and I won't be able to give you a specific,
21              I just recall feeling as though he was overly
22              vehement.  The words were chosen that were
23              unnecessarily harsh.
24      Q.   Okay.  You mentioned you also had some disagreement
25              with the content of what he said.
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 117 of 406
JA0188

Lonnie Billard Vol. I (8/16/17)

1   A.   Uh-huh.

2   Q.   Can you tell me about that?

3   A.   I can recall one thing in particular and it was

4        about how to treat young people, kids, and the way

5        it came across to me was, you start from a position

6        of authority and you start from a position of lack

7        of trust, and if -- if kids want your trust, then

8        they will do what you want them to in order to gain

9        it.  And I don't agree with that.

10  Q.   Okay.  Is there anything else that he said that you

11       remember that you didn't agree with?

12  A.   Not that I recall.

13  Q.   Do you recall if Father Arnsparger used a

14       PowerPoint when he gave his talks?

15  A.   Probably.  I do think -- I do recall some kind of

16       audiovisual thing he had up there.

17  Q.   I'll show you a couple documents, Mr. Billard, to

18       see if any of them look familiar to you.

19      (EXHIBIT NUMBER 3 WAS MARKED FOR IDENTIFICATION)

20  BY MR. DAVEY:

21  Q.   I'll hand you what I've marked as Exhibit 3.

22  A.   Okay.

23  Q.   Ask you to take a look at that and tell me if you

24       recognize Exhibit 3.

25               (WITNESS REVIEWS DOCUMENT)

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 118 of 406
JA0189

Lonnie Billard Vol. I (8/16/17)

Page 118

1   A.   Your question, Josh, is do I recognize the entire
2        document or does this look familiar?
3   Q.   Does it look familiar?
4   A.   Yeah, this would look like something we might get.
5   Q.   Okay.  Do you recognize it as a presentation that
6        Father Arnsparger gave?
7   A.   I don't.
8   Q.   Okay.  Does it look like the kind of thing that he
9        might have given?
10                 MR. BROOK:  Objection to form.
11                 THE WITNESS:  I don't -- I don't know
12            how to answer that, Josh.  It -- it could be
13            something he put together, but I don't know
14            that.
15  BY MR. DAVEY:
16  Q.   Okay.  That's fine.
17            This -- this is dated, this Exhibit 3, has a
18       heading on it that says, Catholic Schools Teachers
19       Meeting, August 17, 18, 19, 2001.  Do you see
20       that --
21  A.   I do.
22  Q.   -- on the first page?
23            Do you recall if you attended that meeting on
24       August 17 through 19 of 2011?
25  A.   I don't.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 119 of 406
JA0190

Lonnie Billard Vol. I (8/16/17)

Page 119

```
 1   Q.   Okay.  Hand you another document and ask you if you
 2        recognize this one.
 3   A.   All right.
 4        (EXHIBIT NUMBER 4 WAS MARKED FOR IDENTIFICATION)
 5   BY MR. DAVEY:
 6   Q.   Handing you what I've been -- what I've marked as
 7        Exhibit 4.
 8               (WITNESS REVIEWS DOCUMENT)
 9          Do you recognize Exhibit 4?
10   A.   I don't.
11   Q.   Does it look familiar at all?
12   A.   Not at all.
13   Q.   Okay.
14        (EXHIBIT NUMBER 5 WAS MARKED FOR IDENTIFICATION)
15   BY MR. DAVEY:
16   Q.   One more.  I'm handing you what I've marked as
17        Exhibit Number 5.  I'll ask you if you recognize
18        Exhibit 5.
19               (WITNESS REVIEWS DOCUMENT)
20   A.   I don't recall seeing this either.
21   Q.   Okay.  Does not look familiar at all?
22   A.   It does not.
23   Q.   Do you recall having attended any other in-service
24        days or other training relating to Catholic
25        identity of Charlotte Catholic High School other
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 120 of 406
JA0191

Lonnie Billard Vol. I (8/16/17)

Page 120

1         than Father Arnsparger's talks?

2    A.   Catholic identity.  That's -- my pause, Josh, is

3         because we would have meetings before school every

4         year.  We would have breakout or teacher days

5         during the year that would focus on our job as

6         teachers and -- and stuff that would have some

7         religious overtones to them that weren't a part of

8         a Father Arnsparger production --

9    Q.   Uh-huh.

10   A.   -- you know, where teachers would do those

11        themselves.  Teachers -- you know, a group of

12        teachers might talk about -- about leading prayer

13        or about, you know, handling crisis or, you know,

14        any number of things.  So I would say that I

15        probably have had some of that, but would been on a

16        less formal level.

17   Q.   Uh-huh.  Okay.  Do you remember any of those type

18        of trainings or meetings specifically?

19   A.   Josh, the answer to that that pops into my head

20        was, you do the right thing.  That's what -- that's

21        how I recall them.

22   Q.   Okay.  Now, Mr. Billard, do you understand that

23        the Catholic church teaches that marriage can only

24        exist between a man and a woman?

25   A.   Yes.

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 121 of 406
JA0192

Lonnie Billard Vol. I (8/16/17)

Page 121

1    Q.    Has there ever been a time when that was -- you did
2          not understand that's what the church taught?
3    A.    No, I think -- I think I've always thought that was
4          the holding.
5    Q.    Okay.  You also understand that the Catholic church
6          teaches that sexual activity outside of marriage,
7          as the church defines it, is immoral?
8    A.    Yes.
9    Q.    Okay.  And has there ever been a -- a time that you
10         did not understand that that was what the Catholic
11         church taught?
12   A.    No, no, I don't think so.
13   Q.    Do you understand that the Catholic church's
14         teaching on those two subjects is not unique to it?
15   A.    Is not what?
16   Q.    Unique to it?
17   A.    I understand that.
18   Q.    There are other Christian denominations that also
19         teach the same thing?
20   A.    That's correct.
21   Q.    Okay.  And there's other faiths that teach the same
22         thing as well, not Christian faiths?
23   A.    Yes.
24   Q.    Okay.  Mr. Billard, let me show you what I'm going
25         to mark as Exhibit Number 6.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 122 of 406
JA0193

Lonnie Billard Vol. I (8/16/17)

Page 122

1    (EXHIBIT NUMBER 6 WAS MARKED FOR IDENTIFICATION)

2                    THE WITNESS:  Okay.

3  BY MR. DAVEY:

4    Q.   Do you recognize Exhibit 6?

5    A.   I do.

6    Q.   What is Exhibit 6?

7    A.   It's a teacher employment contract.

8    Q.   Is this a teacher employment contract that you

9         signed?

10   A.   I did.

11   Q.   Okay.  And that's your signature down near the

12        bottom?

13   A.   It is.

14   Q.   And it looks like the date accepted is May 6, 2011.

15        Do you see that?

16   A.   I do.

17   Q.   Would that be the date that you signed the

18        contract?

19   A.   Yeah.

20   Q.   Okay.

21   A.   Yes.

22   Q.   All right.  And it's my understanding that you

23        signed a contract like this every year that you

24        were a full-time teacher at Charlotte Catholic; is

25        that correct?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 123 of 406
JA0194

Lonnie Billard Vol. I (8/16/17)

```
 1    A.   That's correct.
 2    Q.   Okay.  If you look with me in the paragraph that's
 3         labeled, Duties.  Do you see that there?
 4    A.   I see that.
 5    Q.   The very last sentence says:  (Reading)
 6                   Teacher, regardless of membership
 7              in the Catholic church, must be
 8              consistent at all times in example and
 9              expression with the tenants and morals
10              of the Catholic faith.
11               Did I read that correctly?
12    A.   You did.
13    Q.   Okay.  And you understood that in signing this
14         contract and agreeing to it that you were agreeing
15         to abide by that requirement; is that correct?
16    A.   I suppose.  I never gave it much thought.
17    Q.   Okay.  Did you ever talk with anyone about that
18         particular requirement of the contract?
19    A.   No.
20    Q.   Did you ever ask anyone to explain that requirement
21         to you?
22    A.   I did not.
23    Q.   Okay.  You said you didn't give it much thought.
24         Did you have any understanding of what that
25         requirement meant?
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 124 of 406
JA0195

Lonnie Billard Vol. I (8/16/17)

Page 124

1   A.   Not in any depth.

2   Q.   What was your understanding?

3   A.   As I said, I didn't think about it, so yeah.

4        Regardless of . . .

5            Didn't think about it.

6   Q.   Okay.  Now, as a substitute, did you have to sign a

7        contract like this?

8   A.   No.

9   Q.   Okay.  And if you were -- if you were still

10       substituting at Catholic -- or Charlotte Catholic

11       today and you were asked to sign this contract as a

12       substitute, would you do it?

13  A.   Today?  Probably not.

14  Q.   Why is that?

15  A.   Honestly, it's because of this process --

16  Q.   Uh-huh.

17  A.   -- has made me think much, much more deeply about

18       that -- about this kind of thing.

19  Q.   Okay.

20  A.   Okay?  Where before I was -- I thought of signing a

21       contract as this -- you know, I will teach.

22  Q.   Uh-huh.

23  A.   And I will do the best I can to be a teacher, and

24       that's how I thought the contract was.

25  Q.   Okay.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 125 of 406
JA0196

Lonnie Billard Vol. I (8/16/17)

Page 125

```
 1   A.   That's how I looked at it.  Having gone through
 2        this process, it has made me a great deal more
 3        aware of -- of how much more there might be
 4        expected there.
 5   Q.   Okay.  Before you signed this contract here in
 6        Exhibit 6 in May of 2011, did you -- did you read
 7        the contract?
 8   A.   No.
 9   Q.   Okay.  Were the contracts the same from year to
10        year?
11   A.   I -- they're essentially the same, they may have
12        changed a little bit, but I didn't read them.
13   Q.   And was that true every year, you didn't -- you
14        didn't read the contracts?
15   A.   I didn't pay attention to them.
16   Q.   It's going to be easier for me to find if I look at
17        it this way.
18            Want to take a short break for a few minutes?
19   A.   Sure.
20   (RECESS TAKEN FROM 2:58 P.M. TO 3:11 P.M.)
21                MR. BROOK:  Josh, as we discussed when
22            we were off the record, and my apologies for
23            not doing this when this line of questioning
24            was occurring, but there was a question about
25            whether people would have assumed that
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 126 of 406
JA0197

Lonnie Billard Vol. I (8/16/17)

Page 126

1          Mr. Billard was a Catholic based on his taking
2          communion on occasion and would have assumed
3          that he was Catholic, and I'm just going to
4          object to that as -- as speculative.  Thank
5          you.
6                    MR. DAVEY:  Okay.  Understood.  For
7          the record, I -- I think the objection is -- is
8          late, but understood if that's your position.
9    BY MR. DAVEY:
10   Q.  Mr. Billard, I asked you a question earlier about
11       whether you knew of anyone at Charlotte Catholic
12       who had -- had a roommate.  Do you remember that?
13   A.  A roommate for sharing expenses, is that what
14       you're referring to?
15   Q.  Yes, yes, sir.
16   A.  Yeah, I do recall you asking me that.
17   Q.  Okay.  And do you know ████  █████?
18   A.  I do.
19   Q.  Okay.  Do you know ██████  ████████?
20   A.  I do.
21   Q.  Were you aware that they at one point had lived
22       together?
23   A.  I did not.
24   Q.  Okay.  Do you know what a new teacher at Charlotte
25       Catholic earns in terms of salary?

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 127 of 406
JA0198

Lonnie Billard Vol. I (8/16/17)

1    A.    No, I don't know what -- what it is now.

2    Q.    Okay.  How about when you left, do you know?

3    A.    I think it was in the mid 30s.

4    Q.    Okay.  Mid 30,000 dollar --

5    A.    Yes.

6    Q.    -- per year?

7    A.    Yes.

8    Q.    Okay.

9    A.    Mid 30,000 per year.

10   Q.    All right.  Mr. Billard, I'm going to hand you what

11         I'm marking as Exhibit Number 7.

12      (EXHIBIT NUMBER 7 WAS MARKED FOR IDENTIFICATION)

13   BY MR. DAVEY:

14   Q.    There you go.  Do you recognize Exhibit 7?

15   A.    I do.

16   Q.    What is Exhibit 7?

17   A.    Exhibit 7 is the faculty handbook from Charlotte

18         Catholic High School for the school year 2011 and

19         '12.

20   Q.    Okay.  And did you receive a copy of this handbook

21         when you were teaching at Charlotte Catholic?

22   A.    Yes.

23   Q.    And you -- you would receive a copy of the faculty

24         handbook every year; is that correct?

25   A.    Yes.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 128 of 406
JA0199

Lonnie Billard Vol. I (8/16/17)

Page 128

1    Q.    Did you ever read the faculty handbook?

2    A.    Yes.

3    Q.    Did you read --

4    A.    My hesitation is I'm not sure I read it all the way

5          through, but I think I did.

6    Q.    Okay.  Did you do that every year or was that just

7          a one-time event?

8    A.    I -- no, I would not have read it every year.  I --

9          I recall it being handed out, you know, here you

10         go, here's this year's version type thing, but I

11         don't recall whether it was something that I read

12         every year.

13   Q.    Okay.  Turn with me if you would to the page of

14         Exhibit 7 that's marked at the bottom CCHS 000044.

15   A.    What's the number again?

16   Q.    CCHS 44?

17   A.    Forty-four?

18   Q.    Yeah.

19   A.    Okay.

20   Q.    Do you see the mission statement there?

21   A.    I do.

22   Q.    I'll just read that into the record.  It says:

23         (Reading)

24               Charlotte Catholic High School is

25            an educational community centered in

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 129 of 406
JA0200

Lonnie Billard Vol. I (8/16/17)

Page 129

```
 1              the Roman Catholic faith with
 2              teaches -- excuse me -- which teaches
 3              individuals to serve as Christians in
 4              our changing world.
 5          Did I read that correctly?
 6   A.   You did.
 7   Q.   Have you read that before today, Mr. Billard?
 8   A.   I have.
 9   Q.   Okay.  And you understand that is the mission
10        statement of Charlotte Catholic High School?
11   A.   I do.
12   Q.   Okay.  If you look below that in the first
13        paragraph under, Beliefs, it says:  (Reading)
14              We believe individuals should
15              model and integrate teachings of Jesus
16              in all areas of conduct in order to
17              nurture faith and inspire action,
18              especially in the areas of service and
19              volunteerism.
20          Did I read that correctly?
21   A.   You did.
22   Q.   And you understood that was one of the beliefs of
23        Charlotte Catholic High School?
24   A.   I do.
25   Q.   Okay.  Turn with me if you would to page 50, CCHS
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 130 of 406
JA0201

Lonnie Billard Vol. I (8/16/17)

 1        50 --
 2   A.    Uh-huh.
 3   Q.    -- of Exhibit 7.
 4            And do you see in the middle of the page
 5         there's a heading, Teacher Performance
 6         Responsibilities?
 7   A.    I see that.
 8   Q.    Okay.  And do you see there's a list of items
 9         underneath that?
10   A.    I do.
11   Q.    And is it your understanding that these are
12         performance responsibilities of teachers at
13         Charlotte Catholic?
14   A.    Yes.
15   Q.    All right.  And if you turn the page to page 51 of
16         Exhibit 7, you'll see at the very top, Number 8, it
17         says, Implement the diocesan and school's mission
18         statements.
19   A.    I see that.
20   Q.    Okay.  And what that means is that one of the
21         performance responsibilities of teachers at
22         Charlotte Catholic High School is to implement the
23         mission statement that we just read a moment ago
24         from page 44 of Exhibit 7; is that right?
25   A.    I suppose.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 131 of 406
JA0202

Lonnie Billard Vol. I (8/16/17)

Page 131

1  Q.   You have a different understanding of what that
2       means?
3  A.   No, I haven't thought about it, but I -- that would
4       make sense.
5  Q.   And if you would, turn with me to page 66 of the
6       Exhibit 7.
7  A.   Okay.
8  Q.   And do you see there, item Roman numeral XI, it
9       says, Other Personnel Policies?
10 A.   What page are you on now?
11 Q.   This is page CCHS 66.
12 A.   Oh, I see.  Okay.  Never mind.
13 Q.   Are you with me there?
14 A.   I am now.
15 Q.   Okay.
16 A.   Thank you.
17 Q.   And it says under the heading, Other Personnel
18      Policies, it says:  (Reading)
19              Please consult your diocesan
20          personnel policy handbook for other
21          personnel policies.
22 A.   I do see that.
23 Q.   Did I read that correctly?
24 A.   You did.
25 Q.   And that means that in the diocesan personnel

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 132 of 406
JA0203

Lonnie Billard Vol. I (8/16/17)

1      policy handbook there are other personnel policies

2      that would apply to teachers at Charlotte Catholic;

3      is that correct?

4   A.   I would guess so.

5   Q.   Okay.  Do you have a different understanding of

6      what that means?

7   A.   No.

8   Q.   As a teacher at Charlotte Catholic, you agree to

9      comply with the faculty handbook each year; is that

10     correct?

11  A.   Yes.

12  Q.   Okay.  Let me just show you what I'm marking as

13     Exhibit 8.

14     (EXHIBIT NUMBER 8 WAS MARKED FOR IDENTIFICATION)

15  BY MR. DAVEY:

16  Q.   Do you recognize this Exhibit 8, Mr. Billard?

17  A.   Yes, I believe I do.

18  Q.   Okay.  And is Exhibit 8 a acknowledgment form that

19     indicates that you received a copy of the faculty

20     handbook that we just looked at in Exhibit 7?

21  A.   Yes, it is.

22  Q.   And is that your signature there on Exhibit 8?

23  A.   It is my signature.

24  Q.   Okay.  And if you look at the second full

25     paragraph, it says:  (Reading)

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 133 of 406
JA0204

Lonnie Billard Vol. I (8/16/17)

1                     This will also acknowledge that I

2              have personally received a copy of the

3              Charlotte Catholic High School faculty

4              handbook for employees.  I have read

5              the handbook or have had it read to me.

6              I understand the contents and agree to

7              comply with it.

8     A.   Yes.

9     Q.   Did I read that correctly?

10    A.   Yes.

11    Q.   And by executing this document, you agreed with the

12         statement that I just read here from Exhibit 8; is

13         that correct?

14    A.   That's correct.

15    Q.   Let me show you what I'm going to mark as Exhibit

16         Number 9.

17       (EXHIBIT NUMBER 9 WAS MARKED FOR IDENTIFICATION)

18    BY MR. DAVEY:

19    Q.   Do you recognize Exhibit 9, Mr. Billard?

20    A.   Not initially.

21    Q.   Feel free to look it over.

22                 (WITNESS REVIEWS DOCUMENT)

23    A.   Okay.

24    Q.   Do you recognize Exhibit 9?

25    A.   I -- I do recall having seen it.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 134 of 406
JA0205

Lonnie Billard Vol. I (8/16/17)

Page 134

```
 1   Q.   Okay.  Do you recall if you received a copy of
 2        Exhibit 9?
 3   A.   I don't recall.
 4   Q.   Okay.  Turn with me if you would to the second page
 5        of Exhibit 9.  It's labeled CCHS 80 at the bottom.
 6   A.   Yes.
 7   Q.   Do you see that there?
 8   A.   I do.
 9   Q.   I'm going to read from the second full paragraph.
10        It says:  (Reading)
11                As clergy, religious,
12           seminarians, lay employees, and
13           volunteers, we all share in the mission
14           of the church to continue the work of
15           Jesus Christ.
16         Did I read that correctly?
17   A.   You did.
18   Q.   It goes on to say:  (Reading)
19                This is both a great privilege
20           and an awesome responsibility.  Those
21           who publicly represent the church,
22           whether by office, employment, or
23           appointment, have a special obligation
24           because they have accepted positions of
25           trust.  Because of this, the church
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 135 of 406
JA0206

Lonnie Billard Vol. I (8/16/17)

Page 135

1          must be exemplary.  Clergy, religious,
2          seminarians, lay employees, and
3          volunteers should and will be held
4          accountable for their behavior.
5              Did I read that correctly?
6    A.   You did.
7    Q.   Have you ever read that before today, Mr. Billard?
8    A.   I don't recall that I have.
9    Q.   Okay.  You understand that "lay employees" includes
10        teachers at Charlotte Catholic High School?
11   A.   That would be my assumption.
12   Q.   Okay.  Look with me if you would at the next page
13        of Exhibit 9, page CCHS 81.  Do you see that there?
14   A.   I do.
15   Q.   I'm going to read from the first sentence of the
16        preamble.  It says:  (Reading)
17              Priests, deacons, religious,
18          seminarians, pastoral ministers,
19          administrators, lay employees, and
20          volunteers, paren, church personnel,
21          close paren, in our parishes, agencies,
22          schools, and organizations must uphold
23          Christian values and conduct.
24              Did I read that correctly?
25   A.   You did.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 136 of 406
JA0207

Lonnie Billard Vol. I (8/16/17)

Page 136

1   Q.   All right.  And it goes on to say:  (Reading)

2              The code of ethics policy of the

3           Diocese of Charlotte, paren, code,

4           close paren, provides a set of

5           standards for conduct in certain

6           situations and it's designed to deter

7           wrongdoing and to promote honest and

8           ethical conduct.

9        Did I read that correctly?

10  A.   You did.

11  Q.   All right.  So is it -- is it your understanding

12       that the code of ethics policy of the Diocese of

13       Charlotte prescribes conduct that would apply to

14       lay employees, such as teachers of schools, within

15       the Diocese of Charlotte?

16  A.   Yes.

17  Q.   And then the preamble goes on to say in the next

18       paragraph:  (Reading)

19              The public and private conduct of

20           clergy, religious, seminarians, lay

21           employees, and volunteers can be a

22           source of inspiration and motivation

23           but can also scandalize and undermine

24           the faith of the people that are

25           served.

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 137 of 406
JA0208

Lonnie Billard Vol. I (8/16/17)

1              Did I read that correctly?

2    A.    You did.

3    Q.    All right.  And you understand that sentence also

4          implies to teachers in diocesan schools; is that

5          correct?

6    A.    Yes.

7    Q.    Okay.  And do you agree that the conduct of

8          teachers in diocesan schools can be a source of

9          inspiration and motivation for the people that the

10         schools serve?

11   A.    Absolutely, yes.

12   Q.    And you also agree that the conduct of teachers and

13         diocesan schools could scandalize or undermine the

14         faith of the people those schools serve?

15   A.    It could.

16   Q.    The preamble goes on to say:  (Reading)

17             Church personnel must at all

18          times be aware of the responsibilities

19          that accompany their work.  It is

20          essential, therefore, that anyone who

21          undertakes a position of ministry,

22          employment, or leadership in the

23          diocese be ever mindful of the trust

24          that has been placed in him or her.

25          The fateful discharge of the

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 138 of 406
JA0209

Lonnie Billard Vol. I (8/16/17)

```
 1              responsibilities that accompany our
 2              work requires constant and prayerful
 3              reflection since all of us must be
 4              sustained by God's goodness and grace.
 5              Did I read that correctly?
 6     A.    You did.
 7     Q.    And do you understand that -- that last section I
 8           just read also applies to teachers in diocesan
 9           schools?
10     A.    I do.
11     Q.    Okay.  Turn with me if you would to the third page,
12           or I guess it's the one label CCHS 82 of Exhibit 9.
13           Do you see Number 1.1 under the heading, Principles
14           of Ethics and Integrity -- bless you.
15                      MR. BROOK:  Bless you.
16                      THE WITNESS:  Thank you.  I'm sorry.
17     BY MR. DAVEY:
18     Q.    Making sure you with me.  I'm reading from the
19           page.  Are you with me on page 82 of Exhibit
20           Number 9?
21     A.    I -- yeah, I am.
22     Q.    Thank you.
23              Paragraph 1.1 says:  (Reading)
24                  Church personnel will conduct
25                  themselves at all times in a manner
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 139 of 406
JA0210

Lonnie Billard Vol. I (8/16/17)

Page 139

```
 1            that is consistent with the teachings
 2            and precepts of the Roman Catholic
 3            Church.
 4            Did I read that correctly?
 5    A.   You did.
 6    Q.   And you understand that that applies to teachers in
 7         diocesan schools?
 8    A.   I don't know that I would agree with that.
 9    Q.   Okay.  And why not?
10    A.   "Church personnel."
11    Q.   All right.  So turn with me if you would to page 81
12         of Exhibit Number 9.  The very first sentence under
13         the preamble, do you see there it says, we read
14         this a moment ago --
15    A.   Ah.
16    Q.   -- priests, deacons, religious, seminarians,
17         pastoral ministers, administrators, lay employees,
18         and volunteers are defined as church personnel.  Do
19         you see that?
20    A.   I see that now, yes.
21    Q.   Okay.  So do you understand that Paragraph 1.1 on
22         page 82 of Exhibit 9 applies to teachers in
23         diocesan schools?
24    A.   I do now, yes.
25    Q.   Okay.  And that includes substitute teachers?
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 140 of 406
JA0211

Lonnie Billard Vol. I (8/16/17)

Page 140

1    A.   I would suspect.

2    Q.   Substitute teachers are lay employees, right?

3    A.   Yeah.

4    Q.   Handing you what I've marked as Exhibit 10.

5       (EXHIBIT NUMBER 10 WAS MARKED FOR IDENTIFICATION)

6   BY MR. DAVEY:

7    Q.   I will have you take a look at that and tell me if

8         you recognize Exhibit 10.

9    A.   Yes.

10   Q.   Okay.  And what is Exhibit 10?

11   A.   It's the Diocese of Charlotte Personnel Polices

12        Handbook.

13   Q.   And is this a handbook that you would have received

14        during the course of your employment at Charlotte

15        Catholic?

16   A.   I don't --

17                   MR. BROOK:  Objection,

18           mischaracterizes the facts.

19   BY MR. DAVEY:

20   Q.   Is this a handbook that you received during your

21        employment at Charlotte Catholic?

22   A.   I don't recall.

23   Q.   Okay.  Hand you something that might help.

24   A.   Okay.

25   Q.   Might help you recall.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 141 of 406
JA0212

Lonnie Billard Vol. I (8/16/17)

Page 141

1   A.   All righty.

2   Q.   Handing you what I've marked as Exhibit Number 11.

3      (EXHIBIT NUMBER 11 WAS MARKED FOR IDENTIFICATION)

4              THE WITNESS:  What's this?  Oh, I see

5         that now, yeah.

6   BY MR. DAVEY:

7   Q.   Do you recognize Exhibit 11?

8   A.   I do.

9   Q.   Okay.  And is that your signature on Exhibit 11?

10  A.   It is.

11  Q.   And Exhibit 11 is a acknowledgment form that

12       indicates that you received a copy of the Diocese

13       of Charlotte Personnel Policies Handbook; is that

14       correct?

15  A.   That's correct.

16  Q.   Okay.  Does that refresh your recollection that you

17       would have received a copy of Exhibit 10 while you

18       were working at Charlotte Catholic?

19  A.   Yes.

20  Q.   So if you look with me in Exhibit Number 10, look

21       with me at the page that's labeled at the bottom

22       Billard RFP 58.  Do you see that there?

23  A.   Fifty-eight?

24  Q.   Yes, sir.

25  A.   Got it.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 142 of 406
JA0213

Lonnie Billard Vol. I (8/16/17)

Page 142

1    Q.   Okay.  Read with me if you would the second
2         paragraph in the introduction, it says:  (Reading)
3                   The policies contained herein are
4              to be administrated -- administered
5              completely and inclusively to ensure
6              the consistent and equitable treatment
7              of all employees.  They cover all
8              persons employed by parishes, agencies,
9              schools, ministry, and offices of the
10             diocese, including those hired under a
11             separate employment contract.
12             Did I read that correctly?
13   A.   You did.
14   Q.   All right.  And that means that the policies in the
15        personnel policies handbook of the Diocese of
16        Charlotte apply to substitute teachers in diocesan
17        schools, right?
18   A.   I would think that's what it meant.
19   Q.   Okay.  If you look with me two paragraphs down, the
20        paragraph begins, As employees.  Do you see that
21        there?
22   A.   I see two paragraphs that begin that way.
23   Q.   So --
24   A.   As employees.
25   Q.   As employees of the Diocese of Charlotte?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 143 of 406
JA0214

Lonnie Billard Vol. I (8/16/17)

Page 143

1    A.   Got it.

2    Q.   You see that?  Okay.

3            And that paragraph says:  (Reading)

4                As employees of the Diocese of

5            Charlotte, we share in the mission

6            which Christ entrusted to the church to

7            spread the gospel, to serve our

8            brothers and sisters, and to build up

9            the body of Christ, which is the

10           church.  All of our employees must

11           respect, appreciate, and uphold the

12           teachings, principles, legislation,

13           policies, and traditions of the Roman

14           Catholic Church in both word and

15           example.

16            Did I read that correctly?

17   A.   You did.

18   Q.   All right.  And that is a requirement that applies

19        to substitute teachers in diocesan schools,

20        correct?

21   A.   I would suspect, yes.

22   Q.   When you received a copy of Exhibit 10, did you

23        read it?

24   A.   I don't recall having read it or read all of it.

25   Q.   If you look with me at Exhibit 11, the

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 144 of 406
JA0215

Lonnie Billard Vol. I (8/16/17)

Page 144

1    acknowledgment form, the first full paragraph says:

2    (Reading)

3              This will acknowledge that I have

4          personally received a copy of the

5          Diocese of Charlotte Personnel Policies

6          Handbook, including the Diocese of

7          Charlotte code of ethics and the

8          policies of the Diocese of Charlotte

9          concerning ministry-related sexual

10         misconduct by church personnel.  I

11         agree that I am obligated to read and

12         familiarize myself with its content.

13           Did I read that correctly?

14   A.   You did.

15   Q.   Okay.  And so does that indicate to you that the

16        diocese expected you to read the personnel policies

17        handbook?

18   A.   Yes.

19   Q.   Okay.  And the next sentence -- the first sentence,

20        rather, in the second full paragraph of Exhibit 11

21        says, I understand the contents and agree to comply

22        with it.  Did I read that correctly?

23   A.   You did.

24   Q.   Okay.  And in signing Exhibit 11, you indicated

25        that you understood the contents of Exhibit 10 and

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 145 of 406
JA0216

Lonnie Billard Vol. I (8/16/17)

Page 145

1         that you agreed to comply with it; is that correct?

2    A.   That's correct.

3    Q.   Turn with me if you would to page 60 of Exhibit 10.

4         This is the mission statement of the Diocese of

5         Charlotte?

6    A.   It is.

7    Q.   And it says:  (Reading)

8               We, the people of God in the

9           Diocese of Charlotte, fortified in the

10          Father, redeemed in the Son, empowered

11          in the Spirit, are called to grow ever

12          more perfectly into a community of

13          praise, worship, and witness.  We seek

14          to become ever more enthusiastically a

15          leaven of service and a sign of peace

16          through love in Piedmont and Western

17          North Carolina.

18           Did I read that correctly?

19   A.   You did.

20   Q.   Okay.  And going back to what we talked about a

21        moment ago in Exhibit 7 on page 51 where one of the

22        performance responsibilities for teachers is to

23        implement the diocesan mission statement.  Do you

24        understand, then, that it was a responsibility of

25        teachers in diocesan schools to implement this

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 146 of 406
JA0217

Lonnie Billard Vol. I (8/16/17)

Page 146

1           mission statement of the Diocese of Charlotte that
2           we read from Exhibit 10 just a moment ago?
3     A.    Yes.
4     Q.    Okay.  And that would include substitute teachers
5           as well?
6     A.    I -- yes, I suppose.
7     Q.    When you were teaching at Charlotte Catholic, did
8           you receive evaluations of your work as a teacher?
9     A.    I did.
10    Q.    Okay.  Were you -- were you ever evaluated based on
11          catholicity of the classroom environment?
12    A.    Maybe.  I don't recall, to be honest.  It wouldn't
13          surprise me that that came up in the latter part of
14          my employment there.
15    Q.    Okay.  Do you have an understanding of what that
16          means, "catholicity"?
17    A.    Well, the word it says would imply that it was
18          Catholic like.
19    Q.    Is that -- do you have any other understanding of
20          what the term means?
21    A.    No.
22    Q.    Okay.  Let me show you an exhibit.
23                    MR. DAVEY:  Can I get some more
24             stickers, Amy, when you get a chance?
25

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 147 of 406
JA0218

Lonnie Billard Vol. I (8/16/17)

Page 147

1    BY MR. DAVEY:

2    Q.   Handing you, Mr. Billard, what I've marked as

3         Exhibit 12.

4    A.   Okay.

5      (EXHIBIT NUMBER 12 WAS MARKED FOR IDENTIFICATION)

6              MR. BROOK:  This is 12 or 13?

7              MR. DAVEY:  This is Exhibit 12.

8              MR. BROOK:  Okay.

9              MR. DAVEY:  The next one will be 13.

10             THE WITNESS:  Okay.

11   BY MR. DAVEY:

12   Q.   Mr. Billard, do you recognize Exhibit 12?

13   A.   Yes.

14   Q.   And what is Exhibit 12?

15   A.   It says a formal observation instrument for

16        Charlotte Catholic High School.

17   Q.   And can you explain what a formal observation

18        instrument is?

19   A.   Well, this one was one that Angela Montague, who

20        was assistant principal, it was a form that she

21        used when she -- when she evaluate -- came in and

22        observed a teacher.

23   Q.   Okay.  Turn with me if you would to page marked --

24        excuse me -- CCHS 389, the very last page of

25        Exhibit 12.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 148 of 406
JA0219

Lonnie Billard Vol. I (8/16/17)

Page 148

1   A.   The last page?

2   Q.   Yes, sir.

3   A.   Okay.

4   Q.   And is that your signature down at the bottom of

5       the page?

6   A.   It is.

7   Q.   Okay.  Does that indicate that you received a copy

8       of this evaluation instrument and discussed it with

9       Ms. Montague?

10   A.   Yes.

11   Q.   Okay.  Turn back a couple pages if you would to the

12       one marked CCHS 387.  Do you see that there?

13   A.   387?

14   Q.   Yes.

15   A.   Okay.

16   Q.   And I'll try to -- I'll try to speak up, sorry.

17   A.   That's all right.

18   Q.   I'm looking down at the page.

19   A.   That's all right.  That's all right.

20   Q.   You see down near the bottom of page 387, there's a

21       heading for catholicity and atmosphere?

22   A.   Uh-huh.

23   Q.   Okay.

24   A.   Yes.

25   Q.   And there's some, I guess, evaluation criteria, if

Lowrance Reporting Service, Inc.
704-543-7995   www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 149 of 406
JA0220

Lonnie Billard Vol. I (8/16/17)

Page 149

1           you will, listed here?

2     A.    Yes.

3     Q.    Okay.  Does this help you remember what the term

4           "catholicity" might mean with respect to classroom

5           environment?

6     A.    No, I just finished reading it.  Would you ask me

7           the question again, please?

8     Q.    Sure.  A moment ago I'd asked you if you had an

9           understanding of the term "catholicity."

10    A.    Yes.

11    Q.    And I'm wondering if looking at this document would

12          cause you to remember something else about

13          catholicity or otherwise revise your -- your answer

14          that you gave a moment about your understanding of

15          that term.

16    A.    No, it doesn't change that answer.

17    Q.    Okay.

18              Let me show you what I've marked as Exhibit 13.

19       (EXHIBIT NUMBER 13 WAS MARKED FOR IDENTIFICATION)

20    BY MR. DAVEY:

21    Q.    Do you recognize this Exhibit 13, Mr. Billard?

22    A.    I recognize this.

23    Q.    What is Exhibit 13?

24    A.    It is a teacher evaluation form that was used, as I

25          recall, primarily by Mr. Healy to evaluate

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 150 of 406
JA0221

Lonnie Billard Vol. I (8/16/17)

Page 150

```
 1        teachers.
 2   Q.   Okay.  And if you look at the last page, the second
 3        page, of Exhibit 13, is that your signature down at
 4        the bottom?
 5   A.   It is.
 6   Q.   Okay.  And does that mean you received a copy of
 7        the evaluation that was prepared by Mr. Healy?
 8   A.   Yes.
 9   Q.   Let's look back at the first page of Exhibit 13,
10        under Philosophy, the first section.  It says,
11        Teaches secular subjects in a way agreeable with
12        Catholic thought.  Did I read that correctly?
13   A.   You did.
14   Q.   What's your understanding of what that means?
15   A.   I have no idea.
16   Q.   Okay.  How about Number 2, Implements Catholic
17        social justice principles throughout all
18        curriculum.  Do you have any understanding of what
19        that means?
20   A.   I have no idea.
21   Q.   Number 3 says, Contributes by example to an
22        atmosphere of faith commitment.  Do you understand
23        what that means?
24   A.   I know what that means to me, but I don't know what
25        the implication is from this document.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 151 of 406
JA0222

Lonnie Billard Vol. I (8/16/17)

Page 151

1   Q.   Okay.  So are you saying you understand that -- you

2        have an idea what that means for you, but not an

3        idea of what the Charlotte Catholic thought it

4        meant?

5   A.   That's correct.

6   Q.   Okay.  What is your understanding of what that

7        means to you?

8   A.   Contributes by example to an atmosphere of faith

9        and commitment is that you live your life with

10       integrity, you live your life honestly, and you do

11       so in relationship to your relationship with God.

12       Okay?

13          This -- this document was -- was something that

14       Jerry Healy would fill out on every teacher.  He

15       never once observed me in my classroom so I can

16       tell you that this was never discussed with me.  It

17       showed up in my -- my box.  I was told to sign it

18       and return it.

19   Q.   Okay.

20   A.   That's the extent of this.

21   Q.   Okay.  So you never asked anyone, Mr. Healy or

22        anyone else --

23   A.   No.

24   Q.   -- what -- what he meant by, for example, Teaches

25        secular subjects in a way agreeable with Catholic

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 152 of 406
JA0223

Lonnie Billard Vol. I (8/16/17)

Page 152

1        thought?

2    A.   I did not, sir.

3    Q.   What about Number 4 under Philosophy, it says,

4        Supports and implements objectives of the school.

5    A.   Uh-huh, yes.

6    Q.   Do you have an understanding of what that means?

7    A.   Not -- no.

8    Q.   Okay.  Did you ever discuss any of the evaluations

9        you received at Charlotte Catholic with any of your

10       supervisors?

11   A.   I did with Angela Montague and with Steve

12       Carpenter.

13   Q.   Okay.  But never with Mr. Healy?

14   A.   Never with Mr. Healy.

15            Can I add to that, Josh?

16   Q.   Sure.

17   A.   I also had one conversation with a -- with Father

18       Jim Cassidy because he observed me one time.

19   Q.   Okay.

20   A.   That very first year I taught full-time.

21   Q.   Okay.

22            Let me show you what I've marked as Exhibit

23       Number 14.

24     (EXHIBIT NUMBER 14 WAS MARKED FOR IDENTIFICATION)

25

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 153 of 406
JA0224

Lonnie Billard Vol. I (8/16/17)

Page 153

 1   BY MR. DAVEY:

 2   Q.   I'll ask you to take a look at Exhibit 14 and tell

 3        me if you recognize it.

 4   A.   I do.

 5   Q.   What's Exhibit 14?

 6   A.   Annual License Renewal Plan Review.

 7   Q.   Okay.  And this is a -- a document that you

 8        completed?

 9   A.   It is.

10   Q.   All right.  That looks like your handwriting, I

11        think.

12   A.   It is.

13   Q.   Okay.  What's the purpose of the Annual License

14        Renewal Plan Review?

15   A.   The purpose -- let's see, let me look.  Just a

16        second.  Okay, yeah.

17            The purpose was to be -- to -- for the teachers

18        to be working toward goals that would enhance their

19        ability to teach in the classroom.

20   Q.   Okay.  And so the goals that you would set forth in

21        this document, Exhibit 14, are designed to enhance

22        your ability to teach at Charlotte Catholic; is

23        that right?

24   A.   Yes.

25   Q.   Okay.  Look with me if you would under the section,

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 154 of 406
JA0225

Lonnie Billard Vol. I (8/16/17)

Page 154

```
 1              Impact on Performance.  Do you see that there,
 2              Exhibit 14?
 3    A.    I do.
 4    Q.    There's a -- the second sentence, I guess, it says,
 5          if I'm reading it correctly:  (Reading)
 6                     Learn to better incorporate
 7              lessons from another discipline into my
 8              classes, paren, English and religion,
 9              close paren.
10    A.    Yes.
11    Q.    Did I read that correctly?
12    A.    Yes, you did.
13    Q.    Do you know what you meant by that?
14    A.    Say again, please.
15    Q.    Do you know what that -- that meant when you wrote
16          that?
17    A.    What year is this, '9, okay.  As I recall, this was
18          about -- I recall where it started in that in one
19          of my classes I had planned to teach a play that
20          without my knowledge it was also going to be taught
21          in English.  Okay?  And then English -- it was a
22          Shakespeare play.
23    Q.    Okay.
24    A.    Okay?  And English was also going to share what
25          they learned through the -- with religion teachers.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 155 of 406
JA0226

Lonnie Billard Vol. I (8/16/17)

```
 1          And what I recall being -- like I was -- I felt
 2          like I was kind of -- I'm out here doing this
 3          (indicating) and they're doing that and there was
 4          no coordination of that.
 5    Q.    Yeah.
 6    A.    You know, and there needed to be.
 7    Q.    Right.
 8    A.    And that's where that came from.  That's how I
 9          recall that.
10    Q.    So what was -- do you have an understanding of what
11          the role the religion teacher was relative to the
12          Shakespeare play?
13    A.    I believe, and I did not have the conversation
14          myself.
15    Q.    Uh-huh.
16    A.    I believe -- in -- in Romeo and Juliet, there is
17          the role of the nurse who's actually a nun.
18    Q.    Okay.
19    A.    Okay.  And there's also the friar.
20    Q.    Okay.
21    A.    Okay.  And then throughout many of Shakespeare's
22          plays, and there are lots of them that are taught.
23    Q.    Yep.
24    A.    Okay?  There is often a religious figure.  Many
25          times they -- they appear to be Catholic in nature,
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 156 of 406
JA0227

Lonnie Billard Vol. I (8/16/17)

Page 156

```
 1       whether or not they're -- they're identified as
 2       that.
 3   Q.  Uh-huh.
 4   A.  They may be identified as a friar --
 5   Q.  Right.
 6   A.  -- or something like that.  And so the assumption
 7       would be that they'd have to be either Church of
 8       England or Catholic.
 9   Q.  Catholic, right.
10   A.  Okay?  But because Shakespeare put so many of his
11       plays in Catholic regions --
12   Q.  Uh-huh.
13   A.  -- okay, throughout Italy, et cetera, there --
14       there is a school of thought that thinks that he's
15       referring to the Catholic.
16   Q.  Yes.
17   A.  Although there's nothing that proves that.
18   Q.  Yeah.
19   A.  Okay?  So as I recall, the English teachers and the
20       religion teachers would kind of work together on
21       that, you know, to be -- you know, so that when
22       there was a role that had a significant moral
23       impact on -- on the play, there would be a
24       collaboration between those two.
25   Q.  Okay.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 157 of 406
JA0228

Lonnie Billard Vol. I (8/16/17)

```
 1   A.   If I were teaching something that was parallel to
 2        that, I needed to be in tune to what they were
 3        saying so we were not on different pages --
 4   Q.   Okay.
 5   A.   -- about what was being taught and what it meant.
 6   Q.   So if I've understood you right, let's see if I
 7        can -- can recapsulate this in a way that makes
 8        sense.  But it sounds like what you were trying to
 9        do was coordinate between the drama and the English
10        and the religion departments because they all had
11        sort of expertise they could bring to bear with
12        respect to the Shakespeare play and make sure that
13        that was all integrated in a way that all of those
14        disciplines were brought to bear for the benefit of
15        the students.
16   A.   Essentially, yes.
17   Q.   Is that fair?
18   A.   Essentially, yes.
19   Q.   Okay.
20             You -- you probably did a number of plays as a
21        drama teacher at Charlotte Catholic over the years.
22   A.   I did.
23   Q.   Do you remember any of those that you did, which --
24        which plays you --
25   A.   Plays that I directed?
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 158 of 406
JA0229

Lonnie Billard Vol. I (8/16/17)

Page 158

1    Q.    Correct.

2    A.    Sure.  I won't remember them all.

3    Q.    Sure.

4    A.    Let me think.  Up the Down Staircase, The Glass

5          Menagerie, 12 Angry Men, The Miracle Worker.  Oh,

6          what was that?  It's something like, Be Careful of

7          the Kids, something like that.  It was a silly

8          comedy, slapstick comedy.  I did The Tales of the

9          Brothers Grimm, Abridged Version.  That's what I

10         recall right now.

11   Q.    And a moment ago you made reference to Shakespeare

12         plays.  Do -- did you do any plays by Shakespeare?

13   A.    I did not.

14   Q.    Okay.  So when you said a moment ago there were --

15         I think you said there were a lot of them, what did

16         you mean by that?

17   A.    There were a lot of Shakespeare plays that were

18         taught in English classes.

19   Q.    Okay.

20   A.    Is what I was referring to.

21   Q.    Gotcha.  Okay.

22             Now, you were telling me a moment ago with

23         reference to Exhibit 14 about efforts to bring

24         different disciplines together to help the students

25         with their education.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 159 of 406
JA0230

Lonnie Billard Vol. I (8/16/17)

Page 159

1   A.    Yes.

2   Q.    Do you remember which play was being discussed in

3         terms of this interdisciplinary approach?

4   A.    What I was -- what I was doing was I was taking --

5         this is for my acting class.

6   Q.    Okay.

7   A.    Okay?  I was taking characters that you will find

8         in virtually any play.  You obviously have a

9         protagonist and an antagonist and you've got

10        ancillary characters.  And I -- you know, I would

11        start with Shakespeare characters because they're

12        so clearly drawn.

13  Q.    Yeah.

14  A.    Okay?  And they -- they often became morphed into

15        other characters by other playwrights.  And so

16        that's -- I was -- I was teaching, Kids, if

17        you're -- if you're going to be playing this kind

18        of role, here are the other -- other plays you can

19        look at for guidance, for inspiration, but also how

20        to draw clues to building a character.

21  Q.    Okay.  So the interdisciplinary approach you were

22        telling me about a moment ago, it didn't -- sounds

23        like it didn't necessarily have to be about a play

24        you were directing for performance, but it could be

25        about a play that you were working on in an acting

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 160 of 406
JA0231

Lonnie Billard Vol. I (8/16/17)

Page 160

1          class or something like that?

2     A.   Absolutely.

3     Q.   Okay.

4     A.   None of the things that I directed for performance

5          had any connection whatsoever to the religion

6          department or the English department.

7     Q.   Okay.  That helps very much.  Thank you.

8        (EXHIBIT NUMBER 15 WAS MARKED FOR IDENTIFICATION)

9   BY MR. DAVEY:

10    Q.   I've handed you what I've marked as Exhibit 15.

11         Ask you to look at that and tell me if you

12         recognize Exhibit 15.

13    A.   Yes --

14    Q.   Okay.

15    A.   -- I recognize this.

16    Q.   Can you tell me what Exhibit 15 is?

17    A.   It's called an Individual Growth Plan.

18    Q.   Okay.  And what is an Individual Growth Plan?

19    A.   What it's supposed to be is to -- for an

20         individual -- for each individual teachers to

21         identify their strengths and how they can

22         capitalize on those strengths, and they were also

23         to identify -- I don't think they -- they weren't

24         called -- what are they called here, just a second.

25         Growths.  Things that you could improve on, and

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 161 of 406
JA0232

Lonnie Billard Vol. I (8/16/17)

Page 161

1          then -- and then there was always one that had to
2          do with the -- a little bit to the religious side.
3     Q.   Okay.  And you say there was always one that had to
4          do a little bit with the religious side.  Can you
5          tell me what you mean by that?
6     A.   Well, they would -- they would -- at that point it
7          was a thing where they were wanting you to -- you
8          know, wanting there to be a better cohesion from
9          one school to the other so that it was not, you
10         know, you leave Saint Matt's and you go to Holy
11         Trinity that it was like going to another universe.
12    Q.   Okay.
13    A.   Same thing from -- from Holy Trinity to Catholic.
14         And so they were really trying to promote a way in
15         which we as teachers could identify ways to make --
16         make it a more cohesive experience and less
17         individualist in the way it was handled.
18    Q.   Okay.  So going to here, Exhibit 15, under
19         Individual Growth Goals, the first one, I think it
20         says, Develop connection between drama and liturgy.
21         Did I read that correctly?
22    A.   Where are you?
23    Q.   Exhibit 15.
24    A.   Oh, yes.
25    Q.   In the section, Individual Growth Goals?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 162 of 406
JA0233

Lonnie Billard Vol. I (8/16/17)

Page 162

```
 1   A.   Uh-huh.
 2   Q.   It says, Develop connection between drama and
 3        liturgy?
 4   A.   Uh-huh.
 5   Q.   Can you --
 6   A.   Yes.  I'm sorry.
 7   Q.   No problem.  Thank you.
 8            Can you tell me what that means?
 9   A.   No, I don't recall it.
10   Q.   Okay.  Any connection between drama and liturgy
11        that comes to mind for you sitting here today?
12   A.   I don't recall anything that's coming up.
13   Q.   Okay.
14            If you look down under Section 3 on Exhibit 15
15        under the section, Alignment of Goals to
16        School/Diocese/SACS Priorities.  Do you see that?
17   A.   Yes.
18   Q.   The second bullet, I think, says -- well, there's a
19        heading here, it says, Students using talents
20        to . . .  Did I read that correctly?
21   A.   That's correct.
22   Q.   And then you have a couple of bullet points here?
23   A.   Yes.
24   Q.   And then one of them says, Promote religious
25        expression.  Do you see that?
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 163 of 406
JA0234

Lonnie Billard Vol. I (8/16/17)

```
 1   A.   Yes.
 2   Q.   What did you mean by that?
 3   A.   This was kind of a template we were encouraged to
 4        use.
 5   Q.   Okay.  What sort of religious expression were you
 6        hoping students would engage in?
 7   A.   I have no idea.
 8   Q.   Okay.
 9             Turn with me if you would to the second page of
10        the exhibit, under heading, Action/Timelines to
11        Achieve Goals.
12   A.   Uh-huh.
13   Q.   Do you see that there?
14   A.   Yes.
15   Q.   It says, Goal.  Develop connection between drama
16        and liturgy.
17   A.   Yes.
18   Q.   Which we just talked about.
19             And then, Action, it says, Develop and perform
20        Easter pageant.
21   A.   Yes.
22   Q.   Did I read that correctly?
23   A.   You did.
24   Q.   Do you know what you were referring to here?
25   A.   I was asked, in relationship to what was on the
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 164 of 406
JA0235

Lonnie Billard Vol. I (8/16/17)

1      first page there, to come up with something that

2      would meet that, and I tried to think of something

3      that would and that's what I came up with.

4   Q.  Okay.  In other words, having an Easter pageant

5      would be something you could do to develop a

6      connection between drama and liturgy?

7   A.  That's correct.

8   Q.  Okay.  Did you actually have an Easter pageant?

9   A.  No.

10  Q.  Okay.  Is there a particular reason that didn't

11     happen?

12  A.  Just didn't do it.

13  Q.  Did you ever -- the drama department at Charlotte

14     Catholic, did it ever have any performances for

15     Easter at all?

16  A.  No.

17  Q.  How about for Christmas?

18  A.  No.

19  Q.  Any other religious holidays?

20  A.  No.

21  Q.  Did the drama department at Charlotte Catholic ever

22     put on any religious performances while you were

23     there?

24  A.  Religious --

25  Q.  Did the drama department at Charlotte Catholic ever

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 165 of 406
JA0236

Lonnie Billard Vol. I (8/16/17)

Page 165

1          put on any religious performances while you were
2          there?
3     A.   No.
4     Q.   Now, you retired from full-time teaching after the
5          2011/2012 school year; is that correct?
6     A.   What's the numbers again?
7     Q.   2011/2012 school year.
8     A.   Yes, that sounds right.
9     Q.   Yeah.  And is there a particular reason you chose
10         to retire at that time?
11    A.   Yes.
12    Q.   What was that?
13    A.   I had actually wanted to go part-time because I was
14         at a -- at a age where I could retire.
15    Q.   Uh-huh.
16    A.   Okay?  And I really wanted to go part-time.  I
17         talked that over with Mr. Healy, he agreed that I
18         could go part-time, and that the school would find
19         somebody to do part of my job.  Then in talking
20         with Angela Montague, the assistant principal, she
21         felt pretty strongly that finding a part-time drama
22         teacher would be very difficult to do.
23    Q.   Uh-huh.
24    A.   The drama -- you know, it's harder to find
25         qualified drama people than it is to find English

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 166 of 406
JA0237

Lonnie Billard Vol. I (8/16/17)

Page 166

```
 1         teachers, for example.  Okay?  And so her -- her
 2         strong preference would be that I would, you know,
 3         do one or the other.  And I was tired.  And so I --
 4         I talked to Jerry, Angela, and Steve about, well,
 5         if I did take full retirement, would I be allowed
 6         to substitute so that I could still have that
 7         connection to the kids as well as the connection to
 8         my friends.
 9    Q.   Right.
10    A.   And I was assured that I would be given that
11         opportunity and I've made the decision to retire.
12    Q.   Okay.  Did you have an expectation at that point of
13         how frequently you would be substituting?
14    A.   I -- the only thing is that, you know, Steve said,
15         Well, I'll keep you very busy.
16    Q.   So do you know how many substitute teaching
17         assignments you had during the 2012/'13 school
18         year?
19    A.   I don't.
20    Q.   Can you estimate or --
21    A.   Well, I -- I do recall that very early in the
22         school year I was approached by one of the English
23         teachers who told me that she was pregnant.
24    Q.   Okay.
25    A.   And wanted to know if I'd be interested in covering
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 167 of 406
JA0238

Lonnie Billard Vol. I (8/16/17)

Page 167

```
 1          her classes while she was on maternity leave.
 2    Q.    Okay.
 3    A.    And I took -- and I told her I would do that.  So
 4          she then went to Steve, told Steve she wanted me to
 5          cover her classes for that -- that period of time,
 6          and it was about three months.
 7    Q.    Okay.
 8    A.    Okay?  And it was juniors and freshmen, I think,
 9          were the -- the mixtures that I had there.  And
10          then that -- that was, I'm going to say sometime in
11          November maybe, all the way through to probably
12          close to March.  Then I had other assignments, most
13          of them in the -- in the English department that
14          were one, two, and three-day type things after
15          that.
16    Q.    Okay.  So how many school days are in a year at
17          Charlotte Catholic, is it 180?
18    A.    I think, something close to that.
19    Q.    Could you ballpark how many of those days in the
20          2012/'13 school year you were working?
21    A.    I'd probably say somewhere in the 70 to 80 range.
22    Q.    Okay.  How about the following school year, the
23          '13/'14 school year?
24    A.    Which year, please?
25    Q.    The 2013/2014 school year.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 168 of 406
JA0239

Lonnie Billard Vol. I (8/16/17)

Page 168

```
 1   A.   I do recall one of the English teachers, a very
 2        young man, had a sudden heart attack and he was out
 3        for quite some time and I took his classes for
 4        about 40 days, I think.  And -- but his -- his
 5        recuperation was going to be longer than that, and
 6        I didn't want to -- I didn't want the full-time of
 7        that, so I covered the classes until they could
 8        find a qualified English teacher to come in and
 9        cover.
10   Q.   Okay.
11   A.   And they -- they found somebody to do that.
12             Also, during that year, ███████  ██████  had --
13        English teacher and SAT prep.  I covered for her
14        on -- for a week here and a week there while she
15        dealt with family issues.  So about the same amount
16        of time.
17   Q.   You think -- so approximately 70 to 80 days total?
18   A.   I would think so.
19   Q.   Okay.  And then did you substitute at all in the
20        fall of 2014?
21   A.   Yes, I did.
22   Q.   Okay.  Do you have an estimate of how many days you
23        were substituting during that period of time?
24   A.   Somewhere in the neighborhood of 20 to 25, I would
25        think.  Something like that.
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 169 of 406
JA0240

Lonnie Billard Vol. I (8/16/17)

Page 169

```
 1    Q.    My understanding, Mr. Billard, is that you were --
 2          you were paid for your substitute teaching work,
 3          right?
 4    A.    Oh, sure, yes.
 5    Q.    Did you ever work as a substitute and not get paid?
 6    A.    No.
 7    Q.    Okay.  How much do you earn as a substitute teacher
 8          at Charlotte Catholic?
 9    A.    It's -- oh, gosh.  I think -- I think it was $65 a
10          day.
11    Q.    Okay.
12    A.    Unless you went over X number of days in a
13          consecutive assignment and then you were paid at
14          what would have been your -- your normal contract
15          rate, if that makes sense.  So if I would
16          sign a -- if I would -- let's say as a regular
17          teacher I -- I would have signed a contract for
18          40,000 a year.  If I'm substituting, I get the
19          lesser amount until I reach, I think it's 25, or
20          something like that, consecutive days in the same
21          assignment and then I would go -- I would be paid
22          at the rate as though I were earning 40,000 a year.
23    Q.    Okay.  And that financial arrangement, was that the
24          same from the time you began work as a substitute
25          in 2012 through the end of your tenure at Charlotte
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 170 of 406
JA0241

Lonnie Billard Vol. I (8/16/17)

Page 170

1          Catholic?

2     A.   Yes.

3     Q.   Okay.  Have you ever heard the phrase, "Do as I say

4          but not as I do"?

5     A.   Oh, sure, yes.

6     Q.   What's your understanding of the meaning of that

7          phrase?

8     A.   It means you need to follow my advice rather than

9          my example.

10    Q.   And you've obviously spent a large part of your

11         career working with high school-aged kids?

12    A.   That's correct.

13    Q.   Do you think that sort of an approach, do as I say

14         not as I do, is effective with high school kids?

15    A.   Not at all.

16    Q.   Okay.

17    A.   No, let me rephrase.  Rarely.

18    Q.   Okay.  And is that because kids sort of see through

19         it and they will -- they will look at the example

20         that's being set rather than what someone is

21         saying --

22                   MR. BROOK:  Objection, calls for

23            speculation.

24    BY MR. DAVEY:

25    Q.   -- based on your experience as a teacher?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 171 of 406
JA0242

Lonnie Billard Vol. I (8/16/17)

Page 171

1   A.   I don't know that -- I don't think it is a -- it's
2        a one-pronged thing.
3   Q.   Uh-huh.
4   A.   Kids will take into account a lot of things as it
5        relates to, Do as I say, not as I do, and not just
6        your example.
7   Q.   Okay.
8            Are you familiar, Mr. Billard, with an
9        organization called Charlotte Pride?
10  A.   Charlotte Pride?
11  Q.   Yes.
12  A.   Yes.
13  Q.   What's your understanding of what that organization
14       is?
15  A.   Charlotte Pride is a gay -- LGBT community
16       organization that advocates for equal opportunity
17       for -- equal opportunity and treatment of LGBT
18       people.  It -- I believe it's also the driving
19       entity behind Gay Pride Parade and those kinds of
20       things.
21  Q.   Okay.  Have you ever been to any Charlotte Pride
22       events?
23  A.   Oh, yes.
24  Q.   Okay.  What -- what are those?
25  A.   Been to the Gay Pride parades.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 172 of 406
JA0243

Lonnie Billard Vol. I (8/16/17)

1   Q.   Okay.  And who -- who marches in the parades?

2   A.   Lots of different groups and organizations.  Lots

3        of churches march in the parade, you know, civic

4        organizations, PFLAG.  There -- you know, as well

5        as commercial organizations have floats and

6        flags -- or floats in the parade.

7   Q.   Have you ever seen an organization marching in the

8        parade that was opposed to same-sex marriage?

9   A.   Marching in the parade?

10   Q.   Right.

11   A.   Opposed to same-sex marriage.  I don't recall

12        seeing anything in the parade where that -- that

13        opposition was stated as -- as opposed to

14        gay-sex -- gay-sex marriage.

15   Q.   Okay.  And the purpose of the parade is to promote

16        the point of view that LGBT individuals ought to

17        have protection law and should have the right to

18        marry, things of that nature, right?

19   A.   That LGBT people are just like anybody else and

20        deserve the same rights and protections as anybody

21        else.

22   Q.   Okay.  And if -- if there was a float in the Gay

23        Pride Parade and there was a big banner on the

24        float that said same-sex marriage should be

25        illegal, that would contradict the purpose of the

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 173 of 406
JA0244

Lonnie Billard Vol. I (8/16/17)

Page 173

1      parade, right?

2   A.   No.  It -- it would be an example of someone that

3        didn't agree with it.  It would not cancel out the

4        purpose of the parade.

5   Q.   The message, though, that same-sex marriage should

6        be illegal would -- you know, it's an opposition to

7        the message that the parade as a whole is trying to

8        communicate; is that fair?

9   A.   I think you're making it far too simple, Josh.

10              MR. BROOK:  I'm going to object to --

11           it's sort of an asked-and-answered question,

12           but go ahead, to the extent that you have

13           anything to add beyond what you previously

14           said.

15              MR. DAVEY:  Well, it's a different

16           question so I'm entitled to an answer to the

17           question.

18              THE WITNESS:  The Gay Pride Parade is

19           not a single issue.  It is not an issue of gays

20           should be allowed to marry.  It is not -- you

21           know, so for you to -- it sounds to me like

22           you're asking me if -- if that is the primary

23           purpose of the Gay Pride Parade, and if that is

24           your question, I don't agree with that.

25

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 174 of 406
JA0245

Lonnie Billard Vol. I (8/16/17)

Page 174

```
 1  BY MR. DAVEY:
 2    Q.  Okay.  That's not really my question.
 3    A.  Okay.
 4    Q.  So maybe I'll change the example and see if it
 5        makes a difference.
 6    A.  Okay.
 7    Q.  If there was a float in the parade that said,
 8        Homosexual behavior is sinful, and that was the
 9        banner on the float.
10    A.  Yes, okay.
11    Q.  Would that undermine, in your opinion, the purpose
12        of the parade?
13    A.  Again, no, it would not because it is a single
14        point of view.  It's not the pervasive point of
15        view.  So I don't see how it under -- the purpose
16        of someone doing that may be to undermine, but the
17        effect I don't think would be.
18    Q.  Do you think that the organizers of the parade
19        should be required to allow a float in the parade
20        that says same-sex sexual activity is sinful?
21    A.  Should they be allowed?
22    Q.  Should they be required to allow a float in the
23        parade that said homosexual activity is sinful?
24    A.  I don't know, to be honest.  I mean, should --
25        should they be required?  I mean, to me that sounds
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 175 of 406
JA0246

Lonnie Billard Vol. I (8/16/17)

1       like it's a free speech thing.  Okay?  So should --

2       if you're having a parade and you want -- if it's

3       open, I don't know.  I mean, I don't know how that

4       falls out.

5  Q.   So if the -- if the Charlotte Pride group had a

6       policy that said that we reserve the right to

7       decline participation in our events to groups that

8       don't reflect the mission, vision, and values of

9       Charlotte Pride, would that be appropriate policy

10      for Charlotte Pride to have?

11            MR. BROOK:  Objection, foundation,

12       relevance.

13            THE WITNESS:  I don't know if they

14       have that.  Okay?  And I don't know that -- I

15       don't know how I'd feel.  I'd have to think

16       about it.  I don't know how I'd feel about

17       that.

18 BY MR. DAVEY:

19  Q.   Okay.  Are you aware that Charlotte Pride recently

20      denied permission for a float in its parade to a

21      group called Gays for Trump?

22            MR. BROOK:  Objection, relevance.

23            THE WITNESS:  No, I'm not aware of

24       that.

25

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 176 of 406
JA0247

Lonnie Billard Vol. I (8/16/17)

Page 176

```
 1  BY MR. DAVEY:
 2   Q.   And if the organizers of Charlotte Pride determined
 3        that the Gays for Trump group did not reflect
 4        Charlotte Pride's mission, vision, and values,
 5        should they be allowed to prevent Gays for Trump
 6        from marching in the parade?
 7                    MR. BROOK:  Objection, relevance.
 8                    THE WITNESS:  Again, I'd have to think
 9            about that.  I mean, I don't -- I don't -- I
10            don't know where that's going.  I have to think
11            about that.
12  BY MR. DAVEY:
13   Q.   As I understand it, Mr. Billard, it's your position
14        in this lawsuit that the Defendants in this case
15        should be prohibited by law from terminating
16        someone's employment because that person enters
17        into a same-sex marriage; is that accurate?
18                    MR. BROOK:  Object to the
19            characterization.
20                    You can go ahead and answer.
21                    THE WITNESS:  Yeah, I was treated
22            differently because I'm gay.  When I posted on
23            Facebook that Rich and I were going to get
24            married, within a week, another English teacher
25            posted on Facebook that she was getting
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 177 of 406
JA0248

Lonnie Billard Vol. I (8/16/17)

1          married.  She did not get fired, I did.

2    BY MR. DAVEY:

3     Q.    Okay.  But it's my understanding that it's your

4           position in this lawsuit that the Defendants should

5           be prohibited from terminating someone because that

6           person enters into a same-sex marriage.  Do I have

7           that right or is that not right?

8                         MR. BROOK:  Objection, asked and

9              answered.  Again, characterization.

10                        THE WITNESS:  Yes.

11   BY MR. DAVEY:

12    Q.    Okay.  Thank you.

13             Now, you understand that Christians believe

14           that Jesus Christ is God, right?

15    A.    That Jesus Christ is what?

16    Q.    God.

17    A.    Some Christians, yes.

18    Q.    Okay.  You understand that Catholics believe that,

19           right?

20    A.    That Jesus is part of the Holy Trinity, yes.

21    Q.    Okay.  And that's something that Catholics believe

22           and also other Christians believe, right?

23    A.    Some other Christians do believe.

24    Q.    So do you think that the Defendants in this case

25           should be prohibited from terminating someone's

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 178 of 406
JA0249

Lonnie Billard Vol. I (8/16/17)

1      employment if that person goes on Facebook and

2      writes that they reject the teaching that Jesus

3      Christ is part of the Holy Trinity?

4  A.   Ask that again, I'm confused.

5            MR. DAVEY:  Would you mind reading the

6      question back, Court Reporter?

7   (PREVIOUS QUESTION READ BACK BY THE REPORTER)

8            THE WITNESS:  Should they be allowed

9      to, is that -- so is that the bottom line,

10     should they be allowed to -- to -- I'm just not

11     following, I apologize, I'm not following you

12     very well.

13 BY MR. DAVEY:

14  Q.   Sure.  So a moment ago I asked you -- well, let me

15      ask it this way.  Do you think that the Defendants

16      in this case should be permitted to terminate an

17      employee who goes on Facebook and writes, I reject

18      the teaching that Jesus Christ is part of the Holy

19      Trinity?

20  A.   I suppose not.

21  Q.   Okay.  So you -- you do not think the Defendants

22      should be able to terminate that person?

23  A.   No, I -- I answered in the negative.  I suppose

24      they should be able to.

25  Q.   Okay.  And if -- if some -- let's say a teacher was

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 179 of 406
JA0250

Lonnie Billard Vol. I (8/16/17)

Page 179

1     permitted to come into class in a Catholic school
2     and teach in class that Jesus Christ is not part of
3     the Holy Trinity, that would contradict the -- the
4     message that the Catholic school is trying to
5     convey to its students, right?
6  A.  That would be correct.
7  Q.  And do you think it's fair to say that if students
8     heard a teacher come in and say, Jesus Christ isn't
9     part of the Holy Trinity, that they might be
10     confused as to what the Catholic school actually
11     believes on that point?
12  A.  Yes.
13  Q.  So I want to ask another similar example.  You're
14     familiar, I'm sure, with the Ten Commandments?
15  A.  Yes.
16  Q.  Okay.  And you understand that the Catholic church
17     adheres to the Ten Commandments in its -- in its
18     teaching?
19  A.  Yes.
20  Q.  Okay.  And you're aware that one of the Ten
21     Commandments is, Thou shall not kill?
22  A.  Shall not what?
23  Q.  Kill.
24  A.  Yes.
25  Q.  And so you understand, I think, that Catholics

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 180 of 406
JA0251

Lonnie Billard Vol. I (8/16/17)

Page 180

1      believe that that is a moral command from God,

2      right?

3  A.  Yes.

4  Q.  Okay.  So if someone were to say it's okay to kill

5      somebody without a valid justification, that would

6      be a statement that would contradict the Catholic

7      church's teaching on this issue, right?

8  A.  Yes, it would be.

9  Q.  Okay.  And if someone in a position of authority

10     within the church were teaching that it's okay to

11     kill somebody without adequate justification, that

12     would contradict the church's message that, in

13     fact, it's not okay to do that?

14 A.  That's correct.

15 Q.  Do you think that the Defendants in this case

16     should be permitted to terminate an employee if the

17     employee went on Facebook and wrote, I disagree

18     with the commandment, Thou shall not kill, and I

19     think it's okay to kill people if they're disabled?

20 A.  Yes.

21 Q.  And if a teacher were to teach -- teacher in a

22     Catholic school were to teach that it's okay to

23     kill people who are disabled, for example, and

24     students were to hear that, it's possible that

25     students would be confused about what the message

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 181 of 406
JA0252

Lonnie Billard Vol. I (8/16/17)

Page 181

```
 1          of the church really was with respect to that
 2          issue, right?
 3                    MR. BROOK:  Objection, calls for
 4          speculation.
 5                    THE WITNESS:  Yes, likely.
 6                    MR. DAVEY:  I just need to get --
 7  BY MR. DAVEY:
 8   Q.    Are you okay?  I just need some water, but we can
 9          take a break or we can keep going if you're okay.
10   A.    I'm okay.  Well, I'll run to the men's room.  I'll
11          be right back.
12                    MR. DAVEY:  Short break.
13          (RECESS TAKEN FROM 4:22 P.M. TO 4:30 P.M.)
14  BY MR. DAVEY:
15   Q.    Mr. Billard, we're back from a short break, and off
16          the record you were telling us how you, in addition
17          to directing some plays at Charlotte Catholic that
18          you told us about earlier, you also directed
19          musicals; is that correct?
20   A.    That is correct.
21   Q.    Okay.  Other than plays and musicals, was there any
22          other category of performance that you directed as
23          a drama teacher at Charlotte Catholic?
24   A.    Yes.
25   Q.    And what was that?
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 182 of 406
JA0253

Lonnie Billard Vol. I (8/16/17)

Page 182

1    A.    I directed the -- it was a -- it was a competition
2          team where I entered my team in a national
3          competition for musical theater.
4    Q.    Okay.  Now, how many -- so I'm going to, maybe, use
5          the term "performances" to cover plays as well as
6          musical and similar sorts of things.  How many
7          performances did you have a responsibility for as a
8          drama teacher at Charlotte Catholic each school
9          year?
10   A.    Each school year?  There would be -- the fall play
11         by and large was a two-night affair.
12   Q.    Okay.
13   A.    Okay?  Then the years that I did an interim play,
14         which would be between the fall play and the spring
15         musical, that would be two or three performances,
16         and then the fall -- the spring musical was always
17         four performances.
18   Q.    Okay.  Now, you gave us -- you gave me some
19         examples of plays that you had directed earlier
20         today.  Did that list you provided earlier include
21         any of the musicals?
22   A.    It did not.
23   Q.    Okay.  And did it include any of the interim plays
24         that you just mentioned?
25   A.    It did.

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 183 of 406
JA0254

Lonnie Billard Vol. I (8/16/17)

 1    Q.    Okay.  So can you tell me, the best as you can
 2          recall, what musicals you directed at Charlotte
 3          Catholic?
 4    A.    Hello Dolly, Crazy for You, Anything Goes,
 5          Oklahoma, The Wiz.  We -- there's one called Look
 6          At Us Now, but it was one that I wrote with
 7          students so it was an original work, okay, and it
 8          was called Look At Us Now.  That's what I recall
 9          off the top of my head.
10    Q.    Okay.  And the Look At Us Now that you just
11          mentioned, is that the only one performance that
12          you wrote yourself while you were teaching at
13          Charlotte Catholic?
14    A.    I -- I had some students that -- that particular
15          year that really aspired to be playwrights, and I
16          didn't have a class in playwrighting.  And so
17          instead of taking a canned musical off the shelf,
18          which is what we typically do, you just, you know,
19          go to one of the Broadway providers and pay your
20          fees and that's it, we decided to write one
21          ourselves.
22    Q.    Okay.
23    A.    And that would give those kids that wanted to be
24          playwrights a -- a better shot at doing that, have
25          more experience at it.

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 184 of 406
JA0255

Lonnie Billard Vol. I (8/16/17)

```
 1   Q.   Okay.  And was that the only time that you -- you
 2        did a performance that was something that you and
 3        students had authored as opposed to getting it "off
 4        the shelf," if you will?
 5   A.   Yes, it is.
 6   Q.   Okay.
 7             Switching gears to another topic.  At some
 8        point you and Mr. Donham made the decision to get
 9        married, right?
10   A.   That is correct.
11   Q.   When did that happen?
12   A.   It was not long after the -- the legal ruling in
13        North Carolina that allowed for the marriage --
14        same-sex marriage.
15   Q.   Okay.
16   A.   Within a few weeks.  If I may, Rich and I are of an
17        age that we never expected that kind of right.
18   Q.   Okay.
19   A.   Okay?  We never expected to be able to do that.
20        And when it became a reality that we could, you
21        know, we knew that we needed to take advantage of
22        that to do that.
23   Q.   Okay.  And I know you posted your plans or Facebook
24        to get married in October of 2014, and we'll talk
25        about that in a minute.  But do you remember how
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 185 of 406
JA0256

Lonnie Billard Vol. I (8/16/17)

1       far in advance of that Facebook post you and Rich

2       decided to get married?

3   A.  Oh.  No, I don't.  I mean, we talked about it.

4       Yeah, we talked about it even before the decision

5       came down.

6   Q.  Uh-huh.

7   A.  What would happen if.

8   Q.  Okay.

9   A.  Okay?  And then we talked about it after that, but

10      I don't -- there was a time lapse between, yeah,

11      let's do this, and the time I posted it, but I

12      wouldn't tell you that it was a long lapse.

13  Q.  Okay.  Prior to the Facebook -- well, let me --

14      I'll just -- let me just introduce this as an

15      exhibit because I know we're going to be talking

16      about it, then I'm going to ask you some questions.

17      (EXHIBIT NUMBER 16 WAS MARKED FOR IDENTIFICATION)

18  BY MR. DAVEY:

19  Q.  I've handed you what I've marked as Exhibit 16.

20      Mr. Billard, do you recognize Exhibit 16?

21  A.  I do.

22  Q.  Okay.  And the top of the first page of Exhibit 16

23      appears to be a post that you posted on Facebook on

24      October 25th, 2014; is that correct?

25  A.  That's correct.

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 186 of 406
JA0257

Lonnie Billard Vol. I (8/16/17)

Page 186

```
 1    Q.    Okay.  Now, prior to your posting this on
 2          Facebook --
 3    A.    Yes, sir.
 4    Q.    -- did you -- did you tell any employee of
 5          Charlotte Catholic that you and Mr. Donham planned
 6          to get married?
 7    A.    Prior to posting this?
 8    Q.    Yes.
 9    A.    One person.
10    Q.    Who's that?
11    A.    Joan Stretch.
12    Q.    Okay.  Who is Joan Stretch?
13    A.    She's an English teacher.
14    Q.    Okay.
15    A.    She's my best friend.
16    Q.    Okay.  When -- I'm interested to know when you told
17          her, and maybe if you don't remember the exact
18          date, maybe relative to the Facebook post, when you
19          told Ms. Stretch about your plans?
20    A.    I told Ms. Stretch about -- about our plans to do
21          that before the Facebook post, probably two or
22          three days before, but no more than that.
23    Q.    Okay.  How did you communicate your plans to
24          Ms. Stretch?
25    A.    I told her in person.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 187 of 406
JA0258

Lonnie Billard Vol. I (8/16/17)

1    Q.    Okay.  Were you teaching at Charlotte Catholic that

2          day or did you see her somewhere outside of school?

3    A.    I think -- I think it was at -- no, it was, it was

4          at school.

5    Q.    Okay.  So tell me about that conversation, how

6          did -- as best as you can recall, what was the

7          substance of it?

8    A.    As I recall, it was at the end of our lunch break

9          or lunch period or some break that we shared

10         together.  It may not have been lunch, but it was a

11         breaktime.  And -- because there were no kids in --

12         in her room and there were no kids in the hall so

13         I'm guessing it was lunch, that's why I say that.

14             And I -- and I said, Can I talk to you for a

15         minute before we go -- you go back into class, or

16         something to that effect.  And I told her -- we

17         went into her room, closed the door.  I told her

18         that Rich and I had made the decision to get

19         married.  She was very excited, congratulated me,

20         and then I asked her if she would be the best

21         person -- my best person, my best man, so to speak.

22    Q.   Gotcha.

23             And did she say she would?

24    A.    She did say that she would.

25    Q.    Anything else you recall talking about?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 188 of 406
JA0259

Lonnie Billard Vol. I (8/16/17)

Page 188

```
 1    A.   No.
 2    Q.   And you said you went into her room, that's her
 3         classroom?
 4    A.   Her classroom, yes.
 5    Q.   Sounds like it was a pretty brief conversation?
 6    A.   Yes, yes.
 7    Q.   Okay.  Prior to that conversation, was she aware
 8         that you were in a romantic relationship with
 9         Mr. Donham?
10    A.   Yes.
11    Q.   Okay.  I'm going to ask you more about that in a
12         little bit, but just to make sure, though,
13         Ms. Stretch was the only person who is employed by
14         Charlotte Catholic that you told of your plans to
15         marry Mr. Donham before Facebook post in
16         Exhibit 16?
17    A.   Of plans to marry?  Yes.
18    Q.   Yes.  Okay.
19              Did you tell any employees of the diocese who
20         weren't employees of Charlotte Catholic of your
21         plans to marry Mr. Donham prior to the Facebook
22         post in Exhibit 16?
23    A.   No.
24    Q.   So going to Exhibit 16, the Facebook post.
25    A.   Yes.
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 189 of 406
JA0260

Lonnie Billard Vol. I (8/16/17)

1  Q.  Was there anything in particular that motivated you

2      to put this on Facebook at the time you did?

3  A.  Excitement, joy.

4  Q.  Any other reasons?

5  A.  No.

6  Q.  Okay.

7  A.  Just to share with my friends.

8  Q.  The Facebook post says -- I'm just going to read

9      the first part of it.  It says, Everyone sing

10     along.  It says:  (Reading)

11            Going to the chapel and we're

12        gonna get married.  Going to the chapel

13        and we're going to get married.

14       Some hyphens there.  It says:  (Reading)

15            Yes, I'm finally going to make an

16        honest, at least legal, man out of

17        Rich.

18       Did I read that correctly?

19  A.  You did.

20  Q.  Okay.  My understanding of the phrase "to make an

21     honest man" or woman out of someone means to marry

22     somebody when there's an existing sexual

23     relationship going on.  Is that your understanding?

24  A.  I guess.  I mean, I've heard that term since I was

25     a little kid.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 190 of 406
JA0261

Lonnie Billard Vol. I (8/16/17)

Page 190

```
 1   Q.   Uh-huh.
 2   A.   And I don't -- I never equated it to a sexual
 3        relationship.
 4   Q.   Okay.  So did you have anything particular in mind
 5        when you wrote that?
 6   A.   No, no.
 7   Q.   The end of the post says:  (Reading)
 8               PS:  If you don't agree with
 9            this, keep it to yourself.  You never
10            asked my opinion about your personal
11            life and I'm not asking yours.
12             Did I read that correctly?
13   A.   You did.
14   Q.   Why did you write that?
15   A.   Because on my Facebook list, at the time at least,
16        there were people from years ago that I -- that
17        were on my Facebook friends list that I felt pretty
18        certain they would not approve.  These are people
19        from Missouri.
20   Q.   Okay.
21   A.   Okay?  And in -- there are two -- there were two in
22        particular that I thought may have -- may decide to
23        use their objection as a platform.
24   Q.   Uh-huh.
25   A.   And I was trying to avoid that because this was my
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 191 of 406
JA0262

Lonnie Billard Vol. I (8/16/17)

Page 191

1          joy and announcement.

2     Q.   Okay.  In other words, if I understood you right,

3          you knew that there were going to be some people

4          who would see the post and wouldn't approve of your

5          entering into a same-sex marriage?

6     A.   Certainly.

7     Q.   Okay.  Were any folks in that category employees of

8          the diocese?

9     A.   No.

10    Q.   How about employees of Charlotte Catholic?

11    A.   No.

12    Q.   Or MACS?

13    A.   No.

14    Q.   Did you expect anyone at Charlotte Catholic to

15         object to your planned marriage to Mr. Donham?

16    A.   To object?  I guess on some level I thought there

17         probably would be some that weren't delighted with

18         it.

19    Q.   Uh-huh.

20    A.   But I didn't think of anyone in particular that

21         would -- would actually object, would -- would be

22         that strong a term for it.

23    Q.   Okay.  Now, you weren't Facebook friends with every

24         employee at Charlotte Catholic, right?

25    A.   Say again, please.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 192 of 406
JA0263

Lonnie Billard Vol. I (8/16/17)

1    Q.    You were not Facebook friends with every employee

2          at Charlotte Catholic in October of 2014, right?

3    A.    No, I was not.

4    Q.    Okay.  Do you have any ballpark estimate of how

5          many of your Facebook friends were Charlotte

6          Catholic employees in October of 2014?

7    A.    How many of my friends were Catholic?

8    Q.    No.  Sorry.  How many of your friends on Facebook

9          were employees of Charlotte Catholic?

10   A.    Somewhere around 30.

11   Q.    Any of those folks -- well, let me ask you this.

12         Were you Facebook friends with Kirk Telford?

13   A.    No, he wasn't employed there at the time.

14   Q.    How about Jerry Healy?

15   A.    No, Jerry didn't use Facebook.

16   Q.    Steve Carpenter?

17   A.    No.

18   Q.    Okay.  Were you Facebook friends with anyone in

19         administration at Charlotte Catholic in October of

20         2014?

21   A.    No.

22   Q.    All right.  Were you Facebook friends with any

23         employees of the Diocese of Charlotte who weren't

24         working at Charlotte Catholic in October of 2014?

25   A.    I don't think so.

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 193 of 406
JA0264

Lonnie Billard Vol. I (8/16/17)

```
 1   Q.   Were you Facebook friends with any employees of
 2        MACS who weren't working at Charlotte Catholic in
 3        October of 2014?
 4   A.   No.
 5   Q.   So I'd like to get -- if you could walk through
 6        just the sequence of events after you put this on
 7        Facebook and leading up to the time when
 8        Mr. Carpenter spoke with you, told you you weren't
 9        going to be able to come back --
10   A.   Uh-huh.
11   Q.   -- as a sub.
12   A.   Uh-huh.
13   Q.   Can you tell me about that?
14   A.   Well, I put this out (indicating) and two days
15        later, I believe, it could have been three, but I
16        think it was two days later, I was at school and I
17        made a point to go into -- into Steve's office to
18        talk with him to let -- so that he would know that
19        I had put this (indicating) out since he didn't do
20        Facebook so -- and we weren't friends on --
21        obviously, we couldn't be friends if he didn't do
22        Facebook.
23   Q.   Right.
24   A.   So that he -- he would hear it directly from me
25        rather than from a bunch of other people.  So that
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 194 of 406
JA0265

Lonnie Billard Vol. I (8/16/17)

```
 1        happened within a couple days of doing this
 2        (indicating), doing the post.  Okay?  He
 3        congratulated me and, you know, and I don't -- I
 4        don't recall exactly how -- who said what in what
 5        order, but I do recall saying to him something to
 6        the effect that, you know, Uptown, meaning --
 7        referencing the diocese, would not be delighted.
 8   Q.   Okay.
 9   A.   And as I recall Steve said, Yeah, that's probably
10        true.  And he pointed out at that point a situation
11        that had occurred between a music director, a
12        church music director in Saint Gabe's --
13   Q.   Uh-huh.
14   A.   -- Saint Gabriel's.  And he pointed out that --
15        that when it became known that that musical
16        director had married his same-sex partner that he
17        was -- he was dismissed.  Okay?  And Steve said,
18        But they won't hear it from me.  I took that to
19        mean that he wasn't going to tell the diocese,
20        that's what I took it to mean.
21   Q.   Okay.
22   A.   When he talked about the situation with the -- with
23        the gentleman at Saint Gabe's.  I can't think of
24        his name right now, that's the reason I'm pausing,
25        whatever his name was.  When he talked about that,
```

Lowrance Reporting Service, Inc.
704-543-7995   www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 195 of 406
JA0266

Lonnie Billard Vol. I (8/16/17)

```
 1          you know, I didn't see a direct connection between
 2          what happened with him and what happened with me.
 3          And the reason for that, if I'm allowed to expand.
 4    Q.    Yeah, please.
 5    A.    Okay.  Is that that young man, as I understood it,
 6          was hired and was performing a -- a religious job.
 7          He was working -- you know, his primary function
 8          was to provide music for religious services.  He
 9          was part of the religious side of -- of the -- of
10          this organization.  I saw myself totally secular.
11          My job was not religion, my job was education.  So
12          I didn't -- I didn't take that as anything other
13          than, you know, an antidote.
14    Q.    Okay.  Had you -- prior to this conversation with
15          Mr. Carpenter that you're telling me about, had you
16          heard of the situation involving the music director
17          at St. Gabriel?
18    A.    Had I heard about it?
19    Q.    Yes.
20    A.    I had heard a teacher talking about it or an
21          employee.  I don't -- I can't recall if she was a
22          teacher then or not.  But I didn't -- I didn't pay
23          much attention to it.  I -- I . . .
24    Q.    As best as you can recall, when you went to talk to
25          Mr. Carpenter, what exactly did you tell him about
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 196 of 406
JA0267

Lonnie Billard Vol. I (8/16/17)

```
 1        the post or your plans?
 2   A.   I told him, I said, I want you to hear it from me
 3        rather than somebody else, knowing there was a
 4        chance he could have heard it, but this is as soon
 5        as I could get to him, that I -- that Rich and I
 6        were going to get married and I had posted that on
 7        Facebook.  I didn't -- I didn't quote the Facebook
 8        post and I didn't show it to him.
 9   Q.   Okay.  And when he was -- when he was telling you
10        that Uptown wouldn't be pleased and was telling you
11        about --
12   A.   He did not say that, I said that.
13   Q.   You said that.  Okay.  Sorry, I misunderstood.
14             So when you made that comment, what was his
15        response?
16   A.   His response was, as I recall, I mean, yeah.  That
17        kind of thing.
18   Q.   Acknowledging that Uptown wouldn't be pleased?
19   A.   That -- that -- yeah, that they probably would not
20        be delighted, I think is the word I used.
21   Q.   Because you understood at that point that entering
22        into a same-sex marriage would violate the
23        teachings of the Catholic church, right?
24             MR. BROOK:  Objection,
25        mischaracterizing his testimony.
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 197 of 406
JA0268

Lonnie Billard Vol. I (8/16/17)

```
 1                   THE WITNESS:  No, I didn't think of it
 2            that way.
 3   BY MR. DAVEY:
 4    Q.   Okay.
 5    A.   I didn't -- I saw -- right or wrong, I saw it very
 6         differently.  There was the religious side, like
 7         the gentleman at Saint Gabe's, and there was the
 8         education side.  And I -- I can understand the
 9         church not wanting in their church that -- that
10         kind of relationship.  I did not see the school
11         as -- as a church.  I saw it as an educational
12         institution.
13    Q.   Okay.  So because you were teaching in a school,
14         you didn't think there would be a problem with the
15         same-sex marriage; is that fair?
16    A.   I didn't -- well, I didn't think that it would be
17         received with, you know, balloons and flowers, that
18         they'd be delighted about it, but I didn't see it
19         as -- as a firing offense.
20    Q.   Okay.  And Mr. Carpenter told you about the
21         situation involving the Saint Gabriel gentleman who
22         was fired from his position after his same-sex
23         marriage?
24    A.   He told me about that, yes.
25    Q.   Okay.  And did you think he was conveying to you
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 198 of 406
JA0269

Lonnie Billard Vol. I (8/16/17)

1       that that's what would happen to you if you pursued

2       these plans?

3  A.   I did not take it that way.

4  Q.   Okay.  What did you understand to be his purpose in

5       bringing that up?

6  A.   It came immediately after I said the -- that Uptown

7       would not be delighted.  And he goes into the story

8       about the young man at Saint Gabe's.  Okay?  And

9       then he ended telling me about the guy being fired

10      at Saint Gabe's by saying, But they won't hear it

11      from me.  I thought it was an analogy of some sort,

12      but I didn't see it as -- as an equal situation.

13  Q.   Okay.  So after this conversation you had with

14      Mr. Carpenter, did you tell -- what's the next

15      thing that happened with respect to the ending of

16      your employment at Charlotte Catholic?

17  A.   The next thing that happened?  To my knowledge,

18      Christmas Day, Rich and I were at Joan Stretch --

19      Stretch's house for Christmas dinner, and that's

20      something that we have done for years, and we were

21      all sitting around talking and I -- and I happened

22      to mention to Joan that I had not heard from Steve

23      about me subbing for her right after the school --

24      after the Christmas holiday.

25         For a few years there, she had been going with

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 199 of 406
JA0270

Lonnie Billard Vol. I (8/16/17)

```
 1        her mom and her sister on a vacation immediately
 2        following the Christmas holiday and I had covered
 3        for her that -- I would cover that week she was
 4        gone.  She had asked me would I be willing to do
 5        that.  I told her, yes, I'd be -- I'd be happy to.
 6        She said, Okay, I'll let Steve know.  She came back
 7        and said, Okay, I told Steve that you're going to
 8        cover for me for that week, and he said fine.
 9            So in relationship to that, I said, Joan, you
10        know what, I've not heard from Steve about -- you
11        know, about being -- you know, the coverage for you
12        while -- while you're gone.  And she said, Uh, er,
13        uh.  She's the world's worst liar.
14   Q.   Uh-huh.
15   A.   And I knew something was up, and so I said, Come
16        on, what is it?  Finally, she said, You can't tell
17        him I told you, but Steve told me you won't be
18        allowed to come back.  I said, Really?  When did he
19        tell you that?  She told me that he told her that I
20        would not be able to come back before they went out
21        on Christmas break.  That she had gone in to his
22        office to be sure that everything was copesetic,
23        that I -- that I would be there.  And he said,
24        Well, no.  Told her that a decision had been made
25        that I would not be allowed to come back to teach
```

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 200 of 406
JA0271

Lonnie Billard Vol. I (8/16/17)

Page 200

1          because of the Facebook posting.  That was on
2          Christmas Day that she conveyed that to me.  And
3          she asked me not to tell Steve that she had told
4          me, and I agreed not to tell Steve, but only to the
5          point for a few days because we're getting close to
6          school starting back up, and won't it be a little
7          awkward if I show up to sub for you and I'm not
8          supposed to be there.  So our agreement was I would
9          let it sit for two or three days and then if I
10         still had not heard from Steve, I would contact
11         him.  She agreed to that.
12             On the 28th, I sent Steve a text.  The text
13         said, Steve, is there something you need to tell
14         me, and my name.  Within a few moments Steve called
15         me and told me that -- first of all, he said, Yeah,
16         I've been awful busy, da, da, da, da, da, and he
17         said, But I've -- I've got to tell you you will not
18         be allowed to come back as a substitute teacher at
19         Charlotte Catholic.  And I said, Is there a reason
20         for that?  He said, Because of your Facebook post.
21         And he said -- that's when he said, Not my
22         decision, it came from Uptown.  And he said, I'm
23         sorry.  Reiterated that it was not his decision,
24         and then he said, So how was Christmas?  And that's
25         kind of like saying, So other than that, how was

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 201 of 406
JA0272

Lonnie Billard Vol. I (8/16/17)

1        the play Ms. Lincoln?  I mean, I just got fired and

2        I -- I -- it just was so incongruous to me.  Okay?

3             And I got off the phone.  I was stunned.  I was

4        literally numb.  I was stunned.  That's the long

5        answer to your question, I hope.

6   Q.   No, I appreciate that.  It's very helpful to have a

7        walk through the whole thing.  I have a couple

8        follow ups for you.  Want to make sure I'm clear on

9        the facts.

10            So you had dinner at Joan Stretch's house on

11       Christmas Day and she told you she had been

12       informed by Mr. Carpenter about the decision just

13       prior to leaving for Christmas break?

14  A.   That's what she told me.

15  Q.   When does -- when does school get out right before

16       the Christmas break at Charlotte Catholic, is it a

17       few days before, a week before?

18  A.   Yeah, it's several days.  It -- it often -- it is

19       calendar driven.

20  Q.   Uh-huh.

21  A.   Okay.  So again, I'd say it's pretty safe to assume

22       that they're out by about the 21st --

23  Q.   Okay.

24  A.   -- or 22nd, but again, it's somewhat calendar

25       driven.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 202 of 406
JA0273

Lonnie Billard Vol. I (8/16/17)

Page 202

1   Q.   Okay.  So sometime in the middle part of December
2        is when Joan learned from Steve about the decision;
3        is that fair?
4   A.   That's correct.
5   Q.   Okay.  Now, does school start up after the
6        Christmas break, you know, the first weekday after
7        New Year's?
8   A.   Usually it's on the second, but sometimes it's on
9        the third.  So it's not always the first working
10       day.
11  Q.   Okay.
12  A.   Okay?
13  Q.   But it's just a couple of days after the new year?
14  A.   Yes, yes, it's just a few days.
15  Q.   And that was when you had been scheduled to fill in
16       for Joan during her vacation?
17  A.   That first week, yes, sir.
18  Q.   First week in January?
19  A.   That first week after -- working week of January.
20  Q.   Gotcha.  Okay.
21            Now, I think you told me about, you know, what
22       Steve conveyed to you when he called you to let you
23       know about the decision, and I think you told me
24       you asked him if there was a reason.  Is there
25       anything else that you said to him during that

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 203 of 406
JA0274

Lonnie Billard Vol. I (8/16/17)

```
 1       conversation?
 2   A.  Not that I recall.
 3   Q.  Okay.  Now, you mentioned that you had sent Steve a
 4       text on the 28th, which is a specific day, and I'm
 5       just wondering why it is you remember that
 6       particular date so well?
 7   A.  Sure.  Yeah, I think because it turned out to be
 8       such a significant day.  But I remember that -- as
 9       I -- as I indicated to you that Joan -- Joan and I
10       agreed that I'd wait three days, two or three days,
11       and so I -- I remember she told me on Christmas Day
12       so it would have been three days later.
13   Q.  Okay.  Let me just ask you about that because I
14       have another exhibit I want to show to you.  Helps
15       me get the chronology down.  I'm showing you what
16       I've marked as Exhibit Number 17.
17      (EXHIBIT NUMBER 17 WAS MARKED FOR IDENTIFICATION)
18   BY MR. DAVEY:
19   Q.  Do you recognize Exhibit 17, Mr. Billard?
20   A.  I do.
21   Q.  Okay.  It looks like Exhibit 17 is a copy of the
22       Facebook post you posted on December 29, 2014; is
23       that correct?
24   A.  Yes.
25   Q.  Okay.  And it starts off by saying:  (Reading)
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 204 of 406
JA0275

Lonnie Billard Vol. I (8/16/17)

```
 1                    A sad and dark day for me.  I
 2             found out today that I am no longer
 3             allowed to work of Charlotte Catholic
 4             High School.
 5               Did I read that correctly?
 6    A.    That's correct.
 7    Q.    And I take it you meant work at Charlotte Catholic
 8          High School?
 9    A.    Pardon me?
10    Q.    Instead of work of, I take it you meant work at
11          Charlotte Catholic High School?
12    A.    Oh, I'm sorry, yes.
13    Q.    Okay.  Now, just so -- just so we get the
14          chronology down, do you think it was December 28th
15          or December 29th that you had the conversation with
16          Steve when she told you . . .
17    A.    Twenty-eighth.
18    Q.    Twenty-eighth.  Okay.
19               So is there a reason, then, on the 29th the
20          post says, I found out today that I'm no longer
21          allowed?
22    A.    I don't know.
23    Q.    Okay.  But you're confident it was the 28th that he
24          communicated that to you?
25    A.    Yes.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 205 of 406
JA0276

Lonnie Billard Vol. I (8/16/17)

1    Q.   Okay.  Do you still have your text messages from
2         Mr. Carpenter?
3    A.   I don't know that I do.  I still have the phone
4         that it was sent on, but I -- I don't -- I've not
5         got it -- gotten it off of there.
6    Q.   Okay.  And in connection with this lawsuit, have
7         you made any effort to go search for those text
8         messages?
9    A.   Yes, I took the phone twice -- I'm such a techno
10        idiot.  I took the phone to AT&T because that's why
11        I got it and at two different AT&Ts they told me it
12        couldn't be done.  Okay?  But Brian has told me
13        that it -- there's a chance it can be done.  So
14        that's where it stands at this point.
15   Q.   Okay.  Sounds like what you really need is a nine
16        year old.
17   A.   Yes.
18   Q.   In Exhibit 17 here, it says:  (Reading)
19                 A couple of people object to the
20            fact that I'm gay and saw it, to wit,
21            that the diocese was notified.
22            Did I read that correctly?
23   A.   You did.
24   Q.   What's that referring to?
25   A.   I was told -- okay, let me back up.  After I talked

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 206 of 406
JA0277

Lonnie Billard Vol. I (8/16/17)

Page 206

 1          to Steve, the same day but later in that day, I
 2          called Joan, okay, and told her about the
 3          conversation with Steve.  And I believe it was Joan
 4          who said -- that indicated to me that somebody had
 5          objected to Steve -- or no, had objected to Father
 6          Kauth, I think is what was said to me.
 7    Q.    So you recall Joan telling you someone had made an
 8          objection to Father Kauth's --
 9    A.    Yeah.  It was that day -- I don't know who all knew
10          about my firing.  I told Joan and obviously my
11          husband --
12    Q.    Uh-huh.
13    A.    -- or, yeah, told Rich.  Other people knew about it
14          because I began to get phone calls, people I had
15          not told, and people -- calls that came to me
16          before I told Joan that I talked to her.  So it was
17          somehow communicated by someone that it got into
18          some people within the Catholic -- Charlotte
19          Catholic community that I wouldn't be coming back.
20          That didn't come from me and it was before I told
21          Joan of my conversation with Steve.  Does that make
22          sense?
23    Q.    So -- I think so, but let me ask you this.  So as I
24          understood what you told me earlier, Joan knew
25          about the decision before Christmas Day, right?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 207 of 406
JA0278

Lonnie Billard Vol. I (8/16/17)

1   A.   That's correct.

2   Q.   Okay.  So could it have been the case that she told

3        someone else before Steve called you and that's

4        what led to some of these phone calls?

5   A.   Don't know.

6   Q.   Okay.

7   A.   I mean, could it be?  Could it be?  Sure.  But I --

8        I have to say that I would -- I would be floored if

9        that were the case.

10  Q.   Okay.

11  A.   I don't believe that Joan would do that to me.

12  Q.   Gotcha.

13           So do you know how your Facebook post came to

14       the attention of the administration at Charlotte

15       Catholic?

16  A.   I don't know for sure.

17  Q.   Do you have any understanding of what that process

18       was?

19  A.   I was -- I was told that one of the people that was

20       on my friends list actually shared it with -- with

21       a couple of people that -- you know, in an effort

22       to be sure that it got to Father Kauth.

23  Q.   Have you ever met Father Kauth?

24  A.   I have.

25  Q.   What -- what was the circumstances of that meeting?

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 208 of 406
JA0279

Lonnie Billard Vol. I (8/16/17)

Page 208

1  A.  He was -- he was working at the high school.

2  Q.  Did you ever talk to him about your relationship

3      with Mr. Donham?

4  A.  Ask again, please.

5  Q.  Did you ever talk with Father Kauth about your --

6  A.  No, I did not.

7  Q.  Okay.  And just so we get a good record, I think

8      you said you've never talked to Father Kauth about

9      your relationship with Mr. Donham; is that right?

10 A.  That is correct, I never did.

11 Q.  Okay.

12     Going back to Exhibit 17, the next sentence in

13     the post says, The call to CCHS administration came

14     down that I could not be a substitute any longer.

15 A.  Yes.

16 Q.  What does that refer to?

17 A.  It refers to Steve's comment that the decision was

18     made Uptown.

19 Q.  Okay.  Any other basis for that statement?

20 A.  No.

21 Q.  So do you know who it was who made the decision

22     that you would no longer be allowed to serve as a

23     substitute at Charlotte Catholic?

24 A.  Individually you mean?

25 Q.  Yes.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 209 of 406
JA0280

Lonnie Billard Vol. I (8/16/17)

Page 209

1   A.   I do not.

2   Q.   Okay.  Where were you on the 28th when you had your

3        conversation with Steve Carpenter?

4   A.   Where was I physically?

5   Q.   Yes.

6   A.   I was sitting on the hearth of my fireplace.

7   Q.   Okay.  You were at your house?

8   A.   I was at my house.

9   Q.   Okay.  And your understanding was the reason that

10       you were no longer going to be permitted to

11       substitute at Charlotte Catholic was because of the

12       Facebook post on October 25th, 2014?

13  A.   That's correct.

14  Q.   Okay.  Were you surprised by the decision?

15  A.   I was.

16  Q.   Why's that?

17  A.   As I said earlier in response to a earlier

18       question, I didn't see it as a firing offense

19       because I was in a secular job performing a -- a --

20       the role of a teacher and that -- not that of a

21       minister.

22  Q.   Okay.  Was there anything else that -- any other

23       reason that you were surprised by the decision?

24  A.   No.  I -- I didn't see it as a firing offense.  It

25       was -- I didn't do anything illegal.  So I didn't

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 210 of 406
JA0281

Lonnie Billard Vol. I (8/16/17)

Page 210

1          see that as being morally wrong.  It wasn't illegal

2          so I . . .

3     Q.   Did you think that the school was being

4          hypocritical in deciding not to have you back as a

5          substitute?

6     A.   Yes.

7     Q.   And explain that.  In what way was the school being

8          hypocritical?

9     A.   There are a number of Catholic tenants, Catholic

10         rules, Catholic laws, whatever you want to call

11         them, Catholic guidelines, whichever, that are

12         often overlooked.  There -- there's the old joke

13         about if -- you know, if everyone who is on -- if

14         every Catholic that's on birth control is not

15         allowed to go to mass, then the only people at mass

16         will be under 11 and over 80.

17             It was not unusual for there to be single

18         teachers at Charlotte Catholic knowingly living

19         with their boyfriends.  Not everyone who got

20         divorced got an annulment before they remarried.

21         And, of course, those -- those teachers who were

22         not Catholic didn't have to get an annulment.

23             Yeah, the Catholic church, as I observed it and

24         understand it, is -- takes a lot of that stuff with

25         a wink and a nod.  We know that you're a man, we

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 211 of 406
JA0282

Lonnie Billard Vol. I (8/16/17)

Page 211

```
 1            know you're going to sin, but you'll go to
 2            confession and we'll make it all right again.
 3            Okay?  I -- again, I didn't think that what I was
 4            doing in -- in committing myself to a legal
 5            relationship was -- you know, was -- was a sin,
 6            was wrong.  You know, if -- if the other -- if
 7            other things were being -- were being overlooked.
 8                So yes, I thought that they were being
 9            hypocritical.  I'm going to fire you for this, but
10            these people can get by with these other things and
11            I won't fire them.  You either have the law and
12            abide by it or you don't, is my feeling.
13   Q.    Okay.  So if I've understood you right, you felt
14            that the -- that the school was not applying
15            Catholic teaching consistently in your situation as
16            compared to someone, say, who might be on birth
17            control?
18   A.    That's agreeable.
19   Q.    Okay.  And you thought that under the Catholic
20            church's teaching they ought to treat both of those
21            situations the same?
22   A.    I don't see why not.
23   Q.    Okay.
24   A.    Both are -- getting -- a gay man getting married to
25            another man is -- is -- is the same sin as taking
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 212 of 406
JA0283

Lonnie Billard Vol. I (8/16/17)

Page 212

1          birth control.  It is against Catholic teaching.
2   Q.    Okay.  Now, let me ask you, are you aware of any
3          other employees at Charlotte Catholic who were
4          doing anything that violated Catholic teaching
5          where the administration was aware of it and that
6          person was allowed to continue in their employment?
7   A.    Yes.
8   Q.    Okay.  What do you know about that?
9   A.    I know of two cases where -- one where two
10         teachers, one of them had been married before, got
11         a divorce and then married one of the teacher --
12         one of the fellow teachers at Charlotte Catholic
13         without the benefit of an annulment, and they got
14         married not in a Catholic church and not in a
15         Catholic ceremony.
16  Q.    Okay.  Any other examples?
17  A.    The other example is of a teacher that is Catholic
18         that married just recently, for the third time,
19         without benefit of annulment.
20  Q.    Any other examples?
21  A.    I think it was common knowledge that some -- some
22         people lived together, but I wouldn't know for sure
23         because I -- frankly, I didn't care that they lived
24         with -- lived together.  I never discussed it with
25         anyone.

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 213 of 406
JA0284

Lonnie Billard Vol. I (8/16/17)

```
 1   Q.   And of those situations of people living together,
 2        are you aware that anyone in the administration of
 3        Charlotte Catholic had knowledge of that?
 4   A.   I don't know.  I don't know.
 5   Q.   Okay.
 6   A.   If it were common knowledge among the teachers, you
 7        can darn well bet it was common knowledge among the
 8        administration.  However, I never had that
 9        conversation with a member of administration so I
10        can't say for sure.
11   Q.   Okay.  And your assumption there is that if it's
12        common knowledge among the teachers that it would
13        be common knowledge among the administration?
14   A.   Yes.
15   Q.   Okay.  Now, the first situation you just described,
16        I think you said teacher had been married, got a
17        divorce, married a fellow teacher without an
18        annulment, not in a church and not in a Catholic
19        ceremony?
20   A.   That's correct.
21   Q.   Okay.  How did you know they didn't -- that
22        individual did not have an annulment?
23   A.   They told me directly.
24   Q.   And which party needed an annulment?
25   A.   The husband of the two.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 214 of 406
JA0285

Lonnie Billard Vol. I (8/16/17)

Page 214

 1   Q.   Okay.  Did the wife need an annulment?

 2   A.   No, she did not need an annulment.

 3   Q.   How do you know that?

 4   A.   Because she had never been married before.

 5   Q.   Okay.  And the -- the husband told you he didn't

 6        have an annulment?

 7   A.   They both told me that.

 8   Q.   Okay.  How do you know that the administration of

 9        Charlotte Catholic was aware of the situation?

10   A.   Because they were later told to rectify the

11        situation or be fired.

12   Q.   Okay.  So do you know if they did "rectify the

13        situation"?

14   A.   I don't know as a fact.  I assume so.

15   Q.   Okay.  Are those individuals still working at

16        Charlotte Catholic?

17   A.   Neither of them are.

18   Q.   Okay.  Do you know how much time passed between the

19        time that someone in the administration became

20        aware of the situation and that the individuals

21        involved were told to rectify the situation or be

22        fired?

23   A.   I -- I only know what the wife of the two told me,

24        and it was several months after their marriage that

25        she told me that her husband was studying to -- to

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 215 of 406
JA0286

Lonnie Billard Vol. I (8/16/17)

```
 1         be a administrator, and she was -- she told me
 2         that, you know, if he were ever to make it into the
 3         administration role, he would have -- they would
 4         have to get an annulment and -- and fix that
 5         situation.  That's what she told me.
 6    Q.   Okay.  But you don't know how much time passed
 7         between the time that someone in the administration
 8         of Charlotte Catholic became aware of the situation
 9         and the time that the couple was told they need to
10         rectify it or no longer work there?
11    A.   No, I don't know exactly.
12    Q.   Okay.  And I think you don't know -- I think you
13         told me you don't know if they actually did get an
14         annulment or just exactly what happened?
15    A.   No, I don't know.  I made the assumption because he
16         did get the promotion.
17    Q.   Okay.
18    A.   So I -- based upon that other conversation, I
19         assume so.
20    Q.   And you would assume that if he got promoted that
21         the annulment issue must have been resolved?
22    A.   Yes.
23    Q.   Okay.  And so I guess what you're saying is that
24         the fact that these individuals weren't fired when
25         you were released from your employment means that
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 216 of 406
JA0287

Lonnie Billard Vol. I (8/16/17)

Page 216

```
 1        the school was being inconsistent in the way it
 2        applied Catholic doctrine in their case versus
 3        yours?
 4   A.   Yes.
 5   Q.   Okay.  And that Catholic doctrine should have -- if
 6        it required you to be released from your employment
 7        should likewise have required them to be
 8        terminated?
 9   A.   Yeah.  They -- they continued to work after they
10        were married without the benefit of annulment.  I
11        was fired for announcing I was going to get married
12        without even having gotten married.
13   Q.   What are the names of the couple in the situation
14        you just described to me?
15   A.   Brook and ██████  ██████.
16   Q.   So Mr. Billard, if someone had come to you after --
17        you know, say Steve Carpenter had come to you after
18        learning about your Facebook post and told you that
19        if you decided not to go through with your plans to
20        marry Mr. Donham, that you'd be able to continue as
21        a substitute at Charlotte Catholic.  If that had
22        happened, would you have decided not to get married
23        to Mr. Donham?
24   A.   No, I would not.
25   Q.   Okay.  Going back to the other example you gave me
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 217 of 406
JA0288

Lonnie Billard Vol. I (8/16/17)

```
 1        a moment ago, I think you told me that there was a
 2        Catholic teacher married for the third time without
 3        an annulment.  Did I hear that correctly?
 4   A.   That's correct.
 5   Q.   How do you know that was the situation?
 6   A.   The announcement that she sent me, the pictures of
 7        their wedding in Las Vegas.
 8   Q.   You learned she had gotten married?
 9   A.   Yeah.
10   Q.   Okay.  So how do you know it was her third
11        marriage?
12   A.   Because I've taught with her that long and been
13        with her through all of those.
14   Q.   And how do you know she's Catholic?
15   A.   She told me she is and she went to Catholic high
16        school too.
17   Q.   Did she tell you when she became a Catholic?
18   A.   When she became a Catholic?
19   Q.   Yeah.
20   A.   Family is Catholic.  She's always been a Catholic.
21   Q.   Did she tell you that or you just assuming?
22   A.   I'm assume that.
23   Q.   Okay.  Do you know who her first husband was?
24   A.   I met him, I don't recall his name.
25   Q.   Do you know where they were married?
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 218 of 406
JA0289

Lonnie Billard Vol. I (8/16/17)

1   A.   They were married in the Catholic church.

2   Q.   How do you know that?

3   A.   She told me.

4   Q.   What about her second husband, do you know who that

5        person is?

6   A.   I do.

7   Q.   Okay.  When was she and her second husband married?

8   A.   I don't know where they were married.

9   Q.   Do you know if they were married in the church or

10       out of the church?

11  A.   Don't know.

12  Q.   Do you know if her second husband is a Catholic?

13  A.   Don't know.

14  Q.   Do you know if her second husband has ever been

15       baptized?

16  A.   If her husband --

17  Q.   Has ever been baptized?

18  A.   Don't know.

19  Q.   Do you know if she had her first marriage annulled?

20  A.   I know what she told me was no, she did not.

21  Q.   Do you know if she ever had her second marriage

22       annulled?

23  A.   Don't know.

24  Q.   Okay.  Do you know who her third husband is?

25  A.   Never met him.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 219 of 406
JA0290

Lonnie Billard Vol. I (8/16/17)

Page 219

1   Q.   Is he Catholic?

2   A.   I don't know.

3   Q.   Has he been baptized?

4   A.   I don't know.

5   Q.   You said they got married in Las Vegas?

6   A.   They did.

7   Q.   Was it in a church?

8   A.   It was not.

9   Q.   So how did a -- how does a conversation like this

10       come up?  I guess you saw -- you saw her wedding

11       photographs from her third marriage.  How did the

12       conversation in which she told you about her

13       annulment status happen?

14  A.   She and I worked closely together on several things

15       at school and got to be very good friends, and it

16       was just conversation.

17  Q.   When did her third marriage take place?

18  A.   Maybe about a year ago.

19  Q.   Do you know if she's in the process of trying to

20       get an annulment?

21  A.   I don't know.

22  Q.   Is she still teaching at Charlotte Catholic?

23  A.   She is.

24  Q.   Do you know if anyone has gone to her to tell her

25       that she needs to work on getting an annulment?

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 220 of 406
JA0291

Lonnie Billard Vol. I (8/16/17)

Page 220

1   A.   I don't know.

2   Q.   I think you told me you believe the administration

3        was aware of the situation?

4   A.   Yes.

5   Q.   And what's the basis for your view with respect to

6        that?

7   A.   Well, they gave her -- everybody -- they gave her a

8        bridal shower and a baby shower that the

9        administration attended, is what I'm told.

10  Q.   Okay.  Did you go to the bridal shower?

11  A.   No, I did not.

12  Q.   Did you go to the baby shower?

13  A.   I did not.

14  Q.   Do you have any information that at any of those

15       two events it was made known to those in attendance

16       that this was her third marriage?

17  A.   At the -- at those events?

18  Q.   Right.

19  A.   No.

20  Q.   Okay.  Do you know if anyone in attendance at

21       either of those events was aware she had been

22       married twice before?

23  A.   Yes.

24  Q.   Okay.  Who knew that?

25  A.   Other teachers.

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 221 of 406
JA0292

Lonnie Billard Vol. I (8/16/17)

Page 221

1  Q.   Does anyone in administration know that?

2  A.   Yes.

3  Q.   How do you know that?

4  A.   Because she had been there all those years and she

5       would announce, you know, I'm engaged, I'm getting

6       married, I got married, I got divorced, I'm getting

7       married, I got married.

8  Q.   Which administrators do you think are aware of her

9       situation?

10 A.   Steve Carpenter.  I know Jerry Healy was.  I would

11      assume but don't know about Angela Montague.  And I

12      have no idea -- since I worked such a little time

13      with Kirk Telford, I have no idea what his -- what

14      he knows about that kind of thing.

15 Q.   So other than the -- these two circumstances you

16      told me about, one, the couple -- the first couple

17      who was married without an annulment and then this

18      teacher who's on her -- recently had her third

19      marriage, are you aware of anyone else employed by

20      Charlotte Catholic who has done anything to violate

21      Catholic moral teaching where the administration

22      was aware of it and that person was allowed to

23      continue in their employment?

24 A.   No.

25 Q.   Okay.  Same question, but about other employees of

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 222 of 406
JA0293

Lonnie Billard Vol. I (8/16/17)

Page 222

1      the diocese, not at CCHS, okay.  Are you aware of

2      anyone who's employed in the diocese but not at

3      Charlotte Catholic who did something to violate

4      Catholic moral teaching and someone in a position

5      of authority within the diocese became aware of it

6      and that person was allowed to continue their

7      employment?

8   A.  Only by rumor, sir, no.

9   Q.  Okay.  What's the name of the teacher who had her

10      third marriage recently?

11  A.  Do I have to answer that?  I am terrified that it

12      will -- she will be retaliated against.

13              MR. DAVEY:  Why don't we go off the

14      record for a minute.

15         (DISCUSSION HELD OFF THE RECORD)

16              MR. BROOK:  Mr. Davey, if you don't

17      mind, I'll say something for the record.  We

18      took -- took a break in regard with a question

19      outstanding from you, if memory serves

20      correctly.  Mr. Billard is not interested in

21      answering that question.  He did not plan to

22      answer that question.  In addition, the

23      Plaintiffs do not plan to rely upon that fact

24      pattern which I think Lonnie sort of

25      characterized as the second example of asserted

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 223 of 406
JA0294

Lonnie Billard Vol. I (8/16/17)

Page 223

1           hypocritical action from Defendants in regards

2           to doctrine, and we don't intend to rely upon

3           that fact pattern in the case going forward.

4                   MR. DAVEY:  Okay.  Are you finished?

5                   MR. BROOK:  I am.

6                   MR. DAVEY:  Okay.  Appreciate that.

7           And just to recap, I think what we discussed

8           off the record and to make sure this is all

9           clear, Mr. Billard had indicated that he didn't

10          want to answer my question about the identity

11          of a teacher at Charlotte Catholic who he says

12          is -- about a year ago entered into her third

13          marriage without the benefit of an annulment.

14          It's the position of the Defendants in the case

15          that if Plaintiff intends to use or make any

16          arguments based on the alleged situation

17          involving that individual in this case that the

18          Defendants have the right to conduct discovery

19          including learning of her identity and

20          investigating the circumstances around the

21          testimony Mr. Billard has provided today.

22          However, as I understand it from our

23          conversation off the record, Plaintiff is

24          agreeing that he will not in this lawsuit rely

25          in any way on her particular situation to make

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 224 of 406
JA0295

Lonnie Billard Vol. I (8/16/17)

Page 224

```
 1            any arguments in this case concerning his
 2            claims.  Is that fair?
 3                    MR. BROOK:  That is a fair
 4            distillation.  His concerns about retaliation
 5            in regards to that individual make that the way
 6            that he is most comfortable proceeding.
 7                    MR. DAVEY:  Okay.  So in light of our
 8            agreement on that issue, we are willing to
 9            forgo seeking additional discovery concerning
10            her situation.  All right.
11  BY MR. DAVEY:
12   Q.  Mr. Billard, let me ask, going back to -- we were
13        talking about the sequence of events relative to
14        your being informed that you would no longer be
15        working at Charlotte Catholic.  I want to hand you
16        another exhibit I've marked as Exhibit Number 18.
17       (EXHIBIT NUMBER 18 WAS MARKED FOR IDENTIFICATION)
18  BY MR. DAVEY:
19   Q.  Do you recognize Exhibit 18?
20   A.  I do.
21   Q.  And Exhibit 18 appears to be a Facebook post you
22        posted on December 31 of 2014; is that right?
23   A.  It is.
24   Q.  Okay.  I'm just going to read the post.  I have a
25        questions about it.  It says, Wow, what a year it
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 225 of 406
JA0296

Lonnie Billard Vol. I (8/16/17)

Page 225

```
 1         has been.  Incredible highs with some very low
 2         lows.
 3              When you talk about "low lows," are you
 4         referring to the news that you would no longer be
 5         substituting at Charlotte Catholic?
 6    A.   That was one of the very low lows.
 7    Q.   Okay.  Did any of the other lows have to do with
 8         your employment at Charlotte Catholic?
 9    A.   No.
10    Q.   Okay.  The next thing says:  (Reading)
11                  I want to thank all of you who
12              reached out to me over the last few
13              days about my being fired.  Your kind
14              words of love and support gave me great
15              comfort and not a few tears.
16               Did I read that correctly?
17    A.   You did.
18    Q.   So after you posted your post that we looked at
19         previously in Exhibit 17, the one from December 29,
20         did you hear from people supporting you with
21         respect to your plans to marry Mr. Donham?
22    A.   Yes.
23    Q.   Did you hear from anyone who disagreed with your
24         plans to marry Mr. Donham?
25    A.   I did not.
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 226 of 406
JA0297

Lonnie Billard Vol. I (8/16/17)

Page 226

```
 1   Q.   As a result of posting your plans to marry

 2        Mr. Donham on Facebook, did you unfriend any of

 3        your Facebook friends?

 4   A.   No.

 5   Q.   Okay.  Did anyone unfriend you that you're aware

 6        of?

 7   A.   Don't believe so.

 8   Q.   If you read on in the post from December 31st, it

 9        says -- I'm just going to skip a sentence, but it

10        says:  (Reading)

11              As my son knows, I love a good

12           fight.  I know I will not be rehired,

13           but maybe the fools that did this will

14           think twice before doing it again.  I

15           know, wishful thinking.  But then,

16           maybe the next person will also have

17           courage to stand up.  The narrow minds

18           stuck in the 1800s need to be outed and

19           I intend to do it.  Stay tuned.

20              Can you explain what you meant by that?

21   A.   Yeah, I can.  I assume you're talking about the --

22        the very end of that, Narrow minds stuck in the

23        1800s need to be outed.  Is that -- is that where

24        you're focused?

25   Q.   That's -- that's part of it.  I'm interested in the
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 227 of 406
JA0298

Lonnie Billard Vol. I (8/16/17)

```
 1          whole portion that I read, but that's certainly
 2          part of it, so if you want to start there, that's
 3          fine.
 4    A.    Well, no.  Well, let's -- let's start earlier.
 5          I -- you know, the way people responded to me
 6          was -- was very positive, very heartening, very
 7          supportive, from people I didn't even begin to
 8          suspect that would be.  I felt like what happened
 9          to me was wrong.  I, to this day, am convinced it
10          was the wrong thing to do.  And I understood that,
11          you know, they were not probably going to hire me
12          back even though I would love to teach again or
13          would -- and particularly at that point, would have
14          gone -- loved to continued to teach.  Okay?  So I
15          felt like, one, what they did was wrong and I'm --
16          and I'm not a person that just rolls over and takes
17          it, so I'm going to do something about it.
18          Number two is that I taught my kids -- when I say
19          "my kids" I mean my students --
20    Q.    Uh-huh.
21    A.    -- to live your life honestly and with integrity.
22          And to me, to walk away from a wrong like that
23          would be cowardice and would be in direct
24          contradiction to how I tried to teach kids to live
25          their life with integrity.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 228 of 406
JA0299

Lonnie Billard Vol. I (8/16/17)

Page 228

```
 1              I also thought -- the next thing is maybe the
 2         next person will also have the courage to stand up.
 3         The point behind that is that gays have hid in the
 4         closet, hid in the alleys, have taken the abuse
 5         of -- of the law, of the -- the ability of anyone
 6         and everyone to discriminate against them and many
 7         have gone away quietly rather than call attention
 8         to that -- to that -- that behavior.  And I felt --
 9         the reason I said that is that I felt, you know, if
10         I stand up maybe somebody else will have the
11         courage when they're discriminated against to do it
12         as well.  Because if we keep being quiet about
13         being discriminated against, we will always be
14         discriminated against.
15              So, they need to be outed.  By that time I had
16         decided I was going to take my story to the local
17         media.  And -- and it was after this that I -- I
18         began to put together how I was going to do that
19         and eventually did.
20    Q.   Okay.  Let me show you what I've marked as
21         Exhibit 19.
22         (EXHIBIT NUMBER 19 WAS MARKED FOR IDENTIFICATION)
23    BY MR. DAVEY:
24    Q.   I'll represent this is a copy of an article that
25         ran in the Charlotte Observer on January 13th of
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 229 of 406
JA0300

Lonnie Billard Vol. I (8/16/17)

Page 229

1    2015.

2    A.   Okay.

3    Q.   Do you recognize this as an article that was

4         published in the Charlotte Observer concerning your

5         situation?

6    A.   Yes, I think that's what this is.

7    Q.   Look with me if you would, the first page of

8         Exhibit 19.  In the middle of the page, it says,

9         Billard said Tuesday he remained stunned.  Do you

10        see that?

11   A.   Billard said Tuesday, is that where you are?

12   Q.   Yeah.

13   A.   Yes.

14   Q.   Okay.  And below that you are quoted in the article

15        as saying, This is sort of a don't ask, don't tell

16        policy.  Do you see that?

17   A.   I do.

18   Q.   Is that an accurate quote?

19   A.   I believe it probably is.

20   Q.   Okay.  And it says -- goes on to say that you

21        contend that your sexuality was well known by

22        school officials, fellow teachers, and many of your

23        students and their families.

24   A.   That's correct.

25   Q.   Okay.  And is that something you told Mr. Gordon,

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 230 of 406
JA0301

Lonnie Billard Vol. I (8/16/17)

Page 230

1          the reporter here?

2     A.   Yes.

3     Q.   Okay.  And you spoke to Mr. Gordon about your case?

4     A.   Yes.

5     Q.   Okay.  The next paragraph says:  (Reading)

6                    My response is that if I am in

7               defiance of Catholic teachings, and I

8               probably am, then how do you account

9               for employing teachers who use birth

10              control, how do you account for

11              teachers who divorce and remarry

12              without the blessing of the church?  It

13              was fine when I was living with my

14              parter, but I was wrong when I said we

15              were getting married.  The hypocrisy is

16              ridiculous, close quote.

17           Is that an accurate quotation?

18    A.   I believe it is.

19    Q.   Okay.  I think I asked you this earlier and I

20         can't -- I apologize, I don't remember what you

21         said, but before you had your conversation with

22         Steve in which he brought up the Saint Gabriel

23         music minister, had you heard about the situation

24         at Saint Gabriel?

25    A.   I -- I believe I had.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 231 of 406
JA0302

Lonnie Billard Vol. I (8/16/17)

Page 231

```
1    Q.   Okay.
2    A.   But I'm not positive of that.  I believe -- I
3         remember hearing -- overhearing part of a
4         conversation about a young man at -- at Saint
5         Gabe's getting fired.  Bits and pieces.
6    Q.   Okay.
7    A.   So I'm assuming it's the same thing.
8    Q.   Do you remember anything else about what you
9         overheard and where it took place or who might have
10        told you that or anything like that?
11   A.   I don't know, I don't.  It just didn't -- it didn't
12        ring much of a bell to me at that time.
13   Q.   Yeah.
14        Going down further on the page, this is the
15        second page of Exhibit 19, you see the paragraph
16        that says, Said Billard.  Do you see that?
17   A.   Said Billard, I'm 68.  Is that where you are?
18   Q.   Yeah.  Do you see that?
19   A.   Yes.
20   Q.   Okay.  So it says, Said Billard, and then there's a
21        quote, you know:  (Reading)
22             Quote, I'm 68.  Nobody is going
23          to shove me back in that damn closet.
24          I understand totally that the diocese
25          is within its rights to do this, I know
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 232 of 406
JA0303

Lonnie Billard Vol. I (8/16/17)

Page 232

```
 1           that.
 2           I'll stop there because that's where the quote
 3           ends.  Is that an accurate quotation?
 4    A.    That is.
 5    Q.    And then it goes to quote you to say:  (Reading)
 6                    But this is not right.  The Pope
 7                just recently said that if you're gay
 8                and you're seeking Christ, who am I to
 9                judge?  I guess this diocese has not
10                gotten that message, close quote.
11           Is that an accurate quotation?
12    A.    I believe it is.
13    Q.    Okay.  And what you're saying there, if I
14           understand it, is that you didn't think that the
15           Diocese of Charlotte was correctly applying
16           Catholic teaching as articulated by Pope Francis;
17           is that fair?
18    A.    Say one more time.  I wasn't watching you so I
19           didn't see your lips.  I'm sorry.
20    Q.    No problem.  I'll try it again.
21           And so as I -- if I understand what you're
22           saying here, then I think what you're saying is
23           that you didn't believe that in making the decision
24           it made with regard to your employment at Charlotte
25           Catholic that the diocese was correctly applying
```

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 233 of 406
JA0304

Lonnie Billard Vol. I (8/16/17)

Page 233

```
 1        Catholic teaching as it had been articulated by the
 2        Pope?
 3   A.   Yes, I believe that they were ignoring the Pope.
 4   Q.   Okay.  So you mentioned this -- this phrase, Who am
 5        I to judge, that's attributed to the Pope.  What's
 6        your understanding of what he was saying there?
 7   A.   My -- my understanding was that what he was saying
 8        is that -- that we are too quick to judge and --
 9        and come to conclusions about people, about
10        teachings, about anything, you know, without --
11        without being very careful in our thought process
12        and, you know -- and before we say you are wrong,
13        you are not Christian, you are not this or that,
14        you need to ask yourself, are you in a position to
15        judge that, and who am I to judge.
16   Q.   Now, as a substitute teacher, is it fair to say
17        that it was up to Steve Carpenter to decide who
18        would serve as a substitute teacher at Charlotte
19        Catholic?
20   A.   Yes, yes.
21   Q.   And in your -- in your situation, is it -- is it
22        correct to say that if -- if it hadn't been for the
23        fact that you had been scheduled to substitute for
24        Ms. Stretch the first week of January in 2015, that
25        Mr. Carpenter could have addressed your situation
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 234 of 406
JA0305

Lonnie Billard Vol. I (8/16/17)

Page 234

1     by simply not calling you back?

2   A.  He could have with -- but one small thing.  After I

3       told Steve that -- about the post that Rich and I

4       were going to get married, I continued to work

5       after that.

6   Q.  How many days did you substitute between the time

7       that you told Steve Carpenter about the post and

8       the conversation you had with him on December 28?

9   A.  I don't remember the number of days.  It -- you

10      know, but I was -- I was essentially there at least

11      once a week up until before -- before Christmas.

12  Q.  Okay.

13  A.  So that -- the post was in October.  So, you know,

14      there had been, what, two and a half weeks in

15      November that I would have worked and early part of

16      December.

17  Q.  And I think you said you made Steve aware of the

18      post two days -- two or three days after you put it

19      up there; is that right?

20  A.  Yeah.

21  Q.  Okay.  So do you think that the -- it was

22      hypocritical for the diocese or for the school to

23      allow you to serve as a substitute from the time

24      you made Mr. Carpenter aware of the post through

25      Christmas break?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 235 of 406
JA0306

Lonnie Billard Vol. I (8/16/17)

```
 1   A.   It was hypocritical to allow me to work, is that --
 2        is that your question?
 3   Q.   Well, what I'm trying to get at is, do you think
 4        that the school, if it was going to be faithful to
 5        its own teachings, should have, you know, told you
 6        the day that you told Mr. Carpenter that you could
 7        no longer serve as a substitute teacher?
 8   A.   I would think that if it were a -- such a strong,
 9        well-defined, well-understood policy that you
10        cannot work if you're going -- if you're gay and
11        you're going to get married, there would not have
12        been any time or any ambiguity about making the
13        decision, it simply would have been made and I
14        would have been told then.  The fact that they put
15        it off tells me that somebody was either ignoring
16        it or they weren't sure what the heck to do about
17        it, you know, and that's what that time period was
18        for.
19   Q.   All right.  Do you have any -- I think you told me
20        what you know today, though, about who was involved
21        in making the decision not to have you come back to
22        Charlotte Catholic; is that correct?
23   A.   I know what I was told, yes.
24   Q.   Okay.  And you said a moment ago the fact that
25        there was some time tells you that somebody was
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 236 of 406
JA0307

Lonnie Billard Vol. I (8/16/17)

Page 236

```
 1        either ignoring it or weren't sure what to do about
 2        it.  And I guess my question is, you don't actually
 3        have any information yourself about what was going
 4        on between the time that you first told
 5        Mr. Carpenter about the post and the December 28
 6        call that you had with him other than what you've
 7        already told me about today; is that right?
 8   A.   That's correct.
 9   Q.   Okay.  I think we can stop there for the day.
10   A.   Okay.
11                  MR. BROOK:  All right.
12                  (WHEREUPON, the foregoing deposition
13            adjourned at 6:03 P.M. on August 16th, 2017.
14            Reading and signing were reserved.)
15                      *    *    *    *
16
17
18
19
20
21
22
23
24
25
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 237 of 406
JA0308

Lonnie Billard Vol. I (8/16/17)

Page 237

STATE OF NORTH CAROLINA   )

                          )

COUNTY OF DAVIDSON        )


                   CERTIFICATE OF REPORTER

        I, AMY A. BRAUSER, Registered Merit Reporter and

Certified Realtime Reporter-Notary Public, do hereby

certify that LONNIE BILLARD, was duly sworn by me prior to

the taking of the foregoing deposition, that said

deposition was taken and transcribed under my supervision

and direction, that the parties were present as stated,

and that I am not of counsel for or in the employment of

any of the parties to this action, nor am I interested in

the outcome of this action.

        I do further certify that the foregoing 236

pages constitute a true and accurate transcript of the

testimony, and that the witness is being given 30 days in

which to affix his notarized signature to the testimony

                   This the 21st day of August, 2017.


                   _____

                   AMY A. BRAUSER, RPR, RMR, CRR

                   Notary Public #20023030055

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 238 of 406
JA0309

Lonnie Billard Vol. I (8/16/17)

Page 238

WITNESS CERTIFICATION

I, LONNIE BILLARD, hereby certify:

That I have read and examined the contents of the foregoing testimony as given by me on August 16th, 2017, and that to the best of my knowledge and belief the foregoing pages are a complete and accurate record of the testimony given by me, except as noted on the attached Addendum A hereto.

I have _____ have not_____ made changes/corrections.

_____

LONNIE BILLARD

I, _____, Notary Public for the County of _____, State of _____, hereby certify that the herein above-named appeared before me this the _____ day of _____, 2017; and that I personally witnessed the execution of this document for the intents and purposes of herein-above described.

_____

NOTARY PUBLIC

My Notary Seal Expires: _____

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 239 of 406
JA0310

Lonnie Billard Vol. I (8/16/17)

Page 239

ADDENDUM A

Upon reading and examining my testimony as herein transcribed, I make the following additions, changes and/or corrections, with the accompanying and corresponding reason(s) for the same:

Page      Line                    Is Amended to Read

_____   _____

_____   _____

_____   _____

_____   _____

_____   _____

_____   _____

_____   _____

_____   _____

_____   _____

_____   _____

_____   _____

_____   _____

_____   _____

_____   _____

_____   _____

                    _____

                    LONNIE BILLARD

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 240 of 406
JA0311

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

LONNIE BILLARD,                          )
                                         )
                Plaintiffs,              ) Civil Action No.
        vs.                              ) 3:17-cv-0011
                                         )
CHARLOTTE CATHOLIC HIGH SCHOOL,          ) Volume 2
MECKLENBURG AREA CATHOLIC                ) Pages 240-323
SCHOOLS, and ROMAN CATHOLIC              )
DIOCESE OF CHARLOTTE,                    )
                                         )
                Defendants.              )
_____)


DEPOSITION

OF

LONNIE BILLARD


Taken at:

McGuireWoods, LLP

Fifth Third Center

201 North Tryon Street

Charlotte, North Carolina


On Thursday, August 17, 2017

REPORTER:  AMY A. BRAUSER, RPR, RMR, CRR

Notary Public

Lonnie Billard. Vol. II (8/17/17)

Page 241

                    A P P E A R I N G
For the Plaintiff:    Christopher Brook, Esq.
                      American Civil Liberties Union
                          of North Carolina
                      P.O. Box 28004
                      Raleigh, North Carolina 27611
                      (919) 834-3466
                      cbrook@acluofnc.org
                        (and)
                      Brian Hauss, Esq.
                      American Civil Liberties
                          Union Foundation
                      125 Broad Street, 18th Floor
                      New York, New York 10004
                      (212) 549-2604
                      bhauss@aclu.org
For the Defendants:   Joshua D. Davey, Esq.
                      John G. McDonald, Esq.
                      Meredith A. Pinson, Esq.
                      McGuireWoods, LLP
                      201 North Tryon Street, Suite 3000
                      Charlotte, North Carolina 28202
                      (704) 343-2000
                      jdavey@mcguirewoods.com
                      jmcdonald@mcguirewoods.com
                      mpinson@mcguirewoods.com


                      I N D E X
                                                Page
EXAMINATION BY MR. DAVEY. . . . . . . . . .    242, 316
EXAMINATION BY MR. BROOK. . . . . . . . . .    302


              E X H I B I T S   M A R K E D
Number 20    Facebook post Bates Billard        269
             RFP 000516


Number 21    Complaint Bates CCHS 000001 to 09  276


Number 22    Plaintiff's Responses to           286
             Defendants' First Set of Interrogatories

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 242 of 406
JA0313

Lonnie Billard. Vol. II (8/17/17)

Page 242

1        Pursuant to Notice in the aforementioned matter

2   and in accordance with the North Carolina Rules of Civil

3   Procedures, this continued deposition of LONNIE BILLARD,

4   was taken by the Defendants, beginning at 8:42 a.m. on

5   Thursday, August 17th, 2017, before Amy A. Brauser, RPR,

6   RMR, CRR, Notary Public.

7        LONNIE BILLARD, called as a witness, being

8   previously sworn, was examined and testified as follows:

9

10         EXAMINATION BY MR. DAVEY

11   BY MR. DAVEY:

12   Q.   Good morning, Mr. Billard.

13   A.   Good morning.

14   Q.   We're back on the record this morning after taking

15       a break yesterday just to finish up your deposition

16       this morning.  You remember at the beginning of the

17       deposition yesterday, we went over the ground rules

18       for the deposition?

19   A.   I do.

20   Q.   Okay.  Well, those still apply today.

21   A.   Okay.

22   Q.   So just let me know if you need a break.  If you

23       don't understand a question, let me know.  I'll do

24       my best to rephrase it.  That make sense?

25   A.   Absolutely.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 243 of 406
JA0314

Lonnie Billard. Vol. II (8/17/17)

Page 243

1   Q.   Okay.  Had a couple of follow-up questions from our

2        discussion yesterday and then some other things I

3        want to ask you about.

4            First of all, you remember I asked you

5        yesterday about the -- the motto of Charlotte

6        Catholic:  The soul of education is the education

7        of the soul?

8   A.   I do recall that.

9   Q.   You told me it's outside the building, right?

10  A.   As I recall.

11  Q.   Okay.  So is that something you would see every day

12       as you went into the school?

13  A.   If you go in the front door, yes.

14  Q.   Okay.  And --

15  A.   I didn't always go in the front door, but --

16  Q.   Yeah.

17  A.   -- but generally, yes.

18  Q.   Okay.  And I guess you'd sometimes go in a back

19       entrance?

20  A.   Yeah.

21  Q.   Is that what you did?

22           Okay.  Do you have understanding of what that

23       motto means?

24  A.   The education --

25                    MR. BROOK:  I mean, I'm going to

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 244 of 406
JA0315

Lonnie Billard. Vol. II (8/17/17)

Page 244

```
 1              object.  I think we asked that question
 2              yesterday.
 3                    MR. DAVEY:  I apologize if I did.
 4              Yeah, the record will reflect that.  I just
 5              can't quite really remember, so . . .
 6                    THE WITNESS:  The essence of education
 7              being the soul of education would be the
 8              education of the soul in that you would teach
 9              the -- you would teach strong moral values,
10              strong ethical values, is how I would read it.
11   BY MR. DAVEY:
12   Q.   Okay.  Thank you.
13   A.   Uh-huh.
14   Q.   You remember yesterday I asked you some questions
15        about stereotypes of gay men?
16   A.   I do recall that.
17   Q.   Do you think any stereotypes of gay men apply to
18        you?
19   A.   Hmm.  I've never been told that, okay?  But, you
20        know, in -- in some ways there are pieces of what
21        you described as stereotypical or we -- maybe I
22        said it, you know.  I can't recall exactly.  But,
23        you know, I -- I love show music, I love Broadway,
24        I love that kind of stuff, but I also love sports.
25        I'm a sports nut, okay?  You know, I have zero
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 245 of 406
JA0316

Lonnie Billard. Vol. II (8/17/17)

Page 245

```
 1          interest in doing somebody's hair or decorating
 2          their home, but, you know, I like art.  So there
 3          are -- there are parts of me that could be -- that
 4          would fall under that definition possibly, but I
 5          don't see myself as falling under that.
 6     Q.   Okay.  Thank you.
 7              You -- you recall yesterday we talked about the
 8          sequence of events that led up to the call you had
 9          with Steve Carpenter on December 28th, 2014, in
10          which he told you that you wouldn't be able to
11          substitute at Charlotte Catholic anymore.  Do you
12          recall that?
13     A.   I recall that.
14     Q.   Okay.  And I think you told me yesterday that
15          before you talked to Steve on the 28th of December
16          that people had started to reach out to you because
17          they had heard about the decision that you wouldn't
18          be coming back.  Did I hear that correctly?
19     A.   I don't think so.  If I said it that way, then I
20          misspoke.
21     Q.   Okay.
22     A.   I -- it was very shortly after the conversation
23          with Steve.
24     Q.   Okay.  Gotcha.  So shortly after the conversation
25          with Steve on the 28th, you began to receive
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 246 of 406
JA0317

Lonnie Billard. Vol. II (8/17/17)

1    contact from individuals who had heard of the

2    decision?

3  A.  I -- I heard from a few people, yes.

4  Q.  Okay.  And who -- who was it that reached out to

5     you at that point?

6  A.  Believe it -- I believe it was Karen and -- wow.

7     Karen.  Might have been Nell Baker.  I'm not

8     positive of that.  I -- I know that they both did

9     each reach out to me, so . . .

10 Q.  Okay.  Now, what's Karen's last name?

11 A.  Belciglio.

12 Q.  Do you know how that's spelled?

13 A.  B-E-L-C-I-G-L-I-O, I think.

14 Q.  Okay.  And who is Karen Belciglio?

15 A.  She's a teacher.

16 Q.  And then I think you said Nell.  Is it --

17 A.  Nell.

18 Q.  -- N-E-L?

19 A.  Two Ls.

20 Q.  N-E-L-L?  Okay.

21 A.  Yes.

22 Q.  Like the movie?

23 A.  Yes.

24 Q.  What -- who is Nell Baker?

25 A.  She's a teacher as well.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 247 of 406
JA0318

Lonnie Billard. Vol. II (8/17/17)

Page 247

```
 1   Q.   Teacher as well.  Okay.
 2             Did -- how did they -- how did Karen contact
 3        you?
 4   A.   How did they contact me?
 5   Q.   Yes.
 6   A.   Phone call.
 7   Q.   Okay.  Do you remember what Karen told you when she
 8        called you?
 9   A.   It was along the lines of, I -- I just heard.  Is
10        that true?
11   Q.   Okay.  Did that -- did you understand, then, from
12        her question, then, that she had already heard
13        about the decision?
14   A.   That was how I understood it.
15   Q.   Okay.  Same question with regard to Nell Baker.  Do
16        you remember what she told you when she called you?
17   A.   Essentially the same thing.  It was shock at the
18        fact that I had been -- I think Nell would -- might
19        have been -- I think Nell might have been
20        more -- more about me rather than the event.  Does
21        that make sense?  How are you doing?
22   Q.   Okay.
23   A.   I heard.  Are you okay type thing.
24   Q.   Did either one of them, either Nell or Karen, tell
25        you how they had learned of the decision?
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 248 of 406
JA0319

Lonnie Billard. Vol. II (8/17/17)

Page 248

1   A.   No.

2   Q.   Did you ask either of them?

3   A.   I don't -- no, I didn't.  I don't -- I don't recall

4        asking them.

5   Q.   Okay.  Is there a reason you didn't ask?

6   A.   I -- no, I don't know.  I mean, I guess it seems as

7        though, you know, what they knew was true, but I

8        didn't -- didn't occur to me to say, well, who told

9        you?  So I didn't do that.

10  Q.   Do you remember whether it was Karen or Nell who

11       called you first?

12  A.   I don't.

13  Q.   And I know you said you talked to Steve on the

14       28th.  Do you remember whether it was that same day

15       that Karen or Nell called you or the next day or

16       two days later?

17  A.   I believe it was the next day.

18  Q.   Okay.

19  A.   I'm not positive, but I believe it was.

20  Q.   Do you think that both Karen and Nell called you on

21       the same day?

22  A.   I think so.

23  Q.   Okay.  Have you had any subsequent conversations

24       with either Karen or Nell after that call in late

25       December 2014 about your ending of your employment

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 249 of 406
JA0320

Lonnie Billard. Vol. II (8/17/17)

Page 249

1          at Charlotte Catholic?

2    A.    I missed the last part of the question, I'm sorry.

3    Q.    Sure.  No problem.  Have you had any conversations

4          with either Karen or Nell since you talked to them

5          in late December of 2014 about the decision not to

6          have you come back as a substitute at Charlotte

7          Catholic?

8    A.    Not that I recall.

9    Q.    Okay.  And, Mr. Billard, you have in front of you

10         the exhibits we looked at yesterday?

11   A.    Yes.

12   Q.    I'd ask you to refer back to Exhibit 17.

13   A.    Seventeen?

14                    MR. BROOK:  Which one is that, Josh?

15                    MR. DAVEY:  This is the Facebook post

16             from December 29, 2014.

17                    MR. BROOK:  Thanks.

18                    THE WITNESS:  I have it right here.

19   BY MR. DAVEY:

20   Q.    You have that in front of you?

21         And I'm just -- we talked about this yesterday,

22         how you had posted on December 29, 2014, that you

23         found out today I am no longer allowed to work at

24         Charlotte Catholic High School.  Are you able to

25         tell me about the timing of your conversations with

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 250 of 406
JA0321

Lonnie Billard. Vol. II (8/17/17)

Page 250

1        Karen or Nell relative to the Facebook post here in

2        Exhibit 17?

3    A.  As I recall, the calls from them were before this.

4        This doesn't have a time stamp on it, so I don't --

5        but my recollection is that the calls came before

6        this posting.

7    Q.  Okay.  Were you Facebook friends with either Karen

8        or Nell?

9    A.  Yes.

10   Q.  Okay.  Were you Facebook friends with both of them

11       at that time?

12   A.  Yes.

13   Q.  Okay.  So they -- would they have seen or -- or

14       could they have seen, I guess, your October 2014

15       post about your plans to get married to Mr. Donham?

16   A.  The engagement announcement?

17   Q.  Yes.

18   A.  The original one?  Is that what you're --

19   Q.  Yes.

20   A.  Yeah, they would have seen that.

21   Q.  Okay.  And they would have been able to see the

22       December 29 post in Exhibit 17 --

23   A.  They would have.

24   Q.  -- if they would have logged on to Facebook?

25   A.  Yes, sir, they would.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 251 of 406
JA0322

Lonnie Billard. Vol. II (8/17/17)

1   Q.   Do you know whether either of them actually did see
2        the October 2014 post announcing your engagement?
3   A.   The only way I would know that would be to see if
4        there was a response from them.  I don't -- but
5        that's the only way I would know.
6   Q.   Okay.  We -- we could go look and see if they
7        posted a -- a comment, basically, on your -- in
8        response to your post?
9   A.   Yeah, a -- a response, a like, what -- you know,
10       anything that indicated that they had read it.
11  Q.   Okay.  Do you recall yesterday, Mr. Billard, we
12       talked about the conversation you had with Steve
13       Carpenter a few days after that October post in
14       which you announced your engagement.  Do you
15       remember that?
16  A.   Yes, sir.
17  Q.   Okay.  And -- and I think you told me yesterday
18       that Mr. Carpenter had brought up the situation
19       that had occurred with the music minister at Saint
20       Gabriel and that you did -- you believed that your
21       situation was different from his because of the
22       different jobs you had; is that fair?
23  A.   That -- that's correct.
24  Q.   Okay.  And for that reason you didn't believe that
25       your engagement to Mr. Donham would lead to your

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 252 of 406
JA0323

Lonnie Billard. Vol. II (8/17/17)

Page 252

1          termination as a substitute; is that fair?

2    A.    That's fair.

3    Q.    Okay.  And I think you also told me that

4          Mr. Carpenter had said something to you along the

5          lines that Uptown won't hear it from me.  Did I

6          hear that correctly?

7    A.    That's correct.

8    Q.    All right.  And you understood that to mean that he

9          was telling you he was not going to be the person

10         to tell the Diocese that you had been engaged to

11         Mr. Donham?

12   A.    That's how I took that.

13   Q.    Okay.  So my question is if you thought your

14         situation was different from the Saint Gabriel

15         music minister, why would it matter if

16         Mr. Carpenter communicated the fact of your

17         engagement to the Diocese?

18   A.    Well, it would matter because, yeah, as I said to

19         you yesterday, I -- I think I -- I told you that I

20         said that they would not be delighted, they

21         wouldn't be pleased with it, you know, and I would

22         not want to get in trouble, but trouble and fired

23         were two different things.  I -- I didn't see them

24         as equal.

25   Q.    Okay.  So if -- I think what you're saying is that

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 253 of 406
JA0324

Lonnie Billard. Vol. II (8/17/17)

Page 253

1        you -- you knew that if the Diocese learned of the

2        engagement, that there could be some negative

3        ramifications for you, but that you didn't expect

4        that that would include termination?

5                    MR. BROOK:  Objection in regards to

6            how it characterizes his previous testimony.

7            You can go ahead and answer.

8    BY MR. DAVEY:

9    Q.   Is that -- is that a fair characterization,

10        Mr. Billard?

11   A.   I think so, probably.

12   Q.   Okay, thank you.

13        Do you believe that prior to your October 2014

14        post in which you announced your engagement to

15        Mr. Donham that anyone in the administration at

16        Charlotte Catholic High School was aware that you

17        were in a same-sex sexual relationship with

18        Mr. Donham?

19   A.   Yes.

20   Q.   Okay.  Who do you think was aware of that?

21   A.   Jerry Healy.

22   Q.   Okay.

23   A.   Steve Carpenter.

24   Q.   Okay.

25   A.   I don't -- I don't know about the other two

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 254 of 406
JA0325

Lonnie Billard. Vol. II (8/17/17)

Page 254

```
 1        administrators.  There's Randy Belk, who's a dean
 2        of students.  Don't know about him or about Angela.
 3        I wasn't -- I didn't have that much interaction
 4        with either of them.
 5   Q.   Okay.  So you -- you -- I guess if I understand you
 6        right, you're saying you're not sure if either
 7        Mr. Belk or Ms. Montague were aware that you were
 8        in a same-sex sexual relationship with Mr. Donham
 9        before your October 2014 Facebook post?
10   A.   Yeah, I'm not sure about those two.
11   Q.   Okay.  Anyone else other than Mr. Healy and
12        Mr. Carpenter who was in administration at
13        Charlotte Catholic who you believe was aware of the
14        same-sex sexual relationship you had with
15        Mr. Donham before October 2014?
16   A.   Administration?
17   Q.   Yes, sir.
18   A.   No.
19   Q.   Okay.  So tell me why -- you know, what's the basis
20        for your belief that Jerry Healy knew of your
21        relationship with Mr. Donham, that it was a sexual
22        same-sex relationship?
23   A.   Okay.  Rich would come with me to faculty
24        functions, and where Jerry first met Rich was at
25        a -- a end-of-school party that Jerry threw for
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 255 of 406
JA0326

Lonnie Billard. Vol. II (8/17/17)

```
 1          everybody and, you know, Rich came with me to that.
 2          And Jerry -- Jerry and I or the three of us talked
 3          for a while.  The reason I point that out is that
 4          because for the next thing that happened, which
 5          was, I believe, the next fall for a back-to-school
 6          party, Jerry said, And be sure to bring your, and
 7          he paused, and he said, Bring your, and I said,
 8          Partner?  And he said -- he said, Bring your, your
 9          friend.  You know, a awkward way to say friend.
10          And I said, My partner?  And he said, Well, I
11          didn't know if I could say that.  So that would --
12          you know, that seems to me to be a pretty direct
13          understanding.
14    Q.    Okay.  Other than that exchange you just described,
15          is there any other reason that you believe that
16          Mr. Healy was aware that you were in a same-sex
17          sexual relationship with Mr. Donham?
18    A.    Just that Rich was a part of all -- you know, much
19          of what I did at Charlotte Catholic that involved
20          teachers and other people, that when -- when we --
21          when I was invited to different parties or
22          whatever, be they department or just groups or
23          what -- you know, Rich would go with me.  Jerry
24          would have had -- would have been at some of those,
25          not all of them.  The fact that -- that, you know,
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 256 of 406
JA0327

Lonnie Billard. Vol. II (8/17/17)

Page 256

```
 1          Rich was at all the plays, at all the musicals, all
 2          the events, those kinds of things, I think the
 3          assumption certainly would be made that two men of
 4          our age would -- would likely be in a romantic
 5          relationship.
 6    Q.    Are there any other reasons other than what you
 7          just told me about that you believe Jerry Healy
 8          knew that you were in a same-sex sexual
 9          relationship with Mr. Donham?
10    A.    I can't think of any.
11    Q.    Okay.  Going back to a moment ago, you told me
12          about an end-of-year party that Jerry Healy threw
13          for the -- was it for faculty or --
14    A.    Faculty.
15    Q.    Were staff members invited to that?
16    A.    Yes.
17    Q.    Administration invited?
18    A.    Uh-huh.
19    Q.    Just a reminder to answer out loud.
20    A.    Oh, yes.
21    Q.    Thank you.
22              Do you recall when -- you know, what year that
23          party took place?
24    A.    It was at the end of Jerry's first year as
25          principal, and I'd have to look at a calendar to be
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 257 of 406
JA0328

Lonnie Billard. Vol. II (8/17/17)

Page 257

1          able to figure out exactly when -- when that was.

2     Q.   Okay.  But you're confident it was the end of his

3          first year?

4     A.   Yes.

5     Q.   So if it's an end-of-the-year party, is it a party

6          that happens in May or June?

7     A.   It -- yeah, I -- I think it would have been June.

8     Q.   June, okay.  And then this -- after you -- after

9          this party, you told me about another conversation

10         you had with Mr. Healy where he used the term --

11         where you used the term "partner"; is that right?

12    A.   That's correct.

13    Q.   Okay.  And when did that happen relative to the

14         end-of-year party, as best as you can recall?

15    A.   It -- it would have been -- that would have been in

16         June.  The second conversation would have been

17         probably August prior to school starting.  The --

18         you know, it was a back to school-type thing.

19    Q.   Okay.  So it would have been two -- two or three

20         months after the party; is that fair?

21    A.   Yeah.

22    Q.   Okay.  How -- so you started teaching at Charlotte

23         Catholic in 2001.  Do you remember approximately

24         how many years went by before Jerry Healy became

25         the principal?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 258 of 406
JA0329

Lonnie Billard. Vol. II (8/17/17)

Page 258

1   A.   I think -- I believe that my -- my first year there

2       as a full-time teacher, Father Cassidy was the

3       principal.  My recollection is that Jerry came my

4       second year.

5   Q.   Okay.  Let me ask you about Mr. Carpenter.  What's

6       the -- what's the reasons that you believe

7       Mr. Carpenter was aware before October 2014 that

8       you were in a same-sex sexual relationship with

9       Mr. Donham?

10   A.   Many of the same things where Rich was with me for

11       any number of -- of activities.  The same kinds of

12       things that I explained, that Jerry would have met

13       him and seen him.  I believe also that Steve

14       understood the fact that we were partners because

15       I -- I had recommended to Steve that Rich be -- be

16       a substitute.  Rich had lost his job and was

17       between jobs.  He has a degree, and he could be a

18       substitute.  Steve interviewed him and put him to

19       work as a substitute.

20           On top of that, Rich also substituted at Holy

21       Trinity Middle School.  Susan Carpenter, Steve's

22       wife, was responsible for procuring the -- the

23       substitutes for the middle school, Steve for the

24       high school, okay?  In both of those capacities,

25       Steve -- for example, Steve would say to me, I need

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 259 of 406
JA0330

Lonnie Billard. Vol. II (8/17/17)

1       Rich to come in next Wednesday.  Can he do that?

2       Or Steve -- Steve at times would call and want to

3       talk to Rich about -- about coming in to

4       substitute, and I would answer the phone, and then

5       I would get Rich on the phone.  It -- again, it

6       seemed to me that that was an obvious assumption.

7  Q.  Okay.  So you thought that Steve Carpenter should

8       have assumed from the fact that you had recommended

9       that Rich be a substitute and the fact that he

10      would sometimes call for Rich and reach you on the

11      phone that you were in a same-sex sexual

12      relationship?

13  A.  That -- the fact that we were always together, that

14      we were -- yeah, we were seen as a couple.  One

15      other thing that I will add to that that just came

16      to mind.  I -- I do recall Steve saying, Do you

17      guys have plans for the holidays, or do you -- or

18      you guys have plans for -- for vacation?  That to

19      me is a comment that is made to couples.  It sounds

20      to me to be something that, you know, we are seen

21      as a unit and not as individuals, and that's how --

22      why I believe that.

23  Q.  How would Steve Carpenter know you were always

24      with -- together with Rich, as you said a moment

25      ago, "We were always together"?  How would Steve

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 260 of 406
JA0331

Lonnie Billard. Vol. II (8/17/17)

Page 260

1          Carpenter know that?

2   A.    Well, what I meant by "always together," that he

3          would come to the -- the school functions together

4          with me as spouses did with -- with their -- with

5          their prospective teachers.

6   Q.    If a teacher at Charlotte Catholic had a roommate

7          that they were not in a same-sex sexual

8          relationship with, would it be possible for that

9          roommate to come to school functions?

10  A.    Possible, I would -- I would assume so.

11  Q.    Would it be possible for two men who were roommates

12         and not in a same-sex sexual relationship to go on

13         vacation together?

14  A.    Possible, yes.

15  Q.    Would it be possible for two men who were in a --

16         who were roommates, but not in a same-sex sexual

17         relationship to attend holiday functions together?

18  A.    Yes.

19  Q.    Did you ever tell Steve Carpenter that you were in

20         a same-sex sexual relationship with Mr. Donham

21         prior to October of 2014?

22  A.    Did I use those words?  No.

23  Q.    Did you use other words that conveyed the same

24         meaning?

25  A.    No.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 261 of 406
JA0332

Lonnie Billard. Vol. II (8/17/17)

Page 261

1   Q.   Did you ever tell Jerry Healy that you were in a
2        same-sex sexual relationship with Mr. Donham?
3   A.   No.
4   Q.   Did you ever use other words that conveyed the same
5        meaning with Jerry Healy?
6   A.   No.  The words I used were inclusive of Rich:  Rich
7        and I are doing this.  Rich and I are going to do
8        that.  Rich and I bought this.  Rich and I bought a
9        new house.  Those are things that I would say that
10       I believe any rational person would make an
11       assumption on.
12  Q.   Okay.  And you thought based on, sort of, the whole
13       circumstance of you and Rich living together and
14       the fact that he would come to school functions
15       with you, that you might make plans together, that
16       Mr. Healy and Mr. Carpenter should assume that
17       you're in a same-sex sexual relationship together?
18                   MR. BROOK:  Objection to the
19            characterization and the testimony.
20  BY MR. DAVEY:
21   Q.   Is that -- is that an accurate characterization,
22        Mr. Billard?
23   A.   I think it's very simplistic, but, yes, to some
24        extent.
25

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 262 of 406
JA0333

Lonnie Billard. Vol. II (8/17/17)

1   Q.   Okay.  I just want to make sure I understand

2        everything that you think communicated to Mr. Healy

3        and Mr. Carpenter that you were in a same-sex

4        sexual relationship with Mr. Donham.  So is there

5        anything that you haven't told me about that you

6        believe they should have known of and that would

7        have led them to the conclusion that you were in

8        that type of a relationship?

9   A.   It is over a body of time, okay?  When you see the

10       same two people together, that sit together always

11       next to each other in the breakroom, that -- that

12       attend all functions together, that when you

13       have -- you have a -- a series of years where those

14       two people behave in public as a couple, I think it

15       is reasonable to assume that any thinking person

16       would come up with that.

17   Q.   Is there any other -- any other reasons that you

18       haven't told me about that you believe that

19       Mr. Healy and Mr. Carpenter should have been aware

20       that you were in a same-sex sexual relationship

21       with Mr. Donham?

22   A.   Not that I can think of.

23   Q.   I think you mentioned something about sitting

24       together in the breakroom.  Did I hear that right?

25   A.   Yes.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 263 of 406
JA0334

Lonnie Billard. Vol. II (8/17/17)

Page 263

```
 1   Q.   Okay.  Why would Rich be in the breakroom at
 2        Charlotte Catholic?
 3   A.   When he was subbing there.
 4   Q.   Okay.  You were both there on the same day working?
 5   A.   Yes.
 6   Q.   So tell me about that, when you were sitting
 7        together -- help me understand.  I've never been in
 8        the breakroom.  How is it set up, and where were
 9        you -- you know, where were you sitting and -- and
10        so forth?
11   A.   Okay.  Basically what you have is two, three long
12        tables (indicating), you know, like lunch tables if
13        you will.  They're not wide like this table here,
14        and they're lined on both sides with chairs.  It is
15        that area that is right outside of Steve's office,
16        Jerry's -- all -- all the administrative offices,
17        okay?  It's also where most all teachers, not all,
18        but most all teachers would come through there on
19        their way in to pick up their mail, to pick up
20        supplies, whatever that they needed.  Rich and I
21        would sit there with other teachers at those tables
22        and we would sit together and we would talk to
23        the -- whomever came in.
24   Q.   So when you say "sit together," were you sitting
25        like next to each other or across from each other,
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 264 of 406
JA0335

Lonnie Billard. Vol. II (8/17/17)

Page 264

1           or would you do both?

2    A.    Generally we -- in fact, I think always -- I don't

3           recall us sitting across from each other.

4    Q.    Okay.

5    A.    I -- we -- we went together, we sat together.

6    Q.    Okay.  Did you ever hold hands with Rich in public

7           at Charlotte Catholic High School?

8    A.    No.

9    Q.    Did you ever engage in any other kinds of physical

10          expressions of affection, like hugging or kissing

11          or anything of that nature?

12   A.    I have hugged him.

13   Q.    At Charlotte Catholic?

14   A.    Yes.

15   Q.    How many times has that occurred?

16   A.    I don't know.

17   Q.    Any other expressions of physical affection that --

18          that would have occurred between you and Rich at

19          Charlotte Catholic?

20   A.    No, that I can think of.

21   Q.    And same question about not just at Charlotte

22          Catholic, but at events in which administration of

23          Charlotte Catholic would have attended, like the

24          party that Jerry Healy threw, did you ever hold

25          hands with Rich at any events like that?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 265 of 406
JA0336

Lonnie Billard. Vol. II (8/17/17)

Page 265

```
 1   A.   At an all-school function, no, we -- I don't think
 2        we would have.
 3   Q.   And how -- how about other forms of physical
 4        affection, hugging or kissing or anything of that
 5        nature?
 6   A.   No.
 7   Q.   Did you ever invite anyone other than Rich to any
 8        Charlotte Catholic functions?
 9   A.   My son.
10   Q.   How many times did your son attend Charlotte
11        Catholic functions?
12   A.   Maybe two.
13   Q.   Anyone other than your son and -- and Rich that you
14        invited to Charlotte Catholic functions?
15   A.   My ex-wife came to -- to one of the musicals that I
16        invited her to.
17   Q.   Anybody else you recall?
18   A.   Not that I recall.
19   Q.   Were there functions that occurred where you were
20        there and Rich was not able to make it for some
21        reason?
22   A.   Yes.
23   Q.   Do you remember any specifically?
24   A.   Well, yeah.  Yesterday, I believe, when we were
25        talking about the plays and musicals and that kind
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 266 of 406
JA0337

Lonnie Billard. Vol. II (8/17/17)

1    of thing, I think I indicated to you that they ran

2    multiple nights, more than one night.  Rich did not

3    always attend every performance.  So, yes, there

4    would be times when I would -- I would be at a

5    function, like one of my plays, that -- that he

6    would not be there.

7  Q.  Do you recall if there were ever any times when you

8      had a play or a musical running on multiple days

9      that Rich came to successive days of the same

10     performance?

11 A.  I feel like, yes, that did happen, but I could not

12     tell you exactly when.

13 Q.  You don't recall for sure?

14 A.  No.

15 Q.  Okay.  Off the record just for a minute.  I just

16     need a real short break.

17     (RECESS TAKEN FROM 9:25 A.M. TO 9:34 A.M.)

18 BY MR. DAVEY:

19 Q.  Mr. Billard, how many times did Mr. Donham

20     substitute at Charlotte Catholic?

21 A.  I don't know.

22 Q.  Do you have a ballpark?  Five times?  Ten times?

23     Thirty times?

24 A.  Several.

25 Q.  Was it less than ten?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 267 of 406
JA0338

Lonnie Billard. Vol. II (8/17/17)

Page 267

```
 1   A.   I don't know.

 2   Q.   Okay.  Do you think it was less than 20?

 3   A.   I don't know.

 4   Q.   Less than 30?

 5   A.   I don't know how many times.  He was there, would

 6        seem to me, was a -- quite a few times, a lot, but

 7        I have no clue.  I didn't keep track of it.

 8   Q.   Okay.  Do you know if he -- all the -- did he

 9        substitute during more than one academic year?

10   A.   I don't think so, but I'm not positive.

11   Q.   Okay.  I had asked you about at the plays and the

12        musicals that -- and other functions that you

13        attended with Mr. Donham about, you know, physical

14        affection that may have been displayed.

15   A.   Uh-huh.

16   Q.   Was there a particular reason that you didn't hold

17        hands or engage in other forms of physical

18        affection at those events?

19   A.   We just don't do that.  It's not our nature.

20   Q.   And is it fair to say that if you did something

21        like that at a Charlotte Catholic event, that there

22        would probably be some people there who would

23        object to that?

24   A.   Say again.  I'm not sure I understood all your

25        question.  I'm sorry.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 268 of 406
JA0339

Lonnie Billard. Vol. II (8/17/17)

Page 268

1  Q.   Sure.  Is it fair to say that if you did something

2       like engage in physical display of affection with

3       Mr. Donham at a Charlotte Catholic event, that it's

4       likely there would be some people there at the

5       event who would object to that?

6                     MR. BROOK:  Objection, calls for

7            speculation.

8                     THE WITNESS:  I think, yes, but I

9            think that there would -- if I -- we did that

10           on the street here on North Tryon, they -- the

11           same thing.

12  BY MR. DAVEY:

13  Q.   Okay.  So is -- is that true, then, everywhere in

14       Charlotte, in your experience, that if you were to

15       engage in that kind of display of affection with

16       Mr. Donham, that anywhere in Charlotte you might

17       run into an objection to that?

18                    MR. BROOK:  Objection, calls for

19           speculation.

20                    THE WITNESS:  I think it's possible.

21  BY MR. DAVEY:

22  Q.   Does the potential that someone might object to

23       that kind of thing, did that have any influence on

24       whether you and Mr. Donham decided to engage in

25       that kind of activity?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 269 of 406
JA0340

Lonnie Billard. Vol. II (8/17/17)

Page 269

```
 1   A.   No.  I would not have -- neither of us would have
 2        done that, held hands, kissed, that kind of thing,
 3        in public and certainly not around students.
 4        It's -- I don't think it's students' business as to
 5        the -- the physical relationship between straight
 6        people or gay people.  I don't think you subject
 7        students to that.
 8   Q.   I had asked you -- we talked about who in
 9        administration you believe knew about your same-sex
10        sexual relationship with Mr. Donham.
11   A.   Yes.
12   Q.   Do you believe there was anyone in any position of
13        authority within the Diocese other than Jerry Healy
14        and Steve Carpenter that you told me about who was
15        aware before October 2014 that you were in a
16        same-sex sexual relationship with Mr. Donham?
17   A.   I have no reason to think that.
18   Q.   Let me show you what I've marked as Exhibit 20.
19        (EXHIBIT NUMBER 20 WAS MARKED FOR IDENTIFICATION)
20   BY MR. DAVEY:
21   Q.   I'll ask you to take a look at that.  Tell me if
22        you recognize it.
23                   (WITNESS REVIEWS DOCUMENT)
24   A.   Okay.
25   Q.   It looks like, excuse me, Exhibit 20 is a copy of a
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 270 of 406
JA0341

Lonnie Billard. Vol. II (8/17/17)

Page 270

1          Facebook post that you posted on January 18, 2015;

2          is that correct?

3     A.   Yes.

4     Q.   Okay.  The -- the post starts off by saying, This

5          is the week that was, then there's a colon, and it

6          says, I learned that truth must not be a Catholic

7          core value based on what Mr. Hains had to say about

8          me.

9               Did I read that correctly?

10    A.   You did.

11    Q.   What does that mean?

12    A.   I recall -- I -- I don't recall his exact words,

13         but when he was interviewed by one of the

14         television stations, I -- I recall him saying

15         something that I felt was -- was not really about

16         me or -- or who I truly am.

17    Q.   Okay.  Now -- and I know you don't recall the exact

18         words, but do you remember the substance of what

19         his comment was about?

20    A.   It seemed to me, if I recall it correctly, it -- it

21         was demeaning, that, you know, made me think that I

22         was being blown off, like who is this guy?

23    Q.   If you look back to Exhibit 20 and go down a little

24         farther in the post near the end, it says, I will

25         continue to fight.  Do you see that?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 271 of 406
JA0342

Lonnie Billard. Vol. II (8/17/17)

Page 271

1   A.   I do.

2   Q.   (Reading)

3            I will continue to fight and tell

4        the story.  I will continue to work

5        against discrimination in any form,

6        from any institution, especially the

7        church, but I will limit what I post on

8        here so my teacher friends can talk to

9        me without fear of reprisal.

10  A.   Yes.

11  Q.   Can you explain what you meant by that last part,

12       But I will limit what I post on here so my teacher

13       friends can talk to me without fear of reprisal?

14  A.   Yes.  I was told by -- I can -- I know -- I'm

15       trying to remember exactly who, okay?  I

16       know it -- I know I was told by Joan Stretch that

17       teachers had been warned about what -- you know,

18       how they responded to me on Facebook, that it

19       was -- you know, they should not be seen -- and I'm

20       paraphrasing, but -- they should not be seen in

21       support of my marriage because that would be

22       against the Catholic teaching.

23  Q.   Anything else that you meant by this statement here

24       that we just talked about in Exhibit 20?

25  A.   No, it was -- it was -- I did not -- yeah, that's

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 272 of 406
JA0343

Lonnie Billard. Vol. II (8/17/17)

Page 272

```
 1        essentially it, that they would not get in trouble
 2        by being -- by -- by feeling that they needed to
 3        respond to me in a positive way.
 4    Q.  Okay.  Now, this information that Joan Stretch
 5        provided you about a warning to teachers, when did
 6        she tell you that?
 7    A.  When?  I don't -- it would have been sometime
 8        before that post, but I don't recall the date.
 9    Q.  You -- do you remember the specific conversation in
10        which she conveyed that information?
11    A.  Specific conversation?  No.  I know -- we talk
12        often, so I don't recall which conversation it came
13        up in.
14    Q.  Now, this warning she told you about to teachers
15        about their Facebook interactions with you, did she
16        tell you who gave that warning?
17    A.  It was a faculty meeting, so I would assume either
18        Mr. Telford or Mr. Carpenter, but I don't know
19        that.
20    Q.  Did she tell you that the warning was issued during
21        a faculty meeting?
22    A.  That's how I understood it, yes.
23    Q.  Okay.  And -- and recognizing that was your
24        understanding, do you remember if she actually told
25        you that, or was that just your understanding taken
```

Lowrance Reporting Service, Inc.
704-543-7995   www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 273 of 406
JA0344

Lonnie Billard. Vol. II (8/17/17)

Page 273

1    away from the conversation?

2  A.  I think I'll -- I'll have to stick with my

3       understanding.  For some reason, I -- I have in my

4       head we were told of the meeting today, but I don't

5       know that that's accurate.

6  Q.  Okay.  Okay, that's fair.

7           And if I understood you right, if it took place

8       in the context of a faculty meeting, you would

9       assume that either Mr. Telford or Mr. Carpenter

10      would have been the one telling teachers about

11      this; is that correct?

12 A.  That -- that would be my assumption.

13 Q.  Okay.  But you don't actually know who did it,

14      right?

15 A.  I do not.

16 Q.  Do you know what -- the words that were used with

17      respect to what teachers could and couldn't do in

18      terms of their Facebook interactions with you?

19 A.  I -- as I recall the conversation, it -- it was

20      not, Be careful what you say to Lonnie Billard,

21      okay?  It was a more, In light of recent events,

22      you need to be careful what you say and how you

23      respond type thing.  So it was -- it was a general

24      admonition that seemed to be, from way I took it --

25      you know, if not directed at me, it was

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 274 of 406
JA0345

Lonnie Billard. Vol. II (8/17/17)

Page 274

```
 1         precipitated by what I had done.
 2    Q.   Okay.  So it sounds like what you're saying is that
 3         it was a -- you understood it to be a admonition
 4         relating to social media use for teachers; is that
 5         fair?
 6    A.   Yes.
 7    Q.   Okay.  And did you have an understanding that your
 8         name was used specifically in the context of that
 9         faculty meeting?
10    A.   No, I don't believe it was.
11    Q.   Okay.  But your understanding was or at least your
12         inference was that it might have been motivated by
13         the -- what had recently occurred in terms of your
14         Facebook post and the events that followed?
15    A.   Yes.
16    Q.   Did anyone tell you they couldn't be Facebook
17         friends with you anymore after you announced your
18         marriage to Mr. Donham?
19    A.   Yes.
20    Q.   Who was that?
21    A.   Joel Broderick.
22    Q.   Who is Joel?
23    A.   A person I knew from Missouri.
24    Q.   Okay.  And he -- I assume, then, he was not acting
25         at the behest of anyone at Charlotte Catholic or at
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 275 of 406
JA0346

Lonnie Billard. Vol. II (8/17/17)

Page 275

1         the Diocese?

2    A.   No.

3    Q.   Okay.

4    A.   No.

5    Q.   Anyone else?

6    A.   Not that I'm aware of.

7    Q.   Did you notice any change in the interactions you

8         had on Facebook with anyone who worked at Charlotte

9         Catholic or for the Diocese after you announced

10        your marriage to Mr. Donham?

11   A.   Any change?

12   Q.   Right.  So I'm on Facebook a little bit.  You know

13        how you can go on there and post, and people might

14        like something you did or they might write comments

15        or maybe they'll send you messages, and -- and what

16        I'm trying to get at is whether, you know, that

17        sort of pattern of interaction that you may have

18        had with somebody before you announced your

19        marriage, did -- did you notice any changes in the

20        way you interacted with anyone on Facebook after

21        you had made that announcement?

22   A.   Not initially.  I -- I can only -- and I can only

23        think of a couple of people that over time have --

24        I've kind of lost track of, but no, nothing in

25        particular.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 276 of 406
JA0347

Lonnie Billard. Vol. II (8/17/17)

Page 276

1   Q.   Let me show you what I've marked as

2        Exhibit Number 21.

3   A.   All right.

4      (EXHIBIT NUMBER 21 WAS MARKED FOR IDENTIFICATION)

5  BY MR. DAVEY:

6   Q.   Do you recognize Exhibit 21?

7   A.   I do.

8   Q.   And Exhibit 21 is a copy of the complaint that was

9        filed on your behalf in this lawsuit.  Is that your

10       understanding?

11   A.   That's correct.

12   Q.   Did you review this complaint before it was filed?

13   A.   I did.

14   Q.   All right.  And as I understand it, your claim in

15        this case is that you were discriminated against on

16        the basis of sex in violation of Title VII; is that

17        accurate?

18   A.   That's correct.

19   Q.   Is that the only claim you're making in this

20        lawsuit?

21   A.   Yes.

22   Q.   Who -- who do you contend discriminated against you

23        on the basis of sex?

24   A.   Whomever it was that made the decision to fire me.

25               MR. BROOK:  I'm going to object to the

Lowrance Reporting Service, Inc.
704-543-7995   www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 277 of 406
JA0348

Lonnie Billard. Vol. II (8/17/17)

Page 277

```
 1              extent that that calls for a legal conclusion
 2              as well.
 3                    MR. DAVEY:  Okay.
 4   BY MR. DAVEY:
 5   Q.   Anybody else, Mr. Billard?
 6   A.   No.
 7   Q.   Look with me, if you would, at Paragraph 33 of
 8        Exhibit 21, which is on the page --
 9   A.   I'm sorry, I've lost you.
10   Q.   Sorry.  Paragraph 33 of Exhibit 21.  It's on the
11        page labeled CCHS 7.  Are you with me there,
12        Mr. Billard?
13   A.   I'm on page 7, CCHS 7.
14   Q.   Yep.  Do you see Paragraph 33 there?
15   A.   I do.
16   Q.   All right.  It says:  (Reading)
17                 Defendants terminated Plaintiff
18              because he associated with another man.
19               Do you see that?
20   A.   I see that.
21   Q.   What's the basis for that allegation?
22                    MR. BROOK:  Objection to the extent
23              that that calls for a legal conclusion.
24                    THE WITNESS:  "Defendant terminated
25              Plaintiff because he is associated with another
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 278 of 406
JA0349

Lonnie Billard. Vol. II (8/17/17)

Page 278

1              man," what that means to me is that -- that I
2              was in a romantic relationship with another
3              man.
4    BY MR. DAVEY:
5     Q.   Okay.  So "associated" here means in a romantic
6          relationship with?
7     A.   That would be my take.
8     Q.   Okay.
9                   MR. BROOK:  Same objection to that
10         question.
11   BY MR. DAVEY:
12    Q.   Look with me, if you would, in Paragraph 34 here in
13         Exhibit 21.  It says:  (Reading)
14              Defendants terminated Plaintiff
15            because he did not conform to sex-based
16            stereotypes associated with men in our
17            society.
18         Do you see that there?
19    A.   I do.
20    Q.   What's the basis for that allegation?
21                   MR. BROOK:  Same objection.  And,
22              again, it's calling for -- objecting to the
23              extent that it calls for him to --
24                   MR. DAVEY:  I'm -- I'm interested in
25              the factual basis.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 279 of 406
JA0350

Lonnie Billard. Vol. II (8/17/17)

Page 279

1  BY MR. DAVEY:

2   Q.   So Mr. Billard, what's the factual basis for your

3        allegation here in Paragraph 34?

4   A.   "The Defendant terminated the Plaintiff because he

5        does not conform to sex-based stereotypes

6        associated with men in our society" to me means I

7        do not conform to the typical heterosexual

8        relationship as -- as the -- as a role -- as the

9        only role of a man.

10  Q.   Okay.  Any other ways in which you do not conform

11       to sex-based stereotypes associated with men in our

12       society?

13                 MR. BROOK:  Same objection.

14                 THE WITNESS:  Not that I can think of.

15  BY MR. DAVEY:

16  Q.   Okay.  Look with me at the -- at page -- or, excuse

17       me, Paragraph 35 of Exhibit 21.  It says:

18       (Reading)

19            Defendants discriminated against

20          Plaintiff -- sorry, Defendants

21          discriminated against Plaintiff on the

22          basis of sex.

23           Do you see that there?

24  A.   I do.

25  Q.   What's the factual basis for that allegation?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 280 of 406
JA0351

Lonnie Billard. Vol. II (8/17/17)

Page 280

1   A.   To me, what that was is that -- and I believe I
2        mentioned this yesterday -- is that when I posted
3        the fact that Rich and I were getting married,
4        within a week a -- another teacher, Jessica Miller,
5        posted that she was getting married on Facebook.
6        So with -- within a very short period of time, both
7        of us announced our engagements on Facebook.  I was
8        terminated, she was not.  To me, that's sex
9        discrimination.
10  Q.   Is there any other factual basis for the allegation
11       of sex discrimination here in Paragraph 35?
12  A.   Not that I can think of right now.
13                  MR. BROOK:  Court Reporter, could you
14           read back that last question that was asked by
15           Mr. Davey?
16       (PREVIOUS QUESTION READ BACK BY THE REPORTER)
17  BY MR. DAVEY:
18  Q.   Mr. Billard, what remedies are you seeking in this
19       lawsuit?
20                  MR. BROOK:  Again, I'm going to object
21           as it calls for a legal conclusion, but you can
22           answer.
23                  THE WITNESS:  For this -- I don't --
24           I'm a teacher, and I'm a damn good teacher,
25           and there -- and I make a difference in

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 281 of 406
JA0352

Lonnie Billard. Vol. II (8/17/17)

```
 1              students' lives, and it has nothing to do with
 2              whom I sleep or whom I'm married to.  I don't
 3              teach Catholic doctrine.  I don't also go
 4              against Catholic doctrine.  I teach
 5              individuals, and I want to be a teacher.  I
 6              believe that has been -- I know that that has
 7              been taken away from me, and I find that so
 8              completely unfair that something that has
 9              absolutely nothing to do with how I perform my
10              job is the basis for me being fired.  If I was
11              a lousy teacher, if I said things to students
12              or -- or behaved in ways that -- that would be
13              detrimental to students, I -- I could
14              understand that, but I didn't do that.  I
15              express love.  And I did not even express that
16              love to my students.  So I want to be a
17              teacher.  That's where I was headed with that.
18    BY MR. DAVEY:
19      Q.   Okay.  Are there any other remedies that you're
20           seeking in this lawsuit?
21                   MR. BROOK:  Same objection.
22                   THE WITNESS:  I know we've talked -- I
23           don't recall exactly what it says in the -- in
24           the document in the filing, okay?
25
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 282 of 406
JA0353

Lonnie Billard. Vol. II (8/17/17)

Page 282

```
 1   BY MR. DAVEY:

 2    Q.   Okay.

 3    A.   I'm sorry.

 4    Q.   And you -- okay.  So you -- are you -- can you

 5         think of any other remedies that you're seeking in

 6         this lawsuit as you sit here right now?

 7    A.   Not off the top of my head.

 8    Q.   Between yesterday and what we've talked about this

 9         morning, have you told me all of the reasons that

10         you believe you were discriminated against by the

11         Diocese?

12              Well, let me rephrase that.  Between what we

13         talked about yesterday and we talked about this

14         morning, have you told me all of the reasons you

15         believe you were discriminated against by the

16         Defendants in this lawsuit?

17    A.   I believe I have.

18    Q.   Are there any Charlotte Catholic High School

19         students who have access to you on Facebook?

20    A.   Current students?

21    Q.   Yes.

22    A.   Or -- no, current students, no.

23    Q.   Okay.  Former students?

24    A.   Former students, yes.

25    Q.   How about in October of 2014?  Were there any
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 283 of 406
JA0354

Lonnie Billard. Vol. II (8/17/17)

Page 283

1      Charlotte Catholic students who had access to you
2      on Facebook?
3    A.  I don't believe so, no.
4    Q.  Do you know if friends of your Facebook friends can
5      see your posts on Facebook?
6    A.  I don't know.
7    Q.  Do you know if your Facebook is open to the public,
8      generally?
9    A.  I -- I know that -- I'm trying to remember how
10      that -- that security setting thing, is what I'm
11      trying to recall.  And I believe it -- yeah, it
12      says -- I think when you open that it says who can
13      see your post, and it's friends and friends of
14      friends or just friends, and I think there's an
15      option for groups or something like that, and mine
16      is friends.
17    Q.  Okay.  And was that the case in 2000 -- in October
18      of 2014?
19    A.  I believe so, yes.
20    Q.  Are you -- were you Facebook friends in October of
21      2014 with anyone who was a relative of a current
22      student at Charlotte Catholic?
23    A.  When you -- let me ask -- can I ask a clarifying
24      question?
25    Q.  Sure.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 284 of 406
JA0355

Lonnie Billard. Vol. II (8/17/17)

Page 284

1   A.   When you say "current," are you talking current of

2        that period?

3   Q.   Right.  That's a fair question.  So what I'm

4        getting at is whether in October of 2014 you were

5        Facebook friends with anybody who was a relative of

6        someone who at that time was a student at Charlotte

7        Catholic?

8   A.   I was.

9   Q.   Do you know who those people were?

10  A.   I -- I know some of them I can recall.  They were

11       parents of students that I had had in class that

12       had sent me a -- a friends request.  Mr. and Mrs.

13       Wilson, Dr. and Mrs. Hedrick, the Summers, the

14       Cahills, the Brices, the Townsends, the Mancowskis,

15       the Myricks.  There's more, and I -- it's all I can

16       think of right now.

17  Q.   Okay.  But there were others that you can't recall

18       just sitting here right now?

19  A.   That's correct.

20  Q.   Do you have an estimate of how many Facebook

21       friends you had in October of 2014 who were parents

22       of then current students?

23  A.   An estimate would be somewhere in the upper teens

24       to 20.

25  Q.   Okay.  It's my understanding that since you stopped

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 285 of 406
JA0356

Lonnie Billard. Vol. II (8/17/17)

Page 285

```
 1          serving as a substitute at Charlotte Catholic in
 2          2014, that you've not sought any other employment;
 3          is that accurate?
 4    A.    That is correct.
 5    Q.    Okay.  Why not?
 6    A.    Okay.  If you will recall in our conversation
 7          yesterday, I felt like -- I told you that I needed
 8          to be sure that I could relate to the kids and be
 9          relevant to them.
10    Q.    Uh-huh.
11    A.    Okay?  In order to do both of those things, it
12          takes a lot of time and a lot of effort, and it is
13          not something that can be done in a normal
14          substituting situation in my -- in my opinion.
15    Q.    Okay.
16    A.    Okay?  That's why I was in the classroom.  I wasn't
17          in the classroom to hand out papers.  I wasn't in
18          the classroom to say sit down and shut up.  I was
19          in the classroom to teach.  And if I'm not in a
20          situation where I can be relevant and I can relate,
21          then I don't see the point of doing it, and I don't
22          see how you do that in a substituting situation
23          based on a day here, a day there.
24    Q.    Okay.  So if I've understood you, then, you -- you
25          reached the conclusion that you couldn't achieve
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 286 of 406
JA0357

Lonnie Billard. Vol. II (8/17/17)

Page 286

1          the goals that you had for teaching, you know, to

2          be relevant to the -- to the students through the

3          kind of substitute teaching work that was going to

4          be available at Charlotte Catholic; is that fair?

5     A.   That would be available outside of Charlotte

6          Catholic or at --

7     Q.   Well, my question was at Charlotte Catholic.  Does

8          that make sense?

9     A.   No, it doesn't.  I'm sorry.

10    Q.   That's all right.  I'll try again.

11              So if I'm understanding you right, it sounds

12         like you're saying you had come to the conclusion

13         that through the substitute teaching you were going

14         to be able to do at Charlotte Catholic, that was

15         not going to achieve the goals you had for teaching

16         in terms of relevance to the students and so forth;

17         is that accurate?

18    A.   That's correct.

19    Q.   Okay.  Let me show you another exhibit.  Let me get

20         the right one here.

21     (EXHIBIT NUMBER 22 WAS MARKED FOR IDENTIFICATION)

22  BY MR. DAVEY:

23    Q.   This is what I've marked as Exhibit 22.  Do you

24         recognize Exhibit 22, Mr. Billard?

25    A.   I have seen this, yes.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 287 of 406
JA0358

Lonnie Billard. Vol. II (8/17/17)

Page 287

 1   Q.   This is a copy of the Responses to the Defendants'
 2        First Set of Interrogatories that were served by
 3        you in this lawsuit; is that correct?
 4   A.   Yes.
 5   Q.   Okay.  Look with me, if you would, at the third
 6        page of the exhibit.
 7   A.   Wait a minute.  Make sure.  Hold on.  Okay.
 8   Q.   And this page is actually an answer to a question
 9        that appears at the bottom of the second page.
10        Look with me at the second page.  Do you see
11        Interrogatory Number 1 there?
12   A.   I see it.
13   Q.   It says:  (Reading)
14             Identify all persons who have,
15          claim to have, or whom you believe may
16          have knowledge or information relating
17          to any fact alleged in the pleadings in
18          this action, any fact related to the
19          subject matter of this action, or any
20          element of the damages you seek in this
21          action.
22            Did I read that much of it correctly?
23   A.   You did.
24   Q.   Okay.  And then do you understand, then, that on
25        page 3 of Exhibit 22, the list of names here, those

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 288 of 406
JA0359

Lonnie Billard. Vol. II (8/17/17)

Page 288

```
 1          are individuals that were identified by -- by you
 2          as individuals who may have information relevant to
 3          this lawsuit?
 4    A.    Yes.
 5    Q.    Okay.  So I want to ask you about what you think
 6          some of these folks know.  You're -- you're listed
 7          there and I've asked you a lot of questions, so
 8          I'll skip over you.
 9    A.    Okay.
10    Q.    But Mr. Donham, what do you -- what information
11          does Mr. Donham have that's relevant to this
12          lawsuit that you know about?
13    A.    He knows the basis of the lawsuit.  He knows that I
14          have used our relationship as an example of -- of
15          this.  I mean, he certainly knows my frustrations
16          with the whole thing.  He -- yeah.  But as far as
17          the lawsuit is concerned, he knows the gist, but
18          he's -- I mean, he's not seen this stuff
19          (indicating).
20    Q.    Okay.  Now, you said -- you said -- I think you
21          said, "He knows that I have used our relationship
22          as an example of this."
23    A.    I said that, yes.
24    Q.    What do you mean by that?
25    A.    The fact that we were together all the -- you know,
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 289 of 406
JA0360

Lonnie Billard. Vol. II (8/17/17)

Page 289

1          at so many different functions, that -- that we
2          were -- we were -- we were together.  We were
3          at -- you know, he was at -- at my functions.  He
4          came to my -- my -- to the parties, to the stuff
5          like that.  That's what I'm talking about.
6    Q.    Okay.  So I -- is what you're saying, then, that
7          he -- he knows that in this case you have asserted
8          that because he came to various functions at
9          Charlotte Catholic that folks in the administration
10         and others were aware of your relationship?
11                    MR. BROOK:  Objection in regards to
12             how he characterizes the testimony.
13                    THE WITNESS:  That would be accurate.
14   BY MR. DAVEY:
15   Q.    Okay.  I just -- I just want to make sure I
16         understand the -- the point there.
17             Is there anything else that -- that Mr. Donham
18         knows that's relevant to this case?
19   A.    I can't think of anything.
20   Q.    Okay.  Going back to Exhibit 22, the next name here
21         is Steve Carpenter.  Do you see that?
22   A.    Yes.
23   Q.    Have you told me everything that you know that you
24         believe Mr. Carpenter knows that's relevant to the
25         lawsuit?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 290 of 406
JA0361

Lonnie Billard. Vol. II (8/17/17)

Page 290

1   A.   I believe so.

2   Q.   Okay.  How about Mr. Telford?  Have you told me

3        everything that you think Mr. Telford knows that's

4        relevant to this case?

5   A.   I believe so.

6   Q.   Okay.  The next name on here is Dr. Janice Ritter?

7   A.   Yes.

8   Q.   What information do you believe Dr. Ritter has

9        that's relevant to this case?

10  A.   The fact that she -- you know, that she's

11       superintendent of the schools, I -- I cannot

12       imagine any -- any scenario in which she would not

13       have been consulted in this.

14  Q.   Okay.  So you believe she would have been

15       consulted.  And when you say "in this," are you

16       talking about --

17  A.   In --

18  Q.   -- in terms of your --

19  A.   In my termination.

20  Q.   Okay.  And sounds like that is your, you know,

21       assumption about what would have happened, that you

22       don't actually know if she was consulted; is that

23       fair?

24  A.   That's correct.

25  Q.   Okay.  Is there any other information you believe

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 291 of 406
JA0362

Lonnie Billard. Vol. II (8/17/17)

1      that Dr. Ritter has relevant to this case?

2                  MR. BROOK:  I'm going to object to

3           that question as calling for a legal

4           conclusion.  I'm going to object to this entire

5           line of questioning about relevance along the

6           same grounds.

7                  THE WITNESS:  Ask again, please.

8    BY MR. DAVEY:

9    Q.    Is there any other information other than what you

10         told me about that you believe Dr. Ritter has

11         that's relevant to the lawsuit?

12   A.    No.

13   Q.    The next name here in Exhibit 22 is Monsignore

14         Mauricio West?

15   A.    Yes.

16   Q.    Do you see that?

17             Who is Monsignore West?

18   A.    Monsignore West is General Vicar of the Diocese.

19         He's -- he is a -- a counselor and aide to the

20         Bishop.

21   Q.    Have you ever met Monsignor West?

22   A.    Oh, yes.

23   Q.    What information do you believe Monsignore West has

24         that is relevant to the lawsuit?

25   A.    During my tenure with Charlotte Catholic, there was

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 292 of 406
JA0363

Lonnie Billard. Vol. II (8/17/17)

Page 292

1          very little that -- that went on that regarded

2          policy, procedure, anything like that that Father

3          West was not a part of.

4     Q.   Okay.  Anything else that you believe -- any other

5          information that you believe he has that's relevant

6          to the lawsuit?

7     A.   Not that I'm aware of.

8     Q.   The next name on here is David Hains?

9     A.   Yes.

10    Q.   Have you ever met Mr. Hains?

11    A.   Not in person.

12    Q.   Have you ever talked to him on the phone?

13    A.   I'm not sure -- no, I don't believe I have, so, no,

14         I don't -- I have not met him, period.

15    Q.   What information do you believe Mr. Hains has

16         that's relevant to this lawsuit?

17    A.   Well, being the spokesperson of the Diocese, that

18         after the -- after I -- I had contacted the NBC

19         affiliate here and my story aired, he was -- he was

20         the person who spoke for the Diocese.  So I believe

21         that by him being in that position, he would have

22         information about it.

23    Q.   Okay.  Is there anything else that you believe --

24         any other information, rather, that you believe

25         Mr. Hains may have relevant to the -- to the

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 293 of 406
JA0364

Lonnie Billard. Vol. II (8/17/17)

Page 293

```
 1        lawsuit?
 2   A.   Not that I'm aware of.
 3   Q.   The next name in Exhibit 22 is Mary Jane Dawson.
 4        Do you -- what information do you believe
 5        Ms. Dawson has that's relevant to this lawsuit?
 6   A.   I believe that she knew of my relationship with
 7        Rich, okay?  I believe that she -- she knew the
 8        circumstances under which the decision was made to
 9        fire me.
10   Q.   Sorry, were you finished?
11   A.   I -- I was done.
12   Q.   Okay.  What's the basis for your belief that she's
13        aware of the circumstances under which the decision
14        was made?
15   A.   Because of past times where I -- I believe I've
16        seen that happen where she would be consulted on
17        stuff.
18   Q.   And are you talking about past instances where she
19        was consulted on a decision about whether to -- to
20        terminate someone's employment?
21   A.   No, I -- I don't know about termination, but about
22        the circumstances of someone, if they -- yeah, if
23        they were -- if they were in a position to possibly
24        need counseling or to be -- not counseling.  Bad
25        word.  Let me change that.  Need advice.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 294 of 406
JA0365

Lonnie Billard. Vol. II (8/17/17)

 1  Q.  Okay.  So it sounds like what you're saying is that
 2      you're aware of circumstances in the past where
 3      someone might need advice and Ms. Dawson would be
 4      consulted; is that fair?
 5  A.  That -- that's my understanding, yes.
 6  Q.  Okay.  And so is what you're saying, then, that
 7      you -- you think that might have been the case in
 8      your situation as well?
 9  A.  Yes, I -- that I -- I guess I'm going under the
10      fact that I typically -- I believe that past
11      behavior predicts future performance.
12  Q.  Okay.
13  A.  Okay?  So --
14  Q.  Gotcha.  No, that's fine.  Yeah, and I understand
15      what you're saying.  So I think you're saying that
16      just -- it seemed to you that the way it worked in
17      the past was she was consulted, so you would assume
18      that that would have happened here?
19  A.  That is correct.
20  Q.  Okay.  Did anyone ever tell you that Ms. Dawson was
21      consulted with respect to your situation?
22  A.  They did not.
23  Q.  The next name on the list here in Exhibit 22 is
24      Colin Wilson?
25  A.  That's correct.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 295 of 406
JA0366

Lonnie Billard. Vol. II (8/17/17)

Page 295

```
 1    Q.   Who's -- who is Mr. Wilson?

 2    A.   Colin was a former student of mine, had him for

 3         four years in a variety of different classes.  He

 4         also performed in, I believe, every play and

 5         musical while he was a student.  Highly gifted

 6         young man.

 7    Q.   And what information do you believe that Mr. Wilson

 8         has that's relevant to the lawsuit?

 9    A.   Well, what I -- what it says here is "knowledge

10         regarding the Plaintiff's performance of his job

11         duties."  And that -- what -- Colin

12         would -- because he was in so many classes of mine

13         and also in so many extracurricular things that

14         I -- that I was responsible for, he would have a

15         good perspective on how well I performed my job.

16         Colin, when I won the teacher of the year, the

17         letter that was read as an example of my nomination

18         was one that Colin wrote.

19    Q.   Is there any other information you believe Colin

20         would have relevant to this lawsuit?

21    A.   No.

22    Q.   And then the last name on Exhibit 22 is on the next

23         page.  It's Grant Hedrick?

24    A.   Grant Hedrick.

25    Q.   And who's Grant Hedrick?
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 296 of 406
JA0367

Lonnie Billard. Vol. II (8/17/17)

Page 296

1   A.   Grant is a classmate of Colin much in the same --

2        much the same kind of kid that was in many of my

3        classes, I believe all if not most of the plays,

4        same thing.  He also, I'm told -- or he told me,

5        okay, that he -- he was one of the people that

6        nominated me for teacher of the year.

7   Q.   Okay.  And what information do you think that

8        Colin -- or, excuse me, that Grant Hedrick has

9        that's relevant to this lawsuit?

10  A.   I think it -- no, it's -- it's not relevant to the

11       lawsuit.  It's relevant to my job duties.

12  Q.   Okay.  Is there anyone else other than the folks on

13       this list here in Exhibit 22 that you think has

14       information that's relevant to the lawsuit?

15              MR. BROOK:  Same objection that I

16          previously made.  Continue.

17              THE WITNESS:  I -- nobody comes to

18          mind right now.

19  BY MR. DAVEY:

20  Q.   Okay.  You mentioned the teacher-of-the-year award.

21       When did you win that?

22  A.   The final year of my full-time employment.

23  Q.   Would that have been 2012?

24  A.   '12, I believe.

25  Q.   Okay.  Is that something that's awarded at the end

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 297 of 406
JA0368

Lonnie Billard. Vol. II (8/17/17)

Page 297

1        of the year?

2   A.   I can't hear.

3   Q.   Is that award that's given out at the end of the

4        academic year?

5   A.   Yeah.  There -- the -- the seniors of each class

6        would have the opportunity to write or typically

7        write, but in some way nominate teacher -- a

8        teacher because they felt that the teacher was an

9        excellent teacher, okay?  And I won that my final

10       year.

11  Q.   Do you know how many teachers were nominated for

12       the award that year?

13  A.   Specifically, no, I do not.

14  Q.   Do you have a general idea?

15  A.   Yes.

16  Q.   How many?

17  A.   About seven or eight.

18  Q.   Okay.  And what's that based on?

19  A.   What's what based on?

20  Q.   Your -- your belief that there were seven or eight

21       nominations, what's that based on?

22  A.   Sure.  At the -- at the -- at the -- the award is

23       given at graduation, as part of the graduation

24       ceremonies.  The following -- the following

25       graduation ceremonies, within so many days, a few

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 298 of 406
JA0369

Lonnie Billard. Vol. II (8/17/17)

1    days, there will be a final faculty meeting of the
2    year.  And at that faculty meeting, Mr. Healy --
3    this award was only given while he was principal.
4    I don't know what they're doing now, but --
5  Q.  Okay.
6  A.  Okay?  Mr. Healy would announce all of the teachers
7    that were nominated --
8  Q.  Okay.
9  A.  -- and give them the copies of the letters or the
10   document or whatever it was that the student
11   submitted to nominate them.
12 Q.  Okay.  So you heard at the graduation ceremony the
13   other teachers being identified who had been
14   nominated?
15 A.  Not at the graduation ceremony, at the faculty
16   meeting that followed the graduation ceremony
17   within several days.
18 Q.  Gotcha.  Thank you.
19       You remember yesterday I asked you about
20   examples of other teachers or employees at
21   Charlotte Catholic who might have been doing things
22   that violated church teaching and where no action
23   was taken against them?  Do you remember those
24   questions?
25 A.  I do.

Lowrance Reporting Service, Inc.
704-543-7995   www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 299 of 406
JA0370

Lonnie Billard. Vol. II (8/17/17)

Page 299

```
 1    Q.    Okay.  I want to ask a similar question, of whether
 2          you're aware of anybody who was employed at
 3          Charlotte Catholic who did something that violated
 4          church teaching and you're aware that some action
 5          was taken against that person?
 6    A.    I'm not aware of that.
 7    Q.    Okay.  Let me go off the record for just a minute.
 8          I don't think I have a lot more, but I just want to
 9          look at my notes.
10          (RECESS TAKEN FROM 10:17 A.M. TO 10:31 A.M.)
11   BY MR. DAVEY:
12    Q.    Mr. Billard, I've asked you a lot of questions
13          yesterday and today.  I want to make sure I've
14          heard from you every -- everything that you think
15          supports your case against the Defendants here.  So
16          is there anything that you haven't told me about
17          that you think I should know that's part of the
18          reason why you believe you should prevail in this
19          lawsuit?
20                 MR. BROOK:  Again, I'm going to object
21             as it calls for a legal conclusion.
22                 THE WITNESS:  I suppose this may be
23             the only time I get to say this, so I'm going
24             to say it, okay?  I believe that -- I believe
25             that -- that I was wronged.  I believe that it
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 300 of 406
JA0371

Lonnie Billard. Vol. II (8/17/17)

```
 1              hurt me -- I know it hurt me, devastated me,
 2              but it also hurt future students and other
 3              people.  It is -- you know, that -- that we
 4              have -- when I say "we," in any particular
 5              institution, whether it be a governmental or
 6              legal or religious or whatever, you know, it
 7              becomes more about what -- what that paragraph
 8              means versus what is the reality of living that
 9              paragraph.  And I think that that -- when --
10              when those types of things happen, arbitrary
11              decisions are made.  They are made not -- not
12              in the interest necessarily of the student or
13              in the interest of furthering a kid's education
14              or in building character so that they become
15              strong members of a community, whatever that
16              community turns out to be.  It's done for other
17              reasons, and to me that's wrong.  And I know
18              that there are -- you know, with all this legal
19              minds around here, there are lots of ways to
20              explain it legally, but I'll be damned if I can
21              see how it can be explained morally, and that's
22              all I have to say.
23    BY MR. DAVEY:
24     Q.   Okay.  So -- and I appreciate that.  And just to
25          close it out, is there anything else that you
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 301 of 406
JA0372

Lonnie Billard. Vol. II (8/17/17)

1          haven't told me about between all the questions

2          I've asked and what you just relayed that you think

3          supports your claims in the case?

4   A.    I can't think of anything, Josh.

5   Q.    Okay.  Your lawyers had asked some questions in

6          this case about an assembly that took place with

7          Sister Jane Dominique?

8   A.    The assembly that she conducted?

9   Q.    Yeah.

10  A.    I recall that.

11  Q.    Do you think that assembly and what happened around

12         that assembly has any bearing on this lawsuit?

13                  MR. BROOK:  I'm going to object to the

14             extent that that calls for a legal conclusion

15             as well.

16                  THE WITNESS:  Oh, first of all, I was

17             not in attendance, so what I -- she came, did

18             her thing.  I was a substitute at that point.

19             I wasn't a full-time teacher, and I was not

20             scheduled to work that day.  So I know what was

21             said to me.

22                  And how she -- how -- what -- what I

23             understand she said would certainly support --

24             I believe would support the decision to fire

25             me, but I don't have any indication that it was

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 302 of 406
JA0373

Lonnie Billard. Vol. II (8/17/17)

Page 302

1              a -- an actor in the process.

2   BY MR. DAVEY:

3     Q.   Okay.

4     A.   Am I answering that?

5     Q.   I -- I think so.  So it sounds like what you're

6          saying is, you're not aware of any connection

7          between the assembly and your termination; is that

8          fair?

9     A.   That's fair.  Yeah, that's fair.

10    Q.   Mr. Billard, that's -- unless your attorney asks

11         anything that I need to follow up on, that's all

12         the questions I have.  Thank you very much for your

13         time.

14    A.   Thank you, Josh.

15                         EXAMINATION

16  BY MR. BROOK:

17    Q.   Mr. Billard, I just have a few questions for you

18         this morning, and -- and why don't we pick up where

19         Mr. Davey left off --

20    A.   Okay.

21    Q.   -- with that assembly in regards to what was said

22         by Sister Dominique.  What did you -- you said you

23         were not in attendance; is that right?

24    A.   That's correct.

25    Q.   What did you hear from third parties was said by

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 303 of 406
JA0374

Lonnie Billard. Vol. II (8/17/17)

Page 303

```
 1          Sister Dominique?
 2                    MR. DAVEY:  Objection.
 3                    THE WITNESS:  What I heard was, first
 4          of all, from other -- from students, outrage
 5          from students, from teachers, and then from
 6          parents that what she had said was inaccurate,
 7          was -- was stereotyping of people and their
 8          roles, that -- so it -- there was a lot of
 9          anger that -- expressed about, you know, how
10          dare she assume that if you're raised by a
11          single woman, you're going to be this or that
12          or whatever, that kind of thing.
13  BY MR. BROOK:
14   Q.   Who was expressing this anger?
15                    MR. DAVEY:  Objection.
16                    THE WITNESS:  Students mostly, but --
17          but also other -- you know, other teachers.
18  BY MR. BROOK:
19   Q.   You referenced inaccurate comments.  What did you
20          understand to be inaccurate?
21                    MR. DAVEY:  Objection.
22                    THE WITNESS:  What I under -- what I
23          heard and what -- what was reported to me as
24          being inaccurate, and I do believe it is
25          inaccurate, was that she had made a comment
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 304 of 406
JA0375

Lonnie Billard. Vol. II (8/17/17)

Page 304

1           to -- to the effect that if you are -- if you

2           are a young man and you have been raised by a

3           single woman, by -- without the benefit of a

4           father figure, okay, you're raised by a woman,

5           that you're -- you're probably going to be gay.

6           And the absurdity of the stupidity of that is

7           just beyond comprehension.

8   BY MR. BROOK:

9    Q.   Anything further in regards to what you understood

10        to be inaccurate comments?

11                   MR. DAVEY:   Objection.

12                   THE WITNESS:   Well, inaccurate in that

13        I -- I recall there was a lot of discussion

14        about her comments about traditional

15        male/female roles and that men have the -- the

16        strong provider type role and women have the

17        subservient or supportive type role, and if you

18        have those two roles together, then -- you

19        know, then that would make for the right family

20        dynamic.

21  BY MR. BROOK:

22   Q.   Anything further in regards to --

23   A.   Say again, please.

24   Q.   Anything further in regards to the stereotypes you

25        referenced previously?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 305 of 406
JA0376

Lonnie Billard. Vol. II (8/17/17)

Page 305

```
 1                    MR. DAVEY:  Objection.
 2                    THE WITNESS:  No, the -- the
 3             understanding I had, Chris, was that they were
 4             so -- they were -- they were so old fashioned
 5             that it was -- you're almost talking like
 6             the -- you know, the 1950s where dad goes off
 7             to work and fights the good fight and mom stays
 8             home and -- and bakes brownies, and that those
 9             are the -- that's the only roles men can have
10             and those are the only roles women can have,
11             you know, not taking into account the fact that
12             men and women quite often both work either out
13             of choice or necessity.  There's lots of things
14             that -- that was said to me about -- you know,
15             that it was just so out of date and so
16             stereotypical.
17    BY MR. BROOK:
18    Q.  Do you recollect discussing mass at Charlotte
19        Catholic with Mr. Davey yesterday?
20    A.  Discussing mass?
21    Q.  Yes.
22    A.  Yeah, yeah, we did.
23    Q.  Okay.  What were your responsibilities both as a
24        full-time teacher and as a substitute teacher at
25        Charlotte Catholic when it came to mass?
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 306 of 406
JA0377

Lonnie Billard. Vol. II (8/17/17)

```
 1                    MR. DAVEY:  Objection.
 2                    THE WITNESS:  My role was to
 3           be -- to -- to take my kids, whatever class it
 4           was when we were having mass, that they -- to
 5           take my kids to the gymnasium for -- for mass.
 6           And I would do that generally.  There were
 7           times when I would send them and I would stay
 8           behind and finish up something I needed to do.
 9           So by and large, I escorted them there or
10           followed them there to be sure that they all
11           got there, but not in every occasion.
12              (DISCUSSION HELD OFF THE RECORD)
13                    THE WITNESS:  Once the kids got to the
14           gym, they would -- they -- they knew where they
15           were to -- to sit based upon whatever --
16           whatever format that had been prescribed.  I
17           cannot recall ever having sat with my students.
18           I would typically stand at the back of the gym
19           most often either with or very near
20           Mr. Carpenter.  I would -- and that's where I
21           would observe mass if I stayed for mass.
22     BY MR. BROOK:
23     Q.   Any further responsibilities when it came to the
24          episodic masses?
25     A.   The --
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 307 of 406
JA0378

Lonnie Billard. Vol. II (8/17/17)

Page 307

```
1                      MR. DAVEY:  Objection.
2                      THE WITNESS:  The only thing that
3            would even come close to that, Chris, is that
4            my -- I -- one of my classes was technical
5            theater, and that -- I had students that --
6            that ran the sound system for any kind of
7            assembly, and so those same students would have
8            been responsible for running the sound system
9            for mass.  And the reason I bring that up is
10           because they were in my class.  I didn't
11           supervise them setting it up.  I didn't
12           supervise them running it.
13    BY MR. BROOK:
14     Q.   I have --
15                     MR. BROOK:  Mr. Davey, I have some of
16           the numbers here, but can you remind me, the --
17           the exhibit number, of -- for the Facebook post
18           that's --
19                     Or maybe you can, Mr. Billard.
20                     -- October 25th, 2014, Facebook post,
21           the wedding announcement?
22                     MR. DAVEY:  I think that was 16.
23                     MR. BROOK:  Okay, thank you.
24                     THE WITNESS:  October 25th; is that
25           correct, Chris?
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 308 of 406
JA0379

Lonnie Billard. Vol. II (8/17/17)

Page 308

```
 1   BY MR. BROOK:
 2    Q.   That's right.  So I'd like you to take a look at
 3         Exhibit 16, which is your Facebook post that has
 4         been discussed previously from October 25th, 2014.
 5         Do you have that?
 6    A.   I do.
 7    Q.   Can you point me to the portion of this Facebook
 8         post where you opine on Catholic doctrine?
 9                    MR. DAVEY:  Objection.
10                    THE WITNESS:  There isn't a place for
11           that.
12   BY MR. BROOK:
13    Q.   All right.  We talked about this one a fair amount
14         in regards to the next line of questions I'm going
15         to ask, but -- so Exhibit, I believe, 17 --
16                    MR. BROOK:  Mr. Davey, you can correct
17           me if I'm wrong.
18                    Lonnie, you can correct me if I'm
19           wrong.
20   BY MR. BROOK:
21    Q.   -- is the Facebook post from December 29th, 2014.
22    A.   Got it.  Number 17.
23    Q.   All right.  Do you recollect talking about this
24         post with Mr. Davey previously?
25    A.   I do.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 309 of 406
JA0380

Lonnie Billard. Vol. II (8/17/17)

Page 309

1   Q.   At the time that you posted this --

2   A.   Uh-huh, yes.

3   Q.   -- on Facebook, were you Facebook friends, to the

4        best of your recollection, with any of the

5        students that you would have had in the 2014/2015

6        school year when you were substituting at Charlotte

7        Catholic?

8   A.   No, I was not.

9   Q.   All right.  Same question in regards to the

10       December 31st, 2014, Facebook post, which I believe

11       is Exhibit 18 from this exhibit -- from this

12       deposition, do you have that in front of you,

13       Mr. Billard?

14  A.   I do have that.

15  Q.   When you posted this on December 31st of 2014, were

16       you Facebook friends with any of the students that

17       you would have had as a substitute teacher during

18       the course of the 2014/2015 school year at

19       Charlotte Catholic?

20  A.   I was not.

21  Q.   Exhibit 20, I believe, the Facebook post from

22       January 18th, 2015, do you have that, Mr. Billard?

23  A.   I do.

24  Q.   Do you recollect talking about this post with

25       Mr. Davey earlier?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 310 of 406
JA0381

Lonnie Billard. Vol. II (8/17/17)

Page 310

1   A.   I do.

2   Q.   When, to the best of your recollection, you posted

3        this on Facebook on January 18th, 2015, were you

4        Facebook friends with any of the students that you

5        would have taught at Charlotte Catholic during the

6        2014/2015 school year?

7   A.   I was not.

8   Q.   All right.  Did you ever receive questions about

9        Catholic doctrine from students at Charlotte

10       Catholic when you were a full-time teacher or a

11       substitute?

12                    MR. DAVEY:  Objection.

13                    THE WITNESS:  By "doctrine," if you

14            mean Catholic teaching, what does the church

15            say about this, that type of thing, I -- I

16            didn't have many, but I did have a few.

17  BY MR. BROOK:

18   Q.   What would -- how would you respond when you

19        received queries like that?

20                    MR. DAVEY:  Objection.

21                    THE WITNESS:  In every case I told the

22            kids that they needed to talk to their parish

23            priest.

24  BY MR. BROOK:

25   Q.   Why was that your response?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 311 of 406
JA0382

Lonnie Billard. Vol. II (8/17/17)

 1   A.   Well, because I'm not qualified to answer those

 2        questions.

 3   Q.   All right.  I want to talk -- turn to Mr. Donham --

 4   A.   Okay.

 5   Q.   -- for a moment.

 6            Do you recollect talking with Mr. Davey

 7        about having recommended Mr. Donham for a

 8        substitute teaching position within the MACS

 9        system?

10   A.   I do.

11   Q.   Did you ever recommend any other friends for

12        substitute teaching positions within the MACS

13        system?

14   A.   I did not.

15   Q.   Do you recollect talking with Mr. Davey earlier

16        this morning about conversations that you had with

17        Jerry Healy?

18   A.   Yes.

19   Q.   All right.  Do you recollect at some point noting

20        to Mr. Davey that you had referred to Mr. Donham as

21        your partner to Mr. Healy?

22   A.   Yes.

23   Q.   What did you mean when you referred to Mr. Donham

24        as your partner to Mr. Healy?

25                    MR. DAVEY:  Objection.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 312 of 406
JA0383

Lonnie Billard. Vol. II (8/17/17)

```
 1                    THE WITNESS:  My partner, if I -- if I
 2          can -- at least particularly in the gay world,
 3          before you were able to be married but you were
 4          in a committed relationship with someone, they
 5          were your partner.  And so when I -- when I
 6          made that comment to Mr. Healy, we were not
 7          able to legally be married, but we were in a
 8          committed relationship.  So I introduced --
 9          when he said, Bring your -- your friend, he was
10          obviously uncomfortable, wasn't no -- it was
11          clear to me that he didn't know how to refer to
12          Rich.  And I said, My partner?  And he said,
13          Oh, I didn't know if I could say that.  And
14          that -- that's what that was.
15  BY MR. BROOK:
16    Q.   When an -- when an individual, straight or gay,
17          lives with another individual, talks about that
18          individual as their partner, discusses shared
19          travel plans, and you see those two individuals
20          together repeatedly either at work functions or,
21          you know, outside the workplace context, what do
22          you assume about that situation?
23                    MR. DAVEY:  Objection.
24                    THE WITNESS:  I assume that they are a
25          couple, that they are in a relationship.
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 313 of 406
JA0384

Lonnie Billard. Vol. II (8/17/17)

Page 313

 1   BY MR. BROOK:

 2     Q.   Do you know in the circumstance that I just

 3          described that those individuals are sexually

 4          active with one another?

 5                    MR. DAVEY:  Objection.

 6                    THE WITNESS:  No.  You --

 7   BY MR. BROOK:

 8     Q.   Go ahead.  You need me to repeat the question?

 9     A.   No, you don't know somebody's sex life unless they

10          brag about it or talk about it.

11     Q.   Are you a person who brags or talks about their sex

12          life?

13     A.   No, I am not.

14     Q.   I'd like to point you, Mr. Billard, to Exhibit 22

15          that we have talked about this morning.

16     A.   Okay.  I have it here.

17     Q.   It's Plaintiff's Response to Defendant's First Set

18          of Interrogatories, and I'd like to point you to

19          what is page 4 of the packet, and it's -- I'm going

20          to read now from the answer to Interrogatory

21          Number 2.

22     A.   Whoops.  Just a second.  I'm getting there.  I

23          found it.

24     Q.   All right.  And I'm going to read a portion of that

25          answer --

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 314 of 406
JA0385

Lonnie Billard. Vol. II (8/17/17)

Page 314

1   A.   All right.

2   Q.   -- into the record.

3        It's -- reading now from Interrogatory Number

4        2, answer:  (Reading)

5             The Plaintiff states that he is

6        asserting claims for non-pecuniary

7        compensatory damages for the garden

8        variety emotional pain and suffering,

9        humiliation, embarrassment, anxiety,

10       inconvenience, and loss of enjoyment of

11       life he suffered as a result of

12       Defendant's unlawful discrimination.

13       See 42 USC 1981A(b)(3).

14            Plaintiff further states he will

15       seek the maximum amount of compensatory

16       damages and punitive damages permitted

17       pursuant to the statutory cap under the

18       Civil Rights Act of 1991 as well as

19       nominal damages.

20            Plaintiff further states that he

21       will seek attorney's fees and costs in

22       an amount to be determined.  See 42 USC

23       2000E-5(k).

24            Plaintiff further states that he

25       will seek post-judgment interest in an

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 315 of 406
JA0386

Lonnie Billard. Vol. II (8/17/17)

Page 315

1              amount to be determined.  See 28 USC

2              1961.

3                  Have I read that accurately, Mr. Donham --

4          Mr. Billard?  Pardon me.

5    A.    Yes.

6    Q.    Are you seeking damages beyond what is -- what I

7          just read to you?

8                       MR. DAVEY:  Objection.

9                       THE WITNESS:  Two things come to mind.

10             I don't see in that reinstatement the ability

11             to teach again, okay?  And I also don't see in

12             that a change of policy that resulted in my

13             termination so it doesn't happen to somebody

14             else.

15   BY MR. BROOK:

16   Q.    Beyond what I read to you in the two that you just

17         listed, are you seeking any further remedies in

18         this lawsuit?

19   A.    No.

20                      MR. DAVEY:  Objection.

21                      THE WITNESS:  No.

22   BY MR. BROOK:

23   Q.    If you could, would you return to substitute

24         teaching at Charlotte Catholic?

25   A.    Sure, yes.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 316 of 406
JA0387

Lonnie Billard. Vol. II (8/17/17)

Page 316

1              MR. BROOK:  That's all.  That's all
2         that we have.
3                    EXAMINATION
4    BY MR. DAVEY:
5    Q.   Just a couple of follow-ups, Mr. Billard, on some
6         questions that your attorney asked you.
7              I understand the feeling.  This will be brief.
8              Mr. -- your attorney asked you some questions
9         about Facebook posts that we've looked at as
10        exhibits today and whether you were Facebook
11        friends with any Charlotte Catholic students at the
12        time you put those posts on Facebook.  Do you
13        recall those questions?
14   A.   I do.
15   Q.   So my question is:  You seem to be fairly confident
16        that you weren't Facebook friends with any students
17        when those posts went up.  Why is that?
18   A.   Well, my policy that I did not "friend" students
19        until after they had graduated.
20   Q.   Okay.  And that -- is that a practice that you have
21        followed the entire time you've been on Facebook?
22   A.   Pretty -- yeah, as far as I recall, yes.
23   Q.   Okay.  Mr. Osborne (sic) asked you some questions
24        about Exhibit 22, which you have in front of you
25        there.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 317 of 406
JA0388

Lonnie Billard. Vol. II (8/17/17)

Page 317

1   A.    Yes.

2   Q.    So he -- he read from this answer to Interrogatory

3         2.  It says:  (Reading)

4               Plaintiff states that he is

5           asserting claims for non-pecuniary

6           compensatory damages for the garden

7           variety emotional pain and suffering,

8           humiliation, embarrassment, anxiety,

9           and convenience and loss of enjoyment

10          of life he suffered as a result of

11          Defendants' unlawful discrimination.

12        Did I read that correctly?

13  A.    You did.

14  Q.    What does that mean?

15              MR. BROOK:  Objection, calls for a

16          legal conclusion.

17              THE WITNESS:  I'm trying to relocate

18          it on the page.  That's the reason for my -- my

19          hesitation.  There it is.

20              The pain and suffering, I think, is --

21          I -- I -- as I said to you earlier, you know,

22          this is devastating to me.  It hurt.  It hurt a

23          lot.  In -- yeah, at -- at one point I felt --

24          you know, I felt embarrassed by the whole

25          action.  I'm not a public person by -- by my

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 318 of 406
JA0389

Lonnie Billard. Vol. II (8/17/17)

Page 318

 1              nature, you know, and I did not -- did not
 2              welcome that -- you know, didn't want that
 3              necessarily to be a part of it, but it had to
 4              be a part of it if I were going to -- to do
 5              something about it, okay?
 6                   So it's -- it's -- it's kind of a --
 7              to me, it's all of those things, those emotions
 8              I went through, the anxieties, the -- the
 9              feelings, the hurt, the -- that whole unease of
10              life that I went through as a result of my
11              firing.
12   BY MR. DAVEY:
13   Q.   Have you seen any therapist, psychologist, or any
14        mental health professionals relative to the
15        emotional pain you've experienced as a result of
16        your termination at Charlotte Catholic?
17   A.   I have not.
18   Q.   Is there any way to quantify in your mind the
19        dollar value of that emotional pain and suffering?
20                   MR. BROOK:  Objection to the extent
21              that it calls for a legal conclusion.
22                   THE WITNESS:  Would you reask that
23              because I didn't hear all of it?
24   BY MR. DAVEY:
25   Q.   Sure.  Is there any way to put a dollar figure on

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-1  Filed 09/21/17  Page 319 of 406
JA0390

Lonnie Billard. Vol. II (8/17/17)

Page 319

1          the -- the value of the emotional pain you've

2          experienced?

3                        MR. BROOK:  Same objection.

4                        THE WITNESS:  I would suppose, yes,

5              but I have not done that process yet.

6    BY MR. DAVEY:

7     Q.   How would you do it?

8     A.   I would certainly seek advice and counsel.

9                        MR. BROOK:  Same objection.

10                        THE WITNESS:  Sorry.

11                        MR. BROOK:  No, no, no, no.  That's on

12              me.

13                        THE WITNESS:  Yeah, any -- the same

14              way I make any kind of decision, I -- I do

15              research, I find out, you know, this -- you

16              know, what I'm doing cannot be -- you know, I'm

17              not inventing a wheel here, so I would look to

18              whatever information I could find to try to

19              figure that out.

20    BY MR. DAVEY:

21     Q.   Okay.  So you're not aware, though, of a specific

22              method you would employ, sitting here today --

23     A.   No.

24     Q.   -- to figure that out?

25                        MR. BROOK:  Same -- same objection.

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 320 of 406
JA0391

Lonnie Billard. Vol. II (8/17/17)

Page 320

```
 1                    THE WITNESS:  I am not aware of that
 2          method.
 3   BY MR. DAVEY:
 4    Q.   Mr. Billard, that's all the questions I have.
 5    A.   Thank you.
 6                    MR. BROOK:  Nothing further.
 7                    MR. DAVEY:  You're done.
 8                    (WHEREUPON, the foregoing deposition
 9          concluded at 11:03 A.M. on August 17th, 2017.
10          Reading and signing were reserved.)
11                       *    *    *    *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 321 of 406
JA0392



# DIOCESE OF CHARLOTTE
## EMERGENCY DATA FOR PERSONNEL

*Please print neatly or type. It is your responsibility to keep the information on this form current at all times*

Date this form was completed: AUGUST 24, 2001

Name LONNIE H. BILLARD                    Home Phone ▮▮▮▮▮

Address 3300-1 Selwyn Farms Ln, Chlt, NC    Zip 28209
　　　　 Street　　　　　　　　　City　　　　　State

Date of Birth ▮▮▮▮▮    Social Security # ▮▮▮▮▮

Doctor(s) ANNE BARNARD

Address 200 S. COLLEGE    Phone ▮▮▮▮▮

Hospital CAROLINAS MEDICAL CENTER

Address _____    Phone ▮▮▮▮▮

**FIRST PERSON** to be notified in case of any emergency:

Name JEANNE BILLARD    Relationship WIFE

Address 4192 Kings Court    Chlt    NC    28209
　　　　 Street　　　　　　 City　　　　State　　 Zip

Home Phone ▮▮▮▮▮    Work Phone ▮▮▮▮▮

**SECOND PERSON** to be notified in case of any emergency:

Name _____    Relationship _____

Address _____    _____    _____    _____
　　　　 Street　　　　　　 City　　　　State　　 Zip

Home Phone _____    Work Phone _____

Rev. 8/97

CCHS 000360

12

## DIOCESE OF CHARLOTTE
## EMERGENCY DATA FOR PERSONNEL

*Directions:*    Please print neatly or type. It is your responsibility to keep the information on this form current at all times.

Date this form was completed: Aug 14, 2003

Name LONNIE H BILLARD      Home Phone 704 ▓▓▓

Address 3300-1 SELWYN FARMS LN   City CHLT   State NC   Zip 28209
       Street

Date of Birth ▓▓▓      Social Security # ▓▓▓

Doctor(s) DR ANNE BARNARD

Address BB&T BLDS - COLLEGE ST      Phone 704 ▓▓▓

Hospital _____

Address _____      Phone _____

**FIRST PERSON** to be notified in case of an emergency:

Name RICH DONHAM      Relationship FRIEND

Address 3300-4 SELWYN FARMS LN   City CHLT   Zip 28209
       Street

Home Phone 704 ▓▓▓      Work Phone _____

**SECOND PERSON** to be notified in case of an emergency:

Name JEANNE BILLARD      Relationship EX · WIFE

Address 4922 KINGS CANYON DR.   City CHLT   Zip 28210
       Street

Home Phone 704 ▓▓▓      Work Phone _____

CCHS 000358

## DIOCESE OF CHARLOTTE
## EMERGENCY DATA FOR PERSONNEL

*Directions:* Please print neatly or type. It is your responsibility to keep the information on this form current at all times.

Date this form was completed: Aug 9, 2004          cell# █████████

Name  LONNIE H BILLARD          Home Phone 704-535-9052

Address 3300-1 SELWYN FARMS LN CHLT, NC    Zip 28209
　　　　　Street　　　　　　　　　City　　　　State

Date of Birth ████████          Social Security # ████████

Doctor(s)  DR. ANNE BARNARD

Address 200 S COLLEGE ST    CHLT          Phone ████████

Hospital  CAROLINA MEDICAL CENTER

Address 1000 BLYTHE BLVD    CHLT          Phone ████████

**FIRST PERSON** to be notified in case of an emergency:

Name  JEANNE BILLARD          Relationship WIFE (EX)

Address 4922 KINGS CANYON DR CHLT, NC  28210
　　　　　Street　　　　　　　　　City　　　　Zip

Home Phone ████████          Work Phone ████████

**SECOND PERSON** to be notified in case of an emergency:

Name  RICH DONHAM          Relationship FRIEND

Address 3300-2 SELWYN FARMS LN  CHLT, NC 28209
　　　　　Street　　　　　　　　　City　　　　Zip

Home Phone ████████          Work Phone ████████

CCHS 000357

## DIOCESE OF CHARLOTTE
### EMERGENCY DATA FOR PERSONNEL

*Please print neatly or type. It is your responsibility to keep the information on this form current at all times*

Date this form was completed: August 18, 2005    Cell # 764·491·2538

Name LONNIE BILLARD    Home P ▮

Address 3300-1 Selwyn Farms Ln Chlt NC   Zip 28209
     Street      City      State

Date of Birth ▮    Social Security # ▮

Doctor(s) Dr. Anne Barnard

Address 300 College.   Chlt    Phone ▮

Hospital Carolina Medical Center

Address _____    Phone _____

**FIRST PERSON** to be notified in case of any emergency:

Name Rien Donham    Relationship Friend

Address 3300-1 Selwyn Farms Ln Chlt NC 28209
     Street      City      State      Zip

Home Phon ▮    Work Phone _____    Cell # ▮

**SECOND PERSON** to be notified in case of any emergency:

Name _____    Relationship _____

Address _____
     Street      City      State      Zip

Home Phone _____    Work Phone _____    Cell # _____

Rev. 8/97

CCHS 000356

**DIOCESE OF CHARLOTTE**
**EMERGENCY DATA FOR PERSONNEL**

*Please print neatly or type. It is your responsibility to keep the information on this form current at all times*

Date this Form was completed: August 17, 2006

Name LONNIE H. BILLARD          Home Phone ▮▮▮▮

Address 5101 Harri Ann Dr. Charlotte, NC    Zip 28227

Street          City          State

Date of Birth ▮▮▮▮          Social Security # ▮▮▮▮

Doctor(s) DR. ANNE BERNARD

Address 380 COLLEGE CHLT          Phone ▮▮▮▮

Hospital

Address _____          Phone _____

**FIRST PERSON** to be notified in case of any emergency:

Name Richard Donham          Relationship Friend

Address 3300 Selwyn Farms Ln Chlt NC 28209

Street          City          State          Zip

Home Phone ▮▮▮▮          Work Phone _____

**SECOND PERSON** to be notified in case of any emergency:

Name Ian Pollard          Relationship Son

Address Bejing China

Street          City          State          Zip

Home Phone ▮▮▮▮          Work Phone _____

Rev. 8/97

CCHS 000355

**Diocese of Charlotte**
**Emergency Data for Personnel**

Please print neatly or type. It is your responsibility to keep the information on this form current at all times.

Date this form was completed: August 15, 2007

Name: Lonnie Billard     Home Phone: ▮▮▮▮

Address: 5101 Harri Ann Dr    Chlt    NC    28227
         Street              City      State   Zip

Email Address: ln.billard@aol.com    Cell Phone: ▮▮▮▮

Date of Birth: ▮▮▮▮    Social Security #: ▮▮▮▮

Doctor(s): Dr. Anne Bernard

Address: 100 College St.    Phone: 704-632-4000

Hospital: Carolina Medical Center

Address: 1000 Blythe    Phone: ▮▮▮▮
         Chlt, NC

**FIRST PERSON** to be notified in case of any emergency:

Name: Rich Donham    Relationship: friend

Address: 5101 Harri Ann Dr Chlt    NC    28227
                                    City   State   Zip

Home Phone: ▮▮▮▮    Work Phone: ▮▮▮▮

Cell Phone: SAME

**SECOND PERSON** to be notified in case of any emergency:

Name: _____    Relationship: _____

Address: _____    _____    _____    _____
         Street           City           State          Zip

Home Phone: _____    Work Phone: _____

Cell Phone: _____

CCHS 000354

*August 13, 2008*

**Diocese of Charlotte**
**Emergency Data for Personnel**

Please print neatly or type. It is your responsibility to keep the information on this form current at all times.

Date this form was completed: LONNIE H. BILLARD

Name _____    Home Phone ████████

Address 5101 Harri Ann Dr.    Chlt    NC    28227
        Street                City         State    Zip

Email Address: lhbillard@aol.com    Cell Phone ████████

Date of Birth ████████    Social Security # ████████

Doctor(s) Dr. Anne Bernard

Address 300 College _____ Phone ████████

Hospital CMC

Address 1000 Blythe Rd, Chlt, 28203 Phone ████████

FIRST PERSON to be notified in case of any emergency:

Name Rich Donham    Relationship Friend

Address 5101 Harri Ann    Chlt    NC    28227
        Street            City     State    Zip

Home Phone ████████    Work Phone ████████

Cell Phone ████████

SECOND PERSON to be notified in case of any emergency:

Name Ian Billard    Relationship Son

Address Beijing, China
        Street        City    State    Zip

Home Phone ████████    Work Phone _____

Cell Phone _____

Rev. 9/05

CCHS 000353

JA0399

**Diocese of Charlotte**
**Emergency Data for Personnel**

Please print neatly or type. It is your responsibility to keep the information on this form current at all times

Date this form was completed: 4-19-09

Name: LONNIE BILLARD   Home Phone ▮▮▮▮▮

Address: 5101 HARRI ANN DR CHLT   NC   28227
   Street   City   State   Zip

Email Address: lhbillard@hotmail.com   Cell Phone: SAME

Date of Birth: ▮▮▮▮▮   Social Security #: ▮▮▮▮▮

Doctor(s): DR ANNE BERNARD

Address: 300 COLLEGE CHLT   Phone ▮▮▮▮▮

Hospital: _____

Address: _____   Phone _____

*FIRST PERSON* to be notified in case of any emergency:

Name: RICH DONHAM   Relationship HOUSEMATE / FRIEND

Address: 5101 HARRI ANN DR CHLT   NC   28227
   Street   City   State   Zip

Home Phone ▮▮▮▮▮   Work Phone _____

Cell Phone SAME

*SECOND PERSON* to be notified in case of any emergency:

Name: IAN BILLARD   Relationship SON

Address: 171783 ZANGCH BEIJING CHINA
   Street   City   State   Zip

Home Phone ▮▮▮▮▮   Work Phone _____

Cell Phone _____

Rev. 9/06

CCHS 000352

**Diocese of Charlotte**
**Emergency Data for Personnel**

Please print neatly or type. It is your responsibility to keep the information on this form current at all times

Date this form was completed: 8-17-10

Name LONNIE BILLARD    Home Phone ▉▉▉

Address 5101 HARRi ANN DR CHLT    NC 28227
          Street                    City

Email Address lhbillard@hotmail.com    Cell Phone ▉▉▉

Date of Birth ▉▉▉

Doctor(s) DR. ANNE BERNARD

Address 300 COLLEGE CHLT, NC    Phone ▉▉▉

Hospital C.MC

Address 1600 Blythe Blvd, Chlt    Phone ▉▉▉

**FIRST PERSON** to be notified in case of any emergency:

Name RICH DONHAM    Relationship FRIEND

Address 5100 HARRi ANN    CHLT    NC 28227
          Street                City    State    Zip

Home Phone ▉▉▉    Work Phone ▉▉▉

Cell Phone    SAME

**SECOND PERSON** to be notified in case of any emergency:

Name _____    Relationship _____

Address _____    _____    _____    _____
          Street                City    State    Zip

Home Phone _____    Work Phone _____

Cell Phone _____

Rev. 8/2010

CCHS 000351

**Diocese of Charlotte**
**Emergency Data for Personnel**

*Please print neatly or type. It is your responsibility to keep the information on this form current at all times*

Date this form was completed: August 17, 2011

Name LONNIE BILLARD     Home Phone ▉▉▉▉▉

Address 5101 Harri Ann Dr   Chlt    NC   28227
        Street           City

Email Address lhbillardo@hotmail.com   Cell Phone ▉▉▉▉▉

Date of Birth ▉▉▉▉▉

Doctor(s) Dr. Kendall

Address 3700 Providence Rd     Phone ▉▉▉▉▉

Hospital CMC

Address _____    Phone _____

**FIRST PERSON** to be notified in case of any emergency:

Name RICH DONHAN     Relationship FRIEND

Address 5101 Harri Ann Dr   Chlt    NC   28227
        Street           City      State    Zip

Home Phone ▉▉▉▉▉     Work Phone ▉▉▉ ▉▉▉

Cell Phone _____

**SECOND PERSON** to be notified in case of any emergency:

Name _____     Relationship _____

Address _____ _____ _____ _____
        Street           City      State    Zip

Home Phone _____     Work Phone _____

Cell Phone _____

Rev. 5/2010

CCHS 000350

JA0403

| | | |
|---|---|---|
| DIOCESE OF CHAR~~LO~~TTE - MACS | Salary Level | A |
| TEACHER EMPLOYMENT CONTRACT | Experie~~nce~~ Level | 15 |
| | Subject or Grade: | Fine Arts/Drama |
| | School: | CCHS |

THIS AGREEMENT, made and entered into this 27th day of April, 2011, by and between MACS, hereinafter referred to as "School", and Lonnie Billard, hereinafter referred to as "Teacher."

**WITNESSETH:**

WHEREAS, MACS and School wishes to hire Teacher to teach for the academic year of 2011 - 2012; and
WHEREAS, Teacher wishes to teach in the school system for said academic year;
NOW, THEREFORE, by and with the consent of both parties, the parties hereto covenant and agree as follows:

1. **TERM:** The term of this Contract is for the Academic Year 2011-2012.

2. **SALARY:** In consideration of Teacher performing the services hereinafter described, MACS shall pay to Teacher the total sum of $41309.00.

3. **DUTIES:** Teacher agrees to perform any and all duties for the position for which he/she is hired and all other duties as directed by School including, but not limited to, to teach and supervise the grade, grades or courses assigned by the principal of the School and to perform the other duties or responsibilities involved in his/her assignment to term of this Contract; to attend and participate in all school faculty meetings, and such other professional meetings as called by the Superintendent of Catholic Schools or the principal; to comply with the requirements of the Diocese regarding the educational preparation of teaching; and to participate in associations and meetings as directed by the Superintendent or principal for the promotion of close collaboration between parents and teachers and to otherwise assist the teacher in the performance of his/her duties. Teacher, regardless of membership in the Catholic Church, must be consistent at all times, in example and expression, with the tenets and morals of the Catholic Faith.

4. **TERMINATION DURING TERM OF CONTRACT:** This Agreement may be terminated as follows:
   a. By mutual consent of both parties;
   b. By School, upon thirty (30) days written notice to Teacher, in the event of declining enrollment in the school.
   c. By School, upon written notice to Teacher, for cause including, but not limited to, inefficiency, neglect of duty, unprofessional action/conduct, incompetency, insubordination, moral misconduct, current abuse of alcohol, current use of illegal drugs, current misuse of prescription drugs, conviction of a felony or a crime involving moral turpitude, failure to maintain teaching certificate in current status, or breach of this Agreement.

5. **TERMINATION BY TEACHER:** In the event this Agreement is terminated unilaterally by Teacher, Teacher shall pay School a sum of money equivalent to one month's gross salary, such payment to be deemed as liquidated damages.

6. **SPECIAL TERMS AND CONDITIONS:** Teacher shall further comply with the following special terms and conditions:
   a. Full Time (100%)
   b.
   c.

7. **DIOCESAN RULES AND REGULATION:** This Agreement is subject to the Personnel Policies Handbook of the Diocese of Charlotte and the Policies and Regulations as promulgated by the Diocesan Board of Education, MACS Board of Education and the Superintendent of Catholic Schools for the Diocese of Charlotte.

8. Contracts are to be returned and signed within fourteen (14) working days upon receipt of Contract. This Contract is void beyond the deadline unless an extension of time has been specifically agreed to, in writing, by the teacher and superintendent.

9. **EXCLUSIVE AGREEMENT:** This Contract contains complete agreement concerning the employment arrangement between the parties. Any amendment, deletion or addition to this Contract must be in writing and signed by all parties.

EMPLOYER

_4/27/2011_
Date Offered

_Superintendent of Schools_

_5-6-11_
Date Accepted

_Teacher Signature_

**SELECT ONE:** SALARY IS REQUESTED TO BE PAID

_____ OVER THE SCHOOL YEAR (22 PAYMENTS)    OR

__✓__ OVER THE SCHOOL YEAR AND FOLLOWING SUMMER    (27 PAYMENTS)

(subject to appropriate deductions for State, Federal and Local taxes, FICA and any other deductions authorized by Teacher).

| 1 copy to Teacher | 1 copy for School File | 1 copy for Diocesan Office | 1 copy for Payroll |
|---|---|---|---|

CCHS 000565

JA0405



# CHARLOTTE CATHOLIC HIGH SCHOOL



## FACULTY HANDBOOK
## 2011 - 2012

Phone: (704) 543-1127
School Fax: (704) 543-1217
Attendance Voice Mail: (704) 716-2418
Attendance Fax: (704) 716-2419
Hotline: (704) 845-6548
WEBSITE: WWW.CHARLOTTECATHOLIC.ORG

7702 PINEVILLE-MATTHEWS ROAD
CHARLOTTE, NC 28226

CCHS 000041
Case 3:17-cv-00011-MOC-DCK   Document 31-1   Filed 09/21/17   Page 338 of 406

# MISSION STATEMENT

Charlotte Catholic High School is an educational community centered in the Roman Catholic faith which teaches individuals to serve as Christians in our changing world.

# BELIEFS

1) We believe individuals should model and integrate the teachings of Jesus in all areas of conduct in order to nurture faith and inspire action, especially in the areas of service and volunteerism.

2) We believe academic excellence is a priority as teachers set high expectations of performance while providing appropriate resources and academic challenges for all students.

3) We believe prayer, worship and reflection are essential elements which foster spiritual and moral development of our students, faculty and staff.

4) We believe in cultivating a supportive, healthy and challenging environment which recognizes the dignity, needs and diversity of all individuals.

5) We believe opportunities should be provided for parents and the local community to participate in and support Charlotte Catholic High School.

3

CCHS 000044

JA0407

**Principal - Gerald S. Healy**
> Responsible for all academic and co-curricular activities conducted under the jurisdiction of Charlotte Catholic High School. Responsible for administering the business affairs of the school in the day-to-day financial operations.

**Assistant Principal - Steve Carpenter**
> Responsible for working directly with teachers, students, counselors, campus minister, and parents in areas related to discipline and for promoting school spirit through designated school activities and programs.

**Assistant Principal – Angela Montague**
> Responsible for working directly with teachers, students, counselors, campus minister, and parents in areas related to discipline and for promoting school spirit through designated school activities and programs.

**Dean of Students - Randy Belk**
> Responsible for working with the assistant principal in areas of discipline, oversees all matters of student attendance, and supervises development, maintenance, and distribution of handbooks, curriculum guides, schedules, and the like.

**Secretary - Cissy Bevington**
> Responsible for assisting the Principal with phone calls, appointments, coordinating Parent Newsletter, mailings, assisting teachers, ordering of all office supplies. Issuing work permits and driver's eligibility forms and other office assignments as required. Coordinating Faculty/Staff functions.

5

**Administrative Assistants - Linda Stephenson and
Tracey Tolbert**

Responsible to the principal for maintaining complete and systematic set of records of all financial transactions, handling all service contracts, and inventory and ordering all school supplies, and teacher supplies.

**Registrar - Alice Kerry**

Responsible for maintaining complete and accurate records for all students and alumni, to assist the guidance department with the processing of college applications, and to perform clerical and secretarial functions for the administration and guidance department.

**IT - Beth Acitelli**

Assists faculty, staff and students with technology integration and education. Provides school level support for hardware and software.

**Receptionist - Carolyn McGroarty and Judy Wittman**

Responsible for greeting visitors and determining their needs, answering the office telephone and responding to requests for information.

**Attendance Coordinator - Elizabeth Ryan**

Responsible to the Dean of Students for collecting, maintaining and distributing daily student attendance information.

**Guidance Counselors - Sandy Needham, Cathy Grady, Karen Grauman, Maryangela Morgan and Christopher Causebrook**

Responsible for helping students overcome problems that impede learning and to assist them in making educational, occupational, and life plans that hold promise for their personal fulfillment as mature and responsible men and women.

6

CCHS 000047

**Guidance Assistant – Celia Smith**
Responsible for assisting the Guidance Counselors with a variety of administrative duties.

**Learning Support Department –Mary Ellen Rauch (A-K) and Donna Birch (I-M)**
Responsible for creating and helping to implement accommodation plans for students with documentation of learning differences. Work with teachers to identify students in need of interventions.

**Campus Minister – Mary Jayne Dawson**
Responsible for ministering to the spiritual needs of the school community and responsible with the principal for the implementation of the school's philosophy, as it has reference to the spiritual matters of the school.

**Athletic Director – Kevin Christmas**
Responsible for coordinating the total athletic program.

**Media Specialist – Terri Taylor**
Responsible for maintaining the library; evaluates, selects, and requisitions new library materials; and coordinates all other library activities.

**Assistant Media Specialist – Lynn Hidell**
Responsible for maintaining the library; evaluates, selects, and requisitions new library materials; and coordinates all other library activities.

**Student Council Advisors – Shawn Panther**
Responsible for moderating the Student Council activities and projects.

7

CCHS 000048

# DEPARTMENT HEAD RESPONSIBILITIES

### I. Personnel Responsibilities

a. Initiate the hiring process by reviewing on- file applicants, request postings if needed and schedule interviews with the administration.

b. Assist the principal in the hiring decision and ensure new department personnel is provided appropriate materials including: texts, schedule, keys, and if applicable assign a mentor.

c. Conducts department meetings.

d. Assist department teachers in the handling of day-to-day problems of instruction and acts as a resource person for department teachers on curriculum questions.

e. Conducts formal and informal classroom observations and evaluates teacher performance. As well as informal walk – through on a regular bases.

f. Makes recommendations to the principal regarding department personnel.

g. Monitors the mentoring program for all new teachers

### II. Curriculum Responsibilities

a. Assists in establishing department curriculum objectives, and develops a plan for the implementation and evaluation of these objectives.

b. Recommends textbook choices to the principal after consultation with the department members.

c. Develops and maintains a department library

d. Keeps informed on educational innovations and trends as they relate to their department

8

CCHS 000048

    e.  Assists the principal in his/her role as educational leader in the school through curriculum development within the department

    f.  Monitors department teacher's update of Edline.

    g.  Assists the principal in informing parents and the school community on the school's instructional program

    h.  Attends all department head meetings

**III.  Budgetary Responsibilities**
    a.  Advises the principal on department's budgetary needs

    b.  Assumes responsibility for ordering, inventorying, and distribution of all departmental instructional materials within guidelines developed by the business office.

# TEACHER PERFORMANCE RESPONSIBILITIES

1. Meets and instructs assigned classes in the locations and at the times designated.

2. Plans a program of study that meets the individual needs, interests, and abilities of all students.

3. Creates a classroom environment that is conducive to learning and appropriate to the maturity and interests of the students.

4. Prepares for classes assigned.

5. Has clear and concise rules for all students.

6. Guides the learning process toward the achievement of curriculum goals.

7. Employs a variety of teaching modalities to meet the needs of all students.

9

CCHS 000050

JA0412

8. Implements the diocesan and school's mission statements

9. Assesses the accomplishments of students on a regular basis and updates Edline at a minimum of every two weeks.

10. Seeks the assistance of the learning support staff in addressing student's learning differences.

11. Takes all necessary steps to protect students, equipment, materials, and facilities.

12. Maintains accurate, complete, and correct records as required by law, diocesan and school policy, and administrative regulation.

13. Assist the administration in implementing all policies and/or rules governing student life.

14. Maintains a current NC state teaching license or diocesan license.

15. Continue to acquire 15 CEU's in a five-year cycle. One in technology and 3 in their content area.

16. Makes provision for being available to students and parents for education-related purposes outside the instructional day when required or requested to do so under reasonable terms.

17. Maintain and improve professional development which should encompass technology, teaching methodology, and school goals.

18. Attends staff meetings, departmental meetings, and serves on staff committees as required.

19. Attends all Parent-Teacher conferences and Parent Night.

20. Does not leave a group of students or a class unsupervised.

21. Follows all school, diocesan, and state policies, regulations, and procedures.

22. All correspondence – voice mail, e-mail, etc. must be answered in two working days.

10

CCHS 009051

# DAILY ROUTINE

I.  **ARRIVAL AND DEPARTURE:** School hours are 7:30 am to 3:05 pm. All teachers will remain in their classroom from 2:35 pm to 3:05 to assist students.

II.  **ATTENDANCE (STUDENT)**
   **A. Procedures for reporting absences:**
   1.  The administration and the teachers must share the responsibility for pupil accounting. It is the responsibility of the homeroom teacher to accurately report attendance daily. Our automated system will call the first contact number provided by the student's parents. The dean of students or principal are to be notified of any unusual or irregular absences.

   2.  If the validity of an excuse is questioned, the teacher is to ask the dean of students for clarification.

   3.  The absentee sheet will be e-mailed to each teacher each day. Check your absences against this list. If a student is absent from class and his/her name is not on the list, send a note to the dean of students reporting the missing student. The dean of students or assistant principal will check to see where the student is.

   4.  If a student is listed on the absentee report and is in class, he/she should be sent to the office so that the correction can be made.

   5.  Each teacher is responsible for checking attendance accurately each time class meets.

   6.  Student absence from semester examinations will require a $10.00 fee and approval of the dean of students in order for the exam to be rescheduled or made up. Except for illness all requests for reschedule should be approved three school days prior to the first exam day.

11

CCHS-000052

JA0414

## B. EARLY DISMISSAL OF STUDENTS

1. Requests for early dismissals must be presented to the attendance office before the student's first class. Failure to follow this procedure may result in an unexcused absence from a class or classes.

2. The student will be issued a pass by the attendance office who will record the time of the excused dismissal. This pass must be shown to the teacher whose class the student leaves.

## C. ILLNESS

If a student should become ill in class, he/she should be sent to the health room with a pass. Another student should be sent to accompany the student who is ill.

## D. COUNSELING

It is the responsibility of the counselors and campus ministers to inform classroom teachers in advance when students will be absent from class because of appointments and post facto when an emergency situation arises.

## E. RELEASED ABSENCES

1. A request may be made by the parents for a trip, college day, career day, etc.

2. The request must be presented to the attendance office before the student's first period class. A college day/career day request form must be completed and returned to the dean of students.

## III. CARE OF BUILDINGS, MATERIALS, FURNITURE, GROUNDS

A. All teachers are urged to work constantly with students on the care of furniture, books, materials, and grounds.

12

CGHS 000053

B. All teachers are responsible for keeping clean and neat the area outside and inside their classrooms. Please be sure that the area is checked before each class starts and ask students to clean up the area.

C. At the close of school windows should be locked.

D. Messages for the maintenance staff or cleaning service may be left in the assistant principal, who is charge of facilities, mailbox. Please put all requests in writing. Do not ask for something to be done immediately if it can wait until the staff can work it into the daily routine.

## V. DRESS

All teachers are to see that students observe the dress code. If a student is in violation of the dress code, he/she is to be sent to the office.

## VI. INSURANCE CLAIM FORMS

Insurance claim forms will be handled by the business office. If a student is injured at school or at a school-sponsored event, refer him/her to the office for an insurance claim form.

## VII. STUDENT SCHEDULE CHANGES

The guidance counselors may authorize schedule changes for necessary academic reasons during the designated drop/add period. A student who wants to change a class should go to the guidance counselor who will advise the student and confer with the teacher(s) concerned. The guidance counselor will require written parental permission. There is a $20.00 drop/add fee for any schedule change. The change will go into effect when this procedure has been completed and not before.

13

GCHS 000054

JA0416

## VIII.  TARDIES AND TARDY MEMORANDUMS

A. Students are also expected to arrive to class on time. Four (4) minutes are allowed for class change. Students arriving late to class should have a written excuse from the person detaining him/her. All other tardies to class will be unexcused and the teacher will enforce his/her policy regarding unexcused tardies to class. Faculty should report a student's name to the dean of students on the student's eleventh day of absence from your class. (excluding school business)

B. Teachers are responsible for enforcing promptness to class. Flagrant and/or consistent violation of promptness is to be reported to the dean of students <u>after communication with the student and parents.</u>

C. No teacher should detain a pupil who belongs in another teacher's class. If it is necessary for the office or a teacher to detain a student, the student who is detained will bring to his/her teacher an admission slip which will be duly signed by the individual who has detained him/her. Only those admission slips written and signed by a teacher, administrator, or staff member will be accepted.

# MISCELLANEOUS INSTRUCTIONS AND INFORMATION

## I.  ACTIVITIES

All requests for school activities must be submitted in writing on the *Request for School Activity Form* to the administration for approval.

## II.  ACTIVITY CALENDAR

A school activity calendar will be maintained in the school office. All co-curricular activities, including teacher and student functions, must be approved by the assistant principal, who is in charge of the calendar, and recorded on the calendar.

14

## III. ATHLETICS

Charlotte Catholic High School is a member of the North Carolina Athletic Association. We participate in the Mega 7 in addition to the State regulations for athletic programs; the following rule is followed by the coaches and athletes at CCHS:

During any school year, a student who fails one or more courses for any marking period may not participate in a sport until the next marking period, provided at that time he/she is in compliance regarding the passing of his/her courses. Also, a student must maintain a 2.0 grade point average for each marking period in order to be eligible. The student will be suspended from athletics effective the next school day after report cards are distributed. The suspension from athletics is in effect until the first school day after the distribution of report cards for the next marking period. The marking periods shall be defined as the First Quarter Grades, First Semester Grades and Third Quarter Grades. In the event that a spring sport extends beyond the last day of school, the Second Semester Grades shall be used to determine eligibility.

## IV. ACCIDENT REPORTS

Each faculty/staff member must complete an Accident Report immediately following an incident. A copy of the report is to be given to the principal.

## V. E-MAIL, CELL PHONES, FACEBOOK AND MY SPACE

Due to the rising liability issues throughout the U.S. and for your own protection, teachers and administrators may not distribute personal home phone numbers, cell numbers or personal e-mail addresses to students. All correspondence with students and parents should be through the school phone system and either the school or diocesan e-mail address.

15

CCHS 000056

JA0418

Teachers and Staff are prohibited from corresponding with students through Facebook and My Space, and all other social sites.

Violation of this guideline could result in immediate termination.

Teachers and administrators may not invite students to their homes unless the event is approved by the principal, prior to it happening.

# POLICIES AND PROCEDURES
# RELATED TO STUDENTS

## I.    DISCIPLINE

Charlotte Catholic High School is committed to a policy of requiring good discipline. It is expected that discipline will be the joint responsibility of the classroom teacher, the administration, the student and the parents. Without proper discipline in school and the home, education cannot go on. A concerted effort on the part of all teachers and students toward teaching/learning self-discipline is the basic goal of good discipline. It is expected that within the school, reciprocal channels of communication will be established which will lead to the development and acceptance of proper behavior standards on the part of teachers, pupils, administrators, and parents.

The disciplinary action taken must be deserved and commensurate with the offense. Disciplinary measures must <u>not inflict bodily harm</u>, subject the student to ridicule, or use punishment for punishment's sake.

In line with the establishment of channels of communication, the following procedures are set up for the handling of discipline cases requiring more than routine action by the teacher.

16

A. The teacher will refer pupils to the assistant principal or dean of students when:

   1. Efforts on the part of the teacher to work with the parents and student have failed. (The administration should not be the first contact with the home.)

   2. The exclusion of the pupil from the class is necessary to maintain a good classroom environment for all students.

## II. GUIDANCE DEPARTMENT

Teachers are to report any concerns about a student to the student's counselor. Counselors will hold conferences with individual teachers or groups of teachers regarding students on an as-needed basis.

## III. SUPERVISION OF PUPILS

All teachers are responsible for supervising students and have authority over students <u>at all times when school is in session as well as at all school-related events</u>. The school and teachers, as individuals, can be sued for any accident that occurs while we are supposed to be supervising students, if any negligence can be proved. This responsibility extends to all aspects of school life, e.g., if a student skips school and is not marked absent by a teacher and reported through the attendance office to the parents, there might be cause for legal action should an accident occur while the student is truant.

Smoking is <u>not allowed by students or employees on campus</u> or at any school-sponsored events.

A. **In the Classroom**

   1. The classroom teacher is accountable for pupils in his/her class from the time they first arrive until the end of the period.

   2. Insist on students getting to class on time.

17

3. Do not dismiss students from your class until the bell rings.

4. Do not keep students after the bell rings.

5. Do not send a student on an errand for you if there is any doubt about his/her finishing the errand in time to reach his/her next class on schedule.

6. Do not leave your students without adult supervision.

7. Do not detain a student from attending another teacher's class without first gaining that teacher's permission.

8. Teachers have authority over all they survey at school and all teachers are expected to assume responsibility for supervision of all pupils at school or school sponsored functions on or off campus.

B. **Supervision of Student Activities**

We want to maintain a well-balanced educational program for the students, and at the same time, keep our requests for out-of-class teacher supervision to a minimum. By sharing this supervision responsibility, it would not create a hardship on any one teacher, and all school-wide activities would have proper direction.

1. If a Mass or a prayer service or an assembly or a pep rally is held at a time when a teacher would normally be teaching he/she must be in attendance.

2. Teachers are required to be present at all those activities sponsored by the clubs/classes and to supervise these events.

C. **Hazing/Intimidation**

Hazing or intimidating of students or CCHS faculty/staff in any form is not permitted. Violators will be punished because hazing not only endangers safety to one's life, but it also indicates lack of respect for another individual.

18

Violators will be disciplined according to the seriousness of the offense; such discipline could lead to suspension or expulsion. This rule applies to all extra-curricular activities sponsored by Charlotte Catholic High School. This includes activities of clubs, sports, classes, etc.

D. **Honor Code**

The Christian philosophy of Charlotte Catholic High School is the basis for our Honor Code. The Honor Code represents the spirit of decency and fair play which is an essential quality of a good citizen. It places in the hands of each student the responsibility for honorable conduct as a way of life. A student who attends CCHS must be willing to accept this responsibility. All students are expected to work within the framework of this Honor Code. If a teacher suspects a student of a violation of the Honor Code he/she must have a conversation with the student explaining the reason for the suspension and give the student 24 hours to report to the dean of students.

We believe that personal honor and integrity, honesty, and respect in thought, word, and deed towards individuals and institutions are essential qualities of a student at Charlotte Catholic High School.

Please refer to the student Handbook for the Honor Code.

E. **Building**

Students are not to be in the classroom hallways during any lunch time. During lunch, the students are to remain in the cafeteria, the picnic area or the commons area. Students are not permitted to be in cars or in the parking lot at any time during the school day.

19

CCHS 000060

JA0422

F. **School Sponsored Trips or Meetings**

1. Students attending school-sponsored events shall not be counted absent from class.

2. Teachers desiring to take students on a day trip must obtain approval from the principal at least one week in advance. Teachers desiring to take students on an overnight trip must obtain permission from the principal at least one month in advance of the trip since the principal must have permission from the superintendent for overnight trips. A completed packet must be submitted with an application.

3. For day trips or overnight trips permission slips are to be sent to parents. A student may not participate in a trip unless he/she has returned a parent signed permission slip with the required insurance information listed. In addition to the permission slip for an overnight trip, a parent must complete the Overnight Trip Form and return it.

4. Copies of permission slips and overnight trip forms are to be given to the assistant principal.

5. A list of the names of each student making the trip is to be presented to the attendance office.

6. Permission forms to use the bus or any other school vehicle must be sent to the MACS Director of Transportation. There is a fee for using the buses and this should be included in the cost of the trip for the students. Please check current bus rates when you submit your request to reserve the buses. It is the policy of Charlotte Catholic High School that no student should be prohibited from participating in extracurricular activities or functions due to their inability to pay.

20

# REPORTING TO PARENTS

I.   The grading period will be nine weeks. Edline must be updated at least every two weeks. Also, a telephone call is required if the student is failing. Failure logs are to be sent to the assistant principal 4 ½ weeks into the quarter.

II.  Provision has been made on the report card to record the following grades for each subject:

   A. First Quarter        E. Third Quarter
   B. Second Quarter       F. Fourth Quarter
   C. Exam                 G. Exam
   D. First Semester       H. Second Semester

   The semester grade is the average of the quarter grades and the examination given at the end of the semester. The examination grade may not count more than 25% of the semester average.

III. The following numerical equivalent scale should be used by all teachers in all grades:

       A+  100
       A   94 - 99
       A-  93
       B+  92
       B   86 - 91
       B-  85
       C+  84
       C   77 - 83
       D+  76
       D   70 - 75
       F   69 and below

21

CCHS 000062

JA0424

# WRITING RECOMMENDATIONS

Teachers will be asked during the year to write recommendations for certain students. The following comments are taken from the Guide to the National Merit Scholarship Program as an aid in writing recommendations.

- The most useful recommendations are specific, objective, brief and individualize the student in one or more ways. Vague, general statements about a "fine boy," a "gracious girl," are apt to do the candidate little or no good.

- Illustrate special behavior, achievements. Information concerning negative or handicapping family backgrounds that the individual has overcome is valuable. Give specific examples of a student's ability to work, to study, to think, to deal with abstractions. Mention the student's integrity, citizenship, creativity. Indicate how the student exhibits ambition, drive, and zeal and give relevant examples. Talk in terms of what a student has done over and beyond assigned work—for example, in special areas of investigation or research. The best preparation for writing this letter is to think about the student in your classroom before you begin to write.

# POLICIES AND PROCEDURES
# RELATED TO PERSONNEL

I.  **ABSENCE OF INSTRUCTIONAL PERSONNEL**
    A.  **Time Off**
        In order to request time off a two-part form must be completed and returned to the assistant principal in charge of substitutes for approval. Please refer to the Diocesan policies for other personnel policies regarding Sick Leave, Bereavement Leave, Personal Leave, Family Leave, Leave without Pay, Jury Duty, etc.

22

CCHS 000063

B.  **Leave Of Absence without Pay**
A teacher absent from duty for reasons not falling under one of the classifications enumerated in Diocesan policies or otherwise authorized by the principal shall not be entitled to pay during the period of absence. Please see Diocesan policies.

C.  **Excusing Personnel Early**
1.  The administration may excuse a teacher early from school.

D.  **Substitute Teachers**
If you find it necessary to be absent, the assistant principal should be notified as soon as possible and not later than 6:30 a.m. on the day of absence. The assistant principal in charge of substitutes may be contacted at home at 704-552-5139, preferably the evening before or in the office at 704-716-2401.

E.  **Leaving School Grounds**
The office is to be notified anytime a teacher must leave the campus. This is necessary in case of telephone calls or other communications.

F.  **Preparation for Substitute Teachers**
Teachers substitute folder should contain the following items:
1.  Your daily schedule

2.  Updated class roster

3.  If you have a homeroom, a roster for morning attendance

4.  An assignment which is current and relevant

23

CCHS 009064

5. The assignment should take the entire class period and students should be accountable for the assigned work

6. Special instructions such as a special schedule

7. A list of class rules and expectations

## II. ATTIRE

Teachers are to be clean, dressed neatly and modestly according to professional standards. Shorts, t-shirts, mini-skirts, and denim may not be worn by the faculty or staff. Faculty and staff are expected to be professional role models for students and follow the guidelines for students regarding hair, jewelry, etc. The administration reserves the right to determine other inappropriate attire as necessary.

## III. CERTIFICATION

All teachers hired by Charlotte Catholic High School must follow the certification process as outlined by the Diocese of Charlotte. Please see Diocesan Policy for further information.

All certification changes which will affect salary should be reported to the assistant principal in charge of certification at once.

## IV PARENT-TEACHER CONFERENCES

Teachers are required to be present for all parent-teacher conferences.

## V. PURCHASE ORDER

All requests for materials must be approved by the principal. When requests for spending are for departmental equipment or materials, that request must go to the department chairperson who upon approval will submit the request to the principal. All order numbers to be used on requisition forms must be obtained from the administrative assistant.

24

CCHS 000065

JA0427

The school is not under any obligation to reimburse unauthorized expenditures or expenditures made without an approved purchase order in advance of spending. The individual will assume responsibility for the expense if the above procedure is not followed.

## VI.  SPEAKERS

Teachers need prior approval of the principal before scheduling any guest speaker.

## XI.  OTHER PERSONNEL POLICIES

Please consult your Diocesan Personnel Policy Handbook for other personnel policies.

# USE OF FACILITIES AND MATERIALS

## I.  AUDIOVISUAL EQUIPMENT

The media specialist is in charge of all audiovisual equipment. All teachers must adhere to all policies and procedures of the media center.

## II.  FACULTY WORKROOMS/PLANNING ROOMS

The faculty workrooms/planning rooms are reserved for the faculty use. Teachers may not invite students there for conferences. Students should not use the copiers, microwaves or other equipment in these areas. Student assistants should not be assigned to use the copiers. **Please do not send students to pick up your mail from the faculty mailboxes.** Your mail may contain confidential information, ballots or other information that students should not see.

## III.  KEYS

The business office keeps all keys and distributes them as directed by the principal.

25

CCHS 000066

JA0428

**IV. LOCKERS**

Teachers may not inspect lockers without a student's knowledge. The administration maintains the right to search. Teachers are to notify the principal, assistant principal, or dean of students if there is reason to search a student's locker, i.e., safety or health.

**V. MEDICATION**

Students should be referred to the nurse's office if they need medication.

**VI. TELEPHONE**

Students may only use the classroom telephones with faculty permission and **supervision**.

**VII. COPIER**

Copier machines are available for the teacher's instructional needs.

# TORNADO INSTRUCTIONS

TORNADO WATCH means a tornado is expected to develop.

TORNADO WARNING means a tornado has actually been sighted.

If there is a TORNADO WATCH, the administration will announce this situation over the PA system. You should then be prepared to act immediately if the WATCH is upgraded to a WARNING.

In the event that there is a TORNADO WARNING, the administration will announce this situation over the PA system and a series of triple tones will be sounded.

Upon announcement of a WARNING, students, faculty, and staff should move to the designated area and assume a curled position. Position yourself to be protected from flying glass and other objects.

26

| | |
|---|---|
| Cafeteria | Move to the administrative hallway away from the windows and assume a curled position. |
| Classrooms | Move to the hallway outside your classroom and assume a curled position. For those in classrooms in the center of the building where there are no windows, stay in the room and assume a curled position. |
| Commons | Move to the administrative hallway away from the windows and assume a curled position. |
| Kitchen | Move to the storage room and assume a curled position. |
| Library | Move to the administrative hallway away from the windows and assume a curled position. |
| Offices | Move to the administrative workroom and assume a curled position. |

# FIRE EVACUATION PLAN

**PURPOSE**

The purpose of this plan is to establish procedures for the systematic, safe, and orderly evacuation of Charlotte Catholic High School located at 7702 Pineville-Matthews Road by its occupants in case of fire or other emergency, and to instruct occupants in the use of available fire appliances.

**OBJECTIVES**

    a.   The primary objective of this plan is to minimize and/or prevent injury and property damage at Charlotte Catholic High School and immediate outside areas.

27

b. The secondary objective is to provide proper education as part of the continuing training program for all occupants, to assure the prompt reporting of a fire and the proper response to fire alarms, and the immediate initiation of fire safety procedures to safeguard life and contain fire until the arrival of the Fire Department. This Fire Safety Plan will be placed into effect by designated emergency evacuation personnel upon activation of fire alarms or notification of any emergency condition.

## EQUIPMENT INFORMATION

The design of our building incorporates the following features to insure maximum fire and life safety.

a. Automatic smoke detection system: All hallways, cafeteria, and commons areas have ceiling mounted smoke detectors.

b. Manual Pull Alarm Stations are located on the walls at each outside door entrance/exit and in the hallways.

c. Magnetic door closures are in hallways and automatically close doors when the fire detection system goes off.

d. An emergency power and lighting system will provide electrical power to the Fire Alarm Panel, the Public Address System and be sufficient for evacuation purposes.

e. Fire extinguishers are located throughout the hallways and other commons areas.

f. Emergency exits are marked with illuminated EXIT signs.

## FIRE EVACUATION DRILLS

Fire evacuation drills will be conducted monthly as a continuing part of the fire safety education program for the building. All personnel and students occupying the building will participate in the drills.

28

Details of drills and evacuation of their effectiveness will be maintained on record by the assistant principal. This information will be available for examination by building tenants and the Charlotte Fire Department personnel as requested.

## FIRE DRILL REGULATIONS
1. The alarm is sounded by a series of dual tones.

2. ABSOLUTE SILENCE is observed until students return to classrooms.

3. When the alarm is sounded students rise and leave the building in single file, without books, hats, coats, or other materials, walking rapidly but not running. Classes are to remain together.

4. Everyone is to exit the building according to the evacuation plan and take attendance.

## PROCEDURES FOR LOCK DOWN
Procedures for a lock down are to be implemented when the following announcement is made:

**"Sister Gloria, please come to the office."**

1. All classroom doors are to be locked and all students accounted for. Please move away from the door, keep silent, and if possible take cover under your desk.

2. Students who are in the hallway or bathroom should go to the nearest classroom and telephone your teacher immediately.

3. All classroom telephones are to be clear ASAP so that necessary calls can be made and/or received. Teachers, remove the telephone from the wall, keeping it plugged in and put it on the floor with you.

29

4.  All television sets should be turned to channel 2 for special bulletins.

5.  If a lock down is called for during break, lunch or between classes, then all students, faculty and staff should either move to or remain in the cafeteria, library or a nearby classroom. No one should be outside, in the commons, in the hallways or in the stairwells.

The above procedures are not meant to be limiting but are to be used as basic guidelines in an attempt to account for everyone and to keep everyone in groups. If safe passage cannot be made to a group or designated area, then please use your best judgment and stay where you are.

When the lock down is over, one of the following announcements will be made:

**"Sister Gloria has left the building." or simply "All clear."**

3 0

CCJS 00007

JA0433

JA0434



## Acknowledge of Receipt
## Of CCHS Faculty Handbook and
## Policy on Drugs and Alcohol for CCHS
## 2011-12 School Year

**Faculty and Staff:**

I have read the Diocese of Charlotte Catholic Schools Policy on Drugs and Alcohol posted on the *gocougars.org* web page. I understand the intention of the policy is to keep open communication among students, parents and the school community. The policy is centered on three basic components: Education, Intervention and Responsibility. A refusal to submit any test required by the policy will be deemed as a positive test and substance use violation with the accompanying consequences as set forth in the Policy.

This will also acknowledge that I have personally received a copy of the Charlotte Catholic High School Faculty Handbook for employees. I have read the Handbook or have had it read to me. I understand the contents and agree to comply with them.

Printed   *Lonnie Billard*   Name:
Date 8/30/11

Signature: *Lonnie Billard* Date 8/30/11

### PLEASE RETURN TO THE BUSINESS OFFICE

31

CCHS 000564



*Billard*
EXHIBIT NO. *9*
*8·16·17*  *AB*

# Code of Ethics Policy of the Diocese of Charlotte



**Effective August 15, 2004**
**Revision Date July 1, 2009**

**The Diocese of Charlotte**
**1123 South Church Street**
**Charlotte, NC 28203**
**(704) 370-6299**

CCHS-000079

JA0437

August 15, 2004

My Dear Brothers and Sisters in Christ:

Please accept my sincere gratitude for the very generous way in which you offer your time, talent and gifts in serving the people of Western North Carolina. It is through the prayers, efforts, dedication and collaboration of priests, deacons, religious, seminarians, lay employees and volunteers that we are able to serve those entrusted to our care. We know that as clergy, religious and laity of the Diocese of Charlotte, we have a responsibility to uphold the highest of moral, professional and ethical standards.

As clergy, religious, seminarians, lay employees and volunteers, we all share in the mission of the Church to continue the work of Jesus Christ. This is both a great privilege and an awesome responsibility. Those who publicly represent the Church, whether by office, employment or appointment, have a special obligation because they have accepted positions of trust. Because of this, the Church must be exemplary. Clergy, religious, seminarians, lay employees and volunteers should and will be held accountable for their behavior.

In order to maintain the highest level of accountability, this Code of Ethics Policy is adopted to assist in developing and implementing uniform guidelines for appropriate behavior while exercising ministerial and professional undertakings. It is not intended to address every situation that may arise, rather, it is intended to create a structure for addressing a variety of circumstances that, if not appropriately addressed, may create a risk of incidents, allegations, claims or lawsuits. As we read the code, we must remember that it is more than a set of standards. It is a way of connecting our values, ideals and moral responsibilities with the work that we do every day.

It is my sincere desire that all who are involved in the mission of the Church will exemplify the ethics and integrity lived and taught by Jesus, and that all those we serve will see in us His compassion and love.

Sincerely yours in Christ,

Most Reverend Peter J. Jugis, J.C.D.
Bishop of Charlotte

*Diocese of Charlotte*                                                              *July 1, 2009*

# PREAMBLE

Priests, deacons, religious, seminarians, pastoral ministers, administrators, lay employees and volunteers (Church Personnel) in our parishes, agencies, schools and organizations must uphold Christian values and conduct. The *Code of Ethics Policy of the Diocese of Charlotte* (Code) provides a set of standards for conduct in certain situations and is designed to deter wrongdoing and to promote honest and ethical conduct.

The public and private conduct of clergy, religious, seminarians, lay employees and volunteers can be a source of inspiration and motivation, but it can also scandalize and undermine the faith of the people that are served. Church Personnel must at all times be aware of the responsibilities that accompany their work. It is essential therefore, that anyone who undertakes a position of ministry, employment or leadership in the diocese, be ever mindful of the trust that has been placed in him or her. The faithful discharge of the responsibilities that accompany our work requires constant and prayerful reflection since all of us must be sustained by God's goodness and grace.

Responsibility for adherence to the Code rests with each individual. This responsibility requires each of us to periodically take a personal inventory. It is hoped that the Code will assist us in this task. Church Personnel who disregard this Code will be subject to remedial action. This action can take several forms, from a verbal warning to removal, depending on the nature and circumstances of the offense.

While no policy can anticipate all of the challenges and situations that may arise, the Code communicates key guidelines and will assist in making decisions that are ethical and in accordance with applicable legal requirements, the Diocesan Sexual Misconduct Policy, the Diocesan Personnel Policies Handbook, and the Diocesan Financial Policies Handbook. All Church Personnel are encouraged to discuss any questions or concerns they have with their supervisor. Before beginning any ministerial, employment or volunteer functions, Church Personnel will read or have read to them, understand, and sign the proper acknowledgement of receipt form, and comply with this Code.

# 1. PRINCIPLES OF ETHICS AND INTEGRITY

**1.1**   Church Personnel will conduct themselves at all times in a manner that is consistent with the teachings and precepts of the Roman Catholic Church.

**1.2**   Church Personnel will exhibit the highest Christian ethical standards and personal integrity.

**1.3**   Church Personnel will continually and objectively examine their own actions and intentions to ensure that their behavior promotes the welfare of the diocese and exemplifies the moral tradition of the Church.

**1.4**   Church Personnel will establish clear, appropriate boundaries with anyone with whom they have a ministerial, business, professional or social relationship.

**1.5**   Church Personnel will provide an environment that is free from physical, psychological, emotional, written or verbal intimidation or harassment.

**1.6**   Church Personnel will conduct their relationships with others that are free of deception, manipulation and/or exploitation.

**1.7**   Church Personnel will not sexually abuse or harass a minor child.

**1.8**   Church Personnel will report any suspected sexual abuse of a minor child as required by the diocesan Sexual Misconduct Policy.

**1.9**   Church Personnel will not take unfair advantage of a counseling relationship for their personal benefit.

**1.10**   Church Personnel will not use their position to exercise unreasonable or inappropriate power, influence or authority.

**1.11**   Church Personnel will not accept or confer an office, position, assignment or compensation, which may present the appearance of favoritism or a conflict of interest.

**1.12**   Church Personnel will be responsible stewards of diocesan resources, human and financial, observing both canon and civil law, and making decisions concerning the disposition of resources that reflect Catholic social teaching.

**1.13**   Church Personnel will not make false accusations against another, or reveal the faults and failings to anyone who is not in a position that necessitates a need to know.

1.14    Church Personnel will share concerns about suspicions of inappropriate behavior with the appropriate supervisory or management individual.

1.15    Accountability:    The Diocese and all its parishes, schools and organizations are responsible to its stakeholders, which includes donors and others who have placed their trust in the Church.  To uphold this trust, all Church personnel will:
- Promote good stewardship of all Church resources, including donations, grants, program fees, and all financial support.
- Use all Church resources only for Church related purposes.  Church resources are never to be used for personal purposes, even if it is intended to be temporary.
- Use all Church resources in a prudent-like manner, avoiding unnecessary and excessive spending and wastefulness.
- Use Church credit cards, vendor relationships and lines of credit only for Church related purposes.  They are never to be used for personal transactions, even if it is intended that Church funds will not be used for payment.
- Comply with all applicable laws and regulations.
- Not be a party to any fraud or embezzlement, or neglect their duty to safeguard all Church assets.

## 2.  GUIDELINES FOR WORKING WITH MINOR CHILDREN

2.1    Church Personnel are not to possess any sexually explicit or morally inappropriate materials on church, school or diocesan property, or in the presence of minor children.  Such materials include, but are not limited to, videos, films, pictures, recordings, drawings, posters, cards, calendars, clothing, computer software and/or games.

2.2    Church Personnel are not to engage in sexually oriented conversations with minor children, except in the context of sharing the Church's teaching on human sexuality.  Church Personnel are never to discuss their own sexual activities with minor children.

2.3    Church Personnel are not to take photographs of minor children who are unclothed or dressing, for example in a locker room or bathing facility, nor shall they permit such photographs to be taken by others.

2.4    Church Personnel are not to speak to minor children in a manner that is, or could be construed by an observer as derogatory, demeaning, threatening, intimidating or humiliating, and are not to use profane or foul language in the presence of minor children.

**2.5**    Church Personnel are not to use tobacco products, alcoholic beverages, illegal drugs, or any substance prohibited by law, nor are they to be under the influence of any alcoholic beverage or illegal drugs, when working with minor children. Church Personnel may administer medications to minor children if written permission from parents or legal guardians is given.

**2.6**    Church Personnel are not to sleep in the same bed, hotel or motel room, sleeping bag, tent or cabin with a minor child unless the Church Personnel is the parent, legal guardian or sibling of the minor child.

**2.7**    Church Personnel are not to share showering, bathing, changing or dressing facilities with minor children. When the good of the minor child requires that they be accompanied by an adult to/in any of these locations, the time alone with the minor child should be minimal and another adult should be made aware of the circumstances.

**2.8**    Church Personnel are not to take an overnight trip alone with a minor child who is not an immediate family member.

**2.9**    Clergy and religious are not to allow minor children to be overnight guests in their residence or private accommodations with the exception of an occasional visit from immediate family members. Other Church Personnel are not to provide shared or private accommodations in any diocesan facility, private residence, hotel or motel room, or any other place where there is no other adult supervision present.

**2.10**    When providing transportation for minor children, Church Personnel are to be validly licensed and authorized, ordinarily have written permission from parents or legal guardians, and are to transport minors directly to their approved destination, with no unauthorized stops or deviations unless it is a valid emergency.

**2.11**    At the end of any activity, Church Personnel are to release minor children in their care only to parents, legal guardians, or other persons designated in writing by parents or legal guardians.

**2.12**    Church Personnel should schedule one-on-one counseling sessions or meetings with minor children at times and locations that promote accountability and meet accepted standards of propriety.

**2.13**    Activities and programs for minor children are not to be administered by only one adult. During all activities and programs, facilities should be monitored.

**2.14**    Church Personnel are not to use physical discipline in any way for the

behavior management of minor children. No form of physical discipline is acceptable. This includes spanking, hitting, pinching, or any other physical force as correction or retaliation for inappropriate behavior.

2.15    Church Personnel are to immediately report the unusual or uncontrollable behavior of minor children to parents or legal guardians.

2.16    As a general rule, volunteers for programs involving working with minor children in parishes should be registered members of the parish for at least six months before being placed in a volunteer position. After careful consideration, exceptions may be made for parents of minor children in the specific programs in which their child or children are participating.

2.17    Reference checks should be conducted on employees and volunteers who transfer within the diocese before allowing them to participate in any program involving working with minor children.

## 3. PHYSICAL CONTACT WITH MINOR CHILDREN

3.1    Appropriate affection between Church Personnel and minor children is important for a child's development, and is a positive part of church life and ministry. However, touching must be based on the need of the minor child and not the adult, completely non-sexual, never in private, and otherwise appropriate.

3.2    Though not all-inclusive, the following examples are regarded as appropriate forms of affection:
- side hugs
- shoulder to shoulder or temple hugs
- pats on the shoulder or back
- handshakes
- high fives or hand slapping
- arms around shoulders
- holding hands while walking small children
- kneeling or bending down for hugs with small children
- holding hands during prayer

3.3    Though not all-inclusive, the following examples are forms of affection that are not to be used:
- lengthy or inappropriate hugs or embraces
- kisses on the mouth
- holding children over two years old on the lap
- touching the chests, knees, legs, bottoms or genital areas of

minor children
- showing affection in isolated areas or private rooms
- sleeping in bed with a minor child
- wrestling or tickling minor children
- any type of massage given to or received from a minor child
- comments or compliments that relate to body development or physique
- any form of unwanted affection

3.4    No one should be permitted to develop and/or start new programs for minor children without proper review and approval by the proper authority. Requests to develop new programs should be submitted in writing and must include provisions for adequate adult supervision.

## 4. CONDUCT FOR PASTORAL COUNSELORS AND SPIRITUAL DIRECTORS

4.1    Pastoral Counselors and Spiritual Directors are not to step beyond their competence in counseling situations and are to refer people being counseled to other professionals when appropriate.

4.2    While counseling a minor child, if a Pastoral Counselor or Spiritual Director discovers that there is a serious threat to the welfare of the minor, and that communication of confidential information to a parent or legal guardian is essential to the minor child's health and well-being, the Pastoral Counselor or Spiritual Director should disclose only the information necessary to protect the health and well-being of the minor child.

4.3    Pastoral Counselors and Spiritual Directors are to carefully consider the possible consequences before entering into a counseling relationship with someone with whom they have a pre-existing relationship.

4.4    Pastoral Counselors and Spiritual Directors will conduct all counseling sessions in appropriate settings and at appropriate times. No session is to be conducted in private living quarters.

4.5    Pastoral Counselors and Spiritual Directors are to avoid situations that might present a conflict of interest between a counselor and a person being counseled, including even the appearance of a conflict of interest.

4.6    Pastoral Counselors and Spiritual Directors are not to engage in sexual intimacies with anyone they counsel. This includes consensual and non-consensual contact, forced physical contact and inappropriate sexual comments.

*Diocese of Charlotte*                                                  *July 1, 2009*

CCHS 000086

JA0444

4.7   Pastoral Counselors and Spiritual Directors are not to engage in sexual intimacies with individuals who are close to the person being counseled, i.e. relatives and close friends.

4.8   Pastoral Counselors and Spiritual Directors assume the full burden of responsibility for establishing and maintaining clear, appropriate boundaries in all counseling and counseling-related relationships.

4.9   Pastoral Counselors and Spiritual Directors are to maintain a log of the times and places of sessions with each person being counseled.

4.10  Pastoral Counselors and Spiritual Directors should discuss the nature of confidentiality and its limitations with each person being counseled. Information that is disclosed during the course of counseling or advising is to be confidential, except for compelling professional reasons or as required by law.

4.11  If there is a clear and imminent danger to the person being counseled, or to others, the Pastoral Counselor or Spiritual Director may disclose only the information necessary to protect the parties affected and to prevent harm. Before disclosure is made, if feasible, the Pastoral Counselor or Spiritual Director should inform the person being counseled about the disclosure and the potential consequences.

4.12  With the exception of knowledge gained in the Sacrament of Penance, knowledge that arises from counseling sessions may be used in teaching, writing homilies, or other public presentations only when effective measures are taken to absolutely safeguard both the individual's identity and the confidentiality of the disclosures.

4.13  In accordance with the norm of canon law, the sacramental seal is inviolable, therefore, it is absolutely forbidden for a confessor to betray the confidence of a penitent in any way and for any reason. This is applicable whether the penitent is living or dead.

## 5. HARASSMENT

5.1   Church Personnel are to provide an environment that is free from sexual, psychological or physical harassment. This includes but is not limited to:
- physical or mental abuse
- unwelcome sexual advances or touching
- sexual comments and jokes
- requests for sexual favors used as a term or condition of

employment
- requests for sexual favors used as the basis for an employment decision
- displaying or wearing offensive material
- derogatory racial, religious, age, ethnic, physical or mental condition insults or slurs

**5.2**     Harassment can be a single, severe incident or a persistent pattern of behavior where the intent or the effect is to create a hostile, offensive or intimidating environment.

## 6. POLICY ON CONFLICTS OF INTEREST/PRIVATE INURNMENT, NEPOTISM, OUTSIDE EMPLOYMENT

**6.1**     Identifying a Private Inurnment or Private Benefit Problem:   In brief, "private inurnment" is the *payment* or diversion of an exempt organization's assets to its officials, officers, directors, employees, relatives, friends, major donors, or others in a special relationship to the organization who can influence or control the policy or the day-to-day activities of the organization *for less than full and adequate consideration.* It is a broad concept that can exist in a variety of transactions under a variety of circumstances. Private inurnment also extends to the use of organizational assets for "private benefits" such as sales, leasing, construction contracts, service transactions, etc., at other than fair market value or the exploitation of the exempt organization *for the benefit of a private business* (e.g., "sweetheart deals," promotional schemes, and/or giveaways to private individuals or businesses). Thus, under IRS regulations, a private benefit is similar to, but broader than, private inurnment.

To avoid material private inurnment or benefit in the types of transactions described above, the particular diocesan entity must enter into transactions for its benefit, rather than for a private party's benefit, and exercise due diligence to ensure that the proposed transaction is fair and reasonable such that under the circumstances the organization could not have obtained a more advantageous arrangement with reasonable effort. In addition to screening proposed transactions through the applicable councils and boards, care should be taken to follow diocesan policies and procedures pertaining to the signing of contracts.

**6.2**     Conflicts of Interest:   A conflict of interest may exist when persons employed by the diocese (i.e., the Central Administration, parishes, schools, agencies, and/or affiliated entities), or volunteers with influence over certain activities or transactions including those serving on advisory or consultative boards, councils or committees have a direct or indirect

financial interest, as defined below.

6.3   Financial Interest:  A person has a "financial interest" if the person has, directly or indirectly, through business, investment, or family (including spouses; brothers or sisters; spouses of brothers or sisters; ancestors; children, grandchildren, and great grandchildren; and spouses of children, grandchildren, and great grandchildren), any one of the following:

- An ownership or investment interest in any entity with which the diocese has a transaction or arrangement;
- A compensation arrangement with the diocese or with any entity or individual with whom the diocese has a transaction or arrangement;
- A potential ownership or investment interest with, or compensation arrangement with, any entity or individual with whom the diocese is negotiating a transaction or arrangement. Compensation includes direct and indirect remuneration as well as gifts or favors that are substantial in nature.

6.4   Church Personnel are to avoid situations that might present a conflict of interest.

6.5   Church Personnel are not to take advantage of anyone to whom they are providing ministry or service in order to further their own personal, religious, political, business or economic interests.

6.6   Church Personnel are not to solicit, accept or give any personal gifts, favors, or things of value which could influence, or which could be construed as influencing any decision or obligation to the performance of one's duties.

6.7   Relatives of Church Personnel, or of relatives of various diocesan boards, may be hired as employees only if they will not be working under the line of supervisory authority of a relative or the advisory authority of the board.  Generally, relatives include spouses, children, siblings, grandparents and grandchildren.

6.8   No member of any diocesan board is to knowingly take any action or make any statement that is intended to influence any undertaking of a parish, school, agency, department or institution of the diocese in such a way as to confer any benefit on such member or anyone in the member's family or business.

6.9   No member of any diocesan board, his/her family members, employer, business or business associates, is to solicit business or favors from any diocesan parish, school, agency, department or institution of the

diocese.

6.10    No member of any diocesan board is to vote in connection with any decision that may constitute a conflict of interest.

6.11    Outside employment is permitted as long as Church Personnel notify their supervisor of that fact and satisfactorily perform their job responsibilities. If an individual with an outside job does not perform his/her job requirements satisfactorily, he or she may be asked to terminate the outside employment.

6.12    Whenever a diocesan entity is considering conducting business with any person employed by the diocese (i.e., the Central Administration, parishes, schools, agencies, and/or affiliated entities) or any volunteer, or his/her family member, his/her business, or any entity in which he/she has an investment, the diocesan entity must solicit bids from at least two other sources and may not select the person/entity with the financial interest unless that person/entity is the lowest bidder.

6.13    Duty to Disclose: In connection with any actual or potential conflict of interest, an interested person must disclose the existence and nature of his or her financial interest and all material facts. Reports should be made to the pastor, principal, vicar general/chancellor, attorney, or chief financial officer. Reports made to pastors and principals are to be reported to the vicar general/chancellor. Reports should include relevant information that is discernible.

6.14    Investigation: The person to whom said report was made shall be responsible for a thorough and expeditious investigation of the actual/potential conflict of interest. Proposed decisions on the disposition of a case are to be discussed with the vicar general/chancellor or his designee. The results of all confirmed conflicts of interest and the final resolution shall be reported to the diocesan Finance Council.

6.15    Subsequent Conflicts and Disclosures: Notwithstanding previous disclosure of actual or potential conflicts of interest, an individual shall make a new disclosure of conflicts when any matter involving the conflict of interest arises for discussion or action. In the event that an individual is uncertain whether an actual or potential conflict of interest exists, the individual should make disclosure of the circumstances that may give rise to an actual or potential conflict.

6.16    Confidential or Privileged Information: Information known to be confidential that is acquired by individuals in the course of employment or association with the diocese and its affiliated entities shall be used

*Diocese of Charlotte*                                                    *July 1, 2009*

CCHS 000090

only for the benefit and purposes of the diocese. Individuals shall neither disclose confidential information outside the scope of their authorized duties nor utilize their position or association with the diocese for personal identification or advantage, although there may be instances, based on the use of careful discretion and judgment, where incidental use of the association with the diocese may be appropriate.

## 7. POLITICAL ACTIVITY

7.1    The Diocese of Charlotte encourages individual participation in civic affairs. However, Church Personnel are not to engage in political activities in a manner that may create the appearance that such activity is by or on behalf of the diocese.

7.2    Church Personnel are not to make any contribution to any candidate for public office or political committee on behalf of the Diocese of Charlotte or in a manner that may create the appearance that the contribution is on behalf of the diocese.

7.3    Church Personnel are not to use any parish, school or agency facilities, financial resources, or personnel to endorse or oppose a candidate for public office.

7.4    Church Personnel are to clearly communicate that they are not acting on behalf of the Diocese of Charlotte if identified as an official or employee of the diocese while engaging in political activities in an individual capacity.

## 8. WHISTLEBLOWER POLICY

8.1    The Diocese of Charlotte requires all representatives of the Church, including clergy, religious, directors, and other volunteers, and lay employees, to observe high standards of business and personal ethics in the conduct of their duties and responsibilities. All representatives of the Church must practice honesty and integrity in fulfilling their responsibilities and comply with all applicable laws and regulations.

The objectives of the Whistleblower Policy are to establish policies and procedures for:
- The submission of concerns regarding questionable financial or legal matters, violations and suspected violations of the Code of Conduct, Code of Canon Law and other concerns by the stakeholders of the Church, on a confidential basis;
- The receipt, retention, and treatment of complaints received by

CCHS 000091

the organization;

- The protection of anyone reporting concerns from retaliatory actions.

8.2    Reporting Responsibility - Each representative of the diocese has an obligation to report in accordance with this Whistleblower Policy any reasonably perceived violation of: (a) federal, state or local laws, rules and/or regulations; (b) the diocese's Code of Ethics; (c) the diocesan sexual misconduct policy; (d) diocesan personnel policies; (e) diocesan financial policies, including questionable or improper accounting or auditing matters; as well as gross mismanagement, waste, fraud, embezzlement, neglect of duty; and actions that threaten or are viewed as harmful to the health, safety and welfare of others and any other financial, legal or canonical concerns (hereinafter collectively referred to as Concerns).

Reports of Concerns should be made to the pastor, principal, vicar general/chancellor, attorney, or chief financial officer. Reports made to pastors and principals are to be reported to the vicar general/chancellor. All Concerns are to be reported as soon as possible. Reports of Concerns should include all relevant information about the suspected act, including any material evidence that exists.

8.3    Investigation - The person to whom said report was made shall be responsible for a thorough and expeditious investigation of the reported Concern.

Proposed decisions on the disposition of a case are to be discussed with the vicar general/chancellor or his designee. The results of all reported and confirmed Concerns and the final resolution shall be reported to the diocesan Finance Council.

8.4    No Retaliation - This Whistleblower Policy is intended to encourage and enable stakeholders to raise Concerns within the Organization for investigation and appropriate action. With this goal in mind, no stakeholder who, in good faith, reports a Concern shall be subject to retaliation or, in the case of an employee, adverse employment consequences. Moreover, anyone who retaliates against someone who has reported a Concern in good faith is subject to discipline up to and including dismissal from their position within the Church.

8.5    Acting in Good Faith - Anyone reporting a Concern must act in good faith and have reasonable grounds for believing the information disclosed is a legitimate matter of Concern. The act of making allegations that prove to be unsubstantiated, and that prove to have been made maliciously, recklessly, or with the foreknowledge that the allegations are false, will be viewed as a serious disciplinary offense and

DCHS 000092

may result in discipline, up to and including dismissal from their position with the Church. Such conduct may also give rise to other actions, including civil lawsuits.

8.6    Confidentiality - Reports of Concerns, and investigations pertaining thereto, shall be kept confidential to the extent possible, consistent with the need to conduct an adequate investigation. Disclosure of reports of Concerns to individuals not involved in the investigation will be viewed as a serious disciplinary offense and may result in discipline, up to and including termination of the violators' position in the Church. Such conduct may also give rise to other actions, including civil lawsuits.

## 9. CONFIDENTIALITY

9.1    Church Personnel, regardless of their work or volunteer responsibility, are to keep significant information on a confidential basis and are not to discuss it with anyone who is not directly involved.

9.2    Sacramental records are to be regarded as confidential. When compiling and/or publishing statistical information from these records, great care is to be taken to preserve the anonymity of individuals. Only those who are authorized to access these records and supervise their use are to have access to them.

9.3    Individual contribution records of parishes are to be regarded as private and are to be kept confidential.

## 10. REPORTING ETHICAL MISCONDUCT

10.1    Church Personnel are to hold each other accountable for maintaining the highest ethical and professional standards. When it appears that any Church Personnel has violated this Code, or any other religious, legal, moral, professional or ethical principle, the matter is to be reported to that entity's management authority or the Chancery.

10.2    All reports of possible violations of this Code will be treated in confidence as much as the diocese's duty to investigate and the law allow. If confidentiality cannot be maintained, the individual reporting the violation will be so advised.

10.3    All reported violations of this Code will be investigated, and if needed, appropriate action will be taken based on the nature of the violation and diocesan policy.

CCHS 000099

10.4   Retaliation against a person who suspects and reports a violation of this
       Code in good faith will be treated as an individual violation of this Code.

# Acknowledgement of Receipt
# Diocese of Charlotte Code of Ethics

This will acknowledge that I have personally received a copy of the Diocese of Charlotte Code of Ethics, and that I have read it, had it read to me, or listened to it on tape. I understand the contents and agree to comply with them.

_____          _____
Signature                                 Date


_____
Printed Name

*Diocese of Charlotte*                                    *July 1, 2009*

SCHS 000095

JA0453



# DIOCESE OF CHARLOTTE

## Personnel Polices Handbook

Revision Date July 1, 2009

The Diocese of Charlotte
1123 South Church Street
Charlotte, NC 28203
(704) 370-6299

Billard RFP 00052

Billard RFP 00053

# Table of Contents

INTRODUCTION ................................................................................................ 1

MISSION STATEMENT ...................................................................................... 3

HISTORY OF THE DIOCESE ............................................................................. 4

SECTION 100: EMPLOYMENT .......................................................................... 5

    *104. NATURE OF EMPLOYMENT* ................................................................ 6
    *110. EQUAL EMPLOYMENT OPPORTUNITY* ............................................. 6
    *116. IMMIGRATION LAW COMPLIANCE* ..................................................... 7
    *122. STAFFING PROCEDURES* .................................................................. 7
    *158. BACKGROUND CHECK POLICY* ......................................................... 8
    *164. ACCOMMODATIONS OF DISABILITIES AND OTHER MEDICAL CONDITIONS* .......... 9

Section 200: EMPLOYMENT STATUS AND RECORDS ................................... 11

    *210. EMPLOYMENT* .................................................................................. 13
    *216. PERSONNEL DATA CHANGES* .......................................................... 13
    *222. PERSONNEL FILES* ........................................................................... 13
    *228. PERFORMANCE EVALUATIONS* ....................................................... 13
    *234. TRANSFERS* ...................................................................................... 14
    *240. PROMOTIONS* .................................................................................... 14
    *246. REINSTATEMENTS* ............................................................................ 14

Section 300: EMPLOYMENT BENEFITS AND LEAVE PROGRAMS ............... 15

    *302. EMPLOYEE BENEFITS* ...................................................................... 16
    *306. GROUP INSURANCE PROGRAMS* ..................................................... 16
    *320. SAVINGS AND RETIREMENT PROGRAMS* ........................................ 17
    *332. STATUTORY BENEFITS* ..................................................................... 17
    *352. PAID SICK LEAVE* .............................................................................. 18
    *364. VACATION* .......................................................................................... 19
    *370. RELIGIOUS AND CIVIL HOLIDAYS* ..................................................... 20
    *374. LEAVES OF ABSENCE* ....................................................................... 21
        A. Personal Leaves of Absence ........................................................ 21
        B. Family Medical Leave .................................................................... 22
        C. Bereavement Leave ...................................................................... 27
        D. Military Leave ................................................................................ 27

Billard RFP 00054

JA0457

382. VOTING TIME .................................................................... 28

388. JURY DUTY ..................................................................... 28

Section 400: TIMEKEEPING AND PAYROLL ................................. 29

404. TIMEKEEPING ................................................................. 30

410. PAY DEDUCTIONS ............................................................ 30

Section 500: WORK HOURS ..................................................... 31

504. HOURS OF WORK .............................................................. 32

510. MEAL AND REST PERIODS .................................................... 32

516. OVERTIME ...................................................................... 32

522. INCLEMENT WEATHER ........................................................ 33

Section 600: WORK CONDITIONS ............................................. 35

604. SMOKING ....................................................................... 36

610. SAFETY .......................................................................... 36

616. USE OF DIOCESAN TELEPHONES, MAIL, EMAIL AND INTERNET ...... 36

622. USE OF DIOCESAN EQUIPMENT AND VEHICLES ........................ 37

628. AUTOMOBILE COMPENSATION ............................................. 38

634. SOFTWARE SECURITY ........................................................ 38

Section 700: EMPLOYEE CONDUCT AND WORK RULES ................. 41

704. ATTENDANCE AND PUNCTUALITY ......................................... 42

710. UNEXCUSED ABSENCES ...................................................... 42

716. CONFIDENTIALITY ............................................................ 42

722. COURTESY ...................................................................... 44

728. OUTSIDE COMPLAINTS ....................................................... 44

734. PERSONAL APPEARANCE ..................................................... 44

740. MEDIA RELATIONS ............................................................ 45

746. DRUG AND ALCOHOL USE .................................................... 45

752. FIREARMS AND WEAPONS ................................................... 46

766. SEXUAL AND OTHER UNLAWFUL HARASSMENT ....................... 46

776. DISCIPLINARY PROCEDURES ............................................... 48

782. IMMEDIATE DISCHARGE ..................................................... 49

788. RESIGNATION .................................................................. 50

794. RETURN OF PROPERTY ....................................................... 50

796. GRIEVANCES ................................................................... 50

iv

Roman Catholic Diocese of Charlotte Personnel Policies Handbook
Revised July 1, 2009

Billard RFP 00055

Section 800: CODE OF ETHICS ..................................................................... 53

Section 900: POLICY OF THE DIOCESE OF CHARLOTTE CONCERNING MINISTRY-
RELATED SEXUAL MISCONDUCT BY CHURCH PERSONNEL ................................. 73

Acknowledgement of Receipt ....................................................................... 93

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*                                                                    v

Billard RFP 00056

JA0459

Billard RFP 00057

# INTRODUCTION

The purpose of this Personnel Policies Handbook is to establish policy guidelines and procedures for the proper administration of personnel matters within the diocese. The handbook is designed to acquaint employees with the Roman Catholic Diocese of Charlotte and to provide them with information about working conditions, employee benefits and some of the policies affecting their employment. It offers a standardized approach for the administration of personnel policies and is thereby intended to reduce difficulties which might arise from unwritten policy, inconsistent policy, or lack of proper communication. Written standards, however, cannot address every situation, and the diocese relies heavily on each employee's innate good sense of what is proper and reasonable. Employees should read this handbook carefully and discuss with their supervisor any matters they do not understand. Priests, Deacons and Religious who are employed by the diocese will be covered by these policies except where specific written exclusions are reached and agreed to by the Chancery.

The policies contained herein are to be administered completely and inclusively to ensure the consistent and equitable treatment of all employees. They cover all persons employed by parishes, agencies, schools, ministries and offices of the diocese, including those hired under a separate employment contract. Throughout this handbook, "local authority" shall mean the employing parish, agency, school, ministry or department.

No employee handbook can anticipate every circumstance or question about policy. As the diocese continues to grow and as laws change and/or are enacted, the need may arise to change policies described in the handbook. The diocese, therefore, reserves the right to revise, supplement, or rescind any policies or portions of the handbook at any time.

As employees of the Diocese of Charlotte, we share in the mission which Christ entrusted to the Church, to spread the Gospel, to serve our brothers and sisters, and to build up the Body of Christ which is the Church. All of our employees must respect, appreciate, and uphold the teachings, principles, legislation, policies and traditions of the Roman Catholic Church in both word and example.

All employees should read, understand and comply with the provisions of the handbook. It describes many rights and responsibilities and outlines the programs developed by the diocese to benefit employees. On receipt of the handbook, employees will be required to sign an Acknowledgment of Receipt Form which will be placed in their personnel file.

Billard RFP 00058

Because this handbook is intended to state general guidelines and common practices that may be adapted or varied to fit different circumstances that may be changed, amended or even deleted as experience informs us, nothing in this handbook shall be deemed or construed as contractually binding. Similarly, nothing in this handbook may be construed as establishing any period of guaranteed employment, or as otherwise changing any employee's or the diocese's rights to end the employment relationship when we believe it is appropriate to do so.

Billard RFP 00059

## MISSION STATEMENT
## OF THE DIOCESE OF CHARLOTTE

We, the people of God
in the Diocese of Charlotte,
fortified in the Father,
redeemed in the Son,
empowered in the Spirit,
are called to grow ever more perfectly
into a community
of praise, worship, and witness.
We seek to become evermore enthusiastically
a leaven of service and a sign of peace
through love in Piedmont
and Western North Carolina.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

3

Billard RFP 00060

# HISTORY OF THE DIOCESE

The Diocese of Charlotte was established on January 12, 1972, with the Most Reverend Michael Joseph Begley, a priest of the Diocese of Raleigh, being ordained and installed as first Bishop of Charlotte. Bishop Begley served as Ordinary of the Diocese until his retirement in May 1984.

The Most Reverend John Francis Donoghue, a priest of the Archdiocese of Washington, succeeded Bishop Begley; he was ordained and installed as second Bishop of Charlotte on December 18, 1984. Bishop Donoghue was appointed Archbishop and transferred to Atlanta on June 22, 1993 and installed on August 18, 1993.

The Most Reverend William George Curlin, Auxiliary Bishop of Washington and Titular Bishop of Rosemarkie, was appointed the third Bishop of Charlotte on February 22, 1994, and installed on April 13, 1994. Bishop Curlin served the Diocese of Charlotte until his retirement on September 10, 2002.

On August 1, 2003, the Holy Father appointed the Most Reverend Peter Joseph Jugis, Judicial Vicar and Pastor of Our Lady of Lourdes Church in Monroe, as the fourth Bishop of Charlotte. Bishop Jugis was installed on October 24, 2003.

On September 29, 1974, Bishop Begley ordained the first priest for the Diocese of Charlotte. In January 1980, he announced that he would begin a Permanent Diaconate program in the diocese. The first diaconate formation class began in September of that year. On May 29, 1983, Bishop Begley ordained 19 men to the Permanent Diaconate for the Diocese of Charlotte.

The Diocese of Raleigh, established in 1924, was the first diocese in North Carolina; it included the entire State until the formation of the Diocese of Charlotte in January, 1972. At the time of the establishment of the new Diocese of Charlotte, the Catholic population of the area was just over 34,000; by 2006, the population was estimated to be more than 150,000 registered Catholics and another 240,000 unregistered. Because Catholics are a minority and, also, because there are many people who are considered "unchurched," there are many opportunities within the diocese in the area of evangelization. In fact, the Bishop declared the 1990s to be the "Decade of Evangelization."

The diocese is made up of 92 parishes and missions, 18 schools (15 elementary, 1 middle school and two high schools) and numerous charitable and social institutions. Catholic Social Services offers programs and outreach services to faiths, ages and nationalities, and has offices throughout the diocese.

The diocese consists primarily of two areas: the Mountain area in the west and far west and the Piedmont. The diocese encompasses 20,700 square miles; it includes the 46 western counties of the State of North Carolina.

4

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 00061

# SECTION 100: EMPLOYMENT

Roman Catholic Diocese of Charlotte Personnel Policies Handbook
Revised July 1, 2009

5

Billard RFP 00062

JA0465

## 104. NATURE OF EMPLOYMENT

This handbook is intended to provide employees with a general understanding of our personnel policies. Employees are encouraged to familiarize themselves with the contents of this handbook, for it will answer many common questions concerning employment with the diocese. However, this handbook cannot anticipate every situation or answer every question about employment. It is not an employment contract and it is not intended to create contractual obligations of any kind. Neither the employee nor the diocese is bound to continue the employment relationship, and if either chooses, they can end the relationship at any time.

In order to retain necessary flexibility in the administration of policies and procedures, the diocese reserves the right to change, revise or eliminate any of the policies and/or benefits described in this handbook. The only recognized deviations from the policies contained herein are those authorized and issued through the Chancery.

## 110. EQUAL EMPLOYMENT OPPORTUNITY

The responsibility for assuring that equal opportunity is realized in the diocese rests with every employee. Each Pastor, Principal, Department Head, Manager and Supervisor shall actively support and promote the diocese's Equal Employment Opportunity program and remain informed of and sensitive to the equal opportunity impact of all employment decisions made in their respective areas of responsibility.

It is the policy of the diocese that employment decisions shall be based on qualifications and competence. Except where required or permitted by law or by the diocesan Equal Opportunity Policy, employment practices shall not be influenced or affected by virtue of an applicant's or employee's race, color, sex, national origin, age, disability or any other characteristic protected by law.

The Equal Opportunity Act of 1972 expanded coverage of Title VII of the Civil Rights Act of 1964, as amended, to include both public and private educational institutions. It did, however, grant exemption to religious institutions, including religious educational institutions. The exemption applies only to positions that pertain to carrying on the religious activities of the institution or where faith and worship participation are required as essential for fulfilling the position. Religion is a bona fide occupational qualification in those circumstances that involve religious activities, and hiring an individual on the basis of religion, in that circumstance, is permitted. Except as to positions that involve religious activities, the diocese will not be influenced or affected by an applicant's or employee's religion.

Employees with questions or concerns about any type of discrimination in the workplace are encouraged to contact their immediate supervisor, a higher level manager, the on-site director, or the diocesan Human Resources Office. Employees can raise concerns and make reports without fear of reprisal. Anyone found to be engaging in any type of

6      *Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009.*

Billard RFP 00063

unlawful discrimination will be subject to disciplinary action, up to and including discharge.

## 116. IMMIGRATION LAW COMPLIANCE

The diocese complies with the Immigration Reform and Control Act of 1986 and is committed to employing only United States citizens and others who are authorized to work in the United States.

As a condition of employment, each new employee must properly complete, sign and date the first section of the Homeland Security Form I-9. Before beginning work, newly rehired employees must also complete the form if:

1. They have not previously filed an I-9 with the diocese, or;
2. If their previous I-9 is more than three years old, or;
3. If their previous I-9 is no longer valid.

I-9s are not to be placed in employee personnel files. They should be filed separately in one of two folders labeled either separated or current employees.

## 122. STAFFING PROCEDURES

No parish, agency, school, ministry or office may create a new position, hire an employee or replace an employee without prior approval of the local authority. The required procedures for filling vacancies must be followed when hiring or promoting employees.

When a new employee is hired, a personnel file for that person shall be established and maintained by the local authority. The file shall contain the original employment application and related documents, current salary and job description, evaluations, warnings, commendations, correspondence, and any forms required by federal or state laws. It shall also include a signed statement that the employee has received a copy or a tape of this handbook and a copy or tape of any other applicable policies, including the diocesan sexual misconduct policy and the Code of Ethics.

Contracts for Teachers, Assistant Principals, and Principals are for one year only. The contracts for school employees shall be the standard diocesan contracts. Schools contacts will be offered annually by April 30 to those persons who are currently under contract and will be receiving a contract for the coming year. Contracts are to be signed and returned within fourteen (14) working days upon receipt of the contract. The contract is void beyond the deadline unless an extension of time has been specifically agreed to in writing by the employee and Principal/Superintendent.

Billard RFP 00064

## 158. BACKGROUND CHECK POLICY

State law (NC Gen. Stat. Sec. 114-19.3) requires criminal record checks of individuals who are employed by, or volunteer for, among other things, any profit or non-profit employer that provides direct care or services to children, the sick, the disabled, or the elderly. Federal law (42 USC 13041 (a), (b), (c)) states that an employer may also consider any conviction that may bear upon an individual's fitness for working with children. Additionally, there has been a national upsurge in workplace theft and fraud. Therefore, it is the policy of the Diocese of Charlotte that the employment of all individuals in paid positions in the diocese and all individuals in volunteer positions will be contingent upon the satisfactory completion of a criminal background check. This policy is not restricted to new employees and volunteers, but applies to all current and future employees and volunteers of the diocese who are eighteen (18) years of age or older.

Because an arrest record is, by definition, not evidence of criminal guilt, such information should generally not be used as definitive grounds for rejection. However, evidence of a criminal conviction may, depending upon the nature of the conviction and the related circumstances, be information that must be considered.

PROCEDURE

1. All applicants for paid and volunteer positions in the diocese who are eighteen (18) years of age or older will be informed that criminal background checks will be conducted. In addition, a Sexual Offenders Registry Index Check will be conducted for all applicants for paid or volunteer positions. Background checks are not required for applicants under the age of eighteen; however, these individuals must be under direct supervision at all times. A background check must be completed once the individual reaches the age of eighteen. Background checks are to be repeated at least every five years for active employees and volunteers.

2. Additional background checks in areas specifically related to certain positions may be required. However, additional background checks will be limited in scope and must relate directly to the volunteer or employment position.

3. Any offer of employment, or any offer of acceptance as a volunteer, will be presented in writing to the applicant as an offer that is conditional, based upon the receipt of a favorable background check.

4. Background checks will be conducted only when the applicant or volunteer agrees to the conditional offer of employment or acceptance. At that time, the individual seeking employment or volunteer status will complete a diocesan *Notification and Release* form. Background checks cannot be initiated unless this form is completed, signed and dated by the individual and the requesting official.

5. An individual who accepts a conditional offer of employment or acceptance as a volunteer may not begin active employment or volunteer activity until the background check has been completed.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 00065

6. No diocesan parish, agency, department or school will employ, or accept as a volunteer, any individual who refuses to consent to a background check.

7. The diocesan Human Resources Office will coordinate the processing of all background checks through the use of an outside vendor. The diocese will adhere to the requirements of the *Fair Credit Reporting Act* in all of its practices regarding background checks.

8. All background check requests must be submitted to the diocesan Human Resources Office on the official release form. The requesting official will be notified of the results of the completed background check. The requesting parish, agency, school or department will be billed for the cost of the background checks for its location.

9. If the background check reveals a criminal history, the applicant must be given the opportunity to provide an explanation, submit additional information, or challenge its accuracy. The parish, agency, department or school should consider the following factors before deciding whether or not to offer or deny employment or acceptance as a volunteer:

   - The length of time since a conviction
   - The nature of the crime
   - The relationship between the duties to be performed and the crime committed
   - The number of convictions
   - Rehabilitation efforts
   - Subsequent employment or volunteer history

10. All background check information is to remain confidential. Failure to adhere to this confidentiality requirement by diocesan personnel may result in disciplinary action, up to and including termination.

## 164. ACCOMMODATIONS OF DISABILITIES AND OTHER MEDICAL CONDITIONS

The Diocese of Charlotte's policy is to base selection and other employment criteria on job-related reason and to make reasonable accommodations to assist otherwise qualified disabled applicants and employees in meeting these criteria once we are made aware their disabilities and if the accommodations do not cause an undue hardship for the diocese. For purposes of this policy, "qualified disabled applicant and employees" include applicants and employees who have a mental or physical impairment that substantially limits one or more major life activities, and who meet the skill, experience, education, and other job-related requirements of a position desired or held and can perform the essential functions of the job, with or without reasonable accommodation. We reserve the right to require medical documentation of a disability.

Billard RFP 00066

If you have a disability that will require an accommodation to perform an essential function of a job desired or held, it is your responsibility to notify your supervisor of the disability and of the need for an accommodation. We then can work with you to try to provide a reasonable accommodation, taking into consideration your specific condition and the operational requirements and financial cost and expense to the diocese, among other factors. Please be aware that although we would like to keep employment opportunities open for qualified individuals, we will not be able to accommodate an applicant or employee who poses a significant risk to the health or safety of himself or herself or others in the workplace (including coworkers, vendors and visitors) if a reasonable accommodation will not eliminate or significantly reduce the risk.

We will try to keep disclosures of disabilities, all medical documentation and other information pertaining to such disabilities, and any reasonable accommodations proposed or made for an applicant or employee as confidential as possible. Of course:

1. Appropriate members of management may be informed regarding any restrictions in work duties or necessary accommodations;

2. First aid and safety personnel may be informed, when appropriate, if a disability might require emergency treatment;

3. Government officials investigating compliance with the Americans with Disabilities Act may be provided information in compliance with applicable laws and regulations;

4. We may submit information to the appropriate state workers' compensation agency or our workers' compensation carrier(s) in accordance with applicable workers' compensation laws; and

5. We may use the information for insurance purposes.

We also may consult with occupational health professionals and other similar agents for purposes of considering possible direct threats to health or safety posed by an individual with a disability and/or possible reasonable accommodations for that individual.

10

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 00067

# Section 200: EMPLOYMENT STATUS AND RECORDS

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2000*

11

Billard RFP 00068

JA0471

## 204. EMPLOYMENT CATEGORIES

Each employee is designated as either nonexempt or exempt from federal and state wage and hour laws. Nonexempt employees are entitled to overtime pay under the specific provision of federal and state laws. Exempt employees are excluded from specific provisions of federal and state wage and hour laws. These policies apply to five types of employees:

**Introductory Employees** - new employees who are appointed to a position for a three month introductory period. At the end of the three month period, with the approval of the local authority, the employee will be considered regular full-time or regular part-time. The introductory period may be extended for an additional three months, if the local authority believes that more supervision and/or training will enable the employee to work at an acceptable level of performance. During the introductory period, it may become apparent that the employee is not suitable for the particular job. In this case, employment may be terminated.

**Regular Full-time Employees** - employees who are regularly scheduled to work a minimum of thirty (30) hours in a work week. Regular full-time employees are typically entitled to all fringe benefits, subject to the eligibility requirements as stated in the benefits plans.

**Regular Part-Time Employees** - employees who are regularly scheduled to work from fifteen (15) to twenty-nine (29) hours in a work week. Regular part-time employees will accumulate vacation and sick leave on a prorated basis; however, they are not eligible for participation in the diocesan insurance plans. Regular part-time employees may be eligible to participate in the Lay Retirement and 403b programs, subject to the eligibility requirements of the plans.

**Part-Time employees** - employees who are scheduled to work less than fifteen (15) hours in a work week or are called in from time-to-time. Part-Time employees will be hourly employees. Part-time employees may be eligible to participate in the 403b plan, subject to the eligibility requirements of the plan.

**Temporary Employees** - employees who are hired as interim replacements to temporarily supplement the workforce, or to assist in the completion of a specific project, regardless of the number of hours per week they work. Employment assignments in this category are of a limited duration, usually no longer than six months. Employment beyond any initially stated period does not in any way imply a change in employment status. Temporary employees retain that status unless and until notified in writing of a change by the local authority. Temporary employees will receive all legally mandated benefits; however, they will be ineligible for other benefit programs in the diocese.

**Contract Employees** - employees employed under written contracts for a specified term. All such employees must adhere to the policies and procedures contained in this handbook, as well as the terms of their written contracts. Compensation and benefits for these employees usually are defined by their contracts, subject to the eligibility requirements of the benefit plans. Continued employment is not implied beyond the specified term of the contract.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 00069

## 210. EMPLOYMENT

Each applicant for employment in the diocese must complete the standard diocesan application form and any related documentation required by the local authority, and submit a resume if applicable. The diocese relies heavily on the accuracy of information contained in the employment application, as well as the accuracy of other data presented throughout the hiring process and subsequent employment. The diocese reserves the right to verify all information given by an applicant or employee, which may include reference, education and criminal record checks. Any misrepresentations, falsifications, or material omissions in any of this information or data may result in the diocese's exclusion of the individual from further consideration for employment or, if the individual has been hired, termination of employment.

## 216. PERSONNEL DATA CHANGES

It is the employee's responsibility to promptly notify the local authority of any changes or corrections in personnel data so that this information will be accurate and current at all times. Personnel data includes current Social Security Numbers, birth dates, addresses, telephone numbers, marital status, number and names of eligible dependents, beneficiary information, individuals to be contacted in the event of an emergency, and educational accomplishments.

## 222. PERSONNEL FILES

Personnel files will be established for all employees. Personnel files are the property of the diocese and are to be kept in a locked and secure place. Access to the information they contain is restricted. Only officials and representatives of the diocese, and certain regulatory bodies who have a legitimate reason to review information in a file are allowed to do so.

Medical records and related information are to be kept separate and apart from personnel files in a locked and secure location. I-9 Forms are not to be placed in employee personnel files but should be filed separately in one of two folders labeled either separated or current employees. Certification files for school personnel will be maintained by the Catholic Schools Office.

With reasonable advance notice, employees may be permitted to review material in their files, but only in the presence of supervisory or management officials.

Billard RFP 00070

## 228. PERFORMANCE EVALUATIONS

Formal performance reviews must be conducted on an annual basis to provide both supervisors and employees the opportunity to discuss job tasks, identify and correct weaknesses, encourage recognized strengths, and discuss positive, purposeful approaches for meeting goals. The formal evaluation shall be on an appraisal form that has been adopted and/or approved by the diocesan Human Resources Department.

## 234. TRANSFERS

Employees who transfer from one parish, agency, school, ministry or department within the diocese to another, in the same employment category, will retain and carry with them their length of service and benefit status at the time of their transfer. If the transfer involves a change in employment category, length of service status will be retained; however, any change in benefit eligibility will begin on the effective date of the transfer.

Vacant positions should be posted internally so that interested employees may apply. If a current employee wishes to be considered for a vacant position, he or she should advise the current supervisor and submit a written application for the vacant position.

## 240. PROMOTIONS

Promotions shall depend primarily on an employee's appraised performance and qualifications. Length of service, though a consideration, will not in itself constitute the sole basis for promotion.

Vacant positions should be posted internally so that interested employees may apply. If a current employee wishes to be considered for a vacant position, he or she should advise the current supervisor and submit a written application for the vacant position.

## 246. REINSTATEMENTS

Employees who have a break in service and are rehired, or hired by another parish, agency, school, ministry or department of the diocese within sixty (60) days of the date of separation, will retain their length of service status and accumulated sick leave. The retention of insurance, savings and retirement benefits will be governed by the eligibility requirements of the particular policy.

Billard RFP 00071

# Section 300: EMPLOYMENT BENEFITS AND LEAVE PROGRAMS

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

13

Billard RFP 00072

JA0475

## 302. EMPLOYEE BENEFITS

The diocese has established a number of benefits programs for eligible employees. These include health, long-term disability and life insurance programs, retirement and savings programs, various types of leaves and excused absences, paid holidays and vacations. The diocese also complies with applicable laws by paying all or part of the costs associated with certain public welfare programs like workers' compensation, social security and Medicare.

Many of these benefits programs are generally described in the following pages; however these descriptions are merely intended to inform you about the types of benefits that may be available by virtue of your employment. The descriptions contained in this section are not intended as representations that you are eligible for or will receive the above benefits, nor are they intended to state all terms that may govern each of these benefits programs.

Many of the benefits programs discussed in this section have separate plan documents that should be consulted to determine the specific terms and conditions for these programs. The programs that have such documents are identified in the descriptions that follow. To the extent anything stated in this handbook conflicts with these plan documents, the terms of the plan documents are controlling. Any supervisors and human resources representatives also may be able to help you to understand your benefits; however, again, you are reminded that the plan documents that exist for such benefits programs are controlling and should always be reviewed in regard to any questions that you may have.


## 306. GROUP INSURANCE PROGRAMS

Regular full-time employees may be eligible for medical insurance, which includes health, dental, prescription drugs and vision coverage, long-term disability insurance and life insurance through various group insurance plans sponsored by the diocese. Much of the cost of these benefits is borne by the diocese, but employees may be required to pay some portion of the premiums, depending upon the type of coverage. Medical and life insurance coverage may also be available for spouses and dependent children at the employee's expense. The terms and conditions applicable to these insurance programs and the benefits that are available through these programs are more fully described in the insurance booklets and plan documents applicable to each type of coverage. In addition, you may discuss any questions that you may have about these various insurance programs with your Human Resources representative.

16

Billard RFP 00073

## 320. SAVINGS AND RETIREMENT PROGRAMS

The diocese sponsors the following retirement and savings programs that may be applicable to your employment:

**Lay Retirement Program** – Lay employees who meet the eligibility requirements may participate in the Lay Retirement Program. The diocese makes contributions to the program for eligible employees. A more complete description of the terms and conditions that are applicable to this retirement program is contained in the Lay Retirement Handbook and the applicable plan documents. In addition, you may discuss any questions that you have about this retirement program with your human resources representative.

**403b Savings and Retirement Plan** – Most full-time and part-time employees are eligible to participate in the diocesan 403b plan. Contribution amounts are subject to the limits set by the plan and by the federal government. The diocese also makes a matching contribution, subject to plan limits, to your account. A more complete description of the terms and conditions applicable to participation in this plan and the benefits that it provides is contained in the 403b Plan Handbook and the applicable plan documents. You may also discuss any questions that you may have about this plan with your Human Resources representative.

## 332. STATUTORY BENEFITS

You may also be eligible for certain statutory benefits that are provided by federal and/or state law. Some of these benefits are funded in whole or part by contributions paid by the diocese. The following describes the statutory benefits that may be applicable to your employment:

**Unemployment Compensation** – As a result of the decision of the North Carolina Court of Appeals in the case of *Michael J. Begley, Bishop of Charlotte, North Carolina vs. Employment Security Commission of North Carolina,* 274 SE2d 370, employees of the diocese are not covered by unemployment compensation.

**Workers' Compensation** – Employees of the diocese are covered by Workers' Compensation Insurance. On-the-job injuries must be reported to the proper authority as soon as possible after the injury. Time that is taken off by an employee due to a work-related injury will be coordinated with the use of Family Medical Leave Act (FMLA) leave. FMLA leave and paid sick leave will run concurrently with any leave attributable to an injury that is covered by workers' compensation.

**Social Security and Medicare** – The diocese pays one-half of the contributions required for social security and Medicare benefits based on your diocesan wages. These contributions are a major source of funding for the retirement income and health insurance benefits under federal law when you reach retirement age or if you should become disabled. While these are potentially important benefits, employees are

Billard RFP 00074

JA0477

encouraged not to view these benefits as all that they would need when they are eligible to retire or in the event of a disability. The current pressures on the social security and Medicare systems have raised serious questions about the level of benefits that the government may be able to provide in the future. Employees therefore are encouraged to participate in the 403b plan that is available through the diocese to the extent that they are eligible, and also to consider personal savings plans, individual retirement accounts and other savings and investment options to begin preparing now for retirement.

## 352. PAID SICK LEAVE

The diocese provides paid sick leave benefits to eligible employees for periods of temporary absence due to illness or injuries. Sick leave benefits may only be used for excused absences.

Regular full-time and part-time employees accrue the hourly equivalent of one day of sick leave per month. The calculation of accrued sick leave is based on an average day in a 5-day workweek, no matter which days an employee normally works. For employees whose hours vary from week to week, an average number of hours per week will be used to calculate sick leave. For example, an employee who works 20 hours per week in any combination of days, earns 4 hours of sick leave each month (1/5 of his/her regular weekly hours). Teachers and 10-month school administrators earn eight (8) days of sick leave each school year.

The maximum accrual of sick leave is ninety (90) days. Once the maximum is reached, no further sick leave will be accrued unless leave is taken and the balance falls below the maximum. For employees on leave of absence, the accrual of sick leave stops after they have been on leave for thirty (30) calendar days or more. It shall be the responsibility of both employees and their immediate supervisors to keep an accurate record of the accumulation and use of sick leave. **No payment will be made for unused sick leave upon termination or resignation.**

In cases of injury when an employee is receiving worker's compensation benefits, sick leave may be coordinated with worker's compensation up to the amount of the employee's accumulated sick leave.

Employees who qualify for family medical leave under the provisions of this handbook and the Family Medical Leave act will be required to use paid sick leave in conjunction with the approved family medical leave. Sick leave benefits must also be used in conjunction with any other type of medical-related leave that does not otherwise fall under the provision of the family medical leave policy.

Sick leave benefits may only be used in regards to excused absences and approved family medical leave, workers' compensation-related leaves, and other leaves necessitated by personal or family illness involving a parent, spouse or child. Employees are expected to provide reasonable notice of medical leaves and health care-related appointments that are foreseeable. Failure to do so may result in a denial

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 00075

of sick leave benefits, as well as potential delays in the start of approved leave and/or disciplinary action for unexcused absences. The diocese reserves the right to require a doctor's excuse before approving a request to use sick leave benefits whenever there is reason to believe that an employee is abusing the paid sick leave policy or whenever the medical situation underlying the request is otherwise unclear. A finding that the policy has been abused may result in disciplinary action, up to and including discharge.

In limited circumstances, employees can donate unused sick leave to other employees who have a serious medical condition. The condition must require that the employee be out of work for more than sixty days, and the employee must have no accumulated sick leave of his/her own available. **The illness must meet the definition of a serious illness as specified by the Americans with Disabilities Act.** The maximum donation allowed per employee is ten (10) days. The maximum receipt of donations per employee is thirty (30) days. The term "days" as used in this section will correspond to the number of hours in the normally scheduled work day of the employee who receives the donated leave. The availability of paid sick leave does not extend the provisions of the Family Medical Leave Act beyond those allowed by the law.

## 364. VACATION

Vacation time off with pay is available to eligible employees to provide opportunities for rest, relaxation and personal pursuits. School contract employees are not eligible to accrue paid vacation time under this policy; however, they are granted personal days each school year.

*Note: The accrual of vacation time is based on the hourly equivalent of an employee's regularly scheduled workweek. An average day is calculated to be one-fifth of an employee's scheduled workweek hours. For employees whose scheduled hours vary from week to week, an average number of hours per week will be used for the calculation of vacation. This applies both full-time and part-time employees.*

*For regular full-time employees (30 hours or more per week), the vacation benefit is:*

- *Employed up to five years as of employment anniversary date — the hourly equivalent of two regularly scheduled workweeks per year are accrued;*

- *Employed at least five but less than ten years as of employment anniversary date — the hourly equivalent of three regularly scheduled workweeks per year are accrued;*

- *Employed ten or more years as of employment anniversary date — the hourly equivalent of four regularly scheduled workweeks per year are accrued.*

*For regular part-time employees (15 – 29 hours per week), the vacation benefit is:*

- *Employed up to five years as of employment anniversary date — the hourly equivalent of two regularly scheduled workweeks per year is accrued;*

- *Employed five or more years as of employment anniversary date — the hourly equivalent of three regularly scheduled work weeks per year is accrued.*

Earned vacation is accrued beginning with the date of hire. Although accrual begins at the date of hire, employees are not permitted to take paid vacation during the introductory period. Once the introductory period is successfully completed, vacation accrual is effective from the date of hire. Vacation will be accrued on an ongoing basis throughout the year.

When a recognized diocesan holiday falls during a scheduled vacation, the day is not counted as a vacation day.

If an employee becomes ill during a scheduled vacation, the day(s) cannot be changed from vacation to sick, even if the employee would ordinarily take a sick day in such circumstances.

Accrued vacation may be carried over from one year to the next; however, the maximum carryover on January 1 each year is the equivalent of twenty (20) days. *In special circumstances, accumulated leave that is above the maximum may be carried over if requested by employee and approved by the Chancellor in writing. If this occurs, the overage must be taken before the end of the second quarter of the calendar year.*

Employees who qualify for family medical leave under the provisions of this handbook and the Family Medical Leave act will be required to use paid vacation leave in conjunction with the approved family medical leave, if they have exhausted their accrued sick leave benefits. For employees on leave of absence, the accrual of vacation time stops after they have been on leave for thirty (30) calendar days or more. It shall be the responsibility of both employees and their supervisors to keep an accurate record of the accrual and use of vacation time.

When either party terminates the employment relationship, the accrual of vacation time ceases as of the last day worked. Payment will be made for any unused accrued vacation time; however, there will be no payout of vacation time if the termination occurs during the introductory employment period.

Unless it is an emergency situation, vacation requests must be submitted by the employee and approved by the supervisor in advance of the vacation. There can be no advancing of paid unearned vacation. With the supervisor's approval, an employee may be allowed to take time without pay if no accrued vacation is available. In scheduling vacations, supervisors will review requests based on a number of factors, including employees' length of service, office needs and staffing requirements.

Contract school employees do not accrue vacation time; however, they are granted two (2) days per year for personal business. Personal days are not carried over from year to year. Requests for such leave should be submitted in advance whenever possible.

Billard RFP 00077

## 370. RELIGIOUS AND CIVIL HOLIDAYS

The diocese recognizes specific holidays for employees of the *Pastoral Center. Because of variations in staffing needs, the holidays at other locations are set by the local authority and may differ from the following:*

New Year's Day
Martin Luther King, Jr.
Holy Thursday (half day), Good Friday and Easter Monday
Memorial Day
Fourth of July
Feast of the Assumption
Labor Day
All Saints
Thanksgiving Day and Friday
Feast of the Immaculate Conception
Christmas Day and two days

When holidays other than a religious holiday fall on a Saturday or Sunday, eligible employees will be given the preceding Friday or the subsequent Monday off. When a movable religious holiday other than Christmas falls on a Saturday or Sunday, no other day off will be given.

## 374. LEAVES OF ABSENCE

The diocese provides leaves of absence to assist eligible employees in dealing with personal circumstances, personal family illness, or military service obligations. Employees typically should notify their supervisors, in writing, when they foresee the need for a leave of absence. Whenever advance notice that a leave be needed is not reasonably possible because of particular circumstances beyond the employee's control, the employee or responsible family member should notify the employee's supervisor as soon as reasonably practical that one of the leaves described below may be needed.

A.  Personal Leaves of Absence
B.  Family Medical Leave
C.  Bereavement Leave
D.  Military Leave

Leaves provided in the following situations are subject to the terms and conditions stated herein.

A.  Personal Leaves of Absence

A leave of absence for personal, business and/or family matters may be granted as a privilege to employees.   Requests for leaves of absence are to be in writing and are to state the reason for and probable duration of the leave.  All leaves require the written approval of the appropriate authority.  In cases of extended leave, employees should contact the appropriate authority for the coordination of applicable benefits while on

Billard RFP 00078

leave. Personal leaves of absence are to be without pay; however, if accrued vacation time is available, it must be used during times of authorized personal leave.

**B.  Family Medical Leave**

Leave provided under the Family Medical Leave Act (FMLA) is available to all eligible employees of the diocese. In order to be eligible for FMLA leave, you must: (1) have worked for the diocese for at least 12 months, which need not be consecutive months; (2) have been employed for at least 1,250 hours of service during the 12-month period prior to the commencement of FMLA leave; and (3) be employed at a worksite where 50 or more employees are employed by the diocese within 75 miles of that worksite.

If you are not eligible to receive FMLA leave from the diocese, any leave taken for medical or other reasons will nee to be taken only as permitted by the diocese's other leave policies.

*Reasons for Taking FMLA Leave*

An eligible employee can take up to 12 weeks (or up to 26 weeks of leave to care for an injured or ill service member) under this policy during any 12-month period. The Diocese will measure the 12-month period as a rolling 12-month period measured backward from the date an employee uses any leave under this policy. Each time an employee takes leave, the Diocese will compute the amount of leave the employee has taken under this policy in the last 12 months and subtract it from the 12 weeks of available leave, with the balance remaining being the amount the employee is entitled to take at that time.

Leave may be taken: (1) for the birth of a child, and to care for the newborn child; (2) for the placement of a child for adoption or foster child, and to care for the newly placed child; (3) to care for a spouse, child, or parent (but not a parent "in law") with a serious health condition; and (4) due to your own serious health condition that makes you unable to perform one or more of the essential functions of your job.

An employee's FMLA leave for the birth or placement of a child must within 12 months of the birth or placement.

The combined total FMLA leave of employee of the diocese who are married to each other may not exceed 12 weeks during the applicable 12-month period if the leave is taken for the birth of a child, or to care for the child after birth; for placement of a child for adoption or foster care, or to care for the child after placement; or to care for a parent with a serious health condition. This limitation does not prohibit either employee from taking additional FMLA leave for which he or she may be eligible, such as leave to care for a child with a serious health condition or because of a serious health condition of the employee.

FMLA leave may be taken intermittently or on a reduced leave schedule when medically necessary to care for a family member with a serious health condition or because of your own serious health condition. FMLA leave also may be taken intermittently or on a reduced leave schedule because of the birth of a child or placement of a child for

22                          *Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
                                                    *Revised July 1, 2009*

Billard RFP 00079

adoption or foster care, but only if authorized by the local authority. In determining whether to grant intermittent leave or leave on a reduced schedule in connection with the birth or placement of a child, primary consideration will be given to the nature of an employee's job duties and whether the required leave can be taken with minimal disruption to the workplace operations. If you require or are permitted to take intermittent leave or leave on a reduced schedule, you must try to schedule your leave so as not to disrupt the workplace operations. The local authority may require you to transfer temporarily to an available alternative position (including a part-time position) for which you are qualified and which better accommodates recurring periods of leave than your regular position.

Leave taken for any purpose by an employee who is eligible for FMLA leave will be designated by the local authority as FMLA leave, even if the employee has not specifically requested FMLA leave. FMLA leave will run concurrently with any paid leave that the employee applies toward an FMLA absence.

*Scheduling FMLA Leave*

If your need for FMLA leave is foreseeable, you must provide your supervisor with at least 30 days' advance notice before the FMLA leave is to begin. If 30 days' advance notice is not practicable or if your need for FMLA leave or its approximated timing is not foreseeable, notice must be provided as soon as practicable (normally before the start of your scheduled workday, or in any event, within one or two workdays of learning of the need for leave). Notice should be provided by you personally, or by your spouse, an adult family member, or another responsible person, if you are unable to provide notice personally.

When planning medical treatment for which FMLA leave will be necessary, you should consult with your supervisor and make every reasonable effort to schedule your leave so as not to disrupt the operations of the workplace. This ordinarily should occur prior to scheduling treatment so that a treatment schedule that best suits the needs of both you and your workplace may be worked out. Employees who are out on FMLA leave are expected to report periodically to their supervisor on their status and intent to return to work.

*Compensation and Benefits during Leave*

When you take FMLA leave you are required to apply available sick leave toward your FMLA absence if the reason for your FMLA leave is a reason for which sick leave may be taken under the diocese's sick leave policy. Also, you are required to apply any available vacation leave toward your FMLA absence. Sick and/or vacation leave does not need to be applied toward FMLA leave if you are receiving workers' compensation pay. Any FMLA leave that is not covered by workers' compensation, sick or vacation leave will be without pay.

The diocese will continue providing group health insurance coverage and your employer will continue paying its share of your group health insurance premiums while you are out on FMLA leave (whether paid or unpaid), on the same conditions as the coverage provided by the diocese at the time your leave begins, subject to any diocesan-wide

Billard RFP 00080

changes in these benefits that take place during the leave. During FMLA leave, you are responsible for your share of the group health insurance premium. This amount will be deducted from your paycheck as directed by you during any period of paid leave, but must be paid by you to the diocese at the time it normally would be deducted from your paycheck or as otherwise agreed between you and the diocese during any period of unpaid leave.

The diocese also will continue providing and will pay its share of your other benefits during FMLA leave, to the same extent as these benefits would be provided and paid during any other leave. You are responsible for paying your share of any benefits other than group health insurance during any period of FMLA leave. Premiums for which you are responsible will be deducted from your paycheck as directed by you during any period of paid leave but must be paid by you to the diocese in the same manner as for group health insurance during any period of unpaid leave.

If the premium payment for your share is more than 30 days late, the diocese may cease maintaining health insurance coverage (after providing 15 days' written notice that payment not been received), or may pay your share and recover the amount paid from you. If the 15-day notice is provided and you fail to pay your share of the premium prior to the specified date on which coverage will b dropped, your health insurance e may be terminated as of the end of the 30-day grace period. If you are unable to pay your portion of the group health insurance premium during FMLA leave, the diocese may agree to pay the amounts owed by you to avoid a lapse of coverage. You will be required to reimburse the diocese for any premiums paid on your behalf, whether or not an acknowledgment is signed or submitted, and whether or not you return to work.

*Medical Certifications*

- **Initial Certification** – At or soon after the time you indicate a need for FMLA leave, your employer will require you to furnish certification from your health care provider or the health care provider of your family member, as applicable, by completing and submitting a Certification of Health Care Provider form provided by your employer or certification in another form acceptable to the diocese. Failure to provide medical certification may result in a delay of FMLA leave. The diocese reserves the right to request a second or third medical opinion it its expense. Your employer will reimburse you for reasonable out-of-pocket travel expenses incurred in connection with obtaining a second or third medial opinion. Documentation of these expenses (receipts, mileage information, etc.) should be provided to your employer.

- **Recertification** – Your employer may require you to provide medical recertification while you are on FMLA leave. Costs associated with any recertification requested by your employer will be at your expense.

- **Return to Work Certification** – As a condition of returning to work after FMLA leave that was due to your own serious health condition, your employer may require you to obtain and present a return to work certification from your health care provider. Costs associated with any return to work certification will be at your expense

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*

Billard RFP 00081

*Job Restoration after FMLA Leave*

It is expected that following an FMLA absence, you will return to work. Generally, when you return to work following FMLA leave, you will be restore to the same opposition that you held prior to the beginning of leave, or to an equivalent position with equivalent benefits, pay, and other term and conditions of employment. The resumption of benefits upon your return from FMLA leave will be subject to any diocesan-wide changes in benefits that have taken place during the period of FMLA leave.

*Limitations on Reinstatement*

An employee is entitled to reinstatement only if he/she would have continued to be employed had FMLA leave not been taken. Thus, an employee is not entitled to reinstatement if, because of a layoff, reduction in force or other reason, the employee would not be employed at the time job restoration is sought.

*Failure to Return to Work Following FMLA Leave*

If the employee does not return to work following the conclusion of FMLA leave, the employee will be considered to have voluntarily resigned.

*Premium Charges during FMLA Leave*

We will charge you for health insurance premiums paid by your employer during any unpaid portion of FMLA leave if you fail to return to work after your leave entitlement is exhausted or has expired, unless the reason you do not return to work is due to the continuation, recurrence, or onset of a serious health condition that would entitle you to leave under the FMLA, or other circumstances beyond your control prevent your return. Decisions to remain with a family member who no longer requires your care or to remain at home follow the birth or placement for adoption of foster care of a child who does not have a serious health condition will not be considered beyond your control.

*Instructional Employees*

To avoid disruption to the classroom, instructional employees (teachers, coaches and special education assistants such as signers for the hearing impaired) will have different rules applied in the following circumstances:

- **Leave beginning more than five weeks before the end of the term.** Regardless of the reason for the leave, the school may require the employee to remain out until the end of the term, if:
  1. The leave will last at least three weeks, and;
  2. The employee would have returned to work during the last three weeks of the term.

- **Leave beginning fewer than five weeks before the end of the term.** If an instructional employee takes a leave at this point for a reason other than his or her own serious health condition, the school may require the employee to remain on leave until the end of the term, if:
  1. The leave is longer than two weeks; and;

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook* 25

Billard RFP 00082

2.  The employee would have returned to work in the two weeks before the end of the term.

- **Leave beginning fewer than three weeks before the end of the term.** If an instructional employee takes a leave at this point for a reason other than his or her own serious health condition, the school may require the employee to remain on leave until the end of the term if the length of the leave is more than five working days.

Where the employer requires the instructional employee to remain out until the end of the term, but where the instructional employee is ready and able to work, such time off cannot be counted against the employee's leave entitlement.

### *Covered Family Member's Active Duty or Call to Active Duty in the Armed Forces*

An employee whose spouse, son, daughter or parent either has been notified of an impending call or order to active military duty or who is already on active duty may take up to 12 weeks of leave for reasons related to or affected by the family member's call-up or service.  Reasons related to the call-up or service include helping the family member prepare for the departure or caring for children of the service member. The leave may commence as soon as the individual receives the call-up notice. (Son or daughter for this type of FMLA leave is defined the same as for child for other types of FMLA leave, except that the person does not have to be a minor.) This type of leave would be counted toward the employee's 12-week maximum of FMLA leave in a 12-month period.

Employees requesting this type of FMLA leave must provide proof of the qualifying family member's call-up or active military service before leave is granted.

### *To Care for an Injured or Ill Service Member*

This leave may extend to up to 26 weeks in a 12-month period for an employee whose spouse, son, daughter, parent or next-of-kin is injured or recovering from an injury suffered while on active military duty and who is unable to perform the duties of the service member's office, grade, rank or rating. Next-of-kin is defined as the closest blood relative of the injured or recovering service member. An employee is also eligible for this type of leave when the family service member is receiving medical treatment, recuperation or therapy, even if the service member is on temporary disability retired list.

Employees requesting this type of FMLA leave must provide certification of the family member or next-of-kin's injury, recovery or need for care. This certification is not tied to a serious health condition as for other types of FMLA leave. This is the only type of FMLA leave that may extend an employee's leave entitlement beyond 12 weeks to 26 weeks. Other types of FMLA leave are included with this type of leave totaling the 26 weeks.

If a husband and wife both work for the company and each wishes to take leave to care for a covered injured or ill service member, the husband and wife may only take a combined total of 26 weeks of leave.

26                      *Roman Catholic Diocese of Charlotte Personnel Policies Handbook*

Billard RFP 00083

*Questions and Forms*

Employees are encouraged to direct questions about the FMLA to their supervisors or to Human Resources. Employees may be required to complete certain forms to be eligible to take FMLA leave; therefore, your supervisor should be made aware of your intent to take leave and any reasons for the leave as soon as possible.

## C.  Bereavement Leave

With approval of the supervisor, regular non-temporary employees may be granted a paid leave of up to the equivalent of three (3) days to attend the wake and funeral of a member of their immediate family. Additional time off must be taken as vacation, personal days (for school personnel) or leave without pay. For purposes of this section, immediate family shall be understood to mean: mother or father, guardian, spouse, sister, brother, children, step-children, step-parents, mother or father-in-law, or grandparents.

With approval of the supervisor, time off may be granted to attend the wake or funeral of a relative, friend or colleague not specifically mentioned above.

## D.  Military Leave

An employee who is a member of, applies to be a member of, performs, or who has performed, applies to perform, or has an obligation to perform serviced in the U.S. armed services shall not be denied employment, re-employment, promotion, or any benefit of employment on the basis of his or her military status. Such employees will be granted a military leave of absence to attend scheduled drills or training or if called to active duty with the U.S. armed services.

A military leave of absence will be unpaid. However, employees may use any available paid time off for the absence. Subject to the terms, conditions and limitations of the applicable plans for which the employee is otherwise eligible, health insurance benefits will be provided until the end of the month in which the military leave begins. At that time, the employee will become responsible for the full costs of these benefits if he/she wishes coverage to continue. When the employee returns from military leave, benefits will again be provided according to the applicable plans.

Benefit accruals, such as vacation, sick leave, or holiday benefits, will be suspended during the leave and will resume upon the employee's return to active employment.

Employees on two week active duty training assignments or inactive duty training drills are required to return to work on the first regularly scheduled day after the end of training, allowing reasonable travel time. Employees on longer military leave must apply for reinstatement in accordance with all applicable state and federal laws. Eligible employees returning from military leave will be treated as though they were continuously employed for purposes of determining benefits based on length of service, such as the rate of vacation accrual and job seniority rights, and the absence will not be considered an interruption of employment service.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*                                27

Billard RFP 00084

An employee who returns from a military leave of absence with a service connected disability that renders him or her unqualified for the position he or she left (or for a position her or she would have attained but for the military service) will receive reasonable accommodation and/or reemployment to a different position in accordance with all applicable state and federal laws.

## 382. VOTING TIME

Employees should be able to arrange time for voting outside of working hours. However, if such time cannot be arranged, supervisors may allow employees reasonable time off to vote. The time allowed will be with pay and will not be charged to accrued leave.

## 388. JURY DUTY

Jury duty is excused time off from work. During the first week of jury duty, employees will be entitled to their regular weekly pay. If jury duty lasts for more than one week, jury duty compensation will be coordinated with an employee's regular weekly salary to assure no loss of income. The diocese encourages employees to fulfill their civic responsibility by serving jury duty when required. The diocese may request an employee's excuse from jury duty if it is judged that the employee's absence from work would create serious operational difficulties.

Employees must show the jury duty summons to their supervisor as soon as possible to verify the reason for their absence. Employees are also expected to report for work whenever the court schedule permits.

28

Billard RFP 00085

# Section 400: TIMEKEEPING AND PAYROLL

Billard RFP 00086

JA0489

## 404. TIMEKEEPING

Accurately recording time worked is the responsibility of every non-exempt employee. Federal and State laws require the diocese to keep an accurate record of time worked in order to calculate employee pay and benefits. Time worked is all the time actually spent on the job performing assigned duties. This includes travel time as a driver at any time, or as a passenger during normal work hours, however, it does not include travel time to and from work. Employees should begin work at the appointed time, take full meal periods away from their duty station, and stop work at the appointed time. Overtime work must always be approved by the supervisor _before_ it is performed.

Employees must accurately record the actual times that they start and stop work. Failure to properly record hours worked, tampering, altering or falsifying time records may result in disciplinary action, up to and including discharge.

## 410. PAY DEDUCTIONS

The law requires that the diocese make certain deductions from every employee's compensation. Among these are applicable federal and state income taxes. The diocese must also deduct Social Security taxes on each employee's earnings up to a specified limit. It is the employee's responsibility to advise the diocese of any change in their withholding exemption status.

The diocese offers various benefits and savings programs that may require employees to pay some portion of the cost of participation. Eligible employees may voluntarily authorize deductions from their paychecks to cover these costs.

Employees should contact their supervisor for answers to any questions they have concerning why deductions were made from their paycheck or how the deductions were calculated.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 00087

# Section 500: WORK HOURS

Billard RFP 00088

JA0491

## 504. HOURS OF WORK

The standard hours of work for each location are set by the local authority. At all locations, staffing needs and operational demands may necessitate variations in starting and ending times, as well as variations in the total hours that may be scheduled each day and each week. Flex-time schedules can be adopted and approved by the local authority.

## 510. MEAL AND REST PERIODS

Lunch periods at all locations are set by the local authority. Lunch periods are not considered time worked and must be taken every day, away from the employee's work station, and for the full period of time. Lunch periods cannot be accumulated.

At the discretion of the local authority, one break of not more than fifteen (15) minutes before and after lunch may be given to employees. Break time, to the extent possible, will be taken in the middle of work periods and will not accumulate. Since break time is counted and paid as time worked, employees must not be absent from their duty stations beyond the allotted break time.

Violations of this policy may result in disciplinary action, up to and including discharge.

## 516. OVERTIME

When operating requirements or other needs cannot be met during regular work hours, non-exempt employees may be scheduled to work overtime hours. Non-exempt employees, who are subject to the overtime provisions of the Fair Labor Standards Act, will be paid time and a half for any hours worked in excess of forty (40) hours a week. Paid time off is not counted as hours worked for the purpose of determining eligibility for overtime. When possible, advance notice of the need for overtime work will be provided. Overtime assignments will be distributed as equitably as possible to all employees who are qualified to perform the required work. Employees who are assigned to work overtime are expected to work those hours like any other scheduled hours, but every reasonable effort will be made to accommodate employees who have a legitimate conflict or a personal circumstance that would cause them an undue hardship if they worked the overtime hours requested.

All overtime work _must_ receive prior supervisory authorization. Repeated use of unauthorized overtime may result in disciplinary action, up to and including discharge.

32

Roman Catholic Diocese of Charlotte Personnel Policies Handbook
Revised July 1, 2009

Billard RFP 00089

JA0492

## 522. INCLEMENT WEATHER

**Pastoral Center** – In the event of serious weather conditions, a decision regarding the opening or closing of the Pastoral Center will be made by 7:00 AM. Employees can obtain this information by calling the main telephone number of the Pastoral Center, 704-370-6299. If the Pastoral Center is open, any employee who elects not to work must take either a day of vacation or a day without pay. Sick leave may not be used for weather related absences.

**Mecklenburg Area Catholic Schools** – If the decision has been made to close the schools, hourly employees will not be paid for the time the schools are closed. However, if a supervisor requires an hourly employee to work on a day that the schools are closed, the employee will be paid for the time worked at his or her normal rate of pay.

**All Other Locations** – At locations other than the Pastoral Center and Mecklenburg Area Catholic Schools, the local authority will establish the inclement weather policy.

Billard RFP 00090

Billard RFP 00091

JA0494

# Section 600: WORK CONDITIONS

Billard RFP 00092

## 604. SMOKING

In keeping with the diocese's intent to provide a safe and healthful work environment, smoking is prohibited throughout the entire *Pastoral Center*. This policy applies to all employees, visitors and persons attending meetings within the *Pastoral Center*. All diocesan schools are to be smoke-free during the school day.

The diocese strongly recommends that a smoke-free environment policy be adopted in all diocesan buildings and facilities.

## 610. SAFETY

Employees are expected to obey safety rules and exercise caution in all work activities. Employees must immediately report any unsafe conditions to the appropriate supervisor.

In the case of accidents that result in injury, regardless of how insignificant the injury may appear, employees should immediately notify their supervisor. Such reports are necessary to comply with applicable laws and to initiate insurance and worker's compensation benefits procedures.

## 616. USE OF DIOCESAN TELEPHONES, MAIL, EMAIL AND INTERNET

Neither the use of diocesan telephone lines for personal long distance calls nor the use of diocesan-paid postage for personal correspondence is permitted.

**Internet & E-mail Acceptable Use Policy**

Internet access and E-mail is available to certain employees of the Pastoral Center and schools who are on the diocesan Wide Area Network. Internet connectivity is achieved through a separate server from that which serves the diocesan LAN. This server contains a firewall which is designed to provide secure Internet connectivity along with web content filtering. Email services are also provided by using a separate E-mail server.

The purpose of providing internet access and E-mail services is to facilitate employees in fulfilling the particular responsibilities of their position with the Diocese and schools. As such, Internet access is only available to Pastoral Center and school employees/students who have a specific need pertaining to their job or line of work. Internet access and use of E-mail is intended for diocesan and school business. E-mail should not be used for routine personal communication. Internet access for personal use may only take place after work hours.

36

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 00093

Use of the Internet and E-mail is not private or confidential. The servers maintain a record of each user's access of the Internet and every E-mail received and sent. These records are the property of the Diocese of Charlotte and may be used in any way deemed by the Diocese. Use of the Internet and E-mail will be routinely monitored to ensure compliance with this policy. Violation of this policy may result in disciplinary action and legal action, if appropriate.

Users must abide by the following when accessing the Internet and using E-mail services:

- Never share user IDs and passwords with anyone else; they are confidential.
- Never use anyone else's account, user name, or password.
- Never open an attachment to an E-mail you have received unless you know the person who sent the E-mail. Viruses, disruptive programs, and inappropriate materials are often distributed as E-mail attachments.
- Never download, copy, install or transmit software, shareware or freeware without permission from the IT Department.
- Never attempt access of sites that are inappropriate for a business environment. If you mistakenly access inappropriate information, immediately notify your supervisor and the IT Department.
- Never participate in any illegal activities.
- Never harass anyone, use profanity, or inappropriate language.
- Never type in all CAPITAL LETTERS. It is seen by Internet\Email users as shouting.
- Never participate in Chat Rooms or attempt to meet unknown people.
- Never attempt to access any resource, another user's files, network or site for which you are not authorized.
- Never transmit any material in violation of U.S. or State laws.
- Never reproduce or transmit copyrighted material without explicit written permission.
- Never send mass emails/forwards that are not related to Pastoral Center or School business, or any that contain large attachments including but not limited to graphics, pictures, etc.

The Diocese of Charlotte is not responsible for any damages suffered, including loss of data resulting from delays, non-deliveries, service interruptions, or the accuracy or quality of information obtained via the Internet.

## 622. USE OF DIOCESAN EQUIPMENT AND VEHICLES

Employees must possess a current drivers' license or appropriate operator license in order to operate diocesan vehicles or other equipment and machines that require special licensure or certification. It is the responsibility of employees to renew licenses and certifications in a timely manner and provide copies of the renewal to their supervisors, if needed or requested. Only authorized persons are permitted to drive diocesan vehicles or operate diocesan equipment and machines. When using diocesan property, employees are expected to exercise care, perform required maintenance, and follow all operating instructions, safety standards and guidelines. Employees are to notify the

Billard RFP 00094

appropriate supervisor if any diocesan equipment, machines, tools, or vehicles appear to be damaged or in need of repair.

Employees who use diocesan vehicles should follow these procedures when involved in a vehicular accident:

1. Notify the police
2. Notify your supervisor
3. Notify the Chancery
4. Do not admit fault until the accident can be thoroughly investigated.
5. Remain at the scene of the accident until a police report has been completed and you are released to go by the police.
6. Do not attempt to operate the vehicle. If damage to the vehicle or your personal condition would make it unsafe fro you to do so.
7. Obtain contact information and insurance information for the other parties involved in the accident. Information to have on hand is the name, address, telephone number, driver's license number and insurance company of the other party.

All safety regulations, including but not limited to tags, inspections, numbers of passengers recommended for the vehicle, use of seat belts, etc. are to be followed.

The improper, careless, negligent, destructive or unsafe operation of diocesan equipment or vehicles, as well as excessive or avoidable traffic and parking violations, may result in disciplinary action, up to and including discharge.

## 628. AUTOMOBILE COMPENSATION

In cases where employees are required to travel as part of their work, the use of their personal automobile will be compensated at the current Internal Revenue Service rate per mile. Employees must accurately record applicable mileage and submit it to their supervisor for approval before reimbursement is made.

## 634. SOFTWARE SECURITY

Diocesan policy regarding software security is as follows:

1. All software purchases must be reviewed and approved by the appropriate local authority.
2. All software purchased by the diocese or local authority is not to be reproduced for use on more than one computer, including personally owned computers used for work related purposes.
3. All multi-use software, such as software installed on a computer network, must be used in accordance with the written license agreement.

Billard RFP 00095

4. It is the responsibility of the local authority to periodically audit employees' computers for illegally copied software.
5. Employees who determine that there may be a misuse of software must notify their appropriate local authority.
6. The diocesan finance office may at times negotiate multiple copy or educational discounted software licenses from software vendors. That office will notify diocesan employees of such arrangements. Employees should not assume that such an arrangement exists, but should contact the finance office if they have questions in this regard.
7. Personally owned software should not be installed on diocesan owned computers.

Software copyright violations can subject the user and the diocese to potentially serious legal ramifications. Any violation of this policy may result in disciplinary action, which may include termination of employment and legal action. Individual computer users and their supervisors are responsible for security when computer software is used on their equipment.

Billard RFP 00096

JA0499

Billard RFP 00097

# Section 700: EMPLOYEE CONDUCT AND WORK RULES

Roman Catholic Diocese of Charlotte Personnel Policies Handbook
Revised July 1, 2009

41

Billard RFP 00098

## 704. ATTENDANCE AND PUNCTUALITY

To maintain a safe and productive work environment, the diocese expects employees to be reliable and punctual in attendance. The diocese does not permit excessive absenteeism or tardiness.

If illness or some other problem requires an employee to be absent or late for work, ordinarily the employee's supervisor must be called thirty (30) minutes after the scheduled time for reporting to work. If the absence continues for more than one day, employees must keep their supervisor informed daily of their situation so that arrangements can be made to handle required work. For employees who are not at work due to an approved FMLA leave, less frequent notification may be acceptable.

Usually, employees who are absent for three (3) days without proper notification will be considered as having abandoned their job, and the date of termination will be the last date worked.

Employees who know in advance that they will need to be absent from work, whether for a short or extended period, should discuss the matter with their supervisor so the absence can be handled without disruption to the work of the parish, department, etc.

## 710. UNEXCUSED ABSENCES

An unexcused absence results when an employee:

1. Fails to report to work and/or fails to give proper notice to the appropriate supervisor
2. Is absent for an unapproved reason
3. Misrepresents the reason for an absence
4. Takes extended time off during work hours without permission

Special circumstances, such as FMLA-covered absences, may make it impractical for an employee to provide timely notice to the supervisor. These situations will be considered on an individual basis.

Unexcused absences by employees may result in disciplinary action, up to and including discharge.

## 716. CONFIDENTIALITY

It is the obligation of employees, regardless of their work responsibilities, to keep certain information confidential. Confidential information typically includes personal and employment-related information contained in personnel records, personal and academic information concerning students at diocesan schools, information concerning individual

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 00099

parishioners, counseling records, financial contributions where anonymity has been requested, confidential financial business planning or other business information concerning the strategic planning, business planning or other management activities of the diocese. This or any other similar information should be considered confidential until such time as a release of the information has been authorized by the diocese or by the individual persons who are the subject of such information.

Disclosing confidential information to persons not entitled to such information and assisting any person in gaining unauthorized access to diocesan records are both direct violations of diocesan policy. The communication of false or derogatory information about the diocese or its employees is also a violation of diocesan policy. This also includes information that is disclosed through social media or social networking sites.

In applicable agencies, patient/client records will be kept in a secure and locked place. Only authorized personnel may have access to these records for the purpose of review, making entries or for quality control purposes.

Counselors have a special relationship with students/clients. The information a counselor receives in the client relationship is in many cases of a confidential nature. If students/clients share information with a counselor that affects their own health or safety, or that of another, the counselor receiving that information has an obligation to act by sharing the information with parents and other appropriate persons.

Any violation of this policy may be cause for disciplinary action, up to and including discharge.

**Disposal of Personal Information Policy**

Pursuant to the requirements of the North Carolina Identity Theft Protection Act, the diocese has implemented a Disposal of Personal Information Policy. This policy contains several measures to protect against unauthorized access to any personal information maintained by the diocese. "Personal information" includes, but is not limited to, Social Security numbers, drivers license numbers, addresses, telephone numbers, bank account numbers, credit/debit card numbers, personal identification numbers (PINs), passwords, and e-mail addresses, in combination with a person's name. Pursuant to this Policy, when paper records containing "personal information" are disposed of, they will be shredded so that the information cannot be read or reconstructed.

When electronic records containing "personal information" are disposed of, they will be destroyed or erased so that the information cannot be read or reconstructed. All of our employees are expected to abide by the requirements of this Policy, and suspected violations should be reported promptly to the Human Resources Department. Questions regarding the policy should also be directed to the Human Resources Department.

Billard RFP 000100

## 722. COURTESY

An employee's conduct, on and off the job, forms the public's impression of the employee and, in turn, of the diocese. Therefore, it is important for employees to adhere to high standards of professional and personal behavior. The diocese expects employees to follow directives from supervisors and to fulfill the responsibilities of their position. Courtesy is defined herein to mean the everyday practice of civility, respect and polite behavior towards and around others, in person, on the telephone or in written correspondence. Sleeping or performing personal work on the job, distracting coworkers in the execution of their duties, the use of profane or abusive language, fighting, deliberately causing injury to another or any disorderly conduct or malicious disturbance, including the intimidation or harassment of others, is not acceptable conduct.

A great deal of diocesan contact with others is by telephone, and special emphasis is placed on telephone courtesy. Required ingredients in telephone courtesy are:

1. Answering promptly
2. Identifying yourself and your parish, unit, department, etc.
3. Answering your own telephone whenever possible to avoid needless delay for the caller
4. Using a tone of voice that conveys interest, warmth and a willingness to help

An employee may be disciplined, up to and including discharge, for discourteous conduct, when confirmed by documented proof or credible evidence.

## 728. OUTSIDE COMPLAINTS

In spite of the care with which the diocese handles and conducts its business, misunderstandings may occur and complaints may be received from individuals from outside the diocese or from individuals from another parish, agency, school, ministry or department within the diocese. These complaints should be resolved promptly by the person to whom they are directed or referred to someone in a position to make the necessary decision and response. It is the diocese's objective to resolve fairly any complaint before the close of the business day on which it is received or to indicate a time when a reply can be expected. Essential elements of successfully handling outside complaints include:

1. Getting all the details from involved parties
2. Showing understanding of the individual's problem or concern
3. Where reasonable, agreeing on what can be done, both now and/or later

An employee who receives one or more substantiated complaint(s) may be subject to disciplinary action, up to and including discharge.

Billard RFP 000101

## 734. PERSONAL APPEARANCE

Dress, grooming and personal cleanliness standards contribute to the positive morale of employees and affect the image that the diocese presents to visitors. During business hours, employees are expected to dress in businesslike attire, using good judgment in selecting apparel appropriate to the functional position and avoid extremes in makeup, hair styles, jewelry and clothing.

At the discretion of the local authority, employees may be given periodic casual or "dress down" days. On these days, less businesslike attire may be worn. Employees should consult their supervisor if they have questions as to what constitutes appropriate attire.

Employees of the *Pastoral Center* are required to wear their identification badges at all times while on the premises.

## 740. MEDIA RELATIONS

On occasion, the news media will look to employees of the diocese for information about diocesan events, opinions, interpretations and issues. It is diocesan policy to cooperate with the news media and respond to media inquiries promptly, however, only the Director of Communications is authorized and responsible for coordinating contact with the media on behalf of the diocese. Employees are not to respond to media inquiries or initiate contact with the media regarding diocesan matters. When inquiries are received from the media that concern a diocesan matter, the inquirer should be referred to the diocesan Director of Communications.

Media inquiries that are concerned with specific parish, agency, school or department matters may be responded to by the proper local authority.

## 746. DRUG AND ALCOHOL USE

The unlawful manufacture, possession, distribution, transfer, purchase, sale, use or being under the influence of illegal drugs or alcoholic beverages while on diocesan property, while attending business-related activities, while on duty, or while operating a vehicle or equipment owned or leased by the diocese is strictly prohibited and may lead to disciplinary action, up to and including discharge.

Employees may use physician-prescribed medications, provided that the use of such drugs does not adversely affect job performance or the safety of the employee or others. Employees who use physician-prescribed medications are responsible for determining with their physician whether such medications may impair their job performance or make it unsafe for them to operate a motor vehicle or other equipment or machinery. Where the possibility that such impairment exists, employees are encouraged to notify their supervisor to determine whether modification can be made to their job duties during the period that such medication is being taken or if a leave of absence or alternative job

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2000*

45

Billard RFP 000102

assignment should be considered. Employees who fail to notify their supervisors about the risk presented by physician-medication that they are taking and who unsafely operate machinery, equipment or motor vehicles in an impaired state, or who engage I other unsatisfactory performance because of medication-related impairment, may be subject to disciplinary action, up to and including discharge.

The diocese will make every effort to assist employees who voluntarily identify themselves as suffering from alcoholism and/or drug abuse. Employees who identify themselves as such are nonetheless accountable for their work performance and conduct, and may be subject to appropriate disciplinary action for poor performance or misconduct even where such issues, at least in part, may be attributable to the employee's alcoholism and/or drug abuse.

## 752. FIREARMS AND WEAPONS

The possession of firearms or other dangerous weapons on or in diocesan property, except by authorized security officials, is expressly forbidden. Diocesan property includes buildings and parking areas. Violations may result in disciplinary action, up to and including discharge.

## 766. SEXUAL AND OTHER UNLAWFUL HARASSMENT

The diocese prohibits any form of sexual and other unlawful harassment involving any of its employees in the employment relationship. Harassment, retaliation, coercion, interference, or intimidation of an employee due to his or her race, color, religion, sex, age, national origin, disability, protected activity (i.e., opposition to prohibited discrimination), or other legally protected status, or that of an employee's relatives, friends, or associates, is strictly forbidden. This policy is part of the diocese's efforts to maintain a workplace free of harassment for its employees.

### Sexual Harassment

Sexual harassment does not require physical contact, but can be any type of unwelcome conduct. It includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when submission to the conduct is made a term or condition of an individual's employment (either explicitly or implicitly), when submission to or rejection of the conduct is used as the basis for employment decisions affecting the individual, or when the conduct is sufficiently severe, persistent, or pervasive to interfere with an individual's work performance or to create an intimidating, hostile, or offensive working environment.

Billard RFP 000103

**Other Unlawful Harassment**

Other unlawful harassment may consist of verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of his or her race, color, religion, sex (gender), age national origin, disability, protected activity (i.e., opposition to prohibited discrimination), or legally protected status, or that of his or her relatives, friends, or associates, and has the purpose or effect of creating an intimidating, hostile, or offensive work environment; has the purpose or effect of interfering unreasonably with an individual's work; or otherwise adversely affects and individual's employment opportunities.

**Prohibitions**

Any act, comment, or behavior that constitutes sexual or other unlawful harassment is strictly prohibited and will not be tolerated of any employee, either on or off diocesan premises. For purposes of this policy, this includes but is not limited to: slurs, jokes, or other verbal, graphic, or physical conduct relating to an individual's race, color religion, sex, age, national origin, disability, protected activity (i.e., opposition to prohibited discrimination), or other legally protected status. This prohibition covers not only the relationships between employees of the diocese but also each employee's relationship with customers of the diocese or with the employees of other companies encountered in the course of performing the duties of his or her job.

**Reports and Investigations**

Employees, without any fear of reprisal, have the responsibility to immediately bring any form of sexual or other unlawful harassment (whether by a co-worker, a customer, or someone else encountered while performing their job duties) to attention of their supervisor. All supervisors who receive a complaint of sexual or other unlawful harassment should immediately contact the Human Resources Director. If for some reason an employee does not feel comfortable reporting harassment to his or her supervisor, the employee should report the harassment to another member of management or the Human Resources Director. Upon receipt of an allegation of harassment, the diocese will promptly begin an investigation into the circumstances of the incident and the alleged harassment. Any person who becomes aware of an incident of sexual or other unlawful harassment, whether by witnessing the incident or being told of it, should report it immediately to his or her supervisor or another member of management.

The diocese will keep all information relating to harassment allegations and investigations as confidential as possible under the circumstances.

**Corrective and/or Disciplinary Action**

Following the diocese's investigation, a review of the results of the investigation with the person(s) involved will be conducted and appropriate corrective and/or disciplinary action will be taken, which may result in immediate termination of employment for employees who are determined to have engaged in sexual or other unlawful harassment, conduct approaching sexual or other unlawful harassment, or other conduct that violates the diocese's policy. Be advised that disciplinary action, up to and including

Billard RFP 000104

discharge, will be taken against any employee engaging in sexual or other unlawful harassment.

**Protection against Retaliation**

The diocese will not retaliate in any way against an individual who makes a report of harassment in good faith or who assists in an investigation. Retaliation is a serious violation of this harassment policy and should be reported immediately. Any employee found to have retaliated against another employee in violation of this policy will be subject to disciplinary action, up to and including discharge.

## 776. DISCIPLINARY PROCEDURES

Employees who violate diocesan policies, engage in substandard performance, are excessively absent or tardy, or engage in misconduct may be subject to disciplinary action up to and including immediate dismissal. Disciplinary action may include one or more of the following procedures prior to discharge for non-serious offenses and/or performance, attendance, or performance problems that indicate a willful or intentional failure to meet expectations:

1. **Verbal Warning** – The supervisor notifies and counsels the employee concerning the identified performance or conduct problem. A follow-up letter summarizing the verbal warning and counseling shall be given to the employee. A copy of the letter must be placed in the employee's official personnel file.

2. **Written Warning** – The supervisor gives the employee a written warning, with specific steps to be taken to correct the problem. The supervisor ordinarily will set a timetable for following up with the employee to determine whether the employee has taken appropriate corrective action. The report is signed by the supervisor and employee and placed in the employee's official personnel file.

3. **Probation** – This step typically is taken when an employee's performance, attendance, or tardiness indicates that the employee may be getting close to dismissal. This is an optional step that management, in its discretion, may choose to employ prior to dismissing an employee where it believes that the employee has at other times shown the ability to meet his or her supervisor's expectations, or otherwise has given some indication that he or she should receive one final chance to correct the problems that otherwise likely will result in the employee's dismissal. Probation ordinarily should not exceed 90 days and should include periodic progress assessments during the probationary period by the supervisor to determine if it is worth continuing. Probation is an exceptional step that ordinarily will be used only in cases involving struggling employees who otherwise have given indications that they are capable of performing their jobs according to their supervisors expectations. In no event will step be used more than once for any single employee.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook.*
*Revised July 1, 2009.*

Billard RFP 000105

4. **Demotion** – An employee who does not perform satisfactorily at his or her current level, but who management feels can perform satisfactorily at a lower level, may be demoted.

5. **Suspension** – Suspensions ordinarily will be used only in situations where additional time is needed to investigate a problem or incident that may represent grounds for dismissal, if substantiated, or where more time is needed for an employee's supervisor and/or Human Resources to determine the appropriate action that should be taken for any particular incident or problem. Although suspension would ordinarily not be used as a form of discipline, it may, on occasion, be used to provide a period away from work in which that employee will be asked to decide if he or she wishes to continue in his or her employment or to consider various other options that have been proposed because of some performance or other disciplinary issue. Suspensions may be with or without pay at the option of the diocese.

## 782. IMMEDIATE DISCHARGE

Immediate dismissal may be appropriate for certain serious offenses involving egregious misconduct or blatant insubordination, dishonesty, willful or reckless poor performance, willful or reckless disregard of a supervisor's instructions, or other offenses deemed sufficiently serious by the diocese to warrant an immediate end to the employment relationship. Dismissal also will be the consequence of an employee's failure to correct performance, attendance, tardiness or conduct issues, after being provided a reasonable opportunity to do so.

The following are some examples of grounds for immediate dismissal of an employee:

- Violation of confidentiality;
- Conviction of a felony and/or crime of moral turpitude
- Any conduct tending to reflect discredit upon the Church;
- Continued unexcused tardiness or absences;
- Neglect of duty;
- Stealing;
- Drunkenness, use of illegal drugs, or abusive use of prescription drugs on the job;
- Willful destruction of diocesan property;
- Gross insubordination;
- Possessing or transporting firearms or weapons on diocesan property;
- Falsification of employment information.

This list is intended to be representative of the types of activities that may result in immediate discharge. It is not exhaustive, and is not intended to be comprehensive and does not change the employment-at-will relationship between the employee and the diocese.

Billard RFP 000106

JA0509

Terminated employees will receive their pay on regularly scheduled paydays. When discharged, employees will have the right to continue coverage under the health insurance group plan at their own expense.

## 788. RESIGNATION

Resignation is a voluntary act initiated by an employee to terminate his or her employment with the diocese. To resign in good standing, a two-week written notice is expected from non-exempt employees. Exempt employees are expected to give written notice of at least four (4) weeks prior to the effective date. Due to different staffing requirements and considerations, the local authority may set its own notice requirements.

Resignation by contract school employees is subject to the conditions of their contracts.

If advance notice is not provided pursuant to this or local authority policy, or is not agreed to by mutual consent of both parties, the employee will be considered ineligible for rehire.

## 794. RETURN OF PROPERTY

Employees are responsible for all diocesan property, materials or written information issued to them, or in their possession or control. Employees must immediately, or upon request, return all property of the diocese that is in their possession or control in the event of resignation, lay-off or dismissal.

## 796. GRIEVANCES

It is the policy of the diocese to maintain a climate of openness in which an employee will feel free to express concerns and dissatisfactions and to use the grievance system for their resolution. The objective of the system is to provide for the prompt and fair resolution of grievances when the normal supervisor-employee relationship has failed to do so. The system is neither intended as a substitute for the normal supervisor-employee relationship nor can it substitute for a spirit of cooperation and goodwill between supervisors and employees.

An employee's grievance will be addressed quickly, and every effort will be made to resolve the matter at the level at which it occurred, insuring that just treatment occurs for all concerned. In order to ensure that good working relationships prevail, the concerned individuals should always attempt to reconcile differences on an individual basis. In the event the situation develops beyond this point, the employee should follow this grievance procedure:

Billard RFP 000107

1. Employees should first approach their immediate supervisor and attempt to resolve the problem. The initial contact with the supervisor shall be no later than five (5) work days after the problem developed. The supervisor will take the necessary actions to resolve the complaint and inform the employee of the decision within five (5) work days from receipt of the grievance;

2. If the employee believes that the supervisor's decision does not satisfy the grievance, or if the employee's grievance is with the supervisor, such employee's grievance may be appealed in writing to the appropriate department or agency head. This appeal must be made within five (5) work days from the employee's receipt of the supervisor's decision. The department or agency head will then contact those involved to gather necessary information concerning the grievance and/or to attempt reconciliation. If not reconciled within fourteen (14) work days, the department or agency head will issue a written decision to the employee and the supervisor.

3. If the employee still believes that the grievance is unsatisfactorily resolved, a written request for review by the Human Resources Director may be made. This request must be made within five (5) work days from the employee's receipt of the previous written decision. The Human Resources Director may either accept or deny the request for review. The Human Resources Director's decision will be given to the parties within twenty-one (21) days of receipt.

4. In extraordinary circumstances, an employee may appeal the Human Resources Director's decision. A written request for review may be made to the Chancellor, who may or may not accept the request. The request must be made within five (5) work days from the employee's receipt of the Human Resources Director's written decision.

Every effort must be made to resolve the grievance as quickly as possible, and no undue delay should be experienced in moving from one of the procedural steps to the next. The term "work days" shall mean days other than Saturday, Sunday and diocesan observed holidays.

Each step outlined in the above procedure must be fully documented and the person responsible for the decision at each level shall place all related documentation in the appropriate confidential file(s). Information related to a grievance shall be disclosed only to persons who have a need to know.

Billard RFP 000108

Billard RFP 000109

# Section 800: CODE OF ETHICS

Billard RFP 000110

JA0513

Billard RFP 000111

# Code of Ethics Policy of the Diocese of Charlotte



**Effective August 15, 2004**
Revised July 1, 2009

**The Diocese of Charlotte**
1123 South Church Street
Charlotte, NC 28203
(704) 370-6299

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

55

Billard RFP 000112

August 15, 2004

My Dear Brothers and Sisters in Christ:

Please accept my sincere gratitude for the very generous way in which you offer your time, talent and gifts in serving the people of Western North Carolina. It is through the prayers, efforts, dedication and collaboration of priests, deacons, religious, seminarians, lay employees and volunteers that we are able to serve those entrusted to our care. We know that as clergy, religious and laity of the Diocese of Charlotte, we have a responsibility to uphold the highest of moral, professional and ethical standards.

As clergy, religious, seminarians, lay employees and volunteers, we all share in the mission of the Church to continue the work of Jesus Christ. This is both a great privilege and an awesome responsibility. Those who publicly represent the Church, whether by office, employment or appointment, have a special obligation because they have accepted positions of trust. Because of this, the Church must be exemplary. Clergy, religious, seminarians, lay employees and volunteers should and will be held accountable for their behavior.

In order to maintain the highest level of accountability, this Code of Ethics Policy is adopted to assist in developing and implementing uniform guidelines for appropriate behavior while exercising ministerial and professional undertakings. It is not intended to address every situation that may arise, rather, it is intended to create a structure for addressing a variety of circumstances that, if not appropriately addressed, may create a risk of incidents, allegations, claims or lawsuits. As we read the code, we must remember that it is more than a set of standards. It is a way of connecting our values, ideals and moral responsibilities with the work that we do every day.

It is my sincere desire that all who are involved in the mission of the Church will exemplify the ethics and integrity lived and taught by Jesus, and that all those we serve will see in us His compassion and love.

Sincerely yours in Christ,

Most Reverend Peter J. Jugis, J.C.D.
Bishop of Charlotte

Billard RFP 000113

JA0516

## PREAMBLE

Priests, deacons, religious, seminarians, pastoral ministers, administrators, lay employees and volunteers (Church Personnel) in our parishes, agencies, schools and organizations must uphold Christian values and conduct. The *Code of Ethics Policy of the Diocese of Charlotte* (Code) provides a set of standards for conduct in certain situations and is designed to deter wrongdoing and to promote honest and ethical conduct.

The public and private conduct of clergy, religious, seminarians, lay employees and volunteers can be a source of inspiration and motivation, but it can also scandalize and undermine the faith of the people that are served. Church Personnel must at all times be aware of the responsibilities that accompany their work. It is essential therefore, that anyone who undertakes a position of ministry, employment or leadership in the diocese, be ever mindful of the trust that has been placed in him or her. The faithful discharge of the responsibilities that accompany our work requires constant and prayerful reflection since all of us must be sustained by God's goodness and grace.

Responsibility for adherence to the Code rests with each individual. This responsibility requires each of us to periodically take a personal inventory. It is hoped that the Code will assist us in this task. Church Personnel who disregard this Code will be subject to remedial action. This action can take several forms, from a verbal warning to removal, depending on the nature and circumstances of the offense.

While no policy can anticipate all of the challenges and situations that may arise, the Code communicates key guidelines and will assist in making decisions that are ethical and in accordance with applicable legal requirements, the Diocesan Sexual Misconduct Policy, the Diocesan Personnel Policies Handbook, and the Diocesan Financial Policies Handbook. All Church Personnel are encouraged to discuss any questions or concerns they have with their supervisor. Before beginning any ministerial, employment or volunteer functions, Church Personnel will read, have read to them, understand, and sign the proper acknowledgement of receipt form, and comply with this Code.

Billard RFP 000114

# 1. PRINCIPLES OF ETHICS AND INTEGRITY

1.1   Church Personnel will conduct themselves at all times in a manner that is consistent with the teachings and precepts of the Roman Catholic Church.

1.2   Church Personnel will exhibit the highest Christian ethical standards and personal integrity.

1.3   Church Personnel will continually and objectively examine their own actions and intentions to ensure that their behavior promotes the welfare of the diocese and exemplifies the moral tradition of the Church.

1.4   Church Personnel will establish clear, appropriate boundaries with anyone with whom they have a ministerial, business, professional or social relationship.

1.5   Church Personnel will provide an environment that is free from physical, psychological, emotional, written or verbal intimidation or harassment.

1.6   Church Personnel will conduct their relationships with others that are free of deception, manipulation and/or exploitation.

1.7   Church Personnel will not sexually abuse or harass a minor child.

1.8   Church Personnel will report any suspected sexual abuse of a minor child as required by the diocesan Sexual Misconduct Policy.

1.9   Church Personnel will not take unfair advantage of a counseling relationship for their personal benefit.

1.10  Church Personnel will not use their position to exercise unreasonable or inappropriate power, influence or authority.

1.11  Church Personnel will not accept or confer an office, position, assignment or compensation, which may present the appearance of favoritism or a conflict of interest.

1.12  Church Personnel will be responsible stewards of diocesan resources, human and financial, observing both canon and civil law, and making decisions concerning the disposition of resources that reflect Catholic social teaching.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP.000115

1.13  Church Personnel will not make false accusations against another, or reveal the faults and failings to anyone who is not in a position that necessitates a need to know.

1.14  Church Personnel will share concerns about suspicions of inappropriate behavior with the appropriate supervisory or management individual.

1.15  Accountability:  The Diocese and all its parishes, schools and organizations are responsible to its stakeholders, which includes donors and others who have placed their trust in the Church.  To uphold this trust, all Church personnel will:

- Promote good stewardship of all Church resources, including donations, grants, program fees, and all financial support.
- Use all Church resources only for Church related purposes.  Church resources are never to be used for personal purposes, even if it is intended to be temporary.
- Use all Church resources in a prudent-like manner, avoiding unnecessary and excessive spending and wastefulness.
- Use Church credit cards, vendor relationships and lines of credit only for Church related purposes.  They are never to be used for personal transactions, even if it is intended that Church funds will not be used for payment.
- Comply with all applicable laws and regulations.
- Not be a party to any fraud or embezzlement, or neglect their duty to safeguard all Church assets.

## 2.  GUIDELINES FOR WORKING WITH MINOR CHILDREN

2.1  Church Personnel are not to possess any sexually explicit or morally inappropriate materials on church, school or diocesan property, or in the presence of minor children.  Such materials include, but are not limited to, videos, films, pictures, recordings, drawings, posters, cards, calendars, clothing, computer software and/or games.

2.2  Church Personnel are not to engage in sexually oriented conversations with minor children, except in the context of sharing the Church's teaching on human sexuality.  Church Personnel are never to discuss their own sexual activities with minor children.

2.3  Church Personnel are not to take photographs of minor children who are

Billard RFP 000116

unclothed or dressing, for example in a locker room or bathing facility, nor shall they permit such photographs to be taken by others.

2.4     Church Personnel are not to speak to minor children in a manner that is, or could be construed by an observer as derogatory, demeaning, threatening, intimidating or humiliating, and are not to use profane or foul language in the presence of minor children.

2.5     Church Personnel are not to use tobacco products, alcoholic beverages, illegal drugs, or any substance prohibited by law, nor are they to be under the influence of any alcoholic beverage or illegal drugs, when working with minor children.     Church Personnel may administer medications to minor children if written permission from parents or legal guardians is given.

2.6     Church Personnel are not to sleep in the same bed, hotel or motel room, sleeping bag, tent or cabin with a minor child unless the Church Personnel is the parent, legal guardian or sibling of the minor child.

2.7     Church Personnel are not to share showering, bathing, changing or dressing facilities with minor children.  When the good of the minor child requires that they be accompanied by an adult to in any of these locations, the time alone with the minor child should be minimal and another adult should be made aware of the circumstances.

2.8     Church Personnel are not to take an overnight trip alone with a minor child who is not an immediate family member.

2.9     Clergy and religious are not to allow minor children to be overnight guests in their residence or private accommodations with the exception of an occasional visit from immediate family members.  Other Church Personnel are not to provide shared or private accommodations in any diocesan facility, private residence, hotel or motel room, or any other place where there is no other adult supervision present.

2.10    When providing transportation for minor children, Church Personnel are to be validly licensed and authorized, ordinarily have written permission from parents or legal guardians, and are to transport minors directly to their approved destination, with no unauthorized stops or deviations unless it is a valid emergency.

2.11    At the end of any activity, Church Personnel are to release minor children in their care only to parents, legal guardians, or other persons

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2000*

Billard RFP 000117

designated in writing by parents or legal guardians.

2.12    Church Personnel should schedule one-on-one counseling sessions or meetings with minor children at times and locations that promote accountability and meet accepted standards of propriety.

2.13    Activities and programs for minor children are not to be administered by only one adult. During all activities and programs, facilities should be monitored.

2.14    Church Personnel are not to use physical discipline in any way for the behavior management of minor children. No form of physical discipline is acceptable. This includes spanking, hitting, pinching, or any other physical force as correction or retaliation for inappropriate behavior.

2.15    Church Personnel are to immediately report the unusual or uncontrollable behavior of minor children to parents or legal guardians.

2.16    As a general rule, volunteers for programs involving working with minor children in parishes should be registered members of the parish for at least six months before being placed in a volunteer position. After careful consideration, exceptions may be made for parents of minor children in the specific programs in which their child or children are participating.

2.17    Reference checks should be conducted on employees and volunteers who transfer within the diocese before allowing them to participate in any program involving working with minor children.

## 3. PHYSICAL CONTACT WITH MINOR CHILDREN

3.1    Appropriate affection between Church Personnel and minor children is important for a child's development, and is a positive part of church life and ministry. However, touching must be based on the need of the minor child and not the adult, completely non-sexual, never in private, and otherwise appropriate.

3.2    Though not all-inclusive, the following examples are regarded as appropriate forms of affection:
- side hugs
- shoulder to shoulder or temple hugs

*Roman Catholic Diocese of Charlotte Personal Policies Handbook*
*Revised July 1, 2009*

61

Billard RFP 000118

JA0521

- pats on the shoulder or back
- handshakes
- high fives or hand slapping
- arms around shoulders
- holding hands while walking small children
- kneeling or bending down for hugs with small children
- holding hands during prayer

3.3    Though not all-inclusive, the following examples are forms of affection that are not to be used:

- lengthy or inappropriate hugs or embraces
- kisses on the mouth
- holding children over two years old on the lap
- touching the chests, knees, legs, bottoms or genital areas of minor children
- showing affection in isolated areas or private rooms
- sleeping in bed with a minor child
- wrestling or tickling minor children
- any type of massage given to or received from a minor child
- comments or compliments that relate to body development or physique
- any form of unwanted affection

3.4    No one should be permitted to develop and/or start new programs for minor children without proper review and approval by the proper authority. Requests to develop new programs should be submitted in writing and must include provisions for adequate adult supervision.

## 4. CONDUCT FOR PASTORAL COUNSELORS AND SPIRITUAL DIRECTORS

4.1    Pastoral Counselors and Spiritual Directors are not to step beyond their competence in counseling situations and are to refer people being counseled to other professionals when appropriate.

4.2    While counseling a minor child, if a Pastoral Counselor or Spiritual Director discovers that there is a serious threat to the welfare of the minor, and that communication of confidential information to a parent or legal guardian is essential to the minor child's health and well-being, the Pastoral Counselor or Spiritual Director should disclose only the

62

Billard RFP 000119

Information necessary to protect the health and well-being of the minor child.

4.3     Pastoral Counselors and Spiritual Directors are to carefully consider the possible consequences before entering into a counseling relationship with someone with whom they have a pre-existing relationship.

4.4     Pastoral Counselors and Spiritual Directors will conduct all counseling sessions in appropriate settings and at appropriate times. No session is to be conducted in private living quarters.

4.5     Pastoral Counselors and Spiritual Directors are to avoid situations that might present a conflict of interest between a counselor and a person being counseled, including even the appearance of a conflict of interest.

4.6     Pastoral Counselors and Spiritual Directors are not to engage in sexual intimacies with anyone they counsel. This includes consensual and non-consensual contact, forced physical contact and inappropriate sexual comments.

4.7     Pastoral Counselors and Spiritual Directors are not to engage in sexual intimacies with individuals who are close to the person being counseled, i.e. relatives and close friends.

4.8     Pastoral Counselors and Spiritual Directors assume the full burden of responsibility for establishing and maintaining clear, appropriate boundaries in all counseling and counseling-related relationships.

4.9     Pastoral Counselors and Spiritual Directors are to maintain a log of the times and places of sessions with each person being counseled.

4.10    Pastoral Counselors and Spiritual Directors should discuss the nature of confidentiality and its limitations with each person being counseled. Information that is disclosed during the course of counseling or advising is to be confidential, except for compelling professional reasons or as required by law.

4.11    If there is a clear and imminent danger to the person being counseled, or to others, the Pastoral Counselor or Spiritual Director may disclose only the information necessary to protect the parties affected and to prevent harm. Before disclosure is made, if feasible, the Pastoral Counselor or Spiritual Director should inform the person being counseled about the disclosure and the potential consequences.

Billard RFP 000120

4.12    With the exception of knowledge gained in the Sacrament of Penance, knowledge that arises from counseling sessions may be used in teaching, writing homilies, or other public presentations only when effective measures are taken to absolutely safeguard both the individual's identity and the confidentiality of the disclosures.

4.13    In accordance with the norm of canon law, the sacramental seal is inviolable, therefore, it is absolutely forbidden for a confessor to betray the confidence of a penitent in any way and for any reason. This is applicable whether the penitent is living or dead.

## 5. HARASSMENT

5.1    Church Personnel are to provide an environment that is free from sexual, psychological or physical harassment. This includes but is not limited to:

- physical or mental abuse
- unwelcome sexual advances or touching
- sexual comments and jokes
- requests for sexual favors used as a term or condition of employment
- requests for sexual favors used as the basis for an employment decision
- displaying or wearing offensive material
- derogatory racial, religious, age, ethnic, physical or mental condition insults or slurs

5.2    Harassment can be a single, severe incident or a persistent pattern of behavior where the intent or the effect is to create a hostile, offensive or intimidating environment.

## 6. POLICY ON CONFLICTS OF INTEREST/PRIVATE INURNMENT, NEPOTISM, OUTSIDE EMPLOYMENT

6.1    Identifying a Private Inurnment or Private Benefit Problem: In brief, "private inurnment" is the *payment* or diversion of an exempt organization's assets to its officials, officers, directors, employees, relatives, friends, major donors, or others in a special relationship to the organization who can influence or control the policy or the day-to-day

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 000121

activities of the organization *for less than full and adequate consideration*. It is a broad concept that can exist in a variety of transactions under a variety of circumstances. Private inurnment also extends to the use of organizational assets for "private benefits" such as sales, leasing, construction contracts, service transactions, etc., at other than fair market value or the exploitation of the exempt organization *for the benefit of a private business* (e.g., "sweetheart deals," promotional schemes, and/or giveaways to private individuals or businesses). Thus, under IRS regulations, a private benefit is similar to, but broader than, private inurnment.

To avoid material private inurnment or benefit in the types of transactions described above, the particular diocesan entity must enter into transactions for its benefit, rather than for a private party's benefit, and exercise due diligence to ensure that the proposed transaction is fair and reasonable such that under the circumstances the organization could not have obtained a more advantageous arrangement with reasonable effort. In addition to screening proposed transactions through the applicable councils and boards, care should be taken to follow diocesan policies and procedures pertaining to the signing of contracts.

6.2     Conflicts of Interest:  A conflict of interest may exist when persons employed by the diocese (i.e., the Central Administration, parishes, schools, agencies, and/or affiliated entities), or volunteers with influence over certain activities or transactions including those serving on advisory or consultative boards, councils or committees have a direct or indirect financial interest, as defined below.

6.3     Financial Interest:  A person has a "financial interest" if the person has, directly or indirectly, through business, investment, or family (including spouses; brothers or sisters; spouses of brothers or sisters; ancestors; children, grandchildren, and great grandchildren; and spouses of children, grandchildren, and great grandchildren), any one of the following:
- An ownership or investment interest in any entity with which the diocese has a transaction or arrangement;
- A compensation arrangement with the diocese or with any entity or individual with whom the diocese has a transaction or arrangement;
- A potential ownership or investment interest with, or compensation arrangement with, any entity or individual with whom the diocese is negotiating a transaction or arrangement.

Billard RFP 000122

6.4    Church Personnel are to avoid situations that might present a conflict of interest.

6.5    Church Personnel are not to take advantage of anyone to whom they are providing ministry or service in order to further their own personal, religious, political, business or economic interests.

6.6    Church Personnel are not to solicit, accept or give any personal gifts, favors, or things of value which could influence, or which could be construed as influencing any decision or obligation to the performance of one's duties.

6.7    Relatives of Church Personnel, or of relatives of various diocesan boards, may be hired as employees only if they will not be working under the line of supervisory authority of a relative or the advisory authority of the board.    Generally, relatives include spouses, children, siblings, grandparents and grandchildren.

6.8    No member of any diocesan board is to knowingly take any action or make any statement that is intended to influence any undertaking of a parish, school, agency, department or institution of the diocese in such a way as to confer any benefit on such member or anyone in the member's family or business.

6.9    No member of any diocesan board, his/her family members, employer, business or business associates, is to solicit business or favors from any diocesan parish, school, agency, department or institution of the diocese.

6.10    No member of any diocesan board is to vote in connection with any decision that may constitute a conflict of interest.

6.11    Outside employment is permitted as long as Church Personnel notify their supervisor of that fact and satisfactorily perform their job responsibilities.  If an individual with an outside job does not perform his/her job requirements satisfactorily, he or she may be asked to terminate the outside employment.

6.12    Whenever a diocesan entity is considering conducting business with any

Roman Catholic Diocese of Charlotte Personnel Policies Handbook
Revised July 1, 2009

Billard RFP 000123

person employed by the diocese (i.e., the Central Administration, parishes, schools, agencies, and/or affiliated entities) or any volunteer, or his/her family member, his/her business, or any entity in which he/she has an investment, the diocesan entity must solicit bids from at least two other sources and may not select the person/entity with the financial interest unless that person/entity is the lowest bidder.

6.13    Duty to Disclose: In connection with any actual or potential conflict of interest, an interested person must disclose the existence and nature of his or her financial interest and all material facts. Reports should be made to the pastor, principal, vicar general/chancellor, attorney, or chief financial officer. Reports made to pastors and principals are to be reported to the vicar general/chancellor. Reports should include relevant information that is discernible.

6.14    Investigation: The person to whom said report was made shall be responsible for a thorough and expeditious investigation of the actual/potential conflict of interest. Proposed decisions on the disposition of a case are to be discussed with the vicar general/chancellor or his designee. The results of all confirmed conflicts of interest and the final resolution shall be reported to the diocesan Finance Council.

6.15    Subsequent Conflicts and Disclosures: Notwithstanding previous disclosure of actual or potential conflicts of interest, an individual shall make a new disclosure of conflicts when any matter involving the conflict of interest arises for discussion or action. In the event that an individual is uncertain whether an actual or potential conflict of interest exists, the individual should make disclosure of the circumstances that may give rise to an actual or potential conflict.

6.16    Confidential or Privileged Information: Information known to be confidential that is acquired by individuals in the course of employment or association with the diocese and its affiliated entities shall be used only for the benefit and purposes of the diocese. Individuals shall neither disclose confidential information outside the scope of their authorized duties nor utilize their position or association with the diocese for personal identification or advantage, although there may be instances, based on the use of careful discretion and judgment, where incidental use of the association with the diocese may be appropriate.

Billard RFP 000124

## 7. POLITICAL ACTIVITY

7.1    The Diocese of Charlotte encourages individual participation in civic affairs. However, Church Personnel are not to engage in political activities in a manner that may create the appearance that such activity is by or on behalf of the diocese.

7.2    Church Personnel are not to make any contribution to any candidate for public office or political committee on behalf of the Diocese of Charlotte or in a manner that may create the appearance that the contribution is on behalf of the diocese.

7.3    Church Personnel are not to use any parish, school or agency facilities, financial resources, or personnel to endorse or oppose a candidate for public office.

7.4    Church Personnel are to clearly communicate that they are not acting on behalf of the Diocese of Charlotte if identified as an official or employee of the diocese while engaging in political activities in an individual capacity.

## 8. WHISTLEBLOWER POLICY

8.1    The Diocese of Charlotte requires all representatives of the Church, including clergy, religious, directors, and other volunteers, and lay employees, to observe high standards of business and personal ethics in the conduct of their duties and responsibilities. All representatives of the Church must practice honesty and integrity in fulfilling their responsibilities and comply with all applicable laws and regulations.

The objectives of the Whistleblower Policy are to establish policies and procedures for:
- The submission of concerns regarding questionable financial or legal matters, violations and suspected violations of the Code of Conduct, Code of Canon Law and other concerns by the stakeholders of the Church, on a confidential basis;
- The receipt, retention, and treatment of complaints received by the organization;
- The protection of anyone reporting concerns from retaliatory actions.

68                     *Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
                       *Revised July 1, 2009*

Billard RFP 000125

JA0528

8.2     Reporting Responsibility - Each representative of the diocese has an obligation to report in accordance with this Whistleblower Policy any reasonably perceived violation of: (a) federal, state or local laws, rules and/or regulations; (b) the diocese's Code of Ethics; (c) the diocesan sexual misconduct policy; (d) diocesan personnel policies; (e) diocesan financial policies, including questionable or improper accounting or auditing matters; as well as gross mismanagement, waste, fraud, embezzlement, neglect of duty; and actions that threaten or are viewed as harmful to the health, safety and welfare of others and any other financial, legal or canonical concerns (hereinafter collectively referred to as Concerns).

Reports of Concerns should be made to the pastor, principal, vicar general/chancellor, attorney, or chief financial officer. Reports made to pastors and principals are to be reported to the vicar general/chancellor. All Concerns are to be reported as soon as possible. Reports of Concerns should include all relevant information about the suspected act, including any material evidence that exists.

8.3     Investigation - The person to whom said report was made shall be responsible for a thorough and expeditious investigation of the reported Concern.

Proposed decisions on the disposition of a case are to be discussed with the vicar general/chancellor or his designee. The results of all reported and confirmed Concerns and the final resolution shall be reported to the diocesan Finance Council.

8.4     No Retaliation - This Whistleblower Policy is intended to encourage and enable stakeholders to raise Concerns within the Organization for investigation and appropriate action. With this goal in mind, no stakeholder who, in good faith, reports a Concern shall be subject to retaliation or, in the case of an employee, adverse employment consequences. Moreover, anyone who retaliates against someone who has reported a Concern in good faith is subject to discipline up to and including dismissal from their position within the Church.

8.5     Acting in Good Faith - Anyone reporting a Concern must act in good faith and have reasonable grounds for believing the information disclosed is a legitimate matter of Concern. The act of making allegations that prove to be unsubstantiated, and that prove to have been made maliciously, recklessly, or with the foreknowledge that the allegations are false, will be viewed as a serious disciplinary offense and

Billard RFP 000126

may result in discipline, up to and including dismissal from their position with the Church. Such conduct may also give rise to other actions, including civil lawsuits.

8.6     Confidentiality - Reports of Concerns, and investigations pertaining thereto, shall be kept confidential to the extent possible, consistent with the need to conduct an adequate investigation. Disclosure of reports of Concerns to individuals not involved in the investigation will be viewed as a serious disciplinary offense and may result in discipline, up to and including termination of the violators' position in the Church. Such conduct may also give rise to other actions, including civil lawsuits.

## 9. CONFIDENTIALITY

9.1     Church Personnel, regardless of their work or volunteer responsibility, are to keep significant information on a confidential basis and are not to discuss it with anyone who is not directly involved.

9.2     Sacramental records are to be regarded as confidential. When compiling and/or publishing statistical information from these records, great care is to be taken to preserve the anonymity of individuals. Only those who are authorized to access these records and supervise their use are to have access to them.

9.3     Individual contribution records of parishes are to be regarded as private and are to be kept confidential.

## 10. REPORTING ETHICAL MISCONDUCT

10.1     Church Personnel are to hold each other accountable for maintaining the highest ethical and professional standards. When it appears that any Church Personnel has violated this Code, or any other religious, legal, moral, professional or ethical principle, the matter is to be reported to that entity's management authority or the Chancery.

10.2     All reports of possible violations of this Code will be treated in confidence as much as the diocese's duty to investigate and the law allow. If confidentiality cannot be maintained, the individual reporting the violation will be so advised.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 000127

10.3    All reported violations of this Code will be investigated, and if needed, appropriate action will be taken based on the nature of the violation and diocesan policy.

10.4    Retaliation against a person who suspects and reports a violation of this Code in good faith will be treated as an individual violation of this Code.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook. Revised July 1, 2005*

71

Billard RFP 000128

JA0531

Billard RFP 000129

# Section 900: POLICY OF THE DIOCESE OF CHARLOTTE CONCERNING MINISTRY-RELATED SEXUAL MISCONDUCT BY CHURCH PERSONNEL

Billard RFP 000130

Billard RFP 000131



**Policy of the
Diocese of Charlotte
Concerning Ministry-Related
Sexual Misconduct by
Church Personnel**

*Revised July 1, 2003*

The Diocese of Charlotte
1123 South Church Street
Charlotte, NC 28203
(704) 370-6299

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook.
Revised July 1, 2003*

75

Billard RFP 000132

July 1, 2003

To All Diocesan Personnel:

I am pleased to forward to you a revised "Policy of the Diocese of Charlotte Concerning Ministry Related Sexual Misconduct by Church Personnel." This policy is an updated version of the June 1, 1999 revision and includes mandates contained in the "Charter for the Protection of Children and Young People" adopted June 14, 2002 by the U.S. Bishops during their national meeting in Dallas, Texas and their subsequent November 13, 2002 meeting in Washington, D.C. With the issuance of this revision, the June 1, 1999 revised policy is no longer in effect.

This policy applies to priests, deacons, religious, seminarians, lay employees and volunteers, and covers not only the sexual abuse of minors, but also other forms of sexual misconduct. It is required that pastors and school, agency or departmental managers ensure that all of their associates, employees and volunteers receive a copy of this policy, and that all to whom it is given read and become acquainted with it.

Sincerely,

Reverend Monsignor Mauricio W. West
Diocesan Administrator

76

Billard RFP 000133

# TABLE OF CONTENTS

Purpose of the Policy
Introduction
Commentary

I.   Definitions

II.   General Provisions

III.   Reporting Requirements

IV.   Applications – Lay Personnel

V.   Applications – Clergy, Seminarians And Religious

VI.   Procedures When Allegations Are Made Against A Lay Employee Or
      Volunteer

VII.   Procedures When Allegations Are Made Against Clergy, Religious Or
       Seminarians In Service To The Diocese

VIII.   Education

IX.   Media and Communications

X.   Sanctions

Acknowledgement of Receipt

Billard RFP 000134

JA0537

## PURPOSE OF THE POLICY

The purpose of this policy is to provide the Diocese of Charlotte with an official procedure for dealing with an allegation of sexual misconduct by church personnel.

Nothing in this policy is intended to prevent or relieve any person or group of persons, whether they be clergy, religious, seminarian, employee or volunteer, from reporting any allegation of the sexual abuse of a minor to the proper civil authorities as mandated by law, unless to do so would violate the priest/penitent relationship.

The Diocese of Charlotte will cooperate fully with any investigation by civil authorities and will also thoroughly investigate all allegations to ascertain the truth.

## INTRODUCTION

A common mission of all of us is to be holy. A holy people will not allow one of its members to be a victim of ministry related sexual misconduct. It is with this in mind that the Diocese of Charlotte issues this policy, which affirms that, all human suffering as well as the weaknesses and imperfections of human beings deserve a response that is rooted in love, concern and compassion.

The term ministry related sexual misconduct as used throughout this policy refers to three related forms of misconduct. The first, which is sexual contact between church personnel and a child, is more commonly called sexual abuse. The second, which is sexual contact between church personnel and another adult, is more commonly called sexual misconduct. The third, which is unwanted sexual conduct or language, is more commonly called sexual harassment. All three of these are addressed herein together as ministry related sexual misconduct because they each involve an abuse of power or authority by those in ministry/service to the diocese. It is understood that any action of a sexual nature that is directed toward a child will be considered sexual abuse.

The Diocese of Charlotte is committed to dealing expeditiously, openly, fairly and compassionately with allegations of ministry related sexual misconduct by church personnel. In order to achieve this commitment, the following policy and procedures have been adopted and are to be implemented with dispatch, justice

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 000135

and equity. The Diocese of Charlotte will willingly cooperate with civil authorities as to the extent possible in all circumstances. In addition, there may be cases where the tenets of the Catholic religion, the prescriptions of Canon Law, or the greater good of all concerned require that action at variance with the provisions of this policy be taken; therefore, the Chancery reserves the right to interpret, revise or replace this policy as it deems necessary. The necessary observance of the canonical norms internal to the Church is not intended in any way to hinder the course of any civil action that may be operative. At the same time, the Church reaffirms her right to enact legislation that is binding on all her members concerning the ecclesiastical dimensions of the delict of sexual abuse of minors.

The Diocese of Charlotte presents these guidelines not because of past failures, not to cause alarm or fear, but rather to set forth a clear policy for the protection of our priests, deacons, seminarians, religious, laity and victims. The policies and procedures that the diocese has adopted reflect our experience and the studies of many others and must always be construed in the light of the gospel and the principle, *salus animarum suprema lex*, that is, the well being of the people is our primary obligation.

## COMMENTARY

In June 2002, the American bishops approved the first draft of the *Essential Norms for Diocesan/Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons (Essential Norms)*, and a *Charter for the Protection of Children and Young People (Charter)*. The *Charter* addressed the Church's commitment to respond effectively, appropriately and compassionately to cases of the sexual abuse of minors by priests, deacons or other Church personnel. The bishops promised to reach out to the victims of sexual abuse of minors by anyone serving the Church in ministry, employment or as a volunteer. The *Essential Norms* and the *Charter* served as the basis for this revision of the sexual misconduct policy of the Diocese of Charlotte.

In order to be considered law binding on all bishops in the United States, the draft *Essential Norms* was forwarded to the Vatican for approval (*recognition*). The Vatican acknowledged the grave dimensions of the crisis in the Church in the United States, but was concerned that the *Essential Norms* as submitted in June lacked a balance between the rights of the alleged victims and the accused, and denied the accused the right to due process. To some degree, the proposed *Essential Norms* contradicted established church law. A joint commission comprised of four representatives from the Vatican and four American bishops

Billard RFP 000136

was appointed to revise the *Essential Norms* to "give effective protection to minors and establish a rigorous and precise procedure to punish, in a just way, those who are guilty of such abominable offenses."

On November 13, 2002, the United States bishops meeting in Washington approved the revised *Essential Norms* as submitted by the joint commission, with some minor changes. In addition, the bishops approved the *Charter*, revising it to bring it into conformity with the *Essential Norms*. Respecting always the reputation and privacy of the individuals involved, the bishops said that they would act as openly with the public as possible. They are committed to respond to the pastoral, spiritual and emotional well-being of victims and their families and to work with priests, civil authorities, educators, churches, and community organizations to provide safe environments for children and youth.

As a result of the bishop's actions, the *Policy of the Diocese of Charlotte Concerning Ministry-Related Sexual Misconduct by Church Personnel* has been revised. This policy is believed to be in full compliance with the *Essential Norms* as approved by the Vatican on December 8, 2002, the revised *Charter*, and canon and civil law.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2003*

Billard RFP 000137

## I. DEFINITIONS

1.  **Sexual Abuse:** The exploitation of a child for the sexual gratification of an adult. Sexual abuse includes acts of incest, rape or sexual offenses in any degree, sodomy and unnatural or perverted sexual practices, lewd or indecent acts or proposals, including exhibitionism, touching or fondling, permitting or encouraging a child to participate in acts of pornography or prostitution.

2.  **Child:** Any person under the age of eighteen (18).

3.  **Sexual Misconduct:** (a) The touching of a private part of another person. Private parts can include the genital or anal areas, the groin, the inner thigh, the buttocks, or the bosom of a female. Touching means either a single incident in which church personnel intentionally brings a part of his/her body or another object into physical contact with a private part of another person, or repeated incidents of the same type, whether intentional or unintentional; (b) Any conduct and/or relationship of a sexual nature that can bring scandal.

4.  **Sexual Harassment:** Unwanted attention, ogling, words, pictures, jokes or comments of a sexual nature that are directed towards an individual or in the general environment.

5.  **Church Personnel:** Includes bishops, priests, deacons, religious, lay employees and lay volunteers involved in ministry or work for the Diocese of Charlotte.

6.  **Bishop:** The canonically appointed Bishop of Charlotte, or, in the case of a vacancy, the Diocesan Administrator. For purposes of this policy, the Bishop or Diocesan Administrator may act personally or through a designated representative.

7.  **Administrative Leave:** For purposes of this policy, is defined as the temporary relieving the accused of assigned duties. The application varies depending on the employment, volunteer, or canonical status of the accused. Administrative leave does not infer guilt or innocence.

8.  **Chancery:** The administrative branch of the Diocese of Charlotte under the authority of the Bishop or Diocesan Administrator.

Billard RFP 000138

## II. GENERAL PROVISIONS

1. Compassion requires that primary attention be given to the alleged victim of ministry related sexual misconduct. In that regard, the Diocese of Charlotte will appoint an Assistance Coordinator who will, on notification of an allegation, contact the alleged victim of ministry related sexual abuse of minors for the purpose of offering immediate pastoral care. In addition, the Assistance Coordinator will contact the alleged victim's family with an offer of spiritual help and pastoral counseling. If the need for counseling or medical help for the alleged victim or his/her family is indicated, this too shall be offered, but without admission of guilt or of any liability on the part of the Diocese of Charlotte. The Assistance Coordinator will also ensure that proper assistance and support is offered to faith communities directly affected by ministry related sexual misconduct. When an intervention causes the removal of a priest, deacon, seminarian, religious, employee or volunteer from a parish, mission, agency, school, institution or organization of the Diocese of Charlotte, the Assistance Coordinator will provide necessary concern and direction to the parishioners and/or remaining staff.

2. The Canonically appointed Bishop of Charlotte, or, in the case of a vacancy, the Diocesan Administrator, will appoint a Promoter of Justice. This must be a person of undamaged reputation. He/She will intervene in contentious cases to seek justice and vindicate the public good in penal cases. Functioning as the prosecutor, the Promoter of Justice brings the action, brings forth the evidence, argues the case, and appeals, if necessary.

3. The Canonically appointed Bishop of Charlotte, or, in the case of a vacancy, the Diocesan Administrator, will appoint or retain an investigator who is competent in sexual misconduct investigative procedures and techniques. More than one investigator may be appointed or retained. An investigative file will be established by the investigator for each reported allegation of sexual misconduct referred to him/her and shall contain all material gathered during the investigation. When the investigation has been completed, the investigator will prepare a complete written account of the allegations and findings and give it to the Chancery where it will be filed in a secure and confidential manner.

4. Any accused person who admits to, or on whom an appropriate investigation substantiates an allegation of sexual abuse of a minor will be permanently removed from ministry, employment and/or volunteer status. If the accused is a priest or a deacon, this may include the loss of the clerical state.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 000139

5.  In instances where the accused is not convicted, not found liable by a court of competent jurisdiction, not found guilty by a civil or diocesan investigation, or does not admit to sexual abuse or misconduct, the Chancery will make a determination as to whether or not the accused will be returned to ministry, employment or volunteer status.

6.  The Diocese of Charlotte will not require an attempt at reconciliation between an alleged abuser and victim. The involvement of any diocesan personnel in non-authorized reconciliation efforts will be treated as a violation of this policy.

7.  The Diocese of Charlotte will not enter into any confidentiality agreement with any sexual abuse victim/survivor except for grave and substantial reasons brought forward by the victim/survivor. If done, these reasons will be noted in the text of the agreement.

8.  No pastor, associate pastor or director of any diocesan rectory, institution or facility is permitted to grant full or part-time residence, or regular weekend ministry to an extern priest, a transitional or permanent deacon, or a religious without prior approval from the Chancery. Short-term hospitality in conformity with these norms is at the discretion of the pastor or director. For other individuals, no one may be extended hospitality as a resident, full or part-time, without approval from the Chancery.

9.  An Individual Review Board composed of at least five (5) persons of outstanding integrity and good judgment will be appointed by the Chancery. The majority of the review board members will be laypersons who are not employees of the Diocese of Charlotte. Membership will include at least one priest, one civil lawyer (not the diocesan attorney), and an individual having particular expertise in the detection and treatment of the sexual abuse of minors. The Assistance Coordinator and the Promoter of Justice will attend and participate in discussions in board meetings, but without vote. The members will be appointed for a term of five years, which can be renewed. Terms will be staggered. The functions performed by the Review Board are to be confidential, consultative and advisory, not adversarial and adjudicative, and are to be directed toward the protection of minor children, and the integrity of the priesthood and the Church. The responsibilities of the board will include the review of allegations of ministry related sexual abuse of minors, all actions taken in response to those allegations, ensurance of the integrity of the process, advice as to the need for pastoral care for affected individuals, and advice and recommendations to the bishop regarding the implementation of any aspect of this policy. Other cases of ministry related sexual misconduct may be referred to the Board for review and counsel. The

Billard RFP 000140

10. After having an outside agency conduct a background investigation, the Diocese of Charlotte will evaluate the background check report received on all church personnel who have regular contact with children. Additionally, the diocese will have investigated, screen and evaluate the background of candidates for ordination in deciding their fitness for ordination.

11. Allegations against the Bishop are beyond the scope of this policy. Any such allegation shall be directed to the Vicar General who will contact the Papal Nuncio and the appropriate civil authority.

12. Pastors and agency or department heads are responsible for ensuring that all clergy, seminarians, religious, employees and volunteers under their authority are given a copy of this policy. The original of the signed and dated *Acknowledgement of Receipt of Sexual Misconduct Policy* must be sent to the diocesan Human Relations Department within fourteen (14) calendar days of the date of assignment, hire, or beginning volunteer service. Copies should be kept by the parish, mission, school, agency, department or institution.

## III. REPORTING REQUIREMENTS

1. All cases of alleged, known or suspected ministry related sexual abuse of a minor must be reported to the proper civil authority. Any person having actual knowledge of, or reasonable cause to suspect an incident of ministry related sexual abuse by any church personnel of the Diocese of Charlotte is to immediately report the incident to the Chancery, unless to do so would violate the Sacrament of Penance. The Chancery will then report the incident to the proper civil authority. After notifying the proper civil authority, the Chancery will immediately notify the Assistance Coordinator, the Promoter of Justice, and the Review Board. Following this, the individual reporting the incident to the Chancery will be notified of the particulars regarding the filing of the incident with civil authority. This reporting requirement is not intended to supersede the right of a victim or witness to individually make a report to

84

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 000141

JA0544

2. A lack of information, or the lack of consent of the alleged victim, the victim's parent(s) or legal guardian, or the person(s) providing the information is not to prevent the immediate reporting of the allegation of abuse to civil authorities.

3. At the time of reporting an incident of alleged sexual misconduct to the Chancery, the person making the report will be asked to complete the diocesan form, *Report of Suspected Ministry Related Sexual Misconduct by Church Personnel.*

4. Any act of retaliation or discrimination against an individual who reports or complains of ministry related sexual misconduct is strictly prohibited and will not be tolerated by the Diocese of Charlotte.

## IV. APPLICATIONS – LAY PERSONNEL

1. During the application process, the diocesan form, *Application for Lay Employment,* must be completed and submitted by all lay applicants for any paid position in the Diocese of Charlotte. If the applicant is hired, the application is to be kept in the individual's Official Personnel File.

2. During the application process, the diocesan forms, *Application for Lay Employment* and *Volunteer Profile,* must be completed and submitted by all persons volunteering for positions that involve supervised or unsupervised ministry or work with children. If the volunteer is assigned to a position, the forms are to be kept in the individual's personnel folder.

3. During the application process, the diocesan form, *Notification And Release,* must be completed and submitted by all lay applicants for any paid or volunteer position giving authorization to the Diocese of Charlotte to request investigative background inquiries that give information as to the applicant's character, work habits, performance and experience. The original background check release form must be forwarded to the diocesan Human Relations Department immediately upon receipt. The Human Relations Department will conduct the background check and will notify the requesting parish, mission, school, department, agency or institution of the results within

Billard RFP 000142

## VI.  PROCEDURES WHEN ALLEGATIONS ARE MADE AGAINST A LAY EMPLOYEE OR VOLUNTEER

1. On receiving an allegation of ministry related sexual misconduct, if the allegation is sexual abuse of a minor, the Chancery will immediately report the allegation to the proper civil authority, request to be kept informed of their investigation, notify the accused of the nature of the allegation, and assign an investigator who will conduct an immediate investigation into the matter. Unless required by law, allegations of sexual misconduct and/or sexual harassment will not be reported to civil authority, but all other requirements and procedures in this policy will be followed.  The involvement of the Assistance Coordinator, the Promoter of Justice, and the Review Board will be included where and when necessary but in all cases of sexual abuse.  In cases of sexual abuse, the accused will be placed on administrative leave (with pay for paid employees) pending the outcome of the investigation.

2. The accused will be advised of the investigative process, of their right to civil and canonical counsel, and their right to appear before the Review Board with counsel and/or other advocate.

3. No diocesan investigation will interfere with any civil investigation, and will be conducted with a high level of Christian pastoral care for the alleged victim, his/her family, the person reporting the incident, the accused, and all other persons whose lives are touched by this incident.

4. If required, the Review Board will meet as soon as practical once the investigation has been completed and will carefully examine all information gathered during the investigation.  After due deliberation, the board will either request additional information/interviews or advise the bishop of their recommendation(s).

5. If the investigation finds that there is no reasonable cause to believe that the allegation is true, the accused and the person making the allegation will be notified and the matter will be closed.  The Chancery will make a determination as to whether or not the accused will be restored to duty at his/her original position, to another position, to the same location or to another location.  The Diocese of Charlotte will do all that is possible to restore the good name of the accused.

Billard RFP 000144

6. If the investigation finds that there is reasonable cause to believe that the allegation is true, the accused and the person making the allegation will be notified of that finding and the accused's employment or volunteer relationship with the Diocese of Charlotte will be terminated immediately. The diocese will encourage the individual to seek an appropriate treatment program.

7. It is the responsibility of the accused to obtain and finance his/her own private counsel.

## VII. PROCEDURES WHEN ALLEGATIONS ARE MADE AGAINST CLERGY, RELIGIOUS OR SEMINARIANS IN SERVICE TO THE DIOCESE

1. On receiving an allegation of ministry related sexual misconduct, if the allegation is sexual abuse of a minor, the Chancery will immediately report the allegation to the proper civil authority, notify the accused of the nature of the allegation, place the accused on administrative leave thereby relieving him/her of any ecclesiastical ministry or function, and conduct an immediate investigation into the matter. Unless required by law, allegations of sexual misconduct and/or sexual harassment will not be reported to civil authority, but all other requirements and procedures in this policy will be followed. The involvement of the Assistance Coordinator, the Promoter of Justice, and the Review Board will be included where and when necessary. Any administrative leave will be planned and circumstances determined in a way specific to each situation and to each individual in accord with canon 1722. In general, an administrative leave will be time limited, will allow for re-determination at the end of such time limit, will specify living arrangement, location, financial support, and will address treatment, conduct and aftercare.

2. The accused will be asked to undergo appropriate medical and/or psychological evaluation and intervention, unless to do so would interfere with an investigation by civil authorities. Participation of an accused cleric in appropriate professional treatment/counseling is required as a matter of clerical obedience (c.273). Treatment/Counseling referral is for treatment, not punishment. Any future ministry in the Diocese of Charlotte will require in part a full sharing with the Chancery of all information developed in the course of the treatment. Authorization from the accused is required in all cases to allow the treatment providers to communicate openly and freely with the Chancery.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 000145

3. Following evaluation and treatment, if aftercare is prescribed, the accused will be assigned to a priest-monitor who will be a friend in very difficult circumstances and who will ensure that the aftercare program is carried out.

4. If the diocesan investigation finds that there is no reasonable cause to believe that the allegation is true, the accused and the person making the allegation will be notified and the matter will be closed. The Chancery will make a determination as to whether or not the accused will be restored to duty at his/her original position, to another position, to the same location or to another location. The Diocese of Charlotte will do all that is possible to restore the good name of the accused.

5. If the accused admits that the allegation is true, if the diocesan investigation finds that there is reasonable cause to believe that the allegation is true, or if a civil investigation finds that the allegation is true, the accused will be permanently removed from ministry. Clergy may request dispensation from the obligations of Holy Orders. If this is not voluntarily requested the Bishop of the Diocese of Charlotte or, in the case of a vacancy, the Diocesan Administrator, may request dismissal of the accused from the clerical state without the consent of the accused. If removal from the clerical state is not applied, i.e. for reasons of advanced age or infirmity, the accused will not be allowed to celebrate Mass publicly, wear clerical garb, or present himself publicly as a priest.

6. The accused will be encouraged to retain the assistance of civil and canonical counsel. When necessary, the Diocese of Charlotte will supply canonical counsel to the accused. It is the responsibility of the accused to obtain his/her own private counsel.

7. The Diocese of Charlotte is responsible for the diocesan salary of a priest, seminarian or permanent deacon undergoing treatment who has been relieved of his duties and responsibilities in accordance with this policy.

8. In the case of a priest, seminarian, permanent deacon, or religious from another diocese, on receiving an allegation of ministry related sexual misconduct, the Chancery will immediately notify the appropriate bishop or superior of the allegation and of the actions that have been/will be taken by the Diocese of Charlotte.

9. In cases where the accusation is found to be true, the accused will be the primary person responsible for payment of the victim's therapy and attendant expenses, and will be required to reimburse the Diocese of Charlotte for all expenses that are incurred in connection with the matter.

## VIII. EDUCATION

1. The Diocese of Charlotte will periodically conduct continuing education sessions for clergy, religious, employees and volunteers that will update them from viewpoints such as new scientific knowledge, church policy, canon law, civil law, moral theology, professional ethics, the pastoral care of victims, recognizing the signs of abuse, and coping with the disclosure of misconduct by a colleague.

2. The Diocese of Charlotte will establish safe environment programs for its parishes, missions, schools, institutions and agencies. Through this program, the diocese will cooperate with parents, civil authorities, educators, and community organizations to provide education and training for clergy, religious, employees, volunteers, children, youth, parents, ministers, educators, and others about ways to make and maintain a safe environment for children, including standards of ministerial behavior and appropriate boundaries.

## IX. MEDIA AND COMMUNICATIONS

1. The Diocese of Charlotte is committed to a policy of openness relating to allegations of sexual misconduct by its church personnel. Within the confines of respect for the privacy and the reputation of the individuals involved, the diocese will be as open as possible with members of the media and the community.

2. The Diocese of Charlotte will also cooperate with other churches and ecclesial communities, other religious bodies, institutions of higher learning, social service agencies, support groups for victims/survivors, and other interested organizations in conducting research in the area of sexual misconduct.

3. The Chancery shall be responsible for all media contacts and will appoint a primary spokesperson to handle all media inquiries, all release of information, and all news conference arrangements.

Roman Catholic Diocese of Charlotte Personnel Policies Handbook
Revised July 1, 2009

Billard RFP 000147

JA0549

## X. SANCTIONS

1. Any church personnel who fails to comply with any of the provisions of this policy will be subject to such action(s) by the Diocese of Charlotte as it deems necessary, up to and including removal or termination from any position with any parish, mission, school, department, agency, institution, or organization which is subject under canon or civil law to the administration, authority or governance of the Diocese of Charlotte.

2. Applicants or volunteers for assignment or positions with any parish, mission, school, department, agency, institution or organization in the Diocese of Charlotte who fail to comply with the provisions of this policy may be denied or removed from any position that is subject under canon or civil law to the administration, authority or governance of the diocese.

Billard RFP 000148

JA0550



# Acknowledgement of Receipt

- Personnel Policy Handbook
- Code of Ethics
- Policy of the Diocese of Charlotte Concerning Ministry-Related Sexual Misconduct by Church Personnel

This will acknowledge that I have personally received a copy of the Diocese of Charlotte Personnel Policies Handbook, including the Diocese of Charlotte Code of Ethics and the Policy of the Diocese of Charlotte Concerning Ministry-Related Sexual Misconduct by Church Personnel. I agree that I am obligated to read and familiarize myself with its contents. I understand that this handbook takes the place of any prior policies or manuals that I have received in writing, or heard about verbally.

I understand the contents and agree to comply with them. I further understand that the handbook is the sole property of the Diocese, who can revise, supplement, and/or rescind any of the policies at any time without prior notice to me, and that I may not copy it or give any part of it to anyone outside of the Diocese. I agree to return the handbook in its entirety at such time as I leave the employ of the Diocese.

_Bonnie W. Ballard_
Employee's signature

_October 29, 2009_
Date

JA0553



Lonnie H. Billard
October 25, 2014

Everyone sing along...."Goin' to the chapel and we're gonna' get ma-a-aried. Goin' to the chapel and we're gonna' get maa-aa-ried".
Yes, I'm finally going to make an honest (at least legal) man out of Rich.
We will be married on May 2, 2015...details to follow.
I cannot believe that I am saying this or that it is even possible.
I thank all the courageous people who had more guts than I who refused to back down and accept anything but "equal".
ps. If you don't agree with this...keep it to yourself. You never asked my opinion about your personal life and I am not asking yours.

Like    Comment    Share

Diane Hill Troy, David Meyer and 104 others

View previous comments                                                        49 of 53

Cynthia Gillum Fisher Congratulations Lonnie and Rich. The spring in Charlotte is beautiful and so so your day will be.
October 25, 2014 at 5:55pm · Like

Brian Siler That's awesome! Congratulations! I wish you two the best!
October 25, 2014 at 5:58pm · Like

Anne Rose Galiardi SO happy for you!!! Congratulations to you and Rich! I'm so glad we are now able to live in a world where equality is possible.
October 25, 2014 at 6:01pm · Like

Patti Davies Uribe Lonnie I am so excited for you both! Congratulations!! hugs and kisses!
October 25, 2014 at 6:07pm · Like

Patty-Pat Croghan Congrats Lonnie and Rich
October 25, 2014 at 6:08pm · Like

Sarah Chavez McCoy So happy for you! So glad that this is finally an option for you.
October 25, 2014 at 6:17pm · Like

Kate Rabbin Yassey! What wonderful and happy news! Best wishes and congrats!!!
October 25, 2014 at 6:25pm · Like

Raegan Freeland Congratulations Uncle Lonnie!
October 25, 2014 at 6:29pm · Like

Steve Foral Congratulations, Brother. This is wonderful news.
October 25, 2014 at 6:56pm · Like

Sandy Smith So happy for both of you...kinda gives me goosebumps of joy! Congrats...
October 25, 2014 at 6:56pm · Like

Karen BelcIglio Can't wait to see you all dressed up at the chapel
October 25, 2014 at 7:02pm · Like · 1

Lisa Haas Wilson 💜💜💜💜💜💜💜
See Translation
October 25, 2014 at 7:09pm · Like

Mordechai DeLuca Mazal tov!
See Translation
October 25, 2014 at 7:32pm · Like

Karen VanMeter Ferling Congratulations 💜
October 25, 2014 at 7:37pm · Like

Jeanne Haldeman So happy to hear this 💜
October 25, 2014 at 7:47pm · Like

Dennis Haldeman Congrats to you both
October 25, 2014 at 7:48pm · Like

Michael Troy Congrats! This makes me so happy!! 😄
October 25, 2014 at 7:52pm · Like

Ray Martin Congratulations Mandi Best of wishes and a happy ending or two 😄
October 25, 2014 at 8:11pm · Like · 1

Elizabeth Cranwell mazel tov! God bless you and keep you both.
October 25, 2014 at 8:16pm · Like

Dana Weis Zimmer AMAZING! Congrats, Lonnie!
October 25, 2014 at 8:20pm · Like

Aedan Coughlin This is great M.B! I am so happy for you!
October 25, 2014 at 8:37pm · Like

Wayne Simpson Lonnie, that is awesome!! So happy for you and Rich!
October 25, 2014 at 8:50pm · Like

Suggested Pages

OPC Pedal Boards
27 people like this.
Like

GW Cycle & Machine
35 people like this.
Like

Mountain Made Design
Dee likes this.
Like

English (US) · Español · Português · Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices · More ·
Cookies · More
Facebook © 2017

YOUR GAMES                              MORE

RECOMMENDED GAMES    MORE

Donna Lummus Clark replied to Geralyn Pizalata Kelley's comment.

Hal Lentz Chapple likes Sandy Long's post.

Bill Badgett likes Your Recipes And Cooking Guide's photo.

Katie Gallagher reacted to

Ian Billard

Cynthia Gillum Fisher

Wayne Simpson

Donna Lummus Clark

Nancy M Edmonds

Chris Deileader

Teri Craini

Karen Belciglio

Terri Trent

Colleen Croghan

David Edwin

Monica McLaughlin Z.

Duane Smith                          78

Your Post                                    Search





Billard RFP 00047



Locate   Home 30+

| | | |
|---|---|---|

Emma Winters
23 mutual friends — Friends

Maggie Miller
21 mutual friends — Friends

Bryce Edwards
13 mutual friends — Friends

Rose Werth
23 mutual friends — Friends

Katelin Sawicki
39 mutual friends — Friends

Bobbie Barquist Huckaba
2 mutual friends — Friends

Sarah Dennissedt
21 mutual friends — Friends

Karen Phillps Eggebrecht
23 mutual friends — Friends

Olivia Myrick
21 mutual friends — Friends

Kim Martin
13 mutual friends — Friends

Aedan Coughlin
20 mutual friends — Friends

Regina Barron
5 mutual friends — Friends

Emily Burk
26 mutual friends — Friends

Matthew Giedraitis
16 mutual friends — Friends

Fltz Bailey
6 mutual friends — Friends

Kate Angermeier
16 mutual friends — Friends

Michael Troy
20 mutual friends — Friends

Doug Harris
29 mutual friends — Friends

Dennis Haldiman
8 mutual friends — Friends

Karen VanMeter Ferling
7 mutual friends — Friends

Rachel Thomas
4 mutual friends — Friends

YOUR GAMES          MORE

RECOMMENDED GAMES     MORE

Karen VanMeter Ferling
likes Sharon Marshall's
photo.

Sarah Willard likes
Harrisonville Schools's
album: End-of-the-Year
Awards.

Ellis Lindsay commented
on her own post.

Ian Billard
Cynthia Gillum Fisher
Grant Hedrick
Chris Dallveder
Teri Orsini
Karen Baldiglio
Ed Long
David Edwin
Monica McLaughlin Z.
Andrea Goocher
Duane Smith          7h
Joan Vance Stretch    44m
Sandy Smith          6h

Search

Billard RFP 00049

JA0557



Loralie   Home · 20+

**YOUR GAMES**    More

**RECOMMENDED GAMES**    More

Libby Dennis Lerner
22 mutual friends — Friends

Sandy Smith
3 mutual friends — Friends

Lisa Haas Wilson
5 mutual friends — Friends

Karen Belciglio
35 mutual friends — Friends

Terri Trent
5 mutual friends — Friends

Colin Wilson
45 mutual friends — Friends

Fran Keal
8 mutual friends — Friends

Ashley Stephenson Ausman
14 mutual friends — Friends

Natalie Myrick
20 mutual friends — Friends

Sarah Chaves McCoy
13 mutual friends — Friends

Christina Stevens
24 mutual friends — Friends

Sarah Withers
11 mutual friends — Friends

Dylan Shay
16 mutual friends — Friends

Natalia Diaz
26 mutual friends — Add Friend

Anthony Wynn
11 mutual friends — Add Friend

Griffith Shapack
8 mutual friends — Add Friend

Cat Faughnan
16 mutual friends — Add Friend

Gregg Webber
22 mutual friends — Add Friend

Joanna Lonker
11 mutual friends — Add Friend

Lynda Banks Byrd
8 mutual friends — Add Friend

Moitse Garmilla
26 mutual friends — Add Friend

Karen VanMeter Farling likes Sharon Marshall's photo.

Susan Willard likes Harrisonville Schools's album: End-of-the-Year Awards.

Ellis Lindsay commented on her own post.

Ian Billard

Cynthia Gillum Fisher

Grant Hedrick

Chris Dalleader

Teri Orzini

Karen Belciglio

Ed Long

David Edwin

Monica McLaughlin Z

Andrea Goocher

Duane Smith   7h

Joan Vance Stretch   44m

Sandy Smith   6h

Search

Billard RFP 00050



Billard RFP 00051



Billard
EXHIBIT NO. 3
8·16·17   AB

# Catholic Schools Teachers Meetings
# August 17, 18, 19 - 2011



JA0560

CCHS 000971

USCA4 Appeal: 22-1440      Doc: 27      Filed: 09/29/2022      Pg: 565 of 1438

# Preparation

JA0561

CCHS 000972

# Welcome

- Thank you for being here
- We are brought here by:

  – Our Faith

  – Our Tradition

  – Our quest for Academic Excellence

CCHS 000973

JA0562

USCA4 Appeal: 22-1440   Doc: 27   Filed: 09/29/2022   Pg: 567 of 1438

## Mission Statement



The Mission of the Catholic Schools in the Diocese of Charlotte is

- **to proclaim** the Good News of the Gospel and
- **to provide** a religious and academic program that allows each student to develop spiritually, intellectually, emotionally, physically and socially,
- **so that** each is prepared to live and serve in a changing society as a self-respecting and responsible citizen (of this world and the next.)

4

CCHS 000974

JA0563

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 568 of 1438



Faith • Tradition • Academic Excellence

Scripture focus for 2011:

*"So that in all things God may be glorified"*

(1 Peter 4:11)

CCHS 000975

JA0564

# Theme for 2011

*"Do This In Memory of Me" :*
*Building a culture of holiness and*
*salvation, with faith, reason, grace*
*and excellence in virtue*

CCHS 000976

JA0565

# Prayer

Let us Remember that we are in the holy presence of God.

- In the Name of the Father, and of the Son, and of the Holy Spirit. Amen.

- Father, may everything we do begin with your inspiration and continue with your saving help. Let our work always find its origin in you and through you reach completion. We ask this through our Lord Jesus Christ, Your Son, Who lives and reigns with You and the Holy Spirit, one God for ever and ever. AMEN

CCHS 000977

Filed: 09/29/2022

Doc: 27

USCA4 Appeal: 22-1440

JA0566



**DO THIS IN MEMORY OF ME**
Luke 22:19
Charlotte Convention Center, September 23 & 24, 2011

# PRAYER FOR THE EUCHARISTIC CONGRESS

O Jesus, who art really, truly and substantially present in the Blessed
Sacrament to be the food of our souls, deign to bless and bring to a
successful issue all Eucharistic Congresses and gatherings, and especially the
coming Congress of the Diocese of Charlotte. Be Thou the inspiration of our
labors, resolutions and vows; accept graciously the solemn homage we will
render to Thee; send Your Holy Spirit to kindle the hearts of priests,
religious, and all the faithful, especially the children, so that devout
participation in the Holy Mass and frequent and daily Holy Communion
may be held in honor in all the countries of the world; and grant that the
Kingship of Your Sacred Heart over human society may everywhere be
acknowledged to the glory of God, the Father. Amen.

CCHS 000978

JA0567

*Convent of San Marco, Florence (Refectory) - Fresco of the Last Supper by Domenico Ghirlandaio an Italian Renaissance painter. The Latin inscription above the table is translated, "I confer a kingdom on you, just as my Father has conferred one  on me, that you may eat and drink at my table in my kingdom." (Luke 22: 29-30)*



JA0568

CCHS 000979

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 573 of 1438

Thank you for your love of our Faith, the Church and of those young ones and their parents whom you serve. Your choice to teach in a Catholic School speaks of your commitment to the Mission of the Church and of our Catholic schools.

JA0569

CCHS 000980

USCA4 Appeal: 22-1440   Doc: 27   Filed: 09/29/2022   Pg: 574 of 1438

My desire is to encourage you and to assist
you in your ministry for the Church.
How can we all work together to help
each other give a joyful, zealous and
intentionally Catholic presentation of the
Faith in all the disciplines of learning?

JA0570

CCHS 000981

This morning I would like to consider how we build a culture of holiness and salvation as we fulfill our Lord's instruction to "Do this in memory of Me." (Lk 22:19) Let's look at:

1. Sharing in the Mission of Catholic Schools
2. All Diocesan Employees share in the Mission of the Church
3. All Diocesan Catholic School Employees share in the Mission of our Catholic Schools
4. "Do This in Memory of Me" Luke 19:22 – Theme of the Eucharistic Congress
5. Building a culture of holiness and salvation

CCHS 000982

JA0571

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 576 of 1438

- CCC 25: …The whole concern of doctrine and its teaching must be directed to the *love that never ends*. Whether something is proposed for belief, for hope or for action, the love of our Lord must always be made accessible, so that anyone can see that all the works of perfect Christian virtue spring from love and have no other objective than to arrive at love.

JA0572

CCHS 000983

USCA4 Appeal: 22-1440     Doc: 27     Filed: 09/29/2022     Pg: 577 of 1438

# 2. Proclamation

1. Sharing in the Mission of Catholic Schools
2. All Diocesan Employees share in the Mission of the Church
3. All Diocesan Catholic School Employees share in the Mission of our Catholic Schools
4. "Do This in Memory of Me" Luke 19:22 – Theme of the Eucharistic Congress
5. Building a culture of holiness and salvation, with faith, reason, grace and excellence in virtue

CCHS 000984

JA0573

# 3. Explanation

JA0574

CCHS 000985

# 1. Sharing in the Mission of Catholic Schools



The Mission of the Catholic Schools in the Diocese of Charlotte is

- **to proclaim** the Good News of the Gospel and
- **to provide** a religious and academic program that allows each student to develop spiritually, intellectually, emotionally, physically and socially,
- **so that** each is prepared to live and serve in a changing society as a self-respecting and responsible citizen (of this world and the next.)

CCHS 000986

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 580 of 1438

## Our Goal

Our Goal:

- The normal result of a Catholic School education should be the student's decision to intentionally live a faithful and loyal Catholic life so as to save his or her soul and invite others to do the same.

- This decision is not to just claim to be a Catholic, but to really strive to be one in private and in public; in short, to be a man or woman of integrity who thinks truly critically, believes sincerely and acts responsibly to gain eternal life.

JA0576

CCHS 000987

# Our Holy Father's Challenge to Catholic Schools

- "A...school's Catholic identity is not simply a question of the number of Catholic students.

- It is a question of conviction – do we really believe that only in the mystery of the Word made flesh does the mystery of man truly become clear?

- "Are we ready to commit our entire self – intellect and will, mind and heart – to God? Do we accept the truth Christ reveals? Is the faith tangible in our...schools? Is it given fervent expression liturgically, sacramentally, through prayer, acts of charity, a concern for justice, and respect for God's creation? Only in this way do we really bear witness to the meaning of who we are and what we uphold....Clearly, ... Catholic identity...demands and inspires...that each and every aspect of your learning communities reverberates within the ecclesial life of faith."

**Pope Benedict XVI to Catholic Educators in USA, April 17, 2008**

JA0577

CCHS 000988

# Measuring Outcomes of Catholic Education

*The outcome of our Catechesis is evident and therefore measurable. We can ask:*

- Are our students convinced of the truths of the Catholic Church (which is the bearer of the Gospel)?
- Do they practice their faith in their parish and diocese?
- Are they intentional Catholics or just Catholics by "inertia?"
- Are they living Catholic lives now and are we tracking them to see if they continue to be practicing Catholics?

CCHS 000989

USCA4 Appeal: 22-1440   Doc: 27   Filed: 09/29/2022   Pg: 582 of 1438

JA0578

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 583 of 1438

# Dangers that Catholics Face Today

- The danger for Catholics today is that instead of clear Catholic identity based on true ecclesial and doctrinal foundations, a rather loose socio-cultural Catholic identity will be retained.

- This Catholic identity may be without clear commitment to authentic Catholic faith or moral teachings but more in the line of a cultural affiliation based on ancestry or family tradition.

*(Msgr. Francis Kelley, The Mystery We Proclaim)*

20

JA0579

CCHS 000990

USCA4 Appeal: 22-1440      Doc: 27      Filed: 09/29/2022      Pg: 584 of 1438

## 2. Diocesan Employees share in the Church's Mission

"As employees of the Diocese of Charlotte, we share in the mission which Christ entrusted to the Church, to spread the Gospel, to serve our brothers and sisters, and to build up the Body of Christ which is the Church. All of our employees must respect, appreciate, and uphold the teachings, principles, legislation, policies and traditions of the Roman Catholic Church in both word and example."

(Personnel Policies Handbook, Code of Ethics, Contracts)

JA0580

CCHS 000991

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 585 of 1438

# 3. All Diocesan Catholic School Employees share in the Mission of our Catholic Schools

- **to proclaim** the Good News of the Gospel and
- **to provide** a religious and academic program that allows each student to develop spiritually, intellectually, emotionally, physically and socially,
- **so that** each is prepared to live and serve in a changing society as a self-respecting and responsible citizen (of this world and the next.)

JA0581

CCHS 000992

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 586 of 1438

3. All Diocesan Catholic School Employees share in the Mission of our Catholic Schools

- NDC: Catechists (Principals and Catholic School Teachers)

  "Their personal relationship with Jesus Christ energizes their service to the Church and provides the continuing motivation, vitality, and force of their catechetical activity. ...to follow (Christ) as a teacher of the faith and a witness to the truth of the faith.... "

JA0582

CCHS 000993

These next slides are from a letter of St. Stephen of Hungary to his son and heir apparent; they exemplify the handing on of faith and its subsequent service to every culture.

My dearest son, if you desire to honor the royal crown, I advise, I counsel, I urge you above all things to maintain the Catholic and Apostolic faith with such diligence and care that you may be an example for all those placed under you by God, and that all the clergy may rightly call you a man of true Christian profession.

24

CCHS 000994

JA0583

Failing to do this, you may be sure that you will not be
called a Christian or a son of the Church. Indeed, in
the royal palace, after the faith itself, the Church holds
second place, first constituted and spread through the
whole world by His members, the apostles and holy
fathers, And though she always produced fresh
offspring, nevertheless in certain places she is
regarded as ancient. However, dearest son, even now
in our kingdom the Church is proclaimed as young
and newly planted; and for that reason she needs more
prudent and trustworthy guardians less a benefit
which the divine mercy bestowed on us undeservedly
should be destroyed and annihilated through your
idleness, indolence or neglect.

CCHS 000995

My beloved son, delight of my heart, hope of your
posterity, I pray, I command, that at very time and in
everything, strengthened by your devotion to me, you
may show favor not only to relations and kin, or to the
most eminent, be they leaders or rich men or
neighbors or fellow-countrymen, but also to foreigners
and to all who come to you. By fulfilling your duty in
this way you will reach the highest state of happiness.
Be merciful to all who are suffering violence, keeping
always in your heart the example of the Lord who
said: "I desire mercy and to sacrifice". Be patient with
everyone, not only with the powerful, but also with
the weak.

CCHS 000996

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 590 of 1438

Finally be strong lest prosperity lifts you up too much or adversity cast you down. Be humble in this life that God may raise you up in the next. Be truly moderate and do not punish or condemn anyone immoderately. Be gentle so that you may never oppose justice. Be honorable so that you never voluntarily bring disgrace upon anyone. Be chaste so that you may avoid all the foulness of just like the pangs of death.

All these virtues I have noted above make up the royal crown and without them no one is fit to rule here on earth or attain to the heavenly Kingdom.

JA0586

CCHS 000997

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 591 of 1438

## 4. "Do This in Memory of Me" Luke 19:22 –
## Theme of the Eucharistic Congress

1.   "Do This in Memory of Me" our Lord said. He did not
     say: "Say this in memory of me." I read this
     somewhere recently and it gives us good material for
     reflection. It is not only in saying the words of the
     consecration, as important as they are, but it is in
     doing the action which Christ did at the Last Supper. It
     is re-presenting the mystical banquet and we are
     privileged to participate. The entire liturgical action is
     a participation in the Covenant-Sacrifice and
     Covenant-Communion which Christ effected in the
     Paschal Mystery.

JA0587

CCHS 000998

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 592 of 1438

JA0588

## 4. "Do This in Memory of Me" Luke 19:22 – Theme of the Eucharistic Congress

2. Because we are in "communion" with the Holy Church, we can be in "communio" with the sacrifice of the Cross and therefore in "communio" with the mystical Body of Christ in the "Sacred Banquet" of which St. Thomas wrote so eloquently in the hymns and liturgy for Corpus Christi. In the Divine Liturgy of the Holy Mass, we move from sacrifice to banquet as Msgr. Ronald Knox mentions in his little book explaining the Eucharistic Sacrifice, The Mass in Slow Motion. The Sacrifice is ordered to the Banquet.

CCHS 000999

## 4. "Do This in Memory of Me" Luke 19:22 – Theme of the Eucharistic Congress

4. In the Holy Mass we participate in the sealing of the covenant done at Calvary. Christ dies and is resurrected. Like the Church of the Holy Sepulcher which is also known as the Church of the Resurrection, our churches reflect what is happening in this great exchange of grace and mercy which is the Sacrifice of the Mass. We are permitted to participate in Christ's death. At the same time we participate in the resurrection, and the risen, glorified Christ - body, blood, soul and divinity - comes to feed us in Holy Communion. So the altar within the sanctuary of our churches is the locus of the death, resurrection and the mystical banquet of heaven. Our sanctuary is at once: the upper room, the Cross of Calvary, the tomb of burial and resurrection and the mystical banquet of heaven. What does this mean?

CCHS 001001

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 593 of 1438

JA0589

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 594 of 1438

# 4. "Do This in Memory of Me" Luke 19:22 – Theme of the Eucharistic Congress

6. It is the Sacred Liturgy over all the years which has been the foundation of evangelization and the subsequent development of culture.

Where the Sacred Liturgy is celebrated in a sense of the sacred, with beauty, order and truth, it calls everyone to accept the Gospel and build a culture of holiness and salvation. Truth and Beauty in the Sacred Liturgy lead to a desire of the soul to possess grace, as St. Peter says: "To be partakers in the divine nature." (2 Peter 1:4) To possess grace is to be holy. Beauty and truth in the Sacred Liturgy lead us to desire grace and therefore to be holy. This is the universal call to holiness. The Sacred Liturgy properly celebrated proclaims the call to holiness. Just to walk into a beautiful Catholic Church is to be called to something higher, to holiness; the very building itself calls one to meditate on truth and goodness and beauty and oneness.

JA0590

CCHS 001003

## 5. Building a culture of holiness and salvation

The beginning words of the Apostolic Letter of Blessed
    Pope John Paul II "Mane Nobiscum Domine" help us
    reflect on the mystagogy of those burning hearts and
    opened eyes in the encounter at Emmaus and the
    Emmaus encounter we have the Sacred Liturgy which
    impels us to tell others:

CCHS 001005

## 5. Building a culture of holiness and salvation

2. The image of the disciples on the way to Emmaus can serve as a fitting guide for a Year when the Church will be particularly engaged in living out the mystery of the Holy Eucharist. Amid our questions and difficulties, and even our bitter disappointments, the divine Wayfarer continues to walk at our side, opening to us the Scriptures and leading us to a deeper understanding of the mysteries of God. When we meet him fully, we will pass from the light of the Word to the light streaming from the "Bread of life", the supreme fulfilment of his promise to "be with us always, to the end of the age" (cf. Mt 28:20).

CCHS 001007

USCA4 Appeal: 22-1440   Doc: 27   Filed: 09/29/2022   Pg: 597 of 1438

## 5. Building a culture of holiness and salvation

"How many winds of doctrine have we known in recent
decades, how many ideological currents, how many
ways of thinking. The small boat of the thought of
many Christians has often been tossed about by these
waves - flung from one extreme to another: from
Marxism to liberalism, even to libertinism; from
collectivism to radical individualism; from atheism to
a vague religious mysticism; from agnosticism to
syncretism and so forth. Every day new sects spring
up, and what St Paul says about human deception and
the trickery that strives to entice people into error (cf.
Eph 4: 14) comes true.

CCHS 001009

JA0593

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 598 of 1438

# 5. Building a culture of holiness and salvation

"Today, having a clear faith based on the Creed of the
Church is often labeled as fundamentalism. Whereas
relativism, that is, letting oneself be "tossed here and
there, carried about by every wind of doctrine", seems
the only attitude that can cope with modern times. We
are building a **dictatorship of relativism** that does not
recognize anything as definitive and whose ultimate
goal consists solely of one's own ego and desires."

JA0594

CCHS 001010

## 5. Building a culture of holiness and salvation

"We, however, have a different goal: the Son of God, the true man. He is the measure of true humanism. An "adult" faith is not a faith that follows the trends of fashion and the latest novelty; a mature adult faith is deeply rooted in friendship with Christ. It is this friendship that opens us up to all that is good and gives us a criterion by which to distinguish the true from the false, and deceit from truth."

CCHS 001011

# 4. Application

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 600 of 1438

– Building a culture of holiness and salvation with faith, reason, grace and excellence in virtue requires that we be holy and desiring to be saved. Is there a need?

JA0596

CCHS 001012

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 601 of 1438

# Goals in Forming Intentional Catholics to build a culture of holiness and salvation

1.  **Conversion:**
    - Personal, zealous, intentional Catholic
2.  **Community:**
    - We are a family; much loneliness exists today; need identity
3.  **Content:**
    - Reason AND Faith;
        - Reason without Faith leads to totalitarianism
        - Faith without Reason leads to fanaticism
4.  **Contemplation:**
    - World is too noisy;
    - Need comfort and that comes with quiet;
    - Sunday (give back) (cf. Dies Domini)
5.  **Commitment:**
    - Not cultural or Catholic by inertia

*(Msgr. Francis Kelley, The Mystery We Proclaim)*

JA0597

CCHS 001013

USCA4 Appeal: 22-1440     Doc: 27     Filed: 09/29/2022     Pg: 602 of 1438

## Five Essential Marks of Catholic Schools
### (necessary for building a culture of holiness and salvation)

1. Inspired by a supernatural vision
2. Founded on Christian anthropology
3. Animated by communion and community
4. Imbued with a Catholic world view
5. Sustained by Gospel witness

Source: The Holy See's Teaching on Catholic Schools, **Archbishop J. Michael Miller**

JA0598

CCHS 001014

Pope John Paul II: CT, 5: *"…the definitive aim of catechesis is to put people not only in touch but in communion, in intimacy, with Jesus Christ: only He can lead us to the love of the Father in the Spirit and make us share in the life of the Holy Trinity."*

CCHS 001015

JA0599

- The spiritual life of a catechist should be characterized by:

  - A love of God - Father, Son, and Holy Spirit – and of Christ's Church, our Holy Father and God's holy people

  - A coherence and authenticity of life that is characterized by their faithful practice of the faith in a spirit of faith, charity, hope, courage, and joy

  - Personal prayer and dedication to the evangelizing mission of the Church

  - A missionary zeal by which they are fully convinced of the truth of the Catholic faith and enthusiastically proclaim it

  - Active participation in their local parish community, especially by attendance at Sunday Eucharist

  - A devotion to Mary, the first disciple and the model of catechists, and to the Most Holy Eucharist, the source of nourishment for catechists"

CCHS 001016

JA0600

# Holiness

## is

- the possession of Grace

## not

- the practice of virtue

CCHS 001017

JA0601

# Coherent Integrity

Filed: 09/29/2022     Pg: 606 of 1438

Doc: 27

USCA4 Appeal: 22-1440

JA0602

ENCYCLICAL LETTER: *CARITAS IN VERITATE:*

- "1. Charity in truth, to which Jesus Christ bore witness by his earthly life and especially by his death and resurrection, is the principal driving force behind the authentic development of every person and of all humanity. Love — *caritas* — is an extraordinary force which leads people to opt for <u>courageous</u> and <u>generous</u> engagement…It is a force that has its origin in God, Eternal Love and Absolute Truth. Each person finds his good by adherence to God's plan for him, in order to realize it fully: in this plan, he finds his truth, and through adherence to this truth he becomes free (cf. Jn 8:32).

- "To defend the truth, to articulate it with humility and conviction, and to bear witness to it in life are therefore exacting and indispensable forms of charity. Charity, in fact, "rejoices in the truth" (1 Cor 13:6).

CCHS 001018

# 5. Celebration

JA0603

CCHS 001019

# Raphel's School of Athens



CCHS 001620

JA0604

# Raphael's Triumph of Religion



CCHS 001021

JA0605

# Stanza of the Signatura

- The so called Stanza of the Signatura in the Apostolic Palace was being painted by Raphael in 1508 ff. to be used for the papal library. Philosophy, Poetry, Virtues and Religion were the four themes. The room is painted to show that all knowledge leads to and flows from the Triumph of Religion. But to have that knowledge we must study it. What have the Fathers of the Church, the Philosophers, the great scientists, poets, lawyers, and artists, and the great Saints taught us about God and our need to worship Him?

CCHS 001022

JA0606

One can sense standing within the fresco of the School of
   Athens with Aristotle, Plato and other academics
   discussing various knowledge and philosophy. There
   you are walking with them toward the fresco on the
   opposite wall. You sense you are entering into the fresco
   on the other wall which shows the triumph of Religion
   over all knowledge in the sense that all knowledge finds
   its fulfillment in the Mystical Banquet of heaven, the
   fulfilled Sacred Liturgy. You are in the Heavenly
   Banquet on earth and in heaven; this is called the fresco
   of the Triumph of Religion or sometimes called the
   Disputation on the Eucharist.

All knowledge finds its end in communion in the Church
   because of the Sacrifice of Calvary. Our union in the
   Sacred Liturgy of earth is the foretaste to the Sacred
   Liturgy of Heaven. Here is the fulfillment of a culture of
   holiness and salvation.

CCHS 001023

JA0607

Let's read St. John's description of Heaven from the Apocalypse, Chapter 21, verses 1 – 5:

1   Then I saw a new heaven and a new earth. The former heaven and the former earth had passed away, and the sea was no more.

2   I also saw the holy city, a new Jerusalem, coming down out of heaven from God, prepared as a bride adorned for her husband.

3   I heard a loud voice from the throne saying, "Behold, God's dwelling is with the human race. He will dwell with them and they will be his people and God himself will always be with them (as their God).

4   He will wipe every tear from their eyes, and there shall be no more death or mourning, wailing or pain, (for) the old order has passed away."

5   The one who sat on the throne said, "Behold, I make all things new."

USCA4 Appeal: 22-1440   Doc: 27   Filed: 09/29/2022   Pg: 612 of 1438

JA0608

CCHS 001024

# Raphael's Triumph of Religion



CCHS 001025

JA0609

Filed: 09/29/2022    Pg: 614 of 1438

USCA4 Appeal: 22-1440    Doc: 27

JA0610



Thank you for being a part of the Mission of
our Catholic Schools

*"So that in all things God may be glorified"*

**(1 Peter 4:11)**

CCHS 001026

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

Civil Action No. 3:17-cv-0011

LONNIE BILLARD,

      Plaintiff,

v.


CHARLOTTE CATHOLIC HIGH
SCHOOL, MECKLENBURG AREA
CATHOLIC SCHOOLS, and ROMAN
CATHOLIC DIOCESE OF CHARLOTTE,

      Defendants.

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Exhibit 2
Declaration of Dr. Janice T. Ritter

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

Civil Action No. 3:17-cv-0011

LONNIE BILLARD,

       Plaintiff,

v.

                                             DECLARATION OF
                                        DR. JANICE T. RITTER

CHARLOTTE CATHOLIC HIGH
SCHOOL, MECKLENBURG AREA
CATHOLIC SCHOOLS, and ROMAN
CATHOLIC DIOCESE OF CHARLOTTE,

       Defendants.

I, Janice T. Ritter, pursuant to 28 U.S.C. § 1746, declare as follows:

     1.     I make this declaration based on my own personal knowledge and upon records

maintained by the Diocese and MACS in the ordinary course of their operations.

     2.     I have been employed by the Roman Catholic Diocese of Charlotte (the

"Diocese") since 1997 and have served as the Superintendent of Schools since 2011.

     3.     In my role as Superintendent, I am responsible for the nineteen Catholic schools

within the Diocese, including the nine Catholic schools in the Greater Charlotte area which

comprise the Mecklenburg Area Catholic Schools ("MACS") system.  Charlotte Catholic High

School ("CCHS") is part of the MACS system.

     4.     MACS is a registered 501(c)(3) organization which operates not for profit.

     5.     It is the mission of all of the schools within the Diocese to provide a religious and

academic program that allows each student to develop spiritually, intellectually, emotionally,

physically, and socially, so that each is prepared to live and serve in a changing society as a self-

1

respecting citizen.   Catholic values and teachings are a fundamental part of the educational

process and as a result students are required to take religion courses throughout their time in one

of our schools.   In addition, at CCHS the school day begins and ends with prayer, each class

starts with prayer, and students attend Catholic Mass offered at the school on a regular basis.

### *MACS Policy Requirements*

6.      As Superintendent, I have knowledge concerning the policies of the Diocese and

MACS applicable to employees of the Diocese, including full-time and substitute teachers of

MACS, like Lonnie Billard, as well as the duties and responsibilities of full-time and substitute

teachers within the MACS system.

7.      For example, the Diocese of Charlotte has in place a Code of Ethics that

prescribes conduct expected of all employees within the Diocese, including full-time and

substitute teachers at schools within the Diocese of Charlotte, such as at CCHS.   Diocesan

employees, including teachers at MACS schools, are provided a copy of the Code of Ethics, and

it is also available on the Diocese's website.  A copy of the Code of Ethics is attached as Exhibit

A.

8.      The Code of Ethics provides that all employees of the Diocese, which includes

teachers at CCHS, must "conduct themselves at all times in a manner that is consistent with the

teachings and the precepts of the Roman Catholic Church." Exh. A at Preamble (CCHS000082).

9.      The Diocese of Charlotte similarly maintains a Personnel Policies Handbook,

which applies to all employees within the Diocese including full-time and substitute teachers.  A

copy of the Personnel Policies Handbook is attached as Exhibit B.

10.      The Personnel Policies Handbook states that all employees "share in the mission

which Christ entrusted to the Church, to spread the Gospel, to serve our brothers and sister, and

2

to build up the Body of Christ which is the Church. All of our employees must respect, appreciate, and uphold the teachings, principles, legislation, policies and traditions of the Roman Catholic Church in both word and example." Exh. B at Introduction (Billard 00058). Diocesan employees, including teachers at MACS schools, are provided a copy of the Personnel Policies Handbook, and it is also available on the Diocese's website.

11.    CCHS issues an annual Faculty Handbook that outlines basic guidelines for administrators, teachers and staff at CCHS. A copy of the Faculty Handbook in effect during the 2011-2012 academic year, the last year in which Mr. Billard served as a full-time CCHS teacher, is attached as Exhibit C.

12.    Although the Faculty Handbook changes from time to time, it has always required in substance that teachers at CCHS are expected to implement the Mission Statement of CCHS, which is as follows: "Charlotte Catholic High School is an educational community centered in the Roman Catholic faith which teaches individuals to serve as Christians in our changing world." Exh. C at p. 3 (CCHS000044).

13.    The CCHS Faculty Handbook further provides that "individuals should model and integrate teachings of Jesus in all areas of conduct in order to nurture faith and inspire action, especially in the areas of service and volunteerism." *Id.*

14.    Full-time MACS teachers are also required to execute annual employment contracts. The Teacher Employment Contract used by MACS provides that "regardless of membership in the Catholic Church," teachers must be "consistent at all times, in example and expression, with the tenets and morals of the Catholic faith." A copy of the employment contracted executed by Mr. Billard for the 2011-2012 academic year is attached as Exhibit D.

3

15.     Reverend Roger K. Arnsparger, Vicar for Education for the Diocese would from time to time likewise conduct annual training sessions for all teachers at Diocesan and MACS schools discussing the Catholic mission of MACS and Diocesan schools and the role that teachers play in the fulfillment of that mission.

### *Application of These Policies*

16.     From time to time, MACS schools must address situations involving conduct or public advocacy by employees in opposition to the teachings of the Church and in violation of the policies discussed above.

17.     In dealing with these situations, the Diocese and MACS attempt to work with the employee involved to address the situation in a way that would not require termination of the person's employment, if possible.  Generally, this would involve a school administrator meeting with the individual and requesting that they stop certain behavior or work within the Church's processes to correct the situation, such as by seeking an annulment.  If an employee complies with such instruction, and if there is a path to resolving the situation, and if the situation is not public so as to risk scandal, then termination of employment may not be necessary.

18.     However, if the offending behavior is not something that can be undone or if the employee refuses to stop engaging in the conduct or advocacy opposed to Church teaching, then termination of employment may be necessary to prevent scandal, that is, the potential that an innocent person (such as a student) might be confused or misled with respect to what the Church teaches by the absence of any response to such conduct or advocacy by a person in authority within the Church.

4

JA0615

19.    Mr. Billard's announcement of his engagement to a same-sex partner violated the policies to which he was subject as a substitute teacher at CCHS because the announcement opposed fundamental moral tenets of Catholic faith concerning marriage.

20.    Application of the Diocese's policy prohibiting conduct and public advocacy for positions opposed to the fundamental moral tenets of the Roman Catholic faith, including those concerning marriage, does not turn on the sex or sexual orientation of the person engaging in such advocacy. For example, if a heterosexual male or female substitute teacher were to advocate in favor of same-sex marriage on Facebook, or through some other public forum, and he or she refused to end the behavior after being requested to do so, or if the conduct was such that it could not be undone, the Diocese would be prepared to terminate that employee just as MACS elected to discontinue using Mr. Billard's services as a substitute teacher.

21.    The Diocese would apply the same treatment to a MACS or Diocesan teacher who engaged in public opposition to other aspects of the Church's teaching, regardless of the sex or sexual orientation of the person involved. For example, if a teacher publicly opposed the Christian dogma of the Trinity, which holds that God is a trinity of Father, Son, and Holy Spirit, the Diocese would take disciplinary action, including termination if the teacher refused correction on this point. Similarly, if a teacher took the position publicly that unjustified killing (for instance, through abortion or euthanasia) is acceptable, this would violate the Fifth Commandment's prohibition on unjustified taking of human life. The Diocese would then be forced to take appropriate disciplinary action, including termination.

22.    It is my understanding that in the past, the Diocese and MACS have on multiple occasions taken disciplinary action, including termination of employment, in other situations involving conduct or advocacy in opposition to the Church's fundamental moral teachings.

5

23.     For example, Our Lady of Mercy Catholic School, a non-MACS Diocesan parish school, released a former male physical education Teacher at Our Lady of Mercy Catholic School, from his employment after it came to the attention of school administrators that he was engaged in an extramarital affair.  In addition, it is my understanding that the Diocese made the decision to release a male teacher at St. Patrick's Elementary School from his employment after it was learned that the teacher was involved in a same sex relationship and in the process of adopting a child.   Further, MACS released a female former teacher at St. Matthew Catholic School, from her employment after she made it clear that she intended to marry a Catholic man who had been divorced and did not have an annulment.  Because her Catholic fiancée did not have an annulment, a second marriage for him could not happen according to Church teaching as the first marriage is presumed to be valid.  A civil marriage in this case would be a public act contrary to Church teaching.

24.     MACS and the Diocese would have taken the same actions with respect to the former male teachers at Our Lady of Mercy Catholic School and St. Patrick's Elementary School if each had been a woman, rather than a man.  MACS and the Diocese would have taken the same actions with respect to the former female teacher at St. Matthew Catholic School had she been a man, rather than a woman.

25.     If MACS or the Diocese were forced to employ teachers who publicly engage in conduct or publicly advocate for positions opposed to the fundamental moral tenets of the Roman Catholic faith, it would have a very serious detrimental effect on MACS' and the Diocese's ability to carry out its Catholic educational mission, because the message communicated by such conduct or advocacy is directly contrary to the Catholic teaching that MACS and the Diocese seeks to communicate to their students and desires for them to embrace

6

for themselves. It is essential that those who serve as role models for students in MACS and Diocesan schools, such as teachers, communicate a message consistent with that which MACS and the Diocese seeks to communicate as it relates to fundamental moral tenets of the Catholic faith.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Date: September 20, 2017          By: _Janice T. Ritter_
                                      Dr. Janice Ritter

7

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which will send electronic notice to counsel for Plaintiff at the addresses as follows:

Joshua Block
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004-2400
Telephone: 212-549-2627
Facsimile: 212-549-2650
Email: jblock@aclu.org

S. Luke Largess
Tin Fulton Walker & Owen PLLC
301 East Park Avenue
Charlotte, North Carolina 28202
Telephone: 704-338-1220
Facsimile: 704-338-1312
Email: llargess@tinfulton.com

Christopher Brooke
American Civil Liberties Union of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, North Carolina 27611
Telephone: 919-834-3466
Facsimile: 866-511-1344
Email: cbrook@acluofnc.org

Brian Hauss
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212-549-2604
Facsimile: 212-549-2652
Email: bhauss@aclu.org

Elizabeth O. Gill
American Civil Liberties Union Foundation
39 Drumm Street
San Francisco, CA 94111
Telephone: 415-621-2493

8

Facsimile:  415-255-8437
Email:  egill@aclunc.org

This the 21st day of September 2017.

/s/ Meredith A. Pinson
Meredith A. Pinson (N.C. Bar No. 39990)

9

# EXHIBIT A

# Code of Ethics Policy of the Diocese of Charlotte



**Effective August 15, 2004**
Revision Date July 1, 2009

**The Diocese of Charlotte**
**1123 South Church Street**
**Charlotte, NC 28203**
**(704) 370-6299**

August 15, 2004

My Dear Brothers and Sisters in Christ:

Please accept my sincere gratitude for the very generous way in which you offer your time, talent and gifts in serving the people of Western North Carolina. It is through the prayers, efforts, dedication and collaboration of priests, deacons, religious, seminarians, lay employees and volunteers that we are able to serve those entrusted to our care. We know that as clergy, religious and laity of the Diocese of Charlotte, we have a responsibility to uphold the highest of moral, professional and ethical standards.

As clergy, religious, seminarians, lay employees and volunteers, we all share in the mission of the Church to continue the work of Jesus Christ. This is both a great privilege and an awesome responsibility. Those who publicly represent the Church, whether by office, employment or appointment, have a special obligation because they have accepted positions of trust. Because of this, the Church must be exemplary. Clergy, religious, seminarians, lay employees and volunteers should and will be held accountable for their behavior.

In order to maintain the highest level of accountability, this Code of Ethics Policy is adopted to assist in developing and implementing uniform guidelines for appropriate behavior while exercising ministerial and professional undertakings. It is not intended to address every situation that may arise, rather, it is intended to create a structure for addressing a variety of circumstances that, if not appropriately addressed, may create a risk of incidents, allegations, claims or lawsuits. As we read the code, we must remember that it is more than a set of standards. It is a way of connecting our values, ideals and moral responsibilities with the work that we do every day.

It is my sincere desire that all who are involved in the mission of the Church will exemplify the ethics and integrity lived and taught by Jesus, and that all those we serve will see in us His compassion and love.

Sincerely yours in Christ,

Most Reverend Peter J. Jugis, J.C.D.
Bishop of Charlotte

*Diocese of Charlotte*                                                                 *July 1, 2009*

SCHS 000080

JA0623

# PREAMBLE

Priests, deacons, religious, seminarians, pastoral ministers, administrators, lay employees and volunteers (Church Personnel) in our parishes, agencies, schools and organizations must uphold Christian values and conduct. The *Code of Ethics Policy of the Diocese of Charlotte* (Code) provides a set of standards for conduct in certain situations and is designed to deter wrongdoing and to promote honest and ethical conduct.

The public and private conduct of clergy, religious, seminarians, lay employees and volunteers can be a source of inspiration and motivation, but it can also scandalize and undermine the faith of the people that are served. Church Personnel must at all times be aware of the responsibilities that accompany their work. It is essential therefore, that anyone who undertakes a position of ministry, employment or leadership in the diocese, be ever mindful of the trust that has been placed in him or her. The faithful discharge of the responsibilities that accompany our work requires constant and prayerful reflection since all of us must be sustained by God's goodness and grace.

Responsibility for adherence to the Code rests with each individual. This responsibility requires each of us to periodically take a personal inventory. It is hoped that the Code will assist us in this task. Church Personnel who disregard this Code will be subject to remedial action. This action can take several forms, from a verbal warning to removal, depending on the nature and circumstances of the offense.

While no policy can anticipate all of the challenges and situations that may arise, the Code communicates key guidelines and will assist in making decisions that are ethical and in accordance with applicable legal requirements, the Diocesan Sexual Misconduct Policy, the Diocesan Personnel Policies Handbook, and the Diocesan Financial Policies Handbook. All Church Personnel are encouraged to discuss any questions or concerns they have with their supervisor. Before beginning any ministerial, employment or volunteer functions, Church Personnel will read or have read to them, understand, and sign the proper acknowledgement of receipt form, and comply with this Code.

# 1. PRINCIPLES OF ETHICS AND INTEGRITY

1.1    Church Personnel will conduct themselves at all times in a manner that is consistent with the teachings and precepts of the Roman Catholic Church.

1.2    Church Personnel will exhibit the highest Christian ethical standards and personal integrity.

1.3    Church Personnel will continually and objectively examine their own actions and intentions to ensure that their behavior promotes the welfare of the diocese and exemplifies the moral tradition of the Church.

1.4    Church Personnel will establish clear, appropriate boundaries with anyone with whom they have a ministerial, business, professional or social relationship.

1.5    Church Personnel will provide an environment that is free from physical, psychological, emotional, written or verbal intimidation or harassment.

1.6    Church Personnel will conduct their relationships with others that are free of deception, manipulation and/or exploitation.

1.7    Church Personnel will not sexually abuse or harass a minor child.

1.8    Church Personnel will report any suspected sexual abuse of a minor child as required by the diocesan Sexual Misconduct Policy.

1.9    Church Personnel will not take unfair advantage of a counseling relationship for their personal benefit.

1.10    Church Personnel will not use their position to exercise unreasonable or inappropriate power, influence or authority.

1.11    Church Personnel will not accept or confer an office, position, assignment or compensation, which may present the appearance of favoritism or a conflict of interest.

1.12    Church Personnel will be responsible stewards of diocesan resources, human and financial, observing both canon and civil law, and making decisions concerning the disposition of resources that reflect Catholic social teaching.

1.13    Church Personnel will not make false accusations against another, or reveal the faults and failings to anyone who is not in a position that necessitates a need to know.

*Diocese of Charlotte*                                                *July 1, 2009*

CCHS 000082

JA0625

1.14    Church Personnel will share concerns about suspicions of inappropriate behavior with the appropriate supervisory or management individual.

1.15    Accountability:    The Diocese and all its parishes, schools and organizations are responsible to its stakeholders, which includes donors and others who have placed their trust in the Church.  To uphold this trust, all Church personnel will:
- Promote good stewardship of all Church resources, including donations, grants, program fees, and all financial support.
- Use all Church resources only for Church related purposes.  Church resources are never to be used for personal purposes, even if it is intended to be temporary.
- Use all Church resources in a prudent-like manner, avoiding unnecessary and excessive spending and wastefulness.
- Use Church credit cards, vendor relationships and lines of credit only for Church related purposes.  They are never to be used for personal transactions, even if it is intended that Church funds will not be used for payment.
- Comply with all applicable laws and regulations.
- Not be a party to any fraud or embezzlement, or neglect their duty to safeguard all Church assets.

## 2.  GUIDELINES FOR WORKING WITH MINOR CHILDREN

2.1    Church Personnel are not to possess any sexually explicit or morally inappropriate materials on church, school or diocesan property, or in the presence of minor children.  Such materials include, but are not limited to, videos, films, pictures, recordings, drawings, posters, cards, calendars, clothing, computer software and/or games.

2.2    Church Personnel are not to engage in sexually oriented conversations with minor children, except in the context of sharing the Church's teaching on human sexuality.  Church Personnel are never to discuss their own sexual activities with minor children.

2.3    Church Personnel are not to take photographs of minor children who are unclothed or dressing, for example in a locker room or bathing facility, nor shall they permit such photographs to be taken by others.

2.4    Church Personnel are not to speak to minor children in a manner that is, or could be construed by an observer as derogatory, demeaning, threatening, intimidating or humiliating, and are not to use profane or foul language in the presence of minor children.

*Diocese of Charlotte*                                                                *July 1, 2009*

2.5     Church Personnel are not to use tobacco products, alcoholic beverages, illegal drugs, or any substance prohibited by law, nor are they to be under the influence of any alcoholic beverage or illegal drugs, when working with minor children. Church Personnel may administer medications to minor children if written permission from parents or legal guardians is given.

2.6     Church Personnel are not to sleep in the same bed, hotel or motel room, sleeping bag, tent or cabin with a minor child unless the Church Personnel is the parent, legal guardian or sibling of the minor child.

2.7     Church Personnel are not to share showering, bathing, changing or dressing facilities with minor children. When the good of the minor child requires that they be accompanied by an adult to/in any of these locations, the time alone with the minor child should be minimal and another adult should be made aware of the circumstances.

2.8     Church Personnel are not to take an overnight trip alone with a minor child who is not an immediate family member.

2.9     Clergy and religious are not to allow minor children to be overnight guests in their residence or private accommodations with the exception of an occasional visit from immediate family members. Other Church Personnel are not to provide shared or private accommodations in any diocesan facility, private residence, hotel or motel room, or any other place where there is no other adult supervision present.

2.10    When providing transportation for minor children, Church Personnel are to be validly licensed and authorized, ordinarily have written permission from parents or legal guardians, and are to transport minors directly to their approved destination, with no unauthorized stops or deviations unless it is a valid emergency.

2.11    At the end of any activity, Church Personnel are to release minor children in their care only to parents, legal guardians, or other persons designated in writing by parents or legal guardians.

2.12    Church Personnel should schedule one-on-one counseling sessions or meetings with minor children at times and locations that promote accountability and meet accepted standards of propriety.

2.13    Activities and programs for minor children are not to be administered by only one adult. During all activities and programs, facilities should be monitored.

2.14    Church Personnel are not to use physical discipline in any way for the

*Diocese of Charlotte*                                                    *July 1, 2009*

CCHS 000084

JA0627

behavior management of minor children. No form of physical discipline is acceptable. This includes spanking, hitting, pinching, or any other physical force as correction or retaliation for inappropriate behavior.

2.15 Church Personnel are to immediately report the unusual or uncontrollable behavior of minor children to parents or legal guardians.

2.16 As a general rule, volunteers for programs involving working with minor children in parishes should be registered members of the parish for at least six months before being placed in a volunteer position. After careful consideration, exceptions may be made for parents of minor children in the specific programs in which their child or children are participating.

2.17 Reference checks should be conducted on employees and volunteers who transfer within the diocese before allowing them to participate in any program involving working with minor children.

## 3. PHYSICAL CONTACT WITH MINOR CHILDREN

3.1 Appropriate affection between Church Personnel and minor children is important for a child's development, and is a positive part of church life and ministry. However, touching must be based on the need of the minor child and not the adult, completely non-sexual, never in private, and otherwise appropriate.

3.2 Though not all-inclusive, the following examples are regarded as appropriate forms of affection:
- side hugs
- shoulder to shoulder or temple hugs
- pats on the shoulder or back
- handshakes
- high fives or hand slapping
- arms around shoulders
- holding hands while walking small children
- kneeling or bending down for hugs with small children
- holding hands during prayer

3.3 Though not all-inclusive, the following examples are forms of affection that are not to be used:

- lengthy or inappropriate hugs or embraces
- kisses on the mouth
- holding children over two years old on the lap
- touching the chests, knees, legs, bottoms or genital areas of

*Diocese of Charlotte*                                    *July 1, 2009*

minor children
- showing affection in isolated areas or private rooms
- sleeping in bed with a minor child
- wrestling or tickling minor children
- any type of massage given to or received from a minor child
- comments or compliments that relate to body development or physique
- any form of unwanted affection

3.4    No one should be permitted to develop and/or start new programs for minor children without proper review and approval by the proper authority. Requests to develop new programs should be submitted in writing and must include provisions for adequate adult supervision.

## 4. CONDUCT FOR PASTORAL COUNSELORS AND SPIRITUAL DIRECTORS

4.1    Pastoral Counselors and Spiritual Directors are not to step beyond their competence in counseling situations and are to refer people being counseled to other professionals when appropriate.

4.2    While counseling a minor child, if a Pastoral Counselor or Spiritual Director discovers that there is a serious threat to the welfare of the minor, and that communication of confidential information to a parent or legal guardian is essential to the minor child's health and well-being, the Pastoral Counselor or Spiritual Director should disclose only the information necessary to protect the health and well-being of the minor child.

4.3    Pastoral Counselors and Spiritual Directors are to carefully consider the possible consequences before entering into a counseling relationship with someone with whom they have a pre-existing relationship.

4.4    Pastoral Counselors and Spiritual Directors will conduct all counseling sessions in appropriate settings and at appropriate times. No session is to be conducted in private living quarters.

4.5    Pastoral Counselors and Spiritual Directors are to avoid situations that might present a conflict of interest between a counselor and a person being counseled, including even the appearance of a conflict of interest.

4.6    Pastoral Counselors and Spiritual Directors are not to engage in sexual intimacies with anyone they counsel. This includes consensual and non-consensual contact, forced physical contact and inappropriate sexual comments.

*Diocese of Charlotte*                                                      *July 1, 2009*

**4.7**     Pastoral Counselors and Spiritual Directors are not to engage in sexual intimacies with individuals who are close to the person being counseled, i.e. relatives and close friends.

**4.8**     Pastoral Counselors and Spiritual Directors assume the full burden of responsibility for establishing and maintaining clear, appropriate boundaries in all counseling and counseling-related relationships.

**4.9**     Pastoral Counselors and Spiritual Directors are to maintain a log of the times and places of sessions with each person being counseled.

**4.10**     Pastoral Counselors and Spiritual Directors should discuss the nature of confidentiality and its limitations with each person being counseled. Information that is disclosed during the course of counseling or advising is to be confidential, except for compelling professional reasons or as required by law.

**4.11**     If there is a clear and imminent danger to the person being counseled, or to others, the Pastoral Counselor or Spiritual Director may disclose only the information necessary to protect the parties affected and to prevent harm. Before disclosure is made, if feasible, the Pastoral Counselor or Spiritual Director should inform the person being counseled about the disclosure and the potential consequences.

**4.12**     With the exception of knowledge gained in the Sacrament of Penance, knowledge that arises from counseling sessions may be used in teaching, writing homilies, or other public presentations only when effective measures are taken to absolutely safeguard both the individual's identity and the confidentiality of the disclosures.

**4.13**     In accordance with the norm of canon law, the sacramental seal is inviolable, therefore, it is absolutely forbidden for a confessor to betray the confidence of a penitent in any way and for any reason. This is applicable whether the penitent is living or dead.

## 5. HARASSMENT

**5.1**     Church Personnel are to provide an environment that is free from sexual, psychological or physical harassment. This includes but is not limited to:
- physical or mental abuse
- unwelcome sexual advances or touching
- sexual comments and jokes
- requests for sexual favors used as a term or condition of

employment

- requests for sexual favors used as the basis for an employment decision
- displaying or wearing offensive material
- derogatory racial, religious, age, ethnic, physical or mental condition insults or slurs

5.2    Harassment can be a single, severe incident or a persistent pattern of behavior where the intent or the effect is to create a hostile, offensive or intimidating environment.

## 6. POLICY ON CONFLICTS OF INTEREST/PRIVATE INURNMENT, NEPOTISM, OUTSIDE EMPLOYMENT

6.1    Identifying a Private Inurnment or Private Benefit Problem:  In brief, "private inurnment" is the *payment* or diversion of an exempt organization's assets to its officials, officers, directors, employees, relatives, friends, major donors, or others in a special relationship to the organization who can influence or control the policy or the day-to-day activities of the organization *for less than full and adequate consideration*. It is a broad concept that can exist in a variety of transactions under a variety of circumstances. Private inurnment also extends to the use of organizational assets for "private benefits" such as sales, leasing, construction contracts, service transactions, etc., at other than fair market value or the exploitation of the exempt organization *for the benefit of a private business* (e.g., "sweetheart deals," promotional schemes, and/or giveaways to private individuals or businesses). Thus, under IRS regulations, a private benefit is similar to, but broader than, private inurnment.

To avoid material private inurnment or benefit in the types of transactions described above, the particular diocesan entity must enter into transactions for its benefit, rather than for a private party's benefit, and exercise due diligence to ensure that the proposed transaction is fair and reasonable such that under the circumstances the organization could not have obtained a more advantageous arrangement with reasonable effort. In addition to screening proposed transactions through the applicable councils and boards, care should be taken to follow diocesan policies and procedures pertaining to the signing of contracts.

6.2    Conflicts of Interest:  A conflict of interest may exist when persons employed by the diocese (i.e., the Central Administration, parishes, schools, agencies, and/or affiliated entities), or volunteers with influence over certain activities or transactions including those serving on advisory or consultative boards, councils or committees have a direct or indirect

financial interest, as defined below.

6.3    Financial Interest: A person has a "financial interest" if the person has, directly or indirectly, through business, investment, or family (including spouses; brothers or sisters; spouses of brothers or sisters; ancestors; children, grandchildren, and great grandchildren; and spouses of children, grandchildren, and great grandchildren), any one of the following:
- An ownership or investment interest in any entity with which the diocese has a transaction or arrangement;
- A compensation arrangement with the diocese or with any entity or individual with whom the diocese has a transaction or arrangement;
- A potential ownership or investment interest with, or compensation arrangement with, any entity or individual with whom the diocese is negotiating a transaction or arrangement. Compensation includes direct and indirect remuneration as well as gifts or favors that are substantial in nature.

6.4    Church Personnel are to avoid situations that might present a conflict of interest.

6.5    Church Personnel are not to take advantage of anyone to whom they are providing ministry or service in order to further their own personal, religious, political, business or economic interests.

6.6    Church Personnel are not to solicit, accept or give any personal gifts, favors, or things of value which could influence, or which could be construed as influencing any decision or obligation to the performance of one's duties.

6.7    Relatives of Church Personnel, or of relatives of various diocesan boards, may be hired as employees only if they will not be working under the line of supervisory authority of a relative or the advisory authority of the board.   Generally, relatives include spouses, children, siblings, grandparents and grandchildren.

6.8    No member of any diocesan board is to knowingly take any action or make any statement that is intended to influence any undertaking of a parish, school, agency, department or institution of the diocese in such a way as to confer any benefit on such member or anyone in the member's family or business.

6.9    No member of any diocesan board, his/her family members, employer, business or business associates, is to solicit business or favors from any diocesan parish, school, agency, department or institution of the

diocese.

**6.10**   No member of any diocesan board is to vote in connection with any decision that may constitute a conflict of interest.

**6.11**   Outside employment is permitted as long as Church Personnel notify their supervisor of that fact and satisfactorily perform their job responsibilities.  If an individual with an outside job does not perform his/her job requirements satisfactorily, he or she may be asked to terminate the outside employment.

**6.12**   Whenever a diocesan entity is considering conducting business with any person employed by the diocese (i.e., the Central Administration, parishes, schools, agencies, and/or affiliated entities) or any volunteer, or his/her family member, his/her business, or any entity in which he/she has an investment, the diocesan entity must solicit bids from at least two other sources and may not select the person/entity with the financial interest unless that person/entity is the lowest bidder.

**6.13**   Duty to Disclose: In connection with any actual or potential conflict of interest, an interested person must disclose the existence and nature of his or her financial interest and all material facts.  Reports should be made to the pastor, principal, vicar general/chancellor, attorney, or chief financial officer.  Reports made to pastors and principals are to be reported to the vicar general/chancellor. Reports should include relevant information that is discernible.

**6.14**   Investigation: The person to whom said report was made shall be responsible for a thorough and expeditious investigation of the actual/potential conflict of interest.  Proposed decisions on the disposition of a case are to be discussed with the vicar general/chancellor or his designee. The results of all confirmed conflicts of interest and the final resolution shall be reported to the diocesan Finance Council.

**6.15**   Subsequent Conflicts and Disclosures:  Notwithstanding previous disclosure of actual or potential conflicts of interest, an individual shall make a new disclosure of conflicts when any matter involving the conflict of interest arises for discussion or action. In the event that an individual is uncertain whether an actual or potential conflict of interest exists, the individual should make disclosure of the circumstances that may give rise to an actual or potential conflict.

**6.16**   Confidential or Privileged Information:  Information known to be confidential that is acquired by individuals in the course of employment or association with the diocese and its affiliated entities shall be used

only for the benefit and purposes of the diocese. Individuals shall neither disclose confidential information outside the scope of their authorized duties nor utilize their position or association with the diocese for personal identification or advantage, although there may be instances, based on the use of careful discretion and judgment, where incidental use of the association with the diocese may be appropriate.

## 7. POLITICAL ACTIVITY

7.1    The Diocese of Charlotte encourages individual participation in civic affairs. However, Church Personnel are not to engage in political activities in a manner that may create the appearance that such activity is by or on behalf of the diocese.

7.2    Church Personnel are not to make any contribution to any candidate for public office or political committee on behalf of the Diocese of Charlotte or in a manner that may create the appearance that the contribution is on behalf of the diocese.

7.3    Church Personnel are not to use any parish, school or agency facilities, financial resources, or personnel to endorse or oppose a candidate for public office.

7.4    Church Personnel are to clearly communicate that they are not acting on behalf of the Diocese of Charlotte if identified as an official or employee of the diocese while engaging in political activities in an individual capacity.

## 8. WHISTLEBLOWER POLICY

8.1    The Diocese of Charlotte requires all representatives of the Church, including clergy, religious, directors, and other volunteers, and lay employees, to observe high standards of business and personal ethics in the conduct of their duties and responsibilities. All representatives of the Church must practice honesty and integrity in fulfilling their responsibilities and comply with all applicable laws and regulations.

The objectives of the Whistleblower Policy are to establish policies and procedures for:

- The submission of concerns regarding questionable financial or legal matters, violations and suspected violations of the Code of Conduct, Code of Canon Law and other concerns by the stakeholders of the Church, on a confidential basis;
- The receipt, retention, and treatment of complaints received by

*Diocese of Charlotte*      *July 1, 2009*

CCHS 000091

the organization;

- The protection of anyone reporting concerns from retaliatory actions.

8.2    Reporting Responsibility - Each representative of the diocese has an obligation to report in accordance with this Whistleblower Policy any reasonably perceived violation of: (a) federal, state or local laws, rules and/or regulations; (b) the diocese's Code of Ethics; (c) the diocesan sexual misconduct policy; (d) diocesan personnel policies; (e) diocesan financial policies, including questionable or improper accounting or auditing matters; as well as gross mismanagement, waste, fraud, embezzlement, neglect of duty; and actions that threaten or are viewed as harmful to the health, safety and welfare of others and any other financial, legal or canonical concerns (hereinafter collectively referred to as Concerns).

Reports of Concerns should be made to the pastor, principal, vicar general/chancellor, attorney, or chief financial officer. Reports made to pastors and principals are to be reported to the vicar general/chancellor. All Concerns are to be reported as soon as possible. Reports of Concerns should include all relevant information about the suspected act, including any material evidence that exists.

8.3    Investigation - The person to whom said report was made shall be responsible for a thorough and expeditious investigation of the reported Concern.

Proposed decisions on the disposition of a case are to be discussed with the vicar general/chancellor or his designee. The results of all reported and confirmed Concerns and the final resolution shall be reported to the diocesan Finance Council.

8.4    No Retaliation - This Whistleblower Policy is intended to encourage and enable stakeholders to raise Concerns within the Organization for investigation and appropriate action. With this goal in mind, no stakeholder who, in good faith, reports a Concern shall be subject to retaliation or, in the case of an employee, adverse employment consequences. Moreover, anyone who retaliates against someone who has reported a Concern in good faith is subject to discipline up to and including dismissal from their position within the Church.

8.5    Acting in Good Faith - Anyone reporting a Concern must act in good faith and have reasonable grounds for believing the information disclosed is a legitimate matter of Concern. The act of making allegations that prove to be unsubstantiated, and that prove to have been made maliciously, recklessly, or with the foreknowledge that the allegations are false, will be viewed as a serious disciplinary offense and

may result in discipline, up to and including dismissal from their position with the Church. Such conduct may also give rise to other actions, including civil lawsuits.

8.6    Confidentiality - Reports of Concerns, and investigations pertaining thereto, shall be kept confidential to the extent possible, consistent with the need to conduct an adequate investigation. Disclosure of reports of Concerns to individuals not involved in the investigation will be viewed as a serious disciplinary offense and may result in discipline, up to and including termination of the violators' position in the Church. Such conduct may also give rise to other actions, including civil lawsuits.

## 9. CONFIDENTIALITY

9.1    Church Personnel, regardless of their work or volunteer responsibility, are to keep significant information on a confidential basis and are not to discuss it with anyone who is not directly involved.

9.2    Sacramental records are to be regarded as confidential. When compiling and/or publishing statistical information from these records, great care is to be taken to preserve the anonymity of individuals. Only those who are authorized to access these records and supervise their use are to have access to them.

9.3    Individual contribution records of parishes are to be regarded as private and are to be kept confidential.

## 10. REPORTING ETHICAL MISCONDUCT

10.1    Church Personnel are to hold each other accountable for maintaining the highest ethical and professional standards. When it appears that any Church Personnel has violated this Code, or any other religious, legal, moral, professional or ethical principle, the matter is to be reported to that entity's management authority or the Chancery.

10.2    All reports of possible violations of this Code will be treated in confidence as much as the diocese's duty to investigate and the law allow. If confidentiality cannot be maintained, the individual reporting the violation will be so advised.

10.3    All reported violations of this Code will be investigated, and if needed, appropriate action will be taken based on the nature of the violation and diocesan policy.

*Diocese of Charlotte*                                                              *July 1, 2009*

**10.4**   Retaliation against a person who suspects and reports a violation of this Code in good faith will be treated as an individual violation of this Code.

# Acknowledgement of Receipt
# Diocese of Charlotte Code of Ethics

This will acknowledge that I have personally received a copy of the Diocese of Charlotte Code of Ethics, and that I have read it, had it read to me, or listened to it on tape. I understand the contents and agree to comply with them.


_____          _____
Signature                            Date


_____
Printed Name


*Diocese of Charlotte*                                    *July 1, 2009*

CCHS.000095

JA0638

# EXHIBIT B



# DIOCESE OF CHARLOTTE

## Personnel Polices Handbook

### Revision Date July 1, 2009

The Diocese of Charlotte
1123 South Church Street
Charlotte, NC 28203
(704) 370-6299

Billard RFP 00052
Case 3:17-cv-00011-MOC-DCK   Document 31-3   Filed 09/21/17   Page 30 of 90

Billard RFP 00053

# Table of Contents

INTRODUCTION ............................................................................................... 1

MISSION STATEMENT ................................................................................... 3

HISTORY OF THE DIOCESE .......................................................................... 4

SECTION 100: EMPLOYMENT ........................................................................ 5

   104.  NATURE OF EMPLOYMENT .................................................................. 6
   110.  EQUAL EMPLOYMENT OPPORTUNITY .............................................. 6
   116.  IMMIGRATION LAW COMPLIANCE ...................................................... 7
   122.  STAFFING PROCEDURES .................................................................... 7
   158.  BACKGROUND CHECK POLICY .......................................................... 8
   164.  ACCOMMODATIONS OF DISABILITIES AND OTHER MEDICAL CONDITIONS ... 9

Section 200: EMPLOYMENT STATUS AND RECORDS ............................... 11

   210.  EMPLOYMENT ...................................................................................... 13
   216.  PERSONNEL DATA CHANGES ........................................................... 13
   222.  PERSONNEL FILES ............................................................................. 13
   228.  PERFORMANCE EVALUATIONS .......................................................... 13
   234.  TRANSFERS ......................................................................................... 14
   240.  PROMOTIONS ....................................................................................... 14
   246.  REINSTATEMENTS .............................................................................. 14

Section 300: EMPLOYMENT BENEFITS AND LEAVE PROGRAMS ............ 15

   302.  EMPLOYEE BENEFITS ......................................................................... 16
   306.  GROUP INSURANCE PROGRAMS ...................................................... 16
   320.  SAVINGS AND RETIREMENT PROGRAMS ........................................ 17
   332.  STATUTORY BENEFITS ....................................................................... 17
   352.  PAID SICK LEAVE ................................................................................. 18
   364.  VACATION ............................................................................................. 19
   370.  RELIGIOUS AND CIVIL HOLIDAYS ..................................................... 20
   374.  LEAVES OF ABSENCE ........................................................................ 21
     A.  Personal Leaves of Absence ............................................................. 21
     B.  Family Medical Leave ......................................................................... 22
     C.  Bereavement Leave ........................................................................... 27
     D.  Military Leave ..................................................................................... 27

Roman Catholic Diocese of Charlotte Personnel Policies Handbook
Revised July 1, 2009.

iii.

Billard RFP 00054

Case 3:17-cv-00011-MOC-DCK   Document 31-3   Filed 09/21/17   Page 32 of 90

JA0642

382. VOTING TIME ........................................................................ 28

388. JURY DUTY ........................................................................... 28

Section 400: TIMEKEEPING AND PAYROLL .................................... 29

404. TIMEKEEPING ...................................................................... 30

410. PAY DEDUCTIONS ................................................................. 30

Section 500: WORK HOURS ........................................................... 31

504. HOURS OF WORK .................................................................. 32

510. MEAL AND REST PERIODS ..................................................... 32

516. OVERTIME ........................................................................... 32

522. INCLEMENT WEATHER ........................................................... 33

Section 600: WORK CONDITIONS .................................................. 35

604. SMOKING ............................................................................ 36

610. SAFETY ............................................................................... 36

616. USE OF DIOCESAN TELEPHONES, MAIL, EMAIL AND INTERNET ... 36

622. USE OF DIOCESAN EQUIPMENT AND VEHICLES ....................... 37

628. AUTOMOBILE COMPENSATION ............................................... 38

634. SOFTWARE SECURITY ........................................................... 38

Section 700: EMPLOYEE CONDUCT AND WORK RULES ................... 41

704. ATTENDANCE AND PUNCTUALITY ........................................... 42

710. UNEXCUSED ABSENCES ......................................................... 42

716. CONFIDENTIALITY ................................................................. 42

722. COURTESY ........................................................................... 44

728. OUTSIDE COMPLAINTS ........................................................... 44

734. PERSONAL APPEARANCE ........................................................ 44

740. MEDIA RELATIONS ................................................................. 45

746. DRUG AND ALCOHOL USE ...................................................... 45

752. FIREARMS AND WEAPONS ...................................................... 46

766. SEXUAL AND OTHER UNLAWFUL HARASSMENT ....................... 46

776. DISCIPLINARY PROCEDURES .................................................. 48

782. IMMEDIATE DISCHARGE ........................................................ 49

788. RESIGNATION ....................................................................... 50

794. RETURN OF PROPERTY .......................................................... 50

796. GRIEVANCES ........................................................................ 50

iv

Billard RFP 00055

Section 800: CODE OF ETHICS ............................................................. 53

Section 900: POLICY OF THE DIOCESE OF CHARLOTTE CONCERNING MINISTRY-
RELATED SEXUAL MISCONDUCT BY CHURCH PERSONNEL ............... 73

Acknowledgement of Receipt ............................................................. 93

Billard RFP 00056

JA0644

Billard RFP 00057

JA0645

# INTRODUCTION

The purpose of this Personnel Policies Handbook is to establish policy guidelines and procedures for the proper administration of personnel matters within the diocese. The handbook is designed to acquaint employees with the Roman Catholic Diocese of Charlotte and to provide them with information about working conditions, employee benefits and some of the policies affecting their employment. It offers a standardized approach for the administration of personnel policies and is thereby intended to reduce difficulties which might arise from unwritten policy, inconsistent policy, or lack of proper communication. Written standards, however, cannot address every situation, and the diocese relies heavily on each employee's innate good sense of what is proper and reasonable. Employees should read this handbook carefully and discuss with their supervisor any matters they do not understand. Priests, Deacons and Religious who are employed by the diocese will be covered by these policies except where specific written exclusions are reached and agreed to by the Chancery.

The policies contained herein are to be administered completely and inclusively to ensure the consistent and equitable treatment of all employees. They cover all persons employed by parishes, agencies, schools, ministries and offices of the diocese, including those hired under a separate employment contract. Throughout this handbook, "local authority" shall mean the employing parish, agency, school, ministry or department.

No employee handbook can anticipate every circumstance or question about policy. As the diocese continues to grow and as laws change and/or are enacted, the need may arise to change policies described in the handbook. The diocese, therefore, reserves the right to revise, supplement, or rescind any policies or portions of the handbook at any time.

As employees of the Diocese of Charlotte, we share in the mission which Christ entrusted to the Church, to spread the Gospel, to serve our brothers and sisters, and to build up the Body of Christ which is the Church. All of our employees must respect, appreciate, and uphold the teachings, principles, legislation, policies and traditions of the Roman Catholic Church in both word and example.

All employees should read, understand and comply with the provisions of the handbook. It describes many rights and responsibilities and outlines the programs developed by the diocese to benefit employees. On receipt of the handbook, employees will be required to sign an Acknowledgment of Receipt Form which will be placed in their personnel file.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2006*

1

Case 3:17-cv-00011-MOC-DCK   Document 31-3   Filed 09/21/17   Page 36 of 90

Billard RFP 00058

Because this handbook is intended to state general guidelines and common practices that may be adapted or varied to fit different circumstances that may be changed, amended or even deleted as experience informs us, nothing in this handbook shall be deemed or construed as contractually binding. Similarly, nothing in this handbook may be construed as establishing any period of guaranteed employment, or as otherwise changing any employee's or the diocese's rights to end the employment relationship when we believe it is appropriate to do so.

2

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 00059

# MISSION STATEMENT
## OF THE DIOCESE OF CHARLOTTE

We, the people of God
in the Diocese of Charlotte,
fortified in the Father,
redeemed in the Son,
empowered in the Spirit,
are called to grow ever more perfectly
into a community
of praise, worship, and witness.
We seek to become evermore enthusiastically
a leaven of service and a sign of peace
through love in Piedmont
and Western North Carolina.

Billard RFP 00060

# HISTORY OF THE DIOCESE

The Diocese of Charlotte was established on January 12, 1972, with the Most Reverend Michael Joseph Begley, a priest of the Diocese of Raleigh, being ordained and installed as first Bishop of Charlotte. Bishop Begley served as Ordinary of the Diocese until his retirement in May 1984.

The Most Reverend John Francis Donoghue, a priest of the Archdiocese of Washington, succeeded Bishop Begley; he was ordained and installed as second Bishop of Charlotte on December 18, 1984. Bishop Donoghue was appointed Archbishop and transferred to Atlanta on June 22, 1993 and installed on August 18, 1993.

The Most Reverend William George Curlin, Auxiliary Bishop of Washington and Titular Bishop of Rosemarkie, was appointed the third Bishop of Charlotte on February 22, 1994, and installed on April 13, 1994. Bishop Curlin served the Diocese of Charlotte until his retirement on September 10, 2002.

On August 1, 2003, the Holy Father appointed the Most Reverend Peter Joseph Jugis, Judicial Vicar and Pastor of Our Lady of Lourdes Church in Monroe, as the fourth Bishop of Charlotte. Bishop Jugis was installed on October 24, 2003.

On September 29, 1974, Bishop Begley ordained the first priest for the Diocese of Charlotte. In January 1980, he announced that he would begin a Permanent Diaconate program in the diocese. The first diaconate formation class began in September of that year. On May 29, 1983, Bishop Begley ordained 19 men to the Permanent Diaconate for the Diocese of Charlotte.

The Diocese of Raleigh, established in 1924, was the first diocese in North Carolina; it included the entire State until the formation of the Diocese of Charlotte in January, 1972. At the time of the establishment of the new Diocese of Charlotte, the Catholic population of the area was just over 34,000; by 2006, the population was estimated to be more than 150,000 registered Catholics and another 240,000 unregistered. Because Catholics are a minority and, also, because there are many people who are considered "unchurched," there are many opportunities within the diocese in the area of evangelization. In fact, the Bishop declared the 1990s to be the "Decade of Evangelization."

The diocese is made up of 92 parishes and missions, 18 schools (15 elementary, 1 middle school and two high schools) and numerous charitable and social institutions. Catholic Social Services offers programs and outreach services to faiths, ages and nationalities, and has offices throughout the diocese.

The diocese consists primarily of two areas: the Mountain area in the west and far west and the Piedmont. The diocese encompasses 20,700 square miles; it includes the 46 western counties of the State of North Carolina.

4

Billard RFP 00061

# SECTION 100: EMPLOYMENT

Billard RFP 00062

## 104. NATURE OF EMPLOYMENT

This handbook is intended to provide employees with a general understanding of our personnel policies. Employees are encouraged to familiarize themselves with the contents of this handbook, for it will answer many common questions concerning employment with the diocese. However, this handbook cannot anticipate every situation or answer every question about employment. It is not an employment contract and it is not intended to create contractual obligations of any kind. Neither the employee nor the diocese is bound to continue the employment relationship, and if either chooses, they can end the relationship at any time.

In order to retain necessary flexibility in the administration of policies and procedures, the diocese reserves the right to change, revise or eliminate any of the policies and/or benefits described in this handbook. The only recognized deviations from the policies contained herein are those authorized and issued through the Chancery.

## 110. EQUAL EMPLOYMENT OPPORTUNITY

The responsibility for assuring that equal opportunity is realized in the diocese rests with every employee. Each Pastor, Principal, Department Head, Manager and Supervisor shall actively support and promote the diocese's Equal Employment Opportunity program and remain informed of and sensitive to the equal opportunity impact of all employment decisions made in their respective areas of responsibility.

It is the policy of the diocese that employment decisions shall be based on qualifications and competence. Except where required or permitted by law or by the diocesan Equal Opportunity Policy, employment practices shall not be influenced or affected by virtue of an applicant's or employee's race, color, sex, national origin, age, disability or any other characteristic protected by law.

The Equal Opportunity Act of 1972 expanded coverage of Title VII of the Civil Rights Act of 1964, as amended, to include both public and private educational institutions. It did, however, grant exemption to religious institutions, including religious educational institutions. The exemption applies only to positions that pertain to carrying on the religious activities of the institution or where faith and worship participation are required as essential for fulfilling the position. Religion is a bona fide occupational qualification in those circumstances that involve religious activities, and hiring an individual on the basis of religion, in that circumstance, is permitted. Except as to positions that involve religious activities, the diocese will not be influenced or affected by an applicant's or employee's religion.

Employees with questions or concerns about any type of discrimination in the workplace are encouraged to contact their immediate supervisor, a higher level manager, the on-site director, or the diocesan Human Resources Office. Employees can raise concerns and make reports without fear of reprisal. Anyone found to be engaging in any type of

6

Billard RFP 00063

unlawful discrimination will be subject to disciplinary action, up to and including discharge.

## 116. IMMIGRATION LAW COMPLIANCE

The diocese complies with the Immigration Reform and Control Act of 1986 and is committed to employing only United States citizens and others who are authorized to work in the United States.

As a condition of employment, each new employee must properly complete, sign and date the first section of the Homeland Security Form I-9. Before beginning work, newly rehired employees must also complete the form if:

1. They have not previously filed an I-9 with the diocese, or;
2. If their previous I-9 is more than three years old, or;
3. If their previous I-9 is no longer valid.

I-9s are not to be placed in employee personnel files. They should be filed separately in one of two folders labeled either separated or current employees.

## 122. STAFFING PROCEDURES

No parish, agency, school, ministry or office may create a new position, hire an employee or replace an employee without prior approval of the local authority. The required procedures for filling vacancies must be followed when hiring or promoting employees.

When a new employee is hired, a personnel file for that person shall be established and maintained by the local authority. The file shall contain the original employment application and related documents, current salary and job description, evaluations, warnings, commendations, correspondence, and any forms required by federal or state laws. It shall also include a signed statement that the employee has received a copy or a tape of this handbook and a copy or tape of any other applicable policies, including the diocesan sexual misconduct policy and the Code of Ethics.

Contracts for Teachers, Assistant Principals, and Principals are for one year only. The contracts for school employees shall be the standard diocesan contracts.\ Schools contacts will be offered annually by April 30 to those persons who are currently under contract and will be receiving a contract for the coming year. Contracts are to be signed and returned within fourteen (14) working days upon receipt of the contract. The contract is void beyond the deadline unless an extension of time has been specifically agreed to in writing by the employee and Principal/Superintendent.

Billard RFP 00064

## 158. BACKGROUND CHECK POLICY

State law (NC Gen. Stat. Sec. 114-19.3) requires criminal record checks of individuals who are employed by, or volunteer for, among other things, any profit or non-profit employer that provides direct care or services to children, the sick, the disabled, or the elderly. Federal law (42 USC 13041 (a), (b), (c)) states that an employer may also consider any conviction that may bear upon an individual's fitness for working with children. Additionally, there has been a national upsurge in workplace theft and fraud. Therefore, it is the policy of the Diocese of Charlotte that the employment of all individuals in paid positions in the diocese and all individuals in volunteer positions will be contingent upon the satisfactory completion of a criminal background check. This policy is not restricted to new employees and volunteers, but applies to all current and future employees and volunteers of the diocese who are eighteen (18) years of age or older.

Because an arrest record is, by definition, not evidence of criminal guilt, such information should generally not be used as definitive grounds for rejection. However, evidence of a criminal conviction may, depending upon the nature of the conviction and the related circumstances, be information that must be considered.

PROCEDURE

1.  All applicants for paid and volunteer positions in the diocese who are eighteen (18) years of age or older will be informed that criminal background checks will be conducted. In addition, a Sexual Offenders Registry Index Check will be required for all applicants for paid or volunteer positions. Background checks are not required for applicants under the age of eighteen; however, these individuals must be under direct supervision at all times. A background check must be completed once the individual reaches the age of eighteen. Background checks are to be repeated at least every five years for active employees and volunteers.

2.  Additional background checks in areas specifically related to certain positions may be required. However, additional background checks will be limited in scope and must relate directly to the volunteer or employment position.

3.  Any offer of employment, or any offer of acceptance as a volunteer, will be presented in writing to the applicant as an offer that is conditional, based upon the receipt of a favorable background check.

4.  Background checks will be conducted only when the applicant or volunteer agrees to the conditional offer of employment or acceptance. At that time, the individual seeking employment or volunteer status will complete a diocesan *Notification and Release* form. Background checks cannot be initiated unless this form is completed, signed and dated by the individual and the requesting official.

5.  An individual who accepts a conditional offer of employment or acceptance as a volunteer may not begin active employment or volunteer activity until the background check has been completed.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

6.  No diocesan parish, agency, department or school will employ, or accept as a volunteer, any individual who refuses to consent to a background check.

7.  The diocesan Human Resources Office will coordinate the processing of all background checks through the use of an outside vendor. The diocese will adhere to the requirements of the *Fair Credit Reporting Act* in all of its practices regarding background checks.

8.  All background check requests must be submitted to the diocesan Human Resources Office on the official release form. The requesting official will be notified of the results of the completed background check. The requesting parish, agency, school or department will be billed for the cost of the background checks for its location.

9.  If the background check reveals a criminal history, the applicant must be given the opportunity to provide an explanation, submit additional information, or challenge its accuracy. The parish, agency, department or school should consider the following factors before deciding whether or not to offer or deny employment or acceptance as a volunteer:

    *   The length of time since a conviction
    *   The nature of the crime
    *   The relationship between the duties to be performed and the crime committed
    *   The number of convictions
    *   Rehabilitation efforts
    *   Subsequent employment or volunteer history

10. **All background check information is to remain confidential.** Failure to adhere to this confidentiality requirement by diocesan personnel may result in disciplinary action, up to and including termination.

# 164. ACCOMMODATIONS OF DISABILITIES AND OTHER MEDICAL CONDITIONS

The Diocese of Charlotte's policy is to base selection and other employment criteria on job-related reason and to make reasonable accommodations to assist otherwise qualified disabled applicants and employees in meeting these criteria once we are made aware their disabilities and if the accommodations do not cause an undue hardship for the diocese. For purposes of this policy, "qualified disabled applicant and employees" include applicants and employees who have a mental or physical impairment that substantially limits one or more major life activities, and who meet the skill, experience, education, and other job-related requirements of a position desired or held and can perform the essential functions of the job, with or without reasonable accommodation. We reserve the right to require medical documentation of a disability.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

9

Billard RFP 00066

If you have a disability that will require an accommodation to perform an essential function of a job desired or held, it is your responsibility to notify your supervisor of the disability and of the need for an accommodation. We then can work with you to try to provide a reasonable accommodation, taking into consideration your specific condition and the operational requirements of and financial cost and expense to the diocese, among other factors. Please be aware that although we would like to keep employment opportunities open for qualified individuals, we will not be able to accommodate an applicant or employee who poses a significant risk to the health or safety of himself or herself or others in the workplace (including coworkers, vendors and visitors) if a reasonable accommodation will not eliminate or significantly reduce the risk.

We will try to keep disclosures of disabilities, all medical documentation and other information pertaining to such disabilities, and any reasonable accommodations proposed or made for an applicant or employee as confidential as possible. Of course:

1. Appropriate members of management may be informed regarding any restrictions in work duties or necessary accommodations;

2. First aid and safety personnel may be informed, when appropriate, if a disability might require emergency treatment;

3. Government officials investigating compliance with the Americans with Disabilities Act may be provided information in compliance with applicable laws and regulations;

4. We may submit information to the appropriate state workers' compensation agency or our workers' compensation carrier(s) in accordance with applicable workers' compensation laws; and

5. We may use the information for insurance purposes.

We also may consult with occupational health professionals and other similar agents for purposes of considering possible direct threats to health or safety posed by an individual with a disability and/or possible reasonable accommodations for that individual.

10

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 00067

# Section 200: EMPLOYMENT STATUS AND RECORDS

Billard RFP 00068

## 204. EMPLOYMENT CATEGORIES

Each employee is designated as either nonexempt or exempt from federal and state wage and hour laws. Nonexempt employees are entitled to overtime pay under the specific provision of federal and state laws. Exempt employees are excluded from specific provisions of federal and state wage and hour laws. These policies apply to five types of employees:

**Introductory Employees** - new employees who are appointed to a position for a three month introductory period. At the end of the three month period, with the approval of the local authority, the employee will be considered regular full-time or regular part-time. The introductory period may be extended for an additional three months, if the local authority believes that more supervision and/or training will enable the employee to work at an acceptable level of performance. During the introductory period, it may become apparent that the employee is not suitable for the particular job. In this case, employment may be terminated.

**Regular Full-time Employees** - employees who are regularly scheduled to work a minimum of thirty (30) hours in a work week. Regular full-time employees are typically entitled to all fringe benefits, subject to the eligibility requirements as stated in the benefits plans.

**Regular Part-Time Employees** - employees who are regularly scheduled to work from fifteen (15) to twenty-nine (29) hours in a work week. Regular part-time employees will accumulate vacation and sick leave on a prorated basis; however, they are not eligible for participation in the diocesan insurance plans. Regular part-time employees may be eligible to participate in the Lay Retirement and 403b programs, subject to the eligibility requirements of the plans.

**Part-Time employees** - employees who are scheduled to work less than fifteen (15) hours in a work week or are called in from time-to-time. Part-Time employees will be hourly employees. Part-time employees may be eligible to participate in the 403b plan, subject to the eligibility requirements of the plan.

**Temporary Employees** - employees who are hired as interim replacements to temporarily supplement the workforce, or to assist in the completion of a specific project, regardless of the number of hours per week they work. Employment assignments in this category are of a limited duration, usually no longer than six months. Employment beyond any initially stated period does not in any way imply a change in employment status. Temporary employees retain that status unless and until notified in writing of a change by the local authority. Temporary employees will receive all legally mandated benefits; however, they will be ineligible for other benefit programs in the diocese.

**Contract Employees** -- employees employed under written contracts for a specified term. All such employees must adhere to the policies and procedures contained in this handbook, as well as the terms of their written contracts. Compensation and benefits for these employees usually are defined by their contracts, subject to the eligibility requirements of the benefit plans. Continued employment is not implied beyond the specified term of the contract.

12

JA0657

## 210. EMPLOYMENT

Each applicant for employment in the diocese must complete the standard diocesan application form and any related documentation required by the local authority, and submit a resume if applicable. The diocese relies heavily on the accuracy of information contained in the employment application, as well as the accuracy of other data presented throughout the hiring process and subsequent employment. The diocese reserves the right to verify all information given by an applicant or employee, which may include reference, education and criminal record checks. Any misrepresentations, falsifications, or material omissions in any of this information or data may result in the diocese's exclusion of the individual from further consideration for employment or, if the individual has been hired, termination of employment.

## 216. PERSONNEL DATA CHANGES

It is the employee's responsibility to promptly notify the local authority of any changes or corrections in personnel data so that this information will be accurate and current at all times. Personnel data includes current Social Security Numbers, birth dates, addresses, telephone numbers, marital status, number and names of eligible dependents, beneficiary information, individuals to be contacted in the event of an emergency, and educational accomplishments.

## 222. PERSONNEL FILES

Personnel files will be established for all employees. Personnel files are the property of the diocese and are to be kept in a locked and secure place. Access to the information they contain is restricted. Only officials and representatives of the diocese, and certain regulatory bodies who have a legitimate reason to review information in a file are allowed to do so.

Medical records and related information are to be kept separate and apart from personnel files in a locked and secure location. I-9 Forms are not to be placed in employee personnel files but should be filed separately in one of two folders labeled either separated or current employees. Certification files for school personnel will be maintained by the Catholic Schools Office.

With reasonable advance notice, employees may be permitted to review material in their files, but only in the presence of supervisory or management officials.

Billard RFP 00070

Case 3:17-cv-00011-MOC-DCK   Document 31-3   Filed 09/21/17   Page 48 of 90

JA0658

## 228. PERFORMANCE EVALUATIONS

Formal performance reviews must be conducted on an annual basis to provide both supervisors and employees the opportunity to discuss job tasks, identify and correct weaknesses, encourage recognized strengths, and discuss positive, purposeful approaches for meeting goals. The formal evaluation shall be on an appraisal form that has been adopted and/or approved by the diocesan Human Resources Department.

## 234. TRANSFERS

Employees who transfer from one parish, agency, school, ministry or department within the diocese to another, in the same employment category, will retain and carry with them their length of service and benefit status at the time of their transfer. If the transfer involves a change in employment category, length of service status will be retained; however, any change in benefit eligibility will begin on the effective date of the transfer.

Vacant positions should be posted internally so that interested employees may apply. If a current employee wishes to be considered for a vacant position, he or she should advise the current supervisor and submit a written application for the vacant position.

## 240. PROMOTIONS

Promotions shall depend primarily on an employee's appraised performance and qualifications. Length of service, though a consideration, will not in itself constitute the sole basis for promotion.

Vacant positions should be posted internally so that interested employees may apply. If a current employee wishes to be considered for a vacant position, he or she should advise the current supervisor and submit a written application for the vacant position.

## 246. REINSTATEMENTS

Employees who have a break in service and are rehired, or hired by another parish, agency, school, ministry or department of the diocese within sixty (60) days of the date of separation, will retain their length of service status and accumulated sick leave. The retention of insurance, savings and retirement benefits will be governed by the eligibility requirements of the particular policy.

14                                    *Roman Catholic Diocese of Charlotte Personnel Policies Handbook*

Billard RFP 00071

# Section 300: EMPLOYMENT BENEFITS AND LEAVE PROGRAMS

Billard RFP 00072

## 302. EMPLOYEE BENEFITS

The diocese has established a number of benefits programs for eligible employees. These include health, long-term disability and life insurance programs, retirement and savings programs, various types of leaves and excused absences, paid holidays and vacations. The diocese also complies with applicable laws by paying all or part of the costs associated with certain public welfare programs like workers' compensation, social security and Medicare.

Many of these benefits programs are generally described in the following pages; however these descriptions are merely intended to inform you about the types of benefits that may be available by virtue of your employment. The descriptions contained in this section are not intended as representations that you are eligible for or will receive the above benefits, nor are they intended to state all terms that may govern each of these benefits programs.

Many of the benefits programs discussed in this section have separate plan documents that should be consulted to determine the specific terms and conditions for these programs. The programs that have such documents are identified in the descriptions that follow. To the extent anything stated in this handbook conflicts with these plan documents, the terms of the plan documents are controlling. Any supervisors and human resources representatives also may be able to help you to understand your benefits; however, again, you are reminded that the plan documents that exist for such benefits programs are controlling and should always be reviewed in regard to any questions that you may have.

## 306. GROUP INSURANCE PROGRAMS

Regular full-time employees may be eligible for medical insurance, which includes health, dental, prescription drugs and vision coverage, long-term disability insurance and life insurance through various group insurance plans sponsored by the diocese. Much of the cost of these benefits is borne by the diocese, but employees may be required to pay some portion of the premiums, depending upon the type of coverage. Medical and life insurance coverage may also be available for spouses and dependent children at the employee's expense. The terms and conditions applicable to these insurance programs and the benefits that are available through these programs are more fully described in the insurance booklets and plan documents applicable to each type of coverage. In addition, you may discuss any questions that you may have about these various insurance programs with your Human Resources representative.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 00073

## 320. SAVINGS AND RETIREMENT PROGRAMS

The diocese sponsors the following retirement and savings programs that may be applicable to your employment:

**Lay Retirement Program** – Lay employees who meet the eligibility requirements may participate in the Lay Retirement Program. The diocese makes contributions to the program for eligible employees. A more complete description of the terms and conditions that are applicable to this retirement program is contained in the Lay Retirement Handbook and the applicable plan documents. In addition, you may discuss any questions that you have about this retirement program with your human resources representative.

**403b Savings and Retirement Plan** – Most full-time and part-time employees are eligible to participate in the diocesan 403b plan. Contribution amounts are subject to the limits set by the plan and by the federal government. The diocese also makes a matching contribution, subject to plan limits, to your account. A more complete description of the terms and conditions applicable to participation in this plan and the benefits that it provides is contained in the 403b Plan Handbook and the applicable plan documents. You may also discuss any questions that you may have about this plan with your Human Resources representative.

## 332. STATUTORY BENEFITS

You may also be eligible for certain statutory benefits that are provided by federal and/or state law. Some of these benefits are funded in whole or part by contributions paid by the diocese. The following describes the statutory benefits that may be applicable to your employment:

**Unemployment Compensation** – As a result of the decision of the North Carolina Court of Appeals in the case of *Michael J. Begley, Bishop of Charlotte, North Carolina vs. Employment Security Commission of North Carolina*, 274 SE2d 370, employees of the diocese are *not* covered by unemployment compensation.

**Workers' Compensation** – Employees of the diocese are covered by Workers' Compensation Insurance. On-the-job injuries must be reported to the proper authority as soon as possible after the injury. Time that is taken off by an employee due to a work-related injury will be coordinated with the use of Family Medical Leave Act (FMLA) leave. FMLA leave and paid sick leave will run concurrently with any leave attributable to an injury that is covered by workers' compensation.

**Social Security and Medicare** – The diocese pays one-half of the contributions required for social security and Medicare benefits based on your diocesan wages. These contributions are a major source of funding for the retirement income and health insurance benefits under federal law when you reach retirement age or if you should become disabled. While these are potentially important benefits, employees are

encouraged not to view these benefits as all that they would need when they are eligible to retire or in the event of a disability. The current pressures on the social security and Medicare systems have raised serious questions about the level of benefits that the government may be able to provide in the future. Employees therefore are encouraged to participate in the 403b plan that is available through the diocese to the extent that they are eligible, and also to consider personal savings plans, individual retirement accounts and other savings and investment options to begin preparing now for retirement.

## 352.  PAID SICK LEAVE

The diocese provides paid sick leave benefits to eligible employees for periods of temporary absence due to illness or injuries. Sick leave benefits may only be used for excused absences.

Regular full-time and part-time employees accrue the hourly equivalent of one day of sick leave per month. The calculation of accrued sick leave is based on an average day in a 5-day workweek, no matter which days an employee normally works. For employees whose hours vary from week to week, an average number of hours per week will be used to calculate sick leave. For example, an employee who works 20 hours per week in any combination of days, earns 4 hours of sick leave each month (1/5 of his/her regular weekly hours). Teachers and 10-month school administrators earn eight (8) days of sick leave each school year.

The maximum accrual of sick leave is ninety (90) days. Once the maximum is reached, no further sick leave will be accrued unless leave is taken and the balance falls below the maximum. For employees on leave of absence, the accrual of sick leave stops after they have been on leave for thirty (30) calendar days or more. It shall be the responsibility of both employees and their immediate supervisors to keep an accurate record of the accumulation and use of sick leave. **No payment will be made for unused sick leave upon termination or resignation.**

In cases of injury when an employee is receiving worker's compensation benefits, sick leave may be coordinated with worker's compensation up to the amount of the employee's accumulated sick leave.

Employees who qualify for family medical leave under the provisions of this handbook and the Family Medical Leave act will be required to use paid sick leave in conjunction with the approved family medical leave. Sick leave benefits must also be used in conjunction with any other type of medical-related leave that does not otherwise fall under the provision of the family medical leave policy.

Sick leave benefits may only be used in regards to excused absences and approved family medial leave, workers' compensation-related leaves, and other leaves necessitated by personal or family illness involving a parent, spouse or child. Employees are expected to provide reasonable notice of medical leaves and health care-related appointments that are foreseeable. Failure to do so may result in a denial

18                                          Roman Catholic Diocese of Charlotte Personnel Policies Handbook
                                                                          Revised July 1, 2009

of sick leave benefits, as well as potential delays in the start of approved leave and/or disciplinary action for unexcused absences. The diocese reserves the right to require a doctor's excuse before approving a request to use sick leave benefits whenever there is reason to believe that an employee is abusing the paid sick leave policy or whenever the medical situation underlying the request is otherwise unclear. A finding that the policy has been abused may result in disciplinary action, up to and including discharge.

In limited circumstances, employees can donate unused sick leave to other employees who have a serious medical condition. The condition must require that the employee be out of work for more than sixty days, and the employee must have no accumulated sick leave of his/her own available. **The illness must meet the definition of a serious illness as specified by the Americans with Disabilities Act**. The maximum donation allowed per employee is ten (10) days. The maximum receipt of donations per employee is thirty (30) days. The term "days" as used in this section will correspond to the number of hours in the normally scheduled work day of the employee who receives the donated leave. The availability of paid sick leave does not extend the provisions of the Family Medical Leave Act beyond those allowed by the law.

## 364. VACATION

Vacation time off with pay is available to eligible employees to provide opportunities for rest, relaxation and personal pursuits. School contract employees are not eligible to accrue paid vacation time under this policy; however, they are granted personal days each school year.

*Note: The accrual of vacation time is based on the hourly equivalent of an employee's regularly scheduled workweek. An average day is calculated to be one-fifth of an employee's scheduled workweek hours. For employees whose scheduled hours vary from week to week, an average number of hours per week will be used for the calculation of vacation. This applies both full-time and part-time employees.*

*For regular full-time employees (30 hours or more per week), the vacation benefit is:*

- *Employed up to five years as of employment anniversary date -- the hourly equivalent of two regularly scheduled workweeks per year are accrued;*

- *Employed at least five but less than ten years as of employment anniversary date – the hourly equivalent of three regularly scheduled workweeks per year are accrued;*

- *Employed ten or more years as of employment anniversary date -- the hourly equivalent of four regularly scheduled workweeks per year are accrued.*

*For regular part-time employees (15 – 29 hours per week), the vacation benefit is:*

- *Employed up to five years as of employment anniversary date – the hourly equivalent of two regularly scheduled workweeks per year is accrued;*

Billard RFP 00076

- *Employed five or more years as of employment anniversary date — the hourly equivalent of three regularly scheduled work weeks per year is accrued.*

Earned vacation is accrued beginning with the date of hire. Although accrual begins at the date of hire, employees are not permitted to take paid vacation during the introductory period. Once the introductory period is successfully completed, vacation accrual is effective from the date of hire. Vacation will be accrued on an ongoing basis throughout the year.

When a recognized diocesan holiday falls during a scheduled vacation, the day is not counted as a vacation day.

If an employee becomes ill during a scheduled vacation, the day(s) cannot be changed from vacation to sick, even if the employee would ordinarily take a sick day in such circumstances.

Accrued vacation may be carried over from one year to the next; however, the maximum carryover on January 1 each year is the equivalent of twenty (20) days. *In special circumstances, accumulated leave that is above the maximum may be carried over if requested by employee and approved by the Chancellor in writing. If this occurs, the overage must be taken before the end of the second quarter of the calendar year.*

Employees who qualify for family medical leave under the provisions of this handbook and the Family Medical Leave act will be required to use paid vacation leave in conjunction with the approved family medical leave, if they have exhausted their accrued sick leave benefits. For employees on leave of absence, the accrual of vacation time stops after they have been on leave for thirty (30) calendar days or more. It shall be the responsibility of both employees and their supervisors to keep an accurate record of the accrual and use of vacation time.

When either party terminates the employment relationship, the accrual of vacation time ceases as of the last day worked. Payment will be made for any unused accrued vacation time; however, there will be no payout of vacation time if the termination occurs during the introductory employment period.

Unless it is an emergency situation, vacation requests must be submitted by the employee and approved by the supervisor in advance of the vacation. There can be no advancing of paid unearned vacation. With the supervisor's approval, an employee may be allowed to take time without pay if no accrued vacation is available. In scheduling vacations, supervisors will review requests based on a number of factors, including employees' length of service, office needs and staffing requirements.

Contract school employees do not accrue vacation time; however, they are granted two (2) days per year for personal business. Personal days are not carried over from year to year. Requests for such leave should be submitted in advance whenever possible.

20                                   *Roman Catholic Diocese of Charlotte Personnel Policies Handbook*

Billard RFP 00077

JA0665

## 370. RELIGIOUS AND CIVIL HOLIDAYS

The diocese recognizes specific holidays for employees of the *Pastoral Center. Because of variations in staffing needs, the holidays at other locations are set by the local authority and may differ from the following:*

New Year's Day
Martin Luther King, Jr.
Holy Thursday (half day), Good Friday and Easter Monday
Memorial Day
Fourth of July
Feast of the Assumption
Labor Day
All Saints
Thanksgiving Day and Friday
Feast of the Immaculate Conception
Christmas Day and two days

When holidays other than a religious holiday fall on a Saturday or Sunday, eligible employees will be given the preceding Friday or the subsequent Monday off. When a movable religious holiday other than Christmas falls on a Saturday or Sunday, no other day off will be given.

## 374. LEAVES OF ABSENCE

The diocese provides leaves of absence to assist eligible employees in dealing with personal circumstances, personal family illness, or military service obligations. Employees typically should notify their supervisors, in writing, when they foresee the need for a leave of absence. Whenever advance notice that a leave may be needed is not reasonably possible because of particular circumstances beyond the employee's control, the employee or responsible family member should notify the employee's supervisor as soon as reasonably practical that one of the leaves described below may be needed:

    **A. Personal Leaves of Absence**
    **B. Family Medical Leave**
    **C. Bereavement Leave**
    **D. Military Leave**

Leaves provided in the following situations are subject to the terms and conditions stated herein.

**A. Personal Leaves of Absence**

A leave of absence for personal, business and/or family matters may be granted as a privilege to employees. Requests for leaves of absence are to be in writing and are to state the reason for and probable duration of the leave. All leaves require the written approval of the appropriate authority. In cases of extended leave, employees should contact the appropriate authority for the coordination of applicable benefits while on

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*　　　　　　　　21

Billard RFP 00078

leave. Personal leaves of absence are to be without pay; however, if accrued vacation time is available, it must be used during times of authorized personal leave.

## B. Family Medical Leave

Leave provided under the Family Medical Leave Act (FMLA) is available to all eligible employees of the diocese. In order to be eligible for FMLA leave, you must: (1) have worked for the diocese for at least 12 months, which need not be consecutive months; (2) have been employed for at least 1,250 hours of service during the 12-month period prior to the commencement of FMLA leave; and (3) be employed at a worksite where 50 or more employees are employed by the diocese within 75 miles of that worksite.

If you are not eligible to receive FMLA leave from the diocese, any leave taken for medical or other reasons will nee to be taken only as permitted by the diocese's other leave policies.

### Reasons for Taking FMLA Leave

An eligible employee can take up to 12 weeks (or up to 26 weeks of leave to care for an injured or ill service member) under this policy during any 12-month period. The Diocese will measure the 12-month period as a rolling 12-month period measured backward from the date an employee uses any leave under this policy. Each time an employee takes leave, the Diocese will compute the amount of leave the employee has taken under this policy in the last 12 months and subtract it from the 12 weeks of available leave, with the balance remaining being the amount the employee is entitled to take at that time.

Leave may be taken: (1) for the birth of a child, and to care for the newborn child; (2) for the placement of a child for adoption or foster child, and to care for the newly placed child; (3) to care for a spouse, child, or parent (but not a parent "in law") with a serious health condition; and (4) due to your own serious health condition that makes you unable to perform one or more of the essential functions of your job.

An employee's FMLA leave for the birth or placement of a child must within 12 months of the birth or placement.

The combined total FMLA leave of employee of the diocese who are married to each other may not exceed 12 weeks during the applicable 12-month period if the leave is taken for the birth of a child, or to care for the child after birth; for placement of a child for adoption or foster care, or to care for the child after placement; or to care for a parent with a serious health condition. This limitation does not prohibit either employee from taking additional FMLA leave for which he or she may be eligible, such as leave to care for a child with a serious health condition or because of a serious health condition of the employee.

FMLA leave may be taken intermittently or on a reduced leave schedule when medically necessary to care for a family member with a serious health condition or because of your own serious health condition. FMLA leave also may be taken intermittently or on a reduced leave schedule because of the birth of a child or placement of a child for

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 00079

adoption or foster care, but only if authorized by the local authority. In determining whether to grant intermittent leave or leave on a reduced schedule in connection with the birth or placement of a child, primary consideration will be given to the nature of an employee's job duties and whether the required leave can be taken with minimal disruption to the workplace operations. If you require or are permitted to take intermittent leave or leave on a reduced schedule, you must try to schedule your leave so as not to disrupt the workplace operations. The local authority may require you to transfer temporarily to an available alternative position (including a part-time position) for which you are qualified and which better accommodates recurring periods of leave than your regular position.

Leave taken for any purpose by an employee who is eligible for FMLA leave will be designated by the local authority as FMLA leave, even if the employee has not specifically requested FMLA leave. FMLA leave will run concurrently with any paid leave that the employee applies toward an FMLA absence.

*Scheduling FMLA Leave*

If your need for FMLA leave is foreseeable, you must provide your supervisor with at least 30 days' advance notice before the FMLA leave is to begin. If 30 days' advance notice is not practicable or if your need for FMLA leave or its approximated timing is not foreseeable, notice must be provided as soon as practicable (normally before the start of your scheduled workday, or in any event, within one or two workdays of learning of the need for leave). Notice should be provided by you personally, or by your spouse, an adult family member, or another responsible person, if you are unable to provide notice personally.

When planning medical treatment for which FMLA leave will be necessary, you should consult with your supervisor and make every reasonable effort to schedule your leave so as not to disrupt the operations of the workplace. This ordinarily should occur prior to scheduling treatment so that a treatment schedule that best suits the needs of both you and your workplace may be worked out. Employees who are out on FMLA leave are expected to report periodically to their supervisor on their status and intent to return to work.

*Compensation and Benefits during Leave*

When you take FMLA leave you are required to apply available sick leave toward your FMLA absence if the reason for your FMLA leave is a reason for which sick leave may be taken under the diocese's sick leave policy. Also, you are required to apply any available vacation leave toward your FMLA absence. Sick and/or vacation leave does not need to be applied toward FMLA leave if you are receiving workers' compensation pay. Any FMLA leave that is not covered by workers' compensation, sick or vacation leave will be without pay.

The diocese will continue providing group health insurance coverage and your employer will continue paying its share of your group health insurance premiums while you are out on FMLA leave (whether paid or unpaid), on the same conditions as the coverage provided by the diocese at the time your leave begins, subject to any diocesan-wide

changes in these benefits that take place during the leave. During FMLA leave, you are responsible for your share of the group health insurance premium. This amount will be deducted from your paycheck as directed by you during any period of paid leave, but must be paid by you to the diocese at the time it normally would be deducted from your paycheck or as otherwise agreed between you and the diocese during any period of unpaid leave.

The diocese also will continue providing and will pay its share of your other benefits during FMLA leave, to the same extent as these benefits would be provided and paid during any other leave. You are responsible for paying your share of any benefits other than group health insurance during any period of FMLA leave. Premiums for which you are responsible will be deducted from your paycheck as directed by you during any period of paid leave but must be paid by you to the diocese in the same manner as for group health insurance during any period of unpaid leave.

If the premium payment for your share is more than 30 days late, the diocese may cease maintaining health insurance coverage (after providing 15 days' written notice that payment not been received), or may pay your share and recover the amount paid from you. If the 15-day notice is provided and you fail to pay your share of the premium prior to the specified date on which coverage will b dropped, your health insurance e may be terminated as of the end of the 30-day grace period. If you are unable to pay your portion of the group health insurance premium during FMLA leave, the diocese may agree to pay the amounts owed by you to avoid a lapse of coverage. You will be required to reimburse the diocese for any premiums paid on your behalf, whether or not an acknowledgment is signed or submitted, and whether or not you return to work.

*Medical Certifications*

- **Initial Certification** – At or soon after the time you indicate a need for FMLA leave, your employer will require you to furnish certification from your health care provider or the health care provider of your family member, as applicable, by completing and submitting a Certification of Health Care Provider form provided by your employer or certification in another form acceptable to the diocese. Failure to provide medical certification may result in a delay of FMLA leave. The diocese reserves the right to request a second or third medical opinion it its expense. Your employer will reimburse you for reasonable out-of-pocket travel expenses incurred in connection with obtaining a second or third medial opinion. Documentation of these expenses (receipts, mileage information, etc.) should be provided to your employer.

- **Recertification** – Your employer may require you to provide medical recertification while you are on FMLA leave. Costs associated with any recertification requested by your employer will be at your expense.

- **Return to Work Certification** – As a condition of returning to work after FMLA leave that was due to your own serious health condition, your employer may require you to obtain and present a return to work certification from your health care provider. Costs associated with any return to work certification will be at your expense

Billard RFP 00081

*Job Restoration after FMLA Leave*

It is expected that following an FMLA absence, you will return to work. Generally, when you return to work following FMLA leave, you will be restore to the same opposition that you held prior to the beginning of leave, or to an equivalent position with equivalent benefits, pay, and other term and conditions of employment. The resumption of benefits upon your return from FMLA leave will be subject to any diocesan-wide changes in benefits that have taken place during the period of FMLA leave.

*Limitations on Reinstatement*

An employee is entitled to reinstatement only if he/she would have continued to be employed had FMLA leave not been taken. Thus, an employee is not entitled to reinstatement if, because of a layoff, reduction in force or other reason, the employee would not be employed at the time job restoration is sought.

*Failure to Return to Work Following FMLA Leave*

If the employee does not return to work following the conclusion of FMLA leave, the employee will be considered to have voluntarily resigned.

*Premium Charges during FMLA Leave*

We will charge you for health insurance premiums paid by your employer during any unpaid portion of FMLA leave if you fail to return to work after your leave entitlement is exhausted or has expired, unless the reason you do not return to work is due to the continuation, recurrence, or onset of a serious health condition that would entitle you to leave under the FMLA, or other circumstances beyond your control prevent your return. Decisions to remain with a family member who no longer requires your care or to remain at home follow the birth or placement for adoption or foster care of a child who does not have a serious health condition will not be considered beyond your control.

*Instructional Employees*

To avoid disruption to the classroom, instructional employees (teachers, coaches and special education assistants such as signers for the hearing impaired) will have different rules applied in the following circumstances:

- **Leave beginning more than five weeks before the end of the term.** Regardless of the reason for the leave, the school may require the employee to remain out until the end of the term, if:
  1. The leave will last at least three weeks, and;
  2. The employee would have returned to work during the last three weeks of the term.

- **Leave beginning fewer than five weeks before the end of the term.** If an instructional employee takes a leave at this point for a reason other than his or her own serious health condition, the school may require the employee to remain on leave until the end of the term, if:
  1. The leave is longer than two weeks, and;

2.  The employee would have returned to work in the two weeks before the end of the term.

- **Leave beginning fewer than three weeks before the end of the term.** If an instructional employee takes a leave at this point for a reason other than his or her own serious health condition, the school may require the employee to remain on leave until the end of the term if the length of the leave is more than five working days.

Where the employer requires the instructional employee to remain out until the end of the term, but where the instructional employee is ready and able to work, such time off cannot be counted against the employee's leave entitlement.

### *Covered Family Member's Active Duty or Call to Active Duty in the Armed Forces*

An employee whose spouse, son, daughter or parent either has been notified of an impending call or order to active military duty or who is already on active duty may take up to 12 weeks of leave for reasons related to or affected by the family member's call-up or service. Reasons related to the call-up or service include helping the family member prepare for the departure or caring for children of the service member. The leave may commence as soon as the individual receives the call-up notice. (Son or daughter for this type of FMLA leave is defined the same as for child for other types of FMLA leave, except that the person does not have to be a minor.) This type of leave would be counted toward the employee's 12-week maximum of FMLA leave in a 12-month period.

Employees requesting this type of FMLA leave must provide proof of the qualifying family member's call-up or active military service before leave is granted.

### *To Care for an Injured or Ill Service Member*

This leave may extend to up to 26 weeks in a 12-month period for an employee whose spouse, son, daughter, parent or next-of-kin is injured or recovering from an injury suffered while on active military duty and who is unable to perform the duties of the service member's office, grade, rank or rating. Next-of-kin is defined as the closest blood relative of the injured or recovering service member. An employee is also eligible for this type of leave when the family service member is receiving medical treatment, recuperation or therapy, even if the service member is on temporary disability retired list.

Employees requesting this type of FMLA leave must provide certification of the family member or next-of-kin's injury, recovery or need for care. This certification is not tied to a serious health condition as for other types of FMLA leave. This is the only type of FMLA leave that may extend an employee's leave entitlement beyond 12 weeks to 26 weeks. Other types of FMLA leave are included with this type of leave totaling the 26 weeks.

If a husband and wife both work for the company and each wishes to take leave to care for a covered injured or ill service member, the husband and wife may only take a combined total of 26 weeks of leave.

*Questions and Forms*

Employees are encouraged to direct questions about the FMLA to their supervisors or to Human Resources. Employees may be required to complete certain forms to be eligible to take FMLA leave; therefore, your supervisor should be made aware of your intent to take leave and any reasons for the leave as soon as possible.

## C. Bereavement Leave

With approval of the supervisor, regular non-temporary employees may be granted a paid leave of up to the equivalent of three (3) days to attend the wake and funeral of a member of their immediate family. Additional time off must be taken as vacation, personal days (for school personnel) or leave without pay. For purposes of this section, immediate family shall be understood to mean: mother or father, guardian, spouse, sister, brother, children, step-children, step-parents, mother or father-in-law, or grandparents.

With approval of the supervisor, time off may be granted to attend the wake or funeral of a relative, friend or colleague not specifically mentioned above.

## D. Military Leave

An employee who is a member of, applies to be a member of, performs, or who has performed, applies to perform, or has an obligation to perform serviced in the U.S. armed services shall not be denied employment, re-employment, promotion, or any benefit of employment on the basis of his or her military status. Such employees will be granted a military leave of absence to attend scheduled drills or training or if called to active duty with the U.S. armed services.

A military leave of absence will be unpaid. However, employees may use any available paid time off for the absence. Subject to the terms, conditions and limitations of the applicable plans for which the employee is otherwise eligible, health insurance benefits will be provided until the end of the month in which the military leave begins. At that time, the employee will become responsible for the full costs of these benefits if he/she wishes coverage to continue. When the employee returns from military leave, benefits will again be provided according to the applicable plans.

Benefit accruals, such as vacation, sick leave, or holiday benefits, will be suspended during the leave and will resume upon the employee's return to active employment.

Employees on two week active duty training assignments or inactive duty training drills are required to return to work on the first regularly scheduled day after the end of training, allowing reasonable travel time. Employees on longer military leave must apply for reinstatement in accordance with all applicable state and federal laws. Eligible employees returning from military leave will be treated as though they were continuously employed for purposes of determining benefits based on length of service, such as the rate of vacation accrual and job seniority rights, and the absence will not be considered an interruption of employment service.

Billard RFP 00084

An employee who returns from a military leave of absence with a service connected disability that renders him or her unqualified for the position he or she left (or for a position her or she would have attained but for the military service) will receive reasonable accommodation and/or reemployment to a different position in accordance with all applicable state and federal laws.

## 382. VOTING TIME

Employees should be able to arrange time for voting outside of working hours. However, if such time cannot be arranged, supervisors may allow employees reasonable time off to vote. The time allowed will be with pay and will not be charged to accrued leave.

## 388. JURY DUTY

Jury duty is excused time off from work. During the first week of jury duty, employees will be entitled to their regular weekly pay. If jury duty lasts for more than one week, jury duty compensation will be coordinated with an employee's regular weekly salary to assure no loss of income. The diocese encourages employees to fulfill their civic responsibility by serving jury duty when required. The diocese may request an employee's excuse from jury duty if it is judged that the employee's absence from work would create serious operational difficulties.

Employees must show the jury duty summons to their supervisor as soon as possible to verify the reason for their absence. Employees are also expected to report for work whenever the court schedule permits.

Roman Catholic Diocese of Charlotte Personnel Policies Handbook
Revised July 1, 2009

Billard RFP 00085

# Section 400: TIMEKEEPING AND PAYROLL

Billard REP 00086

JA0674

## 404.  TIMEKEEPING

Accurately recording time worked is the responsibility of every non-exempt employee. Federal and State laws require the diocese to keep an accurate record of time worked in order to calculate employee pay and benefits. Time worked is all the time actually spent on the job performing assigned duties. This includes travel time as a driver at any time, or as a passenger during normal work hours, however, it does not include travel time to and from work. Employees should begin work at the appointed time, take full meal periods away from their duty station, and stop work at the appointed time. Overtime work must always be approved by the supervisor before it is performed.

Employees must accurately record the actual times that they start and stop work. Failure to properly record hours worked, tampering, altering or falsifying time records may result in disciplinary action, up to and including discharge.

## 410.  PAY DEDUCTIONS

The law requires that the diocese make certain deductions from every employee's compensation. Among these are applicable federal and state income taxes. The diocese must also deduct Social Security taxes on each employee's earnings up to a specified limit. It is the employee's responsibility to advise the diocese of any change in their withholding exemption status.

The diocese offers various benefits and savings programs that may require employees to pay some portion of the cost of participation. Eligible employees may voluntarily authorize deductions from their paychecks to cover these costs.

Employees should contact their supervisor for answers to any questions they have concerning why deductions were made from their paycheck or how the deductions were calculated.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 00087

# Section 500: WORK HOURS

Billard RFP 00088

## 504. HOURS OF WORK

The standard hours of work for each location are set by the local authority. At all locations, staffing needs and operational demands may necessitate variations in starting and ending times, as well as variations in the total hours that may be scheduled each day and each week. Flex-time schedules can be adopted and approved by the local authority.

## 510. MEAL AND REST PERIODS

Lunch periods at all locations are set by the local authority. Lunch periods are not considered time worked and must be taken every day, away from the employee's work station, and for the full period of time. Lunch periods cannot be accumulated.

At the discretion of the local authority, one break of not more than fifteen (15) minutes before and after lunch may be given to employees. Break time, to the extent possible, will be taken in the middle of work periods and will not accumulate. Since break time is counted and paid as time worked, employees must not be absent from their duty stations beyond the allotted break time.

Violations of this policy may result in disciplinary action, up to and including discharge.

## 516. OVERTIME

When operating requirements or other needs cannot be met during regular work hours, non-exempt employees may be scheduled to work overtime hours. Non-exempt employees, who are subject to the overtime provisions of the Fair Labor Standards Act, will be paid time and a half for any hours worked in excess of forty (40) hours a week. Paid time off is not counted as hours worked for the purpose of determining eligibility for overtime. When possible, advance notice of the need for overtime work will be provided. Overtime assignments will be distributed as equitably as possible to all employees who are qualified to perform the required work. Employees who are assigned to work overtime are expected to work those hours like any other scheduled hours, but every reasonable effort will be made to accommodate employees who have a legitimate conflict or a personal circumstance that would cause them an undue hardship if they worked the overtime hours requested.

All overtime work <u>must</u> receive prior supervisory authorization. Repeated use of unauthorized overtime may result in disciplinary action, up to and including discharge.

32

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFB 00089

## 522. INCLEMENT WEATHER

**Pastoral Center** -- In the event of serious weather conditions, a decision regarding the opening or closing of the Pastoral Center will be made by 7:00 AM. Employees can obtain this information by calling the main telephone number of the Pastoral Center, 704-370-6299. If the Pastoral Center is open, any employee who elects not to work must take either a day of vacation or a day without pay. Sick leave may not be used for weather related absences.

**Mecklenburg Area Catholic Schools** -- If the decision has been made to close the schools, hourly employees will not be paid for the time the schools are closed. However, if a supervisor requires an hourly employee to work on a day that the schools are closed, the employee will be paid for the time worked at his or her normal rate of pay.

**All Other Locations** -- At locations other than the Pastoral Center and Mecklenburg Area Catholic Schools, the local authority will establish the inclement weather policy.

Billard RFP 00090

Billard RFP 00091

JA0679

# Section 600: WORK CONDITIONS

Billard RFP 00092

## 604. SMOKING

In keeping with the diocese's intent to provide a safe and healthful work environment, smoking is prohibited throughout the entire *Pastoral Center*. This policy applies to all employees, visitors and persons attending meetings within the *Pastoral Center*. All diocesan schools are to be smoke-free during the school day.

The diocese strongly recommends that a smoke-free environment policy be adopted in all diocesan buildings and facilities.

## 610. SAFETY

Employees are expected to obey safety rules and exercise caution in all work activities. Employees must immediately report any unsafe conditions to the appropriate supervisor.

In the case of accidents that result in injury, regardless of how insignificant the injury may appear, employees should immediately notify their supervisor. Such reports are necessary to comply with applicable laws and to initiate insurance and worker's compensation benefits procedures.

## 616. USE OF DIOCESAN TELEPHONES, MAIL, EMAIL AND INTERNET

Neither the use of diocesan telephone lines for personal long distance calls nor the use of diocesan-paid postage for personal correspondence is permitted.

**Internet & E-mail Acceptable Use Policy**

Internet access and E-mail is available to certain employees of the Pastoral Center and schools who are on the diocesan Wide Area Network. Internet connectivity is achieved through a separate server from that which serves the diocesan LAN. This server contains a firewall which is designed to provide secure internet connectivity along with web content filtering. Email services are also provided by using a separate E-mail server.

The purpose of providing internet access and E-mail services is to facilitate employees in fulfilling the particular responsibilities of their position with the Diocese and schools. As such, internet access is only available to Pastoral Center and school employees/students who have a specific need pertaining to their job or line of work. Internet access and use of E-mail is intended for diocesan and school business. E-mail should not be used for routine personal communication. Internet access for personal use may only take place after work hours.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RPF 00093

Use of the Internet and E-mail is not private or confidential. The servers maintain a record of each user's access of the Internet and every E-mail received and sent. These records are the property of the Diocese of Charlotte and may be used in any way deemed by the Diocese. Use of the Internet and E-mail will be routinely monitored to ensure compliance with this policy. Violation of this policy may result in disciplinary action and legal action, if appropriate.

Users must abide by the following when accessing the Internet and using E-mail services:

- Never share user IDs and passwords with anyone else; they are confidential.
- Never use anyone else's account, user name, or password.
- Never open an attachment to an E-mail you have received unless you know the person who sent the E-mail. Viruses, disruptive programs, and inappropriate materials are often distributed as E-mail attachments.
- Never download, copy, install or transmit software, shareware or freeware without permission from the IT Department.
- Never attempt access of sites that are inappropriate for a business environment. If you mistakenly access inappropriate information, immediately notify your supervisor and the IT Department.
- Never participate in any illegal activities.
- Never harass anyone, use profanity, or inappropriate language.
- Never type in all CAPITAL LETTERS. It is seen by Internet\Email users as shouting.
- Never participate in Chat Rooms or attempt to meet unknown people.
- Never attempt to access any resource, another user's files, network or site for which you are not authorized.
- Never transmit any material in violation of U.S. or State laws.
- Never reproduce or transmit copyrighted material without explicit written permission.
- Never send mass emails/forwards that are not related to Pastoral Center or School business, or any that contain large attachments including but not limited to graphics, pictures, etc.

The Diocese of Charlotte is not responsible for any damages suffered, including loss of data resulting from delays, non-deliveries, service interruptions, or the accuracy or quality of information obtained via the Internet.

## 622. USE OF DIOCESAN EQUIPMENT AND VEHICLES

Employees must possess a current drivers' license or appropriate operator license in order to operate diocesan vehicles or other equipment and machines that require special licensure or certification. It is the responsibility of employees to renew licenses and certifications in a timely manner and provide copies of the renewal to their supervisors, if needed or requested. Only authorized persons are permitted to drive diocesan vehicles or operate diocesan equipment and machines. When using diocesan property, employees are expected to exercise care, perform required maintenance, and follow all operating instructions, safety standards and guidelines. Employees are to notify the

JA0682

appropriate supervisor if any diocesan equipment, machines, tools, or vehicles appear to be damaged or in need of repair.

Employees who use diocesan vehicles should follow these procedures when involved in a vehicular accident:

1. Notify the police
2. Notify your supervisor
3. Notify the Chancery
4. Do not admit fault until the accident can be thoroughly investigated.
5. Remain at the scene of the accident until a police report has been completed and you are released to go by the police.
6. Do not attempt to operate the vehicle if damage to the vehicle or your personal condition would make it unsafe fro you to do so.
7. Obtain contact information and insurance information for the other parties involved in the accident. Information to have on hand is the name, address, telephone number, driver's license number and insurance company of the other party.

All safety regulations, including but not limited to tags, inspections, numbers of passengers recommended for the vehicle, use of seat belts, etc. are to be followed.

The improper, careless, negligent, destructive or unsafe operation of diocesan equipment or vehicles, as well as excessive or avoidable traffic and parking violations, may result in disciplinary action, up to and including discharge.

# 628. AUTOMOBILE COMPENSATION

In cases where employees are required to travel as part of their work, the use of their personal automobile will be compensated at the current Internal Revenue Service rate per mile. Employees must accurately record applicable mileage and submit it to their supervisor for approval before reimbursement is made.

# 634. SOFTWARE SECURITY

Diocesan policy regarding software security is as follows:

1. All software purchases must be reviewed and approved by the appropriate local authority.
2. All software purchased by the diocese or local authority is not to be reproduced for use on more than one computer, including personally owned computers used for work related purposes.
3. All multi-use software, such as software installed on a computer network, must be used in accordance with the written license agreement.

Roman Catholic Diocese of Charlotte Personnel Policies Handbook
Revised July 1, 2009

Billard RFP 00095

4. It is the responsibility of the local authority to periodically audit employees' computers for illegally copied software.
5. Employees who determine that there may be a misuse of software must notify their appropriate local authority.
6. The diocesan finance office may at times negotiate multiple copy or educational discounted software licenses from software vendors. That office will notify diocesan employees of such arrangements. Employees should not assume that such an arrangement exists, but should contact the finance office if they have questions in this regard.
7. Personally owned software should not be installed on diocesan owned computers.

Software copyright violations can subject the user and the diocese to potentially serious legal ramifications. Any violation of this policy may result in disciplinary action, which may include termination of employment and legal action. Individual computer users and their supervisors are responsible for security when computer software is used on their equipment.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

39

Billard RFP 00098

JA0684

Billard RFP 00097

# Section 700: EMPLOYEE CONDUCT AND WORK RULES

Roman Catholic Diocese of Charlotte Personnel Policies Handbook
Revised July 1, 2009

41

Dillard RFP 00098

JA0686

## 704. ATTENDANCE AND PUNCTUALITY

To maintain a safe and productive work environment, the diocese expects employees to be reliable and punctual in attendance. The diocese does not permit excessive absenteeism or tardiness.

If illness or some other problem requires an employee to be absent or late for work, ordinarily the employee's supervisor must be called thirty (30) minutes after the scheduled time for reporting to work. If the absence continues for more than one day, employees must keep their supervisor informed daily of their situation so that arrangements can be made to handle required work. For employees who are not at work due to an approved FMLA leave, less frequent notification may be acceptable.

Usually, employees who are absent for three (3) days without proper notification will be considered as having abandoned their job, and the date of termination will be the last date worked.

Employees who know in advance that they will need to be absent from work, whether for a short or extended period, should discuss the matter with their supervisor so the absence can be handled without disruption to the work of the parish, department, etc.

## 710. UNEXCUSED ABSENCES

An unexcused absence results when an employee:

1. Fails to report to work and/or fails to give proper notice to the appropriate supervisor
2. Is absent for an unapproved reason
3. Misrepresents the reason for an absence
4. Takes extended time off during work hours without permission

Special circumstances, such as FMLA-covered absences, may make it impractical for an employee to provide timely notice to the supervisor. These situations will be considered on an individual basis.

Unexcused absences by employees may result in disciplinary action, up to and including discharge.

## 716. CONFIDENTIALITY

It is the obligation of employees, regardless of their work responsibilities, to keep certain information confidential. Confidential information typically includes personal and employment-related information contained in personnel records, personal and academic information concerning students at diocesan schools, information concerning individual

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 00099

parishioners, counseling records, financial contributions where anonymity has been requested, confidential financial business planning or other business information concerning the strategic planning, business planning or other management activities of the diocese. This or any other similar information should be considered confidential until such time as a release of the information has been authorized by the diocese or by the individual persons who are the subject of such information.

Disclosing confidential information to persons not entitled to such information and assisting any person in gaining unauthorized access to diocesan records are both direct violations of diocesan policy. The communication of false or derogatory information about the diocese or its employees is also a violation of diocesan policy. This also includes information that is disclosed through social media or social networking sites.

In applicable agencies, patient/client records will be kept in a secure and locked place. Only authorized personnel may have access to these records for the purpose of review, making entries or for quality control purposes.

Counselors have a special relationship with students/clients. The information a counselor receives in the client relationship is in many cases of a confidential nature. If students/clients share information with a counselor that affects their own health or safety, or that of another, the counselor receiving that information has an obligation to act by sharing the information with parents and other appropriate persons.

Any violation of this policy may be cause for disciplinary action, up to and including discharge.

**Disposal of Personal Information Policy**

Pursuant to the requirements of the North Carolina Identity Theft Protection Act, the diocese has implemented a Disposal of Personal Information Policy. This policy contains several measures to protect against unauthorized access to any personal information maintained by the diocese. "Personal information" includes, but is not limited to, Social Security numbers, drivers license numbers, addresses, telephone numbers, bank account numbers, credit/debit card numbers, personal identification numbers (PINs), passwords, and e-mail addresses, in combination with a person's name. Pursuant to this Policy, when paper records containing "personal information" are disposed of, they will be shredded so that the information cannot be read or reconstructed.

When electronic records containing "personal information" are disposed of, they will be destroyed or erased so that the information cannot be read or reconstructed. All of our employees are expected to abide by the requirements of this Policy, and suspected violations should be reported promptly to the Human Resources Department. Questions regarding the policy should also be directed to the Human Resources Department.

## 722. COURTESY

An employee's conduct, on and off the job, forms the public's impression of the employee and, in turn, of the diocese. Therefore, it is important for employees to adhere to high standards of professional and personal behavior. The diocese expects employees to follow directives from supervisors and to fulfill the responsibilities of their position. Courtesy is defined herein to mean the everyday practice of civility, respect and polite behavior towards and around others, in person, on the telephone or in written correspondence. Sleeping or performing personal work on the job, distracting coworkers in the execution of their duties, the use of profane or abusive language, fighting, deliberately causing injury to another or any disorderly conduct or malicious disturbance, including the intimidation or harassment of others, is not acceptable conduct.

A great deal of diocesan contact with others is by telephone, and special emphasis is placed on telephone courtesy. Required ingredients in telephone courtesy are:

1. Answering promptly
2. Identifying yourself and your parish, unit, department, etc.
3. Answering your own telephone whenever possible to avoid needless delay for the caller
4. Using a tone of voice that conveys interest, warmth and a willingness to help

An employee may be disciplined, up to and including discharge, for discourteous conduct, when confirmed by documented proof or credible evidence.

## 728. OUTSIDE COMPLAINTS

In spite of the care with which the diocese handles and conducts its business, misunderstandings may occur and complaints may be received from individuals from outside the diocese or from individuals from another parish, agency, school, ministry or department within the diocese. These complaints should be resolved promptly by the person to whom they are directed or referred to someone in a position to make the necessary decision and response. It is the diocese's objective to resolve fairly any complaint before the close of the business day on which it is received or to indicate a time when a reply can be expected. Essential elements of successfully handling outside complaints include:

1. Getting all the details from involved parties
2. Showing understanding of the individual's problem or concern
3. Where reasonable, agreeing on what can be done, both now and/or later

An employee who receives one or more substantiated complaint(s) may be subject to disciplinary action, up to and including discharge.

## 734. PERSONAL APPEARANCE

Dress, grooming and personal cleanliness standards contribute to the positive morale of employees and affect the image that the diocese presents to visitors. During business hours, employees are expected to dress in businesslike attire, using good judgment in selecting apparel appropriate to the functional position and avoid extremes in makeup, hair styles, jewelry and clothing.

At the discretion of the local authority, employees may be given periodic casual or "dress down" days. On these days, less businesslike attire may be worn. Employees should consult their supervisor if they have questions as to what constitutes appropriate attire.

Employees of the *Pastoral Center* are required to wear their identification badges at all times while on the premises.

## 740. MEDIA RELATIONS

On occasion, the news media will look to employees of the diocese for information about diocesan events, opinions, interpretations and issues. It is diocesan policy to cooperate with the news media and respond to media inquiries promptly, however, only the Director of Communications is authorized and responsible for coordinating contact with the media on behalf of the diocese. Employees are not to respond to media inquiries or initiate contact with the media regarding diocesan matters. When inquiries are received from the media that concern a diocesan matter, the inquirer should be referred to the diocesan Director of Communications.

Media inquiries that are concerned with specific parish, agency, school or department matters may be responded to by the proper local authority.

## 746. DRUG AND ALCOHOL USE

The unlawful manufacture, possession, distribution, transfer, purchase, sale, use or being under the influence of illegal drugs or alcoholic beverages while on diocesan property, while attending business-related activities, while on duty, or while operating a vehicle or equipment owned or leased by the diocese is strictly prohibited and may lead to disciplinary action, up to and including discharge.

Employees may use physician-prescribed medications, provided that the use of such drugs does not adversely affect job performance or the safety of the employee or others. Employees who use physician-prescribed medications are responsible for determining with their physician whether such medications may impair their job performance or make it unsafe for them to operate a motor vehicle or other equipment or machinery. Where the possibility that such impairment exists, employees are encouraged to notify their supervisor to determine whether modification can be made to their job duties during the period that such medication is being taken or if a leave of absence or alternative job

Billard RFP 000102

assignment should be considered. Employees who fail to notify their supervisors about the risk presented by physician-medication that they are taking and who unsafely operate machinery, equipment or motor vehicles in an impaired state, or who engage I other unsatisfactory performance because of medication-related impairment, may be subject to disciplinary action, up to and including discharge.

The diocese will make every effort to assist employees who voluntarily identify themselves as suffering from alcoholism and/or drug abuse. Employees who identify themselves as such are nonetheless accountable for their work performance and conduct, and may be subject to appropriate disciplinary action for poor performance or misconduct even where such issues, at least in part, may be attributable to the employee's alcoholism and/or drug abuse.

## 752. FIREARMS AND WEAPONS

The possession of firearms or other dangerous weapons on or in diocesan property, except by authorized security officials, is expressly forbidden. Diocesan property includes buildings and parking areas. Violations may result in disciplinary action, up to and including discharge.

## 766. SEXUAL AND OTHER UNLAWFUL HARASSMENT

The diocese prohibits any form of sexual and other unlawful harassment involving any of its employees in the employment relationship. Harassment, retaliation, coercion, interference, or intimidation of an employee due to his or her race, color, religion, sex, age, national origin, disability, protected activity (i.e., opposition to prohibited discrimination), or other legally protected status, or that of an employee's relatives, friends, or associates, is strictly forbidden. This policy is part of the diocese's efforts to maintain a workplace free of harassment for its employees.

**Sexual Harassment**

Sexual harassment does not require physical contact, but can be any type of unwelcome conduct. It includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when submission to the conduct is made a term or condition of an individual's employment (either explicitly or implicitly), when submission to or rejection of the conduct is used as the basis for employment decisions affecting the individual, or when the conduct is sufficiently severe, persistent, or pervasive to interfere with an individual's work performance or to create an intimidating, hostile, or offensive working environment.

46                                        *Roman Catholic Diocese of Charlotte Personnel Policies Handbook*

**Other Unlawful Harassment**

Other unlawful harassment may consist of verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of his or her race, color, religion, sex (gender), age, national origin, disability, protected activity (i.e., opposition to prohibited discrimination), or legally protected status, or that of his or her relatives, friends, or associates, and has the purpose or effect of creating an intimidating, hostile, or offensive work environment; has the purpose or effect of interfering unreasonably with an individual's work; or otherwise adversely affects and individual's employment opportunities.

**Prohibitions**

Any act, comment, or behavior that constitutes sexual or other unlawful harassment is strictly prohibited and will not be tolerated of any employee, either on or off diocesan premises. For purposes of this policy, this includes but is not limited to: slurs, jokes, or other verbal, graphic, or physical conduct relating to an individual's race, color religion, sex, age, national origin, disability, protected activity (i.e., opposition to prohibited discrimination), or other legally protected status. This prohibition covers not only the relationships between employees of the diocese but also each employee's relationship with customers of the diocese or with the employees of other companies encountered in the course of performing the duties of his or her job.

**Reports and Investigations**

Employees, without any fear of reprisal, have the responsibility to immediately bring any form of sexual or other unlawful harassment (whether by a co-worker, a customer, or someone else encountered while performing their job duties) to attention of their supervisor. All supervisors who receive a complaint of sexual or other unlawful harassment should immediately contact the Human Resources Director. If for some reason an employee does not feel comfortable reporting harassment to his or her supervisor, the employee should report the harassment to another member of management or the Human Resources Director. Upon receipt of an allegation of harassment, the diocese will promptly begin an investigation into the circumstances of the incident and the alleged harassment. Any person who becomes aware of an incident of sexual or other unlawful harassment, whether by witnessing the incident or being told of it, should report it immediately to his or her supervisor or another member of management.

The diocese will keep all information relating to harassment allegations and investigations as confidential as possible under the circumstances.

**Corrective and/or Disciplinary Action**

Following the diocese's investigation, a review of the results of the investigation with the person(s) involved will be conducted and appropriate corrective and/or disciplinary action will be taken, which may result in immediate termination of employment for employees who are determined to have engaged in sexual or other unlawful harassment, conduct approaching sexual or other unlawful harassment, or other conduct that violates the diocese's policy. Be advised that disciplinary action, up to and including

discharge, will be taken against any employee engaging in sexual or other unlawful harassment.

**Protection against Retaliation**

The diocese will not retaliate in any way against an individual who makes a report of harassment in good faith or who assists in an investigation. Retaliation is a serious violation of this harassment policy and should be reported immediately. Any employee found to have retaliated against another employee in violation of this policy will be subject to disciplinary action, up to and including discharge.

# 776. DISCIPLINARY PROCEDURES

Employees who violate diocesan policies, engage in substandard performance, are excessively absent or tardy, or engage in misconduct may be subject to disciplinary action up to and including immediate dismissal. Disciplinary action may include one or more of the following procedures prior to discharge for non-serious offenses and/or performance, attendance, or performance problems that indicate a willful or intentional failure to meet expectations:

1. **Verbal Warning** – The supervisor notifies and counsels the employee concerning the identified performance or conduct problem. A follow-up letter summarizing the verbal warning and counseling shall be given to the employee. A copy of the letter must be placed in the employee's official personnel file.

2. **Written Warning** – The supervisor gives the employee a written warning, with specific steps to be taken to correct the problem. The supervisor ordinarily will set a timetable for following up with the employee to determine whether the employee has taken appropriate corrective action. The report is signed by the supervisor and employee and placed in the employee's official personnel file.

3. **Probation** – This step typically is taken when an employee's performance, attendance, or tardiness indicates that the employee may be getting close to dismissal. This is an optional step that management, in its discretion, may choose to employ prior to dismissing an employee where it believes that the employee has at other times shown the ability to meet his or her supervisor's expectations, or otherwise has given some indication that he or she should receive one final chance to correct the problems that otherwise likely will result in the employee's dismissal. Probation ordinarily should not exceed 90 days and should include periodic progress assessments during the probationary period by the supervisor to determine if it is worth continuing. Probation is an exceptional step that ordinarily will be used only in cases involving struggling employees who otherwise have given indications that they are capable of performing their jobs according to their supervisors expectations. In no event will step be used more than once for any single employee.

48

4. **Demotion** – An employee who does not perform satisfactorily at his or her current level, but who management feels can perform satisfactorily at a lower level, may be demoted.

5. **Suspension** – Suspensions ordinarily will be used only in situations where additional time is needed to investigate a problem or incident that may represent grounds for dismissal, if substantiated, or where more time is needed for an employee's supervisor and/or Human Resources to determine the appropriate action that should be taken for any particular incident or problem. Although suspension would ordinarily not be used as a form of discipline, it may, on occasion, be used to provide a period away from work in which that employee will be asked to decide if he or she wishes to continue in his or her employment or to consider various other options that have been proposed because of some performance or other disciplinary issue. Suspensions may be with or without pay at the option of the diocese.

## 782. IMMEDIATE DISCHARGE

Immediate dismissal may be appropriate for certain serious offenses involving egregious misconduct or blatant insubordination, dishonesty, willful or reckless poor performance, willful or reckless disregard of a supervisor's instructions, or other offenses deemed sufficiently serious by the diocese to warrant an immediate end to the employment relationship. Dismissal also will be the consequence of an employee's failure to correct performance, attendance, tardiness or conduct issues, after being provided a reasonable opportunity to do so.

The following are some examples of grounds for immediate dismissal of an employee:

- Violation of confidentiality;
- Conviction of a felony and/or crime of moral turpitude
- Any conduct tending to reflect discredit upon the Church;
- Continued unexcused tardiness or absences;
- Neglect of duty;
- Stealing;
- Drunkenness, use of illegal drugs, or abusive use of prescription drugs on the job;
- Willful destruction of diocesan property;
- Gross insubordination;
- Possessing or transporting firearms or weapons on diocesan property;
- Falsification of employment information.

This list is intended to be representative of the types of activities that may result in immediate discharge. It is not exhaustive, and is not intended to be comprehensive and does not change the employment-at-will relationship between the employee and the diocese.

Case 3:17-cv-00011-MOC-DCK   Document 31-3   Filed 09/21/17   Page 84 of 90

Billard RFP 000106

JA0694

Terminated employees will receive their pay on regularly scheduled paydays. When discharged, employees will have the right to continue coverage under the health insurance group plan at their own expense.

## 788. RESIGNATION

Resignation is a voluntary act initiated by an employee to terminate his or her employment with the diocese. To resign in good standing, a two-week written notice is expected from non-exempt employees. Exempt employees are expected to give written notice of at least four (4) weeks prior to the effective date. Due to different staffing requirements and considerations, the local authority may set its own notice requirements.

Resignation by contract school employees is subject to the conditions of their contracts.

If advance notice is not provided pursuant to this or local authority policy, or is not agreed to by mutual consent of both parties, the employee will be considered ineligible for rehire.

## 794. RETURN OF PROPERTY

Employees are responsible for all diocesan property, materials or written information issued to them, or in their possession or control. Employees must immediately, or upon request, return all property of the diocese that is in their possession or control in the event of resignation, lay-off or dismissal.

## 796. GRIEVANCES

It is the policy of the diocese to maintain a climate of openness in which an employee will feel free to express concerns and dissatisfactions and to use the grievance system for their resolution. The objective of the system is to provide for the prompt and fair resolution of grievances when the normal supervisor-employee relationship has failed to do so. The system is neither intended as a substitute for the normal supervisor-employee relationship nor can it substitute for a spirit of cooperation and goodwill between supervisors and employees.

An employee's grievance will be addressed quickly, and every effort will be made to resolve the matter at the level at which it occurred, insuring that just treatment occurs for all concerned. In order to ensure that good working relationships prevail, the concerned individuals should always attempt to reconcile differences on an individual basis. In the event the situation develops beyond this point, the employee should follow this grievance procedure:

50

Case 3:17-cv-00011-MOC-DCK   Document 31-3   Filed 09/21/18   Page 99 of 150

JA0695

1. Employees should first approach their immediate supervisor and attempt to resolve the problem. The initial contact with the supervisor shall be no later than five (5) work days after the problem developed. The supervisor will take the necessary actions to resolve the complaint and inform the employee of the decision within five (5) work days from receipt of the grievance;

2. If the employee believes that the supervisor's decision does not satisfy the grievance, or if the employee's grievance is with the supervisor, such employee's grievance may be appealed in writing to the appropriate department or agency head. This appeal must be made within five (5) work days from the employee's receipt of the supervisor's decision. The department or agency head will then contact those involved to gather necessary information concerning the grievance and/or to attempt reconciliation. If not reconciled within fourteen (14) work days, the department or agency head will issue a written decision to the employee and the supervisor.

3. If the employee still believes that the grievance is unsatisfactorily resolved, a written request for review by the Human Resources Director may be made. This request must be made within five (5) work days from the employee's receipt of the previous written decision. The Human Resources Director may either accept or deny the request for review. The Human Resources Director's decision will be given to the parties within twenty-one (21) days of receipt;

4. In extraordinary circumstances, an employee may appeal the Human Resources Director's decision. A written request for review may be made to the Chancellor, who may or may not accept the request. The request must be made within five (5) work days from the employee's receipt of the Human Resources Director's written decision.

Every effort must be made to resolve the grievance as quickly as possible, and no undue delay should be experienced in moving from one of the procedural steps to the next. The term "work days" shall mean days other than Saturday, Sunday and diocesan observed holidays.

Each step outlined in the above procedure must be fully documented and the person responsible for the decision at each level shall place all related documentation in the appropriate confidential file(s). Information related to a grievance shall be disclosed only to persons who have a need to know.

Billard RFP 000108

Case 3:17-cv-00011-MOC-DCK   Document 31-3   Filed 09/21/17   Page 8 of 90

JA0697

# Section 800: CODE OF ETHICS

JA0698

Dillard RFP 00111

JA0699

# Code of Ethics Policy of the Diocese of Charlotte



**Effective August 15, 2004**
**Revised July 1, 2009**

**The Diocese of Charlotte**
**1123 South Church Street**
**Charlotte, NC 28203**
**(704) 370-6299**

Case 3:17-cv-00011-MOC-DCK   Document 31-3   Filed 09/21/17   Page 96 of 96   Billard RFP 000119

August 15, 2004

My Dear Brothers and Sisters in Christ:

Please accept my sincere gratitude for the very generous way in which you offer your time, talent and gifts in serving the people of Western North Carolina. It is through the prayers, efforts, dedication and collaboration of priests, deacons, religious, seminarians, lay employees and volunteers that we are able to serve those entrusted to our care. We know that as clergy, religious and laity of the Diocese of Charlotte, we have a responsibility to uphold the highest of moral, professional and ethical standards.

As clergy, religious, seminarians, lay employees and volunteers, we all share in the mission of the Church to continue the work of Jesus Christ. This is both a great privilege and an awesome responsibility. Those who publicly represent the Church, whether by office, employment or appointment, have a special obligation because they have accepted positions of trust. Because of this, the Church must be exemplary. Clergy, religious, seminarians, lay employees and volunteers should and will be held accountable for their behavior.

In order to maintain the highest level of accountability, this Code of Ethics Policy is adopted to assist in developing and implementing uniform guidelines for appropriate behavior while exercising ministerial and professional undertakings. It is not intended to address every situation that may arise, rather, it is intended to create a structure for addressing a variety of circumstances that, if not appropriately addressed, may create a risk of incidents, allegations, claims or lawsuits. As we read the code, we must remember that it is more than a set of standards. It is a way of connecting our values, ideals and moral responsibilities with the work that we do every day.

It is my sincere desire that all who are involved in the mission of the Church will exemplify the ethics and integrity lived and taught by Jesus, and that all those we serve will see in us His compassion and love.

Sincerely yours in Christ,

Most Reverend Peter J. Jugis, J.C.D.
Bishop of Charlotte

56

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2003*

# PREAMBLE

Priests, deacons, religious, seminarians, pastoral ministers, administrators, lay employees and volunteers (Church Personnel) in our parishes, agencies, schools and organizations must uphold Christian values and conduct. The *Code of Ethics Policy of the Diocese of Charlotte* (Code) provides a set of standards for conduct in certain situations and is designed to deter wrongdoing and to promote honest and ethical conduct.

The public and private conduct of clergy, religious, seminarians, lay employees and volunteers can be a source of inspiration and motivation, but it can also scandalize and undermine the faith of the people that are served. Church Personnel must at all times be aware of the responsibilities that accompany their work. It is essential therefore, that anyone who undertakes a position of ministry, employment or leadership in the diocese, be ever mindful of the trust that has been placed in him or her. The faithful discharge of the responsibilities that accompany our work requires constant and prayerful reflection since all of us must be sustained by God's goodness and grace.

Responsibility for adherence to the Code rests with each individual. This responsibility requires each of us to periodically take a personal inventory. It is hoped that the Code will assist us in this task. Church Personnel who disregard this Code will be subject to remedial action. This action can take several forms, from a verbal warning to removal, depending on the nature and circumstances of the offense.

While no policy can anticipate all of the challenges and situations that may arise, the Code communicates key guidelines and will assist in making decisions that are ethical and in accordance with applicable legal requirements, the Diocesan Sexual Misconduct Policy, the Diocesan Personnel Policies Handbook, and the Diocesan Financial Policies Handbook. All Church Personnel are encouraged to discuss any questions or concerns they have with their supervisor. Before beginning any ministerial, employment or volunteer functions, Church Personnel will read, have read to them, understand, and sign the proper acknowledgement of receipt form, and comply with this Code.

Case 3:17-cv-00011-MOC-DCK   Document 31-4   Filed 09/21/21   Page 2 of 64    Billard-RFP 000144

JA0702

# 1. PRINCIPLES OF ETHICS AND INTEGRITY

1.1    Church Personnel will conduct themselves at all times in a manner that is consistent with the teachings and precepts of the Roman Catholic Church.

1.2    Church Personnel will exhibit the highest Christian ethical standards and personal integrity.

1.3    Church Personnel will continually and objectively examine their own actions and intentions to ensure that their behavior promotes the welfare of the diocese and exemplifies the moral tradition of the Church.

1.4    Church Personnel will establish clear, appropriate boundaries with anyone with whom they have a ministerial, business, professional or social relationship.

1.5    Church Personnel will provide an environment that is free from physical, psychological, emotional, written or verbal intimidation or harassment.

1.6    Church Personnel will conduct their relationships with others that are free of deception, manipulation and/or exploitation.

1.7    Church Personnel will not sexually abuse or harass a minor child.

1.8    Church Personnel will report any suspected sexual abuse of a minor child as required by the diocesan Sexual Misconduct Policy.

1.9    Church Personnel will not take unfair advantage of a counseling relationship for their personal benefit.

1.10    Church Personnel will not use their position to exercise unreasonable or inappropriate power, influence or authority.

1.11    Church Personnel will not accept or confer an office, position, assignment or compensation, which may present the appearance of favoritism or a conflict of interest.

1.12    Church Personnel will be responsible stewards of diocesan resources, human and financial, observing both canon and civil law, and making decisions concerning the disposition of resources that reflect Catholic social teaching.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 000115

1.13     Church Personnel will not make false accusations against another, or reveal the faults and failings to anyone who is not in a position that necessitates a need to know.

1.14     Church Personnel will share concerns about suspicions of inappropriate behavior with the appropriate supervisory or management individual.

1.15     Accountability: The Diocese and all its parishes, schools and organizations are responsible to its stakeholders, which includes donors and others who have placed their trust in the Church. To uphold this trust, all Church personnel will:

- Promote good stewardship of all Church resources, including donations, grants, program fees, and all financial support.
- Use all Church resources only for Church related purposes. Church resources are never to be used for personal purposes, even if it is intended to be temporary.
- Use all Church resources in a prudent-like manner, avoiding unnecessary and excessive spending and wastefulness.
- Use Church credit cards, vendor relationships and lines of credit only for Church related purposes. They are never to be used for personal transactions, even if it is intended that Church funds will not be used for payment.
- Comply with all applicable laws and regulations.
- Not be a party to any fraud or embezzlement, or neglect their duty to safeguard all Church assets.

## 2. GUIDELINES FOR WORKING WITH MINOR CHILDREN

2.1     Church Personnel are not to possess any sexually explicit or morally inappropriate materials on church, school or diocesan property, or in the presence of minor children. Such materials include, but are not limited to, videos, films, pictures, recordings, drawings, posters, cards, calendars, clothing, computer software and/or games.

2.2     Church Personnel are not to engage in sexually oriented conversations with minor children, except in the context of sharing the Church's teaching on human sexuality. Church Personnel are never to discuss their own sexual activities with minor children.

2.3     Church Personnel are not to take photographs of minor children who are

unclothed or dressing, for example in a locker room or bathing facility, nor shall they permit such photographs to be taken by others.

2.4     Church Personnel are not to speak to minor children in a manner that is, or could be construed by an observer as derogatory, demeaning, threatening, intimidating or humiliating, and are not to use profane or foul language in the presence of minor children.

2.5     Church Personnel are not to use tobacco products, alcoholic beverages, illegal drugs, or any substance prohibited by law, nor are they to be under the influence of any alcoholic beverage or illegal drugs, when working with minor children. Church Personnel may administer medications to minor children if written permission from parents or legal guardians is given.

2.6     Church Personnel are not to sleep in the same bed, hotel or motel room, sleeping bag, tent or cabin with a minor child unless the Church Personnel is the parent, legal guardian or sibling of the minor child.

2.7     Church Personnel are not to share showering, bathing, changing or dressing facilities with minor children. When the good of the minor child requires that they be accompanied by an adult to/in any of these locations, the time alone with the minor child should be minimal and another adult should be made aware of the circumstances.

2.8     Church Personnel are not to take an overnight trip alone with a minor child who is not an immediate family member.

2.9     Clergy and religious are not to allow minor children to be overnight guests in their residence or private accommodations with the exception of an occasional visit from immediate family members. Other Church Personnel are not to provide shared or private accommodations in any diocesan facility, private residence, hotel or motel room, or any other place where there is no other adult supervision present.

2.10    When providing transportation for minor children, Church Personnel are to be validly licensed and authorized, ordinarily have written permission from parents or legal guardians, and are to transport minors directly to their approved destination, with no unauthorized stops or deviations unless it is a valid emergency.

2.11    At the end of any activity, Church Personnel are to release minor children in their care only to parents, legal guardians, or other persons

Roman Catholic Diocese of Charlotte Personnel Policies Handbook
Revised July 1, 2009

Billard RCDC 0001 ??

designated in writing by parents or legal guardians.

2.12    Church Personnel should schedule one-on-one counseling sessions or meetings with minor children at times and locations that promote accountability and meet accepted standards of propriety.

2.13    Activities and programs for minor children are not to be administered by only one adult. During all activities and programs, facilities should be monitored.

2.14    Church Personnel are not to use physical discipline in any way for the behavior management of minor children. No form of physical discipline is acceptable. This includes spanking, hitting, pinching, or any other physical force as correction or retaliation for inappropriate behavior.

2.15    Church Personnel are to immediately report the unusual or uncontrollable behavior of minor children to parents or legal guardians.

2.16    As a general rule, volunteers for programs involving working with minor children in parishes should be registered members of the parish for at least six months before being placed in a volunteer position. After careful consideration, exceptions may be made for parents of minor children in the specific programs in which their child or children are participating.

2.17    Reference checks should be conducted on employees and volunteers who transfer within the diocese before allowing them to participate in any program involving working with minor children.

## 3. PHYSICAL CONTACT WITH MINOR CHILDREN

3.1    Appropriate affection between Church Personnel and minor children is important for a child's development, and is a positive part of church life and ministry. However, touching must be based on the need of the minor child and not the adult, completely non-sexual, never in private, and otherwise appropriate.

3.2    Though not all-inclusive, the following examples are regarded as appropriate forms of affection:
   - side hugs
   - shoulder to shoulder or temple hugs

- pats on the shoulder or back
- handshakes
- high fives or hand slapping
- arms around shoulders
- holding hands while walking small children
- kneeling or bending down for hugs with small children
- holding hands during prayer

3.3  Though not all-inclusive, the following examples are forms of affection that are not to be used:

- lengthy or inappropriate hugs or embraces
- kisses on the mouth
- holding children over two years old on the lap
- touching the chests, knees, legs, bottoms or genital areas of minor children
- showing affection in isolated areas or private rooms
- sleeping in bed with a minor child
- wrestling or tickling minor children
- any type of massage given to or received from a minor child
- comments or compliments that relate to body development or physique
- any form of unwanted affection

3.4  No one should be permitted to develop and/or start new programs for minor children without proper review and approval by the proper authority. Requests to develop new programs should be submitted in writing and must include provisions for adequate adult supervision.

## 4. CONDUCT FOR PASTORAL COUNSELORS AND SPIRITUAL DIRECTORS

4.1  Pastoral Counselors and Spiritual Directors are not to step beyond their competence in counseling situations and are to refer people being counseled to other professionals when appropriate.

4.2  While counseling a minor child, if a Pastoral Counselor or Spiritual Director discovers that there is a serious threat to the welfare of the minor, and that communication of confidential information to a parent or legal guardian is essential to the minor child's health and well-being, the Pastoral Counselor or Spiritual Director should disclose only the

62

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

information necessary to protect the health and well-being of the minor child.

4.3    Pastoral Counselors and Spiritual Directors are to carefully consider the possible consequences before entering into a counseling relationship with someone with whom they have a pre-existing relationship.

4.4    Pastoral Counselors and Spiritual Directors will conduct all counseling sessions in appropriate settings and at appropriate times. No session is to be conducted in private living quarters.

4.5    Pastoral Counselors and Spiritual Directors are to avoid situations that might present a conflict of interest between a counselor and a person being counseled, including even the appearance of a conflict of interest.

4.6    Pastoral Counselors and Spiritual Directors are not to engage in sexual intimacies with anyone they counsel. This includes consensual and non-consensual contact, forced physical contact and inappropriate sexual comments.

4.7    Pastoral Counselors and Spiritual Directors are not to engage in sexual intimacies with individuals who are close to the person being counseled, i.e. relatives and close friends.

4.8    Pastoral Counselors and Spiritual Directors assume the full burden of responsibility for establishing and maintaining clear, appropriate boundaries in all counseling and counseling-related relationships.

4.9    Pastoral Counselors and Spiritual Directors are to maintain a log of the times and places of sessions with each person being counseled.

4.10    Pastoral Counselors and Spiritual Directors should discuss the nature of confidentiality and its limitations with each person being counseled. Information that is disclosed during the course of counseling or advising is to be confidential, except for compelling professional reasons or as required by law.

4.11    If there is a clear and imminent danger to the person being counseled, or to others, the Pastoral Counselor or Spiritual Director may disclose only the information necessary to protect the parties affected and to prevent harm. Before disclosure is made, if feasible, the Pastoral Counselor or Spiritual Director should inform the person being counseled about the disclosure and the potential consequences.

4.12    With the exception of knowledge gained in the Sacrament of Penance, knowledge that arises from counseling sessions may be used in teaching, writing homilies, or other public presentations only when effective measures are taken to absolutely safeguard both the individual's identity and the confidentiality of the disclosures.

4.13    In accordance with the norm of canon law, the sacramental seal is inviolable, therefore, it is absolutely forbidden for a confessor to betray the confidence of a penitent in any way and for any reason. This is applicable whether the penitent is living or dead.

## 5. HARASSMENT

5.1    Church Personnel are to provide an environment that is free from sexual, psychological or physical harassment. This includes but is not limited to:
- physical or mental abuse
- unwelcome sexual advances or touching
- sexual comments and jokes
- requests for sexual favors used as a term or condition of employment
- requests for sexual favors used as the basis for an employment decision
- displaying or wearing offensive material
- derogatory racial, religious, age, ethnic, physical or mental condition insults or slurs

5.2    Harassment can be a single, severe incident or a persistent pattern of behavior where the intent or the effect is to create a hostile, offensive or intimidating environment.

## 6. POLICY ON CONFLICTS OF INTEREST/PRIVATE INURNMENT, NEPOTISM, OUTSIDE EMPLOYMENT

6.1    Identifying a Private Inurnment or Private Benefit Problem: In brief, "private inurnment" is the *payment* or diversion of an exempt organization's assets to its officials, officers, directors, employees, relatives, friends, major donors, or others in a special relationship to the organization who can influence or control the policy or the day-to-day

64

activities of the organization *for less than full and adequate consideration.* It is a broad concept that can exist in a variety of transactions under a variety of circumstances. Private inurnment also extends to the use of organizational assets for "private benefits" such as sales, leasing, construction contracts, service transactions, etc., at other than fair market value or the exploitation of the exempt organization *for the benefit of a private business* (e.g., "sweetheart deals," promotional schemes, and/or giveaways to private individuals or businesses). Thus, under IRS regulations, a private benefit is similar to, but broader than, private inurnment.

To avoid material private inurnment or benefit in the types of transactions described above, the particular diocesan entity must enter into transactions for its benefit, rather than for a private party's benefit, and exercise due diligence to ensure that the proposed transaction is fair and reasonable such that under the circumstances the organization could not have obtained a more advantageous arrangement with reasonable effort. In addition to screening proposed transactions through the applicable councils and boards, care should be taken to follow diocesan policies and procedures pertaining to the signing of contracts.

6.2     Conflicts of Interest:   A conflict of interest may exist when persons employed by the diocese (i.e., the Central Administration, parishes, schools, agencies, and/or affiliated entities), or volunteers with influence over certain activities or transactions including those serving on advisory or consultative boards, councils or committees have a direct or indirect financial interest, as defined below.

6.3     Financial Interest:  A person has a "financial interest" if the person has, directly or indirectly, through business, investment, or family (including spouses; brothers or sisters; spouses of brothers or sisters; ancestors; children, grandchildren, and great grandchildren; and spouses of children, grandchildren, and great grandchildren), any one of the following:

- An ownership or investment interest in any entity with which the diocese has a transaction or arrangement;
- A compensation arrangement with the diocese or with any entity or individual with whom the diocese has a transaction or arrangement;
- A potential ownership or investment interest with, or compensation arrangement with, any entity or individual with whom the diocese is negotiating a transaction or arrangement.

Case 3:17-cv-00011-MOC-DCK   Document 31-4   Filed 09/21/18   Page 100 of 122

6.4     Church Personnel are to avoid situations that might present a conflict of interest.

6.5     Church Personnel are not to take advantage of anyone to whom they are providing ministry or service in order to further their own personal, religious, political, business or economic interests.

6.6     Church Personnel are not to solicit, accept or give any personal gifts, favors, or things of value which could influence, or which could be construed as influencing any decision or obligation to the performance of one's duties.

6.7     Relatives of Church Personnel, or of relatives of various diocesan boards, may be hired as employees only if they will not be working under the line of supervisory authority of a relative or the advisory authority of the board.   Generally, relatives include spouses, children, siblings, grandparents and grandchildren.

6.8     No member of any diocesan board is to knowingly take any action or make any statement that is intended to influence any undertaking of a parish, school, agency, department or institution of the diocese in such a way as to confer any benefit on such member or anyone in the member's family or business.

6.9     No member of any diocesan board, his/her family members, employer, business or business associates, is to solicit business or favors from any diocesan parish, school, agency, department or institution of the diocese.

6.10    No member of any diocesan board is to vote in connection with any decision that may constitute a conflict of interest.

6.11    Outside employment is permitted as long as Church Personnel notify their supervisor of that fact and satisfactorily perform their job responsibilities.  If an individual with an outside job does not perform his/her job requirements satisfactorily, he or she may be asked to terminate the outside employment.

6.12    Whenever a diocesan entity is considering conducting business with any

Roman Catholic Diocese of Charlotte Personal Policies Handbook
Revised July 1, 2009

person employed by the diocese (i.e., the Central Administration, parishes, schools, agencies, and/or affiliated entities) or any volunteer, or his/her family member, his/her business, or any entity in which he/she has an investment, the diocesan entity must solicit bids from at least two other sources and may not select the person/entity with the financial interest unless that person/entity is the lowest bidder.

6.13    Duty to Disclose: In connection with any actual or potential conflict of interest, an interested person must disclose the existence and nature of his or her financial interest and all material facts. Reports should be made to the pastor, principal, vicar general/chancellor, attorney, or chief financial officer. Reports made to pastors and principals are to be reported to the vicar general/chancellor. Reports should include relevant information that is discernible.

6.14    Investigation: The person to whom said report was made shall be responsible for a thorough and expeditious investigation of the actual/potential conflict of interest. Proposed decisions on the disposition of a case are to be discussed with the vicar general/chancellor or his designee. The results of all confirmed conflicts of interest and the final resolution shall be reported to the diocesan Finance Council.

6.15    Subsequent Conflicts and Disclosures: Notwithstanding previous disclosure of actual or potential conflicts of interest, an individual shall make a new disclosure of conflicts when any matter involving the conflict of interest arises for discussion or action. In the event that an individual is uncertain whether an actual or potential conflict of interest exists, the individual should make disclosure of the circumstances that may give rise to an actual or potential conflict.

6.16    Confidential or Privileged Information: Information known to be confidential that is acquired by individuals in the course of employment or association with the diocese and its affiliated entities shall be used only for the benefit and purposes of the diocese. Individuals shall neither disclose confidential information outside the scope of their authorized duties nor utilize their position or association with the diocese for personal identification or advantage, although there may be instances, based on the use of careful discretion and judgment, where incidental use of the association with the diocese may be appropriate.

JA0712

## 7. POLITICAL ACTIVITY

7.1    The Diocese of Charlotte encourages individual participation in civic affairs. However, Church Personnel are not to engage in political activities in a manner that may create the appearance that such activity is by or on behalf of the diocese.

7.2    Church Personnel are not to make any contribution to any candidate for public office or political committee on behalf of the Diocese of Charlotte or in a manner that may create the appearance that the contribution is on behalf of the diocese.

7.3    Church Personnel are not to use any parish, school or agency facilities, financial resources, or personnel to endorse or oppose a candidate for public office.

7.4    Church Personnel are to clearly communicate that they are not acting on behalf of the Diocese of Charlotte if identified as an official or employee of the diocese while engaging in political activities in an individual capacity.

## 8. WHISTLEBLOWER POLICY

8.1    The Diocese of Charlotte requires all representatives of the Church, including clergy, religious, directors, and other volunteers, and lay employees, to observe high standards of business and personal ethics in the conduct of their duties and responsibilities. All representatives of the Church must practice honesty and integrity in fulfilling their responsibilities and comply with all applicable laws and regulations.

The objectives of the Whistleblower Policy are to establish policies and procedures for:
- The submission of concerns regarding questionable financial or legal matters, violations and suspected violations of the Code of Conduct, Code of Canon Law and other concerns by the stakeholders of the Church, on a confidential basis;
- The receipt, retention, and treatment of complaints received by the organization;
- The protection of anyone reporting concerns from retaliatory actions.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

8.2     Reporting Responsibility – Each representative of the diocese has an obligation to report in accordance with this Whistleblower Policy any reasonably perceived violation of: (a) federal, state or local laws, rules and/or regulations; (b) the diocese's Code of Ethics; (c) the diocesan sexual misconduct policy; (d) diocesan personnel policies; (e) diocesan financial policies, including questionable or improper accounting or auditing matters; as well as gross mismanagement, waste, fraud, embezzlement, neglect of duty; and actions that threaten or are viewed as harmful to the health, safety and welfare of others and any other financial, legal or canonical concerns (hereinafter collectively referred to as Concerns).

Reports of Concerns should be made to the pastor, principal, vicar general/chancellor, attorney, or chief financial officer. Reports made to pastors and principals are to be reported to the vicar general/chancellor. All Concerns are to be reported as soon as possible. Reports of Concerns should include all relevant information about the suspected act, including any material evidence that exists.

8.3     Investigation – The person to whom said report was made shall be responsible for a thorough and expeditious investigation of the reported Concern.

Proposed decisions on the disposition of a case are to be discussed with the vicar general/chancellor or his designee. The results of all reported and confirmed Concerns and the final resolution shall be reported to the diocesan Finance Council.

8.4     No Retaliation – This Whistleblower Policy is intended to encourage and enable stakeholders to raise Concerns within the Organization for investigation and appropriate action. With this goal in mind, no stakeholder who, in good faith, reports a Concern shall be subject to retaliation or, in the case of an employee, adverse employment consequences. Moreover, anyone who retaliates against someone who has reported a Concern in good faith is subject to discipline up to and including dismissal from their position within the Church.

8.5     Acting in Good Faith – Anyone reporting a Concern must act in good faith and have reasonable grounds for believing the information disclosed is a legitimate matter of Concern. The act of making allegations that prove to be unsubstantiated, and that prove to have been made maliciously, recklessly, or with the foreknowledge that the allegations are false, will be viewed as a serious disciplinary offense and

Case 3:17-cv-00011-MOC-DCK   Document 31-4   Filed 09/21/17   Page 74 of 326     Bill00326

may result in discipline, up to and including dismissal from their position with the Church. Such conduct may also give rise to other actions, including civil lawsuits.

8.6     Confidentiality - Reports of Concerns, and investigations pertaining thereto, shall be kept confidential to the extent possible, consistent with the need to conduct an adequate investigation. Disclosure of reports of Concerns to individuals not involved in the investigation will be viewed as a serious disciplinary offense and may result in discipline, up to and including termination of the violators' position in the Church. Such conduct may also give rise to other actions, including civil lawsuits.

## 9. CONFIDENTIALITY

9.1     Church Personnel, regardless of their work or volunteer responsibility, are to keep significant information on a confidential basis and are not to discuss it with anyone who is not directly involved.

9.2     Sacramental records are to be regarded as confidential. When compiling and/or publishing statistical information from these records, great care is to be taken to preserve the anonymity of individuals. Only those who are authorized to access these records and supervise their use are to have access to them.

9.3     Individual contribution records of parishes are to be regarded as private and are to be kept confidential.

## 10. REPORTING ETHICAL MISCONDUCT

10.1     Church Personnel are to hold each other accountable for maintaining the highest ethical and professional standards. When it appears that any Church Personnel has violated this Code, or any other religious, legal, moral, professional or ethical principle, the matter is to be reported to that entity's management authority or the Chancery.

10.2     All reports of possible violations of this Code will be treated in confidence as much as the diocese's duty to investigate and the law allow. If confidentiality cannot be maintained, the individual reporting the violation will be so advised.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

10.3   All reported violations of this Code will be investigated, and if needed, appropriate action will be taken based on the nature of the violation and diocesan policy.

10.4   Retaliation against a person who suspects and reports a violation of this Code in good faith will be treated as an individual violation of this Code.

JA0716

# Section 900: POLICY OF THE DIOCESE OF CHARLOTTE CONCERNING MINISTRY-RELATED SEXUAL MISCONDUCT BY CHURCH PERSONNEL

Billard RFP 000191

JA0719



# Policy of the
# Diocese of Charlotte
# Concerning Ministry-Related
# Sexual Misconduct by
# Church Personnel

*Revised July 1, 2003*

The Diocese of Charlotte
1123 South Church Street
Charlotte, NC 28203
(704) 370-6299

Case 3:17-cv-00011-MOC-DCK   Document 31-4   Filed 09/21/17   Page 20 of 66

Billard RFP 000132

JA0720

July 1, 2003

To All Diocesan Personnel:

I am pleased to forward to you a revised "Policy of the Diocese of Charlotte Concerning Ministry Related Sexual Misconduct by Church Personnel." This policy is an updated version of the June 1, 1999 revision and includes mandates contained in the "Charter for the Protection of Children and Young People" adopted June 14, 2002 by the U.S. Bishops during their national meeting in Dallas, Texas and their subsequent November 13, 2002 meeting in Washington, D.C. With the issuance of this revision, the June 1, 1999 revised policy is no longer in effect.

This policy applies to priests, deacons, religious, seminarians, lay employees and volunteers, and covers not only the sexual abuse of minors, but also other forms of sexual misconduct. It is required that pastors and school, agency or departmental managers ensure that all of their associates, employees and volunteers receive a copy of this policy, and that all to whom it is given read and become acquainted with it.

Sincerely,

Reverend Monsignor Mauricio W. West
Diocesan Administrator

Billard RFP 000133

## TABLE OF CONTENTS

Purpose of the Policy
Introduction
Commentary

   I.    Definitions

   II.    General Provisions

   III.    Reporting Requirements

   IV.    Applications – Lay Personnel

   V.    Applications – Clergy, Seminarians And Religious

   VI.    Procedures When Allegations Are Made Against A Lay Employee Or
         Volunteer

   VII.    Procedures When Allegations Are Made Against Clergy, Religious Or
          Seminarians In Service To The Diocese

   VIII.    Education

   IX.    Media and Communications

   X.    Sanctions

Acknowledgement of Receipt

Billard RFP 000134

JA0722

## PURPOSE OF THE POLICY

The purpose of this policy is to provide the Diocese of Charlotte with an official procedure for dealing with an allegation of sexual misconduct by church personnel.

Nothing in this policy is intended to prevent or relieve any person or group of persons, whether they be clergy, religious, seminarian, employee or volunteer, from reporting any allegation of the sexual abuse of a minor to the proper civil authorities as mandated by law, unless to do so would violate the priest/penitent relationship.

The Diocese of Charlotte will cooperate fully with any investigation by civil authorities and will also thoroughly investigate all allegations to ascertain the truth.

## INTRODUCTION

A common mission of all of us is to be holy. A holy people will not allow one of its members to be a victim of ministry related sexual misconduct. It is with this in mind that the Diocese of Charlotte issues this policy, which affirms that, all human suffering as well as the weaknesses and imperfections of human beings deserve a response that is rooted in love, concern and compassion.

The term ministry related sexual misconduct as used throughout this policy refers to three related forms of misconduct. The first, which is sexual contact between church personnel and a child, is more commonly called sexual abuse. The second, which is sexual contact between church personnel and another adult, is more commonly called sexual misconduct. The third, which is unwanted sexual conduct or language, is more commonly called sexual harassment. All three of these are addressed herein together as ministry related sexual misconduct because they each involve an abuse of power or authority by those in ministry/service to the diocese. It is understood that any action of a sexual nature that is directed toward a child will be considered sexual abuse.

The Diocese of Charlotte is committed to dealing expeditiously, openly, fairly and compassionately with allegations of ministry related sexual misconduct by church personnel. In order to achieve this commitment, the following policy and procedures have been adopted and are to be implemented with dispatch, justice

and equity. The Diocese of Charlotte will willingly cooperate with civil authorities as to the extent possible in all circumstances. In addition, there may be cases where the tenets of the Catholic religion, the prescriptions of Canon Law, or the greater good of all concerned require that action at variance with the provisions of this policy be taken; therefore, the Chancery reserves the right to interpret, revise or replace this policy as it deems necessary. The necessary observance of the canonical norms internal to the Church is not intended in any way to hinder the course of any civil action that may be operative. At the same time, the Church reaffirms her right to enact legislation that is binding on all her members concerning the ecclesiastical dimensions of the delict of sexual abuse of minors.

The Diocese of Charlotte presents these guidelines not because of past failures, not to cause alarm or fear, but rather to set forth a clear policy for the protection of our priests, deacons, seminarians, religious, laity and victims. The policies and procedures that the diocese has adopted reflect our experience and the studies of many others and must always be construed in the light of the gospel and the principle, salus animarum suprema lex, that is, the well being of the people is our primary obligation.

## COMMENTARY

In June 2002, the American bishops approved the first draft of the *Essential Norms for Diocesan/Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons (Essential Norms)*, and a *Charter for the Protection of Children and Young People (Charter)*. The *Charter* addressed the Church's commitment to respond effectively, appropriately and compassionately to cases of the sexual abuse of minors by priests, deacons or other Church personnel. The bishops promised to reach out to the victims of sexual abuse of minors by anyone serving the Church in ministry, employment or as a volunteer. The *Essential Norms* and the *Charter* served as the basis for this revision of the sexual misconduct policy of the Diocese of Charlotte.

In order to be considered law binding on all bishops in the United States, the draft *Essential Norms* was forwarded to the Vatican for approval (*recognition*). The Vatican acknowledged the grave dimensions of the crisis in the Church in the United States, but was concerned that the *Essential Norms* as submitted in June lacked a balance between the rights of the alleged victims and the accused, and denied the accused the right to due process. To some degree, the proposed *Essential Norms* contradicted established church law. A joint commission comprised of four representatives from the Vatican and four American bishops

Case 3:17-cv-00011-MOC-DCK   Document 31-4   Filed 09/21/17   Page 24 of 66
Billard RFP 000136

was appointed to revise the *Essential Norms* to "give effective protection to minors and establish a rigorous and precise procedure to punish, in a just way, those who are guilty of such abominable offenses."

On November 13, 2002, the United States bishops meeting in Washington approved the revised *Essential Norms* as submitted by the joint commission, with some minor changes. In addition, the bishops approved the *Charter*, revising it to bring it into conformity with the *Essential Norms*. Respecting always the reputation and privacy of the individuals involved, the bishops said that they would act as openly with the public as possible. They are committed to respond to the pastoral, spiritual and emotional well-being of victims and their families and to work with priests, civil authorities, educators, churches, and community organizations to provide safe environments for children and youth.

As a result of the bishop's actions, the *Policy of the Diocese of Charlotte Concerning Ministry-Related Sexual Misconduct by Church Personnel* has been revised. This policy is believed to be in full compliance with the *Essential Norms* as approved by the Vatican on December 8, 2002, the revised *Charter*, and canon and civil law.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised: July 1, 2003*

Billard RCP 000197

JA0725

## I. DEFINITIONS

1. **Sexual Abuse:** The exploitation of a child for the sexual gratification of an adult. Sexual abuse includes acts of incest, rape or sexual offenses in any degree, sodomy and unnatural or perverted sexual practices, lewd or indecent acts or proposals, including exhibitionism, touching or fondling, permitting or encouraging a child to participate in acts of pornography or prostitution.

2. **Child:** Any person under the age of eighteen (18).

3. **Sexual Misconduct:** (a) The touching of a private part of another person. Private parts can include the genital or anal areas, the groin, the inner thigh, the buttocks, or the bosom of a female. Touching means either a single incident in which church personnel intentionally brings a part of his/her body or another object into physical contact with a private part of another person, or repeated incidents of the same type, whether intentional or unintentional; (b) Any conduct and/or relationship of a sexual nature that can bring scandal.

4. **Sexual Harassment:** Unwanted attention, ogling, words, pictures, jokes or comments of a sexual nature that are directed towards an individual or in the general environment.

5. **Church Personnel:** Includes bishops, priests, deacons, religious, lay employees and lay volunteers involved in ministry or work for the Diocese of Charlotte.

6. **Bishop:** The canonically appointed Bishop of Charlotte, or, in the case of a vacancy, the Diocesan Administrator. For purposes of this policy, the Bishop or Diocesan Administrator may act personally or through a designated representative.

7. **Administrative Leave:** For purposes of this policy, is defined as the temporary relieving the accused of assigned duties. The application varies depending on the employment, volunteer, or canonical status of the accused. Administrative leave does not infer guilt or innocence.

8. **Chancery:** The administrative branch of the Diocese of Charlotte under the authority of the Bishop or Diocesan Administrator.

Case 3:17-cv-00011-MOC-DCK   Document 31-4   Filed 09/21/17   Page 26 of 66
Billard RFP 000138

JA0726

## II. GENERAL PROVISIONS

1. Compassion requires that primary attention be given to the alleged victim of ministry related sexual misconduct. In that regard, the Diocese of Charlotte will appoint an Assistance Coordinator who will, on notification of an allegation, contact the alleged victim of ministry related sexual abuse of minors for the purpose of offering immediate pastoral care. In addition, the Assistance Coordinator will contact the alleged victim's family with an offer of spiritual help and pastoral counseling. If the need for counseling or medical help for the alleged victim or his/her family is indicated, this too shall be offered, but without admission of guilt or of any liability on the part of the Diocese of Charlotte. The Assistance Coordinator will also ensure that proper assistance and support is offered to faith communities directly affected by ministry related sexual misconduct. When an intervention causes the removal of a priest, deacon, seminarian, religious, employee or volunteer from a parish, mission, agency, school, institution or organization of the Diocese of Charlotte, the Assistance Coordinator will provide necessary concern and direction to the parishioners and/or remaining staff.

2. The Canonically appointed Bishop of Charlotte, or, in the case of a vacancy, the Diocesan Administrator, will appoint a Promoter of Justice. This must be a person of undamaged reputation. He/She will intervene in contentious cases to seek justice and vindicate the public good in penal cases. Functioning as the prosecutor, the Promoter of Justice brings the action, brings forth the evidence, argues the case, and appeals, if necessary.

3. The Canonically appointed Bishop of Charlotte, or, in the case of a vacancy, the Diocesan Administrator, will appoint or retain an investigator who is competent in sexual misconduct investigative procedures and techniques. More than one investigator may be appointed or retained. An investigative file will be established by the investigator for each reported allegation of sexual misconduct referred to him/her and shall contain all material gathered during the investigation. When the investigation has been completed, the investigator will prepare a complete written account of the allegations and findings and give it to the Chancery where it will be filed in a secure and confidential manner.

4. Any accused person who admits to, or on whom an appropriate investigation substantiates an allegation of sexual abuse of a minor will be permanently removed from ministry, employment and/or volunteer status. If the accused is a priest or a deacon, this may include the loss of the clerical state.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Case 3:17-cv-00011-MOC-DCK   Document 31-4   Filed 09/21/17   Page 27 of 66
Billard RFP 000139

JA0727

5. In instances where the accused is not convicted, not found liable by a court of competent jurisdiction, not found guilty by a civil or diocesan investigation, or does not admit to sexual abuse or misconduct, the Chancery will make a determination as to whether or not the accused will be returned to ministry, employment or volunteer status.

6. The Diocese of Charlotte will not require an attempt at reconciliation between an alleged abuser and victim. The involvement of any diocesan personnel in non-authorized reconciliation efforts will be treated as a violation of this policy.

7. The Diocese of Charlotte will not enter into any confidentiality agreement with any sexual abuse victim/survivor except for grave and substantial reasons brought forward by the victim/survivor. If done, these reasons will be noted in the text of the agreement.

8. No pastor, associate pastor or director of any diocesan rectory, institution or facility is permitted to grant full or part-time residence, or regular weekend ministry to an extern priest, a transitional or permanent deacon, or a religious without prior approval from the Chancery. Short-term hospitality in conformity with these norms is at the discretion of the pastor or director. For other individuals, no one may be extended hospitality as a resident, full or part-time, without approval from the Chancery.

9. An individual Review Board composed of at least five (5) persons of outstanding integrity and good judgment will be appointed by the Chancery. The majority of the review board members will be laypersons who are not employees of the Diocese of Charlotte. Membership will include at least one priest, one civil lawyer (not the diocesan attorney), and an individual having particular expertise in the detection and treatment of the sexual abuse of minors. The Assistance Coordinator and the Promoter of Justice will attend and participate in discussions in board meetings, but without vote. The members will be appointed for a term of five years, which can be renewed. Terms will be staggered. The functions performed by the Review Board are to be confidential, consultative and advisory, not adversarial and adjudicative, and are to be directed toward the protection of minor children, and the integrity of the priesthood and the Church. The responsibilities of the board will include the review of allegations of ministry related sexual abuse of minors, all actions taken in response to those allegations, ensurance of the integrity of the process, advice as to the need for pastoral care for affected individuals, and advice and recommendations to the bishop regarding the implementation of any aspect of this policy. Other cases of ministry related sexual misconduct may be referred to the Board for review and counsel. The

10. After having an outside agency conduct a background investigation, the Diocese of Charlotte will evaluate the background check report received on all church personnel who have regular contact with children. Additionally, the diocese will have investigated, screen and evaluate the background of candidates for ordination in deciding their fitness for ordination.

11. Allegations against the Bishop are beyond the scope of this policy. Any such allegation shall be directed to the Vicar General who will contact the Papal Nuncio and the appropriate civil authority.

12. Pastors and agency or department heads are responsible for ensuring that all clergy, seminarians, religious, employees and volunteers under their authority are given a copy of this policy. The original of the signed and dated *Acknowledgement of Receipt of Sexual Misconduct Policy* must be sent to the diocesan Human Relations Department within fourteen (14) calendar days of the date of assignment, hire, or beginning volunteer service. Copies should be kept by the parish, mission, school, agency, department or institution.

## III. REPORTING REQUIREMENTS

1. All cases of alleged, known or suspected ministry related sexual abuse of a minor must be reported to the proper civil authority. Any person having actual knowledge of, or reasonable cause to suspect an incident of ministry related sexual abuse by any church personnel of the Diocese of Charlotte is to immediately report the incident to the Chancery, unless to do so would violate the Sacrament of Penance. The Chancery will then report the incident to the proper civil authority. After notifying the proper civil authority, the Chancery will immediately notify the Assistance Coordinator, the Promoter of Justice, and the Review Board. Following this, the individual reporting the incident to the Chancery will be notified of the particulars regarding the filing of the incident with civil authority. This reporting requirement is not intended to supersede the right of a victim or witness to individually make a report to

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 000141

2. A lack of information, or the lack of consent of the alleged victim, the victim's parent(s) or legal guardian, or the person(s) providing the information is not to prevent the immediate reporting of the allegation of abuse to civil authorities.

3. At the time of reporting an incident of alleged sexual misconduct to the Chancery, the person making the report will be asked to complete the diocesan form, *Report of Suspected Ministry Related Sexual Misconduct by Church Personnel.*

4. Any act of retaliation or discrimination against an individual who reports or complains of ministry related sexual misconduct is strictly prohibited and will not be tolerated by the Diocese of Charlotte.

## IV. APPLICATIONS – LAY PERSONNEL

1. During the application process, the diocesan form, *Application for Lay Employment,* must be completed and submitted by all lay applicants for any paid position in the Diocese of Charlotte. If the applicant is hired, the application is to be kept in the individual's Official Personnel File.

2. During the application process, the diocesan forms, *Application for Lay Employment* and *Volunteer Profile,* must be completed and submitted by all persons volunteering for positions that involve supervised or unsupervised ministry or work with children. If the volunteer is assigned to a position, the forms are to be kept in the individual's personnel folder.

3. During the application process, the diocesan form, *Notification And Release,* must be completed and submitted by all lay applicants for any paid or volunteer position giving authorization to the Diocese of Charlotte to request investigative background inquiries that give information as to the applicant's character, work habits, performance and experience. The original background check release form must be forwarded to the diocesan Human Relations Department immediately upon receipt. The Human Relations Department will conduct the background check and will notify the requesting parish, mission, school, department, agency or institution of the results within

## VI. PROCEDURES WHEN ALLEGATIONS ARE MADE AGAINST A LAY EMPLOYEE OR VOLUNTEER

1. On receiving an allegation of ministry related sexual misconduct, if the allegation is sexual abuse of a minor, the Chancery will immediately report the allegation to the proper civil authority, request to be kept informed of their investigation, notify the accused of the nature of the allegation, and assign an investigator who will conduct an immediate investigation into the matter. Unless required by law, allegations of sexual misconduct and/or sexual harassment will not be reported to civil authority, but all other requirements and procedures in this policy will be followed. The involvement of the Assistance Coordinator, the Promoter of Justice, and the Review Board will be included where and when necessary but in all cases of sexual abuse. In cases of sexual abuse, the accused will be placed on administrative leave (with pay for paid employees) pending the outcome of the investigation.

2. The accused will be advised of the investigative process, of their right to civil and canonical counsel, and their right to appear before the Review Board with counsel and/or other advocate.

3. No diocesan investigation will interfere with any civil investigation, and will be conducted with a high level of Christian pastoral care for the alleged victim, his/her family, the person reporting the incident, the accused, and all other persons whose lives are touched by this incident.

4. If required, the Review Board will meet as soon as practical once the investigation has been completed and will carefully examine all information gathered during the investigation. After due deliberation, the board will either request additional information/interviews or advise the bishop of their recommendation(s).

5. If the investigation finds that there is no reasonable cause to believe that the allegation is true, the accused and the person making the allegation will be notified and the matter will be closed. The Chancery will make a determination as to whether or not the accused will be restored to duty at his/her original position, to another position, to the same location or to another location. The Diocese of Charlotte will do all that is possible to restore the good name of the accused.

6.  If the investigation finds that there is reasonable cause to believe that the allegation is true, the accused and the person making the allegation will be notified of that finding and the accused's employment or volunteer relationship with the Diocese of Charlotte will be terminated immediately. The diocese will encourage the individual to seek an appropriate treatment program.

7.  It is the responsibility of the accused to obtain and finance his/her own private counsel.

## VII. PROCEDURES WHEN ALLEGATIONS ARE MADE AGAINST CLERGY, RELIGIOUS OR SEMINARIANS IN SERVICE TO THE DIOCESE

1.  On receiving an allegation of ministry related sexual misconduct, if the allegation is sexual abuse of a minor, the Chancery will immediately report the allegation to the proper civil authority, notify the accused of the nature of the allegation, place the accused on administrative leave thereby relieving him/her of any ecclesiastical ministry or function, and conduct an immediate investigation into the matter. Unless required by law, allegations of sexual misconduct and/or sexual harassment will not be reported to civil authority, but all other requirements and procedures in this policy will be followed. The involvement of the Assistance Coordinator, the Promoter of Justice, and the Review Board will be included where and when necessary. Any administrative leave will be planned and circumstances determined in a way specific to each situation and to each individual in accord with canon 1722. In general, an administrative leave will be time limited, will allow for re-determination at the end of such time limit, will specify living arrangement, location, financial support, and will address treatment, conduct and aftercare.

2.  The accused will be asked to undergo appropriate medical and/or psychological evaluation and intervention, unless to do so would interfere with an investigation by civil authorities. Participation of an accused cleric in appropriate professional treatment/counseling is required as a matter of clerical obedience (c.273). Treatment/Counseling referral is for treatment, not punishment. Any future ministry in the Diocese of Charlotte will require in part a full sharing with the Chancery of all information developed in the course of the treatment. Authorization from the accused is required in all cases to allow the treatment providers to communicate openly and freely with the Chancery.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

Billard RFP 000145

3.  Following evaluation and treatment, if aftercare is prescribed, the accused will be assigned to a priest-monitor who will be a friend in very difficult circumstances and who will ensure that the aftercare program is carried out.

4.  If the diocesan investigation finds that there is no reasonable cause to believe that the allegation is true, the accused and the person making the allegation will be notified and the matter will be closed. The Chancery will make a determination as to whether or not the accused will be restored to duty at his/her original position, to another position, to the same location or to another location. The Diocese of Charlotte will do all that is possible to restore the good name of the accused.

5.  If the accused admits that the allegation is true, if the diocesan investigation finds that there is reasonable cause to believe that the allegation is true, or if a civil investigation finds that the allegation is true, the accused will be permanently removed from ministry. Clergy may request dispensation from the obligations of Holy Orders. If this is not voluntarily requested the Bishop of the Diocese of Charlotte or, in the case of a vacancy, the Diocesan Administrator, may request dismissal of the accused from the clerical state without the consent of the accused. If removal from the clerical state is not applied, i.e. for reasons of advanced age or infirmity, the accused will not be allowed to celebrate Mass publicly, wear clerical garb, or present himself publicly as a priest.

6.  The accused will be encouraged to retain the assistance of civil and canonical counsel. When necessary, the Diocese of Charlotte will supply canonical counsel to the accused. It is the responsibility of the accused to obtain his/her own private counsel.

7.  The Diocese of Charlotte is responsible for the diocesan salary of a priest, seminarian or permanent deacon undergoing treatment who has been relieved of his duties and responsibilities in accordance with this policy.

8.  In the case of a priest, seminarian, permanent deacon, or religious from another diocese, on receiving an allegation of ministry related sexual misconduct, the Chancery will immediately notify the appropriate bishop or superior of the allegation and of the actions that have been/will be taken by the Diocese of Charlotte.

9.  In cases where the accusation is found to be true, the accused will be the primary person responsible for payment of the victim's therapy and attendant expenses, and will be required to reimburse the Diocese of Charlotte for all expenses that are incurred in connection with the matter.

## VIII. EDUCATION

1. The Diocese of Charlotte will periodically conduct continuing education sessions for clergy, religious, employees and volunteers that will update them from viewpoints such as new scientific knowledge, church policy, canon law, civil law, moral theology, professional ethics, the pastoral care of victims, recognizing the signs of abuse, and coping with the disclosure of misconduct by a colleague.

2. The Diocese of Charlotte will establish safe environment programs for its parishes, missions, schools, institutions and agencies. Through this program, the diocese will cooperate with parents, civil authorities, educators, and community organizations to provide education and training for clergy, religious, employees, volunteers, children, youth, parents, ministers, educators, and others about ways to make and maintain a safe environment for children, including standards of ministerial behavior and appropriate boundaries.

## IX. MEDIA AND COMMUNICATIONS

1. The Diocese of Charlotte is committed to a policy of openness relating to allegations of sexual misconduct by its church personnel. Within the confines of respect for the privacy and the reputation of the individuals involved, the diocese will be as open as possible with members of the media and the community.

2. The Diocese of Charlotte will also cooperate with other churches and ecclesial communities, other religious bodies, institutions of higher learning, social service agencies, support groups for victims/survivors, and other interested organizations in conducting research in the area of sexual misconduct.

3. The Chancery shall be responsible for all media contacts and will appoint a primary spokesperson to handle all media inquiries, all release of information, and all news conference arrangements.

Roman Catholic Diocese of Charlotte Personnel Policies Handbook
Revised July 1, 2009

Case 3:17-cv-00011-MOC-DCK   Document 31-4   Filed 09/21/17   Page 34 of 66

Billard RFP 000147

## X. SANCTIONS

1. Any church personnel who fails to comply with any of the provisions of this policy will be subject to such action(s) by the Diocese of Charlotte as it deems necessary, up to and including removal or termination from any position with any parish, mission, school, department, agency, institution, or organization which is subject under canon or civil law to the administration, authority or governance of the Diocese of Charlotte.

2. Applicants or volunteers for assignment or positions with any parish, mission, school, department, agency, institution or organization in the Diocese of Charlotte who fail to comply with the provisions of this policy may be denied or removed from any position that is subject under canon or civil law to the administration, authority or governance of the diocese.

*Roman Catholic Diocese of Charlotte Personnel Policies Handbook*
*Revised July 1, 2009*

91

Billard RFP 000148

JA0735

# EXHIBIT C

# CHARLOTTE CATHOLIC HIGH SCHOOL



## FACULTY HANDBOOK
### 2011 - 2012

Phone: (704) 543-1127
School Fax: (704) 543-1217
Attendance Voice Mail: (704) 716-2418
Attendance Fax: (704) 716-2419
Hotline: (704) 845-6548
WEBSITE: WWW.CHARLOTTECATHOLIC.ORG

7702 PINEVILLE-MATTHEWS ROAD
CHARLOTTE, NC 28226

# MISSION STATEMENT

Charlotte Catholic High School is an educational community centered in the Roman Catholic faith which teaches individuals to serve as Christians in our changing world.

# BELIEFS

1) We believe individuals should model and integrate the teachings of Jesus in all areas of conduct in order to nurture faith and inspire action, especially in the areas of service and volunteerism.

2) We believe academic excellence is a priority as teachers set high expectations of performance while providing appropriate resources and academic challenges for all students.

3) We believe prayer, worship and reflection are essential elements which foster spiritual and moral development of our students, faculty and staff.

4) We believe in cultivating a supportive, healthy and challenging environment which recognizes the dignity, needs and diversity of all individuals.

5) We believe opportunities should be provided for parents and the local community to participate in and support Charlotte Catholic High School.

3

JA0738

**Principal - Gerald S. Healy**

Responsible for all academic and co-curricular activities conducted under the jurisdiction of Charlotte Catholic High School. Responsible for administering the business affairs of the school in the day-to-day financial operations.

**Assistant Principal - Steve Carpenter**

Responsible for working directly with teachers, students, counselors, campus minister, and parents in areas related to discipline and for promoting school spirit through designated school activities and programs.

**Assistant Principal – Angela Montague**

Responsible for working directly with teachers, students, counselors, campus minister, and parents in areas related to discipline and for promoting school spirit through designated school activities and programs.

**Dean of Students - Randy Belk**

Responsible for working with the assistant principal in areas of discipline, oversees all matters of student attendance, and supervises development, maintenance, and distribution of handbooks, curriculum guides, schedules, and the like.

**Secretary - Cissy Bevington**

Responsible for assisting the Principal with phone calls, appointments, coordinating Parent Newsletter, mailings, assisting teachers, ordering of all office supplies. Issuing work permits and driver's eligibility forms and other office assignments as required. Coordinating Faculty/Staff functions.

5

CCHS 000046

JA0739

**Administrative Assistants - Linda Stephenson and Tracey Tolbert**

Responsible to the principal for maintaining complete and systematic set of records of all financial transactions, handling all service contracts, and inventory and ordering all school supplies, and teacher supplies.

**Registrar - Alice Kerry**

Responsible for maintaining complete and accurate records for all students and alumni, to assist the guidance department with the processing of college applications, and to perform clerical and secretarial functions for the administration and guidance department.

**IT - Beth Acitelli**

Assists faculty, staff and students with technology integration and education. Provides school level support for hardware and software.

**Receptionist - Carolyn McGroarty and Judy Wittman**

Responsible for greeting visitors and determining their needs, answering the office telephone and responding to requests for information.

**Attendance Coordinator - Elizabeth Ryan**

Responsible to the Dean of Students for collecting, maintaining and distributing daily student attendance information.

**Guidance Counselors - Sandy Needham, Cathy Grady, Karen Grauman, Maryangela Morgan and Christopher Causebrook**

Responsible for helping students overcome problems that impede learning and to assist them in making educational, occupational, and life plans that hold promise for their personal fulfillment as mature and responsible men and women.

6

**Guidance Assistant – Celia Smith**
> Responsible for assisting the Guidance Counselors with a
> variety of administrative duties.

**Learning Support Department –Mary Ellen Rauch (A-K) and**
**Donna Birch (I-M)**
> Responsible for creating and helping to implement accom-
> modation plans for students with documentation of learning
> differences. Work with teachers to identify students in need
> of interventions.

**Campus Minister – Mary Jayne Dawson**
> Responsible for ministering to the spiritual needs of the
> school community and responsible with the principal for the
> implementation of the school's philosophy, as it has refer-
> ence to the spiritual matters of the school.

**Athletic Director – Kevin Christmas**
> Responsible for coordinating the total athletic program.

**Media Specialist – Terri Taylor**
> Responsible for maintaining the library; evaluates, selects,
> and requisitions new library materials; and coordinates all
> other library activities.

**Assistant Media Specialist – Lynn Hidell**
> Responsible for maintaining the library; evaluates, selects,
> and requisitions new library materials; and coordinates all
> other library activities.

**Student Council Advisors – Shawn Panther**
> Responsible for moderating the Student Council activities
> and projects.

7

JA0741

# DEPARTMENT HEAD RESPONSIBILITIES

**I. Personnel Responsibilities**
   a. Initiate the hiring process by reviewing on- file applicants, request postings if needed and schedule interviews with the administration.

   b. Assist the principal in the hiring decision and ensure new department personnel is provided appropriate materials including: texts, schedule, keys, and if applicable assign a mentor.

   c. Conducts department meetings.

   d. Assist department teachers in the handling of day-to-day problems of instruction and acts as a resource person for department teachers on curriculum questions.

   e. Conducts formal and informal classroom observations and evaluates teacher performance. As well as informal walk – through on a regular bases.

   f. Makes recommendations to the principal regarding department personnel.

   g. Monitors the mentoring program for all new teachers

**II. Curriculum Responsibilities**
   a. Assists in establishing department curriculum objectives, and develops a plan for the implementation and evaluation of these objectives.

   b. Recommends textbook choices to the principal after consultation with the department members.

   c. Develops and maintains a department library

   d. Keeps informed on educational innovations and trends as they relate to their department

8

    e.  Assists the principal in his/her role as educational leader in the school through curriculum development within the department

    f.  Monitors department teacher's update of Edline.

    g.  Assists the principal in informing parents and the school community on the school's instructional program

    h.  Attends all department head meetings

**III.**  **Budgetary Responsibilities**

    a.  Advises the principal on department's budgetary needs

    b.  Assumes responsibility for ordering, inventorying, and distribution of all departmental instructional materials within guidelines developed by the business office.

# TEACHER PERFORMANCE RESPONSIBILITIES

1. Meets and instructs assigned classes in the locations and at the times designated.

2. Plans a program of study that meets the individual needs, interests, and abilities of all students.

3. Creates a classroom environment that is conducive to learning and appropriate to the maturity and interests of the students.

4. Prepares for classes assigned.

5. Has clear and concise rules for all students.

6. Guides the learning process toward the achievement of curriculum goals.

7. Employs a variety of teaching modalities to meet the needs of all students.

9

8. Implements the diocesan and school's mission statements

9. Assesses the accomplishments of students on a regular basis and updates Edline at a minimum of every two weeks.

10. Seeks the assistance of the learning support staff in addressing student's learning differences.

11. Takes all necessary steps to protect students, equipment, materials, and facilities.

12. Maintains accurate, complete, and correct records as required by law, diocesan and school policy, and administrative regulation.

13. Assist the administration in implementing all policies and/or rules governing student life.

14. Maintains a current NC state teaching license or diocesan license.

15. Continue to acquire 15 CEU's in a five-year cycle. One in technology and 3 in their content area.

16. Makes provision for being available to students and parents for education-related purposes outside the instructional day when required or requested to do so under reasonable terms.

17. Maintain and improve professional development which should encompass technology, teaching methodology, and school goals.

18. Attends staff meetings, departmental meetings, and serves on staff committees as required.

19. Attends all Parent-Teacher conferences and Parent Night.

20. Does not leave a group of students or a class unsupervised.

21. Follows all school, diocesan, and state policies, regulations, and procedures.

22. All correspondence – voice mail, e-mail, etc. must be answered in two working days.

10

# DAILY ROUTINE

I.  **ARRIVAL AND DEPARTURE:** School hours are 7:30 am to 3:05 pm. All teachers will remain in their classroom from 2:35 pm to 3:05 to assist students.

II.  **ATTENDANCE (STUDENT)**
**A. Procedures for reporting absences:**

1.  The administration and the teachers must share the responsibility for pupil accounting. It is the responsibility of the homeroom teacher to accurately report attendance daily. Our automated system will call the first contact number provided by the student's parents. The dean of students or principal are to be notified of any unusual or irregular absences.

2.  If the validity of an excuse is questioned, the teacher is to ask the dean of students for clarification.

3.  The absentee sheet will be e-mailed to each teacher each day. Check your absences against this list. If a student is absent from class and his/her name is not on the list, send a note to the dean of students reporting the missing student. The dean of students or assistant principal will check to see where the student is.

4.  If a student is listed on the absentee report and is in class, he/she should be sent to the office so that the correction can be made.

5.  Each teacher is responsible for checking attendance accurately each time class meets.

6.  Student absence from semester examinations will require a $10.00 fee and approval of the dean of students in order for the exam to be rescheduled or made up. Except for illness all requests for reschedule should be approved three school days prior to the first exam day.

11

B. **EARLY DISMISSAL OF STUDENTS**
1. Requests for early dismissals must be presented to the attendance office before the student's first class. Failure to follow this procedure may result in an unexcused absence from a class or classes.

2. The student will be issued a pass by the attendance office who will record the time of the excused dismissal. This pass must be shown to the teacher whose class the student leaves.

C. **ILLNESS**
If a student should become ill in class, he/she should be sent to the health room with a pass. Another student should be sent to accompany the student who is ill.

D. **COUNSELING**
It is the responsibility of the counselors and campus ministers to inform classroom teachers in advance when students will be absent from class because of appointments and post facto when an emergency situation arises.

E. **RELEASED ABSENCES**
1. A request may be made by the parents for a trip, college day, career day, etc.

2. The request must be presented to the attendance office before the student's first period class. A college day/career day request form must be completed and returned to the dean of students.

III. **CARE OF BUILDINGS, MATERIALS, FURNITURE, GROUNDS**
A. All teachers are urged to work constantly with students on the care of furniture, books, materials, and grounds.

12

B. All teachers are responsible for keeping clean and neat the area outside and inside their classrooms. Please be sure that the area is checked before each class starts and ask students to clean up the area.

C. At the close of school windows should be locked.

D. Messages for the maintenance staff or cleaning service may be left in the assistant principal, who is charge of facilities, mailbox. Please put all requests in writing. Do not ask for something to be done immediately if it can wait until the staff can work it into the daily routine.

## V. DRESS

All teachers are to see that students observe the dress code. If a student is in violation of the dress code, he/she is to be sent to the office.

## VI. INSURANCE CLAIM FORMS

Insurance claim forms will be handled by the business office. If a student is injured at school or at a school-sponsored event, refer him/her to the office for an insurance claim form.

## VII. STUDENT SCHEDULE CHANGES

The guidance counselors may authorize schedule changes for necessary academic reasons during the designated drop/add period. A student who wants to change a class should go to the guidance counselor who will advise the student and confer with the teacher(s) concerned. The guidance counselor will require written parental permission. There is a $20.00 drop/add fee for any schedule change. The change will go into effect when this procedure has been completed and not before.

13

## VIII.  TARDIES AND TARDY MEMORANDUMS

A.  Students are also expected to arrive to class on time. Four (4) minutes are allowed for class change. Students arriving late to class should have a written excuse from the person detaining him/her. All other tardies to class will be unexcused and the teacher will enforce his/her policy regarding unexcused tardies to class. Faculty should report a student's name to the dean of students on the student's eleventh day of absence from your class. (excluding school business)

B.  Teachers are responsible for enforcing promptness to class. Flagrant and/or consistent violation of promptness is to be reported to the dean of students after communication with the student and parents.

C.  No teacher should detain a pupil who belongs in another teacher's class. If it is necessary for the office or a teacher to detain a student, the student who is detained will bring to his/her teacher an admission slip which will be duly signed by the individual who has detained him/her. Only those admission slips written and signed by a teacher, administrator, or staff member will be accepted.

# MISCELLANEOUS INSTRUCTIONS AND INFORMATION

## I.  ACTIVITIES

All requests for school activities must be submitted in writing on the *Request for School Activity Form* to the administration for approval.

## II.  ACTIVITY CALENDAR

A school activity calendar will be maintained in the school office. All co-curricular activities, including teacher and student functions, must be approved by the assistant principal, who is in charge of the calendar, and recorded on the calendar.

14

JA0748

### III. ATHLETICS

Charlotte Catholic High School is a member of the North Carolina Athletic Association. We participate in the Mega 7 in addition to the State regulations for athletic programs; the following rule is followed by the coaches and athletes at CCHS:

During any school year, a student who fails one or more courses for any marking period may not participate in a sport until the next marking period, provided at that time he/she is in compliance regarding the passing of his/her courses. Also, a student must maintain a 2.0 grade point average for each marking period in order to be eligible. The student will be suspended from athletics effective the next school day after report cards are distributed. The suspension from athletics is in effect until the first school day after the distribution of report cards for the next marking period. The marking periods shall be defined as the First Quarter Grades, First Semester Grades and Third Quarter Grades. In the event that a spring sport extends beyond the last day of school, the Second Semester Grades shall be used to determine eligibility.

### IV. ACCIDENT REPORTS

Each faculty/staff member must complete an Accident Report immediately following an incident. A copy of the report is to be given to the principal.

### V. E-MAIL, CELL PHONES, FACEBOOK AND MY SPACE

Due to the rising liability issues throughout the U.S. and for your own protection, teachers and administrators may not distribute personal home phone numbers, cell numbers or personal e-mail addresses to students. All correspondence with students and parents should be through the school phone system and either the school or diocesan e-mail address.

15

Teachers and Staff are prohibited from corresponding with students through Facebook and My Space, and all other social sites.

Violation of this guideline could result in immediate termination.

Teachers and administrators may not invite students to their homes unless the event is approved by the principal, prior to it happening.

# POLICIES AND PROCEDURES
# RELATED TO STUDENTS

## I. DISCIPLINE

Charlotte Catholic High School is committed to a policy of requiring good discipline. It is expected that discipline will be the joint responsibility of the classroom teacher, the administration, the student and the parents. Without proper discipline in school and the home, education cannot go on. A concerted effort on the part of all teachers and students toward teaching/learning self-discipline is the basic goal of good discipline. It is expected that within the school, reciprocal channels of communication will be established which will lead to the development and acceptance of proper behavior standards on the part of teachers, pupils, administrators, and parents.

The disciplinary action taken must be deserved and commensurate with the offense. Disciplinary measures must not inflict bodily harm, subject the student to ridicule, or use punishment for punishment's sake.

In line with the establishment of channels of communication, the following procedures are set up for the handling of discipline cases requiring more than routine action by the teacher.

16

A. The teacher will refer pupils to the assistant principal or dean of students when:

1. Efforts on the part of the teacher to work with the parents and student have failed. (The administration should not be the first contact with the home.)

2. The exclusion of the pupil from the class is necessary to maintain a good classroom environment for all students.

II. **GUIDANCE DEPARTMENT**

Teachers are to report any concerns about a student to the student's counselor. Counselors will hold conferences with individual teachers or groups of teachers regarding students on an as-needed basis.

III. **SUPERVISION OF PUPILS**

All teachers are responsible for supervising students and have authority over students at all times when school is in session as well as at all school-related events. The school and teachers, as individuals, can be sued for any accident that occurs while we are supposed to be supervising students, if any negligence can be proved. This responsibility extends to all aspects of school life, e.g., if a student skips school and is not marked absent by a teacher and reported through the attendance office to the parents, there might be cause for legal action should an accident occur while the student is truant.

Smoking is not allowed by students or employees on campus or at any school-sponsored events.

A. **In the Classroom**

1. The classroom teacher is accountable for pupils in his/her class from the time they first arrive until the end of the period.

2. Insist on students getting to class on time.

17

3. Do not dismiss students from your class until the bell rings.

4. Do not keep students after the bell rings.

5. Do not send a student on an errand for you if there is any doubt about his/her finishing the errand in time to reach his/her next class on schedule.

6. Do not leave your students without adult supervision.

7. Do not detain a student from attending another teacher's class without first gaining that teacher's permission.

8. Teachers have authority over all they survey at school and all teachers are expected to assume responsibility for supervision of all pupils at school or school sponsored functions on or off campus.

B. **Supervision of Student Activities**
We want to maintain a well-balanced educational program for the students, and at the same time, keep our requests for out-of-class teacher supervision to a minimum. By sharing this supervision responsibility, it would not create a hardship on any one teacher, and all school-wide activities would have proper direction.

1. If a Mass or a prayer service or an assembly or a pep rally is held at a time when a teacher would normally be teaching he/she must be in attendance.

2. Teachers are required to be present at all those activities sponsored by the clubs/classes and to supervise these events.

C. **Hazing/Intimidation**
Hazing or intimidating of students or CCHS faculty/staff in any form is not permitted. Violators will be punished because hazing not only endangers safety to one's life, but it also indicates lack of respect for another individual.

18

Violators will be disciplined according to the seriousness of the offense; such discipline could lead to suspension or expulsion. This rule applies to all extra-curricular activities sponsored by Charlotte Catholic High School. This includes activities of clubs, sports, classes, etc.

D. **Honor Code**

The Christian philosophy of Charlotte Catholic High School is the basis for our Honor Code. The Honor Code represents the spirit of decency and fair play which is an essential quality of a good citizen. It places in the hands of each student the responsibility for honorable conduct as a way of life. A student who attends CCHS must be willing to accept this responsibility. All students are expected to work within the framework of this Honor Code. If a teacher suspects a student of a violation of the Honor Code he/she must have a conversation with the student explaining the reason for the suspension and give the student 24 hours to report to the dean of students.

We believe that personal honor and integrity, honesty, and respect in thought, word, and deed towards individuals and institutions are essential qualities of a student at Charlotte Catholic High School.

Please refer to the student Handbook for the Honor Code.

E. **Building**

Students are not to be in the classroom hallways during any lunch time. During lunch, the students are to remain in the cafeteria, the picnic area or the commons area. Students are not permitted to be in cars or in the parking lot at any time during the school day.

19

F. **School Sponsored Trips or Meetings**

1. Students attending school-sponsored events shall not be counted absent from class.

2. Teachers desiring to take students on a day trip must obtain approval from the principal at least one week in advance. Teachers desiring to take students on an overnight trip must obtain permission from the principal at least one month in advance of the trip since the principal must have permission from the superintendent for overnight trips. A completed packet must be submitted with an application.

3. For day trips or overnight trips permission slips are to be sent to parents. A student may not participate in a trip unless he/she has returned a parent signed permission slip with the required insurance information listed. In addition to the permission slip for an overnight trip, a parent must complete the Overnight Trip Form and return it.

4. Copies of permission slips and overnight trip forms are to be given to the assistant principal.

5. A list of the names of each student making the trip is to be presented to the attendance office.

6. Permission forms to use the bus or any other school vehicle must be sent to the MACS Director of Transportation. There is a fee for using the buses and this should be included in the cost of the trip for the students. Please check current bus rates when you submit your request to reserve the buses. It is the policy of Charlotte Catholic High School that no student should be prohibited from participating in extracurricular activities or functions due to their inability to pay.

20

# REPORTING TO PARENTS

I. The grading period will be nine weeks. Edline must be updated at least every two weeks. Also, a telephone call is required if the student is failing. Failure logs are to be sent to the assistant principal 4 ½ weeks into the quarter.

II. Provision has been made on the report card to record the following grades for each subject:
   A. First Quarter          E. Third Quarter
   B. Second Quarter         F. Fourth Quarter
   C. Exam                   G. Exam
   D. First Semester         H. Second Semester

The semester grade is the average of the quarter grades and the examination given at the end of the semester. The examination grade may not count more than 25% of the semester average.

III. The following numerical equivalent scale should be used by all teachers in all grades:

   A+ 100
   A   94 - 99
   A-  93
   B+  92
   B   86 - 91
   B-  85
   C+  84
   C   77 - 83
   D+  76
   D   70 - 75
   F   69 and below

21

# WRITING RECOMMENDATIONS

Teachers will be asked during the year to write recommendations for certain students. The following comments are taken from the Guide to the National Merit Scholarship Program as an aid in writing recommendations.

- The most useful recommendations are specific, objective, brief and individualize the student in one or more ways. Vague, general statements about a "fine boy," a "gracious girl," are apt to do the candidate little or no good.

- Illustrate special behavior, achievements. Information concerning negative or handicapping family backgrounds that the individual has overcome is valuable. Give specific examples of a student's ability to work, to study, to think, to deal with abstractions. Mention the student's integrity, citizenship, creativity. Indicate how the student exhibits ambition, drive, and zeal and give relevant examples. Talk in terms of what a student has done over and beyond assigned work--for example, in special areas of investigation or research. The best preparation for writing this letter is to think about the student in your classroom before you begin to write.

# POLICIES AND PROCEDURES
# RELATED TO PERSONNEL

I.    ABSENCE OF INSTRUCTIONAL PERSONNEL
    A.    **Time Off**
        In order to request time off a two-part form must be completed and returned to the assistant principal in charge of substitutes for approval. Please refer to the Diocesan policies for other personnel policies regarding Sick Leave, Bereavement Leave, Personal Leave, Family Leave, Leave without Pay, Jury Duty, etc.

22

**B.**   **Leave Of Absence without Pay**
A teacher absent from duty for reasons not falling under
one of the classifications enumerated in Diocesan poli-
cies or otherwise authorized by the principal shall not be
entitled to pay during the period of absence. Please see
Diocesan policies.

**C.**   **Excusing Personnel Early**
1. The administration may excuse a teacher early from
school.

**D.**   **Substitute Teachers**
If you find it necessary to be absent, the assistant princi-
pal should be notified as soon as possible and not later
than 6:30 a.m. on the day of absence. The assistant prin-
cipal in charge of substitutes may be contacted at home at
704-552-5139, preferably the evening before or in the of-
fice at 704-716-2401.

**E.**   **Leaving School Grounds**
The office is to be notified anytime a teacher must leave
the campus. This is necessary in case of telephone calls
or other communications.

**F.**   **Preparation for Substitute Teachers**
Teachers substitute folder should contain the following
items:
1. Your daily schedule

2. Updated class roster

3. If you have a homeroom, a roster for morning atten-
dance

4. An assignment which is current and relevant

23

5. The assignment should take the entire class period and students should be accountable for the assigned work

6. Special instructions such as a special schedule

7. A list of class rules and expectations

## II. ATTIRE

Teachers are to be clean, dressed neatly and modestly according to professional standards. Shorts, t- shirts, mini-skirts, and denim may not be worn by the faculty or staff. Faculty and staff are expected to be professional role models for students and follow the guidelines for students regarding hair, jewelry, etc. The administration reserves the right to determine other inappropriate attire as necessary.

## III. CERTIFICATION

All teachers hired by Charlotte Catholic High School must follow the certification process as outlined by the Diocese of Charlotte. Please see Diocesan Policy for further information.

All certification changes which will affect salary should be reported to the assistant principal in charge of certification at once.

## IV PARENT-TEACHER CONFERENCES

Teachers are required to be present for all parent-teacher conferences.

## V. PURCHASE ORDER

All requests for materials must be approved by the principal. When requests for spending are for departmental equipment or materials, that request must go to the department chairperson who upon approval will submit the request to the principal. All order numbers to be used on requisition forms must be obtained from the administrative assistant.

24

JA0758

The school is not under any obligation to reimburse unauthorized expenditures or expenditures made without an approved purchase order in advance of spending. The individual will assume responsibility for the expense if the above procedure is not followed.

**VI. SPEAKERS**
Teachers need prior approval of the principal before scheduling any guest speaker.

**XI. OTHER PERSONNEL POLICIES**
Please consult your Diocesan Personnel Policy Handbook for other personnel policies.

# USE OF FACILITIES AND MATERIALS

**I. AUDIOVISUAL EQUIPMENT**
The media specialist is in charge of all audiovisual equipment. All teachers must adhere to all policies and procedures of the media center.

**II. FACULTY WORKROOMS/PLANNING ROOMS**
The faculty workrooms/planning rooms are reserved for the faculty use. Teachers may not invite students there for conferences. Students should not use the copiers, microwaves or other equipment in these areas. Student assistants should not be assigned to use the copiers. **Please do not send students to pick up your mail from the faculty mailboxes.** Your mail may contain confidential information, ballots or other information that students should not see.

**III. KEYS**
The business office keeps all keys and distributes them as directed by the principal.

25

JA0759

## IV. LOCKERS

Teachers may not inspect lockers without a student's knowledge. The administration maintains the right to search. Teachers are to notify the principal, assistant principal, or dean of students if there is reason to search a student's locker, i.e., safety or health.

## V. MEDICATION

Students should be referred to the nurse's office if they need medication.

## VI. TELEPHONE

Students may only use the classroom telephones with faculty permission and **supervision**.

## VII. COPIER

Copier machines are available for the teacher's instructional needs.

# TORNADO INSTRUCTIONS

TORNADO WATCH means a tornado is expected to develop.

TORNADO WARNING means a tornado has actually been sighted.

If there is a TORNADO WATCH, the administration will announce this situation over the PA system. You should then be prepared to act immediately if the WATCH is upgraded to a WARNING.

In the event that there is a TORNADO WARNING, the administration will announce this situation over the PA system and a series of triple tones will be sounded.

Upon announcement of a WARNING, students, faculty, and staff should move to the designated area and assume a curled position. Position yourself to be protected from flying glass and other objects.

26

| | |
|---|---|
| Cafeteria | Move to the administrative hallway away from the windows and assume a curled position. |
| Classrooms | Move to the hallway outside your classroom and assume a curled position. For those in classrooms in the center of the building where there are no windows, stay in the room and assume a curled position. |
| Commons | Move to the administrative hallway away from the windows and assume a curled position. |
| Kitchen | Move to the storage room and assume a curled position. |
| Library | Move to the administrative hallway away from the windows and assume a curled position. |
| Offices | Move to the administrative workroom and assume a curled position. |

# FIRE EVACUATION PLAN

**PURPOSE**

The purpose of this plan is to establish procedures for the systematic, safe, and orderly evacuation of Charlotte Catholic High School located at 7702 Pineville-Matthews Road by its occupants in case of fire or other emergency, and to instruct occupants in the use of available fire appliances.

**OBJECTIVES**

a.  The primary objective of this plan is to minimize and/or prevent injury and property damage at Charlotte Catholic High School and immediate outside areas.

27

b. The secondary objective is to provide proper education as part of the continuing training program for all occupants, to assure the prompt reporting of a fire and the proper response to fire alarms, and the immediate initiation of fire safety procedures to safeguard life and contain fire until the arrival of the Fire Department. This Fire Safety Plan will be placed into effect by designated emergency evacuation personnel upon activation of fire alarms or notification of any emergency condition.

## EQUIPMENT INFORMATION

The design of our building incorporates the following features to insure maximum fire and life safety.

a. Automatic smoke detection system. All hallways, cafeteria, and commons areas have ceiling mounted smoke detectors.

b. Manual Pull Alarm Stations are located on the walls at each outside door entrance/exit and in the hallways.

c. Magnetic door closures are in hallways and automatically close doors when the fire detection system goes off.

d. An emergency power and lighting system will provide electrical power to the Fire Alarm Panel, the Public Address System and be sufficient for evacuation purposes.

e. Fire extinguishers are located throughout the hallways and other commons areas.

f. Emergency exits are marked with illuminated EXIT signs.

## FIRE EVACUATION DRILLS

Fire evacuation drills will be conducted monthly as a continuing part of the fire safety education program for the building. All personnel and students occupying the building will participate in the drills.

28

Details of drills and evacuation of their effectiveness will be maintained on record by the assistant principal. This information will be available for examination by building tenants and the Charlotte Fire Department personnel as requested.

## FIRE DRILL REGULATIONS

1. The alarm is sounded by a series of dual tones.

2. ABSOLUTE SILENCE is observed until students return to classrooms.

3. When the alarm is sounded students rise and leave the building in single file, without books, hats, coats, or other materials, walking rapidly but not running. Classes are to remain together.

4. Everyone is to exit the building according to the evacuation plan and take attendance.

## PROCEDURES FOR LOCK DOWN

Procedures for a lock down are to be implemented when the following announcement is made:

**"Sister Gloria, please come to the office."**

1. All classroom doors are to be locked and all students accounted for. Please move away from the door, keep silent, and if possible take cover under your desk.

2. Students who are in the hallway or bathroom should go to the nearest classroom and telephone your teacher immediately.

3. All classroom telephones are to be clear ASAP so that necessary calls can be made and/or received. Teachers, remove the telephone from the wall, keeping it plugged in and put it on the floor with you.

29

CCHS 000070

4. All television sets should be turned to channel 2 for special bulletins.

5. If a lock down is called for during break, lunch or between classes, then all students, faculty and staff should either move to or remain in the cafeteria, library or a nearby classroom. No one should be outside, in the commons, in the hallways or in the stairwells.

The above procedures are not meant to be limiting but are to be used as basic guidelines in an attempt to account for everyone and to keep everyone in groups. If safe passage cannot be made to a group or designated area, then please use your best judgment and stay where you are.

When the lock down is over, one of the following announcements will be made:

**"Sister Gloria has left the building." or simply "All clear."**

30

JA0764

# EXHIBIT D

**DIOCESE OF CHARLOTTE - MACS**
**TEACHER EMPLOYMENT CONTRACT**

| Salary Level | A |
| Experie. Level | 15 |
| Subject or Grade: | Fine Arts/Drama |
| School: | CCHS |

THIS AGREEMENT, made and entered into this 27th day of April, 2011, by and between MACS, hereinafter referred to as "School", and Lonnie Billard, hereinafter referred to as "Teacher."

**WITNESSETH:**

WHEREAS, MACS and School wishes to hire Teacher to teach for the academic year of 2011 - 2012; and
WHEREAS, Teacher wishes to teach in the school system for said academic year;
NOW, THEREFORE, by and with the consent of both parties, the parties hereto covenant and agree as follows:

1. **TERM:** The term of this Contract is for the Academic Year 2011-2012.

2. **SALARY:** In consideration of Teacher performing the services hereinafter described, MACS shall pay to Teacher the total sum of $41309.00.

3. **DUTIES:** Teacher agrees to perform any and all duties for the position for which he/she is hired and all other duties as directed by School including, but not limited to, to teach and supervise the grade, grades or courses assigned by the principal of the School and to perform the other duties or responsibilities involved in his/her assignment to term of this Contract; to attend and participate in all school faculty meetings, and such other professional meetings as called by the Superintendent of Catholic Schools or the principal; to comply with the requirements of the Diocese regarding the educational preparation of teaching; and to participate in associations and meetings as directed by the Superintendent or principal for the promotion of close collaboration between parents and teachers and to otherwise assist the teacher in the performance of his/her duties. Teacher, regardless of membership in the Catholic Church, must be consistent at all times, in example and expression, with the tenets and morals of the Catholic Faith.

4. **TERMINATION DURING TERM OF CONTRACT:** This Agreement may be terminated as follows:
   a. By mutual consent of both parties;
   b. By School, upon thirty (30) days written notice to Teacher, in the event of declining enrollment in the school.
   c. By School, upon written notice to Teacher, for cause including, but not limited to, inefficiency, neglect of duty, unprofessional action/conduct, incompetency, insubordination, moral misconduct, current abuse of alcohol, current use of illegal drugs, current misuse of prescription drugs, conviction of a felony or a crime involving moral turpitude, failure to maintain teaching certificate in current status, or breach of this Agreement.

5. **TERMINATION BY TEACHER:** In the event this Agreement is terminated unilaterally by Teacher, Teacher shall pay School a sum of money equivalent to one month's gross salary, such payment to be deemed as liquidated damages.

6. **SPECIAL TERMS AND CONDITIONS:** Teacher shall further comply with the following special terms and conditions:
   a. Full Time (100%)
   b.
   c.

7. **DIOCESAN RULES AND REGULATION:** This Agreement is subject to the Personnel Policies Handbook of the Diocese of Charlotte and the Policies and Regulations as promulgated by the Diocesan Board of Education, MACS Board of Education and the Superintendent of Catholic Schools for the Diocese of Charlotte.

8. Contracts are to be returned and signed within fourteen (14) working days upon receipt of Contract. This Contract is void beyond the deadline unless an extension of time has been specifically agreed to, in writing, by the teacher and superintendent.

9. **EXCLUSIVE AGREEMENT:** This Contract contains complete agreement concerning the employment arrangement between the parties. Any amendment, deletion or addition to this Contract must be in writing and signed by all parties.

**EMPLOYER**

4/27/2011
Date Offered

_(signature)_
Superintendent of Schools

5-6-11
Date Accepted

_(signature)_ Lonnie W Billard
Teacher Signature

**SELECT ONE:** SALARY IS REQUESTED TO BE PAID

_____ OVER THE SCHOOL YEAR (22 PAYMENTS)    OR

__✓__ OVER THE SCHOOL YEAR AND FOLLOWING SUMMER  (27 PAYMENTS)

(subject to appropriate deductions for State, Federal and Local taxes, FICA and any other deductions authorized by Teacher).
1 copy to Teacher        1 copy for School File        1 copy for Diocesan Office        1 copy for Payroll

CCHS 000565

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

Civil Action No. 3:17-cv-0011

LONNIE BILLARD,

      Plaintiff,

v.

CHARLOTTE CATHOLIC HIGH
SCHOOL, MECKLENBURG AREA
CATHOLIC SCHOOLS, and ROMAN
CATHOLIC DIOCESE OF CHARLOTTE,

      Defendants.

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Exhibit 3
Declaration of Rev. Roger K. Arnsparger

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

**Civil Action No. 3:17-cv-0011**

|  |  |
|---|---|
| **LONNIE BILLARD,** | |
| **Plaintiff,** | |
| **v.** | |
| | **DECLARATION OF**<br>**REV. ROGER K. ARNSPARGER** |
| **CHARLOTTE CATHOLIC HIGH SCHOOL, MECKLENBURG AREA CATHOLIC SCHOOLS, and ROMAN CATHOLIC DIOCESE OF CHARLOTTE,** | |
| **Defendants.** | |

I, Roger K. Arnsparger, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I was ordained a Catholic priest in 1977 in Covington, KY. I have served as a priest of the Roman Catholic Diocese of Charlotte (the "Diocese") since 1999. I currently serve as the pastor of St. John the Baptist Catholic Church in Tryon, NC. I am also the Vicar for Education and Director of Faith Formation for the Diocese. I have served in this capacity since 2008.

2.    In my role as Vicar for Education, I serve as the delegate of the Bishop of Charlotte in all educational matters. I am responsible for oversight of the Catholic Schools Office of the Diocese, which supervises and operates the nineteen Catholic schools within the Diocese, including the nine Catholic schools in the Greater Charlotte area which comprise the Mecklenburg Area Catholic Schools ("MACS") system. Charlotte Catholic High School ("CCHS") is part of the MACS system. As Vicar for Education, I oversee development and implementation of Diocesan educational policies and programs. Likewise, I supervise the

93884961_2

1

Directors of the Offices of Youth Ministry, Lay Ministry Foundation and Evangelization, and College Campus and Young Adult Ministry.

3.      I received a bachelor's degree in Philosophy from the Seminary of St. Pius X in Erlanger, KY in 1973 and a Master of Divinity degree from the Theological Seminary of St. Charles Borromeo in Philadelphia, PA in 1977.

4.      I have more than 25 years' experience working in and with Catholic schools, including 14 years as a religion teacher in Catholic High schools, both part time and full time. As Pastor of St. Michael's Parish in Gastonia, NC from 2006 to 2013, I worked with the parish grade school.

5.      I make this declaration based on my personal knowledge and upon records maintained by the Diocese in the course of its regularly conducted business activities.

### *The Church's Educational Mission*

6.      The Diocese of Charlotte is a diocese of the Roman Catholic Church.  It includes 46 counties in western North Carolina, including Mecklenburg County, North Carolina.  The Diocese of Charlotte is under the direction of Bishop Peter Jugis and is comprised of 73 Parishes and 19 Missions.

7.      The Diocese of Charlotte, in keeping with centuries of Church teaching, regards Catholic education as absolutely essential to the Church's mission of spreading the Gospel of Jesus Christ.

8.      For example, as expressed by the Sacred Congregation for Catholic Education in 1977 in *The Catholic School*, "Evangelization is . . . the mission of the Church; that is she must proclaim the good news of salvation to all, generate new creatures in Christ through Baptism, and train them to live knowingly as children of God." (No. 7.)  Further, "The Catholic school

2

93884961_2

forms part of the saving mission of the Church, especially for education in the faith. Remembering that 'the simultaneous development of man's psychological and moral consciousness is demanded by Christ almost as a pre-condition for the reception of the befitting divine gifts of truth and grace', the Church fulfills her obligation to foster in her children a full awareness of their rebirth to a new life. It is precisely in the Gospel of Christ, taking root in the minds and lives of the faithful, that the Catholic school finds its definition as it comes to terms with the cultural conditions of the times." (No. 9.)

9.     The Diocese of Charlotte administers MACS, which is a regional system of Catholic schools in the Charlotte, North Carolina area affiliated with the Roman Catholic Church. MACS includes CCHS in Charlotte, as well as eight other schools in the Charlotte and Mecklenburg County, North Carolina area.

10.     In keeping with the Church's teaching concerning its educational mission, the mission of MACS is to proclaim the Good News of the Gospel and to develop each student spiritually, intellectually, physically and socially to live in a changing society.

11.     MACS strives to maintain an environment in which the teachings of Jesus are promoted as the basis of the values taught and upheld. MACS schools, including CCHS, strive to help students develop a strong foundation of Catholic values through prayer, curriculum study, and outreach. MACS seeks to graduate students who are faith-filled and possess a strong moral compass informed by Catholic teaching. To this end, students in MACS schools, including CCHS, are required to take religion courses and afforded time within the school schedule for prayers, including at the beginning and end of the school day and at the beginning of each class, and to attend Mass when offered during the school day.

3

93884961_2

JA0770

12.     MACS schools, including CCHS, seek to reflect the "five essential marks of a Catholic School" as reflected in the Church's teaching: (1) inspired by a supernatural vision, (2) founded on a Christian anthropology, (3) animated by communion and community, (4) imbued with a Catholic worldview throughout its curriculum, and (5) sustained by Gospel witness.

13.     These aspirations are reflected in the motto of CCHS, which is written at the entrance to the school building: "the soul of education is the education of the soul." Each classroom also is affixed with a crucifix, serving as a reminder to students, faculty and staff, of the school's Catholic identity.

14.     The success of the religious educational mission of MACS schools, including CCHS, depends to a great degree on its teachers. Again, as expressed by the Sacred Congregation for Catholic Education in 1977 in *The Catholic School*:

> The extent to which the Christian message is transmitted through education depends to a very great extent on the teachers. The integration of culture and faith is mediated by the other integration of faith and life in the person of the teacher. The nobility of the task to which teachers are called demands that, in imitation of Christ, the only Teacher, they reveal the Christian message not only by word but also by every gesture of their behavior. This is what makes the difference between a school whose education is permeated by the Christian spirit and one in which religion is only regarded as an academic subject like any other. (No. 43)

### *MACS Policy Requirements*

15.     In light of the Church's educational mission which is founded on Christian anthropology, the Diocese and MACS require that teachers in MACS schools conduct themselves in their professional and personal public lives in such a way that is consistent with the larger Catholic educational mission of MACS and the Diocese. All teachers, including substitute teachers and regardless of their membership in the Catholic Church, serve as role models for students in the context of this mission. Accordingly, teachers may not publicly

4

engage in conduct or publicly advocate for positions opposed to the fundamental moral tenets of the Roman Catholic faith, including those concerning marriage.

16.    The Diocese and MACS communicate this expectation to their employees in a variety of ways, including through the Code of Ethics, the Personnel Policies Handbook, and the CCHS Faculty Handbook.

17.    As Vicar for Education for the Diocese, from 2009-2013, I conducted annual training sessions for all teachers at Diocesan schools discussing the Catholic mission of MACS and Diocesan schools and the role that teachers play in the fulfillment of that mission.

18.    In 2009, I gave a presentation to thank the teachers for their participation in the Mission of Catholic Schools. We looked specifically at the National Directory for Catechesis published by the United States Conference of Catholic Bishops. A copy of the PowerPoint presentation I gave during this talk is attached as Exhibit A. During the talk, I discussed the essential role that all teachers play in the religious mission of MACS schools. I explained that "[t]he nobility of the task to which teachers are called demands that, in imitation of Christ, the only Teacher, they reveal the message not only by word but by every gesture of their behavior." I further explained that "all members of the faculty, at least by their example, are an integral part of the process of religious education . . . . Teachers' life style and character are as important as their professional credentials."

19.    In August 2010, I gave a talk at the annual Catholic School Teachers meeting, which all full-time faculty were expected to attend. I again discussed the mission of the Catholic schools in the Diocese to proclaim the good news of the Gospel and to provide a religious and academic program that allows each student to develop spiritually, intellectually, emotionally, physically and socially, so that each is prepared to live and serve in a changing society as a self-

respecting and responsible citizen. I reviewed the information from the 2009 presentation and provided a handout with Review Notes with quotes concerning the role of all teachers in a Catholic School in the previous paragraph. In my talk, I also quoted from the Personnel Policies Handbook, which states:

> As employees of the Diocese of Charlotte, we share in the mission which Christ entrusted to the Church, to spread the Gospel, to serve our brothers and sisters, and to build up the Body of Christ which is the Church. All of our employees must respect, appreciate, and uphold the teachings, principles, legislation, policies and traditions of the Roman Catholic Church in both word and example.

20.     I elaborated further on these points during my talk at the Catholic School Teachers Meeting in August 2011, which all full-time teachers were expected to attend. A copy of the PowerPoint presentation I used for this talk is attached as Exhibit B.   During the talk, I explained that it was my goal in giving the talk to help teachers consider how we could, as a group, build a culture of holiness and salvation within Diocesan schools. I again emphasized all Diocesan employees share in the mission of the Catholic Church as a whole, and that all employees of our Diocesan schools, including MACS schools, share in the mission of our Catholic schools to proclaim the good news of the Gospel and to provide a religious and academic program that allows each student to develop spiritually, intellectually, emotionally, physically and socially, so that each is prepared to live and serve in a changing society as a self-respecting and responsible citizen of this world. I further explained that the goal of a Catholic education should be the student's decision to intentionally live a faithful and loyal Catholic life so as to save his soul and invite others to do the same. And I again quoted from the Personnel Policies Handbook as set forth in the preceding paragraph.

93884961_2

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Date: September 21, 2017

By: _____
Rev. Roger K. Arnsparger

93884961_2

7

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which will send electronic notice to counsel for Plaintiff at the addresses as follows:

Joshua Block
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004-2400
Telephone: 212-549-2627
Facsimile: 212-549-2650
Email: jblock@aclu.org

S. Luke Largess
Tin Fulton Walker & Owen PLLC
301 East Park Avenue
Charlotte, North Carolina 28202
Telephone: 704-338-1220
Facsimile: 704-338-1312
Email: llargess@tinfulton.com

Christopher Brooke
American Civil Liberties Union of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, North Carolina 27611
Telephone: 919-834-3466
Facsimile: 866-511-1344
Email: cbrook@acluofnc.org

Brian Hauss
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212-549-2604
Facsimile: 212-549-2652
Email: bhauss@aclu.org

Elizabeth O. Gill
American Civil Liberties Union Foundation
39 Drumm Street
San Francisco, CA 94111
Telephone: 415-621-2493

8

93884961_2

Facsimile: 415-255-8437
Email: egill@aclunc.org


This the 21st day of September 2017.

/s/ Meredith A. Pinson
Meredith A. Pinson (N.C. Bar No. 39990)

93884961_2

9

# EXHIBIT A

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 782 of 1438

JA0778



"And the Word Became Flesh and Made His Dwelling Among Us..."

John 1:14

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 783 of 1438



USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 784 of 1438

Case 3:17-cv-00072-NKM-JCH Document 81-5 filed 06/29/17 Page 14 of 29

JA0780

- All catechesis must be Christocentric

- It is the Person of Christ Who is the object of all learning

- He is the center of all history and all activity

- He is the door to Heaven; to eternal communion

Case 3:17-cv-00072-NKM-JCH   Document 813   Filed 08/21/20   Page 12 of 17

JA0781



JA0782



St. Peter, St. John the Baptist, Blessed Mother, St. Jerome, St. Paul
– B. Gozzoli, 1456

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 787 of 1438

JA0783



USCA4 Appeal: 22-1440   Doc: 27   Filed: 09/29/2022   Pg: 788 of 1438

Case 3:17-cv-00051-MOC-DCK   Document 31-5   Filed 09/29/17   Page 18 of 20

JA0784



# Exodus

Egypt          Desert          Holy Land
  ■ Mount Sinai: Identity

Slavery                         Freedom

Childhood   Adolescence   Adulthood
  ■ "Aha" moment of identity

Thank you for your love of our Faith, the Church and of those young ones and their parents whom most of you serve.

JA0785

JA0786

- I want to thank you for your commitment, which I hope is passionate and zealous, to support, develop and provide Catechesis for the adults and the youth of the Diocese of Charlotte. While you are involved in schools, your work affects everyone in the Church.

JA0787

- The Liturgy is, of course, the most important work of the Church and every activity in the Church must be centered upon it. In itself it is catechesis and Catholic formation par excellence. I would ask that we always place the Liturgy, the Liturgical Calendar and rites at the center of all our planning. Everything thing we do should revolve around this continuing *mystagogy.*

USCA4 Appeal: 22-1440   Doc: 27   Filed: 09/29/2022   Pg: 792 of 1438

Case 3:17-cv-00072-NKM-JCH   Document 31-5   Filed 09/21/18   Page 28 of 55

JA0788

- All catechetical programs are centered on the Mystery of the Liturgy – the place where God meets man and man meets God.
- The Sacred Liturgy is the center of Catholic life.
- If what we are doing does not lead the students to the Mass and the Sacraments, we must reassess what we are doing and find what will accomplish this.

- To be effective in our care for Catechesis each of us must pledge to live the spiritual life.

- Our devout participation in Sunday and Holy Day Mass, our frequent Confession, daily prayer and spiritual reading are essential to the project of our handing on the Faith.

- We will only be as effective as is our commitment to our spiritual life.

Case 3:19-cv-00081-NKM-JCH Document 512 Filed 06/08/21 Page 31 of 61

JA0789

Case 3:17-cv-00161-NKM-JCH    Document 31-6    Filed 06/11/18    Page 118 of 131

JA0790

- To be effective in our care for Catechesis each of us must pledge to live the spiritual life.

- We will only be as effective as is our commitment to our own spiritual life.

Our devout participation in:

- Sunday and Holy Day Mass,
- our frequent Confession,
- daily devotions, practices, prayer and spiritual reading

are essential to the project of our handing on the Faith.

JA0791

JA0792

- We learn through beauty and order: the mind is freed to think and embrace truth.

- There is beauty of time; the way our daily schedule at school is fashioned teaches, e.g. Morning Offering, Angelus, etc.

Case 3:17-cv-00081-MOC-DCK   Document 91-8   Filed 08/02/22   Page 147 of 151

JA0793

- My desire is to encourage you and to assist you in your ministry for the Church. How can we all work together to help each other give a joyful, zealous and intentionally Catholic presentation of the Faith in all the disciplines of learning?

JA0794

- All of the Educational Programs of the Diocese are Catechetical programs; they are a part of the larger picture of the apostolic work of the Diocese of Charlotte. I am convinced that they are a very important part of that mission; they enrich and are enriched by all the other elements of the Diocesan mission.

JA0795

- The law of penance on every Friday gives order to the soul to focus on Christ's love and our discipline.

- In the U.S., first place is given to abstinence from meat on every Friday;

- if this is not done, one must impose another penance.

  (Canons 1249-1253; Pastoral Statement on Penance and Abstinence *A Statement Issued by the National Conference of Catholic Bishops,* November 18, 1966)

USCA4 Appeal: 22-1440　　　Doc: 27　　　Filed: 09/29/2022　　　Pg: 800 of 1438

Case 1:12-cv-00311-MOC-DSC　Document 114　Filed 05/15/12　Page 1 of 1

JA0796



NATIONAL DIRECTORY for CATECHESIS

UNITED STATES CONFERENCE OF CATHOLIC BISHOPS

# A Vision for the NDC

- Jesus Christ is the unique emissary of the Father, and the apostles are the emissaries of Jesus Christ.
- "As the Father has sent me, so I send you." Jn. 20:21
- The ministry of the apostles continues the mission of Christ–
  - From the Father and in the Holy Spirit
    - For the <u>Salvation of all</u>.

JA0797

Case 3:17-cv-00072-NKM-JCH   Document 318   Filed 06/01/19   Page 1 of 11

JA0798

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 803 of 1438

JA0799

Case 3:17-cv-00051-NKM-JCH Document 112 Filed 05/01/21 Page 114 of 181

JA0800

# Vision of NDC

- ## The Plan of the Father:
  - The Church has as her origin the mission of the Son and the Holy Spirit.
- ## The Divine Plan of Redemption:
  - The Father sends the Son.
  - He created man and woman to share His own divine life.
  - The communion of God and humanity is brought about in the Church.

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 805 of 1438

Case 3:17-cv-00001-NKM-JCH   Document 91-7   Filed 09/21/21   Page 124 of 132

JA0801

# Vision of NDC

- Jesus Christ, the eternal Son of the Father:
  - Instituted the Church to accomplish the Father's plan of salvation for all
  - Proclaimed the Good News of the coming of the Kingdom of God for all to hear and respond
- The Church is "the kingdom of Christ already present in mystery." (LG, 3)
- (Therefore we love the Church)

Case 1:21-cv-02402-LKG Document 11-1 Filed 09/29/22 Page 1 of 1

JA0802

# Vision of NDC

- Christ's commission involves teaching Christ and the teachings of Christ
  - The Truth Which He is

  - Like their Master, the apostles must declare:
    - "My teaching is not my own.." (Jn 7:16)
    - "I received from the Lord what I also handed on to you." (1 Cor. 11:23)

JA0803

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 808 of 1438

JA0804

# Vision of NDC

- Jesus entrusted a divine mission to His apostles, and it will continue until the end of time.

- This mission is entrusted to all involved in the apostolate of a Catholic School.

JA0805

# NDC Pastoral Efforts: Catholic Schools

- Catholic schools are vital to the Church's mission of evangelization of catechesis.
- They exist in order to educate the whole person: mind, body and soul.
- They present the totality of the Catholic faith.

JA0806

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 811 of 1438

Case 3:17-cv-00011-MOC-DCK  Document 51-2  Filed 09/25/18  Page 2 of 12

JA0807

# NDC Pastoral Efforts: 61.A.4b Catholic Schools

- The Catholic School should strive to integrate the Catholic faith into every aspect of its life.

- It seeks to relate all human culture to the news of salvation, so that the life of faith will illuminate the knowledge that students gradually gain of the world, of life, and of mankind.

USCA4 Appeal: 22-1440     Doc: 27     Filed: 09/29/2022     Pg: 812 of 1438

Case 3:17-cv-00011-NKM-JCH   Document 313   Filed 06/13/19   Page 37 of 175

JA0808

# NDC Pastoral Efforts: 61.A.4b Catholic Schools

- The integration of religious truth and values with the rest of life is a hallmark of education in Catholic schools.

- The Catholic school "must present the Christian message and the Christian event with the same seriousness and the same depth with which other disciplines present their knowledge."

JA0809

# NDC Pastoral Efforts: 61.A.4b
## Catholic Schools

- The Church has made an enormous commitment in human and financial resources to make and keep Catholic schools accessible and affordable...

# NDC 54.B.9a. Principals

- Under the pastor, the principal of the Catholic school plays a crucial role in achieving the catechetical objectives of the parish. (Diocese)
- The Catholic School is a center for evangelization
- The Catholic School is an "active apostolate"

JA0810

# NDC 54.B.9a. Principals

■ The principal of a Catholic school must be a practicing Catholic in good standing who understands and accepts the teachings of the Church and the moral demands of the Gospel.

JA0811

JA0812

# NDC 54.B.9a. Principals

- The principal is called to:
  - Recognize that all members of the faculty and staff "are an integral part of the process of religious education."
  - Recruit teachers who are practicing Catholics, who can understand and accept the teachings of the Catholic Church and the moral demands of the Gospel and can contribute to the achievement of the school's Catholic identity and apostolic goals. [If non-Catholics are hired they must, as our Employee Handbook and Code of Ethics states, give full support and witness to the teachings of the Church.]

JA0813

# NDC 54.B.9a. Principals

- Supervise, through observation and evaluation, the performance of each religion teacher
- Provide opportunities for ongoing catechesis for faculty members
- Design a curriculum that supports the school's catechetical goals
- Develop goals for the implementation of an overall catechetical plan for the school, and periodically evaluate progress toward the goals.

JA0814

# NDC 54.B.9a. Principals

- Foster a distinctively Christian community among the faculty, students, and parents
- Provide, alongside the pastor, for the spiritual growth of the faculty
- Collaborate with parish, area, and diocesan personnel in planning and implementing programs of total parish catechesis

# NDC 54.B.9c. Religion Teachers

- The Catholic School's effectiveness as a community of faith and a center for evangelization and catechesis depends to a large extent on its teachers of religion.
- They should be practicing Catholics with a thorough knowledge of the Christian message and the ability to communicate it completed, faithfully, and enthusiastically

JA0815

JA0816

JA0817

# NDC 54.B.9d. All Teachers

- The nobility of the task to which teachers are called demands that, in imitation of Christ, the only Teacher, they reveal the message not only by word but also by every gesture of their behavior.

- All teachers in Catholic schools share in the catechetical ministry.

- All members of the faculty, at least by their example, are an integral part of the process of religious education... Teachers' life style and character are as important as their professional credentials.

■ NDC, 2005: "The apostolic work of the catechist springs from the Sacrament Baptism...It is strengthened by the Sacrament of Confirmation...

■ Catechists need to be practicing Catholics who participate fully in the communal worship and life of the Church and who have been prepared for their apostolate by appropriate catechetical training...

JA0818

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 823 of 1438

Case 3:17-cv-0001-MOC-DCK Document 31-3 Filed 09/23/17 Page 7 of 11

JA0819

- Their personal relationship with Jesus Christ energizes their service to the Church and provides the continuing motivation, vitality, and force of their catechetical activity. ...to follow (Christ) as a teacher of the faith and a witness to the truth of the faith....

- The spiritual life of a catechist should be characterized by:

JA0820

- A love of God – Father, Son, and Holy Spirit – and of Christ's Church, our Holy Father and God's holy people

- A coherence and authenticity of life that is characterized by their faithful practice of the faith in a spirit of faith, charity, , hope, courage, and joy

- Personal prayer and dedication to the evangelizing mission of the Church

- A missionary zeal by which they are fully convinced of the truth of the Catholic faith and enthusiastically proclaim it

- Active participation in their local parish community, especially by attendance at Sunday Eucharist

- A devotion to Mary, the first disciple and the model of catechists, and to the Most Holy Eucharist, the source of nourishment for catechists"

JA0821

- HANDOUTS-

- St. Ignatius: The Principle and Foundation of the Spiritual Life

- Prayer

- Virtues

JA0822

- What is the purpose of Catechesis? In *Catechesi Tradendae*, Pope John Paul II states: which are above all catechetical centers:

  CT, 5: "...the definitive aim of catechesis is to put people not only in touch but in communion, in intimacy, with Jesus Christ: only He can lead us to the love of the Father in the Spirit and make us share in the life of the Holy Trinity."

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 827 of 1438

JA0823

- Catechetical programs are about making saints.

- They do this by helping our students come into an "intimacy" with Jesus;

  - not just knowing about Him, but knowing Him;
  - not just loving Him distantly, but being in love with Him.

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 828 of 1438

JA0824

- We call ourselves and our students (and their parents) to respond to our Lord's words in Matthew 5:48:

  "You must be made perfect as your heavenly is Father is perfect."

- The universal call to holiness is a call to the perfection of charity.

- Catechesis has one purpose then: to offer the way to eternal life.
- Everything we do in our catechetical programs must lead our students to a deeper understanding of and a more profound participation in the Sacrifice of the Mass and the Sacraments, particularly Confession, in the heart of our Lord's Church.
- Why? Because these are the way to eternal life to Heaven. This is not an option but the core of what we are doing.

JA0825

JA0826

# GOAL OF CATECHESIS:

So, the ultimate goal of Catechesis then is the salvation of the soul of every student.

This is done by a thorough, systematic and organic catechesis.

Msgr. Francis Kelley defines catechesis as: "...the transmission of God's Word to invite people to personal faith.".

Case 3:17-cv-00822-MOC-DCK Document 91-3 Filed 06/11/21 Page 1 of 80

JA0827

- The goal of our Catholic schools must be to invite each student to a:

- personal faith:

- a faith which is
  - intentional and not just cultural.
  - This means the students must
    - understand and
    - be able to articulate the truths of the Catholic Faith and
      - their relation to the truths of the other disciplines of knowledge.
      - Every religion program should be of AP quality.

JA0828

- To have valid interchange with each other in engaging our culture, we must have the knowledge of the "sacred and certain doctrines" of the Church.

- The purpose for which Bl. John XXIII called the Second Vatican Council was that those sacred and certain doctrines would be better understood and lived by all people.

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 833 of 1438

JA0829

- The normal result of a Catechetical program should be the student's decision to intentionally live a faithful and loyal Catholic life so as to save his or her soul and invite others to do the same.

- This decision is not to just claim to be a Catholic, but to really strive to be one in private and in public; in short, to be a man or woman of integrity who thinks truly critically, believes sincerely and acts responsibly to gain eternal life.

JA0830

- The outcome of our Catechesis is evident and therefore measurable. We can ask:

- Are our students convinced of the truths of the Catholic Church (which is the bearer of the Gospel)?

- Do they practice their faith in their parish and diocese?

- Are they intentional Catholics or just Catholics by "inertia?"

- Are they living Catholic lives now and are we tracking them to see if they continue to be practicing Catholics?

JA0831

- The world needs intentional, informed, zealous Catholics. And many are coming forth from our Catechetical programs. Studies show that while our young ones want to be good people and be of service, they often do not know the contents of their Religion nor the specific Catholic or Christian reason for what we do even in service.

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 836 of 1438

JA0832

*The Mystery We Proclaim,*
*Second Edition*
by Msgr. Francis D. Kelly

(Wipf and Stock Publishers, 2007)

Case 3:17-cv-00051-NKM-JCH   Document 313   Filed 08/25/17   Page 10:18:18

JA0833

# Part I, Chapter 1

The most important task for catechesis is:

- To foster an understanding of the divine plan of revelation
- which has made known to us
- "the mystery hidden from ages and from generations past...; it is Christ in you, the hope for glory"; the divine plan of salvation for all mankind, for the whole of human history.
- This is "THE MYSTERY WE PROCLAIM." See Ephesians 1:4 – 10

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 838 of 1438

JA0834

■  Part I, Chapter 2 – Four Frameworks for Modern Catechesis:

1. Cultural: Secular, pluralistic and materialistic

2. Epistemological: How we know – Sense knowledge; feelings, sin

3. Theological: Revelation based; truths of the faith revealed not produced by mind

4. Spiritual: Called to holiness – Knowledge, Sacraments, Actions, Prayer

The very first section of Part One (nos. 26-197) of CCC is essential background reading for the whole of the Catechism and a section that should be central to catechist training and frequently re-read by those in this ministry.

JA0835

# PART TWO:
## The Heritage and the Challenge

- Chap 1:
- Cultural Shifts and Seductions: Major cultural shift in the 1900's. Modern culture and thinking are characterized by strong currents of subjectivism, individualism, relativism, pragmatism, and materialism.

JA0837

- The danger for Catholics now is that instead of clear Catholic identity based on true ecclesial and doctrinal foundations, a rather loose socio-cultural Catholic identity will be retained.

- This Catholic identity may be without clear commitment to authentic Catholic faith or moral teachings but more in the line of a cultural affiliation based on ancestry or family tradition.

JA0838

- Msgr. Kelley suggests these five Catechetical Goals of the Church's Initiation and Socialization Process into intentional Catholic life. I think he has given a good focus to our apostolate of Catechesis (See handout):

- 1. Conversion
- 2. Community
- 3. Content
- 4. Contemplation
- 5. Commitment

JA0839



- 1. Conversion:
  - Personal, zealous, intentional Catholic

- 2. Community:
  - Family; much loneliness today; need identity

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 845 of 1438

Case 3:17-cv-00191-MR-DCK Document 8-16 Filed 08/31/2 Page 1-16

JA0841

- Catechetical programs should assist in the Catholic initiation and socialization of our youth.

- They should engage the soul and the culture with reason and faith on a consistent basis and in the framework of the Church.



Renewing Our Commitment to Catholic Elementary and Secondary Schools in the Third Millennium Copyright © 2005, United States Conference of Catholic Bishops, Inc.

JA0842

JA0843

- "Young people are a valued treasure and the future leaders of our Church. It is the responsibility of the entire Catholic community—bishops, priests, deacons, religious, and laity—to continue to strive towards the goal of making our Catholic...schools available, accessible, and affordable to all Catholic parents and their children, including those who are poor and middle class.

- "All Catholics must join together in efforts to ensure that Catholic schools have administrators and teachers who are prepared to provide an exceptional educational experience for young people—one that is both *truly Catholic and of the highest academic quality.*" (Emp. Added)
http://www.usccb.org/bishops/schools.pdf

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 848 of 1438

Case 3:17-cv-04057-MLB-DSC Document 81-13 Filed 08/21/21 Page 1 of 11

JA0844

- "Truly Catholic and of the highest academic quality"

- These two elements are essential and interrelated, as you know and are committed to.

- Otherwise, the entire venture of Catholic Schools is just one of making private education available in a more affordable way than secular private schools or making possible a school to which people go simply because they don't want to go to another school.

- What is our strategic plan to accomplish the task of making our schools "truly Catholic and of the highest academic quality"?

- We must constantly be reassessing this and implementing the plan.

- I know this is of great concern to you.

JA0845

- A school is Catholic not only in its religion curriculum and service opportunities, but in its entire curriculum – its entire life: academics, sports, schedule, etc.

- The expected practice of the Faith with intellect and will is infused in every aspect of a Catholic School. Of course, that means that it will seek for academic excellence.

- A Catholic school assists a student to come to an understanding of his or her "identity" as a child of God, as a member of the Body of Christ and his purpose in life. He should be able to articulate what that means and what that requires of his intellect and will and his body.

Pope Benedict XVI to Catholic Educators in USA, April 17, 2008:

"A...school's Catholic identity is not simply a question of the number of Catholic students.

"It is a question of conviction – do we really believe that only in the mystery of the Word made flesh does the mystery of man truly become clear?

"Are we ready to commit our entire self – intellect and will, mind and heart – to God?

JA0846

USCA4 Appeal: 22-1440   Doc: 27   Filed: 09/29/2022   Pg: 852 of 1438

JA0848



- "Only in this way do we really bear witness to the meaning of who we are and what we uphold....

- "Clearly, .. Catholic identity...demands and inspires...:

- "...that each and every aspect of your learning communities reverberates within the ecclesial life of faith."

JA0849

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 854 of 1438

JA0850



NATIONAL DIRECTORY
*for* CATECHESIS

UNITED STATES CONFERENCE OF CATHOLIC BISHOPS

Criteria for Authentic Presentation of the Christian Message (NDC, 2005)

- Centers on Jesus Christ (A.D.)
- Introduces the Trinitarian dimension of the Gospel message
- Proclaims the Good News of salvation and liberation
- Comes from and leads to the Church
- Has a historical character
- Seeks inculturation and preserves the integrity and purity of the message
- Offers the comprehensive message of the Gospel and respects its inherent hierarchy of truths
- Communicates the profound dignity of the human person
- Fosters a common language of the faith

JA0851

Case 2:17-cv-03851-MAK DCR Document 81-11 Filed 09/26/21 Page 8 of 92

Tasks of Catechesis (NDC, 2005)

1. Promotes knowledge of the faith
2. Promotes a knowledge of the meaning of the Liturgy and the Sacraments
3. Promotes moral formation in Jesus Christ
4. Teaches the Christian how to pray with Christ
5. Prepares the Christian to live in community and to participate actively in the life and mission of the Church
6. Promotes a missionary spirit that prepares the faithful to be present as Christians in society

JA0852

USCA4 Appeal: 22-1440     Doc: 27     Filed: 09/29/2022     Pg: 857 of 1438

Case 3:13-cv-00314-MOC-DCK   Document 131-5   Filed 08/07/15   Page 364 of 05

Case 3:17-cv-00811-MOC-DCK   Document 71-11   Filed 08/05/19   Page 336 of 63

JA0854

# Philosophy of Education
## A.N. Whitehead

Three stages of learning:

- **Romance**
  - Intrigue; something (thing or idea) not known which the person wants to know

- **Precision**
  - Ascertaining knowledge of the thing (or idea) not known in itself and its relation to reality

- **Generalization**
  - Being intrigued (romanced) by something new which the Precision has introduced: another thing or idea which leads the person to wonder to seek Precision.

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 859 of 1438

JA0855



School of Athens by Rafaello Sanzio in 1509 Stanza della Segnatura, Vatican



Vision of St Thomas Aquinas by Santidi Di Tito (1593) San Marco, Florence

JA0856

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 861 of 1438

JA0857



St. John Bosco – The Dream: The Holy Eucharist and Mary guide the Pope

# The Learning Disciplines
## by Peter Senge, Ph.D.
## from "The Fifth Discipline"

- Personal Mastery
- Mental Models
- Team Learning
- Shared Vision
- Systems Thinking

JA0858

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 863 of 1438

Case 3:17-cv-00072-NKM-JCH    Document 16-19    Filed 03/14/18    Page 4 of 13

JA0859

# Each of the five learning disciplines can be thought of on three distinct levels:

- Practices: what you do

- Principles: guiding ideas and insights

- Essences: the state of being of those with high levels of mastery in the discipline

# The Learning Disciplines

- Personal Mastery



USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 864 of 1438

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 865 of 1438

# The Learning Disciplines

- Mental Models



Essences
- LOVE OF TRUTH
- OPENNESS

Principles
- ESPOUSED THEORY VS. THEORY-IN-USE
- LADDER OF INFERENCE
- BALANCE INQUIRY AND ADVOCACY

Practices
- DISTINGUISHING "DATA" FROM ABSTRACTIONS BASED ON DATA
- TESTING ASSUMPTIONS
- "LEFT-HAND" COLUMN

MENTAL MODELS



USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 866 of 1438

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 867 of 1438

Case 3:17-cv-00612-MSG-CB1   Document 91-10   Filed 09/21/17   Page 4 of 43

# The Learning Disciplines

- Building Shared Vision



Essences — • COMMON-ALITY OF PURPOSE
        • PARTNERSHIP

Principles — • SHARED VISION AS "HOLOGRAM"
        • COMMITMENT VS. COMPLIANCE

Practices — • VISIONING PROCESS
        -- SHARING PERSONAL VISIONS
        -- LISTENING TO OTHERS
        -- ALLOWING FREEDOM OF CHOICE
        • ACKNOWLEDGING CURRENT REALITY

BUILDING SHARED VISION



Case 3:17-cv-00011-MOC-DCK Document 31-33 Filed 09/21/18 Page 3 of 13



The practices are activities upon which practitioners of the discipline focus their time and energy. For example:

- Systems thinking entails using the "systems archetypes" in order to perceive underlying structures in complex situations.

- Personal mastery entails "clarifying personal vision," and "holding creative tension" simultaneously focusing on the vision and current reality and allowing the tension between the two to generate energy toward achieving the vision.

- Working with mental models involves distinguishing the direct "data" of experience from the generalizations or abstractions that we form based on the data.

Case 5:17-cv-00011-RJC-DCK   Document 11-12   Filed 08/21/17   Page 11 of 13

- The practices are the most evident aspect of any discipline.

- They are also the primary focus of individuals or groups when they begin to follow a discipline.

- For the beginner, they require "discipline" in the sense of conscious and consistent effort because following the practices is not yet second nature.

In a heated debate, the novice at working with mental models will have to make an effort to identify the assumptions he is making and why.

Often the beginner's efforts in a discipline are characterized by time displacement: only after the debate, does one see one's assumptions clearly, and distinguish them from the "data" and reasoning upon which they are based

Case 3:17-cv-00011-MOC-DCK   Document 15-12   Filed 08/21/17   Page 13 of 13

- However, eventually, the practices of a discipline become more and more automatic and active in "real time."

- You find yourself spontaneously thinking of systems archetypes, recreating (which is different from recalling) your vision, and recognizing your assumptions as they come into play, while confronting pressing problems.

Case 3:17-cv-00011-MOC-DCK   Document 34-23   Filed 08/21/17   Page 1 of 11





Equally central to any discipline are the underlying principles. These represent the theory that lies behind the practices of the disciplines.

- For example, "structure influences behavior" is a central principle underlying systems thinking, as is "policy resistance," the tendency of complex systems to resist efforts to change their behavior.

- The former implies that the ability to influence reality comes from seeing structures that are controlling behavior and events.

- The latter implies that efforts to manipulate behavior, for example through well-intentioned programs such as building new houses for disadvantaged urban dwellers, will generally improve matters only in the short run and often lead to still more problems in the long run.

Case 3:17-cv-00011-MOC-DCK   Document 21-13   Filed 08/21/17   Page 4 of 13



Similarly, the power of vision is a principle of personal mastery, as is the distinction between "creative tension" and "emotional tension."

- The principles behind a discipline are important to the beginner as well as to the master.

  - For the beginner, they help him in understanding the rationale behind the discipline and in making sense of the practices of the discipline.

  - For the master, they are points of reference which aid in continually refining the practice of the discipline and in explaining it to others.

Case 1:17-cv-00011-MOC-DCK    Document 31-13    Filed 08/23/17    Page 6 of 11

It is important to recognize that mastering any of the disciplines requires effort on both the levels of understanding the principles and following the practices.

It is tempting to think that just because one understands certain principles one has "learned" about the discipline.

This is the familiar trap of confusing intellectual understanding with learning. Learning always involves new understandings and new behaviors, "thinking" and "doing."

This is the reason for distinguishing principles from practices. Both are vital.



The third level, the "essences" of the disciplines, is different.

There is no point in focusing one's conscious attention and effort on these essences in learning a discipline, any more than it would make sense to make an effort to experience love or joy or tranquility.

The essences of the disciplines are the state of being that comes to be experienced naturally by individuals or groups with high levels of mastery in the disciplines.

While these are difficult to express in words, they are vital to grasp fully the meaning and purpose of each discipline.

Each of the disciplines alters its practitioner in certain very basic ways. This is why we refer to them as personal disciplines, even those that must be practiced collaboratively.

For example, systems thinking leads to experiencing more and more of the interconnectedness of life and to seeing wholes rather than parts.

Whenever there are problems in a family or in an organization, a master of systems thinking automatically sees them as arising from underlying structures rather than from individual mistakes or ill will.

Likewise, personal mastery leads to an increased sense of "beingness," awareness of the present moment, both what is happening within us and outside of us, and to a heightened experience of "generativeness" of being part of the creative forces shaping one's life.

- At the level of essences, the disciplines start to converge.

  - There is a common sensibility uniting the disciplines—the sensibility of being learners in an intrinsically interdependent world.

  - Yet, there are still differences between the disciplines.

  - But the differences become increasingly subtle.

Case 3:17-cv-00011-MOC-DCK Document 31-13 Filed 08/21/17 Page 11 of 12

- For example,

- "interconnectedness" (systems thinking) and "connectedness" (personal mastery) are subtle distinctions.

  - The former has to do with awareness of how things interrelate to one another;

  - the latter with awareness of being part of rather than apart from the world.

Case 3:17-cv-00011 MOC-DCK   Document 31-14   Filed 09/21/17   Page 1 of 55

So, too, is the distinction between "commonality of purpose" (shared vision) and "alignment" (team learning) a fine one.

- While the former has to do with a common direction and reason for being,

- the latter has to do with "functioning as a whole" when we actually work together.

- Though subtle, these distinctions are important. Just as the connoisseur of fine wines makes distinctions that the novice would not, so do individuals and groups who develop high levels of mastery in the disciplines see distinctions that might be obscure to beginners.

Case 3:17-cv-00011-MOC-DCK    Document 91-14    Filed 08/31/17    Page 2 of 55



- Lastly, the disciplines of building shared vision and team learning differ from the other three in that they are inherently collective in nature.

- The practices are activities engaged in by groups.
- The principles must be understood by groups.
- And the essences are states of being experienced collectively.

# EXHIBIT B

USCA4 Appeal: 22-1440   Doc: 27   Filed: 09/29/2022   Pg: 888 of 1438

Case 3:17-cv-00011-MOC-DCK   Document 31-14   Filed 09/21/17   Page 5 of 55

# Catholic Schools Teachers Meetings
# August 17, 18, 19 - 2011



DIOCESE OF CHARLOTTE CATHOLIC SCHOOLS

Faith • Tradition • Academic Excellence

CCHS 000971

# Preparation

CCHS 000972

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 890 of 1438

# Welcome

- Thank you for being here
- We are brought here by:

  – Our Faith

  – Our Tradition

  – Our quest for Academic Excellence

CCHS 000973

Case 3:17-cv-00011-MOC-DCK    Document 31-14    Filed 09/21/17    Page 7 of 55

Filed: 09/29/2022    Doc: 27    USCA4 Appeal: 22-1440

## Mission Statement



The Mission of the Catholic Schools in the Diocese of Charlotte is

- **to proclaim** the Good News of the Gospel and
- **to provide** a religious and academic program that allows each student to develop spiritually, intellectually, emotionally, physically and socially,
- **so that** each is prepared to live and serve in a changing society as a self-respecting and responsible citizen (of this world and the next.)

4

CCHS 000974

USCA4 Appeal: 22-1440     Doc: 27     Filed: 09/29/2022     Pg: 892 of 1438



Scripture focus for 2011:

*"So that in all things God may be glorified"*

(1 Peter 4:11)

CCHS 000975

USCA4 Appeal: 22-1440      Doc: 27      Filed: 09/29/2022      Pg: 893 of 1438

# Theme for 2011

*"Do This In Memory of Me"* :
*Building a culture of holiness and
salvation, with faith, reason, grace
and excellence in virtue*

CCHS 000976

# Prayer

Let us Remember that we are in the holy presence of God.

- In the Name of the Father, and of the Son, and of the Holy Spirit. Amen.

- Father, may everything we do begin with your inspiration and continue with your saving help. Let our work always find its origin in you and through you reach completion. We ask this through our Lord Jesus Christ, Your Son, Who lives and reigns with You and the Holy Spirit, one God for ever and ever. AMEN

CCHS 000977

USCA4 Appeal: 22-1440     Doc: 27     Filed: 09/29/2022     Pg: 895 of 1438

Case 3:17-cv-00011-MOC-DCK     Document 31-14     Filed 09/21/17     Page 12 of 55



**DO THIS IN MEMORY OF ME** Luke 22:19

Charlotte Convention Center, September 23 & 24, 2011

# PRAYER FOR THE EUCHARISTIC CONGRESS

O Jesus, who art really, truly and substantially present in the Blessed Sacrament to be the food of our souls, deign to bless and bring to a successful issue all Eucharistic Congresses and gatherings, and especially the coming Congress of the Diocese of Charlotte. Be Thou the inspiration of our labors, resolutions and vows; accept graciously the solemn homage we will render to Thee; send Your Holy Spirit to kindle the hearts of priests, religious, and all the faithful, especially the children, so that devout participation in the Holy Mass and frequent and daily Holy Communion may be held in honor in all the countries of the world; and grant that the Kingship of Your Sacred Heart over human society may everywhere be acknowledged to the glory of God, the Father. Amen.

CCHS 000978

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 896 of 1438

*Convent of San Marco, Florence (Refectory) - Fresco of the Last Supper by Domenico Ghirlandaio an Italian Renaissance painter. The Latin inscription above the table is translated, "I confer a kingdom on you, just as my Father has conferred one on me, that you may eat and drink at my table in my kingdom." (Luke 22: 29-30)*



CCHS 000979

Thank you for your love of our Faith, the Church and of those young ones and their parents whom you serve. Your choice to teach in a Catholic School speaks of your commitment to the Mission of the Church and of our Catholic schools.

CCHS 000980

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022

My desire is to encourage you and to assist you in your ministry for the Church. How can we all work together to help each other give a joyful, zealous and intentionally Catholic presentation of the Faith in all the disciplines of learning?

CCHS 000981

Case 3:17-cv-00011-MOC-DCK   Document 31-14   Filed 09/21/17   Page 15 of 55

This morning I would like to consider how we build a culture of holiness and salvation as we fulfill our Lord's instruction to "Do this in memory of Me." (Lk 22:19) Let's look at:

1. Sharing in the Mission of Catholic Schools
2. All Diocesan Employees share in the Mission of the Church
3. All Diocesan Catholic School Employees share in the Mission of our Catholic Schools
4. "Do This in Memory of Me" Luke 19:22 – Theme of the Eucharistic Congress
5. Building a culture of holiness and salvation

CCHS 000982

USCA4 Appeal: 22-1440   Doc: 27   Filed: 09/29/2022   Pg: 899 of 1438

- CCC 25: …The whole concern of doctrine and its teaching must be directed to the *love that never ends*. Whether something is proposed for belief, for hope or for action, the love of our Lord must always be made accessible, so that anyone can see that all the works of perfect Christian virtue spring from love and have no other objective than to arrive at love.

CCHS 000983

USCA4 Appeal: 22-1440  Doc: 27  Filed: 09/29/2022  Pg: 901 of 1438

# 2. Proclamation

1. Sharing in the Mission of Catholic Schools
2. All Diocesan Employees share in the Mission of the Church
3. All Diocesan Catholic School Employees share in the Mission of our Catholic Schools
4. "Do This in Memory of Me" Luke 19:22 – Theme of the Eucharistic Congress
5. Building a culture of holiness and salvation, with faith, reason, grace and excellence in virtue

CCHS 000984

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 902 of 1438

Case 3:17-cv-00011-MOC-DCK   Document 31-14   Filed 09/21/17   Page 19 of 55

# 3. Explanation

CCHS 000985

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 903 of 1438

# 1. Sharing in the Mission of Catholic Schools



The Mission of the Catholic Schools in the Diocese of Charlotte is

- **to proclaim** the Good News of the Gospel and
- **to provide** a religious and academic program that allows each student to develop spiritually, intellectually, emotionally, physically and socially,
- **so that** each is prepared to live and serve in a changing society as a self-respecting and responsible citizen (of this world and the next.)

16

CCHS 000986

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 904 of 1438

Case 3:17-cv-00011-MOC-DCK   Document 31-14   Filed 09/21/17   Page 21 of 55

## Our Goal

Our Goal:

- The normal result of a Catholic School education should be the student's decision to intentionally live a faithful and loyal Catholic life so as to save his or her soul and invite others to do the same.

- This decision is not to just claim to be a Catholic, but to really strive to be one in private and in public; in short, to be a man or woman of integrity who thinks truly critically, believes sincerely and acts responsibly to gain eternal life.

17

CCHS 000987

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 905 of 1438

# Our Holy Father's Challenge to Catholic Schools

- "A...school's Catholic identity is not simply a question of the number of Catholic students.

- It is a question of conviction – do we really believe that only in the mystery of the Word made flesh does the mystery of man truly become clear?

- "Are we ready to commit our entire self – intellect and will, mind and heart – to God? Do we accept the truth Christ reveals? Is the faith tangible in our...schools? Is it given fervent expression liturgically, sacramentally, through prayer, acts of charity, a concern for justice, and respect for God's creation? Only in this way do we really bear witness to the meaning of who we are and what we uphold....Clearly, ... Catholic identity...demands and inspires...that each and every aspect of your learning communities reverberates within the ecclesial life of faith."

**Pope Benedict XVI to Catholic Educators in USA, April 17, 2008**

18

CCHS 000988

JA0901

Filed: 09/29/2022   Doc: 27   USCA4 Appeal: 22-1440

## Measuring Outcomes of Catholic Education

*The outcome of our Catechesis is evident and therefore measurable. We can ask:*

- Are our students convinced of the truths of the Catholic Church (which is the bearer of the Gospel)?
- Do they practice their faith in their parish and diocese?
- Are they intentional Catholics or just Catholics by "inertia?"
- Are they living Catholic lives now and are we tracking them to see if they continue to be practicing Catholics?

19

CCHS 000989

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 907 of 1438

Case 3:17-cv-00011-MOC-DCK   Document 31-14   Filed 09/21/17   Page 24 of 55

# Dangers that Catholics Face Today

- The danger for Catholics today is that instead of clear Catholic identity based on true ecclesial and doctrinal foundations, a rather loose socio-cultural Catholic identity will be retained.

- This Catholic identity may be without clear commitment to authentic Catholic faith or moral teachings but more in the line of a cultural affiliation based on ancestry or family tradition.

*(Msgr. Francis Kelley, The Mystery We Proclaim)*

20

CCHS 000990

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 908 of 1438

## 2. Diocesan Employees share in the Church's Mission

"As employees of the Diocese of Charlotte, we share in the mission which Christ entrusted to the Church, to spread the Gospel, to serve our brothers and sisters, and to build up the Body of Christ which is the Church. All of our employees must respect, appreciate, and uphold the teachings, principles, legislation, policies and traditions of the Roman Catholic Church in both word and example."

(Personnel Policies Handbook, Code of Ethics, Contracts)

CCHS 000991

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 909 of 1438

Case 3:17-cv-00011-MOC-DCK    Document 31-14    Filed 09/21/17    Page 26 of 55

## 3. All Diocesan Catholic School Employees share in the Mission of our Catholic Schools

- **to proclaim** the Good News of the Gospel and
- **to provide** a religious and academic program that allows each student to develop spiritually, intellectually, emotionally, physically and socially,
- **so that** each is prepared to live and serve in a changing society as a self-respecting and responsible citizen (of this world and the next.)

CCHS 000992

## 3. All Diocesan Catholic School Employees share in the Mission of our Catholic Schools

- NDC: Catechists (Principals and Catholic School Teachers)

  "Their personal relationship with Jesus Christ energizes their service to the Church and provides the continuing motivation, vitality, and force of their catechetical activity. ...to follow (Christ) as a teacher of the faith and a witness to the truth of the faith.... "

CCHS 000993

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 911 of 1438

Case 3:17-cv-00011-MOC-DCK    Document 31-14    Filed 09/21/17    Page 28 of 55

These next slides are from a letter of St. Stephen of Hungary to his son and heir apparent; they exemplify the handing on of faith and its subsequent service to every culture.

My dearest son, if you desire to honor the royal crown, I advise, I counsel, I urge you above all things to maintain the Catholic and Apostolic faith with such diligence and care that you may be an example for all those placed under you by God, and that all the clergy may rightly call you a man of true Christian profession.

24

CCHS 000994

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 912 of 1438

Case 3:17-cv-00011-MOC-DCK  Document 31-14  Filed 09/21/17  Page 29 of 55

Failing to do this, you may be sure that you will not be called a Christian or a son of the Church. Indeed, in the royal palace, after the faith itself, the Church holds second place, first constituted and spread through the whole world by His members, the apostles and holy fathers, And though she always produced fresh offspring, nevertheless in certain places she is regarded as ancient. However, dearest son, even now in our kingdom the Church is proclaimed as young and newly planted; and for that reason she needs more prudent and trustworthy guardians less a benefit which the divine mercy bestowed on us undeservedly should be destroyed and annihilated through your idleness, indolence or neglect.

25

CCHS 000995

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 913 of 1438

Case 3:17-cv-00011-MOC-DCK   Document 31-14   Filed 09/21/17   Page 30 of 55

My beloved son, delight of my heart, hope of your
posterity, I pray, I command, that at very time and in
everything, strengthened by your devotion to me, you
may show favor not only to relations and kin, or to the
most eminent, be they leaders or rich men or
neighbors or fellow-countrymen, but also to foreigners
and to all who come to you. By fulfilling your duty in
this way you will reach the highest state of happiness.
Be merciful to all who are suffering violence, keeping
always in your heart the example of the Lord who
said: "I desire mercy and to sacrifice". Be patient with
everyone, not only with the powerful, but also with
the weak.

CCHS 000996

Filed: 09/29/2022    Pg: 914 of 1438

Doc: 27

USCA4 Appeal: 22-1440

Finally be strong lest prosperity lifts you up too much or adversity cast you down. Be humble in this life that God may raise you up in the next. Be truly moderate and do not punish or condemn anyone immoderately. Be gentle so that you may never oppose justice. Be honorable so that you never voluntarily bring disgrace upon anyone. Be chaste so that you may avoid all the foulness of just like the pangs of death.

All these virtues I have noted above make up the royal crown and without them no one is fit to rule here on earth or attain to the heavenly Kingdom.

CCHS 000997

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 915 of 1438

Case 3:17-cv-00011-MOC-DCK    Document 31-14    Filed 09/21/17    Page 32 of 55

---

## 4. "Do This in Memory of Me" Luke 19:22 –
## Theme of the Eucharistic Congress

---

1.  "Do This in Memory of Me" our Lord said. He did not
    say: "Say this in memory of me." I read this
    somewhere recently and it gives us good material for
    reflection. It is not only in saying the words of the
    consecration, as important as they are, but it is in
    doing the action which Christ did at the Last Supper. It
    is re-presenting the mystical banquet and we are
    privileged to participate. The entire liturgical action is
    a participation in the Covenant-Sacrifice and
    Covenant-Communion which Christ effected in the
    Paschal Mystery.

CCHS 000998

## 4. "Do This in Memory of Me" Luke 19:22 – Theme of the Eucharistic Congress

2. Because we are in "communion" with the Holy Church, we can be in "communio" with the sacrifice of the Cross and therefore in "communio" with the mystical Body of Christ in the "Sacred Banquet" of which St. Thomas wrote so eloquently in the hymns and liturgy for Corpus Christi. In the Divine Liturgy of the Holy Mass, we move from sacrifice to banquet as Msgr. Ronald Knox mentions in his little book explaining the Eucharistic Sacrifice, The Mass in Slow Motion. The Sacrifice is ordered to the Banquet.

CCHS 000999

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 917 of 1438

# 4. "Do This in Memory of Me" Luke 19:22 – Theme of the Eucharistic Congress

4. In the Holy Mass we participate in the sealing of the covenant done at Calvary. Christ dies and is resurrected. Like the Church of the Holy Sepulcher which is also known as the Church of the Resurrection, our churches reflect what is happening in this great exchange of grace and mercy which is the Sacrifice of the Mass. We are permitted to participate in Christ's death. At the same time we participate in the resurrection, and the risen, glorified Christ - body, blood, soul and divinity - comes to feed us in Holy Communion. So the altar within the sanctuary of our churches is the locus of the death, resurrection and the mystical banquet of heaven. Our sanctuary is at once: the upper room, the Cross of Calvary, the tomb of burial and resurrection and the mystical banquet of heaven. What does this mean?

CCHS 001001

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 918 of 1438

Case 3:17-cv-00011-MOC-DCK    Document 31-14    Filed 09/21/17    Page 35 of 55

## 4. "Do This in Memory of Me" Luke 19:22 — Theme of the Eucharistic Congress

6. It is the Sacred Liturgy over all the years which has been the foundation of evangelization and the subsequent development of culture.

Where the Sacred Liturgy is celebrated in a sense of the sacred, with beauty, order and truth, it calls everyone to accept the Gospel and build a culture of holiness and salvation. Truth and Beauty in the Sacred Liturgy lead to a desire of the soul to possess grace, as St. Peter says: "To be partakers in the divine nature." (2 Peter 1:4) To possess grace is to be holy. Beauty and truth in the Sacred Liturgy lead us to desire grace and therefore to be holy. This is the universal call to holiness. The Sacred Liturgy properly celebrated proclaims the call to holiness. Just to walk into a beautiful Catholic Church is to be called to something higher, to holiness; the very building itself calls one to meditate on truth and goodness and beauty and oneness.

CCHS 001003

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 919 of 1438

Case 3:17-cv-00011-MOC-DCK    Document 31-14    Filed 09/21/17    Page 36 of 55

## 5. Building a culture of holiness and salvation

The beginning words of the Apostolic Letter of Blessed
    Pope John Paul II "Mane Nobiscum Domine" help us
    reflect on the mystagogy of those burning hearts and
    opened eyes in the encounter at Emmaus and the
    Emmaus encounter we have the Sacred Liturgy which
    impels us to tell others:

CCHS 001005

## 5. Building a culture of holiness and salvation

2. The image of the disciples on the way to Emmaus can serve as a fitting guide for a Year when the Church will be particularly engaged in living out the mystery of the Holy Eucharist. Amid our questions and difficulties, and even our bitter disappointments, the divine Wayfarer continues to walk at our side, opening to us the Scriptures and leading us to a deeper understanding of the mysteries of God. When we meet him fully, we will pass from the light of the Word to the light streaming from the "Bread of life", the supreme fulfilment of his promise to "be with us always, to the end of the age" (cf. Mt 28:20).

CCHS 001007

## 5. Building a culture of holiness and salvation

"How many winds of doctrine have we known in recent decades, how many ideological currents, how many ways of thinking. The small boat of the thought of many Christians has often been tossed about by these waves - flung from one extreme to another: from Marxism to liberalism, even to libertinism; from collectivism to radical individualism; from atheism to a vague religious mysticism; from agnosticism to syncretism and so forth. Every day new sects spring up, and what St Paul says about human deception and the trickery that strives to entice people into error (cf. Eph 4: 14) comes true.

CCHS 001009

USCA4 Appeal: 22-1440   Doc: 27   Filed: 09/29/2022   Pg: 922 of 1438

Case 3:17-cv-00011-MOC-DCK   Document 31-14   Filed 09/21/17   Page 39 of 55

## 5. Building a culture of holiness and salvation

"Today, having a clear faith based on the Creed of the Church is often labeled as fundamentalism. Whereas relativism, that is, letting oneself be "tossed here and there, carried about by every wind of doctrine", seems the only attitude that can cope with modern times. We are building a **dictatorship of relativism** that does not recognize anything as definitive and whose ultimate goal consists solely of one's own ego and desires."

CCHS 001010

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 923 of 1438

## 5. Building a culture of holiness and salvation

"We, however, have a different goal: the Son of God, the
    true man. He is the measure of true humanism. An
    "adult" faith is not a faith that follows the trends of
    fashion and the latest novelty; a mature adult faith is
    deeply rooted in friendship with Christ. It is this
    friendship that opens us up to all that is good and
    gives us a criterion by which to distinguish the true
    from the false, and deceit from truth."

CCHS 001011

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 924 of 1438

# 4. Application

– Building a culture of holiness and
   salvation with faith, reason, grace
   and excellence in virtue requires
   that we be holy and desiring to be
   saved. Is there a need?

CCHS 001012

Case 3:17-cv-00011-MOC-DCK    Document 31-14    Filed 09/21/17    Page 41 of 55

Filed: 09/29/2022    Doc: 27    USCA4 Appeal: 22-1440

# Goals in Forming Intentional Catholics to build a culture of holiness and salvation

1. **Conversion:**
   - Personal, zealous, intentional Catholic
2. **Community:**
   - We are a family; much loneliness exists today; need identity
3. **Content:**
   - Reason AND Faith;
     - Reason without Faith leads to totalitarianism
     - Faith without Reason leads to fanaticism
4. **Contemplation:**
   - World is too noisy;
   - Need comfort and that comes with quiet;
   - Sunday (give back) (cf. Dies Domini)
5. **Commitment:**
   - Not cultural or Catholic by inertia

*(Msgr. Francis Kelley, The Mystery We Proclaim)*

CCHS 001013

JA0921

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 926 of 1438

Case 3:17-cv-00011-MOC-DCK   Document 31-14   Filed 09/21/17   Page 43 of 55

## Five Essential Marks of Catholic Schools
### (necessary for building a culture of holiness and salvation)

1. Inspired by a supernatural vision
2. Founded on Christian anthropology
3. Animated by communion and community
4. Imbued with a Catholic world view
5. Sustained by Gospel witness

Source: The Holy See's Teaching on Catholic Schools, **Archbishop J. Michael Miller**

44

CCHS 001014

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022

Case 3:17-cv-00011-MOC-DCK   Document 31-14   Filed 09/21/17

Pope John Paul II: CT, 5: *"…the definitive aim of catechesis is to put people not only in touch but in communion, in intimacy, with Jesus Christ: only He can lead us to the love of the Father in the Spirit and make us share in the life of the Holy Trinity."*

CCHS 001015

- The spiritual life of a catechist should be characterized by:

  – A love of God - Father, Son, and Holy Spirit – and of Christ's Church, our Holy Father and God's holy people

  – A coherence and authenticity of life that is characterized by their faithful practice of the faith in a spirit of faith, charity, hope, courage, and joy

  – Personal prayer and dedication to the evangelizing mission of the Church

  – A missionary zeal by which they are fully convinced of the truth of the Catholic faith and enthusiastically proclaim it

  – Active participation in their local parish community, especially by attendance at Sunday Eucharist

  – A devotion to Mary, the first disciple and the model of catechists, and to the Most Holy Eucharist, the source of nourishment for catechists"

CCHS 001016

USCA4 Appeal: 22-1440   Doc: 27   Filed: 09/29/2022   Pg: 928 of 1438

USCA4 Appeal: 22-1440     Doc: 27     Filed: 09/29/2022     Pg: 929 of 1438

# Holiness

## is

- the possession of Grace

## not

- the practice of virtue

CCHS 001017

# Coherent Integrity

**ENCYCLICAL LETTER:** *CARITAS IN VERITATE:*

- "1. Charity in truth, to which Jesus Christ bore witness by his earthly life and especially by his death and resurrection, is the principal driving force behind the authentic development of every person and of all humanity. Love — *caritas* — is an extraordinary force which leads people to opt for <u>courageous</u> and <u>generous</u> engagement…It is a force that has its origin in God, Eternal Love and Absolute Truth. Each person finds his good by adherence to God's plan for him, in order to realize it fully: in this plan, he finds his truth, and through adherence to this truth he becomes free (cf. Jn 8:32).

- "To defend the truth, to articulate it with humility and conviction, and to bear witness to it in life are therefore exacting and indispensable forms of charity. Charity, in fact, "rejoices in the truth" (1 Cor 13:6).

CCHS 001018

Filed: 09/29/2022    Doc: 27    USCA4 Appeal: 22-1440

# 5. Celebration

CCHS 001019

# Raphel's School of Athens



USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 932 of 1438

Case 3:17-cv-00011-MOC-DCK    Document 31-14    Filed 09/21/17    Page 49 of 55

# Raphael's Triumph of Religion



CCHS 001021

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 933 of 1438

Case 3:17-cv-00011-MOC-DCK   Document 31-14   Filed 09/21/17   Page 50 of 55

# Stanza of the Signatura

- The so called Stanza of the Signatura in the Apostolic Palace was being painted by Raphael in 1508 ff. to be used for the papal library. Philosophy, Poetry, Virtues and Religion were the four themes. The room is painted to show that all knowledge leads to and flows from the Triumph of Religion. But to have that knowledge we must study it. What have the Fathers of the Church, the Philosophers, the great scientists, poets, lawyers, and artists, and the great Saints taught us about God and our need to worship Him?

CCHS 001022

Filed: 09/29/2022     Pg: 935 of 1438     Doc: 27     USCA4 Appeal: 22-1440

One can sense standing within the fresco of the School of Athens with Aristotle, Plato and other academics discussing various knowledge and philosophy. There you are walking with them toward the fresco on the opposite wall. You sense you are entering into the fresco on the other wall which shows the triumph of Religion over all knowledge in the sense that all knowledge finds its fulfillment in the Mystical Banquet of heaven, the fulfilled Sacred Liturgy. You are in the Heavenly Banquet on earth and in heaven; this is called the fresco of the Triumph of Religion or sometimes called the Disputation on the Eucharist.

All knowledge finds its end in communion in the Church because of the Sacrifice of Calvary. Our union in the Sacred Liturgy of earth is the foretaste to the Sacred Liturgy of Heaven. Here is the fulfillment of a culture of holiness and salvation.

CCHS 001023

Pg: 936 of 1438    Filed: 09/29/2022    Doc: 27    USCA4 Appeal: 22-1440

Let's read St. John's description of Heaven from the Apocalypse, Chapter 21, verses 1 – 5:

1   Then I saw a new heaven and a new earth. The former heaven and the former earth had passed away, and the sea was no more.

2   I also saw the holy city, a new Jerusalem, coming down out of heaven from God, prepared as a bride adorned for her husband.

3   I heard a loud voice from the throne saying, "Behold, God's dwelling is with the human race. He will dwell with them and they will be his people and God himself will always be with them (as their God).

4   He will wipe every tear from their eyes, and there shall be no more death or mourning, wailing or pain, (for) the old order has passed away."

5   The one who sat on the throne said, "Behold, I make all things new."

CCHS 001024

# Raphael's Triumph of Religion



CCHS 001025

USCA4 Appeal: 22-1440    Doc: 27    Filed: 09/29/2022    Pg: 938 of 1438

Case 3:17-cv-00011-MOC-DCK   Document 31-14   Filed 09/21/17   Page 55 of 55



# Thank you for being a part of the Mission of our Catholic Schools

## *"So that in all things God may be glorified"*

## (1 Peter 4:11)

CCHS 001026

JA0934

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

Civil Action No. 3:17-cv-0011

LONNIE BILLARD,

      Plaintiff,

v.

CHARLOTTE CATHOLIC HIGH
SCHOOL, MECKLENBURG AREA
CATHOLIC SCHOOLS, and ROMAN
CATHOLIC DIOCESE OF CHARLOTTE,

      Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Exhibit 4
Declaration of Bishop Peter J. Jugis

JA0935

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

Civil Action No. 3:17-cv-0011

LONNIE BILLARD,

     Plaintiff,

v.

                                DECLARATION OF
                               BISHOP PETER J. JUGIS

CHARLOTTE CATHOLIC HIGH
SCHOOL, MECKLENBURG AREA
CATHOLIC SCHOOLS, and ROMAN
CATHOLIC DIOCESE OF CHARLOTTE,

     Defendants.

I, Peter J. Jugis, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am the Bishop of the Roman Catholic Diocese of Charlotte (the "Diocese"), and have served in that role since October 2003. I make this declaration based on my personal knowledge.

2.     I was ordained as a priest of the Diocese of Charlotte in 1983. Prior to becoming Bishop of Charlotte, I served in a variety of assignments within the Diocese, including as pastor and parochial vicar (assistant priest) in a number of parishes. I have also served as the Judicial Vicar for the Diocese, in which capacity I had responsibility for interpretation and application of the Church's laws and teachings regarding marriage.

3.     I received a bachelor's degree in business administration from the University of North Carolina at Charlotte in 1979. I studied for priesthood at the Pontifical North American College in Rome, Italy, from 1979 to 1984, and received a theology degree (S.T.B.) from the Pontifical Gregorian University in Rome in 1982. I received a licentiate degree in canon law

1

(J.C.L.) from the Pontifical Gregorian University, Rome, in 1984 and a doctorate in canon law (J.C.D.) from the Catholic University of America in Washington, D.C., in 1993. My doctoral work focused on marriage.

4.      The Roman Catholic Church is hierarchical in its governance. As the Bishop of Charlotte, I am the highest ecclesiastical authority of the Catholic Church within the territorial bounds of the Diocese, which encompasses 46 counties in the western part of North Carolina.

5.      In this capacity, I participate in the apostolic ministry of the Church, pursuant to which the bishops of the world, in communion with the Bishop of Rome (i.e., the Pope) are the divinely-instituted successors to the twelve Apostles of Jesus Christ. *See* Canon 375 § 1.

6.      My ministry as Bishop of Charlotte includes governance not only of the parish churches within the Diocese, but also of the Diocese's educational activities, including the operation of Diocesan and parish-affiliated schools within the Diocese.

7.      I delegate aspects of my authority over the Diocese in certain cases in order to further the work of the Diocese. For example, I appointed Rev. Roger K. Arnsparger as the Vicar for Education for the Diocese effective July 8, 2008. In that capacity, he serves as my delegate in all educational matters. As such, he has responsibility for oversight of the Catholic Schools Office of the Diocese, which supervises and operates the nineteen Catholic schools within the Diocese, including the nine Catholic Schools in the Greater Charlotte area which comprise the Mecklenburg Area Catholic Schools ("MACS") system. He also oversees development and implementation of Diocesan educational policies

### *The Teaching Authority of the Church*

8.      The Roman Catholic Church has existed for nearly 2000 years. Through the centuries, the Church has engaged in teaching on a host of moral and religious topics relating to

humanity's relationship with God. The *Catechism of the Catholic Church* (the "Catechism" or "CCC"), 1997 edition, is a statement of the Church's faith and of Catholic doctrine. Throughout this declaration, I will refer to various portions of the Catechism to elucidate the Church's teachings.

9.      The Catholic Church teaches that God created mankind in a plan of sheer goodness to share in God's own divine life. For this reason, at every time and in every place, God draws close to humanity, and in particular calls together all people, scattered and divided by sin, into the unity of his family, the Church. To accomplish this, God sent his Son Jesus Christ as Redeemer and Savior, and through him, he invites all men to become members of his family, the Church. CCC ¶ 1.

10.      Further, in order that God's invitation should be made known to all mankind, Jesus Christ sent forth the apostles he had chosen, commissioning them to proclaim the Gospel. Jesus instructed his disciples to "Go therefore and make disciples of all nations, baptizing them in the name of the Father and of the Son and of the Holy Spirit, teaching them to observe all that I have commanded you; and lo, I am with you always, to the close of the age." Strengthened by this mission, the apostles "went forth and preached everywhere, while the Lord worked with them and confirmed the message by the signs that attended it." CCC ¶ 2.

11.      The Church thus exists to fulfill the Great Commission of Jesus Christ to announce the Gospel, that is, God's plan to save humanity from sin and make possible for mankind eternal life with God.

12.      In order to fulfill this mission, Jesus Christ gave to the Church the authority, "always and everywhere to announce moral principles, including those pertaining to the social

order, and to make judgments on any human affairs to the extent that they are required by the fundamental rights of the human person or the salvation of souls." CCC ¶ 2032.

13.    The Church teaches that "from generation to generation, under the aegis and vigilance of the pastors [i.e., Bishops and ministers of the Church], the 'deposit' of Christian moral teaching has been handed on, a deposit composed of a characteristic body of rules, commandments, and virtues proceeding from faith in Christ and animated by charity."  The Decalogue, also known as the Ten Commandments, "sets out the principles of moral life valid for all men" that form part of this deposit of Christian moral teaching.  CCC ¶ 2033.

14.    The Roman Pontiff (i.e., the Pope) and the Bishops are the "authentic teachers . . . endowed with the authority of Christ, who preach the faith to the people entrusted to them, the faith to be believed and put into practice." CCC ¶ 2034.

### *The Church's Teaching Concerning Marriage*

15.    The Church's teaching concerning marriage has its roots in God's design for humankind.  As the Catechism explains:

> God, infinitely perfect and blessed in himself, in a plan of sheer goodness freely created man to make him share in his own blessed life. For this reason, at every time and in every place, God draws close to man. He calls man to seek him, to know him, to love him with all his strength. He calls together all men, scattered and divided by sin, into the unity of his family, the Church. To accomplish this, when the fullness of time had come, God sent his Son as Redeemer and Saviour. In his Son and through him, he invites men to become, in the Holy Spirit, his adopted children and thus heirs of his blessed life.

CCC ¶ 1.

The Catechism also explains:

> The desire for God is written in the human heart, because man is created by God and for God; and God never ceases to draw man to himself. Only in God will he find the truth and happiness he never stops searching for: The dignity of man rests above all on the fact

4

> that he is called to communion with God. This invitation to converse with God is addressed to man as soon as he comes into being. For if man exists it is because God has created him through love, and through love continues to hold him in existence. He cannot live fully according to truth unless he freely acknowledges that love and entrusts himself to his creator.

CCC ¶ 27.

16.    Thus, the final authority in matters of theology and the dignity of the human person is God Himself. In other words, the question of authority, *i.e.,* the capacity to teach definitively about God and man, is central to the way the Church views the human person, or what the Church calls "anthropology." The heart of the Church's teaching is that man is a created being. He does not create himself. Therefore, his life is a gift, and the rights that man enjoys flow from his identity as a child of God. Man is not the author of his life, but the steward. He shares in the life of God, and that life is man's happiness and his glory.

17.    While the Church teaches that mankind is "called to communion with God," it also teaches that God, through His divine revelation, has made known to mankind the means by which it may experience that communion.

18.    Part of this revelation of God is the Ten Commandments, which are divinely instituted moral law. The Ten Commandments "sum up and proclaim God's law" and are a gift, inasmuch as they guide the moral life of mankind, which the Church teaches "is a response to the Lord's loving initiative. It is the acknowledgement and homage given to God and a worship of thanksgiving. It is cooperation with the plan God pursues in history." CCC ¶¶ 2052-63. The Ten Commandments "state what is required in the love of God and love of neighbor" and "are obligatory for Christians." CCC ¶¶ 2067-68.

19.    The Sixth Commandment is commonly translated as "you shall not commit adultery." The Church's teaching concerning the meaning of the Sixth Commandment is

5

JA0940

grounded in the Holy Scriptures and the traditions of the Church, which has always "understood the sixth commandment as encompassing the whole of human sexuality." CCC ¶ 2336.

20.    In Genesis 1:27-28, we read that God created man in his own image . . . male and female he created them." Further, God blessed them and said, "be fruitful and multiply." From this, the Church understands and teaches that "[p]hysical, moral, and spiritual difference and complementarity are oriented toward the goods of marriage and the flourishing of family life. The harmony of the couple and of society depends in part on the way in which the complementarity, needs, and mutual support between the sexes are lived out." CCC ¶ 2333. Further, the Church teaches that

> Each of the two sexes is an image of the power and tenderness of God, with equal dignity though in a different way. The *union of man and woman* in marriage is a way of imitating in the flesh the Creator's generosity and fecundity: "Therefore a man leaves his father and mother and cleaves to his wife, and they become one flesh." All human generations proceed from this union.

CCC ¶ 2335.

21.    Thus, For the Church, human sexual relations have a sacred character, because they have to do with new life and with the profound expression, spiritually and physically, of the love of the spouses, which imitates the love of God. Accordingly, the Church teaches that "sexuality is ordered to the conjugal love of man and woman" and, indeed, that human sexuality is proper and exclusive to spouses. In other words, human sexual expression belongs, as a gift, to husband in wife alone, in the context of a marriage covenant that is free, exclusive, permanent, and open to the possibility of children. CCC ¶¶ 2360-79.

22.    The Church teaches that all baptized persons are called to chastity, which means the "successful integration of sexuality within the person and thus the inner unity of man in his bodily and spiritual being." CCC ¶¶ 2337, 2348. In other words, chastity involves the

6

93393951_2

appropriate use, or abstention from, sexual activity according to one's state in life. Those who are married are called to practice conjugal chastity, meaning that spouses enjoy sexual relations exclusively with each other in the context of marriage as the Church understands it. Those who are unmarried are called to practice chastity in continence, by abstaining from sexual activity. CCC ¶ 2349.

23.    The Church's teaching concerning homosexuality is guided by these principles. In the Catechism, the Church distinguishes three things regarding homosexuality: first, the *person*; second, the *tendency* or *inclination* or *attraction*; and third, the *action*.

24.    The Church teaches that persons who experience homosexual tendencies or inclination are children of God, and as a result possess the great dignity that flows from that status. Further, the Church recognizes that the homosexual inclination constitutes a trial for many persons who experience it, and that such persons "must be accepted with respect, compassion, and sensitivity." CCC ¶ 2358. Further, the Church teaches that "[e]very sign of unjust discrimination in their regard should be avoided," and that "[t]hese persons are called to fulfill God's will in their lives and, if they are Christians, to unite to the sacrifice of the Lord's Cross the difficulties they may encounter from their condition." *Id.*

25.    With respect to homosexual acts themselves, the Catechism explains:

> Basing itself on Sacred Scripture, which presents homosexual acts as acts of grave depravity, tradition has always declared that "homosexual acts are intrinsically disordered." They are contrary to the natural law. They close the sexual act to the gift of life. They do not proceed from a genuine affective and sexual complementarity. Under no circumstances can they be approved.

CCC ¶ 2357.

It must be understood that when the Church uses the word "disordered" to refer to homosexual acts, she is not making a moral judgment regarding the person. On the contrary,

7

what "disordered" means in this context is that homosexual acts are not ordered to the proper end, or purpose, of human sexual activity – that is, for the bringing forth of new life and the unification of the spouses in the context of marriage. Said another way, homosexual acts are "misdirected" because they do not corresponded to God's design for human sexual activity.

26.     Likewise, the Church teaches that *tendency* or *inclination* or *attraction* toward homosexual actions is likewise misdirected, because it is an inclination toward something other than the true purpose of human sexual activity. Again, the Church's judgment in this regard implies no condemnation of those who experience such inclinations, many of whom may wish they did not.

27.     The Church teaches that homosexual persons, like all persons, are called to chastity. CCC ¶ 2359. Chastity is part of the good news of Jesus Christ *for all Christians*, challenging though it may be to live. A chaste heart is a peaceful heart because "the chaste person maintains the integrity of the power of life and love placed in him." CCC ¶ 2338.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Date: September 20, 2017                    By: ✠ *Peter J. Jugis*
                                                 Most Rev. Peter J. Jugis

8

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which will send electronic notice to counsel for Plaintiff at the addresses as follows:

Joshua Block
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004-2400
Telephone:  212-549-2627
Facsimile:  212-549-2650
Email:  jblock@aclu.org

S. Luke Largess
Tin Fulton Walker & Owen PLLC
301 East Park Avenue
Charlotte, North Carolina 28202
Telephone: 704-338-1220
Facsimile:  704-338-1312
Email:  llargess@tinfulton.com

Christopher Brooke
American Civil Liberties Union of North Carolina Legal Foundation
P.O. Box 28004
Raleigh, North Carolina 27611
Telephone:  919-834-3466
Facsimile:  866-511-1344
Email:  cbrook@acluofnc.org

Brian Hauss
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY  10004
Telephone:  212-549-2604
Facsimile:  212-549-2652
Email:  bhauss@aclu.org

Elizabeth O. Gill
American Civil Liberties Union Foundation
39 Drumm Street
San Francisco, CA  94111
Telephone:  415-621-2493

9

93393951_2

Facsimile: 415-255-8437
Email: egill@aclunc.org

This the ___ day of September 2017.

/s/ Meredith A. Pinson
Meredith A. Pinson (N.C. Bar No. 39990)

10

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

### Civil Action No. 3:17-cv-0011

**LONNIE BILLARD,**

    **Plaintiff,**

**v.**


**CHARLOTTE CATHOLIC HIGH SCHOOL, MECKLENBURG AREA CATHOLIC SCHOOLS, and ROMAN CATHOLIC DIOCESE OF CHARLOTTE,**

    **Defendants.**

---

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Exhibit 5
Deposition of W. Kurt Telford

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

Civil Action No. 3:17-cv-0011

LONNIE BILLARD,                    )
                                   )
        Plaintiff,                 )
                                   )
vs.                                )
                                   )
CHARLOTTE CATHOLIC HIGH SCHOOL,    )
MECKLENBURG AREA CATHOLIC          )
SCHOOLS, and ROMAN CATHOLIC        )
DIOCESE OF CHARLOTTE,              )
                                   )
        Defendants.                )
_____)

Tuesday, August 15, 2017
Charlotte, North Carolina

Deposition of W. KURT TELFORD, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, before Dayna H. Lowe, Court Reporter and Notary Public in and for the State of North Carolina, at McGuireWoods, LLP, 201 North Tryon Street, Suite 3000, Charlotte, North Carolina, commencing at the hour of 9:00 a.m.

 1  APPEARANCES:

 2

 3      On behalf of the Plaintiff:

 4          JOSHUA A. BLOCK, ESQUIRE
            American Civil Liberties Union Foundation

 5          125 Broad Street, 18th Floor
            New York, New York 10004

 6

 7      On behalf of the Defendants:

 8          JOHN G. McDONALD, ESQUIRE
            JOSHUA D. DAVEY, ESQUIRE

 9          McGuireWoods, LLP
            201 North Tryon Street, Suite 3000

10          Charlotte, North Carolina 28202

11

12

13

14                      *   *   *

15

16

17

18

19

20

21

22

23

24

25

Page 3

C O N T E N T S

1

2

3    Examination by Mr. Block:                                    4

4

5

6

7            (No exhibits were identified.)

8

9

10

11

12

13                    *    *    *

14

15

16

17

18

19

20

21

22

23

24

25

KNOWLES COURT REPORTING
CHARLOTTE, NORTH CAROLINA 704.338.5438

JA0949

Page 4

```
 1                P R O C E E D I N G S
 2   Whereupon,
 3                     W. KURT TELFORD
 4   was called as a witness and, having first been duly
 5   sworn, was examined and testified as follows:
 6                     EXAMINATION
 7           BY MR. BLOCK:
 8       Q.    Good morning, Mr. Telford.
 9       A.    Good morning.
10       Q.    My name is Josh Block.  I'm representing
11   Mr. Billard, and I'll be taking the deposition.  I just
12   want to go over a few ground rules to make sure that the
13   court transcript is clear.
14           The first is that since the court reporter is
15   writing down everything we say, it's important to give
16   answers verbally, like a yes or a no instead of a nod or
17   a uh-huh, just so she has a good transcript.
18           The second is it's very easy to talk over each
19   other, but it's important to make sure to wait until I
20   finish the whole question before answering just so she
21   can write down what I say and what you say.
22       A.    Okay.
23       Q.    And then the third is I want to make sure that
24   if anything I say is unclear that you ask me to clarify.
25   It's my job to ask you questions that you understand and
```

Page 5

1    can answer, so if there's any ambiguity or if you don't

2    understand anything, please let me know and I'll

3    rephrase it.  Is that okay?

4        A.   Yes, sir.

5        Q.   Okay.  Have you ever had a deposition before?

6        A.   I don't know if it was a deposition, but

7    20 years ago it was an unemployment benefits hearing, so

8    it might have been with labor relations.

9        Q.   All right.

10       A.   I'm not really sure, it was so long ago.

11       Q.   Well, if you have a one-every-20-years ratio,

12   that's good.  So I just have a few questions.  Can you

13   say what your name is?

14       A.   Yes.  It's Walter Kurt Telford.

15       Q.   And what is your position at CCHS?

16       A.   Principal at Charlotte Catholic.

17       Q.   And how long have you had that position?

18       A.   Since July of 2014.

19       Q.   And what was your position before then?

20       A.   I was the principal at Our Lady of Grace in

21   Greensboro.

22       Q.   And was there a time at Charlotte Catholic

23   where you were serving in an interim or acting capacity?

24       A.   I was.  I was the interim from July until

25   December of 2014.

Page 6

1      Q.   When is the first time you met Lonnie Billard?

2      A.   I don't recall the exact date.  I met him in

3  the fall but passing through.  He was a substitute

4  teacher.

5      Q.   Did you know him before you arrived at

6  Charlotte Catholic?

7      A.   No, I did not.

8      Q.   And so by the time you met him, he had already

9  retired as a full-time teacher, is that right?

10     A.   Yes, sir.

11     Q.   Do you recall any conversations you had with

12  him while passing in the hall?

13     A.   I don't recall any conversations.

14     Q.   Do you recall any conversations you've had

15  with other people pre-dating September 2014 in which

16  Mr. Billard came up?

17     A.   No.

18     Q.   Were you aware before September 2014 that

19  Mr. Billard is gay?

20     A.   No, I was not aware.

21     Q.   Before September 2014, had you ever met

22  Mr. Donham?

23     A.   No, I had not.  Had not.

24     Q.   When is the first time that you learned that

25  Mr. Billard is gay?

1      A.    December, the week that we were getting out

2  for Christmas break.  First time.

3      Q.    And how did you learn?

4      A.    Father Kauth came to me, and he's the

5  chaplain, and told me Mr. Billard had posted that he

6  was -- on Facebook that he was getting married to his

7  partner.

8      Q.    And you said this is the week before Christmas

9  break?

10     A.    The week we were going to get out for

11 Christmas break.  Mr. Billard was subbing for somebody,

12 I'm not sure who, but for that week.

13     Q.    He was subbing for someone that week that you

14 found out?  He was subbing?

15     A.    Yes.

16     Q.    Now, before Father Kauth told you, had

17 Mr. Carpenter spoken to you about Mr. Billard at all?

18     A.    Not that I'm aware of.

19     Q.    Had you heard any -- before Father Kauth spoke

20 to you, had you overheard anyone talking about

21 Mr. Billard being engaged?

22     A.    No.

23     Q.    So when Father Kauth spoke to you, what

24 exactly did he say?

25     A.    He said that Mr. Billard had posted on

Page 8

1    Facebook that he was going to marry his partner, and I

2    think he was telling me because as principal I have to

3    make decisions as far as employment, things of that

4    nature, and make recommendations.

5        Q.    Did Father Kauth indicate what decision you

6    should make based on that information?

7        A.    I wouldn't say he indicated or asked, but

8    Lonnie posting goes against the tenets of the church,

9    and you can't oppose the tenets of the church, so I

10   thought we wouldn't be calling Lonnie anymore.

11       Q.    Did you feel that you had discretion to have

12   Lonnie continue as a substitute if that's what you

13   wanted to do?

14       A.    I don't think I had discretion in that.  I did

15   call my boss, the superintendent, and I think she talked

16   to HR just to make sure that I was making the right

17   decision not calling him.

18       Q.    So what did you -- when did you call the

19   superintendent?

20       A.    That day.

21       Q.    And the superintendent is Janice Ritter?

22       A.    Yes.

23       Q.    And what did you tell her?

24       A.    I said Lonnie has -- Lonnie Billard -- well, I

25   think she knew who he was -- has posted that he's

Page 9

1  marrying his partner, and I'm not going to call Lonnie

2  anymore.  She said -- as I recall it was -- she called

3  personnel, and I didn't hear any more because, again, I

4  don't think she saw it as I was making the wrong

5  decision.

6      Q.    And your understanding is she called personnel

7  because why?  Why do you have that understanding?

8      A.    Well, any time you're going to not use someone

9  as a sub, they could call HR, and it's almost a

10 heads-up.

11     Q.    So your understanding is she was notifying

12 them of a decision that had already been made not to

13 continue calling Mr. Billard, is that correct?

14         MR. DAVEY:  Objection.

15     A.    I'd be speculating, but possibly.

16         BY MR. BLOCK:

17     Q.    And just to be clear, did she tell you she was

18 about to call HR?

19     A.    No.  No.

20     Q.    When you informed the superintendent, did she

21 express any surprise that Mr. Billard was gay or was

22 getting engaged?

23     A.    I can't recall.

24     Q.    You said that she knew who Lonnie was.  How do

25 you know that?

Page 10

1          A.    Her kids went to Charlotte Catholic.  He was I

2    believe a drama teacher, and Janice as -- Dr. Ritter, as

3    superintendent and as assistant superintendent, I

4    believe went to a lot of the plays.  She has since I've

5    been at Catholic.

6          Q.    At any time in talking with Dr. Ritter has

7    she -- has she -- let me start at the beginning.

8                At any time subsequent to this conversation

9    have you spoke with Dr. Ritter about Lonnie?

10         A.    I've talked to her about, for example, doing a

11   deposition, and that's how I know she spoke to HR.  I

12   found that out a few years later.

13         Q.    A few years later?

14         A.    Yeah.

15         Q.    So I'm not -- I don't want you to tell me any

16   information that involves attorney-client privilege at

17   all, but to the best of your recollection how many times

18   do you think you've spoken with Dr. Ritter about

19   Mr. Billard since December 2014?

20         A.    How many times has it been in the newspaper or

21   on TV?  That's usually the conversation, because it's

22   not something we want to be in the newspaper for.  It's

23   just not positive publicity for the school, so if it's

24   been in the newspaper or on TV generally.

25                And I talk to her three, four times a week,

Page 11

1   sometimes three times a day, so some of the phone calls

2   were a check-in, how is it at Charlotte Catholic, or I

3   would say well, you saw today's paper or you saw

4   something on the news, so any time it was in the

5   newspaper is probably when I talked to her.

6        Q.   Why isn't it positive publicity?

7        A.   Well, I think the way it was presented, that

8   he was fired, and I didn't think we fired him.

9        Q.   How would you characterize it?

10       A.   He was a substitute teacher.  We chose not to

11  use him.

12       Q.   So besides that distinction between choosing

13  not to use him as a substitute and firing him, is there

14  any other aspect of the news stories that you perceive

15  to not be positive publicity?

16       A.   Well, again, probably not, other than the

17  firing.

18       Q.   So do you -- do you think that the fact that

19  Charlotte Catholic will not use substitute teachers who

20  are marrying someone of the same sex is a fact that is

21  going to generate positive publicity or negative

22  publicity or any other type of -- I don't want to -- let

23  me rephrase that question.

24            What type of publicity do you think would be

25  generated by the fact that Charlotte Catholic will not

1    use substitute teachers who have married someone of the

2    same sex?

3        A.    I'm not sure.

4        Q.    So in any of these subsequent conversations

5    with the superintendent, did she discuss her knowledge

6    of Mr. Billard's sexual orientation?

7        A.    No, she did not.

8        Q.    Did she ever indicate meeting Mr. Donham?

9        A.    She did not.

10       Q.    Have you talked with Jerry Healy about

11   Mr. Billard?

12       A.    I have not.

13       Q.    So backing up to when Father Kauth presented

14   you with this information, after Father Kauth told you

15   this, can you walk me through what you did next?

16       A.    I talked to Steve Carpenter, who is the

17   assistant principal who's in charge of substitutes, and

18   said Lonnie has posted -- Mr. Billard has posted.  I

19   said we can't use him anymore.  And then somewhere

20   during the day I called Dr. Ritter because I remember,

21   as I recall, Father Kauth spoke to me fairly early in

22   the day.

23       Q.    And what did Mr. Carpenter say in response?

24       A.    I can't recall.  I don't think it was

25   surprise.  I said let's let him finish out the week, and

```
1   that's why I don't know the exact date but it was
2   midweek, and I said we won't call him anymore.
3        Q.   Did Mr. Carpenter indicate whether he already
4   knew that Mr. Billard was getting married?
5        A.   While we talked that day?
6        Q.   Yeah.
7        A.   No.
8        Q.   While you talked that day, did he indicate
9   that he already knew that Mr. Billard was gay?
10       A.   I can't recall.  Subsequently, yes, he said he
11  knew he was gay.
12       Q.   When was that?
13       A.   Sometime after.  Just -- again, we didn't have
14  a lot of conversations.  I said Lonnie Billard has
15  posted, we can't use him.
16       Q.   And so what did Mr. Carpenter say to you when
17  he indicated that he knew that Lonnie was gay?
18       A.   I can't -- I really can't remember in the
19  conversation, but I think he was aware.
20       Q.   Did he say whether he was aware before the
21  engagement announcement or -- did he say whether he was
22  aware before the engagement announcement?
23       A.   He did not.
24       Q.   He didn't say one way or the other?
25       A.   No.
```

1    Q.    Did you ask him why he didn't inform you

2    earlier that Mr. Billard is gay?

3    A.    No, I didn't ask him.

4    Q.    Why not?

5    A.    I don't think it makes a difference whether

6    you're gay or straight or your sexual orientation.

7    Q.    Why is that?

8    A.    Why doesn't it make a difference?

9    Q.    Yeah.

10    A.    Well, again, the teachings of the church are

11    not -- we love all, so I don't think it matters whether

12    you're gay or straight.

13    Q.    But if a teacher is -- if a teacher at

14    Charlotte Catholic or a substitute teacher at Charlotte

15    Catholic is gay, is it your understanding that they must

16    be celibate in order to continue being a teacher or

17    substitute teacher?

18    A.    All teachers should be celibate, doesn't

19    matter whether you're straight or gay, if you're not

20    married.

21    Q.    So that answer is yes, then, right?  That if

22    you're gay and a teacher at Charlotte Catholic, in order

23    to continue working, you should be celibate?

24    A.    I don't think it's a simple yes-no.  I think

25    it's any teacher, gay or straight.  We're trying to

Page 15

1   model behaviors we want all kids to have.

2       Q.   But you also think that -- it is also your

3   understanding that there is no context in which a

4   teacher at Charlotte Catholic who is gay could have

5   sexual activity with another person of the same sex.  Is

6   that right?

7            MR. DAVEY:  Objection.

8       A.   Can you restate the question?

9            MR. DAVEY:  It was just because I think it got

10  confusing.

11           MR. BLOCK:  Yeah, yeah.

12           BY MR. BLOCK:

13      Q.   So it's your -- your understanding is that

14  there's no -- that it is impossible for -- let me start

15  over.

16           Your understanding is that a teacher at

17  Charlotte Catholic cannot marry someone of the same sex

18  and continue working at Charlotte Catholic.  Is that

19  right?

20      A.   Yes.  That's correct.

21      Q.   And it's also your understanding that the only

22  context in which a teacher at Charlotte Catholic should

23  be having -- may have sexual activity is in the context

24  of marriage.  Is that right?

25      A.   Marriage between a man and a woman, yes.

1    Q.    So, therefore, it's your understanding that

2   there is no context in which a teacher at Charlotte

3   Catholic may have sexual activity with a person of the

4   same sex.

5            MR. DAVEY:  Objection.  You can answer.

6    A.    They should not.

7            BY MR. BLOCK:

8    Q.    So when Mr. Carpenter indicated to you that he

9   knew that Mr. Billard was gay, did he indicate whether

10  he had met Mr. Donham at all?

11   A.    He did not.

12   Q.    Did he indicate whether he knew that

13  Mr. Billard was sexually active?

14   A.    He did not.

15   Q.    Have you ever met someone who identified to

16  you as being gay but not being sexually active?

17   A.    They have not identified themselves that way

18  to me, but I don't ask the question.

19   Q.    Whose job is it at Charlotte Catholic to

20  enforce the prohibition on teachers publicly engaging in

21  conduct or advocating for conduct contrary to the moral

22  tenets of the Catholic faith?

23            MR. DAVEY:  Objection.

24   A.    I would be one of the persons.

25            BY MR. BLOCK:

```
 1        Q.   Who else?

 2        A.   Are you talking in a formal way or --

 3        Q.   Well, let's start with formal and then I'll

 4   ask informal.

 5        A.   Okay.  Well, formal it would be the principal.

 6   It probably would come to me.  And, again, I probably

 7   would talk to HR, and that would be the formal.  And I'd

 8   go through the superintendent to HR.

 9        Q.   And informally who's responsible?

10        A.   Well, I think we all are, so I think what

11   sometimes happens, somebody could send me information

12   and say, again, if somebody's doing something that's --

13   I don't want to say immoral, but maybe objectionable,

14   that could be anybody, because we're all role models.

15        Q.   Has there been any other time in which someone

16   has sent you that sort of information?

17        A.   I was sent something this past year.  A

18   teacher used profane language in a Facebook post.  It

19   was uncalled for.

20        Q.   Has there been any other time?

21             MR. DAVEY:  Just for clarification, are you

22   referring to just at Charlotte Catholic or when he was

23   at Our Lady of Grace as well?  I just want to make sure

24   I understood the time frame.

25             MR. BLOCK:  Any time frame actually.
```

Page 18

1    A.    Sure.  At Our Lady of Grace it happened also.

2          BY MR. BLOCK:

3    Q.    And how many times at Our Lady of Grace?

4    A.    Once.

5    Q.    And what was that about?

6    A.    It was a staff member who was reported to be

7    spending nights with his fiancee, and that was one

8    where -- again, a parish school is a little different.

9    Their superintendent is not directly over the school,

10   the priest is, so I went to the pastor and the pastor

11   dealt with it.

12   Q.    How did he deal with it?

13   A.    He told the gentleman that -- I think he

14   did -- he said he had been there.  The priest said you

15   could lose your job if I hear about it again, you will

16   no longer work for us, and that was how it was dealt

17   with.

18   Q.    In this incident we were just talking about --

19   A.    Yep.

20   Q.    -- how did a third party learn that the

21   teacher was spending nights at his fiancee's?

22   A.    I think he talked about it.

23   Q.    So do you think that when Mr. Carpenter first

24   learned that Mr. Billard was gay and not celibate that

25   he should have reported it to you?

1            MR. DAVEY:  Objection.  Just what's the time?

2     Because I think there was confusion on the prior

3     testimony.  When Mr. Carpenter told him this was after

4     the fact, so I just want to make sure I understand the

5     time.

6            BY MR. BLOCK:

7         Q.   Yeah.  So, I mean, having learned that

8     Mr. Carpenter had previously known, do you think that he

9     should have told you right away?

10           MR. DAVEY:  Again, objection, because my

11    understanding of the testimony is that Mr. Carpenter

12    never told Mr. Telford whether or not or knew whether or

13    not Mr. Billard was celibate or not.  I think your

14    question premised -- the first question said when he

15    told you that he wasn't celibate, so I think it's in

16    reference to --

17           MR. BLOCK:  It's well taken.

18           BY MR. BLOCK:

19        Q.   Did Mr. Carpenter, when he said that he

20    previously had heard that Lonnie was gay, did he

21    indicate whether he had previously heard that Lonnie was

22    getting engaged?

23        A.   He did not.

24        Q.   So if Mr. Carpenter had previously been aware

25    that Lonnie was engaged, should he have told you about

Page 20

1  it?

2       A.   I'm not sure because of the context, because

3  he's known Lonnie for a long time.  So did he say it in

4  confidence?  I'm not sure.  That's hard for me to answer

5  that.

6       Q.   So if Lonnie had said it in confidence, in

7  this hypothetical situation, it would have been okay for

8  Mr. Carpenter not to tell you about it?

9            MR. DAVEY:  Objection.  You can answer.

10      A.   You know, again, it could be, look, you need

11 to go and talk to the priest.  It depends how he was

12 going to direct him.  I think -- again, I wasn't there

13 so I can't -- I'm speculating already.

14           BY MR. BLOCK:

15      Q.   Have you spoken with anyone else at Charlotte

16 Catholic who has indicated that they previously knew

17 that Lonnie was in a relationship with Mr. Donham?

18      A.   I have not.

19      Q.   At any time?

20      A.   Correct.

21      Q.   If another teacher at Charlotte Catholic had

22 known that Mr. Billard and Mr. Donham were in a romantic

23 relationship, what obligations would that teacher have

24 had to report it?

25      A.   That's a difficult question.  I don't know if

Page 21

1  they're obligated to report it.

2      Q.    Why not?

3      A.    I think it's a matter of conscience, what you

4  feel you should report or not report.

5      Q.    You referenced Mr. Billard having made a

6  posting on Facebook.  If Mr. Billard had married

7  Mr. Donham but not posted about it on Facebook, would he

8  have been permitted to continue working as a substitute

9  teacher?

10          MR. DAVEY:  Objection.

11     A.    When I found out, no.

12          BY MR. BLOCK:

13     Q.    Are teachers at Charlotte Catholic allowed to

14  take contraception?

15     A.    Are you asking whether I -- I don't discuss

16  that so -- again, whether they're following the tenets,

17  I don't have that discussion with teachers.

18     Q.    But if you learned that a teacher was taking

19  contraception, what would the response be?

20     A.    I don't know that I'd ever learn that.  I've

21  been in this -- I've been a principal at different

22  levels for over 20 years.  That has never come across my

23  desk.

24     Q.    Do you think that -- if a teacher is engaging

25  in conduct that's contrary to the tenets of the church

Page 22

1    but no one at CCHS finds out about it, are they

2    complying with the policy?

3         A.    Is it a teacher who's engaging in conduct

4    they're not supposed to?

5         Q.    Yeah.  So let me -- a teacher -- in the

6    contracts that teachers sign, is there a provision that

7    says teachers shall not publicly engage in or advocate

8    for conduct contrary to the tenets of the church?

9         A.    Teachings of the church, yes, there is.

10        Q.    If a teacher does engage in that contact but

11   does so in a manner that no one in the CCHS community

12   learns about it, do you think they're in breach of that

13   part of their contract?

14        A.    Yes.

15        Q.    So teachers shouldn't be engaging in that

16   conduct regardless of whether you end up finding out

17   about it, is that right?

18        A.    Correct.

19        Q.    So why don't you affirmatively ask teachers

20   whether they're engaging in that conduct?

21        A.    I don't think -- again, I'm not trying to be

22   the morality police, so it's just -- I don't think

23   that's -- I don't think it's my place to ask those

24   questions.  That's for -- if a priest were to ask -- and

25   I don't think a priest would ask that question.  I think

Page 23

1   that would be you go to confession, you talk to a priest

2   if you have those questions about that.

3           Again, we're all sinners and sometimes it's,

4   you know, the Catholic Church, confession, things of

5   that nature.

6       Q.   When Father Kauth brought to your attention

7   the Facebook post, did he say how he had learned about

8   it?

9       A.   He said some people had sent information to

10  him.  He didn't say who.  I didn't ask.

11      Q.   So we've been talking about people engaging in

12  conduct.  Have you ever encountered a situation where

13  someone was advocating for conduct that ran afoul of the

14  school's policy?

15      A.   Can you give me an example?

16      Q.   Well, I'll give you a couple examples, with

17  the understanding that this is hypothetical.  Someone

18  announces that they support the legality of marriage for

19  same-sex couples.

20      A.   Were they advocating it?  By how?  Are they

21  going to a protest rally or --

22      Q.   How about they -- how about they attend a

23  relative's wedding and talk positively about it.

24      A.   I would probably ask them to talk to a priest.

25           MR. DAVEY:  And you noted it was hypothetical.

Page 24

1    I'm just going to, just for clarity, object to the

2    hypothetical, but you may ask the question and use it

3    however is appropriate.

4            BY MR. BLOCK:

5        Q.    And has there ever been an actual situation in

6    any context, so not limited to the context of gay

7    people, in which someone was advocating for something

8    that you thought ran afoul of the school's policy?

9        A.    No.  But I think sometimes in my role people

10   aren't going to come to me and tell me.

11       Q.    Do you recall an assembly in the spring of

12   2014 in which I think her name was Sister Dominic spoke?

13       A.    Jane Dominic.  I wasn't there so --

14       Q.    Were you principal at Charlotte Catholic at

15   the time the assembly occurred?

16       A.    No.

17       Q.    Do you know how long after the assembly

18   occurred that you arrived at Charlotte Catholic?

19       A.    Four months, five months.

20       Q.    Have you spoken with anyone at Charlotte

21   Catholic about the assembly?

22       A.    Not about what exactly happened but just said

23   it was not good for anybody, and that's from I think

24   staff, parents, kids.

25       Q.    And why wasn't it good for anyone?

Page 25

1      A.    I think some hot topics were pressed in the

2   meeting, and I think it didn't matter what side of the

3   spectrum you were on, it was just I think a difficult

4   assembly.

5      Q.    Do you think that it's okay for -- let me take

6   that back.  Sorry.

7           Do you think it's okay for employees at

8   Charlotte Catholic to say publicly that they disagree

9   with the decision to not allow Lonnie to continue as a

10  substitute?

11     A.    How do you mean public?  What do you mean

12  public?

13     Q.    Well, how about a teacher saying so to, you

14  know, another teacher in the break room?

15     A.    Conversations happen.  People are going to

16  have those.  I consider that private.  Now, public if

17  you meant in the newspaper, that's different.

18          MR. BLOCK:  If we can take a two-minute break,

19  I might actually be done with questions.

20          MR. DAVEY:  Certainly.

21          (Recess from 9:40 a.m. to 9:41 a.m.)

22          BY MR. BLOCK:

23     Q.    Just a few more.  I want to ask about the

24  policy at Charlotte Catholic to begin classes with a

25  prayer.  Was that policy in place before you came to

 1  Charlotte Catholic?

 2       A.    Yes.

 3       Q.    And is it your understanding that a teacher

 4  can choose to have a student lead the prayer instead of

 5  leading it themselves?

 6       A.    They can.  Yes.

 7       Q.    And I want to ask about a teacher's

 8  obligations to escort students to Mass when it's during

 9  their class time.  Was that policy already in place when

10  you arrived?

11       A.    Yes.

12       Q.    Does a teacher in that position have any job

13  duties with respect to participating in the Mass?

14       A.    Well, we would ask to stand and sit and help

15  as kids go to communion.  They can go to communion.

16  They can't receive if they're not Catholic, but ask for

17  a blessing.  So we would ask that they participate in

18  some.

19            Again, teachers are coming back, and I have a

20  group of teachers who -- teachers are going to be

21  assigned areas during Mass because -- so you not only

22  participate but make sure the kids go in an orderly

23  fashion.  They're very good at Mass, but people

24  generally don't want to go up at the top of the

25  bleachers, so that's an administrative that I had some

1    teachers say we'll put together a committee, because it

2    used to be voluntary.

3         Q.    And just to be clear, the people going up and

4    receiving blessings, are they students or teachers that

5    you're referring to?

6         A.    Anybody who's in attendance.

7         Q.    Can a teacher choose not to go up and receive

8    a blessing?

9         A.    Yes.  And so can students.

10        Q.    So it's optional?

11        A.    Yes.

12        Q.    Besides standing up and sitting down, are

13   teachers required to speak or participate in prayers as

14   part of a Mass?

15        A.    They're not.

16        Q.    Do you in your role as principal supervise --

17   sorry.  I want to start that question over.

18             Do you in your role as principal sit in and

19   evaluate teachers' classes at all?

20        A.    Yes.  Yes, I do.

21        Q.    And do you do that for teachers who are

22   teaching secular subjects?

23        A.    Yes.

24        Q.    In those classes, is there a requirement for

25   teachers to discuss Catholic doctrine at all?

Page 28

```
1        A.    No.   There's no requirement.

2        Q.    If teachers wish to discuss Catholic doctrine

3   as part of their secular class, are they permitted to?

4        A.    I would prefer that they not.  And, again, it

5   depends -- let me rephrase.  It depends what they're

6   discussing.  If it's a feast day, a holy day, and you're

7   going to give information, but as far as opinions, no.

8   My preference would be no.

9        Q.    Your preference would be for the teachers

10  teaching religion classes --

11       A.    Religion.

12       Q.    -- to do that?

13       A.    And I've had kids come to me and ask me

14  religious questions and I'll say you need to speak to

15  Father or Sister, Sister Agnes, our department chairman.

16       Q.    Are you aware of whether there are any

17  students at Charlotte Catholic who are gay?

18       A.    I am.

19       Q.    And are you aware of whether there are

20  students who are gay and sexually active?

21       A.    I'm unaware.

22       Q.    Are students who are gay and sexually active

23  allowed to attend Charlotte Catholic?

24       A.    Yes.  And can I clarify?  The reason I know

25  they're gay is their parents have told me.
```

Page 29

1      Q.   And why have the parents told you?

2      A.   Just letting me know.  I'm not -- quite

3  frankly, it happened this summer.  I would have said no

4  until three or four weeks ago.  Parents just told me.

5      Q.   And did the parents ask you to -- in this

6  situation ask you to do anything based on that

7  knowledge?

8      A.   No.

9           (Mr. Davey entered the proceedings.)

10          BY MR. BLOCK:

11     Q.   Were they concerned at all that the student

12  wouldn't be treated in a sensitive manner?

13     A.   Well, I'm not really sure, and when the one

14  parent talked he said I'm not really sure why I'm

15  telling you this.  He didn't come in specifically for

16  that.  I happened to see him.  He has multiple kids who

17  have gone through Catholic, and he said this one's gay,

18  which doesn't really matter.

19     Q.   Have you spoken with Mr. Billard at all?

20     A.   I have not.

21     Q.   And have you spoken with anyone at the Diocese

22  about Mr. Billard?

23     A.   No.

24          MR. BLOCK:  Okay.  I think that's all the

25  questions I have.

1          MR. McDONALD:  Can I just take one second?

2          MR. BLOCK:  Sure.

3          (Recess from 9:47 a.m. to 9:49 a.m.)

4          MR. McDONALD:  I have no questions.

5          (Whereupon, at 9:49 a.m. the deposition was

6    concluded.  Signature was reserved.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              E R R A T A   S H E E T      (1 of 3)
 2
 3  DEPOSITION OF:  W. KURT TELFORD, 8/15/17
 4  Re:        Billard v. Charlotte Catholic High School,
 5             et al., 3:17-cv-0011
 6
    Please read the foregoing transcript with care, and if
 7  you find any corrections or changes you wish to be made,
    list them by page and line number below.
 8
    PLEASE DO NOT WRITE IN THE TRANSCRIPT ITSELF!
 9
    You may return these ORIGINAL errata sheet pages within
10  the 30-DAY REQUIRED timeframe to:
11               Knowles Court Reporting
                    2646 Bay Street
12           Charlotte, North Carolina 28205
                    (704) 338-5438
13
    To assist in making any such corrections, please use the
14  forms provided below.  If additional pages are
    necessary, please furnish same and attach hereto.
15
16  Page  _____ Line  _____  Change _____
17  _____
18  Reason for change _____
19
    Page  _____ Line  _____  Change _____
20

21  _____

    Reason for change _____
22
23  Page  _____ Line  _____  Change _____
24  _____
25  Reason for change _____
```

KNOWLES COURT REPORTING
CHARLOTTE, NORTH CAROLINA 704.338.5438

JA0977

Page 32

1        E R R A T A   S H E E T      (2 of 3)
2
3    Page _____ Line _____ Change _____
4    _____
5    Reason for change _____
6
     Page _____ Line _____ Change _____
7
     _____
8
     Reason for change _____
9
10   Page _____ Line _____ Change _____
11   _____
12   Reason for change _____
13
     Page _____ Line _____ Change _____
14
     _____
15
     Reason for change _____
16
17   Page _____ Line _____ Change _____
18   _____
19   Reason for change _____
20
     Page _____ Line _____ Change _____
21
     _____
22
     Reason for change _____
23
24
                    Thank You!
25

Page 33

1                    WITNESS CERTIFICATE        (3 of 3)

2

3        I, W. KURT TELFORD, do hereby certify that I have

4    read and understand the foregoing transcript and believe

5    it to be a true, accurate, and complete transcript of my

6    testimony, subject to the attached list of changes, if

7    any.

8

9                                    _____

10                                   W. KURT TELFORD

11

12

13

14   *  This deposition was signed in my presence by

15   W. KURT TELFORD on (day) _____, this

16   (date) _____ day of (month) _____,

17   20__.

18

19                                   _____

20                                   Notary Public

21

22   My Commission Expires:

23

24

25

Page 34

1          CERTIFICATE OF NOTARY PUBLIC & REPORTER

2

3   STATE OF NORTH CAROLINA          )

4   COUNTY OF CABARRUS               )

5

6          I, Dayna H. Lowe, the officer before whom the

7   foregoing deposition was taken, do hereby certify that

8   the witness whose testimony appears in the foregoing

9   deposition was duly sworn by me; that the testimony of

10  said witness was taken in stenotype and thereafter

11  reduced to typewriting by me or under my direction; that

12  said deposition is a true record of the testimony given

13  by said witness; that I am neither counsel for, related

14  to, nor employed by any of the parties to the action in

15  which this deposition was taken; and, further, that I am

16  not a relative or employee of any attorney or counsel

17  employed by the parties thereto, nor financially or

18  otherwise interested in the outcome of the action.

19         This the 22nd day of August, 2017.

20

21         _____

22         DAYNA H. LOWE

23         Notary Public #19971830009

24

25

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

**Civil Action No. 3:17-cv-0011**

**LONNIE BILLARD,**

      **Plaintiff,**

**v.**

**CHARLOTTE CATHOLIC HIGH
SCHOOL, MECKLENBURG AREA
CATHOLIC SCHOOLS, and ROMAN
CATHOLIC DIOCESE OF CHARLOTTE,**

      **Defendants.**

---

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

Exhibit 6
Deposition of Steve Carpenter

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:17-cv-0011

LONNIE BILLARD,                        )
                                       )
          Plaintiff,                   )
                                       )
vs.                                    )
                                       )
CHARLOTTE CATHOLIC HIGH SCHOOL, )
MECKLENBURG AREA CATHOLIC              )
SCHOOLS, and ROMAN CATHOLIC            )
DIOCESE OF CHARLOTTE,                  )
                                       )
          Defendants.                  )
_____)


                              Thursday, August 3, 2017
                              Charlotte, North Carolina



     Deposition of STEVE CARPENTER, a witness herein,
called for examination by counsel for Plaintiff in the
above-entitled matter, pursuant to notice, before
Dayna H. Lowe, Court Reporter and Notary Public in and
for the State of North Carolina, at McGuireWoods, LLP,
201 North Tryon Street, Suite 3000, Charlotte, North
Carolina, commencing at the hour of 9:09 a.m.

```
 1   APPEARANCES:

 2

 3        On behalf of the Plaintiff:

 4             JOSHUA A. BLOCK, ESQUIRE
               American Civil Liberties Union Foundation
 5             125 Broad Street, 18th Floor
               New York, New York 10004

 6

 7        On behalf of the Defendants:

 8             JOSHUA D. DAVEY, ESQUIRE
               McGuireWoods, LLP
 9             201 North Tryon Street, Suite 3000
               Charlotte, North Carolina 28202

10

11        Also Present:

12             Mr. Lonnie Billard

13

14

15                        *   *   *

16

17

18

19

20

21

22

23

24

25
```

Page 3

1                    C O N T E N T S

2

Examination by Mr. Block:                              4

3

4

5                    E X H I B I T S

6                    (Carpenter)

7   Plaintiff's 1   Defendants' First Int. Responses    16

8   Plaintiff's 2   Plaintiff's Second Int. Responses   23

9   Plaintiff's 3   Teacher Evaluation Report           66

10  Plaintiff's 4   Formal Observation Instrument       71

11  Plaintiff's 5   Faculty Handbook 2011-2012          78

12  Plaintiff's 6   Faculty Retreat 2004 Draft          99

13  Plaintiff's 7   Faculty Retreat 2007               101

14

15

16          (Exhibits provided with the transcript.)

17

18

19                    *   *   *

20

21

22

23

24

25

Page 4

1                 P R O C E E D I N G S

2    Whereupon,

3                   STEVE CARPENTER

4    was called as a witness and, having first been duly

5    sworn, was examined and testified as follows:

6                        EXAMINATION

7             BY MR. BLOCK:

8         Q.    Good morning.

9         A.    Good morning.

10        Q.    My name is Josh Block.  I'm Lonnie's attorney,

11   and we're going to do a deposition.  Have you ever been

12   deposed before?

13        A.    I have not, no.

14        Q.    Okay.  So first time is the best.  So for this

15   deposition I'm going to be asking you questions, you'll

16   be providing answers, and there are just a few ground

17   rules that make the transcript come out better.

18        A.    Okay.

19        Q.    So one is make sure that you wait for me to

20   finish talking before you answer --

21        A.    Okay.

22        Q.    -- so she doesn't have to write both of us

23   talking at the same time.  And, second, make sure that

24   everything you answer is verbally, so don't go uh-huh or

25   nod.

Page 5

 1        A.   Okay.  I understand.

 2        Q.   You need to answer in a way that can be

 3   written down.

 4             And then the third is my job is to ask you

 5   questions that you understand so that you can answer to

 6   the best of your ability, so if there's any part of a

 7   question that's confusing or ambiguous, I want you to

 8   tell me so I can fix that question right here.  So the

 9   goal is that we don't look back at the transcript and

10   you say oh, if I had understood that that's what you

11   were really asking, I would have given a different

12   answer.  Does that make sense?

13        A.   Yes.

14        Q.   Great.  Is there any reason why you can't give

15   your full and best testimony today?

16        A.   No.

17        Q.   Excellent.  So let's proceed.  What's your

18   name?

19        A.   Steve Carpenter.

20        Q.   And what is your position?

21        A.   Assistant principal at Charlotte Catholic High

22   School.

23        Q.   How long have you had that position?

24        A.   Since 1993.

25        Q.   Wow.  And what did you do before then?

Case 3:17-cv-00011-MOC-DCK   Document 31-17   Filed 09/21/17   Page 6 of 109

Page 6

```
 1        A.   Do you want me to start in the beginning or
 2   just --
 3        Q.   Did you have any job with the Diocese before
 4   that?
 5        A.   Yes.  I actually began teaching in 1977.  Left
 6   in '79.  Worked in the business world for about ten
 7   years.  Went back to Charlotte Catholic and did
 8   maintenance when I was going to graduate school.
 9   Finished graduate school in the spring of '93 and then
10   took the assistant's job that fall, or summer.
11        Q.   And who hired you?
12        A.   Sister Paulette Williams.
13        Q.   And was she the principal at the time?
14        A.   Yes.
15        Q.   And when did she stop being principal?
16        A.   Let's see.  Give me a minute.  Do some math
17   here.  We moved there in '95.  Probably around 2001,
18   somewhere in there.
19        Q.   Okay.  And who was principal after her?
20        A.   Father Jim Cassidy.
21        Q.   And was Jim Cassidy your immediate superior?
22        A.   Yes.
23        Q.   And he had authority to fire you or discipline
24   you if --
25        A.   Yes.
```

1      Q.   And did you report to anyone besides Father

2  Cassidy?

3      A.   No.

4      Q.   Did you report to anyone at the Diocese?

5      A.   No.

6      Q.   Who was principal after Father Cassidy?

7      A.   Jerry Healy.

8      Q.   And do you know approximately when he took

9  over?

10     A.   Father Jim was there three years.  It was

11 probably '06, somewhere in there.

12     Q.   And is the same true that, just like Father

13 Cassidy, Jerry Healy had the power to fire you or

14 discipline you?

15     A.   Yes.

16     Q.   And you reported to Jerry Healy?

17     A.   Yes.

18     Q.   And you did not report to anyone at the

19 Diocese?

20     A.   No.

21     Q.   "No" meaning that -- "no" meaning there was --

22 your answer "no" reflects the fact that there was no one

23 at the Diocese that you reported to?

24     A.   Correct.

25     Q.   And then after Jerry Healy, who was principal

1   then?

2       A.   Kurt Telford.

3       Q.   And approximately when did he take over?

4       A.   Three years ago.

5       Q.   And the same is true --

6       A.   No.  Four years?

7            MR. BILLARD:  Three or four.  Sorry.

8       A.   I think it's four years.

9            BY MR. BLOCK:

10      Q.   And the same is true for him as the other

11  principals, that he had the power to fire you or

12  discipline you, correct?

13      A.   Correct.

14      Q.   And you reported to him, correct?

15      A.   Yes.

16      Q.   And there was no one at the Diocese you

17  reported to, correct?

18      A.   Correct.

19      Q.   Now, what were your job responsibilities with

20  respect to supervising teachers?  And if those differed

21  at different times, let me know that.

22      A.   Each administrator has responsibility to

23  observe teachers in the classroom and write up

24  observations with them.  That was the most direct.

25      Q.   Did you have any role in the curriculum that

Page 9

1   they taught?

2        A.    There were times over the years, not -- that I

3   had a role in curriculum, yeah.

4        Q.    And so did you -- well, what sort of role?

5        A.    It was more of creating the curriculum for the

6   school, whether they be required courses or electives,

7   and part of it -- yeah.

8        Q.    So you mean like the course offerings

9   available?

10       A.    Yes.

11       Q.    Okay.  Who had the power to hire teachers?

12   Was that you?

13       A.    No.

14       Q.    Was it the principal?

15       A.    Ultimately, yes.

16       Q.    Who else besides the principal was involved in

17   hiring teachers?

18       A.    There was a process for hiring teachers.

19   Generally an assistant would be involved, the

20   appropriate department head, but the ultimate decision

21   would be the principal's.

22       Q.    So in your position as assistant principal,

23   you have knowledge about what that process was like, is

24   that right?  You're familiar -- if I ask you about the

25   process, you're familiar with the hiring process in

1    general?

2        A.   Yes.

3        Q.   Did you have any role in hiring Lonnie?

4        A.   Yes.

5        Q.   What was your role in hiring Mr. Billard?

6        A.   Well, I first hired him as a substitute

7    teacher.

8        Q.   And when was that?

9        A.   I don't know.  I couldn't give you -- I mean,

10   I honestly -- 15 years ago maybe, something like that.

11       Q.   Early 2000s?  About then?

12       A.   I guess.

13       Q.   And what was that hiring process?

14       A.   He had come in and asked to work as a

15   substitute for the school, and we talked about it,

16   talked about his background, and put him on the

17   substitute list.

18       Q.   Now, as part of that interview, did you ask

19   him about how frequently he attends Mass?

20       A.   No.  I don't recall.  I mean --

21       Q.   Is it your general practice to ask people you

22   interview for the position of a substitute teacher how

23   frequently they attend Mass?

24       A.   No.

25       Q.   Did you ask him about his sexual orientation?

Page 11

 1      A.   No.

 2      Q.   Did you ask him about what his religion is?

 3      A.   No.

 4      Q.   Did you ask him any questions for the purpose

 5 of determining whether he engages in conduct that's

 6 fundamental to the moral tenets of the Roman Catholic

 7 faith?

 8      A.   No.

 9      Q.   As a general practice, do you ever ask

10 applicants questions for the purposes of determining

11 whether they engage in conduct that's fundamental to the

12 moral tenets of the Catholic faith?

13      A.   No.

14           MR. DAVEY:  Are you talking about substitutes

15 or others?

16           MR. BLOCK:  Right now, substitutes.

17           MR. DAVEY:  Do you understand the question?

18           THE WITNESS:  Yes, I do.

19      A.   No.

20           BY MR. BLOCK:

21      Q.   So that was the process for hiring Mr. Billard

22 as a substitute.  Were you involved in the process for

23 hiring him as a full-time teacher?

24      A.   Yes.

25      Q.   And what was your role in that process?

Page 12

1      A.    Lonnie was transitioned to full-time teacher

2  to replace an English teacher who had been dismissed.

3      Q.    And what did Mr. Billard have to do as part of

4  his application to take over that position?

5      A.    He had to go through the process that's used

6  to hire certified teachers.

7      Q.    And how is that process different than the

8  process for hiring substitute teachers?

9      A.    Well, first of all, it's a contract.  There

10 are certain academic requirements that you have to have

11 to teach content as a full-time teacher as opposed to as

12 a substitute.

13     Q.    And as part of that process did you ask him

14 any questions about his religion?

15     A.    Which process?

16     Q.    The process for hiring him as a full-time

17 teacher.

18     A.    Okay.

19     Q.    Did you ask him about his religion?

20     A.    No.

21     Q.    Did you ask him about how frequently he

22 attends Mass?

23     A.    No.

24     Q.    Did you ask him about his sexual orientation?

25     A.    No.

1    Q.   Did you ask him any questions for the purpose

2  of determining whether he engages in conduct that's

3  fundamental to the moral tenets of the Roman Catholic

4  faith?

5    A.   No.

6    Q.   To the best of your knowledge, did anyone else

7  involved in the hiring process ask him those questions?

8    A.   I'm not aware.

9    Q.   And the other people involved in that process

10  would be you and Jerry Healy, and is there anyone else?

11    A.   I don't recall whether Jerry was the principal

12  at the time.

13    Q.   Oh, yes.  Actually you're correct.  So you and

14  the principal, and anyone else?

15    A.   I don't recall.

16    Q.   Okay.  Do you know how many people are

17  employed by CCHS?

18    A.   Currently?

19    Q.   Yes.

20    A.   About 120.

21    Q.   And that includes not just teachers but all

22  employees, correct?

23    A.   Uh-huh.  Yes.

24    Q.   And how many students attend CCHS?

25    A.   1,219.

Page 14

1      Q.   And about what percentage of those students

2  are Catholic?

3      A.   I have no idea.

4      Q.   Are there students who attend CCHS that are

5  not Catholic?

6      A.   Yes.

7      Q.   Would you say that the percentage of students

8  who are not Catholic is greater than 1 percent?

9      A.   Yes.

10          MR. DAVEY:  Objection.

11          THE WITNESS:  Sorry.

12          MR. DAVEY:  If you know.

13          BY MR. BLOCK:

14      Q.   If you know, would you say that the percentage

15  is greater than 5 percent?

16      A.   Yes.

17      Q.   If you know, would you say that the percentage

18  is greater than 10 percent?

19      A.   I don't know.

20      Q.   What percentage of employees at CCHS are

21  Catholic?

22      A.   I don't know.

23      Q.   And are you able to -- if you know, are you

24  able to say whether the percentage of teachers who are

25  not Catholic is greater than 1 percent?

Page 15

1      A.   Yes.

2      Q.   Greater than 5 percent?

3      A.   Not sure.

4      Q.   Does the Diocese encourage CCHS to hire

5  Catholic teachers whenever possible?

6      A.   I've never been told that.

7      Q.   Have you been given any instructions from the

8  Diocese with respect to criteria you should be using for

9  hiring teachers?

10     A.   I'm not sure I understand that question.

11     Q.   The criteria that you use to hire teachers,

12 who sets those criteria?

13     A.   The Diocese.

14     Q.   And how is that criteria communicated to you?

15     A.   We are aware of certain academic requirements

16 for teachers in order to be qualified to teach under

17 accreditation rules.  That would be the primary

18 information we would use.

19     Q.   And anything else besides -- you mentioned the

20 primary criteria.  Are there any other criteria besides

21 that?

22     A.   None that I'm aware of other than the academic

23 and -- yeah.

24          MR. BLOCK:  I'm having the court reporter mark

25 a document as Exhibit 1.

Page 16

 1                    (Exhibit 1 was marked for identification.)

 2                    BY MR. BLOCK:

 3          Q.    And this is yours to look at.  So this is a

 4    document that's titled Defendants' Responses to

 5    Plaintiff's First Set of Interrogatories.  Have you seen

 6    this document before?

 7          A.    No.

 8          Q.    Okay.  If you turn to page 2, actually

 9    beginning at the bottom of page 1 and continuing to

10    page 2, you see in underline and all caps it says

11    "Answer."

12          A.    Uh-huh.

13          Q.    And then there's several paragraphs in bold.

14    I want to direct your attention to the last sentence of

15    the third-to-last paragraph, the one that begins with

16    the word "Accordingly."  Do you see that sentence?

17          A.    "Accordingly, teachers may not"?  That?

18          Q.    Yes.  So the sentence says, "Accordingly,

19    teachers may not publicly engage in conduct or publicly

20    advocate for positions opposed to the fundamental moral

21    tenets of the Roman Catholic faith, including those

22    concerning marriage."

23                    Did I accurately read what that sentence said?

24          A.    Yes.

25          Q.    Now, were you familiar with such a policy?

Case 3:17-cv-00011-MOC-DCK   Document 31-17   Filed 08/23/17   Page 17 of 109

1    I'll rephrase that.

2            Before December 2014, were you aware of such a

3    policy?

4        A.    Yes.

5        Q.    And what was your -- how were you made aware

6    of that policy?

7        A.    Contracts.

8        Q.    How did the contracts make you aware of that

9    policy?

10       A.    There's a more general statement in the

11   contracts we all sign that refers to that.

12       Q.    As part of your job duties, do you play any

13   role in enforcing that policy?

14       A.    I could.

15       Q.    How so?

16       A.    If made aware of that policy being not

17   followed.

18       Q.    So if you were made aware of that policy being

19   not followed, what would you do?

20       A.    I've -- wow.  I guess first I'd have to make

21   sure that what I understood was accurate.

22       Q.    And if you determined it was accurate, what

23   would you do?

24       A.    I think generally I would discuss that with

25   the principal.

```
1        Q.   During your career, did you ever report to the

2   principal an example of the policy not being followed?

3        A.   No.

4        Q.   Did you ever -- during your career, did you

5   ever report to anyone else an example of the policy not

6   being followed?

7        A.   No.

8        Q.   Did you, in your evaluations of teachers, take

9   any steps to determine whether teachers were in

10  compliance with the policy?

11       A.   No.

12       Q.   Was it anyone's role to determine whether

13  teachers were in compliance with the policy?

14       A.   Not that I'm aware.

15       Q.   Have you ever spoken with teachers about the

16  policy?

17       A.   Yes.

18       Q.   In what context?

19       A.   In their job in the classroom.

20       Q.   So you've spoken with teachers about the

21  policy in their job in the classroom, is that correct?

22  Is that what you said?

23       A.   Say that again.

24       Q.   Well, I'm trying to make sure I -- so you said

25  that you've spoken with teachers about the policy in
```

Case 3:17-cv-00011-MOC-DCK   Document 31-17   Filed 08/23/17   Page 19 of 109

1  evaluating their conduct in the classroom, is that

2  correct?

3       A.   No, it's not.

4       Q.   So tell me -- could you explain further the

5  context in which you've spoken with teachers about the

6  policy?

7       A.   Over the years there have been moments when

8  teachers are reminded of their academic responsibilities

9  and not to -- not to engage in conversations outside of

10  their discipline.  If a student -- as an example, if a

11  student is having a difficult time at home and is upset,

12  teachers should -- their role should be to direct them

13  to the guidance department or follow up with guidance,

14  because that's their level of expertise.  Okay?  So it's

15  that kind of advice that we're referring to.

16       Q.   So the context that you're referring to

17  involves teachers' interactions with students in the

18  classroom, is that right?

19       A.   Just as teachers.  It may not be restricted to

20  a classroom.  It could be a coach.  It could be any

21  number of things in the community, school community.

22  So, yeah, because they take different roles.  They could

23  have a club.  It's not necessarily an academic student.

24       Q.   But it's still the interactions between

25  teachers and students as opposed to what a teacher does

1    in their private life outside of school.  Is that right?

2          MR. DAVEY:  Objection to the form.

3          BY MR. BLOCK:

4      Q.   So the context that we're talking about is a

5    context that involves teachers' interactions with

6    students, is that correct?

7      A.   I'm not sure I like the word "interactions."

8      Q.   Okay.  What word would you use?

9      A.   Teachers' professional relationship with

10   students.

11     Q.   And is there any context besides that in which

12   you would have these discussions?

13     A.   I don't understand that question.

14     Q.   Is there any -- would you ever talk with

15   teachers about the policy in a context other than

16   discussing teachers' discussions with students?

17          MR. DAVEY:  Objection to the form.

18     A.   I don't --

19          MR. BLOCK:  Could you read back like two

20   questions ago?

21          (The reporter read the record as requested.)

22          BY MR. BLOCK:

23     Q.   So then you changed the word "interactions" to

24   discussions.  Well, I don't want to relitigate the

25   transcript.

```
 1          MR. DAVEY:  Object to form.
 2          BY MR. BLOCK:
 3     Q.    Tell me if this is right or wrong.  Okay?
 4     A.    Okay.
 5     Q.    The only context in which you talked to
 6  teachers about their obligations to follow the policy
 7  was in the context of discussing teachers' interactions
 8  with students.  Is that correct?
 9          MR. DAVEY:  Objection to the form.
10     A.    I'm not sure.
11          BY MR. BLOCK:
12     Q.    Can you think -- sitting here, can you think
13  of any other context in which you talked with teachers
14  about their obligations to comply with the policy?
15     A.    Are you referring to the policy that pertains
16  to fundamental moral tenets?
17     Q.    Yes.
18     A.    Specifically?
19     Q.    Yes.  The policy I pointed you to in
20  Exhibit 1.
21     A.    No, probably not.
22     Q.    Have you met Richard Donham?
23     A.    Yes.
24     Q.    When was the first time?
25     A.    I honestly couldn't tell you.
```

Page 22

1      Q.   Over 10 years ago?

2      A.   Yes.

3      Q.   Over 15 years ago?

4      A.   Not sure.

5      Q.   Do you remember how you first met him?

6      A.   No.

7      Q.   Do you remember how he was introduced to you?

8      A.   No.

9      Q.   Was he ever introduced to you as Mr. Billard's

10   partner?

11     A.   No.

12     Q.   How was he introduced -- so when you met him,

13   what was your understanding of who he was?

14     A.    Mr. Billard's friend.

15     Q.   And that's how he was introduced to you as?

16     A.   I don't recall.

17     Q.   How many times have you met him?

18     A.   I have no clue.

19     Q.   Dozens?

20     A.   Probably not.

21     Q.   More than ten?

22     A.   I don't know.

23     Q.   In what contexts did you meet him?

24     A.   For the most part, the few times he

25   substituted.

```
 1        Q.    And when was that?

 2        A.    I honestly couldn't tell you how long ago.

 3        Q.    And you were responsible for hiring him as a

 4   substitute?

 5        A.    Yes.

 6              MR. BLOCK:  And I'm going to mark a second

 7   exhibit.

 8              (Exhibit 2 was marked for identification.)

 9              BY MR. BLOCK:

10        Q.    So this is a document that's titled

11   Plaintiff's Responses to Defendant Mecklenburg Area

12   Catholic Schools' Second Set of Interrogatories, and I

13   want to direct your attention to page 4 and 5.

14        A.    Okay.

15        Q.    And so the bullet point at the bottom of

16   page 4 says, "At various dates between September 2003

17   and February 2004, Mr. Donham worked as a substitute

18   teacher at CCHS."  To the best of your recollection,

19   does that accord with your memory of the time period in

20   which he worked as a substitute?

21              MR. DAVEY:  Objection.  The witness has

22   already testified about his memory.

23              BY MR. BLOCK:

24        Q.    Does this refresh your recollection about --

25        A.    I can't speak to its accuracy.
```

Page 24

1    Q.    Okay.  Turning to page 5, this is a bullet

2    point of events which Mr. Donham attended at CCHS, and I

3    would just like to go through them with you and ask,

4    then, if you were at any of these events and if you met

5    Mr. Donham there.

6            So the first bullet point refers to the fall

7    plays and the spring musicals from 2003 to 2012.  Did

8    you attend any of those events?

9    A.    Yes.

10    Q.    Was it your regular practice to attend those

11    events?

12    A.    Yes.

13    Q.    And at those events, do you recall seeing

14    Mr. Donham there?

15    A.    I don't recall one way or the other.

16    Q.    Okay.  The next bullet point says that, "In

17    June 2004, Plaintiff and Mr. Donham attended an End of

18    School Party hosted by Principal Healy at The Gin Mill."

19    Do you have any recollection of that end of school

20    party?

21    A.    In 2004, no.

22    Q.    Do you -- well, let's go -- so do you have --

23    do you have a recollection of attending any end of

24    school parties in which Mr. Donham was in attendance?

25    A.    I don't recall any.

1        Q.    Do you have any recollection of attending any

2    other school parties or faculty parties in which

3    Mr. Donham was in attendance?

4        A.    None that I could specifically tell you, no.

5        Q.    Do you have any recollection of meeting

6    Mr. Donham in any other context besides your hiring him

7    as a substitute teacher?

8        A.    The wedding.

9        Q.    So before the wedding, was there any other

10   time that you met Mr. Donham other than when you hired

11   him as a substitute teacher?

12       A.    None that I can specifically state.

13       Q.    Now, have you ever heard anyone refer to

14   Mr. Donham as Mr. Billard's partner?

15       A.    Ever?

16       Q.    Before December 2014.

17       A.    No.

18       Q.    Have you ever heard anyone refer to Mr. Donham

19   as Mr. Billard's boyfriend before December 2014?

20       A.    No.

21       Q.    Before December 2014, were you aware that

22   Mr. Donham and Mr. Billard were in a romantic

23   relationship?

24       A.    No.

25       Q.    When did you first learn that Mr. Donham and

Page 26

1    Mr. Billard were in a romantic relationship?

2          A.    Say that again, please.

3          Q.    When did you first learn that Mr. Donham and

4    Mr. Billard were in a romantic relationship?

5          A.    Would be the fall of '14 I guess.

6          Q.    Were you aware before the fall of 2014 that

7    Mr. Donham and Mr. Billard were living together?

8          A.    I knew that they were living together, yes.

9          Q.    And how long did you know they were living

10   together for?

11         A.    I honestly don't know.

12         Q.    At least ten years?

13              MR. DAVEY:  Objection.

14         A.    I don't know.  I couldn't tell you when I

15   became aware of that.

16              BY MR. BLOCK:

17         Q.    Before the fall of 2014, did you have any

18   suspicion that Mr. Billard and Mr. Donham were in a

19   romantic relationship together?

20         A.    Didn't think about it.

21         Q.    Before the fall of 2014, did you know that

22   Mr. Billard is gay?

23         A.    No.

24         Q.    Before the fall of 2014, did you have any

25   suspicion that Mr. Billard is gay?

1      A.   Never thought about it.

2      Q.   Before the fall of 2014, did you have any

3  discussions with Mr. Billard about sexual orientation or

4  homosexuality?

5      A.   No.

6      Q.   Before the fall of 2014, did you have any

7  discussions with Mr. Billard about relatives who are

8  gay?

9      A.   Whose relatives?

10     Q.   Your relatives.

11     A.   Possibly.

12     Q.   Do you remember one way or the other?

13     A.   Not really.

14     Q.   So do you remember having a conversation with

15  Mr. Billard in which you talked to him about your

16  brother being gay?

17     A.   When?

18     Q.   Before 2014.

19     A.   I don't know when.

20     Q.   You don't know when?

21     A.   Because of the timeline, I can't tell you if

22  it happened before or after.

23     Q.   So there was a conversation, correct?

24     A.   Yes.

25     Q.   But you don't remember whether it happened

1   before the fall of 2014 or after the fall of 2014?

2        A.   I don't know the timeline.

3        Q.   So is that a no, you don't remember?

4        A.   Okay.  Yes.  I don't remember.

5        Q.   Did you ever have any conversations with

6   Mr. Billard about students who are gay?

7        A.   I don't specifically recall any.

8        Q.   Do you generally recall any?

9        A.   No.  I mean, none that I -- no, I can't sit

10  here and be specific about, you know, a student.

11       Q.   Even without being able to identify a

12  particular student, can you recall in general having a

13  discussion with Mr. Billard about a student being gay?

14       A.   It's difficult to answer that question,

15  because I have lots of discussions with lots of folks

16  about lots of topics, and whether or not -- including

17  Mr. Billard, about lots of different things.  To sit

18  here and say I did, I can't sit here and tell you I

19  remember this or that, because we discuss lots of

20  things.  So it's difficult to answer that question and

21  know that I'm giving you an honest one way or the other.

22       Q.   When did you first become aware that

23  Mr. Billard and Mr. Donham were getting married?

24       A.   It was in the fall of '14.

25       Q.   And how did you become aware?

Page 29

1      A.    I overheard conversation in the administration

2   workroom.

3      Q.    You overheard a conversation in the

4   administration workroom?  Is that -- I just didn't

5   understand the last --

6      A.    Yes.  I'm sorry.  Yes.

7      Q.    And who was having that conversation?

8      A.    I couldn't tell you that day who was there.

9   That's a very busy area.  Teachers cut through on the

10  way to the mail room, it's the first stop coming

11  through, some stop and chat, some grab a cup of coffee.

12  I have no idea.

13     Q.    So what did you overhear in that conversation?

14     A.    Specifically?

15     Q.    Yes.

16     A.    I just heard that they were going to get

17  married.

18     Q.    Was that statement expressed in a way that was

19  supportive of them getting married, or was it expressed

20  in a way that was disapproving, or was it expressed in

21  any other tone?

22          MR. DAVEY:  Objection to the form.

23     A.    I'm not even sure who said it.  I mean, it may

24  well have been Mr. Billard.  I don't recall.  My office

25  tends to be busy in the morning.  You know, you just

Page 30

1    hear it, and I have no idea who said that.

2            BY MR. BLOCK:

3        Q.    So at the time you heard that statement, you

4    had no idea that Mr. Billard and Mr. Donham were in a

5    romantic relationship?

6        A.    Never told me.

7        Q.    Sorry?

8        A.    No.

9        Q.    And so what did you do when you heard that

10   statement?

11       A.    I honestly don't -- at that moment I honestly

12   don't recall.

13       Q.    How about if not at that immediate moment,

14   what's the next thing you did based on that knowledge?

15       A.    At some point around there I had a private

16   conversation with Lonnie in my office mentioning or -- I

17   don't know what the right word is -- referencing the

18   gentleman at Saint Gabriel's and what had happened when

19   he got married, and speaking to a friend I just told

20   him, you know, if that happens, there's not much I can

21   do.

22       Q.    Who initiated --

23       A.    And that may not be word-for-word.

24       Q.    That may not be what?

25       A.    Word-for-word.

1      Q.    Who initiated the conversation?

2      A.    I'm not sure.

3      Q.    So it could have been Mr. Billard who

4  initiated the conversation?

5      A.    One of us.

6      Q.    And one of those could have been Mr. Billard

7  as far as you recall, correct?

8      A.    Could have been, yes.  I don't recall.

9      Q.    Do you recall whether in the conversation

10 Mr. Billard told you about the engagement?

11     A.    I don't.

12     Q.    Do you remember in the conversation telling

13 Mr. Billard that you had overheard other people talking

14 about the engagement?

15     A.    I don't recall the conversation specifically.

16     Q.    It seems like a significant conversation.  Was

17 it --

18     A.    It is, but it was a number of years ago, and

19 you're asking me to give you a specific, and I can't do

20 that.

21     Q.    So when you told Mr. Billard about -- you

22 referenced a situation at Saint Gabriel.  What were you

23 referring to?

24     A.    I don't even recall the gentleman's name that

25 was in charge of the music at Saint Gabriel's which

Page 32

1    had -- when he had married, that he was relieved from

2    his position at Saint Gabriel's.

3        Q.   And who brought up the topic of this former

4    employee at Saint Gabriel's?

5        A.   Me probably.

6        Q.   Are you -- could it have been Mr. Billard?

7        A.   I don't recall the conversation specifically

8    to answer that.

9        Q.   So what did you mean by telling Mr. Billard if

10   that happens there's nothing you can do about it?

11       A.   What I was referring to is that the Diocese

12   had already, under similar circumstances, removed

13   someone from their position when they had a same-sex

14   marriage and that, you know, that probably is what would

15   happen once he got married.

16       Q.   So was your -- so your understanding was

17   that's what would happen after the marriage took place?

18            MR. DAVEY:  Objection to the form.

19            BY MR. BLOCK:

20       Q.   You said -- I think you referenced about

21   something happening after Mr. Billard got married.  Were

22   you referencing some sort of employment decision being

23   made after the marriage or after the engagement?

24            MR. DAVEY:  Objection to the form.

25            BY MR. BLOCK:

1    Q.   If you understand it, you can answer.

2    A.   Say it again, please.

3    Q.   Were you referencing an employment action

4    being taken by the Diocese after the marriage took place

5    or after his engagement?

6         MR. DAVEY:  Objection to the form.

7    A.   I don't know that I was referencing either

8    specifically.  Yeah.

9         BY MR. BLOCK:

10   Q.   And what did Mr. Billard say in response?

11   A.   I can't tell you specifically.  I would say he

12   certainly acknowledged he heard what I said.

13   Q.   Are you familiar with the term "uptown" being

14   used to refer to the Diocese?

15   A.   Never thought of it that way, but that word

16   has lots of connotations in Charlotte.

17   Q.   But at CCHS did you ever use the term "uptown"

18   to refer to a decision --

19   A.   Oh, to a decision?

20   Q.   To refer to -- well, to refer to the Diocese.

21   A.   You mean the building?  The Catholic Center?

22   Q.   No, I mean the Diocese as an entity.

23   A.   Yes.

24   Q.   So did you ever use the phrase "uptown" in the

25   context of saying that a certain decision was made

1    uptown or comes from uptown?

2         MR. DAVEY:  Objection to the form.

3    A.    Possibly.  I mean --

4         BY MR. BLOCK:

5    Q.    During this conversation with Mr. Billard, did

6    you tell Mr. Billard maybe uptown won't find out about

7    it?

8    A.    I don't recall that one way or the other.

9    Q.    So you could have said that?

10   A.    I don't know.

11   Q.    After this conversation, did you report the

12   fact that Mr. Billard was getting engaged to anyone

13   else?

14   A.    When?

15   Q.    After this conversation took place.

16   A.    At some point I mentioned it to Mr. Telford.

17   Q.    When was that?

18   A.    I don't know.

19   Q.    Was it shortly after the conversation took

20   place?

21   A.    I honestly don't know.

22   Q.    Could it have been more than a week after the

23   conversation took place?

24   A.    I'm not even sure when the conversation took

25   place.  I mean, seriously, I don't know what day it took

Page 35

1    place.

2        Q.   Well, you must have some recollection about

3    whether or not, you know, you waited a day or a week or

4    a month.

5        A.   I would say within a week.  You could say

6    that.

7        Q.   And what did you say to Principal Telford?

8        A.   I don't recall.  Probably just making him

9    aware of the engagement, or to-be engagement.

10       Q.   And you said you messaged him, is that right?

11            MR. DAVEY:  Objection.

12       A.   Message?

13            BY MR. BLOCK:

14       Q.   How did you communicate this to Principal

15   Telford?

16       A.   I spoke to him.

17       Q.   You spoke to him.

18       A.   Yes.

19       Q.   In person?

20       A.   Uh-huh.  Yeah.  Not on the phone, no.

21       Q.   And what did Principal Telford say?

22       A.   He said okay.  In other words, he heard what I

23   had to say.

24       Q.   Did he say what actions he would take based on

25   that information?

1    A.   No.

2    Q.   Did he say whether he would talk to anyone

3  else?

4    A.   I don't specifically remember.

5    Q.   In terms of the date that this conversation

6  took place, you said the fall of 2014.  Do you have any

7  recollection of which month it occurred?

8         MR. DAVEY:  Which conversation are we talking

9  about?

10        BY MR. BLOCK:

11   Q.   The conversation between you and Mr. Billard.

12   A.   I don't think it was early in the school year.

13   Q.   Was it --

14   A.   I don't have the date.  I mean, I honestly

15  don't.  It's -- I don't keep those notes.

16   Q.   Do you know if it was shortly after the

17  engagement was announced on Facebook?

18        MR. DAVEY:  Objection.

19        BY MR. BLOCK:

20   Q.   If you understand the question --

21   A.   Okay.  The conversation was before it was on

22  Facebook.

23   Q.   The conversation was before the news was on

24  Facebook?

25   A.   Yes.

1    Q.   And how do you know that?

2    A.   Because that's my recollection.

3    Q.   When were you first made aware that

4  Mr. Billard posted on Facebook about his engagement?

5    A.   I believe he was working that day and there

6  was -- again, the same administration workroom where

7  they gather and chat, somebody made mention of it.

8    Q.   And this was -- this conversation that you

9  heard in the workroom is a different event than the

10  conversation --

11    A.   As I recall.

12    Q.   -- in which you heard they were being engaged?

13    A.   As I recall.

14    Q.   Let me just say, just so the transcript looks

15  good --

16        MR. DAVEY:  Just make sure he finishes.

17        THE WITNESS:  I'm sorry.  You're right.  I'm

18  sorry.

19        BY MR. BLOCK:

20    Q.   So this conversation that you heard in the

21  workroom about the Facebook announcement was a different

22  conversation than the conversation you heard in the

23  workroom about Mr. Billard being engaged?

24    A.   As I recall.

25        MR. DAVEY:  When you get to a good stopping

1   point, do you mind if we take a short break?

2           MR. BLOCK:  Yeah, yeah.  We can take a break

3   now.

4           (Recess from 10:10 a.m. to 10:20 a.m.)

5           BY MR. BLOCK:

6    Q.   I want to get a quick recap of the extent of

7   your recollection during the fall of 2014.  So you don't

8   recall when in the fall of 2014 you heard that

9   Mr. Billard and Mr. Donham were getting married, is that

10  correct?

11   A.   Specifically, no, I don't.

12   Q.   You don't recall whether you heard they were

13  getting married before or after Mr. Billard posted about

14  it on Facebook, is that correct?

15   A.   Say that again, please.

16   Q.   You don't recall whether you heard they were

17  getting married before or after Mr. Billard posted about

18  it on Facebook?

19   A.   My recollection is that -- trying to remember.

20  I believe I heard it before it went on Facebook.  I

21  think I've already said that I overheard in the workroom

22  that -- I don't know how it was stated.

23   Q.   I'm focusing on timing though.

24   A.   Okay.

25   Q.   You don't recall when this conversation in the

1   workroom took place within the fall of 2014?

2       A.   No.

3       Q.   And you don't recall when you learned that he

4   had posted about it on Facebook within the fall of 2014,

5   is that correct?

6       A.   I don't know when that happened.  I couldn't

7   tell you specifics.

8       Q.   But you think that he posted it on Facebook

9   after you overheard the conversation in the workroom

10  about him being engaged?

11      A.   Yes.

12      Q.   You don't recall -- you don't recall how long

13  after you heard about his engagement in the workroom you

14  talked with Mr. Billard about it.  Is that correct?

15      A.   Specifically, no.

16      Q.   You don't recall whether Mr. Billard initiated

17  the conversation or you initiated the conversation, is

18  that correct?

19      A.   Correct.

20      Q.   You don't recall whether you told Mr. Billard

21  maybe uptown won't find out about it, is that correct?

22      A.   Correct.

23      Q.   You don't recall how much time passed between

24  that conversation between you and Mr. Billard and when

25  you told Principal Telford that Mr. Billard was getting

1    engaged, correct?

2        A.    Correct.

3        Q.    You don't recall what Mr. Telford said he was

4    going to do based on that information, is that correct?

5        A.    Correct.

6        Q.    You don't recall when in 2014 your

7    conversation with Mr. Telford occurred, is that correct?

8        A.    Correct.

9        Q.    Did you have any conversations about

10   Mr. Billard's engagement with anyone else besides

11   Mr. Telford in 2014?

12       A.    In all of 2014?

13       Q.    Yes.

14       A.    I did.

15       Q.    With whom?

16       A.    Ms. Stretch.

17       Q.    Anyone else?

18       A.    Not that I recall.

19       Q.    When did the conversation with Ms. Stretch

20   occur?

21       A.    Over the holidays.

22       Q.    The Christmas holidays?

23       A.    Or Christmas break.  Somewhere in there.

24       Q.    But not Thanksgiving?

25       A.    No, I don't think so.

1      Q.   Did you have any conversations with Father

2  Kauth about Mr. Billard's engagement?

3      A.   Not that I recall.

4      Q.   Did you have any conversations with Father

5  Kauth about Mr. Billard's Facebook post?

6      A.   Not that I recall.

7      Q.   Did you have any conversations with MJ Dawson

8  about Mr. Billard's engagement?

9      A.   No.

10     Q.   Did you have any conversations with MJ Dawson

11  about Mr. Billard's Facebook post?

12     A.   No.

13     Q.   Do you recall how much time passed between

14  your conversation with Principal Telford in which you

15  reported your knowledge that Mr. Billard was engaged and

16  your subsequent conversation with Ms. Stretch?

17     A.   No.

18     Q.   Well, if the conversation with Ms. Stretch was

19  around the time of the holidays --

20     A.   The problem is I don't know when my

21  conversation with Mr. Telford was, so I don't have a

22  beginning and ending.

23     Q.   So you don't recall whether that conversation

24  with Principal Telford was in November or December?

25     A.   I couldn't answer that specifically.  I

Page 42

1    couldn't answer it.  I don't know.

2        Q.   After you first reported to Principal Telford

3    your knowledge that Mr. Billard was engaged, did you

4    have any subsequent conversations with him about it?

5        A.   Yes.

6        Q.   When?

7        A.   When we came back from break.

8        Q.   When you came back from what break?

9        A.   The holiday break, Christmas break.  In

10   that -- yeah.

11       Q.   So this conversation with Principal Telford

12   occurred after your conversation with Ms. Stretch?

13       A.   Yeah.  That particular conversation, yes.

14       Q.   When were you made aware that Mr. Billard

15   would not be allowed to return as a substitute teacher?

16       A.   What do you mean by made aware?

17       Q.   Who made the decision that Mr. Billard would

18   not be allowed to return as a substitute teacher?

19       A.   I informed Mr. Billard.

20       Q.   But who informed -- did someone tell you to

21   inform Mr. Billard?

22       A.   I informed Mr. Billard before anyone said

23   anything to me directly.

24       Q.   So on your own you made the decision that

25   Mr. Billard would not be allowed to return as a

1  substitute teacher?

2           MR. DAVEY:  Objection.

3      A.    Phrase it again, please.

4           BY MR. BLOCK:

5      Q.    Well, you said you informed Mr. Billard before

6  anyone told you anything.

7      A.    The conversation with Mr. Billard when we

8  referenced the gentleman from Saint Gabriel's, okay, was

9  my way of saying that this is -- based on what happened

10 to the gentleman at Saint Gabriel's, that would be how

11 it would be handled.  I don't know how else to say that.

12     Q.    So you viewed your conversation with

13 Mr. Billard as a notification to Mr. Billard that he

14 would not be allowed to return as a substitute teacher

15 after the break?

16          MR. DAVEY:  Objection.

17     A.    Which conversation are you referring to?

18          BY MR. BLOCK:

19     Q.    The conversation in which you mentioned the

20 gentleman from Saint Gabriel's.

21     A.    Okay.  The conversation with the gentleman

22 from Saint Gabriel's, I was using that as an example.

23 Okay?  The gentleman from Saint Gabriel's had a same-sex

24 marriage.  As a result of that, that gentleman was

25 removed from his position.  The point of that

Page 44

1    conversation was -- and, again, I was -- was that, you
2    know, if it happens at Saint Gabriel's, it could happen
3    at Charlotte Catholic.
4        Q.    So if I'm getting this right, you had this
5    conversation with Mr. Billard --
6        A.    Uh-huh.
7        Q.    -- in your offices?
8        A.    My office, yes.
9        Q.    Correct.  Then subsequently you had a
10   conversation with Principal Telford in which you told
11   him that you were aware that Mr. Billard is getting
12   engaged.  You don't recall if Principal Telford said,
13   well, tell him he can't come back again next semester.
14   Is that right?
15            MR. DAVEY:  Objection to the form.
16       A.    Go ahead.
17            BY MR. BLOCK:
18       Q.    No, if you understand my question, can you
19   answer it?
20       A.    My initial informing Mr. Telford, he
21   acknowledged he heard what I said.  Okay?  I don't
22   recall a response at that moment.
23       Q.    And then nothing else occurred until you
24   decided on your own to tell Ms. Stretch something?
25       A.    Mr. Billard was scheduled to work for

1    Ms. Stretch as soon as we came back from Christmas

2    break, okay, because Mr. Billard could teach the

3    material.  She's an English teacher.  Her lesson plans

4    would have been designed for someone that could teach

5    the material, as opposed to a substitute that could not,

6    so I needed to let Ms. Stretch know that she needed to

7    revise her plans for her absence for a substitute that

8    could not teach the material.  That was the purpose of

9    the phone call.

10        Q.   And at the time you had that conversation with

11   Ms. Stretch, you knew that Mr. Billard would not be

12   allowed to return?

13        A.   Yes.

14        Q.   And you knew that based on what happened in

15   Saint Gabriel's?

16        A.    My conversation with Ms. Stretch was over the

17   holidays.  Somewhere between the posting and our break

18   for the holidays, Mr. Telford had said to me Mr. Billard

19   would not be able to work for Ms. Stretch in January.

20        Q.   So when did that communication occur?

21        A.    I would say in December but that's a -- I

22   can't confirm that.

23        Q.   So you previously had talked about a

24   conversation in which you told Mr. Telford that you were

25   aware that Mr. Billard was engaged, and then you

Page 46

1    mentioned a conversation that occurred after the

2    holidays in which you once again talked to Mr. Telford.

3         A.    That was -- that conversation was merely to

4    let him know who was going to be substituting in place

5    of Mr. Billard.

6         Q.    But now you're saying there was a third

7    communication from Mr. Telford that occurred before your

8    conversation with Ms. Stretch in which he told you that

9    Mr. Billard would not be allowed to return?

10        A.    Correct.

11        Q.    When did that third conversation occur?

12        A.    As I just said, I can't be specific.  My guess

13   is sometime in December.

14        Q.    And do you know how much time passed between

15   your first conversation with Mr. Telford in which you

16   reported your knowledge of their engagement and this

17   subsequent conversation?

18        A.    No.

19        Q.    Was this subsequent conversation a

20   conversation in person?

21        A.    Yes.

22        Q.    Where did the conversation occur?

23        A.    I believe my office.

24        Q.    Your office?

25        A.    Yes.

1      Q.    Was there anyone else there besides Principal

2  Telford?

3      A.    Not that I recall.

4      Q.    Did Principal Telford say whether anyone else

5  was involved in the decision that Mr. Billard would not

6  be allowed to return?

7      A.    Not involved in the decision.

8      Q.    But he referenced someone else?

9      A.    He mentioned he had spoken with Father Kauth.

10     Q.    And what did he say about his conversation

11 with Father Kauth.

12     A.    Merely that Father Kauth had made him aware of

13 the posting.

14     Q.    So after you made Principal Telford aware,

15 Principal Telford talked to you again at a later date

16 and said that after your conversation with him, Father

17 Kauth had also talked to Principal Telford about the

18 Facebook posting?

19     A.    I can't give you specific dates.  I can't even

20 tell you how much time was between conversations.  I

21 first mentioned to Mr. Telford that I'd heard that

22 Lonnie was going to get engaged.

23          As best I recall, the next conversation is

24 after Father Kauth had mentioned to him he was aware,

25 Mr. Telford mentioned to me that Mr. Billard would not

1  be able to work after the holidays.

2          The third conversation was after the holidays

3  when it was more referencing who would be -- in essence

4  I was telling him I followed through -- I don't remember

5  who it was -- that Mr. Billard was not substituting,

6  so-and-so was.

7          Q.    And so something that changed between your

8  first conversation with Principal Telford and your

9  second conversation with Principal Telford is that in

10  the meantime Father Kauth had told Principal Telford

11  that Father Kauth was also aware?

12          A.    That is an added event, yes.

13          Q.    What was the significance of Father Kauth

14  having talked to Principal Telford about it?

15          A.    You have to ask Mr. Telford that.

16          Q.    You didn't ask him when he said it to you?

17          A.    No.

18          Q.    Does Father Kauth have any supervisory

19  responsibilities over teachers?

20          A.    Not that I'm aware.

21          Q.    So is it -- does he sit in on teachers'

22  lessons at all?

23          A.    He has or he did -- he's not there much

24  anymore -- sit in on some theology classes, yes.

25          Q.    But for teachers who do not teach religion

Page 49

1    classes --

2        A.    Not that I'm aware of.

3              MR. DAVEY:  Just let him finish.

4              THE WITNESS:  I'm sorry.

5              BY MR. BLOCK:

6        Q.    For teachers who do not teach religion

7    classes, does Father Kauth sit in on lessons?

8        A.    Not that I'm aware of.

9        Q.    Do teachers -- is Father Kauth involved at all

10   in the process of doing teacher reviews?

11       A.    No.

12       Q.    Is Father Kauth involved at all in the process

13   of hiring teachers?

14       A.    First of all, he's no longer -- you probably

15   ought to say "was," but he would interview theology

16   teachers.

17       Q.    Was Father Kauth involved at all in the

18   process of hiring non-religion teachers?

19       A.    Not that I'm aware of.

20       Q.    Does Father Kauth have any responsibility for

21   ensuring that teachers do not engage in conduct opposed

22   to the fundamental moral tenets of the Roman Catholic

23   faith?

24       A.    Say that again, please.

25       Q.    Does Father Kauth have a responsibility for

Page 50

1  ensuring that teachers do not engage in conduct opposed

2  to the fundamental moral tenets of the Roman Catholic

3  faith?

4       A.   I'm not sure what his job description is in

5  that area.

6       Q.   Who supervises Father Kauth?  Who supervised

7  Father Kauth?  Sorry.

8       A.   I don't know.

9       Q.   It wasn't you though?

10      A.   Oh, no.

11      Q.   And you don't know whether the principal

12  supervised him?

13      A.   I don't know whether that was Mr. Telford's

14  responsibility.

15      Q.   When did Father Kauth come to CCHS?

16      A.   Five, six years ago maybe.

17      Q.   Did anyone hold the same position before

18  Father Kauth arrived?

19      A.   When?

20      Q.   At any time before Father Kauth arrived, was

21  there someone else who served --

22      A.   Father Kauth's title is chaplain of Charlotte

23  Catholic High School.  Over the years we've had

24  chaplains, we've had years where we had no chaplain.

25  That is assigned by the bishop.

Page 51

1      Q.   Do you know where Father Kauth worked before

2  coming to CCHS?

3      A.   I do not.

4      Q.   In your conversation with -- in any of your

5  conversations with Principal Telford, did he express

6  surprise at the fact that Mr. Billard and Mr. Donham

7  were engaged?

8      A.   No.

9      Q.   Did he express surprise at the fact that they

10  were in a romantic relationship?

11      A.   No.

12      Q.   Did he express surprise at the fact that

13  Mr. Billard is gay?

14      A.   No.

15      Q.   Did Principal Telford indicate whether he was

16  previously aware that Mr. Billard was gay?

17      A.   No.

18      Q.   Did Principal Telford indicate whether he was

19  previously aware that Mr. Billard and Mr. Donham were in

20  a romantic relationship?

21      A.   No.

22      Q.   In Principal Telford's conversations with you,

23  did he mention discussing the topic of Mr. Billard's

24  engagement and Facebook post with anyone else besides

25  Father Kauth?

Page 52

1      A.    Not that I recall.

2      Q.    And the only people that you spoke to about

3  the topic of Mr. Billard's engagement or Facebook post

4  in 2014 were Mr. Billard, Principal Telford, and

5  Ms. Stretch, is that correct?

6      A.    Best as I can remember, yeah.

7      Q.    Did you hear any other conversations in the

8  break room about Mr. Billard's engagement or Facebook

9  post?

10     A.    I don't remember.

11     Q.    You remember two conversations, right?

12     A.    I remember -- yes.

13     Q.    But you don't remember whether any other

14  conversations occurred?

15     A.    No, I don't.

16     Q.    And you don't -- do you remember any other

17  context, outside of the break room, in which you heard

18  conversations or communications referencing

19  Mr. Billard's engagement or Facebook post?

20     A.    None that I remember.  I'm sorry.  None that I

21  remember.

22     Q.    You mentioned the conversation with

23  Mr. Billard in your office.  What was your next

24  communication with Mr. Billard after that?

25     A.    I have no idea.

1    Q.   When did you next talk with Mr. Billard about

2    whether he would be allowed to return to CCHS?

3    A.   I don't think we spoke about it again until

4    the holidays.

5    Q.   And so what happened in the holidays?

6    A.   We spoke after I had spoken with Ms. Stretch,

7    I believe the next day, and I don't remember what day it

8    was, to be honest with you.  We spoke.

9    Q.   And who initiated that conversation?

10    A.   You know, I don't recall.

11    Q.   Did Mr. Billard contact you by text?

12    A.   Not by text, no.

13    Q.   How did --

14    A.   We talked on the phone the next day I think.

15    Q.   But you don't remember if -- you don't

16    remember what precipitated that phone call?

17    A.   He could have.  I honestly don't recall.  You

18    know, I remember having a conversation with him on the

19    phone.

20    Q.   And what did you say in that conversation?

21    A.   Specifically I couldn't tell you, but I think

22    I just confirmed that he wouldn't be able to work for

23    Ms. Stretch.

24    Q.   Well, what did Mr. Billard say in the phone

25    call?

Page 54

1     A.   I don't recall.

2     Q.   Who did you say was responsible for making the

3  decision that Mr. Billard would not be allowed to

4  return?

5     A.   I don't recall the specifics of the

6  conversation.

7     Q.   Do you recall -- well, did you say this

8  decision is coming from uptown?

9     A.   I don't recall the specifics of the

10 conversation.

11    Q.   So you could have said that?

12         MR. DAVEY:  Objection.

13         BY MR. BLOCK:

14    Q.   You don't recall whether you said --

15    A.   I don't recall.  I mean, I don't.  It's -- you

16 know, the essence of the conversation was that he would

17 not be able to substitute for Ms. Stretch.

18    Q.   But as you sit here, you do not know one way

19 or the other whether you said the words this decision is

20 coming from uptown?

21    A.   No.

22    Q.   Did you say anything else to Mr. Billard?

23    A.   I don't recall the specifics.

24    Q.   Or in general.  Do you in general recall

25 saying anything else?

Page 55

1      A.    No.  I mean, I -- no, I don't.

2      Q.    Did you have any subsequent communications

3 with anyone at CCHS about the fact that Mr. Billard

4 would not be allowed to return?

5      A.    Other than my conversation with Mr. Telford

6 when we first came back, I don't recall any.

7      Q.    Did any other teachers talk to you about the

8 decision that was made that Mr. Billard would not be

9 allowed to return?

10     A.    I don't know.

11     Q.    Did anyone express to you disappointment with

12 that fact?

13     A.    Possibly.  I couldn't tell you who.  There

14 were a lot of people -- I mean, that's -- no, I would

15 not be surprised if some folks didn't voice their

16 disapproval of it.

17     Q.    Well, you started to --

18     A.    But I couldn't tell you who.

19     Q.    It sounded like you started to say there were

20 a lot of people and then stopped talking.

21     A.    I didn't think "a lot" was an appropriate

22 term.

23     Q.    So of the people that voiced their

24 disapproval, those included other CCHS teachers, is that

25 correct?

Case 3:17-cv-00011-MOC-DCK   Document 31-17   Filed 08/23/17   Page 56 of 109

1    A.   Most likely it would have been a teacher as

2  opposed to somebody in maintenance or whatever.  I

3  don't -- you know, Lonnie was beloved in the school, or

4  is.  The fact that he is not allowed to come back, I am

5  sure someone along the line said we hate that he can't

6  come back, or something to that effect.  I can't tell

7  you who, I can't tell you whether it was a teacher or a

8  staff member, but the man was, is, respected in the

9  school for what he did for the school, and to assume

10  that nobody would say anything is -- but I can't tell

11  you specifically who would have said it or what they

12  said.

13    Q.   What did Mr. Billard do for the school?

14    A.   In what context?

15    Q.   Well, you had just said -- you just referenced

16  Mr. Billard being beloved because of what he did for the

17  school.  What were you referencing?

18    A.   Well, as a teacher, as a member of the school

19  community, whether -- you know, so English, drama

20  department, just the man that he was, or is.  Yeah.

21    Q.   Was he a good teacher?

22    A.   Yes.

23    Q.   Was he a good role model?

24    A.   Yes.  In my opinion.

25    Q.   Is there any other reason, besides the fact

1   that he was engaged to Mr. Donham, why he was not

2   allowed to return?

3           MR. DAVEY:  Objection to the form.

4       A.  None that I'm --

5           BY MR. BLOCK:

6       Q.  The phrasing.  Yeah.  So if he had not been

7   engaged to Mr. Donham, would he have been allowed to

8   return?

9           MR. DAVEY:  Object to the form.

10          BY MR. BLOCK:

11      Q.  If you understood the question, you can

12  answer.

13      A.  I understood the question.

14      Q.  Yeah.

15      A.  As his role as a substitute teacher, no.

16      Q.  If he had not been engaged to Mr. Donham, he

17  would not have been allowed to return?

18      A.  Your question, was there any other --

19      Q.  Yeah.  Okay.

20      A.  No.  In his role as a substitute teacher, he

21  would have been -- yes, he would have been able to

22  return.

23      Q.  So to be a teacher of a subject other than

24  religion, do you have to be an ordained member of the

25  clergy?

Page 58

1       A.    I'm sorry.  Say that again.

2       Q.    I'm trying to go through what the job

3   qualifications are, and I expect some of these might be

4   easy yeses or easy noes.

5       A.    I would say no to that one.

6       Q.    So in order to be a teacher of a subject other

7   than religion, does someone have to be a member of the

8   clergy?

9       A.    No.

10      Q.    Do they have to be a member of a religious

11  order?

12      A.    No.

13      Q.    Do they have to undergo any religious

14  training?

15      A.    No.

16      Q.    Do they have to be Catholic?

17      A.    No.

18      Q.    Do they have to be Christian?

19      A.    No.

20      Q.    So they could be Jewish?

21      A.    Yes.

22      Q.    Or they could be Muslim?

23      A.    Yes.

24      Q.    Could they be Buddhist?

25      A.    Yes.

Page 59

1    Q.   Could they be atheist?

2    A.   Not proclaimed.

3    Q.   Sorry?

4    A.   No.  I don't believe so.

5    Q.   Are you aware of any CCHS employees who have

6 had an abortion?

7    A.   No.

8    Q.   Who use birth control?

9    A.   No.

10   Q.   Who have used IVF?

11   A.   No.

12   Q.   Who supports the death penalty?

13   A.   No.

14   Q.   Who supported the Iraq war?

15   A.   No.

16   Q.   Have you ever asked those questions of any

17 CCHS employee?

18   A.   No.

19   Q.   For Mr. Billard's job as a teacher of a

20 subject other than religion, did he have any religious

21 functions as part of his job duties?

22   A.   I believe we had put in place while he was

23 still teaching the say a prayer before every class.  I

24 don't remember whether that was -- the timing of when

25 that happened, I don't recall.

Page 60

1    Q.    Any other religious functions?

2    A.    Not as a teacher.

3    Q.    As someone besides a -- you said not as a

4    teacher.  Did he have --

5    A.    Well, your question was as a teacher did he

6    have any religious duties.  No.

7    Q.    And did substitute teachers also have to say a

8    prayer before class?

9    A.    Everyone.  Well, they do now.  I don't recall

10    at the time Mr. Billard was substituting whether that

11    expectation was in place.  It's -- I don't know.  I

12    don't remember when we actually began that practice.

13    Q.    But the -- you talked about there was a time

14    in which you began that practice for teachers in

15    general, and then we talked about substitute teachers.

16    So did it come -- did it become a formal practice for

17    substitute teachers at some time after it had already

18    been a formal practice for full-time teachers?

19            MR. DAVEY:  Objection to the form.

20    A.    The practice to begin every class with a

21    prayer was the responsibility of the adult in charge of

22    that class, whether it was a teacher or a substitute.

23            BY MR. BLOCK:

24    Q.    And was there a time period in which it had

25    not yet become the responsibility of the substitute?

Page 61

1          A.    It was always the responsibility of the person

2     in charge of the class.

3          Q.    So when you said that you're not sure about

4     whether -- about something with respect to the saying a

5     prayer at the time that Lonnie was a substitute, could

6     you expand on what you meant?

7          A.    I don't remember -- that has not always been a

8     practice.  Okay?  I don't remember exactly when we put

9     that practice into play.  It could have been when

10    Mr. Billard was teaching, meaning while he was

11    substituting.  It may have happened after he had left

12    Charlotte Catholic and we put it into place there.  I

13    don't remember exactly when that became an expectation

14    to begin the classes, so I can't -- it's a timeline

15    issue.

16         Q.    And so who decided that it would -- who

17    decided to make it an expectation of how class --

18         A.    The administration.

19         Q.    The administration?

20               MR. BLOCK:  Sorry.  Did you get the whole --

21               BY MR. BLOCK:

22         Q.    Who decided it would be an expectation that

23    when teachers begin classes there would be a prayer?

24         A.    The administration.

25         Q.    Who within the administration?

1    A.   As I recall the discussion, it was between

2  Mr. Telford, Ms. Montague, who's the other assistant

3  principal, Mr. Belk, who's the dean of students, that we

4  would begin that practice at the beginning of whatever

5  year it began.

6    Q.   Was anyone from the Diocese involved in that

7  decision?

8    A.   No.

9    Q.   Was MJ Dawson involved in that decision?

10   A.   What do you mean by involved?

11   Q.   Did she have any input into whether that would

12  become an expectation?

13   A.   No, I don't think so.

14   Q.   Did Father Kauth have any input?

15   A.   Not that I'm aware of.

16   Q.   What prompted the administration to add this

17  as an expectation?

18   A.   As I recall, it was in a time of trying to

19  include more Catholicity if you will in the school day,

20  and so that was a good way to add that component to our

21  day.

22   Q.   And who thought there was a need to add more

23  Catholicity into the school day?

24   A.   I honestly couldn't tell you where that came

25  from.  I don't -- I don't know who -- I don't recall who

1  first said maybe we should do this.

2      Q.   Did you think there was a need to add more

3  Catholicity into the school day?

4      A.   I think it doesn't hurt.

5      Q.   Were you one of the people who advocated for

6  adding more Catholicity to the school day?

7      A.   Yes.

8      Q.   But you don't remember -- well, whose idea --

9  but you don't remember whose ideas it was to add more

10 Catholicity to the school day?

11     A.   I couldn't tell you specifically who brought

12 that up.

13     Q.   Was there a feeling among that group that

14 there was insufficient Catholicity in the school day?

15     A.   I think it was seen as an enhancement.

16     Q.   But you don't recall what prompted that

17 enhancement?

18     A.   I couldn't tell you how that began, no.

19     Q.   So the requirement to begin class with a

20 prayer, is that written down anywhere?

21     A.   I don't know.

22     Q.   What has to be included in the content of the

23 prayer?

24     A.   That is not specified.

25     Q.   So the teacher can select their own content?

1       A.    Yes.

2       Q.    And does the content have to be explicitly

3   Catholic?

4       A.    It doesn't -- it's not said that anywhere.

5       Q.    Well, you said you didn't know if it was

6   written down.

7       A.    Teachers -- teachers are instructed, or

8   substitutes, that they must begin the class with a

9   prayer.  MJ Dawson does provide a binder if teachers

10  would like to use that.  Some use their own prayer books

11  or some other source of a prayer.  Some teachers will

12  say the prayer, some teachers will ask a student to say

13  the prayer.  We don't specify who or exactly what needs

14  to be said.

15      Q.    Is a moment of silence sufficient?

16      A.    I would say no.  I believe if I were observing

17  a teacher, just as a classroom observation, and they

18  just held a moment of silence, I would probably have at

19  least a discussion about what that was about.

20      Q.    Do teachers who are not Catholic have the same

21  responsibility with respect to beginning with a class

22  prayer?

23      A.    Yes.

24      Q.    Does the prayer have to reference Jesus?

25      A.    No.

1    Q.    Does it have to reference the Trinity?

2    A.    No.

3    Q.    So if I said for what we are about to receive

4  may we be truly thankful -- or that's more of a grace

5  before meals.  If I said -- well, I'll forget that line

6  of questioning.

7         Do you know whether -- what's the difference

8  between prayer and Mass?

9    A.    Would do you mean by difference?

10   Q.    Well, I mean, they're both religious -- are

11 they both religious activities?

12   A.    Yes.

13   Q.    And so are there -- can someone who is not

14 Catholic lead Mass?

15   A.    No.

16   Q.    But someone who's not Catholic can lead

17 prayer?

18   A.    Yes.

19   Q.    And do you know why that is?

20   A.    Because you must be an ordained priest to say

21 Mass.

22   Q.    But do you know why someone doesn't have to be

23 Catholic to lead prayer?

24   A.    Do I know why?  I'd ask why not?

25   Q.    As part of any of Mr. Billard's subjects --

1   let me take that back.

2           Does a teacher of a class other than religion

3   have to teach Catholic doctrine as part of their

4   classes?

5       A.   No.

6       Q.   Does a teacher of a subject other than

7   religion have to incorporate religious teachings into

8   their classes in any way?

9       A.   Are they required to is your question?

10      Q.   Yes.

11      A.   No.

12      Q.   Did you attend any of Mr. Billard's classes as

13  part of your evaluations of him?

14      A.   Yes.

15      Q.   How did he begin classes on those occasions?

16      A.   I don't recall.

17      Q.   And do you recall any conversations with him

18  about whether he was beginning class with a prayer?

19      A.   No.

20           MR. BLOCK:  I'm going to mark this as

21  Exhibit 3.

22           (Exhibit 3 was marked for identification.)

23           BY MR. BLOCK:

24      Q.   This says it's a Diocese of Charlotte Teacher

25  Evaluation Report, and under teacher it says Lonnie

Page 67

1    Billard.  Is that right?

2        A.   It does.

3        Q.   And if you turn over the page, under the

4    signature line there are three names there, and is that

5    your name in the middle?

6        A.   It is.

7        Q.   Okay.  And so this looks like it was an

8    evaluation report from May of 2014 -- of 2004, is that

9    right?

10       A.   That's what it says.

11       Q.   Okay.  So at the beginning of the page, there

12   are four points, followed by four check boxes.  The

13   first is, "Teaches secular subjects in a way agreeable

14   with Catholic" -- it says "though," but I assume it

15   means thought.  Is that right?

16       A.   That's how I've always taken it, yes.

17       Q.   And for number 2 it says, "Implements Catholic

18   Social Justice principles throughout all curriculum," is

19   that right?

20       A.   Yes.

21       Q.   And I'm just reading these into the record.

22   Number 3, it says, "Contributes by example to an

23   atmosphere of faith commitment," is that right?

24       A.   Yes.

25       Q.   And for number 4 it says, "Supports &

1    implements objectives of the school," is that right?

2        A.    Yes.

3        Q.    And was this a standard evaluation form that

4    was used for all teachers?

5        A.    Yes.

6        Q.    And Mr. Billard, on this form he has check

7    marks under meets standards for all four of those.  Is

8    that right?

9        A.    Correct.

10        Q.    Now, as part of determining whether

11    Mr. Billard met those standards, what did you look for?

12              MR. DAVEY:  Which one are you talking about?

13              THE WITNESS:  Yeah.

14              MR. BLOCK:  Any four of them.

15        A.    We probably need to take them individually.

16              BY MR. BLOCK:

17        Q.    Okay.  So teaches secular subjects in a way

18    agreeable with Catholic thought.

19        A.    Well, what I would have looked for in his

20    observations or an evaluation is that nothing contrary

21    to the tenets of the church was stated.

22        Q.    And for the next one, implements Catholic

23    social justice principles throughout all curriculum?

24        A.    That just narrows it down a little more in

25    terms of the social justice issue of the church.

1    Q.   And so what would you look for to make sure

2    that someone met those standards?

3    A.   Well, social justice, as we look at it, you

4    know, deals with our responsibilities for others, so if

5    a teacher were to say something contradictory on how we

6    should treat one another, then that would be noted.

7    Q.   For the third one it says contributes by

8    example to an atmosphere of faith commitment.  What

9    would you look for there?

10   A.   That their behavior underscores the commitment

11   of the school and the Diocese in faith.  And, again, it

12   kind of goes back, nothing contrary to the teachings of

13   the faith.

14   Q.   Well, but what specifically in terms of

15   classroom observation would you look for?

16   A.   Well, going by example to the atmosphere of

17   faith commitment, the school attempts to set a tone that

18   we are Catholic, that it is -- it is an essence within

19   the building that you know you are in a Catholic school.

20   Okay?  So everyone needs to be contributing to that

21   atmosphere as opposed to do things that are contrary or

22   take away from that.

23   Q.   Can you think -- in terms of what someone

24   would be doing in the classroom for purpose of

25   observation, what would be an example of someone --

Page 70

1        A.    This is not an observation form.  This is a

2   teacher evaluation at the end of the school year.

3   Observation form in a class is a different instrument.

4        Q.    Okay.  Well, we'll look at one of those next.

5   So for supports and implements objectives of the school,

6   is there anything in particular you would look for

7   there?

8        A.    I would make -- well, first and foremost, they

9   need to be teaching.  I mean, it's -- you know, part of

10  the objectives of the school is to educate the kids, and

11  as this is a year-end evaluation, if someone is not

12  sufficiently meeting the standards of a good teacher,

13  that might require a different check line.

14       Q.    So in your opinion, Mr. Billard met all these

15  standards for the school year of 2003 through 2004, is

16  that right?

17       A.    Correct.

18       Q.    And in order to meet those standards, he

19  didn't have to teach Catholic doctrine in his classes?

20       A.    That was not part of his curriculum.

21       Q.    And he did not -- he did not even have to be

22  Catholic to meet those standards?

23       A.    Correct.

24       Q.    And he did not have to -- I'll end that

25  question.

KNOWLES COURT REPORTING
CHARLOTTE, NORTH CAROLINA  704.338.5438

JA1051

 1          In your opinion, did Mr. Billard meet those

 2     standards for all the years that he was a full-time

 3     teacher?

 4          A.   In my professional opinion, yes.

 5          Q.   Well, in your opinion did he meet those

 6     standards for all the time he was a substitute teacher?

 7          A.   Yes.

 8               MR. BLOCK:  I'll mark this as Exhibit 4.

 9               (Exhibit 4 was marked for identification.)

10               BY MR. BLOCK:

11          Q.   So this says Charlotte Catholic High School

12     Formal Observation Instrument.

13          A.   Uh-huh.

14          Q.   Is this the observation instrument you were

15     referring to a few moments ago?

16          A.   Yes.

17          Q.   And this is the standard form that is used for

18     these sorts of evaluations?

19          A.   This is the instrument that was used at that

20     time.

21          Q.   And did you yourself use this form when you

22     were doing evaluations at that time?

23          A.   Yes.

24          Q.   But the person doing this observation is

25     Dottie Lippett?

Case 3:17-cv-00011-MOC-DCK   Document 31-17   Filed 08/23/17   Page 72 of 109

Page 72

1      A.    Tippett.

2      Q.    Tippett.  And what was her position?

3      A.    She was department head of fine arts.

4      Q.    So going to the third page under point 7,

5   there are a couple of requirements related to

6   Catholicity and atmosphere.  Do you see those?

7      A.    I do.

8      Q.    And the first -- I want to look at the third

9   one there, 7.3, "Was Catholicity present" -- it says,

10  "Was Catholicity present classroom," but I assume that

11  means was Catholicity present in the classroom.  Is that

12  correct?

13     A.    Yes.  That's how I take it.

14     Q.    And in this form there's a check mark --

15  there's an X over yes, is that correct?

16     A.    Yes.

17     Q.    And then the explanation says, "Dealing with

18  appropriate items within CCHS standards."  Is that your

19  reading of that writing, too?

20     A.    Yes.

21     Q.    Now, is that level of specificity typical of

22  evaluation instruments?

23     A.    Not mine.

24     Q.    So for your evaluation instruments on this

25  question 7.3, was Catholicity present in the classroom,

1  what would you typically write?

2      A.   Well, assuming it was present within the

3  lesson, which is a line, then where it says "How," I

4  might refer to where it showed up within the lesson.

5  If -- trying to give an example.  If it was an English

6  class and they were referencing a piece of Catholic

7  literature as a part of that particular lesson, that

8  might be something I would note.

9      Q.   And how would a piece of -- what would be the

10  expectation for how a piece of Catholic literature is

11  referenced?

12      A.   What would be the what?  I'm sorry?

13      Q.   Expectation for how a teacher should handle a

14  piece of Catholic literature in an English class?

15      A.   I don't know what you mean by expectation in

16  that context.

17      Q.   Well, I mean, is it, you know, you would

18  reference whether -- would you just reference whether a

19  piece of Catholic literature came up or would you

20  also --

21      A.   It would need to be integrated within the

22  lesson.  Okay?  It's got to be a part of the lesson.

23  You know, you just in the middle of an English can't say

24  oh, you know, Saint Matthew's gospel and keep going into

25  something different.  It needs to be integrated in that

 1  lesson.

 2      Q.   Is it required to be integrated into all

 3  lessons -- was Catholicity required to be integrated

 4  into all the lessons of a secular teacher --

 5      A.   No.

 6      Q.   -- a teacher of --

 7      A.   I'm sorry.  I thought you were done.

 8      Q.   I'll say it again.  Was Catholicity required

 9  to be integrated into the lessons of all teachers in

10  subjects other than religion?

11      A.   No.

12      Q.   Was it required to be integrated into any

13  lessons of teachers in subjects other than religion?

14      A.   No.

15      Q.   So this form for 7.3 where it says, "In the

16  lesson?" that was optional on the teacher's part?

17      A.   Correct.

18      Q.   I have one more line of questions, and then we

19  can take another break.  Is that okay with you?

20      A.   Your show.

21      Q.   All right.

22      A.   Don't write that down.

23      Q.   So what were a teacher's -- a teacher of a

24  subject other than religion's job duties with respect to

25  taking students to Mass?

```
 1       A.   Well, teachers were -- when we had a Mass, or
 2  have a Mass, I dismiss by grade level students to the
 3  gym, which is where we have a school-wide Mass.
 4  Teachers will escort their class to the gym.  They sit
 5  by grade level, okay, and we ask teachers that have a
 6  homeroom to sit with and monitor the grade level of
 7  their homeroom.  So if I had a junior homeroom, I would
 8  sit with the juniors, because you can have mixed
 9  classes.  You can have a class that has sophomores and
10  juniors in it.  So that's how we try to distribute the
11  monitoring of students during Mass.
12       Q.   And how frequently do those masses occur?
13       A.   About once a month.
14       Q.   And for a teacher of a subject other than
15  religion who is doing their job duties of supervising
16  during Mass, do they have to participate in Mass?
17       A.   What do you mean by participate?
18       Q.   Well, do they have to -- well, do they have to
19  say -- well, what are the different ways someone could
20  participate in Mass?
21       A.   Well, I mean, that's an individual thing.  You
22  know, in a Mass there are prayers said, there are songs,
23  there's communion, there's blessings, there's all
24  kinds -- you know, it's where people are in their faith
25  journey, and how they choose to participate in the Mass
```

Page 76

1    is up to them.

2        Q.   So a teacher's level of participation is

3    entirely optional?

4            MR. DAVEY:  Objection.  Mischaracterizes what

5    he said.

6            BY MR. BLOCK:

7        Q.   Is a teacher's level of participation

8    optional?

9        A.   The teachers' responsibilities in monitoring

10   is not.  How they participate in the Mass is.

11       Q.   So a teacher's job duties required them to

12   monitor students but not to participate in Mass?

13       A.   Depends how you define participate.

14       Q.   I'm trying to just determine what the job

15   duties are and so --

16       A.   But you're dealing in two different areas, and

17   you're trying to combine the two.

18       Q.   Okay.

19       A.   They have a professional responsibility.  If a

20   teacher doesn't bring his or her class down or doesn't

21   sit with their class, that is negligence on a

22   professional level.  Whether or not they choose to sing

23   is a whole totally different issue.

24       Q.   And whether or not they choose to sing is not

25   part of their job requirement?

Page 77

1        A.   That's not assessed.

2        Q.   Are -- sir?

3        A.   I was going to be a smart aleck.  Go ahead.

4        Q.   Do teachers of topics other than religion play

5    any role in choosing the liturgy of Mass?

6        A.   No.  Well, there are teachers over the years

7    that are involved in the music of the Mass.  Ms. Tippett

8    is one of them.  Her choral group may sing songs during

9    the Mass.

10            When you say liturgy, that's a totally

11   different thing, so no layperson really gets to choose

12   the liturgy of the Mass.  Okay?  Now, they may read an

13   epistle or something as part of the readings, okay, but,

14   you know, that's -- is that making sense?

15       Q.   And is it part of a teacher's job requirements

16   for subjects other than religion to give any readings

17   during Mass?

18       A.   No.

19       Q.   To deliver messages or speeches?

20       A.   No.

21       Q.   Are there restrictions on what a non-Catholic

22   is allowed to do in Mass?

23       A.   Yes.

24       Q.   What are those restrictions?

25       A.   Well, they can't give communion, for example.

1  You can't serve as an altar server and some of those

2  things.

3          MR. BLOCK:  This will be the last exhibit

4  before break.

5          (Exhibit 5 was marked for identification.)

6          MR. BLOCK:  What exhibit number is that?

7          THE COURT REPORTER:  Number 5.

8          MR. BLOCK:  Here you go.  For some reason --

9  see, if this were conducted at our offices, I would have

10  had that extra copy, Josh.

11         MR. DAVEY:  You want to take a break and make

12  one?

13         MR. BLOCK:  No, no.  It's all right.  I know

14  what it says.

15         BY MR. BLOCK:

16     Q.  If you go to page -- the page marked on the

17  bottom as CCHW 59.

18         MR. DAVEY:  You mean CCHS 59?

19         MR. BLOCK:  Yes.

20     A.  Okay.

21         BY MR. BLOCK:

22     Q.  There's a entry there on supervision of

23  student activities.  Do you see that?

24     A.  I do.

25     Q.  Okay.  And there's a sentence there that says,

1  "If a Mass or a prayer service or an assembly or a pep

2  rally is held at a time when a teacher would normally be

3  teaching he/she must be in attendance."  Is that right?

4       A.   That's what it says.

5       Q.   So are a teacher's duties while supervising

6  students at Mass, talking about job duties, different

7  from their job duties while supervising students at pep

8  rallies?

9       A.   Are their responsibilities different?  They're

10  to monitor behavior in both environments.

11       Q.   And acceptable behavior might be different in

12  a Mass versus in a pep rally?

13       A.   Yes.

14       Q.   How about a teacher's responsibilities for

15  supervising students at assemblies?  Are those

16  responsibilities different than a teacher's

17  responsibilities for supervising students at Mass?

18       A.   No.  They're still monitoring behavior.

19            MR. BLOCK:  Okay.  I'm ready to take a break

20  now.  I can go on if you don't want to take a break.

21            MR. DAVEY:  It's probably a good time to take

22  a break.

23            (Recess from 11:37 a.m. to 11:47 a.m.)

24            BY MR. BLOCK:

25       Q.   So we previously referenced a policy saying

Page 80

1   that teachers may not publicly engage in conduct or

2   publicly advocate for positions opposed to the

3   fundamental moral tenets of the Roman Catholic faith.

4   My question is did that policy apply just to teachers or

5   did it extend to other employees of CCHS?

6        A.    You're talking about the statement on page 2

7   where it says, "Accordingly, teachers may not publicly

8   engage"?

9        Q.    Well, I'm talking about the policy that it

10  references where people -- are employees of CCHS who are

11  not teachers also prohibited from engaging in conduct or

12  publicly advocating for positions opposed to the

13  fundamental moral tenets of the Roman Catholic faith?

14       A.    Yes.

15       Q.    Was every employee of CCHS prohibited from

16  publicly engaging in conduct or publicly advocating for

17  positions opposed to the fundamental moral tenets of the

18  Roman Catholic faith?

19       A.    Isn't that the same question?

20       Q.    Well, my first question was, was it more than

21  teachers, and my second question was is it everyone at

22  the school?

23       A.    Yes, it is everyone.

24       Q.    Does CCHS have custodial staff?

25       A.    That is subcontracted out.  They don't work

Page 81

1  for the school.

2      Q.   Does it have cafeteria staff?

3      A.   That is also contracted out.

4      Q.   Does it have administrative secretaries?

5      A.   Yes.

6      Q.   And so if a secretary were to engage in

7  conduct opposed to the fundamental moral tenets of the

8  Roman Catholic faith, she or he could no longer work at

9  CCHS.  Is that right?

10     A.   That may vary on what tenet you're talking

11 about, what issue.

12     Q.   So if a secretary married someone else of the

13 same sex, they could no longer work at CCHS.  Is that

14 correct?

15     A.   That would be my opinion.

16     Q.   That would be your understanding of the

17 policy?

18     A.   Yes.

19     Q.   If a librarian married someone of the same

20 sex, he or she could no longer work at CCHS?

21     A.   Correct.

22          MR. BLOCK:  Josh, can I look at your -- oh,

23 copies are being made.  Never mind.

24          THE WITNESS:  You can look at mine.  It's

25 fine.

Page 82

```
 1              MR. BLOCK:  Yeah, yeah.  Well, I'll just want
 2  to turn to the second page.
 3              THE WITNESS:  Okay.
 4              MR. BLOCK:  Josh isn't going to let you answer
 5  any questions without being able to read --
 6              THE WITNESS:  Oh, I know.
 7              MR. BLOCK:  -- everything it says.
 8              BY MR. BLOCK:
 9      Q.   So from the bottom of page 4 to the bottom of
10  page 7 there's a list of jobs, is that right?
11      A.   Hold on.  Yes.
12      Q.   And for all of those jobs, the employee would
13  no longer be able to work at CCHS if they married
14  someone of the same sex.  Is that correct?
15      A.   Correct.
16      Q.   Okay.  Now, is being openly gay a basis for a
17  student to be expelled from CCHS?
18      A.   No.
19      Q.   So students at CCHS are allowed to be openly
20  gay?
21              MR. DAVEY:  I object to the term "openly gay"
22  inasmuch as you'd have to define what that means.  Go
23  ahead if you can understand.
24      A.   I'm not sure I know what that means either.
25              BY MR. BLOCK:
```

1    Q.    Yeah.  If a student, you know, says I'm gay

2  and I date people of the same sex, are they allowed to

3  enroll at CCHS?

4    A.    Yes.

5    Q.    Are they subject to discipline at CCHS?

6    A.    No.

7    Q.    Have you attended a school assembly where a

8  presentation was given by Sister Jane Dominic Laurel?

9    A.    Yes.

10    Q.    About when did that assembly take place?

11    A.    Spring of '12 I think.

12    Q.    And what --

13    A.    Is that right?  About three years ago I guess.

14  Three or four years ago.

15    Q.    What did she speak about at that assembly?

16    A.    Primarily gender.

17    Q.    Did she talk about homosexuality?

18    A.    Yes.

19    Q.    Did she say that single parents are more

20  likely to have a child who is gay?

21    A.    I believe so.

22    Q.    Did she say that gay men have over a hundred

23  sexual partners?

24    A.    I'm not sure of the number, but reference to a

25  lot, yes.

1     Q.   What else did she say about homosexuality?

2     A.   In essence she was condemning it and

3  referenced how that goes against church teachings and

4  the potential consequences if you will.  She also

5  referenced divorces and the adverse effect on families

6  of divorce in divorces.  I would say, and this is in a

7  nutshell, that she was very specific about roles of men

8  and roles of women and her view of what happens when we

9  differ from those roles as she outlined them.  That's

10 very broad.

11    Q.   Could you elaborate on what you mean about

12 roles of men and roles of women?

13    A.   Well, what she was saying is that there are

14 very -- in her belief, there are very specific roles of

15 a woman in a marriage and a man in a marriage and

16 against -- and that's in a heterosexual marriage -- and

17 deviating from those norms, or whatever you want to call

18 that, is not only against the church, it's also going to

19 lead to other social ills.

20    Q.   So as an example of those norms, would a

21 woman -- a woman joining the work force instead of being

22 a stay-at-home mom, would that be an example of

23 deviating from those norms?

24    A.   I don't remember specifically if she said

25 that, but that could certainly be -- you could take that

Page 85

1  away from her message.  I don't honestly remember

2  whether she specifically said that.

3       Q.   So would another example be that women are

4  primarily responsible for the domestic sphere?

5       A.   Yes.

6       Q.   Did she say that being in a romantic

7  relationship with someone of the same sex is an example

8  of deviating from those specific roles and norms?

9       A.   Yes.

10       Q.   And marrying someone of the same sex is also

11  an example of deviating from those specific roles and

12  norms?

13            MR. DAVEY:  You're asking him if she said

14  that?

15            MR. BLOCK:  Yes.

16       A.   Yes, she did.

17            BY MR. BLOCK:

18       Q.   Now, in terms of consequences that you

19  referenced, let me -- I think you were saying that she

20  spoke about the consequences that would ensue as a

21  result of deviating from those specific roles and norms,

22  and the consequences you were talking about, were they

23  limited to spiritual consequences?

24            MR. DAVEY:  Objection to the form.

25       A.   You want to rephrase that for me?

Page 86

1    BY MR. BLOCK:

2    Q.   Was she making a statement about the

3    consequences for someone's soul?

4    A.   I'm trying to remember if she stated it that

5    way.  Okay?  She clearly indicated it was a sin, okay,

6    and that it was against the teachings of the church and,

7    therefore, a sin.

8    Q.   Did she describe other consequences?

9    A.   She referenced potential social outcomes, such

10   as, you know, kids won't be raised -- if they're not

11   raised by the right male figure and the right female

12   figure, then, you know, this may be the outcome.

13   Nothing in a punitive work environment thing.

14   Q.   Did she say it would lead to health

15   consequences?

16   MR. DAVEY:  Objection.

17   A.   Could.  I wouldn't say would.

18   BY MR. BLOCK:

19   Q.   Now, if what she said had been said by a

20   teacher in a classroom, would it have lived up to the

21   curricular standards that you hold teachers responsible

22   for?

23   A.   First of all, if it were a math teacher,

24   that's not what they're hired to do.  Okay?  That's not

25   their area of expertise, so it would have been -- if

1  that, say, was a question of a student in a classroom,

2  it would have been the responsibility of that teacher to

3  direct that child to either the chaplain, a theology

4  teacher, something like that.  Not to address it.

5       Q.   If it had been in a science class.

6       A.   Same thing.

7       Q.   Well, the statements about -- statements about

8  the causes of homosexuality or promiscuity of gay

9  people.  Would those have lived up to curricular

10  standards for a science class?

11            MR. DAVEY:  Objection to the form.

12            BY MR. BLOCK:

13       Q.   You can answer it if you --

14       A.   I would say if the question was placed by the

15  student, the appropriateness would have been on the

16  response of the teacher.

17       Q.   But if it --

18       A.   If it were an anatomy class and they

19  referenced biologically how something can happen in the

20  body based on whatever, and they kept it within the

21  context -- not in the theology context but in the

22  context of the curriculum, yes.  Again, I would have to

23  hear the response.

24       Q.   I want to talk about the accuracy and validity

25  of the nontheological statements that she made.  Did

 1  those live up to standards for accuracy and scientific

 2  validity that you would hold science teachers

 3  responsible to?

 4          MR. DAVEY:  I'm going to object to this.  I

 5  don't know what statements we're talking about.  I mean,

 6  this was an extended assembly that went on for some time

 7  as I understand it, and there was a lot of things said,

 8  so I don't know what you're asking the witness, and I

 9  object on that basis.

10      A.    You want to rephrase it before I --

11            BY MR. BLOCK:

12      Q.    So her statements about what causes

13  homosexuality.

14      A.    I don't recall them enough to be able to

15  answer that question.

16      Q.    In your opinion, did she say anything at the

17  assembly that was scientifically inaccurate?

18      A.    I don't recall anything specifically that was

19  scientifically, but, you know, there were a lot of

20  things said so I don't -- you'd have to give me a

21  specific example.

22      Q.    That if --

23      A.    It's just too broad.  And I'm not sure I

24  can -- that I'm qualified just to answer a scientific

25  question.

Page 89

1    Q.   Well, let's talk about the theological or

2    religious aspect of her speech.  Was the content of the

3    speech with respect to, you know, roles of men and women

4    content similar to what was taught in the theology

5    department?

6         MR. DAVEY:  Objection to the form.

7    A.   Say that again, please.

8         BY MR. BLOCK:

9    Q.   Was the content of the speech with respect to

10   the specific roles of men and women similar to the

11   content of what was taught within the theology

12   department?

13   A.   I don't have --

14        MR. DAVEY:  Objection.

15        THE WITNESS:  I'm sorry.

16   A.   I don't have the expert in theology and the

17   detail of the curriculum to answer that question.

18        BY MR. BLOCK:

19   Q.   Did you sit in and evaluate any theology

20   classes?

21   A.   Yes.

22   Q.   Had you ever heard a teacher make a similar

23   statement in one of the classes that you sat in on?

24   A.   No.

25        MR. DAVEY:  Objection.

```
 1              THE WITNESS:  I'm sorry.
 2      A.    No.
 3              BY MR. BLOCK:
 4      Q.    You had said that her -- that the references
 5  to homosexuality in the assembly by Sister Dominic were
 6  condemning of homosexuality.  I think you used --
 7      A.    I don't think I used that word.
 8      Q.    Well, I think -- well, do you think that word
 9  is accurate?
10      A.    Yes.
11      Q.    To the best of your knowledge, was
12  homosexuality discussed as part of any classes with a
13  similar condemning tone?
14              MR. DAVEY:  Objection.
15      A.    I'm not aware of it.
16              BY MR. BLOCK:
17      Q.    Was the discussion of homosexuality in the
18  assembly something -- were there any differences between
19  how homosexuality was discussed in the assembly and how
20  homosexuality had previously been discussed at CCHS?
21              MR. DAVEY:  Objection.  The witness has
22  already testified about his lack of involvement in those
23  other teachings at the school, so to the extent you
24  know --
25      A.    Yeah, I can't -- I don't ever recall another
```

Page 91

```
 1   assembly that covered that content.
 2            BY MR. BLOCK:
 3       Q.   Did anyone complain to you afterwards about
 4   the assembly?
 5       A.   Yes.
 6       Q.   Did any teachers complain to you afterwards
 7   about the assembly?
 8       A.   Yes.
 9       Q.   Did MJ Dawson complain to you afterwards about
10   the assembly?
11       A.   I believe so.
12       Q.   What was the substance of her complaints?
13       A.   I believe she was upset over the content.
14       Q.   What part of the content?
15       A.   I don't think there was any one specific
16   thing.  I would say the assembly in general, both in
17   terms of not only what was said but the age
18   appropriateness of who it was said to.
19       Q.   The contents of the assembly was a departure
20   from how that subject matter had previously been
21   addressed.  Is that fair to say?
22            MR. DAVEY:  Objection.
23       A.   I'm not aware how it was previously addressed.
24            BY MR. BLOCK:
25       Q.   Did anyone who complained to you say that the
```

Page 92

1    assembly -- that the assembly was a sign of things

2    changing at CCHS?

3         A.   I don't remember that happening specifically,

4    no.  That ripple effect lasted a while, so I'm quite

5    sure in the -- in those weeks that followed, you know,

6    I'm pretty sure that was said.  I couldn't tell you by

7    who specifically, but yes.  Not necessarily that day.

8    Maybe that day, but not necessarily.

9         Q.   Who invited Sister Dominic to speak?

10        A.   Father Kauth.

11        Q.   And was anyone else from CCHS involved?

12        A.   No.  Other than scheduling the assembly, just

13   from a calendar perspective.  More of I want to bring in

14   a speaker, when can we do it, and it was put on the

15   calendar.

16        Q.   And did any teachers speak publicly about

17   their complaints about the assembly?

18        A.   What is publicly?

19        Q.   Well, I guess I'll break the question down.

20   Did any teachers talk to the media about their

21   complaints about the assembly?

22        A.   I'm not sure.

23        Q.   Did any teachers talk to their classes about

24   their complaints about the assembly?

25        A.   Not that I'm aware of.

Page 93

1      Q.   Did any teachers talk at the -- at any

2  other -- well, let me lay a foundation for the question.

3           Was there subsequently an additional assembly

4  in which some people were invited to voice their

5  concerns?

6      A.   There was a parent meeting -- that's probably

7  what you're referring to -- that was requested by

8  Father Mo.  It was restricted to parents and faculty and

9  staff.  There was -- David Hains monitored the assembly,

10 the meeting if you will.  Father Arnsparger, who's the

11 director of religious education, spoke, Father Kauth

12 spoke, and I spoke.

13          After we spoke, there were rules if you will

14 on who could come up and ask a question of whatever,

15 okay, and that was managed by David Hains.  It was his

16 responsibility to manage those questions that were

17 directed by parents that were attending.  And priests.

18 There were priests.

19     Q.   There were priests?

20     A.   Yeah, some of the diocesan priests were

21 allowed to come.  We literally -- you had to check in to

22 get into the gym.

23     Q.   Did any staff or priests ask questions?

24     A.   I don't remember a priest, and I'm not sure I

25 remember in that -- I don't remember a -- I don't

Page 94

1    remember a teacher or staff member asking a question,

2    but I could be wrong.

3        Q.   Did anyone speak to you favorably about the

4    assembly?

5        A.   I don't recall much being said one way or the

6    other after the assembly.  It was clear within the

7    assembly and the adults that were in there that there

8    were very passionate feelings on both sides.

9        Q.   Did you personally think the content of the

10   assembly was appropriate?

11       A.   No.

12       Q.   I'll change topics.  I want to -- let's turn

13   back to that exhibit, Exhibit 5 that we --

14            MR. DAVEY:  Could I get my copy back?

15            MR. BLOCK:  Oh, yeah.  Sorry.

16            MR. DAVEY:  Thanks.

17            MR. BLOCK:  Let me take the other.  There you

18   go.

19            BY MR. BLOCK:

20       Q.   Exhibit 5.  Turn to page 7.  So it's marked at

21   the bottom as CCHS 48.  Under the job description of

22   campus minister, Mary Jayne Dawson, it says she's,

23   "Responsible for ministering to the spiritual needs of

24   the school community and responsible with the principal

25   for the implementation of the school's philosophy, as it

Page 95

```
 1    has reference to the spiritual matters of the school."
 2    Is that an accurate description for your understanding
 3    of her job responsibilities?
 4         A.   That is the written definition of a campus
 5    minister as it had been presented at that time.  Okay?
 6         Q.   And that time being?
 7         A.   Whatever year this is.
 8         Q.   2011 to 2012.
 9         A.   Yeah.
10         Q.   Has that changed?
11         A.   I don't know if -- I don't write this document
12    any longer.  It's been a long time since I did it.
13    Ms. Montague does.  I couldn't tell you exactly what it
14    says right now.
15         Q.   But your understanding of what Ms. Dawson's
16    job duties are, is that understanding --
17         A.   Or were you mean?  I mean, we're talking about
18    then, right?
19         Q.   Well, I'm talking about -- is she currently at
20    CCHS?
21         A.   Yes.
22         Q.   Okay.  Are her job duties now different than
23    what they were in 2011?
24         A.   I don't know what that says now.  That's --
25    she doesn't respond to me.  That would be between her
```

Page 96

1    and the principal.

2         Q.   But I want to know, regardless of what is

3    written down in this document, is it your understanding

4    that what Ms. Dawson actually does is have

5    responsibility with the principal for implementing the

6    school's philosophy --

7         A.   Okay.  She has --

8              MR. DAVEY:  Let him finish his question.

9              THE WITNESS:  I'm sorry.

10             BY MR. BLOCK:

11        Q.   -- for implementing the school's philosophy,

12   as it has reference to the spiritual matters of the

13   school?

14        A.   If I were writing this, I would say she has

15   responsibilities as opposed to is responsible.

16        Q.   And who would you say is responsible?

17        A.   I would say the bishop.

18        Q.   And has he delegated that responsibility to

19   anyone else besides Ms. Dawson?

20        A.   I can't speak to that.  I don't know.

21        Q.   So within the CCHS building, is there anyone

22   else who has that responsibility other than Ms. Dawson

23   and the principal?

24        A.   Stated or implied?

25        Q.   Implied.

Page 97

1    A.    Yes.

2    Q.    Who?

3    A.    The chaplain.

4    Q.    But that is not -- that responsibility isn't

5  stated anywhere?

6    A.    I can't say anywhere.

7    Q.    You can't say --

8    A.    The chaplain works at the high school as

9  directed by the bishop.  Okay?  His responsibilities are

10 outlined by the bishop, not by the school.

11   Q.    So I'm just trying to get at your clarifying

12 the terms you used about stated versus implied.

13   A.    First, history.  As we talked earlier, there

14 were years we had chaplains and years we did not, so the

15 campus minister carried that role.  Okay?

16         As Father Kauth became chaplain of the school,

17 his perception, in my mind, of what his responsibilities

18 were differed, and he took on roles or at least

19 expectations.  For instance, Mary Jayne had nothing to

20 do with Sister coming.  Mr. Healy had nothing to do with

21 Sister coming.  Okay?  Solely the chaplain of the school

22 brought Sister.  Okay?  It's just that simple.

23         So if you read this document where it says she

24 is responsible, in execution that's not happening, to no

25 fault of her own.

Page 98

```
 1        Q.    But it did --
 2        A.    Excuse me.  And Father Kauth's -- I can't
 3   speak to where Father Kauth feels he is -- that is under
 4   his responsibility as chaplain.  There is no chaplain
 5   listed here.
 6        Q.    So during the time when there was no chaplain
 7   at the school, did Ms. Dawson execute that
 8   responsibility?
 9        A.    Yes.
10        Q.    Does Ms. Dawson have any roles in
11   communicating with teachers?
12        A.    I'm not sure what that means.
13        Q.    So one role you mentioned is that she provides
14   those hymn books, the collection of sample hymns.
15        A.    Yes.
16        Q.    Are there any other contexts in which she
17   communicates with teachers -- let me finish -- with
18   respect to spiritual matters of the school?
19             MR. DAVEY:  Objection to the form.
20        A.    In her role as campus minister, she organizes
21   retreats and would coordinate with teachers,
22   particularly calling teachers that may or may not go on
23   retreat, certainly scheduling of retreats, those kinds
24   of informational things.  When we have school-wide
25   Masses, she has responsibilities with that.  So under
```

```
 1   those kinds of activities.  She certainly has
 2   historically brought in speakers in the past and had
 3   assemblies that were brought in for the spirituality of
 4   the school if you will.
 5            BY MR. BLOCK:
 6       Q.   At these teacher retreats you mentioned --
 7       A.   Student retreats that teachers -- in other
 8   words -- okay.  Sorry.
 9            MR. BLOCK:  Okay.  Well, let me mark another
10   exhibit.  I think this is 6.
11            (Exhibit 6 was marked for identification.)
12            BY MR. BLOCK:
13       Q.   And this one has the title of Faculty Retreat
14   2004.
15       A.   Uh-huh.
16       Q.   Have you seen this document before?
17       A.   I was there, so probably I did, yes.
18       Q.   Do you know who wrote -- who organizes the
19   faculty retreat?
20       A.   Probably Ms. Dawson.
21       Q.   And is she usually the person that sets the
22   agenda for the retreats?
23       A.   Yes.
24       Q.   And at these faculty retreats, who is in
25   attendance?
```

Page 100

1        A.    Faculty certainly.   Depending  upon  the

2    principal, some have wanted some staff to be in

3    attendance and some did not.   It just depended upon how

4    the principal was operating the school.

5        Q.    Are students ever at these retreats?

6        A.    No.

7        Q.    Are substitute teachers at the retreats?

8        A.    No.

9        Q.    Is anyone from the Diocese at these retreats?

10       A.    No, not -- no.

11       Q.    If you look at -- what was the purpose of the

12   faculty retreats, to the best of your understanding?

13            MR. DAVEY:  Are you talking about this retreat

14   in 2004 or generally?

15            BY MR. BLOCK:

16       Q.    In general the faculty retreats.

17            MR. DAVEY:  Objection to the form.

18       A.    It was time set aside for a collective

19   spiritual experience of the faculty and, depending on

20   the year, staff.

21            BY MR. BLOCK:

22       Q.    Was participation mandatory?

23       A.    Yes.

24       Q.    And did you have to be Catholic to attend?

25       A.    No.

1     Q.   Were the retreats a form of religious training

2   in your opinion?

3     A.   No.

4          MR. BLOCK;  Sorry for the paper shuffling

5   here.  All right.  We'll mark this one as 7.

6          (Exhibit 7 was marked for identification.)

7          BY MR. BLOCK:

8     Q.   So this says Faculty Retreat 2007, and I want

9   to direct your attention to a page near the back of the

10  document.  So it's marked CCHS 1071.  It says, "Speaker:

11  Lonnie Billard."  Do you have any recollection about

12  this specific retreat?

13    A.   No, not really.

14    Q.   Do you have any recollection of teachers'

15  roles in conducting these sorts of readings during the

16  retreat?

17         MR. DAVEY:  Objection to the form.

18    A.   I'm not sure I understand the question.

19         BY MR. BLOCK:

20    Q.   So what was your understanding of -- when it

21  says -- when teachers speak at these retreats per this

22  agenda, where are they delivering a speech?

23         MR. DAVEY:  Objection.  He's already said he

24  doesn't remember this.

25         BY MR. BLOCK:

Page 102

1    Q.   Was it common for teachers to be assigned

2    speaking roles at the retreats?

3    A.   I wouldn't say it was common.

4    Q.   When teachers spoke, were they leading anyone

5    in prayer?

6    A.   There are times when they might -- may read a

7    passage from the Bible or a part of a petition as a

8    reading, yes.

9    Q.   And was any teacher required to speak at the

10   retreats?

11   A.   No.

12   Q.   And was -- sorry.  Strike that.

13        MR. BLOCK:  I think I'd like to take just a

14   quick break and then wrap up.

15        (Recess from 12:34 p.m. to 12:38 p.m.)

16        BY MR. BLOCK:

17   Q.   If you remember, near the beginning of the

18   deposition we had a couple questions about teachers

19   straying beyond what they should be talking about in a

20   classroom and you saying, you know, make sure that you

21   refer someone to a guidance counselor.  Do you

22   remember -- understanding that I might not be accurately

23   paraphrasing your words --

24   A.   Right.

25   Q.   -- do you understand the topic I'm

1    referencing?

2         A.    Yes, I do.

3         Q.    Did you have any specific examples in mind

4    when you were talking about that?

5              MR. DAVEY:  Objection to the form.

6         A.    No.

7              BY MR. BLOCK:

8         Q.    So were there specific instances in which you

9    had to talk to a teacher?

10             MR. DAVEY:  Specific instances he had to talk

11   to a teacher?

12             BY MR. BLOCK:

13        Q.    With reference to the topic we were talking

14   about.

15             MR. DAVEY:  I object to the form.

16        A.    The only one I can remember specifically was

17   an English teacher -- not you -- who after an assembly,

18   and I really don't remember what it was about, but it

19   upset him, and he went back to his class and shared his

20   opinion, and that was addressed.

21             BY MR. BLOCK:

22        Q.    And was that assembly the assembly with Sister

23   Dominic?

24        A.    No.  It was not that one.

25        Q.    Has anyone at the Diocese or in the

Page 104

1  administration of CCHS expressed disapproval of how you

2  handled learning of Mr. Billard's engagement and the

3  subsequent events?

4       A.    I've not had a conversation with anybody in

5  the Diocese about it.

6       Q.    Has anyone at CCHS, including Father Kauth,

7  expressed disapproval?

8       A.    No.   The only conversations I really had were

9  with Mr. Telford, and we've talked about those.

10      Q.    So you haven't been disciplined in any way or

11 scolded in any way for anything you've done in

12 connection with this?

13      A.    No.

14            MR. BLOCK:   Okay.   That's all I have.   Thank

15 you so much for sitting with us.

16            THE WITNESS:   You're welcome.

17            MR. DAVEY:   No questions.   Thanks.

18            (Whereupon, at 12:41 p.m. the deposition was

19 concluded.   Signature was reserved.)

20

21

22

23

24

25

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

### Civil Action No. 3:17-cv-0011

**LONNIE BILLARD,**

     **Plaintiff,**

**v.**

**CHARLOTTE CATHOLIC HIGH SCHOOL, MECKLENBURG AREA CATHOLIC SCHOOLS, and ROMAN CATHOLIC DIOCESE OF CHARLOTTE,**

     **Defendants.**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Exhibit 7
Deposition of F. Matthew Kauth

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

Civil Action No. 3:17-cv-0011

LONNIE BILLARD,                    )
                                   )
          Plaintiff,               )
                                   )
vs.                                )
                                   )
CHARLOTTE CATHOLIC HIGH SCHOOL,    )
MECKLENBURG AREA CATHOLIC          )
SCHOOLS, and ROMAN CATHOLIC        )
DIOCESE OF CHARLOTTE,              )
                                   )
          Defendants.              )
_____)


                              Tuesday, August 15, 2017
                              Charlotte, North Carolina



     Deposition of FR. MATTHEW KAUTH, a witness herein,
called for examination by counsel for Plaintiff in the
above-entitled matter, pursuant to notice, before
Dayna H. Lowe, Court Reporter and Notary Public in and
for the State of North Carolina, at McGuireWoods, LLP,
201 North Tryon Street, Suite 3000, Charlotte, North
Carolina, commencing at the hour of 9:53 a.m.

```
 1   APPEARANCES:

 2

 3        On behalf of the Plaintiff:
 4             JOSHUA A. BLOCK, ESQUIRE
                  American Civil Liberties Union Foundation
 5             125 Broad Street, 18th Floor
                  New York, New York 10004

 6

 7        On behalf of the Defendants:
 8             JOSHUA D. DAVEY, ESQUIRE
                  McGuireWoods, LLP
 9             201 North Tryon Street, Suite 3000
                  Charlotte, North Carolina 28202

10

11

12

13

14                        *   *   *

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

1                        C O N T E N T S

2

   Examination by Mr. Block:                                4

3

4

5

6                        E X H I B I T S

7                           (Kauth)

8  Plaintiff's 1    Emails, CCHS 001037-1039              17

9  Plaintiff's 2    Emails, CCHS 001035-1036              23

10

11

12

13                        *   *   *

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                    P R O C E E D I N G S
2     Whereupon,
3                    FR. MATTHEW KAUTH
4     was called as a witness and, having first been duly
5     sworn, was examined and testified as follows:
6                        EXAMINATION
7          BY MR. BLOCK:
8          Q.    Good morning, Father Kauth.
9          A.    Good morning.
10         Q.    My name's Josh Block.  I'm Mr. Billard's
11    attorney, and I'll be doing the deposition.
12               Have you ever had a deposition before?
13         A.    No.
14         Q.    Okay.  So I just have a few small ground rules
15    to make sure the transcript comes out clean.  The first
16    is it's important to give verbal answers to any
17    questions, so by saying yes or no.  Is that okay?
18         A.    Yes.
19         Q.    And the second rule is that it's important to
20    wait for me to finish talking before answering just so
21    the court reporter can have a clean transcript.  Is that
22    okay?
23         A.    Certainly.
24         Q.    And the third is that it's my job to ask you
25    questions that you understand and questions you can

Page 5

1  answer, so if anything I say is unclear, can you please

2  let me know, and I'll rephrase it.

3       A.   Yes.

4       Q.   Okay.  So can you say what your name is for

5  the transcript?

6       A.   Matthew Kauth, K-A-U-T-H.

7       Q.   And what is your position?

8       A.   My current position is I'm rector of our

9  seminary, Saint Joseph College Seminary.  Previously to

10 that I was the chaplain of Charlotte Catholic High

11 School.

12      Q.   And before that?

13      A.   I was studying in Rome.

14      Q.   Do you have any current role at Charlotte

15 Catholic?

16      A.   Nothing official.  I certainly have lots of

17 friends there and people that I'm familiar with, and I

18 probably will go to the football games, but that's about

19 it.

20      Q.   So when did you start at Charlotte Catholic?

21      A.   I started there when I finished my doctorate,

22 which was in 2012.

23      Q.   And when did you leave?

24      A.   I left -- well, officially this summer.

25      Q.   And unofficially?

1      A.   Well, basically we began the seminary a year

2  and a half ago, so I was pulling away from there just

3  given my current responsibilities, and so the bishop had

4  appointed Father Jason Barone to be assistant chaplain,

5  and over the course of two years he basically took over

6  all my responsibilities.

7      Q.   When did you first meet Mr. Billard?

8      A.   I never did meet Mr. Billard.

9      Q.   When did you first become aware of the

10  existence of Mr. Billard?

11      A.   I couldn't say.  I mean, I knew -- I had seen

12  all the faculty at various faculty meetings, but I never

13  encountered him before, so if his name had ever come

14  across anything that I was doing, I can't recall it.

15  Certainly he was finished there by the time I got there,

16  so I know he was a substitute teacher, but I wouldn't

17  have had any encounters with him.

18      Q.   So did there come a time in which someone

19  informed you that Mr. Billard was engaged to Mr. Donham?

20      A.   From my recollection, whether it came as an

21  email or someone told me about it, it had something to

22  do with a Facebook page, but I didn't know who the

23  individual was with whom he was.

24      Q.   So when this information was given to --

25  excuse me.

Page 7

1          When this information was given to you, did
2   you then view the Facebook page yourself?
3          A.    I did not.  I don't have Facebook.
4          Q.    Do you remember who informed you about the
5   Facebook post?
6          A.    I don't.  No.
7          Q.    And just make sure I finish the question.
8          A.    Sorry.
9          Q.    Did you do anything to corroborate whether
10  Mr. Billard had, in fact, posted on Facebook?
11         A.    Not to my recollection.  I think it was
12  presented to me -- in my memory, it was presented to me
13  as people know about this, so it wasn't a question of
14  one person doing X, Y, or Z, and whether it was, again,
15  an email or not, I don't recall.
16         Q.    Were there any other times at Charlotte
17  Catholic in which someone presented you information that
18  someone was doing something that might run afoul of
19  church teachings?
20         A.    Certainly.  Frequently.
21         Q.    And what did you do in response to that
22  information?
23         A.    I always had the same policy.  I met with the
24  principal, Kurt Telford, once a week.  We didn't have a
25  set time, but we would always at least make sure we

 1    touched base with each other once a week.  And sometimes

 2    you have things that people give you, moms, dads, emails

 3    and that sort of a thing, whether it's a book they don't

 4    like or something that was said in class or what have

 5    you and you have to follow up on, but I don't really

 6    have any oversight of the teachers.  My role is

 7    specifically informing the principal this is in

 8    accordance, this is not in accordance with the teachings

 9    of the church.

10          But what we would then always do when we

11    touched base is run each other's stories by each other

12    to say this is what was given to me, do you know about

13    this, and that was pretty much where I would always --

14    my role would sort of end.

15      Q.   So can you recall other instances in which

16    someone gave you information that a teacher at Charlotte

17    Catholic was engaging in conduct that didn't accord with

18    the teachings of the church?

19      A.   Conduct in terms of moral behavior, one coach,

20    one -- yeah.  Athletic director at one point.  Nothing

21    that I was then given to deal with personally after the

22    fact.

23          I certainly recall an occasion of a teacher

24    saying something that was erroneous in class, but that's

25    not moral.  Just she was not informed of what the church

1  taught and said something contrary to the teaching, and

2  so as was the case on a low level like that, I could

3  just see her in the hallway and say a kid said this to

4  me, is this what you said.  And that stuff happened

5  every once in a while, and they would just clarify, or

6  they could be given the opportunity to clarify in class,

7  but that's about it.

8      Q.   So you mentioned moral conduct and you

9  mentioned a coach and athletic director.  Were those two

10 different people?

11     A.   The athletic director -- let me rephrase that.

12 He was not the athletic director.  He was a strength

13 coach if I recall correctly.  Yes.

14          There were other instances of people giving me

15 Facebook things.  One was a teacher.  Again, not moral

16 conduct but something they had said that was contrary to

17 our teachings or what have you, and it was on a Facebook

18 post as well, but thankfully I don't have Facebook so I

19 would just say to Kurt this is out there, you may want

20 to deal with this.

21     Q.   This incident you just described, what was the

22 Facebook post?

23     A.   I'm not sure that I recall that.  It wasn't

24 about -- it had something to do with the -- it was

25 during the election, so it had something to do with the

Page 10

1   elections and something that he said relative to -- boy,

2   I never saw the post, so you're asking me to go back a

3   little farther for me.  It was something contrary to

4   what we believe about one of the moral teachings.

5        Q.   If someone posted on Facebook I support the

6   death penalty, and you heard about it, would that be

7   something you would report to the principal as being

8   problematic?

9        A.   No, because the death penalty is not contrary

10  to the faith, so one -- there's a lot of different

11  things inside the faith that we give a lot of latitude

12  to, and so the death penalty is one of those instances.

13  It's not what we would consider credenda, which means it

14  has to be held.

15          There's inside of that teaching of the death

16  penalty that a state has the right to defend itself.

17  Prudentially when that happens and what should happen in

18  the case of an individual is a wide, you know, variation

19  of possible beliefs simply because as the late Holy

20  Father, John Paul II, he was very much against the death

21  penalty.  Previous popes to him were very much in favor

22  of it.  You may have another one down the road who is in

23  favor of it, depending on what the circumstances are,

24  but his point was simply that in these days it doesn't

25  seem as if we have any danger from these individuals to

Page 11

1    the state.  We can stop them from hurting others, so

2    maybe we should stop the death penalty.  But that's a

3    personal judgment on his part, not part of the teaching.

4        Q.   I had thought that the United States

5    Conference of Catholic Bishops had said that as a

6    practical matter they could not see a situation where in

7    America the death penalty could be carried out in a

8    morally permissible way.  Is that accurate?

9        A.   No, I don't think it is.  There may be bishops

10   that say that.  There certainly are bishops that say

11   that.  They may even want to say something like that as

12   a conference, but it's not binding on an individual

13   conscience because it's not a universal teaching of the

14   church.  So they may say as a body, here, we don't think

15   this is a prudentially wise teaching, and that's fine.

16   That's fine.  That doesn't mean that the governor of

17   Texas, let's say, is bound by that in terms of law, in

18   terms of moral law.  He might deem that in this

19   situation it is a good idea.  But those are questions

20   that are left up to particular judgments.

21       Q.   So the same -- let me -- and just another

22   example.  The Iraq war.  The pope and the Conference of

23   Catholic Bishops of the United States opposed the Iraq

24   war, is that right?

25       A.   Whether the pope opposed the war in any

```
 1   official statute or something, no, he didn't.  I mean,

 2   was he against it?  I think he was.  I think most

 3   Catholics were.

 4       Q.   But that would be an example of something

 5   that's not universally binding?

 6       A.   Right.  Exactly.  Exactly.

 7            MR. DAVEY:  Just remember to let him finish

 8   his question.

 9            BY MR. BLOCK:

10       Q.   It's hard because --

11       A.   Yeah, because we're talking colloquially.

12   Yes.

13       Q.   Right.  Now, the beliefs about the morality of

14   using contraception, is that an example of a universally

15   binding belief?

16       A.   Yes, it is.

17       Q.   And beliefs about the morality of having

18   in vitro fertilization, is that a universally binding

19   belief?

20       A.   Yes, sir.

21       Q.   And beliefs about the morality of having

22   sexual relationships outside of marriage between a man

23   and a woman, is that a universally binding belief?

24       A.   Yes, it is.

25       Q.   Going back to the situations in which it's
```

Page 13

1  been brought to your attention that a teacher or faculty

2  at Charlotte Catholic was engaging in potentially

3  immoral conduct, can you tell me more about what the

4  alleged immoral conduct was in those situations?

5       A.  Of the other individuals?

6       Q.  Yes.

7       A.  I'm not sure that I should.  Since they're not

8  involved in this, I don't know that I should reveal

9  their moral behavior as it were.

10       Q.  Well, obviously I don't want any information

11  given in confessional or anything like that.

12       A.  Sure.

13       Q.  But I'm trying to get a sense of what sort of

14  immoral behaviors were reported, and I don't want -- I

15  don't need any identifying information.

16       A.  Okay.  One instance that I recall was an

17  individual who was posting things about his girlfriend

18  that were certainly improper as to a gentleman,

19  suggestive and -- more than suggestive really, about

20  what he had planned on doing for the weekend as it were.

21  And so he has an influence certainly over a large team,

22  so he was spoken to privately and simply asked to set a

23  better example, take that post down sort of a thing,

24  which he did.

25       Q.  And the person who spoke to him privately was

Page 14

1    Principal Telford?

2        A.    No, in this case it wasn't.  It was -- we

3    Catholics believe in the principle of subsidiary, so we

4    attempt to go to the lowest level first, keep things as

5    personal as possible as it were, and so when a parent

6    had brought it to my attention, I brought it to the head

7    coach's attention who then dealt with it himself.  And

8    it wasn't a massively grave thing, so it was an easy

9    thing to take care of, but if it was something more

10   scandalous I suppose, I would have gone to the

11   principal, but I don't feel I needed to on that one.

12       Q.    Can you recall another situation, other than

13   Mr. Billard's situation, where there was something that

14   was scandalous enough to rise to the level of you

15   bringing it to the principal's attention?

16       A.    Certainly.

17       Q.    And what is that situation?

18       A.    There was one situation in which a teacher had

19   asked the girls to carry around a baby for a week, and I

20   had grown up with that, seeing that, when we had to do

21   home ec and so, you know, at least in my day both the

22   guy and the girl had to carry around a baby to kind

23   of -- I think it was for the purpose of making sure that

24   this wasn't something that was, in the boy's mind, her

25   task.  And yet this teacher -- she was a literature

1  teacher, it wasn't a theology class or anything -- had

2  these girls carrying around a baby.

3      And I asked the girl why she was carrying

4  around this baby doll, and she told me that the teacher

5  told her to do it as a sign of women's oppression, et

6  cetera, et cetera, which obviously is kind of contrary

7  to what we as Catholics believe about life and the

8  goodness of life and the beauty of life and the dignity

9  of motherhood and the woman.  So that certainly was

10  something I had to bring up to the principal, although

11  he had asked me, if I recall, to speak with her before

12  he did just to kind of inform her, because she wasn't a

13  Catholic, what our teaching is on this thing, and I did

14  so.  We had a conversation and it seemed to go well.

15      Q.   Do you have any sense of how many teachers at

16  Charlotte Catholic are not Catholic?

17      A.   I don't.

18      Q.   So in this -- going back to Mr. Billard's

19  specific situation, do you recall when you were made

20  aware of the Facebook post?

21      A.   The only thing I recall is that it was prior

22  to Christmas.  I remember that -- I remember when I

23  spoke with Kurt Telford about it, he said to me that

24  Mr. Billard was a substitute and asked me if I was okay

25  with just maintaining things as they were and not

Page 16

1   creating any difficulty since the semester was about

2   over and Christmas was upon us.  He said would that

3   be -- again, in my role, he said is that something that

4   you think is possible, morally is this a problem, and I

5   didn't see any difficulty with that whatsoever, and that

6   was sort of the end of my involvement in the matter.

7           And I think in part the reason I don't have

8   much of a recollection of it is I get emails every

9   single week from parents, or I did, from parents about

10  something.  Some things are legit, some things are just

11  people's preferences, and so anything that I think might

12  come to Mr. Telford's attention or should come to his

13  attention, they would just all get laid out before him

14  and we would select which things needed to be discussed

15  and which ones didn't so --

16      Q.   After this conversation with Principal

17  Telford, did you speak with anyone at the Diocese about

18  the matter?

19      A.   I can't say this for certain, but usually I

20  would inform Father Arnsparger of things if I thought

21  they had the potential of becoming a larger issue than

22  just a very single, isolated incident, especially when

23  it comes to I'm not sure what our policy is sort of a

24  thing, since I'm not involved in that, but that's the

25  point where he needs to step in as the vicar for

Page 17

```
 1  education.  So I would imagine that I spoke with him,

 2  but I can't say that for certain.

 3       Q.   And is it your understanding that the vicar of

 4  education has supervisory responsibility for personnel

 5  policies at the Diocese's schools?

 6       A.   He would certainly do that, along with whoever

 7  his team is, and Monsignor West, the bishop.

 8       Q.   After you spoke with Principal Telford, what

 9  is the next communication that you can recall having

10  with respect to Mr. Billard?

11       A.   I recall receiving an email, which I found and

12  I believe presented, from ███████████████  and one from

13  ████████████████████  just informing me of the matter in

14  case I hadn't heard, and I simply responded that it was

15  being taken care of, whatever the issue was.

16            MR. BLOCK:  So if we could mark this as

17  Exhibit 1.

18            (Exhibit 1 was marked for identification.)

19            BY MR. BLOCK:

20       Q.   You're looking at a document marked as

21  Exhibit 1.  Is this one of the emails you were referring

22  to?

23       A.   This is correct.

24       Q.   And this email is dated December 30th, 2014,

25  is that correct?
```

```
 1       A.    Uh-huh.  Yes, it is.

 2       Q.    Have you ever spoken with this teacher about

 3  Mr. Billard at all?

 4       A.    Not to my recollection.

 5       Q.    If you could turn the page, and if you see she

 6  says, "The Bible talks about it," meaning homosexual

 7  activity, "in the following verses, among others."

 8  Taking all the time you need to review the contents of

 9  the email, is it your understanding that her description

10  of the church's teachings with respect to homosexual

11  activity is correct and accurate?

12             MR. DAVEY:  Objection to the form.  Feel free

13  to read the whole email, Father.

14       A.    I would say that's accurate.

15             BY MR. BLOCK:

16       Q.    I have a question about the last paragraph.

17  So it begins on the bottom of the page marked CCHS 1038,

18  continuing to the top of the next page.  It says, "I

19  hope you have a great rest of the week, and please let

20  me know if you need anything else from the handmaidens."

21       A.    Uh-huh.

22       Q.    I read that accurately?

23       A.    Uh-huh.

24       Q.    What is the handmaidens?

25       A.    They were a group of moms that pray for our
```

Page 19

1   students, that would come to Mass on Wednesdays, and

2   they would have a Bible study group.  They call

3   themselves the handmaidens, which is a title of the

4   Blessed Mother.

5        Q.   And this was a group of moms you said?

6        A.   Uh-huh.

7        Q.   Did any faculty members participate in it who

8   were not parents of students?

9        A.   Yes, insofar as they didn't have students

10  there any longer, but I think all the faculty members

11  were persons that had students there at least at one

12  time, from my recollection.

13       Q.   Another question about this email before we

14  turn to the next one.  On the first page, the second

15  paragraph -- I'm just going to read it so it's in the

16  transcript -- it says, "Regarding all this mess with

17  Mr. Billard, and him being 'fired' from CCHS, which is

18  not true, since he was not under contract, I found in

19  all of this a great opportunity for evangelization,

20  education, and a reminder of what the Catholic Church

21  stands for in" -- it says "this cases."

22       A.   She's not a native English speaker.

23       Q.   Did you have any sense of what she might have

24  been referring to when she was talking about an

25  opportunity for a reminder?

Page 20

1      A.   Yes.   Yes.

2           MR. DAVEY:   Objection to the form.

3           BY MR. BLOCK:

4      Q.   You can answer it.

5           MR. DAVEY:   You can answer if you know.

6      A.   I do, because given its context, which is the

7  reason at the end she says if you need anything else

8  from us as the handmaidens, I certainly ask them to pray

9  for the school, and especially in light of the things

10 that were transpiring there relative to the issue with

11 Sister Jane Dominic that you're aware of and all of that

12 mess, that the church's teaching became obscured, and so

13 I recall her specifically mentioning this same thing to

14 me, that this is a greet opportunity for the truth about

15 what we teach to get out there and not the caricature of

16 what happened after Sister Jane Dominic, which certainly

17 plays into a popular myth that the church hates and the

18 church discriminates and the church et cetera,

19 et cetera, et cetera.   So her point was that this is our

20 opportunity to give the true teaching.

21           BY MR. BLOCK:

22     Q.   Was there -- did you think the church's

23 teaching was obscured during this time period in people

24 perceiving homosexual activity to be more permissible

25 than it actually is under church teaching?

Page 21

1          MR. DAVEY:  Objection to the form.

2     A.   I couldn't say what individuals were thinking.

3   What I could say, not pursuant to what you just said,

4   was relative to -- it seemed at the school as if the

5   common lore of the church as this big, bad, medieval

6   institution, you know, versus people that want to love

7   was being fostered when it's, of course, the opposite.

8          And so the analogy that I used when I spoke

9   with parents about this issue is that it's a bit like

10  stained glass.  In other words, if you're outside of the

11  church and you're looking at stained glass when it's

12  daylight out, the only thing you can see are metal bars

13  and it feels like a cage.  When you're inside, you see

14  how the thing lights up, but you've got to get inside

15  the teaching.  You've got to see it for what it is and

16  not for the caricature that's given by popular culture

17  about the church, so that part was certainly obscured.

18          BY MR. BLOCK:

19     Q.   You said that this characterization was

20  fostered at the school.  Who was fostering it?

21     A.   The media.  Certainly the media.

22     Q.   Did you think that anyone within CCHS was also

23  fostering that caricature?

24     A.   I couldn't say for sure.

25     Q.   You mentioned this assembly with Sister Jane

Page 22

1    Dominic.  Did you hear any complaints from other

2    teachers that were critical of what Sister Dominic said?

3        A.   Certainly.

4        Q.   And did you hear any complaints from teachers

5    about the appropriateness of addressing this topic in a

6    school assembly?

7        A.   Yes.

8             MR. DAVEY:  Objection to the form.

9             BY MR. BLOCK:

10       Q.   Did you perceive any teachers to disagree with

11   the church's teachings with respect to homosexual

12   activity?

13       A.   No.

14       Q.   Have you heard any teachers at CCHS or

15   administrators at CCHS talk about Pope Francis's comment

16   on who am I to judge?

17       A.   Have I heard them what?  I'm sorry.

18       Q.   Speak with you about it.  Has anyone mentioned

19   that comment to you?

20       A.   No.  I can't think of one.

21       Q.   Did anyone from the handmaidens tell you that

22   they saw a need for CCHS to be better aligned with the

23   teachings of the church?

24             MR. DAVEY:  Objection to the form.

25       A.   No.  I don't recall any of that.  Just the

```
1   fear that we weren't being given the space to speak the
2   truth with clarity, that it was becoming obscured, as
3   she was mentioning there.
4            MR. BLOCK:  I'm going to ask the court
5   reporter to mark this as Exhibit 2.
6            (Exhibit 2 was marked for identification.)
7            BY MR. BLOCK:
8       Q.   This is an exhibit marked as Exhibit 2,
9   CCHS 1035.  Is this another of the emails you were
10  referring to?
11      A.   That's correct.
12      Q.   And I want to just read down from the bottom
13  of the email chain to the top.  I think the original
14  email in this chain begins on the bottom of the first
15  page, and it's dated December 29th, 2014.  Is that
16  right?
17      A.   December 29th?  Yes.
18      Q.   And that email is from ████████████?
19      A.   Correct.
20      Q.   And who is she?
21      A.   She's a teacher at Charlotte Catholic.
22      Q.   And if we go to the second page, so CCHS 1036,
23  I want to just read that first paragraph into the
24  transcript.  It says, "Steve called Joan Stretch
25  (English teacher) on Christmas Eve and asked her to tell
```

Page 24

1  Lonnie that he is 'fired' from CCHS.  Lonnie called

2  Steve today and Steve admitted to Lonnie that he didn't

3  have the guts to tell him himself.  Now Joan and Barbara

4  Chapman (former English teacher) are telling everyone on

5  social media that Suzanne Albertson and I were behind

6  it."

7          I'll end that there.  Are you familiar with

8  the names Joan Stretch or Barbara Chapman?

9      A.   Barbara Chapman I don't know.  I am not

10 familiar with that.  Joan Stretch is a teacher at

11 Charlotte Catholic.  I'm sure that -- it says here that

12 Barbara Chapman was, but I don't remember having any

13 contact with Barbara Chapman.

14     Q.   So if we turn back to the first page, it looks

15 like on December 30th you forwarded the email to someone

16 and wrote "FYI.  Usual suspects ... usual procedures ...

17 Merry Christmas!"  Is that accurate?

18     A.   Yes.

19     Q.   And do you recall who you forwarded -- you

20 sent that forward email to?

21     A.   Yes.  That's to Father Arnsparger.

22     Q.   What did you mean by usual suspects?

23     A.   Meaning that the persons who were engaged with

24 the Sister Jane Dominic affair and had the most

25 vociferous difficulty with it were the same persons that

1  were upset about this one, Joan Stretch being one of

2  them.

3       Q.   Who else besides Joan Stretch would fall into

4  that category?

5       A.   Ms. Winters certainly was very vocal about the

6  difficulty.  He would have probably the larger group of

7  emails, which I didn't have, because they go to him if

8  they're wanting to jump over and deal with things at a

9  higher level.  But there's a sort of normal cadre of

10 women, and men both, that were pretty upset about the

11 Sister Jane Dominic affair, and they were similarly

12 upset about this.  All the names, at this point, I

13 couldn't begin to tell you.

14          But I also was referring to the same people

15 that complained to me about it.  So, in other words,

16 ████████████████████████████████████████████, the

17 librarian.  The same people that would come to me with

18 difficulty, then these same people on the other side

19 that had the difficulty, so that was usually common when

20 I would hear something from someone in the school, not

21 from parents.

22      Q.   So the group of teachers that had the most

23 vociferous objections to the Sister Dominic affair, what

24 were their objections?

25          MR. DAVEY:  Objection to the form.  If you

1  know, Father, you can tell him.

2       A.   All that I am certain of is that the main

3  objection was that it was inappropriate given the

4  diversity in age levels and without parental

5  notification.

6            BY MR. BLOCK:

7       Q.   Were you surprised at all that this group of

8  people would also object to the decision about

9  Mr. Billard?

10      A.   No, clearly, because I'm writing usual

11 suspects, usual procedures, because it was with some

12 frequency that we would get different things from these

13 groups, and so I just pushed them on to Father

14 Arnsparger to see if he wanted to deal with them and if

15 this was something that merited a further investigation.

16 But I do feel as if when any of the teachers on either

17 side of an issue come to me like that about the good of

18 the school and its interior workings, that I'm sort of

19 responsible to make sure that I pass that along to him

20 and to Kurt so --

21      Q.   Was there a diversity of opinion about what

22 the school's policies should be with respect to

23 homosexuality?

24           MR. DAVEY:  Objection to the form.

25      A.   If there was, I never heard one.

1    BY MR. BLOCK:

2    Q.   When you received this email from ████████

3    ████, why did -- what was your understanding of why Joan

4    Stretch would be voicing objections to the decision

5    about Mr. Billard?

6            MR. DAVEY:   Objection.

7    A.   I can certainly say that I didn't give it any

8    consideration in the sense that it's December 29th and

9    I'm not in school, and sometimes one finds the

10   back-and-forth volley just frankly -- I don't want to

11   put it that it's not worthy of a lot of attention, but

12   you get so much volume in the course of a school year

13   that you think, I think, that both sides are sensitive

14   to an issue.

15           But since I wasn't aware of anything really

16   relative to Lonnie, it wasn't part of my business in

17   that sense, so I just passed it along.  So I didn't

18   even -- I don't know -- I can't say I even read it

19   clearly until I went and found this email for these

20   proceedings, because I didn't have any recollection of

21   Joan Stretch even being involved.

22           BY MR. BLOCK:

23   Q.   So going back to what you wrote in your

24   forward, after "usual suspects," you wrote "usual

25   procedures."  What did that refer to?

Page 28

```
 1        A.    Just that I pass it along.  That's my job is
 2   just passing it along.
 3        Q.    And then if we look up the email chain, it
 4   looks like there's a January 9th email from Reverend
 5   Arnsparger to you saying, "I assumed you are in the
 6   loop?"  Is that right?
 7        A.    That's correct.
 8        Q.    And then it looks like on January 10th you
 9   wrote back saying, "I heard something but I don't know
10   if I am."
11        A.    Correct.
12        Q.    What were you referring to when you said, "I
13   heard something"?
14        A.    Well, specifically to what ███████ and what
15   ████████ had spoken to me about.  So if these things took
16   place, transpired over the course of the break, I didn't
17   know what exactly took place.  My last dealings with it
18   were whenever I had that meeting with Kurt, and I didn't
19   hear another thing about it.
20        Q.    After this email exchange, did you have
21   further communication with Reverend Arnsparger in which
22   he told you what happened?
23        A.    Huh-uh.  No.  I asked the question there, but
24   I didn't receive any response, so I took it off my
25   docket of things to be concerned about.
```

Page 29

1    Q.    Since the time in which Mr. Billard's

2  situation has been in the news, have you had any other

3  conversations about him with anyone at Charlotte

4  Catholic?

5    A.    Not to my recollection.  Perhaps Kurt.  I

6  might have spoken with Kurt saying -- asking him what he

7  remembered, and he remembered what I remembered so that

8  was -- but it was a hallway conversation.  This was

9  before, of course, I was aware that we were going to do

10  all of this, but that was all that I recall.

11    Q.    When you first arrived at Charlotte Catholic,

12  did the school have a policy at that time of beginning

13  classes with a prayer?

14    A.    Whether they had a policy or not, I'm not

15  sure.  I don't ever recall going into a class where we

16  didn't.  I was actually surprised, I think, that we did,

17  and whether it started before me or was coterminous, I

18  couldn't say, but I don't ever recall going into a class

19  and there not being prayer offered.

20    Q.    Why were you surprised that we did?

21    A.    I suppose I was happily surprised, because I

22  had had certainly some memory of Charlotte Catholic when

23  I was a seminarian, and I don't recall us ever doing

24  that.  When I would go in there to teach a class on our

25  breaks, for example, when I was, you know, 19, 20,

Page 30

1  21 years old, somewhere around that era, I knew priests

2  that were the chaplains at this time, and so they would

3  have us come in and teach, and I don't recall there ever

4  being prayer, so I think I was just happily surprised.

5       Q.   Do you recall who the principal was at

6  Charlotte Catholic during that time?

7       A.   When I was a seminarian?

8       Q.   Yes.

9       A.   Yes.  Sister -- oh, I can't remember her name.

10  She was there for a long time.  She was a sister, and

11  she has pictures up on the wall still.  For some reason

12  it skips my memory now, but I didn't ever work with her

13  so --

14       Q.   And during what time period were you in

15  seminary?

16       A.   I was in the seminary from 1993 until 2000.

17       Q.   Before you arrived at Charlotte Catholic, did

18  you have any impression about how well the school was

19  integrating catholicity into its culture?

20       A.   I didn't have any contact with Charlotte

21  Catholic after I was a seminarian, specifically because

22  I was a priest in the mountains for six years, Franklin,

23  North Carolina, and then I was in Rome for four years,

24  so ten years of no contact.  I didn't have a clue what

25  Charlotte Catholic was doing so --

1    Q.   Have you ever heard any just talk about

2  Charlotte Catholic being too liberal or permissive?

3              MR. DAVEY:  Objection to the form.

4    A.   I would say that you hear everything.  You

5  know, from this parent it's too conservative, from this

6  parent it's too liberal.  One parent, when they find out

7  you're going to be the chaplain, well, you better go in

8  there and, you know, get all your armor on and your guns

9  blazing.  The other one, you need to be soft and gentle.

10  You hear the whole gamut, because everyone's in a

11  different place, so I certainly got more advice than I

12  asked for before I went to Charlotte Catholic.

13              BY MR. BLOCK:

14    Q.   And when you started at Charlotte Catholic,

15  did you perceive the school environment to be too

16  permissive?

17              MR. DAVEY:  Objection to the form.

18    A.   In what way?

19              BY MR. BLOCK:

20    Q.   Did you think that the school should do more

21  to reflect a Catholic culture than it was?

22    A.   Certainly that's one of the reasons I was

23  going there, not to be a -- not to be a man on a horse

24  leading the cavalry, but certainly to bring a sense of

25  the faith there, because they were without a chaplain

Page 32

1    for some time, so they didn't have frequent sacraments,

2    confessions weren't heard, priests weren't teaching in

3    class, so just the sight of a religious is helpful.

4    There was only one religious there before I got there,

5    and that's Sister Agnes.  And so that certainly raises

6    the level of Catholic culture, because Catholic culture

7    doesn't exist without these guys in black.

8            So certainly I wanted them to have a good

9    sense of the Catholic culture, the Catholic view, and

10   certainly not what was commonly, no doubt, being gotten

11   from the world.  I find that the air that they would

12   normally breathe, in social media, in television, in

13   whatever, is often toxic to the culture of Catholicism

14   certainly, so the more we can do to put the right face

15   on the faith as opposed to the caricature that one finds

16   on this TV show or that movie, definitely.

17       Q.   And after you arrived did you suggest any

18   changes, other than you simply being there, to create a

19   Catholic culture?

20       A.   No, I didn't.  We offered certain prayers for

21   the teachers to use.  We certainly offered prayers that

22   were spoken over the intercom, and I made sure that I

23   was doing that in the morning.  Steve would do it in the

24   afternoon, but I would do it in the morning, just so

25   they hear my voice and they know I'm on campus.  Because

Page 33

1    you're always all over when you're there, and oftentimes

2    kids want to see you, and if they don't hear your voice,

3    they don't think you're there because you're not sitting

4    in your office.

5            So certainly I made my presence felt.  I mean,

6    I was always at the football games or the basketball

7    games or the volleyball games or whatever games just so

8    they can see you.  And I would say the first year I

9    spent almost entirely just, as it were, being present

10   there, trying to find out how the thing works.  It's a

11   big institution with a lot of moving parts, and you can

12   feel pretty overwhelmed pretty quickly in terms of how

13   things run, so just trying to get my bearings straight

14   when I got there I would say.

15       Q.   And when you arrived, was Jerry Healy the

16   principal?

17       A.   He was.

18       Q.   Did you think he was a good principal?

19       A.   I've never been a principal, so I don't know

20   what it's like to receive all of the various demands

21   upon you.  I would say that he seemed to be effective.

22   Certainly when we would do joint sessions together and

23   speak, for example, at the opening -- you know, we were

24   in the classes together every year for the opening or

25   for retreats or for various things like that.  We

Page 34

1    usually tag-teamed on giving them a talk.  It always

2    seemed very solid.

3           But I didn't -- I didn't work as closely with

4    Jerry as I do with Kurt, mostly because I was just

5    starting, and so just learning how to get from one

6    classroom to the next and being with the kids.  I was

7    with the kids a lot more.  And then I would say that

8    with Kurt, I probably worked with Kurt more, so I have

9    more of a sense of his capacity as an administrator.

10   His style is different, so he kind of drew me in a

11   little bit more than Jerry did.  Kurt's a very fine

12   administrator from what I can tell.

13       Q.   How is his style different?

14       A.   He's very personable.  Jerry was, too, but

15   what I've noticed with Kurt is Kurt knows everyone in

16   the school.  He knows everyone in the school.  He knows

17   every kid's name.  He goes to every single thing.  And

18   that was a good example for me because, of course, I had

19   worked -- I was working in a parish as well, plus

20   starting the seminary, so frankly -- and teaching at the

21   abbey, so it was pretty hard to divide up my time, and

22   he was certainly an example to me of just being present

23   to the kids and listening to them, being attentive to

24   them.

25           He'd remember who scored, who didn't, who got

Page 35

1   hurt, who got a foul in the game, or the speech session

2   or whatever, so he was very much a father figure in that

3   school or someone that cares about the kids deeply.  I'm

4   sure Jerry did too.  I just didn't work as closely with

5   him.

6       Q.   You talked earlier about there being times

7   when you brought matters to the attention of Principal

8   Telford in your meetings with him.  Can you recall any

9   similar times with respect to Jerry?

10      A.   I remember when Sister brought up to me an

11  issue relative to the walls.  We had this odd tradition

12  in Charlotte Catholic, I'm not sure if you've been

13  there, but the seniors get to paint the walls if they're

14  in art class, what have you, so we give them a section

15  of wall to paint, and it's supposed to be approved by

16  the principal, that is to say what they're painting.

17  And there were some objectionable things.  I hadn't seen

18  it or noticed it, but Sister notices everything and said

19  this is a symbol for this, this is a symbol for this,

20  and it was relative to some of the music, contemporary

21  music, which I wasn't aware of, but she keeps up on --

22  she's fairly current actually.  I make references and

23  think people are going to understand them but they're

24  from my childhood.  These kids are 18.

25          So I brought that to -- I remember bringing

1  that to Jerry's attention, and I don't know what

2  happened in terms of after that, but I do know that he

3  had some difficulties with a student not wanting to get

4  rid of it, but eventually it was removed from the walls.

5      Q.   What do you mean by he had difficulties with a

6  student?

7      A.   I just recall that the student wanted to have

8  this done as part of their own artistic license, but

9  then you have the difficulty of it's contrary to

10  something significant in the faith, is there another way

11  we can represent what you're trying to say without being

12  contrary to the faith, so that's the only involvement

13  that I had was relative to would this with okay or would

14  this be okay.  I was a bit, in some ways, trying to

15  mediate between Sister and Jerry relative to what would

16  be considered acceptable, so I know that they got there,

17  but the student repainted the thing in a slightly

18  different form.

19      Q.   Who made the decision to invite Sister Jane

20  Dominic to speak?

21      A.   I did.

22      Q.   And why did you make that decision?

23      A.   Specifically because after hearing confessions

24  there and talking with kids over the course of a couple

25  of years, I was speaking with the theology department --

1  at that time the head of the theology department was

2  Donna Turney -- about ways in which we could bring the

3  church's authentic teaching to the kids, especially in

4  relation to marriage and the family.  It was an area

5  that I worked a lot in before I went away to Rome,

6  certainly something that I studied when I was in Rome,

7  what's commonly called John Paul II's Theology of the

8  Body, because it seems to have the means of articulating

9  the teaching with the kind of clarity and beauty that

10  makes it attractive and acceptable as opposed to a sort

11  of heteronomous law that is imposed upon you like a

12  straitjacket, but something that was actually for human

13  flourishing.

14          So I had success with that in individual

15  meetings with students, but I didn't want to be the one

16  to give a larger talk because what's usually the case,

17  if you bring someone in people listen a little bit

18  closer, because they hear you all the time.  So I had

19  gone to a talk by Sister Jane Dominic that was given at

20  Saint Patrick's, and I was very impressed with the talk.

21  A number of our students were there, and I thought she

22  did a fantastic job of presenting the teaching in a very

23  sort of fun but yet not jejune fashion.  It was

24  enlightening.  You walked away wanting to know more

25  about it, and it wasn't a topic about which I was

1  unfamiliar, so I knew where she was going with the

2  various pieces.  Very, very adept at communicating it.

3          Nevertheless, I went to see it again, and I

4  watched some different talks of hers online, because for

5  the most part when you're giving talks like that, you

6  end up polishing the thing down pretty well, and you

7  have sort of a stock talk then that you can go give to

8  different places.  I found out she was certainly doing

9  that.  She was being asked to speak all over the

10  country.

11          So I invited her to speak, not at the larger

12  assembly but at a small assembly.  I thought it was an

13  opportunity for us to have parents over to the school.

14  So we had one night where dads could come with their

15  sons so it could be a bit more male-specific, because

16  they deal with things sometimes differently than females

17  do, and I'm a believer that they learn a bit differently

18  too as a general rule, but not always necessarily with

19  specifics, but sometimes they take things in

20  differently.  And so I wanted to have an opportunity and

21  a space even just for dads to spend time with their sons

22  and moms to spend time with their daughters, so kind of

23  a night to have that with social.

24          It was very successful, a lot of people showed

25  up, and what I got in the ensuing weeks were requests to

Page 39

1   have it at a school-wide event.  I had never done that

2   before.  I've never been in charge of that.  MJ had

3   gotten speakers over the course of my time there and

4   before that, and basically once a year, twice a year

5   we'd bring in a speaker and the whole assembly is there.

6   It's usually a bit more of a pep rally than anything

7   else, but some of them were pretty good.

8           So I thought this would be a good opportunity

9   if the students themselves were asking me to do it,

10  because they wanted their friends to hear what they

11  heard, and not all of them were Catholic even that were

12  saying this.  Some came that weren't Catholic.  And so I

13  thought this is perfect.  So I invited her to come and

14  speak at the general assembly.

15      Q.  Was the content of her speech at the general

16  assembly different than the content of the speech you

17  had heard before?

18      A.  Unfortunately it was.

19      Q.  In what way?

20      A.  Specifically in reference to same-sex

21  attraction and things of that nature.  The opening talk

22  was about Genesis.  The whole beginning was exactly the

23  same, about how both male and female, man and woman,

24  manifest aspects of God that are complementary and not

25  in conflict.  Some of it was a bit -- she used a lot of

Page 40

1   fun images and things, and some of it is sort of classic

2   division, as it were, of the sexes.

3        But she was attempting to make a point that

4   historically we think about them this way, but let's get

5   back to Genesis about why God made us male and female,

6   because he didn't have to, so what's the purpose of it

7   and how does it reveal something more about God.

8        And then she misspoke about something relative

9   to partners, the -- I don't remember how she put it, but

10  it was something relative to the persons that experience

11  same-sex attraction often have X amount of partners, and

12  I think she even said per year or something.  Something

13  that was fairly physically impossible, and that just

14  went across like a wave in the student body and the

15  faculty.  But I think obviously she felt the pushback,

16  but I don't think she knew that she misspoke, and so she

17  kind of drove harder and harder and harder relative to

18  the same issues, and it only got worse, and it was going

19  to be a storm at that point no matter what happened.

20       It was unfortunate, and for that I did

21  apologize to the school.  I had vetted the talk so many

22  times, and it was a polished stone that didn't seem to

23  have any variation, but in this case it did.

24       Q.   Did she at the talk say anything about

25  children with disabilities?

Page 41

1          A.   Children with disabilities.  She spoke about

2     manliness, what it means to be a father in one of the

3     latter slides.  And I could be wrong, but I do believe

4     that she spoke about a child that suffers from autism

5     and the way in which this dad not only takes care of his

6     son but did something relative to starting a more

7     national program for autistic awareness or something

8     like that, but manifesting how if we experience a

9     difficulty or one of our children is experiencing

10    whatever kind of difficulty, the option isn't just to

11    sort of throw up your hands and say my kid's got this

12    difficulty but -- and I don't want to say celebrate the

13    difficulty, but support the difficulty and assist the

14    person through it.  That was, from what I understood,

15    was her intent on manifesting that.

16         Q.   So after the assembly in which she spoke, was

17    there another assembly in which people from the CCHS

18    community voiced opinions?

19         A.   Yes.

20         Q.   When was that?

21         A.   How long after I don't recall.  A few weeks

22    perhaps.  Somewhere around there.  Maybe a month, and

23    maybe not even that long.  It was fairly close upon it.

24              It's a bit of a blur to me, that period,

25    because my phone never stopped ringing, stopped buzzing,

Page 42

1  stopped emails, texts, what have you, from all over the

2  country and beyond, both in terms of support and in

3  terms of condemnation, so you were hated on all sides,

4  and even the people that you thought would be supportive

5  got it wrong.  In other words, oh, yeah, he's getting in

6  there, he's finally changing -- everyone got it wrong,

7  because no one actually listened necessarily to the

8  purpose for which I did it and what I wanted to be

9  communicated, which I did put into a speech at that

10  assembly.  The speech was for -- the assembly was for

11  parents, faculty members, local clergy, that kind of

12  thing.

13      Q.   So the bishop did not attend that assembly, is

14  that right?

15      A.   He did not.

16      Q.   But after the assembly he issued a statement,

17  is that right?

18      A.   That's correct.

19      Q.   And in the statement he referenced what he

20  thought was a lack of charity in people's attitudes

21  toward you, is that right?

22      A.   I believe so.

23           MR. DAVEY:  Objection.  If you recall.

24      A.   I don't recall.  I've not read it since that

25  time.

 1          BY MR. BLOCK:

 2          Q.   Did you perceive that criticisms of you

 3    personally were made with a lack of charity?

 4          A.   There were a lot of emotions going around, and

 5    people were angry, and it snowballed, so certainly there

 6    was uncharitable actions across the board.  People

 7    vilifying others, people condemning others, people

 8    praising acts that would not be praiseworthy on both

 9    sides, whatever one spectrum is at the time, and it got

10    ugly.  It certainly got ugly.

11          I didn't say much.  I tried to answer every

12    question that I could, but it was one of those

13    situations in which no matter what I said it was getting

14    swallowed up.  As a matter of fact, one of the more

15    interesting stories of that night was a father who stood

16    up, and he asked the parents that were there if any of

17    them had any children that experienced same-sex

18    attraction, and not a single hand went up.  And he says

19    well, let me tell you, I do, and my daughter wouldn't be

20    alive if it wasn't for her meeting and speaking with

21    Father Kauth, and he got booed down.  It was really

22    striking.

23          So the only one that actually has an

24    experience of someone who experiences same-sex

25    attraction, his daughter, who was threatening suicide,

Page 44

 1    came to speak with me.  And, frankly, she had a very

 2    beautiful experience, as did I, in the whole reality of

 3    working with the parents and things of that nature, and

 4    yet that night parents weren't happy about it.  Who

 5    knows why.  You know?  Large crowds get -- have kind of

 6    a life of their own, but there were certainly people on

 7    both sides of the fence that night.

 8            MR. DAVEY:  Let me know when you get to a good

 9    spot for a break.

10            MR. BLOCK:  I'm actually almost ready to wrap

11    up the whole thing.

12            BY MR. BLOCK:

13        Q.  Did he use that term, people who experience

14    same-sex attraction?

15        A.  I don't recall.  I don't recall.  He could

16    have used that.  He could have said gay.  He could have

17    said homosexual.  I don't know.

18        Q.  Did anyone at the meeting voice objections not

19    simply to the factually incorrect portions of Sister

20    Jane Dominic's speech but also to having any sort of

21    assembly addressing the topic of homosexuality?

22        A.  No, not about addressing homosexuality.

23    Certainly anger about talking about things which perhaps

24    should be reserved to families to talk about with their

25    kids as opposed to something on a larger scale like

Page 45

1    that, which I heartily agreed with.  Again, from the

2    30,000-foot zone from which she spoke before, she didn't

3    get into particulars and weeds and things of that

4    nature, so I didn't expect that to come, and I would

5    agree with the parental criticism on that because of the

6    wide range of students.  You've got 18-year-olds and

7    13-year-olds, and it just shouldn't have been done.

8         Q.    Are there any classes at CCHS in which the

9    church's teachings on homosexuality are specifically

10   taught?

11        A.    Yes, there are.

12        Q.    Which classes are those?

13        A.    World theology class.

14        Q.    And is that a required course?

15        A.    It is.

16        Q.    And have you ever had complaints from students

17   or parents about how that subject was taught in that

18   course?

19        A.    Never complaints from students or parents.

20   I've had questions.  I've been asked oftentimes to come

21   in and speak to the classes about it if the teacher

22   himself or herself didn't feel competent to answer the

23   objections, and that's been very rewarding I have to

24   say.  Obviously, the smaller the group is, the easier it

25   is to be able to talk about these things with a certain

Page 46

1    amount of rationality, because at the end of the day

2    persons are just going by virtue of their own

3    experience.  I love so-and-so, so-and-so says he's this,

4    what's the problem?  And that's exactly where one has to

5    begin, that is to say you're right, I want them to

6    receive love, and I want you to receive love.  So

7    getting that -- just opening that door with these kids

8    is the first step to blowing away that fog and that

9    caricature of the church's teaching on this issue, and

10   I've had many, many, many experiences of that, both

11   individually with students but also working with groups

12   in the classes.

13        Q.   And have any students expressed concern or

14   dismay or questions about why it was necessary to no

15   longer allow Mr. Billard to be a substitute teacher?

16             MR. DAVEY:  Objection to the form.

17        A.   I never heard about Mr. Billard.  I'm sure

18   that any student when I was there -- certainly must have

19   if he was substitute teaching, but I never heard of a

20   student that was in his class or didn't know anyone that

21   was -- I never heard anything.

22             MR. BLOCK:  That's all the questions I have.

23             MR. DAVEY:  No questions.

24             (Whereupon, at 11:03 a.m. the deposition was

25   concluded.  Signature was reserved.)

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

### Civil Action No. 3:17-cv-0011

**LONNIE BILLARD,**

      **Plaintiff,**

**v.**

**CHARLOTTE CATHOLIC HIGH SCHOOL, MECKLENBURG AREA CATHOLIC SCHOOLS, and ROMAN CATHOLIC DIOCESE OF CHARLOTTE,**

      **Defendants.**

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Exhibit 8
Deposition of Richard Donham

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

LONNIE BILLARD,                          )
                                         )
              Plaintiffs,                ) Civil Action No.
        vs.                              ) 3:17-cv-0011
                                         )
CHARLOTTE CATHOLIC HIGH SCHOOL,          )
MECKLENBURG AREA CATHOLIC                )
SCHOOLS, and ROMAN CATHOLIC              )
DIOCESE OF CHARLOTTE,                    )
                                         )
              Defendants.                )
_____ )

DEPOSITION
OF
RICHARD DONHAM

Taken at:
McGuireWoods, LLP
Fifth Third Center
201 North Tryon Street
Charlotte, North Carolina

On Friday, August 18, 2017
REPORTER:  AMY A. BRAUSER, RPR, RMR, CRR
Notary Public

Richard Donham (8/18/17)

                     A P P E A R I N G
 For the Plaintiff:    Christopher Brook, Esq.
                       American Civil Liberties Union
                          of North Carolina
                       P.O. Box 28004
                       Raleigh, North Carolina 27611
                       (919) 834-3466
                       cbrook@acluofnc.org
                          (and)
                       Brian Hauss, Esq.
                       American Civil Liberties
                          Union Foundation
                       125 Broad Street, 18th Floor
                       New York, New York 10004
                       (212) 549-2604
                       bhauss@aclu.org
 For the Defendants:   John G. McDonald, Esq.
                       McGuireWoods, LLP
                       201 North Tryon Street, Suite 3000
                       Charlotte, North Carolina 28202
                       (704) 343-2000
                       jmcdonald@mcguirewoods.com


                      I N D E X

                                              Page
EXAMINATION BY MR. McDONALD. . . . . . . . .   3, 99
EXAMINATION BY MR. BROOK. . . . . . . . . .    71


              E X H I B I T S   M A R K E D
 Number 1    Facebook post Bates Billard       104
             RFP 00045 to 051
 Number 2    Facebook post Bates Billard       113
             RFP 000041


Lowrance Reporting Service, Inc.
         704-543-7995        www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 3 of 125
                        JA1135

Richard Donham (8/18/17)

1          Pursuant to Notice in the aforementioned matter

2    and in accordance with the North Carolina Rules of Civil

3    Procedures, this continued deposition of RICHARD DONHAM,

4    was taken by the Defendants, beginning at 9:19 a.m. on

5    Friday, August 18th, 2017, before Amy A. Brauser, RPR,

6    RMR, CRR, Notary Public.

7          RICHARD DONHAM, called as a witness, being

8    previously sworn, was examined and testified as follows:

9

10          EXAMINATION BY MR. MCDONALD

11               THE WITNESS:  Is this really a Bible?

12               MR. McDONALD:  I've never had anyone

13          check to see if it was a real Bible or not.

14               THE WITNESS:  Okay.

15               MR. McDONALD:  You good?

16               THE WITNESS:  Yes.

17   BY MR. McDONALD:

18    Q.  Okay.  Mr. Donham, my name is John McDonald, I'm

19         one of the lawyers that's representing the

20         Defendants in the lawsuit brought by

21         Lonnie Billard.  We met earlier.  And I know that

22         off the record you indicated that you have had your

23         deposition taken before, but I'm going to go over

24         some ground rules just so that we're all on the

25         same page today.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 4 of 125
JA1136

Richard Donham (8/18/17)

 1   A.   Okay.

 2   Q.   The court reporter is taking down what we say so

 3        it's very important, first, that only one of us

 4        talk at a time.  I will do my best not to interrupt

 5        you and talk over you and I'd ask you to do the

 6        same. All right?

 7             The second rule is that you must verbalize your

 8        answers.  So unlike when you just nodded your head

 9        to me, the court reporter can't take that down so I

10        need to have a verbal response from you.  Is that

11        fair?

12   A.   Fair.

13   Q.   All right.  Also, we're not -- this is not a

14        marathon, I don't expect this to last all day, but

15        if you do need a break at any time, just let me

16        know, we'll take a break.  All that I ask, if

17        there's a question pending, I'd like an answer to

18        that question before we take a break.  All right?

19   A.   Okay.

20   Q.   And lastly, if I ask a question that you don't

21        understand or that doesn't make sense to you,

22        please ask me -- tell me that so I can try to

23        rephrase it for you.  All right?

24   A.   Okay.

25   Q.   Okay.

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 5 of 125
JA1137

Richard Donham (8/18/17)

Page 5

```
 1              Can you, please, state your name for the
 2        record?
 3    A.   Richard Lee Donham.
 4    Q.   Have you ever gone by any other names?
 5    A.   No.
 6    Q.   And when we were off the record you had indicated
 7        you have given a deposition before; is that
 8        correct?
 9    A.   Yes, I have.
10    Q.   What was the nature of that case?
11    A.   It was a long time ago, and it was a recruiter and
12        she said she had helped me get a job and I said,
13        no.
14    Q.   Were you a party in that -- in litigation?
15    A.   Yes.
16    Q.   Were you the plaintiff?
17    A.   Yes.
18    Q.   Was that case -- where was that case pending?
19    A.   Charlotte.
20    Q.   Okay.  Do you remember what year?
21    A.   I have no idea.
22    Q.   What was the job that you -- that she alleged you
23        had -- she had found for you?
24    A.   I worked at Chili's at the airport.
25    Q.   Okay.  Do you remember when -- when you worked at
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 6 of 125
JA1138

Richard Donham (8/18/17)

Page 6

1       Chili's at the airport?

2   A.  No.

3   Q.  What years you worked there?

4   A.  I don't.  It was a long time ago.

5   Q.  More than ten years?

6   A.  Yes.

7   Q.  Okay.  Is that the only time you've ever given a

8       deposition?

9   A.  Yes.

10  Q.  Have you ever testified in any court proceedings?

11  A.  No.

12  Q.  Any administrative hearings?

13  A.  No.

14  Q.  Have you ever been a -- other than the

15      lawsuit -- what was the nature of the lawsuit that

16      you just mentioned?  What was the claim you brought

17      in that lawsuit you just mentioned?

18  A.  That she did not get me the job.

19  Q.  Okay.  Help me.

20  A.  Maybe I wasn't the plaintiff.  No, she was suing

21      me.

22  Q.  Okay.

23  A.  Saying that she found the job for me and I said no,

24      I looked in the paper and called them.

25  Q.  Okay.  So she was suing you for some kind of fee

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 7 of 125
JA1139

Richard Donham (8/18/17)

```
 1        for finding you a job?
 2   A.   Yes.
 3   Q.   And you were defending?
 4   A.   Yes.
 5   Q.   Okay.
 6   A.   I will get it right.  Maybe.
 7   Q.   That was the only lawsuit you've ever been involved
 8        with?
 9   A.   Yes.
10   Q.   Okay.  Have you ever filed a discrimination charge
11        with the Equal Employment Opportunity Commission?
12   A.   No.
13   Q.   Have you ever filed a discrimination charge with
14        any state or other government agency?
15   A.   No.
16   Q.   Is there any reason that the answers you give me
17        today will not be truthful?
18   A.   No.
19   Q.   Are you on any medications that might impact your
20        ability to recall events --
21   A.   No.
22   Q.   -- or to testify truthfully?
23            I -- I -- you kind of answered in the middle of
24        my question.
25   A.   Sorry.
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 8 of 125
JA1140

Richard Donham (8/18/17)

```
 1   Q.   So are you taking any medications that would impact
 2        your ability to testify truthfully or correctly?
 3   A.   No.
 4   Q.   Thank you.
 5            What did you do to prepare for your deposition
 6        today?
 7   A.   I talked to Chris.
 8   Q.   How long did you talk with Chris?
 9   A.   Maybe an hour.
10   Q.   Is Chris representing you -- is he your attorney
11        for the purposes of this deposition?
12   A.   I don't know.
13                    MR. McDONALD:  Can you represent
14            that -- that --
15                    MR. BROOK:  I can.
16                    MR. McDONALD:  Okay.
17   BY MR. McDONALD:
18   Q.   Mr. Donham, I'm going to ask you some background
19        information.  What's your date of birth?
20   A.   ██████████  ███████  ██████ .
21   Q.   Where were you born?
22   A.   Morgantown, West Virginia.
23   Q.   What's your current address?
24   A.   5101 Harri Ann Drive, Charlotte, North Carolina
25        28227.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 9 of 125
JA1141

Richard Donham (8/18/17)

Page 9

```
 1   Q.   How long have you lived at that address?
 2   A.   I don't remember.
 3   Q.   How -- do you live with anyone else at that
 4        address?
 5   A.   Yes.
 6   Q.   Who do you live with?
 7   A.   Lonnie Billard.
 8   Q.   Where did you live before you lived at the -- at
 9        the -- at this current address?
10   A.   I think it was Selwyn Farms Lane.
11   Q.   Okay.  Are you religious?
12   A.   Yes.
13   Q.   What religion do you practice?
14   A.   Mine.
15   Q.   Are you -- are you a member of any organized
16        religion?
17   A.   I'm probably still a member of the Catholic church.
18   Q.   So you were born -- were you born Catholic?
19   A.   No.
20   Q.   You converted at some point in your life?
21   A.   Yes.
22   Q.   How old were you when you converted to Catholicism?
23   A.   Approximately 19.
24   Q.   What were you -- were you a member of an organized
25        religion prior to converting to Catholicism at age
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 10 of 125
JA1142

Richard Donham (8/18/17)

Page 10

1    19?

2    A.    Yes.

3    Q.    What religion was that?

4    A.    Pentecostal church.

5    Q.    Were you born and raised as Pentecostal?

6    A.    I was.

7    Q.    What led you to convert to Catholicism?

8    A.    I was in college and I was very unhappy with the

9          religion that I was, and being in college, I

10         started experimenting.

11   Q.    Where did you go to college?

12   A.    West Virginia University.

13   Q.    Okay.  What was the -- briefly describe the process

14         of becoming Catholic.

15   A.    I started going to the university church, Catholic

16         church, I went pretty much every week and I liked

17         it.  I liked what they said, and then I went to --

18         and it was almost like two doors down, the Catholic

19         Church of Morgantown, and I became friends with the

20         priest and I converted.

21   Q.    When you converted, did you go through a formal

22         process to convert?

23   A.    Yes.

24   Q.    How long did the process take?

25   A.    Maybe a couple of months.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 11 of 125
JA1143

Richard Donham (8/18/17)

1    Q.    Okay.

2    A.    It wasn't a long process.

3    Q.    Were you baptized at the end of the process?

4    A.    No.

5    Q.    Did you have -- make your -- a confession, first

6          confession?

7    A.    Yes.

8    Q.    And first communion?

9    A.    Yes.

10   Q.    But you were never baptized?

11   A.    Not in the Catholic church.

12   Q.    You had been baptized as a Pentecostal?

13   A.    Correct.

14   Q.    How -- how long did you practice the Catholic

15         faith?

16   A.    From that point forward.  I still do occasionally.

17   Q.    Okay.

18   A.    I mean, I -- I go to Saint Peter's occasionally,

19         which is right down the street.

20   Q.    Have you ever practiced any other faith?

21   A.    Yes.

22   Q.    And what was that?

23   A.    Methodist.  All of them Christian.

24   Q.    Okay.  And when did you practice the Methodist

25         faith?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 12 of 125
JA1144

Richard Donham (8/18/17)

Page 12

1   A.   I don't remember.

2   Q.   Was it between being converted to Catholicism at

3        age 19 and present?

4   A.   It was after being converted.

5   Q.   Okay.  So you left practicing Catholic -- the

6        Catholic faith and became a practicing Methodist

7        for a period of time?

8   A.   And MCC, Metropolitan Community Church.

9   Q.   Okay.

10  A.   But I never left Catholicism, I expanded who I was.

11  Q.   So you attended these other churches but did not

12       consider yourself a member of those churches?

13  A.   Correct.

14  Q.   Okay.  And so since age 19 you've always considered

15       yourself Catholic?

16  A.   Correct.

17  Q.   Mr. Donham, have you ever been arrested?

18  A.   No.

19  Q.   Mr. Donham, can you describe -- I know you've said

20       you attended West Virginia University.  Did you

21       receive a degree from West Virginia University?

22  A.   I did.

23  Q.   And what's your degree in?

24  A.   Political science.

25  Q.   What year did you receive that degree?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 13 of 125
JA1145

Richard Donham (8/18/17)

Page 13

```
 1   A.   '73.
 2   Q.   Have you attended any other colleges or
 3        universities?
 4   A.   No.
 5   Q.   Have you received any other kind of education,
 6        certificate, or -- from attending any kind of
 7        programs that weren't full degree programs?
 8   A.   No.
 9   Q.   Have you taken any vocational training courses?
10   A.   I guess I'm not sure what you mean by "vocational."
11        I've worked for Kentucky Fried Chicken, I've been
12        through many trainings there.  I worked for Home
13        Depot, and I've been through many trainings there.
14   Q.   Well, let's -- let's talk about your employment
15        history, so let's talk about currently, where are
16        you employed?
17   A.   Home Depot.
18   Q.   What is your position at Home Depot?
19   A.   Part-time associate, sales associate.
20   Q.   How long have you been a part-time sales associate
21        at Home Depot?
22   A.   February of last year.  Not this year, last year.
23   Q.   2016?
24   A.   Yes, correct.
25   Q.   And prior to February of 2016, what was your
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 14 of 125
JA1146

Richard Donham (8/18/17)

Page 14

 1      employment status?

 2  A.  Full-time at Home Depot.

 3  Q.  And how long were you full-time at Home Depot?

 4  A.  Twelve years.

 5  Q.  And what position?

 6  A.  Many.

 7  Q.  What was the last position you had at Home Depot?

 8  A.  Department -- let me think.  How about supervisor

 9      for merchandising execution team.

10  Q.  Was that your official title or how you describe

11      what you did?

12  A.  No, I think that's my official title.

13  Q.  Okay.  And were you assigned to a specific Home

14      Depot store?

15  A.  I was at the South Boulevard store at the last I

16      did that.

17  Q.  Is that where you also are part-time?

18  A.  No.

19  Q.  Where -- where do you work part-time?

20  A.  Matthews.

21  Q.  Okay.  Prior to your full-time employment at Home

22      Depot, where were you employed?

23  A.  I worked -- there's many.  When I started at Home

24      Depot, I was also part-time substituting at

25      Charlotte Catholic High School and at Holy Trinity

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 15 of 125
JA1147

Richard Donham (8/18/17)

1    Middle School.  Prior to that I worked as a

2    district manager for an in-home food service for

3    two years.  Prior to that I was at Chili's at the

4    airport.  Prior to that I -- I -- I've worked in

5    restaurant industry for 32 years.

6  Q.  And the last being the Chili's job?  Was that your

7    last restaurant business --

8  A.  Correct.

9  Q.  -- or employment?

10    When -- when were you a substitute at Charlotte

11    Catholic and at Holy Trinity?

12  A.  I started at Home Depot in 2004.  I subbed at

13    Charlotte Catholic High School 2003/2004.  I didn't

14    stop substituting until I went full-time at Home

15    Depot.

16  Q.  Was that in 2004 or . . .

17  A.  Either the -- and I don't remember the exact date.

18  Q.  That's fine.  But -- so you started -- when you

19    started at Home Depot, did you immediately start as

20    full-time or were you part-time?

21  A.  No, part-time.

22  Q.  So you started part-time at Home Depot, went

23    full-time, and now back to a part-time position at

24    Home Depot?

25  A.  Correct.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 16 of 125
JA1148

Richard Donham (8/18/17)

Page 16

1    Q.   Okay.  When were you a substitute at Holy Trinity?

2    A.   Same time I substituted at Charlotte Catholic.

3    Q.   Okay.

4    A.   It just depended on who needed me at that time.

5    Q.   When you left your position at Chili's, was it

6         voluntary or were you terminated?

7    A.   Voluntary.

8    Q.   What was the reason that you left Chili's?

9    A.   Gee, money.

10   Q.   And the job after that was the district manager for

11        the in-home food service?

12   A.   Correct.

13   Q.   Did you leave that position voluntarily or were you

14        terminated?

15   A.   The company closed.

16   Q.   Okay.  And that occurred in 2003 time period?

17   A.   Roughly.  I don't remember the exact time.

18   Q.   And is that when you started doing part -- started

19        to substitute teach at Charlotte Catholic was after

20        that?

21   A.   It was after that.

22   Q.   Was there any employment in between that you

23        recall?

24   A.   I was a waiter and bartender.

25   Q.   Where?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 17 of 125
JA1149

Richard Donham (8/18/17)

Page 17

| | | |
|---|---|---|
| 1 | A. | At -- I don't remember the name of it.  It is now |
| 2 | | Dilworth Bar and Grille, but I don't remember the |
| 3 | | name of it then. |
| 4 | Q. | Okay.  Let's talk about the time you were a |
| 5 | | substitute at Charlotte Catholic and at Holy |
| 6 | | Trinity.  How did you -- how did you get those |
| 7 | | positions? |
| 8 | A. | Lonnie Billard. |
| 9 | Q. | What did Lonnie do to help you get those positions? |
| 10 | A. | Let Steve Carpenter know that I was available and I |
| 11 | | had a degree. |
| 12 | Q. | Is that all -- and how -- how did -- what happened |
| 13 | | after Lonnie let Steve Carpenter know that you were |
| 14 | | interested and you had a degree? |
| 15 | A. | To be honest with you, I don't remember the exact |
| 16 | | thing, but I know at one point I was interviewed. |
| 17 | Q. | Who interviewed you? |
| 18 | A. | Steve Carpenter. |
| 19 | Q. | Did anyone else interview you? |
| 20 | A. | Not that I remember. |
| 21 | Q. | Was it an in-person interview or a telephone |
| 22 | | interview? |
| 23 | A. | In-person from what I remember. |
| 24 | Q. | Did you know Steve Carpenter prior to the |
| 25 | | interview? |

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 18 of 125
JA1150

Richard Donham (8/18/17)

Page 18

```
 1    A.   No.

 2    Q.   What -- do you recall anything about the interview?

 3    A.   No.

 4    Q.   Do you recall how long after the interview that you

 5         first started to work as a substitute at Charlotte

 6         Catholic or Holy Trinity?

 7    A.   No.

 8    Q.   Was it shortly after?

 9    A.   Shortly.

10    Q.   And during the -- earlier you said you were a

11         substitute during the 2003 and 2004 years.  Was

12         that the 2003/2004 school year or did it extend

13         beyond any -- did it extend beyond a school year?

14         In other words --

15    A.   School years.

16    Q.   Okay.  So do you recall how many days you might

17         have substituted at Charlotte Catholic?

18    A.   No.

19    Q.   Do you have a ballpark, was it more than ten days?

20    A.   Yes.

21    Q.   More than 30 days?

22    A.   I -- I think so.  I -- I remember that Home Depot

23         gets paid on one week and the school gets paid on

24         the other week so they both are biweekly.

25    Q.   Uh-huh.
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 19 of 125
JA1151

Richard Donham (8/18/17)

Page 19

 1  A.   And I remember several months of getting both
 2       paychecks.
 3  Q.   Okay.  When you were substituting at Charlotte
 4       Catholic and Holy Trinity, were you they -- was
 5       that -- so it was the same time period?
 6  A.   Yes.
 7  Q.   So who -- who at Charlotte -- I'm sorry.  Who at
 8       Holy Trinity did you -- did you interview at Holy
 9       Trinity?
10  A.   No.
11  Q.   Do you know how you got -- how you were selected
12       to -- to substitute at Holy Trinity?
13  A.   Because of Charlotte Catholic High School, and
14       because I was one of the people that could sub
15       there, I was also one of the people that could sub
16       at Holy Trinity.
17  Q.   Okay.  Who at Holy Trinity would contact you --
18       contact you if they needed you to sub?
19  A.   His name is a Mike Brodowicz.
20  Q.   Okay.  Do you know what Mr. Brodowicz's position is
21       at Holy Trinity?
22  A.   He doesn't work there any longer.
23  Q.   Do you know what his position was at the time when
24       he --
25  A.   Assistant principal, I think.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 20 of 125
JA1152

Richard Donham (8/18/17)

1  Q.  Is there anyone else at Holy Trinity that you dealt

2      with as far as being called to substitute?

3  A.  No.

4  Q.  Do you know how many days you substituted at Holy

5      Trinity?

6  A.  I do not.

7  Q.  Was it more or less than when you substituted at

8      Charlotte Catholic?

9  A.  Probably less but not a lot.

10 Q.  And it was the same time period, the 2003/2004

11     school year?

12 A.  Correct.

13 Q.  At the time you served as a substitute at Charlotte

14     Catholic and at Holy Trinity, did you understand

15     that they -- those -- both of those schools were

16     part of the MACS or MACS system, the Mecklenburg

17     Area Catholic School system?

18 A.  I did.

19 Q.  Who do you understand your employer to have been

20     when you were substituting at Charlotte Catholic

21     and Holy Trinity?

22 A.  Those schools.

23 Q.  Do you recall whether your paychecks came from

24     Charlotte Catholic or from MACS?

25 A.  From MACS.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 21 of 125
JA1153

Richard Donham (8/18/17)

1    Q.    Okay.  Is that the same with -- when you were at

2          Holy Trinity, the paychecks came from MACS?

3    A.    Yes.

4    Q.    At the time you were a substitute at Charlotte

5          Catholic and at Holy Trinity, did you understand

6          that both of those schools are Catholic schools?

7    A.    Yes.

8    Q.    Have you substituted -- have you served as a

9          substitute teacher at any other school?

10   A.    No.

11   Q.    Have you ever sought or attempted to teach -- to be

12         a substitute teacher at any other school?

13   A.    No.

14   Q.    Have you ever tried to be a full-time teacher at

15         any school?

16   A.    I once applied at Charlotte Catholic because I had

17         a lot of math classes and they needed a math

18         teacher so I submitted my -- whatever it is, that

19         form that tells you all the classes, and Steve

20         looked at it and said I did not have enough math

21         classes to teach.

22   Q.    So was this after you were -- after you had been

23         substituting at Charlotte Catholic?

24   A.    Correct.

25   Q.    Okay.  Was it while you were employed at Home

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 22 of 125
JA1154

Richard Donham (8/18/17)

Page 22

1       Depot?

2   A.  Possibly, I don't remember.

3   Q.  Any other schools that you applied to be a

4       full-time teacher at?

5   A.  No.

6   Q.  When you were a substitute teacher at Charlotte

7       Catholic, did you ever substitute for a religion

8       teacher, teach a religion class?

9   A.  Yes.

10  Q.  Do you know what class that was, which religion

11      class that was?

12  A.  No, but I don't think they differentiated.  It was

13      just sophomore.

14  Q.  Okay.

15  A.  Or actually, freshman up to senior.

16  Q.  Okay.

17  A.  Because they had to take religion every year.

18  Q.  Okay.  How often -- do you recall how often you

19      substituted as a religion teacher at Charlotte

20      Catholic?

21  A.  No.  I can -- I can tell you several times, but

22      that's all I remember.

23  Q.  Was it for the same teacher or different --

24      multiple teachers?

25  A.  Multiple.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 23 of 125
JA1155

Richard Donham (8/18/17)

1   Q.   Did you ever substitute -- when you were a

2        substitute at Holy Trinity, did you ever teach

3        religion at Holy Trinity?

4   A.   Yes.  But religion at the middle school was

5        different than the high school.

6   Q.   How was it different?

7   A.   When you subbed at the middle school, you taught,

8        like sixth grade, everything that they went

9        through, so religion was just part of it.

10  Q.   Okay.  So a teacher would teach multiple subjects?

11  A.   Yes.

12  Q.   Okay.  I wasn't quite following you at first.

13            So anytime you taught at Holy Trinity you

14       almost always would have taught religion at some

15       point during the day?

16  A.   Not always.  Middle school is a little different in

17       that some classes like, I think it was sixth grade,

18       did not change classes.  Seventh grade and eighth

19       grade did change classes so it would vary.

20  Q.   Okay.  So if you were in seventh or eighth grade,

21       you may just teach a subject?

22  A.   Correct.

23  Q.   Math, for example?

24  A.   Yes.

25  Q.   And not have religion.  But if you were teaching a

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 24 of 125
JA1156

Richard Donham (8/18/17)

| | | |
|---|---|---|
| 1 | | sixth grade class as a substitute, you would have a |
| 2 | | religious component? |
| 3 | A. | Yes. |
| 4 | Q. | When you were teaching those at Holy Trinity, when |
| 5 | | you were teaching religion, did you have a lesson |
| 6 | | plan to actually teach or were you just passing out |
| 7 | | materials that the full-time teacher had left for |
| 8 | | you? |
| 9 | A. | Typically passing out material. |
| 10 | Q. | Do you recall ever where you actually taught a |
| 11 | | lesson? |
| 12 | A. | Yes. |
| 13 | Q. | Do you recall what the lesson was? |
| 14 | A. | Yes, math. |
| 15 | Q. | Ah, I'm sorry.  Do you ever recall teaching a |
| 16 | | lesson in religion? |
| 17 | A. | No. |
| 18 | Q. | Okay.  And when you were teaching -- a substitute |
| 19 | | teacher at Charlotte Catholic teaching religion |
| 20 | | classes, did you actually teach the class or were |
| 21 | | you just passing out materials that the teacher |
| 22 | | left? |
| 23 | A. | Passing out materials. |
| 24 | Q. | And you never actually taught a lesson to the |
| 25 | | students in the religion classes? |

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 25 of 125
JA1157

Richard Donham (8/18/17)

```
 1   A.   Correct.
 2   Q.   What is the reason you stopped substitute --
 3        stopped working as a substitute at Charlotte
 4        Catholic and Holy Trinity?
 5   A.   Full-time at Home Depot.
 6   Q.   I'm -- I'm sorry if you said this and I don't -- I
 7        didn't make a note.  What is your degree that you
 8        received from West Virginia?
 9   A.   Political science.
10   Q.   Going back to when you started as a substitute at
11        Charlotte Catholic and Holy Trinity, you said you
12        interviewed with Steve Carpenter.  Was there just
13        one interview?
14   A.   As far as I can remember, yes.
15   Q.   Do you remember who the principal at Charlotte
16        Catholic was at the time you started -- you taught
17        there?
18   A.   Jerry Healy.
19   Q.   Did you ever interview with Mr. Healy?
20   A.   No.
21   Q.   Did you -- do -- did you.  Say that again.
22            Did you know Jerry Healy prior to working at
23        Charlotte Catholic?
24   A.   No.
25   Q.   Did you meet him while you were a substitute
```

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 26 of 125
JA1158

Richard Donham (8/18/17)

1        teacher there?

2   A.   Yes.

3   Q.   Who was the principal at Holy Trinity when you

4        substituted?

5   A.   I don't know.

6   Q.   Do you recall meeting the principal?

7   A.   No.

8   Q.   Do you recall meeting any other administrators at

9        Charlotte Catholic other than Steve Carpenter and

10       Jerry Healy?

11  A.   Yes.

12  Q.   Who?

13  A.   Tracy, I don't know her last name, and Cissy.

14  Q.   Do you know what their positions were?

15  A.   Cissy was Jerry's secretary and Tracy was their

16       bookkeeper.  I don't know whether that was their

17       official title, but that's basically what they did.

18  Q.   Would Cissy be Cissy Bevengton?  Does that sound

19       correct?

20  A.   That sounds right.

21  Q.   And Tracy Tolbert?

22  A.   That sounds right.

23  Q.   Do you recall meeting any other employees that were

24       in the administration at Charlotte Catholic?

25  A.   Randy Belk.

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 27 of 125
JA1159

Richard Donham (8/18/17)

1   Q.   And what was Mr. Belk's position?

2   A.   He was a counselor.

3   Q.   Anyone else?

4   A.   Not that I recall.

5   Q.   Okay.  And at Holy Trinity, do you remember any of

6        the other administrators that would have worked

7        there at the time?

8   A.   I remember the secretary.

9   Q.   Who was that?

10  A.   Susan Carpenter.

11  Q.   Is that Mr. Carpenter's wife?

12  A.   It is.

13  Q.   Did you know her prior to working at Holy Trinity?

14  A.   No.

15  Q.   So Mr. Donham, earlier you testified that you --

16       prior to living at your current residence you lived

17       at an address in Selwyn Farms; is that correct?

18  A.   Correct.

19  Q.   Do you recall what the address was in Selwyn Farms?

20  A.   I think it was 3300, but I don't remember the exact

21       number.

22  Q.   Does 3300-4 sound, correct?

23  A.   No.

24  Q.   How about 3300-1?

25  A.   That does.

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 28 of 125
JA1160

Richard Donham (8/18/17)

Page 28

```
 1    Q.    Okay.  Have you ever lived at 3300-4 Selwyn Farms
 2          Lane?
 3    A.    I -- no.
 4    Q.    Do you recall what year you -- you moved to the
 5          Selwyn Farms address?
 6    A.    No.
 7    Q.    Were you living at the Selwyn Farms address alone
 8          or with Mr. Billard?
 9    A.    With Mr. Billard.
10    Q.    Had he lived there prior to you?
11    A.    Yes.
12    Q.    So you moved in with him?
13    A.    Correct.
14    Q.    Okay.  Do you know how long he had lived there
15          prior to you moving in with him?
16    A.    I do not.
17    Q.    Do you recall that you would have lived there in
18          2003?
19    A.    Yes.
20    Q.    August of 2003?
21    A.    Yes.
22    Q.    Okay.  Have you ever lived at 3300-2 Selwyn Farms
23          Lane?
24    A.    No.
25    Q.    Do you know who lives at 3300-2 Selwyn Farms Lane?
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 29 of 125
JA1161

Richard Donham (8/18/17)

```
 1   A.   No.
 2   Q.   Do you -- do you recall when you moved out of the
 3        Selwyn Farms address and moved to the Harri Ann
 4        Drive address?
 5   A.   I don't remember the year.  I do remember the
 6        month.
 7   Q.   What month was that?
 8   A.   July.
 9   Q.   When you moved out of the Selwyn Farms address to
10        move to the Harri Ann Drive address, did you move
11        with Mr. Billard?
12   A.   Kind of.
13   Q.   Can you explain that?
14   A.   We moved most of the stuff from Selwyn Farms, but
15        not all of it, and so I spent some time, I don't
16        remember how long, moving stuff, continuing to --
17        the move.
18   Q.   Okay.  So at the time -- let me ask this question.
19        Who purchased the home at -- on Harri Ann Drive?
20   A.   Mr. Billard.
21   Q.   Is the home in your -- is not in your name
22        currently?
23   A.   No, it is not.
24   Q.   Okay.  So when Mr. Billard bought the home and he
25        moved to that address, you -- you did not move with
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 30 of 125
JA1162

Richard Donham (8/18/17)

```
 1        him?
 2   A.   I did.
 3   Q.   Okay.  But you had some stuff at the Selwyn Farms
 4        address for a period of time?
 5   A.   Not me, we.
 6   Q.   Okay.  Did you stay -- did you continue to reside
 7        at the Selwyn Farms address when he resided at the
 8        Harri Ann Drive address?
 9   A.   No and yes.  There was a --
10   Q.   Okay.  You have to explain the no and yes answers.
11   A.   I do?
12   Q.   Yes.
13                  MR. BROOK:  He is right about that.
14                  THE WITNESS:  There was a short amount
15            of time that I was at the Selwyn Farms
16            continuing the move to Harri Ann.  So there was
17            a time, I don't remember how long, that I
18            continued to move our stuff from Selwyn Farms
19            to Harri Ann.
20   BY MR. McDONALD:
21   Q.   Was it a matter of days?
22   A.   Probably.
23   Q.   Do you think it extended beyond week -- do you
24        think it extended beyond a week?
25   A.   I don't think so.
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 31 of 125
JA1163

Richard Donham (8/18/17)

1    Q.    Okay.  Who owned the property at Selwyn Farms Lane?

2    A.    Mr. Billard.

3    Q.    Were you ever on the deed for the Selwyn Farms Lane

4          property?

5    A.    No.

6    Q.    How long after moving to the Harri Ann Drive

7          address did Mr. Billard sell the Selwyn Farms

8          address?

9    A.    I don't remember.

10   Q.    You remember was it a long -- was -- was the house

11         on the market a long period of time?

12   A.    No, it was not.

13   Q.    Mr. Donham, what is your phone number?

14   A.    ████  ████.

15   Q.    How long have you had that phone number?

16   A.    A long time.

17   Q.    Have you used any other -- in the last five years

18         have you used any other phone number other than

19         that number?

20   A.    No.

21   Q.    How about the last ten years?

22   A.    No.

23   Q.    Have you ever resided at 5100 Harri Ann Drive?

24   A.    No.

25   Q.    Mr. Donham, are you currently married?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 32 of 125
JA1164

Richard Donham (8/18/17)

Page 32

1   A.   Yes.

2   Q.   Who are you married to?

3   A.   Mr. Billard.

4   Q.   How long have you been married to Mr. Billard?

5   A.   Since May the 3rd, 2015.

6   Q.   Prior to being married to Mr. Billard, were you

7        ever married?

8   A.   Yes, I was.

9   Q.   And who were you married to?

10  A.   Kathy Donham.

11  Q.   How long were you married to Kathy Donham?

12  A.   Thirty-two years.

13  Q.   When you were married to Kathy Donham, where did

14       you reside?  Let me -- let me rephrase that, it may

15       be a long -- it may be many -- many places, so

16       let's start with, at the time, did you get a

17       divorce from Kathy Donham?

18  A.   When?

19  Q.   Did you receive a divorce from Kathy Donham at any

20       time?

21  A.   Yes.

22  Q.   What year?

23  A.   I don't remember.

24  Q.   What year were you married to Kathy Donham?

25  A.   1972.

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 33 of 125
JA1165

Richard Donham (8/18/17)

Page 33

1    Q.   So you were -- were you married to Kathy Donham

2         while you were still in college?

3    A.   I was a senior, yes.

4    Q.   Okay.  And you were married for 33 years?

5    A.   Thirty-two.

6    Q.   Thirty-two years.  Okay.

7              So you were divorced from Kathy Donham in 2004?

8    A.   That sounds correct.

9    Q.   Okay.  Were you living with Kathy Donham up until

10        the time of your divorce?

11   A.   No.

12   Q.   When did you separate?

13   A.   February the 14th, I don't remember the exact year,

14        but I would guess it was 2002.

15   Q.   Okay.  So you were separated for a few years before

16        your divorce was final?

17   A.   Correct.

18   Q.   Okay.  Do you have any children?

19   A.   Yes.

20   Q.   How many children?

21   A.   One.

22   Q.   How old?

23   A.   She just turned 40.

24   Q.   And what is your child's name?

25   A.   Stacy.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 34 of 125
JA1166

Richard Donham (8/18/17)

Page 34

1    Q.    What's her last name?

2    A.    Rush.

3    Q.    And where does Stacy Rush live?

4    A.    Bath, England.

5    Q.    How long has she lived in Bath, England?

6    A.    I'm guessing two and a half years.

7    Q.    Is her mother Kathy Donham, your former wife?

8    A.    Yes.

9    Q.    I assumed that, but I wanted to make sure.

10   A.    Good assumption.

11   Q.    Is -- was Kathy Donham a practicing Catholic?

12   A.    I don't know.

13   Q.    Was she when you were married to her?

14   A.    Yes.

15   Q.    Was she -- were you married in a Catholic church?

16   A.    We were.

17   Q.    What Catholic church were you married in?

18   A.    Saint Theresa's in Morgantown, West Virginia.

19   Q.    And is your daughter a practicing Catholic?

20   A.    That's a yes and no.  Yes, she is.  She lived in

21         Augusta for a long time.  The Catholic church in

22         Augusta is very old.  All her friends that were

23         Catholic started going to a Methodist church and

24         that's where she started going because of the

25         family orientation of the church.  She never

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 35 of 125
JA1167

Richard Donham (8/18/17)

```
 1        converted to Methodist, but that's where they went.
 2   Q.   Is she still going to a Methodist church or a
 3        Catholic church, do you know?
 4   A.   I have no idea.
 5   Q.   Is she married?
 6   A.   Yes.
 7   Q.   Was she married in a Catholic church?
 8   A.   Yes, she was.
 9   Q.   What Catholic church was she married in?
10   A.   Saint Peter's.
11   Q.   Who -- what priest at Saint Peter's married her?
12   A.   I don't remember his name.
13   Q.   Do you know what year she was married, do you
14        recall?
15   A.   Fifteen years ago because they just had their 15th
16        year anniversary.
17   Q.   Okay.
18   A.   2002.
19   Q.   Do you recall when you met Mr. Billard?
20   A.   The exact date, I do not.
21   Q.   How about the year?
22   A.   I do not.
23   Q.   When did you start living with Mr. Billard?
24   A.   Roughly 2002.  It could have been 2003.
25   Q.   How -- explain to me how it came about that you
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 36 of 125
JA1168

Richard Donham (8/18/17)

Page 36

1              decided to move in with Mr. Billard?

2    A.    I was married to my wife at the time.  I realized I

3          was gay at that time and started going to a

4          group -- a support group for bi/gay married men and

5          that's when I met Mr. Billard.

6    Q.    Was that support group here in Charlotte?

7    A.    It was.

8    Q.    Where -- who -- who ran the support group, if you

9          remember?

10   A.    Mr. Billard.

11   Q.    What, was it through an organization or a --

12   A.    No.  It was held at a church, Metropolitan

13         Community Church, but it was not through that

14         church.

15   Q.    And you say in -- I think you -- I think, if I

16         understood right, in 2002 you started to go to this

17         group because you -- you realized you were gay.  Is

18         that . . .

19   A.    That wasn't why I started going to the group.

20   Q.    Okay.

21   A.    Because I was also seeing a psychiatrist and a

22         psychologist and I was looking for support.

23   Q.    Okay.  So you -- you met Mr. Billard, he was

24         running the group, how did you -- I'm assuming at

25         some point you started to date?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 37 of 125
JA1169

Richard Donham (8/18/17)

Page 37

 1   A.   Roughly, yes.

 2   Q.   Tell me what that process was, how that process

 3        worked, or how you started dating and how long that

 4        lasted.

 5   A.   I had known him for about a year through that group

 6        and we decided to go out on a date.

 7   Q.   And then have you dated other men other than

 8        Mr. Billard?

 9   A.   No.

10   Q.   How long after you started dating did you decide to

11        move in and live together?

12   A.   It was roughly a couple of months, I don't remember

13        the exact timeline.

14   Q.   Okay.  And -- and since that time, you have always

15        lived with Mr. Billard with the exception of the

16        short period of time when they were -- when you

17        were moving residences?

18   A.   Correct.

19   Q.   Okay.

20             MR. McDONALD:  Let's take a break for

21        one second.

22             MR. BROOK:  Sure.

23             MR. McDONALD:  A minute or two.

24        (RECESS TAKEN FROM 10:13 A.M. TO 10:18 A.M.)

25

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 38 of 125
JA1170

Richard Donham (8/18/17)

 1   BY MR. McDONALD:

 2   Q.   Mr. Donham, we're back on the record after a break.

 3        We -- at the time of the break we were talking

 4        about how you started to date Mr. Billard and how

 5        you two came to live together.  Are -- I'm going to

 6        change topics a little bit here.  Are you familiar

 7        with the term "stereotype"?

 8   A.   Yes.

 9   Q.   What is your understanding of what that means?

10   A.   Different people fit into different stereotypes

11        based on usually profiling.

12   Q.   Okay.  A dictionary definition that -- that I

13        looked up said, A widely held belief about a group

14        of people that is often unfair or untrue.  Would

15        you agree with that statement?

16   A.   No.

17   Q.   Why?

18   A.   Because they're not all unfair and they're not all

19        untrue.

20   Q.   Okay.  Are you familiar with stereotypes -- strike

21        that.

22        Do you think it's appropriate to judge someone

23        based on stereotypes?

24   A.   No.

25   Q.   Are you familiar with stereotypes for straight men?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 39 of 125
JA1171

Richard Donham (8/18/17)

1    A.    No.

2    Q.    Are you familiar with stereotypes for a gay man?

3    A.    No.

4    Q.    Are you -- are you -- do you not believe that there

5          are stereotypes that apply to a gay man?

6    A.    No.

7    Q.    Have you ever heard -- heard or read that people

8          might apply or believe there are stereotypes for a

9          straight man versus a gay man?

10   A.    Yes.

11   Q.    Okay.  What have you heard or read that would be a

12         stereotype for a gay man?

13   A.    Nothing.

14   Q.    You've not heard anything or read anything that

15         would be -- that would -- somebody would describe

16         as stereotype for a gay man?

17   A.    No.

18   Q.    Have you ever heard someone say or have you ever

19         read that gay men might be a -- have effeminate

20         mannerisms?

21   A.    I've heard that.

22   Q.    Okay.  That's my question.  Have you heard or read

23         anything that would indicate what stereotypes some

24         other people apply to gay men?

25   A.    Yes and no.  So I can explain that?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 40 of 125
JA1172

Richard Donham (8/18/17)

Page 40

1    Q.   Yes, you can.

2    A.   I've heard that.  I've not heard it as a

3         stereotype.

4    Q.   Okay.

5    A.   I've heard that people have personalities and

6         traits but not that it makes it a stereotype.

7    Q.   So you have heard people describe traits, physical

8         or personal mannerisms, that would apply -- that

9         would be associated with gay men versus straight

10        men?

11   A.   No, I can't agree with that.

12   Q.   Okay.  I'm just trying -- I'm -- I'm not trying to

13        put words in your mouth, I'm trying to understand

14        how you -- what you just explained to me so maybe

15        you can explain it again.

16   A.   I think there are straight men that are effeminate.

17   Q.   Okay.

18   A.   I think there are gay men that are very masculine

19        acting.  So is that a stereotype for either one of

20        them, no, it is not, not to me.  It is their

21        personality, that's who they are, and I don't

22        associate that with a stereotype.

23   Q.   Okay.  And maybe this is a problem with our

24        definition.  For me, a stereotype or the way I was

25        defining it is, is taking a trait or a personality

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 41 of 125
JA1173

Richard Donham (8/18/17)

Page 41

```
 1          component and saying that if you have this, that
 2          must make you X.  So if you're effeminate, it makes
 3          you -- must mean you're gay versus if you're really
 4          manly, it must make you straight, meaning the
 5          stereo -- in my mind, and as I described it, a
 6          stereotype is not true in -- in all instances.  It
 7          may be true in some instances but not in all
 8          instances.  Does that make sense?
 9      A.  Kind of.  But I think that's the same as profiling
10          and I disagree with that.
11      Q.  I'm not asking whether you agree with it at all,
12          I'm just asking if you -- are you aware of it, that
13          it happens?
14      A.  I'm aware that it happens.
15      Q.  Okay.  And what I'm asking you is, if we're going
16          to -- so I'll use profiling.  Are you aware that
17          people profile individuals, gay and straight, based
18          on mannerisms?
19      A.  No, I can't agree with it.
20      Q.  Do you believe that anyone -- that there are any
21          people that -- that profile an individual and
22          assume they're gay or straight based on mannerisms?
23      A.  I think there are people that do that, it's not
24          something I agree with it.
25      Q.  I'm not asking you whether you agree with it, I'm
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 42 of 125
JA1174

Richard Donham (8/18/17)

```
 1         asking whether you understand that it happens in
 2         the world we live in?
 3  A.     I do.
 4  Q.     Okay.  And what I'm asking is, in that world we
 5         live in, are there some common profiling elements
 6         or traits that might -- somebody might claim, not
 7         you and not that you believe with it, but somebody
 8         might claim, would indicate somebody is gay or
 9         straight?
10  A.     I think and I -- I can agree with that, I think.
11  Q.     Okay.  Would -- let -- let me give you some
12         examples of things that -- that I think that our
13         society, or individuals in our society, might use
14         to profile someone as gay or straight and tell me
15         if you agree with it, that it's out there, not that
16         you agree that it is a truism.  Does that make
17         sense?  That -- these are -- these are elements
18         that some people in our society might apply to
19         making a decision whether someone is gay or
20         straight.
21  A.     I think you're asking me to agree to something that
22         I really cannot agree to.
23  Q.     I am not asking you to agree personally, I'm asking
24         you whether you know that it's out there in the
25         world we live in.  Does that make sense?
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 43 of 125
JA1175

Richard Donham (8/18/17)

1  A.   It does, and I still can't.  Prejudice exists.

2  Q.   Yes.

3  A.   I can't agree to any of it, I -- I just won't do

4       that.  That is not who I am.  I understand what

5       you're saying, I understand where you're going, and

6       I cannot say that for me, nor can I agree with you

7       that that is a truism.  I -- I can't do that.

8  Q.   I'm not asking you to -- to agree that it's true or

9       that it's a -- that the stereotype or the profiling

10      is correct or accurate.  I just want to know

11      whether you're aware that our society sometimes

12      will say a man who is effeminate must mean he's

13      gay.  Not that you agree with that.

14 A.   I -- I can't.  No, I can't do that because of all

15      the things recently with Charlottesville, I am so

16      anti people doing that that you can say that

17      society, I want to know who they are because I

18      disagree with that.  I -- I disagree with society

19      making those judgments.

20 Q.   Okay.

21 A.   And because of that I won't agree that anything

22      that society says is true or possible.  I think all

23      possibilities exist, all of them.  You can be

24      effeminate and be as macho and straight as you want

25      to be.  You can be super masculine and muscular and

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 44 of 125
JA1176

Richard Donham (8/18/17)

```
 1          be gay.  I don't want society to choose for me or
 2          for anyone that ability to say I agree with them.
 3          I -- I cannot do that.
 4    Q.    And I am not asking you to agree with any of -- any
 5          of that, what society has put or the labels or the
 6          profiling or the stereotyping, whatever you call
 7          it, I'm not asking you to agree with it, that's not
 8          what I'm trying to get you to do.
 9    A.    Do I know it exists?
10    Q.    Yes, that's my question.
11    A.    Yes, I do.
12    Q.    Okay.
13    A.    And I am very strong against that.
14    Q.    Okay.
15                    MR. McDONALD:  Yeah.
16                    MR. BROOK:  Could we take a second?
17                    MR. McDONALD:  Sure.
18                    MR. BROOK:  Go off the record for a
19          moment.
20          (DISCUSSION HELD OFF THE RECORD)
21    BY MR. McDONALD:
22    Q.    Mr. Donham, I'm going to try to ask this again.
23          And bear with me, make sure I ask the right
24          question here.  Are you familiar with the fact that
25          in our society some individuals will profile or
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 45 of 125
JA1177

Richard Donham (8/18/17)

```
 1        stereotype an individual based on their physical
 2        characteristics?
 3   A.   Yes.
 4   Q.   And it's my understanding that your -- your
 5        position is that that is just wrong to do that,
 6        correct?
 7   A.   Correct.
 8   Q.   Okay.  Are you familiar with any of the profiling
 9        or stereotypes that some in society will apply to
10        identify a male as either gay or straight?
11   A.   Yes.
12   Q.   Okay.  From your experience, can you identify any
13        of those traits that you have heard or read about
14        that some in society would apply to a gay male?
15   A.   I have a very tough time with that because of
16        personal knowledge.  You were right in that a lot
17        of people, society, which I really don't like and
18        you know that, would assume effeminate is gay.  I
19        also know of people that consider religious people
20        to be gay and that's -- that's where I have the
21        issue.  Are there stereotypes of gay people?  Just
22        as there are stereotypes of straight people.  The
23        same range occurs everywhere.  There are flamboyant
24        gay people.  There are flamboyant straight people.
25        So which one is gay and which one is straight,
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 46 of 125
JA1178

Richard Donham (8/18/17)

```
 1            that's where I have the issue.
 2   Q.   And I am not asking you whether they're -- whether
 3        they're true.  I think we probably will both agree
 4        that stereotypes or profiling are often not true.
 5   A.   Correct.
 6   Q.   So using the term "flamboyant," somebody who sees a
 7        man who is dressed or acting in a flamboyant way
 8        might assume they're gay if they follow the
 9        stereotype or profile, but it may or may not be
10        true, correct?
11   A.   Correct.
12   Q.   Okay.  And somebody who is very masculine and
13        athletic may or may not be straight, correct?
14   A.   Correct.
15   Q.   And it's not fair to -- for anyone in society to
16        judge based on those physical characteristics,
17        correct?
18   A.   Correct.
19   Q.   Okay.  Have you ever been subjected to someone
20        making those assumptions about you?
21   A.   No.
22   Q.   Have you ever --
23             MR. BROOK:  I'm going to step back and
24          just object to that as a speculative question,
25          but go ahead.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 47 of 125
JA1179

Richard Donham (8/18/17)

Page 47

```
 1                    MR. McDONALD:  Yeah.
 2    BY MR. McDONALD:
 3    Q.   Are you -- are you aware of anyone who has ever
 4         assumed you were gay based on your physical
 5         appearance or mannerisms?
 6    A.   No.
 7    Q.   Has anyone -- have you ever heard the term
 8         "gaydar"?
 9    A.   Yes.
10    Q.   What does that term mean to you?
11    A.   Someone that is gay perceives someone else to be
12         gay.
13    Q.   So you don't believe someone who is straight could
14         have gaydar?
15    A.   No.
16    Q.   Why?
17    A.   Because they don't have a clue.
18    Q.   "They don't have a clue" about what?
19    A.   What gay is or who could be gay.
20    Q.   So only a gay person can identify or know another
21         gay person?
22    A.   No.  Some gay people have gaydar.
23    Q.   Okay.
24    A.   Some straight people think they have gaydar and
25         they're like 99.9 wrong most of the time.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 48 of 125
JA1180

Richard Donham (8/18/17)

Page 48

 1   Q.   Why?

 2   A.   Because those assumptions that I don't like.

 3   Q.   But are you not making an assumption that they're

 4        wrong most of the time?

 5   A.   No, I just ask people.

 6   Q.   You ask people what?

 7   A.   If they're gay.

 8   Q.   Do you ask people if they're straight?

 9   A.   Sometimes, and I don't believe either one of them

10        so -- and it doesn't matter to me.  What matters to

11        me is that person's integrity and what they do that

12        affects me.

13   Q.   Okay.  And today you are here and you're dressed in

14        a very colorful shirt?

15   A.   Yes.

16   Q.   You have earrings in both ears.  Have you always

17        dressed this way?

18   A.   No.

19   Q.   When you were married to your wife, Kathy, did you

20        dress this way?

21   A.   Dress?

22   Q.   Yes.

23   A.   Yes.

24   Q.   How long have you dressed in very colorful clothing

25        and worn earrings in both ears?

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 49 of 125
JA1181

Richard Donham (8/18/17)

1    A.    Well, earrings is a whole nother story.

2    Q.    Okay.  We'll break it down, how about just do the

3          dress.

4    A.    Absolutely my whole life.

5    Q.    Okay.  Always colorful?

6    A.    Yes.

7    Q.    Okay.  How long have you had earrings in both ears?

8    A.    Both ears?

9    Q.    Yes.

10   A.    When I met Mr. Billard, I got the other ear

11         pierced.  When I went to the wedding of my

12         daughter's volleyball coach, which was a long time

13         ago, and I was all dressed up in a suit, he had an

14         earring in one ear and my wife said, You know,

15         that's kind of cool, maybe we should get your ear

16         pierced.  So we went and got my ear pierced.

17   Q.    Okay.  But you didn't start wearing two earrings

18         until you started seeing Mr. Donham -- I mean

19         Mr. Billard?  I'm sorry.

20   A.    Yeah.  When I saw Mr. Donham in the mirror, I got

21         both ears pierced.

22   Q.    So -- but it wasn't -- after you started dating

23         Mr. Billard, that's when you got your second ear

24         pierced?

25   A.    Yes.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 50 of 125
JA1182

Richard Donham (8/18/17)

Page 50

1    Q.    Okay.  Would you say that a man with -- that --
2          that there is stereotypical --
3    A.    You don't want to go there.  I'm just telling you.
4          I work for Home Depot.
5    Q.    Yes.
6    A.    Let me give you the clarification.  The number of
7          construction workers that are probably straight,
8          probably, I don't know, that come in with
9          earrings --
10   Q.    Uh-huh.
11   A.    -- is probably over 50 to 75 percent.
12   Q.    Okay.
13   A.    So does -- earrings have nothing to do with being
14         gay or straight.
15   Q.    And I'm not -- I'm not saying that it does at all.
16         I'm just asking if there's a stereotype or a
17         profile --
18   A.    No.
19   Q.    Okay.
20   A.    There is not.
21   Q.    You don't believe that?
22   A.    No, I don't.
23   Q.    Okay.  Are there any other traits, physical traits,
24         or attributes that -- that you think some people in
25         society will look at and make judgments on whether

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 51 of 125
JA1183

Richard Donham (8/18/17)

Page 51

1       someone's straight or gay?

2   A.  To be honest, I can't think of anything.

3   Q.  Okay.  Let me ask you this.  When you were teaching

4       as a substitute at Charlotte Catholic and at Holy

5       Trinity, do you think anyone knew you were gay?

6   A.  Yes.

7   Q.  Okay.  Who?

8   A.  Most of the teachers, most of the students, and I

9       can clarify that if it's okay.

10  Q.  Please do.

11  A.  When I decided to officially come out to the

12      world --

13  Q.  Okay.

14  A.  -- I quit trying to hide the fact that I was gay so

15      all the things that I did to have people not think

16      I was gay, like acting macho, all that stuff, I

17      just got rid of because I didn't care any longer.

18      So that's when I became the real me, the me that

19      you can think whatever you want.  I am gay.  I am

20      very happy with that fact.  And if you think it,

21      it's okay.  If you don't think it, it doesn't

22      matter.  So I think I became more gay in that

23      stereotypes and people could perceive it because I

24      let them.

25  Q.  Okay.  So you said that you think most of the

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 52 of 125
JA1184

Richard Donham (8/18/17)

Page 52

```
 1           teachers and students at Charlotte Catholic knew --
 2           believed you to be gay when you were a substitute
 3           there?
 4      A.   Yes.
 5      Q.   And why would they have believed you to be gay?
 6      A.   See, I wore both earrings.  I'm not sure why they
 7           believed it.
 8      Q.   Okay.
 9      A.   I knew that I did.
10      Q.   That -- I'm sorry, that you believed you were gay
11           or you believed that they thought you were gay?  I
12           am trying to understand which --
13      A.   I believed I was gay and, therefore, they
14           could -- they could perceive that if they were a
15           perceptive person.  Did I do anything, not that I
16           know of.  I was there to do a job.
17      Q.   Okay.
18      A.   I was there to teach or substitute.  That's what I
19           did.  What they perceived of that was their
20           perception and that's not something that I could
21           control, but I do think that they probably
22           suspected --
23      Q.   Okay.
24      A.   -- that I was gay.
25      Q.   Okay.  And earlier we talked about how your belief
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 53 of 125
JA1185

Richard Donham (8/18/17)

Page 53

 1        that someone that applies stereotype, it is wrong
 2        to apply stereotypes to people?
 3   A.   Yes, I do.
 4   Q.   Okay.  So is some -- is believing that you were gay
 5        because of the way you presented yourself not
 6        wrong?  Is it wrong or right?  I'm trying to
 7        understand.
 8   A.   I'm not sure how to explain that.
 9   Q.   Okay.
10   A.   It's okay if they did it with me personally.
11   Q.   Okay.  But you think it's wrong?
12   A.   To generalize that, yes, I do.
13   Q.   Okay.  So before you came out, if someone thought
14        you were gay, what was you -- how did you feel
15        about that?
16   A.   Defensive.
17   Q.   Why?
18   A.   Because I didn't want anyone to think that.
19   Q.   Okay.  And it's wrong to do that, correct, in your
20        opinion?
21   A.   To be defensive?
22   Q.   No, no, no, for somebody to assume that you are one
23        way or the other, gay or straight or pick any --
24        any category you want, based on --
25   A.   Yes --

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 54 of 125
JA1186

Richard Donham (8/18/17)

Page 54

1    Q.    -- your outward --

2    A.    -- I do think that's wrong.  I think people should

3          communicate, talk, and decide for their own if they

4          like the person not based on anything else.

5    Q.    When you were teaching at Charlotte Catholic and at

6          Holy Trinity did you ever -- did you tell anyone

7          affirmatively that you were gay?

8    A.    Yes.

9    Q.    Who did you tell?

10   A.    The person that was gay.

11   Q.    Who was that?

12   A.    I -- I don't want to tell you.

13                    MR. BROOK:  Could we go off the record

14          for a moment?

15                    MR. McDONALD:  Yes, that's fine, yes.

16          (DISCUSSION HELD OFF THE RECORD)

17   BY MR. McDONALD:

18   Q.    Mr. Donham, you said that you were -- when you

19         taught at Charlotte Catholic as a substitute you --

20         you confided in one other individual that you were

21         gay?

22   A.    Yes.

23   Q.    And -- and that person you believed to also be gay,

24         correct?

25   A.    Correct.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 55 of 125
JA1187

Richard Donham (8/18/17)

```
 1   Q.   Was that individual an administrator at Charlotte
 2        Catholic?
 3   A.   No.
 4   Q.   Was just -- was that person a teacher?
 5   A.   Yes.
 6   Q.   Okay.  Was -- did you confide in anyone at Holy
 7        Trinity that you were gay?
 8   A.   No.
 9   Q.   You testified earlier that you believe the teachers
10        at both Charlotte Catholic and Holy Trinity
11        believed you were gay?
12   A.   I don't know about Holy Trinity.
13   Q.   Oh, okay.
14   A.   I do know at Charlotte Catholic.
15   Q.   Okay.
16   A.   And the ones that I associated with knew that I was
17        gay.
18   Q.   Who did you -- who did you associate with at
19        Charlotte Catholic?
20   A.   The teachers that Mr. Billard knew or the ones that
21        I substituted for.
22   Q.   Okay.  How many different teachers did you
23        substitute for roughly?  I'm not ask -- I know
24        you're not going to remember specifics, but do you
25        have a -- do you have a sense?
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 56 of 125
JA1188

Richard Donham (8/18/17)

1   A.   Roughly?

2   Q.   Yeah.

3   A.   Twenty.

4   Q.   Okay.  Did you ever have occasion to speak to any

5        of the administrators at Charlotte Catholic and

6        tell them you were gay?

7   A.   No.

8   Q.   Do you believe any of the administrators at the

9        time you were there knew you were gay?

10  A.   Yes.

11  Q.   Who do you believe knew you were gay?

12  A.   Mr. Carpenter, Mr. Healy, Cissy, Tracy.  I think

13       that's all the administrators that I can think of.

14  Q.   Okay.  And your understand -- or tell me why you

15       believe those four individuals knew you were gay?

16  A.   Because of the relationship between Mr. Billard and

17       I.

18  Q.   What relationship did they know of?

19  A.   That we lived together.

20  Q.   Okay.

21  A.   That if they needed to get in contact with me, they

22       could call him or vice versa.  Probably the way we

23       reacted together.

24  Q.   What do you mean by that?

25  A.   He was -- he was friendly.  One of the things that

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 57 of 125
JA1189

Richard Donham (8/18/17)

Page 57

```
 1          he did with me -- I know I can't say that.  He
 2          would put his hand on my back (indicating) like
 3          that.
 4     Q.   Okay.
 5     A.   And he would escort me to meet people like that.
 6     Q.   Okay.
 7     A.   And it was more than just a hand on the back.  So I
 8          think you could have perceived that as more than
 9          just two friends.
10     Q.   Okay.  So if I see -- if I go to a Carolina
11          Panthers football game and I see Panthers that are
12          hugging each other or patting each other on the
13          back or the butt, am I to assume they're gay?
14     A.   You cannot make that assumption because of the way
15          that he did it versus the way that they do it.
16     Q.   Okay.  But isn't that going to be part of the
17          person that's perceiving or seeing that, how they
18          perceive it versus what you understood it to be?
19     A.   It's always a perception.
20     Q.   Right.
21     A.   Unless you come out with a big sign.
22     Q.   Did you ever "come out with a big sign" when you
23          were at Charlotte Catholic?
24     A.   No.
25     Q.   Did you ever have any conversations with
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 58 of 125
JA1190

Richard Donham (8/18/17)

Page 58

```
 1          Jerry Healy where he acknowledged to you that --
 2          that he understood that you were gay?
 3    A.    Specific conversations, no.  Inferred conversation,
 4          I was invited to the end-of-the-year teacher party.
 5    Q.    Okay.
 6    A.    It was on the top floor of The Gin Mill, I remember
 7          that.  He invited me through Mr. Billard.
 8    Q.    Okay.
 9    A.    He was at my engagement party with his wife.
10    Q.    When was your engagement party?
11    A.    We had like three.  It was before we got married
12          and I don't remember the exact time.  Mr. Billard
13          was still employed though.
14    Q.    Okay.  Was Mr. Healy still there at the time?
15    A.    As far as I can remember, yes.  I don't remember
16          that exact time frame with him because I don't.
17    Q.    Okay.  When did you get engaged to Mr. Billard?
18    A.    We didn't.  When I moved in with him.
19    Q.    When did -- so when were the engagement parties?
20    A.    Probably three months or so before we got married.
21    Q.    And you got married in May of 2015?
22    A.    Correct.
23    Q.    Okay.  So sometime in the spring of 2015?
24    A.    Or the fall.
25    Q.    Of 2014?
```

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 59 of 125
JA1191

Richard Donham (8/18/17)

Page 59

```
 1   A.   It could have been the fall because I remember -- I
 2        remember pumpkins at one point.
 3   Q.   Okay.
 4   A.   So it could have been prior to Halloween or
 5        right -- right after, prior to Thanksgiving maybe.
 6        I don't remember the exact dates.  I just
 7        remember . . .
 8   Q.   Okay.  Did you ever have any discussions with
 9        Mr. Carpenter where you -- where he indicated to
10        you that he knew you were gay?
11   A.   No.
12   Q.   And let me -- let me clarify while you -- while you
13        were a teacher at Charlotte Catholic?
14   A.   Thank you.  Yeah, because the fact that he was at
15        our wedding, yeah.  Not specific conversations that
16        said, I know you're gay.
17   Q.   Okay.  Something that -- did he do or say something
18        that indicated to you he -- he thought you were
19        gay?
20   A.   He referred to Mr. Billard and I and -- and -- like
21        he'd go, Could you ask Rich if he can substitute.
22   Q.   Okay.
23   A.   Or he would make references to us.
24   Q.   Okay.
25   A.   And that's how I perceived that he knew that.
```

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 60 of 125
JA1192

Richard Donham (8/18/17)

```
 1    Q.    Okay.  Were you aware of any other teachers at
 2          Charlotte Catholic who lived together but were not
 3          married?
 4    A.    No.
 5    Q.    Do you -- did you know or do you know ████████
 6          ██████████████?
 7    A.    No.
 8    Q.    Do you know ████████  ██████████?
 9    A.    I've heard that name.  Is he a lawyer?
10    Q.    His father is, but . . .
11                    MR. BROOK:  It's a small world.
12  BY MR. McDONALD:
13    Q.    Would you be surprised that they were both teachers
14          at Charlotte Catholic who live together?
15    A.    No.
16    Q.    Okay.  Or they did at one time.  They're both
17          married to other individuals now and don't live
18          together, but I think -- were you aware of any
19          other faculty members at Charlotte Catholic who --
20          teachers who knew you were gay?
21    A.    Dottie Tippett.
22    Q.    Anyone else?
23    A.    Kevin, and I don't know his last name.  He was the
24          athletic director.
25    Q.    Christmas?
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 61 of 125
JA1193

Richard Donham (8/18/17)

Page 61

1    A.    Yes, thank you.

2    Q.    Anyone else?

3    A.    Lincoln Sigwald.

4    Q.    Any others that you can think of?

5    A.    Nell Baker.

6    Q.    Okay.

7    A.    Joanie, and I don't know her last name.

8    Q.    Anyone else?

9    A.    I don't -- I -- to be honest with you, I don't

10         remember all their names, but a lot of the

11         teachers, it's like I remember the teacher that did

12         IT work, and I don't remember her name.  The

13         English teacher, the head of the department, I

14         don't remember his name.

15   Q.    And -- and for these people, how would they have

16         known you were gay?

17   A.    Some of them because they knew Lonnie and I

18         personally, some of them by perception and knowing

19         our relationship.

20   Q.    Okay.  And so by perception and knowing your

21         relationship, that is somebody who's making

22         assumptions because they've seen you act in a

23         certain way?

24                   MR. BROOK:  Objection to form.

25                   THE WITNESS:  Yeah, no.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 62 of 125
JA1194

Richard Donham (8/18/17)

Page 62

1   BY MR. McDONALD:

2     Q.   So explain what you mean by that, then.

3     A.   If you're sitting there next to your wife, assuming

4          that you have one, there's going to be that

5          interaction that you have that's based on the

6          personal relationship that you have.

7     Q.   Okay.

8     A.   And I would be able to guess that that was your

9          wife because of that relationship.

10    Q.   Okay.

11    A.   That's the same thing.  The relationship that

12         Mr. Billard and I had is that same type of

13         perception that people could have because of the

14         way we interact with each other.

15    Q.   Okay.  And I guess I'm just struggling with what we

16         talked about earlier about making assumptions and

17         profiling, that this seems to be -- what you're

18         saying is -- is people might profile you or

19         stereotype based on how they perceive you to be

20         acting or interacting with Mr. Billard that you

21         were a couple; is that correct?

22                   MR. BROOK:  Objection to form.

23                   THE WITNESS:  How about yes and no.

24    BY MR. McDONALD:

25    Q.   Okay.

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 63 of 125
JA1195

Richard Donham (8/18/17)

Page 63

1   A.   If they perceive that, that's okay.  Do I agree
2        with the fact that they do that, no.  Do I want
3        people to talk to other people and communicate and,
4        therefore, they can find out on their own, if it
5        matters to them.  Perceptions and profiling are bad
6        when you generalize them.
7   Q.   Okay.
8   A.   But if you talk to someone individually and find
9        out, if it matters at all because it may not, then
10       that's okay.  So do I do that?  No, I don't.  I --
11       I don't -- you are who you are.  I haven't made any
12       derogatory comments about lawyers.
13  Q.   I appreciate that.
14  A.   And there are lots of perceptions out there.  I
15       disagree with all of them.  I would rather get to
16       know the person and then I can make judgments as to
17       whether I like the person, whether I want to be
18       around the person.
19  Q.   Okay.
20  A.   And that's -- that's how I feel, not everyone in
21       the world obviously feels that way.
22  Q.   Okay.  Let's change subjects here for a moment.
23  A.   Okay.
24  Q.   You're good with that?
25  A.   Sure.

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 64 of 125
JA1196

Richard Donham (8/18/17)

Page 64

1    Q.    Do -- what is your understanding of what the

2          Catholic church position on same-sex marriage is?

3    A.    I can't get married in a Catholic church.

4    Q.    Do you know why that's the Catholic church's

5          position?

6    A.    No.

7    Q.    Have you ever asked a priest in a Catholic church

8          why that's the church's position?

9    A.    No, I have not.

10   Q.    Have you ever asked anyone in the Catholic faith

11         why that's the Catholic church's position?

12   A.    No.

13   Q.    Why?

14   A.    Because I don't care.

15   Q.    Do you understand that the Catholic church teaches

16         that sexual activity outside of marriage is wrong?

17   A.    Yes, I do.

18   Q.    How do you know that?

19   A.    Oh, it's one of the commandments.  Adultery.

20   Q.    Okay.

21   A.    Oh, yeah.

22   Q.    Got that one?

23   A.    Yeah.

24   Q.    Okay.

25               Do you know what the Catholic church's teaching

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 65 of 125
JA1197

Richard Donham (8/18/17)

Page 65

 1           or position on someone who has a same-sex
 2           attraction is?
 3      A.   No, I don't.
 4      Q.   Okay.  Earlier you testified about, and I'm -- and
 5           I'm not trying to probe deeply, I just want to
 6           understand how -- how your faith may have impacted
 7           your decision to come out as a gay man.  So you
 8           talked about being in a support group and -- and
 9           seeking counseling.  Did you -- in that process,
10           did you consult with any religious authorities or
11           priests or ministers to help you with that process?
12      A.   To help me with that process, no.  Did I talk to a
13           priest about that, yes.
14      Q.   Okay.
15      A.   I talked to a priest about the fact that I was gay
16           and that's when he said we could get you annulled,
17           your marriage annulled, and I said, no.
18      Q.   Okay.  Do you know why he said he -- they would get
19           your marriage annulled?
20      A.   It's one of the reasons that you can get an
21           annulment.
22      Q.   Okay.
23      A.   That's it.
24      Q.   You weren't -- you weren't talking to him for that
25           reason?

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 66 of 125
JA1198

Richard Donham (8/18/17)

1   A.   No.

2   Q.   Okay.

3   A.   I was talking to him out of concern of how to deal

4        with the fact that I was gay and married.

5   Q.   Okay.

6   A.   As you would a counselor.

7   Q.   Okay.  Who was the priest you talked to?

8   A.   I don't remember his name.

9   Q.   Was he here in Charlotte?

10  A.   He was.

11  Q.   Do you know what church or parish?

12  A.   Saint Peter's.  He was the one that married my

13       daughter.

14  Q.   Okay.

15  A.   I just don't remember his name, but that's been 15

16       years.

17  Q.   Fifteen years ago.

18  A.   Yeah.

19  Q.   Did you ever speak with anyone else in the Catholic

20       church?

21  A.   No.

22  Q.   How about since that time?

23  A.   No.

24  Q.   Have you -- have you ever spoken with a priest or a

25       theologian about the Catholic church's position on

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 67 of 125
JA1199

Richard Donham (8/18/17)

Page 67

 1     same-sex marriage?

 2   A.   No.

 3   Q.   Are you aware of the fact that the Catholic church

 4        is not the only faith that has prohibited same-sex

 5        marriage?

 6   A.   I'm aware of that fact.

 7   Q.   Okay.  When you taught at Charlotte Catholic, were

 8        you aware of what the -- the mission statement for

 9        the school was?

10   A.   I think I read it once.

11   Q.   Does the -- does it -- tell me if this is what you

12        recall reading, Soul of education is the education

13        of the soul.  Does that sound familiar?

14   A.   No.

15   Q.   Okay.  What do you recall?

16   A.   That it was about education and that the whole

17        purpose of the school was to educate young people.

18        That's the only thing I remember.

19   Q.   Do you -- do you recall where you read that or

20        heard that?

21   A.   It might have been in the hallway.  It might have

22        been in a little booklet that I had.  I -- I don't

23        remember.

24   Q.   When you say "hallway," was it you heard somebody

25        say it or you read it someplace?

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 68 of 125
JA1200

Richard Donham (8/18/17)

```
 1    A.   Posted.
 2    Q.   Okay.  When you were a substitute teacher at
 3         Charlotte Catholic and Holy Trinity, did classes
 4         start with prayers?
 5    A.   Not always.  Some did.
 6    Q.   Okay.  As a substitute, how would you have known
 7         which ones did and which ones didn't?
 8    A.   If the little book was out on the desk.
 9    Q.   What "little book" are you referring to?
10    A.   I don't know.  It was like Prayer of the Day or
11         something like that.
12    Q.   Okay.  And as a substitute, if the book was out,
13         would you -- would you lead the class in a prayer?
14    A.   Sometimes.
15    Q.   When you were a substitute, did you ever take
16         students to mass when they had school masses?
17    A.   Yes.
18    Q.   Did you stay for the mass?
19    A.   Yes.
20    Q.   Did you participate in the mass?
21    A.   Yes.
22    Q.   Receive Holy Communion at the mass?
23    A.   Yes.
24    Q.   Did you engage in any other religious activities
25         when you were a substitute at Charlotte Catholic or
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 69 of 125
JA1201

Richard Donham (8/18/17)

1       at Holy Trinity?

2  A.   I -- there was a senior retreat that I went on

3       with -- as -- as a substitute.  I substituted for a

4       senior class, I don't remember what it was, and

5       they had a retreat which was mostly religious.  It

6       was -- it was Mary Jane --

7  Q.   Okay.

8  A.   -- was the person that was responsible for it and

9       so there was religious components of it.

10  Q.   Okay.  And you went as a substitute.  Did you

11       participate in it in a formal way?

12  A.   No, I just made sure they didn't act up and got

13       them on a bus and took them back.

14  Q.   Okay.

15  A.   So no, I did not.

16  Q.   Just more of a chaperone role?

17  A.   Correct.

18  Q.   Okay.

19         And you're -- you understand that the Catholic

20       churches teaches that marriage can only exist

21       between a man and a woman, correct?

22  A.   Correct.

23  Q.   Do you know who Angela Montague is?

24  A.   No.

25  Q.   Do you know who Father Jim Cassidy is?

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 70 of 125
JA1202

Richard Donham (8/18/17)

```
 1   A.   I've heard the name.
 2   Q.   Have you -- do you know who Father Kauth is?
 3   A.   I don't think that's how it was pronounced.
 4   Q.   How was it pronounced for you?
 5   A.   I don't -- I don't remember but I don't think it --
 6        I think that's the person you're referring to, but
 7        I don't know.
 8   Q.   The chaplain -- he was the chaplain for a number of
 9        years at Charlotte Catholic, Father Kauth?
10   A.   Yeah, I don't think that's how I heard it
11        pronounced, but I -- yes, I know who he is.
12   Q.   Okay.  Have you ever -- I assume you've never met
13        Father Kauth then?
14   A.   In passing in the hallway.
15   Q.   Was he -- was he there when you substituted -- when
16        you were a substitute?
17   A.   As far as I know, yes.
18   Q.   Okay.  Was there a priest -- do you recall when you
19        were a substitute, was there a priest that was at
20        Charlotte Catholic on a regular basis?
21   A.   No.
22   Q.   Was someone --
23   A.   Not that I recall.
24   Q.   Okay.
25                  MR. McDONALD:  Let's go off the record
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 71 of 125
JA1203

Richard Donham (8/18/17)

```
 1            for a moment.
 2                      MR. BROOK:  Sure.
 3         (RECESS TAKEN FROM 11:08 A.M. TO 11:28 A.M.)
 4    BY MR. McDONALD:
 5     Q.   Mr. Donham, I have no further questions at this
 6          time.  I understand your counsel is going to ask
 7          some questions so I may have follow up after that.
 8     A.   Okay.
 9                      EXAMINATION
10    BY MR. BROOK:
11     Q.   Mr. Donham, same rules as with Mr. McDonald.
12          Do you -- do you recollect talking about some
13          engagement parties that you and Mr. Billard had on
14          direct examination?
15     A.   Yes.
16     Q.   How many -- how many engagement parties did you
17          have?
18     A.   There were three.
19     Q.   Okay.  To the best of your recollection, when were
20          those three engagement parties?
21     A.   One was in the fall, and that's the one I referred
22          to pumpkins so it was probably somewhere between
23          Halloween and Thanksgiving, I'm guessing.  One was
24          winter, it was cold, and one was probably spring.
25          I don't remember the exact dates, but I -- they
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 72 of 125
JA1204

Richard Donham (8/18/17)

Page 72

```
 1        were before May.
 2  Q.    Before May of what year?
 3  A.    2015.
 4  Q.    So let's go through each -- all three of those
 5        engagement parties.  The first one that you said in
 6        the fall, what year would that have been?
 7  A.    It could have been 2013/2014, but those could be
 8        like school years so . . .
 9  Q.    Was Mr. Billard still working at Charlotte Catholic
10        when --
11  A.    He was.
12  Q.    -- that engagement party occurred?
13  A.    All three of them.
14  Q.    Did anyone who worked at Charlotte Catholic attend
15        any of those engagement parties?
16  A.    Yes.
17  Q.    Who, to the best of your recollection?
18  A.    Tracy, who was the administrator, but I'm not sure
19        of her real title, actually, with a couple of
20        teachers put one together.
21  Q.    Uh-huh.
22  A.    There were a lot of teachers.  Mr. Healy was there
23        at one of them.  I don't know whether he was
24        employed at that time, I think he still was, and
25        his wife was there.  I know Joanie, the English
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 73 of 125
JA1205

Richard Donham (8/18/17)

Page 73

```
 1          teacher, was there.  All of them were put on by
 2          people from school, either teachers or
 3          administrators.  There were two other couples that
 4          were all getting married in 2015 that were also
 5          there so it was a joint big engagement party.
 6     Q.   Which one was a -- were all three joint engagement
 7          parties?
 8     A.   All three.
 9     Q.   Was it the same couples for all three engagement
10          parties?
11     A.   Yes.
12     Q.   Do you --
13     A.   As far as I remember.
14     Q.   Okay.  Do you remember who the other couples were?
15     A.   No.
16     Q.   Were they in any way associated with Charlotte
17          Catholic?
18     A.   I think one of each couple was.
19     Q.   Okay.  And how were they?
20     A.   Teachers.
21     Q.   Which to the best -- which of these three
22          engagement parties that we're discussing here, to
23          the best of your recollection, was Mr. Healy at?
24     A.   I think the first one.  I think it's the one that
25          Judy Wittman, I think that's her name, and she was
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 74 of 125
JA1206

Richard Donham (8/18/17)

 1         the receptionist --
 2    Q.   Uh-huh.
 3    A.   -- did and I think that was the first one.  And
 4         I -- I -- again, I wouldn't swear to the dates.  I
 5         remember the house, I remember pumpkins, I remember
 6         it was a nice house.
 7    Q.   Did you ever -- do you recollect talking about your
 8         relationship with Charlotte Catholic on direct
 9         examination?  Can you answer verbally, please?
10    A.   Can I what?
11    Q.   Let me restate.  Let me strike that.
12             Do you recollect talking about your
13         relationship in association with Charlotte Catholic
14         on direct examination?
15    A.   Yes.
16    Q.   Okay.  Did -- subsequent to serving as a substitute
17         at Charlotte Catholic, did you attend events at
18         Charlotte Catholic?
19    A.   Yes.
20    Q.   Can you tell me to the best of your recollection
21         what events you attended at Charlotte Catholic
22         subsequent to serving as a substitute?
23    A.   Every play and every musical that Mr. Billard did,
24         I was at.  There was a spaghetti dinner that I
25         orchestrated and cooked for as a fund raiser for

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 75 of 125
JA1207

Richard Donham (8/18/17)

Page 75

```
 1          his trip to New York with his students.  Of course
 2          I was there, I did the cooking, and I trained most
 3          of the people that were working.  I had help, thank
 4          God.  It was successful, and I forget who got all
 5          of the food donated, but they donated, brought it
 6          home, and I cooked.  I was there.  So twice a year
 7          I was at -- in the spring was some -- I'm trying to
 8          remember.  In the spring was a musical and in the
 9          fall was the play because he did two a year.
10   Q.     All right.  What were some of the -- do you
11          recollect any of the plays or musicals that you
12          attended?
13   A.     Sure.  I was just thinking of one of the plays
14          because it was on Jeopardy the other day.  The one
15          with Scout.  I can't remember the name of it, a
16          very well-known book.  Musicals, Hello Dolly,
17          Oklahoma.  Geez, there were so many.  Ten years'
18          worth.  I don't -- I don't remember all of their
19          names, but I remember who acted in them, I remember
20          who sang.
21   Q.     Did you -- did you just reference Scout as being
22          one of the characters in one of the plays?
23   A.     Yes.
24   Q.     Might it have been To Kill a Mockingbird?
25   A.     Thank you.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 76 of 125
JA1208

Richard Donham (8/18/17)

Page 76

| | | |
|---|---|---|
| 1 | Q. | Is that right? |
| 2 | A. | Yeah, it is, right. |
| 3 | Q. | Okay. |
| 4 | A. | Yeah, that was on Jeopardy the other day.  I know |
| 5 | | the name of the person. |
| 6 | Q. | It's my mom's favorite book. |
| 7 | A. | Oh, is it? |
| 8 | Q. | Yeah, we used to have a dog name Atticus. |
| 9 | A. | It's one of Mr. Billard's favorite books as well. |
| 10 | Q. | Where did the spaghetti dinner take place? |
| 11 | A. | At the school. |
| 12 | Q. | Okay.  And you were present for that? |
| 13 | A. | Yes. |
| 14 | Q. | Okay.  You referenced the spaghetti dinner being |
| 15 | | for a trip? |
| 16 | A. | Yeah. |
| 17 | Q. | What do you mean by that? |
| 18 | A. | Mr. Billard took his seniors, mostly, there were a |
| 19 | | couple of juniors that he took with him as well, to |
| 20 | | New York City and it was to see things that -- we |
| 21 | | saw The Wicked, we saw the Rockettes at Carnegie |
| 22 | | Hall, we saw different parts -- actually, at one |
| 23 | | point there were three or four of the senior guys |
| 24 | | that wanted to go see Ground Zero so I took them |
| 25 | | down.  We jumped on a subway and went because we |

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 77 of 125
JA1209

Richard Donham (8/18/17)

```
 1           were at Central Park at that point.  We went to the
 2           Empire State Building, which I'd never been to the
 3           top of even though I had been there several times,
 4           or in New York.  So he wanted them to experience
 5           New York City from a theater standpoint and that's
 6           why he took them and I went with them.
 7    Q.     Was -- who was on this trip with Mr. Billard?
 8    A.     Students and parents.
 9    Q.     Okay.  How many students and parents, to the best
10           of your recollection?
11    A.     I'd say roughly 10 to 20 parents and roughly 20 to,
12           maybe, 35 or so students.
13    Q.     You referenced, I think, "Wicked," what's Wicked?
14    A.     You've never heard of Wicked?
15    Q.     Don't -- don't look at me that way.
16    A.     Okay, see Wicked is the predecessor to Wizard of
17           Oz.  It has Idina Menzel who was the wicked witch,
18           who's awesome.  It has Kristin Chenworth --
19           Chenoweth who was the good witch.  And we got to
20           see them, and I don't know whether it's still
21           playing or not, but there's been lots of
22           substitutes after that, as with any Broadway play,
23           but they were both unbelievable, and that's --
24           that's right before Kristin Chenoweth went on West
25           Wing.  She's so small and her voice is just
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 78 of 125
JA1210

Richard Donham (8/18/17)

Page 78

1    unbelievable.

2  Q.  How many students and parents were on this trip?

3  A.  A bunch.  Fifteen to 20 parents.  I mean, there is

4      quite a few, I don't know the exact amount, and

5      roughly 30-plus students.  I mean, we had to divide

6      up into groups to go do things and I usually would

7      take one of the groups --

8  Q.  Uh-huh.

9  A.  -- because I knew New York better than all of

10     them --

11 Q.  Uh-huh.

12 A.  -- and we'd go around and see different stuff.

13 Q.  Okay.  Who did you sit with --

14 A.  Mr. Billard.

15 Q.  -- at Wicked?

16 A.  Mr. Billard.

17 Q.  Did -- when -- did you all go out to dinner during

18     the course of these -- this trip to New York?

19 A.  Yes.

20 Q.  Did you all go out to trip -- to dinner as a group

21     on this trip to New York?

22 A.  A couple of them, yes.

23 Q.  Okay.  Who did you sit with at those dinners?

24 A.  Mr. Billard.

25 Q.  Did -- did everyone from the group go to the Wicked

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 79 of 125
JA1211

Richard Donham (8/18/17)

```
 1        performance?
 2   A.   Yes, as far as I can remember.
 3   Q.   Okay.
 4   A.   That was the major thing that we went for.
 5   Q.   During the course of this trip did you ever speak
 6        with anybody on the trip about Mr. Billard?
 7   A.   Yes, probably the parents.  The students -- his
 8        students absolutely loved him and they were really
 9        a great bunch of people.  I mean, they were
10        interested in, you know, New York City, the play,
11        stuff that went -- one of the guys did lighting and
12        sound for his plays, so if you've never seen
13        Wicked, it's -- it's so huge and the sound system
14        is unbelievable, the lighting is -- and it's really
15        incredible.  So yeah, we talked about all the
16        things, like, Mr. Billard did with them on the
17        plays that he did and musicals he did, and the
18        parents, because the parents loved him.  I mean,
19        they thought he was great and he was a good
20        resource and a good person to represent and teach
21        their children.
22   Q.   How did -- how do you refer to -- how would you
23        refer to Mr. Billard when you would talk to -- to
24        students or parents on this trip?
25   A.   I guess it was who I was talking to.  I mean, there
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 80 of 125
JA1212

Richard Donham (8/18/17)

```
 1        was like Mr. Billard.  One of his students knew his
 2        middle initial, Lonnie H., and he bugged me until I
 3        told him what the H stood for.
 4             I'm not going to tell you.
 5             I would refer to him as my partner.  I mean,
 6        most -- most people when I was talking to about
 7        Mr. Billard, he was my partner.
 8    Q.  How did you all travel up to New York?
 9    A.  Train.
10    Q.  What were the seating arrangements like on the --
11        on the train?
12    A.  I think it was kind of like first come, first
13        served.  I sat next to Mr. Billard not very far
14        from the restroom because it was just close, the
15        back of the train which gets the most jiggling and
16        swaying.  So students, teacher -- I mean students
17        and parents just like were everywhere.
18    Q.  Okay.  Were they -- were any students or parents
19        sitting in the same train compartment as you?
20    A.  Yeah, all of them.
21    Q.  Okay.
22    A.  I think we had two cars.  It could have been three,
23        but I think it was two.
24    Q.  Was -- to the best of your knowledge, was this trip
25        to New York City an -- an official Charlotte
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 81 of 125
JA1213

```
 1        Catholic trip to New York City?
 2   A.   Absolutely.  It had to be approved by them.  In
 3        fact, there was -- at one point it was contentious
 4        of whether they were going to approve it and it was
 5        a big uproar.  I don't know all the details of
 6        that.  But it was, because everyone had to have a
 7        signed-off one of those pieces of paper that says
 8        yes, my student can go, and yes, I'm going to be a
 9        chaperone and parents -- and yes, it was official.
10   Q.   Was anyone at Charlotte Catholic aware that you
11        went on this trip?
12   A.   Yes, everybody.
13   Q.   How -- how do you know that?
14   A.   Because it had to be okayed that I was going.  I
15        think I paid my own way.
16   Q.   How do you know that it had to be okayed that you
17        were going?
18   A.   It was okayed that everybody was going.  I mean,
19        it -- like it all had to be approved.
20   Q.   Okay.  Who within -- who specifically within
21        Charlotte Catholic knew that you were going on this
22        trip, to the best of your knowledge?
23             MR. McDONALD:  Objection.
24             THE WITNESS:  Jerry Healy.  Cissy
25        would have known because she knows everything.
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 82 of 125
JA1214

```
 1            Mr. Carpenter, Dottie Tippett because she was
 2            head of the department, probably Tracy because
 3            she would have done the money stuff.
 4   BY MR. BROOK:
 5   Q.   How -- how do you know Jerry Healy would have known
 6        that you were on this trip?
 7   A.   He's the one that had to sign off on the trip.
 8   Q.   Okay.  He had to sign off on everyone who was
 9        making the trip, to the best of your knowledge?
10   A.   As far as I know, yes.
11   Q.   How was --
12   A.   He's -- he's responsible for all the students,
13        therefore, responsible for the trip and I would
14        assume, I know that's a bad word, but he had to
15        sign off on everybody.
16   Q.   Why do you think Steve Carpenter knew that you were
17        on this trip?
18                    MR. McDONALD:   Objection.
19                    THE WITNESS:   Again, Steve was the
20            assistant principal and he knew everything that
21            was going on.
22   BY MR. BROOK:
23   Q.   When you were a substitute teacher at Charlotte
24        Catholic --
25   A.   Uh-huh.
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 83 of 125
JA1215

Richard Donham (8/18/17)

Page 83

1   Q.   -- did you ever talk to any teachers or
2        administrators about Mr. Billard?
3   A.   Yes.
4   Q.   Do you recollect topics that might have come up in
5        those conversations?
6                    MR. McDONALD:  Objection.
7                    THE WITNESS:  Was that objection?
8                    MR. McDONALD:  Yes.
9                    MR. BROOK:  Yeah.  But you can --
10                   MR. McDONALD:  It's -- I think it's
11          confusing, you've got teachers and
12          administrators.
13                   MR. BROOK:  Sure.  Why don't I -- why
14          don't I bifurcate those two topics so that we
15          can have a clean record.
16   BY MR. BROOK:
17   Q.   When you were serving as substitute, did you ever
18        talk to other teachers about Mr. Billard?
19   A.   Yes.
20   Q.   What topics do you recollect coming up with other
21        teachers pertaining to Mr. Billard?
22   A.   One of the topics that came up was food.  I think I
23        mentioned I was in the restaurant industry for a
24        long time.  I love cooking.  I did the majority of
25        cooking at home and I would make things and he

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 84 of 125
JA1216

Richard Donham (8/18/17)

1      would take in leftovers and the teachers sometimes

2      would go, I want that recipe, and it was like,

3      okay, fine, I'll send it to them.  I make some good

4      food and they would frequently, What did Rich cook

5      last night, and that -- that was a discussion.

6           One of the parties that we went to at Christmas

7      was a Christmas party at Joanie's house and Joanie

8      made an appetizer -- actually it was an antipasto,

9      and I asked her, I says, like, what do you put in

10     that and she told me and then I made one the next

11     year and, of course, being the artistic person,

12     maybe flamboyant, or how about creative, I made

13     that antipasto into flowers, so salami, prosciutto,

14     cheese balls, artichoke hearts, all were -- it was

15     gorgeous, but it was an antipasto.  And Joanie

16     goes, Yeah, you would have to one ups me.  And I

17     was like, Yeah, that's what I do.  So that's --

18     usually about food or about the clothes that I

19     bought him for Christmas.

20          Yeah, this is the shirt that I bought, but he

21     has one that's almost exactly the same that I

22     bought him.  We would talk about the fact that we

23     both shop at Stein Mart and it's amazing that we

24     never got each other the same thing because his

25     tastes are similar to mine, so we would talk about

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 85 of 125
JA1217

Richard Donham (8/18/17)

Page 85

1          clothing.

2     Q.   So you -- you made reference to in the course of

3          that answer, you know, "What did Rich cook last

4          night"?

5     A.   Yes.

6     Q.   Can you give me more context on, like, what that

7          conversation looks like?  Let me be more specific.

8          Who -- who -- do you recollect who might have said

9          that on occasion?

10    A.   Yeah, in the mornings there was a group of teachers

11         that got together, had coffee or whatever,

12         doughnuts or something that they brought in

13         sometimes, so there was Nell Baker, Debbie Tacus,

14         Joanie.  I'm going to have to learn her last name.

15         Steve Carpenter would usually come sliding through

16         and, yes, he would flip everybody off, or at least

17         Lonnie.  He would slide through.  The copier was on

18         the other side of the breakroom that they were at.

19         So he would come through and go to the copier,

20         which was also all the mailboxes that they had, and

21         he would be going there.  It's a thing that he and

22         Lonnie did with each other.  They were good

23         friends.

24    Q.   Uh-huh.

25    A.   But -- and then other -- the PE teacher, Kevin,

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 86 of 125
JA1218

Richard Donham (8/18/17)

Page 86

```
 1          would be there sometimes because they would go to
 2          their mailboxes to get stuff so they would be in
 3          and out.
 4     Q.   Uh-huh.  Do you recollect anybody in particular
 5          asking that who did -- what did Rich cook last
 6          night question?
 7     A.   Nell Baker.
 8     Q.   Okay.
 9     A.   Specific.  She's the one that wanted the recipe for
10          chicken piccata.
11     Q.   Uh-huh.
12     A.   Cissy would ask.  A lot of my stuff has garlic, so
13          when he was heating it up in the microwave, you
14          could smell it, and that's when they would ask, oh.
15     Q.   When who was heating it up?
16     A.   Lonnie.
17     Q.   Okay.  So to be clear here, Lonnie was heating up
18          some leftovers from the night before?
19     A.   Correct.
20     Q.   Okay.  And leftovers that you had cooked from the
21          night before?
22     A.   Yes.
23     Q.   Okay.
24               You referenced Steve Carpenter flipping folks
25          off in the breakfast room --
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 87 of 125
JA1219

Richard Donham (8/18/17)

Page 87

1  A.  Yes.

2  Q.  -- in the morning.  Was he flipping off anybody in

3      particular?

4  A.  Lonnie.

5  Q.  Okay.

6          When you were serving as a substitute --

7  A.  Uh-huh.

8  Q.  -- and you spoke to other -- did you ever have

9      occasion to speak to other teachers about Lonnie?

10 A.  Yeah, usually it was about a play or a musical that

11     was coming up and how was it going and how was he

12     reacting and . . .

13 Q.  How would you refer to Mr. Billard in those

14     conversations with other teachers?

15 A.  A combination of ways.  Sometimes it was

16     Mr. Billard and sometimes it was like Lonnie or my

17     partner.

18 Q.  What did you mean by "my partner"?

19 A.  Domestic partnership.  Do I need to explain that?

20 Q.  Have at it.

21 A.  Two people that are living together that are

22     growing a relationship is a domestic partnership.

23 Q.  Did anybody ever ask you what a domestic

24     partnership was?

25 A.  Not me.

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 88 of 125
JA1220

Richard Donham (8/18/17)

Page 88

```
 1   Q.   Did anybody ask --
 2   A.   Ask Mr. Billard?
 3   Q.   Did anyone ever ask Mr. Billard, to the best of
 4        your recollection?
 5   A.   Oh, thanks.  Here, let me help you out.
 6                  MR. McDONALD:  Objection.
 7   BY MR. BROOK:
 8   Q.   You can answer.
 9   A.   Yes, one of the counselors, and he was not too
10        nice --
11   Q.   Do --
12   A.   -- because as a counselor in a high school and you
13        don't know what a domestic partnership is, you're
14        lacking something.
15   Q.   Do you recollect which counselor that was?
16   A.   It was one of the females.  I -- and I think there
17        were two.  I don't remember who it was at that
18        time.
19   Q.   When you were a substitute, did you ever have --
20        when -- strike that.
21            When you were a substitute at Charlotte
22        Catholic, did you ever have occasion to speak to
23        administrators about Mr. Billard?
24   A.   Steve, Mr. Carpenter, we would talk.  You know, he
25        might say how -- because I told you Lonnie has an
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 89 of 125
JA1221

Richard Donham (8/18/17)

Page 89

1           infection because he can't hear out of one ear, I

2           told you about that.  He would be out and I might

3           be subbing for him and he would say, How's he

4           doing.  Some of the other teachers might ask the

5           same thing, but Steve would, out of concern.  Cissy

6           would ask about, you know, how's he doing, how's he

7           doing with this.  So a -- a couple of the

8           administrators would and some of the teachers

9           already knew or they would ask me.  Sometimes it

10          was on Facebook.

11    Q.    You referenced in your response to that last

12          question subbing for Mr. Billard.  Did -- did you

13          ever sub for Mr. Billard?

14    A.    Yes.

15    Q.    How would you come to sub for Mr. Billard?

16    A.    You mean how they would ask me or how did -- I

17          mean, there's several parts in that.

18    Q.    Why don't you just explain --

19    A.    Okay.

20    Q.    -- how it would come to pass that you would be a

21          substitute at Charlotte Catholic for Mr. Billard.

22    A.    A couple ways.

23               (DISCUSSION HELD OFF THE RECORD)

24                    MR. McDONALD:  Objection.

25                    THE WITNESS:  Mr. Carpenter would call

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 90 of 125
JA1222

Richard Donham (8/18/17)

```
 1              and say, Can you sub for this class.  Yes.  Or
 2              Mr. Billard would say, I'm going to be out, can
 3              you sub for my class, and he would tell
 4              Mr. Carpenter.  It's like, yes.
 5                   Subbing for Mr. Billard was different
 6              than subbing for most of the -- most of the
 7              other teachers because it was like you'd walk
 8              in, here's the lesson plan, here's what I want
 9              you to hand out, here's the movie you're going
10              to watch depending on what class it is, or
11              you're going to be a test monitor.  With
12              Mr. Billard it would usually be, here's the
13              lesson plan, here's what I want you to go over,
14              and here's what I want you to do, because I was
15              usually familiar with what he was teaching and
16              where -- you know, where he was in his theater
17              classes.  In his beginning class, they always
18              had a project that they had to build something
19              and he would let me know where they are and
20              what I needed to do.  So I didn't just pass out
21              things.  It was usually I was helping him teach
22              something.
23  BY MR. BROOK:
24   Q.   I'm -- I'm still a little unclear on how when you
25        subbed for Mr. Billard at Charlotte Catholic that
```

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 91 of 125
JA1223

Richard Donham (8/18/17)

Page 91

1          would sort of procedurally come to pass.  Did
2          you -- in those instances, did you speak to
3          Mr. Carpenter directly?
4     A.   Not always.
5     Q.   All right.
6     A.   Sometimes Mr. Billard would say, Can you sub?  And
7          it's like, yes, I'm not working, I can do that.  He
8          would tell Mr. Carpenter and he would okay it and
9          it's like, Okay, you're subbing for me on Thursday.
10             Sometimes Mr. Carpenter would call me and say,
11         Can you sub on Wednesday for Lonnie's class?  It's
12         like, yes.
13    Q.   So there were some occasions where you would sub
14         for Mr. Billard and you would speak directly to
15         Mr. Carpenter about that?
16    A.   Yes.
17    Q.   There were other occasions where you would sub at
18         Charlotte Catholic for Mr. Billard and that -- and
19         you would never speak to Mr. Carpenter about that?
20    A.   No, I -- I -- at some point I would.  I would have
21         to because I would usually have to get the key for
22         the room, and he okayed it, always, and it just
23         depended on what we were doing.
24    Q.   In -- in those -- who would get the ball rolling in
25         that instance?

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 92 of 125
JA1224

Richard Donham (8/18/17)

Page 92

```
 1                    MR. McDONALD:  Objection.
 2                    THE WITNESS:  Mr. Billard would and
 3            Mr. Carpenter would, depending on the
 4            situation.
 5    BY MR. BROOK:
 6     Q.    Okay.
 7     A.    They both would.  I mean, if Mr. Billard knew he
 8            was going to be out for something and he would ask
 9            me at that point, Can you, because I worked
10            part-time at Home Depot at that time also, and it's
11            like, Yes, I can.  So then he would talk to
12            Mr. Carpenter, get it okayed, and then I would go
13            in.  I always checked in to the office when I went
14            in as a sub, always.
15     Q.    Uh-huh.
16     A.    All subs do.
17     Q.    Were there occasions where you subbed at Charlotte
18            Catholic for Mr. Billard where the first time you
19            talked to Mr. Carpenter about that was when you
20            checked in at the office?
21     A.    Yes.
22     Q.    Okay.  And prior to checking in at the office, that
23            entire conversation about you subbing for
24            Mr. Billard had, in your understanding, transpired
25            between Mr. Billard and Mr. Carpenter?
```

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 93 of 125
JA1225

Richard Donham (8/18/17)

```
 1   A.   Yes.
 2   Q.   After you were -- strike that.
 3             When you were -- strike that.
 4             After you had ceased to substitute at Charlotte
 5        Catholic --
 6   A.   Uh-huh.
 7   Q.   -- did you have occasion to talk about Mr. Billard
 8        with any Charlotte Catholic teachers?
 9   A.   Yes.  After I quit subbing, I still went to all the
10        plays, all the musicals.  I would see them there.
11        I would see Mr. Carpenter there, usually.  I would
12        see Ms. Tippett there, who was his boss.  I would
13        see some of the teachers that I knew or had subbed
14        for.  Sometimes I would ask them about the class.
15        I remember one of the -- I -- I forget her name,
16        but the English teacher that I subbed for and I
17        actually taught something or reviewed something
18        with them and so we had a discussion about that at
19        one of the plays or one of the musicals.  So yeah,
20        I -- I saw them at those events.  You know, The Gin
21        Mill that I told you or referred to, when I went to
22        that party, I saw them there, so -- and I was with
23        Mr. Billard and I knew most of them.
24   Q.   You -- you referenced plays, musicals, the outing
25        to The Gin Mill, did you arrive at those events
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 94 of 125
JA1226

Richard Donham (8/18/17)

Page 94

1    with Mr. Billard?

2    A.   The plays and musicals, not always, because he

3         would stay long after, putting everything up and

4         cleaning them up.  The Gin Mill, yes.

5    Q.   After you were done substituting at Charlotte

6         Catholic, when you're speaking to teachers at

7         Charlotte Catholic about Mr. Billard, how would you

8         refer to Mr. Billard?

9                    MR. McDONALD:  Objection.

10                   THE WITNESS:  Again, it was both, you

11           know, like Mr. Billard or my partner or -- it

12           depends what the conversation was and who it

13           was with.

14   BY MR. BROOK:

15   Q.   And what did you mean by "my partner"?

16   A.   The person that I lived with, my domestic partner,

17        the person that I was in a relationship with.

18   Q.   After you were done substituting at Charlotte

19        Catholic, did you ever have occasion to speak about

20        Mr. Billard with any of the administrators at

21        Charlotte Catholic?

22   A.   The ones I mentioned before, Mr. Carpenter, Tracy,

23        and Cissy, and Mr. Healy at one point before he was

24        no longer there.

25   Q.   All right.  Do you recollect that conversation with

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 95 of 125
JA1227

Richard Donham (8/18/17)

```
 1          Mr. Healy?
 2   A.    Mr. -- specifically, no.  He was probably asking
 3          how Mr. Billard was.
 4   Q.    When you would -- you know, in -- after you were
 5          done substituting when you would speak to Cissy,
 6          Tracy, Mr. Carpenter about Mr. Billard, how would
 7          you refer to him?
 8   A.    Again, it depends on the person.  Tracy was
 9          probably Mr. Billard, Cissy was probably my
10          partner, Mr. Billard, and Steve was probably both.
11   Q.    You recollect referring to Mr. Billard as your
12          partner to Mr. Carpenter?
13   A.    Yeah, and his wife.
14   Q.    Mr. Carpenter's wife?
15   A.    Yeah.  She was the secretary at Holy Trinity.
16   Q.    Do you remember having a previous discussion about
17          interactions between two people that might lead you
18          to believe that they are a couple?
19   A.    Yes, I do.
20   Q.    What sort of interactions might you observe that
21          would lead you to conclude that two people were a
22          couple?
23                    MR. McDONALD:  Objection.
24                    THE WITNESS:  The interpersonal
25              conversation, the way they react to each other,
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 96 of 125
JA1228

Richard Donham (8/18/17)

```
 1              the physical response to each other.  I guess
 2              those three things really basically.  There's
 3              parts of all of -- like if I came to you and
 4              started picking the lint off your thing, it
 5              would be suspect, but it would be nothing for
 6              me to pick the lint off Lonnie's coat if it
 7              needed.
 8                   MR. BROOK:  Court Reporter, could you
 9              read back that answer for me.  My apologies.
10         (PREVIOUS ANSWER READ BACK BY THE REPORTER)
11    BY MR. BROOK:
12    Q.   What do you -- what do you mean by "interpersonal
13         conversation"?
14    A.   What are we going to have for dinner tonight?  Are
15         you cooking or am I?
16    Q.   Would you ever have those sorts of conversations
17         with Mr. Billard in front of Charlotte Catholic
18         teachers?
19    A.   Yes, all the time.
20    Q.   Would you ever have those sorts of conversations
21         with Mr. Billard in front of Charlotte Catholic
22         administrators?
23    A.   Yes.
24    Q.   Which administrators?
25    A.   Steve Carpenter, Cissy.  I mean they -- they all
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 97 of 125
JA1229

Richard Donham (8/18/17)

```
 1        knew that I could cook and what I was doing.
 2        Dottie Tippett -- oh, that was -- she was a
 3        teacher, but she was also his boss.
 4   Q.   You also referenced the way they react to one
 5        another as being, you know, the way you could tell
 6        that someone was a couple.  What do you mean by
 7        that?
 8                  MR. McDONALD:  Objection.
 9                  THE WITNESS:  Touching, the way you
10        touch.  The way you react to someone.  I --
11        sorry, I was thinking about the way I would
12        react to my ex-wife.  You can tell if someone
13        has a relationship with someone.  It doesn't
14        mean that they're in a relationship, but if
15        they have a relationship with someone.  You can
16        sense -- you can see.
17   BY MR. BROOK:
18   Q.   Can you give me an example of that sort of -- of
19        what you're talking about there?
20   A.   Lonnie would say what time are you going home, are
21        you making something for dinner, or I would say
22        what are you making for dinner.  That's not
23        something that you would say to -- I'm not going to
24        tell you that, but I would Lonnie, or someone would
25        say that to their wife or husband, whatever they
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 98 of 125
JA1230

Richard Donham (8/18/17)

```
 1         are.  So the types of conversation and I'm -- I'm,
 2         you know, I'm thinking through all the things like
 3         at work, at Home Depot, what types of conversation
 4         do they have and it's those personal -- those
 5         personal conversations.  It's like no, you don't
 6         get to wear those pants because they look really
 7         bad with that jacket.
 8    Q.   You referenced picking the lint off of someone's
 9         coat as a physical response earlier.  Were you
10         providing that as an example of sort of a physical
11         reaction that you associate with people being a
12         couple?
13    A.   That's one.
14    Q.   Yeah.  What's --
15    A.   Or very friendly or it's like Lonnie might like fix
16         my hair or something and it's like, is it standing
17         straight up today or what or, you know, it's like
18         come up and fix my collar.  That -- those types of
19         things that you can tell.
20    Q.   Did, to the best of your recollection, Mr. Billard
21         ever pick lint off your coat in front of Charlotte
22         Catholic teachers?
23    A.   No, but he might have fixed my collar --
24    Q.   All right.
25    A.   -- because it would be like sticking straight up
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 99 of 125
JA1231

Richard Donham (8/18/17)

1        or --

2   Q.   Okay.

3   A.   -- do something to my hair.

4   Q.   Did he ever fix your collar or your hair in front

5        of a Charlotte Catholic administrator to the best

6        of your recollection?

7                    MR. McDONALD:  Objection.

8                    THE WITNESS:  Probably.  And it's like

9            he didn't care.

10                   MR. BROOK:  Could we go off the record

11           for a moment?

12                   (BRIEF PAUSE)

13                   Those are all the questions that I

14           have.

15                   EXAMINATION

16   BY MR. McDONALD:

17   Q.   I do have -- I do have some follow up based on the

18        questions that your attorney just asked.

19            You mentioned the party at The Gin Mill.  That

20        was a party that was put on for the teachers at

21        Charlotte Catholic?

22   A.   Yes.

23   Q.   Do you recall what year that was?

24   A.   No.

25   Q.   Do you recall who hosted the party?

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 100 of 125
JA1232

Richard Donham (8/18/17)

| | | |
|---|---|---|
| 1 | A. | The high school. |
| 2 | Q. | Do you recall was it at the time when Mr. Healy was |
| 3 | | there or after Mr. Healy was gone? |
| 4 | A. | It was Mr. Healy.  His son, I think, was the |
| 5 | | manager of The Gin Mill at that time. |
| 6 | Q. | Okay. |
| 7 | A. | And it was up on the top floor which is out in the |
| 8 | | open. |
| 9 | Q. | You talked about the three parties that were held |
| 10 | | for you and Lonnie plus other teachers to celebrate |
| 11 | | engagements.  Do you recall that? |
| 12 | A. | Yes. |
| 13 | Q. | I believe you testified that you believe that all |
| 14 | | three, Lonnie was still an employee of Charlotte |
| 15 | | Catholic; is that correct? |
| 16 | A. | Yes. |
| 17 | Q. | Do you recall when Lonnie ceased to be a substitute |
| 18 | | teacher at Charlotte Catholic? |
| 19 | A. | I don't remember the date, I remember the time of |
| 20 | | year. |
| 21 | Q. | What time of year was it? |
| 22 | A. | Christmas. |
| 23 | Q. | Okay.  I believe you testified that two of those |
| 24 | | parties were after Christmas? |
| 25 | A. | This was before.  This was like a year or so |

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 101 of 125
JA1233

Richard Donham (8/18/17)

 1          before.
 2     Q.   When did you get engaged to Mr. Billard?
 3     A.   We didn't have an official date.
 4     Q.   Do you recall when you started telling people you
 5          were engaged?
 6     A.   I never did.
 7     Q.   Do you recall -- do you know whether Lonnie ever
 8          told people that you were engaged?
 9     A.   He did not.
10     Q.   Do you recall Lonnie posting on Facebook that you
11          were engaged?
12     A.   No, he posted on Facebook that we were getting
13          married.
14     Q.   Okay.  So were these engagement parties before --
15          did they occur before Lonnie posted on Facebook
16          that you were getting married?
17     A.   As far as I can remember, yes.
18     Q.   Why would somebody host a party for you to get
19          married if they didn't know you were getting
20          married?
21     A.   It didn't have to be on Facebook to know.
22     Q.   When did you announce -- I'm sorry.  When was the
23          first time that anyone at Charlotte Catholic knew
24          you and Lonnie were getting married?
25                    MR. BROOK:  Objection, calls for

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 102 of 125
JA1234

Richard Donham (8/18/17)

```
 1          speculation.
 2                    THE WITNESS:  I don't know.
 3    BY MR. McDONALD:
 4    Q.   Do you know when Lonnie first started telling
 5         people, other employees at Charlotte Catholic, that
 6         you were going to get married?
 7    A.   I don't.
 8    Q.   Was it before he posted on Facebook that he was
 9         going to make an honest man of you?
10    A.   Can I refuse to answer that?
11                    MR. BROOK:  No, you cannot.
12                    THE WITNESS:  I was always an honest
13           man.
14                    MR. BROOK:  Why don't -- why don't you
15           rephrase the question or restate the question,
16           and you should answer directly the question.
17    BY MR. McDONALD:
18    Q.   Do you recall on October 25th of 2014 that Lonnie
19         posted on Facebook that you and he were going to
20         get married?
21    A.   No.
22    Q.   Are you aware that that happened?
23    A.   I'm aware that he posted it, I am not aware of the
24         date.
25    Q.   Okay.  Prior to him posting, had Lonnie told others
```

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 103 of 125
JA1235

Richard Donham (8/18/17)

1          at Charlotte Catholic that you and he were going to

2          get married?

3   A.   I don't know the truth, I can only say probably.

4   Q.   How far -- how much before that October 24th date

5          do you believe Lonnie would have told others at

6          Charlotte Catholic that you and he were going to

7          get married?

8   A.   Months.

9   Q.   How many months?

10  A.   I -- I don't know.

11  Q.   When did you --

12                  MR. BROOK:  And I'm going to object to

13              this line of questioning because I think it

14              mischaracterizes his prior testimony where he

15              said that he did not know if Mr. Billard had

16              conveyed that they were getting married to

17              anyone else.

18  BY MR. McDONALD:

19  Q.   When did you and Lonnie decide to get married?

20  A.   I don't know the exact time, but it was long before

21          he posted it on Facebook because we had a

22          discussion about the wedding.

23  Q.   How long before?

24  A.   Several months.

25  Q.   Do you recall when -- do you recall when it became

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 104 of 125
JA1236

Richard Donham (8/18/17)

 1      legal in North Carolina for same-sex couples to

 2      marry?

 3  A.   The exact date, I do not.

 4  Q.   Do you recall that it was the summer of 2014?

 5  A.   I do not.

 6  Q.   Would you have had the discussion that you

 7      and -- did you and Lonnie talk about getting

 8      married before it was legal in North Carolina for

 9      same-sex couples to marry?

10  A.   Yes.

11  Q.   Where were you planning to get married?

12  A.   Wherever it was legal.  DC, it was legal in DC.

13  Q.   Do you know whether Lonnie ever told any

14      administrators at Charlotte Catholic that you and

15      he were planning to getting married someplace out

16      of the state of North Carolina where it was legal?

17  A.   I have no idea.

18      (EXHIBIT NUMBER 1 WAS MARKED FOR IDENTIFICATION)

19  BY MR. McDONALD:

20  Q.   Mr. Donham, I'm showing you what's been marked as

21      Exhibit 1, ask you to take a look at it and tell me

22      if you're familiar with it, please.

23              (WITNESS REVIEWS DOCUMENT)

24  A.   Am I familiar with this?

25  Q.   Yeah, do you know what this document is?  Does this

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 105 of 125
JA1237

Richard Donham (8/18/17)

Page 105

1          look familiar to you?

2    A.    No.

3    Q.    Are you a Facebook friend of Lonnie Billard?

4    A.    Yes.

5    Q.    Were you a Facebook friend of Lonnie Billard on

6          October 25th, 2014?

7    A.    Yes.

8    Q.    Do you recall receiving this post from

9          Lonnie Billard on Facebook on October 24th of 2014?

10   A.    I have no idea.

11                  MR. BROOK:  I want to clean the record

12          there.  You accidently said October 24th, 2014.

13                  MR. McDONALD:  I'm sorry.

14                  MR. BROOK:  Just to be clear, it's

15          posted from October 25th.

16                  MR. McDONALD:  Yes.

17   BY MR. McDONALD:

18   Q.    Do you recall seeing a post from Lonnie Billard

19          announcing that he was going to marry you on

20          October 25th, 2014?

21   A.    I do not.

22   Q.    Were you aware that he posted on Facebook that you

23          and he were planning to get married?

24   A.    Yes.

25   Q.    Do you have any reason to believe that Exhibit 1 is

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 106 of 125
JA1238

Richard Donham (8/18/17)

1       not that post?

2    A.   No.

3    Q.   Okay.  And it's your testimony that you and he

4         talked about getting married months before this

5         post, correct?

6    A.   As in any relationship, I think, people talk about

7         getting married, whether it's legal or not, I think

8         they have that conversation, so it's a conversation

9         that we've had several times over the years.

10            I'll help you out.  I have a lot of friends on

11        Facebook.  If I can make it through 20 minutes, I'm

12        lucky.  He can post all kinds of stuff, I do not

13        see it.  It's not that I don't care, it's not that

14        I -- it doesn't come up.  So I know he posted it.

15        Those, I'm guessing, are all the reactions and the

16        comments by people.  I don't read them.  If it's

17        something that really interests me and that would

18        be like, yeah, whatever.  What was important to me

19        at that time is we were planning a wedding.

20   Q.   Okay.  And my question, Mr. Donham, is, trying to

21        understand who knew that you and Lonnie were

22        planning a wedding, and more specifically, who at

23        Charlotte Catholic knew.  So prior to October of

24        2014, do you know whether any teachers at Charlotte

25        Catholic knew that you and Lonnie were planning to

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 107 of 125
JA1239

Richard Donham (8/18/17)

1      get married?
2                      MR. BROOK:  I'm going to object
3              because I think a variant on that question has
4              already been asked and has been answered.
5                      You can go ahead and answer that
6              question.
7                      THE WITNESS:  I don't know.
8   BY MR. McDONALD:
9    Q.   Do you know whether any administrators at Charlotte
10        Catholic knew prior to October 2014 that you and
11        Lonnie were going to get married?
12                     MR. BROOK:  Same objection.  I think
13             that a variant of that question has been asked
14             and answered.
15                     THE WITNESS:  I don't know.  They may
16             or may not have.  When he posted it, obviously
17             everyone that was a friend of his on Facebook
18             knew.
19   BY MR. McDONALD:
20    Q.   Do you --
21    A.   I don't.
22    Q.   -- do you know whether any administrators at
23        Charlotte Catholic are friends with Lonnie on
24        Facebook?
25    A.   I can say only I think but I don't know.  I

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 108 of 125
JA1240

Richard Donham (8/18/17)

1          don't -- he has so many friends on Facebook.  He

2          has people from Missouri that I don't know.  He has

3          relatives that I don't know.  I don't keep track of

4          my own friends on Facebook.

5    Q.    Do you know whether Steve Carpenter is a friend of

6          his on Facebook?

7    A.    I don't know.

8    Q.    Do you know whether Jerry Healy was a friend of his

9          on Facebook?

10   A.    I don't know.

11   Q.    Do you know whether Angela Montague was a friend of

12         his on Facebook?

13   A.    I don't even know who she is.

14   Q.    Do you know whether Randy Belk was a friend of his

15         on Facebook?

16   A.    I don't know.

17   Q.    Do you know whether anyone in -- in the

18         superintendent's office at the Mecklenburg Area

19         Catholic Schools was a friend of his on Facebook?

20   A.    I don't know.

21   Q.    Do you know whether anyone at the Diocese of

22         Charlotte is a friend of his on Facebook?

23   A.    I don't know.

24   Q.    Do you know whether Lonnie spoke with any

25         administrator at Charlotte Catholic about getting

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 109 of 125
JA1241

Richard Donham (8/18/17)

1          married to you at any time?

2    A.    Not -- I don't know.

3    Q.    Do you know whether Lonnie spoke to anyone within

4          the Diocese of Charlotte, in the administration of

5          Diocese of Charlotte, that he and you planned to

6          get married?

7    A.    I have no idea.

8    Q.    With respect to the -- the parties, so I'm trying

9          to understand these three engagement parties, and

10         it's your testimony that the winter and spring

11         party occurred before the -- this October 2014

12         announcement?

13   A.    I don't know whether it was before.  I just know

14         the time of year, I don't know what year.

15   Q.    Okay.

16   A.    I just remember the weather outside.

17   Q.    Okay.

18   A.    I remember pumpkins at one point.  I'm guessing

19         that was somewhere around Halloween, Thanksgiving.

20   Q.    Let me ask this then.  Is it possible that those

21         pumpkins were in 2013, a year before Mr. Billard

22         posted this?

23   A.    No.

24   Q.    Okay.  So is it safe to assume that the party where

25         you remember pumpkins would have been in the fall

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 110 of 125
JA1242

Richard Donham (8/18/17)

```
 1          of 2014?
 2    A.    It's possible.
 3    Q.    Is there any other time it could have possibly
 4          been?
 5    A.    I don't -- I -- really, I don't know.  I don't -- I
 6          could go back and check, but I do not remember
 7          those dates.
 8    Q.    And with respect to the engagement party that
 9          occurred in the winter, do you recall how far in
10          advance of your actual wedding in May that party
11          occurred?
12    A.    I do not recall.
13    Q.    Was it more than a year before your wedding?
14    A.    No.
15    Q.    So is it, then, fair to assume that the winter
16          we're referring to would have been the winter of
17          2014/2015?
18    A.    That's probably a fair assumption.
19    Q.    Okay.  And the engagement party that occurred in
20          the spring, was that the spring just before your
21          wedding?
22    A.    I would think so.
23    Q.    Okay.  Do you recall when Jerry Healy was
24          terminated from Charlotte Catholic?
25    A.    I do not.
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 111 of 125
JA1243

Richard Donham (8/18/17)

Page 111

```
 1   Q.   Do you recall an incident that occurred with Sister
 2        Jean --
 3   A.   I --
 4   Q.   -- or Sister Jane, excuse me, Jane Dominic?
 5   A.   -- I have -- I don't even know her.
 6   Q.   I -- I didn't ask if you know her, but do you
 7        recall an incident that occurred at Charlotte
 8        Catholic involving a Sister Jane Dominic?
 9   A.   No.
10   Q.   Okay.  Do you -- do you know why Mr. Healy was
11        terminated from Charlotte Catholic?
12   A.   I do not.
13   Q.   Do you know who Kirk Telford is?
14   A.   I do not.
15   Q.   Do you know who the principal was at the time that
16        Lonnie was -- Lonnie's employment as a substitute
17        ended?
18   A.   I do not.
19   Q.   You testified that -- that all three parties
20        occurred when Lonnie was still a substitute
21        teacher; is that correct?
22   A.   As -- that is correct as far as I can remember
23        because he checked with people at work if I was
24        available.
25   Q.   I'm sorry, he -- I don't understand that.
```

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 112 of 125
JA1244

Richard Donham (8/18/17)

Page 112

| | | |
|---|---|---|
| 1 | A. | He checked with like Tracy to see, because they |
| 2 | | were doing a joint party, if I was available on a |
| 3 | | specific date because of my schedule. |
| 4 | Q. | And I'm just confused.  Why would he check with |
| 5 | | Tracy to see if you're available? |
| 6 | A. | He checked with me.  Tracy gave him a date -- |
| 7 | Q. | Okay. |
| 8 | A. | -- for a possible engagement party.  He checked |
| 9 | | with me to see if I was available on that date. |
| 10 | Q. | And do you recall that occurring with all three |
| 11 | | parties? |
| 12 | A. | I do. |
| 13 | Q. | Okay.  Do you recall that -- that Lonnie's |
| 14 | | employment as a substitute ended in December of |
| 15 | | 2014? |
| 16 | A. | Yes. |
| 17 | Q. | How did you learn that? |
| 18 | A. | I was at a Christmas party with him at Joanie's, |
| 19 | | and Joanie -- he asked Joanie if he was going to be |
| 20 | | subbing for her because she was going to Saint |
| 21 | | Martin's and they were talking about that and what |
| 22 | | she was covering in class so he could take over, |
| 23 | | and Joanie says, You need to talk to Mr. Carpenter. |
| 24 | Q. | Did Joanie tell him why he needed to talk to |
| 25 | | Mr. Carpenter? |

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 113 of 125
JA1245

Richard Donham (8/18/17)

1  A.   I didn't hear the conversation, but yes, because he

2       was upset.

3  Q.   Why was he upset?

4  A.   Because he wasn't going to be subbing, because he

5       was going to be terminated.

6  Q.   And do you know why he was going to be terminated?

7  A.   Because of that.

8  Q.   I'm sorry, what is "that"?

9  A.   When he posted it on Facebook.

10 Q.   Posted what?  You can't point.  The court

11      reporter --

12 A.   Yes, I can.

13 Q.   -- needs to take down what you're referring to.

14 A.   When he posted that we were getting married on

15      Facebook.

16   (EXHIBIT NUMBER 2 WAS MARKED FOR IDENTIFICATION)

17 BY MR. McDONALD:

18 Q.   Okay.  Mr. Donham, I'm showing you what's been

19      marked as Defense Exhibit 2 and ask you to take a

20      moment and just read the -- read the top portion.

21 A.   It should be at Charlotte Catholic.

22            (WITNESS REVIEWS DOCUMENT)

23       Okay.

24 Q.   Mr. Donham, I'm going to -- I'm going to -- this --

25      this is a document that was produced by Lonnie in

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 114 of 125
JA1246

Richard Donham (8/18/17)

Page 114

1      this litigation and it's been represented that this

2      was a Facebook post that he made on December 29th,

3      2014.  Do you have any reason to dispute that?

4  A.  No, I do not.

5  Q.  Were you -- you've had a chance to read the top

6      paragraph --

7  A.  Yes, I have.

8  Q.  -- of Exhibit 2.

9          Is it accurate to what you recall occurring

10     at -- at that time?

11 A.  I remember this one.

12 Q.  Okay.  You remember this Facebook post?

13 A.  Yes.

14 Q.  Do you know whether this Facebook post was sent --

15     was received by any administrators at Charlotte

16     Catholic?

17 A.  I have no idea.

18 Q.  Or administrators or personnel at the Diocese's

19     offices?

20 A.  I have no idea.

21 Q.  Okay.

22         Mr. Donham, you testified that you attended

23     school events with Lonnie --

24 A.  Yes.

25 Q.  -- events at Charlotte Catholic High School.  And

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 115 of 125
JA1247

Richard Donham (8/18/17)

```
 1          you talked about the plays and musicals.
 2     A.   Yes.
 3     Q.   And the one teacher party at The Gin Mill?
 4     A.   Yes.
 5     Q.   Were there any other events that you recall
 6          attending?  I'm sorry, the spaghetti dinner as
 7          well.  Anything other than those events?
 8     A.   Not that I recall.
 9               MR. BROOK:  I object as I don't think
10          it accurately characterizes previous testimony.
11               MR. McDONALD:  Okay.
12   BY MR. McDONALD:
13     Q.   Other than plays and musicals, the one party, and
14          the spaghetti dinner, did you attend any other
15          functions with Lonnie at Charlotte Catholic High
16          School?
17     A.   "Functions"?
18     Q.   Yes.  Functions, events?
19     A.   I don't remember.
20     Q.   When -- when -- with respect to the plays and
21          musicals, my understanding is that they would run
22          on multiple days or nights.
23     A.   Yes.
24     Q.   Is that true?
25               Would you attend each performance --
```

Lowrance Reporting Service, Inc.
704-543-7995      www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 116 of 125
JA1248

Richard Donham (8/18/17)

1   A.   No.

2   Q.   -- or just one?

3   A.   Just one.

4   Q.   Okay.  Do you know how many -- how many days or

5        nights on average the plays or musicals would run?

6   A.   Three.

7   Q.   And you would only attend usually one of those

8        nights?

9   A.   Yes.

10  Q.   Okay.  And you testified that you would see

11       teachers at -- when -- at these events, plays, or

12       musicals when you would attend?

13  A.   Yes.

14  Q.   And I think you testified that you saw Steve

15       Carpenter on at -- on at least one occasion?

16  A.   Yes.

17  Q.   Did you see any other administrators when you

18       attended the plays and musicals?

19  A.   I remember seeing Mr. Healy once for a very short

20       amount of time.  The other ones, teachers, yes, but

21       administrators, no.

22  Q.   Okay.  Did you see any administrator when you

23       attended the spaghetti dinner?

24  A.   I don't remember.

25  Q.   Other than seeing Mr. Healy which -- at The Gin

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 117 of 125
JA1249

Richard Donham (8/18/17)

Page 117

1          Mill, did you see any other administrators at The
2          Gin Mill?
3      A.  I remember Cissy, I think Tracy was there.  It was
4          mostly teachers.  I don't remember everybody.  It
5          was a lot of people.
6      Q.  Okay.  Do you know what Cissy, and when we say
7          Cissy, it's Cissy Bevengton, correct?
8      A.  Yes.
9      Q.  Do you remember what Cissy Bevengton's job was at
10         Charlotte Catholic?
11     A.  From my understanding she was Jerry's secretary.
12     Q.  And you mentioned Tracy, which is Tracy Tolbert,
13         correct?
14     A.  Yes.
15     Q.  Do you know what Tracy Tolbert's position was at
16         Charlotte Catholic?
17     A.  She was the comptroller, I'm not sure exactly what
18         her title was, but the person that handled money.
19     Q.  Okay.  Were there any administrators that attended
20         the New York City trip you testified to?
21     A.  Not that I remember.
22     Q.  And you testified that the administration knew you
23         attended the trip with Lonnie, correct?
24     A.  Yes.
25     Q.  And you said -- I think your testimony was that

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 118 of 125
JA1250

Richard Donham (8/18/17)

1    Steve -- I'm sorry, Jerry Healy is the one that

2    knew, correct?

3  A.  Yes.

4  Q.  How -- how is it that you believe Jerry Healy knew

5    you attended the trip with Lonnie?

6  A.  I believe there was a list of everyone that was

7    going that he had to sign off on.

8  Q.  Okay.

9  A.  My name would have been with Lonnie's.

10  Q.  Okay.  Do you know whether Jerry Healy knew that

11    you were -- strike that.

12    Did you share a room with Lonnie on the New

13    York City trip?

14  A.  Yes.

15  Q.  Do you know whether Jerry Healy knew that you and

16    Lonnie shared a room on the New York City trip?

17  A.  I have no idea.

18  Q.  Do you recall what year that trip was?

19  A.  I do not.

20  Q.  Do you recall whether it was before Lonnie retired

21    as a full-time teacher?

22  A.  He was a full-time teacher then.

23  Q.  Okay.  So it would have been before 2012 when he

24    retired as a full-time teacher, correct?

25  A.  Yes.

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 119 of 125
JA1251

Richard Donham (8/18/17)

```
 1   Q.   Okay.  Mr. Donham, during the questioning by your
 2        lawyer, you -- you spoke at some length about how
 3        you would refer to Lonnie when speaking with others
 4        at Charlotte Catholic.  Do you recall that
 5        testimony?
 6   A.   I do.
 7   Q.   And sometimes you said it would -- you would refer
 8        to him as Mr. Billard, I think sometimes it was
 9        Lonnie, and sometimes you said my partner?
10   A.   Yes.
11   Q.   Okay.  When you -- do you recall who specifically
12        you referred to Lonnie as your partner?  Let -- let
13        me rephrase that, that's a bad question.
14            Do you recall who you were speaking to the
15        times you referred to Lonnie as your partner?
16   A.   I do not.
17   Q.   You also testified about how you can tell whether
18        someone is a couple, correct?
19   A.   Correct.
20   Q.   Okay.  And you talked about how they interact,
21        their interpersonal relationship, and their
22        communication, correct?
23   A.   Correct.
24   Q.   And from those observations, you said that people
25        can tell -- or you said you can tell whether
```

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK   Document 31-19   Filed 09/21/17   Page 120 of 125
JA1252

Richard Donham (8/18/17)

Page 120

1              someone was a couple or not?

2    A.   Sometimes.

3    Q.   Okay.  Can you tell whether that couple is sexually

4         active together from those observations?

5    A.   I couldn't answer that ever.

6    Q.   Okay.  The fact that two men live together, does

7         that necessarily mean that they're sexually active

8         together?

9    A.   No.

10   Q.   The fact that two men who live together may ask

11        who's cooking dinner, does that indicate whether

12        they're sexually active together?

13   A.   No.

14   Q.   In your experience, is it possible for two men to

15        live together as roommates and not be sexually

16        active together?

17   A.   Yes.

18   Q.   You were asked a question by your attorney about

19        conversations you had with different administrators

20        about Lonnie and you -- you mentioned Steve

21        Carpenter as someone that you had talked to

22        Lonnie -- I'm sorry.  You mentioned that you talked

23        with Steve Carpenter about Lonnie at various times;

24        is that correct?

25              Did you ever talk to Steve Carpenter about the

Lowrance Reporting Service, Inc.
704-543-7995     www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 121 of 125
JA1253

Richard Donham (8/18/17)

1       fact that you and Lonnie were in a romantic, sexual

2       relationship?

3   A.    No.

4   Q.    Did you ever speak with any administrator at

5       Charlotte Catholic that you and Lonnie were in a

6       romantic, sexual relationship?

7   A.    No.

8   Q.    Did you ever speak with anyone at the Diocese of

9       Charlotte that you and Lonnie were in a romantic,

10      sexual relationship?

11  A.    No.

12            MR. McDONALD:  I don't have anything

13      further.

14            MR. BROOK:  Can we have two seconds to

15      just confer on a couple things?

16            MR. McDONALD:  Only two seconds.

17      (DISCUSSION HELD OFF THE RECORD)

18            MR. BROOK:  No further questions from

19      us.

20            MR. McDONALD:  And no further

21      questions.

22            (WHEREUPON, the foregoing deposition

23      concluded at 12:44 P.M. on August 18th, 2017.

24      Reading and signing were reserved.)

25             *    *    *    *

Lowrance Reporting Service, Inc.
704-543-7995    www.lowrancereporting.com
Case 3:17-cv-00011-MOC-DCK  Document 31-19  Filed 09/21/17  Page 122 of 125
JA1254

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

**Civil Action No. 3:17-cv-0011**

**LONNIE BILLARD,**

      **Plaintiff,**

**v.**

**CHARLOTTE CATHOLIC HIGH SCHOOL, MECKLENBURG AREA CATHOLIC SCHOOLS, and ROMAN CATHOLIC DIOCESE OF CHARLOTTE,**

      **Defendants.**

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

Exhibit 9
Deposition of Bishop Peter J Jugis
30 (b)(6)

                IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                        CHARLOTTE DIVISION
                Civil Action No. 3:17-cv-0011


LONNIE BILLARD,                     )
                                    )
          Plaintiff,                )
                                    )
vs.                                 )
                                    )
CHARLOTTE CATHOLIC HIGH SCHOOL,     )
MECKLENBURG AREA CATHOLIC           )
SCHOOLS, and ROMAN CATHOLIC         )
DIOCESE OF CHARLOTTE,               )
                                    )
          Defendants.               )
_____)


                            Monday, August 14, 2017
                            Charlotte, North Carolina


     Rule 30(b)(6) Deposition of CHARLOTTE CATHOLIC HIGH
SCHOOL, MECKLENBURG AREA CATHOLIC SCHOOLS, AND ROMAN
CATHOLIC DIOCESE OF CHARLOTTE, by and through their
designee, BISHOP PETER J. JUGIS, a witness herein,
called for examination by counsel for Plaintiff in the
above-entitled matter, pursuant to notice, before
Dayna H. Lowe, Court Reporter and Notary Public in and
for the State of North Carolina, at McGuireWoods, LLP,
201 North Tryon Street, Suite 3000, Charlotte, North
Carolina, commencing at the hour of 9:17 a.m.

```
 1    APPEARANCES:

 2

 3         On behalf of the Plaintiff:

 4              JOSHUA A. BLOCK, ESQUIRE
                American Civil Liberties Union Foundation

 5              125 Broad Street, 18th Floor
                New York, New York 10004

 6

 7         On behalf of the Defendants:

 8              JOSHUA D. DAVEY, ESQUIRE
                McGuireWoods, LLP

 9              201 North Tryon Street, Suite 3000
                Charlotte, North Carolina 28202

10

11

12

13                        *   *   *

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1                    C O N T E N T S
 2
 3   Examination by Mr. Block:                        4
 4
 5
 6                    E X H I B I T S
 7                     [30(b)(6)]
 8   Plaintiff's 1   Diocese of Charlotte web page    6
 9   Plaintiff's 2   Administrative, Canonical &
                     Support Services web page        8
10
     Plaintiff's 3   Schools Office web page          12
11
     Plaintiff's 4   Personnel Policies Handbook      14
12
     Plaintiff's 5   Defendants' First Int. Responses 16
13
     Plaintiff's 6   Catechism, Part Two             25
14
     Plaintiff's 7   Catechism, Part Three           26
15
     Plaintiff's 8   Catechism, Part One             33
16
     Plaintiff's 9   Lay Catholics in Schools        39
17
     Plaintiff's 10  Educating Today and Tomorrow     42
18
     Plaintiff's 11  Educating Together in Catholic
19                   Schools                         43
20   Plaintiff's 12  Review Notes, Aug 18-20, 2010    47
21
22        (Exhibits provided with the transcript.)
23
24
25                      *   *   *
```

Page 4

1              P R O C E E D I N G S

2    Whereupon,

3                   BISHOP PETER J. JUGIS

4    was called as a witness and, having first been duly

5    sworn, was examined and testified as follows:

6                        EXAMINATION

7         BY MR. BLOCK:

8         Q.    Good morning, Bishop.

9         A.    Good morning.

10        Q.    Have you ever been deposed before?

11        A.    No.

12        Q.    So first time for everything.  My name is Josh

13   Block.  I'm Mr. Billard's attorney, and I'll be

14   conducting the deposition today, so just a couple ground

15   rules that I say at the beginning of every deposition.

16        The first is the court reporter is writing

17   down everything we say, so it's really important to give

18   a verbal answer.  Instead of a nod, use a word that she

19   can write down.

20        The second is she can't write down what both

21   of us are saying at the same time, so it's important to

22   wait for me to finish my question before you answer.

23        A.    Uh-huh.

24        Q.    And then the third is it's my job to be asking

25   you questions that you can understand and answer in the

Page 5

1  best way possible, so if there's something I've said

2  that's confusing or inexact, please let me know so I can

3  rephrase it.  I don't want there to be any confusion,

4  you know, about what I was asking.  It's my job to ask

5  the questions clearly.

6      A.   Uh-huh.

7      Q.   Okay.  Are you ready to begin?

8      A.   Yes.

9      Q.   So the easy question first.  Could you please

10  state your name and your position?

11      A.   Bishop Peter Jugis, bishop of the Diocese of

12  Charlotte.

13      Q.   And how long have you been bishop of the

14  Diocese?

15      A.   Since October of 2003.

16      Q.   And did you have a position at the Diocese

17  before that time?

18      A.   Yes.

19      Q.   What position was that?

20      A.   I've been -- well, I was ordained a priest in

21  1983, so I've been pastor and parochial vicar in many

22  different parishes and in addition was a judicial vicar

23  for the Diocese.

24      Q.   And in the Charlotte Diocese the whole time?

25      A.   Yes.

Page 6

1    Q.   Okay.  So I have a couple questions just about

2    the organization of the Diocese and its affiliated

3    entities, so let me actually -- I printed out some

4    charts from the website of the Diocese.

5           MR. BLOCK:  If you could mark this as

6    Exhibit 1.

7           (Exhibit 1 was marked for identification.)

8           BY MR. BLOCK:

9    Q.   So she'll put on a sticker and hand it to you,

10   and this is just for ease of guiding the discussion.  I

11   believe that is the home page of the website.  Is that

12   correct?

13   A.   Yes.

14   Q.   Okay.  So do you know how many employees the

15   Diocese has, both at the Diocese itself and each of its

16   affiliated entities?

17   A.   No.

18   Q.   Do you have like a rough guess?  Would it be

19   in the hundreds?

20   A.   Oh, my.  Thousands.

21   Q.   Thousands?  Okay.  And I just want to walk

22   through the various entities that exist.  So within

23   these four boxes I see on the left there's -- the second

24   box down is Catholic Charities.  Is that right?

25   A.   Yes.

Page 7

```
 1        Q.    And about how big is Catholic Charities of the
 2   Diocese?
 3        A.    It's a significant organization.
 4        Q.    And are there people who work at Catholic
 5   Charities that are not -- who are lay Catholics?
 6        A.    Yes.
 7        Q.    Is that the right term?
 8        A.    Yes.
 9        Q.    And are there people who work at Catholic
10   Charities who are not Catholic at all?
11        A.    Yes.
12        Q.    And are there people who work at Catholic
13   Charities that just spend their time -- well, I guess I
14   want to just go -- let me withdraw that question.
15              Are there people who work at Catholic
16   Charities who are secretaries?
17        A.    Yes.
18        Q.    Are there people who work in an IT department?
19        A.    With the Diocese of Charlotte, yes, we have an
20   IT department.
21        Q.    Okay.  Are there people who work there that
22   don't interact with the public that they're serving but
23   just are based in an office?
24              MR. DAVEY:  Objection to the form.
25              BY MR. BLOCK:
```

 1      Q.   So I'd like to know whether or not -- well,

 2   let me -- I imagine at Catholic Charities there are

 3   people who speak with prospective adoptive couples and

 4   interface with the public.  Is that right?

 5      A.   Yes.

 6      Q.   Are there people who work there that don't

 7   have interaction with the public?

 8           MR. DAVEY:  Objection to the form.

 9           BY MR. BLOCK:

10      Q.   If you understand, you can answer.

11      A.   No.

12           MR. BLOCK:  Okay.  I'm just going to go to the

13   next -- another printout from the page.  Can you mark

14   this as Exhibit 2?

15           (Exhibit 2 was marked for identification.)

16           BY MR. BLOCK:

17      Q.   And this was what came up when I clicked on

18   Administrative, Canonical & Support Services.  Does this

19   look familiar to you as the web page for that?

20      A.   Yes.

21      Q.   I just want to talk briefly about some of the

22   different entities listed here.  What's Catholic News

23   Herald?

24      A.   That is our diocesan newspaper.

25      Q.   And are there people at Catholic News Herald

1  who are lay Catholics?

2      A.   Yes.

3      Q.   Are there employees there who are not

4  Catholic?

5      A.   No.

6      Q.   Next, housing.  What does housing refer to?

7      A.   That is our Catholic Diocese of Charlotte

8  housing corporation.

9      Q.   And what does that do?

10      A.   It is responsible for running the three

11  housing operations that we have currently in Mooresville

12  and Salisbury and Charlotte and looking into the

13  possibility of more -- building more housing.

14      Q.   And the people who run those -- can you say

15  again the phrase you used?  That they run your housing

16  what?  Corporations or projects?

17          MR. DAVEY:  Objection to the form.

18          BY MR. BLOCK:

19      Q.   What's the correct word?  If you could just

20  tell me again.

21      A.   Say the question again.

22      Q.   Yeah.  So you said -- well, you mentioned

23  three locations --

24      A.   Uh-huh.

25      Q.   -- and then you used a noun to describe them.

 1  Did you describe them as corporations?  What did you

 2  describe them as?

 3         MR. DAVEY:  Objection to the form.

 4      A.   Entities.

 5         BY MR. BLOCK:

 6      Q.   Entities.  Okay.  It's always tricky.  I don't

 7  want to put words in your mouth, but I don't always

 8  remember the exact words you've said, and it's obviously

 9  Mr. Davey's job to make sure I'm not attributing

10  something to you that you didn't say.

11         So the people who work at those entities, what

12  sort of jobs do they do?

13      A.   There would be a director of the house.

14  Beyond that I do not know.

15      Q.   Do you know whether the people who work at

16  those entities are involved in religious worship at all?

17      A.   I don't think so.

18      Q.   And do you know whether the day-to-day

19  management of buildings at those entities is done by

20  employees of the Diocese?

21      A.   I don't know.  I don't know whether they are

22  employees or not.

23      Q.   Do you know whether someone can be a lay

24  Catholic and work at the housing entities?

25      A.   Yes.

Page 11

```
 1        Q.    Do you know whether someone can be not
 2   Catholic and work at the housing entities?
 3        A.    Yes.
 4        Q.    The next thing below housing is information
 5   technology, and I think you alluded to that earlier.
 6        A.    Uh-huh.
 7        Q.    About how many people work in information
 8   technology for the Diocese?
 9        A.    About five.
10        Q.    And can you be a lay Catholic and work in IT?
11        A.    Yes.
12        Q.    And can you be not Catholic and work in IT?
13        A.    Yes.
14        Q.    And the last of these -- is there any other
15   box on this page that would represent an entity with its
16   own employees?
17        A.    Conference and retreat centers.
18        Q.    What employees would work at conference and
19   retreat centers?
20        A.    A secretary, director, maintenance, food
21   service.
22        Q.    And can you be a lay Catholic and work there?
23        A.    Yes.
24        Q.    And can you be non-Catholic and work there?
25        A.    Yes.
```

1    Q.    This is the last organization chart I have for

2  you.

3          (Exhibit 3 was marked for identification.)

4          BY MR. BLOCK:

5    Q.    Is this the Diocese website for schools

6  office?

7    A.    Yes.

8    Q.    And I see there are -- there's a big, black

9  box, and then there's smaller boxes in columns, and

10 which one is on the left?  What does it say there?

11   A.    Mecklenburg Area Catholic Schools.

12   Q.    And it says in the box that that includes nine

13 schools.  Is that the correct number?

14   A.    Yes.

15   Q.    And then on the box to the right it says

16 diocesan and parish-based schools.  Do you see that?

17   A.    Yes.

18   Q.    So are these schools that are affiliated with

19 the Diocese but separate from Mecklenburg Area Catholic

20 Schools?

21   A.    Yes.

22   Q.    So they are the diocesan schools that are not

23 in the Mecklenburg area.  Would that be fair to say?

24   A.    Yes.

25   Q.    And so I see there it says this includes nine

1    schools.  Is that still the correct number?

2        A.    Yes.

3        Q.    So the total, then, if there are nine at

4    Mecklenburg and nine at diocesan and parish-based

5    schools, would be 18.  Is that right?

6        A.    Yes.

7        Q.    Okay.  And actually on this website, I see two

8    boxes down from Mecklenburg Area Catholic Schools it

9    says Catholic schools office staff.  Do you see that?

10        A.    Uh-huh.

11        Q.    Do you know approximately how many people work

12    at Catholic schools office staff?

13        A.    I do not.

14        Q.    Do you know whether they can be lay Catholics

15    and work there?

16            MR. DAVEY:  Objection to the form.

17            BY MR. BLOCK:

18        Q.    Okay.  Can you work there if you're a lay

19    Catholic?

20            MR. DAVEY:  Objection to the form.  I'm not

21    sure what you mean by -- work where?

22            BY MR. BLOCK:

23        Q.    Can you work in the Catholic schools office

24    staff?

25            MR. DAVEY:  Objection to the form.  I don't

1    think there's been any testimony that that is an

2    employer, but if you understand the question, Bishop,

3    you may answer.

4         A.    Catholic schools office staff.

5               BY MR. BLOCK:

6         Q.    Is the schools office part of the Diocese?

7         A.    Yes.  I believe that refers to the central

8    schools office, not to the schools office that would be

9    in each individual school.

10        Q.    And with respect to the central schools

11   office, do you know how many people work there?

12        A.    No.

13        Q.    And do people who work in the central schools

14   office -- can they be a lay Catholic?

15        A.    Yes.

16        Q.    And can they be non-Catholic?

17        A.    Yes.

18              MR. BLOCK:  Okay.  I think we're done with

19   that part of the deposition, so if we could mark this as

20   Exhibit 4.

21              (Exhibit 4 was marked for identification.)

22              BY MR. BLOCK:

23        Q.    Do you recognize this document?

24        A.    Yes.

25        Q.    What is it?

Page 15

 1          A.    Diocese of Charlotte Personnel Policies

 2    Handbook.

 3          Q.    And has it changed since the revision date of

 4    July 1st, 2009?

 5          A.    No.

 6          Q.    So even though this is a big document, I just

 7    want to direct your attention to -- it's marked as

 8    page 1.  It's Billard RFP 00058.  Do you see that?

 9          A.    Yes.

10          Q.    Okay.  If you'll look to the second-to-last

11    paragraph, the one that begins "As employees."  I'll

12    just read it so it's in the transcript, and you can read

13    along.  "As employees of the Diocese of Charlotte, we

14    share in the mission which Christ entrusted to the

15    Church, to spread the Gospel, to serve our brothers and

16    sisters, and to build up the Body of Christ, which is

17    the Church.  All of our employees must respect,

18    appreciate, and uphold the teachings, principles,

19    legislation, policies and traditions of the Roman

20    Catholic Church in both word and example."

21                Did I read that right?

22          A.    Yes.

23          Q.    Does this -- is it okay if I refer to this as

24    a policy, just so I don't have to repeat it every time?

25          A.    Okay.

JA1270

1    Q.   So when I say "this policy," it refers to that

2    paragraph.  Does this policy apply to all of the types

3    of employees we were discussing a moment ago when we

4    were looking at the printouts of the Diocese web page?

5    A.   Yes.

6         MR. DAVEY:  Objection to the form.

7         BY MR. BLOCK:

8    Q.   So is there -- and this policy applies even if

9    an employee is not Catholic, is that right?

10   A.   Yes.

11   Q.   So why does the Diocese apply this policy to

12   employees who are not Catholic?

13   A.   An employee who is not Catholic, by applying

14   and wanting to work with the Catholic Diocese of

15   Charlotte, is agreeing to be a part of our mission, and

16   it is their choice to share in our mission.

17   Q.   So to be a little more precise, I wanted -- I

18   want to see -- let me make sure.  Here, I'm actually

19   going to ask you to hold two documents at the same time,

20   if this doesn't get too complicated.

21        MR. BLOCK:  I think this is Exhibit 6.

22   Exhibit 5.

23        (Exhibit 5 was marked for identification)

24        MR. DAVEY:  This is 5, right?

25        MR. BLOCK:  Yes.

 1          BY MR. BLOCK:

 2          Q.    So this document is marked Defendants'

 3     Responses to Plaintiff's First Set of Interrogatories.

 4     Have you seen this document before?

 5          A.    Yes.

 6          Q.    If you could turn to page 2.  Before we get to

 7     interrogatory number 2, there's a one-sentence paragraph

 8     and then a slightly bigger paragraph and then a slightly

 9     bigger paragraph above that, and my question is about

10     the last sentence of that paragraph that's three from

11     the bottom that beginnings "Accordingly."  Do you see

12     that sentence?

13          A.    Uh-huh.

14          Q.    And that sentence says, "Accordingly, teachers

15     may not publicly engage in conduct or publicly advocate

16     for positions opposed to the fundamental moral tenets of

17     the Roman Catholic faith, including those concerning

18     marriage."  So my question is does this sentence in the

19     interrogatories -- does that -- is there any difference

20     between that policy in the interrogatories and the

21     policy that we looked at in the Diocese handbook?

22          A.    No.

23          Q.    So they're both -- okay.  So why does the

24     Diocese want employees who are not Catholic to not

25     engage in conduct or publicly advocate for positions

Page 18

1    opposed to the fundamental moral tenets of the Catholic

2    faith?

3         A.    Such conduct or public advocacy for those

4    positions would undermine the mission of the church.

5         Q.    And how would it undermine the mission?

6         A.    It would send a contradictory message.

7    Period.

8         Q.    Who would it send a contradictory message to?

9         A.    To the public at large.

10        Q.    And what would that -- how would it send a

11   contradictory message to the public at large?

12        A.    There would be scandal in which innocent

13   persons, becoming aware of the contradictory message,

14   would wonder why no official response is coming from

15   someone in authority to respond to the contradictory

16   message that's coming out from the organization.

17        Q.    Now, employees have to adhere to the policy

18   even if they spend all their time in a back office, is

19   that correct?

20        A.    Yes.

21        Q.    So why does the Diocese want employees to

22   adhere to the policy if they're not actually interacting

23   with the public at large?

24        A.    Well, if there is conduct or public advocacy,

25   that's public, and the public at large is aware of it.

```
1        Q.    So if someone -- if someone were to have an
2    affair outside of marriage, and their supervisor found
3    out, but they weren't otherwise public about it, would
4    they be in violation of this policy?
5        A.    Yes.
6        Q.    Why is that?
7        A.    The person in authority who had a
8    responsibility to respond to the wrong behavior has
9    become aware of it.
10       Q.    So it becomes a violation when the person in
11   authority becomes aware of it?
12             MR. DAVEY:  Objection to the form.
13       A.    It can become -- yes.
14             BY MR. BLOCK:
15       Q.    So is there any religious prohibition in
16   Catholic doctrine against hiring someone who doesn't
17   comply with the moral tenets of the Catholic faith?
18             MR. DAVEY:  Objection to the form.  Are you
19   talking about all kinds of employees or anybody in
20   particular?
21             BY MR. BLOCK:
22       Q.    Yeah, I mean in general, all kinds.  Well, I
23   can break it down.  Let's say an employee who's not an
24   employee of the Diocese but an employee hired by a
25   Catholic businessman.  Is there any prohibition on that
```

1  businessman hiring an employee who does not comply with

2  the moral tenets of the Catholic faith?

3      A.    No.

4      Q.    And is there any -- so that wouldn't be --

5  excuse me if I don't use the right words, but that

6  wouldn't be a sin, right?

7      A.    No.

8      Q.    So is there a religious prohibition on the

9  Diocese hiring persons who don't comply with the moral

10 tenets of the Catholic faith?

11     A.    Yes.

12     Q.    And what's that prohibition?

13     A.    It's a contradiction of the mission of the

14 church, which we have an obligation to promote.

15     Q.    And the mission of the church -- well, I'll

16 take that back.

17           Can someone be Jewish and be an employee of

18 the Diocese?

19     A.    Yes.

20     Q.    Can someone be Muslim and be an employee of

21 the Diocese?

22     A.    Yes.

23     Q.    Can someone be Buddhist and be an employee of

24 the Diocese?

25     A.    Yes.

Page 21

```
 1          Q.   So I have just some hypothetical things
 2   someone could post on Facebook, and I'm going to ask you
 3   how you think that would interact with the policy.   So
 4   in this hypothetical, a Jewish employee posts on
 5   Facebook the following:   I'm so proud to announce that
 6   my 13-year-old son is having his bar mitzvah this
 7   Saturday.
 8               Now, would that message on Facebook be
 9   publicly advocating for conduct that's contrary to the
10   fundamental moral tenets of the Roman Catholic faith?
11          A.   No.
12          Q.   Why not?
13          A.   I don't know the answer to that question.
14          Q.   Okay.   Well, does it send a mixed message to
15   have an employee that publicly is bringing up their
16   child in a faith that's different than Catholicism?
17          A.   No.
18          Q.   Why not?
19          A.   Because that person is not a Catholic.
20          Q.   But if that same person wrote on Facebook I'm
21   so proud to announce that I'm getting married to my
22   same-sex partner, that would create a mixed message.   Is
23   that right?
24          A.   Yes.
25          Q.   So why would that create a mixed message when
```

Page 22

1    the statement about a bar mitzvah wouldn't?

2        A.    The Catholic teaching on marriage is that

3    there is -- it's a union between one man and one woman,

4    and that is a direct contradiction to a basic moral

5    tenet of the Catholic faith.

6        Q.    And is the Catholic teaching on marriage

7    something that as a general matter Catholics believe

8    apply to all people, including people who aren't

9    Catholic?

10        A.    Yes.

11        Q.    Is it also a tenet of Catholic doctrine that

12    people should believe in the Holy Trinity?

13        A.    If they are Catholic.

14        Q.    So if someone is not Catholic and doesn't

15    believe in the Holy Trinity, can they -- well, are they

16    living in sin?

17        A.    No.

18        Q.    So what is the moral situation of someone who

19    is not Catholic and doesn't believe in the Holy Trinity?

20        MR. DAVEY:  Objection to the form.

21        A.    I can't judge their moral situation.

22        BY MR. BLOCK:

23        Q.    Okay.  But someone who's not Catholic and is

24    not adhering to the belief that marriage is a union

25    between one man and one woman, is that person acting

Page 23

1    immorally?

2             MR. DAVEY:  Objection to the form.

3        A.   Say the question again.

4             BY MR. BLOCK:

5        Q.   Is it immoral for someone who's not Catholic

6    to not adhere to the church's position that marriage is

7    a union between one man and one woman?

8             MR. DAVEY:  Objection to the form.

9        A.   It's natural law that marriage is a union of

10   one man and one woman, so it would be contradictory to

11   the natural law.

12            BY MR. BLOCK:

13       Q.   I have another Facebook hypothetical.  If a

14   Buddhist teacher posted on Facebook my family and I had

15   a wonderful day bringing offerings to the temple for

16   Chinese New Year, would that run afoul of the policy

17   we've been talking about?

18       A.   No.

19       Q.   And why is that?

20       A.   Catholic doctrine does not have anything to

21   say about the Chinese New Year.

22       Q.   So I want to go back to the interrogatories

23   that you were looking at.  If you'd go to page 5.

24            MR. BLOCK:  And whenever you need a break, let

25   me know.

Page 24

```
 1              MR. DAVEY:  Are you good?

 2              THE WITNESS:  Yes.  I'm okay.

 3              BY MR. BLOCK:

 4       Q.    The answer on number 5, it says, "Subject to

 5   and without waiving the foregoing objections" -- well,

 6   let me take that back.  I'm sorry.

 7              The question in interrogatory number 5 is,

 8   "Identify each reason why Defendants removed Plaintiff

 9   from the CCHS substitute teachers list, and describe the

10   basis for each reason."  Do you see that question there?

11       A.    Yes.

12       Q.    And the answer begins, "Subject to and without

13   waiving the foregoing objection, Defendants have not

14   requested that Plaintiff undertake any additional

15   substitute teaching assignments because Plaintiff

16   publicly opposes fundamental tenets of the Roman

17   Catholic faith concerning marriage."

18              Did I read that sentence correctly?

19       A.    Yes.

20       Q.    So my question is whether there were -- if

21   plaintiff had not announced an engagement but instead

22   announced a commitment ceremony with his same-sex

23   partner, would he have been in violation of the policy?

24       A.    I'd have to get more information as to find

25   out what exactly a commitment ceremony meant, what he
```

Page 25

1   meant by that.

2       Q.   So if it was known that an employee was in a

3   romantic, sexual relationship with someone of the same

4   sex, without any reference to a marriage, would that

5   violate the policy?

6           MR. DAVEY:  Objection to the form.

7       A.   Yes.

8           BY MR. BLOCK:

9       Q.   And what are the fundamental moral tenets that

10  that person would be violating?

11      A.   Sexual relations are reserved only for

12  marriage, and sexual relations outside of marriage are

13  against God's law.

14      Q.   If you scan down about two-thirds of the way

15  down that paragraph, do you see there's a reference to

16  Catechism of the Catholic Church, Sections 1601 to 66?

17      A.   Yes.

18      Q.   So I'm going to mark and give to you, give

19  that to mark as an exhibit, and then I'll have a

20  follow-up question about a different portion of the

21  catechism.

22          MR. BLOCK:  So this one is 6, right?

23          THE COURT REPORTER:  Yes.

24          (Exhibit 6 was marked for identification.)

25          BY MR. BLOCK:

1    Q.    Now, is that the relevant part of the

2    catechism that is alluded to in that answer?

3    A.    Yes.

4         MR. BLOCK:    And then I have a different

5    section to mark as Exhibit 7.

6         (Exhibit 7 was marked for identification.)

7         BY MR. BLOCK:

8    Q.    Does this part of the catechism discuss the

9    Catholic teachings with respect to sex outside of

10    marriage that you had referred to?

11    A.    Yes.    The sixth commandment.

12    Q.    And if you turn to -- the paragraphs are

13    numbered.    If you could turn to paragraph 2357.    Now,

14    actually 2357, 2358, and 2359, do these three paragraphs

15    represent the fundamental moral tenets of the Catholic

16    Church with respect to sexual activity by gay people for

17    purposes of the Diocese employee policy?

18         MR. DAVEY:    Objection to the form.

19         BY MR. BLOCK:

20    Q.    Yeah.    Well, does a teacher -- scratch that

21    again.    Sorry.

22         All employees of the Diocese and its entities

23    must comply with the teachings of these three

24    paragraphs, is that right?

25         MR. DAVEY:    Objection to the form.

Page 27

```
 1        A.   This expresses the teachings of the church,
 2   and all employees do agree to the mission of the church
 3   and the teachings of Christ when they accept employment.
 4             BY MR. BLOCK:
 5        Q.   And these moral prohibitions are part of
 6   natural law that applies to all persons, including
 7   non-Catholics, is that right?
 8        A.   Yes.
 9        Q.   Now, under Catholic doctrine, is it prohibited
10   to simply have a homosexual orientation if you don't act
11   on it?
12        A.   It is not prohibited.
13        Q.   So it's okay for employees of the Diocese to
14   be gay?
15             MR. DAVEY:  Objection to the form.
16             BY MR. BLOCK:
17        Q.   If they don't act on it.
18        A.   Yes.
19        Q.   So is it -- all right.  With respect to the
20   prohibition on having sexual relationships with someone
21   of the same sex, that prohibition applies equally to
22   people with a heterosexual orientation and people with a
23   homosexual orientation, is that right?
24        A.   Yes.
25        Q.   So any man, whether that man is gay or
```

1 straight, cannot have sexual relations with another man,

2 is that right?

3          MR. DAVEY:  Objection to the form.

4      A.   Exactly.  Sexual relations outside of marriage

5 are contrary to God's law.

6          BY MR. BLOCK:

7      Q.   Now, if Mr. Billard were a woman instead of a

8 man, would his marriage, or her marriage, to Mr. Donham

9 violate these Catholic teachings?

10         MR. DAVEY:  Objection to the form.

11         BY MR. BLOCK:

12     Q.   Well, I'll take it back.  If Mr. Donham --

13 excuse me.  If Mr. Billard were a woman instead of a

14 man, would Ms. Billard's marriage to Mr. Donham run

15 afoul of the Diocese's policy?

16         MR. DAVEY:  Objection to the form.

17     A.   Well, more information would be needed, in

18 that Catholics are expected to marry according to the

19 rules of the Catholic Church.

20         BY MR. BLOCK:

21     Q.   Well, let's -- let's -- that's okay.  Maybe

22 I'll come back to that.

23         I had a question actually about the catechism

24 with respect to marriage.  If you go to paragraph 1633,

25 that's under the heading, "Mixed marriages and disparity

Page 29

1   of cult." Do you see that?

2        A.   Yes.

3        Q.   And if you go down two paragraphs to 1635, it

4   says, "According to the law in force in the Latin

5   Church, a mixed marriage needs for liceity the express

6   permission of ecclesiastical authority."

7            Did I read that sentence right?

8        A.   Yes.

9        Q.   So if someone who is an employee of the

10  Diocese who is Catholic entered into a mixed marriage,

11  as that term is used in this paragraph, without

12  obtaining express permission, would they be in violation

13  of the policy we've been discussing?

14           MR. DAVEY:  Objection to the form.

15       A.   If it were publicly known, yes.

16           BY MR. BLOCK:

17       Q.   And the second sentence, after the one I just

18  read, says, "In case of disparity of cult an express

19  dispensation from this impediment is required for the

20  validity of the marriage."

21           Did I read that right?

22       A.   Yes.

23       Q.   And if a Catholic employee entered into a

24  marriage where there was disparity of cult without

25  obtaining an express dispensation, that would also

 1  violate the policy we've been discussing, is that right?

 2          MR. DAVEY:  Objection to the form.

 3      A.  Yes.

 4          BY MR. BLOCK:

 5      Q.  I would like to look at 1637.  It says, "In

 6  marriages with disparity of cult the Catholic spouse has

 7  a particular task:  'For the unbelieving husband is

 8  consecrated through his wife, and the unbelieving wife

 9  is consecrated through her husband.'"

10          My question is why doesn't the disparity of

11  cult create an inherent mixed message regarding -- let

12  me take that back.

13          Why doesn't a marriage involving disparity of

14  cult contain an inherently mixed message?

15          MR. DAVEY:  Objection to the form.

16      A.   This biblical quote is from one of Saint

17  Paul's letters, so from the very beginning of the church

18  some converts to the faith were in this situation where

19  the husband may not have converted but the wife did, and

20  so the church granted the dispensation if the husband

21  would not interfere with the wife's practice of the

22  faith, of her newly-found faith.

23          BY MR. BLOCK:

24      Q.  How common is it for dispensations to be given

25  out today?

Page 31

1      A.   It happens.

2      Q.   Well, why would one be granted today?

3      A.   Once again, if the Catholic party agrees to

4  continue practicing his or her faith and that children

5  born of the union -- the agreement is that they would be

6  raised in the practice of the Catholic faith.

7      Q.   And wouldn't the existence of a parent who is

8  not a member of the Catholic faith inherently set a

9  contrary example that interferes with the child's

10 upbringing?

11          MR. DAVEY:  Objection to the form.

12     A.   No.

13          BY MR. BLOCK:

14     Q.   Why wouldn't it?

15     A.   If the non-Catholic or non-baptized spouse

16 presents no obstacle and is in agreement with the

17 conditions, that spouse is not contradicting anything

18 that the church teaches.

19          MR. DAVEY:  Josh, let me know when you get to

20 a good spot for a break.

21          MR. BLOCK:  Yeah, yeah.  I think so too.

22 Thanks.  Well, you know what, just a few more and then

23 we can take a break.

24          BY MR. BLOCK:

25     Q.   Maybe I'll have to print out a separate piece

1    of the catechism if I'm not laying a foundation for

2    these questions correctly, but am I right that one of

3    the teachings in the catechism is that there's no

4    salvation outside of the church?

5         A.    No.

6         Q.    Okay.  What would the correct statement of the

7    existence of salvation outside of the church be?

8         A.    God is the savior, and he decides who gets

9    saved.

10        Q.    Well, isn't -- aren't -- I apologize about the

11   phrasing, but if there's salvation regardless of whether

12   someone is in -- possible salvation regardless of

13   whether someone's in the church, why is it important to

14   be in the church?

15        A.    The mission of the church is to present

16   Christ's message of salvation, offer of salvation, and

17   people in the world are free to accept or reject the

18   message, and at the end God judges the conscience of

19   each person on that acceptance or rejection of the

20   message that the church delivered on behalf of Christ.

21        Q.    Well, if someone -- if someone marries a

22   person of the same sex, can they -- does God judge their

23   conscience as well?

24        A.    Oh, yes.

25        Q.    But the church views -- well, here's what I'm

Page 33

1  having trouble understanding, why the church views one

2  set of -- why the church views someone not accepting

3  Christ's teachings in one context is not viewed as

4  immoral and why someone not accepting Christ's teachings

5  in another context is viewed as immoral, so could you

6  help me understand the difference?

7           MR. DAVEY:  Objection to the form.

8       A.   Marriage, from the first book of the Bible, in

9  the first chapter, again is defined as one man and one

10 woman, and that's it.

11          MR. BLOCK:  Okay.  Thank you.  Let's take a

12 break.

13          (Recess from 10:13 a.m. to 10:28 a.m.)

14          MR. BLOCK:  Back on the record.  I found that

15 portion of the catechism I wanted to ask about.

16          (Exhibit 8 was marked for identification.)

17          MR. DAVEY:  This is number 8?

18          BY MR. BLOCK:

19      Q.   So you're looking at an exhibit marked

20 Exhibit 8, and these are the paragraph sections

21 beginning at 811, is that right?

22      A.   Yes.

23      Q.   So if you turn to page -- it's actually the

24 paragraph number 846, and right above that paragraph, in

25 quotes, it says, "Outside the Church there is no

1    salvation."  Do you see that?

2         A.    Yes.

3         Q.    So could you explain to me how that applies to

4    people who are not members of the church?

5               MR. DAVEY:  Objection to the form.

6         A.    Please allow me to read this.

7               BY MR. BLOCK:

8         Q.    Yeah, absolutely.  Take all the time you want.

9         A.    It's explained there in the indented section,

10   that if you know the church is the path to salvation and

11   you refuse and reject it, then there is no salvation.

12   You reject salvation.

13        Q.    So wouldn't an employee of the Diocese who

14   does not become part of the Catholic Church be rejecting

15   salvation under that reading?

16        A.    No.

17        Q.    So why not?

18        A.    The church's teachings are offered free to

19   everyone, and everyone is free to accept or reject,

20   according to their own conscience, the church's

21   teaching.

22        Q.    And what happens if they reject it?

23        A.    God is the judge.

24        Q.    But the Diocese is still willing to employ

25   them as employees of the Diocese?

1    A.    Yes.

2    Q.    If you look at the bottom, there's this other

3    bold headline that says, "Mission - a requirement of the

4    Church's catholicity."  Do you see that?

5    A.    Yes.

6    Q.    And then continuing to the next page, it talks

7    about -- paragraph 849 begins with, "The missionary

8    mandate."  Do you see that?

9    A.    Yes.

10   Q.    And feel free to take time to read this in

11   greater depth, but is part of the Diocese's mission to

12   have a missionary mandate?

13   A.    Yes.

14   Q.    Can you explain what that missionary mandate

15   is?

16   A.    To share the message of Christ with everyone

17   and anyone.

18   Q.    And the ultimate goal in sharing that message

19   is the hope that that person will accept it.  Is that

20   right?

21   A.    Yes.

22   Q.    So why -- from the standpoint of the public

23   looking at what the Diocese does, why doesn't it send

24   the public a mixed message about the importance of

25   accepting the church's teachings -- let me take that

1  back.  Find another way to phrase it.

2          Why doesn't -- doesn't employing someone who

3  refuses to become a member of the church undermine the

4  church's message of its missionary mandate?

5      A.   It doesn't undermine the missionary mandate.

6  We're offering the message to everyone, whether

7  employees or non-employees.  They are free to accept or

8  reject the message.  If they are employed by the Diocese

9  or are volunteers working with the church and they're

10 not Catholic, they are agreeing, by their choice, to be

11 employed and become part of our mission and not to

12 contradict the mission.

13     Q.   But isn't accepting the church's message --

14 why doesn't it contradict the church's mission for

15 someone to not accept its message?

16     A.   The message is offered freely, and people are

17 free to accept or to reject.

18     Q.   Well, is the church's message with respect to

19 homosexual activity similarly something that people are

20 free to accept or reject?

21     A.   Exactly.  Yes.

22     Q.   But if the church employed someone who was

23 publicly rejecting the church's teachings about

24 homosexual activity, that would undermine the church's

25 message with respect to that activity.  Is that right?

Page 37

```
 1              MR. DAVEY:  Objection to the form.
 2              BY MR. BLOCK:
 3         Q.   If an employee of the Diocese received the
 4    church's teaching with respect to homosexual activity
 5    and rejected that teaching, would that undermine the
 6    church's ability to spread its message about homosexual
 7    activity?
 8         A.   Yes.  Public rejection presents a scandal and
 9    sends a contradictory message.
10         Q.   But if an employee receives the church's
11    message about salvation in Christ but chooses to reject
12    that message, that doesn't interfere with the church's
13    ability to spread its message?
14         A.   An employee who rejects the church's teaching
15    on salvation, that would interfere also with the
16    church's mission.
17         Q.   So what's entailed with rejecting the church's
18    teachings on salvation?
19              MR. DAVEY:  Objection to the form.
20         A.   There have been volumes of books written on
21    the church's teaching and salvation.
22              BY MR. BLOCK:
23         Q.   Well, so I guess my question is, is there more
24    to -- does rejecting the church's teachings on salvation
25    mean something more than not converting to be a member
```

Page 38

1  of the church?

2      A.   I don't understand the question.  Would you

3  say it again?

4      Q.   I'm sorry.  So if I'm -- so if someone is

5  Hindu, and they're employed by the Diocese, and the

6  Diocese as part of its missionary mandate is spreading

7  the message of the church and salvation in the church,

8  that's what I just -- you shook your head when I just

9  said the words "salvation in the church."

10      A.    Salvation in Christ.

11      Q.    Salvation in Christ.  So I'll go back.  So if

12  a person who's Hindu is employed by the Diocese and

13  receives the church's message about salvation in Christ

14  but chooses not to accept Christ, would that be

15  undermining the church's message of salvation?

16          MR. DAVEY:  Objection to the form.

17      A.    If the person publicly is saying Jesus is not

18  the savior, you know, if there's a public statement

19  contradictory to the church's fundamental teachings,

20  that definitely undermines the church's mission.

21          BY MR. BLOCK:

22      Q.    And if a Hindu employee just speaks publicly

23  about their own religious faith without referencing

24  Jesus or Christ, would that also undermine the church's

25  mission?

Page 39

```
 1        A.    No.
 2              MR. BLOCK:  I have some other documents to
 3    turn to.
 4              (Exhibit 9 was marked for identification.)
 5              BY MR. BLOCK:
 6        Q.    So this is marked as Exhibit 9 and it's
 7    titled, "Lay Catholics in Schools: Witnesses to Faith."
 8    Is that right?
 9        A.    Yes.
10        Q.    And do you recognize this document?
11        A.    Yes.
12        Q.    On the last paragraph of the first page,
13    there's a sentence that says, "This process has
14    coincided with a notable decrease in the number of
15    priests and Religious, both men and women, dedicated to
16    teaching."
17              Do you see that sentence?
18        A.    Yes.
19        Q.    Is it true that there's been a notable
20    decrease in the number of priests and religious
21    dedicated to teaching?
22              MR. DAVEY:  Objection to the form.  I don't
23    know what time frame you're talking about.  Bishop, feel
24    free to read as much of the document as you need to
25    answer the question.
```

1　　　　　　BY MR. BLOCK:

2　　　Q.　Yeah, absolutely.　I mean over the course of

3　the latter half of the 20th century, has there been a

4　decrease in the number of priests and religious

5　dedicated to teaching?

6　　　A.　If that was the observation of the Vatican in

7　1982, I accept that.

8　　　Q.　In your experience, has there been at the

9　Diocese a decrease in the number of priests and

10　religious dedicated to teaching?

11　　　　　　MR. DAVEY:　You're talking about the Diocese

12　of Charlotte?

13　　　　　　MR. BLOCK:　Yes.

14　　　A.　In Catholic schools, yes, but not in parish

15　settings, parish setting locations.

16　　　　　　BY MR. BLOCK:

17　　　Q.　So in Catholic schools there used to be more

18　teachers who were priests and members of religious

19　orders?

20　　　　　　MR. DAVEY:　Objection to the form.　Which

21　Catholic schools are you referring to?

22　　　　　　MR. BLOCK:　Well, in the Diocese.

23　　　A.　In our own Diocese, there's always been a

24　majority lay Catholics teaching in the schools.

25　　　　　　BY MR. BLOCK:

Page 41

 1      Q.   Has that majority grown larger over time?

 2      A.   I would say no, because we've never had any

 3  schools that were exclusively taught by sisters or

 4  priests.

 5      Q.   Why not?

 6      A.   We are in an area of the country where the

 7  Catholic Church is a minority.

 8      Q.   And so there are not enough priests and

 9  members of religious orders to do all the teaching that

10  would be necessary?

11      A.   Yes.

12      Q.   If scarcity weren't a problem and you could

13  fill all the teaching spots with priests or members of

14  religious orders, would you?

15      A.   That would be the ideal.

16      Q.   Why would that be the ideal?

17      A.   I'll change my mind.  No, not necessarily.

18      Q.   Okay.  Why not?

19      A.   Lay Catholics can give a witness to the

20  integration of their faith in their daily life, just as

21  a priest or a religious sister can.

22      Q.   If scarcity weren't an issue, would you prefer

23  to have a larger percentage of the teachers be priests

24  or members of religious orders?

25      A.   Not necessarily.

Page 42

1    Q.   And if you could put this exhibit to the side,

2    but don't put it away.

3          (Exhibit 10 was marked for identification.)

4          BY MR. BLOCK:

5    Q.   This has been marked as Exhibit 10, and this

6    document is titled, "Educating Today and Tomorrow."  Is

7    that correct?

8    A.   Yes.

9    Q.   If you could turn to what's marked on the

10   bottom right as CCHS 109 or 000109.  Hold on one second.

11   I'm just making sure that I -- if you look at the

12   second-to-last paragraph at the bottom, it says, "The

13   number of educators and teachers who are believers is

14   shrinking, hence making Christian testimony more rare."

15          Is that your experience at the Charlotte

16   Diocese, too?

17   A.   No.

18   Q.   So at the Charlotte Diocese there hasn't been,

19   in your experience, a decrease in the number of

20   educators and teachers who are believers?

21   A.   Believers in the Catholic faith?  I actually

22   don't know how many are Catholics and how many are not

23   Catholics.

24   Q.   And then I have one more document to show you,

25   and I apologize if we then jump back and forth between

1   them.

2           (Exhibit 11 was marked for identification.)

3           BY MR. BLOCK:

4       Q.   This one is marked as Exhibit 11, and this

5   one's titled, "Educating Together in Catholic Schools."

6   Is that right?

7       A.   Yes.

8       Q.   If you'd turn to the page marked CCHS 123.

9   Make sure I have the right line.  Okay.  In the last

10  paragraph, about halfway into the last paragraph, after

11  there's a marker footnote 17.  Do you see that marker,

12  footnote 17?

13      A.   Yes.

14      Q.   Okay.  And I'm going to just read a couple of

15  those sentences and then ask you a question about them.

16  So it says, "In this ecclesial context the mission of

17  the Catholic school, lived as a community formed of

18  consecrated persons and lay faithful, assumes a very

19  special meaning and demonstrates a wealth that should be

20  acknowledged and developed.  This mission demands, from

21  all the members of the educational community, the

22  awareness that educators, as persons and as a community,

23  have an unavoidable responsibility to create an original

24  Christian style.  They are required to be witnesses of

25  Jesus Christ and to demonstrate Christian life as

Page 44

1    bearing light and meaning for everyone."

2           Did I read that correctly?

3    A.   Yes.

4    Q.   So is it true that -- well, could you

5    elaborate on the role of teachers at a Catholic school

6    in being a witness of Jesus Christ and demonstrating

7    Christian life?

8           MR. DAVEY:  Objection to the form.  Feel free

9    to read as much as of the document, Bishop, as you need

10    to, or any other documents, to answer that question.

11    A.   Well, as it says in the mission and belief

12    statement of Charlotte Catholic High School handbook,

13    all members of the Charlotte Catholic High School

14    community should integrate Christ's teachings into their

15    conduct.

16           BY MR. BLOCK:

17    Q.   Is that different than being a witness of

18    Jesus Christ?

19    A.   No.

20    Q.   So can someone be a witness of Jesus Christ

21    and still not be Christian?

22    A.   No.  This document is referring only to

23    Catholics.

24           MR. DAVEY:  And for the record, the bishop is

25    referring to the exhibit that is marked as Exhibit 11.

Page 45

1    BY MR. BLOCK:

2        Q.    So if the -- when a school hires someone who's

3    not Catholic, they're hiring someone who cannot be a

4    witness of Jesus Christ before the students, isn't that

5    right?

6        A.    They agree not to contradict the mission of

7    the church.

8        Q.    But it would be preferable to have the

9    positions filled by Catholics, is that correct?

10       A.    Not necessarily.

11       Q.    Is something lost when a teacher can't be a

12   living demonstration of incorporating Christ into their

13   life?

14       A.    You mean if a non-Catholic?

15       Q.    Yeah.

16       A.    No.  Not if they're not publicly contradicting

17   the church and her teachings.

18       Q.    But it is true that -- scratch that.

19            So if you go to the end of paragraph 14, and

20   again please take time to read any other context that

21   you need, but I'm just going to read paragraph 14.  It

22   says, "On the other hand, because of its identity and

23   its ecclesial roots, this community must aspire to

24   becoming a Christian community, that is, a community of

25   faith, able to create increasingly more profound

Page 46

1   relations of communion which are themselves educational.

2   It is precisely the presence and life of an educational

3   community, in which all the members participate in a

4   fraternal communion, nourished by a living relationship

5   with Christ and with the Church, that makes the Catholic

6   school the environment for an authentically ecclesial

7   experience."

8        Did I read that right?

9   A.   Yes.

10  Q.   So if a teacher at the school is not

11  Christian, are they able to participate in that

12  fraternal communion?

13  A.   Not as a Catholic.

14  Q.   Does that dilute the message of teachers as an

15  example of having a living relationship with Christ?

16  A.   No.

17       MR. DAVEY:  Objection to the form.

18  A.   No.

19       BY MR. BLOCK:

20  Q.   Why doesn't it dilute it?

21  A.   Presenting no public contradiction to the

22  church's teaching is actually a sign of goodwill on the

23  part of someone who's not a Catholic and sends a

24  positive message of goodwill to the community.

25  Q.   Can you explain to me more of the difference

Page 47

1  between contradicting the church's message versus not

2  accepting the church's message?

3             MR. DAVEY:  Objection to the form.

4      A.    Contradicting is a public rejection of a basic

5  tenet of the church's teaching.

6             BY MR. BLOCK:

7      Q.    And accepting Christ is also a basic tenet of

8  the church's teaching, right?

9             MR. DAVEY:  Objection to the form.

10     A.    Yes.

11            MR. BLOCK:  Half hour, 45 minutes left.  Is

12  that 12 or 13?

13            THE COURT REPORTER:  12.

14            MR. BLOCK:  Thanks.

15            (Exhibit 12 was marked for identification.)

16            BY MR. BLOCK:

17     Q.    So this is marked as Exhibit 12, and on the

18  top right-hand corner it says Diocese of Charlotte

19  Catholic Schools.  Do you see that?

20     A.    Yes.

21     Q.    Do you recognize the document?

22     A.    Yes.

23     Q.    What is it?

24     A.    It would be the review notes or outline for

25  one of our diocesan teachers meetings from 2010.

Page 48

1    Q.    And who attends those meetings?

2    A.    I presume it's diocesan teachers.  I don't

3    know if others also attend.

4    Q.    If you look on the left-hand column, it says

5    NDC 9a.  What does NDC stand for, if you know?

6    A.    I do not know.

7    Q.    Now, if you look -- well, let's look at the

8    first bullet point.  It says, "The principal of a

9    Catholic school must be a practicing Catholic in good

10   standing who understands and accepts the teachings of

11   the church and the moral demands of the gospel."

12          Do you see that?

13   A.    Yes.

14   Q.    Why does the principal have to be a practicing

15   Catholic?

16   A.    He is the leader of the community and is

17   setting an example for the entire school community.

18   Q.    But couldn't someone who's not Catholic also

19   set a good example as long as they're not contradicting

20   the teachings of the church?

21   A.    That's not what we've decided for our schools.

22   Q.    Why?

23   A.    I do not know the answer to that question.

24   Q.    Okay.  And then three bullet points down it

25   says, bullet point, "Recruit teachers who are practicing

Page 49

1    Catholics, who can understand and accept the teachings

2    of the Catholic Church and the moral demands of the

3    Gospel and can contribute to the achievement of the

4    school's Catholic identity and apostolic goals."

5            Did I read that right?

6       A.   Yes.

7       Q.   So why should the principal recruit teachers

8    who are practicing Catholics as opposed to teachers who

9    aren't Catholic but don't contradict the teachings of

10   the church?

11           MR. DAVEY:  Objection to the form.

12      A.   Going back to the previous question, I see why

13   a Catholic principal should -- a principal of a Catholic

14   school has to be a practicing Catholic, because one of

15   his or her responsibilities is to foster a distinctively

16   Christian community among the faculty, students, and

17   parents, and if one is not a believer, you can't place

18   that obligation on that person to foster a distinctively

19   Christian community.  Certainly he is called to recruits

20   teachers who are practicing Catholics, but not

21   exclusively.

22           BY MR. BLOCK:

23      Q.   If a teacher is not Catholic, would they be

24   able to foster Christian community among the students

25   and parents?

Page 50

1       A.    We can't place that expectation on someone

2   who's not a Catholic.

3       Q.    But if the goal is to foster a Christian

4   community, why would you hire someone on whom you can't

5   place that expectation?

6       A.    As long as they do not publicly reject

7   teachings of the church, they're not not fostering, not

8   obstructing Christian community.

9       Q.    What does apostolic goals mean?

10      A.    Where do you see that word?

11      Q.    It's at the bottom of the fourth bullet point.

12      A.    Apostolic goals would be the church's mission,

13  another way of saying the church's mission to share the

14  teachings of Christ both in word and in action.

15      Q.    And this might just be more of a basic

16  definitional question, but what does apostolic mean?

17      A.    Following the example of the apostles whom

18  Christ chose to be missionaries and share his teaching

19  with others.

20      Q.    So I have a question about what it means to

21  publicly engage in conduct or advocate for positions

22  opposed to the teachings of the Roman Catholic faith.

23  If the only person who finds out about a particular

24  conduct is the person's supervisor, but no one else, has

25  that person engaged in public conduct sufficient to run

1    afoul of the policy?

2          MR. DAVEY:  Objection to the form.

3      A.    I don't know of an example where only one

4    person could be aware of a public action.

5          BY MR. BLOCK:

6      Q.    So let me talk through some hypotheticals,

7    understanding that they're hypothetical.  If someone

8    tells their supervisor, who they're friends with, I have

9    this secret I feel compelled to share with you, I am in

10   a long-term relationship involving sex with someone of

11   the same sex, and I intend to continue doing it.  I

12   can't give it up.  I haven't told anyone else, you're

13   the only one I'm telling.

14          What should the supervisor do in that

15   situation?

16          MR. DAVEY:  Objection to the form.

17     A.    You prefaced the comment, you said I have a

18   secret to tell you.  Then he's bound to confidentiality?

19          BY MR. BLOCK:

20     Q.    No.  That there's -- it's a secret among

21   friends, but it's not a professional psychologist

22   relationship, it's not in confession.

23          MR. DAVEY:  Objection to the form.  I think we

24   need a question.  There's no question pending.

25          BY MR. BLOCK:

1      Q.   The question pending is what should the

2  supervisor do in that situation?

3           MR. DAVEY:  Objection to the form.

4      A.   He's become aware of something which has a

5  potential to be a great scandal and would not remain a

6  secret.

7           BY MR. BLOCK:

8      Q.   So what's the definition of scandal as used in

9  the context of the Catholic faith?

10     A.   A scandal is where some behavior or action

11 which is wrong offends an innocent person such that they

12 would be led astray into thinking, if there was no

13 response from some person in authority, that that

14 activity was acceptable.

15     Q.   So from what you said, it sounds like there

16 are three people involved in that definition, the person

17 who engaged in the conduct, the person in authority, and

18 an innocent person.  Is that right?

19     A.   Uh-huh.

20     Q.   So scandal would, then, require either the

21 existence of an innocent person or the potential

22 existence of an innocent person.  Is that right?

23     A.   I don't know if it requires it, but that's a

24 working definition that I would use.

25     Q.   Say, another hypothetical, a teacher and her

1  husband have trouble conceiving and she conceives using

2  in vitro fertilization.  They never tell anyone about

3  it, but someone -- maybe it's a private investigator --

4  digs up that information and tells her superior.  What

5  should that superior's response be?

6        MR. DAVEY:  Objection to the form.

7     A.   He has no obligation to act on hearsay or

8  information from third parties.

9        BY MR. BLOCK:

10    Q.   What if the third party gives a copy of the

11 doctor's invoice, leaving no doubt that it actually did

12 occur?

13       MR. DAVEY:  Objection to the form.

14    A.   The supervisor of that employee has no reason

15 to pry into her personal life.

16       BY MR. BLOCK:

17    Q.   And what if that investigator then sort of

18 broadcasts it to the whole community so it's widely

19 known?  Does the supervisor then have a duty to take

20 corrective action?

21       MR. DAVEY:  Objection to the form.

22    A.   Well, he would -- he or she would need to just

23 find out more information, the truth of it or not, from

24 the person.

25       BY MR. BLOCK:

Page 54

1    Q.    And if it is true, if he speaks with the
2  person and confirms that it is true, what should he do
3  then?
4           MR. DAVEY:  Objection to the form.
5    A.    I would need more information.  Is the person
6  publicly saying the church is wrong on this practice?
7           BY MR. BLOCK:
8    Q.    Well, then, let me just ask a simpler hypo
9  then.  If a teacher employed by the Diocese, you know,
10  conceives with IVF and doesn't hide the fact that they
11  used IVF but doesn't say anything else about the
12  church's teaching at all, would that teacher be
13  violating the policy?
14           MR. DAVEY:  Objection to the form.
15    A.    They'd have to really say that they realized
16  what they did was wrong.
17           BY MR. BLOCK:
18    Q.    And in terms of someone's conduct becoming
19  public, does it make a difference whether the person
20  willingly and voluntarily was public about it as opposed
21  to was involuntarily outed?
22           MR. DAVEY:  Objection to the form.
23    A.    So many hypothetical questions.  It could go
24  in any direction.  Could you be more specific?
25           BY MR. BLOCK:

Page 55

1      Q.   Sure.  Let's give the -- someone who is in a

2  long-term romantic relationship with someone of the same

3  sex and they are employed at the Diocese.  They are

4  aware of the Diocese's teachings.  They don't want to do

5  anything that would seem to publicly contradict them.

6  They are not out at work whatsoever, but they have a

7  long-term partner that they live with, and they do

8  everything possible to avoid being seen out in public

9  together, but as a result of some, you know, personal

10  squabble with a colleague, the colleague discovers their

11  relationship and outs them.  Would their -- what should

12  that person's superior do?

13          MR. DAVEY:  Objection to the form.

14      A.   Talk to the -- talk to the individual who is

15  alleged to be, you know, in the relationship and just

16  find out if it's true or not.

17          BY MR. BLOCK:

18      Q.   And if that individual says it's true, I don't

19  want to do anything to undermine the church's message

20  and teachings, I know what I'm doing is wrong, but I

21  love this person and I can't stop loving them or stop

22  being in a relationship with them?

23      A.   A sexual relationship?

24      Q.   Yes.

25          MR. DAVEY:  Were you finished?  Were you

Page 56

1    finished?

2              MR. BLOCK:  I was finished.

3              MR. DAVEY:  Objection to the form.

4         A.   Then the supervisor would have to take

5    disciplinary action.

6              BY MR. BLOCK:

7         Q.   Turning specifically to Mr. Billard, if his

8    supervisors had known that he was in a long-term sexual

9    relationship with Mr. Donham, should they have taken

10   disciplinary action?

11             And let me further explain the question.  And

12   I mean they knew he was in a long-term relationship

13   before any talk of engagement.  And I'm not saying this

14   is a fact.  I'm asking hypothetically, if before he got

15   engaged his supervisors knew that he was in a long-term

16   sexual relationship with Mr. Donham, should they in that

17   scenario have taken disciplinary action?

18        A.   Yes.

19             MR. DAVEY:  Objection to the form.

20             MR. BLOCK:  Did you get his answer?

21             THE COURT REPORTER:  Answer, "Yes."

22             MR. BLOCK:  I think I just have about ten more

23   minutes if you're okay continuing.

24             MR. DAVEY:  Are you doing all right?

25             (Witness nodded head.)

1    BY MR. BLOCK:

2    Q.    So in this case, Mr. Billard announced he was

3    getting engaged and did it on Facebook, but he would

4    still -- let me take it back.

5        In this case, Mr. Billard announced he was

6    getting engaged publicly and did it through Facebook.

7    I'm going to ask you some questions about if his

8    behavior had been slightly different, and my goal is to

9    confirm whether or not under those facts he still would

10   not be able to teach at the Diocese schools.

11       If it hadn't been on Facebook, he still

12   wouldn't be able to teach.  Is that right?

13       MR. DAVEY:  Objection to the form.

14   A.    If no one knew about it, it would have been

15   impossible to take any action.

16       BY MR. BLOCK:

17   Q.    So under my hypothetical, he sends invitations

18   to other teachers, come to my wedding, but he hasn't

19   posted it on Facebook where the public at large can see

20   it.  That would still require disciplinary action,

21   right?

22   A.    Yes.

23   Q.    And if he hadn't gotten married but just

24   maintained a sexual relationship with someone of the

25   same sex, and his colleagues knew it, that would also

1  still require disciplinary action, right?

2      A.   Yes.

3      Q.   And even if he didn't have a wedding ceremony

4  but just registered to be married at city hall, that act

5  of registering would itself be a public act, right?

6      A.   If it doesn't come to people's attention,

7  there's no way we can act on it.

8      Q.   Why -- well, let me lay a foundation.  The

9  Diocese doesn't specifically ask employees whether

10 they're engaged in a sexual relationship with someone of

11 the same sex, does it?

12     A.   No.

13     Q.   And it doesn't specifically ask employees

14 whether they use contraception, is that right?

15     A.   No.  Correct.

16     Q.   Thank you.  And it doesn't specifically ask

17 employees whether they have had an abortion, is that

18 right?

19     A.   Correct.

20     Q.   And it doesn't specifically ask employees

21 whether they would have an abortion in the future, is

22 that correct?

23     A.   Correct.

24     Q.   Why not?

25     A.   The presumption is that people are not

 1  involved, engaged, in immoral behavior.

 2       Q.   And that would include all the behavior I just

 3  discussed in the series of questions, is that right?

 4       A.   What were those three again?

 5       Q.   Sexual relationships with someone of the same

 6  sex, contraception, and having an abortion in the past

 7  or willingness to have one in the future.

 8       A.   All of those really are private actions also,

 9  but marriage to a same-sex partner is a public act.  But

10  to answer your question, we presume people are good and

11  moral, and those are the people we want.

12       Q.   So how would the Diocese's schools be affected

13  if they only restricted their hiring to members of the

14  Catholic faith?

15       A.   We would still be engaged in the mission of

16  the church, whether they were all Catholic or not all

17  Catholic teachers.

18       Q.   So hiring non-Catholic teachers isn't a

19  necessity in order to engage in the mission of the

20  church, is that right?

21       A.   Repeat the question.

22       Q.   So hiring non-Catholic teachers is not

23  necessary in order for the Diocese's schools to engage

24  in the mission of the church?

25       A.   Correct.

1    Q.   Would the Diocese be able to offer the same

2    array of course offerings if it didn't open up

3    employment to employees who were not members of the

4    Catholic faith?

5    A.   Not necessarily.

6    Q.   But all those -- but all the teachers who are

7    not members of the Catholic faith are not allowed to

8    teach religious instruction, is that correct?

9    A.   Correct.

10   Q.   So if the Diocese stopped hiring people who

11   are not members of the Catholic faith, that would have

12   an impact on the Diocese's secular course offerings

13   only.  Is that right?

14        MR. DAVEY:  Objection to the form.  You're

15   asking him to speculate if all the non-Catholic teachers

16   were replaced by Catholic teachers, what would that do

17   to the course offerings.  I don't know that anybody

18   could know that, but, Bishop, if you know the answer,

19   please feel free to answer.

20   A.   Could you say the question again?

21        BY MR. BLOCK:

22   Q.   Yeah.  Would hiring Catholic -- hiring

23   teachers who are not Catholic would have -- let me

24   rephrase it.  Sorry.

25        I guess I have two questions.  Would the

Page 61

1    Diocese be able to fill all the teaching positions it

2    wants to fill in secular classes if it restricted hiring

3    to members of the Catholic faith?

4              MR. DAVEY:  Objection.  Don't speculate about

5    the answer, Bishop.  If you know the answer, you can

6    answer.

7              MR. BLOCK:  He's a 30(b)(6) witness.

8      A.    Yeah, I have no reason to think that we

9    wouldn't be able to offer full course offerings.

10             MR. BLOCK:  If you'll give me five minutes,

11   I'm just going to review my notes.

12             (Recess from 11:33 a.m. to 11:37 a.m.)

13             MR. BLOCK:  We're back on.  I have just a few

14   more.  I apologize.  I keep saying just a few more

15   but --

16             MR. DAVEY:  Lawyers are known to do that from

17   time to time.

18             BY MR. BLOCK:

19     Q.    If the Diocese were told that it could --

20   well, let me take that back again.

21             If the Diocese were told that it could not

22   fire a non-ministerial employee for engaging in a sexual

23   relationship with someone of the same sex, what would

24   the Diocese do?

25             MR. DAVEY:  Objection to the form.

Page 62

1    A.    If the Diocese were told by whom?

2          BY MR. BLOCK:

3    Q.    If a court were to say that it's illegal for

4    the Diocese to fire people who are not ministerial

5    employees for having a sexual relationship with someone

6    of the same sex, how would the Diocese respond?

7          MR. DAVEY:  I'm objecting.  That's not an

8    appropriate question.  You're asking the witness about a

9    legal strategy question --

10         MR. BLOCK:  No, no, I'm not.

11         MR. DAVEY:   -- that would be made in response

12   to a court decision.  That's an attorney-client

13   privilege issue, and I'm instructing the witness not to

14   answer a question about legal strategy.

15         BY MR. BLOCK:

16   Q.    I'm absolutely not asking about legal

17   strategy.  I want to find out the burden that would be

18   placed on the Diocese's religious exercise and ability

19   to fulfill its mission if it were not allowed to fire

20   people for engaging in sexual relationships with someone

21   of the same sex, and this isn't a -- I'm not asking for

22   a legal strategy.  I'm asking for how would the Diocese

23   continue to advance its mission in light of such a

24   ruling and how burdensome such a ruling would be to the

25   Diocese's ability to advance its mission.

Page 63

 1          MR. DAVEY:  I'm objecting to the form.

 2    Bishop, don't talk about any legal strategy that the

 3    Diocese may employ in response to such a ruling if it

 4    were to occur.  If you understand, you can answer.

 5          A.    The mission would be irreparably damaged.

 6                BY MR. BLOCK:

 7          Q.    Would the Diocese be able to fulfill its

 8    mission using just ministerial employees?

 9                MR. DAVEY:  Objection to the form.  That's a

10    legal term of art.  The bishop is not a lawyer.

11                BY MR. BLOCK:

12          Q.    Would the Diocese be able to fulfill its

13    mission if it just used employees who had religious job

14    duties in addition to secular ones?

15                MR. DAVEY:  Objection to the form.

16          A.    I do not understand that question.

17                BY MR. BLOCK:

18          Q.    I'm sorry.  How about phrasing it this way.

19    If the Diocese required that all teachers of secular

20    subjects must also be teachers of religious subjects,

21    would the Diocese be able to continue fulfilling its

22    mission?

23                MR. DAVEY:  Objection.  Again that calls for

24    speculation, but if you know how to answer, Bishop, you

25    can.

Page 64

1　　　　A.　Are you asking if only priests or religious

2　　sisters and brothers taught, would the Diocese be able

3　　to fulfill its mission?  Is that your question?

4　　　　　　BY MR. BLOCK:

5　　　　Q.　I'm not limiting it to just religious orders

6　　and priests.  I'm also including lay Catholics who teach

7　　actual -- who teach religion classes and have as part of

8　　their job duties to teach Catholic doctrine.  If the

9　　Diocese restricted its pool of teachers to people in

10　　that category and relied upon those people in that

11　　category to teach all subjects, could it continue to do

12　　its mission?

13　　　　　　MR. DAVEY:  Objection to the form.

14　　　　A.　I don't see why not.

15　　　　　　MR. BLOCK:  All right.  I'm done.  We can go

16　　off.  Well, I'll thank you on the record.  Thank you so

17　　much for taking the time and answering these questions.

18　　I really appreciate it.

19　　　　　　THE WITNESS:  You're welcome.  Thank you.

20　　　　　　MR. DAVEY:  I have no questions.  We'll read

21　　and sign.

22　　　　　　(Whereupon, at 11:44 a.m. the deposition was

23　　concluded.  Signature was reserved.)

24

25

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

Civil Action No. 3:17-cv-0011

LONNIE BILLARD,

     **Plaintiff,**

v.

CHARLOTTE CATHOLIC HIGH
SCHOOL, MECKLENBURG AREA
CATHOLIC SCHOOLS, and ROMAN
CATHOLIC DIOCESE OF CHARLOTTE,

     **Defendants.**

## DEFENDANTS' RESPONSES TO PLAINTIFF'S
## FIRST SET OF REQUESTS FOR ADMISSION

Defendants Charlotte Catholic High School ("CCHS"), Mecklenburg Area Catholic Schools ("MACS"), and Roman Catholic Diocese of Charlotte ("Diocese") (collectively "Defendants"), pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, by counsel and their duly authorized agent, hereby respond to Plaintiff's First Requests for Admission as follows:

**REQUEST FOR ADMISSION NO. 1:**

Admit that Plaintiff was removed from the list of substitute teachers assigned to CCHS after he announced on Facebook that he intended to marry his same-sex partner.

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 2:**

Admit that Plaintiff was removed from the list of substitute teachers assigned to CCHS

solely because he announced his intention to marry to his same-sex partner.

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 3:**

Admit that Defendants believe that Plaintiff's marriage to his same-sex partner renders

him ineligible for any substitute teaching assignments at CCHS or other MACS schools.

**RESPONSE: It is admitted that Plaintiff's continuing public engagement in and advocacy for conduct opposed to the fundamental moral tenets of the Roman Catholic faith – specifically, persisting in a same-sex civil marriage – renders him ineligible for any substitute teaching assignments at CCHS or other MACS or Diocesan schools.**

**REQUEST FOR ADMISSION NO. 4:**

Admit that Plaintiff was professionally qualified for the position of substitute teacher at

the time Defendants removed him from the substitute teacher list.

**RESPONSE: It is admitted that Plaintiff possessed the required educational experience and qualifications to serve as a substitute teacher in December 2014, but denied that he was professionally qualified to do so. The professional qualifications of teachers in MACS and Diocesan schools include commitment to the Catholic educational mission of MACS and the Diocese, an understanding that teachers in Catholic schools act as role models for students seeking a Catholic education in accordance with that mission and in accordance with the beliefs of the Roman Catholic Church, and that they not publicly engage in or publicly advocate for conduct opposed to the fundamental moral tenets of the Roman Catholic faith, including those concerning marriage.**

**REQUEST FOR ADMISSION NO. 5:**

Admit that sex is not a bona fide occupational qualification for the position of substitute

teacher.

**RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 6:**

Admit that Defendants are not aware of any employee who is, or has been, employed by Defendants while being married to a same-sex partner.

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 7:**

Admit that Plaintiff's job title as a substitute teacher at CCHS did not, by itself, convey religious significance.

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 8:**

Admit that Plaintiff was not required to undergo religious training in order to qualify for a substitute teacher position at CCHS.

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 9:**

Admit that Defendants are not aware of any instance in which Plaintiff held himself out as occupying a ministerial position.

**RESPONSE: Denied.**

**REQUEST FOR ADMISSION NO. 10:**

Admit that CCHS educates, and has educated, students who do not identify as Catholic, and that CCHS does not require those students to convert to Catholicism.

**RESPONSE: Defendants object to the phrase "identify as Catholic" as vague and ambiguous. Persons either are or not members of the Catholic Church; membership in the Catholic Church is an objective status that does not depend on an individual's subjective "identification as" Catholic. Subject to this objection, it is admitted that CCHS educates, and has educated, students who are not Catholic, and that CCHS does not require those students to convert to Catholicism.**

**REQUEST FOR ADMISSION NO. 11:**

Admit that CCHS employs, and has employed, teachers who do not identify as Catholic,

and that CCHS does not requires those teachers to convert to Catholicism.

**RESPONSE: Defendants object to the phrase "identify as Catholic" as vague and ambiguous. Persons either are or not members of the Catholic Church; membership in the Catholic Church is an objective status that does not depend on an individual's subjective "identification as" Catholic. Subject to this objection, it is admitted that CCHS employs, and has employed, teachers who are not Catholic, and that CCHS does not require those teachers to convert to Catholicism.**

**REQUEST FOR ADMISSION NO. 12:**

Admit that CCHS employs, and has employed, teachers who are divorced.

**RESPONSE: Admitted.**

**REQUEST FOR ADMISSION NO. 13:**

Admit that CCHS employs, and has employed, teachers who have been divorced and

remarried without obtaining an annulment.

**RESPONSE: Denied.**

This the 16th day of June 2017.

Respectfully submitted,

John G. McDonald (N.C. Bar No. 23848)
jmcdonald@mcguirewoods.com
Joshua D. Davey (N.C. Bar No. 35246)
jdavey@mcguirewoods.com
Meredith A. Pinson (N.C. Bar No. 39990)
mpinson@mcguirewoods.com
MCGUIREWOODS LLP
201 North Tryon Street, Ste. 3000
Charlotte, North Carolina 28202
704.343.2276
704.444.8753 (Facsimile)

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing via electronic mail on counsel for Plaintiff at

the following addresses:

> S. Luke Largess
> Tin Fulton Walker & Owen PLLC
> 301 East Park Avenue
> Charlotte, North Carolina 28202
> Telephone: 704-338-1220
> Facsimile: 704-338-1312
> Email: llargess@tinfulton.com
>
> Christopher Brooke
> American Civil Liberties Union of North Carolina Legal Foundation
> P.O. Box 28004
> Raleigh, North Carolina 27611
> Telephone: 919-834-3466
> Facsimile: 866-511-1344
> Email: cbrook@acluofnc.org
>
> Brian Hauss
> American Civil Liberties Union Foundation
> 125 Broad Street, 18th Floor
> New York, NY 10004
> Telephone: 212-549-2604
> Facsimile: 212-549-2652
> Email: bhauss@aclu.org
>
> Elizabeth O. Gill
> American Civil Liberties Union Foundation
> 39 Drumm Street
> San Francisco, CA 94111
> Telephone: 415-621-2493
> Facsimile: 415-255-8437
> Email: egill@aclunc.org

This the 16th day of June 2017.

_____

Meredith A. Pinson (N.C. Bar No. 39990)

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

LONNIE BILLARD,          )
                         )
        Plaintiff,    )   No. 3:17-CV-11
                         )
    vs.              )
                         )
CHARLOTTE CATHOLIC HIGH  )
SCHOOL, ET AL,         )
                         )
        Defendants.   )
_____)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MAX O. COGBURN, JR.
UNITED STATES DISTRICT COURT JUDGE
SEPTEMBER 16, 2020

APPEARANCES:

On Behalf of the Plaintiff:

    JOSHUA BLOCK, ESQ.
    American Civil Liberties Union
    125 Broad Street, 18th Floor
    New York, New York 10004-2400

    IRENA COMO, ESQ.
    ACLU of North Carolina
    P.O. Box 28004
    Raleigh, North Carolina 27511

    S. LUKE LARGESS, ESQ.
    Tin Fulton Walker & Owen
    301 East Park Avenue
    Charlotte, North Carolina 28203

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

APPEARANCES:

On Behalf of the Defendant:

        JOSHUA DANIEL DAVEY, ESQ.
        Troutman Peppers Hamilton Sanders, LLP
        301 South College Street, 34th Floor
        Charlotte, North Carolina 28202

        MOSES M. TINCHER, ESQ.
        Troutman Pepper Hamilton Sanders, LLP
        600 Peachtree, N.E., Suite 3000
        Atlanta, Georgia 30308

3

1                P R O C E E D I N G S

2           (Due to COVID-19, the courtroom has been

3    reconfigured to allow for social distancing.  The proceedings

4    were reported to the best of my ability to hear and understand

5    what was being said from my position in the back of the well

6    behind counsel.  Some participants appeared via Zoom.  Many

7    participants wore masks.)

8           (Court called to order 10:00 AM.)

9           THE COURT:  All right.  I'll hear from the

10   defendant.

11          MR. DAVEY:  Thank you, Your Honor.  Joshua Davey and

12   Moses Tincher of the Troutman Pepper law firm here on behalf

13   of the defendant in this case, the Roman Catholic Diocese of

14   Charlotte, Charlotte Catholic High School, and Mecklenburg

15   area Catholic schools.

16          Your Honor, we're here on the diocese's motion for

17   summary judgment and Mr. Billard's motion for partial summary

18   judgment.  We're asking the Court to grant the diocese's

19   motion and to deny Mr. Billard's motion.

20          This case, Your Honor, presents the question of

21   whether a Roman Catholic high school, Charlotte Catholic High

22   School, a school that exists to transmit and teach the

23   Catholic faith to the next generation, can require its

24   teachers to refrain from public conduct in opposition to the

25   religious beliefs of the Catholic church with respect to

4

1  marriage.  And the answer, Your Honor, we submit, is not

2  difficult and the answer is that Charlotte Catholic can do

3  that.

4       Your Honor, the free exercise of religion is

5  literally the first liberty guaranteed in the Bill of Rights.

6  And time and again, including recent cases, Your Honor, the

7  Supreme Court and the courts of appeals have emphasized that

8  Title -- that Title VII of the United States Constitution

9  ensures the rights of religious organizations to operate

10 religious schools, including the right to create and maintain

11 communities comprised of individuals who subscribe to and

12 practice the faith that Charlotte Catholic seeks to instill in

13 its students.

14      It's not hard to understand why that's important to

15 religious organizations like Charlotte Catholic because

16 Charlotte Catholic is a mission-driven organization not a

17 money-driven organization.  And the mission, Your Honor, is

18 the message, specifically the Catholic religious message, the

19 promulgation of the Catholic faith, to the students at

20 Charlotte Catholic High School.  The school uses its teachers

21 to convey that message.  And it's easy to see how that message

22 is undermined if the school is required under penalty of law

23 to employ teachers who oppose the message it seeks to convey.

24      Importantly, Your Honor, even in the recent Supreme

25 Court decisions which have expanded and recognized rights and

1  protections for gay and lesbian Americans, Your Honor, the

2  Supreme Court at the same time has made it very clear that

3  religious groups like Charlotte Catholic maintain the right to

4  create these communities comprised of individuals who

5  subscribe to the Catholic faith and that they're free to do

6  that, Your Honor, and that the courts in protecting the rights

7  of gay and lesbian Americans need to simultaneously protect

8  the rights of religious groups to teach and promulgate their

9  faith, Your Honor.

10          We think that Mr. Billard's claims in this case fail

11 for several reasons which I'll touch on.

12          First of all, we believe that the religious

13 exemptions to Title VII, Section 702 and Section 703 of the

14 statute, apply because the reason for the defendant's decision

15 to release Mr. Billard from his employment was based on their

16 religious preference for someone who would live in a manner in

17 accordance with the Catholic faith, Your Honor.

18          Secondly, Your Honor, we don't believe that

19 Mr. Billard can prove that his sex or his sexual orientation

20 was a motivating factor in the decision to release him.  To

21 the contrary, Your Honor, the undisputed evidence here shows

22 that --

23          THE COURT:  You're saying his sex or sexual

24 orientation was not a -- was not a motivating factor.

25          MR. DAVEY:  That's right, Your Honor.

6

1          THE COURT:  Are you saying that the announcement
2   that he was getting married is some kind of advocacy instead
3   of just a common announcement?
4          MR. DAVEY:  Well, Your Honor, if you look at the
5   Facebook post, what he did is he said, "I intend to marry
6   Mr. Donham," his partner.  And he also said, "If you disagree
7   with this, keep it to yourself," and, you know, referenced a
8   song about going to get married.  And that, Your Honor, we do
9   believe is advocacy in favor of a position that is opposed to
10  what the church teaches about marriage.
11         THE COURT:  "If you disagree with this, keep it to
12  yourself" is an advocacy for -- he's not telling -- he's not
13  trying to argue with anybody about whether they should agree
14  or disagree.  He's just saying keep it to yourself if you
15  disagree.  But you're saying that's advocacy.
16         MR. DAVEY:  Your Honor, that's --
17         THE COURT:  Mighty poor advocacy.  If you came in
18  and said, you know, Judge, I just want you to know if you
19  don't think we should win, that's okay and I'm going to sit
20  down and let the other side argue, that's not much advocacy,
21  is it?
22         MR. DAVEY:  Your Honor, that's how my client
23  understood it, as an advocacy for that position.
24             But the facts are Mr. Billard posted on Facebook his
25  intention to get married.  And then as a result of that, he

7

1 was informed by the assistant principal at Charlotte Catholic

2 that he would not be able to serve as a substitute teacher.

3    THE COURT:  And it's clear that if he'd made an

4 announcement he was getting married to a woman, that would not

5 have been a problem for the Charlotte Catholic Church.

6    MR. DAVEY:  Your Honor, I disagree.  Under the

7 *Bostock* case in the Supreme Court, the Court kind of gave us

8 the road map for how you evaluate these things.  And what it

9 said is that the way you know if the decision is based on sex

10 is if you take Mr. Billard and you make him a woman and ask

11 what would have happened under those circumstances, Your

12 Honor.  And the evidence is undisputed here that if

13 Mr. Billard had been a woman and had gone on Facebook and

14 promoted same sex marriage, then the same result would have

15 happened.

16    THE COURT:  No, that's not my question.  My question

17 is had he said I, a man, am going to marry a woman, that would

18 have been okay.

19    MR. DAVEY:  That's also not quite right, Your Honor.

20 Because it's not just enough in the Catholic faith for a man

21 to marry a woman; they have to be free to marry.  And I think

22 if you look at the facts here -- and again, following the

23 Supreme Court's analysis in *Bostock*, if you make Mr. Billard a

24 woman and his spouse, Mr. Donham, is a divorced Catholic man

25 who doesn't have an annulment, then that arrangement, Your

8

1  Honor, is not something that the Catholic church would
2  recognize.  In fact, there's evidence in the record under
3  those exact facts, Your Honor, that another teacher was
4  released from employment for entering into that type of
5  marriage, again, inconsistent with the Catholic view on
6  marriage.
7         Your Honor, I'd like to first address the religious
8  exemptions to Title VII unless the Court has further questions
9  about that specific point.
10        THE COURT:  No, go ahead.
11        MR. DAVEY:  Section 702 of Title VII provides that
12 "this subchapter," those are the words used, "this
13 subchapter," and that refers to Title VII itself, "shall not
14 apply to religious employers, including religious schools,
15 with respect to employment of individuals of a particular
16 religion who carry on the religious mission of the school."
17        Section 703, Your Honor, of Title VII provides that
18 it's not a Title VII violation --
19        MR. LARGESS:  Your Honor, I hate to interrupt, but
20 it appears that Zoom has been frozen for a minute or two here.
21 I don't know if they can hear the argument.
22        THE COURT:  Okay.  Hold on.
23        MR. LARGESS:  Sorry, Josh.
24        MR. DAVEY:  Not a problem.
25        THE COURT:  Now, I'm seeing his eyes are moving.  Is

1  he frozen or is he...

2          MR. LARGESS:  My screen has been frozen.

3          THE COURT:  Can you hear us?

4          (No response.)

5          THE COURT REPORTER:  My screen is frozen.

6          THE COURT:  I mean, he looks -- appears to be...

7          THE CLERK:  It's working for us, but not for him.

8          MR. LARGESS:  Did he respond to you verbally, Your

9  Honor?

10          THE COURT:  Can you hear us?

11          (No response.)

12          THE CLERK:  Okay.  We're going to have to reconnect.

13  I don't know what else to do.

14          (Pause.)

15          THE CLERK:  It's frozen.  Can we take a break to get

16  IT in here?

17          THE COURT:  I guess we have to stop.  I hate to

18  interrupt your train of thought.  Let's get IT in here, and

19  they need to stay in here for the rest of the hearing so we

20  don't have to stop again.

21          (Pause.)

22          THE COURT:  All right.  Proceed.

23          MR. DAVEY:  Can you all see them?  We can't see

24  them.  That's fine, but I just...

25          THE CLERK:  You should be able to.

10

1             MR. DAVEY:  Is Your Honor ready?

2             MR. LARGESS:  I guess the question is where they got

3    cut off, Judge.  Do we need to establish that?

4             What was the last thing you guys heard?

5             UNIDENTIFIED SPEAKER:  The last I heard was the

6    discussion about if you disagree, keep it to yourself and

7    whether that constituted advocacy.  But we don't need to

8    repeat parts --

9             THE COURT:  Yeah, I think that's -- let's move on.

10             MR. DAVEY:  I'll proceed, Your Honor, with the

11    Title VII --

12             THE COURT:  Just proceed where you are and if we

13    need to --

14             MR. DAVEY:  As we were discussing just a moment ago,

15    Section 702 to Title VII provides that this subchapter,

16    meaning all of Title VII, does not apply to religious schools

17    who make an employment decision in preference for someone of a

18    particular religion.

19             Likewise, Section 703 provides that it's not a Title

20    VII violation for a religious school like Charlotte Catholic

21    High School to hire employees of a particular religion where

22    its curriculum is devoted to advancement of that religion.

23             There's no dispute, Your Honor, that Charlotte

24    Catholic and the defendants in this case are covered by these

25    exemptions.  They fall within the definition of a religious

1   entity for purposes of the exemption.

2         THE COURT:  Can you point to any appellate precedent

3   holding that sex discrimination is permissible as long as it's

4   done in the name of religious conviction?

5         MR. DAVEY:  Well, Your Honor, there's a number of

6   cases that we've cited that hold that the religious exemptions

7   to Title VII apply to sex discrimination claims.  And I can

8   point you to some of these.  The *Little versus Wuerl* case from

9   the Third Circuit, Your Honor, the *Hall* case in the Sixth

10   Circuit, the *Curay-Cramer* case in the Third Circuit all hold

11   this way, Your Honor.  And I think it's consistent if you read

12   *Rayburn* and and if you read *Kennedy*, the two Fourth Circuit

13   cases that address this.  They require the same conclusion.

14   And if you read *Kennedy* it explains Congress's purposes in

15   enacting these religious exemptions to Title VII, Your Honor.

16   And I'm going to quote from the decision.

17         "Congress intended to enable religious organizations

18   to create and maintain communities comprised solely of

19   individuals faithful to their doctrine of practices whether or

20   not every individual plays a direct role in the organization's

21   religious activities."  That's the motivation there, Your

22   Honor.

23         And what those decisions say is that the -- it's not

24   the case, Your Honor, that these exemptions create a blanket

25   exception for religious organizations from sex discrimination.

12

1   That's not what we're saying.

2           The important thing to evaluate, though, Your Honor,

3   is what is the reason for the employment decision and whether

4   the reason for the employment decision is motivated by

5   religious preference.  It's not important how the plaintiff

6   styles the claim.  What's important is what is going on behind

7   the decision.

8           And there's no dispute on these facts, Your Honor,

9   and Mr. Billard doesn't contest that the defendant's decision

10  to release him from employment was based on their sincere

11  religious beliefs in view of the Catholic belief about

12  marriage, Your Honor.  That's not in dispute here.  And we

13  submit, Your Honor, that based on that, and based on the cases

14  we've cited, that the Title VII exemptions apply.

15          Your Honor, I think there's another reason to read

16  them that way which is also talked about in *Kennedy* and

17  *Rayburn*, the Fourth Circuit cases that touch on this, and

18  that's the principle, Your Honor, of constitutional avoidance.

19  And of course, that principle dictates that if there's a way

20  to interpret Title VII that avoids substantial constitutional

21  questions, then the Court should adopt that interpretation.

22          And so the question here, Mr. Billard contends that

23  the exceptions only apply if the plaintiff asserts a religious

24  discrimination claim, Your Honor, and we believe that the

25  exception can apply where the reason for the employment

13

1   decision is based on religious preference.  And so in deciding

2   as between the two, if there's a way to avoid a serious

3   constitutional question, then the Court should adopt that

4   reading of the exceptions, Your Honor.

5           If Mr. Billard's reading is right, then what Title

6   VII does is it prohibits Catholic schools from requiring

7   non-ministerial employees to refrain from conduct with respect

8   to marriage that violates the Catholic view of marriage, Your

9   Honor.  That type of a prohibition obviously raises

10  significant constitutional questions.  And we've briefed some

11  of those with respect to the church autonomy doctrine with

12  respect to RFRA.

13          Your Honor, those are concerns that can be avoided

14  if the Court adopts the reading of the exceptions to Title VII

15  that we believe are required by the plain text of the statute.

16  If Congress had intended to provide that those exceptions

17  applied only if the plaintiff brings a claim for religious

18  discrimination, that would have been easy to do.  But if you

19  look at the text of Section 702, it says this subchapter

20  doesn't apply where the reason for the decision is based on

21  religious preference, Your Honor.  And that's what *Rayburn*

22  says about those exceptions, that that's what it means.

23          So, Your Honor, we believe that the argument

24  Mr. Billard is making about this, that it's either a choice

25  between saying that a religious organization is not subject to

14

1  any sex discrimination claim or it's saying that the religious
2  organization is off the hook all together, Your Honor, or that
3  the religious exceptions only apply if the claim is styled as
4  one for religious discrimination, Your Honor, that's a false
5  choice.  What the statute, Your Honor, requires and the case
6  law requires is a middle ground.  That the Court has to look
7  at the reason in a case like this, the reason for the
8  employment decision.  And here it's not disputed that it was
9  motivated by sincere religious belief, Your Honor.  And where
10 that's the case, Title VII doesn't prohibit a Catholic school
11 from requiring its teachers, Your Honor, to conduct themselves
12 publicly in accordance with Catholic teaching.
13        Your Honor, I'm going to move on to the substantive
14 Title VII argument.  We touched on this a moment ago, Your
15 Honor.  That we don't believe that Mr. Billard can prove
16 there's any evidence to support that either his sex or his
17 sexual orientation was the motivating factor in Charlotte
18 Catholic's decision to release him from employment.
19        And *Bostock*, of course, is the most recent work from
20 the Supreme Court on how the Court is to evaluate this type of
21 claim.  And what the Supreme Court said there in terms of how
22 the Court can determine if an employment action is taken
23 because of sex, and I'll quote from the decision, "If the
24 employer intentionally relies in part on an individual
25 employee's sex when deciding to discharge the employee, put

differently, if changing the employee's sex would have yielded
a different choice by the employer, then a statutory violation
occurred."

THE COURT:  Let me get this -- I want to get the
factual -- the facts that this is based on.  This is based on
this announcement.  This wedding announcement is what this is
based on, right?

MR. DAVEY:  Correct.  Yes, Your Honor.

THE COURT:  No statements or anything inside the
school during teaching.  No -- no posts supporting marriage,
gay marriage in general.  Just I'm going to get married to
someone and if you disagree, keep it to yourself.  I mean,
that's the -- that's the facts that Charlotte Catholic is
basing this on.

MR. DAVEY:  Your Honor, Mr. -- that's essentially
right.  Mr. Billard in October of '14, 2014, posted on
Facebook and he said, "Going to the chapel and we're going to
get married.  Going to the chapel and we're going to married.
Yes, I'm finally going to finally make an honest, at least
legal, man out of Rich."  That's Mr. Donham, his partner.
"We'll be married on May the 2nd, 2015.  Details to follow.  I
cannot believe I'm saying this or that it's even possible.  I
thank all the courageous people who had more guts than I who
refused to back down and accept anything but equal.  PS if you
don't agree with this, keep it to yourself.  You never ask my

16

1  opinion about your personal life and I'm not asking yours."

2           That's what he posted on Facebook.  That came to the

3  attention of the Charlotte Catholic administration.  And he

4  was informed in December that he would not be able to continue

5  to serve as a substitute teacher.  Those are the facts, Your

6  Honor.  I don't think there's any dispute about those facts.

7           THE COURT:  A little different than the statement,

8  "Woman, who is here to condemn you?"

9           "No one, Lord."

10          "And neither do I."

11          MR. DAVEY:  Your Honor, with respect to the test

12 articulated by *Bostock*, I think, as we said, there's no

13 dispute about the facts.  There's no dispute that

14 Mr. Billard's announcement of his intention to marry

15 Mr. Donham was a violation of the employment policies that he

16 agreed to abide by as a teacher at Charlotte Catholic High

17 School.  And there's no dispute, Your Honor, that Charlotte

18 Catholic had applied those policies in other cases involving

19 similar conduct, and we've cited some of those examples, Your

20 Honor.

21          And on these facts, then, following the *Bostock*

22 test, Your Honor, I think it's undisputed that if Mr. Billard

23 had been a woman and had gone on Facebook and had thanked

24 advocates of same sex marriage and said I don't want to hear

25 your opinion, Your Honor --

1          THE COURT:  It said the same thing.  You can argue

2     about whether -- your statement is that he's advocating for it

3     rather than making an announcement for it.  But if there was

4     a -- if -- I will agree with you, if a woman had gone on and

5     said I am marrying a woman, I'm sure that Charlotte Catholic

6     would have taken the same position.

7          The question is whether or not the fact that he was

8     a man making an announcement that he was marrying a man,

9     that's the issue that we have here, whether that is

10    discrimination; whether they've engaged in and violated his

11    rights with regard to that, not as -- I agree with you.  I

12    don't think there's any question if it was a woman to woman,

13    it would be the same.

14         MR. DAVEY:  Yes, Your Honor.  And I think further to

15    that point, though, if a woman employee, and this is what the

16    evidence supports, had gone on Facebook and had said something

17    to the effect of what Mr. Billard said, I am grateful to

18    advocates who promoted this before me -- that's the import of

19    his message:  Thanking those who had advocated for this cause,

20    Your Honor.  If that had been the message from a female

21    employee, whether gay or straight, married or not, the

22    evidence is the result would have been the same, Your Honor.

23    And that's the *Bostock* test.

24         THE COURT:  All right.

25         MR. DAVEY:  And I think *Bostock* does not -- what

18

1    *Bostock* holds, Your Honor, is that it's a Title VII violation

2    to fire someone merely for being gay or transgender.  But

3    *Bostock* does not proscribe conduct-based rules, and in

4    particular does not proscribe conduct-based rules based on

5    sincere religious belief, and that's in the *Bostock* decision

6    itself, Your Honor.

7            *Bostock* -- going back to the Title VII exemptions,

8    *Bostock* recognized that those exemptions, while not presented

9    in that case because it didn't involve a religious employer,

10   could apply to claims like these involving a Title VII sex

11   discrimination claim similar to the one Mr. Billard brings.

12           Your Honor, I'd like to next turn to the Religious

13   Freedom Restoration Act issue.  As I've indicated, I don't

14   believe that Title VII applies to Mr. Billard's claims.  But

15   even if it did, under RFRA, the defendants are entitled to an

16   exemption.  RFRA provides that government shall not

17   substantially burden a person's exercise of religion even if

18   the burden results from a rule of general applicability.

19           THE COURT:  Does the language of that statute

20   restrict the statute scope to government action?

21           MR. DAVEY:  The statute proscribes action by the

22   government, Your Honor.  And I think there's no dispute that

23   this Court is part of the government.

24           THE COURT:  So you're saying anything by the Court,

25   then.  It's your position that any -- any action by the Court

19

1   is going to violate RFRA.

2           MR. DAVEY:  Well, Your Honor, I don't know if I'd

3   say any action.

4           THE COURT:  That's adverse -- that's adverse to --

5   in a situation like this is going to violate RFRA.

6           MR. DAVEY:  What Mr. Billard is asking the Court to

7   do is award damages, to reinstate him, and to issue an

8   injunction.  And certainly if the Court were to do that and

9   prohibit Charlotte Catholic from requiring its teachers to

10  conduct themselves in a manner consistent with the Catholic

11  faith, that would be an action by the government and that

12  would be a substantial burden on the religious exercise of the

13  defendants, and I don't believe Mr. Billard contests that much

14  of it, Your Honor.

15          And so the question is what to do under RFRA, Your

16  Honor.  RFRA is a burden-shifting statute, and you can see

17  this from the Supreme Court's discussion of how the statute

18  works in *Hobby Lobby*.  Once a person has shown the existence

19  of a substantial burden -- and, Your Honor, we believe the

20  defendants have done that here -- the burden then shifts to

21  the government to show that RFRA's least restrictive means

22  test is satisfied.  What that requires is a showing that,

23  number one, the particular burden, the burden as applied to

24  Charlotte Catholic High School, is in furtherance of a

25  compelling governmental interest and it is the least

1   restrictive means of furthering that compelling governmental
2   interest, Your Honor.
3           And there's no evidence to support the conclusion
4   that requiring Charlotte Catholic High School on these facts
5   to employ someone opposed to its religious message furthers a
6   compelling governmental interest or is the least restrictive
7   means of doing so.  And we know that from *Hobby Lobby*, Your
8   Honor, where the Court recognized that an exception to a
9   generally applicable rule -- there, a contraceptive mandate;
10  here, a Title VII issue if it applies, Your Honor -- does not
11  seriously undermine the government's interest.  In fact, just
12  as in *Hobby Lobby* where there were exceptions to the mandate
13  at issue there, Title VII already contains exceptions for
14  religious organizations from its prohibitions as we discussed,
15  Your Honor.
16          So just as in *Hobby Lobby*, the appropriate thing
17  under RFRA was for an exception to be granted to the
18  particular defendant at issue there.  Likewise here, if Title
19  VII applies to Mr. Billard's claims, then under RFRA the
20  defendants are entitled to an exception because they've made a
21  showing.  The evidence is undisputed that it's a substantial
22  burden, Your Honor, and the compelling interest standard
23  cannot be satisfied on this record.
24          Mr. Billard's real argument isn't that the RFRA
25  standard doesn't apply -- isn't met, rather.  His argument is

1 that RFRA does not apply in lawsuits involving private

2 parties.  He contends it only applies if the government is a

3 party to the case, Your Honor.  But that's wrong for a number

4 of reasons.

5        First, we know that's wrong because the Supreme

6 Court in *Bostock* said it was wrong.  There again, there was no

7 religious defendant before the Court, Your Honor, but the

8 Supreme Court said that in cases like these involving a

9 private Title VII plaintiff, not the EEOC, that RFRA could

10 apply.

11        It's also not consistent with RFRA's plain text,

12 Your Honor, because RFRA proscribes certain government action

13 that creates a substantial burden on religious exercise.

14        THE COURT:  If people are going to come to the

15 courts to enforce laws, then -- and the courts are the

16 governmental action, then isn't that just sort of -- just sort

17 of a get-out-of-jail-free card for any religion to do it?  We

18 can start the religion of what's happening now and have our

19 own little doctrine and then just do anything we wanted to do

20 to discriminate and nobody could do anything about it.  Sounds

21 like everybody ought to be at church.

22        MR. DAVEY:  Your Honor, I disagree respectfully.

23 RFRA has a pretty high standard that has to be met and -- to

24 show a substantial burden and the government has the option to

25 show a compelling governmental interest.  In many cases, of

1  course, it would be able to do that, Your Honor.  But here, it

2  hasn't attempted to carry that burden.

3         And Your Honor, to the extent that RFRA could apply

4  outside these facts, Your Honor, that's what Congress enacted.

5  Congress, in fact, wrote into the statute its intentions in

6  enacting RFRA, which were to restore the compelling interest

7  test that existed prior to the Supreme Court's decision in

8  *Employment Division versus Smith* and to provide -- this is

9  what Congress expressly said in enacting RFRA, "We want to

10 provide a claim or defense to persons whose religious exercise

11 is substantially burdened by government," Your Honor.  And

12 that standard is met here.

13        One last point with respect to Mr. Billard's

14 argument that RFRA only applies in actions involving private

15 litigants, Your Honor.  That, in particular, doesn't make

16 sense in a Title VII case like this because the EEOC saw

17 Mr. Billard's charge of discrimination.  The EEOC could have

18 filed this lawsuit itself without Mr. Billard.  The EEOC could

19 have intervened in this lawsuit.  Could still do so today if

20 it wanted, Your Honor.  And in fact, Mr. Billard asked for a

21 right to sue letter and asked the EEOC not to, essentially,

22 intervene.  And now we're here, Your Honor.  And it makes no

23 sense for the substantive protections that RFRA is designed to

24 convey to turn on whether or not on the same facts, same claim

25 by Mr. Billard, on whether or not he asked the EEOC to get

1    involved or whether the EEOC chose to get involved.

2         And the Second Circuit, Your Honor, in the *Hankins*

3    decision recognized this and said that at least with respect

4    to schemes like Title VII where there's a governmental

5    enforcer who has the option of getting involved, RFRA clearly

6    applies to those types of claims.

7         And again, Your Honor, going back to *Bostock*.

8    *Bostock* says to follow the plain text of the statute, Your

9    Honor.  And if we do that, it's clear that on this record the

10   defendants have met their burden of showing a substantial

11   burden on their religious exercise.  There's no dispute that

12   this Court falls within the definition of government in the

13   statute, Your Honor.  The only question is whether the very

14   high bar set forth in the *Hobby Lobby* decision from the

15   Supreme Court is satisfied here.

16        And again, that requires that Mr. Billard not simply

17   articulate that eradication of sex discrimination is a

18   compelling governmental interest.  It is, and we don't dispute

19   that, Your Honor.  But what it requires is that Mr. -- that

20   the government or Mr. Billard or someone make a showing that

21   requiring Charlotte Catholic High School, this defendant, to

22   employ someone who opposes its religious message is the least

23   restrictive means of accomplishing that goal.  And under *Hobby*

24   *Lobby*, Your Honor, that argument just doesn't work because the

25   exception is not going to undercut the governmental goal if

24

1   it's extended to the tiny fraction of religious employers who

2   seek to uphold the definition of marriage that's consistent

3   with two millennia of Catholic teaching.

4          Your Honor, finally I'll touch briefly on our First

5   Amendment arguments.  Mr. Billard's claims are also barred by

6   the First Amendment principles of church autonomy and

7   associational freedom, Your Honor.  And I think the recent

8   Supreme Court case --

9          THE COURT:  If you go to freedom of expression, it's

10  really -- it really is a cotton loophole.  There's nothing --

11  I mean, if you go with freedom of expression, if you go with

12  that, then there's -- then you can do anything you want to do

13  because I'm freely expressing my First Amendment rights;

14  therefore, I can do what I want to do and move on.

15         MR. DAVEY:  Your Honor, the Supreme Court in the *Boy*

16  *Scouts versus Dale* case said that the freedom to associate

17  presupposes the right not to associate.  And I acknowledge,

18  Your Honor, that line of reasoning has not been applied on

19  facts like these, Your Honor.  I think it's probably not a

20  surprise to anyone that this case may go up on appeal, Your

21  Honor, and we need to preserve those arguments.

22         But Your Honor, I think there's another point to be

23  made there too.  Prior to the *Bostock* decision, it was the

24  near universal rule of the court of appeals that Title VII did

25  not recognize a cause of action for sexual orientation-based

25

1   discrimination.  And prior to the Second Circuit's decision

2   just a few years ago, no court of appeals had held that Title

3   VII extends to claims like this.  And as a result of that,

4   Your Honor, we now -- and this is -- the *Bostock* court

5   recognized this.  We're now in a situation where the courts

6   have to reconcile the holding of *Bostock* with the principle

7   reiterated time and again by the Supreme Court that the courts

8   must protect the rights of religious organizations and

9   religious schools like Charlotte Catholic to have communities

10   centered around (inaudible), Your Honor.  So it's not

11   shocking, and I don't think anyone should be surprised, that

12   there aren't a lot of decisions dealing with some of these

13   issues on these specific facts because this is the first wave,

14   Your Honor, of cases like this after *Bostock*.

15         But going back to the church autonomy point, Your

16   Honor.  The Supreme Court recently issued its decision in the

17   case *Our Lady of Guadalupe versus Morrissey-Berru*, Your Honor.

18   And the Supreme Court talked about this church autonomy

19   doctrine and said that it's rooted in a broad principle that

20   religious organizations need to be able to operate free from

21   governmental interference.  And Your Honor, that principle

22   dictates a particular application, what's called the

23   ministerial exception, but it's not limited to the ministerial

24   exception.

25         THE COURT:  And you all waived the ministerial.

26

1          MR. DAVEY:  Your Honor, yes.  We don't think
2     Mr. Billard is a minister under the test articulated in the
3     Supreme Court in *Hosanna-Tabor* a few years ago.  We're not
4     contending he meets that specific --
5          THE COURT:  There are a lot of arguments that sound
6     like you touch on the ministerial.  I mean, when you read your
7     briefs and read their briefs, everybody is kind of talking
8     like there is an issue on the ministerial exception.  If you
9     read both sides' writings, there's a lot of stuff there that's
10    kind of telling the courts -- you're arguing the ministerial
11    exception even though you're not using the ministerial
12    exception.  You're trying to push the -- push that -- because
13    if you've waived that, you know, that's -- if he's not a
14    minister, then the question is is he out there advocating
15    against the religion.
16         MR. DAVEY:  Well, I think, Your Honor, the question
17    is -- again, ministerial exception is one application of this
18    church autonomy doctrine and that holds that if a person is a
19    minister -- again, Mr. Billard isn't, but if he was, then he
20    clearly would not have a Title VII claim, Your Honor.
21         But the question for the Court is whether the -- and
22    we submit it does, whether that church autonomy principle
23    extends any further than a minister, Your Honor.  And the
24    Supreme Court has said yes.  And Your Honor, I believe what
25    the Supreme Court has said in its directives to the lower

1  courts is to safeguard the rights of religious organizations

2  and that they need to be able to create and maintain

3  communities made up of like-minded individuals, Your Honor.

4  If they cannot acquire teachers to conduct themselves in a

5  manner consistent with the faith that they're hired to help

6  pass on to the next generation, Your Honor, then it's hard to

7  see -- if that isn't covered by the church autonomy doctrine,

8  I'm not sure what would be.

9      So that's our argument, Your Honor.  We believe that

10  the Supreme Court's reasoning clearly extends to these facts

11  even if these precise facts haven't been presented in a case

12  like this.

13      Your Honor, at the end of the day, Mr. Billard's

14  argument is that Title VII prohibits Charlotte Catholic High

15  School from requiring its teachers in their public conduct to

16  refrain from public opposition to the very message that

17  Charlotte Catholic seeks to convey.  And we submit that that's

18  not the law, Your Honor.  We think that the Supreme Court has

19  made it very clear and the lower federal courts have made it

20  clear that religious institutions like Charlotte Catholic have

21  a right to create and maintain communities, including

22  teachers, of individuals who agree to conduct themselves in a

23  manner consistent with the teachings of the church, Your

24  Honor.

25      And the Title VII exceptions apply here, Your Honor.

1  We don't believe that Mr. Billard can make out his case under

2  the elements of Title VII.  We think RFRA applies and we think

3  the First Amendment applies.

4        And we also think, Your Honor, that it's clear that

5  in every recent decision in which the Supreme Court has

6  extended or recognized protections for gay and lesbian

7  Americans, it has also recognized the need to simultaneously

8  preserve the rights of religious organizations.  When the

9  Supreme Court in 2015 in *Obergefell* recognized the right to

10 same sex marriage, it said at the same time religious

11 organizations that have a different view have the right to

12 continue to teach that view and the First Amendment provides

13 that protection.

14       In *Bostock*, Your Honor, this term, the Supreme Court

15 said it was deeply concerned with preserving the promise of

16 the free exercise of religion and that it recognized that even

17 though Bostock didn't involve a religious employer, that the

18 Title VII exceptions and RFRA and the church autonomy

19 principles we discussed provide protection to religious

20 employers on facts like these, Your Honor.

21       So in closing, we would submit that Charlotte

22 Catholic has the right to teach and practice its Catholic view

23 of marriage and that necessarily entails the right to require

24 its teachers to conduct themselves in a manner consistent with

25 the message that it seeks to convey.  And I'll conclude with

1  that unless Your Honor has any further questions.

2          THE COURT:  I may in a minute.  Let me hear from the

3  other side.

4          I'm viewing him on television here.  I can see

5  there, but it's clearer here so I'm going to go here.

6          MR. BLOCK:  Great.  Thank you, Your Honor.  Joshua

7  Block appearing on behalf of plaintiff Lonnie Billard.  Thank

8  you for letting me appear remotely today.  I'll just begin by

9  addressing some of the arguments that we heard today.

10         The facts are clear that Mr. Billard was a beloved

11 teacher at Charlotte Catholic High School for more than ten

12 years, but he was fired after he posted on Facebook that he

13 was marrying his same sex partner Mr. Donham.  That's

14 undisputed and that's simple.

15         Defendants here try to draw a distinction between

16 the act of becoming engaged and the act of telling someone

17 you're engaged, but that doesn't make a difference one way or

18 the other.  All that matters is that in order to enforce their

19 policy against Mr. Billard as an individual, they had to treat

20 him as an individual differently than they would have treated

21 a woman who is marrying a man or a woman who was announcing on

22 Facebook she was marrying a man.  No matter how you

23 characterize it as announcing you're engaged or getting

24 engaged, the individual sex here is playing an indispensable

25 but-for cause in the individual's -- in the individual

30

1  employment decision.

2        THE COURT:  Let me ask this question.  Did he go too

3  far when he thanked those who had advocated for the right to

4  marry who you love?

5        MR. BLOCK:  Well, Your Honor, today is the very

6  first day in the course of this entire case, in the course of

7  all discovery, all depositions, all briefing that defendants

8  have ever mentioned those other portions of the Facebook

9  announcement.  If you look at all of their admissions, all of

10 their responses to the interrogatories, all of the briefs

11 they've submitted to this Court, that has never once come up.

12 Over and over again they say that what he did wrong was

13 announce his intention to marry a same sex partner.  So if

14 from the beginning of the case the defendants made this

15 argument and preserved it, then we could have responded

16 through discovery and that would be at issue.  I don't think

17 it's at issue here based on the undisputed record before the

18 Court.  Defendant's counsel can't inject a material question

19 of fact by bringing it up at the last minute at oral argument.

20 There's no evidence in the record pointing to those portions

21 of -- I'm sorry, Your Honor.

22        THE COURT:  Has Mr. Billard engaged in any advocacy

23 supporting same sex marriage?

24        MR. BLOCK:  No, Your Honor.  The only thing he did

25 was post this message on Facebook.  This isn't an issue where

1    Mr. Billard, you know, campaigns for marriage equality or
2    posted a political message or even attended a gay pride rally.
3    All he did was announce that he was getting married to his
4    same sex partner.  And in order to determine that that
5    announcement constituted advocacy of any kind, it was a
6    but-for cause that he was a man getting married instead of a
7    woman getting married.
8              THE COURT:  What's the -- what is the evidence that
9    the reason for firing was sex discrimination rather than
10   religious?
11             MR. BLOCK:  Well, it's uncontested that they had a
12   religious motivation for discriminating.  But the *Bostock*
13   decision is crystal clear that motivations for discrimination
14   aren't what matters if they're using sex as a but-for cause of
15   accomplishing that goal.  So in *Bostock* itself the employer
16   said we're not just discriminating based on sex.  We're
17   discriminating based on sexual orientation and we would apply
18   that equally to a gay man or a gay woman.  And the Court said
19   that doesn't matter.  The motives might be to discriminate
20   based on sexual orientation, but in order to accomplish that
21   goal along the way, they had to treat individual employees
22   differently on the basis of sex.
23             So if they're using an individual's sex as a but-for
24   cause of the decision in a particular case, their reasons for
25   doing so don't make any difference.  The Court says their

32

1  motivations, what they call it, what someone else may call it
2  don't matter.  All that matters is that sex is being used as a
3  but-for cause.

4          And that didn't begin with *Bostock*.  That's also
5  what the Court said in *Johnson Controls*:  That whether a
6  policy facially discriminates on the basis of sex isn't
7  determined by the motivations of the discriminator, it's
8  determined by what the policy on its face does.  And on its
9  face a policy saying a man can marry -- can announce they're
10  marrying another -- a man can announce they're marrying a
11  woman but cannot announce they're marrying another man
12  facially discriminates on the basis of sex regardless of the
13  subjective motivations for having that policy.

14          I do want to object -- I want to address a little
15  bit more this issue of these other portions of the Facebook
16  post that they're bringing up now for the first time.  They
17  said the record is undisputed that they've taken similar
18  actions in other cases.  All the other cases they're talking
19  about are cases where someone actually violated Catholic
20  teachings about marriage:  They got married to a Catholic who
21  hadn't previously had an annulment; they had an extramarital
22  affair.  They actually haven't introduced any evidence in the
23  record about other cases where they've punished so-called
24  advocacy.  And in fact, the depositions show that they
25  admitted they wouldn't fire someone just for advocacy.

1        The individual who fired Mr. Billard testified under

2   oath that if someone just posted a message on Facebook

3   supporting same sex marriage, he would have asked them to

4   speak with the priest; he wouldn't have fired them.  And

5   that's what defendant's declaration by Janice Ritter also

6   says.  They say when someone does something in opposition to

7   Catholic teaching, we try to see if it can be addressed short

8   of firing someone.  Only if the employee persists in it do we

9   go to the step of firing.

10        So I don't think all these questions about the

11   so-called advocacy of the Facebook post are even in front of

12   this Court.  But if they were, the undisputed evidence shows

13   that it actually would not have triggered a firing.  And in

14   fact, throughout the deposition of the board's 30(b) -- the

15   school board's -- excuse me, Charlotte Catholic's 30(b)(6)

16   witness, it was crystal clear that the policy prohibits anyone

17   from marrying a same sex partner regardless of whether they

18   talk about it publicly or not, regardless of what type of

19   employee they are.  They can work in a back office, you know,

20   administering the IT equipment and they cannot say a word to

21   anyone about their marriage, it still violates their policy.

22        So I think just as a matter of undisputed fact here,

23   this is a policy against men marrying men or women marrying

24   women and that's what they applied in this case.

25        If the Court doesn't have any other questions about

34

1   the sex discrimination issue, I'd be happy to address the

2   other alleged defenses that defendants raised.

3          THE COURT:  Go ahead and do that.

4          MR. BLOCK:  So I'll begin with Section 702.  The

5   language of the statute says that this provision does not

6   apply with respect to employees -- with respect to employment

7   of individuals of a particular religion.  It doesn't say --

8   that language is very specific in saying the portion of Title

9   VII that doesn't apply is the portion that prohibits

10  discrimination against individuals of a particular religion.

11  And Fourth Circuit precedent is just crystal clear on this

12  point that all that does is it provides a defense to claims of

13  religious discrimination.  It does not provide any defense to

14  claims of race, sex, color, or national origin discrimination.

15         Defendants here say you should use the cannon of

16  constitutional avoidance, but that's exactly what the Fourth

17  Circuit did in *Rayburn*.  *Rayburn* was the first case in which

18  the Fourth Circuit recognized the ministerial exception.  But

19  before going to that constitutional holding, they said we need

20  to look closely at 702 to see if there's any statutory way to

21  avoid this constitutional question.  And after their

22  exhaustive analysis, they said that there wasn't a way to

23  avoid the question; that they had to reach the constitutional

24  question because they had no power to carve out an exception

25  to the statute that Congress (inaudible).

35

1          And you know, the defendants here would like Rule

2    702 to mean something else, but we're at the lowest rung of

3    the federal judiciary right now.  We're bound by Fourth

4    Circuit precedent and the Court doesn't have discretion to

5    write on a clean slate even if it were inclined to except

6    defendant's arguments.

7          And saying that there were other cases that somehow

8    embrace these arguments, defendants are just blatantly

9    misrepresenting the holdings of those courts.  As we explain

10   in our brief, this is on pages 6 and 7 of our opening

11   supplemental brief, all of the cases that they're pointing to

12   are cases in which an employee was fired for a reason that

13   didn't explicitly discriminate on the basis of sex.

14         In *Little* they were fired for remarrying without

15   obtaining an annulment.  In other cases they were fired for

16   advocating in favor of abortion rights.  The employees in

17   those cases tried to say that even though they weren't

18   facially being discriminated against on the basis of sex,

19   the -- their employer somehow punished their type of advocacy

20   differently than they would have punished other types of

21   advocacy, such as, you know, opposition to support for the war

22   in Iraq or support for the death penalty.

23         And the Court said we're not going to look behind to

24   see, you know, how the defendants are applying their religious

25   beliefs to see if they're coming down harder for some

1 religious beliefs than others.  That's not the business of the
2 courts.

3          None of those cases involved a case in which a
4 policy facially discriminated.  And in fact, all of the cases
5 involving the head of household payments confront the
6 situation exactly.  In the Fourth Circuit, in the Ninth
7 Circuit, in other courts across the country, there were
8 schools that said their religious beliefs require that they
9 pay married men more than married women because of their
10 religious belief that the man is the head of household and has
11 to provide.  It's a sincere religious belief.  But every
12 single court said that sincere religious belief is facially
13 discriminating on the basis of sex, and so 702 and 703 don't
14 apply.

15          The Fourth Circuit's case on this, *Dole versus*
16 *Shenandoah*, was not a Title VII case.  It was a Fair Labor
17 Standards Act case involving the Equal Pay Act.  But the other
18 cases were all Title VII cases too.  And it's crystal clear in
19 those cases that they're acknowledging that this is
20 religiously motivated, but they're also saying it's facially
21 discriminatory so 702 doesn't apply.

22          And the same thing has come up in lower court
23 decisions where someone gets pregnant using IVF.  It's
24 uncontested that the employers in those cases had a religious
25 objection to IVF technology; but nevertheless, Title VII

1  explicitly prohibits pregnancy discrimination as part of
2  discrimination on the basis of sex.  And the cases like *Herx*
3  say this violates Title VII's prohibition on pregnancy
4  discrimination and 702 doesn't give you a defense regardless
5  of your religious beliefs.
6          One more thing about constitutional avoidance.
7  There's no constitutional question in this case to avoid.
8  Their best argument is under RFRA.  But under the Constitution
9  itself, it's crystal clear that if an employee is not a
10 ministerial employee, there is no constitutional problem with
11 requiring a religious employer to abide by the generally
12 applicable rules of Title VII.  There are a bunch of statutory
13 accommodations such as the (inaudible) exemption in 702, such
14 as RFRA.  But there's not a serious constitutional case to be
15 had that either the -- either part of the First Amendment
16 gives a religious employer a constitutional right to
17 discriminate against non-ministerial employees on the basis of
18 sex.  No court ever has accepted that argument.
19         So they try to get around --
20         THE COURT:  Let me ask this question, though.  You
21 have a -- you have a religious school where one of the
22 doctrines is opposed to gay marriage, gay -- any -- gay, I
23 guess, anything.  And you've got a person who is -- there who
24 is married to a same sex partner and comes into that school.
25 Is that not a situation where every day that they come in

38

1  there's not a problem for the school with regard to that

2  doctrine since the person that's there is violating that

3  doctrine?

4         MR. BLOCK:  Well, Your Honor, I think that

5  ultimately there may be a conflict for the school, that the

6  school may very well experience it as a burden on their

7  religious exercise if that's how they interpret their

8  doctrine, but neither RFRA nor the Constitution categorically

9  prohibits placing a burden on religious exercise.

10        Everyone, including a religious school -- every

11  employer, including a religious school, is bound by Title VII.

12  Churches are not above the law.  And if there is a

13  compellingly -- compelling governmental interest that's

14  narrowly tailored, the government can burn a religious

15  exercise.  RFRA says that explicitly.

16        And so the question here, like in -- this exact same

17  issue, again, came up in the head of household payments --

18  this is in the Fourth Circuit -- where the school said we have

19  a sincere religious belief that we can't pay married women as

20  much as married men.  You're forcing us to act inconsistently

21  with our religious beliefs.  And the Fourth Circuit said

22  (inaudible) in their religious beliefs, but nevertheless

23  protecting sex discrimination in employment of non-ministerial

24  employees is an interest of the highest order and that

25  prohibiting that discrimination is the most narrowly tailored

39

1  way of achieving it.

2          So, you know, in our society there may come

3  instances in which rights to equality and rights to religious

4  freedom are in tension and we have many, many, many

5  protections for Charlotte Catholic and other religious schools

6  when that happens.  They can fire a ministerial employee for

7  whatever reason they want.  Title VII doesn't apply at all.

8  And under the Supreme Court cases, many teachers qualify as

9  ministerial employees if they're actually teaching religion.

10          That's not what happened here.  Mr. Billard was

11  actively told he shouldn't say anything about religion.  Leave

12  that to the religious teachers.  And of course, they've

13  stipulated that the ministerial exception doesn't (Zoom

14  froze).

15          THE COURT:  Okay.  It's just frozen.

16          MR. LARGESS:  Yes.

17          THE COURT:  Chris, it just froze on us.

18          MR. LARGESS:  Ms. Como is still active, but...

19          There we go.  He doesn't realize he froze.  I think

20  you're going to need to tell him.

21          MR. BLOCK:  Oh, I froze?

22          MR. LARGESS:  Yeah, you froze for a while, Josh.

23          MR. BLOCK:  Oh, that's too bad.  I said something

24  really, really compelling during that time.

25          What's the last thing you heard?

40

1       THE COURT:  You were talking about -- you weren't

2    off for long.  I heard most of what your argument was.  You

3    were off probably -- probably for a minute.

4       MR. BLOCK:  All right.  So I was just saying that on

5    top of the ministerial exception, 702 gives them the right to

6    dictate their religious beliefs to their employees in a way

7    that no private for-profit company could.  This is extremely

8    strong authority to discriminate based on religious beliefs.

9    It's just not unlimited.  They can do it as long as they're

10   not using those religious beliefs in a way that requires

11   discrimination based on race, sex, color, or national origin.

12      So we're talking about huge amounts of accommodation

13   for religious exercise here, but that doesn't mean that the

14   religious school always wins.  When it comes to interest of

15   the highest order, which is protecting employees who are paid

16   for salary from employment discrimination on the basis of sex

17   or race or, for that matter, sexual orientation, those are

18   compelling governmental interests and compelling governmental

19   interests are allowed to outweigh religious exercise if

20   they're narrowly tailored.

21      Their argument about RFRA is that even assuming that

22   RFRA were to apply here, their argument is, well, it might be

23   compelling to prohibit other employers from discriminating,

24   but it's not compelling to prohibit us from discriminating.

25   And again, the Fourth Circuit rejected that argument in

1  *Rayburn* and *Dole*.  Dole was a religious school and they said
2  it's still a compelling interest of the highest order.

3            But the real problem with their argument is in *Hobby*
4  *Lobby*, the reason why it was possible to grant an exception
5  was because the effect of granting an exception would have a
6  negative impact on the individual employees of precisely zero.
7  You could give an exception to *Hobby Lobby* and the employees
8  would still get their insurance for birth control.  It had
9  zero negative impact on them.  That's why it wasn't narrowly
10 tailored and an exception was available.

11           They say, well, this situation is similar because of
12 all the people in the world who are protected by -- from sex
13 discrimination, we're just allowing religious schools to
14 discriminate.  But that's not how it works.  The government
15 has a compelling interest in protecting Mr. Billard as an
16 individual, as an individual human being, from discrimination
17 on the basis of sex in employment.  That is a compelling
18 interest.  And the only way to protect him as an individual is
19 to prohibit employers from discriminating against him on the
20 basis of sex.  That's exactly what the Sixth Circuit said in
21 *Harris Funeral Home*.

22           Which brings me back to one more point about RFRA.
23 It's not true that the -- all the plaintiffs in RFRA, you
24 know, were just involved in private litigation without the
25 government.  The name of the *Harris Funeral Home* case was *EEOC*

1    *versus Harris Funeral Homes*.  It was brought by the EEOC and

2    for that reason Harris Funeral Homes was allowed to raise a

3    RFRA defense in the Sixth Circuit.  Then when the solicitor

4    general's office prohibited the EEOC from defending its

5    judgment on appeal, private counsel for Ms. Stevens came and

6    intervened.  But the reason why RFRA was absolutely in that

7    case is because EEOC was a party.

8            So when the Supreme Court is talking about RFRA, and

9    actually explicitly mentions that the Sixth Circuit rejected a

10   RFRA defense in *Harris Funeral Homes*, but that was an appeal

11   for cert.  The government was absolutely a party in that case.

12           THE COURT:  All right.  Let's move on.

13           MR. BLOCK:  Yeah.  Actually, I think I've covered

14   almost everything.  There's the church autonomy argument.

15   Again, I think that's, you know, very much covered by our

16   briefs.  The only cases they point to in which some other

17   ecclesiastical autonomy applied was very unusual circumstances

18   in which a ministerial employee couldn't challenge their

19   firing so they said that their employer's speech, their

20   antigay speech somehow constituted sexual harassment.  And the

21   courts that they cite said no, no, no, no, you know, you're

22   really just challenging the church's doctrine there.  You

23   know, the speech is protected.  None of those cases involved

24   firing someone.

25           The footnote I'd make to that is actually the two

43

1  district court cases they cite from the Seventh Circuit have

2  now actually been abrogated on appeal.  The Seventh Circuit

3  just recently held that, in fact, the ministerial exception

4  and church autonomy don't bar sexual harassment claims.  I

5  think that whether or not that decision is correct is neither

6  here or there because it doesn't apply to our case.  But I

7  would just note that, you know, right now those district court

8  decisions aren't even good law in the Seventh Circuit.

9        And then as for *Dale*, you know, again, this is yet

10  another unprecedented argument that hasn't been accepted by

11  any court.  *Dale* was a public accommodations case involving a

12  volunteer scout leader.  It was about an organization's

13  ability to choose its own members.  Mr. Billard isn't applying

14  to be a member of the church.  He is an employee who receives

15  salary for the work he performs.  That is a commercial

16  transaction.  It's commercial association.  And the fact that

17  it has religious meaning to defendants doesn't change the fact

18  that it is subject to Title VII as a commercial transaction.

19        THE COURT:  All right.

20        MR. BLOCK:  I guess that's all I have, Your Honor.

21        THE COURT:  All right.  Let me hear a quick brief

22  response from the defense.

23        MR. DAVEY:  Very briefly, Your Honor.

24        We've long contended Mr. Billard's Facebook post

25  about advocacy, so I'm not sure exactly where this waiver

44

1   concept is coming from.  That's been our position for a long

2   time.

3           Your Honor, I just disagree with Mr. Block about his

4   argument about Section 702.  I think the plain text there says

5   this subchapter, that's Title VII, doesn't apply.  And it goes

6   to what is the reason for the employment decision, Your Honor.

7   And there's just no dispute that the decision here of the

8   defendants was motivated by their sincere religious belief

9   which is something that is constitutionally protected, Your

10  Honor.  And the Supreme Court has reiterated time and again

11  courts should protect, even in cases like this that involve

12  rights of gay and lesbian individuals as well.

13          Your Honor, Mr. Block spent a lot of time talking

14  about the government's interest in eradicating sex

15  discrimination.  Again, we don't have a disagreement with that

16  as a general matter.  But what *Hobby Lobby* says, Your Honor,

17  is that the government -- to carry its RFRA burden in this

18  case, the government must show it has a compelling interest in

19  requiring Charlotte Catholic High School to employ individuals

20  who oppose its religious message, Your Honor, and that showing

21  just can't be made here.  And we don't think that interest

22  exists, and you can tell that, Your Honor, because Title VII

23  itself contains exceptions.  RFRA is out there to protect

24  religious organizations.  And there's the First Amendment,

25  Your Honor, and you have to balance those in weighing what is

45

1   the governmental interest at issue.

2         Your Honor, in closing, Charlotte Catholic is not

3   just some commercial defendant the way that Mr. Billard would

4   like to portray them -- Mr. Billard's counsel would like to

5   portray them.  They're a religious school that exists to

6   transmit a good message.

7         THE COURT:  Yeah, they're a good school.

8         MR. DAVEY:  And Mr. Billard knew what he was signing

9   up for when he came to teach at Charlotte Catholic for ten

10  years.  There's no dispute that he was a well liked teacher,

11  Your Honor.  But at the end of the day, Your Honor, Charlotte

12  Catholic has a right to, again, create and maintain a

13  community of individuals who are willing to live by Catholic

14  teaching and has the right to not employ those folks if they

15  decide, as Mr. Billard had a right to do, not to live in that

16  manner.

17        And so for all those reasons, Your Honor, we would

18  ask the Court to grant the diocese's summary judgment motion.

19        THE COURT:  All right.  Thank you all very much, and

20  we will let you know where we go.  This matter is concluded

21  for today.

22        MR. DAVEY:  Thank you, Your Honor.

23        MR. BLOCK:  Thank you, Your Honor.

24        THE COURT:  Normally I would come down and shake

25  your hands, but...

1              MR. DAVEY:  Under the circumstances we can't do
2    that.
3              THE COURT:  Under the circumstances I'm staying away
4    and you probably are glad I'm staying away.
5                   (End of proceedings at 11:01 AM.)
6                           *****
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

47

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I, Cheryl A. Nuccio, Federal Official Realtime Court

7  Reporter, in and for the United States District Court for the

8  Western District of North Carolina, do hereby certify that

9  pursuant to Section 753, Title 28, United States Code, that

10  the foregoing is a true and correct transcript of the

11  stenographically reported proceedings held in the

12  above-entitled matter and that the transcript page format is

13  in conformance with the regulations of the Judicial Conference

14  of the United States.

15

16          Dated this 13th day of July 2022.

17

18

19                    s/Cheryl A. Nuccio

20                    Cheryl A. Nuccio, RMR-CRR
                      Official Court Reporter

21

22

23

24

25

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**No. 3:17-cv-00011**

| | | |
|---|---|---|
| **LONNIE BILLARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **CHARLOTTE CATHOLIC HIGH** | ) | |
| **SCHOOL, MECKLENBURG AREA** | ) | |
| **CATHOLIC SCHOOLS, and ROMAN** | ) | |
| **CATHOLIC DIOCESE OF CHARLOTTE,** | ) | |
| | ) | |
| **Defendants**. | ) | |

---

**FINDINGS AND CONCLUSIONS**

**THIS MATTER** is before the Court on the parties' opposing Motions for Summary

Judgment. Plaintiff filed a Motion for Partial Summary Judgment, and Defendants filed a Motion

for Summary Judgment. (Doc. Nos. 26, 29). These motions are ripe for judicial review pursuant

to the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f)(3). After considering the motions and

reviewing the pleadings, the Court enters the following findings and conclusions and orders that

Plaintiff's Motion for Partial Summary Judgment be granted and Defendants' Motion for

Summary Judgment be denied.

## I.    INTRODUCTION

The First Amendment and several statutes ensure that religious organizations, such as the

Roman Catholic Church, "are given proper protection as they seek to teach the principles that are

so fulfilling and so central to their lives and faiths." See Obergefell v. Hodges, 576 U.S. 644, 679

(2015). As such, the religious and philosophical objections to gay marriage are protected views

and, in some instances, protected forms of expression. At the same time, "our society has come

1

to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth." <u>Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n</u>, 138 S. Ct. 1719, 1727 (2018). For that reason, the laws and the Constitution can, and in some instances must, protect them in the exercise of their civil and employment rights. <u>See id.</u> The exercise of their freedom on terms equal to others in employment and all other aspects of life must be given great weight and respect by the courts. <u>See id.</u>

In this case, Charlotte Catholic High School seeks a variety of First Amendment and statutory protections to enable the school to terminate the employment of a substitute drama teacher—Mr. Lonnie Billard ("Plaintiff"). The school claims that he was fired for his support of gay marriage—something the Catholic Church opposes. Plaintiff claims he was fired, or at least suffered a more severe employment action, because of who he is as a gay man. The Court respects the sincerity of the Catholic Church's opposition to Plaintiff's actions. With a slightly different set of facts, the Court may have been compelled to protect the church's employment decision. However, where as here, Plaintiff lost his job because of sex discrimination and where he was working as a substitute teacher of secular subjects without any responsibility for providing religious education to students, the Court must protect Plaintiff's civil and employment rights.

## II.    PROCEDURAL HISTORY

Plaintiff brings a claim for a Title VII violation under the Civil Rights Act of 1964, which prohibits employers from failing or refusing to hire or to discharge an individual because of their sex. (Doc. No. 1 ("Complaint") at ¶ 35; Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII")). He brings the action against Charlotte Catholic High School, Mecklenburg Area Catholic

2

Schools, and the Roman Catholic Diocese of Charlotte (parties referred to hereinafter as "Defendants"). (Complaint at ¶¶ 5, 6, 7).

In May 2015, Plaintiff filed charges of sex discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging Defendants violated Title VII when they terminated him from his role as a substitute teacher. (Id. at ¶ 8). The EEOC elected not to sue Defendants and, instead, issued Plaintiff a Notice of Right to Sue Letter in November 2016. (Id.). Plaintiff timely filed this action within 90 days of receiving the notice in January 2017. (Id.). In his Complaint, Plaintiff requests, *inter alia*, declaratory relief that Defendants violated Title VII, appropriate injunctive relief, and a variety of damages. (Complaint at 8). Plaintiff now moves for partial summary judgment on all matters other than the amount of damages, and Defendants move for summary judgment on all claims. (Doc. Nos. 26, 29).

### III.    FACTS

#### a.  **Plaintiff's Employment with Charlotte Catholic High School**

Plaintiff is a former teacher and substitute teacher at Charlotte Catholic High School ("Charlotte Catholic") in Charlotte, North Carolina. (Complaint at ¶¶ 15, 18). Charlotte Catholic is a Catholic School that serves grades 9-12 in the Charlotte area. (Id. at ¶ 5). It operates within the Mecklenburg Area Catholic Schools ("MACS") system. (Id. at ¶ 6). MACS is a regional Catholic school system in the Charlotte area that is responsible for nine schools. (Id.). MACS is affiliated with the Roman Catholic Diocese of Charlotte ("Diocese"), an unincorporated religious association with its principal place of business in Charlotte, North Carolina. (Id. at ¶ 7). Plaintiff began working at Charlotte Catholic as a substitute teacher in the fall of 2000. (Id. at ¶ 11).  He was given a full-time teaching position in the fall of 2001, where he first taught English. (Id. at ¶ 15). After a year, he switched to teaching drama classes, which he taught full-time until the fall

of 2012. (Id. at ¶ 16). When Plaintiff retired from full-time teaching, he stayed on as a substitute teacher with Charlotte Catholic from the fall of 2012 until December 2014. (Id. at ¶¶ 18, 26). He was not required to sign a contract for employment with Charlotte Catholic as a substitute teacher. (Id. at ¶ 19). He primarily substituted for English courses because he had expertise in that subject. (Doc. No. 28-2 ("Pl. Decl.") at ¶ 27). Plaintiff only taught non-religious subjects during his time at Charlotte Catholic. (See Complaint at ¶¶ 15, 16).

While Plaintiff was employed by Charlotte Catholic full-time, he received positive work evaluations. (Id. at ¶ 21). He also won the Inspirational Educator Award from North Carolina State University in 2011 and the Charlotte Catholic Teacher of the Year award in 2012. (Pl. Decl. at ¶¶ 22, 23). Mr. Jerry Healy, principal of Charlotte Catholic at the time, said that Plaintiff was the "only teacher who had been nominated for the award every year since its inception." (Id. at ¶ 23).

### b. Plaintiff's Decision to Marry

Plaintiff came out as homosexual to his close friends and family in 1995. (Complaint at ¶ 22). He was married to a woman for about 24 years; they divorced around 2002. (Doc. No. 31-1 ("Billard Dep. 1") at 43-44, 87-88). Plaintiff met Richard Donham ("Mr. Donham") in 2000 when he and his wife were separated, began a romantic relationship with him, and moved in with him in 2002. (Id. at 102-04). Plaintiff listed Mr. Donham on required school contact forms as his "friend" or "housemate." (Id. at 88-90, 99). Sometimes he wrote that Mr. Donham lived at the same address as he did, and other times he listed Mr. Donham's address as another residence nearby. (See id. at 99-102).

Plaintiff brought Mr. Donham to Charlotte Catholic events, including the plays and musicals he directed each semester, a class trip to New York City, faculty parties, and a spaghetti

dinner fundraiser. (See Doc. No. 31-19 at 74-77, 114-15). Mr. Donham also served as a substitute teacher at Charlotte Catholic and at MACS middle school in 2003 and 2004. (Pl. Decl. at ¶ 40; Doc. No. 31-19 at 20-21). Occasionally, Mr. Donham would serve as a substitute teacher for Plaintiff's classes. (Doc. No. 31-19 at 89-92). When Assistant Principal Steve Carpenter ("Assistant Principal Carpenter") called the house to offer Mr. Donham a teaching assignment, Plaintiff would sometimes answer the phone for him, indicating they lived together. (Pl. Decl. at ¶ 40). Plaintiff and Mr. Donham spent time together in the break room at Charlotte Catholic and acted "like any other couple" at faculty and school events. (Billard Dep. 1 at 258-59; Pl. Decl. at ¶ 37). Plaintiff did not explicitly state while at work that he and Mr. Donham were in a sexual relationship. (Billard Dep. 1 at 260-61). However, he contends that some members of the administration at Charlotte Catholic knew he was in a same-sex relationship with Mr. Donham. (Pl. Decl. at ¶¶ 35, 38). Principal Kurt Telford ("Principal Telford") and Assistant Principal Carpenter's claim they were not aware that Plaintiff was homosexual until they heard about his Facebook post in December 2014. (Doc. No. 28-5 at 6-7; Doc. No. 28-3 at 26).

When United States v. Windsor was decided by the Supreme Court, Plaintiff and Mr. Donham discussed marriage. 570 U.S. 744 (2013); (Complaint at ¶ 22). They ultimately decided to get married when same-sex marriage was legalized in North Carolina in 2014. (Id.).

### c. The Catholic Church's Position on Marriage

The Catholic Church believes marriage should be between a man and a woman. (Doc. No. 31-15 at ¶ 21). Human sexual expression belongs to "husband and wife alone." (Id.). Therefore, unmarried people should not engage in sexual intercourse, and same-sex couples should not engage in sexual expression because they cannot be husband and wife. (Id. at ¶¶ 22, 27). Bishop Peter Jugis of the Diocese ("Bishop Jugis") believes that while people who

experience homosexual tendencies or thoughts are to be treated with respect and compassion, individuals who act on those thoughts engage in "disordered" conduct since their acts violate God's plan for human sexuality and reproduction. (Id. at ¶ 25). As Catholic institutions, MACS and Charlotte Catholic use Catholic ideology to inform policies at their schools on employee conduct and appropriate educational material. (Doc. No. 31-3 at ¶ 8). Plaintiff regarded himself as a practicing Catholic while he worked at Charlotte Catholic. (Billard Dep. 1 at 52-53). He admits that he was aware of the Catholic Church's teachings about marriage and its stance against same-sex marriage when he was an employee. (Id. at 120-21).

### d. Defendants' Religious Mission

The Diocese has "thousands" of employees and prohibits all of them from publicly engaging in or advocating for conduct contrary to the moral tenets of the Catholic faith. (Doc. No. 28-4 at 6, 15). Subversive conduct includes engaging in premarital or extramarital sex or engaging in same-sex marriage. (Id. at 25). Diocese employees include secretaries, information technology specialists, food service workers, teachers, substitute teachers, and building maintenance crews. (Id. at 7, 11; Billard Dep. 1 at 142-44). According to Bishop Jugis, the Diocese's prohibition of same-sex marriage extends to all its employees, regardless of whether the employees interact with the public at work or speak publicly about their relationship. (Doc. No. 28-4 at 18).

MACS and Charlotte Catholic use several documents to inform their employees of the Diocese's expectations for their behavior. These include a Code of Ethics, a Personnel Policies handbook, MACS employment contracts, training sessions conducted by Vicar of Education Father Roger Arnsparger ("Father Arnsparger"), and a Faculty Handbook for Charlotte Catholic specifically. (Doc. No. 31-3 at ¶¶ 8-15). The documents instruct employees of MACS and

6

Charlotte Catholic to uphold the teachings and principles of the Catholic Church by serving as role models to students. (Id. at ¶ 10). As role models, they may not publicly engage in conduct or advocacy that contradicts the moral tenets of the Catholic Church. (Id. at ¶ 14). These documents do not explicitly outline what beliefs the Catholic Church holds on marriage, and MACS does not have a written policy for LGBTQ+ employees. (Doc. No. 28-6 at 10). Plaintiff signed the Charlotte Catholic employment contract each year when he was teaching full-time, and received the Faculty handbook, Personnel Policies handbook, and Code of Ethics. (Billard Dep. 1 at 122-23, 127-28, 132, 134-41, 140-42). He also attended Father Arnsparger's training sessions, but walked out on two occasions because he disagreed with their tone. To him, Father Arnsparger made it seem like "all of [the teachers] sitting in the room were...unworthy and [needed] to [toe] the line as Father Arnsparger drew the line." (Id. at 113-16). Father Arnsparger described the purpose of his sessions as being to discuss the "essential role that all teachers play in the religious mission of MACS schools," which is to "provide a religious and academic program that allows each student to develop spiritually, intellectually, emotionally, physically and socially." (Doc. No. 31-5 at ¶¶ 18-19). Father Arnsparger did not indicate that he specifically mentioned same-sex marriage at these sessions. (Id.).

Importantly, Charlotte Catholic discourages teachers of secular subjects from instructing students on any sort of religious subject. The school asks that teachers who teach secular subjects refrain from instructing students on Catholic Doctrine. (Doc. No. 28-5 at 28). Secular teachers do not have to undergo religious training, do not have to be Catholic, and do not have to be Christian. (Doc. No. 28-3 at 58). The administration at Charlotte Catholic does not know the percentage of teachers at the school who are Catholic and does not ask if candidates are Catholic during job interviews. (Id. at 11, 14-15).

Although prayer is not required, teachers at Charlotte Catholic are expected to facilitate prayer at the beginning of their classes. (Doc. No. 31-3 at ¶ 5). Plaintiff opted to lead these prayers occasionally, and at other times he invited students to lead them. (Pl. Decl. at ¶ 29). He characterized these prayers as informal: prayer content was not specified and could be generally spiritual instead of strictly Catholic. (Id.). Furthermore, teachers, including Plaintiff, are required to accompany students to Masses held at the school, but they perform no religious function and serve essentially as chaperones. (Id. at ¶ 31).

In the past, MACS has fired school employees for violating the Catholic Church's beliefs on marriage. A male physical education teacher was fired for having an affair, a male teacher was fired for being in a same-sex relationship and adopting a child with his partner, and a female teacher was fired for planning to marry a Catholic man with no annulment. (Doc. No. 31-3 at ¶ 23).

### e.  Plaintiff's Removal from Charlotte Catholic High School

In October 2014, Plaintiff announced his engagement to Mr. Donham on Facebook with a post that read:

> "Everyone sing along…. 'Goin' to the chapel and we're gonna' get ma-a-aried. Goin' to the chapel and we're gonna' get maa-aa-ried'. Yes, I'm finally going to make an honest (at least legal) man out of Rich. We will be married on May 2, 2015…details to follow. I cannot believe that I am saying this or that it is even possible. I thank all the courageous people who had more guts than I who refused to back down and accept anything but 'equal.' Ps. If you don't agree with this…keep it to yourself. You never asked my opinion about your personal life and I am not asking yours."

(Complaint at ¶ 23). At the time he announced his engagement, Plaintiff was Facebook friends with staff and parents associated with Charlotte Catholic. (Billard Dep. 1 at 284).

Plaintiff informed Assistant Principal Carpenter of his announcement several days after the Facebook post. (Pl. Decl. at ¶ 46). Assistant Principal Carpenter congratulated Plaintiff but stated that the Diocese would likely be unhappy with the message, although he said he would not

8

personally inform them. (Id. at ¶¶ 47-48). When he heard about the engagement announcement, Charlotte Catholic's Chaplain Father Matthew Kauth ("Father Kauth") met with Principal Telford to discuss it. (Doc. No. 31-16 at 6-7; Doc. No. 31-18 at 6-8). Principal Telford believed that Plaintiff could not serve as a substitute at Charlotte Catholic because of his engagement to Mr. Donham. (Doc. No. 31-16 at 7-9). Principal Telford communicated this to Assistant Principal Carpenter, who oversaw substitute assignments. (See Doc. No. 28-3 at 10-12, 45). Substitute teachers at Charlotte Catholic are not guaranteed teaching assignments but are given them at the discretion of Assistant Principal Carpenter. (Id.). Assistant Principal Carpenter typically contacts the chosen substitute when they are needed and asks if they are available. (Billard Dep. 1 at 259-60). After his conversation with Principal Telford, Assistant Principal Carpenter decided not to have Plaintiff return as a substitute teacher. (See Doc. No. 28-3 at 44-45).

In December 2014, after not receiving an assignment from Charlotte Catholic in some time, Plaintiff spoke to fellow teacher Ms. Joan Stretch and expressed his confusion. (Complaint at ¶ 25; Billard Dep. 1 at 200). She admitted that she had heard Plaintiff was unable to work at Charlotte Catholic any longer due to his intention to marry a man. (Id. at ¶¶ 25, 26). Plaintiff texted Assistant Principal Carpenter to confirm. Plaintiff was informed via phone call by Assistant Principal Carpenter that he could no longer work as a substitute teacher because he "announced his intention to marry a person of the same sex." (Doc. No. 8 at ¶ 26).

Plaintiff reports being emotionally devastated and suffering a loss of identity and self-worth after being eliminated from the substitute list at Charlotte Catholic. (Pl. Decl. at ¶ 56). He enjoyed the time he spent teaching children at the school and interacting with their parents. (Id.).

IV.    **LEGAL STANDARD**

9

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The party seeking summary judgment has the initial burden of demonstrating that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Id. at 324. Rather, the non-moving party must demonstrate that specific, material facts exist that give rise to a genuine issue. Id. Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. Anderson, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248 (citations omitted). Further, Rule 56 provides, in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

10

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1). Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, the non-movant must show the existence of a factual dispute on every essential element of her claim.

In considering cross-motions for summary judgment, this Court "examines each motion separately, employing the familiar standard" provided by Federal Rule of Civil Procedure 56. Desmond v. PNGI Charles Town Gaming, 630 F.3d 351, 354 (4th Cir. 2011) (citations omitted). Thus, each motion is reviewed "on its own merits 'to determine whether either of the parties deserve judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted).

V.    **DISCUSSION**

   a.  **Sex Discrimination Claim under Title VII and Bostock v. Clayton County**

Title VII governs sex discrimination claims, making it illegal for an employer to fail or refuse to hire or discharge any person, or to discriminate against a person, with respect to their race, color, religion, sex, and national origin. 42 U.S.C. § 2000e-2. Bostock v. Clayton County held it is impossible to discriminate against someone for being homosexual or transgender without discriminating against them based on sex. 140 S. Ct. 1731, 1741 (2020). Therefore, an employer violates Title VII by firing someone for being homosexual or transgender. Sex need only be "one but-for" cause of the employment decision under Title VII, meaning the plaintiff's sex does not have to be the primary cause of the employer's action. Id. at 1739, 1744. It just needs to play a role in the reasoning behind the adverse employment action. See id. at 1739.

11

> "Consider, for example, an employer with two employees, both of whom are attracted to men. The two individuals are, to the employer's mind, materially identical in all respects, except that one is a man and the other a woman. If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. . . . [T]he individual employee's sex plays an unmistakable and impermissible role in the discharge decision."

Id. at 1741-42. In other words, when an employer fires an employee because they are homosexual, two factors may exist: the sexual preference of the individual, and their sex. Id. at 1742. That there are multiple factors does not change the employer's liability under Title VII. An "employer's ultimate goal might be to discriminate on the basis of sexual orientation," but along the way the employer must "intentionally treat an employee worse based in part on the individual's sex." Id. The employer also cannot escape liability for showing they treat men and women comparably as groups. Id. at 1744.

Religious employers enjoy several protections that enable them to uphold their religious convictions when making employment decisions. Id. at 1753-54. These protections include the Religious Freedom Restoration Act ("RFRA"), the First Amendment, the church autonomy doctrine, the ministerial exception, and Sections 702 and 703 exemptions under Title VII. Defendants bring all these defenses—except for the ministerial exception, which they stipulated away—to defend their employment decision. (Doc. No. 8 at ¶¶ 7-10; Doc. No. 28-1). The Court will deal with each of these defenses in turn but must first decide whether Defendants' termination of Plaintiff is the result, at least in part, of impermissible sex discrimination.

Defendants argue they did not fire Plaintiff because he was homosexual; instead, they fired him because he engaged in "advocacy" that went against the Catholic Church's beliefs when he "publicly announced his intention to marry a person of the same sex." (Doc. No. 8 at ¶ 26). To Defendants, the question is not if Plaintiff would have been fired for being a woman

12

marrying a man, but whether he would have been fired if he were a woman performing anti-Catholic advocacy. (Doc. No. 64 at 1-2). Defendants contend they would have taken the same action against Plaintiff if he were heterosexual or a woman (Id. at 2; Doc. No. 30 at 11).

In making this argument, Defendants contend that Plaintiff believed administrators at Charlotte Catholic knew about his same-sex relationship with Mr. Donham and did not punish him in any way until he announced his engagement. (Pl. Dec. at ¶¶ 35-38, 40) (asserting ex-Principal Healy, Assistant Principal Carpenter, and others knew about their relationship, and Mr. Donham was even a substitute teacher at the Catholic middle school). Defendants assert that this implies they were not punishing Plaintiff for being homosexual, but rather punishing him for his advocacy against the Catholic Church. (Doc. No. 63 at 10-11) (saying that the fact that Plaintiff alleged people knew about his relationship with Mr. Donham but did not do anything until they got engaged "demonstrates that Charlotte Catholic's decision to release Billard was not based on his sex or sexual orientation, even as understood in Bostock"). However, Principal Telford and Assistant Principal Carpenter both said they were not aware that Plaintiff was homosexual until December 2014, when they heard about his engagement post. (Doc. No. 28-5 at 6-7; Doc. No. 28-3 at 25-26). Defendants claim Plaintiff obscured the nature of his relationship with Mr. Donham, calling him his "friend" or his "housemate" on the address and emergency contact forms that he had to fill out each year to work at Charlotte Catholic. (Billard Dep. at 88-102). Since Principal Telford is the person who ultimately decided to relieve Plaintiff of his substitute teaching duties and is also the person who makes employment decisions at Charlotte Catholic, Defendants' argument as to this point is unconvincing. (See Doc. No. 28-5 at 7-9).

On the other hand, Plaintiff asserts that Defendants admitted they fired Plaintiff because he was a man who married another man. (Complaint at ¶¶ 26-27, 32-34). Assistant Principal

<center>13</center>

Carpenter advised Plaintiff that he could not return to Charlotte Catholic because he publicly announced his intention to marry someone of the same sex. (Doc. No. 8 at ¶ 26). While not established as an agreed-upon fact in the case, Plaintiff also asserts that Diocese Communications Director Hains stated that Plaintiff was fired for marrying a man and publicly stating on Facebook that he disagrees with the Catholic Church's teachings. (Complaint at ¶ 27). Plaintiff contends that if a woman on staff announced her engagement to her husband, this would not be considered religious advocacy. (See Doc. No. 62 at 4-5; Pl. Dec. at ¶ 49) (stating that a female teacher got engaged to her husband within a week of his engagement announcement and remained a teacher at Charlotte Catholic for an extended time thereafter). As such, he argues that it was the act of getting engaged that Defendants considered advocacy, and it was only considered advocacy because of Plaintiff's sexual orientation. (Doc. No. 62 at 4). Therefore, Plaintiff argues the school fired him for traits that it would tolerate in his female colleague— getting engaged to a man. (Id.).

Under Bostock, this Court finds that Plaintiff has raised a valid Title VII sex discrimination claim. An employer who discriminates will "almost never announce a discriminatory animus or ... provide direct evidence." Iadimarco v. Runyon, 190 F.3d 151, 157 (3d Cir. 1999). Here, that is not the case. Defendants admit to firing Plaintiff "because he is a man who intended to, and did, marry another man." (Doc. No. 8 at ¶ 32; Doc. No. 1 at ¶ 32). Defendants cannot escape Title VII liability by recharacterizing Plaintiff's announcement of his engagement as "advocacy." If Plaintiff were a woman who posted on Facebook that she was getting married to her husband, Defendants would not have interpreted her announcement as "advocacy" for or against the Catholic Church. Plaintiff's engagement was only considered advocacy because of his sex.

14

Even if this Court were satisfied that Plaintiff's action was advocacy, Plaintiff would still prevail on his sex discrimination claim because he received a harsher punishment than if he had simply expressed positive views of same-sex marriage as a straight person. Defendants admit that while they fired Plaintiff for his actions, they would only have reprimanded a straight teacher who spoke positively about same-sex marriage. (Doc. No. 28-5 at 23; Doc. No. 62 at 5). Principal Telford admitted that if a person went to a relative's same-sex wedding and spoke positively about it then he would merely ask them to speak with a priest. (Doc. No. 28-5 at 23). In contrast, Plaintiff lost his job for his positive Facebook post because he was the one getting married to a same-sex partner.

This is a classic example of sex discrimination under the but-for causation standard of Bostock. Defendants argue that they have fired people in the past for adultery or marrying a divorced person. (Doc. No. 31-3 at ¶ 23). But firing an employee for adultery or marrying a divorced person does not require Defendants to treat the employees differently depending on their sex. Here, Defendants openly admit that they took a more drastic action toward Plaintiff *because* he was homosexual. If Plaintiff were a heterosexual woman posting on Facebook about her engagement, there would be no issue to Defendants. And if Plaintiff were a heterosexual woman advocating for same-sex marriage via Facebook, Defendants would only ask Plaintiff to speak with a priest. Therefore, Plaintiff's sex, as a male, is a but-for cause of the decision to fire him.

### b. Sections 702 and 703 Religious Exemptions under Title VII

Defendants next argue that they qualify for religious exemptions under Sections 702 and 703 of Title VII and thus escape liability. An unanswered question in Bostock is whether a religious employer might have a viable statutory or constitutional defense to Title VII claims of

15

sexual orientation discrimination. In light of <u>Bostock</u>, sex discrimination occurs when an employer treats an employee differently or less favorably because of their sex, which is understood to include pregnancy, sexual orientation, and gender identity. 42 U.S.C. § 2000e-(k); <u>Bostock</u>, 140 S. Ct. at 1754. Religious discrimination, on the other hand, occurs when an employer makes an employment decision based on religious preference. <u>See</u> <u>e.g.</u>, <u>Hall v. Baptist Mem'l Health Care Corp.</u>, 215 F.3d 618, 625 (6th Cir. 2000) (employee fired for joining church that accepted gay people could not sue for religious discrimination); <u>Little v. Wuerl</u>, 929 F.2d 944, 951 (3d Cir. 1991) (employee fired for remarrying without obtaining annulment cannot sue for religious discrimination). Religion is defined to include "all aspects of religious observance and practice." 42 U.S.C. § 2000e-j. As of now, religious employers have strong legal protections for hiring and firing employees who have a role in promoting their religion's message if the employment decision is *religiously* motivated.

Section 702(a) and Section 703(e) of Title VII exempt religious institutions from suits for religious discrimination. Both sections do the same thing for the purposes of this suit; the difference between them is that they each identify a different type of institution covered under the religion exemption.

Section 702 states that Title VII's bans on religious discrimination do not apply to a "religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C. § 2000e-1(a). Religious discrimination is permitted when the organization is religious and promoting said religious "activities" is the purpose of the individual's employment. <u>Id.</u>

16

Section 703 is an exemption specifically for religious schools. It states that it is not an unlawful employment practice for an educational institution to hire and employ people of a particular religion if "such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion." 42 U.S.C. § 2000e-2(e).

Courts have recognized a religious organization's ability to exempt itself from Title VII's ban on religious discrimination through Sections 702 and 703. In Rayburn v. Gen. Conf. of Seventh Day Adventists, a Section 702 Title VII exemption applied when a woman sued after she was denied a pastoral position within the church. 772 F.2d 1164, 1166 (4th Cir. 1985). This was because "[t]he role of an associate in pastoral care is so significant in the expression and realization of [the church's] beliefs." Id. at 1168. In Kennedy v. St. Joseph's Ministries, Inc., the religious-based nursing center was exempt from Title VII religious discrimination claims when they fired an employee for dressing in another religion's garb at work. 657 F.3d 189, 190-91 (4th Cir. 2011).

Although Sections 702 and 703 give religious institutions and schools more leeway for engaging in religious discrimination, they do not permit sex discrimination. Boyd v. Harding Acad. of Memphis, 88 F.3d 410, 413 (6th Cir. 1996). "While the language of § 702 makes clear that religious institutions may base relevant hiring decisions upon religious preferences, Title VII does not confer upon religious organizations a license to make those same decisions on the basis of race, sex, or national origin." Rayburn, 772 F.2d at 1166. Defendants' argument would allow

17

a religious employer to "convert any claim of discrimination on the basis of one of the protected classes under Title VII to a case of religious discrimination, so long as there was a religious reason behind the employment decision." Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc., 496 F. Supp. 3d 1195, 1203 (S.D. Ind. 2020). "This would effectively strip employees of religious institutions of all Title VII protections, if the employer's religion clashed with the employee's protected class status." Id. "If Congress had intended to allow religious employers to avoid liability for discriminating on the basis of race, sex, or national origin, it could have done so." Id. "By its very terms, [Sections 702 and 703 apply] only to discrimination on the basis of religion. The ban on discrimination in employment on account of race, national origin, or sex is still applicable to religious organizations." Elbaz v. Congregation Beth Judea, Inc., 812 F. Supp. 802, 807 (N.D. Ill. 1992) (internal quotations omitted).

Under EEOC v. Mississippi College, a Fifth Circuit case, the court held that Mississippi College's "employment practices subject to Title VII [of sex discrimination] do not embody religious beliefs," which protected the college "from any real threat of undermining its religious purpose" by maintaining Title VII protections. 626 F.2d 477, 488 (5th Cir. 1980). The court reasoned that Congress intended to regulate the employment relationship of schools by Title VII because "the College is not a church," and the fact "[t]hat faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern." Id. at 485. The court reasoned that creating an exemption from the statutory enactment greater than what Section 702 provides would "seriously undermine Congress' attempts to eliminate discrimination," so it was not appropriate. Id. at 489.

In EEOC v. Fremont Christian Sch., the Ninth Circuit held that Title VII exemptions do not apply to a Christian school's practice of giving health insurance benefits solely to "head of household employees," which the school defined as only men or single women. 781 F.2d 1362, 1364 (9th Cir. 1986). Although this practice was a result of genuine religious beliefs regarding who could be the "head of a household," the court struck down the practice because of the state's "strong compelling...interest in eradicating discrimination, coupled with the fact that eliminating the employment policy involved here would not interfere with religious belief, and only minimally, if at all, with the practice of religion." Id. at 1364. The court wrote that the "language and legislative history of Title VII . . . indicate the statute exempts religious institutions only to a narrow extent." Id. at 1366.

Here, Defendants qualify as a religious educational institution under the meaning of Sections 702 and 703 because they are a (1) Catholic School managed in at least substantial part by a (2) Catholic Diocese through a (3) Catholic school system. (Doc. No. 8 at 2).  Defendants contend that Sections 702 and 703 exempt religious organizations from liability when the employment decision is based on religious preference. (Doc. No. 29 at 1). They argue that since they believe Plaintiff was fired for advocating against the moral tenets of the Church, then firing him should fall under the 702 and 703 exemptions to Title VII because they fired him for a religious reason. (Id.). Defendants contend that an employment decision to release an employee "of a particular religion" includes the permission "to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." (Doc. No. 63 at 15 quoting Little, 929 F.2d at 951; Doc. No. 30 at 8). The religious reason Defendants allege they fired Plaintiff for was his single Facebook post, which they view as public opposition to fundamental tenets of the

19

Catholic faith, which includes honoring the sanctity of marriage as a relationship between a man

and a woman. (Doc. No. 29 at 2; Doc. No. 31-15 at ¶ 21).

Plaintiff argues that 702 and 703 exemptions to Title VII do not authorize sex

discrimination: they only allow religious discrimination. The Court agrees, and denies

Defendants' assertion that they qualify for a Section 702 or 703 exemption. Under the Fourth

Circuit's controlling precedent, Section 702 provides an exception only from Title VII's

prohibition against discrimination in employment on the basis of religion; Section 702 "does not

exempt religious organizations from Title VII's provisions barring discrimination on the basis of

race, gender, or national origin." Kennedy, 657 F.3d at 192; accord Rayburn, 772 F.2d at 1166.

As Justice Alito recognized, precedent indicates that religious exemptions under Sections 702

and 703 likely offer "only narrow protection" to religious employers that does not allow them to

discriminate based on sex. 140 S. Ct. at 1781 & n.55 (Alito, J., dissenting) (citations omitted).

The narrowness of these exceptions is highlighted by the Ninth Circuit's opinion in Fremont

Christian Sch., 781 F.2d at 1366. Defendants do not cite a case that allows employers to

discriminate based on sex when the sex discrimination in question is motivated by religion. "The

proper balance is to interpret Title VII's religious exemption to allow a religious employer to

make hiring decisions in favor of coreligionists without facing claims of religious discrimination,

but to allow a plaintiff to bring claims of other forms of Title VII discrimination." Starkey, 496

F. Supp. 3d at 1201.

As mentioned earlier, in Fremont Christian Sch., the court struck down a policy that only

allowed men and unmarried women to obtain health insurance benefits. 781 F.2d at 1364. Health

insurance policies were not offered to married women because men were perceived as the

spiritual heads of households. Id. ("Only the man can be the head of the household, regardless of

what his salary is in relation to that of his wife"). Even though the sex discrimination was

motivated by the defendant's sincere religious beliefs, the court found that the discriminatory

practice still did not qualify for an exemption because

> eliminating the employment policy involved here would not interfere with
> religious belief and only minimally, if at all, with the practice of religion. Because
> the impact on religious belief or practice is minimal and the interest in equal
> employment opportunities is high, the balance weighs heavily in favor of
> upholding Fremont Christian's liability under Title VII for its sexually
> discriminatory health insurance compensation program.

Id. at 1369.

Thus, religious entities are only allowed to be shielded from liability when they can show

(1) the purpose of the employment decision is religious discrimination, and (2) that sex is not a

but-for cause in the decision. If a religious institution presents convincing evidence that the

employment practice results from religious discrimination, Section 702 deprives the EEOC of

jurisdiction to investigate further to see whether the religious discrimination in question is a

pretext for some other form of discrimination. Mississippi Coll., 626 F.2d at 485. However, since

this Court has decided that sex was a but-for cause of Plaintiff's removal, Defendants do not

qualify for Section 702 or 703 protection. It is clear that religious exemptions do not let religious

organizations facially discriminate based on sex. Fremont Christian Sch., 781 F.2d at 1364.

Defendants would like to see the Section 702 and 703 exemptions broadened to afford

greater protections to the Catholic Church and church-sponsored institutions. However, this

could lead to legal outcomes that completely erase Title VII's protections for protected groups

working for religious institutions. See Starkey, 496 F. Supp. 3d at 1203. Religious institutions

oversee a great number of employees in the United States. Seventy-eight percent of private

schools in the United States were religiously affiliated in 2014, and fourteen and half percent

percent of hospitals were religiously affiliated in 2016. ("Private School Statistics at a Glance,"

Council for American Private Education, https://www.capenet.org/facts.html. Last visited June 16, 2021); ("Growth of Catholic Hospitals and Health Systems," Mergerwatch, http://www.mergerwatch.org/. Last visited June 28, 2021). Defendants' argument would let religious employers completely bypass Title VII liability, if they could prove their discrimination was related to a religious justification. This would erase protections against racial discrimination, sexism, gender discrimination, sexual orientation discrimination, and xenophobia by employers against hundreds of thousands of employees. "Consider a religious employer that genuinely believes the Bible forbids interracial marriage. Under Defendants' interpretation of Section 702, that employer would be free to terminate an employee who married someone of a different race." Starkey, 496 F. Supp. 3d at 1203; see also Leora F. Eisenstadt, Enemy and Ally: Religion in Loving v. Virginia and Beyond, 86 FORDHAM L. REV. 2659, 2659-63 (2018) (explaining how religion has been used to oppose and prohibit interracial marriage).

If Congress wished to allow religious employers to do all of these things, it could have. But instead, it wrote narrow exemptions in the form of Sections 702 and 703. Under the current statute, religious institutions may employ those with similar faiths, but they may not discriminate against other protected classes. This Court therefore agrees with judicial precedent that Sections 702 and 703 are narrowly drawn and holds that those exemptions do not apply to shield Defendants from liability in this case.

### c. Church Autonomy Doctrine

The First Amendment's Establishment Clause prohibits excessive government intrusion upon religion, and the Free Exercise Clause protects a religious organization's right to decide important matters of faith, governance, and religious doctrine. U.S. CONST. AMEND. 1. It has long been held that church autonomy, supported by the Religion Clauses, guarantees religious

organizations "independence from secular control or manipulation," especially regarding ecclesiastical matters. Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 116 (1952).

Yet, "[c]hurches are not—and should not be—above the law. Like any other person or organization . . . [t]heir employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions." Rayburn v. Gen. Conf. of Seventh-Day Adventists, 772 F.2d 1164, 1171 (4th Cir. 1985); see, e.g., EEOC, 626 F.2d 477, cert. denied, 453 U.S. 912 (1981) (Title VII could be applied to promotion of secular teacher in religious educational institution); EEOC v. Sw. Baptist Theological Seminary, 651 F.2d 277 (5th Cir. 1981), cert. denied, 456 U.S. 905 (1982) (Title VII applicable to administrative and support staff at a seminary). The Fourth Circuit has clarified that "[w]here no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer unless Congress so provides." EEOC v. Roman Cath. Diocese of Raleigh, N.C. 213 F.3d 795, 801 (4th Cir. 2000).

Because the church autonomy doctrine is not without limits and does not apply to secular decisions, even when made by churches, a threshold inquiry to trigger church autonomy protections is "whether the alleged misconduct is 'rooted in religious belief.'" Bryce v. Episcopal Church in the Diocese of Colorado, 289 F.3d 648, 657 (2002) (citing Wisconsin v. Yoder, 406 U.S. 205, 215 (1972)). Next, the inquiry is whether the employment dispute is ecclesiastical, meaning it concerns "discipline, faith, internal organization, or ecclesiastical rule, custom or law," Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 713 (1976), or a case in which the courts should find religious institutions civilly liable for "purely secular disputes between third parties and a particular defendant, albeit a religiously affiliated organization." Gen.

<u>Council on Fin. and Admin. of & United Methodist Church v. California Superior Ct.</u>, 439 U.S. 1369, 1373 (1978).

The ministerial exception is a branch of church autonomy doctrine. See <u>Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.</u>, 565 U.S. 171, 190 (2012). Within employment discrimination law and Title VII of the Civil Rights Act of 1964, the ministerial exception prohibits legal claims relating to the employment relationships between religious organizations and their ministers. <u>Id.</u> at 188. The ministerial exception, as a "corollary" of the Establishment Clause, restricts the courts from addressing purely religious questions about the employment of ministers. Peter J. Smith & Robert W. Tuttle, <u>Civil Procedure and the Ministerial Exception</u>, 86 FORDHAM L. REV. 1847, 1884 (2018) (proposing that the "government not only lacks prescriptive jurisdiction to regulate the qualifications for ministerial employment, but the courts also face an adjudicative disability to deciding them"). The ministerial exception applies to organizations like Catholic schools and other organizations whose "'mission is marked by clear or obvious religious characteristics.'" <u>Conlon v. InterVarsity Christian Fellowship</u>, 777 F.3d 829, 834 (6th Cir. 2015) (quoting <u>Shaliehsabou v. Hebrew Home of Greater Wash., Inc.</u>, 363 F.3d 299, 310 (4th Cir. 2004)); <u>see also</u> <u>Fratello v. Archdiocese of N.Y.</u>, 863 F.3d 190, 192-93, 206 (2d Cir. 2017) (applying the ministerial exception to a Catholic elementary school).

Defendants argue that the church autonomy doctrine provides broad protections, and that a religious institution is not limited to, nor must rely solely upon, a ministerial exception defense to avoid Title VII liability. (Doc. No. 63 at 16). Defendants also argue that the ministerial exception is simply one application of the broader church autonomy doctrine, and that the ministerial exception is a narrow defense "carved" out by the courts to protect the church from Title VII employment discrimination cases specifically brought by ministers. (Doc. No. 48 at 2)

(discussing Skrypczak v. Roman Cath. Diocese of Tulsa, 611 F.3d 1238, 1242 n.4 (10th Cir. 2010); (see also Doc. No. 35 at 5) (discussing Gomez v. Evangelical Lutheran Church in Am., No. 1:07CV786, 2008 WL 3202925, at *6-7 (M.D.N.C. Aug. 7, 2008)). The Court disagrees with both arguments.

The church autonomy doctrine is narrow in the sense that it prevents civil courts from taking "cognizance of purely spiritual or ecclesiastical questions." Watson v. Jones, 80 U.S. 679, 710 (1871). "Freedom to select the clergy, where no improper methods of choice are proven," is "part of the free exercise of religion," reserved to church autonomy, and exactly the type of religious issue that church autonomy is intended to preclude the courts from addressing. Kedroff, 344 U.S. at 116. As such, the ministerial exception was created to demarcate the line where a religious organization's First Amendment rights outweigh the government's compelling interest in eradicating employment discrimination. See Rayburn, 772 F.2d at 1168-69.

In the context of employment, the church autonomy doctrine is limited only to employees who perform spiritual functions that qualify for the ministerial exception. See Roman Cath. Diocese of Raleigh, N.C. 213 F.3d at 801. If the church autonomy doctrine was so expansive as to create in all religious employers a First Amendment right to engage in employment discrimination, then there would be no need to have a ministerial exception because Title VII would not protect any employee of a religious organization. Religious autonomy means there are some specific cases in which religious organizations can discriminate against employees who perform certain key roles. Our Lady of Guadalupe, 140. S. Ct. at 2060. "[T]eachers at religious schools who are entrusted with the responsibility of instructing their students in the faith" are ideal candidates for a ministerial exception, but the Supreme Court never intended to expand a religious organization's autonomy to encompass all types of employment discrimination. Id. at

2055; see Herx v. Diocese of Ft. Wayne-South Bend Inc., 48 F. Supp 3d 1168, 1176-77 (N.D. Ind. 2014) (holding that a Catholic school language arts teacher was not a minister just because she supervised prayer); Bohnert v. Roman Cath. Archbishop of San Francisco, 136 F. Supp. 3d 1094, 1114-15 (N.D. Cal. 2015) (holding that a biology teacher was not a minister even though she spent some time daily on campus ministry duties).

Adding an additional wrinkle to this doctrine is that the ministerial exceptional defense likely cannot be waived. In Hosanna-Tabor, the Supreme Court held that the ministerial exception is an affirmative defense, and not a jurisdictional bar. 565 U.S. at 195 n.4. Even though the Court classified the ministerial exception as an affirmative defense, the reasoning of the Court in Hosanna-Tabor indicates that the ministerial exception is unwaivable. The "Religion Clauses bar the government from interfering" with the selection of ministers by religious organizations. Hosanna-Tabor, 565 U.S. at 181. "The Establishment Clause . . . prohibits government involvement in such ecclesiastical decisions." Id. at 189. It is thus "impermissible for the government to contradict a church's determination of who can act as its ministers." Id. at 185. In keeping with this logic, most circuits hold that a religious organization cannot explicitly waive the ministerial exception defense. Conlon, 777 F.3d at 836 ("The ministerial exception is a structural limitation imposed on the government by the Religious Clauses, a limitation that can never be waived."); Tomic v. Cath. Diocese of Peoria, 442 F.3d 1036, 1042 (7th Cir. 2006) (holding that the ministerial exception is not waivable), abrogated on other grounds by Hosanna-Tabor, 565 U.S. at 171; but see Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1318-19 (11th Cir. 2012) (holding that a religious organization may waive the defense on appeal by failing to raise it in its brief).

While Defendants may be prohibited from waiving a ministerial exception defense, the parties are not prohibited from stipulating to a set of factual circumstances that they believe lead to a particular conclusion under the ministerial exception. In other words, courts cannot force a religious organization to recognize someone as a minister whom that organization has definitively declared is not a minister. To do so would have courts making impermissible ecclesiastical decisions. From the outset, Defendants stipulated that Plaintiff is not a "minister" for purposes of the ministerial exception. (Doc. No. 28-1). The Court agrees that Plaintiff, as a substitute teacher of a purely secular subject, occupied no such role. Even if Defendants had not entered into that stipulation, however, the Supreme Court's recent decisions would confirm that Plaintiff was not a ministerial employee.

The Court in Hosanna-Tabor focused on four relevant circumstances in its ministerial exception analysis but explicitly declined to "adopt a rigid formula for deciding when an employee qualifies as a minister." 565 U.S. at 190-92. First, whether the religious organization gave the employee the title of "minister, with a role distinct from that of most of its members." Id. at 191. Second, whether the employee's position "reflected a significant degree of religious training followed by a formal process of commissioning." Id. Third, whether the employee "held [themselves] out as a minister of the Church by accepting the formal call to religious service," or by claiming religious tax benefits. Id. at 191-92. And fourth, whether the employee's "job duties reflected a role in conveying the Church's message and carrying out its mission." Id. at 192. But the recognition of the significance of those factors in Hosanna-Tabor does not mean that they must be met—or even that they are necessarily important—in all other cases. Our Lady of Guadalupe Sch. v. Morrissey-Berru, 140. S. Ct. 2049, 2063 (2020). The title "minister" is not

27

itself dispositive to the ministerial exception, as many religions do not use the term. Id. "What matters, at bottom, is what an employee does." Id. at 2064.

In Hosanna-Tabor, the Supreme Court held that a Lutheran school was shielded from an employment discrimination claim because Cheryl Perich qualified as a minister under the ministerial exception. In reaching this decision, the Court weighed the following factors in favor of finding that Ms. Perich qualified as a minister: she (1) possessed the title "Minister of Religion," (2) received religious educational training including eight college-level courses in subjects including biblical interpretation, church doctrine, and the ministry of Lutheran teacher, (3) participated in a formal process of commissioning as a minister, (4) needed to obtain endorsement of her local Synod district, (5) passed an oral examination by the faculty committee at a Lutheran College, (6) became a minister only after election by the congregation, which recognized God's call to her to teach, (7) held herself out as a minister, and (8) carried out the church's mission by "leading students toward Christian maturity," teaching religion four days a week, leading students in prayer three times a day, accompanying students to weekly chapel, and leading chapel twice a year. Hosanna-Tabor, 565 U.S. at 191-92. "In light of these considerations—the formal title given Perich by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church," the Court held that "Perich was a minister covered by the ministerial exception." Id. at 192.

In Our Lady of Guadalupe, the Supreme Court held that two different Catholic elementary schools were shielded by the ministerial exception from employment discrimination claims brought by Ms. Morrissey-Berru and Ms. Biel. 140 S. Ct. at 2066-67. The Court looked broadly at the roles these teachers served in their schools to determine if the ministerial exception should apply. In reaching this decision, the Court weighed the following facts in favor

28

of finding that Ms. Morrisey-Berru qualified as a minister: she (1) took religious education courses at the school's request, (2) was expected to attend faculty prayer services, (3) entered into employment agreements at the beginning of each year that clearly stated the school's Catholic mission and her role in advancing it, (4) participated in school liturgical activities, (5) was considered a catechist by the Archdiocese, (6) taught religion in her classroom and tested students on that curriculum, (7) directed and produced an annual passion play, (8) prepared and accompanied students to weekly Mass and other religious services, and (9) prayed with her students, including a daily Hail Mary. Id. at 2056-57. The Court weighed the following facts in favor of finding that Ms. Biel qualified as a minister: she (1) attended a conference that taught ways to incorporate God into the classroom, (2) entered an employment contract "nearly identical to Morrissey-Berru's," (3) was required to teach religion for 200 minutes each week, (4) administered a test on religion each week, (5) used a religious textbook in her classroom, (6) worshipped with her students, (7) prepared students to be active in the Mass by teaching them about the Eucharist and confession, (8) prayed with her students at monthly Masses, and (9) was required to pray with her students every day—Ms. Biel prayed with her students twice a day. Id. at 2058-59. Because of the "abundant record evidence that [] both [teachers] performed vital religious duties[,]" the Court held that they qualified as ministers under the ministerial exception. Id. at 2066.

Unlike the teachers in these two most recent Supreme Court cases, very few facts weigh in favor of finding that Plaintiff is a minister. The only factor that weighs in favor of finding that he is a minister is that he works at a Catholic School with a Catholic mission and was tasked in his employment handbook with helping Defendants carry out their religious mission. However, many other facts in the record indicate that he was not a minister, as Defendants have stipulated.

29

First, Defendants did not bestow the title of "minister, with a role distinct from that of most of its members[,]" on Plaintiff. Hosanna-Tabor, 565 U.S. at 191. Plaintiff was primarily a substitute teacher of English and drama—purely secular subjects. Unlike the plaintiff in Hosanna-Tabor, who was issued a "diploma of vocation" and accorded the official title of "Minister of Religion, Commissioned," Plaintiff here was a non-contractual secular employee. 565 U.S. at 191. Furthermore, unlike the plaintiff in Hosanna-Tabor, Plaintiff was not required to be a Catholic or even a Christian to hold his post.

Second, the Court agrees with Defendants that Plaintiff's position did not "[reflect] a significant degree of religious training followed by a formal process of commissioning." Id. The plaintiff in Hosanna-Tabor had to complete eight college-level courses in subjects including biblical interpretation, church doctrine, and the ministry of the Lutheran teacher. Id. Here, however, Plaintiff did not have to undergo any religious training. (Doc. No. 31-17 at 58:6-17). He attended some individual religious training sessions when serving as a full-time employee of Charlotte Catholic High School, but this does not amount to a significant amount of religious training. (Doc. No. 31-1 at 120:2-21).

Third, Plaintiff did not "[hold] [himself] out as a minister of the Church by accepting the formal call to religious service" or by claiming religious tax benefits. Hosanna-Tabor, 565 U.S. at 191-92. Plaintiff, as with other teachers at Charlotte Catholic, would sometimes begin class with a prayer. (See Doc. No. 31-1 at 106-09). But sometimes he would have students lead prayer and sometimes there would be no prayer at all. (See id.). The content of the prayer was not specified, the prayers could be ecumenical, and the prayers were not required. (Doc. No. 31-17 at 64:1-14; Doc. No. 31-1 at 106).

Finally, Plaintiff's position as substitute English and drama teacher did not directly "[reflect] a role in conveying the Church's message and carrying out its mission." Hosanna-Tabor, 565 U.S. at 192. Charlotte Catholic High School teachers do not have to reference Catholic principles. (Doc. No. 31-17 at 74:2-17). The High School administration prefers that secular teachers, like Plaintiff, avoid discussing Catholic doctrine. (Doc. No. 31-16 at 28:2-15). Unlike all three teachers in Hosanna-Tabor and Our Lady of Guadalupe, Plaintiff did not teach religion in his classes and was not tasked with preparing students for participation in Catholic worship services.

In sum, the church autonomy doctrine is not as broad as Defendants would have the Court believe. See Little Sisters of the Poor Saints Peter & Paul Home v. Penn., 140 S. Ct. 2367, 2397 n.1 (2020) (Kagan, J., concurring in the judgment) (explaining that in the context of employment discrimination, "there is no general constitutional immunity, over and above the ministerial exception, that can protect a religious institution from the law's operation"). The ministerial exception is the strongest expression of that doctrine in the employment context, and the exception likely cannot be waived. However, Defendants have stipulated that Plaintiff was not a minister, and the Court agrees. But even if they had not made such a stipulation, the Court would find that Plaintiff was not a minister for the purposes of the ministerial exception. As such, church autonomy does not shield Defendants against Title VII liability for sex discrimination.

### d. The Religious Freedom Restoration Act

Defendants next argue that RFRA shields them from Plaintiff's sex discrimination claim. (Doc. No. 30 at 18). RFRA was passed in reaction to the Supreme Court's decision in Employment Division v. Smith, where the Court altered the First Amendment's Free Exercise

31

test to permit laws that are facially neutral, even if they incidentally burden religious exercise.

See Emp. Div., Dept. of Hum. Res. of Or. v. Smith, 494 U.S. 872 (1990); 42 U.S.C. §

2000bb(a)(4). RFRA reinstituted the Sherbert-Yoder test. 42 U.S.C. § 2000bb(b)(1). This test did

not allow the government to substantially burden religion—even with a facially neutral law—

without a compelling governmental interest. See Wisconsin v. Yoder, 406 U.S. 205, 220 (1972).

Therefore, under RFRA, once it is found that the government is substantially burdening a

party's free exercise of religion—as defined by RFRA—the government's action can only

survive by satisfying the RFRA exception. 42 U.S.C. § 2000bb-1. The exception has two parts:

(1) whether the burden imposed on the party asserting RFRA is in furtherance of a compelling

governmental interest, and (2) whether the imposed burden is the least restrictive means of

furthering the compelling governmental interest. Id. Essentially, when RFRA is asserted as a

defense, it functions as a burden-shifting statute. Listecki v. Official Comm. Of Unsecured

Creditors, 780 F.3d 731, 736 (7th Cir. 2015).

Whether RFRA applies to suits between private parties has not been resolved by the

Supreme Court or the Fourth Circuit. See Bostock, 140 S. Ct. at 1754. This Court holds that

RFRA does not apply to suits between purely private parties.

As an initial matter, it is important to clarify that RFRA does not operate under the First

Amendment; therefore, cases in which the First Amendment has been permitted as a defense in

suits between private parties are irrelevant. Defendants argue that, since the First Amendment

has been used as a defense in suits between private parties before, RFRA can as well. (Doc. No.

63 at 12). In N.Y. Times v. Sullivan, the New York Times was sued by Sullivan, a Public City

Commissioner in Alabama, in his personal capacity, for libel under Alabama law. 376 U.S. 254,

256 (1964). The New York Times asserted the First Amendment as a defense to the Alabama

32

libel law. See id. at 264-65. The Supreme Court sustained the defense, explaining "[t]he test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised." Id. Likewise, in Hustler Mag., Inc. v. Falwell, 485 U.S. 46, 56-57 (1988), the Supreme Court allowed Hustler Magazine to use the First Amendment as a defense to Virginia's intentional infliction of emotional distress law because the law prohibited speech that is protected by the First Amendment.

The Supreme Court in Snyder v. Phelps, 562 U.S. 443, 451 (2011), stated that the First Amendment's plain text, which reads "Congress shall make no law … abridging the freedom of speech," allows the First Amendment to be used as a defense in state tort suits—as seen in Sullivan and Hustler Magazine. Of course, the Free Exercise Clause reads the same way: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. AMEND. I. This language, however, is inapplicable to the instant case because RFRA *is not* an exercise of First Amendment Free Exercise Clause enforcement. City of Boerne v. Flores, 521 U.S. 507, 532-35 (1997). Thus, the language "Congress shall make no law" is simply not applicable to a RFRA defense. Therefore, the reasoning underlying the application of the First Amendment as a defense is inapplicable to RFRA.

Second, the plain language of the statute shows that RFRA does not apply to private parties. The relevant portions of RFRA include:

> 42 U.S.C. § 2000bb:
> (a) Findings
> The Congress finds that--
> > (3) governments should not substantially burden religious exercise without compelling justification;
> > (4) in Employment Division v. Smith, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion;

(5) the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

(b) Purposes

The purposes of this chapter are--

(1) to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

(2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

42 U.S.C. § 2000bb-1: Free exercise of religion protected

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

(c) Judicial Relief

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.

42 U.S.C. § 2000bb-2: Definitions

As used in this chapter--

(1) the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity;

(3) the term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion.

42 U.S.C. § 2000bb-3: Applicability

(a) In general

This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993.

Defendants rely heavily on a Second Circuit decision that has since been called into question by the Second Circuit. See Hankins v. Lyght, 441 F.3d 96, 104 (2d. Cir. 2006) (holding RFRA applies in suits between private parties); See also Rweyemamu v. Cote, 520 F.3d 198, 201 & n.2 (2d Cir. 2008) (stating the Second Circuit has doubts about its determination in Hankins,

34

and that it "does not understand" how RFRA can apply to suits between private parties "regardless of whether the government can enforce it"). The Hankins court reasoned that the language of RFRA was broad enough to encompass suits between purely private parties because the statute states RFRA "applies to all Federal law, and the implementation of that law," including "as a … defense in a judicial proceeding." 441 F.3d 96 at 103 (quoting §§ 2000bb-3(a), 2000bb-1(c)). The court decided that the only conceivable limiting language is the phrase "and obtain appropriate relief against a government." Id. (quoting § 2000bb-1(c)). The court said interpreting the phrase "against the government" as being restrictive would require a reading "involv[ing] a convoluted drawing of a hardly inevitable negative implication." Id.[1]

The dissent in Hankins, written by then-judge Sotomayor, began by stating that the limiting language the majority noted is not, in fact, the only such language, and that all of the statute's provisions must be read as a whole. See id. at 114. The dissent then analyzed the langauge of Section 2000bb-1(b), which states the "government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person." Id. The term "demonstrates" is defined as "meet[ing] the burdens of going forward with the evidence and of persuasion." Id. (quoting § 2000bb-2(3)). The dissent concluded that the government cannot "demonstrate" the burden, as defined by the statute, without being a party. Id. Furthermore, the dissent said the phrase "obtain appropriate relief against a *government*" limits RFRA to suits where the government is a party. Id. (emphasis in original). The dissent went on to address Section 2000bb-3(a), which states RFRA applies to "all Federal law." Id. at 115 (quoting 2000bb-3). The dissent reasoned that, when reading the statute as a whole, this "provision simply

---

1 The only case other than Hankins that can be construed as favoring Defendants' position is In re Young, 141 F.3d 854 (8th Cir. 1998). However, the Eighth Circuit in this case did not even discuss—much less hold on—the private party issue.

requires courts to apply RFRA to all Federal law in any lawsuit to which the government is a party." Id. (internal quotations omitted).

Three other circuits have decided the issue, and all three have sided with the dissenting opinion in Hankins and held that RFRA does not apply to suits between private parties. See Gen. Conf. Corp. of Seventh-Day Adventists v. McGill, 617 F.3d 402, 410 (6th Cir. 2010); see also Listecki, 780 F.3d at 737; Tomic, 442 F.3d 1042; Sutton v. Providence St. Joseph Med. Ctr., 192 F.3d 826, 835-36 (9th Cir. 1999). The Sixth Circuit decided RFRA did not apply to suits between private parties. McGill, 617 F.3d at 410. In addition to adopting the textualist analysis of the Hankins dissent, the McGill court noted that RFRA requires the burden to be imposed by the government and that a compelling justification is required by the government. Id. at 411. Since the government cannot satisfy this burden without being a party, the court reasoned that RFRA cannot apply to suits between private parties. Id. The Seventh Circuit came to the same conclusion. Tomic, 442 F.3d at 1042. Judge Posner, writing for the court, described the majority's decision in Hankins as "unsound" and reasoned that "RFRA is applicable only to suits to which the government is a party." Id. In a later case, the Seventh Circuit expanded on Judge Posner's statement by explicitly holding that RFRA is a burden-shifting test where the burden of evidence and persuasion shifts from the party asserting RFRA to the government. Listecki, 780 F.3d at 736-37. The court expressly held that "RFRA is not applicable in cases where the government is not a party." Id. at 736. The Ninth Circuit also decided that RFRA does not apply to suits in which the government is not a party. Sutton, 192 F.3d at 835-36. The court stated RFRA was only applicable to private parties who were willfully participating with a government entity in some activity such that it would be fair to attribute their conduct to the government. Id. at 843. Thus, the Ninth Circuit essentially required a party to either be the government, or to be

36

so intertwined with the government that it would be fair to consider the party's actions to be the government's. See id.

In addition to the decisions in the circuit courts, district courts have almost universally agreed that RFRA does not apply to suits between private parties. See Boggan v. Miss. Conf. of the United Methodist Church, 222 Fed. App'x 352 (8th Cir. 2007) (affirming a district court decision that held RFRA does not apply to suits between private parties); see also Mathis v. Christian Heating & Air Conditioning, Inc., 158 F. Supp. 3d 317, 325-28 (E.D. Pa. 2016) (relying heavily on the reasoning in Listecki and McGill and explicitly rejecting the majority's reasoning in Hankins); Goodman v. Archbishop Curley High Sch., Inc., 149 F. Supp. 3d 577, 588-589 (D. Md. 2016) (stating—in a case between two private parties—that "there is no basis to dismiss this case under [RFRA]"); Johnson v. Wireman, No. 1:15-CV-02254, 2019 WL 1383575, at *5 (W.D. Pa. Mar. 27, 2019) (holding RFRA does not apply unless the government is a party).

Moreover, as noted earlier, the Hankins decision has received criticism from the Second Circuit itself. See Rweyemamu, 520 F.3d at 201 & n.2. Some district courts in the Second Circuit have also expressed their hesitations about applying RFRA to suits between private parties. See Redhead v. Conf. of Seventh-Day Adventists, 440 F. Supp. 2d 211, 218-19 (E.D.N.Y. 2006) (stating "[t]he court has strong reservations in proceeding on the assumption that the RFRA is applicable in a suit between private parties, especially considering the plain language of the statute"); see also Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 531 B.R. 439, 483-84 (Bankr. S.D.N.Y 2015) (stating RFRA does not apply because the government is not a party); Wisc. Province of Soc'y of Jesus v. Cassem, 373 F. Supp. 3d 378, 390 (D. Conn.

2019) (stating "[t]he text of the statute lends itself to the interpretation that the Government must be taking some action in order for RFRA to apply").

In addition to the nearly uniform precedent holding that RFRA does not apply to purely private parties, it is clear from the Court's own analysis of the statute that the plain text mandates that RFRA does not apply in such circumstances. When interpreting a statute, a court should apply the plain and ordinary meaning if the statute is not ambiguous. See Bostock, 140 S. Ct. at 1749 ("This Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end."). In determining the plain or ordinary meaning of a statute, it is helpful to apply canons of construction to glean the plain or ordinary meaning from the text. See Chickasaw Nation v. United States, 534 U.S. 84, 94 (2001). Canons of statutory construction "need not be conclusive[,]" but "are designed to help judges determine the Legislature's intent as embodied in particular statutory language." Id. (internal citations omitted). In the instant case, the statute is clear: RFRA only applies when the government is a party to the suit.

The whole-act rule is often pertinent for statutes that have multiple sections, like RFRA. This rule stipulates that any one section of a statute cannot be read in isolation; rather, it must be read in conjunction with the rest of the statute. See Hankins, 441 F.3d at 114-15 (applying the whole-act rule when interpreting RFRA) (Sotomayor, J., dissenting); see also United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241-42 (1989) (analyzing section of Bankruptcy Code in conjunction with the rest of the act); Philbrook v. Glodgett, 421 U.S. 707, 713 (1975) (analyzing assistance statute for dependent children with whole-act rule); Kokoszka v. Belford, 417 U.S. 642, 650 (1974) (analyzing Consumer Credit Protection Act with whole-act rule). Since RFRA is a multi-section statute, an analysis of RFRA necessarily involves interpreting each section in

38

conjunction with the rest in order to determine the statute's plain meaning. While applying the whole-act rule, the Court will also apply the following canons: the presumption of consistent usage, the rule to avoid surplusage, the general terms canon, and *expressio unius est exclusio alterius*.

Under RFRA, Section 2000bb-1(b) clearly stipulates the *government* must *demonstrate* the burden is in furtherance of a compelling governmental interest and is the least restrictive means of serving this interest. The word "demonstrate" "means meets the burdens of going forward with the evidence and of persuasion[.]" § 2000bb-2(3). The word "government" as used in this section cannot mean a private plaintiff because the term is clearly defined in Section 2000bb-2(1). In this definition, there is no mention of a private party or any word or phrase that can be construed as such. See § 2000bb-2(1). The presumption of consistent usage stipulates that "a term generally means the same thing each time it is used." United States v. Castleman, 572 U.S. 157, 174 (2014) (Scalia, J., concurring). Accordingly, under this canon, the word "government" as used in Section 2000bb-1(b) must have the same meaning as the word "government" as defined in Section 2000bb-2(1). Thus, the party carrying the burden cannot be a private party. Since the government cannot carry the burden of persuasion and evidence if they are not a party to the suit, see Hankins, 441 F.3d at 114-15, and a private citizen cannot carry the burden in the government's place, the government must be a party for a RFRA claim.

Defendants attempt to argue that the judiciary constitutes the government under the statute. However, since the meaning is presumed to be the same throughout, it cannot be argued that the judiciary—as the "government"—is "substantially burdening" Defendants pursuant to Section 2000bb-1(a) because the judiciary—as the same "government" in 2000bb-1(a)—cannot carry the burden of evidence and persuasion required of the "government" in Section 2000bb-

1(b). There is no meaningful variation in the way the term is used, so the term "government" used in each section must carry the same meaning. See Matthew R. Christiansen & William N. Eskridge, Jr., Congressional Overrides of Supreme Court Statutory Interpretation Decisions, 1967—2011, 92 TEX. L. REV. 1317, 1447 (2014) (stating the canon of meaningful variation "presumes that different statutory language must have completely different meanings"). Thus, the judiciary cannot be the source of the "burden" under the definition of "government" defined in the statute. Any attempt to argue that Congress could be the source of the governmental burden, rather than the judiciary, would meet the same fate because Congress is equally incapable of carrying the burden of persuasion and evidence.

Additionally, the rule to avoid surplusage states "that a court should give effect, if possible, to every clause or word of a statute." Moskal v. United States, 498 U.S. 103, 104 (1990). Based on the definitions of "government" and "demonstrate" provided in the statute, it is logically impossible to have the government demonstrate the application without being a party to the case. See §§ 2000bb-2(1), 2000bb-2(3). Thus, under Defendants' interpretation of RFRA, Section 2000bb-1(b), which requires the government to demonstrate the exception to RFRA, would become ineffectual.

Moreover, RFRA may be used as a "defense in a judicial proceeding[,] and [the defendant may] obtain appropriate relief against a government." § 2000bb(b)(2). In an adversarial judicial system, parties to a suit are described as arguing "against" one another. The word "relief" is used when asking the court to have the other party alter their behavior. As stated above, the word "government" cannot mean a private party. This court does not have any jurisdiction over a party that is not involved in the suit, so the court can only grant relief against parties to the suit. The phrase "against a government," therefore, is best understood—in the

context of the adversarial judicial system—as meaning the government must be an adversary to the party asserting RFRA in the suit. See id. Thus, Defendants, by attempting to assert RFRA against a private party, are asking the Court to not give effect to the phrase "against a government." In other words, Defendants' argument treats that phrase as mere surplusage.

Under the rule to avoid surplusage, this Court cannot disregard the majority of the written statute simply because the purpose clause indicates a return to a common law test that occasionally had different results. See Bostock, 140 S. Ct. at 1749 (stating "[t]he people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration"). The purpose clause states that RFRA is reinstituting the First Amendment's Sherbert-Yoder test, which was sometimes applied to private parties. § 2000bb(b)(1); see also Molko v. Holy Spirit Ass'n., 762 P.2d 46 (Cal. Sup. Ct. 1988). Interpreting this clause to mean that RFRA applies to suits between private parties would practically render the majority of the statute ineffectual. To illustrate, what effect would the definitions of "government" and "demonstrates" have if the given definitions are necessarily canceled out by the common law meanings under Sherbert-Yoder? Moreover, what purpose would there be for any other section in the statute? If Congress did intend to have RFRA apply to suits between private parties, the evidence is not found anywhere within the statute.

The only way to give effect to every word of the statute is to hold that RFRA only applies when the government is a party. Contrary to Defendants' argument, it is logically possible for RFRA to apply "to all Federal law" and apply only when the government is a party. See § 2000bb-3(a); see also Hankins, 441 F.3d at 115 (Sotomayor, J., dissenting) (stating "there is no acceptable reading of the statute that would" support holding that RFRA applies to suits between private parties). RFRA practically acts as a modifier to every federal law, and the requirement

41

that the government be a party simply acts as a condition that must be met in order to trigger RFRA's protections, even though these protections will potentially reach each and every federal law. In short, while RFRA modifies every federal law, the conditions necessary to trigger its protections are not always satisfied.

It is important to note that the general terms canon cannot save Defendants' argument that not allowing a RFRA defense in a suit between private parties would improperly limit the phrase "applies to all Federal law." "The General-Terms Canon dictates that '[w]ithout some indication to the contrary, general words (like all words, general or not) are to be accorded their full and fair scope [and] are not to be arbitrarily limited.'" Koenke v. Saint Joseph's Univ., No. CV 19-4731, 2021 WL 75778, at *3 (E.D. Pa. Jan. 8, 2021) (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (2012)); see also § 2000bb-3(a). RFRA explicitly states that "[g]overnment shall not substantially burden a person's exercise of religion" and that government must demonstrate the exception to RFRA. See §§ 2000bb-1(a-b). These sections directly indicate that the phrase "all Federal law" is, in fact, limited to suits where the government is a party.

Of course, the rule to avoid surplusage canon states that all words and phrases should be given effect *if possible*. Moskal, 498 U.S. at 104. One way in which it would not be "possible" to give the words their plain meaning is if it were to produce an absurd result. See Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004) (explaining "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms") (citations omitted). The "absurdity doctrine" began when (and has remained constant since) the Marshall Court stated that the duty of a court to follow the statute ceases when "the plain meaning of a provision, not contradicted by any other provision in

the same instrument, is to be disregarded, because we believe the framers of that instrument could not intend what they say, it must be one in which the absurdity and injustice of applying the provision to the case, would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application." John F. Manning, <u>The Absurdity Doctrine</u>, 116 Harv. L. Rev. 2387, 2388 (2003) (quoting <u>Sturges v. Crowinshield</u>, 17 U.S. 122, 202-03 (1819)).

Defendants contend that reading the statute to not apply when the government is not a party triggers the absurdity doctrine. Here, the EEOC issued a right-to-sue letter to Plaintiff, which means the EEOC *specifically chose not to* enforce Title VII. <u>See</u> <u>Perdue v. Roy Stone Transfer Corp.</u>, 690 F.2d 1091, 1093 (4th Cir. 1982) (noting that "on at least two occasions, the Supreme Court has referred to statutory notice of the right to sue as a jurisdictional prerequisite to private enforcement"). The EEOC is mandated by law to issue the right-to-sue letter if they do not decide to bring enforcement action, or after 180 days. <u>Id.</u> at 1092-93. Instead of enforcing Title VII, the EEOC allowed Plaintiff to enforce his rights himself. At this point, there is no government involvement. The right-to-sue letter itself cannot constitute government action because it is precisely the opposite: it is government *inaction*. Defendants' absurdity argument, then, is that having a different legal standard—for a suit between private parties where the government could intervene, and a suit where the government is formally a party—is itself absurd. The majority in <u>Hankins</u> relied on this distinction in stating RFRA applies to suits between private parties. <u>Hankins</u>, 441 F.3d at 103-04. The majority stated that "the substance of the ADEA's prohibitions cannot change depending on whether it is enforced by the EEOC or an aggrieved private party," and that a decision on the merits should not depend on who brings the action. <u>Id.</u> at 103. The dissent in <u>Hankins</u> rejected the significance of this distinction and ultimately determined that RFRA's protections can change based on who is enforcing it because

43

the plain language of the statute says that it does, in fact, change. Id. at 115 (Sotomayor, J.,

dissenting).

Other courts have noted such a distinction exists and have considered the lack of an

agency that can intervene as one of many factors in their decisions. See Listecki, 780 F.3d at 737

(stating the only circuit to apply RFRA to a suit between private parties did so when the

government could have been a party); McGill, 617 F.3d at 411 (stating one of the court's reasons

for not following the majority in Hankins—in addition to the plain language not supporting their

decision—was because the government could have enforced the statute in Hankins). However,

one court has considered the distinction directly and rejected its significance. See Mathis, 158 F.

Supp. 3d at 328 (explicitly rejecting the reasoning in Hankins regarding the absurdity of having

different standards for government and private enforcement).

The Court concludes that the alleged undesirable policy consequence of having a

different standard for private and government enforcement can hardly be called absurd. The

United States as a nation has always been cautious of governmental overreach. See Citizens

United v. Fed. Election Comm'n, 558 U.S. 310, 340 (2010) (stating the First Amendment is

"[p]remised on mistrust of governmental power"); see also Letter from Thomas Jefferson to

James Madison (Dec. 20, 1787) (on file with National Archives) (stating "I own I am not a friend

to a very energetic government. It is always oppressive."). This is the entire reason for the

inclusion of the Bill of Rights—including the Free Exercise Clause of the First Amendment—in

the Constitution. Letter from Thomas Jefferson to James Madison (Dec. 20, 1787) (on file with

National Archives) (stating "no just government should refuse" a Bill of Rights because

government cannot be trusted). The Bill of Rights was not designed to protect a citizen from his

neighbor, but rather to protect the citizen from the government. Barron v. City of Baltimore, 32

U.S. 243, 250 (1833) (the amendments to the Bill of Rights "demanded security against the apprehended encroachments of the general government."). Therefore, distinguishing between private and government enforcement is not monstrous or absurd; rather, the distinction is in keeping with both the ideas of the Framers and two hundred years of precedent interpreting the Bill of Rights.

Lastly, the canon *expressio unius est exclusio alterius* stipulates that the expression of "one item of [an] associated group or series excludes another left unmentioned." N.L.R.B. v. SW General, Inc., 137 S. Ct. 929, 940 (2017) (quoting Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 80 (2002)). The canon applies when "circumstances support a sensible inference that the term left out must have been meant to be excluded." SW General, 137 S. Ct. at 940 (quoting Echazabal, 536 U.S. at 81) (internal alterations omitted). Here, there is such an inference that suits between private parties were meant to be excluded. Section 2000bb-1(b) gives rise to an inference that the government must be a party in order to carry out their burden of proof. Section 2000bb-2(1) defines government, leaving no room for private parties to be included. There is simply no other language inconsistent with this interpretation. Thus, the inference that private parties are meant to be excluded from RFRA is valid.

Since the plain meaning of the statute is clear, the Court's job is at an end. See Bostock, 140 S. Ct. at 1749. However, even if the Court looks to extratextual sources for legislative intent, RFRA's legislative history does not favor Defendant's position that RFRA applies to private parties. The Court in Bostock explained that "[l]egislative history, for those who take it into account, is used to clear up ambiguity, not create it." 130 S. Ct. at 1749 (citations omitted) (internal quotations omitted). While the Hankins majority stated the legislative history did not favor one interpretation over the other, many courts—as well as then-judge Sotomayor's dissent

45

in Hankins—have stated the legislative history favors finding RFRA does not apply to suits

between private parties.[2] 441 F.3d at 103; see id. at 115 n.9 (Sotomayor, J., dissenting)

(explaining there is not a single example of a citation to a case involving private parties in the

legislative history); Listecki, 780 F.3d at 737 (finding the legislative history of RFRA to be

comprised solely of cases in which the government is a party); McGill, 617 F.3d at 411

(reasoning that "RFRA's legislative history supports our view that Congress did not intend the

statute to apply against private parties"). Thus, precedent indicates that legislative history does

not support Defendants' position.

The dissent in Hankins noted it was telling that in twelve years since RFRA's enactment

in 1994, no court had previously held that RFRA applies to private parties. 441 F.3d at 115. It

has now been twenty-seven years, and Hankins, a decision questioned by district courts in the

Second Circuit and the Second Circuit itself, still stands alone as the only court holding RFRA

applies to private parties. This Court will not be the second. In sum, the Court follows the

overwhelming majority of precedent and holds that RFRA does not apply to suits between

private parties because the plain text of RFRA indicates the government must be a party, the

distinction between private and government enforcement is not absurd, and the legislative history

does not contradict the plain text of RFRA.

    **e.  Freedom of Expression and Freedom of Association**

---

[2] The Senate Committee on the Judiciary issued a report on RFRA that "began by stating that the
nation was founded by those with a conviction that they should be free to practice their religion
'free from Government interference' and 'Government actions...' In describing RFRA's purpose,
the report refers to 'government actions,' 'only governmental actions,' and 'every government
action.'" Listecki, 780 F.3d at 737 (quoting S. Rep. No. 103–111, at 4, 8–9 (1993), reprinted by
1993 U.S.C.C.A.N. 1892, 1894). Furthermore, all of the examples cited in the Senate and House
Reports on RFRA involve actual or hypothetical lawsuits in which the government is a party. See
S.Rep. No. 103–111 [1993 U.S.C.C.A.N. 1892] (1993); H.R. Rep. 103–88 (1993).

Finally, Defendants argue that the freedom of association protects their right to not affiliate with Plaintiff. Freedom of association is a constitutional right falling in the "close nexus between the freedoms of speech and assembly." Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson, 357 U.S. 449, 460 (1958) (citations omitted). There are two protected forms of association, the latter of which is relevant to the instant case: "intimate association" and "expressive association." Roberts v. U.S. Jaycees, 468 U.S. 609, 617–18 (1984). Intimate association is not at issue here, as it pertains to the "choices to enter into and maintain certain intimate human relationships[.]" Id. at 617. Expressive association has been derived from the First Amendment and its guarantees of speech, assembly, and petition. Bates v. City of Little Rock, 361 U.S. 516, 522–23 (1960); United Transp. Union v. State Bar of Michigan, 401 U.S. 576, 578–79 (1971); Healy v. James, 408 U.S. 169, 181 (1972). "Freedom of association therefore plainly presupposes a freedom not to associate." Roberts, 468 U.S. at 623.

"To determine whether a group is protected by the First Amendment's expressive associational right, we must determine whether the group engages in 'expressive association.'" Boy Scouts of Am. v. Dale, 530 U.S. 640, 648 (2000). However, "[t]he First Amendment's protection of expressive association is not reserved [solely] for advocacy groups[,]" and those who merely engage in "some" form of expression fall under its protections. Id. This inquiry requires the court to "independently review the factual record" Id. at 648-49 (citing Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557, 568 (1995)).

Here, freedom of expressive association does not exempt Defendants from Title VII's anti-discrimination provisions. Moreover, even if freedom of expressive association were applicable, the goals of Title VII are sufficiently compelling and narrowly tailored to warrant its application.

47

Defendants argue that freedom of association protects the action of firing Plaintiff. (Doc. No. 63 at 25-26). To support their argument, Defendants note that they are engaged in expressive activities by seeking to instill Catholic teachings in their students. (Id. at 26). Therefore, forcing Defendants to retain Plaintiff as a substitute teacher would constitute compelling expressive association in violation of the First Amendment. (Id.). This argument fails because it disregards clear precedent that freedom of expressive association is inapplicable in commercial contexts where Title VII's antidiscrimination provisions apply, ignores critical aspects of the Dale decision that make it inapplicable to this case, and fails to consider the overall purpose of the freedom of expressive association.

The only First Amendment rights that would allow a religious institution to circumvent Title VII's protections are the Establishment and Free Exercise ("Religious") Clauses. The Fourth Circuit has expressly stated that, "[w]here no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer unless Congress so provides." E.E.O.C. v. Roman Cath. Diocese of Raleigh, N.C., 213 F.3d 795, 801 (4th Cir. 2000). If the freedom of expressive association encompassed the same rights as the Constitution's Religious Clauses, "the First Amendment analysis [would] be the same," which would be a "result [that] is hard to square with the text of the First Amendment itself, which gives special solicitude to the rights of religious organizations." Hosanna-Tabor, 565 U.S. at 189. There would thus be no need to conduct careful analysis of whether a relationship between a religious organization and its employee fell under the ministerial exception. See, e.g., Bryce, 289 F.3d at 656 ("For example, courts have recognized a ministerial exception that prevents adjudication of Title VII employment discrimination cases brought by ministers against churches.") (citations omitted). Moreover, if freedom of association

48

applied to any entity with an expressive mission, then businesses engaged in some small amount of expressive association would be granted an exception from all statutes governing the relationship between a business and the people they interact with. This preposterous result cannot be the case.

Furthermore, hiring paid employees is commercial activity, not expressive association. Freedom of association does not apply in the employment context. The Supreme Court has specifically ruled that Title VII does not infringe upon the First Amendment rights of employers. Wisconsin v. Mitchell, 508 U.S. 476, 487 (1993) ("In Hishon, we rejected the argument that Title VII infringed employers' First Amendment rights.") (citation omitted); see also Hishon v. King & Spaulding, 467 U.S. 69, 78 (1984). "[T]here is only minimal constitutional protection of the freedom of commercial association." Roberts, 468 U.S. at 634 (O'Connor, J., concurring in part). Furthermore, the Court has acknowledged that "[o]nce a contractual relationship of employment is established, the provisions of Title VII attach and govern certain aspects of that relationship." Hishon, 467 U.S. at 74.

To advance their novel theory regarding freedom of association, Defendants rely almost entirely on Boy Scouts of America v. Dale, a Supreme Court case involving an anti-discrimination claim brought by a Boy Scouts assistant scoutmaster whose membership was revoked after the Boy Scouts learned he was gay. 530 U.S. at 643-44; (Doc. No. 63 at 25-26). Defendants claim that because the Dale Court ruled against compelling association with a former scoutmaster who was gay, the same outcome is warranted here. This argument fails because it disregards critical aspects of the Dale decision that make it inapplicable to this case.

In Dale, the Supreme Court ruled that freedom of expressive association exempted the Boy Scouts of America from a discrimination claim filed against them. 530 U.S. at 661. Among

<div align="center">49</div>

the Court's reasons for application of freedom of expressive association was the plaintiff's volunteer status and the fact that the suit sought to enforce a public accommodations law against "a private entity without even attempting to tie the term 'place'" in the statute "to a physical location." Dale, 530 U.S. at 657-59 (2000).

The differences between Dale and the instant case are numerous. The Boy Scouts is a private organization in which the plaintiff was a *volunteer*. See Dale, 530 U.S. at 644. By contrast, the instant case involves employment.  Moreover, the action in question in Dale was the application of a New Jersey law banning discrimination on the basis of sexual orientation in places of public accommodation. Dale, 530 U.S. at 645. The Supreme Court was especially suspicious of the application of a public accommodations "law to a private entity without even attempting to tie the term 'place' to a physical location." Id. at 657. Unlike Dale, the instant case does not need to implicate a particular place because it involves a violation of employment protections. The Boy Scouts of America expressly acknowledged that their organization would have been subject to any employment laws which prevented discrimination based on sexual orientation. Dale, 530 U.S. at 672 (Stevens, J., dissenting) ("we are unaware of any statute or ordinance . . . which prohibits discrimination against individual's employment upon the basis of homosexuality. . . . *In the event that such a law was applicable, it would be necessary for the Boy Scouts of America to obey it*") (quoting Boy Scouts President and Chief Scout Executive Letter on policies and procedures with regards to gay men in the Boy Scouts). Due to the Bostock ruling, Title VII now bans such discrimination. Bostock, 140 S. Ct. at 1744. In short, Dale does not provide significant support for Defendants' arguments.

Next, even if freedom of expressive association were to apply, Plaintiff's claims easily satisfy the compelling interest test in this case because Title VII is narrowly tailored to serve the

government's compelling interest in protecting employees from discrimination based on sex. "The right to associate for expressive purposes is not, however, absolute." Roberts, 468 U.S. at 623. "Infringement on [the right to expressive association] may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." Id. It is the court's job to determine if forced inclusion of an individual would impair a group's expressive message. See Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47, 69 (2006). Thus, to properly apply freedom of expressive association, the Court must weigh the government's interest with the level of restriction imposed on associational freedom by pursuing that interest. See id. There must be a compelling interest and no significantly-less-restrictive means to achieve that interest. Roberts, 468 U.S. at 623.

How much application of a law will restrict associational freedom is a fact-dependent inquiry determined by the group's characteristics and what (if any) speech would be compelled or restricted by such application. For instance, in Roberts, the Supreme Court ruled on the constitutionality of a Minnesota law banning discrimination in places of public accommodation as applied to the United States Jaycees, a nonprofit membership-based organization whose objectives were to pursue educational and charitable opportunities designed to "promote and foster the growth and development of young men's civic organizations in the United States[.]" 468 U.S. at 612-13 (citations omitted). The Court looked to the size and selectiveness of the Jaycees, noting that they were "large and basically unselective[.]" Id. at 621. Next, the Court examined the impact upon the Jaycees of enforcement of the antidiscrimination law, noting that the Jaycees "failed to demonstrate that the Act imposes any serious burdens on the male members' freedom of expressive association." Id. at 626 (citations omitted). The Court further

51

noted that "even if enforcement of the Act causes some incidental abridgment of the Jaycees' protected speech, that effect is no greater than is necessary to accomplish the State's legitimate purposes." Id. at 628. The Court ruled that Minnesota's anti-discrimination law was constitutionally applied to the Minnesota chapter of the Jaycees because "the State has advanced [its] interests through the least restrictive means of achieving its ends." Id. at 626.

Here, Defendants retaining Plaintiff as a substitute teacher for secular classes would not significantly impair its freedom of expressive association. To be clear, Defendants are engaged in expressive activities as the school actively seeks to instill Catholic teachings, including on marriage, in its students. Plaintiff's decision to marry his partner is not in keeping with Catholic teaching. However, Plaintiff is a lay employee, who comes onto the campus of a religious school for the limited purpose of teaching secular classes, with no mandate to inculcate students with Catholic teachings. Indeed, Defendants do not require Plaintiff to be Catholic, and they even explicitly encourage him and other teachers of non-religious subjects to refrain from teaching religious topics in their classrooms. (Doc. No. 28-5 at 28). When students had emotional or spiritual questions outside his disciplines of drama and English, Plaintiff was required to refer those students to the proper individual to handle them, such as by referring a student having a hard time at home to the counseling department. (Doc. No. 28-3 at 19:7-15; 102:17-23). As such, while retaining Plaintiff implicates Defendants' expressive mission, it does not significantly do so.

Even though there is some impairment of Defendants' expressive activities, Title VII is sufficiently compelling to warrant its application here. For a law to qualify for application despite imposing upon an organization's expressive activities, the law must be "'narrowly drawn' to serve a 'sufficiently strong, subordinating interest' 'without unnecessarily interfering

with First Amendment freedoms.'" <u>Roberts</u>, 468 U.S. at 634 (O'Connor, concurring in part) (citations omitted). Title VII is narrowly tailored in part because of the carve-outs for religious discrimination contained in Sections 702 and 703. The Fourth Circuit has further indicated its acceptance of Title VII's tailoring, noting that it is "properly applied to the secular employment decisions of a religious institution, such as those relating to a secular teacher in a church-approved school[.]" <u>Rayburn</u>, 772 F.2d at 1169 (citations omitted). And in <u>Dole v. Shenandoah Baptist Church</u>, the Fourth Circuit held that protecting non-ministerial employees from sex discrimination in church-affiliated schools is an interest "of the highest order" and "a less restrictive means of attaining its aims is not available." 899 F.2d 1389, 1398 (1990) (citations omitted). The Court has also already discussed the fact that Title VII does not unnecessarily interfere with First Amendment associational freedoms.

As in <u>Rayburn</u> and <u>Dole</u>, Plaintiff's right to be free from sex discrimination in employment under Title VII is a compelling interest of the highest order. <u>See</u> <u>EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.</u>, 884 F.3d 560, 593 (6th Cir. 2018) ("The undisputed record demonstrates that Stephens has been and would be harmed by the Funeral Home's discriminatory practices in this case, and the [government] has a compelling interest in eradicating and remedying such discrimination."); <u>cf.</u> <u>Masterpiece Cakeshop, Ltd. v. Colorado Civ. Rights Comm'n</u>, 138 S. Ct. 1719, 1727 (2018) ("[T]he laws and the Constitution can, and in some instances must, protect [same-sex couples] in the exercise of their civil rights. The exercise of their freedom on terms equal to others must be given great weight and respect by the courts."). Furthermore, a less restrictive means of attaining Title VII's aims is not available.

In short, freedom of expressive association does not bar Plaintiff's claim because it involves commercial employment, and thus freedom of association does not apply to the instant

case. But even if freedom of association were to apply, Title VII is sufficiently compelling and narrowly drawn law for its application to be warranted.

## VI.     CONCLUSION

Because the Court concludes that Defendants' employment action against Plaintiff violates Title VII's prohibition on sex discrimination and because the Court finds that Sections 702 and 703 of Title VII, church autonomy, RFRA, and freedom of association do not shield Defendants from liability, the Court holds that Defendants are liable for sex discrimination under Title VII. This case will now proceed to trial to determine the appropriate relief that should be granted.

### ORDER

**IT IS, THEREFORE, ORDERED** that Plaintiff's Motion for Partial Summary Judgment, Doc. No. 26, is **GRANTED**, and Defendants' Motion for Summary Judgment, Doc. No. 29, is **DENIED**.

Signed: September 3, 2021

Max O. Cogburn Jr.
United States District Judge

54

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

LONNIE BILLARD,

     *Plaintiff*,

     v.

CHARLOTTE CATHOLIC HIGH SCHOOL,
MECKLENBURG AREA CATHOLIC
SCHOOLS, and ROMAN CATHOLIC
DIOCESE OF CHARLOTTE

     *Defendants*.

**Civil Action No. 3:17-cv-0011**

## JOINT MOTION FOR ENTRY OF STIPULATED JUDGMENT AND DEFERRAL OF PETITION FOR COSTS AND FEES

Plaintiff Lonnie Billard ("Plaintiff") and Defendants Charlotte Catholic High School, Mecklenburg Area Catholic Schools, and Roman Catholic Diocese of Charlotte ("Defendants") respectfully submit this motion for entry of a stipulated judgement of damages in the amount of $55,000 and for an order pursuant to Federal Rule of Civil Procedure 54(d)(1) deferring the filing of Plaintiff's bill of costs, petition for fees, and calculation of post-judgment interest until the exhaustion of any appeals.  In support of the motion, the Parties state the following:

1.     In this case, Plaintiff alleges that he was terminated from employment because he announced plans to marry his same-sex partner, in violation of Title VII.

2.     On September 3, 2021, this Court entered an order (D.E. 69) denying Defendants' motion for summary judgment (D.E. 29) and granting Plaintiff's motion for summary judgment with respect to liability under Title VII (D.E. 26) (the "summary judgment decision").

3.     On September 28, 2021, this court scheduled a hearing on April 18, 2022, for a bench trial with respect to damages.

4.     The parties have agreed to stipulate to entry of final judgment in the amount $55,000, not including costs, attorney's fees, or post-judgment interest.

5.      After entry of final judgment, Defendants intend to, and reserve their right to, appeal the Court's summary judgment decision (and any prior decision from this Court) to the U.S. Court of Appeals for the Fourth Circuit and, if necessary, to the Supreme Court. *See, e.g.*, *Sprint Nextel Corp. v. Wireless Buybacks Holdings, LLC*, 938 F.3d 113, 124 (4th Cir. 2019).

6.      That is, by stipulating to entry of judgment in the amount of $55,000, Defendants do not waive any right to appeal the Court's summary judgment decision or any prior decision of the court. *See, e.g.*, *id.* at 124.

7.      The Parties agree that interests of judicial economy would be best served by deferring the filing of Plaintiff's bill of costs, petition for fees, and calculation of post-judgment interest until after the resolution of all appeals, including to the Supreme Court.

WHEREFORE, the Parties move the Court for an order:

A.  Entering judgment for damages in the amount of $55,000 in the form attached hereto as Exhibit A.

B.  Deferring the filing of Plaintiff's bill of costs, petition for attorney's fees, and calculation of post-judgment interest pursuant to Federal Rule of Civil Procedure 54(d)(1) until 30 days after the expiration of the deadline to appeal or after final resolution of all appeals, whichever is later.

Respectfully submitted this 25th day of February, 2022.


                                        __/s/  S. Luke Largess__
                                        S. Luke Largess (NC Bar # 17486)
                                        Tin Fulton Walker & Owen PLLC
                                        301 East Park Avenue
                                        Charlotte, NC 28202
                                        Telephone: (704) 338-1220
                                        Facsimile: (704) 338-1312

                                        Irena Como (NC Bar # 51812)
                                        American Civil Liberties Union
                                        of North Carolina Legal Foundation
                                        PO Box 28004
                                        Raleigh, NC 27611
                                        Telephone: (919) 834-3466
                                        Facsimile: (866) 511-1344

Joshua A. Block (*pro hac vice*)
Brian Hauss (*pro hac vice*)
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2604
Facsimile: (212) 549-2652

Elizabeth O. Gill (*pro hac vice*)
American Civil Liberties Union
Foundation
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

*Counsel for Plaintiff*

/s/ Joshua D. Davey
Joshua D. Davey (N.C. Bar No. 35246)
joshua.davey@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
("TROUTMAN PEPPER")
301 S. College Street
Charlotte, North Carolina 28202
Telephone: 704.916.1503
Facsimile: 704.998.4501

Moses M. Tincher (Ga. Bar No. 578906)
moses.tincher@troutman.com
TROUTMAN PEPPER
600 Peachtree Street, N.E., Suite 3000
Atlanta, Georgia 30308
Telephone: 404.885.2593
Facsimile: 404.885.3900

Kevin M. LeRoy (Wis. Bar No. 1105053)
kevin.leroy@troutman.com
TROUTMAN PEPPER
227 W. Monroe Street, Suite 3900
Chicago, Illinois 60606
Telephone: 312.759.1938
Facsimile: 312.759.1939

3

Leah D. Achor (Va. Bar No. 88964)
leah.achor@troutman.com
TROUTMAN PEPPER
1001 Haxall Point
Richmond, Virginia 23219
Telephone: 804.697.1326
Facsimile: 804.697.1339

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed a copy of forgoing document with the Clerk of Court using the CM/ECF system. All participants in the case are registered CM/ECF users and are hereby served through the CM/ECF system.

Dated: February 25, 2022

  **/s/ S. Luke Largess**
S. Luke Largess

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### 3:17-cv-11

LONNIE BILLARD,

     *Plaintiff*,

     v.

CHARLOTTE CATHOLIC HIGH SCHOOL,
MECKLENBURG AREA CATHOLIC
SCHOOLS, and ROMAN CATHOLIC
DIOCESE OF CHARLOTTE

     *Defendants*.

**ORDER AND JUDGMENT**

    **THIS MATTER** is before the Court on the parties' Consent Motion for Entry of Judgment (Doc. No. 71). The motion is **GRANTED**, and the Court enters the following Findings and Order:

    Plaintiff Lonnie Billard ("Plaintiff") alleges that Defendants Charlotte Catholic High School, Mecklenburg Area Catholic Schools, and the Roman Catholic Diocese of Charlotte (collectively, "Defendants") discriminated against him based on his sex in violation of Title VII of the Civil Rights Act of 1964. Plaintiff moved for partial summary judgment as to Defendants' liability on his Title VII claim, but not as to damages. Defendants also moved for summary judgment to dismiss with prejudice Plaintiff's claims. On September 3, 2021, this Court entered an order (D.E. 69) denying Defendants' motion for summary judgment (D.E. 29) and granting Plaintiff's motion for summary judgment with respect to liability (D.E. 26). On September 28, 2021, this court scheduled a hearing on April 18, 2022, for a bench trial with respect to damages.

The parties subsequently filed a joint motion for entry of a stipulated judgment of damages in the amount of $55,000 and for an order pursuant to Federal Rule of Civil Procedure 54(d)(1) deferring the filing of Plaintiff's bill of costs, petition for fees, and calculation of post-judgment interest until the exhaustion of appeals.

Accordingly, the Court hereby enters judgment as follows:

1.     Plaintiff is awarded judgment against Defendants for damages in the total amount of fifty-five thousand dollars ($55,000.00), not including costs, attorney's fees, or post-judgment interest.

2.     The time for Plaintiff to file his bill of costs, petition for attorney's fees, and calculation of post-judgment interest pursuant to Federal Rule of Civil Procedure 54(d)(1) is deferred until 30 days after the expiration of the deadline to appeal or after final resolution of all appeals, whichever is later.

3.     This is a final judgment for purposes of appeal under 28 U.S.C. § 1291. In stipulating to the entry of this judgment, Plaintiff and Defendants reserve and do not waive their rights to appeal the Court's previous summary judgment rulings.

Signed: March 18, 2022

Max O. Cogburn Jr
United States District Judge

**UNITED STATES DISTRICT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| LONNIE BILLARD, | Case No. 3:17-cv-0011 |
| *Plaintiff,* | |
| | **NOTICE OF APPEAL** |
| v. | |
| CHARLOTTE CATHOLIC HIGH SCHOOL, MECKLENBURG AREA CATHOLIC SCHOOLS, and ROMAN CATHOLIC DIOCESE OF CHAR-LOTTE, | |
| *Defendants.* | |

Notice is hereby given that Defendants Charlotte Catholic High School, Mecklen-burg Area Catholic Schools, and Roman Catholic Diocese of Charlotte appeal to the United States Court of Appeals for the Fourth Circuit from: (1) the final judgment entered on March 18, 2022 (ECF 72); (2) the order denying Defendants' Motion for Summary Judgment and granting Plaintiff's Motion for Partial Summary Judgment entered on September 3, 2021 (ECF 69); and (3) all earlier and interlocutory orders and rulings.

1

Dated: April 18, 2022

Respectfully submitted,

/s/ Joshua D. Davey
Joshua D. Davey (N.C. Bar No. 35246)
joshua.davey@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS LLP
("TROUTMAN PEPPER")
301 S. College Street
Charlotte, North Carolina 28202
Telephone: 704.916.1503
Facsimile: 704.998.4501

Moses M. Tincher (Ga. Bar No. 578906)
moses.tincher@troutman.com
TROUTMAN PEPPER
600 Peachtree Street, N.E., Suite 3000
Atlanta, Georgia 30308
Telephone: 404.885.2593
Facsimile: 404.885.3900

*Attorneys for Defendants*

2

**CERTIFICATE OF SERVICE**

I certify that on April 18, 2022, the foregoing document was served on all parties through the CM/ECF system.

Dated: April 18, 2022

/s/ Joshua D. Davey
Joshua D. Davey (N.C. Bar No. 35246)
joshua.davey@troutman.com
TROUTMAN PEPPER HAMILTON SANDERS
LLP ("TROUTMAN PEPPER")
301 S. College Street
Charlotte, North Carolina 28202
Telephone: 704.916.1503
Facsimile: 704.998.4501