No. 22-1440

# United States Court of Appeals
# for the Fourth Circuit

LONNIE BILLARD,
*Plaintiff-Appellee,*

v.

CHARLOTTE CATHOLIC HIGH SCHOOL, MECKLENBURG
AREA CATHOLIC SCHOOLS, and ROMAN CATHOLIC
DIOCESE OF CHARLOTTE,
*Defendants-Appellants.*

On Appeal from the U.S. District Court for the Western District of
North Carolina at Charlotte
Case No. 3:17-cv-00011 (Hon. Max O. Cogburn Jr.)

**BRIEF OF PROFESSORS ROBERT F. COCHRAN JR., DAVID F.
FORTE, RICHARD GARNETT, DOUGLAS LAYCOCK, MICHAEL
W. McCONNELL, MICHAEL P. MORELAND, AND ROBERT J.
PUSHAW AS *AMICI CURIAE* IN SUPPORT OF APPELLANTS**

C. Boyden Gray
Jonathan Berry
R. Trent McCotter
    *Counsel of Record*
Michael Buschbacher
Jared M. Kelson
BOYDEN GRAY & ASSOCIATES
801 17th Street NW, Suite 350
Washington, DC 20006
202-706-5488
mccotter@boydengrayassociates.com

i

## CERTIFICATE OF INTEREST

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici* hereby certifies that *amici* are not corporations, and that no corporate disclosure statement is therefore required. *See* Fed. R. App. P. 29(a)(4)(A). The Fourth Circuit's disclosure forms are attached to this brief.

Dated: September 29, 2022          /s/ R. Trent McCotter

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

INTERESTS OF *AMICI CURIAE* ........................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 2

ARGUMENT ...................................................................................... 4

    I.    The First Amendment Prohibits Government Interference with the Religious Mission of Religious Institutions ............................................................ 4

    II.   The First Amendment Was Designed to End the Long and Abusive Pattern of Government Interference with Religious Institutions. ............................. 9

    III.  The Church Autonomy Doctrine Prohibits Government Intrusion into the Diocese's Decision to No Longer Employ Plaintiff as a Substitute Teacher. ........................... 19

        A.    The Church Autonomy Doctrine Extends to Internal Affairs Beyond Ministerial Status ................. 19

        B.    Plaintiff's Claims are Barred Because his Nonrenewal was Based on a Religious Reason ............ 25

CONCLUSION ................................................................................... 30

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Bell v. Presbyterian Church*, 126 F.3d 328 (4th Cir. 1997) .............. 22, 30

*Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.*, 796 N.E.2d 286
(Ind. 2003) ......................................................................... 25

*Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648
(10th Cir. 2002) .......................................... 19, 22, 24–25, 30

*Dole v. Shenandoah Baptist Church*, 899 F.2d 1389 (4th Cir. 1990) ..... 20

*EEOC v. Catholic Univ. of Am.*, 83 F.3d 455 (D.C. Cir. 1996) .............. 19

*EEOC v. Roman Cath. Diocese of Raleigh, N.C.*, 213 F.3d 795
(4th Cir. 2000) ................................................................. 21

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012) ...................................... 3, 5–7, 9, 14, 17

*Hubbard v. J Message Grp. Corp.*, 325 F. Supp. 3d 1198
(D.N.M. 2018) ................................................................... 25

*Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94 (1952) ...................... 5, 19

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) ........................ 3

*Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013) ................................... 5–6

*McCarthy v. Fuller*, 714 F.3d 971 (7th Cir. 2013) ................................... 6

*Myhre v. Seventh-Day Adventist Church Reform Movement Am.
Union Int'l Missionary Soc'y*, 719 F. App'x 926 (11th Cir. 2018) ....... 25

*NLRB v. Roman Cath. Bishop of Chi.*, 440 U.S. 490 (1979) .. 3, 23–24, 27

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049
(2020) ............................................................ 3, 7, 15, 19, 21

*Paul v. Watchtower Bible & Tract Soc'y of N.Y.*, 819 F.2d 875 (9th Cir. 1987) ............................................................................ 25

*Rayburn v. Gen'l Conf. of Seventh-Day Adventists*, 772 F.2d 1126 (4th Cir. 1985) .................................................... 22, 27, 30

*Shannon v. Frost*, 42 Ky. 253 (1842) ........................................... 5

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931 (7th Cir. 2022) ............................................. 26

*Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036 (7th Cir. 2006) ......... 6

*Watson v. Jones*, 80 U.S. 679 (1872) ................................... 5, 19

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ................................ 22

## Statutes

Act in Restraint of Annates of 1532, 25 Hen. VIII, ch. 20 .................... 10

Act of Supremacy of 1534, 26 Hen. VIII, ch. 1 ........................ 10

Act of Uniformity of 1662, 14 Cha. II, ch. 4 .......................... 12

Corporation Act of 1661,13 Cha. II St. 2, ch. 1 ....................... 12

Test Act of 1673, 25 Cha. II., ch. 2 ................................... 12

Act of Toleration of 1689, 1 Will. & Mary, ch. 18 .................... 13

42 U.S.C. § 2000 ............................................................. 27

## Other Authorities

Harold J. Berman, *Law and Revolution: The Formation of the Western Legal Tradition* (1983) ............................................ 8

Thomas C. Berg et al., *Religious Freedom, Church-State Separation, and the Ministerial Exception*, 106 Nw. U. L. Rev. Colloquy 175 (2011) ............................................................ 7, 18

4 William Blackstone*, Commentaries on the Laws of England* (8th ed. 1778) ...................................................................... 14

E.F. Churchill, *The Dispensing Power of the Crown in Ecclesiastical Affairs*, 38 L. Q. Rev. 297 (1922)............................................ 8–9

H.W. Carless Davis, *England Under the Normans and Angevins* (1915)......................................................................................... 9

Deuteronomy 25:5 (KJV)................................................................. 10

*Disestablishment and Religious Dissent: Church-State Relations in the New American States 1776–1833* (Esbeck & Hartog eds., 2019)......................................................................................... 15

W. Cole Durham, Jr., *Religious Autonomy at the Crossroads*, in *Law, Religion, and Freedom: Conceptualizing a Common Right* (Durham & Martínez-Torrón eds., 2021) ........................................ 21

Richard W. Garnett, *The Freedom of the Church: (Toward) an Exposition, Translation, and Defense*, in *The Rise of Corporate Religious Liberty* (Schwartzman et al. eds., 2015)............................ 6, 21

Letter from Pope Gelasius I to Byzantine Emperor Anastasius I Dicorus (494) in *The Letters of Gelasius I: Micro-manager and Pastor of the Church of Rome* 73 (Neil & Allen eds., 2014.) ............... 7

J. Holt, Magna Carta App. IV (1965)......................................... 9

Leviticus 20:21 (KJV) ................................................................... 10

Luke 22:38 (KJV) ........................................................................... 7

C.S. Lewis, *English Literature in the Sixteenth Century Excluding Drama* (1954) ...................................................................... 11

John Locke, *A Letter Concerning Toleration* (Bennett ed., 2010) (1690)...................................................................................... 12–13

James Madison, *Memorial and Remonstrance Against Religious Assessments*, in 8 *The Papers of James Madison* (Rutland et al. eds., 1973) .......................................................... 16

Letter from James Madison to John Carroll (Nov. 20, 1806), in *The Records of the Am. Catholic Historical Soc'y of Phila.* (1909) ........... 16

Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003) ........................................... 14–15

Michael W. McConnell, *Reflections on Hosanna-Tabor*, 35 Harv. J. L. & Pub. Pol'y 821 (2012) ................................................ 17

Kevin Pybas, *Disestablishment in the Louisiana and Missouri Territories*, in *Disestablishment and Religious Dissent: Church-State Relations in the New American States 1776–1833* (Esbeck & Hartog eds., 2019) .................................................... 17–18

1 Anson Phelps Stokes, *Church and State in the United States* (1950) ....................................................................... 18

Lael Weinberger, *Is Church Autonomy Jurisdictional?*, 54 Loy. U. Chi. L.J. (forthcoming fall 2022) ................................... 5–6

## Constitutional Provisions

U.S. Const. amend. I .................................. 1, 3–5, 7, 15, 19, 23–25, 27–28

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are professors Robert F. Cochran, Professor Emeritus at the Caruso School of Law at Pepperdine University; David F. Forte, Professor of Law at Cleveland State University; Richard Garnett, Paul J. Schierl/Fort Howard Corporation Professor of Law at the University of Notre Dame Law School; Douglas Laycock, the Class of 1963 Research Professor in honor of Graham C. Lilly and Peter W. Low, the Robert E. Scott Distinguished Professor of Law at the University of Virginia School of Law; Michael W. McConnell, the Richard and Frances Mallery Professor at Stanford Law School; Michael P. Moreland, the University Professor of Law and Religion at the Charles Widger School of Law at Villanova University; and Robert J. Pushaw, the James Wilson Endowed Professor of Law at the Caruso School of Law at Pepperdine University. *Amici* are legal scholars whose research and writing focuses on religious liberty.

---

[1] Counsel for *amici curiae* states pursuant to Fed. R. App. P. 29(a)(4)(E) that (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (3) no person, other than *amici curiae* or their counsel, contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief pursuant to Fed. R. App. 29(a)(2).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Religion concerns both belief and conduct. And so religious education focuses not only on teaching doctrines, but also on forming character, morals, and habits. In our modern, pluralistic society, this often means that students at religious schools will be trained to think and act differently than their peers at secular institutions, sometimes in regard to dress, sometimes in regard to food or drink, and sometimes in regard to sexual morality. That is as it should be. Religious liberty means the right to be different, individually and institutionally. This freedom can exist only if religious institutions are free to create learning environments where their beliefs, principles of morality, and way of life are passed on through both instruction and personal example.

Plaintiff asks this Court to radically curtail this fundamental liberty, and to have this Court adjudicate a quintessentially religious question: whether a Roman Catholic school can be forced to employ a teacher who entered into a civil marriage with a member of the same sex, in violation of the school's religious teachings and beliefs. This Court should decline that invitation.

As Defendants have ably argued, the school's decision to no longer employ Plaintiff as a substitute teacher was based on a sincere religious belief regarding a moral principle necessary to educate and form young students within the Catholic moral and religious tradition. Decisions about these kinds of internal religious matters are protected by the "church autonomy doctrine" as defined by the Supreme Court in *NLRB v. Roman Cath. Bishop of Chicago*, 440 U.S. 490, 507 (1979); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 182 (2012); and *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020).

We submit this *amicus* brief to amplify why reversal of the district court's contrary decision is not only mandated by those Supreme Court precedents, but also by the original understanding of the First Amendment, which the Supreme Court has consistently relied on in adjudicating such disputes. *See, e.g.*, *Our Lady*, 140 S. Ct. at 2061; *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2428 (2022). We also expand on Defendants' critical point that Plaintiff's ministerial status is irrelevant to the foreclosure of his claims by the First Amendment's broad protection of religious autonomy because the basis for Plaintiff's non-renewal

was religious and concerned a matter of the internal governance of a religious school.

*     *     *

This is not a hard case, but it is an important one. Unless protected, religious groups will be prevented from structuring and governing their communities in accordance with their beliefs and moral principles. The alternative would allow litigants like Plaintiff to use secular courts to force secular values on religious institutions—inevitably leading to the kind of strife and conflict that the First Amendment was designed to prevent. The framers of the Constitution knew from experience and study how destructive such existential contests could be, and they wisely protected the freedom of the church to operate without government intrusion. This Court should do the same.

**ARGUMENT**

I.   **The First Amendment Prohibits Government Interference with the Religious Mission of Religious Institutions.**

The church autonomy doctrine—also known as "the freedom of the church," "the religious abstention doctrine," or "the ecclesiastical abstention doctrine"—marks "a boundary between two separate polities, the

secular and the religious." *Korte v. Sebelius*, 735 F.3d 654, 677 (7th Cir. 2013). The church autonomy doctrine ensures the freedom of people of faith to organize voluntarily and order their internal affairs according to their religious beliefs, and it saves the state from becoming entangled in those affairs. *See Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94 (1952). And while the Supreme Court has suggested that church autonomy in some circumstances does not act as a "jurisdictional bar" as a matter of civil procedure, *Hosanna-Tabor*, 565 U.S. at 195 n.4, the Constitution's protection of church autonomy *is* jurisdictional in the more colloquial sense that the First Amendment puts adjudication of religious matters outside the proper sphere of authority of secular courts, which by their very nature "hav[e] no ecclesiastical jurisdiction," *Watson v. Jones*, 80 U.S. 679, 730 (1872) (quoting *Shannon v. Frost*, 42 Ky. 253, 258 (1842)). *See* Lael Weinberger, *Is Church Autonomy Jurisdictional*, 54 Loy. U. Chi. L.J. (forthcoming fall 2022).

Part of the reason for the division of authority is simply a matter of competence and public respect. Separating secular and religious sovereignty ensures that "[r]eligious questions are … answered by religious bodies." *McCarthy v. Fuller*, 714 F.3d 971, 976 (7th Cir. 2013). And

"[j]udges have an interest independent of party preference for not being asked to decide an issue that they cannot resolve intelligently. Americans would, moreover, be deeply offended at the thought of their secular courts taking on the additional role of religious courts, as if the United States were a theocracy." *Tomic v. Cath. Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006), *abrogated on unrelated grounds by Hosanna-Tabor*, 565 U.S. 171 (2012).

But church autonomy also rests on a more fundamental grounding: a recognition that religious institutions truly "are separate polities." *Korte*, 735 F.3d at 677. Much like the doctrine of sovereign immunity, the church autonomy doctrine flows from a recognition that religious institutions have a sphere of authority over which they—and not the state—are sovereign. *See* Weinberger, *supra*. Thus, as Professor Richard Garnett has put it, "[t]he 'freedom of the church' can and should be seen as a structural feature of social and political life—one that promotes and enhances freedom by limiting government—and also as a moral right to be enjoyed by religious communities." Richard W. Garnett, *The Freedom of the Church: (Toward) an Exposition, Translation, and Defense, in The Rise of Corporate Religious Liberty* (Schwartzman et al., eds. 2015).

## II. The First Amendment Was Designed to End the Long and Abusive Pattern of Government Interference with Religious Institutions.

Today it is easy to take for granted the enormous sea change that the First Amendment inaugurated in respecting the autonomy of religious institutions to govern religious matters without state interference. But this was not always the case. Thus, as the Supreme Court demonstrated in *Hosanna-Tabor* and *Our Lady of Guadalupe*, to apply the First Amendment properly, courts must consider that amendment's text against the historic backdrop of state interference with religious institutions.

For most of human history, the union—or at least the interdependence—of throne and altar was common. And it was not until the Investiture Crisis of the 11th century that something like a legal notion of a "freedom of the church" began to emerge. *See, e.g.*, Thomas C. Berg et al., *Religious Freedom, Church-State Separation, and the Ministerial*

*Exception*, 106 Nw. U. L. Rev. Colloquy 175, 179 (2011).[2] The Investiture Crisis began in 1072 because of a disagreement between the Pope and the Holy Roman Emperor over who would select bishops. This dispute resolved only after some fifty years of civil war in Germany, when Emperor Henry V agreed on the Concordat of Worms, in which he "guaranteed that bishops and abbots would be freely elected by the church alone," although the emperor retained the right to invest them with their rights of temporal property. Harold J. Berman, *Law and Revolution: The Formation of the Western Legal Tradition* 98 (1983). Yet the Church's victory was in some ways more formal than actual—as monarchs often exercised *de facto* control over the election process and ecclesiastical matters more generally, a recurring pattern in later contests about church autonomy.

English kings were no exception to this tendency to attempt to control the Church. For example, when Pope Gregory VII insisted on his clergy's celibacy, William I (1028–87) saw the situation "from a more

---

[2] The idea itself is much older, dating back at least to the time of Pope Gelasius I (492–496), who wrote in his letter to Byzantine Emperor Anastasius I Dicorus that, "There are two [powers], august Emperor, which hold first place in ruling this world, namely the sacred authority of the priests and the royal power."

worldly point of view" and granted dispensations to the English priests. E.F. Churchill, *The Dispensing Power of the Crown in Ecclesiastical Affairs*, 38 L. Q. Rev. 297, 298 (1922). And while William's successor, Henry I (1068–1135), eventually did agree to enforce the celibacy of the clergy, he too dispensed with the requirement for any offending priest willing to "pay the price of his protection." *Id.* Thus, as Florence of Worcester recounted, "all went home and the decrees stood for nought; all held their wives by the King's leave as they had done before." *Id.* (citing H.W. Carless Davis, *England Under the Normans and Angevins* 146 (1915)).

The English nobility correctly saw such royal intermeddling in Church affairs as a threat to their own prerogatives. So, at Runnymede in 1215, the English barons demanded and the King accepted that "the English church shall be free, and shall have its rights undiminished and its liberties unimpaired." *Hosanna-Tabor*, 565 U.S. at 182 (quoting J. Holt, Magna Carta App. IV at 317 cl. 1 (1965)) (internal quotation marks omitted). Yet Magna Carta too promised more religious independence than it achieved.

The question of who, exactly, was in charge of the Church came to a head during the reign of Henry VIII, after his court officials failed to

secure a papal annulment of his marriage to Queen Catherine of Aragon so that the King could marry Anne Boleyn.[3] Facing a politically fraught decision, Rome delayed its answer. Enraged, Henry took matters into his own hands. With the aid of Parliament and his ecclesial allies, Henry was declared supreme head of the English Church in 1535, with full authority over the English Church's doctrine and practice. *See* Act in Restraint of Annates of 1532, 25 Hen. VIII, ch. 20; Act of Supremacy of 1534, 26 Hen. VIII, ch. 1.

This union of civil and religious authority under a single autocrat dramatically raised the stakes of English politics to a new and bloody height. In the years after the Act of Supremacy, the major parties in the profound religious disagreements of that age each sought to wield civil power to eliminate their opponents, and many of England's leading

---

[3] The disagreement was—as in this case—about religious teachings on sexual morality. Henry's supporters argued that the marriage was cursed because Catherine was the widow of his late brother, making Henry's marriage a violation of Leviticus 20:21 ("And if a man shall take his brother's wife, it is an unclean thing: he hath uncovered his brother's nakedness; they shall be childless.") (KJV). Catherine's supporters disagreed, pointing to Deuteronomy 25:5, which requires the brother of a deceased man to marry his brother's widow if the brother died without an heir.

statesmen and clergy consequently met violent ends at the hands of royal executioners. Thus, as C.S. Lewis observed in his magisterial *English Literature in the Sixteenth Century Excluding Drama* 200–01 (1954), "[i]t was an age very like our own. Behind every system of sixteenth-century thought, however learnedly it is argued, lurks cruelty and Ogpu"—*i.e.,* the Soviet secret police.

This all-or-nothing entanglement of English politics and theology eventually contributed to the outbreak of the English Civil War in 1642 and the trial and execution of Charles I in 1649. Following the restoration of the English monarchy in 1660, Charles II's government reenacted his father's persecutions, ordering all ministers to pledge their allegiance or face being labeled seditious and removed from their positions. Similarly, "all schoolmasters, private tutors, and university professors were required to 'conforme to the Liturgy of the Church of England' and not 'to endeavour any change or alteration' of the church." *Our Lady,* 140 S. Ct. at 2061 (quoting Act of Uniformity of 1662, 14 Cha. II, ch. 4); *see also* Corporation Act of 1661, 13 Cha. II. St. 2, ch. 1 (prohibiting from elected office those who had not received communion within the past twelve months according to the rites of the Church of England); Test Act of 1673,

25 Cha. II, ch. 2 (requiring all government officers to take an oath of supremacy and allegiance while rejecting the doctrine of transubstantiation).

The effects were profound. Following the restoration, England imprisoned, exiled, or otherwise suppressed thousands of Catholics and Protestant non-conformists, including Baptist minister John Bunyan, who wrote *Pilgrim's Progress* while in prison for preaching without a license.

It was in response to these coercive policies that John Locke famously argued for religious tolerance. John Locke, *A Letter Concerning Toleration* 3 (Bennett ed. 2010) (1690). As he explained, it was "utterly necessary" to "draw a precise boundary-line between (1) the affairs of civil government and (2) the affairs of religion." *Id.* Failure to recognize the distinction between civil and religious authority, he warned, would result in endless "controversies arising between those who have ... a concern for men's souls and those who have ... a care for the commonwealth." *Id.* Because government is "constituted only for the purpose of preserving and promoting" life, liberty, and property, while the church "care[s] for the salvation of men's souls," *id.*, they need different laws. And since

members of a church "joined it freely without coercion ... it follows that the right of making its laws must belong to the [church] itself." *Id.* at 5.

Locke's argument made a lasting impact. As part of the Glorious Revolution, England moderated its approach by passing the Act of Toleration of 1689, 1 Will. & Mary, ch. 18, granting non-conforming Protestants limited freedom of worship if they swore allegiance to the Crown. But the Act of Toleration was a half-way reform. Protestant non-conformists were still prohibited from holding public office, and the statute completely excluded Roman Catholics and non-trinitarians from its protections. Thus, many who disagreed with the state on matters of religion continued to face state interference with church government and other forms of persecution and suppression. *See, e.g.*, 4 William Blackstone, *Commentaries on the Laws of England* 55 (8th ed. 1778).

Beginning with the Pilgrims' departure for New England in 1620, many religious dissenters in Great Britain chose to leave rather than suffer under the Crown's heavy-handed interference. In the ensuing decades, thousands of "Puritans fled to New England, where they hoped to elect their own ministers and establish their own modes of worship." *Hosanna-Tabor*, 565 U.S. at 182. "William Penn, the Quaker proprietor of

what would eventually become Pennsylvania and Delaware, also sought independence from the Church of England," and "[t]he charter creating the province of Pennsylvania [in 1681] contained no clause establishing a religion." *Id*. at 183. Maryland, similarly, was founded as a haven for Roman Catholics from the discriminatory policies of the Crown. Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2128 (2003).

Yet even then, many colonial governments continued to exercise varying degrees of "control over doctrine, governance, and personnel of the church." *Id*. at 2131. In particular, colonists were often subject to laws giving government authorities the power to appoint prelates and clergy" and—as "a principal means of government control over the church"— "laws governing doctrine," resulting, predictably, in "continual conflicts between clergymen, royal governors, local gentry, towns, and congregants over the qualifications and discipline of ministers." *Id*. at 2132, 2137.

In light of these problems, "the founding generation sought to prevent a repetition of these practices in our country" by setting a firm

boundary: the First Amendment's categorical prohibition on laws "respecting an establishment of religion or prohibiting the free exercise thereof." *Our Lady*, 140 S. Ct. at 2061 (quoting U.S. Const. amend. I). This codification moved government authority from the center of religious debates to the outer boundary, rejecting "government control over the character and teachings" of any church. McConnell, *supra* at 2133. And gradually, on a state-by-state basis, states with religious establishments in colonial or early republican days enacted laws and constitutional amendments dismantling their own established churches. McConnell, *supra* at 2133; *see Disestablishment and Religious Dissent: Church-State Relations in the New American States 1776 – 1833* (Esbeck & Hartog eds., 2019).

The framers understood this to be a fundamental correction necessary to prevent the kinds of historical abuses catalogued above. Most famously, James Madison—building on Locke's *A Letter Concerning Toleration*—attacked the root of the problem, skewering the contention that a "Civil Magistrate is a competent Judge of Religious truth" as "an arrogant pretension falsified by the contradictory opinions of Rulers in all ages, and throughout the world." James Madison, *Memorial and*

*Remonstrance Against Religious Assessments*, in 8 *The Papers of James Madison* 295, 301 (Rutland et al. eds., 1973).

And unlike previous attempts to preserve the freedom of the church, the founders' novel step of imposing a structural and constitutional restraint on government largely managed to limit state interference with religion. Indeed, early federal treatment of religious institutions is characterized by a remarkable scrupulosity. For example, when the first Roman Catholic Bishop in the United States, John Carroll, asked then-Secretary of State Madison for advice on who should be appointed to head the Catholic Church in New Orleans, Madison refused, responding that he should not take part in the decision because the "selection of [religious] functionaries ... is entirely ecclesiastical." Letter from James Madison to John Carroll (Nov. 20, 1806), in *The Records of the Am. Catholic Historical Soc'y. of Phila.*, 20:63, at 63–64 (1909); *see also* Michael W. McConnell, *Reflections on Hosanna-Tabor*, 35 Harv. J. L. & Pub. Pol'y 821, 830 (2012). Madison withheld comment not because he lacked an opinion, but because he did not believe that his opinions should be shared

in his official capacity as Secretary of State.[4] Madison was consistent in his views on the freedom of the church as President—as the Supreme Court has noted, he refused to allow a secular charter to strip an institution of its religious autonomy. *See Hosanna-Tabor*, 565 U.S. at 184–85.

As President, Thomas Jefferson too advanced the same religious autonomy principles as Madison. For example, when he was informed in 1804 that local authorities had barred entry into a Catholic church in the Orleans Territory in response to a dispute over control of the parish, he complained that

> it was an error in our officer to shut the doors of the church. …
> The priests must settle their differences in their own way, pro-
> vided they commit no breach of the peace. … On our principles
> all church-discipline is voluntary; and never to be enforced by
> the public authority.

Pybas, *supra* at 273, 281–82.

Jefferson penned another letter a few days later in response to a missive from the Ursuline Nuns of New Orleans, who ran an orphanage

---

[4] In fact, Madison later wrote a letter offering his personal opinion as a private citizen. *See* Kevin Pybas, *Disestablishment in the Louisiana and Missouri Territories*, in *Disestablishment and Religious Dissent: Church-State Relations in the New American States 1776–1833*, *supra*, at 273, 283–85 [hereinafter Pybas].

and Catholic school in that city. Jefferson assured the nuns that the Louisiana Purchase would not undermine their "broad right of self-governance and religious liberty," despite Catholic France ceding control over the territory to the non-Catholic United States. Pybas, *supra,* at 281; *see also* 1 Anson Phelps Stokes, *Church and State in the United States* 678 (1950). Jefferson explained that "[t]he principles of the constitution … are a sure guaranty to you that [your property and rights] will be preserved to you sacred and inviolate, and that your institution will be permitted to govern itself according to [its] own voluntary rules, without interference from the civil authority." Pybas, *supra,* at 281. Like Madison, "Jefferson also saw church-state separation as guaranteeing the autonomy, independence, and freedom of religious organizations—not just churches but religious schools as well." Berg, *supra,* at 182–83.

Unlike the decision below, early federal practice understood the First Amendment to protect a religious organization's autonomy in decisions about "theological controversy, church discipline, ecclesiastical government, [and] the conformity of members" to required standards, *Watson*, 80 U.S. at 733, free from state interference and second-guessing.

III. **The Church Autonomy Doctrine Prohibits Government Intrusion into the Diocese's Decision to No Longer Employ Plaintiff as a Substitute Teacher.**

    A. **The Church Autonomy Doctrine Extends to Internal Affairs Beyond Ministerial Status.**

The cases that have explicated the church autonomy doctrine since the time of the founding likewise establish that it broadly safeguards religious institutions' right to govern their own internal affairs whenever their actions are "based on religious doctrine." *See Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 656–60, 658 n.2 (10th Cir. 2002). "[A] long line of Supreme Court cases … affirm the fundamental right of churches to 'decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 462 (D.C. Cir. 1996) (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)).

Historically, the "ministerial exception"—churches' self-governance right to choose their ministers and leadership—has been one of the most-litigated areas of church autonomy. But the ministerial exception is only "a component of this autonomy," *not* the whole thing. *See Our Lady*, 140

S. Ct. at 2060. As the Supreme Court has explained, the ministerial exception rests on "the *general* principle of church autonomy … independence in matters of faith and doctrine and in closely linked matters of internal government," *id.* at 2061 (emphasis added), and "with respect to internal management decisions that are essential to the institution's central mission," *id.* at 2060. State interference in "that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion." *Id.*

To be sure, church autonomy is not a magic wand that religious institutions can waive to avoid any law they don't like, and the distinction between what falls under the church autonomy doctrine and what doesn't is not easily reduced to a bright-line rule with respect to non-ministers. *See* Garnett, *The Freedom of the Church*, *supra*, at 50. Nevertheless, the church autonomy doctrine's protections are broad and well-established. They include matters such as "fundamental beliefs (*e.g.*, doctrine, dogma, polity, governance, and canon law), core ministry (matters of worship, ritual, liturgy, counseling, confession, *teaching*, and humanitarian care), and core administrative functions (the selection, supervision, and

discipline of personnel, church membership decisions, administration of property, and control of finances)." W. Cole Durham, Jr., *Religious Autonomy at the Crossroads*, in *Law, Religion, and Freedom: Conceptualizing a Common Right* 265–67 (Durham & Martínez-Torrón eds., 2021) (emphasis added); *see also Our Lady*, 140 S. Ct. at 2061.

Thus, while a religious institution's "employment decisions may be subject to Title VII scrutiny," this is so *only* "where the decision does *not* involve the church's spiritual functions." *Rayburn v. Gen'l Conf. of Seventh-Day Adventists*, 772 F.2d 1126, 1171 (4th Cir. 1985) (emphasis added). What matters is whether the religious institution is taking an "ecclesiastical" action—"one about discipline, faith, internal organization, or ecclesiastical rule, custom, or law," *or* a "purely secular" one. *Bell v. Presbyterian Church*, 126 F.3d 328, 331 (4th Cir. 1997) (citations omitted). If the action is "ecclesiastical," the church autonomy doctrine bars state interference.

While this Circuit has not yet addressed the issue, it is well established under these principles that the church autonomy doctrine protects "personnel decision[s]" about non-ministers where "the alleged conduct" at issue "is 'rooted in religious belief.'" *Bryce*, 289 F.3d at 657–58 (quoting

*Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)). Enforcing certain religious standards among employees, regardless of ministerial status, is often integral to a religious institution's ability to define its doctrines and moral standards and to communicate those beliefs to its members and next generation.

The Supreme Court made this clear in *NLRB v. Catholic Bishop of Chicago*, shielding religious schools—Catholic high schools—from government interference with managing their lay teachers. 440 U.S. 490 (1979). In that case, unions filed petitions with the National Labor Relations Board ("NLRB") seeking to represent only the lay teachers employed by a group of schools operated by two Catholic corporations. *Id.* at 493. The Catholic schools objected to the unions' petitions, arguing in relevant part that the First Amendment precluded NLRB's jurisdiction over these employees. *Id.* After the Board granted the unions' petitions, the church schools brought suit, ultimately raising their objections in the Supreme Court.

The Supreme Court observed that if the National Labor Relations Act granted NLRB jurisdiction over church schools, it would be forced to decide "serious First Amendment questions" about NLRB's jurisdiction

over lay teachers employed by these schools. *Id.* at 504. "The church-teacher relationship in a church-operated school differs from the employment relationship in a public or other nonreligious school." *Id.* So even though the unions sought to organize only lay teachers, the Board's inquiries would "implicate sensitive issues that open the door to conflicts between clergy-administrators" and government. *Id.* at 503. Because religious schools, by their very nature, "involve substantial religious activity and purpose," *Id.* at 503 (quotation omitted), the Board would have to decide whether "challenged actions were mandated by [schools'] religious creeds," "necessarily involv[ing] inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission." *Id.* at 502.

Just so, other federal courts recognize the constitutional protection afforded to a church's management of its employees, regardless of their ministerial status. For example, in *Bryce v. Episcopal Church in the Diocese of Colorado*, a female youth minister who participated in a civil commitment ceremony with another woman sued her church under Title VII, alleging that church members later made offensive remarks about homosexuality and homosexuals at various church meetings and in church

documents. 289 F.3d at 657–58. The court bypassed the specific ministerial question, holding that the church's actions were protected by the general principle of autonomy over "church governance and doctrine protected by the First Amendment." The court "[found] this inquiry [into the ministerial exception] unnecessary … because Bryce's claims are based solely on communications that are protected by the First Amendment under the broader church autonomy doctrine." *See id.* at 657–58, 658 n.2.

That court, like this one in *EEOC*, *Rayburn*, and *Bell*, explained that objections to religious organizations' "personnel decision[s]" are

constitutionally protected when "the alleged misconduct is rooted in 'religious belief.'" *Id.*[5]

## B. Plaintiff's Claims are Barred Because Defendants' Decision was Based on a Religious Reason.

The district court acknowledged that Defendants acted based on a sincerely held religious belief, but that Title VII's exemption for religious employers nevertheless did not apply because Plaintiff alleged sex discrimination, not religious discrimination. And, because Defendants did not raise a ministerial-exception defense, the court rejected out of hand

---

[5] *See also Paul v. Watchtower Bible & Tract Soc'y of N.Y.*, 819 F.2d 875, 878 n.1 (9th Cir. 1987) (noting that ecclesiastical abstention can bar claims contesting a "decision relating to government of the religious polity," such as that plaintiff was "wrongfully" excluded as a matter of church law or policy); *Myhre v. Seventh-Day Adventist Church Reform Movement Am. Union Int'l Missionary Soc'y*, 719 F. App'x 926, 928–29 (11th Cir. 2018) (tort claims against religious institution were barred because they "required an examination of doctrinal beliefs and internal church procedures"); *Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.*, 796 N.E.2d 286, 294 (Ind. 2003) (defamation claim to "penalize communication and coordination among church officials … on a matter of internal church policy and administration" would violate church autonomy doctrine if adjudicated); *Hubbard v. J Message Grp. Corp.*, 325 F. Supp. 3d 1198, 1214 (D.N.M. 2018) (courts "generally do not permit [defamation and other] tort claims arising from internal processes by which religious organizations discipline their members").

the school's contention that its decision was protected by the religious autonomy doctrine. Both conclusions are wrong.

**Title VII.** To begin with, the notion that the applicability Title VII's broad exemption for religious institutions depends on what provision a plaintiff sues under is indefensible. This case is about a Catholic school's religious beliefs and moral principles concerning human sexuality and education. That "adherence to Roman Catholic doctrine produces a form of sex discrimination," as defined by the Supreme Court's interpretation of Title VII, "does not make the action less religiously based." *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 947 (7th Cir. 2022) (Easterbrook, J. concurring).

This is dispositive. Title VII does not apply to "a religious corporation … [or] educational institution … with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a). And "[a]ny temptation to limit this exception to authorizing the employment of co-religionists … is squelched by the definitional clause in § 2000e(j)," providing that "religion" includes "'*all* aspects of religious observance and practice, as well as belief.'" *Starkey*, 41 F.4th at 946 (Easterbrook, J. concurring) (quoting 42 U.S.C. § 2000e(j)) (emphasis added). Thus, no matter

what Title VII may require in secular contexts, it ensures that a "religious school is entitled to limit its staff to people who will be role models by living the life prescribed by the faith, which is part of 'religion' as § 2000e(j) defines that word." *Id.*

**Church Autonomy.** Even if Title VII did not exempt religious observance and practice, the First Amendment forecloses Plaintiff's claim. All parties agree that Defendants ceased to use Plaintiff as a substitute teacher because of Plaintiff's undisputed violation of Diocesan policy regarding marriage.

If the First Amendment did not protect such decisions, religious schools would often not be able to pursue their missions at all. As the Supreme Court has noted, "the raison d'être of parochial schools is the propagation of a religious faith." *Catholic Bishop of Chi.*, 440 U.S. at 501, 503.

The school's teachers—whether or not they fall within the ministerial exception—have a clear role in this mission. Indeed, "religious authority necessarily pervades the [church] school system." *Catholic Bishop of Chi.*, 440 U.S. at 501. Here, through the schools training sessions, all learned the "'essential role that all teachers play in the religious mission

of MACS schools.'" JA0772. And, to support this unity of purpose, the Diocese prohibits all teachers "from publicly engaging in … conduct contrary to the moral tenets of the Catholic faith." JA1377. Plaintiff states that he was a practicing Catholic while employed at the school who "was aware of the Catholic Church's teaching about marriage." *Id.* And Plaintiff knew that he had a spiritual function as a part in the school's religious mission, alongside *every* other teacher: to provide a good example and support the religious instruction of the school.

*    *    *

Because the Defendant's decision regarding Plaintiff's employment was "an ecclesiastical one about 'discipline, faith, internal organization, or ecclesiastical rule, custom or law,'" and not a "purely secular" decision, it is protected by the church autonomy doctrine. *See Bryce*, 289 F.3d at 658 (quoting *Bell*, 126 F.3d at 331 (4th Cir. 1997)).

## CONCLUSION

The Court should reverse the judgment below.

September 29, 2022                    Respectfully submitted,

                                      /s/ R. Trent McCotter
                                      C. Boyden Gray
                                      Jonathan Berry
                                      R. Trent McCotter
                                      Michael Buschbacher
                                      Jared M. Kelson
                                      BOYDEN GRAY & ASSOCIATES
                                      801 17th Street NW, Suite 350
                                      Washington, DC 20006
                                      202-706-5488
                                      mccotter@boydengrayassociates.com

                                      *Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Date: September 29, 2022          /s/ R. Trent McCotter
                                 R. Trent McCotter
                                 *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief of *amici curiae* complies with Fed. Cir. Rule 29(a)(5) because it has 5439 words, excluding those parts of the brief exempted by Fed. Cir. Rule 32(b)(2).

This document complies with the typeface requirements because this document has been prepared in a proportional spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Date: September 29, 2022      /s/ R. Trent McCotter
                               R. Trent McCotter
                               *Counsel for Amici Curiae*