No. 22-1440

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

**LONNIE BILLARD,**

*Plaintiff-Appellee*,

v.

**CHARLOTTE CATHOLIC HIGH SCHOOL,
MECKLENBURG AREA CATHOLIC SCHOOLS, AND
ROMAN CATHOLIC DIOCESE OF CHARLOTTE,**

*Defendants-Appellants.*

---

**On Appeal from the United States District Court
for the Western District of North Carolina, Charlotte Division**

---

**BRIEF OF PLAINTIFF-APPELLEE LONNIE BILLARD**

---

S. Luke Largess
TIN FULTON WALKER AND OWEN PLLC
301 East Park Avenue
Charlotte, NC 28202
Tel: (704) 338-1220

Kristi Graunke
AMERICAN CIVIL LIBERTIES UNION OF
NORTH CAROLINA LEGAL FOUNDATION
P.O. Box 28004
Raleigh, NC 27611
Tel: (919) 354-5066

Joshua A. Block
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Phone: (212) 549-2593

Daniel Mach
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Str., N.W.
Washington, DC 20005
Tel: (202) 548-6604

*Counsel for Plaintiff-Appellee*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................... ii

TABLE OF AUTHORITIES ............................................................... iv

STATEMENT OF ISSUES ..................................................................1

INTRODUCTION ................................................................................1

STATEMENT OF THE CASE .............................................................3

SUMMARY OF THE ARGUMENT ....................................................7

ARGUMENT ....................................................................................10

I.    Defendants Discriminated Against Mr. Billard Because of His Sex in Violation of Title VII. ..............................................................10

II.    Title VII's Statutory Exemptions Do Not Provide a Defense for Policies That Facially Discriminate Based on Race, Color, Sex, or National Origin. .......................................................................13

   A.    Section 702 Exempts Religious Organizations Only From Claims for Religious Discrimination. ......................................14

   B.    Defendants' Revisionist Interpretation of Section 702 Is Wrong. ..........19

III.    The "Church Autonomy" Doctrine Does Not Provide a Defense to Mr. Billard's Claims. .......................................................................31

   A.    The "Ministerial Exception" Does Not Apply to This Case. ...................32

   B.    Hiring Non-Ministerial Employees Is Not a Matter of Internal Church Government Protected By Church Autonomy. .......................................35

   C.    Applying Title VII to Facially Discriminatory Policies Does Not Require Courts to Answer Ecclesastical Questions. .............................................39

IV.    Defendants Do Not Have an Expressive-Association Right to Discriminate Against Non-Ministerial Employees Based on Sex. ..................................42

   A.    An Employer-Employee Relationship Is Not an Expressive Association. ..................................................................................43

   B.    Any Burden on Defendants' Expressive Association Satisfies Strict Scrutiny. .......................................................................46

V.    RFRA Does Not Provide a Defense to Mr. Billard's Claims ....................49

   A.    RFRA Does Not Apply to Litigation Between Private Parties. ...............50

B.    Mr. Billard's Claim Survives RFRA's Strict Scrutiny. ...........................53

REQUEST FOR ORAL ARGUMENT ...................................................................55

CONCLUSION .........................................................................................................55

CERTIFICATE OF COMPLIANCE.........................................................................56

CERTIFICATE OF SERVICE ..................................................................................57

# TABLE OF AUTHORITIES

## Cases

*A Helping Hand, LLC v. Baltimore Cty., MD*,
  515 F.3d 356 (4th Cir. 2008) ................................................................12

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975)..............................................18

*Ballard v. Bank of Am., N.A.*, 734 F.3d 308 (4th Cir. 2013) ...............................11

*Bear Creek Bible Church v. EEOC*,
  571 F. Supp. 3d 571 (N.D. Tex. 2021) .................................... 20, 30, 45

*Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014).....................................................47

*Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731 (2020) .................................... passim

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000)................................................ 43, 44

*Boy Scouts v. Wyman*, 335 F.3d 80 (2d Cir. 2003)....................................................45

*Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410 (6th Cir. 1996) .................15

*Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.*, 796 N.E.2d 286 (Ind. 2003).....39

*Bryce v. Episcopal Church in the Diocese of Colo.*,
  289 F.3d 648 (10th Cir. 2002) ............................................................38

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ............................ 49, 54

*Butler v. St. Stanislaus Kostka Cath. Acad.*,
  No. 19-CV-3574(EK)(ST), 2022 WL 2305567 (E.D.N.Y. June 27, 2022) .........39

*Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661 (2010) ..................................................................34

*Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006)............................44

*Ciena Corp. v. Oyster Optics, LLC*, 958 F.3d 1157 (Fed. Cir. 2020) ....................33

*Cline v. Cath. Diocese of Toledo*, 206 F.3d 651 (6th Cir. 2000)...........................16

*Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829 (6th Cir. 2015) .........32

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*,
  483 U.S. 327 (1987)...............................................................................14

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*,
  450 F.3d 130 (3d Cir. 2006) ............................................. 28, 29, 30, 39

*DeMarco v. Holy Cross High Sch.*, 4 F.3d 166 (2d Cir. 1993) ........................ 37, 41

*Doe v. Cath. Relief Servs.*,
  No. CV CCB-20-1815, 2022 WL 3083439 (D. Md. Aug. 3, 2022)............ passim

*Dole v. Shenandoah Baptist Church*, 899 F.2d 1389 (4th Cir. 1990) .............. 36, 53

*Dr. A. v. Hochul*, 142 S. Ct. 552 (2021) ................................................................40

*Edd Potter Coal Co., Inc. v. Dir., Off. of Workers' Comp. Progs.*,
  39 F.4th 202 (4th Cir. 2022) ...............................................................33

*EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991) ..............................24

*EEOC v. Cath. Univ.*, 83 F.3d 455 (D.C. Cir. 1996) ..............................51

*EEOC v. Fremont Christian Sch.*, 781 F.2d 1362 (9th Cir. 1986...........16

*EEOC v. Miss. Coll.*, 626 F.2d 477 (5th Cir. 1980)................................28

*EEOC v. Pac. Press Pub. Ass'n*, 482 F. Supp. 1291 (N.D. Cal. 1979) ...................17

*EEOC v. Pac. Press Pub. Ass'n*, 676 F.2d 1272 (9th Cir. 1982) .................. passim

*EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*,
884 F.3d 560 (6th Cir. 2018) ..................................... 47, 50, 54

*EEOC v. Roman Cath. Diocese of Raleigh*, 213 F.3d 795 (4th Cir. 2000) .............36

*Employment Div. v. Smith*, 494 U.S. 872 (1990)......................................36

*Freytag v. Comm'r of Internal Rev.*, 501 U.S. 868 (1991)......................33

*Fulton v. City of Phila*, 141 S. Ct. 1868 (2021)......................................48

*Garrick v. Moody Bible Inst.*, 412 F. Supp. 3d 859 (N.D. Ill. 2019),......................39

*Geary v. Visitation of Blessed Virgin Mary Par. Sch.*,
7 F.3d 324 (3d Cir. 1993) ......................................... 37, 41

*Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*,
617 F.3d 402 (6th Cir. 2010) ..................................... 50, 52

*Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316 (11th Cir. 2012).........32

*Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006) .................................... 50, 51

*Herx v. Diocese of Ft. Wayne-S. Bend Inc.*,
48 F. Supp. 3d 1168 (N.D. Ind. 2014) .....................................16

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ......................................43

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012)......................................................... passim

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995).........................................................44

*In re Young*, 82 F.3d 1407 (8th Cir. 1996), ..........................................51

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v.*
*Johnson Controls, Inc.*, 499 U.S. 187 (1991 ......................................40

*Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189 (4th Cir. 2011).......... passim

*Larson v. Valente*, 456 U.S. 228 (1982) .................................................19

*Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*,
903 F.3d 113 (3d Cir. 2018) .....................................................32

*Listecki v. Official Comm. of Unsecured Creditors*,
780 F.3d 731 (7th Cir. 2015) ..................................... 50, 52

*Little v. Wuerl*, 929 F.2d 944 (3d Cir. 1991) .........................................28

*Maguire v. Marquette Univ.*, 627 F. Supp. 1499 (E.D. Wis. 1986) ......................30

*Maguire v. Marquette Univ.*, 814 F.2d 1213 (7th Cir. 1987) ...................................30

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
138 S. Ct. 1719 (2018)................................................................ 40, 45, 47

*McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972) ............................15

*NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490 (1979) ........................................ 41, 42

*Noyes v. Kelly Servs.*, 488 F.3d 1163 (9th Cir. 2007)............................................28

*Obergefell v. Hodges*, 576 U.S. 644 (2015)............................................................19

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
140 S. Ct. 2049 (2020).......................................................... 34, 35, 45

*Our Lady's Inn v. City of St. Louis*,
349 F. Supp. 3d 805 (E.D. Mo. 2018))............................................................45

*Perdue v. Roy Stone Transfer Corp.*, 690 F.2d 1091 (4th Cir. 1982).....................52

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992)............................................44

*Rayburn v. Gen. Conf. of Seventh–Day Adventists*,
772 F.2d 1164 (4th Cir.1985) ........................................................... passim

*Richardson v. Nw. Christian Univ.*, 242 F. Supp. 3d 1132 (D. Or. 2017)...............46

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ..................................... 43, 44, 47, 49

*Rweyemamu v. Cote*, 520 F.3d 198 (2d Cir. 2008)................................................51

*Scharon v. St. Luke's Episcopal Presbyterian Hosps.*,
929 F.2d 360 (8th Cir. 1991) ...............................................................37

*Shapolia v. Los Alamos Nat. Lab.*, 992 F.2d 1033 (10th Cir. 1993) ......................28

*Slattery v. Cuomo*, 531 F. Supp. 3d 547 (N.D.N.Y. 2021).....................................45

*Snyder v. Phelps*, 562 U.S. 443 (2011)..................................................................46

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,
496 F. Supp. 3d 1195 (S.D. Ind. 2020)............................................... passim

*Tomic v. Cath. Diocese of Peoria*, 442 F.3d 1036 (7th Cir. 2006).........................50

*Torres v. Lynch*, 578 U.S. 452, (2016) ...................................................................22

*Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977) ................................21

*United States v. O'Brien*, 391 U.S. 367 (1968) .....................................................44

*Venters v. City of Delphi*, 123 F.3d 956 (7th Cir. 1997)........................................28

*Vigars v. Valley Christian Ctr. of Dublin, Cal.*,
805 F. Supp. 802 (N.D. Cal. 1992).................................................. 16, 40

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) .........................................................43

*Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929 (2022) ......................................23

## Statutes

20 U.S.C. § 1681(a)(3)...............................................................................23

42 U.S.C. § 12113(d)(1) ........................................................25
42 U.S.C. § 12113(d)(2) ................................................. 23, 25
42 U.S.C. § 2000bb(b)(2) ...................................................53
42 U.S.C. § 2000bb-1 .........................................................51
42 U.S.C. § 2000bb-1(b) .....................................................51
42 U.S.C. § 2000bb-2(3) .....................................................51
42 U.S.C. § 2000e(f) ............................................................24
42 U.S.C. § 2000e(j) ............................................................21
42 U.S.C. § 2000e-1(a) ................................................ passim
42 U.S.C. § 2000e-2(a) ................................................ passim
42 U.S.C. § 2000e-2(a)(1) .....................................................1
42 U.S.C. § 2000e-2(e)(1) ...................................................31
42 U.S.C. § 2000e-2(e)(2) ...................................................13
42 U.S.C. § 2000e-2(m) ......................................................13

## Other Authorities

EEOC, Legislative History of Title VII and XI of Civil Rights Act
    of 1964 (1968)...................................................... 17, 24
EEOC, Questions and Answers: Religious Discrimination in the
    Workplace (2008) ....................................................19
Fed. R. Civ. P. 32(d)(3)(B)(i) ............................................42
H.R. Rep. 101-485, 1990 U.S.C.C.A.N. 303 .................. 25, 26

## STATEMENT OF ISSUES

Whether religious organizations have a legal entitlement to discriminate against non-ministerial employees on the basis of sex whenever the discrimination is motivated by the organizations' religious beliefs.

## INTRODUCTION

Plaintiff Lonnie Billard taught drama at Charlotte Catholic High School for over a decade and continued to work as a substitute teacher after retirement. It is undisputed that he was a non-ministerial employee with no responsibility for performing religious functions or teaching religious doctrine. Mr. Billard was a beloved figure and widely recognized as a gifted and caring teacher. But after learning he had decided to lawfully marry his long-time partner, Defendants told Mr. Billard he could no longer work as a substitute teacher because his marriage was contrary to the Catholic faith, which limits marriage to one man and one woman. In doing so, Defendants violated Title VII, which prohibits employers from "fail[ing] or refus[ing] to hire or to discharge any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). *See Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731 (2020).

Although the Supreme Court only recently confirmed that Title VII protects lesbian, gay, bisexual, and transgender people from sex discrimination, "worries about how Title VII may intersect with religious liberties are nothing new." *Id.* at

1

1754. For over 50 years, employees of parochial schools, church affiliated hospitals, and other religious organizations have asserted Title VII claims against their employers. And during that time, every court of appeals to address such claims has reached the same conclusions: (1) Title VII provides religious organizations an exemption from claims for religious discrimination, but not from claims for discrimination based on race, color, sex, or national origin; (2) The First Amendment prevents courts from applying Title VII to ministerial employees and from delving into ecclesiastical questions; (3) Religious organizations do not have a statutory or constitutional right to discriminate against non-ministerial employees based on race, color, sex, or national origin even when they invoke religious reasons for doing so.

Applying these settled precedents, the district court held that Defendants discriminated against Mr. Billard based on sex, and that Defendants' religious reasons did not provide a statutory or constitutional defense to liability. In asking this Court to reverse, Defendants seek to dramatically alter the legal landscape by claiming that religious organizations have a legal entitlement to disregard Title VII and other laws prohibiting employment discrimination whenever they assert that complying with those laws would conflict with the organizations' religious beliefs. To support these sweeping claims, Defendants misrepresent the text of Title VII and 50 years of precedent by abbreviating sentences, omitting key phrases, or splicing together sentence fragments to alter their meaning. This Court should reject

2

Defendants' revisionist history, adhere to its precedents, and affirm the district court's decision.

## STATEMENT OF THE CASE

**Defendants' Sweeping Prohibition on Marrying a Same-Sex Partner**

The Roman Catholic Diocese of Charlotte (the "Diocese") has "thousands" of employees. JA1261. They include secretaries, information technology specialists, food service workers, and building maintenance crews. JA1262, JA1266. The Diocese also operates a network of schools, including Charlotte Catholic High School ("CCHS"), with secretaries, administrative workers, librarians, and teachers. JA1062. Students do not have to be Catholic to attend CCHS, and students who are openly gay and sexually active may attend the school. JA0069, JA0995, JA1064.

Although the Diocese does not require all of its employees to be Catholic, it prohibits them from engaging in conduct contrary to the moral tenets of the Catholic faith. JA1270-1272, JA1281-1282. According to the Diocese, this policy prohibits employees from being in a sexual relationship with—or marrying—a same-sex partner because sexual activity should be limited to marriage between one man and one woman. JA0941, JA1280. The Diocese's prohibition is not limited to employees performing religious functions, and it is not limited to teachers. JA1061-1063, JA1270-1271, JA1281-1282. It is not limited to employees who interact with the public, and it is not limited to employees who speak publicly about their

3

relationships. JA0063, JA1273-1274, JA1310-1312. The Diocese regards simply being legally married as an inherently "public act." JA0617, JA1314.

**Mr. Billard's Work at CCHS as a Secular Employee**

Mr. Billard began working at CCHS in 2001, first teaching English and then drama until his retirement eleven years later. JA0035. As a full-time drama teacher, Mr. Billard taught classes in film, acting, technical theater, and other drama-related subjects. JA0035. He was also responsible for the school plays and musicals every semester. JA0035. Mr. Billard retired from full-time teaching in 2012, but he continued to work as a substitute teacher, primarily in English classes. JA0036.[1]

Mr. Billard loved teaching at CCHS, and he "was beloved in the school." JA1037. In 2011, Mr. Billard received the Inspirational Educator Award from North Carolina State University. JA0035. The next year, he was selected by CCHS as Teacher of the Year. JA0035. He was the only teacher who had been nominated for the award every year since its inception in 2005. JA0035.

At CCHS, Mr. Billard and other teachers of secular subjects did not have to undergo any religious training, and they did not even have to be Catholic. JA1039. Although all classes began with a short prayer, the content of the prayer was not specified, the prayer could have been ecumenical without referencing any particular

---

[1] As a substitute teacher, Mr. Billard was not required to sign a contract for employment. JA0024, JA0036.

religion, and the prayer could have been led by students instead of by the teacher. JA0066-0067, JA1044-1046. In their lesson plans, teachers of secular subjects did not have to reference Catholic principles at all. JA1055. Indeed, the administration preferred that secular teachers avoid discussing Catholic doctrine and leave those discussions to the teachers of religious subjects. JA0068-0069.

When CCHS held an all-school Mass, teachers had to monitor students the same way they monitored students at other assemblies, but teachers did not have to participate in the religious services. JA1057, JA1060. Mr. Billard, for example, did not perform any religious duties or functions during the Mass, nor did he direct or lead any of the religious elements of the service. JA0036-0037.

**Mr. Billard's Relationship With His Husband**

Mr. Billard came out as gay to his family and close friends in 1995, and he met Richard Donham in 2000. JA0037. They began a romantic relationship a year after they first met, and they began living together in 2002. JA0037. Throughout his tenure at CCHS, Mr. Billard was open about his relationship with Mr. Donham. JA0037. Mr. Donham customarily accompanied Mr. Billard to a variety of CCHS functions, including faculty parties, school plays, and other CCHS events. JA0037.

After marriage for same-sex couples was legalized in North Carolina, Mr. Billiard announced their engagement in a Facebook post on October 25, 2014. JA0038. Mr. Billard anticipated that his marriage might upset some officials at the

Diocese, but he did not expect to be fired because he was a secular employee and had been open about his relationship with Mr. Donham during his tenure at CCHS. JA0038-0039.[2]

**Defendants' Termination of Mr. Billard**

Several weeks later, the school's chaplain, Father Kauth, informed Principal Kurt Telford that he had learned about Mr. Billard's engagement. JA0953-0954, JA1092, JA1101-1102. Principal Telford determined that Mr. Billard could no longer work as a substitute teacher because his relationship with Mr. Donham violated the Diocese's policy against engaging in conduct that was contrary to moral teachings of the Catholic faith, which limited marriage to one man and one woman. JA0056-0057. Principal Telford's decision to terminate Mr. Billard was based on the fact of his marriage and not on the specific content of his Facebook post. *See* JA0056, JA0062.[3]

Mr. Billard was emotionally devastated by his termination. JA0040. He loved the opportunity to interact with students and parents, and he was frequently

---

[2] The parties dispute whether the Principal and Vice Principal were aware of the romantic nature of the relationship.

[3] Father Kauth does not have a Facebook account and never reviewed the actual Facebook post. JA1093, JA1095. Principal Telford decided to terminate Mr. Billard during the meeting with Father Kauth, and there is no evidence in the record that Principal Telford viewed the Facebook post at the time he made the decision. JA0953.

commended on the difference he made to children's lives. JA0040. The CCHS administration had told Mr. Billard that he was a "blessing" and an "asset" to the school. JA0040. The loss of his position deprived him of his sense of identity and self-worth. JA0040. These wounds were deepened by the fact that Mr. Billard lost his position simply because he decided to commit his life to his long-term partner. JA0040.

**Procedural History**

After receiving a right-to-sue letter from the EEOC, Mr. Billard filed this lawsuit alleging sex discrimination in violation of Title VII. JA0012-0020. During discovery, Defendants admitted that "sex" was not a "bona fide occupational qualification" for Mr. Billard's position (JA1321) and stipulated they would not rely on the "ministerial exception" as a defense to Mr. Billard's claim (JA0031). Following discovery, the district court granted summary judgment to Mr. Billard with respect to liability and denied Defendants' cross-motion. JA1372-1425. The parties then stipulated to damages in lieu of trial, and the court entered final judgment. JA1426-1429, JA1430-1431.

## SUMMARY OF THE ARGUMENT

The district court properly found—and Defendants do not contest on appeal—that Defendants discriminated on the basis of sex by terminating Mr. Billard's employment because he is a man who married another man. When a religious

organization fires an employee for failing to follow religious doctrine, the doctrine at issue is often facially sex-neutral, but when an employer fires an employee for being a man who marries another man, the employee's sex is a "but for" cause of the employer's decision under Title VII, and "it's irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might motivate." *Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731, 1744 (2020).

Defendants have no statutory defense for sex discrimination. For nearly 50 years, every court of appeals to address the question has held that Section 702 of Title VII (codified at 42 U.S.C. § 2000e-1(a)) provides only a narrow exemption from claims of discrimination based on an employee's religion—not from claims based on sex or other protected characteristics. Thus, courts have consistently held that when a religious employer enforces a religious doctrine that facially discriminates based on sex, Section 702 does not prevent employees from bringing sex discrimination claims. Defendants' revisionist interpretation of Section 702 alters and misrepresents both the text of Title VII and the governing legal precedents.

Defendants' constitutional arguments are even more radical. Defendants claim they are entitled under the "church autonomy" doctrine to discriminate against their entire workforce—whether ministerial or not—based on race, color, sex, or national origin whenever they have a religious reason for doing so. But this Court and every other circuit to address the question has already held that "church

autonomy" does not insulate non-ministerial employees from generally applicable antidiscrimination regulations. By contrast, Defendants' proposal would create *more* constitutional difficulties by making liability turn on an organization's subjective religious motivations instead of an objective assessment of its conduct.

There is also no First Amendment right to engage in employment discrimination under the banner of "expressive association." Laws regulating an organization's membership or speech are subject to strict scrutiny because they directly burden expressive-association rights. But when laws regulate commercial conduct, such as hiring and firing employees, any incidental burden on associational rights are judged by a far more deferential standard. And even if strict scrutiny applied, Title VII and other laws protecting non-ministerial employees from discrimination would be narrowly tailored to serve compelling governmental interests of the highest order.

Finally, although the Religious Freedom Restoration Act ("RFRA") applies when the government brings an enforcement action, the statutory text makes clear that it does not apply to litigation between private parties. And if RFRA applied, laws protecting non-ministerial employees from sex discrimination would plainly satisfy strict scrutiny.

# ARGUMENT

## I. Defendants Discriminated Against Mr. Billard Because of His Sex in Violation of Title VII.

The district court properly found that Defendants discriminated against Mr. Billard "because of" his "sex," under Title VII. 42 U.S.C. § 2000e-2(a). It is undisputed that Defendants terminated Mr. Billard from his job as a substitute teacher "because he is a man who intended to, and did, marry another man." JA0018, JA0026-0027. The fact that Mr. Billard is a man—and not a woman—thus played "an unmistakable and impermissible role in the discharge decision." *Bostock*, 140 S. Ct. at 1741-42. Defendants' "ultimate goal" may have been to enforce the Church's moral teachings about marriage, "[b]ut to achieve that purpose" Defendants "along the way, intentionally treat[ed] an employee worse based in part on that individual's sex." *Id.* at 1742. And when an employee's sex is a "but for" cause of the employer's decision, "it's irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might motivate it." *Id.* at 1744.

That explicit sex discrimination distinguishes this case from myriad other contexts in which religious organizations require employees to conform to the organizations' religious beliefs. Firing an employee for adultery or marrying a divorced Catholic (*see* Defs.' Br. 13) does not facially discriminate based on the sex of the employee. By contrast, it is impossible to fire an employee for marrying a same-sex partner without treating a *man* who marries a man differently from a

*woman* who marries a man. Title VII's prohibition on sex discrimination "has nothing to say about remarrying without following the proper canonical process; it does have something to say about sexual orientation." *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 496 F. Supp. 3d 1195, 1204 (S.D. Ind. 2020), *appeal dismissed*, No. 20-3265, 2021 WL 9181051 (7th Cir. July 22, 2021).[4]

Nor is this a case in which a religious employer has enforced a facially sex-neutral prohibition on public advocacy. A religious employer could prohibit employees from publicly advocating in favor of marriage for same-sex couples without discriminating based on the sex of the speaker. But the district court found—and Defendants do not contest on appeal—that Defendants fired Mr. Billard for marrying a same-sex partner and not for the particular content of his Facebook post. JA1383-1386. As Principal Telford testified at his deposition, teachers "cannot marry someone of the same sex and continue working at" CCHS (JA0056), and Mr. Billard would have been fired even if he had not posted a message on Facebook (JA0062).

---

[4] Defendants note that full-time teachers at Defendants' schools must sign an annual "Teacher Employment Contract" stating that teachers "must be consistent at all times, in example and expression, with the tenets and morals of the Catholic Faith." Defs.' Br. 10. As a substitute teacher, Mr. Billard did not sign that contract. JA0036. And, even if he had done so, non-ministerial employees cannot contract away Title VII's protections from sex discrimination. *See Ballard v. Bank of Am., N.A.*, 734 F.3d 308, 313 (4th Cir. 2013).

On appeal, Defendants have abandoned the argument that Mr. Billard engaged in advocacy by specifically posting: "PS: If you don't agree with this, keep it to yourself. You never asked my opinion about your personal life and I'm not asking yours." JA0262. *See A Helping Hand, LLC v. Baltimore Cty., MD*, 515 F.3d 356, 369 (4th Cir. 2008) (explaining that litigants abandon arguments not raised in their opening brief). Although Defendants' counsel pointed to that sentence for the first time during the summary judgment hearing, such assertions by counsel are not evidence. The only "advocacy" Defendants identified during discovery as grounds for Mr. Billard's firing was his "persisting in a same-sex civil marriage." JA1321. There is no evidence in the record that Principal Telford was even aware of the specific content of the Facebook post when he made the decision. *See supra* n.3. And Defendants concede they would *not* have fired someone for simply posting a positive Facebook message about a same-sex couple's marriage. *See* JA0064 (Telford testifying that that he would only have asked such an employee to talk to a priest); Defs.' Br. 11-12 (emphasizing that administration usually works with employees to correct public statements).

Moreover, even if the "advocacy" argument had not been abandoned and were supported by the summary judgment record, Defendants would still be liable under Title VII because Mr. Billard's marriage was, at a minimum, a "motivating factor"

for Defendants' termination of their employment relationship with him. 42 U.S.C. § 2000e-2(m).

## II. Title VII's Statutory Exemptions Do Not Provide a Defense for Policies That Facially Discriminate Based on Race, Color, Sex, or National Origin.

Section 702 contains a narrow exemption allowing religious organizations to discriminate based on an individual's religion. For nearly 50 years, courts have interpreted Section 702 consistently with its plain text and rejected attempts by religious organizations to use religious beliefs as a basis for discriminating based on other protected characteristics. Applying these longstanding precedents together with the Supreme Court's decision in *Bostock*, the district court held that Section 702's exception for religious discrimination does not authorize Defendants to discriminate against employees who marry same-sex partners by treating them in a manner that, but for their sex, would be different. *See* JA1386-1393; *accord Doe v. Cath. Relief Servs.*, No. CV CCB-20-1815, 2022 WL 3083439, at *4 (D. Md. Aug. 3, 2022); *Starkey*, 496 F. Supp. 3d at 1204.[5]

In the face of binding circuit precedent and the unanimous agreement of every circuit to address the question, Defendants now seek to overturn the settled

---

[5] Because Defendants do not raise separate arguments based on Section 703(e)(2) (codified at 42 U.S.C. § 2000e-2(e)(2)), which provides a parallel exemption for religious schools (Defs.' Br. 22), Mr. Billard follows Defendants' lead for the purpose of this brief and focuses on the exemption in Section 702.

interpretation of Section 702 with an alternative reading based on misleading, incomplete, and inaccurate descriptions of Section 702's text, structure, and precedent. The district court properly rejected Defendants' revisionist history, and this Court should do so as well.

A. **Section 702 Exempts Religious Organizations Only From Claims for Religious Discrimination.**

Title VII prohibits discrimination "against any individual with respect to his . . . employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Against the backdrop of that general prohibition, Section 702 carves out a limited exception providing that "[t]his subchapter shall not apply to" a religious organization "with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a).

The plain language of Section 702 thus "exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 329 (1987). But—as this Court has repeatedly recognized— Section 702 "does not exempt religious organizations from Title VII's provisions barring discrimination on the basis of race, gender, or national origin." *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011). "While the language of § 702 makes clear that religious institutions may base relevant hiring decisions upon religious preferences, Title VII does not confer upon religious organizations a

license to make those same decisions on the basis of race, sex, or national origin."
*Rayburn v. Gen. Conf. of Seventh–Day Adventists*, 772 F.2d 1164, 1166 (4th Cir.1985).

Every other circuit to consider the question agrees. The exemption "merely indicates that such institutions may choose to employ members of their own religion without fear of being charged with religious discrimination. Title VII still applies, however, to a religious institution charged with sex discrimination." *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996); *accord EEOC v. Pac. Press Pub. Ass'n*, 676 F.2d 1272, 1276 (9th Cir. 1982) ("[A]lthough Congress permitted religious organizations to discriminate in favor of members of their faith, religious employers are not immune from liability for discrimination based on race, sex, national origin, or for retaliatory actions against employees who exercise their rights under the statute."); *McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972) (agreeing with EEOC that Section 702 "permits a religious organization to discriminate only on the basis of religion" and such organizations are not "exempted from liability for discriminating against [their] employees on the basis of race, color, sex or national origin").

The circuits also agree that Title VII prohibits religious organizations from engaging in sex discrimination even when that discrimination is motivated by religious beliefs. "Thus, church organizations have been held liable under Title VII

for benefit and employment decisions which they contended were based upon religious grounds but which also discriminated against women based upon sex." *Vigars v. Valley Christian Ctr. of Dublin, Cal.*, 805 F. Supp. 802, 807 (N.D. Cal. 1992); *see also Herx v. Diocese of Ft. Wayne-S. Bend Inc.*, 48 F. Supp. 3d 1168, 1175-76 (N.D. Ind. 2014) (collecting cases), *appeal dismissed*, 772 F.3d 1085 (7th Cir. 2014). For example, in *Pacific Press*, a publishing house affiliated with the Seventh-Day Adventist church could not fire an employee for filing a charge of sex discrimination with the EEOC even though the employee had violated church doctrine that prohibited lawsuits by members against the church. *See* 676 F.2d at 1276-77, 1280. In *EEOC v. Fremont Christian School*, a religious school could not enforce the religious belief that men should be head of household by paying health benefits to married men but not to married women. *See* 781 F.2d 1362, 1365-67 (9th Cir. 1986). And in *Cline v. Catholic Diocese of Toledo*, a religious employer could not enforce a religious prohibition on sexual activity outside marriage in a facially discriminatory manner by using "the mere observation or knowledge of pregnancy as its sole method of detecting violations of its premarital sex policy." 206 F.3d 651, 667 (6th Cir. 2000). No circuit has ruled to the contrary. *See Bostock*, 140 S. Ct. at

1781 & n.55 (Alito, J., dissenting) (surveying existing circuit precedent interpreting Section 702 to provide "only narrow protection").[6]

These long-settled precedents are consistent with Section 702's legislative history and purpose. *See Rayburn*, 772 F.2d at 1167. Congress repeatedly rejected proposals to expand the exemption beyond claims for religious discrimination. The original 1964 bill passed by the House of Representatives would have provided a complete exemption for religious organizations, but the Senate replaced it with a narrower exemption limited to the employment of individuals of a particular religion. *See* EEOC, Legislative History of Title VII and XI of Civil Rights Act of 1964 at 1004, 3004, 3017 (1968) ("1964 Legis. Hist."). In 1972, Congress expanded Section 702 to cover all of a religious organization's activities (not merely its religious ones) but rejected an amendment that would have covered all types of discrimination (not merely discrimination based on religion). *See EEOC v. Pac. Press Pub. Ass'n*, 482 F. Supp. 1291, 1304 (N.D. Cal. 1979), *aff'd*, 676 F.2d 1272 (9th Cir. 1982) (collecting legislative history). Section 702 thus strikes a balance by

---

[6] As discussed, *infra*, none of the circuit cases cited by Defendants held that Section 702 allows employers to facially discriminate based on sex. They either involved claims of religious discrimination or attempts by plaintiffs to demonstrate that a facially sex-neutral religious reason was a pretext for sex discrimination.

providing a broad exemption for all of an organization's activities, but with a narrow scope limited to discrimination based on religion.[7]

Extending Section 702 beyond its statutory text to cover all forms of discrimination would have far-reaching consequences. As Defendants' supporting *amici* make clear, Defendants' interpretation of Section 702 would stretch far beyond just religious schools to cover employees engaged in humanitarian relief, social services, broadcasting, publishing, health care, camping, and financial services. *See* Christian and Missionary Alliance, *et al. Amicus* at 1. It would also apply to every employee working at religiously affiliated hospitals. *See* JA1392 (noting that 14.5 percent of hospitals were religiously affiliated in 2016). Such a sweeping exemption would conflict with the plain text of Section 702, the relevant legislative history, and Title VII's "central statutory purpose[] of eradicating discrimination throughout the economy." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975).

Moreover, although Defendants in this case seek to enforce religious beliefs related to marriage for same-sex couples, Section 702's exemption cannot be limited

---

[7] Defendants assert that the purpose of Section 702 was "to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices," a quote that originated with *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991). *See* Defs. Br. 29-30, 32. But *Little* involved a claim for only religious discrimination, and the court never suggested that Congress intended for Section 702 to extend beyond such claims.

just to religious beliefs that Article III judges find to be "decent and honorable." *Obergefell v. Hodges*, 576 U.S. 644, 672 (2015); *cf. Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."). Defendants' reading of Section 702 would necessarily apply beyond this specific context to cover religious organizations that seek to enforce other religious beliefs requiring discrimination based on race, color, sex, or national origin. For example, in explaining why Section 702 is limited to claims for religious discrimination, the EEOC has long taken the position that "a religious organization is not permitted to engage in racially discriminatory hiring by asserting that a tenet of its religious beliefs is not associating with people of other races." *See* EEOC, Questions and Answers: Religious Discrimination in the Workplace (2008). Yet, that is precisely what would be permitted if Defendants' interpretation were to prevail.

### B.    Defendants' Revisionist Interpretation of Section 702 Is Wrong.

In the face of decades of settled precedent, Defendants advance a revisionist interpretation of Section 702, arguing that the exemption allows religious organizations to engage in race, color, sex, and national-origin discrimination as long as the discrimination is grounded in their religious beliefs. When the district court issued its decision in September 2021, Defendants were unable to identify a single case interpreting Section 702 in such a manner. *See* JA1391. In the past two years,

however, Defendants' revisionist interpretation has been accepted by a district court

in *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, 591 (N.D. Tex. 2021),

*appeal filed* No. 21-10145 (5th Cir. Feb. 14, 2022), and by Judge Easterbrook's solo

concurrence in *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41

F.4th 931, 947 (7th Cir. 2022) (Easterbrook, J, concurring).

Unlike the judges in those two cases, this Court is bound by Fourth Circuit

precedent in *Rayburn* and *Kennedy*, which have already rejected Defendants'

position. But, even if the panel were writing on a clean slate, Defendants' arguments

would still fail. While purporting to ground their interpretation in Section 702's

"text, structure, and precedent" (Defs.' Br. 22), Defendants provide a misleading,

incomplete, or simply false account of the sources to which they cite.

### 1.    Defendants' Revisionist Description of Section 702's Text.

Although Defendants claim their interpretation is supported by the plain text

of Section 702, Defendants repeatedly alter or abbreviate the text to suit their

purposes. Defendants first assert that Section 702 applies to all discrimination

claims—not just claims for religious discrimination—because Section 702 says "this

subchapter shall not apply" and "[t]he subchapter referenced is the entire subchapter

of Title VII." Defs.' Br. 23 (internal quotation marks omitted). But that argument

omits the rest of the sentence, which says that this subchapter shall not apply only

"with respect to the employment of individuals of a particular religion." 42 U.S.C. §

2000e-1(a). Thus, "the entire 'subchapter' of Title VII" (Defs.' Br. 23) does not apply to religious organizations with respect to discrimination "because of [an] individual's . . . religion," but *does* apply with respect to discrimination "because of such individual's race, color, . . . sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Defendants also assert that Section 702 provides an exemption for religiously motivated sex discrimination because Title VII defines "religion" to include "*all aspects* of religious *observance and practice*, as well as belief.'" Defs.' Br. 23-24 (quoting 42 U.S.C. § 2000e(j)) (emphasis by Defendants). But Defendants quote just a fragment of the definition. The full definition states that "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). "The intent and effect of this definition was to make it an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977).

Thus, the definition of "religion" simply indicates that protections from religious discrimination include the right to reasonable accommodations for an employee's religious practice. By the same token, Section 702's exemption from

religious discrimination claims includes an exemption from the requirement to make reasonable accommodations for an employee's religious practice. It does not provide religious organizations with new rights to use *their own* religious beliefs to discriminate based on an employee's race, color, sex, or national origin. After all, the relevant religion referred to in Section 702 is the religion of the "individual," not the religion of the employer.

Defendants complain that "if Congress had wanted to limit the exemption to only religious discrimination claims" it could have written the statute differently by referring to "claims of religious discrimination" (Defs.' Br. 25) instead of referring to "individuals of a particular religion," 42 U.S.C. § 2000e-1(a). But when interpreting statutes, the question is not whether "Congress could have expressed itself more clearly" but what is "the right and fair reading of the statute before us?" *Torres v. Lynch*, 578 U.S. 452, 472-73 (2016). Here, the text of Section 702 follows naturally from the text of Title VII's underlying prohibition on discrimination, which does not use the phrase "religious discrimination" either. Title VII prohibits discrimination "because of [an] individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 702 tracks that phrasing by carving out an exception "with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a). Both provisions focus on the attributes of the "individual," not the motivations of the employer.

By contrast, Defendants fail to identify any text in Section 702 referring to *the employer's* religious motivations. In other antidiscrimination statutes, Congress has provided religious organizations exemptions based on the organization's "religious tenets." *See* 20 U.S.C. § 1681(a)(3) (Title IX); 42 U.S.C. § 12113(d)(2) (ADA). But Congress did not include the same language in Title VII. *Cf. Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1941 n.2 (2022) ("[R]ather than compare the [statute] to hypothetical language Congress could have used, it seems more appropriate to compare [its] terms to language Congress did use in closely related statutes[.]").

### 2.    Defendants' Revisionist Description of Section 702's Structure.

Unable to find textual support for their interpretation of Section 702's religious exemption, Defendants attempt to draw analogies to *other* statutory provisions that (according to Defendants) have been interpreted to provide more comprehensive exemptions. Defs.' Br. 26-28. But Defendants' analogies fall flat because Defendants misunderstand or misrepresent the statutes they cite.

Defendants first argue that Section 702's religious exemption "must be read equally broadly" as Section 702's "alien exemption." *See* Defs.' Br. 26. But there are crucial textual differences between the "alien exemption" and the partial exemption for religious organizations. The original version of Section 702 passed by the House provided a categorical exemption for employment of aliens abroad *and* for religious organizations; it provided that "[t]his title shall not apply to an employer

23

with respect to the employment of aliens outside any State, or to a religious corporation, association, or society." *See* 1964 Legis. Hist. at 3050 (reprinting annotated text of House bill showing Senate changes). The Senate then added new language limiting the exemption for religious organizations to an exemption "with respect to the employment of individuals of a particular religion." *Id.* As discussed above, the phrase "individuals of a particular religion" tracks the language of Title VII's underlying prohibition on discrimination because of an "individual's… religion" in 42 U.S.C. § 2000e-2(a)(1). The "alien exemption" does not contain similar phrasing about an "individual's" characteristics and cannot provide any guidance on how the phrase "individuals of a particular religion" should be interpreted. 42 U.S.C. § 2000e-1(a). When Congress adds text to limit the scope of one exemption and not the other, there is no basis for courts to read the two exemptions "equally broadly." Defs.' Br. 26.[8]

---

[8] Defendants also misunderstand what the "alien exemption" actually does. Non-citizens outside the United States are excluded from the scope of Title VII because they are not encompassed in Title VII's definition of "employee" in 42 U.S.C. § 2000e(f)—not because of Section 702. That is because the Supreme Court held in *EEOC v. Arabian American Oil Co.,* 499 U.S. 244 (1991), that Title VII did not apply to the employment of *anyone* outside the United States, rendering the "alien exemption" functionally irrelevant. Congress responded by amending the definition of "employee" to provide that "[w]ith respect to employment in a foreign country, such term includes an individual who is a citizen of the United States." 42 U.S.C. § 2000e(f).

Defendants also attempt to analogize Section 702 to two provisions in the Americans with Disabilities Act ("ADA"), but those analogies are even less convincing. Defs.' Br. 27-28. The first ADA provision states that "[t]his subchapter shall not prohibit a religious [organization] from giving preference in employment to individuals of a particular religion." 42 U.S.C. § 12113(d)(1). That provision does not allow religious organizations to discriminate based on a person's disability (whether for religious reasons or otherwise). It merely provides reassurances that religious organizations are not prohibited "*from giving preference* in employment to individuals of a particular religion" over a qualified person with a disability. 42 U.S.C. § 12113(d)(1) (emphasis added). "Thus, assume that a Mormon organization wishes to hire only Mormons to perform certain jobs. If a person with a disability applies for the job, but is not a Mormon, the organization can refuse to hire him or her." H.R. Rep. 101-485, 76, 1990 U.S.C.C.A.N. 303, 359.

While the first ADA provision fails to support Defendants' position, the second ADA provision undermines it. That provision states that religious organizations "may require that all applicants and employees conform to the religious tenets of such organization." 42 U.S.C. § 12113(d)(2). That language was not drawn from Section 702 of Title VII. It was drawn from the more sweeping religious exemption in Title IX. The House Report notes that the "religious tenets" provision contains language "not included in title VII," and specifically instructs that

"[t]he inclusion of a 'religious tenets' defense [in the ADA] is not intended to affect in any way the scope given to section 702 of title VII." H.R. Rep. 101-485, 76, 1990 U.S.C.C.A.N. 303, 359. Thus, if the understanding of Congress in 1990 can be used to determine the meaning of Section 702, Congress's understanding was that Section 702 did *not* provide the sweeping exemption for "religious tenets" that Defendants claim in this case.

### 3.    Defendants' Revisionist Description of Precedent.

No circuit court has ever held that Section 702 allows employers to engage in religiously motivated discrimination based on race, color, sex, or national origin. In attempting to leave a contrary impression, Defendants rely on cases involving either (a) claims of religious discrimination, or (b) claims in which an employee was fired for religious reasons that were facially sex-neutral and courts held that principles of "church autonomy" barred the plaintiff from attempting to prove those reasons were pretextual.

Defendants' misleading survey of precedent begins with this Court's decision in *Kennedy*, which was a straightforward case of religious discrimination. *See* Defs.' Br. 23, 28-29. The plaintiff in *Kennedy* sued for religious harassment and retaliation, arguing that Section 702's exemption for "employment of individuals of a particular religion" was just limited to hiring and firing decisions. *See* 657 F.3d at 192. This Court rejected that position and interpreted the term "employment" to encompass all

26

forms of discrimination based on religion, not just hiring and firing decisions. *See id.* at 192-94. At the same time, *Kennedy* specifically reaffirmed that Section 702 "does not exempt religious organizations from Title VII's provisions barring discrimination on the basis of [an individual's] race, gender, or national origin." *Id.* at 192.

Ignoring *Kennedy*'s actual holding, Defendants alter the text of the opinion to create the false impression that *Kennedy* expanded Section 702 beyond religious discrimination claims. Defendants quote *Kennedy* as stating that "if Congress had wished to limit the religious organization exemption to [certain] decisions, it could clearly have done so." Defs.' Br. 25 (quoting *Kennedy*, 657 F.3d at 194) (alterations by Defendants). The actual quote is "if Congress had wished to limit the religious organization exemption to ***hiring and discharge*** decisions, it could clearly have done so." *Kennedy*, 657 F.3d at 194 (emphasis added). Nothing in *Kennedy* remotely suggests Section 702 allows discrimination by religious employers based on race, color, sex, or national origin. The decision says just the opposite.

Defendants also quote *Kennedy* for the proposition that Section 702 grants "permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts." Defs.' Br. 29 (quoting *Kennedy*, 657 F.3d at 194). But that is because requiring an employee to conform to an employer's religious beliefs is a form of religious discrimination that would otherwise be

prohibited by Title VII. *See, e.g.*, *Noyes v. Kelly Servs.,* 488 F.3d 1163, 1168-69 (9th Cir. 2007); *Venters v. City of Delphi*, 123 F.3d 956, 972 (7th Cir. 1997); *Shapolia v. Los Alamos Nat. Lab.*, 992 F.2d 1033, 1037 (10th Cir. 1993). Section 702 allows religious employers to enforce their religious beliefs without being sued by employees for *religious* discrimination. *See Kennedy*, 657 F.3d at 194 (drawing the "religious precepts" language from *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991), which is another case involving claims for only religious discrimination, not sex discrimination). It does not grant free-standing authority to use religious beliefs to discriminate based on race, color, sex, or national origin.

Looking beyond this Court's precedents, Defendants attempt to bolster their argument with *EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir. 1980), and *Curay-Cramer v. Ursuline Academy of Wilmington, Del., Inc.*, 450 F.3d 130 (3d Cir. 2006). *See* Defs.' Br. 29-30. But, despite Defendants' assertions to the contrary, neither case held that Section 702 allows religious employers to apply religiously motivated policies that facially discriminate based on race, color, sex, or national origin.

In *Mississippi College*, the Fifth Circuit held that if a religious institution "presents convincing evidence that the challenged employment practice resulted from discrimination on the basis of religion, § 702 deprives the EEOC of [authority] to investigate further to determine whether the religious discrimination was a pretext

for some other form of discrimination." 626 F.2d at 485. But the court went on to suggest that the outcome would be different if the discrimination *facially* discriminated on the basis of sex. The court noted that "[t]he only practice brought to the attention of the district court that is clearly predicated upon religious beliefs that might not be protected by the exemption of § 702 is the College's policy of hiring only men to teach courses in religion." *Id.* at 487. The court deferred resolution of that issue until after the EEOC completed its investigation and the College had "an opportunity to litigate in a federal forum whether § 702 exempts or the [F]irst [A]mendment protects that particular practice." *Id.*

Similarly, in *Curay-Cramer* a school fired a teacher for including her name on a political advertisement supporting *Roe v. Wade*. *See* 450 F.3d at 132. Unlike the act of firing teachers for marrying a same-sex partner, firing teachers for engaging in pro-choice advocacy does not discriminate based on the sex of the employee. The plaintiff in *Curay-Cramer* nevertheless alleged that the school engaged in sex discrimination by punishing women more harshly for publicly supporting abortion than it would have punished men who opposed religious teachings on different issues (such as the Iraq war). *See id.* at 139. The Third Circuit rejected that argument because plaintiff's theory required the court to balance the relative importance of different religious doctrines, raising substantial constitutional concerns under principles of church autonomy. *Id.* at 141. The court did not hold (as

29

Defendants contend) that facial sex discrimination claims are barred whenever a school offers a religious justification for decision. *See Starkey*, 496 F. Supp. 3d at 1204-05 (explaining why *Curay-Cramer* is inapposite).[9]

Defendants' invocation of the EEOC's 2021 guidance fails for the same reasons. *See* Defs.' Br. 32. Like *Curay-Cramer* itself, the EEOC's 2021 guidance merely acknowledges that principles of church autonomy might prevent a plaintiff from probing a facially neutral policy to establish pretext. The guidance does not purport to overturn the EEOC's longstanding position that Section 702 does not allow religious employers to engage in race, color, sex, or national-origin discrimination for religious reasons.

Defendants are ultimately able to cite one—and only one—decision that actually adopts their interpretation of Section 702. *See Bear Creek*, 571 F. Supp. 3d at 591. That district court failed to mention the uniformly contrary precedent, and the decision conflicts with other districts courts that have addressed the issue recently. *See Doe*, 2022 WL 3083439, at \*4 (Section 702 did not bar sex

---

[9] Defendants' reliance on *Maguire v. Marquette University*, 627 F. Supp. 1499 (E.D. Wis. 1986), is similarly inapposite. Defs.' Br. 30. In that case, a plaintiff alleged that a Catholic university engaged in sex discrimination by refusing to hire her as a theology professor because of her views about abortion, which (as the Seventh Circuit subsequently held) is not facially discrimination based on sex. *See Maguire v. Marquette Univ.*, 814 F.2d 1213, 1218 (7th Cir. 1987).

discrimination claim related to employee's marriage to a same-sex partner); *Starkey*, 496 F. Supp. 3d at 1201-05 (same).

Defendants also cite Judge Easterbrook's solo concurrence in *Starkey*, which proceeded from the erroneous assumption that "[o]ne function of § 702(a) is to permit sex discrimination by religions that do not accept women as priests." 41 F.4th at 946. To the contrary, that function is already accomplished by the ministerial exception and by the exception for positions in which sex is a bona fide occupational qualification. *See* 42 U.S.C. § 2000e-2(e)(1). The only "function" of applying Section 702 to sex discrimination claims would be to authorize sex discrimination against non-ministerial employees.

\* \* \*

Defendants' attempt to expand Section 702 to all religiously motivated discrimination is foreclosed by precedent and wrong on the merits. The text, structure, and history of Section 702 all confirm that the statute does not authorize organizations to use religious beliefs to discriminate against their entire secular workforce based on race, color, sex, or national origin.

## III. The "Church Autonomy" Doctrine Does Not Provide a Defense to Mr. Billard's Claims.

After attempting to extract sweeping immunity from the text of Section 702, Defendants argue in the alternative that this Court should read that immunity into the "church autonomy" doctrine. But this Court's precedents are clear: The "church

autonomy" doctrine applies to ministerial employees and ecclesiastical questions, but when religious organizations employ non-ministerial employees, they must comply with Title VII and other generally applicable laws prohibiting sex discrimination.

### A.    The "Ministerial Exception" Does Not Apply to This Case.

Defendants have stipulated that the "ministerial exception" does not apply to Mr. Billard's claims. JA0031. The district court nevertheless expressed concern that religious organizations may not be able to waive the "ministerial exemption," and that it might have to decide *sua sponte* whether Mr. Billard was a minister. JA1397. The district court's concern was based on decisions by the Sixth Circuit and Third Circuits, which held (with minimal analysis) that the ministerial exception is non-waivable because it is a "structural limitation" on courts' power. *See Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir. 2015); *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 118 n.4 (3d Cir. 2018).[10]

But the Supreme Court squarely held in *Hosanna-Tabor* that the ministerial exception is "an affirmative defense to an otherwise cognizable claim, not a

---

[10] *Conlon* quoted the Seventh Circuit as holding the ministerial exception "is not subject to waiver or estoppel," 777 F.3d. at 836 (quoting *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006)), but *Tomic* was referring to alleged waiver based on statements made by a religious organization in an employee handbook—not waivers that occur during the course of litigation. *See also Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318-19 (11th Cir. 2012) (holding that a religious organization waives the defense by failing to raise it in its brief).

jurisdictional bar." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 195 n.4 (2012). And it is well-settled that courts have no obligation to raise non-jurisdictional defenses *sua sponte*—even when those defenses are "structural limitations." While courts may "exercise [their] discretion" to forgive a party's forfeiture and hear "nonjurisdictional structural constitutional objections," they are not required to do so—much less raise the issue *sua sponte*. *Freytag v. Comm'r of Internal Rev.*, 501 U.S. 868, 878-89 (1991); *see Ciena Corp. v. Oyster Optics, LLC*, 958 F.3d 1157, 1161 (Fed. Cir. 2020). After all, "[p]ersonal rights that happen to bear upon governmental structure are no more laden with public interest (and hence inherently nonwaivable by the individual) than many other personal rights one can conceive of." *Freytag*, 501 U.S. at 895 (Scalia, J., concurring in part). This Court and others routinely decline to consider structural challenges that have been forfeited below. *See, e.g.*, *Edd Potter Coal Co., Inc. v. Dir., Off. of Workers' Comp. Progs.*, 39 F.4th 202, 207 (4th Cir. 2022).

It would be particularly inappropriate to consider the "ministerial exception" *sua sponte* in this case because Defendants did not merely forfeit reliance on the "ministerial exception," but entered into a binding stipulation. JA0031-0032. Such stipulations are "formal concessions that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Christian Legal*

*Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 677-78 (2010) (ellipses omitted).

In any event, as the district court recognized, Mr. Billard was not a ministerial employee. The ministerial exception applies to "teachers at religious schools who are entrusted with the responsibility of instructing their students in the faith." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020). But a "purely secular teacher" in a religious school does "not qualify for the 'ministerial' exception." *Hosanna-Tabor*, 565 U.S. at 204 (Alito, J., concurring). The undisputed evidence here shows that Mr. Billard was a purely secular teacher who provided no religious instruction and had no religious duties. JA1402. Indeed, the school administration prefers and expects that secular teachers like Mr. Billard avoid discussing Catholic doctrine and leave those discussions to the teachers of religious subjects. JA0068-0069.

Of course, the fact that Mr. Billard was not a ministerial employee does not mean that substitute teachers could never be ministerial employees. Schools retain the ability to structure teaching and other job responsibilities as they see fit. But regardless of whether a substitute teacher would qualify for the ministerial exception under other circumstances, the parties agree that *this* case is about a non-ministerial employee.

**B.** **Hiring Non-Ministerial Employees Is Not a Matter of Internal Church Government Protected By Church Autonomy.**

Despite waiving reliance on the ministerial exception, Defendants argue that the "church autonomy" doctrine provides an absolute right to fire *any* employee based on an organization's religious beliefs regardless of the employee's position. Defs.' Br. 38-40. But the "church autonomy" doctrine is limited to "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady*, 140 S. Ct. at 2061. It does not extend to all employment decisions, but only "internal management decisions that are essential to the institution's central mission," such as the "selection of the individuals who play certain key roles" or hold "certain important positions." *Id.* at 2060. Within that narrow sphere of "ministerial employees," the doctrine of "church autonomy" provides an absolute barrier to liability without any balancing of competing interests because "the First Amendment has struck the balance for us." *Hosanna-Tabor*, 565 U.S. at 196.

Defendants attempt to dramatically expand the "church autonomy" doctrine beyond ministerial employees to insulate *all* personnel decisions from legal regulation when those decisions are based on religious doctrine. Under this Court's binding precedent, however, the employment of non-ministerial employees is not part of "church autonomy" and is subject to neutral and generally applicable regulations. In *Rayburn*, this Court explained in emphatic terms that "churches are not—and should not be—above the law. Like any other person or organization . . .

35

[t]heir employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions." 772 F. 2d at 1171. In *Dole v. Shenandoah Baptist Church*, this Court rejected the argument that applying the Equal Pay Act to non-ministerial employees with respect to a religiously motivated "head of household" policy "impairs the church's ability to administer its relationship with employees and thereby its power to decide free from state interference, matters of church government as well as those of faith and doctrine." 899 F.2d 1389, 1397 (4th Cir. 1990) (internal quotation marks and ellipses omitted). And in *EEOC v. Roman Catholic Diocese of Raleigh*, this Court again reiterated that "[w]here no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer unless Congress so provides." 213 F.3d 795, 801 (4th Cir. 2000).[11]

The other circuits agree. "The employment relationship between" a religious school and its non-ministerial "faculty and staff is one intended by Congress to be

---

[11] To be sure, generally applicable laws may in certain circumstances place a substantial burden on an organization's religious exercise. But under the Supreme Court's binding precedent in *Employment Division v. Smith*, 494 U.S. 872 (1990), that burden does not give rise to a free-exercise claim with respect to non-ministerial employees. *See Hosanna-Tabor*, 565 U.S. at 189-90 (distinguishing between hiring of "ministerial employees" and other conduct governed by *Smith*); *Diocese of Raleigh*, 213 F.3d at 800 n* (same). Defendants have not argued—either in the district court or their opening brief on appeal—that applying Title VII in this case violated their free exercise rights under *Smith*. Nor have Defendants preserved an argument that *Smith* should be overruled.

regulated by Title VII," and the fact that "faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern." *Miss. Coll.*, 626 F.2d at 485. A non-ministerial employee's "local church [can] invoke[] disciplinary actions such as censure or expulsion from the church which undoubtedly would qualify as ecclesiastical decisions immune from judicial review," but firing a non-ministerial employee "is an action that involves more than purely religious considerations; it also conflicts with rules of conduct established by Congress for legitimate secular reasons." *Pac. Press*, 676 F.2d at 1281. And "notwithstanding [non-ministerial employees'] apparent general employment obligation to be a visible witness to the Catholic Church's philosophy and principles, a court [can] adjudicate [their] claims without the entanglement that would follow were employment of clergy or religious leaders involved." *Geary v. Visitation of Blessed Virgin Mary Par. Sch.*, 7 F.3d 324, 331 (3d Cir. 1993); *see also DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 171 (2d Cir. 1993) (distinguishing between ministerial and non-ministerial employees); *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360, 363 n.3 (8th Cir. 1991) (same).

None of Defendants' cases supports their repeated assertion that "'[w]hen a church makes a personnel decision based on religious doctrine,' even if the employee is not a minister, the 'broader church autonomy doctrine' applies." Defs.'

Br. 5, 40 (quoting *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 656-58 & n.2, 660 (10th Cir. 2002)). Defendants fabricate that quote from *Bryce* by splicing together a sentence fragment from the "conclusion" of the opinion with a sentence fragment from a footnote appearing two pages earlier. *Bryce* was a case about a religious organization's *speech* about its employment decisions, not about the legality of employment decisions themselves. The plaintiff employee in *Bryce* was a "youth minister," *see* 289 F.3d at 658 n.2, who did not challenge the church's decision to terminate her employment, but instead attempted to challenge the church's speech about the termination decision as a form of sexual harassment, *see id.* at 657. Thus, the rest of the sentences selectively quoted by Defendants are: (a) "When a church makes a personnel decision based on religious doctrine, *and holds meetings to discuss that decision and the ecclesiastical doctrine underlying it*, the courts will not intervene," *id.* at 660 (emphasis added); and (b) "Bryce's claims *are based solely on communications* that are protected by the First Amendment under the broader church autonomy doctrine," *id.* at 658 n.2 (emphasis added). That holding has no bearing on this case because Mr. Billard is not challenging Defendants' speech about its religious beliefs; he is challenging the Defendants' actions in firing him.

38

Defendants' other idiosyncratic cases follow a similar pattern.[12] None calls into question the long line of precedent protecting non-ministerial employees from facially discriminatory employment policies.

### C. Applying Title VII to Facially Discriminatory Policies Does Not Require Courts to Answer Ecclesastical Questions.

Finally, there are no ecclesiastical questions in this case that would implicate principles of "church autonomy." In cases such as *Curay-Cramer*, 450 F.3d 130, the plaintiffs' allegations of sex discrimination required courts to evaluate whether a church's doctrinal beliefs about abortion were equivalent to its doctrinal beliefs about the Iraq war. But these types of problems are wholly absent where a policy facially discriminates on the basis of race, color, sex, or national origin. "Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the

---

[12] The plaintiff in *Garrick v. Moody Bible Institute*, 412 F. Supp. 3d 859, 872 (N.D. Ill. 2019), alleged she was fired for opposing her employer's "beliefs on the role of women in the ministry," not for violating any allegedly discriminatory church doctrines herself. The plaintiff in *Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.*, 796 N.E.2d 286, 293-94, 296 (Ind. 2003), sought to apply Indiana's anti-blacklisting law to communications between two religious officials. And the plaintiff in *Butler v. St. Stanislaus Kostka Catholic Academy*, No. 19-CV-3574(EK)(ST), 2022 WL 2305567 (E.D.N.Y. June 27, 2022), sought to prove that a Catholic school fired him simply for being gay and not (as the school alleged) for his statements that he intended to eventually marry his boyfriend. The court found that proving pretext would intrude on principles of autonomy. *Id.* at *13-14. But the plaintiff (oddly) never argued that firing an employee for intending to marry a same-sex partner would itself be a form of sex discrimination.

explicit terms of the discrimination." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991); *accord Vigars*, 805 F. Supp. at 806. Because liability for facial discrimination in this case depends on Defendants' stated policy—not their subjective motivations—"[t]his court need not question the sincerity or content of [Defendants'] religious beliefs to assess the applicability" of the statute. *Doe*, 2022 WL 3083439, at *3.

By contrast, Defendants' proposal would create *more* constitutional difficulties by making liability turn on an organization's subjective religious motivations instead of an objective assessment of its conduct. And courts would have to make that assessment, not only for religious beliefs "the Catholic Church has taught for millennia," Defs.' Br. 7, but also less common religious beliefs that might "seem strange [or] bewildering" to the unfamiliar. *Dr. A. v. Hochul*, 142 S. Ct. 552, 558 (2021) (Gorsuch, J., dissenting). In a country filled with religious diversity, "[t]he Constitution protects not just popular religious exercises." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1734 (2018) (Gorsuch, J., concurring). "It protects them all." *Id.*

Nor does Title VII involve courts in the type of entanglement at issue in *NLRB v. Catholic Bishop of Chicago*, where the Court held that that applying the collective-bargaining requirements of the National Labor Relations Act ("NLRA") to church-

operated schools would potentially intrude upon church autonomy. 440 U.S. 490, 502 (1979). *See* Defs.' Br. 42-44. All the circuits to consider the question agree that there is "an important distinction between the ongoing government supervision of all aspects of employment required under labor relations statutes like the NLRA and the limited inquiry required in anti-discrimination disputes." *DeMarco*, 4 F.3d at 169. An "award of monetary damages . . . does not amount to continuous supervision of the kind the Supreme Court sought to avoid in *Catholic Bishop*." *Pac. Press*, 676 F.2d at 1282; *accord Geary*, 7 F.3d at 328 (distinguishing between the NLRB's "pervasive jurisdiction in *Catholic Bishop*" and "the simple prohibitions of the ADEA").[13]

To support their assertions that applying Title VII would lead to unconstitutional "entanglement" under *Catholic Bishop*, Defendants point to the fact that Bishop Jugis was asked certain hypothetical questions during a deposition in this case. Defs.' Br. 43-44. But Defendants fail to mention that Bishop Jugis was not deposed as a fact witness and was, instead, *voluntarily designated* by Defendants as a Rule 30(b)(6) witness. JA1256.[14] The questions did not "inquir[e] into the good

---

[13] *Geary* also observed that there was no direct conflict between the school's religious beliefs and the requirements of the ADEA, but noted this observation was not intended to "imply that a direct conflict would render a neutral law of general applicability inapplicable to a religious institution." 7 F.3d at 328 (citing *Smith*).

[14] Defendants also fail to mention that defense counsel posed many similar hypotheticals to Mr. Billard. *See* JA0248-0252.

faith" of Defendants' positions, *Catholic Bishop*, 440 U.S. at 502, because good faith is irrelevant to the legal question of whether facial discrimination occurred. Despite their *post hoc* criticisms, Defendants did not raise any contemporaneous objections to questions at the 30(b)(6) deposition based on "church autonomy." If they had done so, the parties could have discussed alternative discovery arrangements or stipulations. Having failed to do so—or to raise the issue to the district court—any objections have been waived. *See* Fed. R. Civ. P. 32(d)(3)(B)(i) ("An objection . . . is waived if," *inter alia*, "it relates to the manner of taking the deposition, the form of a question or answer, . . . a party's conduct, or other matters that might have been corrected at that time.").

Because Mr. Billard is a non-ministerial employee and his claims do not require the court to resolve any ecclesiastical question, "church autonomy" does not insulate Defendants' discrimination from review.[15]

## IV. Defendants Do Not Have an Expressive-Association Right to Discriminate Against Non-Ministerial Employees Based on Sex.

In addition to their arguments based on church autonomy, Defendants raise an even more sweeping First Amendment argument based on the right to expressive

---

[15] Defendants assert that the Court should construe Section 702 to avoid constitutional questions raised by *Catholic Bishop*. Defs.' Br. 52-53. But this Court in *Rayburn* already held that constitutional avoidance is not an option in light of the statute's text and legislative history. 772 F.2d at 1167. The constitutional questions in this case were asked and answered decades ago.

association. The district court properly rejected Defendants' novel attempt to recharacterize routine employer-employee relationships as a form of expressive association—a theory so expansive as to be "preposterous." JA1420; *accord Starkey*, 496 F. Supp. 3d at 1208-09 (rejecting similar "expressive association" argument).

### A.  An Employer-Employee Relationship Is Not an Expressive Association.

The Supreme Court has never recognized a First Amendment right to engage in employment discrimination under the banner of "expressive association." To the contrary, the Supreme Court has already "rejected the argument that Title VII infringed employers' First Amendment rights." *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993); *see Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984). "[T]here is only minimal constitutional protection of the freedom of commercial association" because "the State is free to impose any rational regulation on the commercial transaction itself." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 634 (1984) (O'Connor, J., concurring in part and concurring in judgment). Thus, "[o]nce a contractual relationship of employment is established, the provisions of Title VII attach and govern certain aspects of that relationship." *Hishon*, 467 U.S. at 74.

The commercial nature of the employment relationship distinguishes Title VII from public accommodation laws regulating a voluntary association's membership or speech. *See, e.g.*, *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) (forced inclusion of volunteer, unpaid scout leader); *Christian Legal Soc'y v. Walker*, 453 F.3d 853,

857 (7th Cir. 2006) (forced inclusion of members in student organization that had no employees); *cf. Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572 (1995) ("peculiar" application of public accommodations statute to private entity's speech without any connection to "the provision of publicly available goods, privileges, and services"). Applying public accommodation laws to an expressive association's membership policies "directly and immediately affects associational rights." *Dale*, 530 U.S. at 659. Indeed, "[t]here can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire." *Roberts*, 468 U.S. at 623.

By contrast, when the government prohibits discrimination in employment or other economic transactions, those "acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 390 (1992). To the extent that regulations of those commercial transactions have an "incidental effect" on an organization's expressive message, *Dale*, 530 U.S. at 659, those regulations are evaluated by the more deferential standard of *United States v. O'Brien*, 391 U.S. 367 (1968). Thus, while "religious and philosophical objections are protected, it is a general rule that such objections do not allow business owners and other actors in the economy and in society to deny

protected persons equal access to goods and services." *Masterpiece*, 138 S. Ct. at 1727.

Defendants cite only two federal decisions actually permitting employment discrimination as a form of "expressive association," and neither case acknowledged the critical distinction between *direct* burdens on an organization's membership policies and *incidental* burdens resulting from the regulation of commercial transactions. *See* Defs.' Br. 52 (citing *Bear Creek* and *Our Lady's Inn v. City of St. Louis*, 349 F. Supp. 3d 805 (E.D. Mo. 2018)).[16]

---

[16] *Our Lady's Inn* held that a non-discrimination ordinance prohibiting employers from discriminating based on employees' reproductive health care decisions violated a religious employer's rights of expressive association. 349 F. Supp. 3d at 820-22. But another court has reached the opposite conclusion with respect to a substantially similar law in New York. *See Slattery v. Cuomo*, 531 F. Supp. 3d 547, 568-69 (N.D.N.Y. 2021), *appeal filed* No. 21-911 (2d Cir. Oct. 17, 2021). Meanwhile, the *Bear Creek* decision held that even a *for-profit employer* had an expressive association right not to hire gay people to avoid "lend[ing] approval to homosexual behavior." 571 F. Supp. 3d at 615. That holding would eviscerate antidiscrimination law and is irreconcilable with *Masterpiece*'s admonition that "philosophical objections" to the relationships of same-sex couples "do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services." *Masterpiece*, 138 S. Ct. at 1727.

Defendants also assert that the Second Circuit applied *Dale* to employment discrimination in *Boy Scouts v. Wyman*, 335 F.3d 80 (2d Cir. 2003), but they misread the opinion. In that case, the Connecticut Commission on Human Rights and Opportunities ("CHRO") excluded the Boy Scouts from a state program allowing state employees to deduct portions of their paychecks to make voluntary contributions to certain charities. The stated basis for CHRO's decision was its objection to the Boy Scouts' "policy of excluding homosexuals." *Id*. at 90. The Second Circuit said that this stated reason implicated the Boy Scouts' rights under *Dale* to the extent that it penalized the Boy Scouts for excluding "gay activists from

45

Defendants' assertion that they have a right to engage in employment discrimination as a form of expressive association would, if accepted, have sweeping consequences. Because "[t]he right to freedom of association is a right enjoyed by religious and secular groups alike," *Hosanna-Tabor*, 565 U.S. at 189, the "associational rights [of religious institutions] are no stronger than those of other private entities," *Richardson v. Nw. Christian Univ.,* 242 F. Supp. 3d 1132, 1153 (D. Or. 2017). Thus, if Defendants have a "freedom of association" right to engage in employment discrimination, non-religious expressive organizations would also have the same right to do so. And such a right would not be limited to issues of sexual orientation. It would cover any organization with racist, misogynist, or xenophobic viewpoints because First Amendment rights do not depend on the courts' assessment of whether a particular viewpoint is worthy of protection. *Cf. Snyder v. Phelps*, 562 U.S. 443, 458 (2011). As the district court recognized, this "preposterous result" cannot be the law. JA 1420.

## B.    Any Burden on Defendants' Expressive Association Satisfies Strict Scrutiny.

As the district court properly found in the alternative, any cognizable burden on Defendants' freedom of association with respect to non-ministerial employees would survive strict scrutiny. JA1421-1425. "The right to associate for expressive

---

leadership positions," *id.* at 91, but the court did not indicate it was using the term "leadership positions" beyond the volunteer "leadership positions" at issue in *Dale*.

purposes is not . . . absolute," and "[i]nfringements on that right may be justified by regulations adopted to [a] serve compelling state interests, [b] unrelated to the suppression of ideas, that [c] cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623. Those requirements are easily satisfied here.

First, this Court has already held that Title VII and other laws prohibiting sex discrimination in employment serve "an interest of the highest order" and may be "properly applied to the secular employment decisions of a religious institution, such as those relating to a secular teacher in a church-approved school." *Rayburn*, 772 F.2d at 1169. Prohibiting sex discrimination with respect to lesbian, gay, bisexual, and transgender people is equally compelling. "[T]he laws and the Constitution can, and in some instances must, protect [same-sex couples] in the exercise of their civil rights. The exercise of their freedom on terms equal to others must be given great weight and respect by the courts." *Masterpiece*, 138 S. Ct. at 1727. Excluding same-sex couples from marrying "prohibits them from participating fully in our society, which is precisely the type of segregation that the Fourteenth Amendment cannot countenance." *Bostic v. Schaefer*, 760 F.3d 352, 384 (4th Cir. 2014); *see also EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 591 n.12 (6th Cir. 2018) ("*Harris Funeral*") ("Courts have repeatedly acknowledged that Title VII serves a

47

compelling interest in eradicating all forms of invidious employment discrimination proscribed by the statute."), *aff'd sub nom. Bostock*, 140 S. Ct. 1731.

In arguing to the contrary, Defendants misrepresent the Supreme Court's decision in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), as "h[o]ld[ing] that the government's interest in eliminating sexual-orientation discrimination does not justify penalizing religious groups for adhering to their religious views on marriage." Defs.' Br. 4. *Fulton* held that Philadelphia's interests in prohibiting discrimination by foster agencies was undermined by its "creation of a system of exceptions" in its foster agency contracts, and that Philadelphia offered "no compelling reason why it has a particular interest in denying an exception to [a religious foster care agency] while making them available to others." 141 S. Ct. at 1882. The Court emphasized that the contracts contained "no generally applicable non-discrimination requirement" because the contracts allowed the city to grant exceptions in its "sole discretion." *Id.* at 1879. There are no similarly discretionary exceptions in Title VII.[17]

---

[17] Defendants' other argument—that Title VII's compelling interests are undermined by the fact that the statute applies only to employers of 15-or-more employees—is nonsense. Defs.' Br. 50-51. If accepted, Defendants' argument would mean that the government lacks a compelling interest in enforcing Title VII's prohibition on racial discrimination in employment too. *Cf. Doe*, 2022 WL 3083439, at *6-7 (rejecting similar argument under Free Exercise Clause).

Second, as already discussed, Title VII and other prohibitions on discrimination in commercial transactions are viewpoint neutral and unrelated to the suppression of ideas. Like the public accommodations law in *Roberts*, Title VII's prohibition on employment discrimination "does not aim at the suppression of speech, does not distinguish between prohibited and permitted activity on the basis of viewpoint, and does not license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria." 468 U.S. at 623.

Third, like the public accommodations law in *Roberts*, applying Title VII to prohibit discrimination in employment with respect to non-ministerial employees "responds precisely to the substantive problem which legitimately concerns the State and abridges no more speech or associational freedom than is necessary to accomplish that purpose." *Id.* at 628–29 (internal quotation marks omitted); *cf. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014) ("The Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal.").

## V.    RFRA Does Not Provide a Defense to Mr. Billard's Claims.

Defendants assert one final defense under RFRA. But RFRA's plain text makes clear that the statute does not apply to litigation between private parties, and this Court's precedents have repeatedly held that Title VII and other laws prohibiting

49

religious organizations from engaging in sex-based employment discrimination survived strict scrutiny.

## A.    RFRA Does Not Apply to Litigation Between Private Parties.

As the Sixth and Seventh Circuits have already recognized, RFRA does not apply to suits between private parties because "[t]he plain language [of the statute] is clear that RFRA only applies when the government is a party." *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 737 (7th Cir. 2015); *accord Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 411 (6th Cir. 2010). And, despite Defendants' assertion to the contrary, both courts have applied that conclusion to antidiscrimination statutes capable of being enforced by the EEOC. *See Harris Funeral*, 884 F.3d at 584 (recognizing that "if [the plaintiff] had initiated a private lawsuit against the Funeral Home to vindicate her rights under Title VII, the Funeral Home would be unable to invoke RFRA as a defense because the government would not have been party to the suit."); *Tomic v. Cath. Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006) (involving claim for discrimination under ADEA). Every district court in this circuit to consider the question has reached the same conclusion. *See Doe*, 2022 WL 3083439, at *5-6 (collecting cases).

The only circuit decision to expressly apply RFRA to a lawsuit between private parties is *Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006), and the Second Circuit subsequently criticized that decision in *Rweyemamu v. Cote*, 520 F.3d 198,

203 n.2 (2d Cir. 2008). Defendants point to two additional circuit decisions as "better-reasoned" cases (Defs.' Br. 56), but neither case discussed RFRA's application to private parties at all. That omission is unsurprising because *EEOC v. Catholic University*, 83 F.3d 455, 468-70 (D.C. Cir. 1996) was a case brought by the government as a co-plaintiff through the EEOC, and *In re Young*, 82 F.3d 1407, 1416-17 (8th Cir. 1996), *cert. granted, judgment vacated*, 521 U.S. 1114 (1997) was a case brought by a court-appointed bankruptcy trustee. *See Hankins*, 441 F.3d at 103 n.4 (noting that a "bankruptcy trustee is arguably 'acting under color of law' and therefore falls within the RFRA's definition of 'government.'").

The text of RFRA is unambiguous: RFRA provides that the "*[g]overnment* shall not substantially burden a person's exercise of religion" unless it "demonstrates" certain criteria, and that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding … against [the] *government*." *See* 42 U.S.C. § 2000bb-1 (emphases added). The statute also requires the "government" to "demonstrate[] that application of the burden to the person" survives strict scrutiny, and the statute defines "demonstrates" as "meets the burdens of going forward with the evidence and of persuasion." 42 U.S.C. §§ 2000bb-1(b), 2000bb-2(3). "It is self-evident that the government cannot meet its burden if it is not party to the suit."

*Listecki*, 780 F.3d at 736; *accord McGill*, 617 F.3d at 410 ("Where, as here, the government is not a party, it cannot 'go[ ] forward' with any evidence.").

Defendants attempt to contort around RFRA's plain text by arguing that private parties suing under RFRA should be considered to be acting on behalf of the government because "[w]hen a private citizen brings a Title VII claim, he does so only after the EEOC, by declining to bring its own enforcement action and issuing a right-to-sue letter, has authorized him to do so." Defs.' Br. 56-57. But as the district court explained, "[t]he EEOC is *mandated by law* to issue the right-to-sue letter if they do not decide to bring enforcement action, or after 180 days." JA1414 (emphasis added). This Court has already made clear that a plaintiff's legal authorization to sue comes directly from Title VII itself, not from the EEOC's ministerial action in providing a right-to-sue letter. *See Perdue v. Roy Stone Transfer Corp.*, 690 F.2d 1091, 1093 (4th Cir. 1982). Thus, "[t]he Commission's failure actually to issue the [right-to-sue] notice cannot defeat the complainant's statutory right to sue in the district court" after 180 days. *Id.*

Without text or precedent on their side, Defendants note that *Bostock* left open the question whether RFRA "might supersede Title VII's commands" in "future cases." 140 S. Ct. at 1754. *See* Defs.' Br. 59. But leaving a question open for "future cases" does not forecast what the conclusion will be. *Bostock* did not address RFRA's applicability to private parties, even in dicta.

Ultimately, Defendants' assertions boil down to a policy argument that following RFRA's plain text would fail to fulfill RFRA's "purpose" (Defs.' Br. 54) and would produce "anomalous result[s]" (Defs. Br. 58). But RFRA expressly declares that its purpose is "to provide a claim or defense to persons whose religious exercise is substantially burdened *by government*." 42 U.S.C. § 2000bb(b)(2) (emphasis added). And there is nothing "anomalous" (Defs.' Br. 58) about Congress being especially "cautious of governmental overreach." JA1415. Even if there were, *Bostock* makes clear that courts may not disregard a statute's plain text based on disapproval of allegedly "undesirable policy consequences." 140 S. Ct. at 1753. "[C]ontentions about what . . . the law was meant to do, or should do, [do not] allow [courts] to ignore the law as it is." *Id*. at 1745.

## B.     Mr. Billard's Claim Survives RFRA's Strict Scrutiny.

Even if RFRA applied to this case, Mr. Billard's claims would easily satisfy RFRA's "strict scrutiny" test. Defendants argued below that there is no compelling governmental interest in applying Title VII's prohibitions specifically to the non-ministerial employees of a religiously affiliated school. Dist. Ct. ECF No. 33 at 19-20. But this Court has already rejected that argument—twice—in cases decided under the strict scrutiny test that RFRA codified into law. *See Rayburn*, 772 F.2d at 1169; *Dole*, 899 F.2d at 1398.

Defendants also argued below that RFRA's "to the person" standard, "requires [the court] to loo[k] beyond broadly formulated interests and to scrutiniz[e]" whether those compelling interests would actually be harmed by "granting specific exemptions to particular religious claimants." Dist. Ct. ECF No. 63 at 13 (quotation marks omitted) (alteration in original) (citing *Hobby Lobby*, 573 U.S. at 726-27). For example, the Supreme Court in *Hobby Lobby* held that the government failed to satisfy strict scrutiny because the Court concluded that the harm to employees by granting an exemption would have been "precisely zero." 573 U.S. at 693.

The undisputed evidence here, by contrast, shows that Defendants' discrimination *did* cause harm. The firing "was devastating" to Mr. Billard and took away "a great deal of [his] personal identity and self-worth." JA0040. "Failing to enforce Title VII against" Defendants "would be allowing a particular person—[Mr. Billard]—to suffer discrimination, and such an outcome is directly contrary to [Title VII's] compelling interest in combating discrimination in the workforce." *Harris Funeral*, 884 F.3d at 591. When religious organizations hire non-ministerial employees to perform purely secular functions, Congress has a compelling interest in protecting each of those employees from discrimination on the basis of sex, and Title VII is "'precisely tailored to achieve that critical goal.'" *Id.* at 595 (quoting *Hobby Lobby*, 573 U.S. at 733).

## REQUEST FOR ORAL ARGUMENT

Mr. Billard respectfully requests oral argument pursuant to Local Rule 34(a).

## CONCLUSION

The district court's decision should be affirmed.

Respectfully submitted,

/s/ Joshua A. Block

| | |
|---|---|
| S. Luke Largess | Joshua A. Block |
| TIN FULTON WALKER AND OWEN PLLC | AMERICAN CIVIL LIBERTIES UNION |
| 301 East Park Avenue | FOUNDATION |
| Charlotte, NC 28202 | 125 Broad Street, 18th Floor |
| Tel: (704) 338-1220 | New York, New York 10004 |
| | Phone: (212) 549-2593 |
| Kristi Graunke | |
| AMERICAN CIVIL LIBERTIES UNION OF | Daniel Mach |
| NORTH CAROLINA LEGAL FOUNDATION | AMERICAN CIVIL LIBERTIES UNION |
| P.O. Box 28004 | FOUNDATION |
| Raleigh, NC 27611 | 915 15th Str., N.W. |
| Tel: (919) 354-5066 | Washington, DC 20005 |
| | Tel: (202) 548-6604 |

Dated: November 23, 2022

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[x] this brief or other document contains 1,2970 words

[ ] this brief uses monospaced type and contains [state number of] lines

2.    This brief complies with the typeface and type style requirements because:

[x] this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in in 14-point Times New Roman.

[ ] this brief or other document has been prepared in a monospaced typeface using [identify word processing program]

Dated:  November 23, 2022          /s/ Joshua A. Block
                                     Counsel for Plaintiff-Appellee

## CERTIFICATE OF SERVICE

I hereby certify that on this 23d day of November, 2022, I filed the foregoing Brief with the Clerk of the Court using the CM/ECF system, which will automatically serve electronic copies upon all counsel of record.

/s/ Joshua A. Block
Counsel for Plaintiff-Appellee