No. 22-1440

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

LONNIE BILLARD,

*Plaintiff-Appellee,*

v.

CHARLOTTE CATHOLIC HIGH SCHOOL,
MECKLENBURG AREA CATHOLIC SCHOOLS, AND
ROMAN CATHOLIC DIOCESE OF CHARLOTTE,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Western District of North Carolina, Charlotte Division
Case No. 3:17-cv-0011 – Judge Max O. Cogburn Jr.

### APPELLANTS' REPLY BRIEF

Joshua Daniel Davey, Esq.
Troutman Pepper Hamilton
  Sanders LLP
301 South College Street
  34th Floor
Charlotte, NC 28202
(704) 916-1503
joshua.davey@troutman.com

Luke W. Goodrich
Nicholas R. Reaves
Laura Wolk Slavis
The Becket Fund for
  Religious Liberty
1919 Pennsylvania Ave. N.W.,
  Ste. 400
Washington, DC 20006
(202) 955-0095
lgoodrich@becketlaw.org

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES.................................................................viii

INTRODUCTION.......................................................................... 1

ARGUMENT ................................................................................ 3

   I.   Billard's claim is barred by Title VII's religious exemption. ........ 3

   II.  Billard's claim is barred by the First Amendment. ................... 15

      A. Billard's claim is barred by church autonomy....................... 15

      B. Billard's claim is barred by freedom of association. .............. 21

      C. Constitutional avoidance requires reversal............................ 26

   III.  Billard's claim is barred by RFRA............................................ 27

CONCLUSION ............................................................................ 29

CERTIFICATE OF COMPLIANCE.......................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bear Creek Bible Church v. EEOC,*
571 F. Supp. 3d 571 (N.D. Tex. 2021)............................................ 9, 21

*Bell v. Presbyterian Church (U.S.A.),*
126 F.3d 328 (4th Cir. 1997)............................................................ 20

*Bostock v. Clayton County,*
140 S. Ct. 1731 (2020)................................................................ 14, 24

*Boy Scouts v. Dale,*
530 U.S. 640 (2000)........................................................ 21, 24, 26, 29

*Boyd v. Harding Academy of Memphis,*
88 F.3d 410, 413 (6th Cir. 1996) ....................................................... 9

*Brown v. Ent. Merchs. Ass'n,*
564 U.S. 786 (2011)...................................................................22-23

*Bryce v. Episcopal Church in the Diocese of Colo.,*
289 F.3d 648 (10th Cir. 2002)................................................. 15, 17-18

*Buck v. Davis,*
137 S. Ct. 759 (2017)........................................................................ 25

*Chi. Area Council of Boy Scouts v. City of Chi. Comm'n on Hum. Rels.,*
748 N.E. 2d 759 (Ill. App. Ct. 2001) ................................................ 21

*Christian Legal Soc'y v. Walker,*
453 F.3d 853 (7th Cir. 2006)............................................................ 24

*Cline v. Catholic Diocese of Toledo,*
206 F.3d 651 (6th Cir. 2000)............................................................. 9

*Corp. of Presiding Bishop v. Amos,*
483 U.S. 327 (1987).......................................................................... 24

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*,
450 F.3d 130 (3d Cir. 2006) ................................................ 8, 10, 17, 26

*DeMarco v. Holy Cross High Sch.*,
4 F.3d 166 (2d Cir. 1993) ...................................................... 19

*Digital Realty Trust, Inc. v. Somers*,
138 S. Ct. 767 (2018) .............................................................. 5

*Dole v. Shenandoah Baptist Church*,
899 F.2d 1389 (4th Cir. 1990) ............................................... 19

*EEOC v. Fremont Christian Sch.*,
781 F.2d 1362 (9th Cir. 1986) ................................................. 9

*EEOC v. Kroger Ltd. P'ship I*,
No. 4:20-cv-1099, 2022 WL 2276835
(E.D. Ark. June 23, 2022) ........................................................ 5

*EEOC v. Miss. Coll.*,
626 F.2d 477 (5th Cir. 1980) ................................................... 8

*EEOC v. Pacific Press Publishing Association*,
676 F.2d 1272 (9th Cir. 1982) ............................................. 9, 19

*EEOC v. Roman Catholic Diocese of Raleigh*,
213 F.3d 795 (4th Cir. 2001) .............................................. 18-19

*Elvig v. Calvin Presbyterian Church*,
375 F.3d 951 (9th Cir. 2004) ................................................. 18

*Fulton v. City of Philadelphia*,
141 S. Ct. 1868 (2021) ........................................................... 25

*Geary v. Visitation of Blessed Virgin Mary Parish*,
7 F.3d 324 (3d Cir. 1993) ................................................... 19, 20

*Hankins v. Lyght*,
441 F.3d 96 (2d Cir. 2006) .................................................... 27

*Hishon v. King & Spalding*,
  467 U.S. 69 (1984) ........................................................ 22, 23

*Holt v. Hobbs*,
  574 U.S. 352 (2015) ............................................................ 28

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
  565 U.S. 171 (2012) ........................................................... 23

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
  515 U.S. 557 (1995) ........................................................... 24

*Kedroff v. St. Nicholas Cathedral*,
  344 U.S. 94 (1952) ............................................................. 15

*Kennedy v. St. Joseph's Ministries, Inc.*,
  657 F.3d 189 (4th Cir. 2011) ......................................... 3, 8, 9

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*,
  503 F.3d 217 (3d Cir. 2007) .............................................. 14

*Listecki v. Off. Comm. of Unsecured Creditors*,
  780 F.3d 731 (7th Cir. 2015) ............................................. 27

*Maguire v. Marquette Univ.*,
  627 F. Supp. 1499 (E.D. Wis. 1986) .............................. 10-11

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
  138 S. Ct. 1719 (2018) ....................................................... 22

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ........................................................... 23

*NLRB v. Catholic Bishop of Chi.*,
  440 U.S. 490 (1979) .............................. 16-17, 20, 22-23, 26

*Obergefell v. Hodges*,
  576 U.S. 644 (2015) ........................................... 15, 24, 26

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  140 S. Ct. 2049 (2020) ................................................ 20, 22

*Our Lady's Inn v. City of St. Louis,*
349 F. Supp. 3d 805 (E.D. Mo. 2018).................................21

*Rayburn v. Gen. Conf. of Seventh-day Adventists,*
772 F.2d 1164 (4th Cir. 1985)...................... 8, 17, 18, 24, 26

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
487 U.S. 781 (1988)...........................................23

*Roberts v. U.S. Jaycees,*
468 U.S. 609 (1984)...........................................22

*Runyon v. McCrary,*
427 U.S. 160 (1976)...........................................26

*Serbian E. Orthodox Diocese v. Milivojevich,*
426 U.S. 696 (1976)...........................................20

*Spencer v. World Vision, Inc.,*
633 F.3d 723 (9th Cir. 2011)..................................14

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.,*
41 F.4th 931 (7th Cir. 2022) .................................10

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.,*
496 F. Supp. 3d 1195 (S.D. Ind. 2020)........................9-10

**Statutes**

42 U.S.C. § 2000bb-1 .........................................27

42 U.S.C. § 2000bb-2 .........................................28

42 U.S.C. § 2000bb-3 .........................................27

42 U.S.C. § 2000e ......................................3, 4, 5, 6

42 U.S.C. § 2000e-1 ..................................... *passim*

42 U.S.C. § 2000e-2 ...........................................4

42 U.S.C. § 12113 ..........................................6, 7

## Other Authorities

1983 Code c.803, § 2 ................................................................. 16

H.R. Rep. 101-485 (1990) ........................................................ 7

## INTRODUCTION

Billard's Title VII claim is barred by several mutually reinforcing protections for religious freedom. His efforts to evade these protections contradict both the text of Title VII and decades of precedent.

First, Title VII exempts religious organizations "with respect to the employment of individuals of a particular religion," and defines "religion" to include "all aspects of religious observance and practice, as well as belief." This means religious organizations are exempt when they make employment decisions based on an individual's particular religious belief, observance, or practice—as the Diocese undisputedly did here.

Billard spends much of his brief running away from Title VII's text—invoking legislative history, policy arguments, and out-of-circuit dicta. He eventually offers two contradictory theories of the religious exemption: that it applies *only* to "claims for religious discrimination," Resp.2, or that it *can* apply to claims for sex discrimination if the "religious doctrine" at issue is "facially sex-neutral," Resp.8. But neither theory can be squared with Title VII's text, structure, or precedent.

Second, church autonomy protects the freedom of churches to decide matters of church doctrine, discipline, and governance. Billard initially claims that church autonomy is limited to "ministerial employees." Resp.32. But multiple courts have applied church autonomy to non-ministers. So Billard pivots, claiming the Diocese seeks "to insulate *all* personnel decisions from legal regulation when those decisions are based on

1

religious doctrine." Resp.35. But that's a strawman. The Diocese seeks only narrow protection for a long-recognized matter of church governance: determining the religious qualifications for teachers in religious schools.

Third, freedom of association protects expressive groups from being forced to include members who undermine their messages. Billard can't deny that the Diocese easily satisfies the controlling expressive-association test. Instead, he takes a hatchet to the test, claiming that freedom of association never applies to "employment" relationships. Resp.43. But no case has so held, and Billard eventually concedes that "two federal decisions actually" hold the opposite. Resp.45.

Finally, the Religious Freedom Restoration Act (RFRA) protects the Diocese from the application of "all Federal law" that substantially burdens its religious exercise without satisfying strict scrutiny. Billard says RFRA "does not apply to litigation between private parties." Resp.49. But this argument misreads RFRA's text, undermines its purpose, and asks the Court to join the wrong side of a circuit split.

*          *          *

Billard's argument is not just wrong but would dramatically alter the relationship between church and state. No Circuit has ever held that religious schools can be penalized under Title VII for asking teachers to uphold their religious belief in traditional marriage. Rather, courts have

2

long recognized that churches have the freedom to form religious communities around shared religious values—including the freedom to establish religious schools with teachers who uphold those values. That freedom is protected by Title VII, the First Amendment, and RFRA.

## ARGUMENT

### I. Billard's claim is barred by Title VII's religious exemption.

Title VII's religious exemption bars Billard's claim. His counterarguments cannot be squared with Title VII's text, structure, or precedent.

*Text.* The religious exemption's text is simple: "This subchapter shall not apply" to a religious organization "with respect to the employment of individuals of a particular religion." 42 U.S.C. §2000e-1(a). Billard doesn't dispute that "the entire 'subchapter' of Title VII" "does not apply" when the exemption is triggered. Resp.20-21; *see Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 194 (4th Cir. 2011).

So the only question is what it means for a religious organization to be exempt "with respect to the employment of individuals of a particular religion." Br.22. Title VII defines "religion" to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. §2000e(j). Thus, the exemption applies when a religious organization employs individuals based on their particular religious belief, observance, or practice—including, as this Court explained in *Kennedy*, when it decides "to terminate an employee whose conduct or religious beliefs are inconsistent with those of its employer." 657 F.3d at 192. That's just what the Diocese

3

did here, as Billard himself concedes. Resp.1 (Billard "could no longer work as a substitute teacher because his marriage was contrary to the Catholic faith").

Billard's counterarguments distort the text. First, while the exemption says Title VII shall not apply "with respect to the employment of individuals of a particular religion," 42 U.S.C. §2000e-1(a), Billard, without explanation, quotes a different statutory section and transforms this to "with respect to discrimination 'because of [an] individual's … religion.'" Resp.21 (quoting 42 U.S.C. §2000e-2(a)(1)). This shifts the exemption's focus from the *employer's action* ("employment of individuals") to the *employee's claim* ("discrimination because of religion"). Congress could have framed an exemption this way but didn't. Br.25. Rather, the exemption focuses on the *employer's action*: "employment of individuals of a particular religion." 42 U.S.C. §2000e-1(a); *see also id.* §2000e-2(e)(2) ("hire and employ employees of a particular religion"). If the employer engages in that action, the exemption is triggered—whether the employee claims "discrimination because of" religion or something else.

Next, Billard tries to obfuscate the definition of religion, noting that religion is defined to include all aspects of religious observance, practice, and belief "unless" an employer demonstrates that accommodating religion under that definition would cause an "undue hardship." Resp.21 (quoting 42 U.S.C. §2000e(j)). But the "unless" clause merely describes

4

the circumstances in which the broad definition of religion is *inapplicable*: i.e., when the employer demonstrates that accommodating religious observances or practices would impose an undue hardship. It doesn't *change* the definition of religion. *See EEOC v. Kroger Ltd. P'ship I*, No. 4:20-cv-1099, 2022 WL 2276835, at *11 (E.D. Ark. June 23, 2022) (§2000e(j) "first provides an unquestionably broad statutory definition of the term 'religion' … then goes on to create a defense to a failure-to-accommodate claim."). Because this is not an undue-hardship case, the broad definition of religion applies. And "[w]hen a statute includes an explicit definition, we must follow that definition." *Digital Realty Trust, Inc. v. Somers*, 138 S. Ct. 767, 776-78 (2018).

**Structure.** Billard also misunderstands the Diocese's structural arguments. Br.25-28. The religious exemption appears in the same sentence as Title VII's alien exemption. The two exemptions share the same structure, providing that Title VII "shall not apply" to employers who engage in specific conduct—"employment of individuals of a particular religion" or "employment of aliens outside any State." 42 U.S.C. §2000e-1(a). Courts have interpreted the alien exemption to bar all types of Title VII claims, not just claims of national-origin discrimination; the same must follow for the religious exemption. Br.26.

In response, Billard says the exemptions should be interpreted differently because the religious exemption contains "phrasing about an 'individual's' characteristics," while the alien exemption "does not." Resp.24.

5

Not so. Both address an individual's characteristics: his "religion," or whether he is an "alien" "outside any State." 42 U.S.C. §2000e-1(a). Alternatively, Billard says the alien exemption is "functionally irrelevant" because Title VII does not apply to "the employment of *anyone* outside the United States." Resp.24, n.8. But this is both wrong and irrelevant: wrong because Title VII covers "citizen[s]" outside the United States, 42 U.S.C. §2000e(f), and irrelevant because even if it were true, it wouldn't change the fact that the exemption covers *all* types of Title VII claims.

Billard also misunderstands the parallelism with the ADA's religious exemption. As explained, the ADA uses language identical to Title VII, exempting religious organizations from "this subchapter" with respect to employment of "individuals of a particular religion." Br.27 (quoting 42 U.S.C. §12113(d)(1)). But the ADA doesn't prohibit religious discrimination; it prohibits only disability discrimination. Thus, the only way to give this language any meaning is to construe it to bar claims of disability discrimination—which can't be squared with Billard's contention that the same language in Title VII bars only religious-discrimination claims. *Id.*

In response, Billard first notes that the ADA protects "*giving preference* in employment to individuals of a particular religion," while Title VII protects "employment of individuals of a particular religion." Resp.25. But he doesn't say what the difference between these phrases is, much

6

less how any difference could change the grounds of alleged discrimination against which the exemptions apply.

Alternatively, he quotes legislative history saying a Mormon organization can't be held liable under the ADA for disability discrimination for refusing to hire a disabled person because the person "is not a Mormon." Resp.25. But this proves our point. A Mormon organization likewise can't be held liable for sex discrimination under Title VII for refusing to hire someone because the person rejects Mormon beliefs, observances, or practices. Indeed, the very next sentence of the legislative history confirms the two exemptions are analogous: "because of the similarity between the 'religious preference' provisions in title VII and the ADA, it is the Committee's intent that title I of the ADA be interpreted in a manner consistent with title VII … as it applies to the employment relationship between a religious organization and those who minister on its behalf." H.R. Rep. 101-485, at 76-77 (1990).

Billard likewise misses the point of the ADA's "religious tenets" exemption. Br.27-28; 42 U.S.C. §12113(d)(2). Just as the ADA provides that religious employers may require employees to "conform to the[ir] religious tenets"—barring claims of disability discrimination—so too Title VII provides that religious employers may require employees to conform to their "religious observance and practice"—barring claims of sex discrimination. The point is not, as Billard says, that the "religious tenets" language is "drawn from" Title VII or "intended to affect" its scope,

Resp.25-26; it is that if the ADA's exemption isn't limited to claims of religious discrimination, neither is Title VII's.

*Precedent*. Regarding precedent, Billard makes the sweeping claim that "every court of appeals to address the question has held that" the religious exemption "provides only a narrow exemption from claims of discrimination based on an employee's religion—not from claims based on sex or other protected characteristics." Resp. 8, 2, 13, 15. This is demonstrably false: The Third and Fifth Circuits have expressly applied the religious exemption to bar sex-discrimination claims. Br.29-30 (citing *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130 (3d Cir. 2006); *EEOC v. Miss. Coll.*, 626 F.2d 477 (5th Cir. 1980)).

Grasping for support, Billard repeatedly cites cases making the obvious point that religious organizations are not *completely* exempt from Title VII—a point we agree with. *See* Br.23-24, 36 (rejecting "blanket exemption"). For example, Billard quotes *Kennedy* for the proposition that religious organizations aren't exempt from "Title VII's provisions barring discrimination on the basis of race, gender, or national origin." Resp.14 (quoting 657 F.3d at 192). But this passage simply makes the undisputed point that *when Title VII's religious exemption doesn't apply*, religious organizations remain subject to its prohibitions on discrimination. *Kennedy*, 657 F.3d at 194. So too for Billard's citation to *Rayburn v. Gen. Conf. of Seventh-day Adventists*, 772 F.2d 1164 (4th Cir. 1985). *Compare* Resp.14-15, *with* Br.33-34. This doesn't resolve the exemption's *scope*.

8

On that point, *Kennedy* supports the Diocese: The exemption applies to "the entire 'subchapter' of Title VII"—not just some types of claims—and it "include[s] the decision to terminate an employee whose conduct or religious beliefs are inconsistent with those of its employer." 657 F.3d at 192, 194. That is what occurred here.

Billard's out-of-circuit cases similarly fail to support him. *Boyd v. Harding Academy of Memphis* supports the Diocese, as the Sixth Circuit affirmed that a religious school could make an employment decision based on the plaintiff's "sex outside of marriage in violation of Harding's code of conduct." 88 F.3d 410, 413 (6th Cir. 1996). *Cline v. Catholic Diocese of Toledo* stands for the same proposition. 206 F.3d 651, 658 (6th Cir. 2000) (citing *Boyd*). In *EEOC v. Pacific Press Publishing Association*, the Ninth Circuit simply rejected the notion (which we also reject) that religious organizations have "a complete exemption from regulation under [Title VII]." 676 F.2d 1272, 1276 (9th Cir. 1982). And the challenged religious policy there—differential pay based on sex—wouldn't qualify for the exemption anyway because it isn't based on the *employee's* particular religious belief, observance, or practice. So too in *EEOC v. Fremont Christian School*, 781 F.2d 1362, 1365-67 (9th Cir. 1986); Br.35.

Billard also fails to distinguish the cases rejecting his position. He admits he can't distinguish *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571 (N.D. Tex. 2021). Resp.20, 30. He says only that it "conflicts with" the district court's narrow interpretation of the exemption in *Starkey v.*

9

*Roman Catholic Archdiocese of Indianapolis*, *Inc.,* 496 F. Supp. 3d 1195 (S.D. Ind. 2020), which he invokes repeatedly, Resp.11, 13, 30, 31, 43. But the Seventh Circuit in *Starkey* didn't adopt that narrow interpretation. 41 F.4th 931, 945 (7th Cir. 2022). And Judge Easterbrook's concurrence squarely rejected it. *Id.* at 945-47. This is the only court of appeals opinion addressing the issue post-*Bostock*. Yet Billard doesn't even attempt to grapple with its analysis, offering only the mistaken (and irrelevant) claim that courts should apply the constitutional "ministerial exception" before the statutory religious exemption. Resp.31; *cf. Starkey*, 41 F.4th at 945 (Easterbrook, J., concurring) ("the proper sequence" is to start "with the statute" before reaching "a constitutional question").

Nor can Billard distinguish *Mississippi College* or *Curay-Cramer*, both of which applied the religious exemption to bar sex-discrimination claims. In *Mississippi College*, the Fifth Circuit held that the religious exemption would "preclude any investigation by the EEOC" of a "sex discrimination claim" if the Baptist college "presents evidence showing that it made the challenged employment decision on the basis of an individual's religion." 626 F.2d at 485-86. In *Curay-Cramer*, the Third Circuit barred a sex-discrimination claim by a teacher dismissed for engaging in pro-abortion advocacy, explaining that "Congress intended the explicit exemptions of Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices." 450 F.3d at 141; *see also Maguire v. Marquette Univ.*,

627 F. Supp. 1499, 1502-04 (E.D. Wis. 1986) (religious exemption barred sex-discrimination claim).

Billard doesn't dispute that these cases applied the religious exemption to preclude sex-discrimination claims—contrary to his mantra that "every court of appeals" limits the exemption to religious-discrimination claims. Resp.8, 28-30. Instead, he concocts a new theory to try to distinguish them: The religious exemption *can*, in fact, bar sex-discrimination claims, but only if the "employee was fired for religious reasons that were facially sex-neutral," not if the religious reasons "*facially* discriminated on the basis of sex." Resp.26, 29. Under this theory, Billard says, the religious exemption *can* bar sex-discrimination claims when employers dismiss employees "for adultery," for "marrying a divorced Catholic," or for "publicly advocating" against Church teaching—because "the [religious] doctrine at issue" "does not facially discriminate based on the sex of the employee." Resp.8, 10-11. But the exemption *can't* bar sex-discrimination claims when employers dismiss employees for entering same-sex marriages, because that is "a religious doctrine that facially discriminates based on sex." Resp.8, 10-11.

There are many problems with this "facial-discrimination" theory. First, it lacks even a whiff of textual support—and Billard offers none. The exemption protects "employment of individuals of a particular *religion*." It doesn't distinguish between "religious doctrine that facially dis-

criminates" and religious doctrine that doesn't. Resp.8. Billard simply rewrites the exemption to protect only "employment individuals of a particular religion *when the employment policy does not facially discriminate on the basis of race, color, sex, or national origin.*"

Second, this theory has no basis in precedent. Although Billard invented it to try to distinguish *Mississippi College* and *Curay-Cramer*, neither case even mentions the concept of facial discrimination, much less makes anything turn on it. Nor does Billard identify any other case articulating this theory.

Third, Billard's "facial-discrimination" theory doesn't even fit *this* case. Billard says "liability for facial discrimination … depends on Defendants' stated policy." Resp.40. But the "stated policies" here are all facially neutral. Billard violated the Code of Ethics, Diocesan Handbook, and Charlotte Catholic Handbook, all of which neutrally required him to "uphold" or "be consistent" with "the teachings and the precepts of the Roman Catholic Church" in "all areas of conduct." Br.9-11 (quoting JA613, JA625, JA646, JA738, JA766). Beyond that, his Facebook post violated the policy against "public advocacy for positions opposed to the fundamental moral tenets of the Roman Catholic faith," JA616—which Billard admits is "facially sex-neutral," Resp.11. And even the requirement to uphold the Church's teaching on marriage is facially neutral, JA771-72, as Billard himself admits it can be applied in sex-neutral ways, Resp.10.

12

Instead, Billard complains that the Church's teaching *as applied to him* is discriminatory because "it is impossible to fire an employee for marrying a same-sex partner without treating a *man* who marries a man differently from a *woman* who marries a man." Resp.10-11. But that's a complaint about the Diocese's policy *as applied*, not facially. And in any event, even if Billard had married a *woman* after divorcing his wife of over 20 years, Br.14, he would have violated the Church's teaching on divorce and remarriage absent an annulment, JA617—which Billard admits is a valid, sex-neutral policy, Resp.10. So even the policy *as applied* to Billard is sex-neutral.

Finally, Billard's theory produces unconstitutional (and bizarre) results. First, it violates neutrality by requiring courts to prefer some religious beliefs over others—protecting beliefs about "adultery," "marrying a divorced Catholic," and "advocacy," but penalizing the belief in male-female marriage. Resp.10-11. Second, since Billard says "principles of church autonomy" "prevent a plaintiff from probing a facially neutral policy to establish pretext," Resp.30, his theory gives more protection to religious beliefs that are allegedly pretextual than to beliefs (like the Diocese's) that everyone agrees are genuine.

***Policy.*** Lastly, Billard and his *amici* resort to a policy argument—that applying the religious exemption as written would protect too many "re-

13

ligiously affiliated" organizations (like "hospitals") and would protect invidious "religious beliefs" in "not associating with people of other races." Resp.18-19; AU Br.15-19; NWLC Br.16-17.

*Bostock* expressly rejected this policy-oriented reasoning as "the last line of defense for all failing statutory interpretation arguments." Br.36. Regardless, Billard is crying wolf. Despite over fifty years of litigation under the religious exemption, Billard and his *amici* fail to identify a single case of a religious organization claiming an exemption for religious beliefs supporting racism. Nor does the exemption protect merely "religiously *affiliated*" organizations. Resp.18 (emphasis added). Rather, the organization must qualify as "religious," 42 U.S.C. §2000e-1(a), which requires satisfying a complex, multi-factor test. *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 226 (3d Cir. 2007) (listing nine factors). In fact, the Ninth Circuit has expressly held that the religious exemption *doesn't* protect religious hospitals—or any other organization that engages "substantially in the exchange of goods or services for money beyond nominal amounts." *Spencer v. World Vision, Inc.*, 633 F.3d 723, 724 (9th Cir. 2011) (per curiam); *id.* at 746-47 (Kleinfeld, J., concurring). Remarkably, Billard and his *amici* simply pretend this key requirement of the exemption doesn't exist.

Meanwhile, Billard ignores the consequences of his own position. Br.36-37. He doesn't dispute that thousands of houses of worship and religious schools have employment policies just like the Diocese; that these

14

organizations have relied for decades on the promise that they can ask employees to share their religious beliefs and practices; and that adopting his position would unleash a wave of lawsuits against these organizations. Nor does he dispute that *Obergefell* and *Bostock* warned against precisely this result, promising that religious organizations would receive "proper protection as they seek to teach" and "advocate with utmost, sincere conviction" that "same-sex marriage should not be condoned." *Obergefell v. Hodges*, 576 U.S. 644, 679-80 (2015). Billard simply cries wolf about imaginary harms while asking the Court to ignore real ones.

## II. Billard's claim is barred by the First Amendment.

Even apart from Title VII's religious exemption, Billard's claim independently runs afoul of church autonomy and freedom of association. His counterarguments on both are meritless.

### A. Billard's claim is barred by church autonomy.

As explained, church autonomy protects the freedom of churches "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." Br.38 (quoting *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952)). This includes the freedom to make certain "personnel decision[s]" "rooted in religious belief"— such as establishing religious qualifications for teachers in religious schools. Br.39-40 (quoting *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 656-58 & n.2 (10th Cir. 2002)).

15

In response, Billard first argues he is "not a ministerial employee," Resp.32-35—even though the Diocese has not asserted a ministerial-exception defense. Apparently, Billard worries this Court will "raise the issue *sua sponte*" and conclude he was a minister. Resp.33. So he says he "was a purely secular teacher" with "no religious duties." Resp.34. But this is untrue; it is undisputed that Billard was required to (and did) begin every class with prayer, accompany students to Mass, uphold Church teaching, advance the school's religious mission, and "[t]each[] secular subjects in a way agreeable with Catholic … though[t]"—none of which could be required at a public school. Br.14-15. In any event, ministerial status aside, "the First Amendment's broad protection of religious autonomy" still forecloses his claim. Legal Scholars Br.3.

On that point, Billard doesn't dispute that "the *raison d'être* of parochial schools is the propagation of a religious faith" and that teachers play a "critical and unique role … in fulfilling [that] mission." *NLRB v. Catholic Bishop of Chi.,* 440 U.S. 490, 501, 503 (1979). Nor does he dispute that canon law requires Catholic-school teachers to "be outstanding in correct doctrine and integrity of life," 1983 Code c.803, §2, and "reveal the Christian message not only by word but also by every gesture of their behavior," JA771—religious requirements that are at the core of church governance.

Instead, Billard claims that "the employment of non-ministerial employees is not part of 'church autonomy'"—full stop. Resp.35. But this

runs headlong into multiple cases applying church autonomy to non-min-isters—including *Catholic Bishop*, *Bryce*, *Garrick*, *Brazauskas*, and *But-ler*. Br.40-44. Billard has no good answer to these cases.

In *Catholic Bishop*, the Supreme Court held it would "give rise to se-rious constitutional questions" to require Catholic schools to bargain col-lectively with "lay teachers" who "provide a traditional secular educa-tion." 440 U.S. at 492-93, 501. Billard says this was solely about "entan-glement" resulting from "the collective-bargaining requirements of the National Labor Relations Act." Resp.40-41. But this Court has expressly applied *Catholic Bishop* to Title VII, explaining that "[a] Title VII action is potentially a lengthy proceeding" with "far-reaching" remedies, where "[c]hurch personnel and records" are subject to "the full panoply of legal process designed to probe the mind of the church." *Rayburn*, 772 F.2d at 1171. Other circuits have done the same. *E.g.*, *Curay-Cramer*, 450 F.3d at 138. More importantly, the intrusion on church autonomy here is far greater than in *Catholic Bishop*: there, the diocese merely had to bargain collectively with qualified teachers it willingly employed; here, it must employ teachers against its will who are religiously disqualified. Thus, this is an *a fortiori* case, Br.44—a point Billard ignores.

Billard also cannot distinguish *Bryce*, where the employee was dis-missed for entering a same-sex union, and the Tenth Circuit held that the "broader church autonomy doctrine" "extends beyond the specific

17

ministerial exception" to protect "personnel decision[s]" "rooted in religious belief." 289 F.3d at 656-58 & n.2. Billard says "*Bryce* was a case about a religious organization's *speech*," because the employee brought a sexual-harassment claim challenging statements about her termination, rather than the termination itself. Resp.38. But that is because a termination claim would have been even more obviously barred. Telling a religious organization that it must employ religiously disqualified individuals is far more intrusive than telling a religious organization it must avoid harassing them as they depart. That is why some courts have allowed sexual-harassment claims while barring termination claims under church autonomy. *E.g.*, *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 963 (9th Cir. 2004). But we are aware of no court that has done the reverse, and Billard identifies none.

Nor can Billard distinguish *Garrick*, *Brazauskas*, or *Butler*—each of which applied church autonomy to bar employment claims by non-ministers. Br.40-41. He simply calls them "idiosyncratic cases" and gestures toward factual differences irrelevant to the church-autonomy analysis. Resp.39 n.12.

Turning to his own cases, Billard starts by quoting two of this Court's ministerial-exception cases for the truism that "employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions." Resp.35-36 (quoting *Rayburn*, 772 F.2d at 1171; *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 801

18

(4th Cir. 2001)). But both cases were straightforward applications of the ministerial exception; the Court didn't address church-autonomy claims regarding non-ministers.

Next, Billard cites *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389 (4th Cir. 1990), which rejected a church's claim that it was entirely exempt from the Fair Labor Standards Act and could therefore pay women less than men and pay employees less than minimum wage. Resp.36. But the Court rejected that claim because the church admitted that complying with the FLSA would conflict with "no [church] doctrine"; in fact, the church had already abandoned its challenged practices. 899 F.2d at 1397-98. Thus, "any burden" on religious exercise was "limited." *Id.* at 1397.

Alternatively, Billard quotes dicta from three out-of-circuit cases involving non-ministers, all inapposite. Resp.36-38. The court in *Pacific Press* addressed the "sweeping" claim (not at issue here) "that all employees at a sectarian publishing house are immune from EEOC scrutiny." 676 F.2d at 1282. The plaintiff in *DeMarco v. Holy Cross High School* wasn't religiously disqualified for violating church teaching. 4 F.3d 166, 168 (2d Cir. 1993). And the plaintiff in *Geary v. Visitation of Blessed Virgin Mary Parish* didn't claim that employment-discrimination laws made it illegal for the school "to implement Catholic teachings on marriage"—so there was no "direct conflict" requiring "application of *Catholic Bishop*'s interpretive rule." 7 F.3d 324, 328 (3d Cir. 1993). But the court

said if there were such a conflict—as there is here—it would present serious "First Amendment concerns." *Id.* at 329.

Lastly, Billard distorts the Diocese's position, claiming we seek "to insulate *all* personnel decisions from legal regulation when those decisions are based on religious doctrine." Resp.35. That's a strawman. Church autonomy is no "magic wand" protecting every personnel decision tangentially related to religion. Legal Scholars Br.20. But it does protect a *church's* application of *canon law* to a *teacher* at a *religious school* who has become *religiously disqualified* for violating *religious doctrine*. The Supreme Court has repeatedly recognized teachers' unique role in helping religious schools fulfill their religious mission. *Catholic Bishop*, 440 U.S. at 490-93, 501. It has also repeatedly recognized the authority of religious institutions to decide "matters of discipline, faith, internal organization, or ecclesiastical rule, custom or law." *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 331 (4th Cir. 1997) (quoting *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713 (1976)). That's what is at stake here: whether a Catholic diocese can decide a critical matter of discipline, faith, and ecclesiastical law for teachers in Catholic schools. That is a quintessential "matter[] of internal government" protected by church autonomy. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2061 (2020).

**B. Billard's claim is barred by freedom of association.**

Billard's claim also conflicts with freedom of association. Under *Boy Scouts v. Dale*, 530 U.S. 640 (2000), the analysis is not complex. The Court first asks if the Diocese "engage[s] in some form of expression" that would be "significantly affect[ed]" by forcing it to retain Billard. *Id.* at 648, 650. If so, Billard's claim is barred unless he satisfies strict scrutiny. *Id.* at 648, 659. And this case is even easier than *Dale*: The Diocese has a clearer message on human sexuality and marriage than the Boy Scouts ever had, Br.49-50, and the government has far less interest in forcing Catholic schools to retain teachers who reject Catholic teaching than in preventing discrimination by the Boy Scouts, Br.50-51.

In response, Billard doesn't dispute that the Diocese qualifies as an expressive association or that requiring it to retain Billard would significantly impair its message. Resp.43-44. Instead, he makes the sweeping claim that expressive association is categorically inapplicable to any "commercial transaction," including any "relationship of employment." Resp.43-45. But this claim founders on both precedent and logic.

Multiple courts have already applied expressive association to employment claims. Br.52 & n.3 (collecting cases). Some of these Billard simply ignores. *E.g., Chi. Area Council of Boy Scouts v. City of Chi. Comm'n on Hum. Rels.*, 748 N.E.2d 759, 769 (Ill. App. Ct. 2001). Others he claims are wrong. *E.g., Our Lady's Inn v. City of St. Louis,* 349 F. Supp. 3d 805, 813, 820-22 (E.D. Mo. 2018); *Bear Creek*, 571 F. Supp. 3d at 615-16. But he

21

admits they "permit[] employment discrimination as a form of 'expressive association,'" and he doesn't distinguish any of them. Resp.45 & n.16.

Nor does Billard identify any case holding that all employment relationships fall outside the protection of expressive association. His main cases—*Hishon v. King & Spalding,* 467 U.S. 69 (1984), and *Roberts v. U.S. Jaycees,* 468 U.S. 609 (1984)—actually undercut such a rule. *Hishon* involved an employment relationship in a large, for-profit law firm, 467 U.S. at 71-72, and *Jaycees* involved an organization that "refer[red] to its members as customers and membership as a product it is selling," 468 U.S. at 639 (O'Connor, J., concurring). Yet neither decision declared expressive association categorically inapplicable. Rather, both cases analyzed the expressive association defense on the merits. Such analysis would be entirely unnecessary if expressive association were categorically inapplicable to commercial relationships.

Billard's theory also founders on logic. The Supreme Court routinely applies the First Amendment to employment relationships and other commercial transactions. The Court has applied church autonomy to bar employment-discrimination claims, *Our Lady,* 140 S. Ct. at 2055-56, and collective bargaining in Catholic schools, *Catholic Bishop*, 440 U.S. at 507; the Free Exercise Clause to bar discrimination claims against a for-profit baker, *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n,* 138 S. Ct. 1719, 1723 (2018); and the Free Speech Clause to protect the sale of violent video games to minors, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786,

799 (2011), and the placement of a "paid, 'commercial' advertisement" in a newspaper, *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964). In so doing, it has repeatedly emphasized that "a speaker's rights are not lost merely because compensation is received." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988). Why, then, should expressive association be the lone First Amendment doctrine wholly inapplicable to commerce? Billard never says.

Lacking precedent or logic, Billard again predicts disaster—claiming that if small religious schools can ask teachers to uphold their religious practices, then large for-profit corporations can fire employees in furtherance of "racist, misogynist, or xenophobic viewpoints," and courts cannot distinguish between the two. Resp.46. But the expressive-association analysis is not so ham-fisted. In most cases, for-profit businesses could not show that they engage in the requisite expression, that their message would be impaired, or both. *Hishon*, 467 U.S. at 78. And even if they could, the strict-scrutiny analysis would be markedly different for large commercial enterprises engaged in invidious discrimination. Religious schools, by contrast, are not commercial businesses. They "are the archetype of associations formed for expressive purposes," *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200-01 (2012) (Alito, J., joined by Kagan, J., concurring), and their teachers play a "critical and unique role" in fulfilling that religious mission, *Catholic Bishop*, 440 U.S. at 501. Asking teachers to uphold that mission is not

23

invidious discrimination but the basic "means by which a religious community defines itself." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring). In that context, *Dale*'s test is readily satisfied.

Billard fares no better on strict scrutiny. Remarkably, he doesn't even mention the strict-scrutiny analysis in *Dale*, *Hurley*, or *Walker*, Br.49-50, each of which held that the government's "interest in eliminating discrimination" based on "sexual orientation" "d[id] not justify" the "severe intrusion" of requiring an expressive organization to accept an unwanted member. *Dale*, 530 U.S. at 650, 657, 659; *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 578-79 (1995); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 863-64 (7th Cir. 2006). Those cases alone foreclose Billard's strict-scrutiny argument.

Nor does he address *Bostock* or *Obergefell*, which said the government must be "deeply concerned with preserving the promise of the free exercise of religion," *Bostock v. Clayton County*, 140 S. Ct. 1731, 1754 (2020), and must provide "proper protection" to religious groups that teach "same-sex marriage should not be condoned," *Obergefell*, 576 U.S. at 679-80—not that it has a compelling interest in doing the opposite, Br.50.

Citing *Rayburn*, Billard argues Title VII serves "an interest of the highest order" and may be applied to "secular employment decisions of a religious institution." Resp.47 (quoting *Rayburn*, 772 F.2d at 1169). But a decision that a religious schoolteacher is religiously disqualified under

24

canon law is hardly a "secular employment decision." And *Rayburn* rightly held that the government's interest in enforcing Title VII was *not* sufficiently compelling to justify the "inroad on religious liberty" in that case. 772 F.2d at 1169. So too here.

Next comes *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), which unanimously held that the government failed strict scrutiny when applying its sexual-orientation nondiscrimination law to a Catholic foster-care agency. Br.51. Billard tries to distinguish it by saying the non-discrimination law there had "discretionary exceptions" that are not present in Title VII. Resp.48. But nothing in *Fulton*'s strict-scrutiny analysis turned on the exceptions' discretionary nature. Indeed, the Court held that the "system of exceptions" undermined the government's interest in "equal treatment" for "gay couples" even where the government "has never granted one." *Fulton,* 141 S. Ct. at 1879-82. Here, by contrast, Title VII already categorically exempts millions of secular businesses from every prohibition on discrimination entirely—even when they have no constitutionally cognizable reason for dismissing an employee. Br.50-51.

Billard's only response is to claim that considering Title VII's broad exemptions "would mean that the government lacks a compelling interest in enforcing Title VII's prohibition on racial discrimination in employment too." Resp.48 n.17. Not so. The Supreme Court has distinguished between race discrimination, which is "odious in all aspects," *Buck v. Davis*, 137 S. Ct. 759, 778 (2017), and a commitment to traditional marriage,

25

which is "based on decent and honorable religious or philosophical prem-
ises" that must receive "proper protection," *Obergefell*, 576 U.S. at 672,
679-80. "[T]he Constitution … places no value on [race] discrimination,"
*Runyon v. McCrary*, 427 U.S. 160, 176 (1976), and merely following the
strict-scrutiny analysis in *Dale*, *Hurley*, *Walker*, and *Fulton* does nothing
to change that.

### C. Constitutional avoidance requires reversal.

The canon of constitutional avoidance also requires reversal, because
Billard's reading of Title VII "would give rise to serious constitutional
questions," and there is no "clear expression of an affirmative intention
of Congress" to require it. *Catholic Bishop*, 440 U.S. at 501, 504. In re-
sponse, Billard offers a footnote claiming that *Rayburn* settled the con-
stitutional avoidance issue "decades ago." Resp. 42 n.15. But *Rayburn* was
an ordinary ministerial-exception case; the church didn't argue that it
rejected the plaintiff based on her religious beliefs or practices, and the
Court expressly declined to consider "whether the reason for Rayburn's
rejection had some explicit grounding in theological belief." 772 F.2d at
1169. Thus, *Rayburn* didn't address the issue here. *Curay-Cramer* did,
however, and it correctly held that constitutional avoidance required it
to construe Title VII to protect the school. 450 F.3d at 137-42.

## III. Billard's claim is barred by RFRA.

Billard's claim is further barred by RFRA, which provides that the federal government may not "substantially burden" a person's religious exercise unless doing so satisfies strict scrutiny. 42 U.S.C. §2000bb-1(b). Billard doesn't dispute that imposing liability on the Diocese would "substantially burden" its religious exercise. Instead, he repeats the district court's assertion that RFRA "does not apply to litigation between private parties." Resp.49. But that argument fails as a matter of text, purpose, and precedent.

Textually, RFRA "applies to all Federal law, and the implementation of that law"—necessarily including Title VII—and may be asserted as a "defense in a judicial proceeding," which is how the Diocese asserts it here. 42 U.S.C. §2000bb-3(a); *id.* §2000bb-1(c). As the Second Circuit held, "[t]his language easily covers" employment-discrimination suits brought by private parties. *Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006). But Billard doesn't address this language.

Instead, he notes that RFRA also says the "government" must "demonstrate" that the burden on religious exercise satisfies strict scrutiny—claiming that "[i]t is self-evident that the government cannot meet its burden if it is not party to the suit." Resp.51-52 (quoting *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 736 (7th Cir. 2015)). But as we explained, private parties carry the analogous governmental burden in First Amendment cases as a matter of course. Br.56 (collecting cases).

27

RFRA also defines "government" to include any "branch" or "agency" or any "person acting under color of law." 42 U.S.C. §2000bb-2(1). And when a private party brings a Title VII claim, he does so only because the statute has clothed him with that authority, and only after the EEOC has issued a right-to-sue letter—meaning he is standing in the government's enforcement shoes. Br.57. In response, Billard says a plaintiff's authority to sue "comes directly from Title VII itself, not from the EEOC's … right-to-sue letter." Resp.52. But either way, the enforcement power comes from the "government," triggering RFRA. Br.57; *see also* Christian Legal Soc'y Br.20-21.

As for RFRA's purpose, Billard doesn't dispute that "Congress enacted RFRA in order to provide greater protection for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). Nor does he dispute that the First Amendment routinely bars private lawsuits under Title VII (and other laws) even when the government isn't a party. Br.54 (collecting cases). Thus, Billard cannot dispute that his interpretation would transform a statute designed to provide greater protection than the First Amendment into one that provides far less. Br.54-55.

On precedent, Billard says two circuits have chosen his side of the circuit split. Resp.50. But he fails to show that those decisions are better-

reasoned than the three circuits that have reached the opposite conclusion. As explained, the majority position more faithfully applies RFRA's text and purpose, under which Billard's claim is barred. Br.55-56.

Finally, Billard argues that his claim can survive strict scrutiny under RFRA. But as explained above (at 24-25), Billard's strict-scrutiny argument is foreclosed by *Dale*, *Hurley*, and *Fulton*.

## CONCLUSION

The district court's decision should be reversed.

Respectfully submitted,

/s/ Luke W. Goodrich

| | |
|---|---|
| Joshua Daniel Davey, Esq. | Luke W. Goodrich |
| Troutman Pepper Hamilton | Nicholas R. Reaves |
|   Sanders LLP | Laura Wolk Slavis |
| 301 South College Street | The Becket Fund for |
|   34th Floor |   Religious Liberty |
| Charlotte, NC 28202 | 1919 Pennsylvania Ave. N.W., |
| (704) 916-1503 |   Ste. 400 |
| joshua.davey@troutman.com | Washington, DC 20006 |
| | (202) 955-0095 |
| | lgoodrich@becketlaw.org |

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

This document complies with type-volume limits because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 6,493 words.

This document complies with the typeface requirements because this document has been prepared in a proportional spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Date: December 16, 2022

/s/ Luke W. Goodrich
Luke W. Goodrich
*Counsel for Appellants*